# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA
United States Department of Justice
Antitrust Division
1401 H Street, NW, Suite 8000
Washington, D.C. 20530

        Plaintiff,

   v.

SBC COMMUNICATIONS, INC.
175 East Houston
San Antonio, TX 78205

     and

AT&T CORP.
One AT&T Way
Bedminster, NJ 07921

       Defendants.

---

Civil Action No. _____

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the merger of two of the largest providers of telecommunications services in the United States, SBC Communications, Inc. ("SBC") and AT&T Corp. ("AT&T"), and alleges as follows:

1.      On January 30, 2005, SBC entered into an agreement to acquire AT&T. If approved, the transaction would create the nation's largest provider of telecommunications services.   Plaintiff seeks to enjoin this transaction because it will substantially lessen competition for (a) Local Private Lines that connect hundreds of commercial buildings in SBC's franchised territory to a carrier's network or other local destination, and (b) other telecommunications services that rely on Local Private Lines.

2.      SBC and AT&T compete in the sale of wireline telecommunications services to retail and wholesale customers in the United States.

3.      For hundreds of commercial buildings in the metropolitan areas of Chicago, Illinois; Dallas-Fort Worth, Texas; Detroit, Michigan; Hartford-New Haven, Connecticut; Indianapolis, Indiana; Kansas City, Missouri; Los Angeles, California; Milwaukee, Wisconsin; San Diego, California; San Francisco-San Jose, California; and St. Louis, Missouri, SBC and AT&T are the only two firms that own or control a direct wireline connection to the building. These building connections are used to supply voice and data telecommunications services to business customers.  As described in this Complaint, the proposed merger is likely to substantially reduce competition for Local Private Lines and telecommunications services that rely on Local Private Lines to those buildings.

# I. JURISDICTION AND VENUE

4.      This action is filed by the United States under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act,

15 U.S.C. § 18.

5.       SBC and AT&T are engaged in interstate commerce and in activities substantially

affecting interstate commerce.  The Court has jurisdiction over this action pursuant to Sections

15 and 16 of the Clayton Act, 15 U.S.C. §§ 25, 26, and 28 U.S.C. §§ 1331, 1337.

6.       SBC and AT&T transact business and are found in the District of Columbia.

Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

## II.  THE DEFENDANTS AND THE TRANSACTION

7.       SBC is a corporation organized and existing under the laws of the State of

Delaware, with its headquarters in San Antonio, Texas.  SBC, formerly Southwestern Bell, is a

regional bell operating company ("RBOC"), formed as one of the seven regional holding

companies to result from the breakup of AT&T's local telephone business in 1984.  In 1996,

SBC acquired another of the seven original holding companies, Pacific Telesis, and in 1999 it

acquired a third RBOC, Ameritech.  SBC acquired another incumbent local exchange carrier

("ILEC"), Southern New England Telephone Corporation, in 1998.  SBC's wireline

telecommunications operations currently serve around 52 million switched access lines,

including 27.5 million residential and 17.6 million business lines in 13 states.  In 2004, SBC

earned approximately $36.9 billion in revenues from its wireline services, including almost $13

billion attributable to business customers.  SBC has fiber optic or copper connections to virtually

all of the commercial buildings in its franchised territory.

8.       AT&T is a corporation organized and existing under the laws of the State of New

York, with its headquarters in Bedminster, New Jersey.  AT&T is the nation's largest

interexchange carrier ("IXC"), offering traditional long distance telephone service, as well as one

of the largest competitive local exchange carriers ("CLEC"), offering local network exchange

and access for voice and data services.  AT&T serves consumers and businesses across the

United States and around the globe, and owns significant local network assets within SBC's 13-

state operating territory including direct fiber optic connections to numerous commercial

buildings.  In 2004, AT&T earned approximately $30.5 billion in revenues, including $22.6

billion from business customers.

9.      Pursuant to an Agreement and Plan of Merger dated January 30, 2005, SBC

agreed to acquire AT&T for approximately $16 billion.


## III.  TRADE AND COMMERCE

A.      Nature of Trade and Commerce

10.     SBC owns and operates local telecommunications networks throughout its

territory and provides local and long distance voice and data services to, *inter alia,* business

customers and other telecommunications carriers.

11.     AT&T owns and operates local networks in dozens of metropolitan areas in the

United States, a substantial number of which are in SBC territory.  Like SBC, AT&T also

provides local and long distance voice and data services to business customers and other

telecommunications carriers.  Significant numbers of AT&T's customers have locations in

SBC's franchised territory, and the two firms compete to serve those wholesale and retail

customers.

12.     One element of the parties' local networks are local loops, sometimes referred to

4

as "last-mile" connections, which are typically either copper or fiber-optic transmission facilities that connect commercial buildings to a carrier's network. These last-mile connections are a critically important asset for providing service to business customers.

