IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, ) | |
| ) | Civil Action No.: 1:05CV02102 (EGS) |
| Plaintiff, ) | |
| ) | |
| v. ) | Filed: November 16, 2005 |
| ) | |
| SBC Communications Inc. and ) | |
| AT&T Corp., ) | |
| ) | |
| Defendants. ) | |

**COMPETITIVE IMPACT STATEMENT**

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

**I.   Nature and Purpose of the Proceeding**

Defendants entered into an Agreement and Plan of Merger dated January 30, 2005, pursuant to which SBC Communications Inc. ("SBC") will acquire AT&T Corp. ("AT&T"). The United States filed a civil antitrust Complaint on October 27, 2005 seeking to enjoin the proposed acquisition. The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially for Local Private Lines and other telecommunications services that rely on Local Private Lines located in 11 metropolitan areas in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition would result in customers facing higher

prices for Local Private Lines and other telecommunications services that rely on Local Private Lines than they would absent the merger.

At the same time the Complaint was filed, the United States also filed a Stipulation and proposed Final Judgment that are designed to eliminate the anticompetitive effects of the acquisition.  Under the proposed Final Judgment, which is explained more fully below, Defendants are required to divest, in most situations, indefeasible rights of use ("IRUs") for lateral connections to certain buildings located in a number of metropolitan areas as listed in Appendix A of the proposed Final Judgment (collectively the "Divestiture Assets").  Under the terms of the Stipulation, Defendants will take certain steps to ensure that these assets are preserved and maintained.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA.  Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof. Defendants have also stipulated that they will comply with the terms of the Stipulation and the proposed Final Judgment from the date of signing of the Stipulation, pending entry of the proposed Final Judgment by the Court and the required divestitures.  Should the Court decline to enter the proposed Final Judgment, Defendants have also committed to continue to abide by its requirements and those of the Stipulation until the expiration of time for appeal.

## II. Description of the Events Giving Rise to the Alleged Violation

### A. The Defendants and the Proposed Transaction

SBC is a corporation organized and existing under the laws of the State of Delaware, with its headquarters in San Antonio, Texas. SBC, formerly Southwestern Bell, is a regional bell operating company ("RBOC"), formed as one of the seven regional holding companies created as a result of the breakup of AT&T's telephone business into local and long distance components initially in 1984. Since then, SBC has acquired two other RBOCs--Pacific Telesis and Ameritech--as well as an incumbent local exchange carrier ("ILEC"), Southern New England Telephone Corporation. SBC owns and operates local telecommunications networks throughout its 13-state territory and provides local and long distance voice and data services to, *inter alia,* business customers and other telecommunications carriers. SBC's wireline telecommunications operations currently serve around 52 million switched access lines, including 27.5 million residential and 17.6 million business lines. In 2004, SBC earned approximately $36.9 billion in revenues from its wireline services, including almost $13 billion attributable to business customers.

AT&T is a corporation organized and existing under the laws of the State of New York, with its headquarters in Bedminster, New Jersey. After the 1984 breakup, AT&T was primarily a long distance provider and is still the nation's largest interexchange carrier ("IXC"), offering traditional long distance telephone service, as well as one of the largest competitive local exchange carriers ("CLEC"), offering local network access for voice and data services. AT&T serves consumers and businesses across the United States and around the globe. It also owns and operates local networks in dozens of metropolitan areas in the United States, a substantial

3

number of which are in SBC territory. Like SBC, AT&T also provides local and long distance voice and data services to business customers and other telecommunications carriers. AT&T competes with SBC to serve wholesale and retail customers' locations in SBC's franchised territory. In 2004, AT&T earned approximately $30.5 billion in revenues, including $22.6 billion from business customers.

Pursuant to an Agreement and Plan of Merger dated January 30, 2005, SBC agreed to acquire AT&T for approximately $16 billion. The proposed transaction, as initially agreed to by Defendants, would lessen competition substantially for Local Private Lines and other telecommunication services that rely on Local Private Lines in 11 metropolitan areas. This acquisition is the subject of the Complaint and proposed Final Judgment filed by the United States.

