# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | Civil Action No. 1:05CV02102 (EGS) |
| ) | |
| **SBC Communications, Inc. and** ) | |
| **AT&T Corp.,** ) | |
| ) | |
| **Defendants.** ) | |

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | Civil Action No. 1:05CV02103 (EGS) |
| ) | |
| **Verizon Communications, Inc. and** ) | |
| **MCI, Inc.,** ) | |
| ) | |
| **Defendants.** ) | |

---

## MOTION AND MEMORANDUM IN SUPPORT OF COMPTEL'S MOTION FOR LEAVE TO INTERVENE, OR IN THE ALTERNATIVE TO PARTICIPATE AS AMICUS CURIAE

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................2

ARGUMENT ......................................................................................................7

I. THE TUNNEY ACT REQUIRES THE COURT TO AFFIRMATIVELY FIND
   THAT THE PROPOSED CONSENT DECREE IS IN THE PUBLIC INTEREST ......7

II. COMPTEL SHOULD BE GRANTED PERMISSIVE INTERVENTION
    TO ASSIST THE COURT IN MAKING ITS PUBLIC INTEREST
    DETERMINATION ......................................................................................10

    A.  COMPTEL's Motion Is Timely and Will Not Unduly Delay or Prejudice the
        Adjudication of the Rights of the Original Parties .................................11

    B.  COMPTEL Has a Claim That Shares A Question of Law or Fact with the
        Main Action ......................................................................................12

    C.  Divestiture of an Operating Business Is Required to Restore Competition ..........13

    D.  The DOJ Fails to Explain How Their Proposed Consent Decree Addresses
        the Increase Risk of Coordination By the Post-Merger Firms ............................18

III. IN THE ALTERNATIVE TO INTERVENTION, THE PROPOSED
     INTERVENOR SHOULD BE ALLOWED TO JOIN AS AMICUS CURIAE .......20

CONCLUSION ....................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

California v. America Stores Co.,
    495 U.S. 271 (1980)................................................................................................14

Diamond v. Charles,
    476 U.S. 54 (1986)................................................................................................12

Equal Employment Opportunity Commission v. National Children's Ctr., Inc.,
    146 F.3d 1042 (D.C. Cir. 1998)............................................................................12

Ford Motor Co. v. United States,
    405 U.S. 562 (1972)..............................................................................................13

Hodgson v. United Mine Workers of America,
    473 F.2d 118 (D.C. Cir. 1972)..............................................................................11

National Association for Advancement of Colored People v. New York,
    413 U.S. 345 (1973)..............................................................................................11

Nuesse v. Camp,
    385 F.2d 694 (D.C. Cir. 1967)..............................................................................12

Smuck v. Hobson,
    408 F.2d 175 (D.C. Cir. 1969)..............................................................................12

Textile Workers Union of America, CIO v. Allendale Co.,
    226  F.2d 765 (D.C. Cir. 1955)..............................................................................12

United States v. AT&T Co.,
    642 F.2d 1285 (D.C. Cir. 1980)............................................................................11

United States v. America Telegraph & Telegraph,
    552 F. Supp. 131 (D.D.C. 1982)....................................................................6, 7, 15

United States v. E.I. du Pont de Nemours & Co., ,
    366 U.S. 316 (1961)..............................................................................................13

## FEDERAL STATUTES

15 U.S.C. § 16(f)(3) ..................................................................1, 2, 8, 9, 10, 11, 20

15 U.S.C. § 18 ..........................................................................................................2

15 U.S.C. § 26 ..................................................................................................................13

Fed R. Civ. P. 24(b) .....................................................................................................11, 12

## OTHER MATERIAL

150  Cong. Rec. H3656 (June 2, 2004)............................................................................2

150 Cong. Rec. S3610 (daily ed. June 2, 2004)........................................................3, 9

Pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, COMPTEL respectfully requests leave to intervene in this Tunney Act proceeding for the limited purpose of assisting the Court in understanding the inadequacy of the remedies contained in the two Proposed Amended Final Judgments (collectively referred to as the "PAFJ" since the terms of each respective proposed judgment are identical) proposed by the Department of Justice ("DOJ") concerning the mergers between SBC Communications Corp. ("SBC") and AT&T, Inc. ("AT&T") on the one hand, and Verizon Communications, Inc. ("Verizon") and MCI, Inc. ("MCI") on the other, and to assist in fashioning appropriate and necessary remedies. *See* Antitrust Procedures and Penalties Act ("Tunney Act") 15 U.S.C. § 16(f)(3) (granting Court the discretion to authorize intervention).

Pursuant to Tunney Act procedures, COMPTEL intends to submit, on the February 13, 2006 due date, comments to DOJ concerning the inadequacies of the remedy proposed in the PAFJ. 15 U.S.C. § 16(d). DOJ will then file COMPTEL's comments (along with others received) with the Court and provide a response to the comments. With this motion, COMPTEL requests permission to intervene for the limited purpose of (1) submitting to the Court a response to the Government's response to COMPTEL's comments; (2) participating in hearings held by the Court (or seeking a hearing if necessary); and (3) any discovery relevant to DOJ's relevant market definition, competitive effect in the relevant market, and any information DOJ considered in determining the proposed remedy. In the alternative, COMPTEL respectfully requests leave to participate to a similar extent as *amicus curiae*.[1]

---

[1] Pursuant to Local Rule 7(m), COMPTEL has conferred with counsel for DOJ and Defendants, and two parties oppose this motion.

