# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>)<br>Plaintiff,          )<br>v.                )<br>)<br>SBC Communications, Inc. and  )<br>AT&T Corp.,         )<br>)<br>Defendants.       )<br>_____) | Civil Action No. 1:05CV02102 (EGS) |
| UNITED STATES OF AMERICA,  )<br>)<br>Plaintiff,          )<br>v.                )<br>)<br>Verizon Communications, Inc. and  )<br>MCI, Inc.,           )<br>)<br>Defendants.       )<br>_____) | Civil Action No. 1:05CV02103 (EGS) |

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF COMPTEL'S MOTION FOR LEAVE TO INTERVENE, OR IN THE ALTERNATIVE, TO PARTICIPATE AS *AMICUS CURIAE*

CompTel respectfully submits this Supplemental Memorandum in Support of COMPTEL's Motion for Leave to Intervene, or in the Alternative, to Participate as *Amicus Curiae* and its Reply to Opposition of the Department of Justice ("DOJ"), AT&T, and Verizon to the Motion. In the week since COMPTEL filed its Reply, another significant merger involving AT&T has been announced that makes an even stronger case for the grant of COMPTEL's intervention request.

On March 5, 2006 AT&T (the name under which the post-merger SBC/AT&T is operating) announced that it was acquiring 100% of the stock of BellSouth Corporation.

BellSouth Corporation is the incumbent Bell monopoly in a nine-state area of the Southeastern United States, and is AT&T's minority partner (with a 40% interest) in Cingular Wireless, the largest wireless telecommunications carrier in the country, with over 54 million customers. Press Release, AT&T, AT&T, BellSouth to Merge (Mar. 5, 2006), *available at* http://att.sbc.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=22140 (attached as Ex. 1). AT&T's acquisition of BellSouth will further exacerbate certain anticompetitive effects of the SBC/AT&T merger identified in the DOJ Complaint ("Complaint"). Moreover, the acquisition further underscores the validity of COMPTEL's contention that the Proposed Amended Final Judgment ("PAFJ") must be rejected as inconsistent with Supreme Court precedent and the public interest.

## Direct Impact on Private Line Competition

First, the BellSouth acquisition further enhances AT&T's ability to maintain a chokehold on Local Private Lines throughout the SBC ILEC region. Because the acquisition will allow AT&T to offer selective "discounts" on Local Private Line services over an even greater monopoly territory, the post-BellSouth-merger firm will be able to demand an even greater percentage of purchases of Local Private Line services where a potential competitor exists. Thus, the expansion of territory over which AT&T has market power in the sale of Local Private Lines/Special Access would further enhance AT&T's ability to frustrate any possibility that a lessee of the idle capacity "divestiture assets" could actually use that capacity to develop business. In other words, by expanding AT&T's monopoly territory for Local Private Lines, AT&T is better able to "lock down" (through non-efficiency-related means) business that could potentially have been captured by the lessees of the "divestiture assets."

Second, the BellSouth acquisition will facilitate anticompetitive coordinated behavior between Verizon and AT&T by giving AT&T a larger market area over which to "punish" Verizon's out-of-region (former MCI) unit for "cheating" (by competing too aggressively through lower retail rates, or by providing other competitive carriers with lower cost Local Private Line service in competition with AT&T), and strengthen the incentives and ability for post-merger AT&T and post-merger Verizon to coordinate on prices and terms of competition, and detect and punish cheating. Again, the likelihood of diminished post-merger competition through the creation of these incentives and abilities (to coordinate, and detect and punish "cheating") was the direct result of the first two mergers (SBC/AT&T and Verizon/MCI). However, these incentives and abilities will only be enhanced as the result of the BellSouth acquisition. The consent decrees do nothing to remedy this anticompetitive effect.

## Impact on Essential Access for Wireless Carriers

The BellSouth acquisition will expand the anticompetitive effects in markets described in the Complaint, but not addressed in the PAFJ. Specifically, the Complaint charges that "competition in the provision and sale of voice and data telecommunications services that rely on Local Private Lines in numerous geographic markets would be substantially lessened" as a result of the SBC/AT&T merger. Compl. ¶ 33(b). One service that relies on Local Private Lines for which competition will be appreciably and obviously lessened in every geographic market identified in the Complaint, is retail wireless service. Wireless communications travel wirelessly only for a very short distance (from the radio handset to the antennae at the cell site) relative to the distance over which the calls are typically carried and switched through wireline facilities.

AT&T Wireless (which later merged with Cingular) has succinctly explained this vulnerability of wireless carriers on wireline incumbents:

3

> [Wireless] carriers are major consumers of ILEC[1] special access services. They have no choice. Although wireless services are increasingly viewed as a form of inter-modal competition to wired telephony services, including broadband services, the ironic fact is that wireless networks out of necessity consist largely of wireline facilities. . . . These [facilities] overwhelmingly are made with landline transport facilities purchased from ILEC special access tariffs.

