# EXHIBIT 2

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of ) <br> ) <br> AT&T Corp. ) <br> ) <br> Petition for Rulemaking To Reform ) <br> Regulation Of Incumbent Local Exchange ) <br> Carrier Rates For Interstate Special ) <br> Access Service ) <br> ) | RM No. 10593 |

## COMMENTS OF AT&T WIRELESS SERVICES, INC.

Pursuant to the Commission's Public Notice, AT&T Wireless Services, Inc. ("AWS") hereby files these comments in support of AT&T Corp.'s ("AT&T") petition for a rulemaking to reform regulation of incumbent local exchange carrier rates for interstate special access services ("AT&T Petition").[1/] As a major consumer of incumbent local exchange carrier interstate special access services, AWS has a keen interest in this proceeding. AWS urges the Commission to promptly initiate a rulemaking and expeditiously address the serious issues raised in the AT&T Petition.

### INTRODUCTION

The AT&T Petition presents compelling evidence that incumbent local exchange carriers ("ILECs"), in particular the Bell Operating Companies ("BOCs"), are reaping monopoly profits by charging unjust and unreasonable rates for interstate special access services. Current special access rates, according to the AT&T Petition, allow the BOCs to obtain excessive rates of return,

---

[1/]   Public Notice, *Wireline Competition Bureau Seeks Comment on AT&T's Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, RM No. 10593 (rel. October 29, 2002) ("*Public Notice*").

Comments of AT&T Wireless Services, Inc.
RM No. 10593
December 2, 2002

and effectively impose a tax on consumers of special access services of at least $5 billion annually.[2]

The issues raised by the AT&T Petition are of extreme importance to the wireless industry. Just as special access services are essential inputs for competitive wireline services, special access services are a critical input for the services provided by CMRS carriers such as AWS. The extraction of monopoly rents identified in the petition constitutes an unjustified transfer of wealth from CMRS carriers to the BOCs, and leads to a gross misallocation of scarce resources. To stem these abuses, AWS supports AT&T's request to the Commission to promptly initiate a rulemaking, as well as to provide interim relief by revising special access rates to reflect normal rates of return, to place a moratorium on further pricing flexibility applications, and to vitiate termination penalties that otherwise will preclude special access consumers from availing themselves of the requested relief.

**I.     CMRS Carriers are Captive Consumers of Special Access Services**

CMRS carriers are major consumers of ILEC special access services. They have no choice. Although wireless services are increasingly viewed as a form of inter-modal competition to wired telephony services, including broadband services, the ironic fact is that wireless networks out of necessity consist largely of wireline facilities. As explained in other proceedings, the ubiquitously deployed array of wireless cell sites required to provide CMRS services must all be connected to mobile switching centers.[3] These connections overwhelmingly

---

[2]     *See* AT&T Petition at 8 (showing that the BOCs' rate of return on special access services range from 21.72% to 54.60% -- far in excess of the 11.25% rate of return that the Commission found just and reasonable).

[3]     *See, e.g., Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Comments of AT&T Wireless Services, Inc., at 24-25, filed April 5, 2002 ("AWS Triennial Review Comments"); *Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Comments of VoiceStream Wireless Corporation, at 1-2, filed

Comments of AT&T Wireless Services, Inc.
RM No. 10593
December 2, 2002

are made with landline transport facilities purchased from ILEC special access tariffs. There are few alternatives to the ILECs' ubiquitous transport networks, and the ILECs refuse to provide these facilities as unbundled network elements ("UNEs").[4/] The ILECs have even refused to provide UNEs to *wireline* carriers that need ILEC facilities to provide a source of competitive transport services to CMRS carriers.[5/]

The extent of CMRS carrier reliance on ILEC special access services has been amply explained in comments filed in the ongoing triennial review proceeding and special access performance metrics proceedings.[6/] AWS has previously pointed out, for example, that more than ninety percent (90%) of its transport costs go to paying ILECs for special access services.[7/] Voicestream reported that ninety six percent (96%) of the circuits it uses to connect its mobile switching centers and cell site base stations are provisioned by the ILECs.[8/]

CMRS carrier reliance on ILEC special access services mirrors that of wireline competitors. Competitive local exchange carriers ("CLECs") report similar levels of special

---

April 5, 2002 ("VoiceStream Triennial Review Comments"); *Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Comments of Nextel Communications, Inc, at 2, filed April 5, 2002, ("Nextel Triennial Review Comments"); *Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Comments of Sprint Corporation, at 47-49, filed April 8, 2002 ("Sprint Triennial Review Comments").

