## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | Civil Action No.: 1:05CV02102 (EGS) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| SBC Communications, Inc. and | ) | |
| AT&T Corp., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| The Alliance for Competition in | ) | |
| Telecommunications | ) | |
| 3050 K Street, NW | ) | |
| Fourth Floor | ) | |
| Washington, DC 20007 | ) | |
| (202)342-8400 | ) | |
| | ) | |
| Applicant-*Amicus.* | ) | |

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | Civil Action No.: 1:05CV02103 (EGS) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Verizon Communications Inc. and | ) | |
| MCI, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| The Alliance for Competition in | ) | |
| Telecommunications | ) | |
| 3050 K Street, NW | ) | |
| Fourth Floor | ) | |
| Washington, DC 20007 | ) | |
| (202)342-8400 | ) | |
| | ) | |
| Applicant-*Amicus.* | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ACTEL'S MOTION FOR *AMICUS CURIAE* AND INTERVENOR STATUS PURSUANT TO THE TUNNEY ACT AND IN OPPOSITION TO THE UNITED STATES' MOTION FOR ENTRY OF FINAL JUDGMENTS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION .................................................................................... 1

ARGUMENT ......................................................................................... 5

   I.  ACTel Should Be Permitted to Participate in These Proceedings ...................... 5

  II.  The 2004 Tunney Act Amendments Reject a Strictly Circumscribed
       Role for the Court and Require Consideration of Competition in the Relevant
       Market ...................................................................................... 7

        A.  Early Tunney Act Decisions .......................................................... 8

        B.  The *Microsoft* Decision ............................................................. 11

        C.  The *West* Case ....................................................................... 12

        D.  Antitrust Division Procedures ...................................................... 15

        E.  Tunney Act Amendments ............................................................ 15

  III.  The Government's Proposed Remedy Fails to Meet the Case Law Standards
       Because It Ignores Both the Economic Characteristics of Networked Markets
       and the Results of Empirical Analysis ............................................... 16

        A.  Market Characteristics .............................................................. 16

        B.  Data Sets ............................................................................... 19

        C.  ACTel Comments ..................................................................... 21

          1.  *Only a Subset of "2 to 1" Buildings* ........................................ 21

          2.  *Inclusion of Transport* ........................................................ 22

          3.  *Failure to Remedy the Economic Injury* .................................. 24

CONCLUSION ...................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993) .................26

*Ford Motor Co. v. United States, 405 U.S. 562 (1972) .......................................................3

Maryland v. United States, 460 U.S. 1001 (1983).................................................................6

Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) ...........26

*United States v. AT&T, 552 F. Supp. 131 (D.D.C. 1982)...................................................6

United States v. AT&T Co., 642 F.2d 1285 (D.C. Cir. 1980).............................................7

United States v. Airline Tariff Pub'g Co., 1993 WL. 95486 (D.D.C. 1983) .......................6

*United States v. BNS Inc., 858 F.2d 456 (9th Cir. 1988) ............................................9, 10

United States v. Bechtel Corp., 648 F.2d 660 (9th Cir. 1981)......................................9, 10

United States v. DuPont & Co., 366 U.S. 316 (1961) ..........................................................3

*United States v. Gillette Co., 406 F. Supp. 713 (D Mass. 1975) ................................9, 10,
                                                                                                        11

*United States v. Microsoft, 56 F.3d 1448 (D.C. Cir. 1995)..........................................8, 9,
                                                                                                    10, 12,
                                                                                                       13

United States v. Microsoft Corp., 159 F.R.D. 318 (D.D.C. 1995) ....................................11

United States v. Parson PLC, 55 F. Supp. 2d 43 (D.D.C. 1999) .......................................12

United States v. Thomson Corp., 949 F. Supp. 907 (D.D.C. 1996) ............................6, 12,
                                                                                                      13, 14

United States v. Thomson Corp., 1997 WL. 90992 (D.D.C. Feb. 27, 1997)........................7

*United States v. Western Electric Co., 900 F.2d 283 (D.C. Cir. 1990) ...........................10

*United States v. Western Electric Co., Inc., 993 F.2d 1582 (D.C. Cir. 1993)................11

## STATUTES

15 U.S.C. § 16(f)(3) ...........................................................................................................1, 2,
                                                                                                                        5, 9,
                                                                                                                          27

## INTRODUCTION

Pursuant to 15 U.S.C. § 16(f)(3) of the Tunney Act and Rule 24 of the Federal Rules of Civil Procedure, the Alliance for Competition in Telecommunications ("ACTel") requests *amicus curiae* status in this proceeding for the purposes of opposing the Department of Justice's ("DOJ" or "the Government") Motion for Entry of Final Judgments and providing information to this Court that is crucial to the resolution of that motion and the Court's understanding of the issues it presents. Because of the nature of its participation in the proceedings before the DOJ, ACTel is in a unique position to aid the Court in a comprehensive and accurate understanding of the record available for evaluation of these mergers. ACTel further requests that it be granted intervenor status for the purpose of appealing any judgment by this Court, in the event that this Court grants the DOJ's motion because, without the ability to appeal, ACTel will be unable to protect its substantial interests.[1] In the alternative, ACTel requests leave of court to file an opposition to the United States' Motion for Entry of the Final Judgment

This is an important case. At issue is judicial review of the successful efforts of the two largest local telephone monopolists, SBC[2] and Verizon, aided and abetted by the current administration of the Antitrust Division of the Department of Justice ("Antitrust Division"), to reconstitute as a nationwide local and long distance duopoly what was formerly the Bell System monopoly. A prior conservative Republican administration broke up AT&T, producing both vigorous price competition between the resulting long distance company and the local phone monopolies, as well as enormous innovation in telecommunications – including the Internet

---

[1]     In order to minimize delay and provide the Court with the fullest understanding of the nature and value of ACTel's participation, ACTel incorporates its Opposition to the United States' Motion for Entry of Final Judgment for the Court's consideration upon granting the instant motion to participate.

[2]     To avoid confusion, this memorandum uses the corporate names of the merging parties prior to the acquisitions.

itself. A prior Democratic FCC chairman labeled an acquisition of AT&T by SBC as "unthinkable."[3] But the current Antitrust Division now seeks the blessing of this Court to permit the reconstruction of telecommunication behemoths with market power that will alter the flow of commerce and information for decades to come, long after the departure of this Administration.

