# EXHIBIT 1

Comments Regarding the
Proposed Consent Decrees
in
United States v.
SBC Communications, Inc. and AT&T Corp.
(Civil Case No. 05-2102)
and
United States v.
Verizon Communications, Inc.  and MCI, Inc.
(Civil Case No. 05-2103)

_____

**Submitted on behalf of the
Alliance for Competition in Telecommunications
(ACTel)**

_____

Thomas Cohen                                         Gary L. Reback
Executive Director                                    Carr & Ferrell *LLP*
Alliance for Competition in Telecommunications

On December 15, 2005, the Department of Justice published in the Federal Register the Proposed Final Judgments resolving virtually identical Complaints filed by the United States to enjoin the acquisition of AT&T Corp. by SBC Communications Inc., and the acquisition of MCI, Inc. by Verizon Communications, Inc. The respective Complaints characterize the former acquisition as creating "the nation's largest provider of telecommunications services," and the latter transaction as creating "one of the nation's largest providers of telecommunications services." Complaints at ¶1. Among all of the overlaps and increases of concentration in telecommunications products, services and assets that the transactions produce, and notwithstanding the complaints and protests of consumer and business customers at both the state and Federal level, the Department of Justice's challenge to the proposed transaction is limited to the effect of a single duplicative product offering.

Specifically, the Complaints seek to enjoin both transactions, because they "will substantially lessen competition" in the provision and sale of "Local Private Lines" (also known as "special access") to the wholesale market as well as voice and data services that rely on Local Private Lines, with the likely result that prices for the Lines and services using those Lines will increase "to levels above that which would prevail absent the merger(s)." Complaints ¶¶1, 25, 33. The Complaints indicate that, absent relief, competition will be diminished and prices will rise for both wholesale and retail "Local Private Line" customers. Complaints ¶25.

These comments are directed to both cases and are timely submitted pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. §16(b)-(e) (known as the "Tunney Act"), on behalf of the Alliance for Competition in Telecommunications ("ACTel").

ACTel members include both competitive local exchange carriers ("CLECs") and interexchange carriers ("IXCs") that buy Local Private Lines[1] at wholesale from the merging companies. ACTel members combine these purchased lines with additional facilities, technology, products and services to sell their own value-added telecommunications services, sometimes in competition with the merging companies, to end user business customers. Many of these value-added telecommunications services are directed to small and medium-sized business customers. These facts are described in the Complaints at ¶¶14, 23.

ACTel members and their customers are therefore among those that the Complaints identify as suffering competitive injury from the transactions, and on whose behalf the Government seeks relief. ACTel agrees that the harm alleged in the Complaints is accurate, demonstrable, and unless adequately remedied, ruinous. Indeed, ACTel members, in compliance with Department of Justice compulsory process, produced documents and information revealing that the proposed transactions can be expected to increase the cost of Local Private Lines from 20% to 500% depending on the metropolitan area and type of circuit being purchased – if the merged parties even continue to sell Local Private Lines to ACTel members at all after the acquisitions.

But while the Complaints correctly identify the competitive harm produced by the transaction, the remedy in the Proposed Final Judgments fails even the most deferential standard for Tunney Acts review. The remedy does not prevent the elimination of competition for Local Private Lines (the injury charged in the Complaints) because, among other things, the remedy set forth in the Proposed Judgments, unlike the injury charged in

---

[1] Actually the Lines are leased, but because the Complaint uses terminology of sale, these comments do, as well.

the Complaints, addresses only the part of the Private Line that connects to a building, not

the part of the Private Line that connects to a carrier's network.  Hence, reviewing the

remedy "in relationship to the violations that the United States has alleged in its

Complaint(s),"[2] and deferring to the Government to whatever extent is required by law, the

remedy does not, and cannot logically, ameliorate the harm alleged in the Complaints.

The judicial review of the Government's settlements in these cases will constitute

the first significant application of the Tunney Act since Congress amended that statute in

2004.  The Congressional amendments specifically overruled District of Columbia Circuit

Court of Appeals and District Court precedent that was deemed overly deferential to

Antitrust Division consent decrees.[3]  In response to those decisions, Congress reemphasized

its intention that courts reviewing consent decrees "make an independent, objective, and

active determination without deference to the DOJ."[4]  Courts are to provide an "independent

safeguard" against "inadequate settlements."[5]  Specifically, the Act was amended to compel

reviewing courts to consider both "ambiguity" in the terms of the proposed remedy, as well

as the "impact" of the proposed settlements on "competitors in the relevant market or

---

[2] This is the standard the Government claims is appropriate for Tunney Act review. See Fed. Reg. at 74350. However, given that Congress amended the Tunney Act to overrule District of Columbia Circuit Court of Appeals and District Court precedent that was overly deferential to Antitrust Division consent decrees, it would make a mockery of the legislation to impose the very narrow standard of review advocated by the Government.  The amendments to the Tunney Act compel the reviewing court to consider, inter alia, the "impact" of the entry of judgment on "competition in the relevant market." See Pub. L. 108-327, § 221(b)(2) rewriting 15 U. S. C. § 16(e).

