IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>SBC Communications, Inc. and )<br>AT&T Corp., )<br>)<br>Defendants, )<br>)<br>The Alliance for Competition in )<br>Telecommunications )<br>)<br>and )<br>)<br>COMPTEL, )<br>)<br>*Amicus-Curiae*. )<br>) | Civil Action No.: 1:05CV02102 (EGS) |
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>Verizon Communications Inc. and )<br>MCI, Inc., )<br>)<br>Defendants, )<br>)<br>The Alliance for Competition in )<br>Telecommunications )<br>)<br>and )<br>)<br>COMPTEL, )<br>)<br>*Amicus-Curiae*. )<br>) | Civil Action No.: 1:05CV02103 (EGS) |

**ACTEL'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO THE UNITED STATES' MOTION FOR ENTRY OF FINAL JUDGMENTS**

As directed by the Court on May 10, 2006, and pursuant to the Minute Order of that date, the Alliance for Competition in Telecommunications ("ACTel") submits this memorandum with attached exhibits and declarations to supplement its principal memorandum of May 4, 2006. ACTel's May 4 memorandum was directed to opposing the Department of Justice's ("DOJ" or "the Government") Motion for Entry of Final Judgments and ACTel continues to rely on that memorandum and attached Wilkie Declaration as its primary submission. This supplemental memorandum is intended to bring additional arguments, authorities and citations to the Court's attention. Of particular importance is the attached declaration of one of the bidders for the divested "indefeasible rights of use" ("IRUs"), explaining that the divestiture of these assets will in no way replace the competition lost by the mergers at issue, even with respect to the divested circuits themselves. *See* Nicklas Decl., attached as Exhibit 1.

## I. THIS COURT UNDERSTANDS ITS TUNNEY ACT OBLIGATIONS.

ACTel's May 4 memorandum made two points. The first was that the 2004 Amendments to the Tunney Act rejected a strictly circumscribed role for the Court and instead required the Court to consider, in the words of the amended statute, "competition in the relevant market." The Court's comments at the May 10 hearing demonstrate that the Court has clearly in mind the Congressional criticism of prior District of Columbia Circuit Tunney Act cases and Congress' new direction to Tunney Act courts in the future.

We see no need, therefore, to belabor this part of our argument further, except to note that the assertion of Verizon's counsel at the May 10 hearing, that this Court is without power to rule against the Proposed Final Judgment absent a showing of what amounts to improper conduct by

the Government,[1] is simply wrong. That was not even the standard prior to the 2004 Amendments and is certainly no longer the standard, as both the language of the statute and the legislative history demonstrate. Verizon's arguments to the contrary merely lead this Court to error.

This Court seems clearly to understand its obligation to conduct an "independent, objective and active determination without deference to the DOJ." *See* 150 Cong. Rec. S 3617. The only real question is how the Court will satisfy that obligation in determining whether the proposed remedy is effective. "The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'" *Ford Motor Co. v. United States* 405 U.S. 562, 573 (1972) (citing *United States v. DuPont & Co.*, 366 U.S. 316, 326 (1961) (internal citations omitted)).

## II.  THE GOVERNMENT ACCEPTED ACTEL'S CLAIMS OF COMPETITIVE INJURY IN THE RELEVANT MARKET BUT FAILED TO REMEDY THE HARM PLED IN THE COMPLAINTS.

The second point in ACTel's May 4 memorandum addressed the merits – namely, that the proposed remedy is not effective, fails to "restore competition," and therefore falls short of the Tunney Act's public interest standard. In support of this position and to describe the facts on which the Government based its complaint, ACTel submitted a declaration from Simon Wilkie, the former chief economist of the FCC, describing the empirical data submitted to the Government, the results of the econometric analysis of that data, and the obvious economic and logical flaws in the Government's proposed remedy.

---

[1] As of this writing, the official transcript of the May 10 hearing is not yet available, and therefore specific citations to that transcript cannot be provided at this time.

