# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, ) | |
| Plaintiff, ) | Civil Action No.: 1:05CV02102 (EGS) |
| v. ) | |
| SBC Communications, Inc. and ) | |
| AT&T Corp., ) | |
| Defendants, ) | |
| The Alliance for Competition in ) | |
| Telecommunications ) | |
| and ) | |
| COMPTEL, ) | |
| *Amicus-Curiae.* ) | |
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Civil Action No.: 1:05CV02103 (EGS) |
| v. ) | |
| Verizon Communications Inc. and ) | |
| MCI, Inc., ) | |
| Defendants, ) | |
| The Alliance for Competition in ) | |
| Telecommunications ) | |
| and ) | |
| COMPTEL, ) | |
| *Amicus-Curiae.* ) | |

## DECLARATION OF BRAD E. MUTSCHELKNAUS
## KELLEY DRYE & WARREN LLP

Pursuant to 28 U.S.C. § 1746, and the Rules of Civil Procedure of the United States District Court for the District of Columbia, I, Brad E. Mutschelknaus, hereby declare the following:

1.  My name is Brad E. Mutschelknaus. I am a Partner in the law firm of Kelley Drye & Warren LLP ("Kelley Drye"). I am a 1980 graduate of the Georgetown University law school. Upon graduation, I was admitted to the District of Columbia bar, and began practice as an associate with the law firm of Cadwalader Wickersham & Taft. Between 1984 and 1990, I held a succession of management positions in the legal departments of Satellite Business Systems, Sprint Communications and National Telephone Services. I joined the firm of Wiley Rein & Fielding as a partner in 1990, and joined Kelley Drye in 1996 as a founding partner of its Telecommunications Practice Group, which now ranks as one of the largest such practice groups in the nation. I have practiced in the area of telecommunications law for more than twenty years. During that time, I have represented scores of telecommunications companies in regulatory, corporate and litigation matters. I regularly represent telecommunications companies in regulatory proceedings before the Federal Communications Commission ("FCC") and most state Public Utility Commissions ("PUCs") across the country.

2.  In early 2005, Kelley Drye was retained by the Alliance for Competition in Telecommunications ("ACTel"), to represent it in connection with various regulatory proceedings established to consider the proposed acquisition of AT&T by SBC, and the proposed acquisition of MCI by Verizon. Since in both cases the merging parties were telecommunications carriers operating pursuant to licenses granted by the FCC and various

PUCs, advance consent to the transaction by the FCC and multiple PUCs was required by applicable law. I was the lead partner at Kelley Drye in charge of representing ACTel in the proceedings established by the FCC to consider whether to permit the two proposed mergers to close.

3. ACTel's primary objection to the proposed transactions was to the adverse horizontal effects of effectively eliminating the two most important suppliers of wholesale telecommunications transmission services from the marketplace. As is typical in the telecommunications business, ACTel members are unable for many reasons to deploy their own network facilities universally to all locations. Thus, ACTel members must purchase facilities from other providers to augment their networks in order to compete. The largest suppliers of such wholesale facilities in their operating territories were SBC and Verizon. However, ACTel's position was that AT&T and MCI were the two most important alternative sources of wholesale transmission services, and that the loss of AT&T and MCI as wholesale competitors to SBC and Verizon, respectively, would drive prices upward substantially – and thereby undermine the ability of ACTel members to continue to price competitively in the retail market. To support its position, ACTel retained a team of expert economists to assemble a database comprised of thousands of individual circuit bids provided by wholesale suppliers to ACTel members to provide wholesale transmission services. The economists used the database to determine the importance of AT&T and MCI to wholesale market for telecommunications services, and estimate the price impact of the loss of these companies as competitive suppliers. The economic team concluded – based upon their review of the data – that AT&T and MCI were in fact the most important players in terms of providing discipline to the wholesale pricing of SBC and

Verizon, and calculated that prices were likely to escalate substantially once they were lost to the marketplace (at least within the SBC and Verizon operating territories) through merger.

4. The bid data assembled by the ACTel economic team was extremely sensitive and confidential business information. No ACTel member was permitted any access or visibility to the data supplied by any other ACTel member. Access to the database was strictly restricted to the third party economists and outside counsel. However, when DOJ asked to see the actual data underlying the report of the ACTel economists, ACTel members readily agreed provided that DOJ requested the information subject to a Civil Investigative Demand ("CID") that fully protected the confidentiality of the information supplied. DOJ provided the CIDs, and ACTel members turned their bid data and related documentation and analyses over to DOJ.

5. Unfortunately, the FCC has no procedure that protects the confidentiality of information to the extent provided by DOJ's CID process. Information provided to the FCC in formal proceedings such as the merger reviews at issue normally becomes public information. The FCC entered a Protective Order in the merger dockets which enabled information designated as confidential to be protected from release to the general public – however, any party that signed the Protective Order was entitled to review the confidential information. In the instance of the ACTel members' bid data, the FCC Protective Order provided insufficient protection from disclosure because, among other things, much of the bid data was subject to Nondisclosure Agreements ("NDAs") required by the companies making the bids. Supplying the information to other private companies, even pursuant to a Protective Order, could have been regarded as a breach of the NDAs. Consequently, it was not possible to file the ACTel members' bid data or detailed analyses of it with the FCC as was done at DOJ.

6. Due to the legal inability to prevent disclosure to all parties, the problem described in paragraph 5 above is not an unusual one encountered in FCC merger reviews. In such situations, it is relatively commonplace for the FCC to resolve the dilemma by asking the disclosing party to consent for FCC staff to review the confidential CID responses on file with DOJ without incorporating them into the formal FCC record. ACTel members repeatedly told the FCC staff reviewing the mergers that they would grant permission for the FCC to review their CID responses. At first, the FCC staff members expressed a desire to see the CID responses, and began negotiating the terms of consent letters. However, for reasons unexplained to my clients or me, the staff members involved reversed their position and told ACTel that they no longer were interested in reviewing the bid information on file at DOJ. We encouraged them without success to revisit their position and take steps to review the bid data. Since it would have been a violation of the CID statute for anyone outside of DOJ to see CID responses without an express waiver of confidentiality, we can be sure that the FCC never bothered to take a look at this critical information.

7. We were disappointed that the FCC did not avail itself of the opportunity to examine the critical and highly relevant wholesale supply bid database and related analyses assembled by the ACTel economic team. We cannot know what caused the sudden reversal of position, and loss of interest in the ACTel members' bid data, by the FCC staff. What we do know is that the FCC did not have available to it for its decision critical information before the DOJ. Consequently, the FCC decision to allow the transactions to close – as a regulatory matter – was not based on the same complete record that was before DOJ.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 16, 2006.

_____
Brad E. Mutschelknaus