IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:05CV02102 (EGS) |
| v. | ) ) | |
| SBC Communications, Inc. and AT&T Corp., | ) ) ) | **NOTICE OF AMICUS CURIAE MOTION WITH ACCOMPANYING BRIEF ON BEHALF OF MICHAEL** |
| Defendants. | ) ) ) ) | **LOVERN, SR. ET AL, IN OPPOSTION TO U.S. MOTION FOR ENTRY OF FINAL JUDGMENT** |

**MOTION BY AMICUS, MICHAEL LOVERN, SR., NATIONAL TELEPROCESSING, INC., AND AMERICAM TELEDIAL CORP. CASE NO. 1:05CV02102 (EGS)**

**TO: ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN:**
*Amicus In Opposition To U.S. Motion For Entry of Final Judgment*

The undersigned, Michael Lovern, Sr., National Teleprocessing, Inc., and American

TeleDial Corp., (Opposing Parties) respectfully submit this motion with supporting brief

*amicus curiae* in opposition to the U.S. Motion for entry of final judgment. The Opposing

Parties file this motion pursuant to Rule 24(a)(1)&(2) F.R.Civ.P.; and, 15 U.S.C., § 16 –

(f)(3), and CLERK'S OFFICE GENERAL INFORMATION & CIVIL FILING

PROCEDURES (February 21, 2006), II. F. 2, h.

> Rule 24. Intervention - (a) Intervention of Right.
> (1) when a statute of the United States confers an unconditional right
> to intervene; or (2) when the applicant claims an interest relating
> to the property or transaction which is the subject of the action and
> the applicant is so situated that the disposition of the action may as
> a practical matter impair or impede the applicant's ability to protect
> that interest, unless the applicant's interest is adequately represented
> by existing parties; and,

15 U.S.C., § 16 - (f) Procedure for public interest determination
  3) authorize full or limited participation in proceedings before the
court by interested persons or agencies, including appearance amicus
curiae, intervention as a party pursuant to the Federal Rules of Civil
Procedure, examination of witnesses or documentary materials, or
participation in any other manner and extent which serves the public
interest as the court may deem appropriate.

## I. PRELIMINARY STATEMENT

Opposing Parties challenge DOJ's position that there are no competitive issues regarding

the InterCompany Settlement System (ISS), AT&T's Original Billing System that Judge

Greene ordered AT&T to divest themselves of, part and parcel to the Modified Final

Judgment (MFJ). For the record it should be noted that DOJ makes no mention of the ISS

in any of their filings.

Amicus did not file comments in this case because they provided DOJ, the FCC, and the

Missouri PSC all the evidence in the AT&T Wireless case in 2004/2005, which the

Regulators swept under the carpet.

"November 11, 2004

R. Hewitt Pate, Matthew C. Hammond
Antitrust Division - New Case Unit
950 Pennsylvania Ave., N.W. Suite 3322
Washington, DC 20530
Via fax: (202)-514-6381

  RE: SBC Communications, Inc. / Bell South Corporation

Dear Gentlemen:

As we discussed Tuesday, AT&T Wireless has been looted by its executives in
conjunction with Cingular's takeover, even though the merger is not final. SBC

Communications, Inc. (SBC) and Bellsouth Corporation (BS) have been operating an anticompetitive Universal Billing & Collection System known as the InterCompany Settlement System (ISS) since 1984. The ISS is located in Missouri at Southwestern Bell telephone (SWBT). It has been operated for 20 years under the radar without a single tariff being filed anywhere, and to the detriment of consumers nationwide and competition. It is a monopoly. It is the only billing & collection system with 100% on net capability.

SBC is the "Contract Administrator" and the "King Pin" of the racketeering enterprise. The lieutenants [ISS Direct Participants] of the criminal enterprise began in 1985 as the Seven RBOCs, Cincinnati Bell, and Southern New England Telephone (SNET). Today they are no different:

New England Telephone Company
New York Telephone Company
Bell Atlantic, NJ
Bell Atlantic, PA
Bell Atlantic, DE
Bell Atlantic, DC
Bell Atlantic MD
Bell Atlantic VA
Bell Atlantic WV
Southern Bell Telephone Company
South Central Bell Telephone Company
Ohio bell Telephone Company (Ameritech)
Michigan Bell Telephone Company (Ameritech)
Indiana Bell Telephone Company (Ameritech)
Illinois Bell Telephone Company (Ameritech)
Wisconsin Bell Telephone Company (Ameritech)
Northwestern Bell Telephone Company
Southwestern Bell Telephone Company
Mountain Bell Telephone Company
Pacific Bell Telephone Company
Nevada Bell Telephone Company
Southern New England Telephone Company
Cincinnati Bell Telephone Company

These 23 companies can control every single USA toll message placed on a LEC bill anywhere in the U.S., Canada & Caribbean. The ISS is AT&T's original billing system and they have installed numerous derivatives of the system within their respective territories to allow themselves to look like they act independently, when in fact they act as a single monopoly with anticompetitive pricing, part and parcel to a two tier system of billing and collection, violating since 1984 the Clayton Act,

Sherman Act, FTC Act and RICO. The criminal enterprise has lined its pockets with hundreds of billions of dollars of dirty money. We have their secret internal documents, flow charts included, showing how they laundered the money. It is the best kept secret in telecommunications. They have paid off numerous public officials to keep the criminal enterprise going over the last 20 years.

By allowing Cingular & AT&T Wireless to merge, Cingular will now enjoy market share advantages no one can appreciate except Verizon Wireless. When SBC, Bellsouth, and Verizon begin bundling wireline service and wireless on the same bill we will see the wireless industry controlled by the racketeering enterprise, specifically Cingular [SBC/Bellsouth] and Verizon Wireless [Verizon]. Nextel, Sprint et al will become extinct as no one can compete with 100% ON NET Universal Billing & Collection (B&C). Anyone can transport Mr. Hammond, but what separates the "Big Boys" from the "little boys" is billing & collection. Not just collecting your money. The speed, expense, accuracy, accounting, and reporting capabilities of the ICS is so anticompetitive in comparison to the tariffed B&C product offered to the competition it's like comparing Sandlot football to the NFL. In addition to the obvious, the 23 ISS hosts listed above micro manage their competitors messages by unpacking and editing out what the criminal enterprise doesn't want on the LEC bill. The infamous 23 completely controls what goes on the LEC bills. When Judge Greene broke up AT&T he did not give SBC and its partners in crime AT&T's billing system to be used as a monopoly, yet that is exactly what they did, which is why the playing field has never been level since divestiture. To compete one must be able to control its cash flow.

Bill McGowen [MCI Founder] told me personally in 1991 that he knew AT&T had been getting preferential billing treatment since 1985, but that he couldn't prove it. It has taken me 13 years and millions of dollars but be assured that I can prove that and much, much more. I have enough evidence to put the infamous 23's Executives in jail. Through the telecom companies I owned, I lost about $900 million because of the anticompetitive ISS, and by adding 5% compound interest, today my damages are around $1.7 Billion. I intend to collect my damages.

