## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:05CV02102 (EGS)** |
| | ) | |
| **SBC Communications, Inc. and AT&T Corp.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:05CV02103 (EGS)** |
| | ) | |
| **Verizon Communications, Inc. and MCI, Inc.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AT&T INC.'S RESPONSE TO ACTEL'S OPPOSITION AND SUPPLEMENTAL OPPOSITION TO THE DEPARTMENT OF JUSTICE'S MOTION FOR ENTRY OF FINAL JUDGMENTS

This Court framed the issue succinctly at the May 10 hearing: "[S]ince they've already been heard at length in this process, why is it necessary . . . to allow [ACTel] to participate as either intervenors or amicus?  The bottom line is what else would the Court learn . . .?"  May 10 Tr. at 5:18-24.  We now know the answer:  nothing.  Indeed, ACTel's two filings opposing the Government's motion for entry of final judgment, as well as its oral presentation at the May 10 hearing, have added nothing new to the extensive pre- and post-Complaint record in these proceedings.  Rather, the arguments submitted are simply a rehash of arguments contained in

ACTel's Tunney Act comments and its submissions to DOJ and the FCC during the Government's pre-Complaint investigations.[1] ACTel's failure to produce anything new – notwithstanding three opportunities before this Court to do so – confirms that its substantive arguments have been exhausted. The Court's public interest determination can – and should – be made on the existing record without any further supplementation of the record or participation by ACTel.

As to the merits of the public interest determination, there is only one proper conclusion – the Proposed Amended Final Judgment ("PAFJ") is in the public interest. ACTel would have this Court believe that it has provided the Court with "evidence" in the form of declarations that require rejection of the PAFJ. But the declarations hardly rise to this level. First and foremost, they are premised on an impermissible Court-imposed broadening of the Government's Complaint by resurrecting arguments rejected by the Government during its pre-Complaint investigation into potential violations of the antitrust laws caused by the merger. However, the Court is not authorized to retread this ground. The Tunney Act does not grant a district court license to intrude upon the executive branch's prosecutorial role by rewriting the Government's Complaint. The Court is confined to analyzing the public interest within the scope defined by the Government's Complaint.

---

[1]     ACTel purports to respond to the opportunity provided by the Court to present any new information by "bring[ing] additional arguments, authorities and citations to the Court's attention." *See* ACTel's Supplemental Memorandum (May 16, 2006) at 2 ("ACTel Supplemental Brief"). Regardless of the manner in which ACTel chooses to describe the substance of the brief, there simply is no avoiding the fact that it presents no new issues -- the brief simply restates in varying forms the same arguments that have previously been made. *See, e.g.,* ACTel Supplemental Brief at 13. (In again arguing that the competitive harm is not limited to 2 to 1 buildings, "ACTel submits with [its] memorandum two additional declarations that make the same point.").

Moreover, the filings raise no reason for the Court to second-guess DOJ's determinations regarding the alleged violations. ACTel's rehashed declarations, which purport to challenge those determinations, are full of conclusory assertions based on the same faulty analysis that was previously rejected by the Government. Significantly, the declarations fail to even address the reasons the Government gave in rejecting them. In short, there is nothing new in these declarations or any of ACTel's other assertions that would be material to the Court's analysis. And there certainly is no good reason provided for arriving at any conclusion other than that the proposed settlement is in the public interest.

For these reasons, the Court should reject ACTel's request to permit its further participation in these proceedings as well as its invitation to delay entry of the PAFJ by prolonging these proceedings. The Court already has everything it needs to make its public interest determination and it should proceed promptly to do so. In that regard, AT&T submits that the record more than amply supports a finding by this Court that the consent decree is in the public interest.

## I.    ACTEL HAS NOT RAISED ANY NEW ISSUES RELEVANT TO THE COURT'S PUBLIC INTEREST DETERMINATION.

### A.    ACTel Disputes the Sufficiency of the Government's Complaint Rather Than the Remedy.

ACTel's premise for opposing the entry of the PAFJ is that the competitive harm likely to result from the mergers extends beyond the violation alleged in DOJ's Complaint. However, as AT&T has previously explained, the Court must confine its public interest inquiry to the proposed remedy only, and may not challenge the sufficiency of the Government's Complaint.

*See* AT&T Inc.'s Response to COMPTEL (April 18, 2006), at 4 & n.2.[2]  Although ACTel pays

lip service to this settled legal proposition,[3] its arguments are plainly directed toward what it

perceives to be an inadequacy in the Government's Complaint.  Relying on a declaration by Dr.

Simon Wilkie, ACTel asserts that the merger will result in "severe economic injury going <u>well</u>

<u>beyond</u> '2 to 1' loop situations" and that the harm extends beyond such 2 to 1 buildings

"<u>throughout</u> <u>the</u> <u>local</u> <u>networks</u>."  Memorandum of Points and Authorities in Support of ACTel's

Motion for *Amicus Curiae* and Intervenor Status (May 4, 2006) at 24 ("ACTel Brief") (emphasis

added); ACTel Supplemental Brief at 13 (emphasis added).  By these statements ACTel clearly

admits that its objection lies not with the DOJ's proposed remedy for the harm the Government

alleged, but with whether the Government brought the right case – an issue plainly outside the

scope of Tunney Act review.  The Court may not accept ACTel's invitation to rewrite the

Complaint.  To so do would impinge on a fundamental and unassailable Constitutional constraint

imposed by separation of powers principles.  *See Bordenkircher v. Hayes*, 434 U.S. 357, 364

(1978) ("In our system, . . . the decision whether or not to prosecute, and what charge to file . . .

generally rests entirely in [the prosecutor's] discretion."); *Haitian Refugee Center v. Gracey*, 809

F.2d 794, 804 (D.C. Cir. 1987) ("The refusal of courts to interfere with prosecutorial discretion is

---

[2]        COMPTEL appears to concede this point.  *See, e.g.,* May 10 Tr. at 12:18-13:2 ("We are not here asking you to rewrite the complaint.  They alleged a substantial lessening of competition in a relevant product market that we accept, private line services.  They alleged a substantial lessening of competition in a geographic market that includes either buildings or Metropolitan areas.  We accept that. … [W]e want them to explain to you, because we think that they have to meet their burden, how this remedy addresses that appropriate relevant market."); *see also id.* at 7:8-11 ("The question you have to answer is whether these proposed final judgments will remedy an anticompetitive harm that was alleged in the complaints in a relevant market or relevant markets.").  *But see id.* at 7:24-25 (seemingly asking Court to "evaluat[e] whether there is a violation in a relevant market").

