## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | )    Civil Action No.: 1:05CV02102 (EGS) |
| v. | ) |
| | ) |
| SBC Communications, Inc. and | ) |
| AT&T Corp., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| The Alliance for Competition in | ) |
|     Telecommunications | ) |
| | ) |
| and | ) |
| | ) |
| COMPTEL, | ) |
| | ) |
| *Amicus-Curiae.* | ) |

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | )    Civil Action No.: 1:05CV02103 (EGS) |
| v. | ) |
| | ) |
| Verizon Communications Inc. and | ) |
| MCI, Inc., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| The Alliance for Competition in | ) |
|     Telecommunications | ) |
| | ) |
| and | ) |
| | ) |
| COMPTEL, | ) |
| | ) |
| *Amicus-Curiae.* | ) |

## ACTel's REPLY MEMORANDUM IN OPPOSITION TO THE UNITED STATES' MOTION FOR ENTRY OF FINAL JUDGMENTS

# TABLE OF CONTENTS

**Page**

I.    AS A RESULT OF THE 2004 AMENDMENTS, THE TUNNEY ACT STATUTORY LANGUAGE REQUIRES THIS COURT TO CONSIDER "COMPETITION IN THE RELEVANT MARKETS"........................................2

II.   PRICES HAVE INCREASED, JUST AS PREDICTED BY THE MERGER GUIDELINES, THE EMPIRICAL STUDIES, AND THE OTHER EVIDENCE ............7

    A.    Merger Guidelines ...............................................................................8

    B.    Empirical and Other Forms of Evidence .............................................10

    C.    Evidence of Actual Post-Merger Price Increases...............................12

        1.    Market Structure ....................................................................12

        2.    Price Increases .......................................................................15

    D.    Efficiencies .........................................................................................19

III.  THE ELEMENTS OF A MORE EFFECTIVE REMEDY CAN BE EASILY IDENTIFIED ..............................................................................................22

CONCLUSION......................................................................................................25

This is truly an extraordinary case. In the normal Tunney Act challenge, the court is left to weigh and consider the accuracy of projections by economists as to what will likely happen to prices post merger. But here, as it turns out, the Antitrust Division has done a public service by simply ignoring the 2004 Amendments to the Tunney Act and permitting the acquisitions to proceed.

The transactions closed long ago and the merged companies have been conducting business as combined entities, and discussing financial results on a combined basis, for many months. AT&T recently told the investment community that Local Private Lines prices post merger reversed their prior decline and "stabilized." Indeed, AT&T itself has announced numerous price increases for both DS1 and DS3 Local Private Line circuits (including both loop and transport) all over the country since the mergers closed. Prices that were declining due to competition have, in fact, gone up, just as Professor Wilkie's analysis indicated. And the Government now finds itself in the more than awkward position of explaining to this Court why, based on the investigation the Antitrust Division claims to have made in 2005, post-merger price increases will not happen, even though they have already occurred.

Contrary to the Government's assertions, Professor Wilkie's analysis was never the only evidence on which these *amici* relied. On the contrary, the basic analysis of the Government's Merger Guidelines results in a *prima facie* case of competitive injury and anticompetitive price increases flowing from these mergers. Analysts and news reports prior to the mergers also predicted prices would go up as a result of the mergers. The Wilkie study indicated precisely the same thing, and these predictions all have been borne

out – the merged companies have announced price increases and have admitted that declining prices have now reversed their course.

The only antitrust defense to this overwhelming body of evidence is the Government's offhanded suggestion that the mergers will produce "efficiencies." Government Reply Mem. at 32.  The Court will note that neither the Government nor the merged companies cite any case law in their memoranda to support the invocation of an "efficiencies" defense, and with good reason.  The parties' claims do not come close to satisfying this Circuit's requirements for an efficiency defense – among which is that "efficiencies" must result in lower customer prices and consumer benefits.  Prices, post merger, are going up.  The "efficiencies" touted by Verizon and the Government will only permit the merged companies to line their pockets at the expense of customers.  This is not permitted by the case law.

Most startling is the Government's continued reliance on the discredited *Microsoft* decision as very nearly its only legal authority for the limitations of Tunney Act review it proposes to impose on this Court.  The Government continues to pretend that the overwhelming bipartisan majority of Senators and Congressmen who amended the Tunney Act precisely because of the *Microsoft* decision were simply engaged in an effort to change nothing at all.  The Government reaches this result only by ignoring the 2004 changes to the language of the statute itself.

I.     **As a Result of the 2004 Amendments, the Tunney Act Statutory Language Requires This Court to Consider "Competition in the Relevant Markets."**

The Government's reply retreats not an inch from its position that the 1995 *Microsoft* decision, 56 F. 3d 1448 (D. C. Cir. 1995), continues to govern this Court's Tunney Act review.  Assertion after assertion in the Government's reply memorandum is

supported by citation to the *Microsoft* decision and that decision alone. The Government (and the merging parties) claim that the *Microsoft* decision was not (and could not be) overruled by Congress and that, at best, Congress wanted courts to stop from applying a "mockery of the judicial function" standard. Everything else said in the *Microsoft* decision, according to the Government, remains good law. Thus, the Government would concede that this Court should not apply a "mockery of the judicial function" standard, but that it is otherwise obligated to follow the rigid and excessively deferential directions of the *Microsoft* decision by rejecting the proposed decrees only if the Court "has exceptional confidence that adverse antitrust consequences will occur." Government Reply Mem. at n. 9, page 4, citing *Microsoft* at 1460.

