# EXHIBIT C



REDACTED
VERSION

# "A BIT OF IRONY"

## ACTel White Paper

### The Anticompetitive Effects of the Telecommunications Acquisitions on Business Customers and the Wholesale Market, and Remedial Actions to Address those Harms

<br />

Thomas Cohen
Executive Director
Alliance for Competition in
Telecommunications

Gary L. Reback
Carr & Ferrell *LLP*

CID material – Confidential

{00158997v1}

# A BIT OF IRONY

**"SBC's acquisition of AT&T, therefore, carries a bit of irony as it is acquiring its one time parent, causing many to believe that the telecom industry appears to be reverting to its pre-1984 state."**

-- U.S. Wireline Services

Bear, Stearns & Co., Inc.

June 2005

Many, if not most businesses satisfy their telecommunications needs using carriers that provide services over a combination of circuits they own and circuits they lease from other carriers. Today, circuits can be leased from the "Baby Bells," of which SBC and Verizon are by far the two largest of the group, as well as the two largest local telephone companies in the country. But, circuits can also be leased from companies like AT&T and MCI, the two largest local competitive carriers, that have deployed fiber and other facilities in competition with the Bells. Over many years, in fact, a robust, efficient market has developed to provide access to such leased circuits at prices well below what the Baby Bell companies charge for the same connectivity. AT&T and MCI are mainstays of this market and the most aggressive price competitors, forcing other companies, including the Bells, to offer their own circuits to competitors at low prices in the local wholesale market.

Absent sufficient conditions and oversight, the proposed acquisitions of AT&T by SBC and MCI by Verizon will decimate the local wholesale market. If that market survives at all, prices will go up astronomically. Businesses, particularly medium-sized businesses, will pay more for their telecommunication services and have fewer competitive choices.

This White Paper, submitted by the Alliance for Competition in Telecommunications ("ACTel"), analyzes the proposed acquisitions, most specifically in light of bid and other offering data kept in the normal course of business by a variety of companies that purchase in the local wholesale market.

The first part of this Paper describes the local wireline exchange briefly for the purpose of establishing a common nomenclature. The second part of the Paper describes the formation, operation, and role of the local wholesale market in providing

CID material – Confidential                                                                                              2

{00158997v1}

telecommunication services to business customers.  The third section evaluates the effect of the proposed acquisitions on the prices and operation of the local wholesale market, with specific emphasis on the data supplied by companies that purchase in that market and sell to business customers in competition with the merging companies.

The final section of this Paper considers some of the remedial proposals that have been mentioned in the press and elsewhere to ameliorate the enormous injury the acquisitions will cause.  This section concludes by showing that incidental divestitures of specific loop or lateral circuits in concentrated areas will not begin to address the injury to business customers, and that more realistic divestitures that would maintain some level of competition in the wholesale market, along with other simple transitional remedies of a type DoJ has employed in the past, should be adopted to redress the harm that will be caused by the mergers.  This section of the Paper draws parallels to the widely criticized remedies adopted by the Division in clearing Thomson's acquisition of West Publishing Co. a decade ago.

## A.    Loop, Transport and the Local Network

Figure 1 (attached at the end of this document) is a simple schematic of a representative local wireline exchange. The following explanation of the components of the exchange is intended to clarify the use of terms in this White Paper.

When a "wireline" call is made from the business premise, the call generally first travels along a circuit between the office building and a "central office" ("CO," i.e., a switch), owned by the local Bell company. We refer to this first segment, which may be either copper wire or fiber, as a "loop." The call is then usually routed from central office to central office. We refer to the circuit that connects these offices as "local transport."

Sometimes a competitive access provider ("CAP") like AT&T or MCI may have a fiber ring (which is similar to transport) around a city, and the fiber ring is connected to a building by a "lateral" (which is similar to a loop). There are companies other than AT&T and MCI that have fiber rings in some metropolitan areas, but, generally, their fiber rings are connected directly to only a fraction of the buildings that AT&T or MCI are connected to. In both types of cases, (either AT&T/MCI or a smaller company), the ring may also be connected to a Bell central office, which in turn is connected to other buildings by "loops."

