***REDACTED – FOR PUBLIC INSPECTION***

Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Special Access Rates for Price Cap Local Exchange Carriers | ) ) ) | WC Docket No. 05-25 |
| | ) | |
| AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Access Services | ) ) ) ) | RM-10593 |

## DECLARATION OF PARLEY C. CASTO
## ON BEHALF OF SBC COMMUNICATIONS INC.

I.  **WITNESS IDENTIFICATION AND QUALIFICATIONS**

1. My name is Parley C. Casto. I am the Executive Director – Industry Markets Special Access Product Management for SBC. I am responsible for product management, product development, rate development, policy development, and tariff management for the wholesale special access business of SBC on an enterprise-wide basis.

2. I previously served as Director of various other product management organizations within SBC. In those positions, I supervised product management teams responsible for switched access, advanced data services, and certain transport (special access and unbundled network element) product management teams. I also was responsible for SBC enterprise-wide product development, rate development, and company policy for these products.

***REDACTED – FOR PUBLIC INSPECTION***

3. I began working for Illinois Bell Telephone Company in 1992 in the network services organization in Chicago, Illinois. Since then I have held a variety of positions in network construction, fiber optic engineering, and product management.

4. I received my BA from DePaul University in Chicago, Illinois in 1999 and my MBA from DePaul University in 2002. I also earned a Telecommunications Certificate on telecommunications traffic management and engineering from DePaul University's School of Computer Science, Telecommunications and Information Systems.

## II. PURPOSE AND SUMMARY OF DECLARATION

5. The purpose of this declaration is to describe the stiff competition SBC faces in the special access market from a variety of sources, including existing wireline and intermodal competitors, and the increasing competitive threat posed by new entrants using technologies—such as WiMAX—that can provide reliable, high-capacity services at a fraction of the cost of traditional wireline carriers, as well as the ways in which SBC has responded to this competition to acquire and retain customers in this increasingly competitive marketplace.

6. As detailed in my prior declarations before the Commission in the *Triennial Review Remand Proceeding*,[1] SBC has confronted increasingly robust competition in the special access market for several years. Traditionally, this competition has come from a variety of facilities-based carriers that rely on self-deployed and/or third party facilities, and others that rely on a combination

---

[1] Declaration of Parley C. Casto on Behalf of SBC Communications Inc., filed in WC Docket No. 04-313, CC Docket No. 01-338, Oct. 1, 2004; Reply Declaration of Parley C. Casto on Behalf of SBC Communications Inc., filed in WC Docket No. 04-313, CC Docket No. 01-338, Oct. 19, 2004.

2

***REDACTED – FOR PUBLIC INSPECTION***

of such alternative facilities and SBC's special access services.[2] These competitors have been building their networks for decades, and now have deployed facilities in markets representing the vast majority of SBC's special access revenues. In MSAs in which SBC has received Phase II pricing flexibility, for example, the number of active competitors has nearly doubled on average since 1999, as shown below.[3]

**Figure 1**



Percent Increase In Competitive Alternatives

7.  As might be expected, these competitors focused initially on the highest capacity, highest revenue customers, and thus have succeeded in winning the lion's share of the market for the highest capacity, OCn-level services. But competition from these competitors has not been limited only to SONET services; it also has extended to lower capacity, DS3 and DS1 services, including stand-alone DS1 services.[4]

---

[2]  The ability of these CLECs to successfully compete with SBC for special access customers, at least in part through their purchases of SBC's special access services indicates that such competition may be virtually unbounded.

[3]  See supporting data, *infra*.

[4]  While SBC does not have firm market share data regarding the percentage of DS1s and DS3s served by competing carriers, evidence previously submitted in the *Triennial Review Remand* and other Commission proceedings makes clear that CLECs have continued to win a large and

3

***REDACTED – FOR PUBLIC INSPECTION***

8. *Competition in the special access market has begun to accelerate dramatically with increasingly vigorous entry by cable operators, which have deployed fiber extensively in areas where small and medium-sized businesses are concentrated, and fixed wireless providers, including providers of WiMAX service (like TowerStream), which have initiated commercial offerings of DS1 (and higher) replacement services that have quality of service guarantees that equal those of wireline carriers, but at a fraction of the cost and with minimal installation intervals.*[5/]

9. SBC has responded, and continues to respond, to this competition by lowering the price its customers pay for special access services, and offering a variety of innovative pricing plans, including individually-negotiated contract tariffs, designed to meet the specific needs of its customers. These offers include MSA-specific plans and, as many of SBC's customers have demanded, comprehensive, region-wide, and SBC-wide discount plans that offer customers discounts across a broad-range of services in return for making certain revenue commitments.

10. Based on comments raised in the *Triennial Review* and *Triennial Review Remand* proceedings, I expect that some parties here will contend that SBC's discount plans and contract tariffs that span various MSAs and capacity levels are anticompetitive, and enable SBC to leverage its purported market power in markets with less competitive entry into markets with more competitive alternatives. That claim is specious. First, SBC has offered such plans in response to

---

increasing number of special access customers at capacities of DS3 and DS1. SBC Communications Inc. Reply Comments filed in WC Docket No. 04-313, Oct. 19, 2004, at 5, 31-34 ("SBC Reply Comments") and Attach. B, Joint Declaration of Scott J. Alexander and Rebecca L. Sparks on Behalf of SBC Communications Inc., filed in WC Docket No. 04-313, Oct. 19, 2004, at ¶ 21 ("Alexander/Sparks Decl.").

[5/]    TowerStream Service Level Agreement, *available at* http://www.towerstream.com/content.asp?sla ("TowerStream Service Level Agreement").

4

***REDACTED – FOR PUBLIC INSPECTION***

56.    An internal analysis of the price per unit SBC offered its customers in MSAs in which SBC was granted Phase II pricing flexibility demonstrates that the prices customers actually paid SBC for DS1 and DS3 services continued to fall steadily over the same period. In particular, between 2000 and 2004, the average prices that customers paid SBC in Phase II MSAs dropped by approximately **[BEGIN CONFIDENTIAL INFORMATION]** **[END CONFIDENTIAL INFORMATION]** percent for DS1 channel terminations and associated transport, and approximately **[BEGIN CONFIDENTIAL INFORMATION]** **[END CONFIDENTIAL INFORMATION]** percent for DS3 channel terminations and associated transport,[47/] as shown below:

**[BEGIN CONFIDENTIAL INFORMATION]**

---

[47/]    In calculating the average price for DS1s and DS3s, SBC aggregated data from all MSAs in which SBC received Phase II pricing flexibility, including those in which it received relief for both end user channel terminations and POP side transport as well as those in which it received relief for POP side transport only. For those areas in which SBC did not receive Phase II relief for end user channel terminations, SBC normalized the demand and price trends to remove the effects of any price reductions due to price cap productivity adjustments for channel terminations. In addition, in calculating these average prices, SBC took into account revenues received from customers' purchasing pursuant to SBC's basic schedule, term plans, contract pricing plans, and overlay discount plans (such as MVP).

38

***REDACTED – FOR PUBLIC INSPECTION***

**Figure 9**

**Figure 10**

[END CONFIDENTIAL INFORMATION]

This downward trend in DS1 and DS3 prices was driven entirely by SBC's response to customers' purchasing decisions, not reductions mandated by regulation.

57.   At first blush, these price reductions may not appear to be as great as those of SBC's competitors. But the average price per channel termination shown above takes into account services purchased pursuant to SBC's basic, month-to-month rates, as well as services purchased pursuant to long-term pricing plans entered several years previously, and thus do not represent the

39

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 13, 2005.

_____
Parley Casto