# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 1:05CV02102 (EGS) |
| ) | |
| v. ) | |
| ) | |
| SBC Communications, Inc. and ) | |
| AT&T Corp., ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 1:05CV02103 (EGS) |
| ) | |
| v. ) | |
| ) | |
| Verizon Communications Inc. and ) | |
| MCI, Inc., ) | |
| ) | |
| Defendants. ) | |

## UNITED STATES' SUPPLEMENTAL RESPONSE TO ACTEL'S REPLY

In furtherance of its effort to have this Court substitute the case that ACTel advocates for the case brought by the United States, ACTel urges this Court to find that the proposed Final Judgments are not in the public interest by relying on "evidence" consisting primarily of snippets of information with little or no evidentiary value and arguments that are at best misleading (some of which are raised for the first time in its "reply"). The "evidence" relied on by ACTel includes Dr. Wilkie's flawed study, a few analyst reports, a newspaper article, and a handful of "example" pricing tariffs and general statements by executives of the merging parties supposedly proving

post-merger price increases. Neither the "evidence" nor ACTel's new arguments are persuasive. The United States respectfully submits that the Court should find that the settlements in the proposed Final Judgments adequately and appropriately remedy the alleged harm[1] and therefore fall within the reaches of the public interest.

    1. ACTel again misstates the proper focus of this proceeding. Relying on a portion of a sentence in the amended Tunney Act ("competition in the relevant market"), it urges this Court to undertake a broad review of the potential impact of each of the mergers.[2] The relevant part of the Act actually requires that the Court consider *"the impact of entry of such judgment* upon competition in the relevant market."[3] As the United States previously has explained,[4] the full phrase shows that the Court's proper focus is on the proposed judgments and their impact on the harm alleged, not the possibility of unalleged harms from the underlying mergers.[5]

---

[1] Although ACTel asserts that the United States alleged harm for all Local Private Lines, *see* ACTel's Reply Memorandum in Opposition to the United States' Motion for Entry of Final Judgments at 4 (filed June 7, 2006) ("ACTel Reply"), the United States actually alleged harm only as to services provided to certain buildings where the two merging parties were the only facilities-based providers. *See* Complaints ¶ 3 (filed Oct. 27, 2005) ("For hundreds of commercial buildings in [certain] metropolitan areas . . . [the merging parties] are the only two firms that own or control a direct wireline connection to the building . . . . As described in this Complaint, the proposed merger is likely to substantially reduce competition for Local Private Lines and telecommunications services that rely on Local Private Lines to those buildings."); *see also id.* ¶¶ 17, 18, 29.

[2] ACTel Reply at 4-7.

[3] 15 U.S.C. § 16(e)(1)(B) (emphasis added).

[4] Reply of the United States to ACTel's Opposition to the United States' Motion for Entry of the Final Judgments at 3-9, 18 (filed May 31, 2006) ("United States' Reply to ACTel").

[5] The only legislative history relevant to the point supports this reading. Senator Kohl's floor statement explained: "A mandate to review the impact of entry of the consent judgment upon 'competition in the relevant market or markets' is also added by our bill. This will ensure that the Tunney Act review is properly focused on the likely competitive impact of the judgment, rather than extraneous factors irrelevant to the purposes of antitrust enforcement." 150 Cong. Rec. S3618 (statement of Sen. Kohl).

2. Even if it were appropriate for the Court to expand the scope of these proceedings as ACTel requests, case law in this circuit does not support the degree of ACTel's reliance on HHIs to establish its claim that competitive harm is likely in situations beyond those alleged in the Complaints. Statistics reflecting market concentration are a useful tool in competitive analysis, but the Court of Appeals has held that they are "not conclusive indicators of anticompetitive effects."[6] In fact, "this Circuit has cautioned against relying too heavily on a statistical case of market concentration alone, and that instead a broad analysis of the market to determine any effects on competition is required."[7] As the United States has explained, other factors, including potential entry, made competitive harm unlikely except in the limited set of buildings identified in the United States' papers.[8]

---

[6] *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 717 n.12 (D.C. Cir. 2001) (citing *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974); *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n.38 (1962)); *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 50 (D.D.C. 2002).

