**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| AT&T Corp. | **)** | WC Docket No. 05-65 |
| | **)** | |
| and | **)** | |
| | **)** | |
| SBC Communications Inc. | **)** | |
| | **)** | |
| Application Pursuant to Section 214 of the | **)** | |
| Communications Act of 1934 and Section | **)** | |
| 63.04 of the Commission's Rules for Consent | **)** | |
| to the Transfer of Control of AT&T Corp. to | **)** | |
| SBC Communications Inc. | **)** | |

**COMMENTS OF**
**THE NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER**
**ADVOCATES**

Janine Migden-Ostrander
Consumers' Counsel
David C. Bergmann
Chair, NASUCA Telecommunications
Committee
Terry L. Etter
Assistant Consumers' Counsel
Office of the Ohio Consumers' Counsel
10 West Broad Street, Suite 1800
Columbus, OH 43215-3485
Telephone: 614-466-8574
Facsimile: 614-466-9475

NASUCA
8380 Colesville Road, Suite 101
Silver Spring, MD 20910
Phone (301) 589-6313
Fax (301) 589-6380

# TABLE OF CONTENTS

I.  SUMMARY ........................................................................................... 3

II.  INTRODUCTION................................................................................ 7

III.  THE LAW PLACES THE BURDEN ON SBC AND AT&T TO
     DEMONSTRATE THAT THEIR MERGER WILL SERVE THE PUBLIC
     INTEREST, CONVENIENCE AND NECESSITY. ......................................... 8

IV.  THE CURRENT COMPETITIVE LANDSCAPE IS BLEAK. ....................... 9

V.  THE IMPACT OF THE MERGER ON THE COMPETITIVE
    LANDSCAPE WILL BE SUBSTANTIAL HARM TO THE PUBLIC
    INTEREST. .................................................................................... 13

VI.  THE BENEFITS THAT SBC AND AT&T ASSERT THE MERGER WILL
     PRODUCE ARE NOT MERGER-SPECIFIC, NOT LIKELY AND NOT
     CREDIBLE........................................................................................ 18

VII.  THE PUBLIC INTEREST HARMS THAT WOULD RESULT FROM THIS
      MERGER ARE SO SUBSTANTIAL THAT A MULTITUDE OF
      CONDITIONS WOULD BE REQUIRED TO MAKE IT IN THE PUBLIC
      INTEREST. ................................................................................... 21

      A.  THE CONTEXT OF COMMITMENTS ............................................. 21

      B.  FEDERAL CONDITIONS SHOULD BE A FLOOR, NOT A CEILING. ..................... 22

      C.  THE CONDITIONS SHOULD REMAIN IN PLACE FOR FIVE YEARS AND SURVIVE
          CHANGES IN LAW. ....................................................................... 22

      D.  THE CONDITIONS................................................................... 23

          1. Conditions to promote competition...................................... 23

          2. Conditions to limit harm to competition and consumers ...................... 26

          3. Conditions to ensure consumer benefits ............................... 28

          4. Conditions to realign the regulatory regime ........................ 29

          5. Enforcement ...................................................................... 30

**VIII.  CONCLUSION** ...................................................................................... **30**

**ATTACHMENT A: ETI White Paper, "Confronting Telecom Industry Consolidation: A Regulatory Agenda for Dealing with the Implosion of Competition"**

**ATTACHMENT B: List of news articles and related items**

**ATTACHMENT C: List of SBC/Ameritech merger conditions**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| AT&T Corp. | ) | WC Docket No. 05-65 |
| | ) | |
| and | ) | |
| | ) | |
| SBC Communications Inc. | ) | |
| | ) | |
| Application Pursuant to Section 214 of the | ) | |
| Communications Act of 1934 and Section | ) | |
| 63.04 of the Commission's Rules for Consent | ) | |
| to the Transfer of Control of AT&T Corp. to | ) | |
| SBC Communications Inc. | ) | |

**COMMENTS OF**
**THE NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES**

## I.    SUMMARY

SBC Communications Inc. ("SBC") and AT&T Corp. ("AT&T") seek approval from the

Federal Communications Commission ("Commission") of SBC's takeover of AT&T and its

subsidiaries.  The National Association of State Utility Consumer Advocates ("NASUCA")[1]

submits that this merger, as currently structured, does not serve the public interest, convenience

and necessity, as required by the governing statutes and this Commission's rules.  As with prior

---

[1]NASUCA is a voluntary association of 43 advocate offices in 40 states and the District of Columbia, incorporated in Florida as a non-profit corporation.  NASUCA's members are designated by laws of their respective jurisdictions to represent the interests of utility consumers before state and federal regulators and in the courts. See, e.g., Ohio Rev. Code Chapter 4911; 71 Pa. Cons. Stat. Ann. § 309-4(a); Md. Pub. Util. Code Ann. § 2-205(b); Minn. Stat. § 8.33; D.C. Code Ann. § 34-804(d).  Members operate independently from state utility commissions as advocates primarily for residential ratepayers.  Some NASUCA member offices are separately established advocate organizations while others are divisions of larger state agencies (*e.g.*, the state Attorney General's office).  NASUCA's associate and affiliate members also serve utility consumers but are not created by state law or do not have statewide authority.

mergers considered by this Commission, the proposed merger will not serve the public interest, convenience and necessity unless definitive and enforceable conditions are adopted that will: 1) promote competition in the local, broadband and long distance markets for residential and small business consumers; 2) protect residential and small business customers from negative impacts of the merger, such as declines in SBC's or AT&T's service quality; and 3) provide additional benefits to residential and small business customers.  Given that this merger is both qualitatively and quantitatively different -- more likely prejudicial to consumers -- from mergers previously considered by the Commission, the conditions need to be more substantial and more effectively enforceable than the conditions previously adopted.

This merger would join AT&T, the Nation's largest long distance carrier, which is also the largest competitive local exchange carrier ("CLEC"), with SBC, the second largest long distance carrier, which is also the nation's second largest incumbent local exchange carrier ("ILEC").  The merger would also join two of the largest providers of broadband service in the nation, as well as join two competitors that provide Voice over Internet Protocol ("VoIP") service.  In addition, the merger would eliminate an announced competitor for cellular telephone service.

The merger would, unfortunately, go a long way to recombining major piece parts of the national carrier that was AT&T prior to the divestiture of the Regional Bell Operating Companies ("RBOCs").  This merger follows the last major round of mergers that recombined RBOCs, so that now, instead of seven RBOCs, there remain only four.

