**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| AT&T Inc. | ) | WC Docket No. 06-74 |
| | ) | |
| and | ) | |
| | ) | |
| BellSouth Corporation | ) | |
| | ) | |
| Application Pursuant to Section 214 of the | ) | |
| Communications Act of 1934 and Section | ) | |
| 63.04 of the Commission's Rules for Consent | ) | |
| to the Transfer of Control of BellSouth | ) | |
| Corporation to AT&T Inc. | ) | |

**COMMENTS OF**
**THE NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER**
**ADVOCATES**

AT&T Inc. ("AT&T") and BellSouth Corporation ("BellSouth") seek approval

from the Federal Communications Commission ("Commission") of AT&T's takeover of

BellSouth and its subsidiaries.  The National Association of State Utility Consumer

Advocates ("NASUCA")[1] submits that this merger does not serve the public interest,

convenience and necessity, as required by the governing statutes and this Commission's

---

[1]NASUCA is a voluntary association of 45 advocate offices in 42 states and the District of Columbia, incorporated in Florida as a non-profit corporation.  NASUCA's members are designated by laws of their respective jurisdictions to represent the interests of utility consumers before state and federal regulators and in the courts. See, e.g., Ohio Rev. Code Chapter 4911; 71 Pa. Cons. Stat. Ann. § 309-4(a); Md. Pub. Util. Code Ann. § 2-205(b); Minn. Stat. § 8.33; D.C. Code Ann. § 34-804(d).  Members operate independently from state utility commissions as advocates primarily for residential ratepayers.  Some NASUCA member offices are separately established advocate organizations while others are divisions of larger state agencies (*e.g.*, the state Attorney General's office).  NASUCA's associate and affiliate members also serve utility consumers but are not created by state law or do not have statewide authority.

rules.[2]  Nonetheless, NASUCA expects that the Commission will approve the merger, as

it has the other mergers over the last decade.

This merger would join AT&T, the Nation's largest local and long distance

carrier, with BellSouth, the third largest incumbent local exchange carrier ("ILEC").  It

also combines the two owners of the second-largest wireless carrier (Cingular).

Indeed, it is fair to say that the current proceeding is the inevitable result of this

series of merger approvals, beginning in 1996:

SBC + Pacific Telesis = SBC[3]

NYNEX + Bell Atlantic = Bell Atlantic[4]

SBC + SNET = SBC[5]

SBC + Ameritech = SBC[6]

Qwest + US West = Qwest[7]

---

[2] NASUCA's comments are submitted pursuant to the Public Notice filed on April 19, 2006 in this docket, DA 06-904.

[3] *Pacific Telesis Group and SBC Communications, Inc.*, Report No. LB-96-32, Memorandum Opinion and Order, 12 FCC Rcd 2624 (1996).

[4] *Applications of NYNEX Corporation Transferor, and Bell Atlantic Corporation Transferee, for Consent to Transfer Control of NYNEX Corporation and Its Subsidiaries*, File No. NSD-L-96-10, Memorandum Opinion and Order, 12 FCC Rcd 19985 (1997).

[5] *In the Matter of Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from Southern New England Telecommunications Corporation, Transferor to SBC Communications, Inc., Transferee*, CC Docket No. 98-25, Memorandum Opinion and Order, 13 FCC Rcd 21292 (1998).

[6] *In re Applications of Ameritech Corp. and SBC Communications Inc., for Consent to Transfer Control*, CC Docket No. 98-141, Memorandum Opinion and Order, 14 FCC Rcd 14712 (1999) ("*SBC/Ameritech Order*").

[7] *In the Matter of Qwest Communications International Inc. and US West, Inc., Applications for Transfer of Control of Domestic and International Sections 214 and 310 Authorizations and Application to Transfer Control of a Submarine Cable Landing License*, CC Docket No. 99-272, Memorandum Opinion and Order, 15 FCC Rcd. 5376 (2000).

Bell Atlantic + GTE = Verizon[8]

SBC + AT&T = AT&T[9]

Verizon + MCI = Verizon[10]

At the time of the breakup of the original AT&T, there were seven firms that owned most of the nation's local telecommunications infrastructure,[11] and there were two firms that owned most of the nation's long distance infrastructure.[12] When the AT&T/BellSouth merger is approved, these nine firms will have been reduced to three. The survivors at this point in time will be two mammoth corporations with substantial market power, AT&T and Verizon, and Qwest.

