IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SBC Communications, Inc. and )<br>AT&T Corp., )<br>)<br>)<br>)<br>)<br>Defendants. )<br>)<br>) | Civil Action No. 1:05CV02102 (EGS)<br><br>**MICHAEL LOVERN, SR. ET AL<br>(INTERVENOR / AMICUS CURIAE)<br>MOTION FOR RECONSIDERATION,<br>Rule 60 (b) F.R.Civ. P., of COURT'S<br>SCHEDULING ORDER DATED<br>JULY 7, 2006** |
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>Verizon Communications Inc. and )<br>MCI, Inc., )<br>)<br>Defendants. ) | Civil Action No.: 1:05CV02103 (EGS) |

**RECEIVED**

JUL 1~~~~ 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

**MICHAEL LOVERN, Sr. et al's, MOTION FOR RECONSIDERATION OF
COURT'S SCHEDULING ORDER DATED JULY, 7, 2006, PURSUANT TO
RULE 60 (b), F.R.Civ.P.**

**TO: ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN:**

The undersigned, Michael Lovern, Sr., et al (Intervenor / Amicus Curiae)

(Lovern) respectfully submits this Motion For Reconsideration under Rule 60 (b)(1) &

(6), F.R.Civ.P., Rule 24(a) & (b); and, the Tunney Act, Sherman Act, and Clayton Act.

Lovern, respectfully asks the Court to reconsider its decision to not allow Lovern to address the Court, regarding his personal financial claims, and his claims as a Consumer, on July 12, 2006, at the upcoming hearing, the same as Comptel and ACTel. Lovern has met the court's requirements as an Intervenor under Rule 24(a), and as an Amici under Rule 24(b), Federal Rules of Civil Procedure.

> **"the Tunney Act does not distinguish between pre- and post-trial consent decrees; the Act simply requires the district court, '[b]efore entering any consent judgment' in a Government antitrust case, to 'determine that the entry of such judgment is in the public interest.'" 15 U.S.C. § 16(e).**

Who is the public in this case? Is it the Department of Justice, or is it Lovern in his dual capacity as a member of the general public and representing his personal business financial claims? The answer is both, however, DOJ is not properly representing the general public's interest in competition, anti-competitive behavior, and monopolistic conduct relating to the Intercompany Settlement System, only Lovern is doing such. So, why is Lovern being denied the right to argue his rights as they apply to this case?

His Honor has asked the question in his July 7, 2006, Order;

"(8) Through the eyes of a layperson, the mergers, in and of themselves, appear to be against public interest given the apparent loss in competition. In layperson's terms, why isn't that the case?"

It is the case, yet, who is going to address this for the public as it relates to the Intercompany Settlement System (ISS)? DOJ admitted they intentionally didn't bring up

the anti-competitive issues surrounding the ISS, and that doesn't represent the PUBLIC,

or the public's interest. No one is more qualified than Lovern, in his capacity as a

CONSUMER, member of the PUBLIC and Industry expert on the ISS, to address the

competition issues surrounding the ISS. Granted the lawyers for DOJ, SBC, and AT&T

will be at a severe disadvantage trying to respond to the "layperson" in this case

regarding the ISS, but should that dictate how the public gets to protect their interest?

Isn't this case about "public interest," not "corporate interest?"

In UNITED STATES v. DU PONT & CO., 366 U.S. 316 (1961) the Court said;

**"Divestiture or dissolution must take account of the present and future conditions in the particular industry as well as past violations. It serves several functions: (1) It puts an end to the combination or conspiracy when that is itself the violation. (2) It [366 U.S. 316, 366] deprives the antitrust defendants of the benefits of their conspiracy. (3) It is designed to break up or render impotent the monopoly power which violates the Act. . . . 12**

*[ Footnote 12 ] For a similar statement see United States v. Minnesota Mining & Mfg. Co., 96 F. Supp. 356, 357.*

> *'In general the object of the remedies under the anti-trust laws is to prevent the continuance of wrongful conduct, and to deprive the wrongdoers of the fruits of their unlawful conduct, and to prevent the creation anew of restraint forbidden by law. . . .'"*

This Court is independently obliged both to evaluate the proposed final order

under the standards of Section 4 of the Sherman Act, *see United States v. Microsoft,* 56

F.3d 1448, 1461 (D.C. Cir. 1995), and, to impose a remedy designed to prevent the

continuance of wrongful conduct associated with the ISS.

