## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

United States of America,

           Plaintiff,

    v.

SBC Communications, Inc. and
AT&T Corp.,

           Defendants.

Civil Action No.:  1:05CV02102 (EGS)

**<u>FILED UNDER SEAL</u>**
**<u>PURSUANT TO PROTECTIVE ORDER</u>**
**<u>ENTERED AUGUST 4, 2006</u>**

## REDACTED FOR
## PUBLIC INSPECTION

United States of America,

           Plaintiff,

    v.

Verizon Communications Inc. and
MCI, Inc.,

           Defendants.

Civil Action No.: 1:05CV02103 (EGS)

## UNITED STATES' SUBMISSION IN RESPONSE TO THE
## COURT'S MINUTE ORDER OF JULY 25, 2006

Pursuant to the Court's Minute Order of July 25, 2006, the United States submits the

attached materials to assist the Court in determining that entry of the proposed Final Judgments in

these matters is in the public interest. The submission consists of the Declaration of W. Robert

Majure, Chief of the Antitrust Division's Competition Policy Section, and supporting materials,

including maps, data submissions, business records, and other materials obtained from the parties

and other market participants. Dr. Majure explains the harm alleged in the Complaints and how

the remedies address the harm. The Court should find that this Submission, including the Declaration and supporting materials, provides ample support for the Court to find that the remedies negotiated and proposed by the United States are in the public interest. The accompanying Declaration of Jared A. Hughes, Staff Attorney, Department of Justice, provides an index to the supporting materials and their sources.

I.    The Scope and Nature of the Materials Provided

In inviting this submission, the Court left the volume and types of materials to be submitted to the discretion of the United States.[1] The Court, however, explained that it was not interested in reviewing all of the materials that informed the United States' decision about the underlying transactions or the proposed remedies.[2] This limitation is entirely consistent with the Court's critical yet limited role under the Tunney Act.

The likely competitive effects of an underlying transaction or of a proposed divestiture are rarely evident from a few "smoking gun" documents.[3] Rather, as the United States detailed during the July 12 hearing, its analysis was informed by a lengthy investigation during which Antitrust Division attorneys and economists immersed themselves in the facts of the industry – reviewing

---

[1] Status Conf. Hr'g Tr. at 10-11, July 25, 2006.

[2] *Id.* at 9-10.

[3] *See* Declaration of W. Robert Majure (Aug. 7, 2006) ("Majure Decl."), ¶ 5. In these matters, there were no "materials and documents which the United States considered determinative in formulating" the proposed decrees. 15 U.S.C. § 16(b); *see also Mass. School of Law at Andover, Inc. v. United States* ("*MSL*"), 118 F.3d 776, 784 (D.C. Cir. 1997) (determinative documents are limited to those "that are either 'smoking guns' or the exculpatory opposite").

millions of pages of documents, conducting hundreds of interviews, and evaluating large volumes of electronic data.

In selecting which of these materials to submit to the Court, the United States has sought to provide the information that will most directly advance the Court's public interest determination.[4] Materials in the submission address the focus of the Tunney Act's concern:  whether the proposed remedies adequately address the harm the United States alleged in the Complaints.  This pleading provides a roadmap for locating those materials that can assist the Court in considering each of the Congressionally mandated factors.

## II.    The Submitted Materials Demonstrate that the Proposed Final Judgments Satisfy Each of the Factors that the Court Must Consider in Reaching Its Public Interest Determination

The Tunney Act requires the Court to consider certain factors in making its public interest determination:

---

[4] Some of the materials are representative of information obtained in the investigation.  For example, the submission includes declarations from Verizon and AT&T that document facts the Department obtained from the merging parties and confirmed through other sources during the investigation.  Attachments to Declaration of W. Robert Majure ("Decl. Attachs."), Tab 14, Declaration of Charles H. Carnes, Jr. (Verizon) (Aug. 4, 2006) ("Carnes Decl."); Tab 15, Declaration of Michael E. Todd (AT&T) (Aug. 3, 2006) ("Todd Decl.").

