**Tab 14, Declaration of Charles H. Carnes, Jr.**

**PARTIALLY REDACTED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　Plaintiff,　　　　　　　　　） | |
| v.　　　　　　　　　　　　　　　　　） | Civil Action No. |
| 　　　　　　　　　　　　　　　　　　） | 1:05CV02102 (EGS) |
| SBC Communications, Inc. and　　　　） | |
| AT&T Corp.,　　　　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　Defendants.　　　　　　　　　） | |

| | |
|---|---|
| UNITED STATES OF AMERICA,　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　Plaintiff,　　　　　　　　　） | |
| v.　　　　　　　　　　　　　　　　　） | Civil Action No. |
| 　　　　　　　　　　　　　　　　　　） | 1:05CV02103 (EGS) |
| Verizon Communications Inc. and　　　） | |
| MCI, Inc.,　　　　　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　Defendants.　　　　　　　　　） | |

## DECLARATION OF CHARLES H. CARNES, JR.

1.　　　My name is Charles H. Carnes, Jr. I make this Declaration on August 4, 2006. I am currently the Director of Global Operations, Technical Services for Verizon Business. Up until two weeks ago, I was the Regional Director for the Mid-Atlantic Territory Field Operations for Verizon Business. I have worked for Verizon and the former MCI entities for nearly 17 years. During my entire tenure at the former MCI, I worked on or around fiber networks either as a technician, Operations Support Consultant, or in a supervisory or management roll. In my last position, I supervised MCI's field forces for MCI's local fiber networks in the Mid-Atlantic Region. My team was responsible for designing and implementing MCI's local networks, splicing local



fiber strands into MCI's fiber rings, and installing fiber into a customer's building.  I

have attached a copy of my resume as Exhibit A to this Declaration.

2.    The purpose of my declaration is to describe how Local Private Line

services are provided to customers at commercial office buildings.  My focus here is on

how competitive carriers (such as the former MCI) provide these services, rather than on

how incumbent local exchange carriers (such as Verizon) provide them.

3.    When a competing carrier decides to enter a new metropolitan area it has a

number of choices on how to provide Local Private Line services to its customers.  It can

deploy its own facilities, such as a metropolitan fiber "ring,"[1] or it can obtain facilities

from a third party.  A carrier can either lease facilities from another competitive provider

(which is usually done in the form of an Indefeasible Right of Use or "IRU"[2]) or it may

purchase "special access"[3] from an incumbent local exchange carrier and resell it.  A

carrier could also use a combination of its own facilities and those obtained from a third

---

[1] A metropolitan fiber "ring" connects to major points of traffic concentration in an area –
such as, central offices or nodes (which are buildings where carriers house their facilities
and where customer lines terminate), carrier hotels (which are locations where multiple
carriers connect their networks to each other), and office buildings.  These networks are
called "rings" because they are capable of transmitting traffic between any two points in
opposite directions.

[2] An IRU is a possessory interest that provides the IRU holder with nearly complete
autonomy to use the fiber as it wishes.  When a carrier obtains an IRU, it has the same
flexibility to provide services over that facility as if the carrier owned the facility itself.
For all practical purposes, the only difference between owning the fiber and having an
IRU for the fiber is the legal title.  When carriers obtain IRUs to connect to office
buildings – in place of fiber laterals they deploy themselves – they will specify a point of
interconnection that they can use to connect the IRU to their network.  The IRU granted
to the carrier will be for the use of the fiber between those two end points – the customer
location and the point of interconnection that the carrier specifies.

[3] Special access is the name given to the Local Private Line services that incumbent
LECs like Verizon sell to retail and carrier customers.  When a carrier purchases special
access, it receives what is in effect a short-term lease to use the ILEC's facility for the
services it seeks to provide.

party. MCI serves far more customer locations using third party facilities (either alone or in combination with its own facilities) than it serves entirely over its own network.

4.     There are two principal components of a local network that a carrier may deploy itself or obtain from a third party in order to serve a customer. The first is the so-called "last-mile" connection between the customer's location and the carrier's network. A connection between a metropolitan fiber ring and a customer location is known as a fiber "lateral," and the point at which a lateral connects to the ring is known as a splice point. The second is the "transport" between that splice point and other locations – on the carriers' network or other carriers' networks. With respect to both laterals and transport, MCI deploys its own facilities in some cases and obtains facilities from third parties in some cases.

5.     To provide communications services over fiber (which is made out of individual glass strands), it is necessary to attach electronics at both ends in order to "light" it. Electronics can be used to provide any kind of service over fiber – voice, data, video, Internet access, etcetera. When MCI leases facilities from a third party (e.g., as an IRU), it typically obtains "dark fiber," which refers to fiber that is not attached to any electronics. MCI then deploys its own electronics to light the fiber.

6.     The amount of capacity that a carrier will deploy itself or obtain on any given route depends on a variety of factors, but particularly on the amount of traffic it seeks to carry on that route. When MCI deploys its own fiber lateral to serve a building, it generally splices only between ██ and ██ fiber strands in that lateral to MCI's fiber ring, as it is unusual for MCI to require a greater number of strands to serve a building. Depending on the electronics that are used, each individual fiber strand can be used to

serve very large amounts of customer traffic. For example, even the least-expensive electronics light each fiber strand at the "OC3" level, which is the equivalent of 2,016 ordinary telephone lines. Higher-end electronics can be used to light an individual fiber strand at several times that capacity. It is my understanding that at the buildings Verizon is divesting, customer demand is typically below OC3 levels, and thus each individual strand that Verizon is divesting at those buildings could theoretically be used to serve all the traffic at those locations.

7.      Fiber is typically deployed in sheaths that contain multiple individual strands of fiber. Each individual fiber strand in a lateral can either be dedicated to an individual customer, or can be shared among multiple customers using specialized electronics know as dense wave division multiplexers. Carriers may also dedicate individual strands on transport links to individual customers or may use a single strand to carry the traffic of multiple customers. Even in the situation where an individual strand is used to carry the traffic of multiple customers, it is possible to provide a dedicated circuit on the strand to individual customers by using electronics that subdivide the fiber into individual "wavelengths." Each wavelength can then be dedicated to an individual customer or, by using multiplexers, can be used to serve multiple customers.

8.      The cost of deploying electronics to light fiber laterals has decreased considerably in the past five years due to a variety of factors. The prices of the components used in these electronics – particularly semiconductors – have declined steadily and significantly over this period. Further, the market for optical electronics has become increasingly competitive during this time.

*[Signature Page for Charles H. Carnes, Jr. Declaration on next page]*

*[Signature Page for Charles H. Carnes, Jr. Declaration]*

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Charles H. Carnes, Jr.