13. A Local Private Line is a dedicated, point-to-point circuit offered over copper and/or fiber-optic transmission facilities that originates and terminates within a single metropolitan area and typically includes at least one local loop. Local Private Lines are sold at both retail (to business customers) and wholesale (to other carriers). SBC refers to Local Private Line circuits as "special access."

14. Depending on how they are configured, Local Private Lines can be used to carry voice traffic, data, or a combination of the two. Local Private Lines may be purchased as stand-alone products but are also an important input to value-added voice and data telecommunications services that are offered to business customers.

15. For the vast majority of commercial buildings in its territory, SBC is the only carrier that owns a last-mile connection to the building. Thus, in order to provide voice or data telecommunications services to customers in those SBC-only buildings, competing carriers typically must lease the connection from SBC as Local Private Line service (special access).

16. For a small percentage of commercial buildings (though one that accounts for a substantial percentage of customer demand and revenue), SBC's CLEC competitors have built or acquired their own last-mile fiber-optic connections, separate from SBC's, to connect their networks to the buildings. The CLECs typically refer to buildings with these connections as their "lit buildings" or "on-net buildings." Once a CLEC has incurred the high fixed cost to construct a last-mile connection to a building, the CLEC can usually provide service to business

5

customers in the building at a lower marginal cost than it would otherwise be able to do if it had

to lease the connection from the RBOC.  It can also provide alternative access to other CLECs

seeking to serve business customers in the building.

17.    AT&T is among leading CLECs in SBC's territory in the number of buildings it

has connected with its own last-mile fiber facilities.  For hundreds of buildings in SBC's

territory, the only two carriers that own or control the direct building connection are AT&T and

SBC.

18.    In the hundreds of buildings where AT&T is the only CLEC with a last-mile

connection, the merger of SBC and AT&T would reduce the number of carriers with an owned or

controlled  last-mile connection from two to one.


B.    Relevant Product Markets

19.    The relevant product markets affected by this transaction are the markets for:  (a)

Local Private Lines, and (b) voice and data telecommunications services that rely on Local

Private Lines.

20.    SBC is the dominant provider of Local Private Lines (special access) in its

franchised territory with approximately $ 4.4 billion in special access sales in 2004.  AT&T is

one of SBC's largest competitors with $ 311 million in Local Private Line sales in 2004, of

which over $ 90 million were in SBC territory.

21.    Local Private Lines are a recognized service category among telecommunications

carriers and end-user business customers.  Customers typically purchase Local Private Lines in

standard bandwidth increments such as DS1 ("T1," 1.54 megabits per second), DS3 (44.74

megabits per second), OC3 (155.52 megabits per second), and higher.  Local Private Lines can interconnect with industry-standard data networking and telephone equipment, and can be "channelized" to carry various amounts of voice and/or data traffic.

22.    Local Private Lines are distinct from switched local exchange telephone services. Switched local exchange lines route calls through a voice switch in the local carrier's central office and do not necessarily use a dedicated circuit.  These switched circuits do not offer the guaranteed bandwidth, high service levels, and security that Local Private Lines provide.

23.    Competing carriers often rely on Local Private Line (special access) circuits to connect an end-user customer's location to their networks, enabling the competitor to supply value-added data networking, Internet access, local voice and long distance services to the customer.  Although carriers can provide some types of voice and data services over switched local exchange lines (*e.g.,* when an access line is pre-subscribed to a long distance carrier), most large business customers do not find those services to be a viable or cost-effective substitute for voice and data telecommunications services provided via Local Private Lines.  In the event of a small, but significant, nontransitory increase in price for either Local Private Lines or voice and data telecommunications services provided via Local Private Lines, insufficient customers would switch to switched circuits to render the increase unprofitable.

C.    Relevant Geographic Markets

24.    The relevant geographic markets for both Local Private Lines, as well as voice and data telecommunications services that rely on Local Private Lines, are no broader than each metropolitan area and no more narrow than each individual building.

7

## IV.  ANTICOMPETITIVE EFFECTS

25.    SBC and AT&T are the only two carriers that own or control a Local Private Line connection to many buildings in each region.  The merger would, therefore, effectively eliminate competition for facilities-based Local Private Line service to those buildings, and many retail and wholesale customers would no longer have AT&T as a competitive alternative to SBC. Although other competitors might resell Local Private Lines from SBC, those competitors would not be as effective a competitive constraint because SBC would control the price of the resold circuits.  The merged firm would, therefore, have the ability to raise price to retail and wholesale customers of Local Private Lines.