### B. Local Private Lines

A Local Private Line is a dedicated, point-to-point circuit offered over copper and/or fiber-optic transmission facilities that originates and terminates within a single metropolitan area and typically includes at least one local loop. A local loop, sometimes referred to as a "last-mile" connection, is typically either a copper or fiber-optic transmission facility that connects commercial buildings to a carrier's network, making the local loop a critically important asset for providing telecommunications services to business customers.

Local Private Lines are a recognized service category among telecommunications carriers and end-user business customers and are sold at both retail (to business customers) and wholesale (to other carriers). Depending on how they are configured, Local Private Lines can be used to carry voice traffic, data, or a combination of the two. Local Private Lines may be purchased as

stand-alone products but are also an important input to value-added voice and data telecommunications services for business customers and represent a significant portion of the costs incurred in providing those services. Customers typically purchase Local Private Lines in standard bandwidth increments such as DS1 ("T1," 1.54 megabits per second), DS3 (44.74 megabits per second), OC3 (155.52 megabits per second), and higher. Local Private Lines can interconnect with industry-standard data networking and telephone equipment, and can be "channelized" to carry various amounts of voice and/or data traffic. Local Private Lines are distinct from switched local exchange telephone services, which route calls through a voice switch in the local carrier's central office and do not necessarily use a dedicated circuit. Customers do not consider switched local exchange services to be a substitute because they do not offer the guaranteed bandwidth, high service levels, and security that Local Private Lines provide.

Competing carriers often rely on Local Private Line circuits to connect an end-user customer's location to their networks, enabling the competitor to supply value-added data networking, Internet access, local voice and long distance services to the customer. Although carriers can provide some types of voice and data services over switched local exchange lines (*e.g.,* when an access line is pre-subscribed to a long distance carrier), most large business customers do not find those services to be a viable or cost-effective substitute for voice and data telecommunications services provided via Local Private Lines. In the event of a small, but significant, nontransitory increase in price for either Local Private Lines or voice and data telecommunications services provided via Local Private Lines, insufficient customers would switch to switched circuits to render the increase unprofitable.

For the vast majority of commercial buildings in its territory, SBC is the only carrier that owns a last-mile connection to the building. Thus, in order to provide Local Private Line circuits or voice or data telecommunications services to customers in those SBC-only buildings, competing carriers typically must lease the connection from SBC as Local Private Line service, which SBC refers to as "special access." For a small percentage of commercial buildings (though these buildings account for a significant amount of customer demand and revenue), SBC's CLEC competitors have built or acquired their own last-mile fiber-optic connections, separate from SBC's, to connect their networks to the buildings. The CLECs typically refer to buildings with these connections as their "lit buildings" or "on-net buildings." Once a CLEC has incurred the high fixed cost to construct a last-mile connection to a building, the CLEC can usually provide service to business customers in the building at a lower marginal cost than it would otherwise be able to do if it had to lease the connection from the RBOC. It can also provide alternative access to other CLECs seeking to serve business customers in the building.

The relevant geographic market for both Local Private Lines, as well as voice and data telecommunications services that rely on Local Private Lines, is no broader than each metropolitan area and no more narrow than each individual building.

### C. The Competitive Effects of the Transaction on Local Private Lines

SBC's acquisition of AT&T will substantially lessen competition in the markets for (a) Local Private Lines and (b) voice and data telecommunications services that rely on Local Private Lines. SBC is the dominant provider of Local Private Lines in its franchised territory, and AT&T is one of its largest competitors. AT&T is among the leading CLECs in SBC's territory in the number of buildings it has connected with its own last-mile fiber facilities. For

hundreds of commercial buildings located in the metropolitan areas of Chicago, Illinois; Dallas-Fort Worth, Texas; Detroit, Michigan; Hartford-New Haven, Connecticut; Indianapolis, Indiana; Kansas City, Missouri; Los Angeles, California; Milwaukee, Wisconsin; San Diego, California; San Francisco-San Jose, California; and St. Louis, Missouri, SBC and AT&T are the only two firms that own or control a direct wireline connection to the building.  In these buildings, the merger of SBC and AT&T would reduce the number of carriers with an owned or controlled last-mile connection from two to one.