## INTRODUCTION

DOJ filed both of these civil antitrust cases on October 27, 2005, alleging that the proposed acquisitions of AT&T by SBC, and MCI by Verizon, should be enjoined by the court because they are likely to substantially lessen competition in the Local Private Line services market in many cities in violation of Section 7 of the Clayton Act. 15 U.S.C. § 18.  Although DOJ fails to specifically define the relevant geographic market in these cases – vacillating between  metropolitan-area markets and narrow, single building markets, Compl.'s ¶ 24 – the Complaints make clear that SBC's merger with AT&T (like Verizon's with MCI) "would tend to lessen competition for retail voice and data telecommunications services provided over dedicated access" in dozens of cities. Compl.'s ¶ 26.  The Complaints further state that the mergers will result in competitors being reduced from two competitors to one competitor in many geographic areas.  Compl.'s ¶ 25.

Concurrent with the filing of its Complaints, DOJ filed Proposed Final Judgments, which were subsequently amended.  Before it can enter these Proposed Amended Final Judgments, this Court must decide whether such entry is in the public interest, after reviewing the PAFJ with regard to specific enumerated criteria.[2]  15 U.S.C. § 16(e).  In 2004, the Tunney Act was amended, in order "to effectuate the original Congressional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest."  150

---

[2] Notwithstanding the Court's obligation to conduct an independent review of the PAFJ prior to entry, DOJ has allowed the parties to consummate their mergers prior to entry of any Final Judgments.  DOJ did not require a "hold separate" order along with its Complaint and Final Judgment filings.  SBC and AT&T closed their merger on November 18, 2005, and Verizon and MCI closed their merger on January 6, 2006.  Indeed, the notion that DOJ would actually withdraw its consent of the settlements, instead of its Complaints, is so unlikely in the opinion of "the new at&t" that it has embarked on what some have estimated to be a $500 million dollar corporate "rebranding" advertising campaign.  *See* "Launching the new AT&T" , Sanford Nowlin, at MySA.Com, December 29, 2005 (available at: http://www.mysanantonio.com/business/stories/MYSA122905.1E.advertising.171af833.html).

Cong. Rec. H3656 (June 2, 2004).  The "original Congressional intent" of the Tunney Act which

Congress meant to restore in passing the 2004 Tunney Act Reform was succinctly stated by

Senator Kohl in the legislative history:

> The amendments to the Tunney Act found in our bill will restore the original
> intent of the Tunney Act, and make clear that courts should carefully review
> antitrust consent decrees to ensure that they are in the public interest. It will
> accomplish this by, No. 1, a clear statement of congressional findings and
> purposes expressly overruling the improper judicial standard of recent D.C.
> Circuit decisions; No. 2, by requiring, rather than permitting, judicial review of a
> list of enumerated factors to determine whether a consent decree is in the public
> interest; and No. 3, by enhancing the list of factors which the court now must
> review.
>
> The Tunney Act was enacted in 1974 to end the practice of courts "rubber
> stamping" antitrust consent decrees, and to remove political influence from the
> Justice Department's decision as to whether to settle antitrust cases.

150 Cong. Rec. S3610 at 3616 (daily ed. June 2, 2004) (statement of Sen. Kohl).  "Rubber

stamping" is what the original Tunney Act sought to prevent and what the 2004 Tunney Act

Reform expressly prohibited.  Yet, it is clearly a "rubber stamp" that the Government seeks, and

Defendants expect, the Court to apply in the present case.  Indeed, the Government repeatedly

cites limiting language from the 1995 D.C. Circuit *Microsoft* case that has been overruled by

Congress in the 2004 Tunney Act Reform, and is not part of the legal standard this court must

apply.  Competitive Impact Statement at 16-18.

　　COMPTEL seeks intervenor status to help the Court conduct an impartial and thorough

analysis that ensures that any consent decree it enters serves the public interest.  COMPTEL

seeks to intervene because the PAFJ's "divestiture" requirements do not provide an adequate

remedy for the harm alleged in the Complaints.  The PAFJ fails to follow DOJ's own long-

standing policies and Supreme Court precedent that require the divestiture of a viable business in

order to ensure that competition will not be diminished as the result of a merger.  Moreover, the

PAFJ even fails to address harms described in the Complaints and Competitive Impact Statement.