Comments of AT&T Wireless Services, Inc., *In the Matter of AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Service*, RM-10593, 2-3 (FCC Dec. 2, 2002), *available at* http://svartifoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6513389974 (attached as Ex. 2). To be clear just how dependent wireless carriers are on Local Private Lines/Special Access from the Bells, AT&T Wireless noted that 90% of its transport costs go to ILEC special access. *Id.* at 3. Sprint has stated that, for its wireless services, "[t]he single largest network operating cost is [special access]." Comments of Sprint Corp., *In the Matter of Unbundling Obligations of Local Exchange Carriers,* CC Docket Nos. 01-338, 98-147, and 96-98, at 49 (FCC Apr. 5, 2002) *available at* http://svartifoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6513182042 (attached as Ex. 3). More recently, Sprint has noted that even for its highest capacity circuits (for which more competitive alternatives might be expected), it is dependant on the ILECs for well over 80% of its circuits. Comments of Sprint Corp., *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers,* WC Docket No. 05-25, 6-8 (FCC Jun. 13, 2005) *available at* http://svartifoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6517632831 (attached as Ex. 4). Sprint also acknowledged that this high level of dependence on the Bells was mitigated—to the degree it

---

[1] ILEC stands for incumbent local exchange carrier, and it refers to companies (like SBC, Verizon, and BellSouth) that were the historical local monopolies and that, generally, continue to have monopoly shares (well over 80%) of their traditional monopoly markets—like special access.

4

was—by the presence of AT&T and MCI in the market, which Sprint described as its two largest non-ILEC suppliers. *Id.* T-Mobile made similar observations:

> [t]he proposed Verizon-MCI and SBC-AT&T mergers . . . will, if permitted to proceed, result in the two largest ILECs absorbing two of the largest independent providers of special access services. Such increased consolidation will sharpen the competitive problems of the special access marketplace to the detriment of these firms that rely on the ILECs' special access services.

Reply Comments of T-Mobile USA, Inc., *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers*, WC Docket No. 05-25, 2 (FCC Jul. 29, 2005) (internal citations omitted), *available at* http://svartifoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf =pdf&id_document=6518114880 (attached as Ex. 5). Additionally, T-Mobile confirmed that for many types of circuits it must purchase well over 90% of its demand from the ILEC. *Id.* at 5.

Having established that commercial mobile wireless services are the type of "voice and data telecommunications services that rely on Local Private Lines," whether competition for these services is adequately restored by the consent decree is an appropriate concern of the Court in this proceeding. The BellSouth acquisition, in and of itself, increases the likelihood that competition will be reduced in the SBC ILEC metropolitan markets identified in the Complaint, if the proposed remedy is not substantially modified. The reason is that following the BellSouth/AT&T merger, one firm will be the dominant wireless provider in the nation, as well as the dominant wireless input provider throughout a 22-state area.

As a 40% owner of Cingular, if BellSouth had raised rates—in a non-discriminatory way—to all wireless carriers, the BellSouth ILEC may have increased its profits—from special access/local private line sales. However, its majority partner would not have been happy that BellSouth was "cheating" SBC by taking Cingular's profits in the form of special access revenues that went only to BellSouth. Similarly, BellSouth would have felt cheated if SBC did

5

the same thing. Hence, both firms had an incentive to charge Cingular a "normal" and "fair" input price for special access—even if the rates were higher than a competitive market would have produced. Similarly, Cingular—when a 60-40 joint venture—had to have operational (*i.e.*, price-setting) autonomy in order to fulfill its fiduciary duty to shareholders of both owners.

In contrast, a post-merger single owner of both the ILEC input supplier and the downstream mobile wireless carrier would likely have an incentive to raise input prices to Cingular, as well as all of its rivals. By raising its rivals' costs, the merged firm could either collect higher profits through a combination of higher access revenue and higher retail wireless revenue (if the rivals raised their retail rates and Cingular followed), or the merged firm could raise its rivals' costs, not follow their price increase, and simply take profits through increased access revenues and higher market share in the retail market. In the metropolitan markets identified in the Complaint, the acquisition of BellSouth by AT&T will create an incentive and ability to manipulate wholesale input (i.e., Local Private Line) and retail prices for wireless services that did not exist previously. Finally, while the Court has an obligation to consider "the impact of entry of such judgment upon competition in the relevant market or markets" under the Tunney Act Reform, 15 U.S.C. § 16(e)(1)(B), it is clear that the DOJ's PAFJ cannot, and does not attempt to, restore the competition that will be lost in the retail market for wireless voice and data service that relies on Local Private Lines as a result of the intervening transaction. Thus, AT&T's acquisition of BellSouth isolates, and amplifies, the failures of the DOJ's proposed remedy to address the elimination of competition in the markets identified in the Complaint.[2]

---

[2] While these issues will undoubtedly be the subject of DOJ's review of AT&T's proposed BellSouth acquisition, the fact that the acquisition is looming underscores the importance of ensuring that the consent decree in this case provides a meaningful remedy.

## CONCLUSION

For the foregoing reasons, those listed in COMPTEL's Motion, and the intervening transaction that occurred after COMPTEL filed its Reply, the Court should allow COMPTEL to intervene in the proceeding.

Dated: March 8, 2006                                  Respectfully submitted,

/s/ Kevin R. Sullivan
Kevin R. Sullivan (D.C. Bar No.411718)
Peter M. Todaro (D.C. Bar No. 455430)
King & Spalding LLP
1700 Pennsylvania Avenue N.W.
Washington, DC 20006
202-737-0500
202-626-3737 (fax)

Jonathan Lee (D.C. Bar No. 435586)
Sr. Vice President, Regulatory Affairs
COMPTEL
1900 M Street, NW
Suite 800
Washington, D.C. 20036-3508
202-296-6650
202-296-7585 (fax)

*Attorneys for Proposed Intervenor COMPTEL*

7