[4/]   *Petition for Declaratory Ruling of AT&T Wireless and VoiceStream Wireless Corporation*, CC Docket No. 96-98, (Nov. 19, 2001) ("AWS/VoiceStream UNE Petition").

[5/]   *See, e.g.*, *Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Comments of Progress Telecom Corporation, filed April 5, 2002, at 5 (noting that BellSouth has refused to provide loop and dedicated transport to Progress Telecom for the purpose of connecting Progress Telecom's collocation arrangements with its wireless customers' base stations or cell sites); *Letter to Marlene H. Dortch from Parker Poe, Counsel for DukeNet Communications LLC*, filed in CC Docket Nos. 01-338, 96-98, 98-147, FCC 01-361, October 18, 2002, at 2 ("DukeNet Ex Parte") (explaining that ILECs have refused to provide UNE dark fiber and DS-1 circuits to enable DukeNet to fill out its network and provide route diversity in serving its CMRS customers).

[6/]   *See*, n. 3, *supra*; *see also Performance Measurements and Standards for Interstate Special Access Services*, CC Docket 01-321, Comments of AT&T Wireless Services, Inc., at 4-6, filed Jan. 22, 2002.

[7/]   AWS/VoiceStream UNE Petition at 8.

Comments of AT&T Wireless Services, Inc.
RM No. 10593
December 2, 2002

access use due to the ILECs' refusal to provide access to these facilities as UNEs, and given the lack of alternatives outside the ILECs' networks.[9] The similarity is not surprising. Both CMRS carriers and CLECs rely on the same type of ILEC facilities for the same purposes. Both, for example, require DS-1 level facilities to carry traffic to aggregation points, and DS-1 or higher level transport from such points to their switches. If there is no competitor in an area providing alternative transport options, CMRS carriers have no greater ability to avoid the necessity of having to use ILEC special access services than do the CLECs.

## II.    Special Access Services are A Substantial Cost for CMRS Carriers

Given the extent to which CMRS carriers must rely on special access services, it is not surprising that special access services represent one of the single largest operating costs for CMRS carriers. Indeed Sprint has reported that "[t]he single largest network operating cost of Sprint's mobile wireless division is the purchase of dedicated transport facilities."[10] The wireless industry annually spends hundreds of millions of dollars on ILEC special access services.[11]

To the extent that the special access rates paid by AWS and other CMRS carriers result in supra-competitive profits for the ILECs, as strongly indicated by the AT&T Petition, the CMRS industry is unjustly being required to transfer substantial wealth to incumbent carriers.[12] This

---

[8]    VoiceStream Triennial Review Comments at 15.

[9]    AT&T Petition at 17. AT&T notes, for example, that over 98% of AT&T's *local* services for business customers of DS-1 level or higher is provided over ILEC special access services.

[10]    Sprint Triennial Review Comments at 49.

[11]    AWS alone projected that it would spend $200 to $400 million on special access circuits. *Letter from Douglas Brandon, AT&T Wireless, to Michelle Carey, Common Carrier Bureau*, April 6, 2001 at 4 (projecting AWS special access costs for 2001).

[12]    *See* Petition, Willig/Ordorver Dec. ¶ 46 ("[t]hese rents are an unnecessary transfer of resources to the RBOCs from their customers and, ultimately, from consumers.").

- 4 -

Comments of AT&T Wireless Services, Inc.
RM No. 10593
December 2, 2002

transfer of wealth constitutes a gross misallocation of resources. Amounts paid by the CMRS industry to the ILECs as monopoly profits are unavailable for the enhancement of wireless networks and the more rapid deployment of wireless broadband technologies.

### III. Excessive Special Access Rates Highlight the Need to Provide Access to Unbundled Network Elements

The AT&T Petition points out that ILECs receive excessive returns based on *embedded* ARMIS cost data. When measured against forward-looking economic costs, the ILECs returns are even more egregious. As an estimate of the magnitude of these margins, the AT&T Petition compared special access rates to the cost-based rates for the same facilities when made available as unbundled network elements. The petition shows that special access rates for DS-1 and DS-3 facilities – the very type of facilities that CMRS carriers must obtain – are 100% to 400% higher than UNE rates for the same facilities.