No sooner was the ink dry on the Government's stamp of approval for these mergers than SBC signed an agreement to acquire the largest of its remaining competitors, BellSouth[4] and to take full control of the largest cellular company in the country, Cingular, which has the potential to be SBC's largest local competitor. It is evident SBC and Verizon have an insatiable appetite to gain market power over all the wireline and wireless telecommunications "pipes" and then charge customers whatever they wish.

When the software monopolist Microsoft stated its intention to charge a "vigorish" – the slang term for a bookie's or loan shark's cut – on every transaction over the Internet,[5] the Antitrust Division initiated a lawsuit to break up the company. But when SBC and Verizon unabashedly announced the very same goal, this Antitrust Division gave them a free pass – and now comes into this Court to clear the way for the phone companies' power grab.

This case is also important because it is the first contested merger case to reach the courts following the 2004 Congressional amendments to the Tunney Act, in which Republicans and Democrats, Senators and Congressmen, pointedly overruled by legislation a line of authority

---

[3]    *See, e.g.,* Jon Van, *Whitacre restoring AT&T piece by piece,* Chicago Tribune, online edition at <http://www.chicagotribune.com/technology/chi-0603070236mar07,1,4023906.story?coll=chi-business-utl>, March 7, 2006.

[4]    *See, e.g.,* Ken Belson, *Huge Phone Deal Seeks to Thwart Smaller Rivals,* The New York Times, online edition at <http://www.nytimes.com/2006/03/06/business/06phone.html?ex=1299301200&en=0e34f66246637472&ei=5088&partner=rssnyt&emc=rss>, March 6, 2006.

[5]    David Bank, *Microsoft Moves to Rule On-Line Sales,* Wall Street Journal, June 5, 1997 at B 1.

from the District of Columbia Circuit which unduly circumscribed judicial review of DOJ antitrust settlements.[6] The disposition of this case will undoubtedly influence judicial review of forthcoming telecommunications acquisitions and, even beyond that, Tunney Act review of all future consent decrees.

The Government's complaints in these cases identify the relevant market as "Local Private Lines" and claim that the mergers will substantially lessen competition and "would likely increase" prices for Local Private Lines "to levels above those that would prevail absent the merger[s]." Complaints at ¶33. The Government asserts that this Court may not consider, in performing its judicial review, harm to markets other than the ones identified in the Complaints. Accepting *arguendo*, this highly dubious assertion, the sole question this Court must resolve is whether the method chosen by the Government to remedy the harms of higher prices and lessened competition for Local Private Lines – divesting a discrete number of "loops" that connect a very limited set of buildings to exchanges in a handful of cities – meets the Supreme Court's test, that "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'"[7]

To answer this question, the Court need consider but two issues. The first concerns the role of the courts following the 2004 amendments. The Department of Justice claims that the actions of Congress in 2004 do not require changes in either Antitrust Division merger policy or in the scope of Tunney Act merger review. This brief demonstrates that precisely the opposite is correct: the Court is now *required* by Congress to consider specific factors, including

---

[6]     CompTel's Opposition to the United States' Motion for Entry of Judgment contains a lengthy discussion of the effect of this type of Congressional action on cases already decided, and the extent to which such cases should continue to be relied upon. In the interests of brevity, this discussion will not be repeated here.

[7]     *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (*citing United States v. DuPont & Co.*, 366 U.S. 316, 326 (1961) (internal citations omitted).

competition in the relevant market, and is no longer obligated to accept at face value the Government's characterization of the harm in that market.

The second issue goes to the evidence the Government must present to meet its Tunney Act burden. In this case, empirical evidence and economic analysis was provided to the Department of Justice pursuant to compulsory process, demonstrating precisely the injury claimed in the complaints – increased prices for Local Private Lines. This empirical analysis has now been placed before this Court through the declaration of an expert (the immediate past chief economist of the Federal Communications Commission), attached to this memorandum. In the face of this evidence, the issue is whether the Government can continue to rely on an illogical rationale that makes little economic sense to satisfy its burden of proving that its remedy "restores competition." Can the Government continue to assert its rationale purely on its own say-so and without providing the Court either (1) evidence or (2) an expert opinion that is both economically sound and legally sufficient?

This motion and accompanying memorandum are submitted on behalf of the Alliance for Competition in Telecommunications. ACTel members buy Local Private Lines at wholesale from the merging companies. ACTel members then combine these purchased lines with additional facilities, technology, products and services to sell their own value-added telecommunications services, sometimes in competition with the merging companies, to end user business customers. Many of these value-added telecommunication services are directed to small- and medium-sized business customers. ACTel members and their customers are therefore among those the Complaints identify as suffering competitive injury from the transactions, and on whose behalf the Government nominally seeks relief.

4

By this filing, ACTel does not wish to interfere with the orderly and expeditious resolution of the instant case, but rather seeks only two things. First, ACTel desires, if it were to prove necessary, to have standing to appeal or to defend the Court's opinion on appeal. Second, ACTel wishes to be heard directly with respect to the Proposed Final Judgment, and to submit evidence and expert testimony through declaration so that the Court may properly discharge its Tunney Act obligations. ACTel understands from previous filings in this case that the Government does not oppose third party filings. ACTel therefore petitions the Court for participation as *amicus curiae*, and to intervene for the purposes of appeal.

## ARGUMENT

### I.    ACTel Should Be Permitted to Participate in These Proceedings.

ACTel's participation in these proceedings will substantially aid this Court in its understanding of the market and economic issues and implications that will result from these proceedings, as well as the reasons that the Government has not met its obligations under the Tunney Act. Moreover, ACTel's participation is necessary to protect its interests. ACTel requests either participation status pursuant to the Tunney Act and intervenor status for the purpose of appeal, or, in the alternative, for leave to file an opposition to the proposed final judgment pursuant to 15 U.S.C. § 16(f)(3).