No suggestion is made in the statute or legislative history that the courts should defer to either the Government's identification of injury or the Government's proposed remedy to that injury.  On the contrary, as explained in the text following footnote 2 above, the reviewing court is to conduct an "independent, objective, and active determination without deference to the DOJ."

[3] See 150 Cong. Rec., S 3617 (April 2, 2004) (Statement of Sen. Kohl).

[4] Id.

[5] Id.

markets."[6]

This is not a case in which there is some debate about the efficacy of the proposed remedy. Rather, this is the case in which the court documents filed by the Government, as well as uncontroverted parts of the Government's evidence, compel the conclusion that the remedy cannot succeed. The proposed remedy fails to satisfy the Tunney Act even when judged under the overly deferential standard proposed by the Government. When evaluated under the standard required by Congress in the 2004 amendments to the Tunney Act, the proposed remedy is barely worthy of serious consideration.

**Prior to the Acquisitions,**
**The Wholesale Market Functioned Effectively,**
**Producing Low Prices**

Any evaluation of the Government's efforts in these cases to protect the wholesale Private Line market from anticompetitive injury must begin with an understanding of the magnitude of the wholesale market and its importance. While the Complaint[7] formally denominates the relevant product market as "Local Private Lines," the Complaint goes on to explain that SBC and Verizon refer to these products as "special access" circuits.

As the Complaint points out, most office buildings are connected, or "lit," only by either SBC or Verizon in their respective territories. In pricing "special access" circuits, then, SBC and Verizon can frequently charge whatever the market will bear, unless the price for a particular circuit is constrained by FCC regulations. Consequently, SBC and Verizon special access revenues, as well as annual rates of return on special access, have

---

[6] See id at S 3618; Pub. L. 108-327, § 221(b)(2) amending 15 U. S. C. § 16(e).

[7] The two Complaints use identical paragraph numbering and virtual identical language. For ease of presentation, the singular is generally used instead of the plural throughout the rest of these comments, and SBC and AT&T are generally used as examples (as opposed to Verizon or MCI) but the comments are directed to both cases unless otherwise indicated.

grown dramatically over the past decade. Verizon's annual rate of return on special access was 2.14% in 1996, but over 23% in 2003. SBC's annual rate of return on special access was 63.14% in 2003. Overall, according to official comments filed by MCI at the FCC, special access revenues were approximately $3.14B in 1996, but had grown to $13.4B in 2003.

Over the years, in response to the high special access prices that SBC and Verizon charged, a robust and competitive wholesale market for Local Private Lines has emerged. In this wholesale market, carriers like the ACTel members lease Local Private Lines from other carriers, in order to reach business customers. AT&T and MCI have the largest networks, aside from "Baby Bells" like Verizon and SBC, see Complaint ¶17, and AT&T and MCI have become mainstays of the wholesale market. In fact, it is doubtful there would be a wholesale market, certainly a market of the current size and scope, without these two companies.

The AT&T and MCI networks were not created overnight; they were built up over decades. Because neither AT&T nor MCI started from a position of local monopoly, as Verizon and SBC did, the business incentives and perceived opportunities of AT&T and MCI, on one hand, and SBC and Verizon on the other, were always quite different. In particular, both AT&T and MCI seized upon the opportunity to capture additional revenue by leasing capacity in their local networks to other competitive carriers. In addition, AT&T and MCI negotiated significant discounts from SBC and Verizon for the circuits they leased. These discounted, leased circuits, coupled with the large networks built or acquired by AT&T and MCI, permitted those companies to make very broad, low-priced offerings to the wholesale market. As a result, the wholesale market for Local Private Lines grew to an

enormous size.  In widely published reports that were submitted to the Department of Justice, two respected analysts estimated the Local Private Line market at roughly $14B.

Companies that procure Local Private Lines in the wholesale market keep records of competitive bids submitted to them for the purchase of these Lines from other companies, specifically including AT&T and MCI.  Many such bidding records, kept in the ordinary course of business to select the lowest wholesale price offered for circuits to be procured, were turned over to the Government in response to compulsory process as part of the Government's investigation of these acquisitions.

These data sets show that AT&T and MCI are the low-price leaders in the wholesale market for Local Private Lines.  They are not only the most pervasive suppliers, but they are the most aggressive and cheapest suppliers, as well.  Standard statistical analysis of this bid data demonstrates that AT&T's bids result in lower prices for Local Private Lines in SBC territory, and MCI's bids result in lower prices for Local Private Lines in Verizon territory, regardless of the number of other bidders offering the same circuit.  In fact, the data gathered by the Government's investigation showed that even SBC itself has responded to competition from AT&T by lowering its own Local Private Line wholesale prices.

Finally, the data sets gathered by the Department of Justice also demonstrate that the larger the number of competing offers (up to a reasonable level), the lower the price charged for a particular circuit to the acquiring purchaser.  In other words, these are not markets in which two competitors are as good for competition as a larger number of competitors would be.  To the contrary, three competitors offering to sell a particular circuit produces lower prices than just two competitors, and four competitors produces lower prices than three competitors.