3

As these points were argued before the Court on May 10, both the Government and the merging parties seemed to suggest that this is a case in which Amici submitted evidence of injury during the Government's investigation, and the Government, after due consideration, rejected that evidence. This is simply not what happened. What is remarkable about this case is that the Government <u>accepted</u> ACTel's showing of injury, filed complaints alleging that very injury, and proposed a remedy which the Government claims addresses the injury alleged by ACTel.

As the Wilkie Declaration explains, ACTel members submitted extensive bid database evidence showing that injury will flow in the markets for Local Private Lines. ACTel members not only submitted extensive databases – that is, empirical evidence – but also economic analysis quantifying the extent of the injury. The Government did not reject ACTel's claims. On the contrary the Government's Complaints identified the relevant market in both mergers as "Local Private Lines" – precisely what ACTel's empirical data showed – and the Complaints alleged that prices would go up "to levels above those that would prevail absent the merger[s]" Complaints at ¶ 33 – again, exactly what ACTel's data showed. The only issue between ACTel and the Government is whether the Government's remedy – divesting a discrete number of "loops" that connect a very limited set of buildings to exchanges in a handful of cities will remedy that harm.

In SBC[2] territory, every local circuit (both loop and transport) owned by the "old AT&T" overlapped with an SBC circuit serving the same area. *See* Exh. 1 (Nicklas Decl. at ¶ 6). And, in Verizon territory, every MCI local circuit (both loop and transport) overlapped with a Verizon circuit serving the same area. *Id.* The Department of Justice's usual procedure in such circumstances is to order the divestiture of all overlapping assets, together with customers and

---

[2] To avoid confusion, this memorandum uses the names of the merging companies prior to completion of the acquisitions.

4

network traffic, as the Government's proposed decree in the Qwest/Allegiance merger, submitted to this Court with the CompTel papers, demonstrates. The Federal Trade Commission ("FTC") has precisely the same practice. The FTC's study of antitrust divestiture procedures endorses what it calls the "common sense conclusion" that "the Commission should prefer the divestiture of an on-going business" to the divestiture of piecemeal assets.[3] If something less than an on-going business is divested, the FTC study requires at a minimum provision for "rights to hire employees, rights to technical assistance and supply contracts" in order to put the buyer of the assets in a more competitive position.[4] The Department of Justice provided none of these protections in this case.

Instead, the Government asserts it can remedy the harm caused by the mergers – price increases for Local Private Lines -- merely by requiring divestiture of the identified "2 to 1" loops. The empirical evidence, economic analysis, additional documents submitted herewith, and plain common sense all lead inexorably to the conclusion that divesting a few circuits cannot possibly replace competition lost by the acquisition of the <u>entire networks</u> of AT&T and MCI. Whatever company ends up buying the divested IRUs will be much smaller than either AT&T and MCI and logically could not even offer prices on the divested circuits at the same low prices that AT&T and MCI have been charging. The divested IRUs are competitively insignificant. The company acquiring them could in no way replace the competition lost by the elimination of AT&T and MCI. *See, e.g.,* Exh. 1 (Nicklas Decl. at ¶ 7).

---

[3] Staff of the Bureau of Competition of the Federal Trade Comm'n, *A Study of the Commission's Divestiture Process*, at p. 12. (1999).
[4] *Id.*

### III.   THE FCC DID NOT EVEN LOOK AT ACTEL'S DATA AND ANALYSIS.

During the May 10 argument, counsel for Verizon asserted that the Wilkie Declaration and analysis, submitted with ACTel's principal memorandum on May 4, was "impeached" at the Federal Communications Commission ("FCC" or "Commission"). In addition, the Government has repeatedly asserted both in writing and orally that the FCC rejected ACTel's position. Of course, what the FCC did or did not do would be of little consequence to a Tunney Act court, which must be satisfied on its own review that the public interest standard is satisfied. But given the repeated representations with regard to FCC action made by the merging parties, and the insistence of the Government and the merging parties that this Court defer to, or at least weigh heavily, the FCC action, we cannot let irresponsible assertions regarding the FCC's action (or lack thereof) go unanswered.