SBC has violated Sarbanes-Oxley with their 2004, lst, 2nd and 3rd Quarter Q filings with the SEC as we put SBC on written notice of the ISS liability in March 2004, and warned them to disclose pursuant to 17 CFR 229.303, as interpreted by the U.S. Supreme Court. James Turley [Global Managing Partner, Ernst & Young, a personal friend of Ed Whitacre - Chairman of SBC]... Mr. Turley was put on written notice in June 2004, [enclosed] as Ernst & Young is the outside auditor for SBC. Bank of America (BOA) was notified as one of the lead banks in SBC's $6 Billion Credit agreement used to finance the AT&T Wireless deal. BOA covered up the liability [BOA Audit Committee Chairman is a good friend of Whitacre and he refused to look at the evidence], which means the credit agreement is in default, specifically Art. III, Sec. 3.01 (b) of the agreement; and, fraudulent NOTES have

been sold to the public. BOA is now a co-conspirator along with Ernst & Young, SBC and its outside lawyers who handled this matter in the upcoming class action that has joint & several liability around $2.5 Trillion, which includes treble damages.

In their capacity as lead bank for the $6 Billion credit agreement, Citibank has knowingly allowed SBC to stay in default since the agreement closed October 18, 2004. The other 19 banks are fighting over how to get out. SBC used this money to issue fraudulent Debt Securities to the public, and now 19 additional banks/lenders are involved in funding antitrust and racketeering. Defendant, C. Michael Armstrong [former CEO at AT&T who covered up the criminal enterprise while at AT&T] sits on the Audit Committee at Citigroup. This incestuous conduct is normal for the defendants.

The list of banks is as follows: Citibank; Bank of America; ABN AMRO Bank, N.V.; Barclays Bank; Deutsche Bank A.G. [NY]; JP Morgan Chase; Lehman Brothers Bank, FSB; UBS Loan Finance LLC; IISBC Bank USA, N.A.; Merrill Lynch Bank USA; Credit Suisse First Boston; William Street Commitment Corp.; Morgan Stanley; Bank of Toyoko-Mitsubishi, Ltd.; Sumitomo Mitsui Banking Corp.; Mellon Bank.,N.A.; Wachovia bank N.A.; The Northern Trust Co.; Frost National Bank. These banks/lenders are all now facing joint & several liability in excess of $2.5 Trillion in the upcoming class action mentioned above.

It is important that you notify Judge Walton immediately about the looting of AT&T Wireless, and that we are going to challenge the merger pursuant to the APPA, as it will be necessary to put AT&T Wireless back in tact when the merger is cancelled. As we discussed, it is inappropriate for the AT&T Wireless Executives to loot the company of its files before the merger is even final. As I told you I know this has happened by talking to insiders still around. I will follow this letter up with detailed evidence of the antitrust violations, but first we must protect AT&T Wireless from being destroyed as the merger could be nullified one way or another.

Yours truly,"



The Companies listed in the above letter are the original Bell System stakeholders.  BUT

– all certified local service providers MUST also participate in ISS through their Bell

System stakeholder.

This is RAO administration – where the purpose of the RAO is to route, report, and facilitate the CMDS 1 A/Ps, A/Rs, and associated charges represented by certain EMI records.

The Stakeholders also further distribute, report, and facilitate the CMDS 1 A/Ps, A/Rs, and associated charges represented by these EMI records.

ALL Independents, CLECs, and Resellers <u>MUST</u> participate in the ISS through interconnection agreements.

These 23 companies can control every single USA toll message placed on an incumbent Local Exchange Carrier's (LEC) end-user billing statement, an Independent Telephone Carrier's (ITC) end-user billing statement, a Competitive Local Exchange Carrier's (CLEC's) end-user billing statement, and a Reseller's end-user billing statement anywhere in the U.S., Canada, U.S. Protectorates & certain Caribbean nations.

Judge Greene ordered AT&T to divest themselves of the ISS as it violates antitrust laws as it provided AT&T an unfair advantage for billing and collection of long distance charges, operator and third number billed revenue as it is the only 100% ON NET billing System in North America. 100% ON NET means it can bill and collect revenue from every telephone in the U.S., Canada, U.S. Protectorates, and the Caribbean Nations, without a B&C Contract between the owner of the receivable flowing through the system, and the appropriate billing Local Exchange Carrier (LEC). In addition, the billing LEC provides extensive reporting, customer service and collections, and end-user statement

billing, which translates into extremely low uncollectibles and extremely high return on revenues.

**THE HISTORY OF THE BELL SYSTEM DECREE**

It is appropriate to begin with some history, because the competition that we have today in the billing and collection of long distance is no different today than it was back in 1984. The MFJ was made possible by DOJ's landmark antitrust case against the Bell System. That case, as you know, was a completely nonpartisan undertaking. It began with an investigation that was initiated in 1969 during the Nixon Administration, accelerated with the filing of the case in 1974 in the Ford Administration and was pursued vigorously through the Carter and Reagan Administrations until it was settled in 1982 by law professor, William Baxter, President Reagan's Assistant Attorney General for Antitrust. That historic settlement resulted in the entry of the Modification of Final Judgment (or MFJ), which dismantled the Bell System's vertically integrated telephone monopoly.

The seven Regional Bell Operating Companies (Bell Companies) were created by the MFJ and each had a maintained service monopoly over local telephone service in its respective region. The MFJ restricted the Bell Companies from entering the inter-Lata and inter-state long distance and equipment manufacturing markets. These line-of-business restrictions grew out of the central issue in the case: *the ability of the local monopoly to impede competition in those other markets.*

(7)

Before it was broken up, the Bell System used its control over local telephone service to maintain monopolies in long distance and equipment manufacturing. [See *United States v. AT&T*, 552 F. Supp. 131, 162 (D.D.C. 1982), aff'd sub nom., *Maryland v. United States*, 486 U.S. 1001 (1983). Long after competition in long distance service and communications equipment became technologically and economically feasible, the Bell System abused its control of the local bottleneck to frustrate consumer choice and actual competition.

As Judge Harold Greene, who presided over the eleven month trial of the case and who continued to administer the terms of the MFJ up to the 1996 Telecommunication Act explained, it was control of local exchange service that gave the Bell System its power over the competition. That control enabled the System to foreclose or impede interconnection to its network of lines of its long distance competitors and of equipment produced by its manufacturing rivals. It also made possible the subsidization of one activity with the profits achieved in another. *United States v. Western Elec. Co.*, 673 F. Supp. 525, 536 (D.D.C. 1987), aff'd in relevant part, 900 F.2d 283 (1990). In other words, control of the regulated local monopoly bottleneck gave the Bell System the incentive and the ability to discriminate against competitors in other markets in the terms, price and quality of interconnection with the local network and to shift costs from unregulated markets to the regulated local market, where they were passed on to local ratepayers. The newly formed Regional Bell Operating Companies (RBOCs) were prohibited from providing AT&T any service that was not offered to their Competitors in ***"type, quality, and price."***

Until the success of the Department's suit, regulation and litigation had not been effective in breaking through that local bottleneck. The Bell System proved itself adept at devising new ways to use the bottleneck to hurt competition in other markets more quickly than the courts and regulatory agencies could order solutions. Among other things, the Bell System used its monopoly profits to hire legions of lawyers to make sure that any proceeding that challenged any aspect of the monopoly was bogged down in endless proceedings. For example, the struggle to allow telephone customers the right to use their own equipment on their own premises, rather than being forced to purchase that equipment from the Bell System, spanned decades -- from the beginning of the Hush- a-Phone litigation in the 1940s to the break-up of the Bell System in 1984, which finally resulted in open competition in customer premises equipment. [See, *United States v. AT&T*, 552 F. Supp. at 162-63 (discussing a portion of this struggle -- the Bell System's use of "protective connecting arrangements" to discourage the use of competitors' equipment)].