[3]        At the May 10 hearing, counsel for ACTel noted: "We're saying the remedy is ineffective.  The remedy that's pled in the complaint is ineffective . . . ."  May 10 Tr. 48:15-17.

. . . an aspect of the separation of powers."); *In re International Business Machines Corp.*, 687

F.2d 591, 602 (2d Cir. 1982) (DOJ has the power to dismiss antitrust litigation without court

approval pursuant to the Tunney Act; "[t]he district court's involvement in the executive

branch's decision to abandon litigation might impinge upon the doctrine of separation of

powers"); *United States v. Mercedes-Benz of North America, Inc.*, 547 F. Supp. 399, 401 (N.D.

Cal. 1982) (the government's dismissal of an antitrust complaint does not require court approval

under Tunney Act, which "could raise serious questions of separation of powers").[4]

No one disputes that the Tunney Act requires the Court to conduct an independent and

deliberate review of the PAFJ to determine whether the proposed consent decree is in the public

---

[4]        *See also United States v. Armstrong*, 517 U.S. 456, 464 (1996) (the Attorney
General and U.S. Attorneys are given "latitude because they are designated by statute as the
President's delegates to help him discharge his constitutional responsibility to 'take Care that the
Laws be faithfully executed.'  U.S. Const., Art. II, § 3 . . . . As a result, '[t]he presumption of
regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the
contrary, courts presume they have properly discharged their official duties.'" (quoting *United
States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)); *Wayte v. United States*, 470 U.S.
598, 607 (1985) (The Government's "broad discretion rests largely on the recognition that the
decision to prosecute is particularly ill-suited to judicial review. . . . Judicial supervision in this
area, moreover, entails systemic costs of particular concern."); *Maryland v. United States*, 460
U.S. 1001, 1006 (1983) (Rehnquist, J., dissenting) ("The question whether to prosecute a lawsuit
is a question of the execution of the laws, which is committed to the Executive by Art. III.");
*Heckler v. Chaney*, 470 U.S. 821, 831 (1984) ("[A]n agency's decision not to prosecute or
enforce, whether through civil or criminal process, is a decision generally committed to an
agency's absolute discretion. . . . This recognition of the existence of discretion is attributable in
no small part to the general unsuitability for judicial review of agency decisions to refuse
enforcement"); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("the Executive Branch has
exclusive authority and absolute discretion to prosecute a case"); *Vaca v. Sipes*, 386 U.S. 171,
182 (1967) (agency "has unreviewable discretion to refuse to institute [a] . . . complaint");
*Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1868) ("Civil suits, in the name and for the
benefit of the United States, are also instituted by the district attorney . . . [who] controls the
prosecution of the same . . . and may, if he sees fit, allow the plaintiffs to become nonsuit, or
consent to a discontinuance."); *Marbury v. Madison*, 1 Cranch 137, 170 (1803) ("The province
of the court is, solely, to decide on the rights of individuals, not to inquire how the executive
officers perform duties in which they have discretion."); *Newman v. United States*, 382 F.2d 479,
481 (D.C. Cir. 1967).

interest.[5]  Nor is there any serious dispute about the standard of review that the Court should

apply.  Plainly, the 2004 amendments to the Tunney Act make clear that the "mockery of the

judicial function" test, first suggested in *United States v. Microsoft*, 56 F.3d 1448, 1462 (D.C.

Cir. 1995), should not be applied by courts.  The statutory criteria must be applied to assess

whether the reasonableness of the proposed remedy as a means of  addressing the harm alleged

in the complaint warrants a finding that the consent decree is in the public interest.[6]

But the issue regarding the "judicial mockery" standard of review was only a part of the

guidance provided by the D.C. Circuit.  In *Microsoft*, the D.C. Circuit also discussed at length

the proposition that district courts cannot extend the scope of the Tunney Act review beyond the

confines of the Government's complaint.  A district court simply does not "have the power to

force the government to make [a] claim.  And since the claim is not made, a remedy directed to

that claim is hardly appropriate."  56 F.3d at 1460.[7]

-----

[5]      The "independent, objective and active determination without deference to the
DOJ" language upon which ACTel relies (ACTel Supplemental Brief at 3) originates from a law
review article that specifically referred to "when [the Court is] determining if a consent decree is
in the public interest."  *See* 150 Cong. Rec. S3610 at S3616-17 (remarks of Senator Kohl).

[6]      However, Congress certainly did not intend to adopt a higher evidentiary
requirement in the 2004 amendments.  It considered *but rejected* alternative amendment
language requiring "substantial evidence and reasoned analysis" to support a consent judgment.
Antitrust Criminal Penalty Enhancement and Reform Act of 2003, S. 1797, 108th Cong. (2003).

[7]      *See also id.* at 1459-60 ("The district court was troubled that if its review were
limited to the market and practices within that market against which the complaint was directed,
the government could, by narrow drafting, artificially limit the court's review under the Tunney
Act. . . . We think, with all due respect, that the district court put the cart before the horse.  The
court's authority to review the decree depends entirely on the government's exercising its
prosecutorial discretion by bringing a case in the first place.").