The complete legislative history of the 2004 Tunney Act Amendments has been placed in this record. We will not further burden the Court by citing to it. We note only that Congress intended to make it clear that the *Microsoft* decision required excessively deferential judicial review; Congress' criticism was not merely limited to a particular formulation of words as an inappropriate standard. Something much more important and much broader than the mere linguistic formulation of the "mockery" standard was at issue. The point of the new legislation was that the District of Columbia Circuit had adopted a set of standards and limitations on procedures that produced judicial "rubber stamping" of proposed decrees. This was at variance with what Congress *originally* intended in adopting the Tunney Act. The stated Congressional purpose of the Amendments, set forth in the public law as passed and quoted by the Government only in a footnote (n. 31, p. 10), was to "effectuate the *original* Congressional intent in enacting the Tunney Act" (emphasis applied). The Congressional intent was that Tunney Act

courts conduct independent evaluations of proposed decrees. The *Microsoft* decision misconstrued and failed to apply Congress' original intent.

More importantly, a determination of what this Court is now supposed to do in a Tunney Act review is not based merely upon the legislative history, nor even upon the original Congressional purpose. Rather, the statutory wording of the 2004 Amendments imposed a new requirement on Tunney Act courts – that they consider "competition in the relevant markets." 15 U.S.C. § 16 (e). This requirement did not exist before 2004.

The Complaints in these cases identify, explain in some detail, and define the relevant product markets as "Local Private Lines," Complaints at ¶¶ 19-23 – not certain "2-to-1" loop buildings within the Local Private Lines market. Indeed, the "geographic markets" in the Complaints include everything from individual buildings to entire metropolitan areas. Complaints at ¶ 24. The "Violation Alleged" in the Complaints is increased prices for Local Private Lines. Complaints at ¶ 33. By the express language of the statute, as amended in 2004, this Court must consider competition in these pled markets – not merely a subset of buildings in those markets that the Government finds convenient. The Government and the parties continue to pretend that the Tunney Act confines review to only certain violations in places within the relevant markets, but that is contrary to the express wording of the statute.

Neither the Government nor the merging parties come to grips with the express statutory language. The Government mentions this important change in the statutory language only at the end of a footnote (n. 29 at p. 10) and continues to claim that judicial review is not only limited to the relevant markets pled in the Complaints, but is limited

even further to particular harms in the relevant markets. There is no basis for such a position in the statutory language.

Prior to the 2004 change of statutory language, perhaps there was some basis for a more deferential standard of review. Perhaps, giving the District of Columbia Circuit's 1995 *Microsoft* opinion the benefit of every doubt – perhaps there was some basis before the 2004 Amendments required (rather than merely permitted) the Court to consider the identified factors, and before Congress expressly added "competition in the relevant markets" as a factor the Court must consider – perhaps at that earlier point prior to 2004 there was some reasonable basis for a Tunney Act court to enter challenged consent decrees in important cases without a supporting declaration of an economist (or anyone else) and without any other evidentiary showing as to "competition in the relevant markets." But that time has long since passed.

The plain language of the amended statute makes clear that the Government has no business proceeding as if the 2004 Amendments never occurred. Yet that is precisely what the Government has done. It continues to place principal reliance on the very decision criticized by Congress and published before there was a judicial requirement to consider "competition in the relevant markets." And it has undermined this Court's ability to conduct the very analysis Congress now requires by permitting the merging companies to close their transactions, leaving the Court only the most limited ability to correct the Government's errors. The Government's Reply Memorandum neither apologizes for its behavior nor promises this conduct will not happen again. On the contrary, the Government clearly indicates that it would do the same thing again unless

prevented from doing so by this Court. In short, the case now before this Court will dictate the Government's conduct going forward.

These *amici* accept both the specification of the "Violation Alleged" section of the Complaints, as well as the Government's "relevant markets" definition. We contest only the adequacy of the remedy proposed in those markets. Nevertheless, we urge the Court to reject the Government's invitation to limit Tunney Act challenges more generally to only the relevant markets pled in Tunney Act complaints. There is simply not a sufficient record before this Court to permit such a sweeping generalization that would apply to future cases, and there are certainly reasons why courts in these and other cases might need to examine markets beyond those pled by the Government.

For example, in Judge Sporkin's *Microsoft* decision (159 F. R. D. 318) that was reversed by the Court of Appeals, the trial court pointed out a serious policy concern – that the Government could uncover major antitrust violations but bow to political pressure and file a narrow complaint and consent decree as a cosmetic measure, leaving the major violations untouched. Commentators fully credit this concern,[1] and we have noted that in this case there is the disturbing series of facts respecting the Government's approval of these mergers at a time its leadership was under intense political pressure.[2]

In any event, when a court directs its attention to the relevant markets pled in the Government's complaint, as the statute now requires, and rejects a proposed settlement

---

[1] *See, e.g.,* Lloyd C. Anderson, "United States v. Microsoft, Antitrust Consent Decrees, and The Need for a Proper Scope of Judicial Review," 65 Antitrust L. J. 1, 32, 39-40 (Fall 1996).