For our purposes, it's important to note that a call frequently goes from the business premise over a loop to a CO, and then from CO to CO over local transport. The call may then be routed back to a loop in the same exchange if it is a local call, or it may pass out of the exchange if it is a long distance call intended to terminate in another metropolitan area. The call may do this by being routed from a central office to a

"tandem switch" over transport, and then on to the point of present ("PoP") of a long distance carrier, via another "transport" segment.

This process occurs in reverse when a call from one metropolitan area is received in another metropolitan area. The call might enter the local exchange from the Inter-exchange Carrier's ("IXC's") PoP. The call is then routed over interoffice transport circuits to a tandem switch and then on to one or more COs until it reaches a loop, and is directed to a business premise. Or the IXC PoP might be connected to an AT&T or MCI switch via a transport circuit, which then gets connected to the business premise.

The loop or lateral may enter the building through the basement and then be directed to a particular customer on a particular floor. The building's landlord controls how a loop enters the building and how many competing loop offerings the businesses in the building may choose from.

Businesses may currently buy wireline telecom services from a variety of vendors. The local Bell company, in this case SBC or Verizon, has typically wired all buildings in its own operating region, which includes many different metropolitan areas. The Bell has also deployed circuits connecting all COs, and connecting COs to tandem switches, so that calls can be passed from one metropolitan area to another.

CAPs have deployed loop and transport in competition with the Bells. The largest CAPs, AT&T and MCI, have not wired as many buildings as the Bells have. But these two companies have wired far more buildings and deployed far more fiber for transport than any other CAPs have. It is not uncommon (as the Division's professional staff has seen from lit building lists) that a building might be connected to the local exchange only by the local Bell and AT&T or only by the local Bell and MCI. As explained in greater detail below, AT&T and MCI extend the reach of the buildings to which they connect by

combining their own facilities with circuits purchased from the Bells at a substantial discount.

Of course, a building might be wired only by the local Bell company, but as we explain below, the dynamics of the wholesale market currently prevent the Bell from extracting a monopoly rent on such a loop, and the businesses that are serviced over such a loop enjoy some of the benefits of competition, whether they are serviced by more than one loop/lateral connection or not. It is also important to note that the AT&T/MCI fiber ring and transport fiber deployed by AT&T and MCI provides competition for the Bell's transport circuits.

Other local competitors like XO and TWT, for example, have also built telecom facilities in metropolitan areas. They have deployed equipment ("co-located") at Bell central offices, and have deployed fiber for both loop and transport. Such companies are sometimes known as "facilities-based CLECs" (although they might also be called CAPs). Facilities-based CLECs sell telephone services in competition with the local Bell, but they cannot reach all businesses with which they need to connect without making use of loop and fiber other than their own. Some CLECs, such as Cbeyond and Nuvox, do not deploy their own fiber, but rather lease circuits from other providers. Such CLECs nevertheless deploy their own switches, electronics and software in one form or another at co-location facilities and use the circuits of others to make product offerings to businesses in competition with the local Bell. ACTel members include both types of CLECs.

CLECs have traditionally targeted medium-sized businesses as optimum customers and many have had great success in moving such customers from the Bells by offering more differentiated product, lower prices, and better service. But CLECs such as

XO and TWT also compete for the largest businesses, in competition with the Bells and AT&T/MCI.

ACTel members also include companies like Savvis and the Broadwing, which are most fundamentally IXCs. These companies own little or no local facilities. But they compete for local and long-distance traffic by adding value or managing telecom services, and they frequently target the largest businesses (with worldwide operations) as their actual and potential customers.

All of these ACTel members (facilities-based CLECs, other CLECs, IXCs) have one important common concern. They all rely on the local wholesale market for both transport and loop to reach their customers. Some buy in the local wholesale market from CAPs like AT&T and MCI. Some buy from the local Bell, as well, using competitive offers from AT&T/MCI as leverage to get lower Bell prices. But all these companies are concerned that the proposed acquisitions will damage or destroy the wholesale market, which will in turn eliminate competition and raise prices for their business customers.