[7] *FTC v. Arch Coal, Inc.* 329 F. Supp. 2d 109, 130 (D.D.C. 2004); *see also United States v. Baker Hughes*, Inc., 908 F.2d 981, 984 (D.C. Cir. 1990) ("That the government can establish a prima facie case through evidence on only one factor, market concentration, does not negate the breadth of this analysis. Evidence of market concentration simply provides a convenient starting point for a broader inquiry into future competitiveness."); *accord*, U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 2.0 (rev. Apr. 8, 1997) ("*Merger Guidelines*") (Concentration data provides "only the starting point for analyzing the competitive impact of a merger. Before determining whether to challenge a merger, the Agency also will assess the other market factors that pertain to competitive effects, as well as entry . . . .").

[8] *See* Plaintiff United States' Response to Public Comments at 17-25 (filed Mar. 21, 2006) ("Response to Public Comments") (responding to ACTel's comments on a failure to address metropolitan area-wide harm and include all 2-to-1 buildings as well as 3-to-2 and 4-to-3 buildings), 29-32 (responding to COMPTEL's comments on failure to address metropolitan area-wide harm or allege coordinated interaction as a basis for any alleged harm); United States' Reply to ACTel at 16 n.48, 20 (noting exclusion from remedy of 2-to-1 buildings that are "vacant, occupied only by the merged firm, or likely to attract entry in response to a price increase"), 21-23; Reply of the United States to COMPTEL's Opposition to the United States' Motion for Entry of the Final Judgments at 7-11, 12-14 (filed Apr. 17, 2006) (discussing coordinated interaction as an inappropriate theory of harm); *see also* Complaints ¶ 29; Competitive Impact Statements at 8 (filed Nov. 16, 2005) ("CISs").

3. ACTel's reply introduces a discussion of efficiencies, but it is irrelevant to whether the proposed remedy adequately resolves the likely, alleged harm. The United States never claimed that efficiencies would overcome anticompetitive effects in Local Private Line or related services.[9] No "efficiencies defense" is before the Court here, and therefore no Tunney Act purpose would be served by the Court's analysis of the extent of efficiencies. The United States did not allege competitive harm for Local Private Lines in situations other than those identified in its Complaints because it did not believe the evidence demonstrated the likelihood of such harm,[10] not because it believed that the harm would be sufficiently counteracted by merger-specific efficiencies.

4. In an earlier filing, ACTel relied heavily on the work of Dr. Simon Wilkie in arguing that the United States should have brought a broader case. The United States and the Defendants detailed flaws with the Wilkie studies that undercut their reliability.[11] Without responding to the

---

[9] Indeed, by filing the case it did, the United States indicated that there was a competitive problem in 2-to-1 buildings that was not adequately resolved by merger-specific efficiencies. The United States only mentioned potential efficiencies in noting that (a) a delay in the closing of the transactions during the pendency of these proceedings would have delayed the realization of efficiencies (that occur in other product markets) and any benefit to consumers, *see* Response to Public Comments at 7 n.10, 51, and (b) the alternative remedy it actually considered of completely enjoining the transactions would deny the benefit of any efficiencies, whereas the narrower remedy in the proposed Final Judgments would not, *see* United States' Reply to ACTel at 28, 31-32. Where feasible, the Department will narrowly tailor a remedy to preserve efficiencies in markets other than the market where it is alleging competitive harm while still remedying the alleged harm. *See Merger Guidelines* § 4 n.36; Fed. Trade Comm'n & U.S. Dep't of Justice, *Commentary on the Horizontal Merger Guidelines* at 56-57 (Mar. 2006); *see also* U.S. Dep't of Justice, Antitrust Div., *Policy Guide to Merger Remedies* at 4 (Oct. 2004) ("Effective remedies preserve the efficiencies created by a merger, to the extent possible, without compromising the benefits that result from maintaining competitive markets.").