The proposal for this merger occurs after a series of decisions by the United States Court of Appeals for the District of Columbia Circuit and this Commission that had a devastating impact on the competition that was just beginning to develop for local wireline service to

4

residential and small business customers.  This merger would create a situation that -- even if

those judicial and regulatory decisions are reversed -- would make the further development of

wireline competition for residential and small business customers even less likely.

Thus residential and small business consumers would be relegated to the possibility of

so-called "intermodal" opportunities, for services that are not really substitutes for wireline local

and long distance service.  Even this "competition" from wireless and broadband service would

be unreasonably limited, however, because of the dominance of the merged firm in the wireless

and broadband industries.

In its totality, this merger -- as currently structured -- fails to pass the public interest test.

The concerns raised by this merger are substantially heightened, however, by the other major

merger currently under consideration, that between MCI – the second-largest interexchange

carrier ("IXC") and CLEC in the United States -- and either Verizon or Qwest, both of which are

RBOCs.  Taken together, these two mergers would result in the elimination of competition far

greater than for each merger taken individually.  In assessing both mergers, the Commission

must consider the interrelationship and cumulative effect of the mergers, rather than looking at

them in isolation.

NASUCA's comments consist of the following parts:

1)    A recitation of the law applicable here.

2)    A description of the current competitive landscape.  This description, like the

rest of the comments, is greatly aided by the attached white paper,

"Confronting Telecom Industry Consolidation: A Regulatory Agenda for

Dealing with the Implosion of Competition" ("*Confronting Consolidation*"),

prepared for NASUCA by the consulting firm Economics and Technology Inc.

("ETI").  The description here also challenges the description of the competitive landscape included in the application by SBC and AT&T.

3)     A description of the harms that can reasonably be expected to result from the proposed merger on the competitive landscape, including local, long distance and broadband markets and addressing both intramodal and intermodal opportunities.  This responds to the SBC/AT&T claims of limited impacts.

4)     A discussion and rebuttal of the public interest benefits claimed by SBC and AT&T.

5)     A presentation of a wide range of efficiently-enforceable conditions that would be needed in order to bring this merger within the public interest.  The list presented here is not intended to be all-inclusive; NASUCA may add to the list based on other submissions in this record.  As noted above, this merger is more serious from the consumer perspective than those previously authorized by this Commission that were approved subject to numerous conditions; hence the conditions proposed here are broader in scope than those previously ordered.

6)     A conclusion.

There are also three attachments to the comments.  Attachment A is the ETI White Paper, *Confronting Consolidation*.  Attachment B is a list of pertinent news articles.  Attachments C is the list of conditions that the Commission placed on the SBC/Ameritech merger in order for that merger to be found to be in the public interest.

## II.    INTRODUCTION

These comments are filed in response to the Commission's Public Notice released March

11, 2005.[2]  NASUCA's comments are submitted in the context of the Commission's previous

major round of merger approvals, which provide much guidance on how this merger -- and the

merger of MCI with Verizon or Qwest[3] -- should be treated.[4]  Yet as a result of a concatenation

of events -- many of them Commission-initiated[5] -- the competitive environment that was

anticipated and nourished in the SBC/Ameritech[6] and Bell Atlantic/GTE[7] mergers has been

choked almost out of existence.  This has occurred at a time when SBC's operating companies

have been deregulated -- either through state legislative or regulatory action -- based on the

presumption of a level of competition that was never really reached, and is unlikely to be reached

in the future absent major action by the Commission.

In the last major round of mergers, the Commission reviewed the mergers in detail,

finally approving the mergers after two rounds of comments, negotiation among some

---

[2] DA 05-656.

[3] The Commission put a Verizon/MCI filing out for comment (DA 05-762).  It is still not clear whether MCI will be able to finalize a merger with either Verizon or Qwest, however.  The proposed MCI/Sprint merger of 1999 fell through because of regulatory concerns.

[4] *In re Applications of Ameritech Corp. and SBC Communications Inc., for Consent to Transfer Control*, CC Docket No. 98-141, Memorandum Opinion and Order ("*SBC/Ameritech Order*"); *In re Application of GTE Corporation and Bell Atlantic Corporation for Consent to Transfer Control*, CC Docket No. 98-184, Memorandum Opinion and Order ("*BA/GTE Order*").

[5] *In the Matter of Unbundled Access to Network Elements, WC Docket No. 04-313, Review of the Section 271 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Report and Order and Order on Remand, FCC 03-36 (rel. August 20, 2003) ("*Triennial Review Order*"), rev'd *United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ("*USTA II*"); id., Order on Remand, FCC 04-290 (rel. February 4, 2005) ("*Triennial Review Remand Order*"); *In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*, WC Docket No. 03-173, Notice of Proposed Rulemaking, FCC 03-224 (rel. September 15, 2003).

[6] *SBC/Ameritech Order*, ¶¶ 148-166.

[7] *BA/GTE Order*, ¶¶ 260-323.

stakeholders, and major concessions by the applicants.  The importance of the SBC/AT&T

merger is even greater.  And this merger deserves even greater scrutiny because SBC and AT&T

customers deserve more than the unfulfilled promises arising from SBC/Ameritech and Bell

Atlantic/GTE mergers.

### III.     THE LAW PLACES THE BURDEN ON SBC AND AT&T TO DEMONSTRATE THAT THEIR MERGER WILL SERVE THE PUBLIC INTEREST, CONVENIENCE AND NECESSITY.

The Commission's task in reviewing the proposed merger is, pursuant to 47 U.S.C §

214(a), to "determine whether the Applicants have demonstrated that the public interest would be

served" thereby.[8]  The Commission is to "weigh the potential public interest harms of the

proposed transaction against the potential public interest benefits to ensure that the Applicants

have shown that, on balance, the merger serves the public interest, convenience and necessity."[9]

As the Commission affirmed in the *SBC/Ameritech Order*, "The Applicants bear the burden of

proving, by a preponderance of the evidence, that the proposed transaction, on balance, serves

the public interest."[10]  NASUCA submits that, as filed, the SBC/AT&T petition does not meet

---

[8] *SBC/Ameritech Order*, ¶ 46.  Given the presence of SBC in the current merger, most of the citations here are to the *SBC/Ameritech Order*.

[9] *Id.* (citation omitted).