In each of these cases, the Commission has approved the merger, holding that the public interest would benefit. Few if any of these public interest benefits, such as cost savings and new services, have materialized. In some of the earlier cases, the Commission imposed conditions on the mergers; in the later cases, this strategy was pretty much abandoned. The benefits of the conditions were minimal and short-lived.

---

[8] *In re Application of GTE Corporation and Bell Atlantic Corporation for Consent to Transfer Control*, CC Docket No. 98-184, Memorandum Opinion and Order, 15 FCC Rcd 14032 (2000) ("*BA/GTE Order*").

[9] *In the Matter of AT&T Corp. and SBC Communications Inc., Application Pursuant to Section 214 of the Communications Act of 1934 and Section 63.04 of the Commission's Rules for Consent to the Transfer of Control of AT&T Corp. to SBC Communications, Inc.*, WC Docket No. 05-65, Memorandum Opinion and Order, 20 FCC Rcd 18290 (2006).

[10] *In the Matter of Application for Transfer of Control Filed by Verizon Communications, Inc. and MCI, Inc.*, WC Docket No. 05-65, Memorandum Opinion and Order, 20 FCC Rcd 18433 (2006).

[11] The regional bell operating companies ("RBOCs") were Ameritech, Bell Atlantic, BellSouth, NYNEX, Pacific Telesis, Southwestern Bell and US West.

[12] AT&T and MCI.

As a result of a concatenation of events -- many of them Commission-initiated[13] --

the competitive environment that was anticipated and nourished in the SBC/Ameritech[14]

and Bell Atlantic/GTE[15] mergers has been choked almost out of existence.  Then the

SBC/AT&T and Verizon/MCI mergers further limited competition.  Now we are left with

complements like wireless and voice over Internet protocol that are supposed to represent

so-called "intermodal" alternatives, yet in which the mega-corporations have a large

stake.  That is particularly evident here:  The merger of AT&T and BellSouth will result

in a single firm owning Cingular Wireless.  The supposed threat of competition from

cable companies (for telecommunications services) is constrained by cable's limited

geographic reach, especially crucial in rural areas.[16]

**CONCLUSION**

In the *SBC/Ameritech Order*, the Commission noted the reasons for the breakup

of AT&T, which the SBC/Ameritech merger -- like the other SBC mergers and the

mergers that led to the creation of Qwest and Verizon -- reversed in part:

> To put it simply, the Bell System was broken up because of two

---

[13] *In the Matter of Unbundled Access to Network Elements, WC Docket No. 04-313, Review of the Section 271 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Report and Order and Order on Remand, FCC 03-36, 18 FCC Rcd 16978 (2003), rev'd *United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004); id., Order on Remand, 20 FCC Rcd 2533 (2005); *In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*, WC Docket No. 03-173, Notice of Proposed Rulemaking, 18 FCC Rcd 18945 (2003).

[14] *SBC/Ameritech Order*, ¶¶ 148-166.

[15] *BA/GTE Order*, ¶¶ 260-323.

[16] Of course, the RBOCs are moving full speed ahead to compete with the cable companies for video services.

firmly held beliefs.  One belief was that competition, rather than regulation, could best decide who would sell what telecommunications services at what prices to whom.  The other belief was that the principal obstacles to realizing that competitive ideal were the incentive and ability of dominant local exchange carriers, who typically controlled virtually all local services within their regions, to wield exclusionary power against their rivals.[17]

The mergers approved by the Commission have actually harmed wireline competition and the prospects for consumer benefits that competition could bring.  And the combined companies also wield significant market power in the intermodal markets that have sprung up as a result.  This merger should not be approved.  But then again, at least in retrospect, none of the mergers of the RBOCs should have been approved.

Respectfully submitted,

_____
Charles A. Acquard
Executive Director

NASUCA
8380 Colesville Road, Suite 101
Silver Spring, MD 20910
Phone (301) 589-6313
Fax (301) 589-6380

---

[17] *SBC/Ameritech Order*, ¶ 14.