(3)

Lovern, intervened in this case under his guaranteed right pursuant to Rule 24(a) F.R.Civ.P., and is entitled to party status, based on his personal, significant, financial interests, which will be severely compromised if this merger is allowed to go forward as requested by DOJ.

"[a] party has the right to judicial resolution of disputed facts not just as to the liability phase, but also as to appropriate relief." *United States v. Microsoft*, 253 F.3d at 101.

The Court of Appeals remanded to the District Court "with instructions to conduct a remedies-specific evidentiary hearing," *id.* at 103, and fashion an injunction that "unfetter[s] [the] market from anticompetitive conduct, . . . terminate[s] the illegal monopoly, den[ies] to the defendant the fruits of its statutory violation, and ensure[s] that there remain no practices likely to result in monopolization in the future," *id.*

**Section 4. Jurisdiction of courts; duty of United States attorneys; procedure**

**"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title;"**

Give Lovern and the Public their day in court just like all the other interested Parties. Just because DOJ, SBC/AT&T, and Verizon are afraid of what will come out in an open hearing is not legal justification to deny Lovern his opportunity to be heard. Lovern has met the requirement to be a party. He will be in the courtroom sitting with all the other attorneys, unless the Judge changes his mind and asks him to sit in the gallery. AT&T, DOJ, nor Verizon denied the allegations of wrongdoing/illegal conduct associated with the ISS pled by Lovern, so why not give the Public the right to hear the

(4)

truth? Denying Lovern the right to be heard only creates more problems, it does not protect the public's interest, nor does it afford Lovern his protected rights regarding his claims.

Over and above Lovern's personal financial claims, the general public has been defrauded out of Hundreds of Billions of Dollars. AT&T's Competitors were defrauded out of Hundreds of Billions of Dollars. Local, State, & Federal Government Agencies were defrauded out of Billions of Dollars.

MCI Shareholders were not properly informed as to the amount of money MCI was defrauded out of over the years associated with the ISS, nor the liability Verizon is facing due to its role in the racketeering enterprise, nor was AT&T Shareholders informed of the massive liability facing SBC, and this brings us to the Securities Fraud, Sarbanes Oxley, and a second on-going conspiracy, which this Court cannot overlook; and, without a complete and thorough airing of the issues surrounding the ISS, shareholders of SBC, AT&T, Verizon, MCI et al will once again be in the dark, and that is 100% wrong, and in violation of securities law[s].

Former and current management/lawyers at SBC Communications, Inc. (SBC), AT&T Corp (AT&T), and Verizon Communications, Inc. (Verizon) (hereinafter referred to as "Companies"), et al, with the aid of outside lawyers, conspired in a scheme to defraud shareholders and the public stock market as to the liability of their respective

company[s]. The Companies, and their Audit Committees were put on formal written notice by Lovern on October 24, 2004. The enormous joint & several liability [**All Claims available to all victims over and above Lovern is in excess of One Trillion Dollars**] is undeniably an <u>**uncertainty**</u> that will have an <u>**unfavorable impact on…continuing operations**</u>. The overwhelming physical evidence in Lovern's possession proves his claims, and everyone else's claims, beyond a reasonable doubt, which is way beyond the standard in a civil trial, but an important factor in a criminal trial. Not one piece of required disclosure can be found by Lovern in a single SEC filing by any of the Companies, to include AT&T's [a.k.a. SBC] 8 K regarding $1.5 Billion in *floating notes* filed 3 days after receiving Lovern's brief in this case. From **FORM 8-K CURRENT REPORT - Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, Date of report (Date of earliest event reported) <u>May 18, 2006 - AT&T INC., pg. 5 (k)</u>:**

> "**(k) Except as described in the General Disclosure Package, there is no material litigation or governmental proceeding pending or, to the knowledge of the Company, threatened against the Company or any of its subsidiaries which is Reasonably expected to result in any material adverse change in the financial condition, results of operations, business or prospects of the Company and its subsidiaries taken as a whole or which is required to be disclosed in the General Disclosure Package.**" [Note: There is nothing in the "General Disclosure Package that addresses this alleged liability].