This submission also includes declarations and statements memorializing the views of 27 retail customers regarding the SBC/ATT transaction.  These statements were submitted to the Department by the parties to the merger.  *See* Decl. Attachs., Tab 1, Retail Customer Statements.  More than 100 additional declarations from retail customers were submitted by the merging parties but are not included in the submission due to confidentiality requests by the retail customers that provided the statements.  The United States has requested that the parties take any steps necessary to facilitate its filing of these statements under seal.

The submission also includes a letter from a customer group to the Federal Communications Commission concerning the potential adverse impact that divestitures could have on the user community.  *Id.,* Tab 13, Letter from C. Douglas Jarrett, Keller and Heckman, to Marlene H. Dortch, FCC (Sept. 27, 2005) (summarizing oral *ex parte* discussion of concerns of eCommerce Telecommunications User Group and the American Petroleum Institute) ("eTUG/API FCC Letter").  This letter is consistent with views that were expressed by third parties to the Department during its investigation.

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from determination of the issues at trial.[5]

All these factors weigh in favor of entry of the proposed Final Judgments. We address each in turn.

## A.    The Proposed Final Judgments Terminate the Alleged Violations

The Tunney Act first directs the Court to consider the judgments' impact on the "termination of alleged violations."[6] Plainly, the "alleged violations" are those alleged in the Complaints.[7] The accompanying materials, including the Declaration of Dr. Majure, demonstrate that the proposed Final Judgments fully terminate the violations alleged in the Complaints. The proposed judgments thus provide comprehensive and effective remedies for the violations alleged.

---

[5] 15 U.S.C. § 16(e)(1).

[6] 15 U.S.C. § 16(e)(1)(A).

[7] The Court's role under the Tunney Act is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. A focus on what is not alleged in the complaint would inappropriately bring into question the executive branch's decision regarding what case to bring. The Supreme Court long has recognized that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (citing, *inter alia*, *Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869)).

4

1.    **The Alleged Violations Relate Solely to the Effects of the Mergers on Competition at Two-to-One Buildings Where Entry is Not Likely**

After an extensive review of the proposed mergers, the Department of Justice, in an exercise of its prosecutorial judgment, elected to bring Complaints that allege specific anticompetitive effects at more than seven hundred identifiable buildings. Dr. Majure's Declaration explains that the United States made this election after fully evaluating where and to what extent the merging parties compete, who else competes, how competition occurs, and who else is likely to enter if conditions change.[8] Through review of documents and other materials, as well as interviews with numerous and varied industry participants, Antitrust Division attorneys and economists assembled an in-depth picture of the merging parties and the mechanics of competition in the markets in which they compete.[9] The United States found that a significant number of other competitors also operate in each of the metropolitan areas where the merging parties' operations overlap, and that some were in the process of expanding the number of buildings connected to their networks.[10] Dr. Majure discusses this and other competitive factors uncovered during the investigations that led the United States to file the Complaints it did in each case.[11]

Each Complaint alleges a violation of Section 7 of the Clayton Act with respect to the effect of the proposed mergers on competition for local private lines and related services to several hundred identifiable buildings. Specifically, paragraph 3 of each Complaint alleges:

---

[8] Majure Decl. ¶¶ 4-14.

[9] *Id.*

[10] *See* Decl. Attachs., Tab 6, CLEC Network Maps and Buildings Lists; Tab 7, Overlapping CLEC Fiber Maps and Note on Overlapping Fiber Maps; Tab 8, CLEC Business Plans; Tab 9, CLEC Interrogatory Responses; Tab 10, Documents Pertaining to CLECs as Providers of Access.

[11] Majure Decl. ¶¶ 7-14.

For hundreds of commercial buildings in the metropolitan areas of [cities], [the merging parties] are the only two firms that own or control a direct wireline connection to the building. These building connections are used to supply voice and data telecommunications services to business customers. As described in this Complaint, *the proposed merger is likely to substantially reduce competition for Local Private Lines and telecommunications services that rely on Local Private Lines to those buildings.*[12]

Each Complaint acknowledges that, depending on certain enumerated factors, new competitive entry may occur in some buildings where the merger would otherwise leave the merged firm without sufficient competition.[13] Each alleges, however, that the conditions for entry are unlikely to be met in hundreds of other buildings, so that entry would not eliminate the competitive harm likely to result from the proposed merger.[14] The United States' investigation identified the factors that are most likely to impact entry decisions, including the proximity of a building to a competitive local exchange carrier's ("CLEC") network connection points, the expected revenue from "lighting" the building (that is, physically connecting that building to the CLEC's network), and the physical and practical barriers to building the lateral connection.[15] The United States' submission includes materials that show the criteria that various CLECs utilize in determining whether to build a new connection,[16] and that demonstrate that some industry participants are