26.    In addition, because the cost of dedicated local access via Local Private Line represents an important cost component of many value-added voice and data telecommunications services provided over such access, by (a) eliminating AT&T as the only competitive alternative to SBC for such services with its own Local Private Line connection to hundreds of buildings, and (b) depriving other carriers seeking to provide such value-added services of the only fully-facilities based wholesale competitive alternative to SBC in those buildings, the merger would tend to lessen competition for retail voice and data telecommunications services provided over dedicated access.

## V.  ENTRY

27.     Although other CLECs can, theoretically, build their own fiber connection to each building in response to a price increase by the merged firm, such entry is a difficult, time-consuming, and expensive process.  Whether a CLEC builds a last mile connection to a given building depends upon many factors, including:

a.      the proximity of the building to the CLEC's existing network interconnection points;

b.      the capacity required at the customer's location (and thus the revenue opportunity);

c.      the availability of capital;

d.      the existence of physical barriers, such as rivers and railbeds, between the CLEC's network and the customer's location; and

e.      the ease or difficulty of securing the necessary consent from building owners and municipal officials.

28.     The costs of building a last-mile connection vary substantially for each location. Even if all the above criteria favor the construction of a last-mile connection in a particular case, a single such connection typically costs tens, sometimes hundreds, of thousands of dollars to build and activate.  Thus, CLECs will typically only build in to a particular building after they have secured a customer contract of sufficient size to justify the anticipated construction costs for that building.

29.    Although entry may occur in response to a post-merger price increase in some of buildings where AT&T is the only connected CLEC, the conditions for entry are unlikely to be met in hundreds of those buildings.  Thus, entry is unlikely to eliminate the competitive harm that would likely result from the proposed merger.

## VI.  VIOLATION ALLEGED

30.    The United States hereby incorporates paragraphs 1 through 29.

31.    Pursuant to an Agreement and Plan of Merger dated January 30, 2005, SBC and AT&T intend to merge their businesses.

32.    The effect of the proposed acquisition of AT&T by SBC would be to lessen competition substantially in interstate trade and commerce in numerous geographic markets for (a) Local Private Lines and (b) voice and data telecommunications services that rely on Local Private Lines, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

33.    The transaction would likely have the following effects, among others:

a.    competition in the provision and sale of Local Private Lines in numerous geographic markets would be eliminated or substantially lessened;

b.    competition in the provision and sale of voice and data telecommunications services that rely on Local Private Lines in numerous geographic markets would be substantially lessened; and

c.    prices for Local Private Lines, as well as voice and data telecommunications services provided via Local Private Lines, would likely increase to levels above those that would prevail absent the merger.

10

## VII.  PRAYER FOR RELIEF

The United States requests:

34.    that SBC's proposed acquisition of AT&T be adjudged to violate Section 7 of the

Clayton Act, 15 U.S.C. § 18;

35.    that Defendants be permanently enjoined and restrained from carrying out the

Agreement and Plan of Merger dated January 30, 2005 or from entering into or carrying out any

agreement, understanding, or plan by which SBC would merge with or acquire AT&T, its capital

stock or any of its assets;

36.    that the United States be awarded costs of this action; and

37.    that the United States have such other relief as the Court may deem just and

proper.

DATED: October 27, 2005

                                        Respectfully submitted,

FOR PLAINTIFF UNITED STATES:


_____/s/_____                  _____/s/_____
THOMAS O. BARNETT                       LAURY E. BOBBISH
Acting Assistant Attorney General       Assistant Chief
                                        Telecommunications and Media
                                            Enforcement Section


_____/s/_____                  _____/s/_____
J. BRUCE McDONALD                       LAWRENCE M. FRANKEL
Deputy Assistant Attorney General       (D.C. Bar No. 441532)

                                        CLAUDE F. SCOTT, JR. (D.C. Bar No. 414906)
                                        MARY N. STRIMEL (D.C. Bar No. 455303)
                                        MATTHEW C. HAMMOND
                                        LAUREN J. FISHBEIN (D.C. Bar No. 451889)
_____/s/_____                  CONRAD J. SMUCKER (D.C. Bar No. 434590)
J. ROBERT KRAMER II                     JEREMIAH M. LUONGO
Director of Operations                  JARED A. HUGHES
                                        DAVID T. BLONDER
                                        WILLIAM LINDSEY WILSON
                                        WILLIAM B. MICHAEL

                                        Trial Attorneys
_____/s/_____                  U.S. Department of Justice
NANCY M. GOODMAN, Chief                 Antitrust Division
Telecommunications and Media            Telecommunications and Media
    Enforcement Section                     Enforcement Section
    (D.C. Bar No. 251694)               1401 H Street, N.W., Suite 8000
                                        Washington, DC 20530
                                        Telephone: (202) 514-5621
                                        Facsimile: (202) 514-6381