The merger would, therefore, effectively eliminate competition for facilities-based Local Private Line service to those buildings, and many retail and wholesale customers would no longer have AT&T as a competitive alternative to SBC.  Although other competitors might resell Local Private Lines from SBC, those competitors would not be as effective a competitive constraint because SBC would control the price of the resold circuits.  The merged firm would, therefore, have the ability to raise price to retail and wholesale customers of Local Private Lines. In addition, because the cost of dedicated local access via Local Private Line represents an important cost component of many value-added voice and data telecommunications services provided over such access, the merger would tend to lessen competition for retail voice and data telecommunications services provided over dedicated access by (a) eliminating AT&T as the only competitive alternative to SBC for such services with its own Local Private Line connection to hundreds of buildings and (b) depriving other carriers seeking to provide such value-added network services of the only fully-facilities based wholesale competitive alternative to SBC in those buildings.

Although other CLECs can, theoretically, build their own fiber connection to each building in response to a price increase by the merged firm, such entry is a difficult, time-consuming, and expensive process. Whether a CLEC builds a last-mile connection to a given building depends upon many factors, as noted in the Complaint, and the costs of building a last-mile fiber-optic connection vary substantially for each location. Because a single such connection may cost hundreds of thousands of dollars to build and light, CLECs will typically only build in to a particular building after they have secured a customer contract of sufficient size and length to justify the anticipated construction costs for that building. While entry may occur in some buildings where AT&T is the only CLEC present in response to a post-merger price increase, the conditions for entry are unlikely to be met in the hundreds of buildings that are the subject of the Complaint. For these buildings, the expected customer demand and proximity of other CLEC fiber to the building (two important factors in the decision to build in) indicate that such entry, even in the face of a price increase, is unlikely to be profitable for any CLEC. Thus, entry would not be timely, likely, or sufficient to eliminate the competitive harm that would likely result from SBC's proposed acquisition of AT&T.

For these reasons, the United States concluded that SBC's proposed acquisition of AT&T will likely substantially lessen competition, in violation of Section 7 of the Clayton Act, in the provision of Local Private Lines and other telecommunication services that rely on Local Private Lines in the 11 metropolitan areas listed above.

### III. Explanation of the Proposed Final Judgment

The divestiture requirements of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in Local Private Lines and other telecommunications services that rely on Local Private Lines in the relevant areas. The proposed Final Judgment requires Defendants, within 120 days after the closing of SBC's acquisition of AT&T, or five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest the Divestiture Assets. The Divestiture Assets consist of IRUs for lateral connections (or last-mile connection) to hundreds of buildings in the identified metropolitan areas along with transport facilities sufficient to enable the IRUs to be used by the purchaser to provide telecommunications services. Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective purchasers.

These assets must be divested in such a way as to satisfy the United States in its sole discretion that they will be used by the purchaser to compete effectively and remedy the harm alleged in the Complaint in the markets for Local Private Lines and other telecommunications services that rely on Local Private Lines. In reviewing the purchaser or purchasers of the Divestiture Assets, the United States will be particularly focused on the purchaser's ability to be a viable competitor in offering Local Private Lines on both a retail and/or wholesale basis. Purchasers that are already offering similar services in or near the metropolitan area are more likely to be viable competitors than other potential purchasers.