Rather, the PAFJ only requires the ten-year lease of existing unused (non-revenue producing) assets, that are not capable of producing revenue without further substantial investment, and, even then, are constrained to reaching only those customer locations in specific isolated buildings. PAFJ at II, IV. Even if there were any remaining demand in such buildings (for DOJ is only requiring the merged entity to divest that capacity that sits idle already), the capacity extends only to a building's point of entry, thereby requiring (i) additional investment to acquire a building access agreement with the owner and payment of ongoing building access fees, (ii) the further expense of inside wiring and equipment installation which in many cases will duplicate existing facilities; and (iii) capital expenditures to connect the building lateral to the purchasing carrier's owned or leased network.[3] Significantly, the PAFJ does not require the parties to divest a single customer, or any capacity that is being put to productive use serving the individual buildings. PAFJ at II. D. Even after the divestiture, Defendants will own the only revenue-producing assets in the buildings in question. This failure is exacerbated by the fact that all the customers in these buildings are either directly or indirectly served by the merging parties under contracts of uncertain scope and duration.[4] Yet buyers of the leases proposed in the PAFJ are nevertheless expected to bid on the divested assets of an entire metropolitan area without knowing if they will be able to enter into commercially reasonable building access agreements or win a single existing customer of the merged parties located within the buildings once contracts

---

[3] The PAFJ also requires the 10 year lease of "sufficient" transport to connect the leased lateral connections to the buyer's telecommunications network.

[4] In addition, for multi-location customers, these contracts likely include locations in non-divested buildings such that the contract price paid by the customer is determined by all the buildings/services under contract, and not merely the isolated demand in these individual buildings.

expire.  As a result of these deficiencies, potential lessees of the offered lateral connections will be required to make substantial investments to facilitate the very uncertain generation of revenue which renders purchasers unable to compete effectively in the Local Private Line services market.

COMPTEL is an association of competitive local communications providers that are both wholesale customers of and competitors to the merging parties in the Local Private Line service markets that are the subject of the Complaints.  COMPTEL members include Sprint Nextel, XO Communications, RCN Corporation, TDS Metrocom, Covad Communications, IDT Corp., CTC Communications, PAETEC Communications, The Pager Company, Alpheus Communications, Logix Communications, and Pac-West Telecomm, in addition to over 300 other members. Defendants AT&T and MCI were members of COMPTEL prior to the mergers that are the subjects of these proceedings.

These mergers harm COMPTEL's members as wholesale customers who lose the ability to purchase Local Private Line Services from AT&T instead of SBC or from MCI instead of Verizon.  Following the merger, COMPTEL's members will face dramatically concentrated Local Private Line service markets that will now further foreclose access to non-Bell transmission facilities in dozens of cities.  The monopolies created by the merger ensure that prices for Local Private Line services will be even more completely controlled by the merged company in each respective city identified in the Complaints to the detriment of COMPTEL members as wholesale customers and millions of business customers further downstream.

Simply stated, the PAFJ also fails to correct for the merger-related harms to COMPTEL members as competitors to Defendants.  Because the remedies offered in the PAFJ fail to restore competition by divesting an ongoing business, there is little chance that the competition between

the merging parties will be restored.  As such, COMPTEL and its members have an interest in this case as the association of wholesale customers and actual competitors most directly affected by the harm to competition identified in the Complaints and not remedied by the PAFJ.

Pursuant to Tunney Act procedures, DOJ must receive and respond to comments made by third parties about the proposed remedy and must file the comments received and its responses with the Court.   ACTel, the Alliance for Competition in Telecommunications, intends to submit a detailed set of important substantive comments.  COMPTEL asks that the Court read and consider the ACTel's comments.  COMPTEL intends to submit its comments to DOJ concerning the inadequacies of the remedy proposed in the PAFJ by the February 13, 2006 due date.  DOJ will then file COMPTEL's comments (along with others received) with the Court and provide a response to the comments.  With this motion, COMPTEL requests permission to intervene for the limited purpose of (1) submitting to the Court a response to the Government's response to COMPTEL's comments; (2) participating in hearings held by the Court (or seeking a hearing if necessary); and (3) seeking discovery related to DOJ's relevant market definition, the competitive effect in the relevant market, and its determination of a proposed remedy.  In the alternative, COMPTEL respectfully requests leave to participate to a similar extent as *amicus curiae*.

The requested intervention is consistent with that granted to third parties in the original AT&T Case that involved the break-up of the Bell System into seven local Regional Bell Operating Companies ("RBOCs") and a separate long distance company, AT&T.  *See United States v. Am. Tel. & Tel.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).  These mergers involve the reconstitution of the Bell System with the second largest RBOC, SBC (itself a combination of three original RBOCs) recombining with

AT&T, not to mention, Verizon, the largest RBOC, acquiring MCI, AT&T's largest competitor in the years after the break-up of the Bell System. Moreover, even though the nation's largest incumbent monopolies are acquiring their largest local competitors, they are also each becoming the other's largest in-region "competitor" or "coordinator," depending on the incentives created by the terms of the relief being proposed.