The disparity between special access rates and UNE rates highlights the need to provide CMRS carriers and others dependent on ILEC facilities access to UNEs as contemplated by the 1996 Act. By denying AWS and other carriers access to these facilities at cost-based, forwarding looking economic rates, ILECs condemn its captive customers to paying monopoly rents. The Commission has an opportunity to address this issue in its triennial review proceeding by confirming that CMRS carriers, and the wireline carriers seeking access to UNEs to provide competitive transport alternatives for CMRS carriers, have access to unbundled network elements. To the extent, however, that CMRS carriers must continue to rely on special access services, the Commission must ensure that the ILECs receive no more than a reasonable rate of return.

Comments of AT&T Wireless Services, Inc.
RM No. 10593
December 2, 2002

### IV. Excessive Special Access Rates Force AWS to Enter into Long-Term Commitments that Stifle Competition, And Pricing Flexibility Affords No Relief

The AT&T Petition notes the Commission's concern that ILECs can forestall competition by "locking up" large customers.[13] This is an aspect of the ILECs' special access pricing structure that AWS is all to well aware. In the absence of UNE access, the only ability AWS has to mitigate special access costs is by entering into long-term volume commitments with the ILECs in order to obtain pricing discounts. Typically, such arrangements require AWS to purchase substantial volumes of special access services over three to five years. Onerous penalties attach for failure to meet the volume and term commitments and effectively lock AWS into the ILECs' special access services.

By locking AWS into long-term commitments, the ILECs greatly constrict AWS's ability to avail itself of alternatives that may arise, and create a disincentive to deploy alternatives facilities even where otherwise economically feasible. AWS must constantly weigh the costs of the termination liability when assessing the feasibility of alternatives to ILEC facilities. AWS simply cannot afford to both pay termination liabilities and the costs of deploying alternative facilities. Long term commitments with onerous termination penalties invariably act to delay the deployment of competitive alternatives to ILEC facilities.

Consistent with the discussion of pricing flexibility in the AT&T Petition,[14] AWS has found that pricing flexibility provides no relief from exorbitant special access rates. Indeed, AWS has been unsuccessful in getting any of the BOCs to engage in serious contract negotiations in areas where the BOC has obtained pricing flexibility. Moreover, it has been AWS's experience that the BOCs do not intend to provide pricing flexibility for the existing base

---

[13]   *Id*. at ¶ 60.

of special access serviced tied up under long term commitments. Instead, pricing flexibility will be available only for incremental growth above AWS's current revenue and/or term commitments, and this incremental growth must also be locked into a long term commitment. Even then, the BOCs have proffered only marginal additional savings from existing volume discounts.

## CONCLUSION

The AT&T Petition provides compelling evidence of a market failure of substantial proportions. The possibility that ILECs are extracting monopoly profits from captive consumers requires prompt regulatory review and intervention. AWS thus urges the Commission to launch a rulemaking expeditiously, and, in the meantime, grant the interim relief requested in the AT&T Petition.

Respectfully submitted,

AT&T WIRELESS SERVICES, INC.

/s/

| | |
|---|---|
| Howard J. Symons | Douglas I. Brandon |
| Michael H. Pryor | Vice President – External Affairs |
| Mintz, Levin, Cohn, Ferris, | 1150 Connecticut Avenue, N.W. |
|   Glovsky and Popeo, PC | Suite 400 |
| 701 Pennsylvania Avenue, N.W. | Washington, DC 20036 |
| Suite 900 | (202) 223-9222 |
| Washington, DC 20004 | |
| (202) 434-7300 | |

*Counsel for AT&T Wireless Services, Inc.*

Dated: December 2, 2002

---

14/   AT&T Petition at 32-33.

CERTIFICATE OF SERVICE

I, Michelle S. Cadin, hereby certify that on this 2nd day of December 2002, copies of the foregoing Comments of AT&T Wireless Services, Inc. were sent via electronic mail to the following:

Tamara Preiss
Division Chief
Pricing Policy Division
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, S.W.
Washington, DC 20554
tpreiss@fcc.gov

Qualex
445 12th Street, S.W.
Washington, DC  20554
Qualexint@aol.com

/s/
Michelle S. Cadin

WDC 323519v2