The Tunney Act expressly authorizes the Court to permit "full or limited participation in proceedings before the court by interested persons or agencies, including appearance *amicus curiae*, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate," 15 U.S.C. § 16(f)(3), and leave of Court should be granted where "some further, limited participation by [third parties] in the

5

Tunney Act proceedings could serve a useful purpose in assisting the Court with its public interest determination," *United States v. Airline Tariff Pub'g Co.*, 1993 WL 95486 at *1 (D.D.C. 1983).

ACTel is an association of Local Private Line customers that will be significantly harmed if the Court grants the Department of Justice's motion for judgment and who participated extensively in the administrative proceedings below. Exh. 1 (ACTel's Comments to the DOJ). Beyond the interests it has in this case, ACTel's participation in this Tunney Act review would "serve a useful purpose in assisting the Court" since the most crucial question in this case is what the economic and market impact of approval of the mergers will be. ACTel provided to the Government data and empirical analysis, the results of which are most useful to this Court. ACTel is the only entity that can aid the Court's understanding of the economic impact and the evidence previously provided. As such, ACTel should be permitted Tunney Act participation.[8]

This Court should also grant ACTel intervenor status for the purpose of appeal under Fed.R.Civ.P. 24(b). For the reasons, above, ACTel's participation will advance this Court's understanding of the proceedings and the issues before it and certainly involves the same facts and law at issue in the proceedings. Moreover, ACTel's participation will neither delay the proceedings nor prejudice the parties. ACTel neither seeks nor desires any additional discovery but requests only the opportunity to be heard and to submit declarations and evidence to this

---

[8]     *See United States v. Thomson Corp.*, 949 F. Supp. 907, 912 (D.D.C. 1996) (this Court granted a competitor company *amicus* status, while denying full intervention, in order to contest a proposed consent decree with a legal publishing company under the Tunney Act); *Airline Tariff Pub'g Co.*, 1993 WL 95486 at *1 (Court permitted trade association to file responsive briefs and give oral argument during its Tunney Act review of a proposed settlement); *United States v. AT&T*, 552 F. Supp. 131, 219 (D.D.C. 1982), *aff'd mem. sub nom. Maryland v. United States*, 460 U.S. 1001 (1983) (this Court allowed several third parties to present oral argument on the proposed consent decree and granted some third parties full intervenor status to appeal the decree, to participate fully in the review of the parties' plan for divestiture, and to appeal the Court's subsequent decision regarding the divestiture plan).

Court to enable the Court to discharge its Tunney Act obligations and to be permitted to appeal this Court's decision in the event that it is necessary. *United States v. Thomson Corp.*, 1997 WL 90992 *4-5 (D.D.C. Feb. 27, 1997).

Under the circumstances of this case, ACTel's request is timely. ACTel submitted comments to the Government's Proposed Final Judgment in a timely manner. Exh. 1. The Government's Motion to Enter the Proposed Final Judgment was filed on April 5, 2006. This motion has been filed prior to the Court's resolution of the Government's motion and promptly upon the Court's scheduling of CompTel's motion to intervene. *United States v. AT&T Co.*, 642 F.2d 1285, 1294-95 (D.C. Cir. 1980).

**II.    The 2004 Tunney Act Amendments Reject a Strictly Circumscribed Role for the Court and Require Consideration of Competition in the Relevant Market.**

In 2004, Congress amended the Tunney Act and overruled by legislation a line of District of Columbia Circuit authority. The Department of Justice, in both its conduct and argument, makes it seem that Congress intended only that courts no longer use the words "mockery of the judicial function" in their opinions, but otherwise continue to "rubber stamp" Government consent decrees. This is incorrect.

In its Opposition to the DOJ's Motion for Entry of Final Judgments ("Comptel Opposition"), Applicant-Intervenor CompTel attached the complete judicial history of the Tunney Act amendment, and a "markup" of the statutory language showing the changes in the law that Congress made. Repeatedly in the legislative history, Congress made clear its intent that courts conduct a "meaningful" and "independent" review of antitrust consent decrees – an "independent, objective and active determination without deference to the DOJ." *See, e.g.*, 150

7

Cong. Rec. S 3617.[9] The legislative history praised Judge Harold Greene's decision breaking up

AT&T as a correct application of the Tunney Act and specifically criticized a line of D.C. Circuit

authority, starting with the first *Microsoft* decision, *United States v. Microsoft*, 56 F.3d 1448

(D.C. Cir. 1995), on the ground that these latter decisions paid lip service to the appropriate

standard, but otherwise "improperly and strictly circumscribe the role of the trial court and give

it little leeway to fail to approve an antitrust decree."  150 Cong. Rec. S 3617.

The DOJ, by parsing the language of the *Microsoft* opinion to identify those specific

words of the decision it believes were rejected by Congress and those which were not, continues

to place principal reliance on the very decision that was discredited and overruled by Congress.

More instructive for this Court in its judicial review of the proposed settlement is the state of the

law and precedent *prior to* the discredited *Microsoft* decision, as well as the lower courts'

struggle with the application of that decision that led to the amendment of the Tunney Act.

## A.    **Early Tunney Act Decisions**

One of the central purposes underlying the Tunney Act was Congress' desire to impose a

judicial check on the Justice Department's decisions regarding consent decrees.  In the Senate

debate on what would become the Tunney Act, Senator Tunney recited a long series of what he

described as "blatantly inequitable and improper antitrust settlements" entered into by the

Department of Justice.  119 Cong. Rec. S 24598 (daily ed. July 18, 1973).  In one of these cases,

which Senator Tunney described as "perhaps the leading atrocity in the whole litany of antitrust

suits," he noted that the "Supreme Court, in language which some have described as unique for

that body, accused the Antitrust Division of 'knuckling under' to the El Paso Natural Gas Corp."

---

[9]    This memorandum uses a short form for citations to the Congressional Record of the
Tunney Act amendments because the relevant portions of the Congressional Record have been
submitted to this Court in full as an attachment to the CompTel Opposition.

*Id.* In the belief that "these abuses might have been stopped" if the Department's conduct had received greater scrutiny, *id.,* Senator Tunney sought to remedy "the almost mechanistic manner in which some courts have been, in effect, willing to rubber stamp consent decrees." *Id.* To this end, in 1994 Congress passed the Tunney Act, which provided that "[b]efore entering any consent judgment … the court shall determine that the entry of such judgment is in the public interest."[10] Circuit Judge Aldrich, sitting by designation in *United States v. Gillette Co.*, 406 F. Supp. 713 (D Mass. 1975), observed upon reviewing the legislative history of the Act:

> The legislative history shows clearly that Congress did not intend the court's action to be merely pro forma, or to be limited to what appears on the surface. Nor can one overlook the circumstances under which the act was passed, indicating Congress' desire to impose a check not only on the government's expertise – or at least, its exercise of it – but even on its good faith.