In sum, there is good reason for the Department of Justice to file lawsuits to try and prevent competitive injury to the wholesale market for Local Private Lines. That market, prior to the acquisitions, was vast, robust and competitive. It operated efficiently, producing significantly lower prices than the prices that SBC or Verizon charged, and it allocated resources according to competitive bidding. The wholesale market has been producing differentiated telecommunications services at low, free-market prices to all types of business customers, particularly medium-sized enterprises. Unless conditioned in a meaningful way, the proposed acquisitions will devastate this market. But by its own terms, the Government's proposed remedy does not meet the competitive danger.

### The Proposed Judgment
### Is Inconsistent with the Complaint
### in the Treatment of "Transport."

The Complaint identifies the relevant product market as "Local Private Lines," and telecommunications services that rely on those lines. Complaint ¶19. As the Complaint explains, a Local Private Line is not a fixed, freestanding physical product, but rather is more akin to a marketing concept – a recognized service category among carriers and customers. Complaint ¶21. It is basically a portion of a carrier's network (a circuit or group of circuits) that is specified ("dedicated") and sold to ACTel members and other carriers to connect their networks to discernible points outside of those networks. As the Complaint states, a Local Private Line originates and terminates within a single metropolitan area. Complaint ¶13.

According to the Complaint, a "typical" Local Private Line has two components – "local loop" (also called "laterals") and "transport." Complaint at ¶13. See also Proposed Final Judgment §II, D; Competitive Impact Statement, Fed. Reg. 74348. A "loop" connects

a building to a carrier's network. But that connection might not occur at the right point on the network to facilitate the transmission of voice and data from the building to its desired termination point – a faraway building, for example. As the Proposed Final Judgment explains, the loop only goes from a building to the <u>first</u> splice point on a carrier's network used to serve different buildings. Proposed Final Judgment §II F. So a "transport" circuit is added into the Private Line to extend it, from the end of the loop to the right place on the carrier's network (perhaps a switching facility farther away), or from one carrier's network to another carrier's network. <u>See</u> Figure 1.



**FIGURE 1**

    There may be multiple carrier suppliers of a particular "loop" and the same or different multiple carrier suppliers of transport circuits that connect to the loop. Increasingly, as documents submitted to the Government indicate, CLECs and IXCs buy

transport and loop circuits separately from different suppliers, and combine the segments into Local Private Lines for resale to end user business customers.

The Government documents sometimes focus on Local Private Lines and sometimes focus only on the loop portions of those Lines. For example, the "Relevant Product Markets" in the Complaint are defined as Local Private Lines, Complaint at ¶19, and the "Anticompetitive Effects" section of the Complaint is directed to the effect of the merger on "Local Private Line" service, Complaint at ¶25. Similarly, the explanation of the relief in the Competitive Impact Statement speaks of a remedy that will "eliminate the anticompetitive effects of the acquisition of Local Private Lines." See Fed. Reg. 74348. The 2004 Tunney Act amendments require the reviewing court to consider the impact of the proposed settlement on competition in this particular market identified by the Government. See 15 U. S. C. §16(e); S 3618.

But the Proposed Final Judgment does not speak of "Local Private Lines" at all. Rather, the Judgment requires the divestiture only of certain "loop" circuits, identified by the addresses of the buildings at which the loops originate. See Proposed Final Judgment §II D. The Competitive Impact Statement explains that these are buildings serviced pre-merger by both AT&T and SBC loops (or MCI and Verizon loops, as the case may be). However, not all buildings serviced by merging parties are covered by the terms of the Proposed Judgment. Divestiture of a loop circuit to a particular building is required only if AT&T and SBC (or Verizon and MCI) were the only carriers connected by their own loops to the building prior to the acquisition. Only in these "2 going to 1" loop scenarios is a divestiture required. See Fed. Reg. At 74348. See Figure 2.



**FIGURE 2**

The Final Judgment also provides for the divestiture of certain "transport" circuits – but only those attendant to the divested loops. <u>See</u> Proposed Judgment §II D. The Competitive Impact Statement explains that the only transport circuits to be divested are those that enable the divested loops to be connected to the network of the specific carrier purchasing those loops. Fed. Reg. 74348. No provision is made for the transmission of voice and data information <u>from</u> the purchasing carrier's network to another building in the same metropolitan area not directly connected to that carrier's network.

Merely from a review of the Government's documents, it is apparent that three deficiencies in the Government's approach prevent the proposed remedy from being effective.

**The Proposed Final Judgment Does Not Even
Appear to Cover All "2 to 1" Loop Buildings.**

First, there is some ambiguity, if not outright error, in the discrepancy between the number of buildings the Proposed Final Judgment identifies and what publicly available data suggests in terms of the number of "2 to 1" loop buildings affected by the mergers. Ambiguity in the proposed remedy is one of the issues the District Court is required to consider by the express terms of the 2004 Tunney Act amendments.