At the May 10 hearing, the undersigned counsel argued, but did not have the opportunity to explain in detail, how the FCC made no attempt whatsoever to review or consider the ACTel data and proceeded to its decision without even looking at that evidence. ACTel therefore submits with this memorandum a detailed declaration by the lead counsel for the ACTel members in the FCC proceeding, setting forth his unsuccessful efforts to get the Commission to look at the data that was available at the Department of Justice. *See* Mutschelknaus Decl., attached as Exhibit 2.

Basically, as the declaration explains in greater detail, data submitted by ACTel members, as well as the reports and evaluations of the ACTel economists, were provided to the Department of Justice only through (and subject to) a Civil Investigative Demand ("CID") that fully protected the confidentiality of the information supplied. Exh. 2 (Mutschelknaus Decl. at ¶¶ 3-4). But the FCC has no procedure that protects the confidentiality of information to the

same extent. *Id.* at ¶ 5. Consequently, it was not possible to file the ACTel members' bid data or the detailed analysis of it with the FCC, as was done with DOJ. *Id.*

As the declaration explains, this problem is not uncommon to FCC merger reviews, and it is relatively common in such situations for the FCC to request that the disclosing parties consent for the FCC staff to go to the DOJ and review the confidential CID responses, so that the Commission can have the relevant information when making its decision. *Id.* at ¶ 6. But in this case, notwithstanding the repeated offers by ACTel members to provide the necessary consent, the FCC told counsel for the ACTel members that the Commission and its staff were not interested in reviewing the bid information on file at the DOJ. *Id.* It is a violation of the CID statute for anyone outside of DOJ to gain access to CID responses without an express waiver of confidentiality, 15 U.S.C. §§ 1313(c)(3), 1314(g), and, hence, the FCC did not even make an effort to look at the most critical evidence available to it. *Id.*

Deference to what the Government claims was the FCC's position on harm to the relevant market would, in the best of circumstances, be inconsistent with the plain language of the Court's obligations under the Tunney Act. And particularly here, given the facts set forth above and in the attached declaration, we ask the Court to accord no consideration whatsoever to anything the FCC may have said about ACTel's evidence.

IV.   **THE CIRCUMSTANCES OF THE DOJ DECISION IN THIS MATTER ARE, AT BEST, WORRISOME.**

At the hearing on May 10, the Court made inquiry to the Government's counsel with regard to the concerns the Government had with the mergers. The Court appeared to suggest that the Government may have seriously negotiated the proposed remedy as a way to address those concerns. Counsel for ACTel then represented to the Court that, contrary to the Court's impression, <u>both</u> the Complaints and the Consent Judgments were filed on the very same day at

7

the very same time. Undersigned counsel also represented to the Court that, if given the opportunity to file an additional brief, ACTel would provide press reports showing that the remedy the Government attempts to defend in this Court was widely circulated to the press by the merging companies, even prior to the filings of the Complaints. A number of such articles are attached herewith, along with other materials that suggest what can only be described as a worrisome chain of events.

These mergers followed a widely publicized decision by the Administration in 2004 not to support the Supreme Court appeal, taken by the old AT&T, of a District of Columbia Circuit decision that restricted AT&T's ability compete against what it characterized as the "powerful Bell telephone monopolies."[5] Without the backing of the Administration, the Supreme Court declined to hear AT&T's appeal,[6] and AT&T sold itself to SBC in January 2005. Verizon's acquisition of MCI was announced in February 2005.

On May 10, the head of the Antitrust Division Hewitt Pate, announced his resignation. The Wall Street Journal greeted this event with an editorial that severely criticized Mr. Pate and urged the Administration to approve "the recent telecom mergers."[7] Thomas Barnett was named Acting Assistant Attorney General, effective June 25, 2005.[8] The Assistant Attorney General position requires Senate confirmation.