Upon creation of Bellcore, Southwestern Bell Telephone (SBC) became the "Contract Administrator" for the ISS, and a replicated version of AT&T's ISS software was installed in Kansas City, MO at SBC. AT&T never truly divested itself of the system as ordered. They simply replicated the ISS and provided SBC with a copy of the software, whereby in turn the RBOCs gave AT&T illegal back door access, which led to the Intervenors' legal claims, financial losses, along with Consumer[s] and AT&T's competitors.

(9)

The significant market advantage that AT&T maintained after Divestiture was the legacy ISS relationship with the RBOCs that allowed AT&T to enjoy 100% On-Net Billing & Collection Agreements with ALL local service providers throughout the U.S., Canada, U.S. Protectorates, Caribbean Nations, and even the CLECs, such as MCI, when that MCI subscriber dialed-up around the MCI network and used an AT&T service.

Further, AT&T enjoyed local service providers billing and collecting AT&T's charges under the local service provider's end-user billing statement, which included extensive reporting, low uncollectibles, and high revenue returns to AT&T. In other words, AT&T maintained and enjoyed a highly significant competitive position over all other new entrants to the telecommunications market. A highly significant competitive position that was never addressed by the DOJ.

## II. THE CHALLENGE

The Amici challenges DOJ's position that allowing AT&T to become the "Contract Administrator" for the ISS creates a conflict of interest as their competitors, [Verizon, Bellsouth, Cincinnati Bell, and Qwest excluded] will not be able to compete in the billing and collection of revenue, to included bundled services, as only those entities have direct access to the ISS. All other competitors have to go out and negotiate individual contracts with every telephone company at inflammatory rates to be able to bill their customer, via the LEC bill, or to obtain what is known as billing/name/and address. Granted LEC billing is not as big today as in the past, but billing name and address requirements is huge.

Judge Greene's original legal position is not different today just because AT&T is smaller, and, DOJ's proposed final order in this case will not comply with the prerequisite that the Bells open up their services as a condition to getting into the long distance business; hence, the basis of the MFJ, the 1996 Telecommunications Act, and the antitrust laws are all being trampled.

### III. INTERESTS OF AMICI

Michael Lovern, Sr. is a businessman and a Consumer. He is also the founding partner of American TeleDial Corp. (ATC), and National TeleProcessing, Inc. (NTI). Both ATC and NTI were put out of business illegally by the RBOCs. At the CompTel Convention in Las Vegas in February 1992, all the RBOCs and their lawyers sat in the hotel suite of ATC and NTI to meet with Michael Lovern, Sr. (Lovern). The purpose of the meeting was to discuss the RBOCs' proposals to Lovern for the RBOCs to provide Billing & Collection Services (B&C) to Lovern, ATC, and NTI. ATC was a national long distance billing company, and NTI was a carrier.

Lovern proceeded to tell the RBOCs that he was turning down all their B&C contract offers as he [Lovern] intended to use the same billing system AT&T was using, the *secret billing system* located in Kansas City at Southwestern Bell Telephone. Lovern explained that it was a superior system to what was being offered, via the contracts, and the price was $.05 per message [inquiry included], compared to an average of about $.45 per message nationwide spanning from NYNEX to Pac Bell [with no inquiry] being offered

(11)

by the RBOCs. The RBOC lawyers denied that the **InterCompany Settlement System** (ISS) even existed.

On March 29,1992, through Lovern's strategic partnership with Fidelity Telephone, ATC began legally downloading messages into the ISS for LEC Billing. The messages were formatted in EMR [secret system] instead of the more expensive EMI format [RBOC inferior B&C service offered to AT&T's competitors at a much higher price], and they flew through the system as expected, ending up at LECS throughout the country just like AT&T messages did daily, except for one thing, when the LECs began calling Southwestern Bell (SWBT) [Bellcore appointed "Contract Administrator"] asking what was going on, SWBT panicked. They knew Lovern had figured out the codes and was in the "Country Club's" secret billing system, **the circle within the circle**.

In the spring of 1992, SWBT blocked the access of ATC / Lovern, by blocking Fidelity Telephone's access to the Computer system that controls the ISS. Pursuant to a litigation management contract, and assignment of legal claims from Fidelity to Lovern/ATC, Lovern successfully obtained an injunction in state court in Missouri whereby SWBT was ordered to unblock the ISS and allow Fidelity/ATC/Lovern access.

During this time period of <u>court ordered protection</u>, Lovern / ATC entered into the ISS B&C call records of non-AT&T transported long distance calls, the receivable having been purchased by Lovern / ATC. These calls were not transported by AT&T, yet charged to one of the infamous AT&T scrambled Caribbean / CIID Calling Cards. All of

(12)

the these call record receivables were returned to ATC and Lovern marked "Uncollectable – Caribbean Calling Card, No B&C Agreement." Approximately $154,000 was edited out as uncollectable, and the scrambled call records were sent back to ATC by SWBT.

What Lovern had at the time, that no one else had ever had, was the Bellcore codes to unscramble the call records, which once <u>unscrambled</u> they showed the calls did not originate outside the United States as represented, but in fact they were domestic calls charged to one of the infamous AT&T Caribbean Calling or CIID Cards (hereinafter referred to as "Special Calling Card"), said calls initiated by an AT&T customer, transported by ATC's customer [non AT&T carrier], receivable purchased by Lovern / ATC.

For years AT&T's competitors had been losing hundreds of millions of dollars in revenue charged to these Special Calling Cards, and because the call records had been intentionally scrambled by AT&T, non of their competitors could identify the originating LEC, or terminating LEC, hence making collection physically impossible. What AT&T's competitors did not know is that the Bellcore Client Companies (BCCs) [7 RBOCs, Southern New England Telephone (SNET), and Cincinnati Bell (CBT) – only parties with direct access to the ISS], were not actually editing out those calls at all. **In fact, they were going back via a sophisticated scheme created by Bellcore, and they were actually collecting the call revenue, taking a percentage, and remitting to AT&T who was <u>stealing the money</u>, part and parcel to a racketeering enterprise.**

(13)

**MORE HISTORY –**     [RAO stands for Revenue Accounting Office]

The secret billing system got its foot on the ground as a result of RBOC proposals sent to

AT&T in August 1985. Soon after the RBOCs all agreed to bill AT&T messages

covertly, CMDS I was created [paid for by AT&T], which allowed AT&T to covertly go

into the ISS and manage its toll messages throughout North America, Canada, and the

Caribbean secretly.