ACTel erroneously suggests that the Ninth Circuit has held that a court is not confined by
the complaint.  ACTel Brief at 9-10.  However, the Ninth Circuit has held just the opposite.
While acknowledging that the statute "suggests that a court may . . . look beyond the strict
relationship between complaint and remedy," the Court of Appeals, in fact, held that it "cannot
agree that a district court should engage in an unrestricted evaluation of what relief would best
serve the public" and that "[t]he balancing of competing social and political interests affected by

(continued…)

This holding of *Microsoft* was not altered by the 2004 Tunney Act amendments. While the congressional findings state that a court's inquiry must not be confined "solely to determining whether entry of consent judgments would make a 'mockery of the judicial function,'" 150 Cong. Rec. S3609 (daily ed., April 12, 2004), they do not mention anything so revolutionary as granting courts the ability to redraft the Government's complaint. Such expansions of a statute should not be inferred under normal circumstances (*see Overseas Educational Association v. Federal Labors Relations Authority*, 876 F.2d 960, 975 (D.C. Cir. 1989)), let alone here where constitutional considerations are implicated. *See supra* n.4. In fact, the plain language of the Amendments themselves confirms Congress's intent to restrict the court's inquiry to the bounds of the Government's complaint: this Court must determine whether the decree will effect "termination of the alleged violations" and must consider the impact of the judgment on injury "from the violations set forth in the complaint."[8] 15 U.S.C. § 16(e)(1)(A), (B) (emphasis added)).[9]

---

(…continued)

a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981). Seven years later, the Ninth Circuit reaffirmed that the Tunney Act "does not authorize a district court to base its public interest determination on antitrust concerns in markets other than those alleged in the government's complaint." *United States v. BNS Inc.*, 858 F.2d 456, 462-63 (9th Cir. 1988). *See Microsoft*, 56 F.3d at 1458 & n.7 (discussing *Bechtel* and *BNS*).

[8]     It is within this same context of the complaint that the Court is charged with considering "the impact of entry of such judgment upon competition in the relevant market or markets …." 15 U.S.C. § 16(e)(1)(B). The Court is not authorized to *determine* the relevant market(s), but rather to consider the impact of the remedy embodied in the proposed final judgment on competition in the particular market(s) where DOJ, in the exercise of its prosecutorial judgment and discretion, has concluded that anticompetitive effects would result from the merger if left unaddressed.

[9]     Thus to the extent any of Senator Kohl's statements or those of other legislators may suggest to the contrary, the statute's plain language must prevail. *See Fox Television Stations v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002) ("'[T]he remarks of a single legislator, even the sponsor,' cannot be allowed to alter the plain meaning of the legislation upon which he

(continued…)

ACTel is plainly trying to broaden the Complaint here by expanding the allegations of competitive harm to include other buildings that ACTel and its economist argued to DOJ should be included, but that DOJ rejected. The Government expressly (and logically) decided after an extensive investigation that the competitive harm that needed to be addressed occurred at certain buildings where the merging partners were the only two loop providers:

> SBC and AT&T are the only two carriers that own or control a Local Private Line connection to many buildings in each region. The merger would, therefore, effectively eliminate competition for facilities-based Local Private Line service to those buildings, and many retail and wholesale customers would no longer have AT&T as a competitive alternative to SBC.

Complaint, ¶ 24; *see also* ¶¶ 3, 18, 25, 26. The Government determined that the proper charges to be brought – and the case it intends to prosecute before this Court – relate to certain buildings where the number of competitors would be reduced from two to one. *See* Complaint at ¶ 29 ("Although entry may occur in response to a post-merger price increase in some of [the] buildings where AT&T is the only connected CLEC, the conditions for entry are unlikely to be met in hundreds of those buildings.").[10] Nowhere does the Complaint allege harm arising from 4

---

(…continued)

comments.") (*quoting Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979)); *FTC v. Retail Credit Company*, 515 F.2d 988, 995 (D.C. Cir. 1975) ("The proper function of legislative history is to resolve ambiguity, not to create it.").

[10] In a rehash of its Tunney Act comments and COMPTEL's arguments to the Court, ACTel argues that the DOJ's Complaint should have included all 2 to 1 buildings and not excluded those where the DOJ found that competitive entry was likely. ACTel Brief at 21-22. AT&T has already addressed this argument. *See* AT&T Inc.'s Reply to COMPTEL's Opposition to the Department of Justice's Motion for Entry of Final Judgments (March 8, 2006), at 6. Contrary to ACTel's speculation that the DOJ "decided to just take what the merging companies were offering, including the omissions in their analysis" (ACTel Brief at 22), the DOJ used extensive materials and data it received from the parties as well as from third parties through Civil Investigative Demands ("CIDs") and created its own analysis. DOJ Response to Comments at 22. The DOJ provided a explanation of some of the most important factors used to analyze why the competitive situation in certain 2 to 1 buildings differed from the others due to

(continued…)

to 3 or 3 to 2 reductions.[11]  Neither ACTel nor the Court has "the power to force the government

to make [a different] claim." *Microsoft*, 56 F.3d at 1460.

Considered within the scope of the Complaint's allegations, the PAFJ is in the public

interest.  It provides complete relief for the anticompetitive harm alleged by the Government.

Even though it is a settlement, it in fact gives the Government 100% of the relief it could have

achieved at trial by fully restoring two competitors in the "hundreds of those buildings" where,

according to the Government, the merger would reduce the number of competitors from two to

one.  That remedy is plainly in the public interest.  *See United States v. National Broadcasting

Co.*, 449 F. Supp. 1127, 1145 (D.C. Cal 1978) (finding consent decree in the public interest

where the "relief provided by the judgment is consistent with the government's general theory of

liability as manifested in its complaint.").[12]

---

(…continued)

the likelihood of competitive entry.  *Id.*  ACTel does not dispute the validity of these factors,
suggesting instead that DOJ must provide expert testimony to support them.  ACTel Brief at 22.