[2] The suggestion in the Government's reply brief (at p. 5, n. 11) that this Court can conduct only a superficial public interest inquiry and must accept a manifestly inadequate remedy or run afoul of the "separation of powers" doctrine is pure fantasy. The entire legal foundation for a deferential Tunney Act review because of "separation of powers" concerns in the *Microsoft* decision is based on a single case law citation – a citation to the *dissent* from the summary affirmance of the AT&T decree. *See* U.S. v. Microsoft, 56 F. 3d 1448, 1459 (D.C. Cir. 1995). A dissent is no precedent at all, and the *Microsoft* decision cites no other authority for its assertion that the "public interest" issue is the province of the Executive Branch alone.

because the remedy is inadequate, the Court is in no sense rewriting the complaint or compelling the Government to file a different lawsuit. The Tunney Act was intended to address the misleading and hypocritical situation in which the Government proclaims as an antitrust "victory" meaningless concessions by the merging companies. If the Government cannot secure meaningful relief, it can and should refrain from filing a complaint at all. It should admit in its press release that it lacks the resources and wherewithal to defend the public interest against large corporations. Alternatively, it can file a real complaint and truly secure meaningful relief. But, under the Tunney Act, the Justice Department cannot compel a court to join a charade that undermines public confidence in law enforcement by approving a settlement that does not do what the case law says an adequate remedy must do.

## II.    Prices Have Increased, Just as Predicted by the Merger Guidelines, the Empirical Studies, and the Other Evidence.

The Government's reply brief claims that *amici's* position is based solely on the Wilkie study – "a single empirical study submitted by interested party," in the words of the Government's brief (at p. 15). Nothing could be further from the truth. In fact, the sources normally relied upon by the Government in merger analysis pointed, from the beginning, to an anticompetitive effect from these mergers. The Government's Merger Guidelines[3] predicted anticompetitive effects including price increases. Other evidentiary sources predicted the same result. Analysts and commentators predicted price increases. The Wilkie empirical study similarly predicted price increases. And now the merged companies have in fact raised and stabilized prices. The Government did not just ignore

---

[3] United States Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines (revised 1997).

the Wilkie study in its analysis; the Government ignored all these other sources of concern.

### A. <u>Merger Guidelines</u>

Under the Government's established procedures, merger analysis begins with an evaluation of market concentration produced by the transactions at issue. According to the Merger Guidelines, "market concentration is a useful indicator of the likely potential competitive effect of a merger." Guidelines at § 1.51. The Guidelines measure concentration by the Herfindahl-Hirschmann Index (HHI). Guidelines at § 1.5. The methodology for calculating HHIs is described in the Guidelines (§ 1.51 n. 18) and in the case law of this Circuit.[4] According to the Guidelines, when the post-merger HHI exceeds 1800, it will be presumed that a merger producing an increase in the HHI (between the pre-merger calculation and the post-merger calculation) of more than 100 points is likely to create or enhance market power or facilitate its exercise. Guidelines at § 1.51.

Given that the Government pled a product market of Local Private Lines in all geographic markets as small as single buildings and as large as metropolitan areas, Complaints at ¶ 24, it would have been reasonable to expect the Government to simply examine whether the overall prices of Local Private Lines will rise as a result of the mergers. But the Government instead conducted a "microanalysis of competition," analyzing types of buildings based on the number of loops connected to those buildings.

Accordingly, we review the HHI calculations giving full credit to the Government's assertions. Specifically, we assume, as the Government contends, that

---

[4] *See* FTC *v.* H. J. Heinz Co., 246 F. 3d 708, 716 n. 8 (D.C. Cir. 2001).

each building can be treated as a market. Complaints at ¶ 24. We also accept the Government's contentions that "Local Private Lines are largely a commodity product …" and that "[a] purchaser who is a viable provider of Local Private Lines in the metropolitan areas in question should be able to use the divested assets to compete aggressively to provide service to the buildings in question." Government Reply Mem. at p. 18, n. 51 and p. 19. Under these conditions, and particularly where, as here, the products at issue are bought by competitive bidding, the Merger Guidelines specify that each competitor in the market should be assigned an equal share. Guidelines at § 1.41, n. 15.[5]

The HHI calculations under the Merger Guidelines are straightforward. In buildings (*i.e.,* geographic markets) with two Local Private Lines going to one after the merger, the pre-merger HHI is 5,000, the post-merger HHI is 10,000 (merger to monopoly), and the increase in HHI as a result of the merger is 5,000. These results are far beyond the presumption of market power threshold set out in the Guidelines (post-merger HHI over 1800 with an increase of 100), and the Antitrust Division's proposed remedy purports to address at least some of the buildings in this group.

But "5-to-4," "4-to-3," and "3-to-2" buildings also produce increases in concentration well beyond the Guideline thresholds – concentrations that the Guidelines say are "likely to create or enhance market power or facilitate its exercise." A "5-to-4" building experiences a post-merger HHI of 2800 with an increase of 800. A "4-to-3"

---

[5] For a more detailed discussion of this methodology, *see* Gregory Werden, "Assigning Market Shares," 70 Antitrust Law Journal 67, 85-86 (2002).

building experiences a 3,750 post-merger HHI with an increase of 1,250, and a "3-to-2" building experiences a post-merger HHI of 5,556 with an increase of 2,222.[6]

Under the law of this Circuit, these HHI results by themselves establish "a prima facie case that a merger is anticompetitive." *Heinz, supra,* at 716. By way of comparison, in the *Heinz* case, this Circuit court blocked a merger in which the post-merger HHI was 4775 with an increase of 570. Similarly, in *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 53 (D. D. C. 1998), the District Court for the District of Columbia enjoined two mergers, one with a post-merger HHI of 2450 and an increase of 802, and the other with a post-merger HHI of 2277 with an increase of 629.

The Government's explanation in its reply brief of its analysis of the mergers now before this Court contains not a word about market concentration or HHI calculations, despite the fact that such analysis is the fundamental starting point for merger evaluations in both the Guidelines and the law of this Circuit. Rather, in attempting to explain away the Wilkie empirical results, the Government merely states that it "did not find significant reliable corroborating evidence to support the claimed competitive problem in 4-to-3 or 3-to-2 situations." Government Brief at 16. Really? What about the fact that the HHI levels alone establish a *prima facie* case that the mergers are anticompetitive under both the Guidelines and the case law? The Government provides no evidence, nor any satisfactory analysis explaining why the mergers harm "2-to-1" situations, but not "3-to-2" situations.