Virtually all ACTel members have responded to CIDs from the Antitrust Division. A number of the CID recipients provided databases with competing bids or competing Master Service Agreement offerings. These databases were kept in the ordinary course of business by ACTel members in order to select the lowest wholesale offer for each circuit the member needed to (or will need to) lease. ACTel members also provided the Division's professional staff, under CID, with detailed statistical analyses of these databases. Conventional statistical analysis of these databases provided profound insights into the likely effects of the proposed acquisitions on prices in the local wholesale market. All requested analysis and work papers have been submitted to the

DoJ, and in at least one case, DoJ has audited the analytical methodology by direct

discussions with company personnel.

## B.     The Wholesale Market

When a competitive provider (like the ACTel members) needs access to some other company's local circuit to service a business customer, it can buy (more correctly, lease) that circuit three ways: as an unbundled network element (UNE) from the Bell; as a special access circuit again from the Bell; or as a loop, or transport circuit, or as a combination of these circuits from a competitive local carrier. Some carriers, specifically CLECs, may be able to buy certain circuits as UNEs from the Bells at cost-based rates established by state regulatory commissions under a formula that falls within the jurisdiction of the FCC. Without belaboring the point, it is evident that the FCC is phasing UNEs out.

If UNEs are not available to a competitive carrier, the carrier must purchase the circuit as a "special access" service from the Bell and pay a far higher rate. The reason that a Bell would offer its circuits (beyond legal requirements) to competitors *at any price* is discussed below. The "rack" special access rate is basically unregulated (although the same terms must be offered to similarly situated buyers) and the rate basically represents what the Bell can get away with charging. Not surprisingly, the rack Bell rate is generally about three times the UNE rate.

Both Bell special access revenues, as well as annual rates of return on special access, have grown dramatically over the past decade. According to official comments filed by MCI in the FCC's TRRO docket, the Bell special access revenues were approximately $3.4 B in 1996, but had grown to $13.4 B in 2003. Similarly, Verizon's annual rate of return on special access was 2.14% in 1996, but 23.02% in 2003. SBC's annual rate of return on special access was 63.16% in 2003.

Over the years, a robust and competitive wholesale market for local loop and transport has emerged. This market has flourished as a competitive alternative to high special access prices. In this local wholesale market, as previously explained, carriers lease loop and transport to other carriers, so that the latter can reach business customers.

The databases provided to DoJ by ACTel members list those companies that actually offer their circuits at wholesale. There are, doubtless, other companies with fiber in the ground – municipal utilities, for example. But the fiber from those companies is neither configured nor certified for the wholesale market. Given that ACTel members want to pay as little as possible for wholesale circuits, it is reasonable to believe that they have solicited offers from every company that might provide downward pressure on the prices they are charged.

ACTel members and other companies that buy at wholesale for the purpose of serving business customers buy both loop and transport circuits. Companies that sell at wholesale offer both loop and transport circuits. Most "selling" companies offer to provide access over circuits they own. These are called Type I circuits. AT&T and MCI both offer Type I circuits. But, in addition, both AT&T and MCI have greatly expanded the reach of the networks they offer at wholesale by leasing additional circuits from the Bells and combining them with circuits that AT&T or MCI own. Circuits that contain at least some leased components are known as Type II circuits.

AT&T and MCI have the largest networks aside from the Bells, and they have become mainstays of the wholesale market. In fact, it is doubtful that there would be a wholesale market, certainly a market of the current size and scope, without these two companies. The AT&T and MCI networks were not created overnight; they were built up over decades. Networks of this magnitude cannot be built quickly nor can they be

"willed" into existence merely by the deployment – or divestiture – of fiber and switches. The experiences of AT&T and MCI are therefore instructive as to the putative benefits of divestitures to remedy the injury to competition that the proposed mergers would cause.

After the 1984 breakup, AT&T was left with a robust long-distance network, including customers, particularly business customers, sufficient in number to run the network profitably. MCI, having entered the long-distance market earlier in competition with AT&T, also had both facilities and sufficient numbers of customers for profitable operation. Both companies thereafter entered the local facilities markets through large acquisitions (AT&T purchasing Teleport and MCI purchasing MFS, Brooks, and Intermedia), and because both companies had ample network traffic, the acquisitions were successful. Over the years, the pre-existing high levels of network traffic (and the revenues produced by that traffic) permitted both companies to expand, wiring additional buildings and deploying additional transport fiber in competition with the Bells.