[10] *See supra* note 8 and accompanying text.

[11] *See* United States' Reply to ACTel at 15-16; AT&T Inc.'s Response to ACTel's Opposition and Supplemental Opposition to the Department of Justice's Motion for Entry of Final Judgments at 10-13 (filed May 31, 2006); Verizon's Reply in Support of the United States' Motion for Entry of Final Judgment and in Opposition to ACTel's Memorandum of Points and Authorities in Support of ACTel's

cited flaws in Dr. Wilkie's study, in its reply, ACTel declined to make the details of the studies part of the record here,[12] and shifted to relying on other "evidence" that it contends corroborates Dr. Wilkie's prediction that prices would increase. This "evidence" is no more reliable or persuasive than the study that it supposedly corroborates. First, ACTel relies on two stock analyst reports and one newspaper article,[13] which are of at best limited evidentiary value, and in this case likely of no value because they do not refer directly to the specific markets alleged in the Complaints or analyzed in the Wilkie study.[14] Second, ACTel relies on two statements made at analyst meetings by AT&T executives post-closing suggesting increasing "price stability."[15]

---

Motion for *Amicus Curiae* and Intervenor Status at 16-21 (filed May 31, 2006).

[12] *See* ACTel Reply at 13-14 n.10.

[13] *Id.* at 11.

[14] Although ACTel now wishes to claim that "[t]he fact that the merged companies intend to raise prices was hardly a state secret," ACTel Reply at 11, the 10-K filed by ACTel member XO in March 2005 – presumably a more reliable source than a newspaper article – notes a very different potential impact from the mergers: "if the business combinations involving SBC and AT&T, and either Verizon or Qwest and MCI . . . are consummated, those businesses as combined will enable SBC and Verizon or Qwest to offer the same or similar network reach as we do, and enable those companies to more effectively target the potential customers that are the focus of our business. This competition places downward pressure on prices for local and long distance telephone service and data services, which can adversely affect our operating results." XO Communications, Inc., Form 10-K at 28 (filed March 18, 2005), *available at* http://www.sec.gov/Archives/edgar/data/1111634/000095013305001110/w06781e10vk.htm.

[15] ACTel's argument that the mergers resulted in "price stabilization" depends, in part, on its contention that "prices for Local Private Lines were in steep decline, and had been for many years." ACTel Reply at 16. But this is inconsistent with statements made by ACTel members in FCC proceedings. *See* Comments of XO Communications, Inc., *In re: Special Access Rates for Price Cap Local Exchange Carriers*, FCC WC Docket No. 05-25, at 8 (June 13, 2005) ("*In re: Special Access*") ("CLECs are observing a trend showing a *steady increase* in special access pricing." (emphasis in original)), *available at* http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6517632828; Reply Comments of CompTel, Global Crossing North America, Inc. and NuVox Communications, *In re: Special Access*, at 3 (July 29, 2005) ("Bell company filed rates for special access services subject to pricing flexibility have increased in most cases, and in virtually no case have they declined below price cap levels."), *available at* http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518114509; Emergency Petition of XO Communications, Inc., *In re:*

5

These quotes suggest at most that pricing for enterprise customers, i.e., large retail business customers, may be stabilizing. But Local Private Lines are primarily a *wholesale* product, and indeed, Dr. Wilkie's work only involved data from carriers relating to their wholesale purchase of Local Private Lines.[16] Third, ACTel attaches a selected handful of state tariffs filed by AT&T announcing price increases. But carriers like ACTel's members typically purchase Local Private Lines from the RBOCs at wholesale under special access tariffs, not retail tariffs such as these.[17] Thus, none of the "evidence" provided by ACTel refers directly to the wholesale Local Private Line sales studied by Dr. Wilkie and, therefore, cannot "corroborate" his predictions. And even with respect to industry segments not at issue here, the "evidence" is insufficient to suggest that prices are higher than they otherwise would be as a result of the mergers.