[10] *Id.*, ¶ 48, citing *Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from Tele-Communications, Inc., Transferor, to AT&T Corp., Transferee*, CS Docket No. 98-178, Memorandum Opinion and Order, 14 FCC Rcd at 3160, 3169-70, ¶ 15 (1999) (*AT&T/TCI Order*).  *See also WorldCom/MCI Order*, 13 FCC Rcd at 18031, ¶ 10 n.33 (citing 47 U.S.C. § 309(e) (burdens of proceeding and proof rest with the applicant); *American Telephone and Telegraph Co. and MCI Communications Corporation Petitions for the Waiver of the International Settlements Policy*, File No. USP-89-(N)-086, Memorandum Opinion and Order, 5 FCC Rcd 4618, 4621, ¶ 19 (1990) (applicant seeking a waiver of an existing rate bears the burden of proof to establish that the public interest would be better served by the grant rather than the denial of the waiver request); *LeFlore Broadcasting Co., Inc.*, Docket No. 20026, Initial Decision, 66 FCC 2d 734, 736-37, ¶¶ 2-3 (1975) (on the ultimate issue of whether the applicants have the requisite qualifications and whether a grant of the application would serve the public interest, as on all issues, the burden of proof is on the licensees).

this burden.  The merger, as presently structured, is not in the public interest.

## IV.     THE CURRENT COMPETITIVE LANDSCAPE IS BLEAK.

As *Confronting Consolidation* conclusively shows, the current competitive landscape is such that the competitive promise of the 1996 Act -- once on the brink of bringing benefits to consumers across the Nation -- has largely been stifled.[11]  Six years ago, in the *SBC/Ameritech Order* and the *BA/GTE Order*, the Commission adopted conditions that recognized that competition had yet to develop.  For example, in the *SBC/Ameritech Order*, the Commission stated:

> All evidence suggests that competition has been slow to emerge in the territories of these Baby Bells and that not all geographic areas, and not all types of customers, are receiving the benefits of competition.  Furthermore, this merger application comes at a critical juncture when competitive LECs may shortly be able to take advantage of more favorable market conditions resulting from:  (1) recent court decisions; (2) final prices for interconnection, UNEs and resale that have been determined in state cost proceedings; and (3) extensive section 271 collaborative processes supervised by state commissions.[12]

The Commission's citation to favorable court decisions was to *Iowa Utils. Bd.*, which upheld the Commission's rulemaking authority to carry out local competition provisions of the Telecommunications Act of 1996, and upheld the "pick and choose" rule, but remanded the Commission's interpretation of the "necessary and impair" standard of the 1996 Act in its network element unbundling rules.[13]

Since that time, of course, the D.C. Circuit Court of Appeals has independently rewritten

---

[11] *Confronting Consolidation*, Chapter 2.

[12] *SBC/Ameritech Order*, ¶ 29 (footnotes omitted).

[13] *AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366 (1999) ("*Iowa Utils. Bd.*").

the Act, making unbundling -- under its theory -- a rare beast indeed.[14]  Removal of the

unbundling requirements of 47 U.S.C. 251(c)(2) means that **if** CLECs have access to the ILECs'

networks, it will be at "market-based" prices.  And, as shown in *Confronting Consolidation*, the

market in question is the ILECs' bottleneck.[15]  For the UNEs that remain at TELRIC rates, the

Commission's pricing pronouncements have resulted in substantial price increases.[16]  The value

of the "section 271 collaborative processes supervised by state commissions" is severely

constrained by these other environmental factors.  And the Commission itself has eliminated the

"pick and choose" rule.[17]  Thus the current market conditions -- caused by these regulatory and

judicial decisions -- are not favorable to competition.

In the *SBC/Ameritech Order*, the Commission noted that a key SBC response to the

competitive urging of the Act was merging with other RBOCs:  "For its part, in response to the

1996 Act, SBC appears to have adopted an acquisition strategy."[18]  The Commission noted

SBC's in-line mergers with PacTel, with SNET, and then with Ameritech.[19]  SBC has now

moved beyond taking over other RBOCs, who were *potential* competitors; with this merger,

SBC is eliminating the *current* competition.  Further, as noted at length in *Confronting*

*Consolidation*, SBC -- like the other RBOCs, of course -- has engaged in a running battle to limit

---

[14] *USTA II*; *United States Telecom Ass'n v. FCC*, 290 F.3d 415 (D.C. Cir. 2002) ("*USTA I*").

[15] *Confronting Consolidation*, pp. 17-23.

[16] *Triennial Review Order*, ¶¶ 668-691; *In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*, WC Docket No. 03-173, Notice of Proposed Rulemaking, FCC 03-224 (rel. September 15, 2003).

[17] *In the Matter of  Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338, Second Report and Order, FCC 04-164 (rel. July 13, 2004).

[18] *SBC/A Order*, ¶ 26.

[19] *Id.*

competitors' access to its networks.

The Applicants assert that the merger will not reduce competition because providers of wireless, cable and Internet Protocol -based services, including VoIP, are competitors to the merged company.[20]  Intermodal competition is largely a myth.  As detailed by *Confronting Consolidation*, the notion of "intermodal" competition has been used by RBOCs primarily to expand the view of the relevant competitive telephone market in order to claim lower market shares so that their mergers will seem less detrimental to competition.[21]  The intermodal "competitors" cited by the Applicants do not compete ubiquitously throughout SBC's service territory or for certain customer segments, and their services are complements to SBC's services.[22]

For example, there is no "intermodal" competition for residential basic local exchange service, i.e., dial tone service that does not include features or other services.  Wireless, cable and IP-based service providers tend to offer bundled services exclusively.[23]  Only SBC offers standalone residential basic local exchange service ubiquitously -- or at all -- in its service territory.

In addition, cable, wireless and VoIP have limitations that make these services less than adequate substitutes for SBC and AT&T service.  Consumers cannot subscribe to telephone

---

[20] Application at 5-9.

[21] *Confronting Consolidation* at 24-25.

[22] *Id*. at 36.

[23] See, e.g., Verizon Wireless (http://www.verizonwireless.com/b2c/store/controller?item=planFirst&action=viewPlanDetail&sortOption=priceSort&catId=323&cm_re=Home%20Page-_-Personal%20Box-_-Individual%20Plans ) ; Time Warner (http://www.timewarnercable.com/corporate/products/digitalphone/unlimitedcallingdigitalphone.html); Vonage (http://www.vonage.com/products.php).

service over cable unless they reside in the cable provider's franchise territory.  Franchise

territories generally do not coincide with SBC's telephone service territories.  Thus, some SBC

customers might have competition available through their local cable system, while others might

not.  In addition, because the type, price and quality of service may vary from cable company to

cable company, the nature of competition may vary from franchise area to franchise area.  Not all

of SBC's residential customers have the same level of competition available from cable

companies.