This by itself is a violation of legal disclosure requirements, and a perfect example of AT&T's belief that this Court would **<u>rubber stamp the merger</u>**. *"no material litigation or governmental proceeding pending or, to the knowledge of the Company, threatened against the Company or any of its subsidiaries which is reasonably expected to result in any*

*material adverse change in the financial condition, results of operations, business or prospects of the Company and its subsidiaries taken as a whole…"* – **AT&T must have thought they had His Honor in their pocket.**

The New York Stock Exchange (NYSE) was given this information by Lovern after May 18, 2006, as they have jurisdiction over their Members who sold the AT&T [a.k.a. SBC] $1.5 Billion in "Floating Notes," yet the NYSE, which is also a public stock company, did nothing even though the Notes are fraudulent as they did not provide investors proper disclosure.

**(1)… 17 C.F.R. Ch. II, 229.303 states in (3) (ii);**

> **"Describe any known trends or <u>uncertainties</u> that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." [underline added for emphasis].**

The key word is uncertainties.

Commentary to 303 (a) 3 states;

> **"The discussion and analysis shall focus specifically on material events and <u>uncertainties</u> known to management that would cause reported financial information <u>not</u> to be necessarily indicative of future operating results or of future financial condition."**

Commentary to 303 (a) 3 cont-

> **"This would include descriptions and amounts of (A) matters that would have an <u>impact</u> on future operations and have not had an impact in the past,…" [underline added for emphasis].**

Again the key word is uncertainties, with further inference on not and impact.

(7)

For uncertainties to be eliminated from disclosure to public stockholders one must conclude that the legal claims filed by Lovern in this Case are certain not to materialize. No one, especially Management from the Companies, can make that claim considering the Companies et al violated Judge Greene's Modified Final Judgment (MFJ) and federal antitrust laws, overcharging Consumers Hundreds of Billions of Dollars, plus, stealing Hundreds of Billions of Dollars from AT&T's Competitors, et al, in conjunction with the billing & collection of long distance via the LEC [Local Exchange Carrier] Bill. The Conspiracy is still ongoing as we speak and the overt acts in furtherance of it never stopped. These claims can not only change the bottom line of these Companies et al, it can **bankrupt** them, and the public has a right to know. Civil lawsuits do not have to be filed with the court for disclosure to be mandatory under 303, only 103. Under 303 it's only a question of whether Management knows about the allegations.

> **"...issue of materiality is a mixed question of law and fact that is generally for the jury." In Re Par Pharmaceutical, Inc. Securities Lit.,** 733 F. Supp. at 677, quoting **TSC Industries, Inc. v. Northway, Inc.,** 426 U.S. at 450, 96 S. Ct. at 2132.

Information is material if **"...a reasonable investor might have considered [it] important in the making of [the investment] decision." Affiliated Ute Citizens of Utah v. United States,** 406 U.S. 128, 153-54; **Cook v. Avien,** 573 F. 2d 685, 693. In the case of **Roeder v. Alpha Industries, Inc.,** 814 F. 2d 22, 25, the court said;

> **"...we conclude that reasonable investors might have considered defendants' alleged illegal conduct to be important information they would want to have before they made investment decisions."**

(8)

"Investors may prefer to steer away from an enterprise that circumvents fair competitive bidding and opens itself to accusations of misconduct. Furthermore, regardless of financial motives, investors may not want to associate themselves with such an enterprise." *Roeder Id.*