---

[12] Complaint, *United States v. Verizon Communications, Inc.*, 1:05CV02102(EGS), ¶ 3 (D.D.C. filed Oct. 27, 2005) (emphasis added); Complaint, *United States v. SBC Communications, Inc.*, 1:05CV02103(EGS), ¶ 3 (D.D.C. filed Oct. 27, 2005) (emphasis added) (collectively, "Complaints").

[13] *Id.* ¶¶ 27-29.

[14] *Id.* ¶ 29.

[15] Majure Decl. ¶ 14 & n.27.

[16] Decl. Attachs., Tab 9, CLEC Interrogatory Responses (explaining criteria for adding buildings and reporting recent additions).

actively pursing entry opportunities.[17] [REDACTED]    , for example, reported a faster rate of adding new buildings than either MCI or AT&T.[18]

### 2. The Proposed Remedies Address the Effect of the Mergers at Two-to-One Buildings Where Entry is Not Likely

Like the Complaints, the proposed Final Judgments were crafted to reach all of the anticompetitive effects predicted by the United States' investigation. The scope of the remedies corresponds to the scope of the violations alleged. Specifically, each proposed Final Judgment requires asset divestitures to remedy harm at all buildings where harm is alleged – the two-to-one buildings where entry was unlikely.

Using information obtained from the parties and other CLECs, the United States identified the buildings at which each merger would effectively create a monopoly for facilities-based Local Private Line service.[19] The United States' submission includes, for each of the cities identified in the relevant Complaint, a list of the buildings where AT&T owned a lateral connection within SBC's franchise territory, leading to a competitive overlap,[20] and a list that shows the corresponding overlap information for Verizon and MCI in the cities identified in that

---

[17] Decl. Attachs., Tab 8, CLEC Business Plans; Tab 9, CLEC Interrogatory Responses.

[18] Decl. Attachs., Tab 9, CLEC Interrogatory Responses,                    [REDACTED]      Response to DOJ Interrogatory 5, DOJ-BUILDEVALS- ■ -000003, at -0003 (
[REDACTED]                                            ); MCI, Inc. Response to DOJ Interrogatory 5, DOJ-BUILDEVALS-MCI-000001, at -0002 (                    [REDACTED]
[REDACTED]                    ); AT&T Corp. Response to DOJ Interrogatory 5, DOJ-BUILDEVALS-000005, at 0005 (                               [REDACTED]
); see also Majure Decl. ¶ 10 n.12.

[19] Majure Decl. ¶¶ 13-14.

[20] Decl. Attachs., Tab 3, AT&T Buildings List.

7

Complaint.[21]  The United States also obtained data from competing CLECs to identify the buildings where they have lateral connections.[22]  Using all of this data, the United States was able to identify buildings where the merger would reduce the number of competitors with lateral connections from two to one.[23]

The United States then considered whether certain of these buildings should be excluded from the proposed Final Judgments on the grounds that entry would be likely to prevent anticompetitive effects.  Based on the criteria utilized by individual CLECs, the Department developed a screen to identify whether entry was likely at each two-to-one building.[24]  This screen is fully consistent with the factors identified in the Complaints.[25]  Appendix A to each proposed Final Judgment lists the two-to-one buildings for which application of this screen predicts that entry is not likely.  Thus, the hundreds of buildings identified in each proposed Final Judgment correspond to the hundreds of buildings where the Complaints allege competition would be eliminated or substantially diminished.[26]  Stated differently, resolving the competitive concerns related to these buildings fully resolves the competitive problems alleged in the Complaints.

---

[21] Decl. Attachs., Tab 5, MCI Buildings List.

[22] Decl. Attachs., Tab 6, CLEC Network Maps and Buildings Lists.

[23] Majure Decl. ¶¶ 8-14.

[24] *Id.* ¶ 14 & n.27.