Divesting the last-mile connections to the hundreds of buildings in SBC's territory will remedy the harm alleged in the Complaint. Although other CLECs have local fiber networks in each of the metropolitan areas at issue, they cover only a small percentage of buildings, and the

buildings covered vary from CLEC to CLEC. As a result, there are numerous buildings where AT&T is the only CLEC with a last-mile connection. It is the decreased competition in the provision of these last-mile connections to buildings where AT&T is the only CLEC that creates the harm alleged in the Complaint. Whether the geographic market for the sale of Local Private Line or other telecommunications services that rely on Local Private Lines is as broad as the metropolitan area or as narrow as individual locations or buildings, divesting these last-mile connections will restore the lost facilities-based competition. The proposed Final Judgment also strengthens metropolitan area competition by divesting to a single purchaser in each area all of the buildings that were unique to AT&T.

To ensure that the purchaser has adequate capacity to serve customers in a given location, the lateral or last-mile connection to be divested will consist of an IRU for the greater of (1) eight (8) fiber strands or (2) one-half of the currently unused fiber strands in AT&T's facilities serving the building measured at the time of the filing of the Complaint, from the point of entry of the building to the splice point with fiber used to serve different buildings. This should be sufficient capacity for the purchaser to serve current demand and allow for future growth and changes in the local service area while allowing SBC to retain the AT&T circuits being used to serve current customers without disruption to their service. In addition, to accommodate network engineering and design requirements, the divestiture IRUs can be granted for fiber strands owned or controlled by either SBC or AT&T, as mutually agreed by Defendants and the purchaser.

Last-mile connections, however, are of little use if they are not connected to a network. Therefore, the proposed Final Judgment also requires the divestiture of IRUs for transport facilities sufficient to connect the divested last-mile connections to locations mutually agreed upon by

Defendants and the purchaser. This will ensure that the purchaser can connect the last-mile connections to its network facilities and provide both Local Private Lines and any other telecommunications services that rely on Local Private Lines that a customer in the building may require.

An IRU (or indefeasible right of use) is a long-term leasehold interest commonly used in the telecommunications industry that gives the holder the right to use specified strands of fiber in a telecommunications facility. The proposed Final Judgment contemplates that the purchaser and Defendants will negotiate commercially reasonable IRUs that must meet minimum requirements, including: (1) to ensure that the purchaser has the asset for a long enough time period to serve customers while taking into account the dynamic nature of the telecommunications industry and the useful life of the existing fiber, the IRU must be for a minimum of 10 years; (2) to minimize ongoing carrying costs for the IRU, the IRU cannot contain a monthly or other recurring fee; and (3) to ensure that Defendants cannot limit the purchasers' use of the last-mile connection, the IRU cannot unreasonably limit the right of the purchaser to use the asset as it wishes (e.g., the purchaser shall be permitted to splice into the IRU fiber, though such splice points must be mutually agreed upon by Defendants and purchaser). This last requirement, allows the purchaser to splice into the IRUs to serve locations other than those listed in Appendix A of the proposed Final Judgment, at mutually agreed upon splice points.

The requirements of the proposed Final Judgment ensure that the purchasers can use the Divested Assets to begin competing immediately for customers in these buildings and will have the rights and cost structure necessary to be effective by (1) minimizing carrying costs so that viability

is not threatened if customers are not immediately procured and (2) giving the purchaser flexibility in use of the last-mile connections by allowing splicing into the fiber.

In some locations, AT&T serves the building using fiber that it controls through an IRU, rather than full ownership. In these locations if the United States determines in its sole discretion that such an alternative disposition will meet the aims of the proposed Final Judgment, Defendants may alternatively (1) enter into a dark fiber service agreement or other commercial arrangement for the last-mile connections and, if necessary, associated transport with the purchaser or (2) relinquish a portion of AT&T's IRU rights back to the owner of the fiber. In either of these circumstance, as with approving a purchaser, the United States will consider whether the fiber is likely to be used it in a manner that will remedy the competitive harm alleged in the Complaint.

Lastly, with the approval of the United States, in its sole discretion, and at the purchaser's option, the Divestiture Assets may be modified to exclude assets and rights that are not necessary to meet the aims of this Final Judgment. This will allow for minor modifications of the Divestiture Assets to exclude assets that may not be necessary in order to remedy the competitive harm.