In many ways, these mergers and the inadequate remedies proposed, amount to an abandonment of over 30 years of effort to foster competition in telecommunication services. In the original AT&T Case, Judge Green permitted third parties to intervene to file comments and briefs, participate in oral argument, and fully participate in hearings when the court determined factual development would be of assistance. *Id*. at 221. Because DOJ is now willing to reverse that historic action, parties should have the same opportunity to inform the Court of the effects of DOJ's action here as they did when DOJ

sought to create the conditions for competition initially. Given the magnitude of the competitive implications at stake in this case, this Court should grant COMPTEL permission to intervene consistent with the intervention granted to third parties in the original AT&T Case.

As demonstrated below, COMPTEL satisfies the standards for permissive intervention under Rule 24(b). COMPTEL also satisfies the standard for participation as *amicus curiae*. Therefore, COMPTEL should be allowed to participate in this matter for the limited purposes of submitting a response to the Government, participating in (or seeking) hearings, and seeking limited discovery.

## ARGUMENT

## I.    THE TUNNEY ACT REQUIRES THE COURT TO AFFIRMATIVELY FIND THAT THE PROPOSED CONSENT DECREE IS IN THE PUBLIC INTEREST

The Tunney Act requires the Court to find that the judgment proposed by DOJ to remedy the significant anticompetitive effects caused by these mergers is in the public interest. 15 U.S.C. § 16(e). Indeed, the 2004 amendments to Tunney Act made clear through the changes shown in red-line below that the Court must affirmatively find that certain public interest criteria are demonstrated by DOJ and the parties:

(e) Public interest determination

**(1)** Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court ~~may~~**shall** consider--

~~(1)~~**(A)** the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration ~~or~~**of** relief sought, anticipated effects of alternative remedies actually considered, **whether its terms are ambiguous,** and any other **competitive** considerations bearing upon the adequacy of such judgment**: that the court deems necessary to a determination of whether the consent judgment is in the public interest; and**

~~(2)~~**(B)** the impact of entry of such judgment upon **competition in the relevant market or markets, upon** the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial**.**

**(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene**.

*Id.* Through these amendments to the Tunney Act, Congress put a greater burden on courts than existed before—when the specific elements of a public interest finding were permissive (the court had to find the consent decree was in the "public interest" but the statute left to the court's discretion whether the court would consider each suggested element of the public interest analysis). 15 U.S.C. § 16(e) (1980). Now, however, the Court must consider certain points, such as whether terms in the decree are ambiguous and the impact of the proposed judgment on competition in the relevant markets. 15 U.S.C. § 16(e).

The Court here must consider the effect of the decree on competition in the relevant markets, and then affirmatively find that entry of the decree is in the public interest. *Id.* The

legislative history of the 2004 Tunney Act amendments further emphasizes the need for the

Court to independently assess the proposed remedy and determine if it served the public interest

by adequately addressing the anticompetitive harm alleged in a complaint.  As Senator Hatch

succinctly put it: The 2004 amendments "end the problem of courts simply 'rubber-stamping'

antitrust settlements reached with the Justice Department."  150 Cong. Rec. S3610, at 3613.

Senator Kohl explained at greater length the Congressional expectations underlying the

2004 modifications:

> It is important to explain clearly and specifically why it is necessary to amend the Tunney Act and what we intend to accomplish with these changes. In recent years, courts have been reluctant to give meaningful review to antitrust consent decrees, and have been only willing to take action with respect to most egregious decrees that make a "mockery" of the judicial function. Our bill will effectuate the legislative intent of the Tunney Act and restore the ability of courts to give real scrutiny to antitrust consent decree.
>
> * * *
>
> First, section 221(a) of our bill contains Congressional Findings and Declarations of Purposes. These provisions clarify that we are determined to effectuate the original Congressional intent of the Tunney Act. In other words, after the enactment of this legislation, courts will once again independently review antitrust consent decrees to ensure that they are in the public interest. The Congressional Findings expressly state that for a court to limit its review of antitrust consent decrees to the lesser standard of determining whether entry of the consent judgments would make a "mockery of the judicial function" misconstrues the meaning and intent in enacting the Tunney Act. The language quoted paraphrases the D.C. Circuit decisions in  *Massachusetts School of Law v. U.S.,* 118 F.3d 776, 783 (D.C. Cir. 1997) and *U.S. v. Microsoft,* 56 F.3d 1448, 1462 (D.C. Cir. 1995). To the extent that these precedents are contrary to section 221(a) of our bill regarding the standard of review a court should apply in reviewing consent decrees under the Tunney Act, these decisions are overruled by this legislation. While this legislation is not intended to require a trial de novo of the advisability of antitrust consent decrees or a lengthy and protracted review procedure, it is intended to assure that courts undertake meaningful review of antitrust consent decrees to assure that they are in the public interest and analytically sound.
>
> Section 221(b)(2)(A) of our bill amends the existing subsection of Section 5 of the Clayton Act (codified at 15 U.S.C.  16(e)) containing the requirement that

courts review antitrust consent decrees to determine that these consent decrees are in the public interest. Our bill modifies the law by stating that, in making this determination, the court "shall" look at a number of enumerated factors bearing on the competitive impact of the settlement. The current statute merely states that the court "may" review these factors in making its determination. Requiring, rather than permitting, the court to examine these factors will strengthen the review that courts must undertake of consent decrees and will ensure that the court examines each of the factors listed therein. Requiring an examination of these factors is intended to preclude a court from engaging in "rubber stamping" of antitrust consent decrees, but instead to seriously and deliberately consider these factors in the course of determining whether the proposed decree is in the public interest.