*Id.* at 715.

Despite this clear statutory intent, the Department of Justice's submissions in the present case suggest that the Court's review should be circumscribed in ways not supported by either the statute or by the case law preceding the *Microsoft* decision overruled by Congress. First, the Department of Justice claims that this Court should only look at the specific anticompetitive injury the Department identified in the relevant market to determine whether the decree is in the public interest. The law prior to *Microsoft*, however, plainly was otherwise. For example, in *United States v. BNS Inc.*, 858 F.2d 456 (9th Cir. 1988), the court observed that "the statute suggests that a court may, and perhaps should, look beyond the strict relationship between the complaint and remedy in evaluating the public interest." 858 F.2d at 462 (*quoting United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981), *cert. denied,* 454 U.S. 1083 (1981). Indeed,

---

[10]     15 U.S.C. § 16(e).

the Ninth Circuit went even further and emphasized that effects beyond the injury identified in

the complaint can and should be considered:

> [T]he statute clearly indicates that the Court may consider the impact of the
> consent judgment on the public interest, even though that effect may be on an
> unrelated sphere of economic activity. For example, the government's complaint
> might allege a substantial lessening of competition in the marketing of grain in a
> specific area. It would be permissible for the Court to consider the resulting
> increase in the price of bread in related areas.

*Id.* at 463. Prior to the *Microsoft* decision, then, courts were not so strictly limited to the specific

harm that the Department of Justice identified in its complaint. *See e.g., BNS*, 858 F.2d at 462;

*Gillette*, 406 F. Supp. at 715.

The Department of Justice's prior submissions to this Court have also emphasized that, in

assessing whether a decree is in the "public interest" under Section 16(e) of the Tunney Act, the

Court should not "determine whether the resulting array of rights and liberties is the one that will

best serve society, but only to confirm that the resulting settlement is within the reaches of the

public interest." *United States v. Western Electric Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990), *cert.*

*denied,* 498 U.S. 911 (1990). The "reaches of the public interest" standard was specifically

criticized in the legislative history of the 2004 amendments. *See* 150 Cong. Rec. S 3617. But

even under this standard, the Department of Justice's further assertion – that the submissions

already made by the Department are sufficient to satisfy this standard – is simply without

foundation.

A comparison of the cases that employed the "reaches of the public interest" test prior to

*Microsoft* with the information provided here highlights just how far short the Department has

fallen in providing this Court with an adequate record upon which to act. For example, in

finding that there was a sufficient "factual foundation for the judgment call made by the

Department of Justice and to make its conclusion reasonable," the Court of Appeals in *Western*

*Electric* expressly pointed to the "array of prominent economists (including two Nobel laureates, Stigler and Arrow)" who had submitted affidavits in the record that supported the Department's position. *United States v. Western Electric Co., Inc.* 993 F. 2d 1582 (D.C. Cir. 1993). These affidavits provided detailed support for the factual predicates underlying the Department's proposal, including the view that the Bell operating companies would not be able to discriminate or engage in cross-subsidization; that government oversight would be effective in regulating their behavior; and that the proposal would enhance competition in the relevant markets. *Id. at* 1578-82. Similarly, in *Gillette*, which first formulated the "reaches of the public interest standard," *see* 406 F.Supp. at 716, Judge Aldrich concluded that he was able to make an independent determination regarding the adequacy of the proposed decree because "the record [in the case] is both open and exhaustive." *Id.* at 715. Here, the record is neither.

**B.    The *Microsoft* Decision**

In 1995, Judge Stanley Sporkin applied these precedents to the Department of Justice's first consent decree with Microsoft Corp. Following extensive briefing and a contentious hearing, Judge Sporkin rejected the settlement proposed by the Department of Justice primarily on the ground that "[t]he parties did not create the necessary record to enable the Court to make its public interest determination." *United States v. Microsoft Corp.*, 159 F.R.D. 318, 322 (D.D.C. 1995). In addition, Judge Sporkin found the decree on its face to be too narrow. "The proposed decree, without going further, is not in the public interest because it does not meet the test of an antitrust remedy." *Id.* at 334.

The Department of Justice took an emergency appeal to the District of Columbia Circuit and that court reversed Judge Sporkin, recused him from the case, and *directed* the new judge to enter the decree. The Court of Appeals opinion limited substantive Tunney Act review to the

question of whether the remedies sought are "so inconsonant with the allegations charged as to fall outside of the reaches of the public interest." Under the opinion, only if the proposed decree would "make a mockery of the judicial function" is the district court permitted to reject it. *See United States v. Microsoft Corp.,* 56 F.3d 1448, 1461-62 (D.C. Cir. 1995).

In the intervening years between the *Microsoft* decision and the amendment to the Tunney Act, the lower courts in the District of Columbia Circuit tried faithfully to apply the Court of Appeals test, causing one district court to lament that appellate decisions "have made it clear that the public interest inquiry authorized by the Tunney Act is so limited in scope as to be very nearly a ministerial act." *United States v. Parson PLC*, 55 F.Supp.2d 43, 45 (D.D.C. 1999).

## C.    The *West* Case

Of particular import during this period was the district court's decision to approve the antitrust settlement that permitted the Thomson Corp., then the nation's second largest legal publisher, to acquire its largest competitor and the nation's largest legal publisher, West Publishing Co. *United States v. Thomson Corp. and West Publishing Co.*, 949 F.Supp. 907 (D.D.C. 1996). This is the case on which AT&T places principal reliance in seeking to preclude CompTel's participation as an intervenor. It is also the case most similar to the one now before this Court – particularly as to the efficacy of the proposed remedy. There, as here, the greatest concern was that the acquisition would put the two principal competing systems (here, the competing local networks) under common ownership. There, as here, counsel for the merging companies argued for piecemeal divestiture of individual properties, rather than something more substantial.