The building lists attached to the Proposed Judgment lists only 383 buildings in SBC territory and 356 buildings in Verizon territory to which the remedy will apply. This is inconsistent with data relied upon by both SBC and Verizon in Federal Communications Commission proceedings. GeoResults, Inc., a private corporation, publishes data listing the presence and type of network terminating equipment carriers have placed in buildings. Verizon has stated, in FCC proceedings, that the data used by GeoResults is "recognized as an industry standard by numerous national and international telecommunications standard-setting bodies" and can be reliably used to "identify and locate buildings ... that are served by [competitive providers'] fiber-enabled network equipment." [8] SBC similarly stated to the FCC that "GeoResults is a reasonably reliable source, and if anything its data understate the deployment of competitive fiber." [9]

GeoResults data includes buildings in which CLECs buy loops from SBC and Verizon, as well as buildings to which CLECs physically connect with their own fiber. GeoResults may therefore significantly overestimate the number of "2 to 1" loop

---

[8] Verizon comments, Declaration of Verses, LaTaille, Jordan and Reny, July 15, 2004, FCC Docket 01-338, ¶¶ 22-24.

[9] Joint Declaration of Scott Alexander and Rebecca Sparks of SBC, ¶¶ 22-23, attached to Letter of Christopher Hermann of SBC to Ms. Marlene Dortch of FCC, Nov. 16, 2004, FCC Docket 01-338.

situations the Government's remedy purports to address. But the difference between what the GeoResults data predicts and the number of buildings the Government's remedy purports to address is so vast as to defy such an easy explanation. This is true for both SBC and Verizon territory. For example, as to SBC territory, GeoResults data indicates that in Cleveland there are approximately 1630 "2 going to 1" buildings, but the Government's list in the Proposed Final Judgment includes none. In Milwaukee, the GeoResults data predicts 1124 such buildings, but the Proposed Final Judgment lists but 38. In Los Angeles, GeoResults predicts 6318 buildings requiring the Government's remedy, but the Government lists only 36.

The same discrepancy appears for the cities in Verizon territory. GeoReults data indicates there are more than 100 "2 to 1" buildings in Pittsburgh, but the Government has none listed. According to GeoResults, Philadelphia should have almost 300 such buildings, but the Government lists only 12. So, making whatever allowance is appropriate for the inclusion of leased loops in the GeoResults data, the Government's lists seem to include far too few buildings.

The Government does not explain or document, for the benefit of both the Court and the public, how it arrived at its lists of "2 to 1" situations. Presumably the Government started with building lists tendered by the merging parties, and either audited or made adjustments to these lists. While the GeoResults inclusion of leased loops might account for some of the discrepancy between the GeoResults data and the Government lists, it certainly appears likely, from the filings AT&T made in the FCC to secure clearance for its acquisition, that the Government's remedy does not include all buildings that the Complaint purports to cover. There is another more plausible

explanation for this discrepancy.

At the FCC, AT&T's economic expert filed a declaration in aid of the merging companies' claim that the proposed merger would not produce the anticompetitive effects feared by the Government. The declaration sets forth the total number of "2 to 1" buildings in SBC territory based on AT&T internal records.[10] That precise number is redacted from the FCC public record, but the other verbiage from the declaration, including the expert's methodology, remain in the public record. In the declaration, the expert starts with the total number of "2 to 1" buildings and then makes subtractions from that total. For example, in aid of his argument that all "2 to 1" situations will not produce price increases, the expert subtracts "2 to 1" situations in which he argues that other CLECs might build their own loops, even if AT&T's loops are acquired by SBC. Similarly, he subtracts situations in which he claims that, although AT&T is eliminated as SBC's only competitor, the FCC regulates the price SBC can charge for the loop in question, so competitive injury is minimized. See Carlton Dec. at ¶¶15-48.

Given the large discrepancy between publicly available data and the number of buildings on the Government's lists, it would appear that the Government made such subtractions from the total number of "2 to 1" buildings to come up with the lists attached to the Proposed Final Judgment. It appears, for example, that the Government subtracted the situations in which AT&T's expert argued that the CLECs would build their own loops.

---

[10] Reply Declaration of Dennis W. Carlton and Hal S. Sider, May 9, 2005, as an attachment to the Joint Opposition of SBC Communications Inc. and AT&T Corp. To Petitions To Deny and Reply Comments, filed *In the Matter of Applications for Consent to Transfer of Control of Licenses and Section 214 Authorizations from AT&T Corp., Transferor, to SBC Communications Inc., Transferee*, WC Docket No. 05-65, Federal Communications Commission, May 9, 2005, at ¶¶ 15-48 (hereinafter sometimes "Carlton Dec.").

14

But such subtractions are impermissible by the express terms of the Complaint. The Complaint plainly states, for example, that competitive injury will occur whenever AT&T is the only "facilities-based," (i.e. owning its own line) competitive alternative to SBC for Local Private Line connections to buildings. Complaint at ¶¶25, 26. The Competitive Impact Statement similarly states that "buildings where AT&T is the only CLEC with a last-mile-connection" – without limitation or subtractions – are the places where injury to competition occurs. Fed. Reg. At 74348. And the Complaint expressly rejects the notion that other CLECs might build their own lateral connections to these buildings. Complaint at ¶¶27-29. After reviewing the costs associated with building a lateral, the Complaint concludes that "entry is unlikely to eliminate the competitive harm that would likely result from the proposed merger." Complaint at ¶29.