During the spring and summer of 2005, the Antitrust Division investigated the proposed mergers, and ACTel members submitted the data described in this memorandum, pursuant to

---

[5] Susan Polyakova, *Supreme Court Declines to Review FCC's TRO*, Communications Daily, Oct. 13, 2004, *available at* 2004 WLNR 12929000, attached as Exhibit 3.
[6] *Id.*
[7] *The Antitrust Wars,* The Wall Street Journal, May 11, 2005 *available at* <http://users1.wsj.com/lmda/do/checkLogin?mg=wsj-users1&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2FSB111576728487129768.html%3Fmod%3Dopinion%25255Fmain%25255Freview%>.
[8] *See* official biography of Thomas O. Barnett at <http://www.usdoj.gov/atr/barnettbio.htm>.

confidential compulsory process. The merging companies repeatedly represented to the press, the public and the investment community that the deals were unlikely to close prior to the first half of 2006.[9] One key factor affecting the timing of the merger review was that no Assistant Attorney General had to that point been confirmed to lead the Antitrust Division, and given the normal procedures of the Antitrust Division, review of such significant transactions would not be appropriate without a permanent appointee in place.[10] But suddenly, without explanation, in the early fall the timing of the review process appeared to change. It was widely reported in the legal press that the merging companies hired many hundreds of lawyers, probably more than a thousand, to work for approval of the deals.[11] Verizon alone hired four major east coast law firms to influence the Government. *See, e.g.,* Cecile Kohrs Lindell, *Why Verizon has a dream team*, The Deal, Apr. 14, 2005, *available at* http://www.thedeal.com/servlet/ContentServer?pagename=TheDeal/TDDArticle/TDStandardArticle&bn=NULL&c=TDDArticle&cid=1112030883061, and attached hereto as Exhibit 6.

It became apparent in the press that DOJ was under considerable political pressure. On October 26, 2005, the Wall Street Journal ran an article specifically criticizing the Acting Assistant Attorney General, Mr. Barnett, for, among other things, "sitting on the proposed SBC/AT&T and Verizon/MCI mergers." The editorial ended tartly by noting that "Mr. Barnett's nomination is pending before the Senate," but "he belongs in another job."[12] The Journal later

---

[9] *See* Suzanne King, *Merger Mania Keeps Calling,* Kansas City Star, February 1, 2005, *available at* 2005 WLNR 22823604, attached as Exhibit 4.

[10] *See* Denise Pappalardo, *SBC/AT&T Merger: Full Steam Ahead,* Network World, August 1, 2005, *available at* 2005 WLNR 12520266, attached as Exhibit 5.

[11] *See, e.g.*, Stephen R. Strahler, *Lawyers for Hire on AT&T's case; Temp Attorneys round out Sidley's workforce in merger case*, Crain's Chicago Business, May 16, 2005, *available at* 2005 WL 8029172; Editor's Note and Correction, Crain's Chicago Business, May 23, 2005, *available at* 2005 WLNR 8446758; Jason McLure, *Detailing a Deal*, 28 Legal Times 44, Oct. 31, 2005.

[12] *Antitrust Busters*, The Wall Street Journal, October 26, 2005, *available at* <http://online.wsj.com/PA2VJBNA4R/article/SB113029164675279590.html>, attached as Exhibit 7.

reported that Mr. Barnett's nomination had been placed on hold while two Senators "asked Mr. Bush to reconsider the appointment [on] grounds of Mr. Barnett's activist antitrust bent."[13]

After a couple of telephone conferences (the first of which was on August 12, 2005) to discuss the economic basis of ACTel's position and the methods of statistical analysis, Antitrust Division economists and attorneys, along with the outside experts retained by the Division, began on September 20 the process of auditing the data submitted by the ACTel members. But this activity was abruptly terminated before even a single company's data had been fully reviewed. ACTel's counsel was told on or about September 24 that ACTel needed to submit a White Paper setting forth its views promptly, if ACTel wished to have such a document considered. ACTel worked diligently and submitted its White Paper to the Department of Justice on October 3, 2005.