When DOJ ordered all the Bell Operating Companies to cancel AT&T's 12 million

line based Bell Operating Company issued calling cards because they violated the MFJ,

AT&T had no way to replace the 12 million cards, so they purchased the right to use

Caribbean LEC RAO numbers [four] owned by Cable & Wireless, plus, Cincinnati Bell

(CBT) received two CIID numbers from Bellcore. Each RAO/CIID number was good for

2 million calling card combinations; hence, the 12 million cancelled cards were replaced,

except with one very serious difference. The new AT&T proprietary calling cards

(Special Calling Card) had scrambled numbers on them, which made it impossible for

AT&T's competitors to format a billable call record, which resulted in 100% of these call

record receivables being sent back to AT&T's competitors marked "unbillable." Bottom

line, when someone other than AT&T transported a call charged to one of the AT&T

scrambled calling cards the IXC who transported the call never got paid. The industry

thought the AT&T customer was getting free long distance. WRONG! Through a

sophisticated illegal scheme now known as *"Reverse Translation"* stolen messages were

all collected by the BCCs in their capacity as "Hosts", then sent to CBT who sold the

receivables to AT&T via PARIS [accounting system designed for AT&T, part and parcel

(14)

to the secret billing system] on paper, who then in turn sold them back to CBT [decoding the messages in the process], which said messages were then submitted by CBT [domestic] Bellsouth {International] into the secret billing system [ISS] coded 000 [000 means transported by the BCC LEC] in the carrier identification code in the EMR format instead of 288 [AT&T's carrier identification code]. By being coded 000 it appeared that the messages had been transported by the BCC LEC, therefore the revenue belonged to the BCC. Between 1985 and 1995 the vast majority of the messages were laundered through CBT including interstate interLata messages. The big problem was CBT did not transport interstate messages outside OHIO. Millions of dollars in interstate message revenue was credited to CBT's BCC CATS account. Alex Abjornson has testified in federal court in Kansas City that before retiring from Bellcore he noticed all this money being credited to CBT and he questioned his boss, William (Bill) Micou, who promptly told Alex that it was a secret deal for AT&T called **"Stargate"** and that if he said anything about it he would be fired and lose his pension. Mr. Abjornson has since told the AMICI all. CBT was being credited Millions of Dollars by Bellcore for interstate messages, via their CATS account / reports. CBT to this day denies ever billing AT&T interstate messages, even though the physical evidence is undeniable.

ATC, after unscrambling the Special Calling Card records, resubmitted them into the ISS under the protection of the same court order as the first time. This time they went straight through, made it to the appropriate billing LEC, the billing LEC purchased the receivable as required, remitted the funds to SWBT who in turn remitted to CBT and BS, who in turn remitted ATC's money to AT&T. Amici was able to go inside the ISS and do what is

(15)

called a *"trace audit"* whereby Amici found their physical money inside AT&T's bank account. Just like all the Special Calling Card calls prior, not transported by AT&T [the court needs to take into consideration that during this time frame all phones, especially pay phones were known as <u>dumb phones</u> as there was no technology to allow the carrier to identify anything except that the caller was using an AT&T calling card, which is why the carrier usually accepted the call].

In 1992 and even today, SWBT/SBC lawyer, Al Richter, General Counsel for External Affairs, admitted that AT&T had Amici's money, but that SWBT was not going to pay Amici as they did not take it, even though in their capacity as "Contract Administrator" they simply could have debited CBT and BS's account, who in turn could have debited AT&T, or they could have debited AT&T directly and paid Amici. AT&T lawyers Ed Rutan and Sue McCarthy admitted on the record that AT&T had Amici's money. Today, Al Richter works under the AT&T name, yet Amici still has not been paid.

Letter to SBC:

**"November 11, 2004**

**SBC COMMUNICATIONS INC. (NYSE: SBC)**
**Edward Whitacre, James Ellis**
**Al Richter**
**175 E. Houston**
**San Antonio, Texas 78205-2233**
**Via fax: 210-351-3507**

   **RE: Demand for payment of stolen money**

**Dear Gentlemen:**

**In the summer of 1992, the three of you authorized the theft of $554,000 of my**

(16)

money billed and collected through the InterCompany Settlement System (ISS) under the protection of a Missouri Court Order. SWBT in their capacity as "Contract Administrator" allowed my money, with your approval, to be transferred to AT&T even though the money did not belong to AT&T. Al participated in conference calls with myself and AT&T lawyers whereby AT&T admitted to having my money but refused to give it back.

SWBT as contract administrator had the authority to debit the money back through Cincinnati Bell and Bellsouth pursuant to Bellcore CIID Card Processing Guidelines, Issue 90-111 dated April 30,1990. The three of you elected not to return my money. The criminal and civil statutes of limitation have not run out, therefore, I demand payment in the amount of $554,000 at 7% compound interest for 13 years, total payment due is $1,335,054.13. If I do not receive payment today, I will use the full force of the law to recover, including criminal prosecution. This is not a settlement offer. It is a demand for payment and I suggest you take it seriously.

Yours truly,"

Today, SBC is operating as AT&T. Today they have Amici's stolen money, and, if final order is entered in this case AT&T is officially becomes the ISS "Contract Administrator," which is not in the best interest of Amici, the public, or the industry as it creates a huge conflict of interest. If the Court issues a final order Amici expects the new AT&T to totally destroy any remaining evidence that is still inside AT&T. This will damage not only Amici, but Consumers and AT&T's competitors who still have valid legal claims.

ATC and its sister company National Teleprocessing, Inc. (NTI) had signed billing & collection contracts in 1992 with AT&T competitors valued at $900 Million at the time. These AT&T competitors had been using the seven RBOCs, CBT and Southern New England Telephone (SNET) {nine companies were known as the Bellcore Client

(17)

Companies – BCCs} – SWBT/SBC being the Contract Administrator, as their CMDS

Host. Today the remaining BCCs are called Direct Participants.

Amici's 1992 contracts, worth about $300 Million over a three year period, each had two,

3 year extensions, total value about $900 Million. At 7% compound interest calculated

one time annually that is about $2.3 Billion today. This is why Amici has a protected

right to intervene, over and above the stolen $154,000 associated with the Special Calling

Cards, which if calculated at 7% compound interest calculated daily, that figure is

approximately $410,000.00 by itself, plus expenses.

An Amici applicant must show that (1) it has an interest relating to the subject of the

action; (2) it is so situated that the disposition of the action may as a practical matter

impair or impede its ability to protect that interest; and (3) its interest is not adequately

represented by existing parties. Amici has met the requirements.

The statute of limitations on conspiracy does not begin to run until the last overt act has

been committed. Overt acts are committed every day, and have been since March 29,

1992, part and parcel to the ISS.


## ARGUMENT

Amici claims that the Department of Justice (DOJ) has failed to represent the public

interest vigorously, and that the DOJ Antitrust Department acted with bad faith or

malfeasance in agreeing to approve the merger without considering the future of the

InterCompany Settlement System (ISS) and the impact of having AT&T as its "Contract Administrator."

"[I]ntervention of right has been recognized only where a showing of bad faith or malfeasance on the part of the Government has been made." United States v. International Business Machines Corp., 1995-2 Trade Cas. (CCH) ¶ 71,135, at 75,456 (S.D.N.Y. 1995).

"[A] private party will not be permitted to intervene as of right [in a Tunney Act proceeding] absent a showing that the Government has failed 'fairly, vigorously and faithfully' to represent the public interest." United States v. American Cyanamid Co., 556 F. Supp. 357, 360 (S.D.N.Y. 1982), aff'd in part and rev'd in part, 719 F.2d 558 (2d Cir. 1983), cert. denied, 465 U.S. 1101 (1984) (quoting United States v. Ciba Corp., 50 F.R.D. 507, 513 (S.D.N.Y. 1970)); see also United States v. Stroh Brewery Co., 1982-2 Trade Cas. (CCH) ¶ 64,804, at 71,960 (D.D.C. 1982) (requiring claim of bad faith or malfeasance).