[11] *See also* Competitive Impact Statement at 3-4 ("For hundreds of commercial buildings
located in [eleven] metropolitan areas . . ., SBC and AT&T are the only two firms that own or
control a direct wireline connection to the building.  In these buildings, the merger of SBC and
AT&T would reduce the number of carriers with an owned or controlled last-mile connection
from two to one.  The merger would, therefore, effectively eliminate competition for facilities-
based Local Private Line service to those buildings, and many retail and wholesale customers
would no longer have AT&T as a competitive alternative to SBC.").

[12]    ACTel's suggestion that the PAFJ would somehow fail the pre-*Microsoft* standard
of review is without merit.  *See* ACTel Brief at 8.  In many courts, including the D.C. Circuit, the
standard used for approving settlements prior to *Microsoft* was "not to determine whether the
resulting array of rights and liabilities 'is the one that will best serve society' but only to confirm
that the resulting settlement is 'within the reaches of the public interest.'" *United States v.
Western Electric Co*, 900 F.2d 283, 309 (D.C. Cir. 1990) (quoting *Bechtel Corp.*, 648 F.2d at 666
and *United States v. Gillette Co.*, 406 F. Supp. 713,  716 (D. Mass. 1975)).  *See also United
States v. Stroh Brewery Company*, 1982 WL 1861, *3 (D.D.C. 1982) ("Preliminary negotiation
over the content of the proposed final judgment is a function vested in the government in the first
instance. . . . It is not our function to determine whether it 'is the best possible settlement that
could have been obtained.'") (*quoting United States v. Carrols Development Corp.*, 454 F. Supp.
1215, 1222 (N.D.N.Y. 1978)); *United States v. Agri-Mark, Inc.*, 512 F. Supp. 737, 739 (D. Vt.

(continued…)

**B.    The "Evidence" with Which ACTel Seeks to Broaden the Complaint
Was Properly Rejected by the Government During Its Investigation.**

In its effort to encourage the Court to improperly broaden the Complaint's allegations of

anticompetitive effects, ACTel proffers the declaration of Dr. Simon Wilkie in support of the

proposition that the anticompetitive harm resulting from the merger extends beyond 2 to 1

buildings.  Dr. Wilkie's study is old news.  It was provided to the DOJ, and its conclusions were

rejected by both DOJ and the FCC during their pre-Complaint investigations.  Having failed to

convince the Government to file a Complaint with a different scope, ACTel next used the

Tunney Act comment process to raise the Wilkie study yet again.  The Government responded,

explaining once again that its investigation led to different conclusions, and pointing to the flaws

in the analysis found by the FCC.  DOJ Response to Public Comments at 25 n.45.  Significantly,

ACTel did not address those flaws in its Tunney Act comments or in either of its filings with this

Court.

Even more significantly, while continuing its dogged focus on analyses that have been

rejected and issues that are outside the scope of this Court's review, ACTel consciously avoids

addressing the only issue before the Court -- namely, whether the remedy for the violation

_____

(…continued)

1981) ("Our function in this regard is not to determine whether this is the best possible
settlement that could have been obtained, but rather to determine whether the settlement
achieved is within the reaches of the public interest."); *United States v. LTV Corp.*, 1984 U.S.
Dist. LEXIS 24598, *35 (D.D.C. 1984) (same); *United States v. Alcan Aluminum Ltd.*, 605 F.
Supp. 619, 622 (D. Ky. 1985) (same); *NBC*, 449 F. Supp. at 1143 (same); *United States v.
American Brands, Inc.*, 1983 U.S. Dist LEXIS 18706, at *2 (S.D.N.Y. 1983) (same); *United
States v. Airline Tariff Publishing Co.*, 836 F. Supp. 912 (D.D.C. 1993) (same); *United States v.
American Telephone & Telegraph Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (same).

alleged by the Government is in the public interest.[13]  Rather, ACTel apparently hopes that the

conclusory declaration will cause the Court to hold an evidentiary hearing for the purpose of

expanding the Government's Complaint.  There is, of course, no legitimate justification for such

a course of action, which the cases cited above make clear would be both inappropriate and

unnecessary.  *See supra* note 4 and *infra* note 29.

        While ACTel's attempt to resurrect the Wilkie study does not advance the merits of its

position, its attempt in this regard does expose the lengths to which it will go to press its point.

The FCC and the DOJ did not credit Dr. Wilkie's bid study because of substantive flaws and

because ACTel refused to provide any portion of its data or methodologies to the FCC or the

parties, thus effectively shielding Dr. Wilkie's work from the rigors of cross-examination.

ACTel claims that it could not submit confidential third-party data to the FCC under the

established protective order because "any party that signed the Protective Order was entitled to

review the confidential information."  Mutschelknaus Decl. ¶ 5.  However, what ACTel neglects

to mention is that the FCC approved a second protective order that limited review to outside

counsel and experts – precisely the same categories of people to whom ACTel released the data

to create the study.[14]  Alternatively, ACTel could have submitted the data without naming the

_____

        [13]     ACTel's suggestion that prior applications of the "reaches of the public interest"
standard required a surfeit of proof including affidavits from economists (ACTel Brief at 10-11),
is wrong.  The Tunney Act imposes no such requirement, and neither do the cases ACTel cites.
While the court in *Western Electric* found that certain economic presentations supported the
DOJ's decision, the court also stated: "[T]he fact that [the DOJ's decision] is supported by an
array of prominent economists . . . does not in itself make that action right."  *United States v.
Western Electric Co.*, 993 F.2d 1582, 1582 (D.C. Cir. 1993).  Thus, the court not only rejected
ACTel's theory outright but specifically declined to adopt any requirement or preference for
economic submissions in the record.