## B. Empirical and "Other Forms of Evidence"

The Government's reply states that both empirical evidence and "other forms of evidence" are important for merger analysis. Government Reply Mem. at p. 16, n. 47. In

---

[6] A spreadsheet showing pre- and post-merger HHIs for each of these situations is attached as Exhibit A.

this case there was plenty of both. The fact that the merged companies intend to raise prices was hardly a state secret. These *amici* have already provided examples of analyst reports (both to the Government during its analysis and to this Court) projecting price increases as a result of the mergers.[7] There were numerous stories in the press to the same effect, quoting industry consultants who actually negotiate telecommunications deals. "Obviously, they plan on raising rates," was the typical analyst comment in the press.[8] The Government Reply brief makes no mention of such evidence.

The Wilkie study provided the Government with empirical evidence based on actual business records showing that prices for Local Private Lines will go up as a result of the mergers. The Government reply criticizes certain aspects of the Wilkie study – that the data set allegedly was small and the results allegedly were not sufficiently robust – but fundamentally discounts the study's results because the Government "did not find significant reliable corroborating evidence" with respect to "4-to-3" and "3-to-2" situations. Government Reply Mem. at 16.

The Court will note that here, again, the Government engages in a "microanalysis of competition," focusing on a purported lack of evidence about particular "3-to-2" situations as opposed to the real question – whether prices for Local Private Lines in the pled product and geographic markets will go up. In its entire brief, the Government never once contends that Professor Wilkie's conclusion – that prices for Local Private Lines will go up as a result of the mergers – is incorrect. Rather, the Government simply

---

[7] *See* ACTel Supplemental Memorandum in Opposition to the United States' Motion for Entry of Final Judgments (May 16, 2006) at nn. 17, 18.

[8] Jon Van, "Rate hikes in offing after phone takeovers," Chicago Tribune, May 29, 2005, available at http://www.chicagotribune.com/business/chi-0505290253may29,1,62938.story?ctrack=2&cset=true (attached as Exhibit B).

says that it couldn't find "significant reliable corroborating evidence" of competitive problems in specific situations.

Did the Government ever look for such "significant reliable corroborating evidence?" Perhaps at the time the Government did its analysis of the mergers in 2005, it could plausibly stick its head in the sand and claim to find no corroborating evidence of price increases, notwithstanding what a straightforward HHI analysis shows. But by the time the Government filed its reply brief in this case, it needed only to pick up the phone and call the CFO of AT&T to get "significant reliable corroborating evidence."

## C. Evidence of Actual Post-Merger Price Increases

### 1. Market Structure

It is helpful to bear in mind the structure of the Local Private Line wholesale market in evaluating the post-merger price increases that have occurred. ACTel's previous submissions in this Court have described the Local Private Line market at a high level. A more complete description was provided to the Government in the White Paper ACTel filed with the Antitrust Division (at pp. 9-14) while the mergers were under review. To aid the Court's analysis, a public version of that White Paper is attached to this memorandum as Exhibit C.

The basic points can be recounted quickly. ACTel members and others purchased Local Private Lines from the former Bell companies, SBC and the old Verizon, at "special access" rates. Because these rates were so high, a robust wholesale market developed in which other carriers, most notably the old AT&T and MCI, sold Local Private Lines to ACTel members and others at rates substantially below the "special access" rates of SBC and the old Verizon. ACTel members and others bought (actually

leased) Local Private Lines at wholesale; they resold the Lines, together with their own facilities and servers, to enterprise customers. Wholesale Local Private Lines are specifically included in the Complaints. *See, e.g.,* Complaints ¶ 25, 26. In the wholesale market, the old AT&T and MCI offered to ACTel members and others circuits that they owned, as well as circuits that they leased from SBC and Verizon at rates better than the ACTel members could secure.[9] The lower wholesale prices of competitive carriers like AT&T and MCI restrained the ability of SBC and the old Verizon to actually force customers to pay higher "special access" rates for the same circuits.

ACTel's initial memorandum argued, based on the Wilkie study of actual business records as well as public sources, that the old AT&T and MCI were mainstays of the wholesale market. The Government's reply memorandum now suggests that the old AT&T and MCI were not all that important in the Local Private Line market, and suggests that other unnamed carriers might be equally important. *See* Government Reply Mem. at pp. 16-19 and nn. 49-51.

Of course, actual bidding records submitted by ACTel members as part of the Wilkie studies belie such claims.[10] But there is plenty of publicly available information

---

[9] In the Declaration of Parley C. Casto accompanying SBC Communications' filing in FCC WC Docket 05-25 (June 13, 2005), he indicates that competition in the local wholesale private line market comes from providers deploying their own facilities or relying "on a combination of such alternative facilities and SBC's special access services." (pp. 2-3) According to a UBS research report (*Paying to Play? How Access Charges Determine Winners and Losers in Telecom Services,* UBS, (April 2, 2004)), the pre-merger AT&T and MCI were by far the largest purchasers of special access services – in combination over $12B nationwide in 2004 out of total nationwide sales of approximately $13B. (p. 2) It is therefore not surprising that the data sets submitted by ACTel members indicate that pre-merger they purchased significant amounts of Type II ("combination") local private line circuits from AT&T and MCI, and, in fact, did not purchase such circuits from any other competitive providers.