Because neither AT&T nor MCI started from a position of local monopoly, as the local Bell companies have, the business incentives and the perceived opportunities of the two companies were always quite different from those of the Bells. In particular, both AT&T and MCI seized upon the opportunity to capture additional revenue by leasing capacity in their local networks to other competitive carriers. Bells would have to worry about the effect of selling at wholesale prices on their local monopoly prices. But neither AT&T nor MCI had a local monopoly, and both welcomed the additional revenues that selling at wholesale provided. Indeed, both companies went further and negotiated significant discounts (almost 40% from the special access rack rate) from the Bells for the circuits they leased. Doubtless, the size of the existing AT&T/MCI networks, coupled with the threat of those companies to continue to build out their own facilities, induced

ILECs to offer AT&T and MCI significant discounts, if only to forestall further expansion of their networks. In any event, the discounts enable AT&T and MCI to make very broad, low priced offerings to the local wholesale market.

SBC has stated in the FCC docket that it makes the same discounts available to other companies. Perhaps this is so. But the fact is, no other companies, beyond AT&T and MCI, have a sufficient combination of owned and leased facilities to have a Type II presence in the local wholesale market. A number of ACTel members have provided databases showing both consideration and purchase of AT&T and MCI Type II circuits. No other Type II supplier has more than a de minimus presence in any of the databases. Company purchasing personnel will confirm that it is worth soliciting and considering Type II offerings from AT&T and MCI (and rarely any other carrier) because only those two companies can price and have priced Type II circuits at competitive levels in the local wholesale market.

The local wholesale market is vast. (The following numbers represent only the local aspect of the wholesale market, not the long-distance wholesale market.) A January 2004 Yankee Group analysis sized the market for "metro private line" (the local wholesale market at issue here) at $14 B. A January 2005 Bernstein Research Report estimates a similar number.

In FCC filings, AT&T has taken the position that it does not participate significantly in the local wholesale market. This claim is preposterous. The Yankee Group analysis reports MCI and AT&T with the two largest shares of the local wholesale market, other than the ILECs themselves. The Yankee Group Report states that MCI has 10% of the local wholesale market, and AT&T has 9% of that market – or about $1.4 B of revenues.

Nor is it just analyst data that the belies AT&T's claim. In point of fact, AT&T is present as a supplier (for Type I, Type II or both) in every database provided by ACTel members to the Department of Justice. AT&T makes offerings to ACTel members, either by bid or by Master Service Agreement, covering a substantial portion (generally more than 50%) of the circuits ACTel members wish to purchase. MCI provides a comparable, if not greater, percentage of coverage for ACTel member networks. Whatever the heuristic argument about the role of AT&T and MCI in the local wholesale market, the databases of actual offerings produced by ACTel members are the best evidence as to the presence and effect of those two companies.

The data supplied to the Antitrust Division also indicates that AT&T and MCI are the low price leaders in the local wholesale market. They are not only the most pervasive suppliers but they are the most aggressive and cheapest suppliers as well. The net result of all this competition is that CLECs and IXCs can purchase circuits in the local wholesale market at rates as low as 25% of the Bell rack rate. Again, this is not merely argument; it is what the data kept in the ordinary course of business shows.

The data produced to the DoJ also proves three other important points. First, the larger the number of competing offers (up to a reasonable level), the lower the price charged purchasing carriers. In other words, these are not markets in which two competitors are as good for competition as a larger number of competitors would be. To the contrary, three competitors produce lower prices than two competitors, and four competitors produce lower prices than three competitors. This was a pervasive feature of all data sets from all ACTel companies supplied to the Department of Justice.

And the effect of competition by AT&T and MCI specifically, in the form of lower prices, without regard to the number of competing offers, was demonstrated in

virtually all submissions. This point cannot be overstated. AT&T's offers have a competitive effect (i.e., lower prices) in SBC territory and MCI's offers have a competitive effect (i.e., lower prices) in Verizon territory, regardless of whether there are two or three (or more) other suppliers.