5. The only arguably relevant new information ACTel provides is the XO declaration, but the declarant apparently misunderstands the remedies contained in the proposed Final Judgments. The declarant complains that the interconnection points "where XO would connect to these [divested] lateral IRUs in virtually every instance are far from the XO network.

---

*Unbundled Network Elements*, FCC WC Docket No. 04-313, at 33 (Sep. 29, 2004) ("Over the past months several ILECs have filed for major, across the board, increases in special access rates . . . . XO has observed a steady increase in special access pricing."), available at http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document= 6516486436.

[16] The earnings conference call transcript cited by ACTel discusses wholesale separately, and there is no mention at all of "price stabilization" in this discussion. Although Local Private Lines are sold to enterprise customers also (alone and as components of larger value-added services), the Local Private Lines in question here are a small part of overall "enterprise sales."

[17] *See, e.g.,* ACTel Reply at 12 (noting that carriers purchase "Local Private Lines from the former Bell companies, SBC and the old Verizon, at 'special access' rates"); *see also id.* at 15 (claiming that the mergers relieve pricing pressure on "special access" prices). Even if the tariffs in question did pertain more directly to the products at issue in these cases, the filing of tariffs does not establish that actual negotiated prices in the marketplace increased or that the price increases were a result of the mergers, as opposed to other regulatory or competitive changes in the market.

Consequently, XO would have to construct the necessary transport and collocation facilities. This also is a lengthy and costly process . . . ."[18] The declaration suggests that the decrees should therefore be modified to require the merged firms to provide the needed transport connections.[19] But the decrees already provide for those connections, which should resolve that complaint.[20] Similarly, XO complains that the proposed divestiture includes only "a mere 2 to 4 strands of dark fiber"[21]; but, in actuality, the proposed decrees require the divestiture of "the greater of (1) eight (8) fiber strands or (2) one-half of the currently unused fiber strands in [AT&T's/MCI's] facilities serving the building," which should be sufficient for purposes of replacing the competition provided by AT&T or MCI.[22]

---

[18] Declaration of Richard D. Pierce, XO Communications ¶ 6 (June 6, 2006) ("XO Decl."), Attach. to ACTel Reply, Ex. I.

[19] *Id.* ¶ 8(c) (suggesting the decrees require the parties "to connect the dark fiber IRU or 'lit' fiber services at their expense to at least one and preferably two technically feasible points of interconnection").

[20] *See* Proposed Final Judgments § II(D) (requiring the divestiture of sufficient transport); *see also* CISs at 10-11 (explaining that the decrees require divestiture of transport to allow the purchaser to connect the laterals to their network); Response to Public Comments at 19 (same). The three divestiture deals AT&T has signed with other carriers all provide for the divestiture of transport strands that connect the laterals to the buyer's network.

[21] XO Decl. ¶ 4.

[22] *See* Proposed Final Judgments § II(F); CISs at 10.

## CONCLUSION

For the reasons stated above and in the United States' prior filings, the Court should conclude that the proposed Final Judgments are in the public interest and enter them so that the needed divestitures can take place.

        Respectfully submitted,

        /s/
        Laury E. Bobbish
        Assistant Chief

        /s/
        Claude F. Scott, Jr. (D.C. Bar No. 414906)
        Lawrence M. Frankel (D.C. Bar No. 441532)
        Trial Attorneys

        Telecommunications & Media Section
        Antitrust Division
        U.S. Department of Justice
        1401 H Street, N.W., Suite 8000
        Washington, D.C. 20530
        (202) 514-5621
        Attorneys for the United States