Wireless service is more ubiquitous than cable, however, the cost of using wireless

service for some purposes is often greater than the cost of wireline service, due to higher base

costs,  and roaming and overage charges that may accrue.  In addition, wireless is not a substitute

for certain data transmission purposes, such as alarm systems.

The nascent VoIP service is also not a suitable substitute for wireline in many instances,

largely because of the requirement to have a broadband connection.  Few VoIP providers offer

reliable E-911 service, and many VoIP providers encourage customers to maintain a landline

phone for E-911 purposes.

Further, much of the intermodal "competition" cited by the Applicants involves other

portions of their own companies.  As noted in *Confronting Consolidation*, a large portion of

SBC's "lost" residential access lines have gone to other SBC companies, whether wireless or

DSL.[24]

--------

[24] *Id*. at 25, 28, 32-33.

**V.      THE IMPACT OF THE MERGER ON THE COMPETITIVE LANDSCAPE WILL BE SUBSTANTIAL HARM TO THE PUBLIC INTEREST.**

SBC and AT&T would have it that the absorption of the Number Two carrier by the Number One carrier in SBC territory will enhance competition.[25]  Part of that theory is that the two companies are not actually competitors, but rather that some segments of their product lines are merely complementary.[26]  Even if that were true, it is safe to say that in the majority of their operations, SBC and AT&T are current competitors.

SBC and AT&T attempt to minimize the impact of their merger by arguing that AT&T is no longer in the residential service market.[27]  The decision of AT&T to exit the residential market is described in the Application as "irreversible."[28]  No contemporary citation is provided (particularly for the "irreversible" part); perhaps that is because its statements at the time stressed that AT&T was taking its actions as a result of the RBOCs' and the FCC's actions.[29]  If this merger is consummated, however, there will evidently be no reversing of that specific decision.[30]  AT&T continues to serve hundreds of thousands of residential local service customers across the country.

As to the current SBC/AT&T competition, wherever it is and however structured, that

---

[25] Application at 5.

[26] *Id*. at 6.  Perversely, SBC and AT&T also look at complementary services like wireless and VoIP as competitive.

[27] *Id*. at 7.

[28] *Id*.

[29] "AT&T to Stop Competing in the Residential Local and Long Distance Market in Ohio and Six Other States," AT&T News Release (June 23, 2004).

[30] AT&T is not exactly famous for irreversible -- or good -- decisions.  The acquisitions of NCR and cable come to mind.

will disappear in the merger. The application touts the efficiency of the combined firm.[31] This amounts to nothing more than a "bigger is better" argument, that cannot meet the public interest test.

In the *SBC/Ameritech Order*, the Commission found that the merger "significantly decreases the **potential** for competition in local telecommunications markets by large incumbent LECs."[32] The Commission noted that with SBC and Ameritech "[b]oth firms have the capabilities and incentives to be considered most significant market participants in geographic areas adjacent to their own regions, and in out-of-region markets in which they have a cellular presence."[33] With SBC and AT&T, clearly both firms have the capabilities and incentives to be considered most significant market participants in geographic areas within the SBC region.

As discussed in *Confronting Consolidation*, the combination of SBC and AT&T would be anti-competitive.[34] In the *SBC/Ameritech Order*, the Commission found that

> the proposed merger also would increase the incentives and ability of the larger merged entity to discriminate against rivals in retail markets where the new SBC will be the dominant incumbent LEC. The merger will lead the merged entity to raise entry barriers that will adversely affect the ability of rivals to compete in the provision of retail advanced services, interexchange services, local exchange and exchange access services, thereby reducing competition and increasing prices for consumers of those services.[35]

Virtually the same incentives and similar abilities will be seen with the larger merged entity of SBC and AT&T.

---

[31] Application at ii-iii.

[32] *SBC/Ameritech Order*, ¶ 56 (emphasis added).

[33] *Id*.

[34] *Confronting Consolidation*, pp. 23, 40-42, 42-44.

[35] *SBC/Ameritech Order*, ¶ 60.

14

In the *SBC/Ameritech Order*, the Commission also stated:

We conclude that the merger causes a public interest harm by eliminating SBC and Ameritech as among the most significant potential participants in the mass market for local exchange and exchange access services in each other's regions.[36]

If SBC and AT&T merge, one of them will be eliminated as among the most significant participants in the mass market in the country.[37]  The Commission also stated:

The Act's goal was to introduce competition in these markets to the ultimate benefit of customers, both as entrants attempted to win consumers' business with lower prices and improved services, and as incumbents were forced in turn to respond to the entrants or lose customers.  **The realization of this goal is jeopardized if the incumbent and one of the most significant competitors in its region choose to merge instead of compete.**[38]

But this merger has impacts beyond the simple elimination of just another competitor.  From reading their Application, one would conclude that SBC and AT&T were merely two among many competitors, rather than being the still-dominant incumbent and its *largest* competitor.

In the *SBC/Ameritech Order*, the Commission found that the merger, as initially proposed, would seriously weaken oversight of the applicants' behavior toward competitors.[39] The Commission also found that the merger would "increase predation while weakening our ability to combat it."[40]  The Commission found that, specifically, "incumbent LECs, such as SBC and Ameritech, have the incentive and ability to discriminate against competitors in the provision of advanced services, interexchange services, and circuit-switched local exchange services" and

---

[36] *Id.*, ¶ 66; see also *id.*, ¶ 71, 99.

[37] It seems unlikely that after the merger, whatever remains of AT&T will be allowed to continue competing for residential customers outside SBC territory.

[38] *Id.*, ¶ 92 (emphasis added).  The Commission found this to be true even for the potential competition between SBC and Ameritech; the concern should be heightened with the actual competition between SBC and AT&T.

[39] *Id.*, ¶ 57.

[40] *Id.*, ¶ 186.

that "such incentive and ability will increase as a result of the merger."[41]

The merger between SBC and AT&T will also increase the incentive and ability to discriminate.  It will "result in a public interest harm, because it will adversely affect national competitors' provision of services … and, as a further result, will harm consumers who ultimately will be forced to pay more for retail services, with reduced quality and choice."[42]

In the *SBC/Ameritech Order*, the Commission found that the increased ability to discriminate would harm residential and small business customers disproportionately: "We believe that this increased discrimination particularly will be aimed at, and harmful to, competitive providers of local exchange services to mass market customers (smaller businesses and residential customers)."[43]  It is not reasonable to believe that the merger of SBC and AT&T will have any different result.