"The securities laws do not operate under the assumption that material information need not be disclosed if management has reason to suppress it. Investors may want to know about illegal activity for the same reason management will be reluctant to reveal it: it threatens to damage the corporation severely. Excepting from the disclosure rules information management has reason to hide would eviscerate the protection for investors embodied in the securities laws." *Roeder Id.*

Most important court quote, *" Information is material if, a reasonable investor might have considered [it] important in the making of [the investment] decision."* *Roeder* citing - **Affiliated Ute Citizens of Utah, supra. [U.S. Supreme Court].**

Lovern concedes that the Companies [et al] in question are not required to disclose the legal theories as to the many different causes of action; however, there is no doubt about the uncertainty of the alleged liability, [it] is not unsubstantiated as Lovern has undeniable evidence in the form of the Companies et al secret internal documents where they discuss how they're going to <u>launder</u> the stolen money, which clearly proves the allegations and, it will result in anything but "...routine litigation," plus, and most important, the <u>**Companies in this case have not even denied the allegations in this Court proceeding**</u>. Lovern even has interviewed future witnesses who participated in secret meetings in St. Louis where the Companies et al discussed how they were going to circumvent Judge Green's MFJ in the billing & collection of AT&T's toll calls. Lovern

has interview future witnesses who actually participated in the actual violation[s] themselves, those parties having been told by respective management at the time that everything going on was legal but not to say anything.

Therefore, the alleged liability being referred to should have been disclosed so the investors can decide for themselves. *"Reasonable investors might consider the information important."* The *Ute Citizens of Utah* case opinion requires disclosure.

**(2)... Aiding & Abetting By Third Parties:  Disclosure requirements**

One of the things this Court needs to consider is the disclosure requirements of outside attorneys and third parties in conjunction with the securities laws. As you know, there are an abundance of outside lawyers / third parties directly involved with the public companies in question - specifically pertaining to the disclosure issue under **17 CFR 229.303** in dispute. The Companies' lawyers have made the same mistakes that former White House lawyers made when they took the position that they represented the President and First Lady [Clintons'] instead of the American People. Companies' lawyers in this case have made that same mistake by taking the position that they represent management/lawyers instead of the shareholders.

The types of frauds prohibited under the securities laws are less rigid than the standards established by common law. Examples: **Lerman v. Tenney, 295 F. Supp. 780; U.S. v. Prey, 452 F. Supp. 788; Miller v. Steinbach, 268 F. Supp. 255.** In the

current dispute certain lawyers for Companies, Qwest, Bellsouth (BS), Cincinnati Bell

(CB), et al, have become Aiders and Abettors.

> "Where a person or business entity knowingly gives aid
> and assistance to a securities fraud perpetrated by
> another, the regulatory or deterrent purpose of the
> securities laws will be best served by allowing persons
> injured by the wrongs to get relief from the aiders and
> abettors, as well as the wrongdoers."

**In re Equity Funding Corp. of America Securities Litigation,** 416 F. Supp. 161.

Many times third parties have a disclosure requirement under the securities laws

the same as management. **See Hochfelder v. Earnst & Earnst,** 503 F. 2d 1100;

**Hochfelder v. Midwest Stock Exchange,** 503 F. 2d 364; **Kerbs v. Fall River**

**Industries, Inc.,** 502 F. 2d 731; **Strong v. France,** 474 F. 2d 747. Third parties can

easily become parties to derivative actions for failure to disclose to the shareholders.

What's really scary is the number of **"Officers of The Court"** that are involved in

aiding and abetting securities fraud connected to this matter. There is a fiduciary

relationship of trust and confidence between outside lawyers working for the company[s]

and the shareholders. The United States Supreme Court has decreed that under the federal

securities laws, a duty to disclose; ... " **arises from the relationship between parties."**

**Dirks v. SEC,** 463 U.S. 646, 658; and, it will exist if there is ... **"fiduciary or other**

**similar relation of trust or confidence between them." Chiarella v. United States,**

445 U.S. 222, 228; See **Schatz v. Rosenberg,** 943 F. 2d 485 (4th Cir. 1991).

(11)