[25] *See* Complaints ¶ 27 (describing factors influencing whether a CLEC will build a lateral connection to a given building).

[26] Majure Decl. ¶ 16.

### 3.    The Proposed Remedies Are Adequate to Resolve the Violations Alleged

Each proposed Final Judgment addresses the competitive harm everywhere it was likely to occur by requiring the divestiture of lateral connections to all of the buildings identified in that proposed Final Judgment's Appendix A.[27]  For each one of these buildings, then, the buyer of the divested assets would replace the competition lost due to the merger.  As new sales opportunities arise in the buildings, the buyer will be positioned to compete with the merged firms, just as AT&T or MCI would have been.[28]  After entry of the proposed Final Judgment, all customers will have a choice of two facilities-based providers at these locations – just as they did before the mergers.  The United States investigated, but did not find evidence suggesting a unique competitive role for either of the acquired firms in selling local private lines.[29]

[REDACTED]

[30]

[31]  In short, any supplier that can provide a technically reliable point-to-point connection is a competitive option.[32]

---

[27]  Proposed Final Judgments §§ II(D), IV(A) & Apps. A; *see also* Majure Decl. ¶¶ 14, 16; Competitive Impact Statements at 8-10 ("CISs").

[28]  Majure Decl. ¶¶ 15-25.

[29]  *Id.* ¶ 17 & n.22.

[30]  Decl. Attachs., Tab 10, Documents Pertaining to CLECs as Providers of Access, [REDACTED]

[31]  Decl. Attachs., Tab 11, AT&T Documents, [REDACTED]

[32]  Majure Decl. ¶ 17 & n.22.

The proposed Final Judgments require divestiture of sufficient assets to restore competition lost due to the mergers. For each designated building, the merging parties are required to divest the greater of eight fiber strands or half of the unused fiber in the form of a long-term indefeasible right of use ("IRU"). Requiring at least eight strands to be divested ensures that the purchaser of the divested assets will have sufficient capacity to be a viable competitor. Eight strands of fiber will be sufficient to serve likely customer demand in the affected buildings, as CLECs rarely use more than that in a building.[33] Similarly, the use of IRUs is appropriate. IRUs, which convey substantially all of the important rights of fiber ownership, are commonly used by service providers to compete for local private line business, as demonstrated by the fact that AT&T's local networks are constructed, to a large extent, via fiber controlled through IRUs.[34]

To ensure that the buyers can effectively use these lateral connections without substantial additional capital expenditure, the proposed Final Judgments require the merged firms also to divest sufficient transport capacity to connect the lateral connections to the purchasing carrier's network.[35]   It is appropriate to use this mechanism to move traffic from the purchased lateral connections to the buyer's network. These transport connections typically carry traffic aggregated from multiple lateral connections. Requiring the parties to divest the entire fiber transport network necessary to connect the divested laterals to the buyer's network is unnecessary and would likely create significant customer disruption and result in the loss of efficiencies.[36]

---

[33] *Id.* ¶ 20; Decl. Attachs., Tab 14, Carnes Decl. ¶ 6 (declaration by former MCI employee); Tab 15, Todd Decl. ¶ 6.

[34] Decl. Attachs., Tab 15, Todd Decl. ¶ 5; *see also* United States' Response to Public Comments at 39-40 ("Resp. to Public Comments").

[35] Proposed Final Judgments § II(D); *see also* CISs at 10-11; Resp. to Public Comments at 19.

[36] Majure Decl. ¶ 24.

10

Finally, to ensure that the purchaser of the assets can be a viable and effective competitor (i.e., that it will have the requisite expertise, assets, and financial strength), the proposed Final Judgments give the United States the right to approve each buyer, in its sole discretion.[37] In addition, the United States retains approval over the terms of the divestiture agreements to ensure that they are compatible with the purposes of the proposed Final Judgments and that no provisions would interfere with a buyer's ability to replace the competition that would otherwise be lost due to the merger.[38] Buyers for the assets to be divested by AT&T have been proposed, approved by the United States, and have entered into contracts to purchase the divested assets.[39] The proposed purchasers are significant CLECs that are experienced in the purchase and sale of local private lines. Business plans for these companies are included with this Submission.[40] Contracts for the divestitures by MCI are under review by the United States. Based on these factors, as well as the financial and other terms of the contracts, the proposed buyers are likely to provide vigorous competition after the proposed Final Judgments are entered.