### A. Timing of Divestitures

To rapidly restore lost competition, the United States requires divestitures to be completed within the shortest time period reasonable under the circumstances. In this case, the proposed Final Judgment requires, in Section IV.A, divestiture of the Divestiture Assets, within 120 days after the closing of SBC's acquisition of AT&T, or five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later. The United States in its sole discretion may extend the date for divestiture of the Divestiture Assets by up to sixty (60) days. The divestiture timing provisions of the proposed Final Judgment will ensure that the divestitures are carried out in

a timely manner, and at the same time will permit Defendants an adequate opportunity to accomplish the divestitures through a fair and orderly process.

### B.  Use of a Divestiture Trustee

In the event that Defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestitures.  To ensure that the divestiture trustee can promptly locate and divest to an acceptable purchaser, the United States, in its sole discretion, may require Defendants to include additional assets, or allow Defendants to substitute substantially similar assets, which substantially relate the Divestiture Assets to be divested by the divestiture trustee.

The proposed Final Judgment provides that Defendants will pay all costs and expenses of the divestiture trustee.  The divestiture trustee's commission will be structured, under Section V.D of the proposed Final Judgment, so as to provide an incentive for the divestiture trustee based on the price obtained and the speed with which the divestitures are accomplished.  After his or her appointment becomes effective, the divestiture trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestitures.  Section V.G of the proposed Final Judgment requires the divestiture trustee to divest the Divestiture Assets to an acceptable purchaser or purchasers no later than six (6) months after his or her appointment.  At the end of six (6) months, if all divestitures have not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or term of the trustee's appointment.

## IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V. Procedures Available for Modification of the Proposed Final Judgment

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

>Nancy M. Goodman
>Chief, Telecommunications and Media Enforcement Section
>Antitrust Division, U.S. Department of Justice
>1401 H Street, N.W., Suite 8000
>Washington, DC  20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.  Alternatives to the Proposed Final Judgment

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  The United States could have continued the litigation and sought preliminary and permanent injunctions against SBC's acquisition of AT&T.  The United States is satisfied, however, that the divestiture of assets and other relief described in the proposed Final Judgment will preserve competition for Local Private Lines and other telecommunications services that rely on Local Private Lines in the metropolitan areas identified in the Complaint.

## VII.  Standard of Review Under the APPA for the Proposed Final Judgment

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty (60) day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In making that determination, the Court shall consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). As the United States Court of Appeals for the District of Columbia Circuit has held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the consent judgment is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the consent judgment may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).[1]

---

[1] *See United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing it was not the court's duty to settle; rather, the court must only answer "whether the settlement achieved [was] within the reaches of the public interest"). A "public interest" determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed by the Department of Justice pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. § 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have

Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]

---

raised significant issues and that further proceedings would aid the court in resolving those issues. *See* H.R. Rep. No. 93-1463, 93d Cong., 2d Sess. 8-9 (1974), *reprinted* in 1974 U.S.C.C.A.N. 6535, 6538-39.

[2]     *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. AT&T Corp.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent judgment even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60.

## VIII.  Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: November 16, 2005

                        Respectfully submitted,

                        /s/
                        Laury E. Bobbish
                        Assistant Chief

                        /s/
Lawrence M. Frankel  (D.C. Bar No. 441532)

Claude F. Scott, Jr. (D.C. Bar No. 414906)
Mary N. Strimel (D.C. Bar No. 455303)
Matthew C. Hammond
Lauren J. Fishbein (D.C. Bar No. 451889)
Conrad J. Smucker (D.C. Bar No. 434590)
Jeremiah M. Luongo
Jared A. Hughes
David T. Blonder
William Lindsey Wilson
William B. Michael

Trial Attorneys
U.S. Department of Justice
Antitrust Division
Telecommunications and Media
   Enforcement Section
1401 H Street, N.W., Suite 8000
Washington, DC 20530
Telephone: (202) 514-5621
Facsimile: (202) 514-6381