Our bill, in section 221(b)(2)(B), also revises and enhances the factors which the court is now required to review in making its public interest determination. In addition to the factors enumerated under current law, the court must examine whether the terms of the proposed decree are ambiguous. While complete precision when dealing with future conduct may be impossible to achieve, an overly ambiguous decree is incapable of being enforced and is therefore ineffective. A mandate to review the impact of entry of the consent judgment upon "competition in the relevant market or markets" is also added by our bill. This will ensure that the Tunney Act review is properly focused on the likely competitive impact of the judgment, rather than extraneous factors irrelevant to the purposes of antitrust enforcement. Finally, this list is not intended to be exclusive, as the court is directed to review any other competitive consideration "that the court deems necessary to a determination of whether the consent judgment is in the public interest."

*Id.*[5]

Thus, the text of the Tunney Act, as amended, and the legislative history of the 2004 amendments make clear that this Court must independently assess the remedy proposed by DOJ and the parties in the PAFJ.

## II.     COMPTEL SHOULD BE GRANTED PERMISSIVE INTERVENTION TO ASSIST THE COURT IN MAKING ITS PUBLIC INTEREST DETERMINATION

In order to assist the Court in making its public interest determination, COMPTEL should be granted permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure.  Rule 24(b) states:

---

[5] Supporting comments were made by Sen. Hatch, Sen. Leahy, Congressman Sensenbrenner, Congressman Scott, and Congressman Conyers.  *Id.* at S3614-15, H3658-60.

[u]pon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

Fed R. Civ. P. 24(b). Permissive intervention is granted upon a showing of timeliness and the applicant's claim or defense sharing a question of law or fact with the main action. Fed. R. Civ. P. 24(b)(2). "In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* The Tunney Act also makes clear the Court may allow intervention in antitrust consent decree matters to assist in its public interest determination. 15 U.S.C. § 16(f)(3).

### A.     COMPTEL's Motion is Timely and Will Not Unduly Delay or Prejudice the Adjudication of the Rights of the Original Parties

Courts determine whether a motion to intervene is timely based on an assessment of the surrounding circumstances. *Nat. Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973). Among the circumstances considered are the purpose for which intervention is sought, the necessity of intervention as a means of preserving the applicant's rights, and the improbability of prejudice to those already in the case. *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 129 (D.C. Cir. 1972).

The D.C. Circuit has held that a motion to intervene is timely if made soon after it becomes reasonable to expect inadequate representation by the United States. *United States v. AT&T Co.*, 642 F.2d 1285, 1294-95 (D.C. Cir. 1980). Because the DOJ's PAFJ filed on November 28, 2005 was a severely inadequate attempt to correct the anticompetitive concerns alleged in the Complaints, COMPTEL's motion to intervene, which was filed only slightly more than one month later, is timely. *Id.* The present case is about the Government's failure to follow its own merger analysis guidelines in its Complaints, its failure to follow its remedial guidelines in its PAFJ, and, again, in fashioning the novel remedy of "promoting new entry" the

11

Government even fails to ensure that the prospective relief is consistent with conditions that would facilitate new entry that would be "timely, likely, and sufficient" to restore competition in the metro markets identified in each Complaint.

COMPTEL seeks limited intervention to address the PAFJ's severe inadequacies before it is finalized. *See Smuck v. Hobson*, 408 F.2d 175, 181-82 (D.C. Cir. 1969) (intervention was timely even when made after the final judgment). COMPTEL's request for intervention is timely as it is being submitted to the Court after an opportunity to review the PAFJ, but prior to the Court's final judgment on the PAFJ's adequacy. Furthermore, the limited scope of COMPTEL's request – to submit a response to the Government's response to COMPTEL's comments and participate in (or seek) hearings – ensures that COMPTEL's intervention will not result in undue delay. Therefore, this motion to intervene is timely and prevents undue delay and prejudice to the existing parties.

### B.      COMPTEL Has a Claim That Shares a Question of Law or Fact with the Main Action

Rule 24(b)(2) gives the court discretion to grant intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). "Claim[s]" refers "to the kinds of claims … that can be raised in courts of law as part of an actual or impending law suit." *Diamond v. Charles*, 476 U.S. 54, 76 (1986) (O'Connor, J., concurring). The D.C. Circuit "eschew[s] strict readings of the phrase 'claims or defense,' allowing intervention even in 'situations where the existence of any nominate "claim" or "defense" is difficult to find,'" preferring a broad, liberal reading of "claim and defense" so as not to preclude permissive intervention. *Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998) (quoting *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967)); *see also Textile Workers Union of Am., CIO v. Allendale Co.*, 226

F.2d 765, 768 (D.C. Cir. 1955) ("failure to come within the precise bounds of Rule 24's provisions does not necessarily bar intervention if there is a sound reason to allow it.").