12

Thomson and West were the dominant players in many sectors of the market for legal research materials.[11] The announcement of the acquisition precipitated an enormous outcry from customers of the merging companies and from the press. Critics predicted that the merger would result in higher prices because of diminished price and innovation competition. But Thomson's lawyers convinced the Department of Justice to focus its investigation on "minute analysis of the market for particular books" rather than on either "the clout the merged company would gain because it would be the primary supplier to most lawyers" or "the possibility [the merged company] would control so many important works that no competitor would be able to offer fully integrated products."[12]

Having adopted the merging companies' view of market analysis and competitive effects, the Department of Justice acceded to Thomson's proposed remedy – a divestiture of piecemeal properties, rather than a comprehensive set of properties in the form of an ongoing business that could be used in the marketplace to actually produce competitive benefits. The result, in terms of antitrust enforcement, was a fiasco. *See e.g.*, John E. Morris, *How the West Was Won*, The American Lawyer, September 1996.

Several parties opposed entry of the consent decree at the district court's Tunney Act hearing. Although clearly troubled by the facts before it, the district court ultimately approved the proposed settlement. *Thomson Corp.,* 949 F.Supp. 907. Repeatedly citing to the Court of Appeals' *Microsoft* decision, now overruled by Congress, the district court held that

> [t]he government concluded that the divestiture products will remain viable and that their divestiture is sufficient to cure the anticompetitive effects of the merger

---

[11]    *See* John E. Morris, *How the West Was Won*, The American Lawyer, September 1996 at 73.

[12]    *Id.*

in the relevant markets for such products. It is not the court's role to second-guess these factual and reasoned predictive findings.[13]

The court reached its conclusion over objections that characterized the settlement as "a failure" – anticompetitive, ill-conceived, and against the public interest. One law professor branded the proposed settlement "only a charade that pretends to exercise the Department's role in protecting the consumer."[14]

Following the district court's decision, all divested properties were sold and no appeal was ever taken of the district court's decision. The American Lawyer characterized the settlement process as "microanalysis of competition" in which the government became "obsessed with competing seedlings and overlooked how the giants of the forest can block out the light," attributing this result to the action of Thomson's lawyers in "deftly maneuvering the merger through the government review process."[15] The consent decree was entered as a final judgment on March 7, 1997. The following months were filled with published press reports claiming that the owner of West had pledged a substantial contribution to the reelection of the party then in power just before the Department of Justice cleared the deal in June 1996 and delivered the money right after the DOJ's public announcement.[16] Even the most prestigious legal publications then joined in the criticism.[17] In the years following the consummation of the

---

[13]     *Thomson Corp.*, 949 F. Supp. at 918.

[14]     Thomas Scheffley, *Showdown at the Altar*, Connecticut Law Tribune, Sept. 16, 1996 at 1 (Decl. of Professor Mary Brandt-Jensen).

[15]     Morris, *supra*, at 73.

[16]     *See., e.g.,* Brooks Jackson, *Moving Money Through States Capitals*, CNN, April 11, 1997; http://www.cnn.com/ALLPOLITICS/1997/04/11/jackson/; Viveca Novak and Michael Weisskopf, *The Cheerful Giver*, Time Magazine, April 21, 1997; http://www.cnn.com/ALLPOLITICS/1997/04/14/time/novak.html>.

[17]     *See, e.g.,* Mark Hansen, *A Question of Influence*, 83 American Bar Assn. Journal 36, June 1997.

acquisition, prices to customers rose dramatically, just as critics predicted, producing further criticism of the Division's decision.[18]

### D.     Antitrust Division Procedures

During the period before the Tunney Act amendments the Antitrust Division changed its procedures to permit merging companies to close transactions subject to consent decree prior to court clearance.  This further eroded the integrity of the judicial role, reducing Tunney Act review from "very nearly a ministerial act" in the words of Judge Robertson, to very nearly a *meaningless* ministerial act.

### E.     Tunney Act Amendments

In 2004, Congress stepped in, amending the Tunney Act to require consideration of a list of specific factors, and reaffirmed the role of the judiciary in antitrust settlements.  The Department of Justice apparently believes the actions of Congress stand for nothing and can be readily ignored.  The DOJ continues to cite the very same pre-2004 court decisions in support of its position, notwithstanding the fact that those decisions were specifically criticized and overruled by Congress.

Nor has the Department of Justice changed any of its procedures in light of the actions of Congress.  Prior to the 2004 amendments, the Antitrust Division permitted merging companies to close their transactions prior to Tunney Act review.  In this highly controversial case, long after

---

[18]     *See, e.g.,* Susan M. Ryan, *Cost Inflation by Page Reductions,* 14 The Bottom Line: Managing Library Finances, No. 1, at pp. 6-11 (2001); Douglas McCollam, *Volumes Are Giving Way to Velocity,* 25 National Law Journal, No. 43, at S1 (July 14, 2003).

the 2004 Amendments, the Department permitted the merging parties to close their transaction prior to even publishing notice of the Proposed Final Judgment in the Federal Register.[19]

According to the legislative history of the 2004 Amendments, Congress intends that the District Court engage in an "independent, objective, and active determination [of the public interest] without deference to the DOJ." 150 Cong. Rec. S 3617. Perhaps the Department of Justice might explain to this Court how it intends to proceed should the Court determine that the settlement is not in the public interest. Does the DOJ intend to simply ignore this Court as it has ignored Congress?

The Department has certainly ignored the statutory language of the 2004 Amendments. The Tunney Act does not limit judicial review to a particular injury within the relevant market. On the contrary, the amended language of the statute *requires* the District Court to consider "the impact of the entry of [the] judgment upon *competition in the relevant market or markets* ... " (amended language italicized).

The question in this case is how this Court can possibly make the determination required by Congress on the record before it. The Department of Justice has not supplied this Court with the affidavit of *any* economist, or for that matter anyone else, that would provide a factual predicate for any of the matters the Court must decide in reviewing the adequacy of the proposed decree. The DOJ has provided no factual basis (other than its own say-so) for believing that the remedies proposed in the decree would be sufficient "to restore competition" in the relevant market. Worse yet, the Department of Justice appears to have ignored the Supreme Court's requirement that antitrust claims make economic sense and resorted to rudimentary structural

---

[19]    SBC and AT&T closed their merger on November 19, 2005, and the Federal Register notice was published on December 15, 2005.

analysis to defend its position, in the face of hard empirical evidence that demonstrates continuing harm.