The Government needs to explain its methodology to permit meaningful judicial review. The Government papers are filled with precisely the ambiguity that the amended Tunney Act does not permit. If the Proposed Final Judgment does not address all situations in which AT&T is eliminated as the only facilities-based competitive alternative to SBC for loops, the court must withhold its approval of the settlements.

<strong>The Proposed Judgment Fails to Remedy the Injury<br>Because the Judgment Addresses<br>Only the Building End of Loops.</strong>

Even when the building lists are made complete to conform to the Government's allegations, the remedy in the Proposed Final Judgment – providing a divestiture for all "2 going to 1" loop situations – fails to correct the competitive injury alleged in the Complaint (elimination of competition for "Private Line" service), and therefore fails the most deferential Tunney Act review. This failure results from the fact that the remedy,

unlike the injury charged in the Complaint, addresses only the part of the Local Private Line that connects to a building, not the part of the Private Line that connects to a carrier's network.

The Complaint explains that a "typical" Local Private Line has two components – a "loop" (or "lateral") and a "transport" circuit. Complaint at ¶13. As explained above, the "loop" connects the building to a carrier's network and the "transport" circuit extends the loop from the initial splice point on the carrier's network to other points on the carrier's network or to other carriers' networks.

The Complaint alleges that where AT&T is eliminated as the only facilities-based competitor to SBC for Local Private Lines, the merged company will be able to raise prices to customers of Local Private Lines (including ACTel members), thereby creating an antitrust violation. Complaint ¶¶25, 32-33. But the Proposed Final Judgment orders the divestiture of only certain loops ("laterals") with attendant transport. Final Judgment §II D. The Competitive Impact Statement tries to explain this inconsistency by suggesting that it is the decrease in competition for loops (2 going to 1) that creates the injury in the Local Private Line market. Fed. Reg. 74348.

The approach used in the Proposed Final Judgment requires the divestiture only of those loop segments (with attendant transport) that result in a "2 to 1" loop situation when viewed from the origin of the loop, that is, from the building. Even assuming the rather dubious assertion that it is the decrease in competition for loops that creates the injury in the Local Private Line market, the remedial approach used in the Final Judgment (looking to the origin point of the loop by building address), will not prevent the harm alleged in the Complaint (a price increase to customers of Local Private Lines).

This is because the "remedy" will only maintain competitive alternatives for transmissions from a building to a carrier's network. But no one simply calls a carrier's network; the intended destination of a call is always another building, frequently connected to the carrier's network by another Local Private Line that may not be covered by the terms of the Proposed Final Judgment. Because the Proposed Final Judgment identifies the affected "2 to 1" Local Private Lines only from the point of the loop origin at the building, it does not prevent the acquisition from restraining competition by producing "2 to 1" situations in the Local Private Lines that take the call from the carrier's network to the destination building.

This is best illustrated by the example of a corporation with main offices in a downtown high-rise and branch offices in suburban office parks in the same metropolitan area. The corporation is a customer of a CLEC. The customer's headquarters downtown needs to send high-volume voice and data transmissions to its branch offices in the suburbs. Before the merger, the CLEC bought a Private Line from AT&T to service the customer and connect the originating building to the CLEC's network. If AT&T were the only facilities-based carrier serving the building in competition with SBC before the merger, the Final Judgment remedy, in theory, would prevent the merged company from extracting a higher price for the Private Line because the CLEC would be able to buy the divested loop itself, or lease it from the carrier that buys it as a "divestiture asset" under the Proposed Final Judgment.

The Proposed Final Judgment also requires the divestiture of transport circuits sufficient to connect that loop's splice point on the AT&T network to the purchasing CLEC's network. Fed. Reg. 74348. So, prior to the acquisition, the CLEC had two Private

Line choices from the downtown main office to its network, and the CLEC continued to have two choices after the acquisitions. The remedy can therefore be presumed successful at getting the call onto the CLEC's network without a price increase created by a "2 to 1" loop situation resulting from the acquisition. See Figure 3.



FIGURE 3

But when the voice and data transmissions leave the CLEC's network and go to the suburban office park location, the Final Judgment "remedy" often will be of no help. The transmissions would have to go from the CLEC's network over a "transport" circuit to a splice point for the lateral connecting to the suburban office building. Before the acquisition, if AT&T and SBC provided the only facilities-based competition for the transport circuit, then after the acquisition the merged company, as the only supplier of the transport circuit, is in a position to raise the price for that circuit to higher than competitive levels under the theory of the Government's Complaint. See Complaint at ¶25. The "remedy does not address the "2 to 1" transport situation.

This problem cannot be argued away by suggesting that there is a great deal of duplicative transport circuitry in each metropolitan area. This kind of areawide analysis would also show a plethora of duplicative loops in each metropolitan area. But the Government has decided that this type of areawide analysis is inappropriate. Instead, the Complaint elects to analyze each Local Private Line individually in order to assess the effect of the mergers on competition. The Government conducts this analysis for the loop components of the Local Private Lines on a segment-by-segment basis and must therefore do the same for transport. A change in methodology for transport would undermine the integrity of the Government's loop analysis.