But, by that date, the press was already reporting that the deals were tracked for quick approval with only minor conditions. Reuters reported on September 30, 2005, for example, that the Department of Justice would "only require the sale of selected high-capacity lines to allay antitrust concerns." Reuters quoted its source as saying, "It's coming out far better for the carriers than even the carriers anticipated."[14] And on October 5, 2005, the Chicago Tribune bemoaned the fact that the mergers "will undo a competitive structure that goes back nearly 20 years, when two little-known companies pioneered the concept of bypassing the Bell monopoly on local phone companies."[15]

---

[13] *Antitrust Anxiety*, The Wall Street Journal, December 16, 2005, *available at* <http://online.wsj.com/PA2VJBNA4R/article/SB113470344278424342.html>, attached as Exhibit 8.

[14] Peter Kaplan, *Big U.S. Telecom Deals Seen Winning Antitrust OK,* Reuters, September 30, 2005, attached as Exhibit 9.

[15] Jon Van, *2 Telecom Mergers Hovering Over Rivals,* Chicago Tribune, October 5, 2005, *available at* 2005 WL 23415054, attached as Exhibit 10.

10

On October 27, 2005, the Department of Justice announced that it had approved the acquisitions with only divestitures of IRUs in some lateral facilities, and had filed both Complaints and pre-negotiated settlement decrees simultaneously. The Senatorial hold was subsequently taken off of Mr. Barnett, and he was confirmed on February 10, 2006. *See,* Barnett biography, *supra,* n. 8.

Does this indicate that a political deal was cut to secure approval of these mergers? Absolutely not. But many of the facts are worrisome. It is unfortunate that the merging companies decided abruptly to press their transactions through the Antitrust Division at a time when the Assistant Attorney General Designee was under political attack and not yet confirmed. And it is also unfortunate that the Antitrust Division, facing both the political pressure and the overwhelming legal resources deployed by the merging companies, convinced itself that a remedy that cannot possibly succeed was all that it would demand in transactions of enormous consequence to the economy.

### V.    THE DATA AND ANALYSIS SUBMITTED TO DOJ BY ACTEL MEMBERS ARE CORROBORATED BY NUMEROUS SOURCES, EQUALLY AVAILABLE TO THE GOVERNMENT.

The principal conclusions of the econometric analysis of the data submitted by ACTel members is found in the Declaration of Simon Wilkie, attached to ACTel's May 4, 2006 memorandum as Exhibit 2. Professor Wilkie's Declaration is relatively short, non-technical, and in summary form. It is important for the Court to understand that the short, summary nature of the declaration should not be taken to suggest that what was provided to the Department of Justice was similarly short and non-technical. The Wilkie Declaration itself describes how lengthy, complicated, detailed, and expensive the underlying analysis was. The submissions to the Government included approximately 34 megabytes of data in more than thirty separate files,

which were delivered on a number of compact discs. The material included data, expert reports, numerous tables, computer programs and the like. This analysis is submitted to the Court in summary form in the Wilkie Declaration, both to protect its confidentiality and to enable the Court to evaluate it for Tunney Act purposes without the complication of unnecessary technical or economic jargon.