Once again an applicant must show that (1) it has an interest relating to the subject of the action; (2) it is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (3) its interest is not adequately represented by existing parties. Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc., 725 F.2d 871, 874 (2d Cir. 1984); United States v. International Business Machines Corp., 1995-2 Trade Cas. (CCH) ¶ 71,135, at 75,455 (S.D.N.Y.

(19)

1995); In re Ivan F. Boesky Securities Litigation, 129 F.R.D. 89, 94 (S.D.N.Y. 1990).

Amici, Michael Lovern, Sr., is not only a businessman, but also a Consumer, one who

does not want anticompetitive facets in the telecommunication industry any longer.

The Amici's principal purpose is to not only protect their individual claims, but to protect

the claims of all Consumers, and AT&T's Competitors, who all were defrauded post

divestiture starting around 1985, part and parcel to the InterCompany Settlement System

(ISS). "Interest" under Rule 24(a)(2) "must be significant, must be direct rather than

contingent, and must be based on a right which belongs to the proposed Intervenor rather

than to an existing party to the suit", aff'd mem., 515 F.2d 505 (2d Cir. 1975); Wright,

Miller & Kane, Federal Practice and Procedure (Civil 2d) § 1908, at 270-72 (1986); 3B

Moore's Federal Practice ¶ 24.07[2], at 24-54, 24-57 (2d ed. 1993). The Intervenor in this

case clearly has a protected interest in this merger.

The Amici's claim that the entry of the proposed final order in this case would affect their

ability to prevail in their claims against SBC, AT&T, CBT, BS, Verizon, Missouri PSC

Officials, and DOJ Officials. Thus, entry of the proposed order in the government case

will infringe on any interest the Intervenors have in any "transaction which is the subject

of the [government] action." Fed. R. Civ. P. 24(a). It will also directly impact the claims

available to all Consumers who made a long distance call between 1985 and present date,

as well as AT&T's competitors during those same times.

The control and governance of the ISS should be turned over to an independent third

party so it can be made available to all IXC Carriers, CLECS, Independent Telephone

Companies, etc, whereby all parties have the same access and advantages as SBC/AT&T, BS, Verizon, and CBT. An equal playing field is a requirement under existing law.

## CONCLUSION

**POST DIVESTITURE HISTORY:**

It was the beginning of the unraveling of the RBOCs discriminatory practices. The ISS has been used as a criminal racketeering enterprise. The criminal enterprise is still in operation today, but controlled by Bellsouth, Verizon, and SBC/AT&T. SBC, now using the name AT&T, is still the "Contract Administrator."

The beginning of the criminal racketeering enterprise started when Judge Greene ordered AT&T to divest themselves of their original billing and collection system [ISS], but that didn't happen. Once again, <u>worth repeating</u>, it was replicated and the replicated version was installed at Southwestern Bell Telephone in Kansas City, MO by Alex Abjornson who worked at Bell Labs, and he is the person who designed and built the system for AT&T. Mr. Abjornson installed the replicated version at SWBT, and he eventually went to work for Lovern after retiring from Bell.

The installation at Southwestern Bell Telephone (SWBT) occurred in 1984 [cost recovery system – **paid by consumers**]. In the Spring of 1984 there was a secret meeting at a Hotel in St. Louis between the RBOCs and AT&T to discuss how the RBOCs were going to bill and collect AT&T's toll calls. AT&T supposedly did not have a billing system any longer, or so the industry thought.

(21)

On February 28, 1983, Judge Greene's Modification of Final Judgment was affirmed [103

S. Ct. 1240] in the now famous case, **U.S. v. American Tel. and Tel. Co.,** 552 F. Supp.

131 (1982). In his decision the court said;
**"Antitrust consent decree must leave defendant without ability to resume actions**
**which constituted antitrust violation in first place; the decree should not be limited**
**to past violations, but it must also effectively foreclose possibility that antitrust**
**violations will occur or recur." [underline added for emphasis].**

Judge Greene went on to say that the way AT&T had maintained monopoly power in

telecommunications was through the control of the Bell Operating Companies (BOCs)

and their strategic bottleneck position. Divestiture was intended to require the removal of

the two main barriers that previously deterred firms from entering or competing

effectively in the interexchange market. Regarding exchange access services, which

included B&C services, [bottleneck service] the court said;


Judge Greene 552 F. Supp. at pg. 171

**"AT&T will no longer have the opportunity to provide discriminatory**
**interconnection to competitors. The Operating Companies [BOCs] will own the**
**local exchange facilities. Since these companies will not be providing interexchange**
**services [S-1822], they will lack AT&T's incentive to discriminate.**

**Moreover, they will be required to provide all interexchange carriers with exchange**
**access that is equal in type, quality, and price to that provided to AT&T and its**
**affiliates."**

How badly did the BOCs (RBOCs) violate Judge Greene's Order? **Here is information**

**going back to 1984,** legal claims that are still good today as the statute of limitations has

not even begun to run as overt acts in furtherance of the conspiracy have been, and

continue to be, committed every day. AT&T, with the aid of Bellsouth (BS), SWBT, and

Cincinnati Bell Telephone (CBT) stole several hundred thousand dollars from Amicis,

(22)

part and parcel to the AT&T Caribbean Calling Card Scam, and then illegally put ATC

and NTI out of business.

## INDUSTRY COMPETITION IN 1994

What changed in the telecommunications industry, as far as reshuffling the wealth since

the first day of January, 1984 was remarkable; however, what has not changed in the

telecommunication industry since the first day in January, 1984, is the continuing AT&T

dominance through its ability to exclusively offer RAO based *"Special Number Calling*

*Cards"* and to receive preferential premium billing services from all US telephone

companies.

The importance of these two issues is this:

AT&T dominated the calling card market, making billions of dollars over the years,

through a special calling card arrangement with Cincinnati Bell and Bell South. This

special arrangement allowed AT&T to receive,

**\* preferential treatment and premium billing services, as if the card had been issued
by a Bell Operating Company ("RBOC") or Independent Telephone Company
("ITC") and,**

**\* no other competitive interexchange carrier has received such preferential
treatment and almost 11 years after Divestiture, no competitive interexchange
carrier had been able to market an intraLATA and interLATA calling card that
was accepted by virtually the entire telephone industry in the United States.**

What is this arrangement I am referring to?

## SPECIAL BILLING NUMBER (RAO) CALLING CARDS

Here's what that included; [Again – RAO stands for Revenue Accounting Office]

1. Exclusive use of Cincinnati Bell's RAOs. AT&T was able to issue Special Calling

(23)

Cards (approximately 4 million) using 308 and 077 (077 appears as 677 on the actual calling card - per Bellcore specifications).