        [14]     *See* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-05-1322A1.pdf .
ACTel was well aware of this second protective order – which prohibited viewing by internal
company representatives of the parties – because ACTel complained to the FCC about the

(continued…)

companies from which the data came.  It chose not do so.  Accordingly, ACTel's tortured

attempt to explain why it failed to produce the underlying support for a study that it deems so

critical should not be credited.[15]

In short, the so-called "evidence" that ACTel seeks to present to this Court as the basis

for challenging the PAFJ was deemed by the Government to be flawed on its face;[16] was the

subject of criticism to which ACTel provided no response; was well-shielded by ACTel from any

in-depth review; and concerns issues that are outside the scope of this Court's Tunney Act

---

(…continued)

restrictions that it placed on its ability to photocopy and obtain in electronic form certain highly
sensitive AT&T and SBC documents.  *See* 5/25/05 *ex parte* from Brad Mutschelknaus to Kevin
Martin at 2, *available at* http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_
document =6517616472 .

[15]     ACTel's declarations are misleading in another respect.  At the hearing on May
10, counsel for AT&T represented that AT&T's divestitures were subject to a July 31 walk away
right.  May 10 Tr. at 36:2-37:3.  In response, ACTel references a declaration submitted by
Randolph Nicklas of XO Communications, and asserts that "the bidder for the divested assets
whose declaration is attached to this memorandum makes clear there is no particular significance
to the July 31 date."  ACTel Supplemental Brief at 15.  But ACTel fails to advise the Court that
XO is not purchasing any of the AT&T divestiture assets, and instead is bidding on Verizon
assets.  It was a walk away right in the AT&T divestiture agreements to which AT&T's counsel
was obviously referring.

[16]     Dr. Wilkie's study is so obviously flawed that there is no need to request the
underlying data.  First, as ACTel admitted in filings before the FCC and as the FCC found, the
bid study fails to distinguish between services offered over facilities that are fully owned and
those that are not.  *See FCC SBC/AT&T Merger Order*, ¶ 46 & n.130 (noting the apparent error
and that Type I and Type II services belonged to different product markets); 6/6/05 *ex parte* from
Brad Mutschelknaus to Marlene Dortch at 10-11, *available at* http://gullfoss2.fcc.gov/prod/ecfs/
retrieve.cgi?native_or_pdf=pdf&id_document= 6517626817.  Second, with regard to the bare
details of the basic underlying methodology that are discernable from context, the FCC faulted
the study for failing to control for differences in the bid process, post-bidding negotiations, and
the likelihood that bids were conducted in several rounds.  *SBC/AT&T Merger Order*, ¶ 46 &
n.132.  Moreover, Dr. Wilkie apparently did not control for non-price factors such as quality of
service (including, for example, performance intervals, service level quality assurances, etc.).
These problems with the study that were identified by the Government or FCC (*see id.*; DOJ
Response to Public Comments at 25 n.45)  – but to which ACTel provided no response –
undermine the study's methodology and, necessarily, its results.

review.  For all of these reasons, ACTel's attempt to resurrect the issues contained in the Wilkie study should be rejected.

C.     **ACTel's Other Assertions Also Add Nothing New, or of Merit, to These Proceedings.**

1.     **Divestiture of Assets Is Appropriate.**

ACTel makes the same argument previously made by COMPTEL regarding the scope of the remedy, claiming that the DOJ should have ordered an overbroad divestiture of "all overlapping assets, together with customers and network traffic, as with the Government's proposed decree in the Qwest/Allegiance merger."[17]  But the asset divestitures required here are entirely consistent with DOJ Guidelines, which clearly explain that merger remedies should provide the most narrowly tailored solution that cures the anticompetitive harm that the DOJ identifies.  DOJ *Guide to Merger Remedies* at 2, 3, 4.[18]  As AT&T has previously noted in response to COMPTEL, it is inappropriate to compare the DOJ's preliminary position on divestitures in the merger of Qwest/Allegiance with the DOJ's final divestiture requirements in this merger due to the specific circumstances surrounding Allegiance's expedited bankruptcy auction and the nature of the DOJ's ultimatum, which was to accept the overbroad divestitures or

_____

[17]     ACTel's apparent disdain for the divestiture remedy of assets that Judge Friedman approved in the *Thompson* case, which ACTel describes as a "fiasco" (ACTel Brief at 13), is interesting, given that ACTel's own counsel represented third party Lexis in the case and ultimately helped to construct and support the remedy that was approved.  Lexis initially argued for broader divestitures, but subsequently bought the divestiture assets and ultimately entered papers "support[ing] entry of the Proposed Final Judgment" and "accept[ing] the substantive positions of plaintiffs and defendants."  *United States v. Thompson Corp.*, 1997 U.S. Dist. LEXIS 1893 (D.D.C. 1997).

[18]     The DOJ Guidelines provide that "[t]here must be a significant nexus between the proposed transaction, the nature of the competitive harm, and the proposed remedial provisions. Focusing carefully on the specific facts of the case at hand will not only result in the selection of the appropriate remedies but will also permit the adoption of remedies ***specifically tailored to the competitive harm***."  DOJ *Guide to Merger Remedies* at 2 (emphasis added).

accede to a regular, full-length investigation with the attendant delay. *See AT&T Inc.'s Response to COMPTEL's Motion for Leave to File an Opposition to the Department of Justice's Motion for Entry of Final Judgments*, at 6-7.[19] Rather, confirmation that under appropriate circumstances asset divestiture is well within the bounds of standard DOJ procedure can be found in other cases where asset divestitures were deemed the appropriate remedy by DOJ and the reviewing court.[20]

     Because the harm that the DOJ identified was the loss of competitive access into certain buildings, providing the facilities to reach those buildings is exactly the correct remedy to address the harm identified. All of the remedies ACTel suggests are unnecessarily overbroad. Indeed, even competitor CLECs advised the FCC that the concept of "divesting" customers here would be extremely difficult to accomplish because many business customers that AT&T serves via its local facilities are part of national contracts, and would risk interruption of vital telecom

---

[19]    Indeed, the DOJ Guidelines caution against "includ[ing] a remedy in a decree merely because a similar provision was included in one or more prior decrees." DOJ *Guide to Merger Remedies* at 2.