[10] The Court may wish to understand why ACTel members that submitted databases and analyses to the Antitrust Division's investigation do not simply provide the Wilkie studies to this Court. There are two reasons. First, the studies contain highly confidential and competitive business data which is protected from public disclosure by the Antitrust Division's Civil Investigative Demand statute. Companies would

to adequately explain the key competitive positions held by the old AT&T and MCI, starting with the Complaints in these cases. The Complaint before the Court in the SBC case alleges that "AT&T is among leading CLECs in SBC's territory in the number of buildings it has connected ... ." The Verizon complaint makes the same assertion about MCI's position in the old Verizon territory. Complaints at ¶ 17.

The analyst study (prepared in the normal course of business and not for this litigation), previously submitted by ACTel to this Court and to the Government during its merger review, found that MCI was the largest provider of wholesale Local Private Lines, other than the Bell companies, and that AT&T was the second largest.[11] In addition, in both SBC's 2002 and 2003 annual reports, SBC identified only AT&T and MCI by name as competitors.[12] Verizon's submissions to the FCC have identified AT&T and MCI as primary competitors in the precisely the same way:

> Other carriers have been building and extending the reach of their facilities deeper and deeper into our local networks ... . AT&T and MCI purchased the two largest competitive access providers, TCG and MFS, in order to expand the reach of their own facilities, and they also provide wholesale high capacity service.[13]

---

not cooperate with governmental investigations at all if their identities and confidential information could be disclosed to the companies they are complaining about.

Second, the written agreements some ACTel members have with AT&T preclude disclosure of AT&T's bids to anyone, even the Government, without AT&T's approval. In this case, one ACTel company sought AT&T's permission to submit data to the Government and AT&T denied the company's request. That company declined to cooperate further in the investigation. In light of AT&T's position, no other ACTel members want their data or identities disclosed to any AT&T personnel or counsel.

Given that ACTel's position is simply that the Wilkie studies predicted price increases, and price increases have in fact occurred, the Court has no need for the detailed studies in any case.

[11] See ACTel's Supplemental Memorandum, (May 16, 2006) at p. 12, n. 16, and Exhibit 11 thereto.

[12] See SBC 2003 Annual Report to Shareowners (pp. 16, 21 available at http://www.sec.gov/Archives/edgar/data/732717/000073271704000205/ar2003.pdf; SBC 2002 Annual Report available at http://www.sec.gov/Archives/edgar/data/732717/000073271703000210/exhibit13.htm

[13] See In the Matter of Unbundled Access to Network Elements, FCC WC Docket No. 04-313, CC Docket No. 01-338, Comments of Verizon, Declaration of Claire Beth Nogay at ¶ 28.

This is precisely the point (in almost exactly the same words) that ACTel has previously made both to the Government and to this Court.

There can be little doubt that the old AT&T and MCI were primary competitors to SBC and Verizon and were perceived as such. Their offers to the Local Private Line market, at small fractions of the SBC and Verizon "special access" rates, curbed the Bell companies' abilities to force customers to pay high prices. The Government's submission appears to contest the fact that the acquired companies offered prices much lower than those of SBC and Verizon. To remove any doubt on that question, we are submitting under seal a document previously produced to the FCC in the "highly confidential" category, showing, by way of example, that one of the ACTel members regularly received price quotes from MCI at discounts as high as 90% of the Verizon "special access" rate.[14] We are required to submit this document under seal because the ACTel member is bound by a written agreement with MCI (now Verizon) forbidding public release unless required by law.

### 2. Price Increases

The mergers produced anticompetitive price increases. By eliminating key lower-priced competitors (AT&T and MCI), downward price pressure on SBC and Verizon "special access" pricing was relieved; prices that were declining are "stabilized." Moreover, the acquiring companies (Verizon and SBC – now the "new AT&T"), having been freed from the strictures of competition, can actually raise their "special access" prices directly. In fact, both types of price increases have already occurred.

---

[14] Filed under seal but to be attached as Exhibit D. As a highly confidential FCC document, counsel for the merging companies already have this document but the Antitrust Division lawyers may not.

Prior to the mergers at issue here, prices for Local Private Lines were in steep decline, and had been for many years.  ACTel has previously submitted publicly published analyst reports that demonstrate this fact.[15]  But the most telling evidence of declining Local Private Line prices prior to these mergers came from the testimony of the acquiring companies themselves, in governmental proceedings. (As the Complaints in these cases explain, Local Private Lines are sometimes referred to as "special access." Complaints at ¶ 13.)  In mid 2005, for example, SBC testified:

> SBC has confronted increasingly robust competition in the special access market for several years.  Traditionally, this competition has come from a variety of facilities-based carriers that rely on self-deployed and/or third party facilities, and others that rely upon a combination of such alternative facilities and SBC's special access services.
>
> ***
>
> SBC has responded, and continues to respond, to this competition by lowering the price its customers pay for special access services, and offering a variety of innovative pricing plans, including individually-negotiated contract tariffs, designed to meet the specific needs of its customers.
>
> ***
>
> An internal analysis of the price per unit SBC offered its customers in [metropolitan areas] in which SBC was granted Phase II pricing flexibility demonstrates that the same prices actually paid SBC for DS1 and DS3 [Local Private Line] services continued to fall steadily over the same period.[16]

The old Verizon, for its part, testified to the same effect:

> Not surprisingly, the result of these aggressive discounts has been a drop in the prices customers pay for Special Access services.  Indeed, prices for DS-1 services alone have fallen nine percent since 2001.[17]

---

[15] *See, e.g.,* ACTel Supplemental Mem. (May 16, 2006) at p. 12, nn. 17-18.