Finally, the benefits of competition are not restricted to offerings by CAPs. The ██████████, for example, demonstrates that SBC itself has responded to competition from AT&T by lowering its own loop and transport prices, in order to avoid losing IXC business to AT&T. This competitive effect is equally true for loop as well as transport. In other words, competition from AT&T (and the threat of expanding potential competition from AT&T) has caused SBC to lower even its loop rates. And, as is the case with respect to offers by CAPs, SBC gives its wholesale customers increasingly lower prices as the number of its competitors for a particular circuit increases.

In sum, there is currently a vast, robust, competitive market for wholesale local loop and transport. That market operates efficiently. It produces significantly lower prices than the monopolists' prices, and it allocates resources according to competitive bidding. The wholesale local market produces differentiated services at free market (low) prices to all types of business customers, particularly medium sized enterprises. The proposed acquisitions will devastate this market. No remedy has been proposed, at least publicly, that would offset the injury to business customers that these acquisitions will produce.

### C.    Effects of the Acquisitions

The anticompetitive effects of the acquisitions are apparent, and demonstrable at almost any level of analysis. First, post-merger concentration will increase enormously for both loop and transport.

ACTel members have provided analyses of lit building lists and, doubtless, the Division's attorneys and economists have performed a more refined study. Lit building lists reveal that there are hundreds, if not thousands, of office buildings which are connected to local exchanges only by the local Bell company and the respective CAP that is being acquired in this case. There are even more buildings that currently have three competitive loop or lateral connections, but after these acquisitions, only two competitors will remain. In this market, two competitors do not produce the same level of price competition as three competitors. So, even by the most rudimentary measure, the acquisitions dramatically reduce the competitive connections between office buildings and the local exchange. In short, the merged companies will have a stranglehold on local loop.

This, however, is only the smallest part of the story. The surviving companies will also have a stranglehold on transport in each local metropolitan area within their respective operating regions. As in the case of loop/lateral, there are many transport circuits for which there are only two competitors, one of which will be eliminated by these acquisitions. The databases submitted by ACTel members demonstrate this. And the number of competitors on many other transport circuits will be reduced from three to two.

The effect of consolidation in transport is equally damaging to business customers. If transport is not competitive, it matters little whether loop is competitive or

not because a wholesale provider to business customers must invariably go over leased transport and loop to reach a customer's premises.

In the FCC merger proceedings, the merging parties had placed into the record route maps purporting to show many competitors on each transport circuit. (These maps generally come from the GeoTel database.) Presumably, the merging companies have made the same argument to the Antitrust Division. But these maps do not begin to address the actual state of competition on any given transport circuit, or with respect to transport circuits throughout any metropolitan area. We are aware that the Division has CIDed transport information from at least some providers and can therefore, perhaps, make a more refined analysis that what can be adduced from the maps. But any analysis must consider only lit fiber in the ground that is owned by a company in the business of selling at wholesale. Cities and utilities have fiber recorded on these route maps, but neither of these entities would substitute for a loss of competition among wholesale providers. Similarly, fiber must be configured electronically for use in a buyer's network. And the fiber owner must be certified as a provider of telecom transport.

Most importantly, fiber in the ground must be connected to a building in order to be considered a viable competitive alternative. Otherwise, there are right of way costs (if right of way can be secured at all) and costs associated with building access from the landlord, all of which must be considered. And the fiber must terminate at a location at which other companies have facilities to connect to it. Generally speaking, fiber maps provide none of this information.

During the FCC TRRO proceedings, some state public utility oversight bodies gathered information from which transport concentration could be evaluated. Recently, the New York PSC staff performed such an analysis in light of the proposed acquisitions.

The PSC staff made calculations based on the Merger Guidelines methodology and found, under the Guidelines, that "transport market concentration is problematic even in the most competitive subset of routes in the New York Metropolitan LATA." Moreover, according to the New York commission, there is a significant overlap of local transport facilities between Verizon and MCI, and a lack of additional transport providers on many of these routes, producing what the PSC staff concluded is a "significant anticompetitive impact" from the mergers.