In the SBC/Ameritech merger, the Commission noted an important public interest detriment:  the loss of diversity in positions.  Specifically, the Commission said that "[t]he loss of Ameritech's independence would be especially severe because Ameritech frequently has taken an approach that differs from the position taken collectively by the other RBOCs."[44]  As noted here, AT&T has been one of the strongest competitors against SBC (and the other RBOCs).[45]  Also extremely important has been the presence of AT&T as a "policy competitor" to SBC and the RBOCs.  Both on the national level and in the states, AT&T had been one of the few with the

---

[41] *Id.*

[42] *Id.*, ¶ 186; see also *id.*, ¶ 190, 193.

[43] *Id*, ¶ 236.

[44] *Id.*, ¶ 149.

[45] See also *id.*, ¶¶ 57-59.

resources to stand in opposition to SBC.  Now SBC is "buying out" its main competitor in the

economic marketplace as well as in the political and regulatory arenas.[46]

As discussed above, in the *SBC/Ameritech Order*, the Commission viewed the merger

in the context of the contemporaneous competitive landscape.  The Commission stated,

> [A]s the 1996 Act is being implemented and local markets are opening to
> competition, it is necessary to use an analysis of competitive effects that accounts
> for the transitional nature of these local markets.  This "transitional market"
> analysis is relevant to the examination of a merger under the Communications Act
> because the Act requires this Commission actively to promote the development of
> competition in telecommunications markets, not merely to prevent the lessening
> of competition, which is the policy objective of antitrust laws.[47]

The merger of SBC and AT&T must also be addressed in the context of the current competitive

environment.  We are again in a "transitional market"; this time, unfortunately, it is the transition

from a market that was beginning to show widespread competition to a market where wireline

competition is dying, at least for residential and small business customers.  The presence of

complementary intermodal services[48] does not make this merger any less market-constraining.

Given the foregoing, it is vitally important that these actual competitors provide more

information on their operations to the Commission in order that the impact of their merger on

competition can be accurately assessed.  So far, the applicants have presented only generalities.[49]

**In order to accurately assess the application, SBC and AT&T should provide the**

---

[46] "Consumer advocates fear losing AT&T's voice", USA Today, March 7, 2005, at
http://www.usatoday.com/printedition/money/20050307/1b_attcover07.art.htm (accessed on April 19, 2005); "MCI
and AT&T Leave Little Guys Behind", Washington Post, March 3, 2005, at http://www.washingtonpost.com/wp-
dyn/articles/A2825-2005Mar2.html (accessed on April 19, 2005).

[47] *SBC/Ameritech Order*, ¶ 63 (footnote omitted).

[48] *Confronting Consolidation*, Chapter 4; see also Section V, *supra*, at 8-10.

[49] Application at 6.

**Commission substantive data on their competitive positions -- at least on a state by state basis, if not wire center by wire center -- for local service, long distance service and broadband.**

Further, as previously mentioned, the Commission cannot address this merger in isolation. **The horizontal and vertical implications of this merger must be examined in the context of the proposed Verizon/MCI merger -- or even the possible Qwest/MCI merger**.[50]

### VI.    THE BENEFITS THAT SBC AND AT&T ASSERT THE MERGER WILL PRODUCE ARE NOT MERGER-SPECIFIC, NOT LIKELY AND NOT CREDIBLE.

In the *SBC/Ameritech Order*, the Commission examined whether the benefits of the merger outweighed the harms.[51]  The first concern was "whether the merged entity is likely to pursue business strategies resulting in demonstrable and verifiable benefits to consumers that could not be pursued but for the merger."[52]  The Commission also held that "[p]ublic interest benefits also include any cost saving efficiencies arising from the merger if such efficiencies are achievable only as a result of the merger, are sufficiently likely and verifiable, and are not deemed the result of anti-competitive reductions in output or increases in price."[53]

The Commission also held in the *SBC/Ameritech Order* that "merger-specific benefits may also include beneficial conditions either proffered by the Applicants, by other parties, or

---

[50] The Sprint/Nextel merger and the accompanying spin-off of Sprint's local operations are also factors to be considered.

[51] *SBC/Ameritech Order*, ¶ 257.

[52] *Id.*, ¶ 255.

[53] *Id.*, citing *1992 Horizontal Merger Guidelines* at 30.

18

imposed by the Commission."[54]  **The Applicants here have proposed no conditions that add "redeeming public interest benefits.**[55]

The "benefits" claimed by the Applicants include the fact of their continued existence in the face of the "direct threat to the nation's traditional wireline infrastructure" caused by competition from cable telephony, wireless services and the "proliferation of broadband networks."[56]  The Joint Applicants also say they have "complementary strengths and product sets."[57]  These factors will, according to the application, produce

> a stronger and more enduring U.S.-based global competitor than either company could be alone…. The merger will produce a flagship carrier that will offer the most efficient, highest quality capabilities to government, business and residential customers nationwide.[58]

The Joint Applicants also promise "a true nationwide end-to-end broadband network."[59]

SBC and AT&T also claim that a substantial public interest benefit of their merger will be that the merger will "enhance, not harm, competition."[60]  Section V above has shown the significant negative effects that this merger will have on competition in many sectors.  It should be clear that most of the benefits posited by the Joint Applicants come as a result of the merged company's increased dominance of markets.

---

[54] *Id.*, ¶ 255.

[55] *Id.*

[56] Application at ii.  SBC and AT&T fail to acknowledge, as discussed above, the merged entity would have a significant presence in all of those "competitive" markets.

[57] *Id.*

[58] *Id.* at iv.

[59] *Id.* at iii.  This would likely be the **only** true nationwide end-to-end broadband network.

[60] *Id.* at v.

That is, in fact, the basis for SBC's and AT&T's national security argument:[61]  A bigger, stronger carrier will fare better on the international scene.  The Joint Application cites no recent threats to the independence of American companies, such as those seen in the not-too-distant past.[62]

In the Introduction to their Application, SBC and AT&T identify three broad significant public interests benefits that they say will flow from their merger: "creation of a vigorous U.S. carrier," "strengthen[ing of] national security," and "increase[d] innovation and investment."[63] But it should be clear that "benefits" such as the combining of research and development functions[64] and the consolidation of networks[65] come directly from the merger of competitors. These "efficiencies" would be maximized, of course, if all R&D and all networks in the Nation were combined in a single firm.  The combination of functions would, as discussed above, give the combined firm far more incentive and opportunity to take advantage of the resulting increased market dominance.