It is well established that the **"Right of Contribution"** for violations of the federal securities laws exists among **"Joint Tortfeasors." See <u>Greene v. Emerson, Ltd.,</u> 102 F.R.D. 33, 36, (S.D.N.Y.), aff'd. sub nom; <u>Kenneth Leventhal & Co. v. Joyner Wholesale Co.,</u> 736 F. 2d 29; See also, <u>Tucker,</u> 646 F. 2d 727; and, <u>In Re Leslie Fay Companies, Inc. Securities Litigation,</u> 918 F. Supp. 749.**

I hope this Court will take into consideration that not only has the PUBLIC been duped and kept in the dark regarding illegal conduct surrounding the ISS, but SHAREHOLDERS of the Companies [Public Stock Companies] have been kept in the dark about the liability connected to that illegal conduct, and here we are once again in a <u>public courtroom</u> and the public, in a public interest hearing, is going to be kept in the dark some more. This is wrong. The only actual member of the public participating is Lovern, and he is not going to be allowed to address the Court on July 12, 2006, even though he will be there, and has met the court's legal requirements to intervene.

Under Sarbanes-Oxley and Rule 10A-3, **"REASONABLE INVESTORS HAVE THE RIGHT TO CONSIDER ALLEGED ILLEGAL CONDUCT BEFORE MAKING INVESTMENT DECISIONS."** *Roeder supra.* The court said *alleged*, NOT *proven.* SBC, AT&T, and Verizon have all <u>committed securities fraud</u> already in conjunction with the allegations of wrongdoing connected to the ISS, pled in Lovern's brief. If these mergers go forward as planned, the claims of everyone, Lovern and Shareholders included, will be compromised.

(12)

Even though several federal district courts have held that there is no private right of action under Item 303, a properly pled case alleging common law fraud and negligent misrepresentation in conjunction with the Defendants disclosure duty under Rule 10b-5 will suffice.

**The determination of what needs to be disclosed often depends on the materiality standard.** SEC Rule 12b-2 states that, "The term 'material,' when used to qualify a requirement for furnishing information as to any subject, limits the information required to those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to buy or sell the securities registered." With respect to misstatements or failures to disclose, relevant factors for the determination of materiality include the following:

• Whether the misstatement masks a change in earnings or other trends;
• Whether the misstatement turns a loss into income or vice versa;
• Whether the misstatement masks a failure to meet analysts' projections;
• Whether the misstatement hides an illegal activity, etc."

The mixing of qualitative and quantitative factors can result in a numerically insignificant matter being considered by the SEC and the courts to be material. In light of higher standards of accountability and the greater consequences of noncompliance, companies should always err on the side of accurate and full disclosure.

Especially post ENRON, the SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make,

prompt disclosure of significant corporate developments." SEC Release No. 18271, 1981

SEC LEXIS 292, at *13 (Nov. 19, 1981). Furthermore, under Items 303(a) and 303(b) of

Regulation S-K, promulgated by the SEC under the Exchange Act, there is a duty to

disclose in annual and periodic reports filed with the SEC "known trends or any known

demands, commitments, events or uncertainties" that are reasonably likely to have a

material impact on a company's sales revenues, income or liquidity, or cause previously

reported financial information not to be indicative of future operating results. 17 C.F.R.

§229.303(a)(1)-(3) and Instruction 3. While a company is not required to make

predictions about its future performance in its public records pursuant to Item 303 of

Regulation S-K, the SEC explicitly distinguishes predictions from presently known <u>data</u>

which will impact upon future operating results, which the SEC <u>does</u> require to be

disclosed if material. See, e.g., In re Caterpillar, Inc., SEC Release No. 30532, 1992 SEC

LEXIS 786, at *15 (Mar. 31, 1992) (a company must provide sufficient information to

permit investors to see the company "through the eyes of management").