---

[37] Proposed Final Judgments §§ II(D), IV(A), (H); *see also* Resp. to Public Comments at 26-27, 41.

[38] Proposed Final Judgments § IV. In order to determine whether a divestiture buyer is likely to be an effective competitor in the market in question, the United States typically conducts a thorough inquiry into the proposed divestiture buyer and the terms of the divestiture agreement. This review often involves interviewing, as well as requesting confidential financial and business information from, the proposed buyer to assist the United States in determining whether the buyer has the management experience and financial ability to compete using the divestiture assets, as well as a viable business plan. *See* U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* at 30-33 (Oct. 2004). That procedure has been followed here.

[39] *See* Decl. Attachs., Tab 16, Divestiture Assets Purchase Agreements.

[40] Decl. Attachs., Tab 8, CLEC Business Plans.

11

**B.    The Proposed Final Judgments Include Appropriate Provisions for Enforcement and Modification**

The proposed Final Judgments include standard provisions that have been effective in numerous past decrees to maintain the Court's jurisdiction and ensure compliance with the decrees as entered.[41]  The Court retains jurisdiction over the action for further orders necessary to carry out, construe, modify, enforce, or punish violations of the proposed Final Judgments.[42]  To preserve the Divestiture Assets until divested, the proposed Final Judgments, in conjunction with the Stipulations filed with the Court, require the preservation of the Divestiture Assets and bar any actions that would interfere with the divestitures.[43]  To ensure all necessary actions are being taken to comply with the Final Judgments, the proposed Final Judgments require the defendants or trustees, if appointed, to make regular submissions of affidavits describing efforts to comply with the Final Judgment.[44]  Finally, the United States may investigate any potential violations of the Final Judgments, by, among other things, gathering documents, interviewing employees on the record, and requesting written submissions.[45]

---

[41] *See* Resp. to Public Comments at 50-51.

[42] Proposed Final Judgments § XII; *see also* CISs at 15.

[43] Proposed Final Judgments § VIII; Amended Stipulations § V(A)-(D).

[44] Proposed Final Judgments § IX.

[45] *Id.* § X(A)-(B).  Were the United States to discover violations of the Final Judgments, it could bring them to the Court's attention, for example, by initiating contempt proceedings.

12

## C.    The Materials Demonstrate that the Duration of Relief Specified by the Proposed Final Judgments Is Sufficient to Protect Competition

The proposed Final Judgments would expire 10 years from their date of entry.[46]  The Antitrust Division usually limits decrees to 10 years because industries change dramatically over time and a decree which started out in the public interest may end up doing more harm than good as a result of industry changes.

In this industry, 10 years is a relatively long time.  This period coincides with the minimum duration of the IRUs for the Divestiture Assets.[47]  Customer contracts, in contrast, are typically one to three years, so the IRU runs through multiple contracting cycles.[48]  Moreover, some of the prospective buyers have negotiated extensions in the IRUs for the divested assets.[49]  A buyer may choose to replace the IRUs with its own facilities over that period or another carrier may build additional overlapping facilities in the interim.  In a dynamically changing industry, a 10-year remedy is likely more than sufficient to ensure that competition is replaced for the affected buildings.[50]

---

[46] *Id.* § XIII.

[47] *Id.* § II(E); *see also* Resp. to Public Comments at 40.

[48] Majure Decl. ¶ 23.

[49] *Id.*; *see, e.g.,*Decl. Attachs., Tab 16, Divestiture Assets Purchase Agreements, First Amendment to the Master Agreement (between AT&T and    [REDACTED]    ), Ex. A, IRU Agreement §§ 3.1-3.2, DOJ-AGREEMENTS-000111 at -0119 to -0120 (providing for extension beyond initial term of 10 years).

[50] *See* Majure Decl. ¶ 23; *see also* Resp. to Public Comments at 40, 50-51.  Excessively long decrees, particularly in rapidly changing industries, tend to become obsolete due to their failure to account for changing circumstances, and then require both judicial and prosecutorial resources to determine whether termination or modification is appropriate.  Over the past few decades, the Antitrust Division has had to devote considerable resources to reviewing and seeking to modify old outmoded perpetual decrees.  As a matter of policy 10 years is now the standard decree length sought by the Department. *See Antitrust Division Policy Guide to Merger Remedies* at 35 n.48.