COMPTEL's claims clearly share a question of law and fact with the claims and defenses in these cases. COMPTEL claims that the remedies proposed in the PAFJ are grossly inadequate to remedy the anticompetitive harms alleged in the Complaints. Thus, the main question of law and fact raised by COMPTEL is the same as that already at issue here: will the proposed remedies ensure against the harm to competition in the Local Private Line services market caused by these mergers?[6]

### C. Divestiture of an Operating Business is Required to Restore Competition

Where mergers between competitors reduce customer choice and harm competition, consent decrees must require divestitures that immediately restore the lost competition. U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies, at 12 (October 2004) ("Merger Remedies Guide"). DOJ's own policy manual on merger remedies plainly states:

> Any divestiture must contain at least the minimal set of assets necessary to ensure the efficient current and future production and distribution of the relevant product and thereby replace the competition lost through the merger. The Division favors the divestiture of an existing business entity that has already demonstrated its ability to compete in the relevant market.

*Id.* Not merely a DOJ policy choice, the requirements for antitrust remedies stem from the Supreme Court's recognition that "relief in an antitrust case must be effective to redress the violations and 'to restore competition' [and that] … [c]omplete divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (citing *United States v. E.I. du Pont de Nemours & Co.*,

---

[6] COMPTEL, as an association of customers of and competitors to the Defendants, has standing to bring Sherman Act Section 7 cases against the merging parties. The Clayton Act gives private parties standing to assert a Section 7 claim. 15 U.S.C. § 26 (allowing any person, firm, corporation, or association to sue for injunctive relief against threatened loss or damage by a violation of federal antitrust laws).

366 U.S. 316, 331 (1961)); *accord California v. Am. Stores Co.*, 495 U.S. 271, 280-81 (1980).

Thus, the Merger Remedies Guide states that, "An existing business entity should possess not

only all the physical assets, but also the personnel, customer lists, information systems,

intangible assets, and management infrastructure necessary for the efficient production and

distribution of the relevant product." Merger Remedies Guide at 12.

DOJ has followed this policy and precedent time and time again in divestitures across

various industries including telecommunications. In previous telecommunications mergers in

which DOJ negotiated remedies, the assets divested included not just network infrastructure, but

also customer contracts, business and customer records and information, customer lists,

accounts, leases, patents, licenses, and operational support systems -- in essence complete

operating businesses. For example, in *United States. v. Cingular Wireless Corp.*, DOJ required

the divestiture of AT&T Wireless's entire mobile wireless business in the identified geographic

markets to prevent the substantial lessening of competition for mobile wireless services. *See* No.

1:04cv01850, Proposed Final Judgment (D.D.C. Nov. 3, 2004) (attached as Exhibit A).

Similarly, in *U.S. v. WorldCom, Inc. and Intermedia Commc'ns*, DOJ required WorldCom to

divest all Intermedia assets, except for the voting interest in Digex, as an ongoing, viable

business to prevent the substantial lessening of competition in the market for Tier 1 Internet

backbone services. No. 1:00cv02789, Proposed Final Judgment (D.D.C. Nov. 17, 2000)

(attached as Exhibit B). Again, the required divestiture included customer contracts, operational

support systems and each of the aforementioned assets among a host of others. *Id.*, *see also U.S.*

*v. SBC Commc'ns Inc. and Ameritech Corp.*, No. 99-0715, Proposed Final Judgment (D.D.C.

March 23, 1999) (attached as Exhibit C) (DOJ required divestiture of an entire business

including the assets listed above).

DOJ follows its policy to require divestitures of ongoing businesses in other industries as well. *See United States v. Connors Bros. Income Fund and Bumble Bee Seafoods, LLC*, No. 1:04cv01494, Proposed Final Judgment (D.D.C. Aug. 31, 2004) (attached as Exhibit D) (divestiture of an entire business required in the sardine snack products market including, but not limited to, the types of assets listed above). Divestiture of an operating, on-going business effectively redresses the antitrust violations and restores competition in the affected markets. *See* Merger Remedies Guide at 9. The ten-year lease of limited non-revenue producing capacity, connecting buildings where the available revenue is already locked into long term contracts with the defendants (which are likely interdependent upon the customer's commitment of additional locations), and which cannot be placed into any productive use without substantial future investment, simply does not redress the competitive harm of this merger. *Id.*

This Court in the original AT&T Case allowed customers and competitors to intervene to assist in determining whether the proposed consent decree should be filed. *See Am. Tel. & Tel.*, 552 F. Supp. 131. The significant competitive issues raised by these mergers are similar to those raised in the original AT&T Case as these mergers largely reconstitute the monopoly Bell System the original case broke up. Indeed, as recognized by DOJ in its Complaints, for thousands of Local Private Line customers, the mergers result in a complete monopoly. Compl.'s ¶¶ 15, 17-18, 25. An adequate remedy is as essential here as it was in the original AT&T Case to prevent the anticompetitive effects of the mergers to monopoly identified in the Complaints. COMPTEL's members as both customers and competitors of Defendants, in both retail and wholesale "Local Private Line" markets, are well-positioned to comment on the inadequacy of the PAFJ, as were the customers and competitors who were allowed to intervene in the original AT&T Case.