III.  **The Government's Proposed Remedy Fails to Meet the Case Law Standards Because It Ignores Both the Economic Characteristics of Networked Markets and the Results of Empirical Analysis.**

A.  **Market Characteristics**

The Department of Justice's filings have provided this Court with virtually no information about the structure, additional competitors, or the competitive dynamics of the affected markets which would enable the Court to evaluate the proposed remedy. ACTel provided a brief description of these matters in its comments to the Proposed Judgment; the DOJ has filed these comments in this Court. Additional relevant description is found in the Wilkie Declaration, attached to this memorandum. The most important facts are summarized below.

The products at issue here are basically circuits that connect buildings to carrier exchanges. These circuits are known as "Local Private Lines," which the Government sometimes refers to as "special access." Basically, the competitive entry in the special access markets arose in response to the high monopoly prices charged by the Bell operating companies for circuits. Other, smaller phone companies began to build their own facilities – that is, to create their own networks – in order to compete with SBC and Verizon in the provision of Local Private Lines to customers. By far the largest networks competing against SBC and Verizon were those created, owned and operated by AT&T and MCI. As competition intensified, AT&T and MCI also began to lease lines from SBC and Verizon, and offer those leased lines to customers in combination with their own facilities.[20]

---

[20]    SBC and Verizon have asserted that they offer circuits to other carriers at the same rates offered to AT&T and MCI, but the customer databases indicate that only AT&T and MCI make substantial use of lines leased by SBC and Verizon in their own customer offerings.

ACTel members are customers for (that is, purchasers of) Local Private Lines. When a customer wants to purchase (more correctly, lease) a particular Local Private Line circuit, the customer frequently solicits bids from all carriers willing to supply that particular circuit. Customers generally keep records in large databases each time they solicit offers from suppliers. Prior to the acquisition at issue here, competition among suppliers was intense, producing prices far below the monopoly prices offered by SBC and Verizon. The most frequent bidders to supply circuits to customers, and the bidders that offered the lowest prices, were invariably AT&T and MCI. *See* Exh. 2 (Samuel J. Wilkie Dec. at ¶ 5).

The circuits at issue, Local Private Lines, are parts of supplier networks. This means, in antitrust parlance, that the markets at issue are "networked markets." The Antitrust Division has a great deal of experience with the competition characteristics of networked markets, having policed both the phone industry and the desktop software industry for antitrust violations. But the Antitrust Division has provided none of this learning to the Court.

The simple fact that Local Private Lines are parts of networked markets exposes fundamental fallacies in the Government's proposed remedy. The price at which a network supplier, AT&T for example, offers a particular circuit is *not* merely a function of whether the supplier has that particular circuit in its network. If that were the only factor, all suppliers of a particular circuit would offer that circuit at the same price. Rather, the price at which a particular circuit can be offered is a function of, among other things, the size and quality of the rest of the supplier's network, the overall customer traffic on the supplier's network, etc. *See* Exh. 2 at ¶ 11. Given that AT&T and MCI were the largest and most formidable competitors to SBC and Verizon, it is logical that they could, and did, offer more circuits at lower prices than did other suppliers. *See id.* at ¶ 5.

The Government simply ignored this economic reality and resorted instead to the same type of "microanalysis of competition" that was harshly criticized in the West-Thomson merger. The Department's remedy assumes that if a circuit previously owned by AT&T is divested in a "2 to 1" loop situation to a supplier with a smaller network, the circuit will still be offered for sale at the same low price at which AT&T previously offered the circuit. This defies both common sense and the factual record. A few divested AT&T circuits attached to some other network will be offered (if at all) at a higher price because of the scale and economics of the acquirer's overall network. *See id.* at ¶ 11.

The proposed remedy also assumes that eliminating AT&T and MCI as competing suppliers for all other loop and transport circuits on which there are at least two other suppliers will have no effect on customer prices. Again, this defies both the record and common sense. The presence of competition provided by AT&T and MCI is what drives all bids prices lower. *See id.* at ¶ 5. Eliminating AT&T and MCI will increase prices, even if there are two smaller and less formidable competitors continuing to offer the same circuit that AT&T or MCI formerly offered. *See id.* at ¶ 11.

**B.    Data Sets**

Pursuant to compulsory process, extensive and detailed customer databases were supplied to the Department of Justice during its investigation of the proposed mergers. Over 20 different bid databases that contained more than 6,000 entries were submitted from a number of companies. ACTel retained a well-known economist, Dr. Simon Wilkie, the former chief economist of the Federal Communications Commission, to evaluate the data and information that customers supplied to the Government. Dr. Wilkie conducted an extensive evaluation of the data using standard statistical and economic techniques, and provided his results to the Department of

Justice, again pursuant to compulsory process. The examination and evaluation of the data consumed over 3,000 hours of work by economic professionals. *See id.* at ¶ 4.

The Department of Justice retained a widely recognized economist, Dr. Michael Katz, a former chief economist of the Antitrust Division, as well as the economic consulting firm of Charles River Associates, to assist in the investigation. Charles River Associates' personnel, as well as Government attorneys and staff economists, received Dr. Wilkie's findings and began the process of auditing the data and interviewing company personnel from the companies, but these efforts were abruptly terminated before even a single company's data was fully checked.[21]

The results of the evaluation are summarized in the attached declaration. Exh. 2. Basically, throughout all the databases, MCI and AT&T were the most frequent and most price-aggressive suppliers. Furthermore, standard statistical analysis revealed that the greater the number of suppliers for (that is, the more bidders supplying) a given Local Private Line circuit, up to four or five suppliers, the lower the price the customer had to pay. And, finally, the evaluation revealed that the elimination of AT&T and MCI as suppliers could be predicted with statistical rigor to result in dramatic price increases for all types of Local Private Line circuits, going well beyond "2 to 1" loop situations. *See id.* at ¶¶ 5-7.