It is impossible to say, from the public record, precisely how often a "2 to 1" reduction in transport circuit providers occurs. But this much is known. SBC itself has acknowledged that there are numerous situations in which AT&T is likely positioned as the only facilities-based competitor for a group of transport circuits around an SBC wire center.[11] The actual bid data submitted by ACTel members to the Department of Justice is even more compelling. These data sets reflect carriers that actually have transport circuits to sell to the wholesale market (some carriers may have transport circuits filled entirely by their own traffic). The data contains numerous examples in which SBC and AT&T (or MCI and Verizon) were the only competitors on a particular transport circuit. Indeed, the data shows that AT&T and MCI are far and away the leading CLEC suppliers of transport circuits to the wholesale market.

---

[11] SBC has admitted in the public record that there are scores of wire centers in which AT&T is SBC's only competitor. See letter from Gary L. Phillips of SBC to Ms. Marlene Dortch of the FCC filed as an *ex parte* communication on August 12, 2005, *In the Matter of Applications for Consent to Transfer of Control of Licenses and Section 214 Authorizations from AT&T Corp., Transferor, to SBC Communications Inc., Transferee*, WC Docket No. 05-65, Federal Communications Commission. But even this may understate the number of transport circuits for which AT&T and SBC are the only competitors because AT&T's expert has also admitted in the public record that the presence of smaller competitors at other SBC wire centers does not necessarily indicate ownership of transport circuits in competition with SBC. See Carlton Dec.¶54.

In short, then, although the transport circuit from the carrier's network to the splice point for the loop goes from two facilities-based competitors to one, the "remedy" will not provide relief unless the loop circuit from the end of the transport segment to the destination building also goes from "2 to 1." Frequently, however, the merger will not result in a true "2 going to 1" situation for the loop segment connecting the splice point to the building. Sometimes, for example, there might be only one supplier of the loop to begin with, SBC, but price regulation by the FCC prevents SBC from raising the rate on the loop to higher than competitive levels. However, the connecting transport circuit is likely not under a similar FCC constraint. The merged company could therefore raise the price of the Local Private Line from the carrier's network to the destination building by using its "choke hold" over the transport segment of that Line.

Nor is this problem confined to a situation in which there is only one supplier of the loop going from the transport segment to the building. If there are three suppliers of the outbound loop, for example, the divestiture remedy would not apply at all. Nor would the divestiture remedy apply if the two suppliers of the loop were carriers other than both AT&T and SBC. (See Figure 3) In each such case, the remedy does not apply, but the merged company can create precisely the anticompetitive injury identified by the Complaint because of its "choke hold" over the transport circuit from the carrier's network to the splice point.[12]

The Government's solution fails to remedy the injury identified in the Complaint because the solution applies, by its own terms, only to loops connecting buildings to networks, but not to transport connecting networks to each other. Even assuming the relief

---

[12] The data sets submitted by ACTel members to the Government contain numerous examples of all three situations described in the text: (a) SBC as the only supplier of a loop circuit under UNE pricing; (b) three suppliers of a loop circuit; (c) two suppliers of a loop circuit, but not both SBC and AT&T.

proposed in the Proposed Final Judgment is effective for transmissions <u>to</u> a carrier's network, transmissions <u>from</u> that network to terminating buildings will still be subject to the "2 to 1" choke hold because the Government's remedy does not include transport (unless it is attendant to a divested loop for a building).

### The Proposed Judgment Does Not Produce the Promised Remedy Because the Judgment Does Not Eliminate the Anticompetitive Effects of the Acquisitions.

The Government's remedy only addresses certain "2 to 1" loop situations. The most serious problem with the proposed "remedy" is that the remedy simply cannot logically or factually "eliminate the anticompetitive effects of the acquisition of Local Private Lines," the claim made in the Competitive Impact Statement. <u>See</u> Fed. Reg. at 74348. The Complaint also focuses on Local Private Lines, defining the relevant product market as "Local Private Lines," not loop segments going from two choices to one. Under the 2004 amendments, Tunney Act review must therefore consider the impact of the remedy on that very market. The Government's remedy might at best "eliminate" certain "2 to 1" loop situations, but the remedy does not "eliminate the anticompetitive effects of the acquisition of Local Private Lines" because there are many "anticompetitive effects" in Private Line situations beyond "2 to 1" loops.

The Complaint correctly points out that AT&T competes with SBC and MCI competes with Verizon pervasively across the metropolitan areas at issue – not just at "2 to 1" buildings. Complaint at ¶11. In fact, according to the Complaint, AT&T and MCI are the most significant competitors for SBC and Verizon <u>See</u> at 17. Id. The actual bid data produced by wholesale purchasers of Local Private Lines confirms precisely what the Complaint charges: AT&T and MCI are by far the most significant competitors of SBC

21

and Verizon in the Local Private Lines market, and competition by AT&T and MCI produces lower Local Private Line prices in all competitive situations – not just "2 to 1" loop situations.

Moreover, the actual bid data produced by purchasers of Local Private Lines demonstrates exactly what common sense and economic theory suggest – that four competitors offering a particular Local Private Line produce lower prices than three competitors. And three competitors produce lower prices than just two competitors. Of course, the data also show that two competitors produce lower prices than a single vendor, but no one could rationally suggest that merely addressing the latter situation will do what the Competitive Impact Statement and Complaint indicate – elimination of the anticompetitive effects of the acquisition of Local Private Lines.