The econometric results of ACTel's analysis are wholly consistent with many public reports of the same time, a few of which are attached as exhibits to this memorandum. For example, the bid data of ACTel members indicates that MCI and AT&T were the largest, most price-competitive, and most pervasive suppliers of Local Private Lines to the wholesale market. This conclusion could hardly have come as a surprise to the Department of Justice. Industry analyst reports prepared in the normal course of business prior to the mergers made exactly the same statement based on empirical analysis; such reports were provided to the Government during the course of its investigation.[16]

Similarly, the principal findings of the data analysis were that competition provided by AT&T and MCI produced low prices for Local Private Lines and that prices would rise if AT&T and MCI were acquired by SBC and Verizon. Again, this is hardly surprising. Before the merger, industry analyst reports contained data and analysis showing that stiff competition in the industry had produced declining prices, but that the acquisitions could be expected to reverse that trend. For example, in June 2005, a prominent Bear Stearns report stated that, "[a]s the mergers are finalized, we expect competition in the SME [small and medium-sized enterprise] market to

---

[16] *See, e.g., Wholesale Communication Strategy Session: Survey Results and Research Overview,* The Yankee Group, January, 2004, excerpts attached as Exhibit 11.

slow down. ... [P]ricing is likely to stabilize and possibly rise over time."[17] After the acquisitions, industry reports indicated that 2006 pricing would become "better" (*i.e.,* higher) for the new AT&T and Verizon.[18]

Neither the ACTel data nor the industry analysts limit the effect on competition to "2 to 1" loop buildings. On the contrary, the anticompetitive effects are felt throughout the local networks, on both loop and transport circuits. It is well beyond implausible to suggest that divesting IRUs to a limited number of buildings in a discrete set of cities will remedy that injury. The divestitures will simply not replace the competition lost by the elimination of AT&T and MCI as competitors. The Wilkie Declaration explains this in some detail.

ACTel submits with this memorandum two additional declarations that make the same point. First, ACTel submits the declaration of one of the bidders for the divested assets. That declaration, attached to this memorandum as Exhibit 1, explains the limited nature and value of what is being divested. *See* Nicklas Decl. at ¶ 6. Most importantly, as previously noted, the declaration explains that the winning bidder simply cannot replace the competition previously provided by AT&T and MCI because the winning bidder will have a smaller network, fewer resources, and fewer overall capabilities. The bidder will not even be able to offer prices on the divested lines at the same low prices as AT&T and MCI charged, much less provide the same level of competition for other loops and transport circuits. *Id.* at ¶¶ 6-7. AT&T and MCI were the most aggressive and competitively priced sellers. The competition provided by AT&T and MCI forced prices offered by other suppliers down on all circuits. The Government's remedy

---

[17] Mike McCormack, et al., *U.S. Wireline Services,* Bear Stearns Equity Research, June 2005 at pp. 41, excerpts attached as Exhibit 12.
[18] *See, e.g.,Wireline Telecom Playbook: What's In Store For 2006?*, UBS Investment Research, January 3, 2006, attached as Exhibit 13.

provides no mechanism to maintain the same level of competition. Prices are bound to go up because the chief competitors have been eliminated.

In addition to Professor Wilkie's Declaration, ACTel submits with this memorandum an additional economic declaration from a telecommunications expert, Joe Gillan, who has broad and deep testimonial experience in telecommunications cases. Like the Wilkie Declaration, the Gillan Declaration explains that the competition provided by the large AT&T and MCI networks cannot be replaced merely by divesting a few isolated circuits. *See* Gillan Decl., attached as Exhibit 14.

## VI. THIS COURT SHOULD TAKE THE TIME IT NEEDS TO PERFORM THE APPROPRIATE TUNNEY ACT EVALUATION AND SHOULD AVAIL ITSELF OF THE APPROPRIATE TUNNEY ACT PROCEDURES.

At the hearing on May 10, both the Government and the merging parties urged the Court to make its decision by July 31, 2006, which is the date the parties represented to the Court that the bids for the divested assets expire. ACTel does not object to the Court deciding by this date if the Court believes it can fulfill all of its Tunney Act obligations in this time frame.[19] However, ACTel wishes to point out that the Tunney Act legislative history expressly instructs courts to take the time required to perform an appropriate review, even if that results in lengthy delay. For example, during the course of hearings on the original Tunney Act bill, the Honorable J. Skelly Wright, whose views were repeatedly cited by Senator Tunney, expressly addressed himself to this point:

> [I]n many cases, I would think, and have seen, no opposition filed, where the case is of great national importance, then time should be taken – court's time and counsels' time should be taken to study the decree, to get information from the public concerning the ramifications of the decree, the anticipated results of the decree and, in my judgment, this time is well spent, even though it may take days,

---

[19] The undersigned counsel is particularly grateful to the Court for accommodating his schedule.