2. Exclusive use of Caribbean RAOs. AT&T was able to issue Special Calling Cards (approximately 8 million) using RAO codes 503, 506, 507, 508. Each of these RAO codes - having been assigned by Bellcore to specific Caribbean countries - were never intended to be used for the issuance of calling cards, let alone calling cards for AT&T. The use of those RAOs enabled AT&T to issue 12 million, fully honored and completely billable calling cards that generated billions of dollars over the course of a few years, inclusive of an enormous amount of money for calls transported over other IXC networks, charged to one of these cards, yet AT&T was paid for the call instead of the IXC who actually transported the call. [Amici has the secret, proprietary Bellcore Instructional Bulletins {obtained legally} directing the RBOCs as to how to launder the stolen money to AT&T after receiving their cut for upfront edits and processing from EMI into the EMR format. The covert operation was operated on behalf of AT&T by Bellsouth out of Bellsouth International's Human Resource Department.

Let's examine the preferential treatment that goes along with that arrangement.

**BILLING & COLLECTION**

AT&T received premium billing services since day one of Divestiture. AT&T believes they paid too much money for the service, but the rewards have been enormous.

EXAMPLES;

* What competitive interexchange carrier can say that they had 100% market presence in non-equal access as well as equal access telephone companies?

\* What competitive interexchange carrier can market a calling card that was universally accepted by virtually every US Telephone Company - for intraLATA, interLATA, and international calling?

\* What competitive interexchange carrier received the comprehensive detail level Billing & Collection ("B&C") reports that AT&T received before, during and after Divestiture?

\* What competitive interexchange carrier can boast that Bellcore actually changed the Bellcore CIID assignments document, for the entire Bellcore Client Companies [RBOCs as you know them] to legitimize AT&T's blatant misuse of Cincinnati Bell and the Caribbean RAOs that resulted in the issuance of up to 12 million AT&T exclusive calling cards?

\* And what competitive interexchange carrier had their own unique version of the Exchange Message Interface ("EMI") that is used by the telephone industry to maintain premium billing services for AT&T?

I am referring to the AT&T - EMI or Exchange Standards Reference Document, or

AT&T ESRD. [published and put out by AT&T, not Bellcore et al].


To summarize, since divestiture, there are two systems for billing and collection services.

A premium system, or Rolls Royce for AT&T and the "Bellcore Client Companies"

(BCCs), [included the RBOCs, Southern New England Telephone Company [(SNET) –

Gateway to Canada, also the reason SBC purchased them] & CBT – AT&T's partner in

crime since divestiture]. Then there is the Chevrolet for everyone else. Oddly the

Chevrolet use to cost as much as a 1200% more to use than the Rolls Royce system and

guess who paid for it all, the American Consumer, via the rates associated with the LEC

Billing of long distance. There has never been anything close to **"type, quality & price,"**

when it comes to B&C, except for maybe the last few years after the RBOCs kicked

AT&T out of the "Country Club," which is one of the reasons AT&T couldn't maintain

market share, eventually causing their demise. Anybody can transport long distance these

(25)

days, but what still separates the "Big Boys" from the "Little Boys" is Billing &
Collection.

Once again, <u>worth repeating</u>, most people think AT&T divested themselves of their
original billing system (ISS) <u>per Judge Greene's order</u>. Not true. The original CMDS and
CATS systems have been alive and well for the last 23 years, still controlled by
SWBT/SBC, now AT&T. To understand what needs to be done today, and how the
public at large was defrauded you still need to understand the,

## HISTORY ON THE BELL COMPANIES AND DIVESTITURE:

It is important to understand the history of billing services, as offered by the Regional
Bell Operating Companies or ("RBOCs"). As a result of Divestiture the Access Service
Tariff came into existence. The initial intent of the Tariff was to structure how the
RBOCs would be compensated for carrier use of BOC facilities.

Billing and Collection services were not directly a part of local access considerations and
were defined as "Ancillary Services."

RBOC analysis determined that under Divested conditions, End User Billing [B&C]
could be more than an ancillary requirement of Divestiture.

RBOC awareness as to the revenue potential of Billing & Collection grew, and as a result
the RBOCs directed the CSO [later became Bellcore] in September, 1982, to form a Task
Force to evaluate billing as a line of business or "LOB."

(26)

It should be noted that the development of Billing as a LOB was constrained by the historical regulated rate of return philosophy until April 1983.

In April, 1983, because of the FCC Third Report and Order, Docket 78-72, it became evident that even the short run potentials for Billing as a Line of Business (LOB) were theoretically expanded considerably. [HUGE PROFITS]

This resulted in the creation of a new CSO (Bellcore) Task Force to evaluate the potential.

At this time in history, spring of 1983, B&C was no longer subject to regulation. This meant that if B&C revenues were above or below the FCC allowed rate of return for the other Access Services, whatever B&C earned [more than or less than the normal FCC allowed rate of return] would not impact other Access Service revenues.

In essence, as of April 1983, B&C was allowed to make as much money as it could - **AN IMPORTANT POINT TO REMEMBER.**

[THIS RESULTED IN THE CREATION OF A NEW TASK FORCE TO EVALUATE THE REVENUE POTENTIAL FOR THE RBOCS.]

The Task Force met between April 28th through May 29th, 1983. The product of this Task Force was the compilation of over 300 pages of significant data that provided National Parameters from which the RBOCs could utilize for their regional "price driving".. B&C models.

**TASK FORCE RESULTS & CONCLUSIONS**

A couple of the key recommendations from this Task Force are as follows:

(27)

1. Billing & Collection should be considered a LOB by the RBOCs.

2. The mechanism to be used by the RBOCs for determining prices should be based upon the J. Goldberg cost model, generally referred to as the "Top Down Methodology." This process would allow each RBOC to quickly ...calculate revenue maximizing prices, [they artificially inflated costs associated with B&C].

Through the allocation of costs to the various billing elements, each RBOC could assign

various costs. What this means is;

1. Billing & Collection rates were manipulated to fully recover the money that RBOCs were receiving from AT&T before Divestiture.

2. There was no consideration by the RBOCs of pricing B&C services competitively - because there were no other competitors.

**INTERCOMPANY SETTLEMENTS AND THE CMDS I SYSTEM**

At the same time the Task Force was developing AT&T and B&C rates, the RBOCs and

CSO [Bellcore] were creating what I refer to as the *Country Club* billing system, the

Rolls Royce, the second system, the "circle within the circle."

This secret billing system for the telephone industry was fully functional in every way to

the Tariffed billing system being presented to the FCC, except for the COSTS. THE

RATES WERE SIGNIFICANTLY LOWER. HOW LOW? Originally the rate per

message for billing was set at $.10 per message.

This rate was immediately lowered by 50% to $.05 per message including inquiry

inclusive of the Rolls Royce reporting system. This still exists today as we speak. Once

again this is the InterCompany Settlements System ("ISS") which is facilitated through

the Centralized Message Distribution System ("CMDS I") and BOC (BCC) CATS,

(28)

controlled by the remaining RBOCs, administered through SBC today, and now controlled by SBC/AT&T.

Imagine $.05 per message [a nickel], inclusive of all services including inquiry and full premium reporting [Rolls Royce] versus $.20, $.30, $.40, $.60 per message, even higher, from the Chevrolet which provided inadequate audit reporting.

## QUESTION NO. 1

**Why**, when the RBOCs and Bellcore had a fully functional means of providing B&C services through ISS at $.05 per message did the FCC approve B&C Tariffs that reflected rates to the interexchange carrier [IXC] market that were as much as 1200% greater than the rates the RBOCs charged themselves? [**The difference in cost clearly passed on to the consumer**].