[20]    *See, e.g.*, *United States v. Cingular Wireless Corp.*, Civil No. 1:04cf01850 (Final Judgment, filed Nov. 3, 2004, *available at* COMPTEL's Mem. in Support of Leave to Intervene, Ex. A) (requiring divestiture of some business units where the DOJ identified broad competitive harm but requiring only the divestiture of bare wireless spectrum where the concern, as similar to here, involved access to a scarce resource necessary for entry); *United States v. 3D Systems/DTM*, Civil No. 1:01CV01237, (GK) (Proposed Final Judgment, filed Aug. 16, 2001, *available at* http://www.usdoj.gov/atr/cases/f8900/8926.htm) (requiring only divestiture of intellectual property assets to permit entry into U.S.); *U.S. v. General Electric Co.,* Civil No. 1:98CV01744 (RCL) (Competitive Impact Statement, filed July 14, 1998, at 6, *available at* http://www.usdoj.gov/atr/cases/ f1800/1843.htm) (requiring divestiture of certain software and related equipment so that third parties could compete, but not requiring divestiture of customers because a base of customers was not the obstacle to effective competition). The Cingular Wireless consent decree related to the telecommunications field. Thus, COMPTEL's counsel plainly erred at the May 10 hearing when he told the Court that "in every other telecommunications consent decree in the last ten years they have required the divestiture of a full business." May 10 Tr. at 11:15-17.

service.[21]  Rather, DOJ tailored a specific remedy to fit the violation alleged -- one that fully

restores competitor access to the buildings in question.

### 2.    Divestiture Purchasers Can Use the Assets Effectively.

ACTel complains that the DOJ remedy is limited to "divesting IRUs to a limited number

of buildings." ACTel Supplemental Brief at 13. In truth, however, the DOJ required AT&T to

divest lateral fiber facilities to nearly 400 buildings, which comprise almost 25% of AT&T's

local fiber connected commercial buildings in the SBC territories.  In addition, the DOJ required

AT&T to provide transport sufficient to ensure that the purchaser would be able to connect its

network to those divested facilities.  PAFJ at 2-3.[22]

Through a declaration submitted by Randolph Nicklas of XO Communications, ACTel

then speculates that the three divestiture purchasers will be "much smaller" than AT&T and MCI

and "logically could not even offer prices on the divested circuits at the same low prices that

---

[21]    *See* 6/17/05 *ex parte* by Level 3 Communications, Inc., at 2-3 ("Requiring
divestiture of AT&T's and MCI's customer agreements, while preferable from the standpoint of
reducing market concentration of the merged entities, is not feasible" due to the difficulty of
splitting up Master Service Agreements with large customers in multiple locations, the resulting
cooperation between carriers required for centralized customer services such as billing,
provisioning, and network operation support, the resulting need to share proprietary service
information, and likelihood of customer switchback), *available at* http://gullfoss2.fcc.gov/prod/
ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6517889406.

[22]    ACTel argues that the divestitures do not remedy 2 to 1 transport "choke points"
because SBC earlier identified roughly fifty central offices (*i.e.*, locations for transport
connections) in legacy-SBC territory where SBC thought AT&T was SBC's only competition,
yet was required to divest only two of those buildings.  ACTel Brief at 22-23.  At least two
factors account for the difference:  (1) the data requests from the parties and the CIDs issued to
AT&T's competitors which would ultimately provide DOJ with a far clearer picture of the
competitive landscape than was possessed by AT&T or SBC; and (2) the test for whether entry
into the central offices was likely which would obviate the need for divestiture.  Generally
speaking, transport through metropolitan areas and the existence of alternative networks are
readily available to customers, as there are many competitors providing these services. *See, e.g.*,
DOJ Response to Public Comments at 14.  Thus, the focus of the Government's Complaint is on
lateral loops to certain buildings.

AT&T and MCI have been charging." ACTel Supplemental Brief at 5; Nicklas Decl. at ¶¶ 6-7.

ACTel offers no data to support this assumption, which flatly contradicts ACTel's own

supplemental exhibits which note that CLECs (such as XO and the rest of ACTel's membership),

are "very competitive in Tier 1 metros." ACTel Supplemental Brief, Exhibit 11.

     The key point ACTel fails to acknowledge is that proposed divestitures will not be to

start-up companies, but will add assets to the existing networks of the purchasers. For example,

if the purchaser already serves 50 buildings in a metro area, and buys access to 50 more from

AT&T, it not only gains access to those individual buildings but it becomes more competitive by

increasing the size and scope of its local and national network.

     In addition, the Government explained that, in evaluating the divestiture purchasers, it

"will be particularly focused on the purchaser's ability to be a viable competitor in offering

Local Private Lines on both a retail and/or wholesale basis" and that "purchasers that are already

offering similar services in or near the metropolitan area are more likely to be viable competitors

than other potential purchasers." CIS at 3-4. The DOJ has carefully monitored the bidding and

negotiations that AT&T has conducted for its divestitures and has followed through on its word:

all three of the expected divestiture purchasers are strong, well-established telecommunication

companies with extensive networks across the United States.