[16] In The Matter of Special Access Rates for Price Cap Local Exchange Carriers, FCC Docket No. 05-25, RM-10593, Comments of SBC Communications, Inc., Declaration of Parley C. Casto, ¶¶ 6, 9, 56 (June 13, 2005 (Excerpts attached as Exhibit E).

[17] In The Matter of Unbundled Access to Network Elements, FCC WC Docket No. 04-313, CC Docket No. 01-338, Comments of Verizon, Declaration of Claire Beth Nogay ¶ 37 (October 4, 2004) (attached as Exhibit F).

During the spring and summer of 2005, the Antitrust Division conducted its investigation of the mergers at issue here. On October 27, 2005, the Department of Justice announced it had approved the mergers, requiring only divestitures of IRUs in some lateral facilities, and had filed complaints and pre-negotiated settlement decrees simultaneously. The Government then permitted the parties to close their transactions, prior to Tunney Act review. SBC closed its acquisition of AT&T on November 18, 2005, the Verizon acquisition of MCI closed on January 6, 2006.

On April 25, 2006, the Chief Financial Officer of AT&T conducted that company's quarterly earnings announcement to the investment community, a transcript of which is attached as Exhibit G. In this conference, fully subject to the accuracy requirements of the securities laws, AT&T's CFO repeatedly claimed – based on the "combined results," that is, the results of "combined operations" and "integration" of SBC and AT&T – that the new AT&T saw "positive indications of price stability" – "more stability in pricing" following the mergers.[18] Equally as telling, the Chairman and CEO of AT&T said just one week ago (May 31, 2006) at the Strategic Decisions Conference sponsored by the financial firm, Sanford C. Bernstein & Co., "Prices have stabilized in our judgment and even in some cases believe, it or not, there's some upside to pricing, which is a good thing."[19]

In fact, following the mergers, AT&T itself repeatedly increased the prices for DS1 and DS3 Local Private Lines at almost every opportunity. The FCC's order

---

[18] *See* Final Transcript, T-Q1 2006 AT&T Conference Call, Thomson Street Events, April 25, 2006, at pp. 2, 3, 5 (Transcript attached as Exhibit G).

[19] *See* Final Transcript, T- AT&T at Sanford C. Bernstein & Co. Strategic Decisions Conference, Thomson Street Events, May 31, 2006, at p. 9 (Transcript attached as Exhibit J).

approving the mergers blocked the ability of AT&T and Verizon to raise price for some Local Private Lines – those within the jurisdiction of the FCC.[20]  But elsewhere after the mergers, no longer constrained by competition, AT&T raised prices with abandon. Exhibit H contains representative examples of these price increases from around the country – from Ohio, Indiana, Missouri, Michigan, Texas, etc. – on DS1 and DS3 Local Private Lines.[21]

The Government takes the position in its reply memorandum that it should be required neither to provide a declaration from an economist (Government Reply Mem. at 18 n. 53), nor even to "clearly state" that the mergers will not produce competitive injury beyond the "2-to-1" situations addressed by the Proposed Remedy (Government Reply Mem. at p. 14, n. 44).  In light of the evidence of price "stabilization" and increases, it is no small wonder that the Government cannot produce an expert declaration and does not want to be forced to "clearly state" the absence of economic injury.  Simply put, the Government does not want to lie.  It would rather prevaricate – and hide behind the assertion that it could not "find significant reliable corroborating evidence" of competitiveness problems. Had the Government bothered to look, it would certainly have found such evidence before it filed its reply brief.

---

[20] *See* In the Matter of Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control, Memorandum Opinion and Order, Federal Communications Commission WC Docket No. 05-75, Rel. November 17, 2006, Appendix G; In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control, Memorandum Opinion and Order, Federal Communications Commission WC Docket No. 05-65, Rel. November 17, 2006, Appendix F.

[21] The Exhibit includes examples of nine AT&T price increases in seven states announced since the merger closed.  For the components of DS1 private line services, the increases ranged up to 20.6% for channel terminations, 8.7% for channel mileage terminations, 16.25% for channel mileage, and 12.4% for multiplexing.  For the components of DS3 private line services, the increases ranged up to 6.9% for channel terminations, 9.6% for channel mileage terminations, 12.5% for channel mileage, and 5.8% for multiplexing.  AT&T also offers a DS3 private line "Service Pack", and those increases range from 12.7%-15.8%.

The Government's Reply Memorandum candidly admits that "price increases" are precisely the type of "anticompetitive effects" that justify prosecuting a Section 7 case against the mergers. Government Reply Mem. at 21. So, why has the Government not remedied the "anticompetitive effects" of these mergers? Even the most restrictive aspect of the *Microsoft* standard – that this Court should enter the proposed decrees "unless it has exceptional confidence that adverse antitrust consequences will result"[22] – will not justify the approval of these settlements. The Court has "exceptional confidence" of price increases because many such increases have already occurred. The proposed settlements are well beyond "the reaches of the public interest." And the Justice Department's explanations are simply not "reasonable under the circumstances."

### D. Efficiencies

The only antitrust defense to the anticompetitive effects of the mergers suggested at any point in the reply papers is the Government's offhanded suggestion that the mergers "would potentially" provide "billions of dollars in efficiencies." Government Reply Mem. at 28. The Verizon Reply attempts to embellish the point, arguing that the efficiencies "would total $7.3 billion" and listing some examples of the purported efficiencies. Verizon Reply Mem. at 5. Neither the Government nor Verizon cite any case law for the proposition that such "efficiencies" provide a legal justification for the proposed transactions. Doubtless the Antitrust Division, under enormous political pressure in 2005 to clear the mergers, found these vague incantations of efficiencies adequate for its purposes. But these claims do not remotely satisfy the case law. No case law citations are provided in the reply briefs because neither the Government nor Verizon can come close to satisfying this Circuit's legal requirements for an "efficiency" defense.