The New York metro area is surely the most competitive metropolitan area for transport offerings. Analysis of the transport data assembled by the Division must surely demonstrate even more serious problems in other cities.

But trying to evaluate the effect of these acquisitions by looking at any particular loop or transport circuit, or even the concentrations the acquisitions produce in loop and transport city-wide, is like focusing on individual trees rather than the forest. It is as if a doctor tried to evaluate the health of the cancer patient by examining only the point of a single tumor.

There is a vibrant, competitive wholesale market today because of the strength of the AT&T and MCI networks and the business incentives those companies have to participate in the local wholesale market. The competitive conditions at any particular point in the network are determined as much by the vitality of the competitors and the scope of their offerings throughout the network as by the number of particular competitors on any particular circuit. AT&T and MCI have the resources and incentives to produce a competitive wholesale market. Post-acquisition, SBC and Verizon will have wholly different incentives. There is no reason to believe those companies will participate in the wholesale market at all (except as legally required). And if they did

CID material – Confidential                                                    17

participate, they would certainly price their facilities at ILEC pricing, rather than the more competitive AT&T and MCI pricing.

Beyond all that, there is no reason in this case to make a determination of competitive injury based on inferences from concentration. Here, there is bid data from which the effects of the acquisitions can be calculated in dollars and cents.

Making the most wishful assumption – that a competitive wholesale market can continue to exist without AT&T and MCI – is clear that the acquisitions will produce inordinate wholesale price increases – from 20% to 500% depending on the operating area and type of circuit. This is not speculation; it is what the purchaser's databases demonstrate.

Purchasers at wholesale (including ACTel members) would have no choice but to attempt to pass these price increases on to their business customers. More likely, retail prices would go up astronomically, but many of the providers would nevertheless go out of business, because they could neither pass on the price increases fully nor absorb the increases themselves. The result will be that business customers will pay a great deal more and have many fewer choices.

Business customers will not have other facilities-based competitive alternatives to fulfill their telecom needs at reasonable prices. For example, while there is significant wireless penetration into the business community, no one has suggested that cell phones are a substitute for wireline for businesses. Rather, wireless is a complement to wireline in the business market. And fixed wireless is at best a niche solution. Finally, while cable companies may in the future provide sufficiently reliable and pervasive phone service for residential customers, the FCC as recently as last year (after an exhaustive

factual analysis) found that cable phone service was an alternative to wireline for only the smallest home businesses.

Perhaps, again thinking wishfully, the post merger Verizon will compete aggressively against the post merger SBC. That might be a possible source of competitive benefit for business customers that are on-net for both companies. But unless one is willing to indulge in the implausible assumption that, post-merger, the companies will each aggressively build out in the other's territories to connect mid-sized businesses in lower density areas (something that would take years, if not decades), the effect of retail competition by the companies post merger will have a de minimus effect on business customers whose current suppliers are most dependent on a robust wholesale market. More likely, each company will successfully exploit the businesses in its own operating area by raising those prices, without risking retaliation by expanding further in the other Bell's territory.

Every reasonable analysis forecasts grevious competitive injury to business customers that purchase their telecom services from suppliers that rely on the wholesale market. And none of the merging companies, in the public record at least, has offered a remedy to address that harm, much less rectify it.

## D.    Remedies

The most widely reported "remedy" (we use the term advisedly) that the merging companies have allegedly proposed is merely divesting ownership (whether real or virtual, in the form of IRUs) of some lateral (or loop) connections to on-net office buildings.  Indeed, this has been further limited to suggest the divesture of such laterals/loops only where the acquiring and the acquired companies in the proposed mergers own the only connections to a particular building ("2 to 1" situations).

Any proposal merely to divest overlapping loops or laterals is an offer to give up the sleeves off a vest.  Such a remedy will do absolutely nothing to ameliorate the competitive injury caused by the acquisitions.

First, there is no reason to believe that any particular divested lateral could be connected easily or at all to another competitor's network.  Currently, one end of the lateral terminates in a building, but the other is connected, for example, to the AT&T fiber ring.  The "divested" lateral might not easily connect, either physically or electronically, to a competitor's network.