Finally, the Application touts the benefits to consumers from merger-related savings. Those savings are alleged to amount to $2 billion annually by 2008.[66]  That may seem like a lot of money.  However, put into perspective against SBC's 2004 revenues of $40.8 billion and

---

[61] Application at 4-5, 13-21.

[62] Verizon's recent acquisition of a large chunk of MCI ownership from a foreign investor shows an opposite trend, in fact.  "Verizon Agrees to Buy Stake of MCI's Biggest Shareholder", Washington Post, April 10, 2005 at http://www.washingtonpost.com/wp-dyn/articles/A40350-2005Apr9.html (accessed April 19, 2005).

[63] Application at 4-5.

[64] Id. at 21.

[65] Id. at 39-43.

[66] Id. at 44.

AT&T's 2004 revenues of $30.5 billion, the 2008 savings represent only 2.8% of 2004 revenues.[67]  It should also be pointed out that there is little evidence that consumers benefited from the savings from the SBC/Ameritech merger.

VII.  **THE PUBLIC INTEREST HARMS THAT WOULD RESULT FROM THIS MERGER ARE SO SUBSTANTIAL THAT A MULTITUDE OF CONDITIONS WOULD BE REQUIRED TO MAKE IT IN THE PUBLIC INTEREST.**

   A.  **The context of commitments**

When reviewing the SBC/Ameritech merger, the Commission engaged in a careful deliberative process.  The Commission took an initial round of comments.[68]  The Commission held a series of three public forums.[69]  Staff requested specific information from the applicants.[70]  The Commission's Chairman communicated serious concerns to the applicants.[71]  The applicants met with Commission Staff.[72]  Another public forum was held.[73]

Then SBC and Ameritech supplemented their application with "an integrated package of conditions."[74]  The Commission requested public comment on the conditions.[75]  The applicants

---

[67] *Id*. at 9 and Appendix A at A-4.

[68] *SBC/Ameritech Order*, ¶ 39.

[69] *Id*.

[70] *Id*., ¶ 41.

[71] *Id*., ¶ 42.

[72] *Id*., ¶ 43.

[73] *Id*., ¶ 44.

[74] *Id*., ¶ 45.

[75] *Id*.

further clarified their commitments.[76]

Given the potential harms and speculative benefits of that merger, only after all that -- including the iterations of the numerous commitments -- was the Commission able to approve the SBC/Ameritech merger.[77]  A listing of the conditions ordered in SBC/Ameritech is found in Attachment C.

The proposed SBC/AT&T merger at issue here has greater potential for harm, and fewer real benefits.  Therefore, in order to make this merger in the public interest, the Commission must adopt more numerous and more enforceable conditions.

**B.  Federal conditions should be a floor, not a ceiling.**

In the *SBC/Ameritech Order*, the Commission adopted a condition that allowed states to impose their own conditions on the merger.[78]  Such state-imposed conditions, based on the specific environment -- competitive and otherwise -- in each state, also reflect the specific requirements of state laws.  In the context of the SBC/AT&T merger, with its greater possible public interest harms, the Commission should be even more deferential to the decisions of individual states.

**C.  The conditions should remain in place for five years and survive changes in law.**

In general, the conditions imposed on the SBC/Ameritech merger were allowed to sunset 36 months after the merger closing date.[79]  Since the "sun went down" on the conditions, darkness has fallen on the environment the conditions were designed to protect and benefit, as

---

[76] *Id.*

[77] *Id.*, ¶ 2.  The process in Bell Atlantic/GTE was similar.  *BA/GTE Order*, ¶ 17-19.

[78] Condition XXX (see Attachment C); see, e.g., *SBC/Ameritech Order*, ¶ 34 (Ohio conditions).

[79] Condition XXIX (see Attachment C).

described above and in *Confronting Consolidation*.  Despite the rapid changes occurring in telecommunications, the sheer mass of this merger requires that the conditions imposed upon it have more endurance.  The general term for these conditions should, therefore, be five years rather than three.

Endurance would also come with a condition that would require the conditions to persist in the face of changes in federal law.[80]  We are facing likely massive changes in federal law, given all of the talk of rewriting the 1996 Act.  SBC, AT&T, the rest of the industry and the public in general would likely benefit from the certainty of knowing that the conditions will persist despite legislative vicissitudes.

### D.  The conditions

The conditions that the Commission should adopt fall into four broad categories:  1) conditions to encourage and enable the at-this-point badly damaged prospects for competition for residential and small business customers; 2) conditions aimed at limiting the harm to competition and consumers from the merger; 3) conditions to ensure that residential and small business customers benefit from the merger; and 4) conditions to realign the regulatory regime to recognize the new market conditions arising from the merger.[81]  NASUCA's current proposals -- not intended to be exhaustive at this point -- are set forth here.

### 1.    *Conditions to promote competition*

The sheer dominance of the merged company will have many anti-competitive effects. These effects will only exacerbate the recent harms to competition caused by the D.C. Circuit's

---

[80] Unless, of course, the statutory change specifically forbade the substance of the condition.

[81] The conditions are proposed here specifically for the SBC/AT&T merger.  As *Confronting Consolidation* makes clear, similar conditions will have to be imposed for an MCI/Verizon or Qwest merger.

and the Commission's interpretations of the impairment standard in 47 U.S.C. § 251(c),

interpretations that had nothing to do with the "fair and ordinary" meaning of the term reviewed

by the Supreme Court.

The harm is most directly evident in the removal of local switching as a facility ILECs

must make available to CLECs. Unbundled local switching ("ULS") is the key element -- along

with the unbundled loop and transport -- that makes up the unbundled network element platform

("UNE-P"), which has been the basis for the majority of residential competition to date.[82]

Another key element for residential competition for broadband-based services is the high

frequency portion of the loop ("HFPL") though which competitors can provide broadband

without having to provide basic service. The availability of these UNEs at TELRIC-based prices

is crucial to further progress on residential and small business competition.

**A condition of this merger should be that SBC makes the UNE-P and the HFPL**

**available to competitors at TELRIC rates.**[83]

That condition will stimulate competition within the SBC territory. But as the

Commission recognized in the SBC/Ameritech merger, there was also a need for conditions

addressing competition outside SBC territory.