     The SEC has repeatedly stated that the anti-fraud provisions of the federal

securities laws, which are intended to ensure that the investing public is provided with

"complete and accurate information about companies whose securities are publicly

traded," apply to all public statements by persons speaking on behalf of publicly traded

companies "that can reasonably be expected to reach investors and the trading markets,

whoever the intended primary audience." SEC Release No.33-6504, 1984 SEC LEXIS 2559, at *2 (Jan. 13, 1984).

Not only does Rule 10b-5 forbid the making of "any untrue statement of a material fact," it also provides for **scheme liability**. Scheme liability is authorized by the text of §10(b). According to the Supreme Court, §10(b)'s prohibition of "any manipulative or deceptive device or contrivance" necessarily encompasses any "scheme to defraud." In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185(1976), the Court referred to the dictionary definitions of §10(b)'s words to find that a "device" is ' "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice.' " Id. at 199 n.20 (quoting Webster's International Dictionary (2d ed. 1934)). The Court found that a "contrivance" means ' "a scheme, plan, or artifice.'" Id. (quoting Webster's International Dictionary (2d ed. 1934)); see also Aaron v. SEC,446 U.S. 680, 696 n.13 (1980).

Clearly, "scheme" is encompassed in the broad language of §10(b). Thus Rule 10b-5 – adopted by the SEC to implement §10(b) – makes it unlawful for any person "directly or indirectly" to employ "any device, scheme, or artifice to defraud," "[t]o make any untrue statement[s]," or to "engage in any act, practice, or course of business which operates... as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5. [See also U.S. Quest, Ltd. v. Kimmons, 228 F.3d 399, 407 (5th Cir. 2000)].

(15)

Liability to the corporation for a loss may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss. Cases arising whereby ("an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss") do not afford directors the protection of the business judgment rule because in such cases the directors did not exercise any judgment. Such cases could potentially involve the directors' failure to adequately supervise the affairs of the corporation. In proposed rules relating to audit committees and other Sarbanes-Oxley Act issues, the New York Stock Exchange observed that "[w]hile it is not the audit committee's responsibility to certify the company's financial statements or to guarantee the auditor's report, the committee stands at the crucial intersection of management, independent auditors, internal auditors and the board of directors."

Audit committee members continue to have fiduciary duties to the company and its shareholders, which include the duty of care, the duty of loyalty, and the duty to make informed judgments. The business judgment rule (BJR) is a defense available in litigation to shield directors from breach of fiduciary claims provided that, among other things, directors make informed, rational decisions. Whether audit committee members can successfully defend a claim for breach of duty to make informed judgments will depend upon whether they fully <u>considered</u> all material information reasonably available to them before making a decision [see *Smith v. Van Gorkam*, 488 A.2d 858 (1985)]. Thus, audit

(16)

committees must be able to probe for reliable and relevant information, which means they must meet with me and consider the information that has been sent to the Board in relation to the upcoming disclosure [Public Report] of the Missouri PSC. This is why you, the Audit Committee, has no choice but to meet with me on this issue.

Audit committee members are subject to actions by the SEC under the Securities and Exchange Act of 1934, which grants the SEC broad enforcement powers, increases the maximum penalties for existing crimes, and creates new federal crimes, such as banning any director or officer of an issuer of securities from taking any action to fraudulently influence, coerce, manipulate, or mislead an accountant engaged in the performance of an audit for the purpose of rendering such financial statements materially misleading.

Section 10(b) of the 1934 Act also lowers the threshold for the SEC to ban a person from serving as a director or officer upon a finding that such person demonstrates "unfitness" to serve as an officer or director. The SEC also has the power to ban a person from serving as a director or officer in a cease-and-desist proceeding if such person demonstrates unfitness. The Companies' Audit Committees are in a no win situation as they have intentionally covered up the legal issues surrounding the ISS. Lovern asks this Court not to allow SBC, AT&T, Verizon and MCI to once again hide from the Public, which includes the respective Shareholders, the truth surrounding illegal conduct connected to the ISS, and the resulting anti-competitive environment it creates for the general public, and, most important the **liability** already facing these parties.