13

**D.    Alternative Remedies Would Be Inappropriate, Less Effective, or Less Beneficial to Consumers**

During the investigation, a number of competitors – including members of ACTel and COMPTEL – suggested certain remedies to the United States, and the investigative staff discussed those remedies.[51] Most of those suggestions sought to remedy purported harms that were neither substantiated by the United States' investigation, nor alleged in the Complaints. Once it became clear that the only likely competitive problem was limited to certain buildings, it also became clear that a divestiture of fiber-optic capacity to those buildings could adequately remedy the harm.[52] Thus, no remedy except for an asset divestiture to address these particular buildings was "actually considered" at the conclusion of the investigation except, as is always the case, the alternative of an injunction completely barring the transactions.[53] Enjoining the transactions, however, would not have been warranted given the relatively small magnitude of the harm that would result from the transactions compared to the billions of dollars in efficiencies that would potentially be lost had the mergers not been consummated.[54] Moreover, had the United States filed suit, its success would not have been assured. The parties continue to deny even the narrow violations alleged in the Complaints.[55]

---

[51] Some of the remedies suggested, such as a divestiture of all overlapping assets including customer contracts, could have created considerable practical difficulties as well as the risk of significant customer disruption. *See* Majure Decl. ¶¶ 18-19, 24-25; *see also* Resp. to Public Comments at 37 n.65.

[52] *See* Majure Decl. ¶¶ 13-16.

[53] *See* United States' Reply to COMPTEL Opp. at 6 n.15; CISs at 15.

[54] *See* Resp. to Public Comments at 51.

[55] *See, e.g.*, Motion Hr'g Tr. at 96, July 12, 2006 (Verizon counsel asserting "we don't think we need a remedy at all").

As discussed in the declaration, in crafting the particular terms of these divestitures, the United States evaluated whether certain related assets should also be included to ensure the competitive viability of the assets. For example, the United States evaluated whether the merging firms should be required to sell the customer contracts along with the live circuits that serve those customers, but concluded that this was neither necessary nor desirable.[56]

The remedies set forth in the proposed Final Judgments strike a desirable balance between customers' concerns and the preservation of competitive options.

### E.    The Proposed Final Judgments Are Not Ambiguous

Because the Court must "preside over the implementation of the decree,"[57] it must also consider whether the proposed decree is ambiguous or otherwise likely to generate difficulties in implementation. If it is, the court properly "insist[s] that these matters be attended to."[58]

The proposed Final Judgments contain no significant ambiguities: they are clear and specific regarding the assets to be divested, how the divestitures will occur, to whom the assets may be divested, the circumstances in which modifications can be made, and how the judgments can be enforced.[59] The buildings to which lateral connections must be divested are listed by street address in Appendix A to each proposed Final Judgment, respectively; more than 700 addresses

---

[56] Majure Decl. ¶¶ 18-19. Similarly, the United States determined not to require divestiture of wiring or electronics inside the impacted buildings. The investigation showed that the benefits of including these facilities would not have been significant and could lead to disruptions for existing customers. *Id.* ¶ 21.

[57] *Microsoft*, 56 F.3d at 1461-62.

[58] *Id.* at 1462. The 2004 Amendments added "whether [the proposed decree's] terms are ambiguous" to the list of factors for a court to consider. *See* 15 U.S.C. § 16(e)(1)(A).

[59] *See* Proposed Final Judgments *passim*; Resp. to Public Comments at 51.

are identified in total.[60] For each building, the divestiture must include specifically defined "Lateral Connections," a specified number of fiber-optic strands, and sufficient transport.[61] The proposed Final Judgments also specifically control other terms and aspects of the divestiture sales process including the timing of the divestitures, provisions for making information about the Divestiture Assets available to prospective buyers, necessary warranties that the defendants must make in relation to the Divestiture Assets, and a ban on reacquisition of the Divestiture Assets to avoid sham transactions.[62]

As is typically the case, some terms of the purchase agreement are left to negotiation by the purchasers and the defendants in commercial arms-length agreements. This arrangement allows the purchaser to address its specific needs; the undesirable alternative would be to force a one-size-fits-all solution on the potential purchasers. To a large extent, however, any potential risk arising from this flexibility no longer exists. Negotiations to purchase the divested assets have already been completed for the AT&T divestitures and the approved contracts are attached.[63] The United States has reviewed the resulting contracts and has concluded that the negotiated terms are consistent with the language and purposes of the proposed Final Judgments and will not diminish the ability of the divestitures to restore the competition that would otherwise be lost due to the mergers.