Here, the PAFJ's requirements come nowhere close ensuring the restoration of competition in the post-merger Local Private Line services markets, and COMPTEL's participation will be useful to the Court in making its public interest determination.  The PAFJ proposes that the merged company divest selected unused assets, namely fiber strands within the network connections into specific office buildings where the merging parties are the only two facilities-based providers of Local Private Line services. In other words, notwithstanding the lack of any explanation of why only buildings where the mergers will result in a complete monopoly merit any remedy (vs. the rest of AT&T's, or MCI's, local assets), the fact remains that even after the "divestitures" have been completed, the post-merger firm will control the only revenue-producing assets into these buildings.  DOJ appears to contend that this will sufficiently restore competition in the "Local Private Line" services market in the affected areas, but nowhere in its papers does it identify why such a limited remedy -- one contrary to its own policy and precedent -- could be successful here.

One obvious deficiency of the proposed remedy is its failure to force the merged parties (who according to DOJ's Complaints become monopolists as a result of the merger) to divest a single customer – or even to require the merged entities to waive all termination liabilities penalty associated with any contract that includes service in the identified buildings.[7]  Access to customers is necessary to enable a potential purchaser of divested assets to compete.  DOJ's own guidelines plainly state that "in markets where an installed base of customers is required in order to operate at an effective scale, the divested assets should either convey an installed base of customers to the purchaser or quickly enable the purchaser to obtain an installed customer base."

---

[7]     So called "fresh look" requirements would at least permit the customers using the productive capacity that DOJ is permitting the merged firm to retain to consider shifting their demand to dormant capacity that DOJ would have the merged firm divest.

Merger Remedies Guide at 10.  Telecommunications services, which necessarily have high fixed costs (a high proportion of which are sunk), are the quintessential example of markets that require an installed base of customers for competition to be successful.

DOJ recognizes just this reality when it correctly observes that "CLECs will typically only build in to a particular building after they have secured a customer contract of sufficient size to justify the anticipated construction costs for the building."  Compl.'s ¶ 28.  DOJ, however, seems unable to appreciate the lack of a difference between capital expenditures incurred as construction costs and capital expenditures incurred as long-term leasehold acquisition costs.  The fact is that competitors typically do not deploy capital on speculation.  If they do not have a contract for a satisfactory level of demand at a particular location, then they usually will not spend capital to provide facilities to that location.

Other inadequacies with the proposed remedy include:

- The 10-year lease of unused capacity for a fraction of AT&T's buildings without a renewal option does not provide a stable facilities platform necessary to support a viable local competitor, particularly a competitor looking to establish wholesale arrangements because of the unpredictability of the period following the 10-year IRU lease.  After the lease expires, the merged companies will once again control the assets supposed to be "divested."

- Without full transfer of assets, prospective purchasers will have no rights to access any building without first obtaining access from the landlord or property manager of the building.  This, again, makes the ability of the buyer to serve potential customers dependent on yet another factor.

- The limited divestitures ensure that the buyer remains dependent on the monopolist merged companies for transport to the buyer's telecommunication network.  Given the merged companies' incentives as competitors of the buyer, there is a significant likelihood that the terms of service offered to the buyer will be unfavorable and meant to stifle, not encourage, competition.

As demonstrated by the problems above, the PAFJ fails to provide any potential buyer of the "divested" assets with a viable opportunity to compete because it only requires the lease of

limited unused assets that have no demonstrated associated demand and not an existing business actually capable of competing. These inadequacies form the basis of COMPTEL's claim that the remedy proposed by the PAFJ is grossly inadequate to remedy the anticompetitive harms alleged in the Complaint, and thereby ensures the substantial reduction of competition in the "Local Private Line" services market.

### D. The DOJ Fails to Explain How Their Proposed Consent Decree Addresses the Increase Risk of Coordination By the Post-Merger Firms

This Court is required to consider the effects of the consent decrees on competition in the relevant markets and on the public generally in those markets. The DOJ notes in its Complaints that SBC and Verizon each have acquired one of its largest competitors. Compl. ¶20. This means that, as a result of the transactions, post-merger SBC/AT&T is the largest competitor in the Verizon/MCI incumbent LEC regions, and vice versa. The DOJ, in its merger guidelines, notes that a significant potential anticompetitive effect of mergers is an increased ability of the remaining firms in the market to coordinate in ways that harm consumers. United States Dep't of Justice, Fed. Trade Comm'n, Horizontal Merger Guidelines § 2.1 (1997). The DOJ notes that "[c]ertain market conditions that are conducive to reaching terms of coordination also may be conducive to detecting or punishing deviations from those terms." *Id.*

COMPTEL submits that these conditions are fully satisfied in the case of the present mergers. Not only do the mergers eliminate the major competitor of each in-region monopoly, but they also substitute the largest out-of-region monopoly that each Bell will have to deal with post-merger. In other words, instead of a small but aggressive independent MCI as the new largest competitor in SBC/AT&T region, the new, post-merger largest competitor is also SBC/AT&T's largest out-of-region monopoly supplier.