ACTel therefore urged the Department of Justice to require, if the acquisitions were approved at all, substantial divestitures of all overlapping assets, along with customers and employees, for all affected geographic regions. Exh. 1. This would have been roughly comparable to what would have been imposed in the proposed Qwest/Allegiance merger previously brought to the Court's attention by CompTel. Such a divestiture would have enabled companies acquiring divested assets, employees and customers to compete with the same vigor

---

[21]    The FCC, for its part, did not even seek access to the material and made its decision without reviewing the material at all.

as AT&T and MCI.  But the Antitrust Division required only the divestiture of loop leases ("IRUs") for a small number of buildings.  Once the Government published its Proposed Final Judgment, ACTel timely filed comments, to which the Government has responded in its papers seeking entry of the Proposed Judgment.  *See* Exh. 1; *United States' Response to Public Comments*, Case. Nos. 05-02101(EGS) and 05-02103(EGS), filed March 21, 2006 (D.D.C.) (hereinafter "Government's Response").

### C.    ACTel Comments

ACTel filed three comments on the Proposed Final Judgment, two of which were largely administrative.

#### 1.    *Only a Subset of "2 to 1" Buildings*

First, ACTel argued that the Proposed Final Judgment was at best ambiguous in that it did not appear to cover all "2 to 1" buildings.  Exh. 1 at 12-15.  Rather, it appeared that the Government attorneys subtracted from the list of all "2 to 1" buildings those buildings for which AT&T's economic expert argued that other competitive suppliers might build their own loops in the future.  This is known as an "ease of entry" defense.  ACTel noted how the Government's complaint and Competitive Impact Statement appeared to repeatedly preclude consideration of such "entry" analysis.  ACTel's comment called for a candid disclosure of how the list of "2 to 1" buildings was prepared.

The Government has responded that there was no ambiguity; the Government claims never to have intended to effect a remedy for *all* "2 to 1" buildings but only certain ones. Government's Response at 16-26.  We leave to the Court the determination as to whether the Government candidly disclosed this fact in its initial filings.

What is now clear is that the Government's proposed remedy covers only a fraction of the affected buildings – not even all "2 to 1" buildings – surely a "microanalysis of competition." Beyond that, the Government's response to ACTel simply invites cynicism. Although the Government explains the steps it claims were taken to develop the list of "2 to 1" buildings, the Government's methodology bears more than a striking resemblance to the analysis prepared by AT&T's economic expert in the Federal Communications Commission proceedings.[22] Perhaps the Government found AT&T's expert particularly convincing. More likely, the Government decided to just take what the merging companies were offering, including the omissions in their analysis. Taking what is offered by companies under investigation was listed by Senator Tunney as one of the hallmarks of "knuckling under."

In any event, the Government offers no expert economic testimony from Dr. Katz or any other economist to support its contention that entry at some of the "2 to 1" sites would be so simple as to preclude the need for remedial relief. *See generally* Government's Response. Apparently the Government expects the Court to just take its word for the viability of an "entry" defense at many of the "2 to 1" buildings.

### 2. *Inclusion of Transport*

Second, ACTel argued that the proposed remedy did not even eliminate all potential "2 to 1" choke points because the remedy addressed only loop and not transport circuits that connect loops to exchanges. Exh. 1 at 16-21. The ACTel comments explained that remedying

---

[22]    *See* Reply Declaration of Dennis W. Carlton and Hal S. Sider, May 9, 2005, as an attachment to the Joint Opposition of SBC Communications Inc. and AT&T Corp. To Petitions to Deny and Reply Comments, filed *In the Matter of Applications for Consent to Transfer of Control of Licenses and Section 214 Authorizations from AT&T Corp., Transferor, to SBC Communications Inc., Transferee,* WC Docket No. 05-65, Federal Communications Commission, May 9, 2005, at ¶¶ 15-48 (hereinafter sometimes "Carlton Dec.").

"2 to 1" loop choke points is ineffective without remedying transport choke points at the same time.

The Government has replied variously (1) that relief as to transport is beyond the scope of the harm set forth in the complaint; (2) that there is no harm with respect to transport choke points because maps show plenty of fiber deployed by other providers in the ground, albeit not with respect to the particular circuits under consideration; and (3) that the remedy did in fact include "2 to 1" transport choke points. Government Response at 15-26. The Government's first two responses are specious; only the third merits consideration, and it is set forth in what can best be described as a vaguely worded footnote in the Government brief. *See* Government's Response at 15, n. 32. Basically, the Government's footnote claims to have identified Bell central offices which manifest "2 to 1" transport characteristics, deleted those offices for which entry was likely (again without expert explanation or verification), and included the remaining two SBC offices and three Verizon offices in the building list for which divestiture was required. *Id.*

What is most suspicious about this response is that it is contradicted by the filings of the merging companies in the Federal Communications Commission. In the Commission, for example, SBC admitted that there were scores of wire centers – not just two – in which AT&T was SBC's only competition.[23] These suspicions are heightened by the fact that the FCC has no way, from public documents, to determine which carriers are connected to specific transport circuits to and from a particular wire center. The Commission records can only provide a list of competitors that reside in a wire center as a collocator. As AT&T's expert has publicly

---

[23] *See* letter from Gary L. Phillips of SBC to Ms. Marlene Dortch of the FCC filed as an *ex parte* communication on August 12, 2005, *In the Matter of Applications for Consent to Transfer of Control of Licenses and Section 214 Authorizations from AT&T Corp., Transferor, to SBC Communications Inc., Transferee,* WC Docket No. 05-65, Federal Communications Commission.

conceded, this information does not necessarily indicate ownership of transport circuits in competition with SBC.[24]

Here again, the Government provides no evidence, nor any explanation, to indicate how it determined which carriers were "connected" to central offices. Yet again, the Government provides no expert declaration in support of whatever undisclosed "entry" analysis it performed. Most assuredly, the Government would do well to point out where in the published building lists the five central offices are specified, so that interested parties can make their own determinations as to accuracy.

### 3. *Failure to Remedy the Economic Injury*

ACTel's principal comment and the principal basis for its opposition to entry of the Proposed Judgment is that the Government's remedy, eliminating certain "2 to 1 loop" situations, Exh. 1 at 21-26, cannot logically or factually "eliminate the anticompetitive effects of the acquisition of Local Private Lines," the claim made in the Competitive Impact Statement, *see* Fed. Reg. at 74348. During the Government investigation, customers presented data that conclusively demonstrated severe economic injury going well beyond "2 to 1" loop situations. That evidence, and the rational economic conclusions to be drawn from it, have been placed before this Court through Dr. Wilkie's Declaration. Exh. 2.