If the Government's Complaint and Competitive Impact Statement purported to remedy "only a small portion of the competitive injury caused to the Local Private Line market," at least the documents would be internally consistent. But the Final Judgment remedy addresses only certain "2 to 1" loop situations, while the Complaint and Competitive Impact Statement claim to "eliminate" the anticompetitive effects of the acquisitions on Local Private Lines – claims that are not only inconsistent with the Proposed Final Judgment, but also with the data gathered by the Government's investigation.

The Government's failure to address anything other than "2 to 1" situations, while at the same time claiming to "eliminate" the anticompetitive aspects of the acquisitions, runs afoul of the 2004 Tunney Act amendments. Moreover, the Government's actions in these cases are a marked departure from long-established Antitrust Division practices.

Remedying only "2 to 1" situations prevents only "mergers to monopoly." The Final Judgment remedy does not prevent the competitive injury caused by lessening competition ("4 to 3" or "3 to 2") in highly concentrated but not monopoly situations. For decades, there have been those who have argued that only "merger to monopoly" situations should be remedied by the Antitrust Division, but the Division for the entire period of time, on the basis of sound economics, has adopted both written Guidelines and consistent practices that recognize the competitive injury caused by reducing competition – even if the reduction is not the elimination of all but a single vendor. Yet the Government in this case does an about-face and precludes only "merger to monopoly," without any public discussion of this most significant departure from established and documented procedures.

Furthermore, AT&T and MCI are the most significant and effective competitors to the acquiring companies. See Complaint ¶17. As the Government has long recognized, acquisitions that eliminate the most formidable competitors, leaving only less effective or ineffective competition, are anticompetitive and must be remedied. Yet in this case the Government assumes that the carrier purchasing the divested assets from the merging companies will be an effective competitive substitute for AT&T or MCI merely because the purchasing carrier has a "viable, ongoing telecommunications business." Proposed Final Judgment § IV H. Given that AT&T and MCI are the most significant competitors for SBC and Verizon, there is no basis for the assumption that any acquiring carrier will be even a remotely effective competitor. All competitors are not equally effective; merely giving customers a second choice does not mean that the second choice is meaningful. The Government's prior practice recognized these facts, but the current proposal is to the contrary.

Finally, and most significantly, the proposed remedy denies widely accepted principles of network economics that the Government has long recognized in its Guidelines and practices. AT&T and MCI were the most effective competitors of the acquiring companies because of the breadth of the AT&T and MCI networks and the robustness of their customer base in terms of network traffic. It was these factors, not the presence of AT&T or MCI on a particular loop circuit, that made those companies effective competitors. These factors enabled AT&T and MCI to offer loop and transport circuits to wholesale purchasers at lower prices than other carriers. The fact that a "viable, ongoing telecommunications business" will purchase divested lines does not in any sense mean that those lines will be offered to the wholesale market at the same low prices at which AT&T and MCI sold the lines.

Given that the acquiring company is certain to be significantly smaller than AT&T or MCI (as the Complaint indicates at ¶17), the only rational inference is that the prices for the lines will go up and competition will be damaged, even if two carriers present choices on every loop circuit. Of course, this conclusion does not merely rest on rational inferences or even on the allegations in the Complaint. Data gathered by the Government during its investigation demonstrate that AT&T and MCI were far and away the low price sellers for Local Private Lines at wholesale, and the prices for such lines will increase enormously in the future. The Government's proposal does not remedy those facts; it does not even address them.

### A Truly Effective Remedy Will Produce No Loss in Efficiency.

The Complaints correctly state that AT&T's local networks (every single loop and transport circuit in every metropolitan area) are wholly redundant with those of SBC.

24

Complaint ¶¶11, 12-17.  MCI's local networks (every single loop and transport circuit in every metropolitan area) are wholly redundant with those of Verizon.  Even the most modest effective remedy would include the divestiture of all of the redundant loop and transport circuits.  Such a divestiture might at least enable the acquiring carrier to offer a significant competitive alternative to the merged corporations.

Even assuming that the mergers produce some efficiencies by combining the local networks of SBC and Verizon with the long-distance networks of AT&T and MCI, a divestiture of all redundant local assets would not interfere at all with the realization of the claimed efficiencies.  It would, on the other hand, produce a viable competitor for local traffic without sacrificing any benefit the mergers allegedly produce.

To make the divestitures competitively effective, the Government should enable any customer under an old contract to the merging companies to solicit and accept new, post-divestiture competitive offers. Otherwise, the divestitures will not provide any benefits to existing customers of the merging companies.

And, as both an interim step and a more complete remedy if the Government is not going to require any meaningful divestitures, the Government should at a minimum expressly prohibit the merged companies from raising prices to anticompetitive levels in the wholesale market for Local Private Line services.  This is a remedy recently adopted by the Commonwealth of Virginia's State Corporation Commission in response to public protests and concerns regarding the impact of the loss of an "independent MCI" on the provision of local services to mid-size business customers in Virginia. See Order Granting Approval, Virginia State Corporation Commission, Oct. 6, 2006, at 27.