> even though it may take weeks; it could have a trial that would last months and months.
>
> So, to suggest that S. 782 will not require judicial time and counsel time would be misleading. In important cases, S. 782 would require judicial time, necessarily so, and I believe rightfully so.

Senate Hearings at 51.

Here, the divested assets are not competitively or commercially significant and the bidder for the divested assets whose declaration is attached to this memorandum makes clear there is no particular significance to the July 31 date; the Court can and should take more time to perform Tunney Act review if that time is necessary – the bidding process will not be burdened. *See* Exh. 1 (Nicklas Decl. at ¶ 8).

The Court also indicated at the May 10 hearing that it may wish to take advantage of some of the alternatives identified in Section 16(f) (1)-(5) of the Tunney Act, including perhaps the taking of live testimony. The Tunney Act specifically contemplates such procedures and, indeed, the breadth of the procedures Congress sought to authorize can hardly be overstated. In his remarks introducing the bill, Senator Tunney described Section 16(f) (5) as a "blanket authorization" for the use of any "tools as may be useful in fulfilling the mandate placed upon it to evaluate the proposed decree." 119 Cong. Rec. S 3453. Moreover, the legislative history makes it clear that these procedures may well prove necessary in cases of complexity and importance. Thus, as Senator Tunney summarized concerning Section 16(f):

> [A]ll of the procedural devices cont[ain]ed in this subsection are discretionary in nature. They are tools available to the district court for its use, but use of a particular procedure is not required. ... There are some cases in which none of these procedures may be needed. On the other hand, there have been and will continue to be cases where the use of many or even all of them may be necessary. In fact, in a very few complex cases, failure to use some of the procedures might give rise to an indication that the district court had failed to exercise its discretion properly.

15

119 Cong. Rec. S 3453 (daily addition Feb. 6, 1973) (Remarks of Sen. Tunney).

VII. **IF THE PARTIES AND GOVERNMENT WILL NOT PROVIDE THE APPROPRIATE DIVESTITURE REMEDY, THE COURT SHOULD SIMPLY REJECT THE SETTLEMENT.**

ACTel believes that once the Court has examined all of the facts, there will be little doubt that a far more meaningful remedy is appropriate – a remedy like the one contemplated by the Government in the proposed Qwest merger in which all overlapping metropolitan area assets, along with customers, were to be divested. This would give the acquiring company a far better ability to compete meaningfully in supplying the market for Local Private Lines, and to prevent anticompetitive price increases.

But in this case, the Government has already permitted the parties to close the transactions. Meaningful divestitures would require a substantial allocation of Government resources and the cooperation of the merging parties. If the Court believes that this would not be forthcoming, the Court should consider simply rejecting the settlement as failing the "public interest" test. AT&T and Verizon, as well as the Government, would draw the obvious conclusion that further acquisitions are highly questionable. In such an action by the Court would be helpful guidance to Congress, which is currently considering new amendments to the Telecommunications Act.

## CONCLUSION

For the foregoing reasons and those stated in ACTel's Opposition to the Department of Justice's Motion for Entry of Final Judgments, this Court should deny the Department of Justice's motion.

May 16, 2006

Respectfully submitted,

By: /s/ *[signature]*
Gary Reback (Bar No. 218594)
Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA 94303
50-812-3489 (phone)
50-812-3444 (facsimile)
greback@carrferrell.com

Thomas Cohen (Bar No. 269332)
3050 K Street, NW, Suite 400
Washington, DC 20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
tcohen@kelleydrye.com

*Attorneys for the Alliance for Competition in Telecommunications*