## WHAT IS SOME OF THE IMPACT OF TWO B&C SYSTEMS

As a result of the industry having to pay the Tariffed B&C rates, the RBOCs were able to fully recover pre-Divestiture revenues, in essence - WINDFALL PROFITS.

At the same time the RBOCs have maintained a monopolistic [oligopoly] InterCompany Settlement Billing System for their own use, at a fraction of the cost being charged to the IXC industry. How many of the IXCs in the industry today have B&C rates of $.05 per message, with inquiry, detail reporting and, *100% ON- NET CAPABILITY?* **[As of 1994, NONE, and there are none today in 2006, except for SBC/AT&T, Qwest, Verizon, BS and CBT]. Good reason to get into the long distance business if you're an RBOC, or CBT.**

The artificially inflated costs associated with B&C, which were part of the 1983 tariffs filed at the FCC, pursuant to Divestiture, were essentially the same tariff structures and rates that the RBOCs filed in each of the NARUC states during this time frame. The ITCs [Independent Telephone Companies] also used the same poison data as the CSO filed the tariffs for the ECA ["NECA" as you know it today], based on the cost information compiled by the infamous Task Force. *This affected every consumer in the country as these artificially inflated B&C costs resulted in higher rates.*

**[Note: As of 2006, estimated overcharges to consumers {wireline only} appears to exceed $500,000,000,000, AT&T Competitors appears to exceed $400,000,000,000].**


## POST DIVESTITURE RESULTS

The Task Force, via the J. Goldberg costing methodology, had already shifted *ALL* B&C service costs down into the basic rate elements of the service, so regardless of the rate of return, windfall profits would exist, corrupting the FCC's decision to place a 12.75 maximum rate of return on billing services.

On February 17, 1984, the FCC released Memorandum Opinion and Order, CC Docket No. 83-1145, [FCC 84-51, 34298], Investigation of Access and Divestiture Related Tariffs.

In this document the FCC states that the common line rate elements represent a $10.8 Billion revenue requirement, of which the BOCs claim $8.53 Billion or 79%. This is the "... best estimate of future costs"... represented in the BOCs tariffs, however the FCC stated and I quote,

"The budget view is a list of 59 items relating to unseparated investment, expenses, taxes, and reserves listed in work papers. However, no documentation is presented to explain the source for all the figures which are used to derive interstate amounts, and thus the basis for all the access costs and rates, the discussion of the budget view occupies less than two and a half pages in each BOC filing."

They went on to say;

"...it is not possible from these filings to evaluate or verify the figures in the budget view. First, the sources of the budget view figures are not clearly specified and <u>cannot be checked.</u>"

**The FCC then predicted the future by stating that if the figures are <u>wrong</u> the whole industry would be affected. [Fruit from the poison tree], I quote again;**

"As we pointed out, the budget view is of crucial importance in these filings as the direct basis for the BOCs claimed revenue requirements is the root for every individual rate. It is additionally important because of the BOC and ECA top - down methodology. <u>Any errors in the budget view would affect essentially every rate under this approach.</u>"

To my knowledge, at no time has the FCC or any other Federal agency ever fully

investigated or audited the component costs of the RBOC billing services to determine if

the costs applied to the billing elements were true, reasonable, and not overstated. The

FCC went on to say;

" ...that given their inability to understand and evaluate these rates, they were going to determine whether billing and collection should be detariffed."

Billing & Collection Services were subsequently detariffed under CC Docket No. 85-88.

effective January 1, 1987. **[NOTE: That is the famous The Bert Halprin Doctrine, which made him a rich man in post FCC service, representing the RBOCs].**

[2006 - Keep in mind that the MFJ required the RBOCs to provide AT&T's competitors the same services as AT&T was receiving in **"...type, quality, and price."**


**QUESTION NO. 2**

Considering the overwhelming evidence that indicates the costs associated with Billing &

Collection were <u>intentionally artificially inflated</u>, costing consumers <u>hundreds of billions of dollars in higher rates</u>, why hasn't anyone audited the RBOCs component costs associated with billing services? **[I hope this Court will ask the FCC and DOJ this very question].** Why did the FCC and DOJ just walk away, or turned their heads from what they new to be an obvious problem.

AT&T new it was a problem, that's why they were filing emergency petitions in late 1983 and early 1984. AT&T said they would lose roughly 60% of there interstate revenue based on the costs and tariffs filed by the newly formed RBOCs and ECA.

To calm AT&T the RBOCs secretly settled with AT&T outside the FCC, with the help of *Bert Halprin* – FCC Common Carrier Bureau Chief, and the RBOCs gave AT&T a present to sooth the wound. That present was called "**Stargate**". Cincinnati Bell Telephone [CBT] was AT&T's sponsoring LEC into the CMDS I / BOC CATS billing system [this is how CBT became a BCC {Bellcore Client Company}]. This included access to the ISS system and the $.05 price.

In 1987, the Department of Justice investigated SNAFA ("Shared Network Access Facilities Agreement"). For some reason DOJ [Philip Sauntry] completely missed ???? the entire calling card scheme. They missed the fact that AT&T still maintained their original billing system CMDS & CATS. Someone was asleep at the wheel, or ????.

By 1988, AT&T was now issuing calling cards based on Cincinnati Bell's CIID numbers [RAOs] and Caribbean LEC RAO numbers provided by Cable & Wireless (C&W) –a

secret deal negotiated with C&W. Mass marketing began on these new AT&T joint use calling cards. AT&T's use of the RAOs assigned to CBT and the C&W Caribbean LECs went unchallenged by Bellcore or the RBOCs, and the *FCC and DOJ acted as if nothing was going on.*

In 1989, Card Issuer Identifier ("CIID" Numbers) were being talked about by Bellcore as a solution for universal calling cards.

In 1990, CIID Numbers are assigned to requesting carriers.

In 1991, the FCC finds CBT **guilty** of discrimination for violating *Title Two of the Communications Act*, in connection with there refusal to supply validation information about the AT&T Special Number calling cards to other IXCs. CBT's response is they will get out of the Calling card business, yet Bellcore reassigns CIID numbers to AT&T that just happen to match [gift from the Gods], AT&T's RAO based Special Number joint use calling cards, issued in connection with CBT and the Caribbean LECs. This brings us to;

## QUESTION NO. 3

Why is it that no other IXC, other than AT&T and then UNITEL a Canadian Long distance carrier, had a universally accepted calling card based on any Bellcore assigned CIID numbers almost 11 years after Divestiture. This is an important question as I know it's not because no other IXC wanted to go to market with one. Amici NTI did, but was not allowed. No one launched an investigation into the anticompetitive barriers put up by the RBOCs which prevented any other IXC from being able to compete head to head

(33)

with AT&T, the LECs, and then UNITEL in the lucrative calling card business. The

monopoly by which the RBOCs controlled Billing & Collection needed to be

disassembled. The bottleneck on billing services was worse in 1994 than in 1984.