     For example, the proposed purchaser in two of the metropolitan areas, AboveNet, owns

over 1.5 million miles of fiber, operates in 14 U.S. metro markets, and recently noted that "on the

last five occasions AboveNet has come up against the traditional competitors – AT&T, MCI and

Verizon – it has won on four occasions, and should have won the other as well."[23] Level 3,

---

[23]    *See* AboveNet website at http://www.abovenet.com/about/index.html; *AboveNet – Meeting Demand for Bandwidth at More Locations* (Sept. 2, 2005), *available at* http://www. above.net/news/pr090205.html.

which is to purchase the assets in six metropolitan areas, owns in aggregate almost one million miles of installed optical fiber, connects to 850 on-net buildings, and has itself constructed over 650 laterals.[24]   Level 3 also recently purchased TelCove's 22,000 route-mile metro fiber network, which connects 4,000 buildings in 70 Eastern U.S. markets.[25]   Time Warner Telecom, which is purchasing the divestiture assets in the other three metropolitan areas, connects 21,000 local and regional fiber route miles across 44 markets and serves roughly 6,200 buildings "directly with TWTC fiber."[26]   Thus, it is abundantly clear that, even if XO could not operate the divested assets efficiently and profitably, there are other companies, including the prospective purchasers of AT&T's divested assets, that can.

> ### 3.   The Claimed "Worrisome" Events Are Neither Unusual Nor Supported By Actel's Own Exhibits.

ACTel's supplemental brief finally resorts to the dubious exercise of assembling four pages of rampant speculation and out-of-context quotations from news stories.   The apparent point is to cobble together a conspiracy theory, which ACTel itself then renounces, in effect admitting it has wasted four pages of this Court's time.   *See* ACTel Supplemental Brief at 11 ("Does this indicate that a political deal was cut to secure approval of these mergers?   Absolutely not.").

    a.   ACTel begins its tale with the observation that "both the Complaints and the Consent Judgments were filed on the very same day at the very same time," to insinuate that a

---

[24]    *See* Level 3 website at http://www.level3.com/3257.html; http://www.level3.com/674.html; and http://www.level3.com/2700.html.

[25]    *See* Carol Wilson, "Level 3 buys TelCove," *Telephony Online* (May 1, 2006), *available at* http://telephonyonline.com/broadband/news/Level3_TelCove_acquisition_050106/index.html; "TelCove 'Buildings On Net' Jump By More Than 20% in 2005," (March 23, 2006).

[26]    *See Investor Presentation* (May 2006), at 5, *available at* http://www.twtelecom.com/Documents/Announcements/News/2006/IR_Presentation_May_06.pdf.

nefarious plot is afoot.  ACTel Supplemental Brief at 7-8.  Yet, in the decades since the DOJ was

invested with the power of issuing Civil Investigative Demands prior to filing claims with the

courts, it has become increasingly common for the DOJ to issue consent decrees after extensive

CID investigations and concurrently with the filing of a complaint, particularly in merger cases.
[27] DOJ is now able to conduct a full investigation and gather all the relevant facts in order to

fully understand the competitive effects involved *before* deciding what its complaint should

include.  Then DOJ offers the merging parties a chance to settle the case, which frequently is

accepted in the interests of resolving the dispute so the transaction can close.  As numerous other

cases make clear, it is less the exception than the rule for DOJ to file its complaint and proposed

final judgment at the same time.[28]

     b.    ACTel also appears to suggest some improper influence from its assertion that

"hundreds of lawyers, probably more than a thousand," were hired "to work for approval of the

deals."  ACTel Supplemental Brief at 9.  Yet the cited articles make clear that these lawyers were

temporary help hired to review the huge quantity of data and documents requested by the DOJ,

FCC, and numerous state agencies investigating the deal – and not to lobby Congress or federal

---

[27]    In the *Thompson* case in which ACTel's counsel represented LEXIS, the Complaint and the Proposed Final Judgment were both filed with the court on June 27, 2001. *See* http://www.usdoj.gov/atr/cases/indx325.htm.

[28]    *See* "Justice Department Requires Divestitures in UnitedHealth Group's Acquisition of Pacificare Health Systems," (Dec. 20, 2005) (noting the DOJ "filed a civil lawsuit today . . . to block the proposed transaction.  At the same time, the Department filed a proposed consent decree that, if approved by the court, would resolve the Department's competitive concerns with the lawsuit."), *available at* http://www.usdoj.gov/atr/public/press_releases/ 2005/213814htm; "Justice Department Requires Divestitures in ALLTEL's Acquisition of Western Wireless," (July 6, 2005) (same), *available at* http://www.usdoj.gov/atr/public/ press_releases/2005/209918.htm; "Justice Department Requires Sardine Divestitures in Connors Bros. Acquisition of Bumble Bee," (Aug. 31, 2004) (same), *available at* http://www.usdoj.gov/ atr/public/press_releases/2004/205267.htm; "Justice Department Requires Restructuring of Syngenta's Acquisition of Advanta," (August 25, 2004) (same), *available at* http://www.usdoj. gov/atr/public/press_releases/2004/205195.htm.

agencies. Thus, the articles do not support ACTel's conspiracy theory, but do support the point that the government agencies conducted extensive investigations.

        c.     ACTel's insinuations regarding the timing of the merger review are equally lacking in merit. ACTel suggests that "suddenly, without explanation" following alleged political pressure applied in October, the companies began expecting the merger to close in late 2005 rather than early 2006. ACTel Supplemental Brief at 9. However one of ACTel's own exhibits, a news report from August 1, 2005, quotes the Associate General Counsel of SBC as stating that "[w]e remain confident of completing the process late this year," and notes that "[o]fficials from both companies have been saying the merger will close toward year end or in early 2006." ACTel's Supplemental Brief, Exhibit 5. More generally, there is nothing suspicious about merging parties taking a conservative view of timing in early public statements so as not to seem to pressure regulators or mislead investors, and then revising the schedule as the process proceeds.