---

[22] Government Reply Mem. at p. 4, n. 9, quoting Microsoft, 56 F. 3d at 1460.

The leading case in this Circuit on this issue is *FTC v. H. J. Heinz Co.,* 246 F. 3d

708 (D. C. Cir. 2001), in which the Court rejected an efficiencies defense.  The *Heinz*

court noted that "the Supreme Court has not sanctioned the use of the efficiencies defense

in a section 7 case," and while lower courts sometimes theoretically recognize the

existence of the defense, they have generally found it inadequate. *Id.* at 720.  In fact, the

decisions in this Circuit have uniformly rejected efficiencies defenses.

In order to prevail in an efficiencies defense, the parties would have to provide

rigorous verifiable proof of efficiencies, beyond "mere speculation and promises about

post-merger behavior." *Id.* at 377.  Such verifiable efficiencies may be considered if they

"likely would be sufficient to reverse the merger's potential harm to consumers in the

relevant market, e.g., by preventing price increases in that market." *Guidelines* at  § 4.

More specifically, the parties would have to show, first, that the purported

efficiencies occur in the same market as the anticompetitive effects.[23]  Most of the

nominal efficiencies listed by Verizon pertain to different markets and have nothing

whatsoever to do with Local Private Lines (*e.g.,* integrating Information Technology

systems).

Second, the proposed efficiencies may not arise from anticompetitive reductions

in output or services, *Guidelines* at § 4, but Verizon's claimed efficiency of "avoiding

redundant capital expenditures to build network facilities" (but one example) is just that.

Third, the parties have to show that the nominal efficiencies are "merger specific"

– that they cannot be achieved by means such as a licensing relationship or by either

---

[23] *See, e.g.,* Areeda, et al., 4A Antitrust Law ¶ 972a and cases cited therein.

company alone.[24]  Again, Verizon's claimed efficiencies fail this portion of the test.
There is no reason, for example, why Verizon has to buy MCI and wipe out competition
merely in order to more efficiently transfer "traffic from third party networks to MCI's
networks."  This is an "efficiency" that MCI could achieve on its own or by licensing
some technology from Verizon.

Finally, and most importantly, the efficiencies must benefit customers in the form
of lower prices and other consumer benefits.  There are legions of cases that stand for this
proposition, including many in this Circuit.[25]  These cases explain that the point of an
efficiencies defense is not to produce greater profits for the merging companies, but
rather to enable the merged company to respond to competition by lowering prices.  The
merging companies are not permitted to line their own pockets with "cost savings" that
are achieved by eliminating competitors.  Verizon makes no showing that its
"efficiencies" will result in lower prices.  Nor can it.  Post-merger prices for Local
Private Lines are going up.  This is precisely what the merging parties intended.
Customers will not benefit from Verizon's claimed "efficiencies" – only Verizon will.
Hence, there is no basis for an efficiencies defense in this case.

---

[24] *See* Heinz at 378 and Guidelines at § 4.

[25] *See, e.g.,* FTC v. University Health, 938 F. 2d 1206, 1223 (11th Cir. 1991) (requiring that, in order to be considered, efficiencies would have to "ultimately benefit competition and hence consumers"); FTC v. Swedish Match, 131 F. Supp. 2d 151 (D. D. C. 2000) (rejected efficiencies defense because "the savings that will be passed on to consumers in the form of lower prices in this case is at best speculative"); United States v. United Tote Inc., 768 F. Supp. 1064, 1084-85 (D. Del. 1991) (efficiencies rejected because "there are no guarantees that these savings will be passed on to the consuming public"); California v. American Stores, 697 F. Supp. 1125, 1133 (C. D. Cal. 1988) (rejecting claim of $50 million in efficiencies because savings will not "invariably" be passed on to consumers).

**III.    The Elements of a More Effective Remedy Can be Easily Identified.**

In its zeal to secure Court endorsement for a remedy that does not begin to address the harm caused by the mergers, the Government misstates the law as to what the remedy must do.  The Government asserts without citation:

> The issue is whether the [divested] assets are sufficient for a competitive carrier to be interested in purchasing them, and be able to use them quickly to compete for Local Private Line and related services in the "2-to-1" buildings in question.

Government Reply Mem. at p. 26, n. 77.  That is, most emphatically, *not* a correct statement of what the proposed remedy must do.  According to the Supreme Court, "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'" *Ford Motor Co. v. United States*, 405 U. S. 562, 573 (1972) (citing *United States v. DuPont & Co.*, 366 U. S. 316, 326 (1961).  The fact that some company might buy the divested assets does not satisfy the legal standard.  The remedy must "redress the violations" and "restore competition."  This proposed remedy does neither.

ACTel has argued that the purchasers of the divested assets cannot substitute for the loss of the combined networks of AT&T and MCI, nor even afford to resell the divested circuits they acquire at the same low prices that AT&T and MCI did.  The Government replies that it does not even intend by its remedy to replace the competition lost by the acquisitions of AT&T and MCI, Government Reply Mem. at 14, and also argues that the size of the acquiring company is irrelevant in terms of the prices it charges, noting that the largest networks owned by the Bell companies, Verizon and SBC, charge the highest prices.