But this is minutiae.  The more fundamental point about such proposals is that they are simply preposterous as remedies for the harms inflicted.

Suppose a CLEC like TWT or XO purchases a divested lateral/loop.  The purchasing company would be connected to a building to which it was not previously connected.  But without far more extensive remedial relief, the purchasing carrier could not provide competitive services to businesses in the building connected to the divested lateral.  This is because TWT and XO (and even companies like Qwest, for that matter) can only connect calls to that building (even after making the purchase of the divested

lateral) by using the rest of their networks. And the rest of their networks are wholly dependent on the wholesale market for competitive pricing and broad coverage.

Even if all over lapping loops to every building in each operating area were divested to a company that would continue to offer these circuits at wholesale, and all logistical problems were resolved, the competitive carrier acquiring the loops must still make use of transport from the wholesale market to provide a competitive offering to any newly connected office building. So, overlapping transport circuits (particularly on routes of high concentration with few other alternatives) would also have to be divested.

The Division's personnel would then be required to ensure that all divested circuits could not only be meaningfully connected to a competitor's network both physically and electronically but, more fundamentally, the Division would have to make certain that these divestitures could be cobbled together by someone in someway so as to actually provide wholesale alternatives. And, even this, if successful, would not begin to restore competition in the wholesale market.

This is because, as previously explained, both AT&T and MCI have expanded the reach of their own networks by leasing Bell circuits at attractive rates, the savings from which are passed on to the entire wholesale market. This pricing currently benefits the competitive wholesale market every bit as much as the circuits actually owned by AT&T and MCI do. Therefore, in order for the wholesale market to remain viable after the acquisition, and even after divestitures, some entity or entities must realistically be able to offer the scope of AT&T's and MCI's Type I and Type II circuits at the prices they are currently being offered. It is not enough that SBC and Verizon continue to offer the same prices on the same basis as they do today. Only AT&T and MCI are able to use today's Bell pricing to benefit competition across the entire wholesale market. This is precisely

what the ACTel databases show: ████████████████████ have Type II bids from both AT&T and MCI.

Merely divesting overlapping (or even concentrated) loop and transport routes will not begin to remedy the competitive damage caused by the mergers. The whole point of a divestiture remedy is to permit a free market solution (after the divesture) to resolve the concentration issues created by the merger. But a divestiture remedy that focuses at the granular level of overlapping facilities has no hope of achieving that result. At a minimum, facilities need to be divested in operating units over wide areas, probably nationwide, or at least region-wide, to enable the competitive carrier acquiring the assets to have even a shot at replacing the competitive pricing from MCI and AT&T lost by the acquisitions.

From the perspective of remedies, the acquisitions now before the Division bear a strong resemblance to the Division's controversial clearance of Thomson's acquisition of West Publishing Co. a decade ago. There, as here, the greatest concern was that the acquisition would put the two principal competing systems (here, the competing local networks) under common ownership. There, as here, counsel for the merging companies argued for piece-meal divestiture of individual properties, rather than something more substantial.

In the West deal, the Division adopted the approach sought by the merging companies, requiring divestiture of piece-meal properties, rather than a comprehensive set of properties that could be used in the market place to actually produce competitive benefits. The result, in terms of antitrust enforcement, was a fiasco. *See, e.g.,* John E. Morris, *How the West was Won, The American Lawyer*, September 1996.

Indeed, *The American Lawyer* characterized the settlement process as a "microanalysis of competition" in which the government became "obsessed with the competing seedlings and overlooked how the giants of the forest can block out the light," attributing this result to the actions of Thomson's lawyers in "deftly maneuvering the merger through the government review process."

In the years following the consummation of the West acquisition, prices to customers rose dramatically, just as critics predicted, producing further criticism of the Division's decision[1]. And when it came to light that the Division's clearance of the deal conceded with extensive political maneuvering, criticism reached both the largest mass circulation media[2] and even the most prestigious legal publications. *See, e.g.,* Mark Hansen, *A Question of Influence*, 83 American Bar Assn. Journal 36, June 1997.

There is no reason to repeat the problems of West/Thomson. Remedial relief can be achieved in this case with minimum disruption and inconvenience to either the merging companies or business customers.