The public interest harm identified by the Commission in the SBC/Ameritech merger

generated one of the conditions attached to the Commission's approval of the SBC/Ameritech

merger. The "Out-of-Territory Competitive Entry (National-Local Strategy)" condition required

---

[82] *Confronting Consolidation*, pp. 19-20.

[83] Even if one assumes that the D.C. Circuit was correct in *USTA I* and *II* that Sec. 251(c) does not compel unbundling of ULS or the HFPL -- which it was not -- the Commission may yet impose such conditions on mergers.

24

that SBC implement its proposed National-Local Strategy. [84]  Specifically, the condition required

the combined firm, within 30 months of the merger closing date, to enter at least 30 major

markets outside SBC's and Ameritech's incumbent service area as a facilities-based provider of

local telecommunications services to business and residential customers.[85]  The Commission

found that this

> will ensure that residential consumers and business customers outside of
> SBC/Ameritech's territory benefit from facilities-based competitive service by a
> major incumbent LEC.  This condition effectively requires SBC and Ameritech to
> redeem their promise that their merger will form the basis for a new, powerful,
> truly nationwide multi-purpose competitive telecommunications carrier.  We also
> anticipate that this condition will stimulate competitive entry into the
> SBC/Ameritech region by the affected incumbent LECs.[86]

The condition stated that

> Under this condition, SBC and Ameritech will select the 30 out-of-territory
> markets from the list of 50 major markets that they included in their proposal.  As
> part of the combined firm's entry into each of these new markets, SBC and
> Ameritech will either meet certain verifiable entry requirements in each market
> (*i.e.*, installing or obtaining switching capability; providing facilities-based
> service to each of three business or residential customers; collocating in each of
> ten wire centers; offering facilities-based service to all business and all residential
> customers served by each of those ten wire centers; and offering service, whether
> by resale, unbundled elements or facilities, to all business and all residential
> customers within the entire service area of the incumbent RBOC or Tier 1
> incumbent LEC in the market), or make voluntary incentive payments to a state-
> designated fund (or as governed by state law) in the amount of $110,000 per day
> for each missed entry requirement, for a total of $1.1 million per entry
> requirement per market.  SBC/Ameritech would therefore be obligated to pay
> $39.6 million if it missed all 36 entry requirements in a market, or nearly $1.2
> billion for missing the entry requirements in all 30 markets.  The Applicants'
> implementation schedule requires the combined firm to enter Boston, Miami and
> Seattle within 12 months after the merger closing, an additional 12 markets within
> 18 months of closing, and all 30 markets by the later of 30 months after the

---

[84]  *SBC/Ameritech Order*, Section VII.B.3 and Appendix C at Section XXI, ¶ 59.

[85]  *Id.*, ¶ 398.

[86]  *Id.*

merger closing date or 60 days following the company's authorization to provide in-region, interLATA services in states representing at least 60 percent of all access lines served by the combined firm's incumbent LECs.[87]

As explained elsewhere in these Comments and in *Confronting Consolidation*, the proposed merger of SBC and AT&T causes a greater concern and public interest harm than did the SBC/Ameritech merger. It cannot be overemphasized or said too often that the proposed merger of SBC and AT&T involves *actual* competitors in the mass market not merely *potential* market participants.

It is obvious that the SBC/Ameritech out-of-territory competitive entry condition was not successful in forcing SBC to be an active enduring CLEC in these markets. Nor has the retaliatory competitive entry into SBC territory that the Commission hoped for actually occurred. Surely, however, with the additional force of AT&T behind it, SBC will be able to handle sustained entry into the thirty markets that were part of the National-Local Strategy.[88]

**The merged company should be required to repeat the National Local Strategy on today's terms.**

A standard anti-trust and regulatory response to anti-competitive combinations like this one is to open duplicative facilities to competition. **As a condition of merger, SBC and AT&T should be required to divest themselves of duplicative long-distance and Internet backbone capacity.**

   2.   *Conditions to limit harm to competition and consumers*

There is no reason to believe that the management of a newly-merged SBC/AT&T

---

[87] Condition XXI, ¶ 59 (footnotes omitted) (see Attachment C).

[88] If a corporation the size of the combined SBC/AT&T cannot make a go of it in these other markets -- markets likely subject to the anti-unbundling directives of the D.C. Circuit -- that will demonstrate conclusively that there is impairment in those markets.

will have the same -- let alone a greater -- commitment to service quality and network reliability than existed in each company prior to the merger.  It is of concern that a service quality may in fact decline as a result of the merger.  That was precisely the case with the SBC/Ameritech merger.  There is no reason to believe that a decision will be made in favor of the highest rather than the lowest common denominator of service quality practices by the merged SBC/AT&T.  The Commission must adopt conditions to ensure retail service quality.

One of the significant regulatory events of the last few years was the adoption of the California Consumer Bill of Rights ("CBOR").[89]  This even-handed set of consumer protections applied to a broad spectrum of telecommunications providers; to use regulatory clichés, to a great extent the CBOR as originally adopted "leveled the playing field" and provided "regulatory parity" among providers in California.  It is exceeding unfortunate for the consumers of California that the California Public Utilities Commission inexplicably reversed course and suspended the effectiveness of the rules.[90]

Despite this, the CBOR remains a rational and reasonable set of protections for telecommunications consumers.  It deserves to be more widespread.  It is appropriate as a means to protect the customers of a merged SBC/AT&T against management's cost-cutting moves.

**As a condition of the approval of the SBC/AT&T merger, the merged firm should**

---

[89] Order Instituting Rulemaking on the Commission's Own Motion to Establish Consumer Rights and Consumer Protection Rules Applicable to All Telecommunications Utilities, Rulemaking 00-02-004, Order adopted May 27, 2004.  See http://www.dca.ca.gov/r_r/telecommunications_rights.htm and http://www.cpuc.ca.gov/PUBLISHED/NEWS_RELEASE/36910.htm .

[90] See "Telecom bill of rights suspended – for now" at http://www.consumerwatchdog.org/utilities/nw/nw004862.php3, Jeffrey Silva, RCR Wireless News, January 31, 2005; "Regulatory shift worries state consumer advocates" at http://www.thedesertsun.com/apps/pbcs.dll/article?Date=20050129&Category=NEWS10&ArtNo=501290321&SectionCat=topics&Template=printart, Terence Chea and Jennifer Coleman, Associated Press, January 29, 2005.