(17)

**Judge Greene's Modification of Final Judgment:**

Section II – BOC Requirements:

> "Subject to Appendix B each BOC shall provide to all interexchange
> carriers and information service providers exchange access, information
> access, and exchange services for such access on an unbundled, tariffed
> basis, that is equal in **type, quality, and price** to that provided to AT&T and
> its Affiliates." [underline added for emphasis].

Appendix B:

> "Nothing in this Modification of Final Judgment shall be construed to
> permit a BOC to refuse to provide to any interexchange carrier or
> information service provider, upon bona fide request, exchange or
> information access superior or inferior in type and quality to that
> provided for AT&T's interexchange services or information services
> at charges reflecting the reduced or increased cost of such access."

The reason Judge Greene required AT&T to divest themselves of the ISS is that to

allow AT&T to continue to control the ISS violated antitrust law[s]. This Court, via

Judge Greene, has already established that if AT&T controls the ISS it's a violation of

U.S. antitrust law, and, to provide AT&T any **"exchange access, information access,**

**and exchange services"** that are NOT EQUAL in **"type, quality, and price to that**

**provided AT&T and its Affiliates,"** also violates antitrust law[s].

## CONCLUSION

At a minimum, Intervenor Lovern, in his capacity as a Consumer, raises important

questions about what effects the Proposed Final Judgment (PFJ) will have on the many

consumer and competitor actions yet to be filed against the Companies, MCI

Management, Qwest, CB, BS, et al in courts around the country. The public interest demands that these questions be answered now, by this court, before judgment is entered. *See Security Insurance Co. v. Schipporeit, Inc.,* 69 F.3d 1377, 1381 (7th Cir. 1995) – ("Perhaps the most obvious benefits of intervention in general are the efficiency and consistency that result from resolving related issues in a single proceeding"); 15 U.S.C. §16(f)(3) (in making its public interest determination, the court may "authorize . . . participation . . . by interested persons, including . . . intervention as a party"). Accordingly, Lovern has standing to intervene as a Consumer.

Intervention is also appropriate because Lovern's personal financial interests are not "adequately represented" by the Companies or the Department of Justice. *See* Fed. R. Civ. P. 24(a). AT&T / SBC and DOJ, in fact, have agreed with each other to extinguish Lovern's interests. Finally, with the period for objecting to the PFJ still open, this Motion is timely. *See Twelve John Does v. District of Columbia*, 117 F.3d 571 (D.C. Cir. 1997). Should the Court deny Lovern the right to participate in the hearings by not allowing him to address his claims in open court on July 12, 2006, and at any future hearings,  would be a miscarriage of justice, and certainly not in the "Public's Interest" and this is a public interest case first an foremost.

The Tunney Act, sections 5(b)-(h), which applies *before* any testimony is taken, makes both the record of proceedings and the competitive impact statements required to

be filed under the Act inadmissible against defendants in future antitrust actions. 15

U.S.C. §16(h). Together, sections (a) and (h) thus encourage early settlement. AT&T,

SBC, Verizon et al, have refused to settle Lovern's claims on the hopes this Court will

not allow them to be aired out. The D.C. Circuit has declared that 5(a) must override "the

mere appendage" of a nonliability clause to an antitrust agreement entered after trial has

begun. *Southern Pacific Comms. Co. v. AT&T*, 740 F.2d 1011, 1022 (D.C. Cir. 1984).

Furthermore, consent decrees cannot "limit nonparty rights that would otherwise prevail."

*United States v. Bleznak*, 153 F.3d 16, 19 (2d Cir. 1998); *Firefighters Local 93 v.*

*Cleveland*, 478 U.S. 501, 521 (1986); *see also Parklane Hosiery Co. v. Shore*, 439 U.S.

322 (1979). SBC, AT&T, Verizon, nor DOJ have denied Lovern's claims, nor has MCI

denied having knowledge of the legal issues and how they might impact MCI

Shareholders, or MCI Shareholders' votes as to the merger had they known.