---

[60] Proposed Final Judgments Apps. A; *see also* Resp. to Public Comments at 21-22.

[61] Proposed Final Judgments §§ II(D), (F); *see also* CISs at 9-11; Resp. to Public Comments at 19.

[62] Proposed Final Judgments §§ IV(A) - (G), XI; *see also* CISs at 9, 12-13.

[63] Decl. Attachs., Tab 16, Divestiture Assets Purchase Agreements.

16

**F.    No Other Competitive Considerations Bear Upon the Adequacy of the Proposed Final Judgments or Upon the Court's Public Interest Determination**

Congress provided for the Court to consider "any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest." The United States does not believe there are any additional factors that would indicate that the proposed Final Judgments are inadequate or not in the public interest,[64] notwithstanding the concerns specifically raised in the comments filed with the United States as part of the Tunney Act proceedings, or the subsequent submissions by *amici*.[65] In particular, arguments that the proposed Final Judgments do not remedy supposed harm not alleged in the Complaints have no bearing on the adequacy of the proposed Final Judgments in replacing the lost competition: the proposed Final Judgments adequately remedy the only competitive harm alleged in the Complaints.

**G.    The Materials Demonstrate that Entry of the Proposed Final Judgments Would Benefit Competition in the Relevant Markets**

Entry of the proposed Final Judgments would replace the competition that would be lost in the relevant markets were the mergers to proceed without the proposed remedies, while still permitting the public to reap the benefits of efficiencies likely to result from the mergers.

The divestitures will redress the only competitive problem identified by the United States: a loss of competition in certain 2-to-1 buildings.[66] The divestitures will replace the acquired

---

[64] *See* CISs *passim.*

[65] *See, e.g.,* Resp. to Public Comments at 21-23 (explaining inclusion of only 2-to-1 buildings where competition is likely to be substantially lessened), 30-32 (explaining that the remedy resolves the likely harm alleged in the Complaints regardless of the way the geographic market is defined), 32-34 (noting divestitures will be combined with an existing network so divestiture of on-going business unnecessary), 37 & n.65 (explaining complications from divesting customers).

[66] *See* CISs at 9-10; Resp. to Public Comments at 20-23, 30-32, 46-47.

17

CLEC in those buildings where competitive harm is likely, ensuring that customers in those buildings continue to have a competitive option other than the RBOC.[67] There is ample evidence that purchasers of the Divested Assets will be capable of replacing the competition lost due to the merger.[68]

### H.    Entry of the Proposed Final Judgments Will Likely Benefit the Public Generally

The proposed Final Judgments correct the limited competitive problem for local private line and related services for more than seven hundred buildings alleged in the Complaints in a minimally intrusive manner.[69] Because the proposed Final Judgments correct the problem, and do so in a way that does not interfere with the realization of the substantial efficiencies (potentially in the billions of dollars) that these transactions likely will generate, the general public will benefit from their entry.[70]

---

[67] Majure Decl. ¶¶ 15-25; *see also* CISs at 8-10; Resp. to Public Comments at 6, 19, 51.

[68] Majure Decl., ¶¶ 15-25.

[69] *See* Majure Decl. ¶¶ 15-25. A more intrusive remedy, such as one involving the divestiture of customer contracts, might have caused significant harm, particularly to large retail business customers. *See id.* ¶¶ 18-19; Resp. to Public Comments at 37 n.65; *see also* eTUG/API FCC Letter at 1 (noting concerns about potentially disruptive impact of certain divestiture proposals).