18

Compounding this new-found interdependency is the fact that both post-merger firms, out-of-region, are totally dependent on the other large incumbent for the vast majority of their "Local Private Line" service by virtue of contracts that—due to their discount structures, volume commitments, and termination liabilities—provide enormous disincentives to use their newly-acquired fiber networks to take traffic off of the incumbent network through aggressive wholesaling to other competitors or the aggressive grooming of Bell-supplied "Local Private Line" circuits onto their own out-of-region competitive fiber networks. These commitment contracts for wholesale inputs constitute a perfect mechanism to detect and punish cheating in the retail market, as any significant increase in circuits purchased can indicate that the competitor is experiencing an increase in retail demand as the result of a decline in retail price. The dominant firm can then perfectly signal, through either price responses by its own CLEC in the other Bell's region, or through output restrictions—quality disruptions from its ILEC to the "maverick" CLEC. This is a significant risk of harm to the public interest, because most telecommunications services that the post-merger firms will sell in each other's ILEC regions (local, long distance, voice, data, and wireless) rely in large part on "Local Private Line" service as a critical input.

Given the significance of the competitive issues raised by these mergers and the unprecedented inadequacies of the remedies proposed by DOJ, COMPTEL should be entitled to intervene for the limited purpose of submitting to the Court a response to the Government's response to COMPTEL's comments, participating in (or seeking) hearings prior to the Court's entry of Judgment in this case, and seeking limited discovery related to the relevant market definition in DOJ's Complaints, the competitive effect in the relevant market, and its determination of a proposed remedy.

### III.    IN THE ALTERNATIVE TO INTERVENTION, THE PROPOSED INTERVENOR SHOULD BE ALLOWED TO JOIN AS AMICUS CURIAE

In the alternative, COMPTEL requests that it be permitted to participate as *amicus curiae* and be allowed to submit, as an *amicus* to the Court, a response to the Government's response to COMPTEL's comments, and participate in hearings.  The Tunney Act gives the Court broad discretion to permit such *amicus* participation for the benefit of the Court. 15 U.S.C. § 16(f).  In the recent *Microsoft* Tunney Act proceedings,  this Court granted *amicus* status to customers and competitors of Microsoft (including trade associations) to present "detailed challenges to the adequacy of specific aspects of the [proposed remedies]."  *E.g.*, *United States v. Microsoft Corp.*, No. 98-1232 at 6, Mem. Op. and Order, Doc. 708 (D.D.C. February 28, 2002) (granting *amicus* status to Computer & Communications Industry Association) (attached as Exhibit E).  In fact, in *Microsoft*, SBC (one of the parties here) sought to intervene or participate as an *amicus*, and was allowed by this Court to join precisely for the same reasons COMPTEL seeks to join in this case -- to detail the inadequacy of the proposed remedy -- and was permitted to submit a response to the Government's response to comments and participate in hearings.  *United States v. Microsoft Corp.*, No. 98-1232 at 6, Mem. Op. and Order, Doc. 704 (D.D.C. February 28, 2002) (granting *amicus* status to SBC) (attached as Exhibit F).  At a minimum the Court should follow the same course of action in this matter as it did in *Microsoft* and grant COMPTEL *amicus* status for the limited participation it seeks.

COMPTEL's limited involvement in this matter is necessary because of the overwhelmingly negative effect the merger will have on Local Private Line service markets if more complete remedies are not required.  COMPTEL is uniquely positioned to comment on the adequacy of the PAFJ because its members have an intimate knowledge of the industry. Moreover, as customers and competitors of the merged parties, COMPTEL's members are

directly injured by the harm to competition caused by these mergers and detailed in the

Complaints.  Therefore, COMPTEL should be permitted to participate as *amicus curiae*.

## CONCLUSION

For all of the foregoing reasons, COMPTEL's Motion to Intervene should be granted.  In

the alternative, COMPTEL should be entitled to participate in the case as *amicus curiae*.  A

proposed order is attached.

Dated:  February 8, 2006                    Respectfully submitted,

                                            Kevin R. Sullivan  (D.C. Bar No.411718)
                                            Peter M. Todaro (D.C. Bar No. 455430)
                                            King & Spalding LLP
                                            1700 Pennsylvania Avenue N.W.
                                            Washington, DC  20006
                                            202-737-0500
                                            202-626-3737 (fax)

                                            Jonathan Lee (D.C. Bar No. 435586)
                                            Sr. Vice President, Regulatory Affairs
                                            COMPTEL
                                            1900 M Street, NW
                                            Suite 800
                                            Washington, D.C.  20036-3508
                                            202-296-6650
                                            202-296-7585 (fax)

                                            *Attorneys for Proposed Intervenor*
                                            *COMPTEL*