The customer data entries analyzed by Dr. Wilkie are facts – ordinary course business records. *Id.* Dr. Wilkie's conclusions are based on empirical analysis of those facts. He rests his conclusions on what actually happened in the market, not on what might be inferred by some economic theory from market structure variables like market share or number of competitors.

---

[24] *See* Carlton Dec. ¶ 54.

In response to this expert analysis of customer data showing massive price increases for both loop and transport, throughout the entire market for Local Private Lines, the Government raises only "considerations relating to market structure." Government Response at 24. Empirical analysis of hard evidence projects price increases for "3 to 2" and "4 to 3" loop and transport situations and many other situations throughout the relevant market, but the best the Government can offer in response is:

> [L]argely because the merging firms were not especially close substitutes, the evidence did not support a finding of likely unilateral anticompetitive effects in these buildings.

*Id.*

This is simply obfuscation. On this record, neither ACTel nor the Court should have any interest in "unilateral effects analysis" in particular buildings. (For the benefit of the Court, a "unilateral effects analysis" is an econometric method of projecting market performance based on structural variables like market share.) Every economist worth his salt – and every antitrust lawyer, as well – knows that inferences drawn from rudimentary structural analysis cannot overcome empirical analysis of actual events. Former officials of both the Antitrust Division and the Federal Trade Commission have criticized the use of structural analysis when better data is available.[25] Perhaps structural analysis has some role when data is not available and empirical analysis cannot be performed. But it is hard to imagine any credible economist suggesting that a rudimentary structural analysis is more reliable than actual bidding data.

---

[25]    *See, e.g.,* Abbot B. Lipsky, Jr., *Antitrust Economics*, 12 Geo. Mason L. Rev. 163 (2003); Timothy J. Muris, *Improving the Economic Foundations of Competition Policy*, George Mason Law Review Winter Symposium, January 15, 2003.

In any event, the Supreme Court has repeatedly stated that antitrust cases must make economic sense to be cognizable by courts.[26] The Government's remedy fails this test. The Government neither explains nor considers the economic effects of network competition in its remedy. The Government shows little regard for either data in the record or the empirical analysis of that data. The Government meets empirical results with theoretical economic inferences drawn from rudimentary structural analysis. In short, its remedy defies both logic and economics and is contracted by the record itself.

Customers, market analysts, and observers from the press expect the proposed transactions to raise prices for Local Private Lines. If the Government does not believe this will occur, Dr. Katz, or some other neutral economic expert should say so unequivocally, and without resort to confusing economic references or "weasel words." The Government's expert needs to provide a straightforward explanation of all the facts in the record, including data and empirical analysis, together with an unequivocal declaration that the proposed remedy will restore competition in the market for Local Private Lines to the levels that existed prior to the acquisitions – and, in particular, the Government's expert should clearly state that "4 to 3" and "3 to 2" loop and transport situations identified in the customer data do not produce economic injury.

ACTel does not believe the Government's expert can truthfully make such claims. The most any credible economist could say about the Government's remedy is that it may ameliorate to some extent – however minor – the economic harm caused by the acquisitions. On this point, the issue will be joined. The proposed remedy will not even prevent price increases on "2 to 1" loop buildings. The Tunney Act is not satisfied by a remedy that cures such a small and

---

[26]     *See, e.g., Matsushita Electric Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).

insignificant percentage of the injury caused by the transactions.  The Government has not shown that the Proposed Judgment is in the public interest and its motion should be denied.

## CONCLUSION

For the foregoing reasons, the Court should grant ACTel's request for *amicus curiae* status pursuant to the Tunney Act to participate in these proceedings for the purposes of opposing the Government's Motion for Entry of Final Judgment and grant ACTel intervenor status for the purposes of filing an appeal. In the alternative, ACTel should be granted leave to file this opposition to the Government's Motion for the Entry of Judgment pursuant to 15 U.S.C. § 16(f)(3).  The Court should further consider ACTel's Opposition to the Government's Motion for Entry of Judgment and deny the Government's motion.

May 4, 2006

By: ⟨signature⟩

Gary Reback (Bar No. 218594)
Carr & Ferrell LLP
200 Geng Road
Palo Alto, CA  94303
50-812-3489 (phone)
50-812-3444 (facsimile)
greback@carrferrell.com

Thomas Cohen (Bar No. 269332)
3050 K Street, NW, Suite 400
Washington, DC  20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
tcohen@kelleydrye.com

*Attorneys for the Alliance for
Competition in Telecommunications*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of May 2006, true and correct copies of foregoing Motion for *Amicus Curiae* and Intervenor Status Pursuant to the Tunney Act, Memorandum of Point and Authorities in Support and Proposed Order were filed with the Court and sent by U.S. Mail to the following:

*Attorneys for Plaintiff*

Laury E. Bobbish, Assistant Chief
Telecommunications & Media
Enforcement Section – Antitrust Division
U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530

Lawrence M. Frankel, Attorney
Telecommunications & Media
Enforcement Section – Antitrust Division
U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530

*Attorneys for Verizon Communications, Inc.*

John Thorne
Verizon Communications, Inc.
1515 North Courthouse Road
Arlington, Virginia 22201

*Attorneys for MCI, Inc.*

Paul M. Eskildsen
MCI, Inc.
22001 Loudoun County Parkway
Ashburn, Virginia 20147

*Attorneys for SBC Communications*

Wm. Randolph Smith
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Richard L. Rosen
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

James D. Ellis
Wayne Watts
SBC Communications Inc.
175 East Houston Street
San Antonio, Texas 78205

*Attorneys for AT&T Corp.*

Ilene Knable Gotts
Wachtell, Lipton Rosen & Katz
51 West 52nd Street
New York, New York 10019

David L. Lawson
David W. Carpenter
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005

James W. Cicconi
Lawrence J. Lafaro
AT&T Corp.
One AT&T Way
Bedminster, New Jersey 07921

Barbara A. Miller