Following a thorough staff investigation, public hearings and written submissions,

25

the Virginia Corporation Commission required MCI, post-merger, to continue to offer wholesale customers in Virginia private line loop and transport facilities "at pre-merger terms and conditions and at prices that do not exceed pre-merger rates." Id. The Commission made this order applicable to both "existing and future wholesale customers of MCI in Virginia" thereby preserving a wholesale market for Local Private Lines in Virginia at competitive rates. Id. at 27. The order is to remain in effect until the loss of MCI as a competitor will no longer raise rates on Local Private Lines to an anticompetitive level. Id.

This remedy is currently in effect in Virginia and must be obeyed by the merging companies. Extending the remedy nationwide would in no way prevent the merging parties from fully exploiting any efficiencies the merger might produce. However, a nationwide remedy of this type would prevent the merged companies from gouging their wholesale customers with higher than competitive rates. Unless the merged companies have the intention to raise prices post-merger, it is difficult to see any objection to this remedy.[13]

---

[13] The FCC provided price protection to existing customers under contract with the merging parties for a short period of time after the mergers. But the FCC remedy does not preserve a competitive wholesale market. Rather, by only protecting existing contracts and not bids to new customers, the FCC simply postponed the date at which the merging parties will be able to raise their customer's prices.

## Conclusion

The whole point of a divestiture remedy is to permit a free market solution (after the divestiture) to resolve the concentration issues created by the merger. But the divestiture remedy proposed by the Government has no hope of achieving that result. At a minimum, facilities need to be divested in operating units over wide areas, probably nationwide, and at the very least regionwide, to enable the competitive carrier acquiring the assets to have even a reasonable chance at replacing the competitive pricing from MCI and AT&T lost by the acquisitions. And the wholesale market needs to be protected with interim pricing provisions while these divestitures become competitively effective.

From the perspective of remedies, the acquisitions now before the Courts bear a strong resemblance to the Government's controversial clearance of Thomson's acquisition of West Publishing Company a decade ago. There, as here, the greatest concern was that the acquisition would put the two principal competing systems (here, the competing local networks) under common ownership. There, as here, counsel for the merging companies argued for piecemeal divestiture of individual properties, rather than something more substantial.

In the West deal, the Government adopted the approach sought by the merging companies, requiring divestiture of piecemeal properties, rather than a comprehensive set of properties that could be used in the marketplace to actually produce competitive benefits. The result, in terms of antitrust enforcement, was a wholly ineffective remedy. See, e.g., John E. Morris, *How the West Was Won, The American Lawyer*, September 1996. The District Court ultimately approved the remedy with modifications, but under the constraint of the Court of Appeals authority subsequently repudiated by Congress. See

27

*United States v. Thomson Corp. and West Publishing Co.*, 949 F. Supp. 907 (D. D. C. 1996).

The American Lawyer characterized the West settlement process as a "microanalysis of competition" in which the Government became "obsessed with the competing seedlings and overlooked how the giants of the forest can block out the light," attributing this result to the actions of Thomson's lawyers in "deftly maneuvering the merger through the government review process."

In the years following the consummation of the West acquisition, prices to customers rose dramatically, just as critics predicted, producing further criticism of the Division's decision.[14] And when it came to light that the Division's clearance of the deal coincided with extensive political maneuvering, criticism reached both the largest mass circulation media[15] and even the most prestigious legal publications. See, *e.g.,* Mark Hansen, *A Question of Influence*, 83 American Bar Association Journal 36, June 1997.

There is much in the current situation to suggest precisely these concerns – the very concerns voiced by Congress in overruling the District of Columbia Circuit in 2004 – "political pressure to enter into a 'sweetheart settlement.'"[16] Department of Justice clearance of these telecommunication acquisitions followed extensive lobbying by the merging companies of both the Administration and Congress. Indeed, the acquisitions

---

[14] See, *e.g.,* Susan M. Ryan, *Cost Inflation by Page Reductions*, 14 The Bottom Line: Managing Library Finances, No. 1, at pp. 6-11 (2001); Douglas McCollam, *Volumes Are Giving Way To Velocity*, 25 National Law Journal, No. 46 at S1, July 14, 2003.

[15] See, *e.g.,* Brooks Jackson, *Moving Money Through State Capitals,* CNN, April 11, 1997; http://www.cnn.com/ALLPOLITICS/1997/04/11/Jackson/; Viveca Novak and Michael Weisskopf, *The Cheerful Giver,* Time Magazine, April 21, 1997; http://www.cnn.com/ALLPOLITICS/1997/04/14/time/novak.html: Mark Hansen, *A Question of Influence,* 83 A.B.A.J. 36, June 1997.

[16] 150 Cong. Rec. § 3617, *supra.*

were brought to a head and cleared by the Antitrust Division at a time when there was not a confirmed head of that group – when the Administration's designated Assistant Attorney General was awaiting confirmation and was subsequently under Senatorial "hold" because, according to the press, of his more serious enforcement mentality.

There is no reason to repeat the problems of West/Thomson. Remedial relief can be achieved in these cases with minimum disruption and inconvenience to either the merging companies or business customers.