**[Note: Here we are in 2006, and AT&T is now in control again, and their**
**competitors (Verizon, BS and CBT excluded – {Bellsouth being acquired by SBC})**
**once again cannot compete due to Billing & Collection, and the ISS].**

The MFJ not only required divestiture of the Bell System local exchange operations, but

also required the dissolution of the partnership arrangements among the Bell System

Companies. Preferential partnership arrangements between AT&T and the RBOCs just

between 1985 -1995 cost consumers Hundreds of billions of dollars in overcharges.

The industry [AT&T Competitors] lost hundreds of billions of dollars because of anti-

competitive barriers controlled by the RBOCs and something few people know, most

states and the federal government, have lost an incredible amount of tax dollars due to the

inflated costs associated with billing services which have been used to wrongfully deduct

expenses from tax returns. This has happened at every telephone company in America.

It is important that this Court look at Billing & Collection as it is the most misunderstood,

yet probably the most important aspect of the entire telecommunication industry. B&C

services are not even close to being competitive. The RBOCs bottleneck controlled

everyone accept AT&T, until Lovern exposed them in 1992-94, then the RBOCs threw

AT&T out of the Country Club and quickly sold Bellcore as soon as they could,

attempting to hide their tracks. No one was allowed to use the system as the court

originally intended, accept the RBOCs. AT&T's competitors [NTI/ATC included] were

(34)

held hostage, some, like ATC and NTI have been put out of business for challenging the

RBOCs control, while attempting to compete.

**[Note: American TeleDial Corp (ATC) & National Teleprocessing, Inc. (NTI), were illegally put out of business for legally accessing the ISS (InterCompany Settlement System), via Fidelity Telephone, beginning in March 1992. SBC, in their capacity as "Contract Administrator" shut off ATC's access, then illegally settled a federal lawsuit filed by Lovern on behalf of Fidelity [Fidelity signed over all their legal claims to ATC/Lovern] without Lovern's approval as Lovern was the only party authorized to settle {litigation management agreement} on behalf of the plaintiffs; and, Lovern-ATC-nor NTI ever received one dime of the settlement. SBC, Bellcore and Fidelity lawyers committed fraud on the court in U.S. District Court in Kansas City, Mo. by allowing Fidelity to mislead the court as to its legal right to settle the case during an unannounced hearing, which Lovern was not present.**

If AT&T and SBC are officially allowed to merge, no one, and I emphasize NO ONE

would be able to compete head to head with them, accept Verizon, BS –soon to become

AT&T, and CBT. Amici expects Ed Whitacre, AT&T Chairman, to go after CBT next,

that will give him a clean sweep of potential lose cannons. [Qwest has become a non-

factor] AT&T and Verizon's competitors will still have to negotiate individual B&C

contracts, whereas AT&T and Verizon will not, and no one will be 100% ON NET

except AT&T & Verizon, Qwest having been compromised with legal problems. That

will leave only three major co-conspirators left.

When you sell a service to the general public it's important to be able to collect your

money in an efficient manner. Billing services are not competitive today, they never have

been competitive, and until and unless the ISS is opened up to all carriers on a level

playing field the "Country Clubs" strangle hold on the industry is tighter than ever. The

evidence of foul play warrants the attention of this Court, and the attention of Congress.

I hope this Court will take appropriate steps to protect the consumers and the industry

from further erosion. The Supreme Court said it best in the case *International Salt Co. V.*

*United States;*
"... it is not necessary that all of the untraveled roads to [anticompetitive conduct] be left
open and that only the worn one be closed. The usual ways to the prohibited goals may be
blocked against the proven transgressor."

**Testimony from R. Hewitt Pate, Assistant Attorney General – Antitrust Division,
before the Senate Judiciary Committee presented on October 30, 2003:**

> "The antitrust savings clause in the 1996 Act makes clear that
> the antitrust laws continue to apply fully in telecommunications,
> and are in no way displaced by the 1996 Act's own requirements.
> A corollary to this is that passage of the 1996 Act did not have the
> effect of increasing any party's obligations under the antitrust laws.
> Consistent with existing precedents, and consistent with the Division's
> position since its 1991 amicus brief in *Consolidated Rail Corp. v.
> Delaware & Hudson Railway Co.*, and followed in our *Microsoft* and
> *American Airlines* filings, we are taking the position that, for an incumbent's
> denial of an essential facility to a rival to constitute a section 2 violation, the
> denial must be predatory or exclusionary  that is, it must make business
> sense for the incumbent only because it has the effect of injuring competition.
> While the Telecommunications Act can and does impose other requirements,
> we believe it is important to preserve the distinction between a violation of the
> Telecommunications Act and a violation of the Sherman Act."

Amici's damages exceed **$2.3 Billion** with interest, totally, which includes the Caribbean

Calling Card Scam. Amici attempted to get the FCC's Market Dispute Resolution Bureau

to intervene and mediate resolution prior to Amici filing a formal complaint, or

intervening in this case, however, the FCC said the legal issues are too complex for them

and sent Amici back to DOJ, who has refused to even acknowledge this problem, nor

have they ever addressed the issues surrounding the ISS in any of their merger

investigations or court filings.

(36)

The Missouri PSC was given all this data beginning in 2004, yet they elected to cover-up the illegal activity and fraud, and in fact ignored the Missouri Public Counsel's demand for an investigation into this proposed merger after having received all this information from Amici. [See - In the Matter of the Proposed Acquisition of AT&T Corporation by SBC Communications, Inc. – **Case No. TM-2005-0355, Missouri Public Service Commission**].

Over and above Amici's financial loses, the U.S. Consumer[s] and AT&T Competitors have lost in excess of **$900,000,000,000.00**. No one knows [IRS and GAO included] how much the U.S. Government has lost in taxes, not to mention the B&C overcharges applied to government agencies who have purchased long distance all these years. There is certainly precedent for this intervention, and now it's time for the Court to deal with the problem of the InterCompany Settlement System and who is going to control it.

The Regulators simply want to sweep it under the carpet, existing law prohibits that and it should not be tolerated by this Court. For the foregoing reasons the United States Motion for entry of final judgment should be denied, and a full investigation of the ISS, its future use, and who is best suited to be its "Contract Administrator" should be ordered by this Court.

Respectfully submitted,

_____

Michael Lovern, Sr.
3713 Parke Drive
Edgewater, MD 21037
(206)-202-9074
pratgen@myway.com

(37)

American TeleDial Corp. &
National Teleprocessing, Inc.

By: Michael Lovern, Sr.
3713 Parke Drive
Edgewater, MD 21037
(206)-202-9074
pratgen@myway.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 10th day of May, 2006, copies of the foregoing
MOTION & BRIEF OF MICHAEL LOVERN, SR., ET AL, AS AMICUS CURIAE IN
OPPOSITION TO U.S. MOTION FOR ENTRY OF FINAL JUDGMENT to be
served by U.S. Mail, on counsel of record as follows:

Lawrence M. Frankel (D.C. Bar No. 441532)
Matthew C. Hammond
Trial Attorneys
Telecom & Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States

--------------------------------------------------------------------------------

FOR DEFENDANT
SBC COMMUNICATIONS, INC.

Wm. Randolph Smith (D.C. Bar No. 356402)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2700

(38)

FOR DEFENDANT AT&T CORP.

David L. Lawson (D.C. Bar No. 434741)
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-808

Michael Lovern, Sr., et al
3713 Parke Drive
Edgewater, Maryland 21037
(206)-202-9074
pratgen@myway.com

May 10, 2006