        In short, ACTel has created a fictionalized account of the merger process that is so removed from reality that even ACTel refuses to stand behind it. *Id.* at 11. It is exactly this sort of last-ditch effort to raise an unsupported incendiary claim against the merger that AT&T warned would waste the time of this Court and the parties. The Court should not entertain such specious insinuations.

## II.    THE PAFJ IS IN THE PUBLIC INTEREST.

        Nearly a year and a half after the parties first announced their intent to merge and six months after receiving all state and federal agency approvals, this Court must now determine whether the entry of the PAFJ is in the public interest. The Court must consider the statutory factors in reaching its conclusion. To do so, it now has before it an extensive record consisting of the Government's Complaint, PAFJ, Competitive Impact Statement, the public comments,

DOJ's response to those comments, as well as multiple briefs filed in the proceeding over the last

four months by the parties and by COMPTEL and ACTel. Additional materials in the public

record include those filed with and by the FCC in its own determination that the merger was in

the public interest.[29]

The Court can and should decide that entering the judgment and permitting the

divestitures to go forward to remedy the harm alleged in the Complaint satisfies the public

interest standard. The key point is that the Government's remedy is an entirely logical and

reasonable response to the competitive harm alleged. At the May 10 hearing, the Court

expressed interest in receiving from the parties "the very precise reasons . . . why entry of this

final judgment is, indeed, in the public interest." Tr. 24:15-17. The reasons are as follows:

First and foremost, the competitive impact of entering the PAFJ will be "termination of

[all] alleged violations" in the Complaint. *See* 16 U.S.C. § 16(e)(1)(A). The DOJ has alleged

anticompetitive effects resulting from the the reduction in private line competition in hundreds of

buildings from two competitors to one, and the divestitures completely eliminate this concern by

---

[29]     Contrary to ACTel's assertion, there is no need for an evidentiary hearing and
other prolonged proceedings here. *See* ACTel Supplemental Brief at 14-16. As the legislative
history of the Tunney Act makes clear, its procedures were intended to produce a streamlined
review process unburdened by unnecessary evidentiary hearings:

> It is not the intent of the Committee to compel a hearing or trial on the public
> interest issue. It is anticipated that the trial judge will adduce the necessary
> information through the least complicated and least time consuming means
> possible. Where the public interest can be meaningfully evaluated simply on the
> basis of briefs and oral arguments, this is the approach that should be utilized.
> Only where it is imperative that the court should resort to calling witnesses for the
> purpose of eliciting additional facts should it do so.

S. Rep. No. 93-298, quoted with approval in House Rep. No. 93-1463, reprinted in U.S. Code
Cong. And Admin. News, 93d Cong. 2d Sess., at 6538-39 (1974). As amply demonstrated in
this Reply, ACTel has fallen far short of demonstrating a need for such additional proceedings
under the circumstances here.

granting a competitor the necessary lateral connection to the building and sufficient transport to carry telecommunications traffic to its own network.  Nothing additional could be gained by the DOJ via the "alternative remedies" arising from a trial on the merits.  *See* 16 U.S.C. § 16(e)(1)(A).

The PAFJ is not "ambiguous" and has sufficient "provisions for enforcement and modification."  *See* 16 U.S.C § 16(e)(1)(A).  Indeed, AT&T has completed the bidding process for all assets and is proposing three buyers to purchase its divestiture assets across eleven metropolitan areas.  The process was carefully monitored by the Government pursuant to the PAFJ.  And, as the DOJ explained in presenting the PAFJ to the Court, "a long-term leasehold interest" is "commonly used in the telecommunications industry," and the ten year period takes "into account the dynamic nature of the telecommunications industry and the useful life of the existing fiber."  CIS at 11.  *See* 16 U.S.C. § 16(e)(1)(A).

Finally, as to the impact on competition, it is plainly a positive one.  *See* 16 U.S.C. § 16(e)(1)(B).  The PAFJ restores competition in those buildings to which the DOJ's Complaint is addressed to two providers and thereby completely eliminates the "specific injury from the violations set forth in the complaint."  *See* 16 U.S.C. § 16(e)(1)(B).  The Government also took the additional step of requiring that all the divested assets within a single metropolitan area be sold to a single buyer with a competitive network in that area, thereby increasing the breadth of the buyer's network on a metropolitan area basis.  *See* CIS at 9-10.  In short, the PAFJ completely remedies the anticompetitive effects alleged by the Government in its Complaint.

## **CONCLUSION**

For the foregoing reasons and those separately expressed by the Government, the Court should grant the Department of Justice's Motion for Entry of Final Judgments.

Respectfully submitted,

  /s/ Wilma A. Lewis           

Wilma A. Lewis (D.C. Bar No. 358637)
Wm. Randolph Smith (D.C. Bar No. 356402)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Counsel for Defendant AT&T Inc.

Dated:  May 31, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May, 2006, true and correct copies of AT&T Inc.'s Response to ACTel's Opposition and Supplemental Opposition to the Department of Justice's Motion for Entry of Final Judgments were sent by first class mail, postage prepaid, to the following:

*Attorneys for Plaintiff*

Laury E. Bobbish
Assistant Chief, Telecommunications &
Media Enforcement Section
Antitrust Division
U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530

Lawrence M. Frankel
Attorney, Telecommunications & Media
Enforcement Section
Antitrust Division
U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 800
Washington, D.C. 20530

*Attorneys for ACTel*

Gary Reback
Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA 94303

Thomas Cohen
3050 K Street, N.W., Suite 400
Washington, DC 20007

*Attorneys for COMPTEL*

Kevin R. Sullivan
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*Attorneys for Verizon Communications, Inc.*

John Thorne
Verizon Communications Inc.
1515 North Courthouse Road
Arlington, Virginia 22201

*Attorneys for MCI, Inc.*
Paul M. Eskildsen
MCI, Inc.
22001 Loudoun County Parkway
Ashburn, Virginia 20147

2774697