ACTel explained in its initial White Paper the different incentives and motivations that separate the Bell companies from their former independent competitors

in terms of pricing.  *See* ACTel White Paper, Exhibit C at 11-12.  But, more
fundamentally, the point the Government makes cuts strongly against it.  If the
Government wishes to insist that "Local Private Lines are largely a commodity product,"
Government Reply Mem. at p. 18, n. 51, so be it.  The Government succeeds only in
proving that the competitive situations it failed to address ("5-to-4", "4-to-3," etc.) violate
the thresholds in the Antitrust Division's own Merger Guidelines, as explained above.

  ACTel submits with this reply one additional declaration to demonstrate to the
Court just how simple it would have been for the Government to secure a more effective
remedy.  As the Pierce Declaration, attached as Exhibit I, explains, the merged
companies are not really divesting anything.  The winning bidders for the divested assets
get a ten year lease for 2 to 4 strands of fiber that are part of a larger bundle of strands in
a fiber cable.  The remainder of the strands in the cable continue to be owned and
controlled by the merged companies, who will continue to serve their customers at the
buildings listed in the Proposed Final Judgment.  In a very real sense, the merged
companies gave up nothing.  This conclusion is surprisingly publicly supported by the
Chairman and CEO of AT&T.  At last week's Sanford C. Bernstein & Co. conference, he
stated in response to a question about whether regulators are going to demand conditions
as part of the approval process for the pending proposed merger of AT&T with
BellSouth:  "I don't think we'll have to give back one thing to gain approval of the
BellSouth merger.  And we really did not on the AT&T merger; I think the same
conditions exist here, I don't expect to give back anything."[26]

---

[26]*See* Final Transcript, T- AT&T at Sanford C. Bernstein & Co. Strategic Decisions Conference at p. 6
(Transcript attached as Exhibit J).

But it would be equally costless for the merged companies to give up 2 to 4 strands of fiber (or the equivalent "lit" fiber services) in all metropolitan area network assets of the old MCI that overlap with the old Verizon network facilities (and the same with respect to the old AT&T and SBC). This would result in divesting leases on most if not all of the old MCI and AT&T circuits, and would enable winning bidders to provide far more meaningful competition. But such a divestiture would no more disrupt the new AT&T and Verizon than divestiture of the few strands in the Proposed Remedy would. AT&T and Verizon could continue to own the rest of the strands in the bundle and would continue to serve their customers at all locations. Indeed, permitting the merged companies to keep overlapping assets that could easily be divested serves no goal other than the suppression of competition.

The Government claims that ACTel's request to divest customers with the divested facilities would be disruptive to some third parties. But the Government had no difficulty requiring the divestiture of customers in the Qwest-Allegiance merger proposal, previously submitted to this Court. And, in any event, to avoid any disruption to existing customers, the merged companies could simply guarantee and pay for traffic on the strands they divest, thereby permitting the winning bidders to actually acquire revenue generating facilities that could be used to compete more meaningfully. No customers would actually have to be inconvenienced.

These modest additional divestitures would improve the level of competition post merger. But they would not restore the level of competition in the wholesale market lost by the acquisitions, nor provide for competitive, free market level pricing going forward. The FCC's order permitting these mergers addressed a small portion of this problem by

prohibiting the merged companies for a period of months from raising prices for Local Private Lines that were already under contract. In order to offset the competitive injury caused by the mergers, the merged companies should be prohibited from raising any prices – either regulated (including so-called "UNEs") or unregulated prices – for a period of many years.

If their filings in this Court are to be believed, the merged companies should not object to these additional provisions. Their claimed efficiencies should permit them to charge lower prices with higher profits – and a price freeze of this type would only prohibit anticompetitive effects which the Government says will not happen in any case. If the parties cannot agree to these modest changes, the Court should simply reject the proposed decrees.

## **Conclusion**

To anyone interested in the fair application of the antitrust laws, the record before this Court is intensely unsettling. For reasons neither explained nor even addressed by the reply briefs, these mergers were approved by the Antitrust Division under some sort of expedited schedule at a time when the Division was under intense political pressure and did not even have a confirmed leader; the designee to head the Division was under Senatorial hold.

The Government nevertheless approved mergers that exceeded the thresholds in its own Guidelines. The Government's proposed remedy was widely criticized as inadequate to prevent price increases and other anticompetitive injury flowing from the mergers.

In this case, the Government has refused to concede in any respect that the Congressional action in 2004 should influence its behavior. In the face of expert economic analysis and other evidence indicating post-merger price increases, the Government refuses to provide expert analysis, in the form of declarations or otherwise, that might provide guidance to this Court. The Government even refuses to "clearly state" that the mergers will not produce economic injury beyond that addressed by the Proposed Remedy. The Government responds to all arguments merely by claiming that it could not corroborate evidence of anticompetitive effects at the time it did its analysis in 2005. And now it becomes clear that the prices for Local Private Lines have risen post merger, just as predicted.

The record before this Court is of precisely the type that concerned Congress the most. Congress has indicated – twice now – that courts should not "rubber stamp" antitrust settlements negotiated by the Government. If the Congressional intent as embodied in the amended statute is to have any plausible meaning, these proposed decrees must be rejected. The proposed settlements benefit the merging parties, not the public interest.

Respectfully submitted,

_____    /s/    _____

Gary Reback (Bar No. 218594)
Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA 94303
650-812-3489 (phone)
650-812-3444 (facsimile)
greback@carrferrell.com

Thomas Cohen (Bar No. 269332)
Kelley, Drye & Warren LLP

3050 K Street, NW, Suite 400
Washington, DC  20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
tcohen@kelleydrye.com

*Attorneys for the Alliance for
Competition in Telecommunications*