We understand, as ACTel members have explained to the Department of Justice during employee interviews, that AT&T's Local Services organization continues to be maintained, at least to some degree, as a separately identifiable entity – and probably a separable entity, as well. We believe similar conditions exist with respect to MCI's local services. Divesting the whole of a network like AT&T Local Services, or at least the assets in the SBC operating region (or the Verizon region in the case of MCI) is the first

---

[1] *See, e.g.,* Susan M. Ryan, *Cost Inflation by Page Reductions*, 14 The Bottom Line: Managing Library Finances, No. 1, at pp. 6-11 (2001); Douglas McCollam, *Volumes Are Giving Way To Velocity*, 25 National Law Journal, No. 43, at S1 (July 14, 2003).

[2] *See, e.g.,* Brooks Jackson, *Moving Money Through States Capitals*, CNN, April 11, 1997; <http://www.cnn.com/ALLPOLITICS/1997/04/11/Jackson/>; Viveca Novak and Michael Weisskopf, *The Cheerful Giver*, Time Magazine, April 21, 1997; http://www.cnn.com/ALLPOLITICS/1997/04/14/time/novak.html; Mark Hansen, *A Question of Influence*, 83 A.B.A.J. 36 (June 1997).

CID material – Confidential                                                23

step toward maintaining a competitive wholesale market. As DoJ is aware from employee interviews, we believe it is straightforward to "unplug" local services from the long-distance businesses of AT&T and MCI at the site of the IXC PoP.

Of course, divesting assets without customers is a disastrous scenario. It costs money to run divested facilities, and, unless there are customers on the network, the network will run its owner into bankruptcy. These networks are not like cell phone networks, where individual consumers and their phone numbers can be painlessly divested. Here, the customers currently running over AT&T's network use that company for a myriad of telecommunication services. Rather than trying to divest customers, ACTel members have suggested that the merged companies be required to contract on a "take or pay" basis for services from the company acquiring the divested assets, so the divested network can be maintained during the transitional period of five to seven years while it attracts new customers and offers access to other competitive carriers that currently purchase in the local wholesale market.

This kind of transition will take time to become effective. It is imperative during this period of time that the merged companies not be permitted to raise wholesale prices above those currently offered in the market before competitive alternatives are in place. Otherwise, the merged companies will destroy the wholesale market before the remedies can prevent the harm.

ACTel members have suggested several simple procedures for guaranteeing continued competitive pricing as well as fairness to business customers during the transitional period. These proposals include a "fresh look" by businesses locked into long-term contracts and commercial negotiations with "baseball arbitration" linked to pre-merger agreements to provide competitive pricing during the transitional period. We

note that merger decrees negotiated by DoJ have in the past included provisions to guarantee prices for periods as long as seven years from contracts that pre-existed the merger, among other ameliorative pricing conditions. *See, e.g., United States v. Thomson Corp. and West Publishing Co., 949 F. Supp. 907 (D.D.C.1997).* Even if the Division cannot see its way clear to require substantial divestitures, transitional pricing protection should be included in any settlement in order to mitigate the anticompetitive effects of the mergers.

But these issues, at this stage, are details. The key is to begin with a divestiture scenario that has some reasonable chance of preserving what is now a competitive wholesale market that operates efficiently for the benefit of business customers. That result cannot be secured by incidental divestitures of particular circuits. The broad AT&T and MCI networks are the backbone of current competitive conditions. Post acquisition, there must be competitive networks that fill the same role.

## Conclusion

There is, at this time, a vast, vibrant and efficient local wholesale market for transport and loop that works to the benefit of business customers, producing lower retail prices for telecommunications, as well as the considerable array of services and technologies from which business customers may choose.

The proposed acquisitions will destroy that market. And the remedies proposed by the merging parties invite the Division down the unfortunate road taken in the West-Thomson acquisition.

If, nevertheless, the Division intends to permit the acquisitions to proceed, there are remedial measures that would, at least in part, ameliorate the injury the acquisitions will produce. These conditions, including meaningful divestitures and transitional price protection, will cause little pain to the merging parties, but will maintain a level of competition that will benefit retail business customers.



FIGURE 1