**be subject to the terms of the originally-adopted CBOR, for all of its operations -- wireline, wireless and broadband.  If the regulatory commission or other body within a state is unable to enforce such a condition, the Commission should retain enforcement jurisdiction.**

In the SBC/Ameritech merger, the Commission adopted service quality requirements for *wholesale* service.[91]  Without such requirements, the competition-enhancing condition discussed above under *1.* will likely see numerous problems.

**Condition VII of the SBC/Ameritech merger should be reinvigorated as a condition of the SBC/AT&T merger.**

The RBOCs (including SBC) have been involved in efforts to restrict municipalities and other governmental entities from investing in broadband networks that will be made available to consumers.[92]  A combined SBC/AT&T will have even more incentive and ability to participate in these anti-competitive efforts.  **As a condition of their merger, the Applicants should be required to commit not to participate in such efforts.**

*3.    Conditions to ensure consumer benefits*

In the SBC/Ameritech Order, the Commission adopted a condition that required that xDSL service be "fairly deployed" in urban (upper and lower income areas) and rural wire centers.[93]  That policy should be followed and expanded on here.

**The Commission should require as a condition of approval of this merger that the**

---

[91] Condition VII (see Attachment C).

[92] "Wi-Fi plan to face static," The Business Journal (Minneapolis/St. Paul), April 25, 2005 at http://twincities.bizjournals.com/twincities/stories/2005/04/25/story1.html?t=printable; "Verizon CEO sounds off on Wi-Fi, customer gripes," San Francisco Chronicle, April 16, 2005 at http://sfgate.com/cgi-bin/article.cgi?file=/chronicle/archive/2005/04/16/BUGJ1C9R091.DTL&type=business; "Is Low-Cost Wi-Fi Un-American?", In These Times, April 18, 2005 at http://www.inthesetimes.com/site/main/article/2071/.

[93] *SBC/Ameritech Order*, ¶ 376.

combined company provide broadband capabilities ubiquitously throughout the SBC territory within five years.

Further, despite the promises of increased efficiencies flowing from the SBC/Ameritech merger, it does not appear that the benefits of those efficiencies have flowed through to consumers. In Ohio, for example, SBC has used a local alternative regulation rule to impose a wide range of rate increases on optional services, evidently without much impact on subscription to those services.

**Flowing the benefits of merger synergies and cost-savings back to consumers should be a condition for the merger. Further, SBC should be required to show, at the end of 2008, that the merger produced $2 billion in savings per year.**

One condition of the SBC/Ameritech merger was the adoption throughout SBC territory of Lifeline plans that provided benefits comparable to the Lifeline plan adopted as part of alternative regulation in Ohio.[94] **That condition should be revived for this merger.**

### 4.    Conditions to realign the regulatory regime

As explained in detail in *Confronting Consolidation*, the impact of this merger on the competitive landscape would be such that resinstatement of many regulations to control market dominance must be considered. This would include

- de novo reviews of deregulation/detariffing/flexible pricing of "competitive" services;

- restoration of incentive regulation safeguards such as productivity offset factors and earnings sharing/capping;

- reinitialization of rates at "authorized" rates of return;

- imputation of earnings that benefit from joint BOC/affiliate activities (e.g., local/long

---

[94] Condition XXIII (see Attachment C).

distance).

       *5.      Enforcement*

The Commission determined that it would "utilize every available enforcement mechanism" to ensure that the benefits of the SBC/Ameritech merger conditions were realized.[95] The Commission will have to make that determination again.

SBC's track record on the conditions dictated in that merger is not encouraging.[96] Therefore, the Commission must adopt specific and effective enforcement mechanisms here. The enforcement mechanisms must be substantial enough that SBC will not make the calculation that it is cheaper -- or more desirable -- to pay the fine than comply with the condition. In the SBC/Ameritech merger, the Commission hinted that enforcement would include, "if necessary, revocation of the merged firms section 214 authority."[97] The Commission must make clear here that such a penalty is a real possibility, in order to give the merged company a real disincentive to not complying with the conditions.

NASUCA looks forward to reviewing the comments of other stakeholders for conditions that might be added to -- or might, perhaps, substitute for -- the conditions outlined here.

## VIII.  CONCLUSION

In the *SBC/Ameritech Order*, the Commission noted the reasons for the breakup of AT&T, which the SBC/Ameritech merger -- like the other SBC mergers and the mergers that led

---

[95] *SBC/Ameritech Order*, ¶ 360.

[96] See Attachment B.

[97] *SBC/Ameritech Order*, ¶ 360.

to the creation of Qwest and Verizon -- reversed in part:

> To put it simply, the Bell System was broken up because of two firmly held beliefs. One belief was that competition, rather than regulation, could best decide who would sell what telecommunications services at what prices to whom. The other belief was that the principal obstacles to realizing that competitive ideal were the incentive and ability of dominant local exchange carriers, who typically controlled virtually all local services within their regions, to wield exclusionary power against their rivals.[98]

The merger of SBC and AT&T will harm competition. And the combined SBC/AT&T will be able to raise substantial obstacles to other competitors by wielding their dominant market power in much of the Nation.

This merger will combine the second largest and the third largest firms in terms of total revenues.[99] Yet this merger must be reviewed in context with the proposed Verizon/MCI merger, which will combine the largest and the fourth largest firms.[100] The combinations will leave the next-largest firm with less than one-fourth the revenues of the smallest of the two industry giants. *Confronting Consolidation* is precisely the Commission's problem here.

For the reasons set forth here, the public interest harms of this merger far outweigh the speculative benefits alleged for the merger. As currently structured, the merger should not be approved. If the Commission adopts substantial enforceable conditions such as those outlined here, the public interest harms will be sufficiently limited and the public interest benefits will be adequately increased so as to make approval of this merger proper under the law.

Respectfully submitted,

_____

[98] *SBC/Ameritech Order*, ¶ 14.

[99] FCC Statistics of Common Carriers, 2003-2004, Tables 1.1 and 1.2.

[100] *Id.*

31

_____/s/ David C. Bergmann_____
Janine Migden-Ostrander
Consumers' Counsel
David C. Bergmann
Assistant Consumers' Counsel
Chair, NASUCA Telecommunications
Committee
Office of the Ohio Consumers' Counsel
10 West Broad Street, Suite 1800
Columbus, OH  43215-3485
Telephone: 614-466-8574
Facsimile:  614-466-8475

NASUCA
8380 Colesville Road, Suite 101
Silver Spring, MD 20910
Phone (301) 589-6313
Fax (301) 589-6380

32