   To silence Lovern in this proceeding would not only be illegal, but a serious blow

to protecting the public's interest. His claims of antitrust violations not raised by DOJ,

affects every single member of the Public. How is that not worth the Court's time?

Lovern has no equal as to knowledge of the ISS and its anticompetitive nature and use by

the Companies et al, so how is He not helpful to the Court?

   Even if this court *could* vacate Judge Greene's MFJ findings and conclusions, or

even if the Court's position is that the 1996 Communications Act made the MFJ moot, it

didn't make the antitrust violations connected to the ISS moot. If AT&T is allowed to

control the ISS again by virtue of this merger, all the antitrust issues associated with and connected to Judge Greene's attempt to remedy, go down the toilet. Where does that leave the PUBLIC?

Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), which preceded and survived the passage of the Tunney Act, 15 U.S.C. §§ 16 (b)-(h), makes any final judgment or decree rendered in a civil case brought by the United States "to the effect that a defendant has violated [the antitrust] laws . . . *prima facie* evidence against [that] defendant in any action or proceeding brought by any other party against the same defendant under [the antitrust] laws . . .." At the same time Congress provided in section 5(i) for the statute of limitations to be suspended "in respect of every private or State right of action" during the pendency of a government action based on the same facts. 15 U.S.C. § 16(i). The purpose of these tandem statutory provisions was "to stimulate private antitrust suits and aid . . . private suitors," *New Jersey Wood Finishing Co. v. Minnesota Min. & Mfg. Co.*, 332 F.2d 346, 354 (3d Cir. 1964), "by making available to them all matters previously established by the Government in antitrust actions" and then "vouchsaf[ing] the intended benefits of related government proceedings by suspending the running of the statute of limitations." *Minnesota Min. & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 317, 318 (1965), *aff'd* 332 F.2d 346 (3d Cir. 1964) (citations omitted).

The aid to private litigants conferred by sections 5(a) and 5(i) offers an incentive for defendants who settle early. The evidentiary weight assigned by section 5(a) does

(21)

"not apply to consent judgments or decrees entered before any testimony has been taken."
15 U.S.C. § 16(a). AT&T, SBC, Verizon et al, have made no effort to settle the dispute
between themselves and Lovern, and DOJ wants Lovern to go away because former DOJ
Antitrust Officials who covered-up these claims have been immensely, personally,
enriched by specific Parties to this case after having left government service. MCI wants
Lovern to go away because they don't want to explain to their shareholders why MCI
Management didn't disclose all this prior to the merger being voted on. And last, but very
important, that leaves us with the Securities Fraud. How is the Court going to justify that
situation? Allowing Lovern the right to address the Court solves the problem.

   **THEREFORE**, for all the reasons stated above, Intervenor / Amici, Lovern,
requests this Court to modify it's scheduling order for July 12, 2006, and allow Lovern to
address the Court the same as Comptel and ACTel.

                              Respectfully submitted,

                              Michael Lovern, Sr.
                              3713 Parke Drive
                              Edgewater, MD 21037
                              (206)-202-9074
                              pratgen@myway.com

American TeleDial Corp. &
National Teleprocessing, Inc.

By: Michael Lovern, Sr.
3713 Parke Drive
Edgewater, MD 21037
(206)-202-9074
pratgen@myway.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of July, 2006, copies of the foregoing Motion For Reconsideration were e-mailed to the Following Parties:

Lawrence M. Frankel (D.C. Bar No. 441532)
Matthew C. Hammond
Telecom & Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States

FOR DEFENDANT
SBC COMMUNICATIONS, INC. & AT&T

Wm. Randolph Smith (D.C. Bar No. 356402)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2700

FOR VERIZON COMMUNICATIONS, INC. & MCI

Toby Vic, McGuire Woods
One James Center
901 East Cary Street
Richmond, VA 23219-4030

Michael Lovern, Sr., et al
3713 Parke Drive
Edgewater, Maryland 21037
(206)-202-9074
pratgen@myway.com

July 11, 2006

(23)