[70] As noted, the Department conducted extensive interviews of retail customers during the investigation of these mergers. *See* Majure Decl. ¶ 4 n.1. Retail customers generally did not express concerns about the mergers. The submission includes a sample of declarations and statements from retail customers submitted to the Department by the parties to the mergers. *See* Decl. Attachs., Tab 1, Retail Customer Statements. The views expressed in these documents are consistent with what the Department learned from its interviews. Numerous similar declarations are on file with the Department. *See supra* note 4.

I.    **Entry of the Proposed Final Judgments Will Not Adversely Affect Individuals Alleging Specific Injury from the Violations Set Forth in the Complaints**

Since a court seeks to do no harm, "if third parties contend that they would be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate."[71] None of the commenters or *amici*, however, have alleged harm deriving from the decrees themselves, as opposed to the underlying transactions. There is no evidence that entry of the proposed Final Judgments would adversely affect individuals alleging specific injury from the violations set forth in the Complaints.

To the contrary, the divestitures required by the proposed Final Judgments will replace the lost competition alleged in the Complaints, preventing competitive harm to any individuals (including harm to COMPTEL's and ACTel's members in their capacity as customers) that would otherwise arise from the violations set forth in the Complaints.[72] Entry of the proposed Final Judgments has no preclusive effect on any action that any individual nevertheless claiming to be harmed by the defendants' conduct may want to bring.[73] Nor do the proposed Final Judgments or

---

[71] *Microsoft*, 56 F.3d at 1462.

[72] *See* Majure Decl. ¶¶ 15-26; Resp. to Public Comments at 51-52; *see also id.* at 16-23, 33-37. That the remedies are not as extensive as some *amici* would like does not suggest that they are "adversely affected" by entry of the proposed Final Judgments. *See, e.g., MSL*, 118 F.3d at 780 ("[I]f we may take the state of the world without the Department's lawsuit as the baseline, mere failure to secure better remedies for a third party . . . is not a qualifying impairment. And indeed, our Tunney Act jurisprudence seems to make clear that that is the baseline for the Act's substantive purposes – the district court is not to reject an otherwise adequate remedy 'simply because a third party claims it could be better treated.'" (citation omitted)).

[73] *See* 15 U.S.C. § 16(a); *see also* CISs at 14. However, the United States is not prepared at this point to opine as to the preclusive effect of entry of the proposed decrees on any person who by intervention may become a party to these cases. The Court to date has not granted intervention to anyone.

the sales of the Divestiture Assets as a practical matter limit the remedies that any individual harmed by the mergers could seek on its own, including broader divestitures.

### J.    Determination of the Issues at Trial Will Not Result in Any Significant Public Benefit

A trial on the merits would provide no significant public benefit, but would serve only to delay the implementation of an effective remedy. The cases brought by the United States involve a loss of competition for local private lines and related services in certain 2-to-1 buildings. If they were to proceed to trial, that is all the United States would attempt to prove. Litigation would impose substantial costs and burdens on the United States, the parties, and the Court. Even litigation of these limited cases would involve considerable complexity, detailed evidence, and difficult confidentiality issues. But more importantly, even if the United States were to be successful in proving liability, the remedy for the alleged harm would likely be no different. Because adequate remedies for the harm alleged are now before the Court, there is no significant benefit to adjudicated liability at trial.[74]

## III.    Conclusion

Accordingly, the United States respectfully requests that the Court grant its motion for entry of the proposed Final Judgments.

_____

[74] Although collateral estoppel and the *prima facie* evidence provision of the Clayton Act, 15 U.S.C. § 16(a), would allow subsequent antitrust plaintiffs to take advantage of judicial findings if the defendants were found liable after trial, any such "benefit" must be weighed against (a) the fact that because the remedies before the Court prevent the harm alleged in the Complaints, any damages claims that individuals might bring are unlikely to be viable, and (b) the possibility that the government would lose at trial, which, as a practical matter, would make private actions harder to bring successfully.

Respectfully submitted,

_____

Laury E. Bobbish
Assistant Chief

_____

Claude F. Scott, Jr. (D.C. Bar No. 414906)
Lawrence M. Frankel (D.C. Bar No. 441532)
John M. Snyder (D.C. Bar No. 456921)
Matthew C. Hammond
Trial Attorneys

Telecommunications and Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States

Dated:  August 7, 2006