IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action No. 1:05CV02102 (EGS) |
| SBC Communications, Inc. and AT&T CORP., | |
| | REDACTED VERSION |
| Defendants. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 1:05CV02103(EGS) |
| v. | |
| Verizon Communications, Inc. and MCI, Inc., | |
| Defendants. | |

COMPTEL'S RESPONSE TO THE DEPARTMENT OF JUSTICE'S
SUPPLEMENTAL SUBMISSION

Despite being given multiple chances by the Court to demonstrate that entry of its

consent decrees ("PAFJs") is in the public interest, the Department of Justice ("DOJ")

has failed to provide the Court with anything more than argument, casual empiricism, and

misleadingly-select portions of information collected from third parties in the course of

its investigation. The evidence the DOJ does provide does more to weaken its argument

that entry of the PAFJs is in the public interest, than it does to support a public interest

finding. Nonetheless, it is striking that, in light of what the DOJ asserts was a very

extensive investigation, the DOJ would choose to rely so extensively on "evidence"

proffered by, or--in some cases--created by the Defendants, who have every incentive to convince this Court to adopt a remedy that serves their private interests, rather than the public interest.[1]  More troubling, still, is the evidence that the DOJ would have been expected to have produced, but chose not to, either because the evidence the DOJ had was inconclusive or -- an even more disturbing possibility— the evidence would not have supported the consent decrees most favorable to the private interest of the Defendants.

Far from providing evidence that would allow the Court to "determine that entry of such judgment is in the public interest," the DOJ's Submission validates the concerns that COMPTEL has previously raised.  The DOJ confirms, through the sworn declaration of its lead economist, that its theory of harm cannot be cogently explained and that it is unsupported by substantial evidence gathered during the investigation.  Indeed, the DOJ's theory of harm is supported only by some limited evidence, created by the Defendants just days prior to the submission of the economist's declaration.  When a theory of harm is so logically disjointed, as is the DOJ's in this case, as to make a reasoned analysis of the remedy's likely efficacy all but impossible, the Court is compelled to scrutinize the Complaints with much more caution than might otherwise have been necessary.   Once it becomes questionable whether a Complaint is capable of being supported by existing, or future evidence, a prudent inquiry into the DOJ's theory of harm is not only legally permissible, but compelled under both the Tunney Act as well as general principles of judicial discretion. .

The analytical failures, and faults, in the DOJ's theory of harm, are exposed vividly in what is the keystone of the DOJ's filing—the Declaration of W. Robert Majure

---

[1]     For example, the materials submitted by the DOJ include declarations of employees of the Defendants and retail customer letters obtained by the Defendants.

The cracks in the DOJ's reasoning are both obvious and fundamental. What is strikingly clear is that the DOJ is trying to sell the Court on Complaints and Consent Decrees that are completely divorced from commercial reality. The DOJ never explains how firms purchase and sell service in either product market identified in the Complaints; the DOJ never explains how it defined a geographic market for either product market (or explained why it has not); nor does the DOJ even attempt a reasoned explanation of how firms buy and sell, what firms are in the market, how the elimination of AT&T and MCI will affect customers, or how the proposed remedy will restore the loss of this competition. The attached Declaration of Joseph P. Gillan.[2] explains some of the DOJ's most egregious analytical lapses in both the Complaints and the Consent Decrees.

Mr. Gillan explains why the DOJ's theory of harm and its proposed remedies are not a plausible interpretation of the facts the DOJ gathered. Not only is the DOJ's theory unsupported by any direct evidence from actual market participants, but the limited direct evidence of market participants that was produced—gathered by the Defendants— actually contradicts the DOJ's theory of harm, and hence its theory of relief. Even the economist's declaration, which is designed to support the DOJ's theory of harm with factual evidence, is nothing more than an incorporation of confidential business information as the basis for some unsupported theorization by Dr. Majure that unsuccessfully attempts to explain the Complaints and the remedies.

However, what really stands out in the DOJ's submission is the evidence that is not produced; what might be described as "the dogs that didn't bark." After all, the DOJ claims to have based its Complaints and its Consent Decrees on the analysis of millions

---

[2]    See Appendix 1.

of pages of documents, from both the Defendants and third parties, as well as "hundreds" of interviews. Where were the fruits of this investigation? We do not know because they were not produced.

While the DOJ never shows the Court the full extent of the document requests, or interrogatories, it sent to third parties, the DOJ did produce some of the responses to these requests from market participants—network maps, building lists and factors considered in whether to construct facilities. Did the DOJ ever ask the third parties how they provide and purchase local private line services? It must have. But if the third parties submitted answers that explained their other information and supported the DOJ's theory of harm and remedies, why did the Defendants have to hastily cobble together some declarations for Dr. Majure to rely upon? Would the DOJ really sue the Defendants without having one non-Defendant market participant willing to provide a short declaration supporting the DOJ's choice of product and geographic markets? Would the DOJ really go to trial without one customer declaration, or any evidence at all, to support its theory of harm?

Significantly, the DOJ filed its Complaints, signed by 16 DOJ attorneys— including the Acting Assistant Attorney General for the Antitrust Division—with the Court nine months prior to the July 25th hearing. After the DOJ had repeatedly touted its extensive and thorough investigation as a basis for the Court to deny *any* permissive participation by members of the public, as the authority for its conclusory dismissal of the public comments, as the bulwark of its indignant response to COMPTEL's Opposition to the DOJ's Motion to Enter the PAFJs, and yet again at the July 12th oral argument, how could the Court doubt that the DOJ had the evidence to support its Complaints and its

Consent Decrees? Despite its consistent refusal to produce evidence in response to numerous invitations by the Court to do so, was it really possible that the DOJ did *not* have the evidence to support its theory of the case and its proposed remedies? We now know the answers to these questions.

Since this matter was initiated, the Court has diligently sought to discharge its responsibilities under the Tunney Act Reform of 2004. For better, or worse, the DOJ has conclusively failed to show that the entry of the PAFJs is in the public interest. The DOJ's failure has proven the wisdom of the Court's prudence in earnestly seeking to implement the will of Congress. Similarly, the DOJ's behavior in this proceedinghas validated the concerns which led Congress to reform the Tunney Act and demand that the Judiciary conduct a thorough and independent public interest analysis of antitrust consent decrees. Accordingly, the DOJ, by demonstrating, in a persuasive manner, the logical and evidentiary inadequacy of its remedies to address an equally incoherent and evidence-less theory of harm, compels the Court to reject the PAFJs.

## I.    The Court Is Not Only Authorized, But Required, to Carefully Scrutinize the Complaints

### a.  Scope of the Court's Authority to Review the Complaints

At the July 12th hearing, the Court asked COMPTEL (as well as DOJ, the Defendants, and Amicus Curiae ACTel) what authority, if any, it has to question the scope of the Complaints in these two cases. COMPTEL explained, consistent with the plain language of the Tunney Act, and prior case law interpreting the Tunney Act, that while the Court may have to limit its inquiry to the antitrust violations alleged in the

Complaints, it was free to look *within* the Complaints in order to understand whether the remedies are adequate to offset the harms alleged in the Complaints.[3]

Such an analysis is fully consistent with pre-Tunney Act Reform case law. For example, the Ninth Circuit has explained that while a Court reviewing a consent decree should limit its review to the effects of the remedy on antitrust violations in the markets alleged in the Complaint,

> the court may consider the impact of the consent judgment on the public interest, even though that effect may be on an unrelated sphere of economic activity. For example, the government's complaint might allege a substantial lessening of competition in the marketing of grain in a specified area. It would be permissible for the court to consider the resulting increase in the price of bread in related areas.

*United States v. BNS Inc.*, 858 F.2d 456, 463 (9th Cir. 1988). The amended Tunney Act also supplements the previous list of enumerated factors that a court [now] "*shall*" consider to include "any other considerations bearing upon the adequacy of such judgment *that the court deems necessary to a determination of whether the consent judgment is in the public interest*." 15 U.S.C. § 16(e)(1)(A) (new language in bold italics).

### b.    The Tunney Act Cannot Be Divorced From the Underlying Antitrust Laws

Since the first filings in this review, the parties have sought to limit the Court's ability to conduct a thorough and independent review.[4] Despite the fact that the Supreme Court requires that a merger remedy restore the competition lost as a result of

---

[3]    July 12, 2006 Hearing Transcript at 160-161.
[4]    See, *e.g.*, DOJ Submission at 4, n.7.

the merger,[5] the DOJ has contended that it is entitled to a more lenient standard in this matter:

> The proper test of the proposed Final Judgment, therefore, is not whether it is certain to eliminate every anticompetitive effect of a particular merger or to assure absolutely undiminished competition in the future. Court approval of a consent judgment must be subject to a standard more flexible and less strict than the standard the court would apply were it devising a remedy after an adjudication of liability [6]

For this excessively deferential standard of review, the DOJ relies upon the 1995 D.C. Circuit decision in the Microsoft case, and a string cite to cases cited by the Microsoft court for a similar proposition, including the 1982 AT&T case, and *U.S. v. Gillette*, 406 F. Supp. 713, 716 (D. Mass. 1975) ("*Gillette*"), which the DOJ elsewhere cites for the proposition that "it was not the court's duty to determine whether the proposed decree was the best settlement, because the parties, not the court, settle the dispute."[7]

Notwithstanding the fact that Congress has statutorily foreclosed the deferential standard of review that the DOJ seeks, it is important to understand the facts and antitrust violations alleged in the cases on which the DOJ relies to cobble together this standard -- a standard that, under the guise of "flexibility," seeks to *deprive* this Court of discretion to conduct a flexible, case-appropriate review. First, of these cases, only *Gillette* was a merger case—and the relief in the consent decree originally proposed was modified through a satisfactory compromise to all "parties" to that case, including the "opposers" (competitors that did not believe the initial decree was sufficient to remedy the

---

[5]    The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.' *United States v. Ford Motor Co.*, 405 U.S. 562, 573 (1972) citing *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961).

[6]    DOJ Response to Public Comments, filed March 21, 2006, at 9-10.

[7]    *Id.* at 9, n. 12.

competitive harm). Thus, the *Gillette* consent decree was not entered over the strenuous objection of a significant group of consumers for whom, the decree was designed to preserve pre-merger competition.

In contrast, both *Microsoft* and *AT&T* were "conduct" cases—meaning that the antitrust violations that gave rise to the consent decrees were based on the DOJ's allegations that the defendants were engaging in *actions* that violated the antitrust laws. The consent decrees that were proffered for Tunney Act review required the Defendants to *change* their behavior going forward. Thus, while the defendants in the *status quo ante* situation were entitled to the ordinary presumption that, absent any action by law enforcement, their behavior was not in violation of the antitrust laws, the DOJ had—by filing the Complaints and extracting the consent decrees—altered the *status quo ante*. In situations like this, a consent decree which requires the Defendant to modify its conduct going forward, is entitled to at least some minimal presumption of good faith on behalf of the DOJ. After all, the DOJ was not required to initiate an investigation, or file a Complaint, but it did. Because it did, entry of the consent decrees would curtail the conduct that may have violated the antitrust laws. It is these type of "conduct" cases in which there seems to be the greatest danger that excessive judicial scrutiny may negatively affect the use of consent decrees.

The Supreme Court, however, has recognized that mergers are different. In a merger case, the merger *is* the conduct that violates the antitrust laws. The DOJ, along with the Federal Trade Commission ("FTC"), has articulated "Guidelines" which propose to guide antitrust practitioners and the courts in the analysis of merger legality under Section 7 of the Clayton Act. These Merger Guidelines contain threshold

"concentration" (the number of firms in the market) measures that are designed to indicate the likelihood that a merger will reduce competition in violation of Section 7 of the Clayton Act. When post-merger concentration thresholds, and the change in market concentration resulting from the merger, exceed certain levels, the DOJ considers the mergers "presumptively" illegal. The DOJ and the FTC believe their Guidelines are the correct way to analyze mergers under Section 7—so much so, that these Agencies frequently cite their own Guidelines in Complaints seeking to enjoin mergers. [8]  The DOJ contends—under its own Guidelines, for which it and the FTC seek deference from the courts day in and day out—that certain mergers are *presumptively* illegal. Thus, the act of merger itself exposes consumers in the affected markets to harms from which the antitrust laws were designed to protect them.

What is highly significant about the DOJ's Submission here is the lack of any evidence presented with respect to pre-merger or post-merger concentration levels. Of the two Agencies that reviewed these mergers, only the Federal Communications Commission ("FCC") even attempted to analyze the mergers under the DOJ's Merger Guidelines, and [

REDACTED

]. [9]   To the degree

---

[8]    See, *e.g.*, the Complaint of the DOJ in United States v. WorldCom, Inc. and Sprint Corporation attached as Appendix 2.

[9]    *In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Transfer of Control,* WC Docket No. 05-65, Memorandum Opinion and Order, FCC 05-

that the market concentration figures measured by the FCC are generally accurate—and there is no reason to believe they are not, at least "in the ballpark"—many consumers have been the victims of a significant loss in competition.[10]

Thus, the harms have been permitted to occur; these mergers have been consummated. Understanding that the "*status quo ante*" in the case of a merger violation is the preferred—if unobtainable—state of affairs, Congress enacted antitrust laws that

> empower 'the Attorney General, to institute proceedings in equity to prevent and restrain . . . violations' of the antitrust laws. The relief which can be afforded under these statutes is not limited to the restoration of the *status quo ante.* There is no power to turn back the clock. Rather, the relief must be directed to that which is 'necessary and appropriate in the public interest *to eliminate the effects* of the acquisition offensive to the statute,' <u>United States</u> v. <u>Du Pont & Co.</u>, 353 U.S. 586, 607 (emphasis added), or which will '*cure the ill effects* of the illegal conduct, and *assure the public freedom from* its continuance.' <u>United States</u> v. <u>United States Gypsum Co.</u>, 340 U.S. 76, 88 (emphasis added).

*Ford Motor Co v. United States*, 405 U.S. 562, 573, n.8. Congress has given the Attorney General great powers to seek redress for the harms created by anticompetitive mergers. Congress has similarly given this Court the expanded responsibility to ensure that the Attorney General uses these powers to promote and protect the public interest.

---

183 (rel. November 17, 2005) at ¶¶69-73 and Appendix C; *In the Matter of Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, WC Docket No. 05-75, Memorandum Opinion and Order, FCC 05-184 (rel. November 17, 2005) at ¶¶ 69-74 and Appendix C.

[10]    Despite the fact that there are many markets in which competition has been reduced as a result of the mergers, none of the Amici in this case has asked the Court to inquire into other markets that the DOJ did not investigate. If the DOJ only seeks to enforce the antitrust laws in a limited way, COMPTEL does not dispute that this decision is within the discretion of the Attorney General. However, the Attorney General cannot serve both the Bell monopolies and the antitrust laws. If the Attorney General does not want to enforce the antitrust laws, that is his right, but it is this Court's obligation to make sure that the DOJ accepts the responsibility, and accountability, to the public for that decision.

By urging the Court to adopt a standard cobbled together from Tunney Act decisions approving consent decrees involving inapposite underlying antitrust violations, the Attorney General invites the Court in this case of first impression to create a Procrustean bed for conducting public interest reviews under the Tunney Act. A standard for Tunney Act review that treats consent decrees that originated under different circumstances, and were designed to cure different antitrust violations with equal deference, is as inequitable as one that evaluates similar cases under differing public interest standards. The public has an interest in being assured that the laws are administered with procedural integrity in future cases as well as in the present case.

c.    **The Appropriate Framework for Evaluating the Public Interest Under the Tunney Act**

As noted in the preceding section, the DOJ attempts to limit the Court's discretion in performing its compulsory public interest analysis to the purely ministerial role articulated by the D.C. Circuit in the 1995 Microsoft case, which was expressly repudiated by Congress in 2004. Despite the fact that the Court has already explained that it intends to diligently perform the independent public interest review that Congress demanded in the 2004 Tunney Act Reform amendments, and despite the fact that the DOJ only submitted a filing at all because the Court generously allowed it yet another opportunity to provide the Court some basis for determining that entry of the PAFJs is in the public interest, the DOJ continues in its attempts to persuade the Court into granting it the excessive deference that it needs to survive an independent review. It does so by raising the specter that anything but blind acceptance of the limitations the DOJ now seeks to read into its Complaints would transgress the prosecutorial discretion of the

11

executive branch.[11]    Contrary to DOJ's assertions, the Court has ample room to review

the factors enumerated in the Tunney Act Reform amendments without impinging on

prosecutorial discretion

As COMPTEL has previously noted, the appropriate level of public interest review

under the Tunney Act must be sufficient for the Court to address the factors that

Congress has specifically required the Court to consider. If the record before it

(including the public comments and the DOJ's response to these comments) does not

contain the requisite information the Court needs to give due consideration to the factors

enumerated in the Tunney Act, the Court must decide whether to seek further information

(versus simply explanation) from the DOJ. In making its determination as to whether

additional information is likely to be helpful, or even necessary, the Court should take

into account how the case originated (through the Hart-Scott-Rodino pre-merger review

process), the underlying antitrust violations alleged, whether the DOJ's Complaints and

PAFJs are consistent with the governing precedent for the violations alleged, legal

standards for the adequacy of remedies for the violations alleged (if any), and whether the

Complaints and remedies seem consistent with any publicly-articulated agency guidelines

for the enforcement, or remediation, of the particular antitrust harm.

For a merger case settled prior to the development of a factual record, the Court must

first consider the level of information provided in the Complaints and the Competitive

Impact Statements, the public comments, the DOJ's response, and any other relevant

information in the record. The Court should also consider any prior experience that the

District, or Circuit, has had with similar antitrust consent decrees, other antitrust

---

[11]    DOJ Submission at 4, n.7.

complaints involving the same defendants or the DOJ, or any other antitrust matters involving the same industry. After considering this information, the Court should then ask the threshold question -- do the Complaints as written seem to accord with a reasoned analysis, and a structured application of the relevant antitrust principles to the facts known about the industry in question? Are the Complaints consistent with previous actions brought by the DOJ in the same industry? If not, does the DOJ offer a reasonable explanation for any departure from previous practice in the same industry?

The Court should then ask similar questions with respect to the proposed remedy. Does the remedy seem adequate to resolve the harms caused by the violations alleged in the Complaints? Does it comport with other requests for relief by the DOJ in previous cases? Does the remedy adequately protect those who have alleged injury as a result of the violations alleged in the Complaints?

If, in the aggregate, the answers to these questions are largely in the affirmative, then the Court is unlikely to need much, if any, additional information from the DOJ, the Defendants, or any third parties. The Court will already be very close to being able to conclude that, after a "reasoned application of antitrust principles and precedent" the Complaints and remedy comport with the commercial realities of the properly-identified relevant markets, the remedy adequately restores the competition lost from the violations alleged in the Complaints, and entry of the consent decrees is, therefore, in the public interest.

On the other hand, if, after asking itself these questions, the Court is unable to conclude that a "reasoned application of antitrust principles and precedent" would allow the Court to find that entry of the consent decrees is in the public interest, the Court

should seek further information from the DOJ. If the Court finds that it cannot satisfy itself, based on the record, that the Complaints and the corresponding remedies represent a "reasoned application of antitrust principles and precedent," then the Court should do exactly what this Court has done—offer the DOJ one last opportunity to provide the information that would allow the Court to satisfy itself that entry of the consent decrees is in the public interest.

In order to fill the gaps in the DOJ's submission, COMPTEL submits that the Court should request from the DOJ a brief summary of exactly what investigative efforts were undertaken, as well as a copy of the information requests sent to the Defendants and to third parties, and the identities of the third parties who received compulsory process. COMPTEL makes this suggestion not to invite the Court to assume the role of investigator, but only so that the Court will be better able to evaluate the evidence that was produced, by being made aware of the "dogs that didn't bark" (evidence/information that would seem likely to support or refute a case, but yet was not supplied).

Under a "reasonable application of antitrust principles and precedent" analysis, it is clear that, in the present cases, the DOJ does not even attempt to explain how its Complaints or remedies comport with commercial realities (*i.e.*, its own third-party evidence), its own enforcement guidelines, its own prior filings with this District in conjunction with the same product markets, or the District's own prior findings with respect to the same product markets. At the same time, the DOJ fails to even acknowledge, much less attempt to provide a reasoned explanation for, its departure from its own guidelines and prior filings with this District with respect to the same product markets. In light of so many "red flags," this Court clearly and correctly should

determine that the DOJ failed in the first instance to demonstrate on the pleadings, and responses to public comments, that entry of the PAFJs is in the public interest.  Finally, and fatally, when given the opportunity to provide the Court with evidence sufficient to demonstrate that the Complaints make out a *prima facie* case, and that the remedies address the harms to competition resulting from the violations alleged, the DOJ failed to cure the obvious weaknesses in its pleadings with any evidence that entry of the consent decrees would be in the public interest.

## II.    DOJ Fails to Explain or Support Its Theory of Harm

It is impossible to understand whether, and how, the PAFJs are supposed to adequately replace the competition lost by the elimination of AT&T and MCI as competitors in the alleged relevant product and geographic markets without first understanding the DOJ's theory of harm.  Applying a "reasonable application of antitrust principles and precedent" analysis to the DOJ's theory of harm, COMPTEL will show that the third party evidence provided by the DOJ with its Submission, the DOJ's expert testimony, and the DOJ's prior filings with the District regarding one of the same product markets do not warrant entry of the PAFJs.  Looking at each set of criteria, it is apparent that the DOJ's theory of harm—its version of what specific harms result from the antitrust violations alleged in the Complaints—cannot be supported by its third party evidence, its own expert, its adherence to its own Guidelines, or its prior practices.  However, it is critical to distinguish between the DOJ's theory of harm—which is very much styled toward supporting the relief in the PAFJs—and the plain language of the Complaints.

The Complaints simply allege that the mergers will lessen competition substantially in the sale of 1) Local Private Lines and 2) voice and data telecommunications services that rely on Local Private Lines[12] , in "numerous geographic markets," the definition of which is pled in the alternative ("no broader than each metropolitan area and no more narrow than each individual building").[13]    COMPTEL submits that the Complaints, as written—particularly the "Violation(s) Alleged" sections[14]—do articulate fully supportable violations of Section 7 of the Clayton Act, 15 U.S.C. § 18.  However, what is clear from the DOJ's Submission is that the theory of harm the DOJ is now asserting is not a theory that could have supported antitrust liability, such that the limited remedy proposed in the PAFJs would be an adequate solution to some cognizable antitrust injury to competition.  To be clear, COMPTEL does not attack the Complaints as written, nor does COMPTEL ask the Court to inquire into issues not raised in the Complaints.  Rather, COMPTEL disagrees with the DOJ's insistence on this contorted theory of harm as the only possible interpretation of its Complaints.  While the DOJ's theory of harm is the only interpretation of the Complaints that would allow the Court to find that entry of the obviously-inadequate PAFJs is in the public interest,  the attached Declaration of Mr. Gillan provides a much more extensive explanation of why the DOJ's  theory of harm and its proposed remedy are plainly inadequate, and are unsupported—and unsupportable—by commercial reality.  In the following Sections,

---

[12]    Complaints at ¶ 32.

[13]    Complaints at ¶ 24.

[14]    Complaints ¶¶ 30-33.

COMPTEL explains why the DOJ has failed to support its own theory of harm through a "reasonable application of antitrust principles and precedent."

### a.    Overview-The Elements of a Theory of Harm Under Section 7

While the DOJ refers to Section 7 of the Clayton Act tangentially in both its Submission and in the Majure Declaration, it is notable that—in this Submission where the DOJ must explain to the Court its theory of harm under Section 7, and how its proposed remedy cures that harm—the DOJ never fully explains the legal standards for establishing a Section 7 claim. Section 7 prohibits firms from acquiring the stock or assets of other companies "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Courts have typically interpreted this language to mean that "[t]he three basic issues in a § 7 proceeding are (1) line of commerce, (2) section of the country, and (3) the probable competitive impact of the merger." *United States v. Pennzoil Co.*, 252 F. Supp. 962, 972 (W.D. Pa. 1965).

The "line of commerce" and "section of the country" issues have been interpreted to require the delineation of relevant product and geographic markets. The *Pennzoil* case succinctly explains:

> [t]wo elements comprise a relevant market: (1) the product or subject of
> economic activity, and (2) the geographic area in which the economic
> activity exists. Determination of a relevant market, both as respect the
> product and the geographical area, is a necessary step precedent to
> determining whether a corporate acquisition violates this section. The
> relevant market is the 'area of effective competition' within which the
> defendants operate. '[The] problem of defining a market turns on
> discovering patterns of trade which are followed in practice.'

*Id.* (internal citations omitted).

When considering the issue of probable competitive effect of the merger, the

Supreme Court has counseled,

> [m]arket shares are the primary indicia of market power but a judgment
> under § 7 is not to be made by any single qualitative or quantitative test.
> The merger must be viewed functionally in the context of the particular
> market involved, its structure, history and probable future. Where a
> merger is of such a size as to be inherently suspect, elaborate proof of
> market structure, market behavior and probable anticompetitive effects
> may be dispensed with in view of § 7's design to prevent undue
> concentration. Moreover, the competition with which § 7 deals includes
> not only existing competition but that which is sufficiently probable and
> imminent.

*United States v. Continental Can Co.*, 378 U.S. 441, 458 (1964). Furthermore, an

additional aspect of evaluating the competitive effects of a merger requires a

determination of whether other competitors would be likely to enter the market to replace

the competition lost by the elimination of the acquired firm. Prospective entry will not

replace lost competition, unless it would be "timely, likely, and sufficient in its

magnitude, character and scope to deter or counteract the anticompetitive effects" of the

merger.[15]   It is useful to keep the product market, geographic market and competitive

effect framework (concentration, and likelihood of entry) in mind when looking at the

third party evidence and in evaluating whether the DOJ adequately followed its

Guidelines framework—which tracks the above-referenced case law.

### b.   The Third-Party Evidence Does Not Support the Department's Theory of Harm

<u>Geographic Market Definition</u>. The DOJ's notion of a building as a properly-

defined geographic market is undermined by the evidence accompanying the DOJ's

Submission as attachments to the Declaration of W. Robert Majure. First, the

---

[15]    Merger Guidelines, § 3.0.

declarations of the Defendants' retail customers tend to undermine the DOJ's theory of a building-centric market.[16] Not one of the customers indicated that it split up its demand on a building-specific basis, or that there would be any advantage to doing so where a customer is seeking to purchase a total telecommunications solution for multiple locations. Similarly, from a "dogs that didn't bark" perspective, the Department has failed to produce one contract—out of the millions of pages of documents and interrogatory responses it has analyzed—that shows that building-specific pricing, versus customer-specific pricing, or product specific pricing over a larger geographic area, *ever occurs at all*, much less with enough frequency to constitute a geographic market. ("[The] problem of defining a market turns on discovering patterns of trade which are followed in practice." *United States v. United Shoe Machinery Corp.,* (D.C. Mass. 1953) 110 F. Supp. 295, 303, *affirmed per curiam*, 347 U.S. 521, 74 S. Ct. 699, 98 L. Ed. 910.

What little evidence that is made available on how customers decide to purchase Local Private Line service also refutes the DOJ's notion that customers, either retail or wholesale, or competitors, view a building as a market. In its Submission, the Department misleadingly cites an [          REDACTED          ] for the proposition that MCI is not a unique vendor of Local Private Line service. [REDACTED

---

[16]     In the following section, COMPTEL points out the absurdity of the DOJ's expert relying on evidence generated by the Defendants. These customer "declarations" are, of course, worthless from an evidentiary perspective, because, as the DOJ indicated in its presentation to the Court on July 12th and in the Majure Declaration, the DOJ itself conducted nearly 300 interviews with customers and competitors, and seems likely to have issued compulsory process to some retail customers (the presentation said DOJ had issued compulsory process to 60 third parties and identified 45 as "competitors" (some of whom could also be wholesale private line customers)). When DOJ possesses the "best evidence" on an issue (customer opinion), but does not produce it, it should not be allowed to proffer what is clearly inferior "evidence." However, even though the DOJ cannot rely on this "evidence" for much, the "evidence" can be used by the Amici as statements against interest.

REDACTED

]$^{17}$   The quote,

however, is one of several quotes generally describing the challenges confronting the

wholesale data services group (a unit which appears to have sold a variety of wholesale

data services, including long-haul and Internet data service, which are not "Local Private

Line" services. The quote only mentions "customers," and, importantly, the very next

quote refers to MCI's "competitors" as [                    ] —all of whom

provided primarily long-haul data service and Internet backbone service in competition

with one another and MCI. It is doubtful that the author of that quotation would have

been referring to Local Private Line customers at all given that neither Verizon nor SBC

is identified as a competitor.

Elsewhere in the document MCI does refer to specific bids for Local Private Line

services. In two examples—one of a "win," the other of a "loss"—[ REDACTED

]

This document suggests what every other example of purchasing behavior confirms—

that customers strongly prefer to purchase on a total customer-demand basis, and not a

building-specific, demand basis. See Tab 10, MCI-DOJ-TT0032025-032.

Indeed, other documents that the DOJ produced also indicate that a building

cannot be a properly-defined relevant geographic market. For example, a report

produced by a third-party consultant for Verizon Wholesale Services notes that where

competitors exist, [        REDACTED

---

$^{17}$    DOJ Submission at 9, citing Decl. Attachs., Tab 10, Documents Pertaining to
CLECs as Providers of Access, [                                    ],
MCI-DOJ-TT0032025 at 2026 (Jan. 1, 2004).

REDACTED                              ] See Majure Declaration, Tab 10,

VZ-074-0117279, at 0117290.  If a building, or a route from a building to a point of

aggregation, were really a cognizable market, such price disparities simply could not

persist.[18]  The fact that the consultant compares the competitors' pricing to that of the

ILECs demonstrates that the ILEC is the price leader in the Local Private Line market, a

market that Verizon's consultant clearly defines more broadly than a single building.[19] [


REDACTED




]

Competitive Effects—Concentration.  The DOJ produced little, if any, evidence

of how wholesale and retail customers purchase products, or evaluate alternative

suppliers.  This is evidence that should have been provided, and evidence that the DOJ

seems likely to have.  It seems that Interrogatory 4, which was reproduced on one of the

third-party carrier's responses to Interrogatory 5 (how carriers decide to extend

networks), was designed to elicit the respondent's patterns of purchasing and evaluating

---

[18]     See, e.g., Areeda & Hovenkamp, Antitrust Law, at ¶ 534(b).  "The absence of
close price relationships among products presumptively indicates that they are in separate
markets. The prices charged by various producers of identical or nearly identical products
in the same geographic market rarely differ materially, and the differences do not last
long  No producer can persistently maintain a price higher than that charged by others
without a fatal loss of sales."

[19]     See also, Gillan Declaration at ¶10.

prospective vendors. If these responses were produced, they may have shown some basis

on which to further limit the firms in the market. Alternatively, these responses could

have also confirmed what Verizon explained in its presentation at the Court's July 12th

hearing, that "[t]he great bulk of MCI's fiber-based business—over 95%--consists of

[sales to large retail customers]" which "buy a package of services, usually at multiple

locations, and compare prices on the package." Verizon Presentation at 5.

  Competitive Effects—Prospective Entry. From a supply-response perspective,

the DOJ's theory that carriers typically build speculatively based on a building's

aggregate demand and the distance of that building from the carrier's fiber[20] is

contradicted by numerous documents, including the recently-minted Declaration of

Michael E. Todd ("Todd Declaration"). In his August 3, 2006 Declaration, [

   REDACTED


       ] Todd Declaration ¶ 4, emphasis added. In other

words, network expansions are dependent on committed, not speculative, revenue.

  Significantly, the DOJ acknowledges the importance of committed revenue,[21] but

then creates "screens" to purportedly identify which buildings are likely "markets" for

entry that contradict this important precondition to entry.[22] The effect of the DOJ's

---

[20]  Majure Declaration at ¶ 14, n. 17.

[21]  Complaints at ¶28.

[22]  See Gillan Declaration at ¶22.

deficient entry screens was to excuse the Defendants from including more than [ %] of the combined AT&T/SBC and Verizon/MCI "2 to 1" buildings in the consent decrees.[23]

The DOJ's "Field of Dreams" version of competitive fiber expansion—that is, lease the dark fiber and customers will come -- is also contradicted by third party evidence submitted in support of Dr. Majure's Declaration. See, e.g.. [

REDACTED


REDACTED


] . Most of the responses to Interrogatory 5 directly contradict the DOJ's premise that decisions to deploy fiber are based largely on building demand and proximity to the building.

The carriers assert that decisions to commit capital to a fiber-build are based on the likelihood of a fairly certain return on investment. The reasons that competitors do not build speculatively, based on building (versus customer) demand, have much to do with the way that wholesale and retail customers all must typically purchase significant portions of their demand under a long-term contract with the Bell company. Thus, even a

---

[23]    COMPTEL wishes to make clear its belief that the DOJ's "building-centric" entry and demand theories are out of touch with how wholesale and retail customers and competitors buy and sell service, as well as how they decide to provide service using their own facilities. Thus, even if all of the 2 to 1 buildings were included in the consent decrees, the remedy would still not come close to replacing the pre-merger competitive significance of AT&T or MCI.

building with a high aggregate demand will be unattractive if it has only one tenant, or a few large tenants, perhaps purchasing for multiple locations—and all are under term contracts not coming due for two or more years.[24]  If the DOJ's "screens" held any validity, they would suggest the existence of a "booming" wholesale market. Nonetheless, ten years after the local telephone markets were "opened" to competition via the Telecommunications Act of 1996,[25] AT&T, the nation's largest competitive carrier at the time of the merger, was still spending [          REDACTED

]. See Tab 10,

ATT140024376.

c.    **The DOJ's Expert Does Not Follow the Department's Merger Guidelines Analytical Framework, and Fails to Support the DOJ Theory of Harm**

COMPTEL has previously explained that the DOJ's Complaints do not give any indication that the DOJ followed the analytical framework set forth in its own Merger Guidelines.  The DOJ has still not produced any explanation to refute this impression, or an explanation of why the DOJ decided to depart from the Guidelines framework.

Market Definition and the Guidelines Framework.  The Department's primary witness, Dr. Majure, begins his Declaration with the startling assertion that, "[t]he questions posed in an antitrust analysis are not the ones that companies study in the

---

24    See Comments of COMPTEL filed with the DOJ pursuant to the Tunney Act on February 16, 2006 at pp 22-27 and Appendix D (describing anticompetitive barriers to entry resulting from Defendant AT&T's exclusionary contracting practices for local private line service).

25    47 U.S.C. §§ 251 et seq.

normal course of business."[26]  This observation helps to brace the reader for the

revelation that, "it is rare for internal business documents to provide complete answers."

*Id.*  The first statement is clearly at odds with the publicly-expressed view of the

Department—when acting in a law enforcement capacity—that,

> [i]n testing a particular postulated risk of competitive harm arising from a merger, the Agencies [DOJ and FTC] take into account pertinent characteristics of the market's competitive process using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. The Agencies carefully consider the views of informed customers on market structure, the competitive process, and anticipated effects of the merger.[27]

The second statement is, on its face, not controversial.  It is not surprising that the

internal business documents of any one company would fail to provide "complete

answers," particularly if the questions are about future effects on competition.  However,

the issue of competitive effects is most commonly considered in light of post-merger

market concentration figures.

The DOJ's Merger Guidelines presume an anticompetitive effect when the

Hirschman-Herfindahl Index (calculated by adding the sum of each firm's market share)

exceeds 1800 for the market and the merger increases concentration by 100 or more

points.[28]  After first properly defining a relevant product and geographic market, the DOJ

can calculate market shares for the individual firms in the market by percent of market

sales, by capacity, or—if each firm in the market has an equal chance of securing sales on

a forward-looking basis—the DOJ can simply assign an even percent of the market to

---

[26]     Majure Declaration at ¶ 5.

[27]     Joint DOJ/FTC Commentary on the Horizontal Merger Guidelines, rel. March 2006, at 3, available at http://www.usdoj.gov/atr/public/guidelines/215247.htm .

[28]     DOJ/FTC Horizontal Merger Guidelines §151(c).

each firm in the market (i.e., each firm is assigned a share of 1/n, where "n" is the number of firms in the market). Regardless, though, the DOJ's Merger Guidelines are designed to remove some of the "guess work" in evaluating the likely competitive effects of mergers. Curiously, these Guidelines were not followed in this case. Dr. Majure never explains what criteria he used for departing from the DOJ's ordinary presumptions, especially in what is, by all accounts, a highly concentrated market.

Market Definition Practice—Product Market. In its joint (with the FTC) Commentary on the Merger Guidelines, the DOJ explains that "[t]he Guidelines indicate that the relevant market is the smallest collection of products and geographic areas within which a hypothetical monopolist could raise price significantly."[29] Furthermore, the DOJ states that "[c]ustomers typically are the best source, and in some cases they may be the only source, of critical information on the factors that govern their ability and willingness to substitute in the event of a price increase."[30]  "In the vast majority of cases, the Agencies largely rely on non-econometric evidence, obtained primarily from customers and business documents."[31]

On the other hand, Dr. Majure is able to define markets without even considering hypothetical price increases on a *customer* basis, either for private line customers or customers that purchase voice and data telecommunications services provided over private lines in any geographic area.[32]  However, Dr. Majure does cite to the importance

---

[29]    Merger Guidelines Commentary at 8.

[30]    Merger Guidelines Commentary at 9.

[31]    *Id.*

[32]    Complaints at ¶19;  Majure Declaration at ¶¶3-9.

of customer information in "supporting a valid economic theory that indicates that the merger is likely to harm customers."[33]  Unfortunately, based on the DOJ's ambivalent attitude toward COMPTEL and its members, this concern apparently does not extend to carrier customers.[34]  In his citation for the sentence regarding customer information, Dr. Majure notes that "the DOJ conducted extensive interviews of retail customers.  The comments of the retail customers did not raise concerns consistent with an antitrust theory of harm."[35]   Curiously, Dr. Majure supports this point by including with his Declaration "copies of declarations and statements from retail customers submitted to the Department by the *parties to the mergers*."[36]

The Merger Guidelines Commentary does not discuss whether, and to what degree, the DOJ typically relies on the parties it is investigating *to do its investigation*, so COMPTEL offers no commentary on the propriety of this practice. Moreover, Dr. Majure assures us that, while the Defendants were busy producing the customer declarations, "[t]he views expressed in these documents are consistent with what the Department learned in its interviews."[37] Somehow, in spite of this evidence to the contrary, *a retail product market seems to have made its way into the Complaints*.  ("[By eliminating AT&T [MCI] as a retail and wholesale competitor to SBC [Verizon]], *the merger would*

---

[33]     Majure Declaration at ¶ 4.

[34]     COMPTEL members' concerns show up nowhere in the evidence presented yet many COMPTEL members were served by the DOJ with compulsory process.

[35]     Majure Declaration at n.1.

[36]     *Id.* (Emphasis added.)

[37]     *Id.*

*tend to lessen competition for retail voice and data telecommunications services provided over dedicated access.*")[38]

Market Definition Practice – Geographic Market.   After reading all of the customer statements that the Defendants prepared for the DOJ, what was most disappointing is that none of the customer statements even attempts to speak to the issue of market definition at all, much less devote any attention to finding the "smallest collection of products and geographic areas within which a hypothetical monopolist could raise price significantly." Merger Guidelines Commentary at 8.  Nonetheless, most of the customers do speak to *how they purchase telecommunications services on a geographic basis*—and the issue of how customers actually make purchasing decisions can be very telling on the issue of geographic market definition.  See, *e.g., Lansdale v. Philadelphia Electric Co* , 692 F.2d 307, 311 (3d Cir. 1982) ("The definition of the relevant geographic market, therefore, is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration.")  Once again, the customer statements obtained by the Bell investigators have undermined the Complaints of the DOJ.  In a stunning concession to commercial reality, most of the customers explain that they tend to purchase telecommunications services for multiple locations from one provider.[39]

a.    **The DOJ Failed to Follow Its Own Previous Analysis**

One of the things that COMPTEL found most surprising, and frustrating, when it first read the Complaints and PAFJs in this case was that the DOJ had, for large

---

[38]    Complaints ¶ 26 (emphasis added).
[39]    See Gillan Declaration at   ¶15.

enterprise customers, departed so radically from its previous market definition for this

product market.[40]  About five years before the DOJ filed the Complaints in this Court—

before SBC and Verizon were vigorous participants in the InterLATA (long-distance

voice and data) markets—the DOJ filed suit in this District to enjoin the merger of

WorldCom (subsequently known as Defendant MCI) and Sprint Corporation.[41]

In that merger complaint, which alleged many of the same product and

geographic markets that the FCC addresses in its Merger Orders (and which are still

highly concentrated), the DOJ alleges a market for "Custom Network Services" or

"CNS."  All of the services that the DOJ lists as being exemplary of the sophisticated,

customized, telecommunications services large businesses purchase are services that rely

on local private lines.  Moreover, the DOJ also explains customer purchasing behavior

somewhat differently in its WorldCom/Sprint Complaint:

> [m]ost large businesses purchase the majority of the aforementioned
> services from *one of the Defendants [MCI or Sprint] or AT&T* pursuant to
> a CNS agreement, typically through a single, multiyear contract,
> sometimes referred to as a "primary" contract. Advantages of contracting
> this way include the administrative convenience of having a single point
> of contact with the primary carrier and the ability to obtain significant
> volume discounts by acquiring large amounts of multiple services from a
> single carrier.[42]

As the DOJ explains in its WorldCom/Sprint Complaint, this product market and the

corresponding geographic market—the United States, for very large business customers

---

[40]    COMPTEL understands the product market described in ¶ 19 of the Complaints
as product market "(b)" ("(b) voice and data telecommunications services that rely on
Local Private Lines") to be primarily a retail market for enterprise customers of varying
sizes.

[41]    See, United States v. WorldCom and Sprint, filed June 27, 2000, available at
http://www.usdoj.gov/atr/cases/f5000/5051.htm , attached as Appendix 2.

[42]    WorldCom/Sprint Complaint at ¶ 149 (emphasis added).

(those who purchase more than $5 million/year in voice and data telecommunications services)—are the ones best supported by the way customers purchase, and the way that carriers sell, these services.[43]

Dr. Majure's characterization of the competitive roles played by AT&T and MCI as telecommunications providers to large retail business customers also differs markedly from what was alleged in the WorldCom/Sprint Complaint. In the WorldCom/Sprint merger, the DOJ claimed that, for very large business users,

> [b]ecause shortcomings or failures in the provision of CNS can produce
> costly and even catastrophic consequences for large businesses, many of
> these customers place a high premium on the reputation and proven
> quality of a provider and are unwilling to entrust to carriers other than the
> *Defendants and AT&T* the mission-critical aspects of their CNS.[44]

In these cases, the DOJ urges the Court to accord no such "unique" position to AT&T and MCI in either product market offered by the DOJ. Dr. Majure asserts, and the DOJ argues, that he found "no evidence suggesting a unique competitive role for either of these firms in selling local private lines."[45]

If the Department had followed its own previous market definition convention, and that which best reflects commercial reality and a reasoned application of the Merger Guidelines framework, the Department would have alleged markets similar to those described by the FCC. [46] The FCC produced data tables with HHI concentration figures

---

[43]    See, *e.g.*, WorldCom/Sprint Complaint at ¶¶ 148-156.

[44]    WorldCom/Sprint Complaint at ¶ 150 (emphasis added).

[45]    Majure Declaration at ¶ 17.

[46]    See, *e.g.*, *In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Transfer of Control*, WC Docket No. 05-65, Memorandum Opinion and Order, FCC 05-183 (rel. November 17, 2005) at ¶ 63 ("For larger, multi-location

for the "enterprise data" market for the SBC/AT&T merger[47] The concentration numbers

for this market went from an already-highly-concentrated pre-merger level of [    ] to a

post-merger level of [    ]—an increase of almost [  ] times the level that the DOJ's

Merger Guidelines require before mergers will be "presumed . . . to create or enhance

market power, or facilitate its exercise." Merger Guidelines, § 1.51(c) (mergers with

post-merger HHI of 1800 or more and a minimum increase of 100 points presumed to be

anticompetitive). Similarly, the FCC produced data tables with HHI concentration

figures for the large enterprise frame relay market for the Verizon/MCI merger.[48] The

concentration numbers for this market went from an already-highly-concentrated pre-

merger level of [   ] to a post-merger level of [    ]—an increase of almost [  ] times the

level that the DOJ's Merger Guidelines presume to be anticompetitive.

     In light of the FCC's findings, and the DOJ's previous representations to this

District regarding the purchasing patterns of large retail telecommunications customers,

and the DOJ's previous representations regarding the unique competitive positions of

AT&T and MCI, the DOJ should—at a minimum—be required to explain why there is no

longer any reason for concern with respect to these consumers. The DOJ's failure to

satisfactorily address why it has departed from its prior conventions and even address

market concentration levels precludes a finding on this record that that entry of its

proposed remedy is in the public interest.

---

enterprise customers . . . we conclude that this geographic market should encompass all
the geographic locations where these multi-location customers may have a presence.")

[47]    *Id.* at Appendix C.
[48]    *In the Matter of Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, WC Docket No. 05-75, Memorandum Opinion and Order, FCC 05-184 (rel. November 17, 2005) at Appendix C, Table 1E.

III.    **The DOJ's Proposed Remedy Is Plainly Inadequate To Resolve Any Theory Of Harm from the Violations Alleged**

a.    **The DOJ's Proposed Remedy Does Not Address the Harms to Competition that Are Reasonably Anticipated from the Violations Alleged in the Complaint**

As COMPTEL has demonstrated, the DOJ has failed to articulate a cogent theory of harm based upon the application of reasonable antitrust principles and precedent. The DOJ has not provided any evidence from the marketplace in support of its theory of harm, nor has the DOJ explained how the limitations it seeks to impose on the considerably-broader "Violations Alleged" are supported by any reasoned application of antitrust principles, such as those described in the Merger Guidelines, or by any antitrust precedent. More importantly, the DOJ has failed to provide any reasoned explanation for its departure from Guidelines precepts, or why it decided to depart from its own prior practice with respect to defining markets for high-capacity telecommunications services. As a result, the DOJ cannot provide the Court with a reasonable level of assurance that its proposed remedy, will be sufficient to address all of the likely harms arising from the violations alleged in the Complaints.

For example, the remedy is supposed to provide customers with a "replacement" for the competition lost by the elimination of AT&T and MCI from the market. The DOJ's Submission, however, is woefully lacking in assurances for the Court as to what safeguards are built into their decrees. The DOJ has not pointed to any experience at all with location-specific, excess capacity leases as a remedy for anticompetitive mergers in the telecommunications industry. What if the DOJ is wrong about the geographic market (as seems likely), and customers purchase on a "customer demand" basis? Do most of

32

the customers in the "divestiture" buildings have one, or multiple, locations?  Do the

retail customers in the "divestiture" buildings who have demand spread over multiple

buildings typically split up their service purchases on a building specific basis?

Similarly, does the Court feel comfortable that the remedy appears to rely

exclusively on the ability of other wholesale carriers to expand their presence in the

markets—whatever they may be—in order to provide relief for the retail customers?  For

customers who are unlikely to split up their demand into building-specific contracts, has

the DOJ attempted to determine whether the same carriers who are purchasing the assets,

also have fiber into the customer's other demand locations?  Do the carriers leasing the

assets believe that they will be able to efficiently provide all the services that retail, or

wholesale, customers are currently purchasing from AT&T or MCI?  The Court cannot

know.  The DOJ will make no such commitment, and it is unlikely that a wholesale lessor

could either—without first knowing how much "uncommitted" (under multi-location

term contract) demand really exists at each "divestiture building."

It would be impossible for the DOJ's proposed remedy to replace the competition

lost by the elimination of AT&T and MCI.  As Dr. Gillan explains,

> [t]hese carriers' local competitive positions are the consequence not only
> of their extensive (relative to other competitors) networks, they are also a
> product of their customer support capabilities, name recognition and large
> customer base.

Gillan Declaration at ¶ 21.  Nonetheless, the DOJ's explanations as to why it did not

consider a more traditional divestiture remedy basically amount to its opinion that such a

remedy would be inconvenient for the Defendants.  Dr. Majure discusses how the DOJ

must  "balance . . . the competitive benefits from a divestiture with any burdens the

divestitures could create for customers."  Majure Declaration at ¶ 18.  This is not a

satisfactory answer to customers' genuine concerns about facing a monopoly over most of their demand, when they may have had only one practical choice (due to their demand configuration) pre-merger. Customers would only be burdened if they were getting all, or a substantial percentage, of their demand served by AT&T or MCI, and the DOJ ordered only a *partial divestiture* of the AT&T or MCI facilities used to serve these retail customers. It seems doubtful that the DOJ ever considered requiring the Defendants to divest all customer-associated AT&T and MCI facilities—throughout the customer's demand footprint—if the customer had the bulk of its demand in the SBC or Verizon regions. Such a modification would, of course, still not replace the competition lost by the elimination of AT&T and MCI as independent competitors for local private line, and local private line-based business services.

**b.    The Remedy Does Not Even Address the DOJ's Own Theory of Harm**

Even if customers in "2:1" buildings were not an impermissibly, and arbitrarily, narrow group of customers to single out for redress, considering all of the customers that are likely to be harmed by the violations alleged in the Complaints, the DOJ's proposed remedy is extremely limited. The DOJ only requires the Defendants to lease a certain amount of unused fiber from the entry point of a building, to the purchasing carrier's network for a very limited number of AT&T's and MCI's total "on net" buildings in the incumbent Bell company regions. Indeed, the remedy only proposes to allow this limited access for a [         REDACTED                    ] in each Bell Company's region. See Gillan Declaration at ¶ 21 (even if the asset divestiture made sense as a remedy, the assets being divested are "woefully inadequate to the task.")

Given that this remedy does not—on its face—even address the [      ] of 2:1 buildings in the SBC and Verizon regions, it is important for the Court to determine how comfortable it is with the DOJ's "screens" and its predictive judgment. The DOJ's consent decrees provide no insurance, and no guarantees, if the DOJ guesses wrong with respect to the likelihood of entry for 2:1 buildings not on the list. If competitors do not subsequently—in a "timely, likely, and sufficient" manner—deploy fiber to the AT&T or MCI buildings not on the list, why do the consent decrees not provide that these buildings be added back to the list? The decrees would still be inadequate because of their impermissibly narrow scope, but at least with such language the DOJ could seem committed to the arbitrarily small subset of the markets on which it has decided to focus its attention.

c.    **The Remedy Is Impermissibly Vague as to Purpose**

The DOJ argues that "[t]he proposed Final Judgments require divestiture of sufficient assets to restore competition lost due to the mergers." DOJ Submission at 10. However, the DOJ has not even articulated a notion of market competition for both product markets alleged, or either geographic market alleged, that is supported by "real world" facts. For these reasons, it will be impossible to "measure" whether the decree will have any positive effect at "restoring" competition lost at all.

For example, the DOJ has not established that any retail telecommunications provider engages in building-specific, but not customer-specific, pricing, but this does not mean such pricing may not occur. COMPTEL would like to understand more about how "competition"—as the DOJ conceives it—currently works in the building-specific market for which the DOJ has required divestiture. Does DOJ think that all private line-based

retail customers in those buildings pay a lower price for service (even if they do not purchase their service from AT&T or MCI)? Said differently, does DOJ believe that customers in the vast majority of buildings that have no competitive alternative for private line-based service pay a higher price for the same service than a similarly-situated customer in one of the buildings to which AT&T or MCI has deployed fiber? This seems unlikely, except for a very few (how many?) high-demand, single-location, customers.

The DOJ never addresses the contention made by Verizon at the July 12th hearing, that, even for the 2:1 buildings, "[t]he services sold to MCI customers at those buildings account for less than 1% of what those same customers purchase from MCI nationwide." Verizon Presentation at 5. If this statement is true—and no other customers get the benefit of Verizon offering the "building-specific" deals just because MCI is in the building -- then what is the point? If the DOJ cannot even point with specificity to a cognizable, and significant, group of consumers—wholesale or retail—who will benefit from entry of the PAFJs, then what, indeed, is the point of all of this effort?

## CONCLUSION

The DOJ has failed to articulate, under a reasonable application of antitrust principles and precedent, how the proposed consent decrees remedy any plausible—or even the DOJ's own implausible—theory of harm resulting from the very serious Section 7 violations alleged in the Complaints. Because the decrees serve no purpose, other than to transfer the shame of passively allowing the two largest Bell monopolies to eliminate

the two largest local competitors in their respective regions, COMPTEL recommends that

the Court reject the proposed consent decrees as inconsistent with the public interest.

                                       Respectfully submitted,

September 5, 2006                    Jonathan D. Lee
                                         Mary C. Albert
                                         COMPTEL
                                         1900 M Street N.W., Suite 800
                                         Washington, D.C. 20036
                                         (202) 296-6650

# Appendix 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>        v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>                    Defendants., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 1:05CV02102 (EGS)<br><br>**FILED UNDER SEAL<br>PURSUANT TO PROTECTIVE<br>ORDER ENTERED JULY 25, 2006<br>AND AUGUST 4, 2006**<br><br>**REDACTED FOR PUBLIC<br>INSPECTION** |
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 1:05CV02103 (EGS) |

## DECLARATION OF JOSEPH GILLAN

Pursuant to 28 U.S.C. § 1746, and the Federal Rules of Civil Procedure, I, Joseph Gillan, hereby declare the following:

### Introduction

1.     My name is Joseph Gillan.  My business address is PO Box 541038, Orlando, Florida, 32854.  I am a consulting economist with a practice that specializes in the telecommunications industry.

1

2.      I am a graduate of the University of Wyoming where I received B.A. and M.A. degrees in economics. My graduate program focused on the analysis of economic issues involving public utilities, including telecommunications. In 1980 I was recruited to join the recently formed Policy Analysis and Research Division at the Illinois Commerce Commission, the state agency responsible for regulating public utilities in Illinois.

3.      From 1980 to 1985, I was on the staff of the Illinois Commerce Commission where I had responsibility for the policy analysis of issues created by the emergence of competition in regulated markets, in particular the telecommunications industry. In that role, I directed the Illinois Commission's response to the divestiture of Illinois Bell by AT&T, including the design of Illinois' Local Access and Transport Areas,[1] the initiation of intrastate access charges,[2] and establishing the rate levels for the post-divestiture Illinois Bell and AT&T Communications of Illinois.

4.      While on the staff of the Illinois Commission, I was named to the Staff Subcommittee for the Communications Committee of the National Association of Regulatory Utility Commissioners (NARUC). I was also appointed to the Research Advisory Council overseeing the National Regulatory Research Institute, NARUC's research arm located at Ohio State University.

---

[1]      Local Access and Transport Areas (LATAs) were the geographic areas used to guide the assignment of facilities between the post-divestiture Illinois Bell and AT&T, as well as implement the ongoing restriction in the AT&T Divestiture Agreement (the Modified Final Judgment) that prohibited Illinois Bell from offering interLATA long distance service. This restriction on the provision of in-region long distance service was lifted once Illinois Bell (then known as SBC Illinois) satisfied Section 271 of the Telecommunications Act of 1996.

[2]      Prior to the divestiture, the compensation for the use of local network facilities to originate/terminate long distance service was achieved through a complex set of revenue/profit-sharing agreements within the pre-divesture AT&T, as well as contracts between AT&T's affiliates and other local telephone companies.

5.    In 1985, I left the Commission to join U.S. Switch, a venture firm organized to develop interexchange access networks in partnership with independent local telephone companies.    At the end of 1986, I resigned from my position as Vice President, Marketing and Strategic Planning to begin a consulting practice.    Over the past twenty years, I have provided testimony before more than 35 state commissions, seven state legislatures, the Commerce Committee of the United States Senate, and the Federal/State Joint Board on Separations Reform.    I have also been called to provide expert testimony before federal and state civil courts by clients as diverse as the trustees of a small competitive carrier in the Southeast to Qwest Communications.    In addition, I have filed expert analysis with the Finance Ministry of the Cayman Islands and before the Canadian Radio-Telecommunications Commission.

6.    I currently serve on the Advisory Council to New Mexico State University's Center for Public Utilities (since 1985) and I am an instructor in their "Principles of Regulation" program taught twice annually in Albuquerque.    I also lecture at Michigan State University's Regulatory Studies Program and have lectured at the School of Laws at the University of London (England) on telecommunications policy and cost analysis in the United States.    A complete summary of my qualifications, testimonies and publications is provided in Attachment 1.

7.    I have been asked by COMPTEL to evaluate the economic analysis described by the Department of Justice ("Department") in the Declaration of W. Robert Majure.[3]    As I explain in more detail below, the Department's assumption concerning the appropriate

---

[3]    *See* Declaration of W. Robert Majure, United States Department of Justice, filed August 7, 2006 ("Majure Declaration").

geographic market is fundamentally wrong.[4]  The local private line market is a *multi-location market*, with customers and carriers preferring solutions that meet their total demand, not isolated end-points in particular buildings.[5]  The Department's building-by-building analysis is structurally designed to minimize the importance of AT&T and MCI in local markets because it eliminates *any* consideration of the cumulative investment by these carriers and their relative position meeting customer demand across a broader, more relevant, market.  By adopting the narrowest definition of the relevant geographic market possible – a choice, importantly, that the Department never explains in its complaint or supporting materials – the Department seriously underestimates the actual competitive harm of these acquisitions and causes it to craft a remedy that cannot hope to replace the competition lost by the acquisition of AT&T and MCI by the dominant providers, SBC and Verizon.[6]

---

[4]     In the discussion that follows, I generally focus on the retail (as opposed to wholesale) local private line market.  The reason for this retail focus is that CLECs will typically only build to a particular building <u>after</u> they have secured a customer contract of sufficient size to justify the anticipated construction costs for that building.  (*See* SBC Complaint at ¶ 28)  This means that retail-level competition must, as a practical matter, precede the development of wholesale competition.  Except in the unique circumstance where the "customer" in a building is another carrier, network construction is initiated by retail, not wholesale, demand.

[5]     The fact that any network must include an ability to connect to its customers does not mean that the *market* should be defined by each individual end-point.  Indeed, the reason carriers offer *services* is to ameliorate distinctions between individual network components, thereby providing the customer a complete communications solution.

[6]     The principal reason that SBC and Verizon remain dominant in the local market is because their former monopoly status provided these carriers networks that effectively serve every customer location, a fact acknowledged by the Department (*see* Majure Affidavit at ¶¶ 8, 9).  Consequently, only the incumbent is likely to be in a position to serve all customer locations, which forces an entrant to offer substantial discounts to attract a portion of the customer's business.

4

**Geographic Market Definition**

8.    To begin, it is important to understand that the Department clearly acknowledged in its complaint(s) that the relevant geographic market for local private line service can be larger than a single, isolated building.[7]  Specifically, the Department began its discussion of the relevant geographic market stating:

> The relevant geographic markets for both Local Private Lines, as well as voice and data telecommunications services that rely on Local Private Lines, are no broader than each metropolitan area and no more narrow than each individual building.[8]

9.    The Department never explains why, however, after having initially defined the relevant geographic market as being (at least in some circumstances) as large as a metropolitan area, it chose to conduct its analysis, as well as structure its purported remedy, under the assumption that the appropriate geographic market is the other far end of its spectrum, *i.e.*, the individual building.  The Department's geographic definition here conflicts with prior analyses by the Department, it is inconsistent with the FCC's market definition, and it fundamentally ignores how these services are actually purchased in the market.  Nevertheless, the Department has designed a remedy that only makes sense -- to the extent it makes sense at all -- under the narrowest geographic definition possible,[9] without even a *footnote* of explanation as to how it arrived at the decision.[10]

---

[7]    For simplicity, my affidavit focuses on the SBC acquisition of AT&T.  As the Court is aware, both the FCC and the Department applied parallel analyses to SBC-AT&T and Verizon-MCI acquisitions.  As such, the criticisms against the SBC-AT&T acquisition described herein apply equally to the Verizon-MCI merger.

[8]    SBC Complaint at ¶ 24.

[9]    It is possible (one can conjecture) a smaller market definition equal to each floor in a building that would be no less arbitrary than the definition adopted by the Department.

[10]    The Court should understand that any explanation for its geographic market selection that the Department offers in response to these filings will be the first time that any of the Amici will

10.    First, the Department's approach in defining the relevant geographic market in
these acquisitions is very different than the approach that it used to evaluate the proposed
merger between WorldCom and Sprint. In that merger, the Department found that the
relevant geographic market for *all* product markets was the entire United States.[11]
Indeed, the Department adopted a national market even for Custom Network Services –
products that are *individually* tailored to meet the needs of a single customer.    The
Department recognized that while specific *transactions* would occur on a customer-by-
customer basis, the *market* itself was defined on a national scale. There is no discernible
difference here – while private line services are provided to customers in individual
buildings, the standard contracting practice is for the customer's aggregate demand over
multiple locations, and pricing is established for much larger areas (the smallest of which
is generally the Metropolitan Statistical Area).

11.    Second, the FCC defined the relevant geographic market by the totality of a
customer's demand (*i.e.*, the market is defined by a particular customer's location).[12]
Although this definition would *collapse* to a single building in the rare circumstance of a
single-location customer, the predominance of multi-location customers as purchasers of
local private line service means that the market is far broader than the Department

---

have seen its analysis. As such, the Court will not have the benefit of any independent review of
the Department's logic.

[11]    *Complaint, United States of America Department of Justice v. WorldCom, Inc. and Sprint
Corporation*, June 26, 2000.

[12]    *In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Approval of
Transfer of Control*, Federal Communications Commission WC Docket No. 05-65, October 31,
2005 ("SBC/AT&T Order") at¶ 28.

assumes.[13]  Moreover, the FCC further recognizes that while individual customers certainly participate in a market, the market itself is more properly viewed as the collection of similarly situated customers, not the individuals themselves.[14]

12.    Third, the standard pricing practices of the market's dominant providers – the incumbent local exchange carriers – support adopting a broader market definition than the individual building.  As the FCC concluded, these dominant providers of local private line service (also called special access)[15] price their services on a wider basis than an individual building:

> In addition, however, we [the FCC] will consider the potential effect of the merger on SBC's special access prices, which are generally set on a wider geographic basis.  Because SBC has gained Phase II pricing flexibility for its special access services in some metropolitan statistical areas (MSAs), but not others, <u>SBC's rates for special access may vary from MSA to MSA.</u>[16]

The Department recognizes that the intended purpose of its analysis is to determine whether the loss of competition resulting from these acquisitions "is likely to affect

---

[13]    The prevalence of multi-location customers in the local private line market is amply demonstrated by the Customer Declarations provided by the Department to the Court (*See* Tab 1 of DOJ Submission) and is described extensively in ¶¶ 16 and 19 *infra*.

[14]    *SBC/AT&T Order* at ¶ 28.

[15]    The FCC uses the term "special access" to describe the local private line market (the term adopted by the Department).  This difference in labeling, however, is immaterial to the substantive analysis of each agency.  *See SBC/AT&T Order* fn. 86 (citation omitted):

> We [the FCC] recognize that different companies, particularly carriers that are not incumbent LECs, may use slightly different terms to refer to dedicated loop and transport links between two points.  For example, AT&T uses the terms "Local Private Line" and "Domestic Private Line" to refer to services consisting of loops and transport, typically in combination that generally compete directly with SBC's special access service.  For simplicity, we will use the term "special access" to refer to all services provided by any carrier that involves such dedicated links.

[16]    *SBC/AT&T Order* ¶ 29.  Footnotes omitted.  Emphasis added.

7

competition for any particular product in any particular geographic area."[17]   Yet, the Department has focused its analysis and remedy on a network component (not a product),[18] and is ignoring the geographic area for which prices are generally established (the MSA, not an individual building).

13.    Moreover, SBC's MSA-specific special access prices are deviations from its standard practice to price special access service across an even *wider* basis, with pricing that varies by inherited operating region,[19] and discounts (and, therefore, *actual* prices) tied to the customer's total demand across an even broader area, such as all of the states served by the carrier.[20]   Consequently, it is arguably most appropriate to consider the MSA as the smallest relevant market (not the largest as assumed by the Department); even accepting the Department's view that the MSA represents the upper bound of the relevant market, however, must lead the Court to reject the Department's remedy as inadequate, as it is based on a building-by-building definition unsupported by the record (and unexplained by the Department).

14.    The relatively broad pricing practices of the incumbents reflect considerations of administrative practicality and market reality.   Attempting to price on a basis as discreet

---

[17]    Majure Declaration at ¶ 4.

[18]    As the Department recognized, these loop facilities are merely "one element of the parties' local networks" and should be viewed as an "<u>asset</u> for providing service to business customers." (*See* SBC Complaint at ¶ 12, emphasis added)

[19]    For instance, AT&T today comprises the operations of the former Pacific Telesis (California and Nevada), Ameritech (the upper Midwest), Southwestern Bell (Texas, and the south-central states west of the Mississippi), and Southern New England Telephone (Connecticut).   Interstate special access prices are generally established separately for each of these legacy regions, while intrastate special access prices are generally established for each state. For its part, Verizon has generally unified its standard interstate special access pricing across all states served by the former RBOCs NYNEX and Bell Atlantic, while maintaining separate prices for those exchanges served by the former GTE.

[20]    *SBC/AT&T Order*, fn. 94.

8

as the individual building is simply impractical -- there are over 240,000 commercial buildings in just the 19 MSAs where AT&T has local facilities.[21]  More importantly, however, is that customer demand for private line service is not generally limited to individual buildings because most large business customers desiring private line service have multiple locations.  Consequently, there is little *interest* in building-specific pricing, even if such pricing were administratively reasonable.

15.    The fact is that the large business customers that are typically accessed by (or purchase retail services using) private line services have multiple locations and are interested in obtaining service, whenever possible, from a single provider.    The importance of the multi-location customer and its significance to market definition is apparent in the customer-declarations that the Department has provided the Court as being representative of this market.[22]  More than 85% of these declarations describe a customer with multiple locations, with most expressing a preference for a provider that meets all of its needs.[23]

---

[21]     *SBC/AT&T Order*, fn. 98.  The 240,000 commercial buildings cited by the FCC greatly overstates the relevant market for competitor-supplied local loop connections, however, because that is the number of buildings with 10 or more equivalent business lines.  As the Department recognizes (Majure Declaration, fn. 17), a competitor would not construct facilities to an individual building unless there were at least 2DS3s of demand (1,344 equivalent lines).  Consequently, the number of actual buildings with sufficient demand to justify network construction by a competitor is far smaller than the 240,000 commercial buildings cited by the FCC.

[22]     *See* Tab 1 of DOJ Submission.  The Court should view with skepticism the usefulness of the customer declarations in determining the likely effect of the proposed acquisitions (in that the customers are not trained to determine the market-wide effects of the transactions).  The declarations are useful, however, for purposes of identifying the characteristics of the customers themselves.

[23]     DOJ Submission, Tab 1.

16.    The FCC similarly observed that multi-location customers would prefer a single provider and recognized that these demand-considerations required a broader definition of the geographic market:

> For larger, multi-location enterprise customers, we reach a slightly different conclusion. We find that these customers typically seek service from a provider that can serve all of their locations, and generally only a few carriers serving a particular location have such capabilities. In light of the fact that there are relatively few providers that can offer a high level of ubiquitous service, we conclude that this geographic market should encompass all the geographic locations where these multi-location business customers may have a presence.[24]

17.    What is lacking in the Department's analysis – not to mention the analysis of the FCC that inexplicably adopts the Department's remedy even though the FCC adopts a different market definition – is the recognition that the multi-location private line customer is the rule, not the exception. Pricing is rarely established for a single building because it is the rare customer for such services that would be interested in only a single location.[25]    Consequently, what is needed is a competitive analysis – and, more importantly, a structural remedy – intended to restore the competition lost by these acquisitions in a broader geographic market defined by the most common customer type, i.e. the multi-location customer.

---

[24]    *SBC/AT&T Order* at ¶ 63.

[25]    The fact a CLEC would not typically construct network facilities to add a building until a retail contract is executed means that there may well be building-specific pricing to the <u>initial</u> anchor tenant by a new entrant. This exception, related to the unique circumstance of network expansion by new entrants with relatively small market presence, does not define the relevant geographic market for private line services generally.

**The Implications of a Proper Geographic Market to the Competitive Analysis**

18.     As explained above, the principal user of private line services is a multi-location large business or, in the underlying wholesale market, a carrier developing a local network to serve this customer segment. Indisputably, such customers seek out and prefer carriers that can meet their total needs (as much as practical), both so that they may have a single carrier responsible for quality and reliability, as well as to achieve larger cumulative discounts under volume and term plans.[26]  Consider, for instance, the common thread expressed by the customer-declarations submitted by the Department:[27]

> Ideally, we want to stay with a single provider to the extent that we can, as this approach has proven to be valuable in all respects, including service manageability and pricing.[28]

> In contracting for telecommunications services, NOVO 1 prefers using single source contracting for its primary needs because of economies of scale and reliability issues.[29]

> We are a midsize company, and we have proven that it is more cost-advantageous for us to go with a single provider that can offer a total package…. It is essential to me to have one point of contact if a problem arises which provides accountability without the finger pointing that could likely occur if we had multiple providers.[30]

---

[26]     There are, however, some customers that deliberately seek to split their demands among multiple providers so that the services are provided over redundant facilities. *See* Declaration of William Noakes (Meijer Inc.) at 8 explaining that Meijer will continue to use multiple telecom providers because it ensures reliability and guarantees that the providers will continue to compete based on price, service and overall quality.

[27]     The following citations are drawn from Tab 1 of the DOJ Submission and are intended to be representative, but not exhaustive, of the perspectives exposed therein.

[28]     Declaration of Jim Johnson, Young's Market, at 7.

[29]     Statement of Mitchell Swindell (NOVO 1 Inc.) at 3. Although NOVO 1 prefers a single source, it does indicate that it sometimes uses multiple providers for redundancy and other reasons.

[30]     Statement of Randy Dotemoto (NIX Check Cashing) at 3.

I think that the ability of companies to have a one-stop shop that offers all of the voice and data services that an organization needs through a single account service team is a big benefit for customers.[31]

Gregg Appliances, like most enterprise customers, prefers to work with one telecommunications vendor. This allows us to allocate our money effectively and increases our vendors' ability to work through ownership of any issues, like the interconnectivity problems that frequently occur in connecting the last mile of communications.[32]

Ideally, I would like to have one provider to cover Granite's entire, or at least 90% of Granite's, geographic footprint.[33]

19.    Ironically, this desire by the enterprise customer to place as much of its network requirements with a single vendor as possible provided a primary motivation for SBC's previous acquisition, its purchase of Ameritech (the Regional Bell Operating Company serving the Upper Midwest). According to SBC's sworn affidavit, the typical large corporate customer places a high premium on the ability of its primary vendor to meet a large portion of its needs:

In order to have an opportunity to be considered along with our competitor/opponents to serve these large corporate customers, we believe that 70-80% coverage of the customers 'local and long distance expenditures is critical. It is at this point that SBC can become a viable candidate for delivering telecommunications services as a primary carrier, as opposed to a niche carrier. This is true for the following reasons:

-    Larger geographic coverage enables SBC to be considered for a higher percentage of the customers' telecommunications services;

-    Broader geographic coverage allows a provider to develop and roll-out new products and services more cost effectively;

-    This broader geographic coverage results in a higher percentage of the customers' telecommunications expenditures being considered in a

---

[31]    Statement of Joel Clark (Dairy Farmers of America) page 1.

[32]    Statement of Bob Ellison (Gregg Appliances Inc.) at 4.

[33]    Statement of David Watts (Granite Construction) at 4.

consolidated contract which recognizes the customers' total telecommunications purchasing power;

-    Consolidated contracts based on revenue and term commitments result in SBC being able to deliver reduced rates and value added service packages for the customers; and

-    Larger geographic coverage by a telecommunications provider also results in the customer having to make fewer contacts to accomplish ongoing move, add and change activity throughout their nationwide organizations. This is a key, value-added consideration for large business customers.[34]

20.    Given the nature of the enterprise market and the preference of its customers for multi-location services, a key competitive dimension for any provider of local private line services would be its geographic footprint. Despite the clear importance of a carrier's geographic footprint in defining its competitive position, however, there is no indication that the Department ever analyzed the factor.[35] Rather, the Department's unfathomable selection of the individual building as its effective geographic market blinded its subsequent analysis to this key competitive attribute.[36]

---

[34]    Reply Affidavit of James Kahan, Senior Vice President for Corporate Development, SBC Corporation, Federal Communications Commission CC Docket 98-141, Filed November 13, 1998 at 16.

[35]    The FCC does not directly analyze the geographic footprint of AT&T and/or MCI being lost through these acquisitions. Summary data provided by the FCC (see, for instance, SBC/AT&T Order at ¶ 44) suggests that AT&T has the largest footprint, but the FCC's penchant for comparing AT&T's individual network to the cumulative network of all other providers prevents any meaningful review. Obviously, given the customers' preference to at least minimize (if not avoid) obtaining service across multiple networks, it is flatly inappropriate to compare the network scale of a single provider to that of all other networks combined. Customers clearly do not want to "piece together" their serving arrangements and, as a result, treating all competitor networks in their totality, as though customers would similarly perceive these discreet networks in that manner, is misleading.

[36]    Remarkably, the Department concluded that neither AT&T nor MCI satisfied a unique competitive role selling local private line service (Majure Declaration at ¶ 17), despite the clear evidence that market-footprint was a defining advantage. Moreover, AT&T and MCI each had a preexisting base of enterprise-level retail customers, which provided them a decided advantage (over a new entrant) in finding that first anchor contract needed to justify network construction

**A Flawed Analysis Produces Absurd Results**

21.    As explained above, because the Department myopically examined the market at the level of each individual building, it underestimated the competitive value of AT&T and MCI in the local market.   These carriers' local competitive positions are the consequence not only of their extensive (relative to other competitors) networks, they are also a product of their customer support capabilities, name recognition and large customer base.   These "back office" functions comprise a significant cost in providing local exchange service.[37]   Moreover, even if it made sense to try and restore the competition lost by these mergers through the divestiture of network assets (as contrasted with a divestiture of a viable business), the assets being divested by the Proposed Final Judgments are woefully inadequate to the task.

22.    To begin, the only competitive harm even arguably addressed by the Department is the extreme condition where competitive choice collapsed from a duopoly (2 choices) to an absolute monopoly (1 choice) in *some* buildings.[38]  The Department never offers a reasoned explanation as to why only these 2-to-1 buildings should be offered a remedy, no matter how inadequate that remedy is.   Moreover, the Department eliminated nearly [**%] of the 2-to-1 buildings from its analysis on the theory that entry would be likely in

---

(*see* SBC Complaint at ¶ 28 acknowledging that CLECs would typically only extend network facilities to buildings after having a customer contract that would justify the construction costs).

[37]      For instance, in 2005, AT&T reported that nearly one-third of the total expense incurred by its local operating companies was expended on customer operations and general administrative activities AT&T 2005 ARMIS 43-01.   ARMIS is a set of routine financial and operating reports required by the Federal Communications Commission.

[38]      *See* Majure Declaration at ¶ 14.

these buildings.[39]    The Department's screen eliminating these buildings, however, is contradicted by its own description of the market.    Specifically, the Department acknowledged in its complaints that "CLECs will typically only build to a particular building after they have secured a customer contract of sufficient size to justify the anticipated construction costs for that building."[40]    Yet the screen that it devised to identify where entry was "likely" considered *potential* (not secured) revenues, and *building* demand (not the demand that could be contracted by a single customer).[41]

23.    More fundamental, however, is the fact that the remedy itself cannot replace the competition lost by AT&T and MCI, even in these few buildings.    First, as explained above, the competitive position of these carriers is not defined merely by these individual buildings, but by the percentage of the customer's total demand that they are positioned to serve.    Nothing in the Department's analysis or remedy addresses this key fact.

24.    Equally important, however, is that the network assets being divested are effectively "scraps," with limited, if any, competitive value.    These facilities represent excess fiber for which there is no demand in the buildings being served.[42]    Moreover, to the extent that demand in a building grows, the incumbent enjoys a substantial advantage with its ability to address such growth as an incremental add to the customer's existing service.

---

[39]    For an estimate of the total number of 2-to-1 buildings, see *SBC/AT&T Order* and *MCI/Verizon Order* at ¶ 38.

[40]    Complaints at ¶ 28.  Emphasis added.

[41]    Majure Declaration ¶ 14.

[42]    Obviously, with only two networks serving each building, the total demand in the building is already being met by SBC and AT&T (or, alternatively, Verizon and MCI).  Thus, any dark fiber being divested is unnecessary to meeting customer demand at this time.

25.    In addition, any carrier leasing the divested assets that attempts to win circuits from the post-merger incumbents (SBC and Verizon) would have to overcome the same customer concerns regarding network rearrangement that caused the Department to eschew any divestiture that included revenue-producing accounts.[43]

26.    The *de minimis* competitive worth of the divested assets is confirmed by the amount being paid for these facilities. By way of illustration, consider the facilities being divested in Indianapolis MSA.[44]  In that MSA, AT&T has agreed to divest over [*** **redacted** ***] buildings.   The total price paid for the 10-year IRU on these facilities, however, is only [***          **redacted**          ***] dollars for each building served (plus the associated transport).[45]  This price demonstrates that the assets have little competitive worth, which is exactly what a proper analysis would have predicted.

27.    It is useful to consider whether it is plausible that a [* **redacted** *] investment can restore the competition lost by AT&T's exit as a competitor from the Indianapolis market.   The following table summarizes AT&T's competitive position in the Indianapolis market as determined by the FCC:[46]

---

[43]       Majure Declaration at ¶ 18.

[44]       The Indianapolis MSA is used here because it is the only MSA that uniquely corresponds to data that the FCC provided with respect to AT&T's competitive position on a statewide basis. Because Indianapolis is the only market in Indiana in which the premerger AT&T owned local facilities – and because the FCC provided summary statistics describing AT&T's relative market position in the Indiana – it is possible for this market to directly compare the value of the assets being divested to the competition that these assets are expected to replace.

[45]       The IRU agreement for Indianapolis indicates that fewer strands of dark fiber for transport will be provided than are being leased as laterals.

[46]       *SBC/AT&T Order*, Appendix C.

16

**Summary of AT&T Market Position in Indianapolis MSA**

| Measure | Customer Segment | AT&T Share | AT&T Rank[47] |
|---------|-----------------|-----------|---------------|
| Local Voice Revenue | Medium/Large Enterprise | *** Redacted *** | |
| High Cap Revenue | Medium/Large Enterprise | | |
| Basic Business Line Account | Medium/Large Enterprise | | |
| Local Access Customers | Small Enterprise | | |

Is it really plausible that the competition lost by a carrier with the competitive share and rank of AT&T in this MSA (*i.e.*, [ *** **redacted** *** ]) can be restored through an investment of only [** **redacted** **] dollars?[48] Of course not. The *de minimis* values attributed to the assets being divested accurately reflects the absence of any real competitive worth for these facilities, even though the competitor being replaced (AT&T) is the largest competitor in the market.

**Conclusion**

28.     As explained above, the competitive worth of AT&T (and MCI) is not defined by individual network components in a particular area, but by the sum total of its local network, its customer base and its supporting assets (billing, marketing, etc.).     By acquiring its largest (by a large margin) competitor with any semblance of a national network, SBC solidified its network dominance, rivaled only by the consolidated

---

[47]     AT&T's competitive rank is based on its relative share among competitors in the Indianapolis MSA (SBC has the largest share in each category). For some measures, the total combined share of unnamed competitors exceeds that of AT&T individually. Because this share cannot be attributed to an individual carrier (the share is totaled across a number of smaller market participants), it is assumed that no individual carrier in that group is larger than AT&T.

[48]     The market measure most closely aligned with conditions in the local private line market would be high cap revenues, which is the core product offered using these facilities.

17

Verizon/MCI. (The acquisition of BellSouth by AT&T/SBC will add the Southeast to AT&T's network footprint). AT&T's market presence in any particular metropolitan area is defined by its collection of *all* local facilities in (at the least) that metropolitan market, including its rights-of-way and building access agreements, as well as the customers contractually locked to those facilities.

29.    The Department's market definition contradicts SBC's view of the market, it contradicts the prevailing pricing (either MSA or regionwide), and it contradicts the FCC's market definition (which, for the multi-location customer that defines the core of the market, is defined to include all the customer's locations). The Department has never explained how it arrived at its conclusion that the competitive consequences of these acquisitions should be analyzed at the narrowest point possible, even though its assumption in this regard is central to its claims. The Court should reject its analysis and proposed remedy as inadequate to protect the public interest.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2006.


_____
Joseph Gillan

# Appendix 2

This document is available in three formats: this web page (for browsing content), PDF (comparable to original document formatting), and WordPerfect. To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Department of Justice<br>Antitrust Division<br>1401 H Street, N.W., Suite 8000<br>Washington, DC 20530,<br><br>Plaintiff,<br><br>v.<br><br>WORLDCOM, INC.,<br>500 Clinton Center Drive<br>Clinton, MS 39056,<br><br>and<br><br>SPRINT CORPORATION,<br>2330 Shawnee Mission Parkway<br>Westwood, KS 66205,<br><br>Defendants. | Civil Action No. |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin WorldCom, Inc. from acquiring Sprint Corporation and alleges as follows:

1. For most of the twentieth century, the provision of long distance telecommunications services and many other telecommunications services in the United States was monopolized by AT&T. In the 1970s, this monopoly was challenged by new entrants, supported by changes in Federal Communications Commission ("FCC") regulations designed to promote competition and by the government's antitrust case challenging AT&T's actions to preserve its monopoly. These efforts ultimately succeeded in bringing competition to long distance services.

2. In the 1980s and 1990s, two companies -- and only two companies -- emerged as major competitors to AT&T, and to each other. MCI (which merged with WorldCom in 1998) and Sprint each constructed national and international fiber optic networks, developed sophisticated systems for handling many millions of customer accounts, hired and trained large workforces capable of providing a wide range of high-quality telecommunications services to customers throughout the nation, and invested billions of dollars over many years to establish widely known and trusted brands.

3. Many other carriers have entered on a much smaller scale, but none has produced beneficial effects on competition comparable in magnitude to the effects produced by competition between WorldCom and Sprint, and between those companies and AT&T. Those two companies, together with AT&T, dominate the provision of long distance services to residential and small/home office consumers, the provision of international services between the United States and many countries throughout the world for customers in the United States, and the provision of key data network services and custom network services used by many large business customers. In addition, WorldCom has attained (primarily through a series of acquisitions) a commanding position in the ownership and operation of the "backbone" networks that connect the thousands of smaller networks that constitute the Internet, and Sprint is WorldCom's largest competitor in that market.

4. In particular, the Defendants are:

   o the largest and second-largest of a small group of top-tier providers of Internet "backbone" network services in the United States and the world;

   o the second- and third-largest of three providers who collectively dominate long distance telecommunications within the United States, and between the United States and numerous overseas destinations;

   o the largest and third-largest of three providers who collectively dominate international private line services to business customers;

   o two of three providers who collectively dominate various data network services to large business customers; and

   o two of three providers who collectively dominate custom network telecommunications services to large business customers.

5. The proposed merger of WorldCom and Sprint will cause significant harm to competition in many of the nation's most important telecommunications markets. By combining two of the largest telecommunications firms in these markets, the proposed acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. For millions of residential and business consumers throughout the nation, the

merger will lead to higher prices, lower service quality, and less innovation than would be the case absent its consummation. The United States therefore seeks an order permanently enjoining the merger.

## I.

### JURISDICTION AND VENUE

6. This Complaint is filed under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain the violation by the Defendants, as hereinafter alleged, of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

7. WorldCom and Sprint are engaged in interstate commerce and in activities substantially affecting interstate commerce. The Court has jurisdiction over this action and over the parties hereto pursuant to 15 U.S.C. §§ 22, 25 and 28 U.S.C. §§ 1331, 1337.

8. WorldCom and Sprint each transact business and are found in the District of Columbia. Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

## II.

### THE DEFENDANTS AND THE TRANSACTION

**A. WorldCom, Inc.**

9. WorldCom, Inc., formerly known as MCI WorldCom, Inc., is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Clinton, Mississippi. It is one of the largest global telecommunications providers, with operations in more than 65 countries in the Americas, Europe, and the Asia-Pacific region, and more than 22 million residential and business customers worldwide. WorldCom's 1999 annual revenues totaled approximately $37 billion.

10. WorldCom's UUNET subsidiary is by far the largest provider of Internet backbone services in the world, whether measured by traffic or revenues. UUNET's backbone network extends from North America to Europe and Asia, and serves more than 70,000 businesses in 114 countries. UUNET offers a wide range of retail and wholesale Internet backbone services, including "dial-up" (i.e., through shared modem banks) and dedicated Internet access (i.e., through direct connections to the customer), as well as value-added services such as Internet protocol virtual private networks ("IP/VPNs"), website hosting, collocation at data centers, applications hosting, and Internet security services.

11. WorldCom is the second-largest domestic long distance telecommunications carrier in terms of revenues. Its broad fiber optic network reaches nearly every corner of the United States and numerous markets abroad. As measured by revenues, it is also the second-largest provider of various data

network services, and the second-largest of only three meaningful competitors in the market for custom network telecommunications services for large U.S. business customers.

12. WorldCom is the second-largest provider of international long distance services to U.S. customers and the largest provider of U.S.-connected international private voice and data lines. It provides service to virtually every country and territory in the world and has operations in more than 65 countries. In 1999, WorldCom's U.S.-billed international voice and data services revenues totaled more than $6.6 billion. WorldCom's extensive international facilities and ownership or control of capacity in approximately 100 submarine cables, along with its direct bilateral connections with 213 carriers in 157 countries, give it one of the strongest and most ubiquitous international networks of any U.S. carrier.

13. WorldCom has achieved its current competitive position in large part through the acquisition of more than 60 competitors and other companies. For example:

   a. In January 1995, WorldCom acquired the network services operations of Williams Telecommunications Group and its 11,000-mile fiber optic nationwide network for $2.5 billion.

   b. In December 1996, WorldCom acquired MFS Communications Company, Inc. ("MFS"), the largest competitive local access provider in many U.S. and Western European metropolitan areas, for $12.5 billion in stock. Through the MFS acquisition, WorldCom gained control of UUNET, the world's leading Internet backbone provider, which MFS had itself acquired in August 1996.

   c. In January 1998, WorldCom acquired another large local access provider, Brooks Fiber Properties, Inc. ("BFP"), for approximately $1.2 billion in stock.

   d. Also in January 1998, WorldCom acquired Compuserve Corp., one of the nation's leading Internet and data network services providers, for approximately $1.3 billion.

   e. In a related transaction, WorldCom bought ANS Communications, Inc. ("ANS") from America Online ("AOL") for approximately $500 million. ANS served as one of AOL's primary Internet backbone networks, and as part of the ANS transaction, WorldCom secured a long-term contract to provide AOL with Internet backbone services. WorldCom has subsequently renewed this contract and will continue to be AOL's principal supplier of Internet backbone services through at least December 31, 2004.

   f. WorldCom has also acquired other Internet backbones, including GridNet, Unicom-Pipex, InNet, NL Net, and Metrix-Interlink.

g. In August 1998, WorldCom acquired control of Embratel Participaçes S.A. ("Embratel"), Brazil's leading long distance telecommunications provider.

h. Finally, in September 1998, WorldCom completed the acquisition of MCI Communications Corp. ("MCI"), the United States' second-largest provider of long distance telecommunications and a leading Internet backbone services provider. As a result of actions taken by the U.S. Department of Justice, the FCC, and the Commission of European Communities, MCI divested its internetMCI ("iMCI") assets to Cable & Wireless PLC ("C&W") pursuant to conditions designed to ensure the continued competitive vigor and vitality of the divested business. Shortly after acquiring the iMCI assets, C&W initiated legal and arbitration proceedings regarding WorldCom's implementation of its divestiture agreement with C&W. WorldCom settled this litigation earlier this year by paying $200 million to C&W. In connection with the settlement, WorldCom required that C&W agree not to continue to publicly state that it was impossible to successfully divest an integrated Internet business without weakening the new entity's competitive strength and thereby harm competition in the market.

## B. Sprint Corporation

14. Sprint Corporation is a corporation organized and existing under the laws of the State of Kansas, with its principal place of business in Westwood, Kansas. It is one of the largest telecommunications providers in the United States, serving more than 17 million residential and business customers. Sprint built the first nationwide, all-digital, fiber optic network; operates the nation's second-largest Internet backbone; and competes head-to-head against WorldCom in many markets in which the two companies operate. Sprint had revenues of approximately $17 billion in 1999. Sprint also is an incumbent local exchange carrier, serving about 8 million local lines in 18 states.

15. Sprint operates SprintLink, the second-largest Internet backbone provider in the nation in terms of traffic and revenues, and provides dedicated Internet access to more than 4,000 corporate and ISP customers. Sprint also operates the International Connections Management Backbone Network ("ICM"), which was originally established for the National Science Foundation to provide international Internet connectivity and now provides service to foreign-based research and educational customers, and DialNet, a separate network used by Internet service providers ("ISPs") such as such as America Online and EarthLink to provide dial-up Internet access to their customers. Through these networks, Sprint offers retail and wholesale Internet backbone services, including dial-up and dedicated access as well as value-added services such as IP/VPNs, website hosting, and managed network security services.

16. Sprint is the third-largest domestic long distance telecommunications

carrier, based on revenues. Like WorldCom and AT&T, Sprint's fiber optic network reaches nearly every corner of the United States. In terms of revenues, Sprint is also one of only two significant providers of data network services in the United States using the X.25 protocol (the other being WorldCom), one of the three largest providers of data network services overall, and the third-largest of only three meaningful competitors in the market for custom network telecommunications services for large U.S. business customers.

17. Sprint is the third-largest provider of international long distance services to U.S. consumers and U.S.-connected international private lines, with outbound traffic to more than 200 countries and international service revenues of approximately $1.7 billion in 1999. Sprint has a strong international network, with ownership rights or control of capacity in approximately 75 international cables, and direct bilateral connections with 150 carriers in at least 120 countries.

## C. The Proposed Transaction

18. On October 4, 1999, WorldCom entered into an Agreement and Plan of Merger with Sprint pursuant to which Sprint will be merged into WorldCom by means of a stock-for-stock transaction, initially valued at $129 billion. The merged company will be named "WorldCom, Inc."

19. On November 17, 1999, the Defendants filed an application for the transfer of control of various licenses issued by the FCC to Sprint that are necessary for it to conduct its business. Unless and until their FCC application is granted, the Defendants cannot consummate the merger. The transaction is also subject to review and approval by the Commission of European Communities.

## III.

## "TIER 1" INTERNET BACKBONE SERVICES MARKET

## A. Relevant Product Market

20. The Internet is a vital conduit for commerce and communication for millions of Americans, and it is fast becoming as much a part of daily life as the television and the telephone. This global network of public and private networks, i.e., the Internet, enables end users to communicate with each other and access large amounts of information, data, and educational and entertainment services. Until April 30, 1995, the Internet was administered by the National Science Foundation ("NSF"), an independent federal agency. Thereafter, the NSF relinquished its role, which allowed the development of the current commercial Internet to occur.

21. The end users of the Internet -- individuals, business customers, content providers, governments, and universities -- obtain access either through a "dial-up" modem or other consumer Internet access connection (e.g., cable

modem or digital subscriber line service), or through a dedicated high-speed facility accessing the Internet ("dedicated access") through one of thousands of Internet service providers ("ISPs"). ISPs provide access to the Internet on a local, regional, or national basis. ISPs operate their own networks of varying size, but most have limited facilities.

22. An ISP can connect any customer on its network to any of the other customers on its network. In order to allow its customers to communicate with the many end users connected to other networks, however, an ISP must establish direct or indirect interconnections with those other networks. Because the Internet comprises thousands of separate networks, direct interconnections between each of those networks and all other networks would be impractical. Instead, the Internet has developed a hierarchical structure, in which smaller networks are interconnected with one of a few large Internet "backbone" networks, which operate high-capacity long-haul transmission facilities and are interconnected with each other. In a typical Internet communication, for example, an ISP sends data from one of its customers to the large network that the ISP uses for backbone services, which in turn sends the data to another backbone network, which then delivers it to the ISP serving the end user to whom the data is addressed.

23. Internet backbone providers ("IBPs") and ISPs can generally exchange traffic directly through one of two interconnection arrangements: "transit" or "peering." Through "transit" service, an ISP, small IBP, or other corporate customer purchases a dedicated access facility linking it directly to the transit provider's Internet backbone network. That transit service provides the purchaser full Internet connectivity, i.e., the ability to send and receive traffic through the purchaser's IBP to any other network or destination on the Internet. Under a transit arrangement, the customer pays a fee for the connection in addition to the fee paid for transit service. A transit provider does not pay any fee for access to its transit customers' networks.

24. Networks, including IBPs and ISPs, may also exchange traffic with other networks through "peering" arrangements whereby each "peer" will only accept traffic that is destined either for its own network or for one of its own transit customers. Peers do not accept traffic destined for non-customer networks, i.e., transit traffic. Unlike transit, peering is typically a settlement-free, or "bill and keep," arrangement under which neither party pays the other for terminating traffic. Each peer typically pays for one half the cost of the connections between their networks.

25. Interconnection arrangements between networks are voluntary and consensual in nature, and are not subject to governmental regulation. Internet networks exchange traffic either at private interconnection sites or at public interconnection sites known as Network Access Points ("NAPs") or Metropolitan Area Exchanges ("MAEs"). The NSF established the first public interconnection facilities, which were to be operated by private parties, to enable any two ISPs or IBPs who chose to peer with each other to do so at a NAP or MAE. UUNET operates three of the largest and busiest public interconnection points (MAE-East, MAE-West, and MAE-Central)

and four smaller regional MAEs. Similarly, Sprint operates another of the busiest NAPs that is located in the New York City area in Pennsauken, New Jersey. Together, the Defendants will control four of the seven primary public interconnection points.

26. The explosive growth of the Internet overwhelmed these NAPs and MAEs, and despite the addition of new public access points to accommodate this growth, the public interconnection facilities remain chronically congested. In an effort to avoid these congested facilities, some networks have established private bilateral interconnection facilities with their peers. Today, large IBPs exchange most of their traffic with other IBPs at private interconnection sites at various points throughout their networks. Many smaller networks, however, still rely solely or substantially upon public access points. These networks have been unable to provide high-quality Internet access to their customers.

27. There are a small number of large, powerful IBPs -- referred to as "Tier 1" IBPs -- that sell transit service to substantial numbers of ISPs and sell dedicated Internet access directly to corporate customers or other enterprises. Tier 1 IBPs have large nationwide or international networks capable of transporting large volumes of data. These Tier 1 IBPs typically maintain private peering relationships with all other Tier 1 IBPs on a settlement-free basis, as opposed to purchasing Internet connectivity (e.g., transit) from any other IBP. Most Internet communications are carried over the networks of these Tier 1 IBPs, and either originated or terminated, or both, with end users that obtain Internet access directly from a Tier 1 IBP, or from an ISP or other network that purchases transit from a Tier 1 IBP (i.e., a Tier 1 IBP's customer).

28. Smaller IBPs, often referred to as "Tier 2" or "Tier 3" IBPs, may also sell transit to smaller ISPs or IBPs and sell dedicated Internet access to end users. However, these Tier 2 or Tier 3 IBPs typically purchase transit from (rather than peer with) one or more Tier 1 IBPs, and/or rely substantially upon exchanging traffic at the inferior public interconnection facilities. Lower-tier IBPs that must purchase a significant amount of connectivity from other IBPs operate at substantial cost disadvantages compared to Tier 1 IBPs, which rely exclusively on peering.

29. Tier 1 IBPs also have significant competitive advantages compared to lower tier IBPs in terms of their ability to provide higher-quality service through their direct and private interconnections, rather than relying on indirect transit service or on the inferior and congested public interconnection points. Generally, network operators seek the most direct routing for their Internet communications -- i.e., over routes with the fewest possible number of cross-network connections or "hops" -- because of the greater risk that data will be lost or its transmission delayed as the number of interconnection points increases. Lower-tier IBPs that must rely on transit typically reach other networks indirectly through their transit provider's network, adding "hops." Because Tier 1 IBPs provide direct connections to large numbers of ISPs and to other Tier 1 IBPs that collectively handle most Internet traffic,

Tier 1 IBPs can offer higher quality services than can lower-tier IBPs. Many important ISPs and business customers will not purchase Internet connectivity from an IBP unless that IBP maintains direct, private peering connections with most, if not all, Tier 1 IBPs.

30. Because of these differences, the provision of Tier 1 backbone services is distinguished from that provided by other IBPs. Typically, Tier 1 IBPs charge higher prices for Internet access than do lower-tier IBPs because they offer distinct value to their customers and are not significantly constrained by the competition of lower-tier IBPs. The provision of connectivity to Tier 1 IBPs is a line of commerce and a relevant product market for purposes of Section 7 of the Clayton Act. There are no substitutes for this connectivity sufficiently close to defeat or discipline a small but significant nontransitory increase in price.

## B. Relevant Geographic Market

31. Tier 1 IBPs provide connectivity to their networks throughout the United States. Because providing customers with Tier 1 IBP connectivity in the United States requires domestic operations, such customers are unlikely to turn to any foreign providers that lack these domestic operations in response to a small but significant and nontransitory increase in price by domestic Tier 1 IBPs. The United States is the relevant geographic market for purposes of Section 7 of the Clayton Act.

## C. Market Concentration and Anticompetitive Effects

32. WorldCom's wholly owned subsidiary, UUNET, is by far the largest Tier 1 IBP by any relevant measure and is already approaching a dominant position in the Internet backbone market. Based upon a study conducted in February 2000, UUNET's share of all Internet traffic sent to or received from the customers of the 15 largest Internet backbones in the United States was 37%, more than twice the share of Sprint, the next-largest Tier 1 IBP, which had a 16% share. These 15 backbones represent approximately 95% of all U.S. dedicated Internet access revenues. UUNET's and Sprint's 53% combined share of Internet traffic is at least five times larger than that of the next-largest IBP. The Herfindahl-Hirschman Index ("HHI"), the standard measure of market concentration (defined and explained in Appendix A), indicates that this market is highly concentrated. The HHI in terms of traffic is approximately 1850; post-merger, the HHI will rise approximately 1150 points to approximately 3000. (Note: Throughout the Complaint, market share percentages have been rounded to the nearest whole number, but HHIs have been estimated using unrounded percentages in order to accurately reflect the concentration of the various markets.)

33. The proposed merger threatens to destroy the competitive environment that has created a vibrant, innovative Internet by forming an entity that is larger than all other IBPs combined, and thereby has an overwhelmingly disproportionate size advantage over any other IBP.

34. The proposed transaction would produce anticompetitive harm in at least two ways. First, it would substantially lessen competition by eliminating Sprint, the second-largest IBP in an already concentrated market, as a competitive constraint on the Internet backbone market. The elimination of this constraint will provide the combined entity with the incentive and ability to charge higher prices and provide lower quality of service for customers.

35. Second, the combined entity ("UUNET/Sprint") will have the incentive and ability to impair the ability of its rivals to compete by, among other things, raising its rivals' costs and/or degrading the quality of its interconnections to its rivals. As a result of the merger, UUNET/Sprint's rivals will become increasingly dependent upon being connected to the combined entity, and the combined entity will exploit that advantage. Such behavior will likely enhance the market power of the combined firm, and ultimately facilitate a "tipping" of the Internet backbone market that will result in a monopoly.

36. As is true in network industries generally, the value of Internet access to end users becomes greater as more and more end users can easily be reached through the Internet. The benefit that one end user derives from being able to communicate effectively with additional users is known as a "network externality."

37. When the networks that constitute the Internet operate in a competitive market, this network externality creates powerful incentives for each individual network to seek and implement efficient interconnection arrangements with other networks. Efficient interconnection has many requirements, including the physical connection to exchange traffic and the effective implementation of cross-network protocols or standards. For example, providers in competitive network industries have strong incentives to cooperate in the development of new cross-network protocols or quality of service ("QoS") standards that would enable new services or applications to be used across interconnection points on multiple providers' networks. By securing efficient interconnection, an ISP or IBP makes its services more valuable to its existing and potential customers. End users can enjoy the benefits of network externalities regardless of which network they belong to so long as their cross-network communications are of similar quality to communications "on-net," or purely within their provider's network. Thus, a failure to secure efficient interconnection arrangements places any given network at a significant competitive disadvantage when such customers can turn to a competing network that is efficiently interconnected to other networks.

38. The explosive growth of Internet traffic, which has been doubling in volume every three to four months, and the introduction of new applications that depend upon the transmission of large quantities of data, have made it necessary for IBPs to constantly increase the capacity, i.e., bandwidth, of their own networks, and of the facilities through which they interconnect with other networks. A network that upgrades bandwidth within its own network in an adequate and timely manner can maintain the quality of its

customers' Internet experience with regard to communications that originate as well as terminate on that network. In order to maintain the quality of its customers' Internet experience with regard to communications that originate or terminate on another network, however, a network must constantly upgrade the capacity of its interconnections with other networks, as well as upgrade capacity within its own network.

39. Any failure to keep pace with the growing demand for increased interconnection capacity -- or, worse yet, any degradation in the quality of existing interconnections with other networks -- would adversely affect the quality of an Internet user's experience regardless of the capacity and efficiency of an IBP's own network. Due to the Internet's growth rate, any failure to make adequate and timely upgrades of interconnection capacity is tantamount to a degradation of the quality of interconnection. When networks operate in competitive markets, they have mutual incentives to avoid such degradation.

40. Similarly, when operating in competitive markets, networks have incentives to negotiate reasonable prices for interconnection arrangements. An IBP that sells transit to another network will have incentives to charge reasonable prices for that service in order to prevent a transit customer from taking its business to a rival IBP. Furthermore, two networks will have incentives to enter into peering arrangements when, for each, the cost of terminating the other's traffic is roughly comparable to the benefit of having its own traffic terminated by the other, taking into account, among other factors, whether the networks have comparable traffic levels, similar geographic scope, and a roughly comparable input/output ratio at each interconnection point. As long as there are a sufficient number of Tier 1 IBPs of roughly comparable size, there exist sufficient incentives for all Tier 1 IBPs to peer privately with each other at the necessary capacity levels. In turn, this enhances both Internet connectivity and competition among Tier 1 IBPs. Nevertheless, an IBP makes peering decisions on a discretionary basis, and may refuse to peer or may terminate a peering relationship with any other IBP on short notice or without cause if it determines that doing so is in its self-interest.

41. When a single network grows to a point at which it controls a substantial share of the total Internet end user base and its size greatly exceeds that of any other network, network externalities may cause a reversal of its previous incentives to achieve efficient interconnection arrangements with its rival networks. In this context, degrading the quality or increasing the price of interconnection with smaller networks can create advantages for the largest network in attracting customers to its network. Customers recognize that they can communicate more effectively with a larger number of other end users if they are on the largest network, and this effect feeds upon itself and becomes more powerful as larger numbers of customers choose the largest network. This effect has been described as "tipping" the market. Once the market begins to "tip," connecting to the dominant network becomes even more important to competitors. This, in turn, enables the dominant network to further raise its rivals' costs, thereby accelerating the tipping effect. As a result of an increase in their costs, rivals may not be able to compete on a

long-term basis and may exit the market. If rivals decide to pass on these costs, users of connectivity will respond by selecting the dominant network as their provider. Ultimately, once rivals have been eliminated or reduced to "customer status," the dominant network can raise prices to users of its own network beyond competitive levels. Once this occurs, restoring the market to a competitive state often requires extraordinary means, including some form of government regulation.

42. If the merger is allowed to proceed, the Defendants will be in a commanding position vis-à-vis all of their Tier 1 IBP rivals. With a majority of all Internet traffic on its own network, UUNET/Sprint and its customers will derive relatively less benefit from being efficiently connected to smaller networks than will the customers of these smaller networks derive from being efficiently connected to UUNET/Sprint. Whereas in a competitive environment Tier 1 IBPs have roughly equal incentives to peer with each other, the merged entity will be so large relative to any other IBP that its interest in providing others efficient and mutually beneficial access to its network will diminish. Because other Tier 1 IBPs will have a relatively greater need to be connected to UUNET/Sprint, in the absence of a peering relationship, they will be forced to purchase transit services from UUNET/Sprint to maintain adequate interconnection capacity.

43. Whereas in a competitive environment Tier 1 IBPs have incentives to charge reasonable prices for transit, the merged entity will be so large relative to other IBPs that its interest in providing reasonable prices or terms for transit service will diminish. Ultimately, there is a significant risk that, as a result of the merger, the combined entity will be able to "tip" the Internet backbone services market and raise prices for all dedicated access services.

44. The proposed transaction will substantially enhance the risk that UUNET/Sprint will have the power to engage in anticompetitive behavior. Such behavior may involve refusing to peer with other Tier 1 IBPs for interconnection, and either failing to augment (e.g., by denying, withholding, or "slow-rolling" requested upgrades) or otherwise degrading the quality of interconnection capacity between peers.

45. The Defendants already require both their transit customers and peers to enter into strict nondisclosure agreements ("NDAs") as a condition of doing business. The NDAs prohibit these customers and peers from disclosing the nature or existence of the interconnection agreements and, in the case of customers, the prices charged. By enforcing secrecy, these NDAs will enhance the Defendants' ability to price discriminate (i.e., charge different prices) among their customers and to grant or deny peering on an arbitrary basis.

46. Another way in which a combined UUNET/Sprint will be able to limit rivals' abilities to compete will be by refusing to cooperate with other Tier 1 IBPs in implementing interconnection arrangements required for the development of new Internet-based services, such as voice over Internet

protocol ("VoIP"), video conferencing, live video transmission, or Internet protocol virtual private networks ("IP/VPNs"). These new services are becoming increasingly important to Internet users and require specialized arrangements for effective transmission across two or more backbone networks. For example, cross-network QoS standards that are required for two individual networks to share in providing certain Internet-based services have not yet been adopted on an industry-wide basis. UUNET/Sprint will be able to take advantage of its size to enhance its market power by implementing a QoS standard "on net" while refusing to cooperate in the implementation of cross-network QoS standards. Because UUNET/Sprint will have such a large percentage of traffic on net, customers seeking to use these services over as much of the Internet as possible will have little choice but to migrate to or select it as their provider. UUNET/Sprint will also have the incentive and ability to exploit its unmatched scale and scope to control the development of these new services so that only its own customers will have access to them.

**D. Entry**

47. Entry into the Tier 1 Internet backbone services market would not be timely, likely, or sufficient to remedy the proposed merger's likely anticompetitive harm. In the current market environment, entry barriers are already high, and the proposed transaction will substantially raise barriers to entry. An entrant into the Tier 1 Internet backbone market must establish and maintain adequate peering interconnections to provide Internet connectivity. Entry into the Tier 1 Internet backbone market requires that an IBP peer privately, on a settlement-free basis, with all other Tier 1 IBPs, as well as interconnect with other IBPs without having to purchase any significant amount of Internet connectivity. Incumbent Tier 1 IBPs only grudgingly grant private peering to another IBP when it has a sufficiently large customer base such that other Tier 1 IBPs will be able to derive sufficient positive network externalities from interconnection with it. In a classic "Catch-22," without adequate peering interconnections a rival cannot gain customer traffic and without sufficient customer traffic a rival cannot gain peering connections.

48. UUNET/Sprint would be able to control and inhibit successful entry by refusing to interconnect with new entrants or by limiting those connections in order to control the growth of its rivals. By degrading the quality of interconnection and raising its rivals' costs, UUNET/Sprint would further prevent entry and expansion by other IBPs. Moreover, through its control of public interconnection facilities (e.g., MAE-East, MAE-West, New York NAP) and its refusal to upgrade these facilities, UUNET/Sprint would be able to limit opportunities for existing rivals and new entrants to build their traffic volumes through public peering.

49. Entry into the Tier 1 Internet backbone services market also requires substantial time and enormous sums of capital to build a network of sufficient size and capacity, and to attract and retain the scarce, highly skilled technical personnel required for its operations.

# IV.

## MASS MARKET DOMESTIC LONG DISTANCE TELECOMMUNICATIONS SERVICES

### A. Relevant Product Market

50   Consumers need and want to communicate with others over large distances as well as locally. "Long distance" telecommunications services enable consumers to complete communications from their local area to locations throughout the world. Throughout much of the twentieth century, AT&T possessed a monopoly in the provision of long distance telecommunications services in the United States and in the provision of local telecommunications services in most of the country. In 1982, by means of a consent decree entered in *United States v. American Telephone & Telegraph Co.*, AT&T was divided into a long distance telecommunications carrier, AT&T, and seven regional Bell Operating Companies ("BOCs") that provide local telephone service. The decree also divided the nation into 193 local access and transport areas, known as "LATAs." It permitted the BOCs to offer *intra*LATA services, but prohibited them from offering *inter*LATA services. The prohibition was substantially preserved by the Telecommunications Act of 1996, but Section 271 of the Act provided for the removal of the prohibition on a state-by-state basis if a BOC satisfied certain requirements.

51.   Domestic long distance services allow consumers to make *inter*LATA telephone calls that originate in one LATA and terminate in a different LATA within the United States. International long distance services allow consumers to make telephone calls that originate in (or are billed in) a U.S. LATA and are carried over terrestrial links, submarine cables, or satellite connections to a termination point in a foreign country.

52.   Long distance telecommunications services are used by millions of individual consumers, as well as small, medium, and large businesses of all kinds. Different types of customers have diverse needs that influence their respective purchasing decisions. The service offerings of long distance providers are tailored to meet the needs of particular types of customers, and services are marketed and priced differently for each type of customer.

53.   Residential and small/home office telecommunications consumers (the "mass market") comprise one such type of long distance customer, and constitute a market distinct from long distance services sold to other types of customers (e.g., larger businesses). They typically purchase all or most of their domestic and international long distance services by "presubscribing" to a specific carrier (the presubscribed interexchange carrier or "PIC"). Presubscribed long distance (interLATA and international) offerings are commonly known as "dial-1" or "1+" toll services. Such offerings permit the customer to call from a presubscribed telephone line to any other telephone in the world for per-minute or per-call charges that are billed monthly.

54. In addition to dial-1 service, mass market consumers can also select a long distance carrier at any time from their presubscribed line by dialing a carrier's access code (e.g., 10-10-321) before dialing the called party's telephone number. This long distance service, known as "dial-around," allows consumers to bypass their PIC when making a specific call. Dial-around service is also typically billed on a monthly basis with per-minute or per-call charges.

55. The rates charged by a long distance carrier for interstate interLATA calls generally are the same, regardless of the location of the called party. (Because of differences between the regulation of intrastate and interstate communications, rates for *intra*state interLATA calls may differ from rates for *inter*state interLATA calls.)

56. Similarly, with few exceptions, the rates charged by a long distance carrier are generally the same for all calls from the United States to a particular foreign country, regardless of the location of the called party within that foreign country. However, rates for calls to one foreign country may vary greatly from rates to another foreign country, and rates for international calls are usually much higher than rates for domestic calls. Dial-1 and dial-around services generally include the capability to make both domestic interLATA (intrastate and interstate) and international long distance calls, but a substantial proportion of mass market consumers are infrequent users of international long distance services, and for them, the rates charged for calls to a specific foreign country or to all foreign countries are not a significant factor in choosing a dial-1 long distance carrier. For mass market consumers who make frequent calls to a specific country, however, the rates for calls to that country will often be a significant or decisive factor in choosing a long distance carrier. *See infra* Section V.

57. Long distance communications may originate from wireline telephones (i.e., telephones connected by wires to the local telephone network) or from mobile wireless phones. The vast majority of mass market consumers use wireline telephones to make long distance calls. While a growing percentage of mass market customers also subscribe to mobile wireless telephone service and may make wireless long distance calls, wireless long distance only accounts for a small percentage of total long distance calling. Wireline long distance service generally provides higher-quality and more reliable communications than does wireless service. The prices for long distance calls charged by wireless carriers usually are substantially different from the prices paid by consumers for long distance calls over wireline telephones. Long distance communications originating from wireless phones are not a close substitute for long distance calls originating from wireline phones; the price of the former is not a significant competitive constraint on the price of the latter.

58. All of the BOCs except Bell Atlantic in New York are currently prohibited from providing long distance services to their local telephone service customers, but local telephone companies other than the BOCs may do so. In some cases, these local telephone companies have become significant

competitors in the provision of mass market long distance within their limited local service areas, but none (with the exception of Sprint) is a significant competitor outside its local service area. These local telephone companies, other than Sprint, collectively have an insignificant share of the nation's mass market long distance customers.

59. Domestic wireline interLATA telecommunications services provided on a dial-1 or dial-around basis to mass market residential and small/home office consumers ("mass market long distance services") is a line of commerce and a relevant product market for purposes of Section 7 of the Clayton Act. There are no substitutes for mass market long distance services sufficiently close to defeat or discipline a small but significant nontransitory increase in price.

## B. Relevant Geographic Market

60. The "Big 3" -- AT&T, WorldCom, and Sprint -- and many fringe carriers offer their services to mass market consumers located throughout the United States, and each generally charges the same price for interstate interLATA calls and international calls, regardless of the consumers' locations within the United States.

61. At present, in most parts of the country mass market customers have substantially similar alternatives in choosing among long distance carriers. The Defendants, AT&T, and many of the other competitors offer mass market long distance services throughout the United States and the prices of their services are substantially the same throughout the United States. The United States is a relevant geographic market for purposes of Section 7 of the Clayton Act.

## C. Market Concentration and Anticompetitive Effects

62. The market for the provision of mass market long distance services is highly concentrated, and will become substantially more concentrated as a result of the proposed combination of WorldCom and Sprint. AT&T, WorldCom, and Sprint each provide long distance telephone services by carrying voice and data communications over their broad national and international fiber optic networks, and collectively the Big 3 have continuously dominated mass market long distance for many years. For example, in 1999 more than 80% of residential lines in the United States that are presubscribed to one of the Big 3 as their long distance carrier, with approximately 19% of residential lines subscribing to WorldCom and approximately 8% subscribing to Sprint. In Sprint's local exchange territories, substantially more than 8% of the lines subscribe to Sprint; outside of its local exchange territories approximately 7% of the lines subscribe to Sprint. The Big 3 in 1999 also accounted for approximately 80% of interLATA revenue, including dial-1 and dial-around, with WorldCom accounting for approximately 21% and Sprint for approximately 9%. Again, Sprint has captured substantially more than 9% in its local exchange territories, and slightly less outside of its local exchange territories. According to the HHI,

the standard measure of market concentration (defined and explained in Appendix A), this market is highly concentrated. The HHI for this market measured in terms of residential lines is approximately 3500; post-merger, the HHI will rise approximately 300 points to approximately 3800, and the combined company will have a share of approximately 27%. Measured in terms of revenue, including dial-1 and dial-around, the HHI is approximately 3500; post-merger, the HHI will rise approximately 400 points to 3900, and the combined company will have a share of approximately 30%.

63. The Big 3 each have substantial competitive advantages in serving the mass market because of their respective powerful brand equity and recognition, as well as the scale and scope of their respective operations, including near ubiquitous facilities-based networks, broad customer bases, storehouses of technological expertise and service experience, and corps of highly skilled, experienced personnel.

64. Over the years, the Defendants and AT&T have collectively invested billions of dollars to market their long distance services and to establish, maintain, and enhance their brand images with mass market consumers. Brand recognition is often a deciding factor in mass market consumers' choices when they face complex price decisions such as those often presented by competing long distance plans.

65. The Defendants and AT&T are the only telecommunications providers whose broad networks and operations reach virtually every corner of the United States without significant reliance upon the facilities of other long distance carriers, and who benefit from widely recognized and firmly established brand names. Both WorldCom's and Sprint's fiber optic networks have local interconnection points of presence ("POPs") in LATAs reaching more than 99% of U.S. households.

66. Apart from the Big 3, there are many smaller competitive "fringe" long distance carriers that offer services to mass market consumers. A large number of these smaller domestic carriers have few or no network facilities of their own and purchase capacity from the Defendants and AT&T to provide them with access to network facilities on a wholesale basis. As a result, "resellers" and other fringe carriers are handicapped in any competitive response, not only by their little-known brands, but also because their networks are often dependent upon the provision of wholesale services by the Big 3 and others. In addition, many of the competitive fringe carriers confine their marketing activities to local or regional areas, or to targeted ethnic or other niche groups. The Defendants and AT&T have been the only mass market long distance carriers since AT&T's divestiture of the regional BOCs in the mid-1980s to garner more than a two to three percent nationwide market share.

67. Competition from Sprint provides a significant constraint on the prices charged by WorldCom. A disproportionate number of mass market consumers who leave WorldCom for a new long distance provider switch to

Sprint. The proposed acquisition, by eliminating this competition from Sprint, will permit the merged entity profitably to charge higher prices than it could profitably charge absent the merger.

68. Similarly, competition from WorldCom provides a significant constraint on the prices charged by Sprint. A disproportionate number of mass market consumers who leave Sprint for a new long distance provider switch to WorldCom. The proposed merger will permit the merged entity profitably to charge higher prices for the Sprint products than it could profitably charge absent the merger.

69. The merger will also facilitate coordinated or collusive pricing or other anticompetitive behavior by the merged entity and AT&T. If the merger is consummated, AT&T and WorldCom/Sprint will collectively control approximately 80% of the market, while their next largest competitor will have a market share of no more than 3%.

70. The merged entity would be able to raise prices without losing sufficient sales to the "competitive fringe" carriers to cause the price increase to be unprofitable. Despite the fact that for many years a large number of long distance carriers have been competing and, in many cases, have offered materially lower prices than the Big 3, none has ever successfully attracted a substantial share of the nationwide mass market.

71. Competition from the fringe carriers will be insufficient to prevent coordinated pricing or other anticompetitive behavior based on the strength of the Big 3's brand names and to some extent on the superior capacity and coverage of their networks.

72. Allowing the Defendants to merge will remove the competitive pressure directly exerted by the merging Defendants on each other, and on AT&T. This will harm consumers through higher prices.

**D. Entry**

73. Entry into this market will not be timely, likely, or sufficient to remedy the proposed merger's likely anticompetitive harm to consumers. Barriers to sufficient entry in this market are high, and the market is not growing rapidly. Although it is possible to enter on a small scale and serve ethnic or geographic niche markets, in order to offer sufficient competition for mass market consumers, a carrier must be able efficiently to handle long distance traffic and manage millions of customer relationships. It must also develop substantial brand equity and recognition, which requires a heavy capital investment over a substantial period of time.

74. Although there are numerous generic fringe carriers, each with a very small share of the market, all of these carriers face significant barriers to expansion and their presence is unlikely to mitigate the anticompetitive effects of the proposed transaction.

75. BOC entry into long distance, as envisioned by the Telecommunications Act of 1996 ("the 1996 Act"), also will not be timely, likely, or sufficient to remedy the proposed merger's anticompetitive harm to mass market long distance consumers.

76. The 1996 Act authorized the BOCs to offer long distance services in states where they were not the incumbent local telephone company. No BOC has succeeded in selling mass market long distance services on a significant scale in states outside its region, and no BOC is likely to do so in the foreseeable future. The 1996 Act authorized the BOCs to offer interLATA service originating in any state within their respective regions only after applying for and receiving FCC approval pursuant to Section 271 of the Act. In order to receive FCC approval to enter in-region long distance markets, the 1996 Act required the BOCs to, among other things, take numerous steps to demonstrate that their monopoly markets for local telephone service had been sufficiently opened to competition from other local carriers and establish that their entry into long distance is in the public interest.

77. Since passage of the 1996 Act, only one BOC, in only one state, has taken the steps required for and obtained FCC approval of a Section 271 application, thereby obtaining the ability to provide long distance services to its local telephone service customers. Five other BOC applications have been denied by the FCC and one other application -- by SBC Communications, Inc. in Texas -- is pending.

78. Successful BOC entry into mass market long distance services, to the extent it occurs, will occur over time on a state-by-state basis, and such entry is unlikely to have a significant impact on mass market competition in time to prevent the anticompetitive effects of this merger for large sections of the country, or for the country as a whole.

79. In any event, each of the BOCs has stated well before the announcement of this merger that it intended eventually to provide mass market long distance service, and presumably will do so regardless of whether the proposed merger occurs. Thus, whatever the extent or timing of BOC entry, consummation of the merger will result in the loss of an important competitor, and would undermine the goals of the 1996 Act, whose passage reflected the judgment of Congress and the President that it would be very valuable to add a fourth major competitor to the long distance market. Even assuming that BOC entry occurs as quickly and as potently as the Defendants' have claimed, the merger would take us back to only three major mass market competitors in those territories where such BOC entry occurs.

V.

## MASS MARKET INTERNATIONAL LONG DISTANCE TELECOMMUNICATIONS SERVICES

**A. Relevant Product Markets**

80. As with domestic long distance services, there are millions of customers, including residential customers and business customers of all sizes who want to complete calls internationally to foreign countries. Different types of international services customers have diverse needs and their purchasing decisions are influenced by different considerations. The service offerings of international long distance telecommunications providers are tailored to meet the needs of particular types of customers, and services are marketed and priced differently to different types of customers.

81. The residential and small/home office consumers (the "mass market") are one such type of international long distance customer, and constitute a market distinct from international long distance services sold to other types of customers (e.g., larger businesses). Mass market consumers typically purchase all or most of their international long distance services by presubscribing to a particular carrier or on a call-specific basis, such as dial-around (e.g., 10-10-321) services. The rates charged to mass market consumers in the United States for international long distance calls to a particular foreign country are generally the same regardless of the location of the calling party. However, prices charged by a carrier for calls to a particular foreign country reflect competitive conditions on that U.S.-foreign country route and, therefore, differ from prices for calls to other foreign countries.

82. As mentioned, *supra*, most mass market international long distance services are sold to presubscribed consumers as a bundle with domestic mass market long distance services. However, there are many mass market consumers for whom calls to a particular foreign country constitute an important portion of their total long distance usage. For these customers, the rates charged for calls to a particular foreign country are a significant, if not driving, factor in their choice of a presubscribed dial-1 or a dial-around long distance carrier. For mass market consumers who call only infrequently to foreign countries, the rates for such calls are not a significant factor in their choice of a presubscribed carrier. *See supra* Section IV.

83. Mass market international long distance services between the United States and other countries are provided on a per-minute basis over terrestrial links, submarine cables, or satellites. In some foreign countries, U.S. carriers are legally prohibited from owning telecommunications facilities. For calls to such countries, a U.S. facilities-based carrier usually delivers its traffic to a virtual mid-point on an international circuit serving the route and contracts with a foreign carrier in the destination country to carry the traffic from the mid-point to its final destination. In this type of relationship, the U.S. facilities-based carrier owns the U.S. half-circuit, i.e., the part of the circuit originating in the United States and terminating at the virtual mid-point, while the foreign carrier owns the corresponding foreign half-circuit. Payments to the foreign carrier (the "settlement rate") generally constitute a large percentage of a U.S. carrier's total costs for providing these calls.

84. In other countries, a U.S. carrier may legally own its own facilities. Although the U.S. carrier may still choose to deliver its traffic as described

above, often it is less costly for a carrier to use its own facilities to deliver traffic to the foreign country and then contract with a foreign carrier in the destination country for local termination. In this type of arrangement, a U.S. facilities-based carrier may own the whole international circuit between the United States and the foreign country with no hand-off at a virtual mid-point.

85. As with domestic mass market long distance, *see supra* Section IV, international long distance calling using mobile wireless telephones accounts for only a small percentage of total mass market international long distance calling. For this reason and those described, *supra*, international long distance communications originating from wireless phones are not a close substitute for international long distance calls originating from wireline phones; the price of the former is not a significant competitive constraint on the price of the latter.

86. International wireline long distance telecommunications services provided between the United States and each of the foreign countries listed in Appendix B to mass market consumers are lines of commerce and relevant product markets for purposes of Section 7 of the Clayton Act. There are no substitutes for mass market international long distance services sufficiently close to defeat or discipline a small but significant nontransitory increase in price.

## B. Relevant Geographic Market

87. The Defendants, as well as most of their competitors in the provision of mass market international long distance services, offer such services throughout the entire United States and each generally charges the same rates for those services throughout the United States regardless of the consumers' locations.

88. At present, in most parts of the country mass market customers have substantially the same alternatives in choosing among international long distance providers. The Defendants, AT&T, and many of the other competitors offer mass market international long distance services throughout the United States and the prices of their services are generally the same throughout the United States. The United States is a relevant geographic market for purposes of Section 7 of the Clayton Act.

## C. Market Concentration and Anticompetitive Effects

89. The relevant markets for the provision of mass market international long distance telecommunications services between the United States and each of the countries listed in Appendix B are highly concentrated according to the HHI, the standard measure of market concentration (defined and explained in Appendix A). The merger would substantially increase concentration in each of these markets. On seven of these U.S.-foreign country routes, the combined market share of WorldCom and Sprint would be 50% or greater. *See* Appendix B.

90. For mass market international long distance services, the best publicly available data is the FCC's report on international message telecommunication service ("IMTS") revenues, which includes data on outbound voice services to both businesses and mass market consumers. Based on FCC data for 1998, the most recent year for which the data is available, the merger will substantially increase concentration in many markets. For example, WorldCom had a 26% share of the IMTS revenues of carriers that had their own facilities on the U.S.-Brazil route, and Sprint had an 8% share. The Big 3 combined accounted for 98% of revenues on the U.S.-Brazil route. The pre-merger HHI is 4868; post-merger, it will increase by 389 points to 5257. Similarly, on the U.S.-India route in 1998, WorldCom had a 39% market share and Sprint's share was 7%. The Big 3's combined share was 89%. The pre-merger HHI is 3481; post-merger, it will increase by 533 points to 4014. On the U.S.-Israel route, WorldCom had a 22% market share, and Sprint had a 14% share. The Big 3's combined market share was 99%. The pre-merger HHI is 4580; post-merger, it will increase 625 points to 5205. On the U.S.-Vietnam route, WorldCom and Sprint accounted for 34% and 13% of the 1998 U.S.-billed IMTS revenues, respectively. The Big 3's combined market share was 92%. The pre-merger HHI is 3379; post-merger, it will increase 913 points to 4292.

91. The Defendants and AT&T have a dominant share of IMTS revenues and minutes on each of the U.S.-foreign country routes listed in Appendix B. No other U.S. carrier has more than 4% of total IMTS revenues (all routes combined) for service that is provided by carriers using their own facilities.

92. Competition from Sprint provides a significant constraint on the prices charged by WorldCom for calls between the United States and each of the countries identified in Appendix B. The proposed acquisition, by eliminating competition from Sprint, will permit the merged entity profitably to charge higher prices for these calls than WorldCom could profitably charge absent the merger.

93. Competition from WorldCom provides a significant constraint on the prices charged by Sprint for calls between the United States and each of the countries identified in Appendix B. The proposed acquisition will permit the merged entity profitably to charge higher prices for these calls than Sprint could profitably charge absent the merger.

94. The merger would also facilitate coordinated or collusive pricing or other anticompetitive behavior by the merged entity and AT&T. If the merger is consummated, AT&T and WorldCom/Sprint would collectively control at least 80% of facilities-based revenues on each of the country-pair routes identified in Appendix B, and more than 90% on over two-thirds of those routes.

95. The merged entity would be able to raise prices without losing sufficient sales to smaller carriers to cause the price increase to be unprofitable.

**D. Entry**

96. Entry into the relevant markets for mass market international long distance telecommunications services would not be timely, likely, or sufficient to remedy the proposed merger's likely anticompetitive harm to consumers.

97. International long distance services may be provided by firms that do not own their own facilities but that resell services provided over the international facilities owned by others, including the Defendants. Because they lack ownership or control of facilities, resellers are handicapped in many cases in their competitive responses by cost and quality of service disadvantages compared to facilities-based carriers such as the Defendants and AT&T. Facilities-based entry requires a significant investment in capacity and equipment and requires substantial time in order to make arrangements to terminate traffic in foreign countries. For these reasons, competition from resellers does not adequately constrain the prices of the Big 3.

98. In many countries international long distance services are provided by a state-sanctioned monopolist. In order to provide facilities-based services directly to these countries, a U.S. carrier needs to establish bilateral or correspondent arrangements with the foreign monopolist. In other countries, the number of carriers allowed to provide facilities-based service is still significantly restricted by law, so that obtaining a correspondent relationship with one of the few foreign carriers in that country is a practical requirement for U.S. facilities-based carriers to provide service to that country. Countries where long distance services are provided by a monopoly collectively represent approximately 37% of U.S.-billed IMTS revenues, and countries where facilities-based entry is restricted by law represent approximately 10% of U.S.-billed IMTS revenues. AT&T, WorldCom, and Sprint each already have such arrangements with carriers in most foreign countries. For potential entrants, however, obtaining a correspondent relationship on these routes is often a difficult and time-consuming process.

99. For example, delays are particularly likely on the U.S.-Brazil route, where WorldCom has a controlling interest in Embratel, the incumbent Brazilian long distance carrier. Competing U.S. carriers are not free to establish their own facilities in Brazil because competition in facilities-based long distance (both domestic and international) services is limited by Brazilian law. The Brazilian long distance market is now a duopoly of Embratel, the dominant carrier, and one other new provider.

100. In order to provide facilities-based services to liberalized foreign countries that no longer accord special rights to one carrier or to a limited group of carriers, bilateral agreements may no longer be legally required for the termination of traffic. A U.S. carrier may choose to send traffic to the foreign country directly over its own facilities if such an arrangement has been approved by U.S. and foreign regulators, thereby bypassing the above-cost settlement rate and more effectively controlling the quality and cost of the call. Even on such liberalized routes, however, important barriers to entry often still exist. Such barriers include, but are not limited to, limitations on the share of foreign facilities that can be owned by a U.S.

carrier, delays by the foreign country in enacting legislation to implement liberalized telecommunications policies, failure of foreign regulatory agencies to enforce the implementing legislation, difficulties in obtaining operating licenses and other necessary regulatory approvals, and delays in the foreign carriers' provision of interconnection to local networks.

101. The need to establish brand equity constitutes a further barrier to entry into mass market international long distance telecommunications services. The Big 3's brand-name power in these markets is underscored by the higher prices each is able to charge on international routes relative to the rates charged by its smaller competitors. The Defendants have continued to possess higher market shares than non-Big 3 competitors despite these higher prices, even on those routes for which the destination country has permitted competition in termination of calls from the United States.

## VI.

## INTERNATIONAL PRIVATE LINE SERVICES

### A. Relevant Product Markets

102. Private line services are dedicated circuits provided to a customer to use in any manner and with any hardware that the customer chooses. Private lines are used predominantly for data traffic although they can carry voice communications as well. A private line comprises a specific amount of bandwidth that is exclusively available to a customer for point-to-point communications. As with international long distance services, international private line services between the United States and a particular country are provided on the basis of U.S. half-circuits or -- in those foreign countries that allow U.S. carriers to own their own facilities and hand off traffic directly to the foreign local exchange carrier -- whole circuits. As explained above, *see supra* Section V, on some routes U.S. carriers are legally prohibited from owning facilities on the foreign-end and can own only the U.S. half-circuits, so that traffic is handed off to a foreign carrier at a virtual mid-point on an international circuit serving the route.

103. A private line comprises a specific amount of bandwidth that is exclusively available to a customer for point-to-point communication. Private lines provide maximum security and dependability but, because of their expense, are economical only if the transmission capacity is fully utilized. Private lines are typically preferred by customers who have a need for very large and steady data transmission 24 hours a day, 7 days a week.

104. The provision of private lines between the United States and each of the foreign countries listed in Appendix C, including U.S.-connected half-circuits and whole circuits but excluding foreign half-circuits, are lines of commerce and relevant product markets for purposes of Section 7 of the Clayton Act. There are no substitutes for international private line services sufficiently close to defeat or discipline a small but significant nontransitory increase in price.

## B. Relevant Geographic Market

105.  International private line services offered from the United States to a
      particular country are generally similar regardless of the U.S. location of the
      customer, although the prices for domestic connections to an international
      private line may differ depending on where the customer is located. The
      Defendants, as well as most of their competitors offer international private
      line services to customers throughout the United States. The United States is
      a relevant geographic market for purposes of Section 7 of the Clayton Act.

## C. Market Concentration and Anticompetitive Effects

106.  The markets for the provision of international private line services between
      the United States and each of the countries listed in Appendix C are highly
      concentrated. According to the HHI, the standard measure of market
      concentration (defined and explained in Appendix A), a merger between
      WorldCom and Sprint would substantially increase the concentration in
      many markets for international private line services.

107.  For example, on the U.S.-Israel route in 1998, WorldCom had a 69% share
      of international private line revenues, and Sprint had a 20% share. The Big 3
      combined account for 100% of the market. The HHI for the U.S.-Israel
      route is 5251; post-merger, it would increase by 2697 points to 7948. On the
      U.S.-Brazil route, where WorldCom owns a controlling interest in Embratel,
      the incumbent Brazilian long-distance carrier, WorldCom's share is 59%,
      and Sprint's is 14%. The Big 3 combined have a 97% share. The HHI is
      4274; post-merger, the HHI would increase 1662 to 5936. On the U.S.-
      Kuwait route, WorldCom has a market share of 92%, and Sprint has an 8%
      share, yielding a combined market share of 100%. The pre-merger HHI is
      8456; post-merger, the HHI would increase 1544 points to 10000.

108.  The Defendants and AT&T collectively have a dominant share of
      international private line revenues in the relevant markets set forth in
      Appendix C. Unlike the markets for mass market international long distance
      telecommunications services, in which AT&T is still the largest carrier on
      an aggregate basis for all routes, WorldCom has the predominant share of
      revenues in the markets for international private line services on an
      aggregate basis for all routes, as well as in most of the individual markets
      listed in Appendix C.

109.  On many U.S.-foreign country routes, WorldCom and Sprint are the
      predominant providers of international private line services. The merger will
      result in increased concentration in markets that are already highly
      concentrated. Furthermore, this merger will result in the merged entity
      holding a market share in excess of 50% on more than 60 U.S.-foreign
      country routes. *See* Appendix C. On 29 U.S.-foreign country routes listed in
      Appendix C, this transaction will reduce the number of competitors from
      three to two, and on 12 routes, this transaction will reduce the number of
      providers from two to only one (i.e., the merged entity will hold a 100%
      market share).

110. Competition from Sprint provides a significant competitive constraint on the prices charged by WorldCom for private lines connecting the United States to each of the countries identified in Appendix C and in several of these markets provides the only direct competitive constraint. The proposed merger will eliminate competition from Sprint, and will permit the merged entity profitably to charge higher prices for these private lines than WorldCom could charge absent the merger.

111. Competition from WorldCom provides a significant competitive constraint on the prices charged by Sprint for private lines connecting the United States to each of the countries identified in Appendix C and in several of these markets provides the only direct competitive constraint. The proposed merger will permit the merged entity profitably to charge higher prices for these private lines than Sprint could charge absent the merger.

112. The merger will also facilitate coordinated or collusive pricing behavior between the merged entity and AT&T in these markets, threatening to result in higher prices than those firms could charge absent the merger. Competition from smaller carriers will be insufficient to prevent such coordinated pricing because of the superior capacity, coverage, and reliability of the Big 3's international networks, and their superior access to foreign carriers for the completion of international circuits.

**D. Entry**

113. Entry into the relevant markets for international private line services would not be timely, likely, or sufficient to remedy the proposed merger's likely anticompetitive harm to consumers, as explained with regard to mass market international long distance telecommunications services. *See supra* Section V.

## VII.

## MARKETS FOR INTERLATA PRIVATE LINE SERVICES AND INTERLATA X.25, ATM, AND FRAME RELAY DATA NETWORK SERVICES

**A. Relevant Product Markets**

114. Private line services and data networks using various technologies -- X.25, asynchronous transfer mode ("ATM"), and frame relay -- are each used to transmit data files between computers connected to a local area network ("LAN") or a wide area network ("WAN"). Data networks may be restricted to computers within an organization (e.g., an Intranet). Data networks may also connect with authorized users outside an organization who have a continuing relationship with that organization, such as a manufacturer's network of independent dealers or vendors (e.g., an Extranet). In addition, data networks may allow "packets" of data to be transmitted to any other computer connected to the Internet.

115.  Private lines are dedicated circuits provided to a customer to use in any
      manner and with any hardware and software the customer chooses. A
      private line comprises a specific amount of bandwidth that is exclusively
      available to a customer for point-to-point communication. Private lines
      provide maximum security and dependability but, because of their expense,
      are economical only if the transmission capacity is fully utilized. Private
      lines are typically preferred by customers who have a need for very large
      and steady data transmission 24 hours a day, 7 days a week. The overall
      U.S. private line market is valued at over $9.5 billion.

116.  Data networks utilizing the X.25 protocol were introduced in the mid-1970s
      and still comprise a nearly $495 million U.S. market. X.25 networks
      typically use a dial-up access facility to connect the originating computer to
      a point-to-point virtual circuit that allows it to communicate with the
      destination computer. These networks provide a secure, error-free,
      inexpensive, but relatively slow means of transmitting data files and are
      primarily used today for intermittent, "bursty" data transmissions (e.g.,
      credit-card authorization and point-of-sale terminal applications, automatic-
      teller machines, and computerized reservation networks). Because X.25
      networks that are operated by different vendors can be easily
      interconnected, X.25 is often the service of choice for data communications
      between the United States and countries in which the newer forms of data
      networks may not be ubiquitously deployed.

117   Frame relay data network technology was introduced in the mid-1980s and
      constitutes a market valued at over $3.5 billion in the United States. Frame
      relay networks use dedicated access facilities to connect the originating
      computer to a point-to-point virtual circuit that allows it to communicate
      with the destination computer on a secure basis. Frame relay networks
      typically cost more than X.25 networks but provide a better means for
      relatively high-speed transmission of data files on a continuous basis. Frame
      relay is also capable of providing very high-quality service due to its ability
      to provide committed information transmission rates with very little, if any,
      data packet loss and very little delay or "latency." Frame relay is a superior
      application for business customers who wish to transmit data between a
      headquarters and numerous remote locations (e.g., hub-and-spoke networks)
      on a regular and secure basis. Frame relay is ideal for data but currently is
      less well-suited to deliver high-quality multimedia files (e.g., voice and
      video). Today, frame relay is the dominant type of data network in the
      United States and in many other industrialized nations.

118.  ATM networks were introduced in the mid-1990s and provide their users
      with extremely high-speed data transmissions as well as excellent video and
      voice transmission capabilities. Thus, ATM networks are ideal for such
      applications as voice, live video-streaming, video conferencing,
      conferencing with imaging, or interactive learning. For example, ATM
      networks are used in the medical context to enable doctors to consult
      colleagues in other cities by conferencing them into consultations and
      showing them CT scans, MRIs, and the like, in real time. ATM network
      services typically cost more than frame relay network services. The overall

U.S. ATM data network market is valued at approximately $423 million.

119.   As discussed in Section IV, *supra*, the BOCs are permitted to provide intraLATA services, but, except in New York, cannot yet offer interLATA services in their local service regions. Many data customers require interLATA networks. For those customers, the BOCs are not among the providers who can service their needs.

120.   Carriers compete to provide each of the interLATA data network services described above to customers who seek to create new networks, enlarge existing networks, or change suppliers of existing networks.

121.   For each of the interLATA data network services described above, the Defendants and other carriers are capable of discriminating, and in fact do discriminate, in the prices, terms, and conditions of sale for such network services based on the specific circumstances of the customer. Business customers with more than approximately 1,000 employees and U.S. interLATA telecommunications expenditures in excess of $30,000 per month ("high-end customers") face substantially the same competitive conditions for the purchase of each of the interLATA data network services described above. These customers typically have complex data network needs, require a high level of network reliability, and have numerous and widely dispersed data network locations.

122.   Based on the foregoing, a high-end customer for interLATA data network services often has clear preferences for one type of network based on, among other things, the customer's particular needs in terms of technical network features, geography, security, transmission speed, and network costs. In these circumstances, there are no sufficiently close substitutes for each of these data network services to defeat or discipline a small but significant nontransitory increase in price. For other needs of high-end customers, however, one type of network may be a close substitute for another, and purchasing decisions may be influenced by the relative prices of the different types of data network services. *See infra* Section VIII.

123.   The provision of interLATA data network services by means of private lines and by means of X.25, ATM, and frame relay networks, respectively, to high-end business customers are each lines of commerce and relevant product markets for purposes of Section 7 of the Clayton Act.

**B. Relevant Geographic Markets**

124.   Because linking a high-end customer's U.S. data network sites requires extensive domestic operations, such customers are unlikely to turn to any foreign providers that lack these domestic operations in response to a small but significant and nontransitory increase in price by providers of domestic data network services. Therefore, although the services provided in the markets for private lines and X.25, ATM, and frame relay network services, respectively, may include some international as well as domestic interLATA transmission of data, these markets are properly defined in terms of the

provision of those services to high-end customers in the United States. The United States is a relevant geographic market for purposes of Section 7 of the Clayton Act.

## C. Market Concentration and Anticompetitive Effects

125.  Each of the particular markets for interLATA data network services is highly concentrated and would become substantially more concentrated as a result of the proposed merger.

126.  In the market for the provision of private line services to high-end customers, WorldCom has a revenue share of at least 27% and Sprint a share of at least 9%. WorldCom and Sprint would have a combined post-merger market share of 36%, leaving only AT&T as a serious rival. According to the HHI, the standard measure of market concentration (defined and explained in Appendix A), combining WorldCom and Sprint would substantially increase the already high concentration in this market. The HHI for the private line data network services market is at least 2800; post-merger, it would increase by nearly 500 points to approximately 3300.

127.  In the market for the provision of X.25 data network services to high-end customers, WorldCom has a revenue share of at least 25% and Sprint a share of at least 50%. The HHI for the X.25 data network services market is at least 3300; post-merger, it would increase by at least 2700 points to approximately 6000.

128.  The Defendants dominate the market for X.25 data network services, especially since the withdrawal of AT&T at the end of 1999. Thus, by acquiring Sprint, WorldCom would eliminate its only meaningful competitor in this market, which would lead to higher prices and lower service quality than would prevail absent the merger.

129.  In the market for the provision of ATM data network services to high-end customers, WorldCom has a revenue share of at least 37% and Sprint a share of at least 33%. The HHI for the ATM data network services market is at least 3000; post-merger, it would increase by approximately 2500 points to approximately 5500.

130.  The Defendants dominate the market for ATM data network services. The merged entity will have a market share of over 70%. By acquiring Sprint, WorldCom would eliminate its biggest competitor in this market, which would lead to higher prices and poorer service than would prevail absent the merger.

131.  In the market for the provision of frame relay data network services to high-end customers, WorldCom has a revenue share of at least 36% and Sprint a share of at least 19%. The HHI for this market is at least 3100; post-merger, it would increase by 1400 points to approximately 4500.

132.  The merged entity will have a combined share of more than 50% of the

frame relay services market. By acquiring Sprint, WorldCom would eliminate one of its principal rivals in this market, which would lead to higher prices and lower service quality than would prevail absent the merger.

133. In the aforementioned markets for the provision of private line services, and ATM, and frame relay data network services, respectively, the Defendants and AT&T are the only large and important participants. In each of these markets, the Defendants' products are regarded by customers as close substitutes.

134. The merger will facilitate coordination between the merged entity and AT&T in each of the markets for private lines and ATM and frame relay data network services, respectively. Indeed, the merged entity and AT&T will be the only firms capable of providing a full range of services to high-end customers across the country and around the world in each of these markets, except that for X.25 data network services, which the merged entity alone will dominate.

135. Because each of these networks depends upon the ability of the provider to connect sites at diverse locations throughout the United States and, in some cases, around the world, the provider must possess a vast network of optical fiber, POPs, nodes, switches, routers, and other associated facilities. Because WorldCom and Sprint are two of only three such providers in the United States, the effect of the merger will be to eliminate one of the very few carriers that possesses the full range of facilities required to compete in these markets. Although it is technically feasible to interconnect data networks belonging to different suppliers, the Defendants and AT&T have refused to provide quality of service guarantees in cases where data networks of different vendors are interconnected. Without these quality of service guarantees, customers are reluctant to rely on interconnected data networks to transmit important business data.

**D. Entry**

136. Entry into each of the markets for the provision of private line services and X.25, ATM, and frame relay data network services, respectively, to high-end customers would not be timely, likely, or sufficient to remedy the proposed merger's likely anticompetitive harm. Entry would take at least several years and require a large capital investment in equipment and facilities.

137. To successfully compete in these markets over the long run, a carrier must own or control fiber and POPs in all parts of the United States where customers may wish to connect to a data network, as well as nodes, routers, switches, and other associated facilities. The construction of such network facilities is very costly and time-consuming. In addition, a carrier must maintain a large, highly trained marketing and technical staff to operate the network and to obtain and service clients. Thus, entry barriers are very high in each of the data network services markets.

138. The market for X.25 data network services is a declining market. Companies such as AT&T have recently exited the market rather than incur the costs of Y2K compliance. It is therefore highly unlikely that any new provider would make the investment necessary to compete successfully against WorldCom or Sprint, the dominant providers of X.25 data network services.

139. Post-merger, the Defendants will be able to further raise entry barriers to rival networks by, among other things, making it more difficult for them to interconnect with the Defendants' networks and by refusing to cooperate in providing inter-network connections that would allow them to compete for some portion of a high-end customer's data network requirements.

## VIII.

## INTERLATA DATA NETWORK SERVICES MARKET

### A. Relevant Product Market

140. Internet protocol virtual private networks ("IP/VPNs") are data networks that use the same protocol -- known as "TCP/IP" -- that is commonly used over the public Internet. Unlike other data networks, *see supra* Section VII, IP/VPN data networks may use either public Internet transmission facilities, private lines, or ATM or frame relay data networks as means of transmission. When used on public Internet facilities, however, transmissions over IP/VPNs are subject to the same delay and data losses as other Internet transmissions and may also be subject to unauthorized access or threats of denial of service, such as occurred in April 2000 to CNN.com, Yahoo!, and other popular Internet sites. In order to provide more secure and reliable delivery of data, network providers now offer IP/VPNs that encapsulate IP data packets into frame relay frames or ATM cells and route the IP packets over frame relay or ATM networks. This enables a vendor to offer IP/VPN services with the higher quality of service typically associated with frame relay and ATM networks (and far above the public Internet's typical quality levels) provided, however, that the transmissions stay on the vendor's own network. Recent improvements will enhance IP/VPN security by permitting the encryption of IP data packets, so that they may be securely transmitted over public Internet facilities. Two of the largest and most important providers of IP/VPNs are WorldCom's UUNET subsidiary and Sprint.

141. As mentioned, *see supra* Section VII, the needs of many high-end customers are best served by only one type of particular data network and other data networks are not close substitutes. For other needs, high-end customers may choose data networks based largely or exclusively on price, and two or more of the above-mentioned network solutions -- i.e., private lines and X.25, frame relay, ATM, and IP/VPN data networks -- may be close substitutes for each other. In response to a small but significant nontransitory increase in price that applied to only one type of data network, these customers can and would switch to another type of data network.

142. The provision of interLATA data network services, consisting of all the particular data network services, plus IP/VPNs, for those high-end customers whose needs may be satisfied by two or more types of data network services, *see supra* Section VII, is a line of commerce and a relevant product market for purposes of Section 7 of the Clayton Act. There are no substitutes for interLATA data network services sufficiently close to defeat or discipline a small but significant nontransitory increase in price.

**B. Relevant Geographic Market**

143. As discussed, *see supra* Section VII, although the market for the provision of high-end customer data network services may include some international as well as domestic transmission of data, the relevant market is properly defined in terms of the provision of services to high-end customers in the United States. The United States is a relevant geographic market for purposes of Section 7 of the Clayton Act.

**C. Market Concentration and Anticompetitive Effects**

144. The market for data network services combined sold to high-end customers is highly concentrated and is dominated by the Defendants and AT&T. WorldCom has a market share of approximately 30%, and Sprint has a market share of approximately 14%. The HHI is approximately 2650; post-merger, it will increase approximately 800 points to 3450.

145. Combining WorldCom and Sprint will reduce the combined entity's incentives to lower prices, increase quality, and pursue innovation in the interLATA data network services market.

146. Because it is necessary to possess a vast network of fiber, POPs, nodes, switches, routers, and other associated facilities to compete effectively in this market, the elimination of Sprint will leave only two carriers, WorldCom and AT&T, and allow them to dominate the market. The merger would facilitate coordination between the merged entity and AT&T in this market.

**D. Entry**

147. For the same reasons discussed, in relation to the individual interLATA data network services markets, *see supra* Section VII, entry into the market for the provision interLATA data network services to high-end customers would not be timely, likely, or sufficient to remedy the proposed merger's likely anticompetitive harm. Entry would take at least several years and require a large capital investment in equipment, facilities, and personnel.

### IX.

### CUSTOM NETWORK SERVICES MARKET

**A. Relevant Product Market**

148. Large businesses typically have extensive and complex telecommunications needs for both internal and external voice and data communications. Their needs include simple services (e.g., outbound long distance voice service) and the most advanced and complex services (e.g., managed data networks that connect hundreds of business locations with exacting quality-of-service guarantees, or enhanced toll-free voice services with automatic call-management features). Large businesses also often require sophisticated and consolidated billing and accounting systems, as well as provision and maintenance of diverse customer premises equipment. Moreover, for many of these customers, voice and data network services are critical to the daily operations of their enterprises.

149. Large businesses typically purchase a substantial majority of their telecommunications services in a bundle of custom network services ("CNS") that is tailored to meet their particular needs. Although the requirements of these large businesses vary, most large business customers require several of the following types of telecommunications services: (1) "outbound" domestic long distance voice; (2) "in-bound" toll-free voice services (both advanced and plain "1-800"); (3) data network services (e.g., private lines and X.25, ATM, frame relay, and IP/VPN); (4) ancillary services such as teleconferencing and broadcast fax; (5) Internet services such as dedicated Internet access; and (6) international voice and data services. Most large businesses purchase the majority of the aforementioned services from one of the Defendants or AT&T pursuant to a CNS agreement, typically through a single, multiyear contract, sometimes referred to as a "primary" contract. Advantages of contracting this way include the administrative convenience of having a single point of contact with the primary carrier and the ability to obtain significant volume discounts by acquiring large amounts of multiple services from a single carrier.

150. Because shortcomings or failures in the provision of CNS can produce costly and even catastrophic consequences for large businesses, many of these customers place a high premium on the reputation and proven quality of a provider and are unwilling to entrust to carriers other than the Defendants and AT&T the mission-critical aspects of their CNS. By contrast, smaller business customers tend to have simpler telecommunications requirements and are therefore more willing and likely to deal with carriers other than the Defendants and AT&T.

151. In addition to CNS, large business customers may purchase a limited number of additional services -- typically standard services (e.g., simple outbound voice services) that are not mission-critical -- from carriers others than the Defendants and AT&T. These services are typically purchased under "secondary" or "backup" contracts, as distinguished from the "primary" contracts that cover CNS. Businesses use secondary contracts to promote flexibility and redundancy in services and to take advantage of the lower prices offered by second- and third-tier carriers.

152. The CNS market includes only retail sales to large businesses, not the

provision of wholesale capacity to other telecommunications carriers for resale. The needs of wholesale customers are significantly different from the needs of large business retail customers. Among other differences, wholesale customers purchase standardized wholesale products and have far fewer support and service requirements than do large business retail customers.

153. While CNS often include some international services, the majority of the traffic carried and locations served pursuant to CNS agreements are within the United States. Contracts that cover primarily the provision of services between the United States and foreign countries have supply characteristics that are very different from those of CNS agreements and, therefore, are not in the relevant product market.

154. Providers of CNS discriminate in the prices, terms, and conditions of sale among their customers for CNS based upon the specific circumstances of each customer. While each customer could be viewed as a relevant product market, customers who face the same competitive conditions for CNS can conveniently and usefully be aggregated for purposes of analyzing the competitive effects of the merger. Nearly all large business customers who spend $5 million or more per year on interLATA U.S. telecommunications services face the same competitive conditions and therefore are such a group. These customers typically have more complex needs, buy more customized products, and have more numerous and widely dispersed locations. In these circumstances, there are no substitutes for CNS sufficiently close to defeat or discipline a small but significant nontransitory increase in price.

155. The provision of CNS in the United States to large business customers (i.e., those purchasing $5 million or more per year on U.S. interLATA CNS) is a line of commerce and a relevant product market affected by this transaction for purposes of Section 7 of the Clayton Act.

**B. Relevant Geographic Market**

156. Because providing a customer's CNS needs in the United States requires extensive domestic operations, such customers are unlikely to turn to any foreign providers that lack these domestic operations in response to a small but significant and nontransitory increase in price by providers of CNS in the United States. Therefore, although CNS may include some international as well as domestic services, the market is properly defined in terms of the provision of CNS to large business customers in the United States. The United States is a relevant geographic market for purposes of Section 7 of the Clayton Act.

**C. Market Concentration and Anticompetitive Effects**

157. Although published market share statistics for the CNS market are unavailable, there are only three meaningful CNS competitors -- the Defendants and AT&T -- and the market is therefore highly concentrated.

Other carriers have won no more than a handful of CNS contracts.

158. Nearly all large businesses look to AT&T, WorldCom, and Sprint for competitive CNS bids, and a significant number are unwilling to give serious consideration to any carrier other than the Big 3. The proposed transaction will reduce these customers' competitive alternatives from three to two.

159. By acquiring Sprint, WorldCom will eliminate one of only two serious competitive constraints to its CNS business. Each is disciplined in pricing and service offerings by competition from the other because it fears that large businesses will contract with the other instead. Post-merger, WorldCom/Sprint will no longer be so constrained and will have the incentive and ability to charge higher prices, provide lower quality customer service, and offer less innovation than it would absent the merger.

160. The likely harm to large business customers is exacerbated by the fact that, among the Big 3, WorldCom and Sprint are frequently the low-priced carriers. The merged entity will be able to raise prices without losing sales because large business customers do not contract with emerging carriers for CNS to any significant degree.

161. The merger also will facilitate coordination between the merged entity and AT&T. The loss of Sprint will substantially increase the likelihood of increased interactive pricing between the merged entity and AT&T in the CNS market. Competition from smaller carriers is insufficient to prevent this coordinated pricing due to both the superior scope of the Big 3's networks and product offerings and CNS customers' requirement that their providers have a proven track record of reliably delivering CNS to comparable large business customers.

**D. Entry**

162. Entry into the CNS market would not be timely, likely, or sufficient to remedy the proposed merger's likely anticompetitive harm.

163. No carriers other than the Big 3 currently provide all of the services and features that meet large business customers' CNS requirements. In order to provide such services and features, carriers other than the Big 3 must obtain the ubiquitous facilities-based networks, technological expertise, account management and sales staff, and advanced operational support systems that are required to compete in the CNS market. These carriers must also hire the numerous highly skilled personnel needed to provide the level of customer support that most large business customers require of their CNS carriers. End-to-end managed services as well as rapid trouble-shooting and recovery from network failures is deemed by large businesses to be important in insuring a high quality of service.

164. CNS customers demand that their carriers have a reputation for reliability. Smaller carriers cannot get experience and references without winning CNS

DOJ/Antitrust

contracts, but their lack of experience and references prevents many large business customers from purchasing CNS from these carriers. The only way a potential entrant can surmount this hurdle is to establish a track record of reliability on secondary contracts for large businesses and, over time, develop a reputation sufficient for a large business to award it a CNS contract. This is a difficult process that usually requires several years of effort. Indeed, WorldCom and Sprint were able successfully to enter the CNS market only after many years of sustained effort in this regard.

## X.

## VIOLATIONS ALLEGED

165. The United States hereby incorporates paragraphs 1 through 164.

166. Pursuant to an Agreement and Plan of Merger dated October 4, 1999, WorldCom and Sprint intend to consolidate or merge their businesses.

167. The effect of the proposed acquisition of Sprint by WorldCom would be to lessen competition substantially in interstate trade and commerce in each of the relevant markets alleged above in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

168. The transaction will likely have the following effects, among others:

   a. competition in the development, provision, and sale of services in each of the relevant markets will be eliminated or substantially lessened;

   b. actual and future competition between WorldCom and Sprint, and between these companies and AT&T, in development, provision, and sale of services in each of the relevant markets will be eliminated or substantially lessened;

   c. prices for services in each relevant product market will likely increase to levels above those that would prevail absent the merger;

   d. innovation and quality of service in each relevant product market will likely decrease to levels below those that would prevail absent the merger; and

   e. barriers to entering each of these important relevant product markets will be increased.

## XI.

## REQUEST FOR RELIEF

Plaintiff prays:

1. That WorldCom's proposed consolidation and merger with Sprint be adjudged to violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18;

2. That a permanent injunction be issued to prevent and restrain the Defendants and all persons acting on their behalf from consummating the merger agreement described in Paragraph 18 or from going forward with any other plan or agreement by which WorldCom would merge with or acquire Sprint, its capital stock, or any of its assets;

3. That the United States be awarded the costs of this action; and

4. That the Court impose such additional equitable relief as it deems necessary and proper.

Dated: June 26, 2000

Respectfully submitted,

_____/s/_____
Joel I. Klein
Assistant Attorney General

_____/s/_____
A. Douglas Melamed
Principal Deputy Assistant
        Attorney General

_____/s/_____
Constance K. Robinson
Director of Operations

_____/s/_____
Donald J. Russell
Chief

_____/s/_____
Laury E. Bobbish
Assistant Chief

_____/s/_____
Stephen M. Axinn
Special Trial Counsel

David F. Smutny (D.C. Bar #435714)
Phillip H. Warren
Yvette F. Tarlov (D.C. Bar #442452)
Peter S. Guryan
Trial Attorneys

Telecommunications Task Force
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, DC 20530
(202) 514-5621

**APPENDIX A**

## Herfindahl-Hirschman Index

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30%, 30%, 20%, and 20%, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). (Note: Throughout the Complaint, market share percentages have been rounded to the nearest whole number, but HHIs have been estimated using unrounded percentages in order to accurately reflect the concentration of the various markets.) The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997). Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See id.*

## APPENDIX B

### U.S. Foreign-Country Markets for Mass Market International Long Distance Services

| Route | Market Shares (IMTS Revenues) | | | | | HHIs/Change in HHI | | |
|-------|------|------|--------|--------|-------|---------|----------|--------|
|       | AT&T | WCom | Sprint | Merged | Big 3 | Pre-HHI | Post-HHI | Change |
| Albania | 19.10% | 56.94% | 4.99% | 61.93% | 81.03% | 3790 | 4359 | 569 |
| Algeria | 46.55% | 36.16% | 5.43% | 41.59% | 88.14% | 3545 | 3938 | 393 |
| Antigua & Barbuda | 49.57% | 30.82% | 16.93% | 47.75% | 97.32% | 3698 | 4742 | 1044 |
| Argentina | 59.76% | 25.07% | 11.02% | 36.10% | 95.85% | 4324 | 4877 | 553 |
| Bangladesh | 43.84% | 33.27% | 5.80% | 39.07% | 82.90% | 3166 | 3552 | 386 |
| Barbados | 63.64% | 29.17% | 6.08% | 35.25% | 98.88% | 4938 | 5292 | 354 |
| Benin | 31.01% | 23.11% | 31.89% | 55.00% | 86.01% | 2584 | 4057 | 1473 |
| Bermuda | 69.05% | 22.02% | 8.38% | 30.39% | 99.45% | 5324 | 5692 | 368 |
| Bolivia | 63.81% | 27.22% | 7.65% | 34.87% | 98.67% | 4871 | 5288 | 417 |
| Brazil | 64.44% | 25.61% | 7.61% | 33.22% | 97.66% | 4868 | 5257 | 389 |
| Bulgaria | 49.95% | 36.58% | 5.62% | 42.20% | 92.14% | 3883 | 4294 | 411 |
| Burkina | 46.66% | 31.06% | 10.05% | 41.11% | 87.77% | 3298 | 3923 | 625 |
| Canada | 58.89% | 31.63% | 8.96% | 40.59% | 99.48% | 4549 | 5116 | 567 |
| Chile | 52.26% | 27.51% | 13.71% | 41.23% | 93.48% | 3691 | 4446 | 755 |
| Colombia | 63.22% | 27.43% | 6.60% | 34.03% | 97.25% | 4794 | 5157 | 363 |

DOJ/Antitrust

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cuba | 46.47% | 43.78% | 6.36% | 50.13% | 96.60% | 4120 | 4676 | 556 |
| Dominica | 48.59% | 29.59% | 8.94% | 38.53% | 87.12% | 3400 | 3929 | 529 |
| Egypt | 59.27% | 26.70% | 9.83% | 36.53% | 95.81% | 4328 | 4853 | 525 |
| El Salvador | 52.04% | 27.21% | 9.48% | 36.68% | 88.72% | 3582 | 4098 | 516 |
| Ethiopia | 57.36% | 25.85% | 13.01% | 38.86% | 96.22% | 4135 | 4807 | 672 |
| Finland | 52.00% | 35.73% | 8.66% | 44.39% | 96.40% | 4062 | 4681 | 619 |
| French Overseas Dep'ts | 3.49% | 84.46% | 5.33% | 89.79% | 93.27% | 7190 | 8090 | 900 |
| Gambia, The | 54.23% | 27.75% | 7.94% | 35.70% | 89.93% | 3830 | 4270 | 440 |
| Greece | 59.81% | 33.89% | 4.70% | 38.60% | 98.40% | 4749 | 5068 | 319 |
| Grenada | 56.71% | 28.89% | 13.28% | 42.17% | 98.89% | 4228 | 4995 | 767 |
| Guinea | 55.23% | 30.72% | 6.60% | 37.32% | 92.56% | 4056 | 4462 | 406 |
| Haiti | 43.79% | 40.85% | 10.19% | 51.04% | 94.83% | 3703 | 4535 | 832 |
| Hong Kong | 51.07% | 21.55% | 21.07% | 42.62% | 93.69% | 3526 | 4434 | 908 |
| India | 43.64% | 38.65% | 6.89% | 45.54% | 89.18% | 3481 | 4014 | 533 |
| Indonesia | 58.16% | 28.69% | 7.64% | 36.32% | 94.49% | 4276 | 4714 | 438 |
| Israel | 62.47% | 21.66% | 14.43% | 36.09% | 98.55% | 4580 | 5205 | 625 |
| Italy | 55.46% | 37.77% | 6.03% | 43.80% | 99.26% | 4539 | 4995 | 456 |
| Jamaica | 64.27% | 21.90% | 11.32% | 33.23% | 97.50% | 4742 | 5238 | 496 |
| Japan | 60.09% | 20.57% | 11.35% | 31.92% | 92.01% | 4176 | 4643 | 467 |
| Korea, South | 55.59% | 30.14% | 11.00% | 41.14% | 96.73% | 4121 | 4784 | 663 |
| Mexico | 53.65% | 34.99% | 8.26% | 43.25% | 96.90% | 4173 | 4751 | 578 |
| Montserrat | 58.15% | 30.67% | 9.87% | 40.54% | 98.69% | 4421 | 5026 | 605 |
| Nicaragua | 61.53% | 25.12% | 10.16% | 35.28% | 96.81% | 4522 | 5033 | 511 |
| Nigeria | 37.73% | 52.33% | 3.62% | 55.95% | 93.69% | 4189 | 4568 | 379 |
| Panama | 66.55% | 23.94% | 7.30% | 31.24% | 97.79% | 5057 | 5406 | 349 |
| Peru | 58.84% | 31.43% | 6.10% | 37.53% | 96.37% | 4491 | 4875 | 384 |
| Portugal | 63.13% | 28.28% | 7.03% | 35.31% | 98.45% | 4836 | 5233 | 397 |
| Rwanda | 2.70% | 61.29% | 15.52% | 76.81% | 79.51% | 4185 | 6088 | 1903 |
| Saint Lucia | 63.06% | 23.99% | 9.20% | 33.19% | 96.25% | 4641 | 5082 | 441 |
| Saint Vincent & The Grenadines | 50.37% | 32.79% | 13.49% | 46.27% | 96.64% | 3799 | 4683 | 884 |
| Senegal | 46.01% | 15.89% | 27.34% | 43.22% | 89.24% | 3173 | 4041 | 868 |
| South Africa | 56.69% | 22.49% | 16.27% | 38.76% | 95.45% | 3989 | 4721 | 732 |
| Sri Lanka | 41.01% | 31.76% | 11.25% | 43.02% | 84.02% | 2869 | 3584 | 715 |
| Sweden | 54.70% | 24.92% | 9.36% | 34.29% | 88.99% | 3750 | 4217 | 467 |
| Taiwan | 59.38% | 22.89% | 11.36% | 34.25% | 93.64% | 4188 | 4708 | 520 |
| Trinidad & Tobago | 56.81% | 32.62% | 8.61% | 41.23% | 98.03% | 4366 | 4928 | 562 |
| Turkey | 57.70% | 36.13% | 4.78% | 40.91% | 98.61% | 4658 | 5004 | 346 |
| United Kingdom | 57.55% | 28.96% | 10.33% | 39.29% | 96.84% | 4259 | 4857 | 598 |
| Venezuela | 63.28% | 25.63% | 6.67% | 32.29% | 95.57% | 4709 | 5051 | 342 |
| Vietnam | 45.12% | 33.91% | 13.45% | 47.36% | 92.48% | 3379 | 4292 | 913 |
| Yemen | 39.84% | 30.09% | 13.90% | 43.99% | 83.83% | 2773 | 3609 | 836 |

Page 40 of 41

DOJ/Antitrust

## APPENDIX C

### U.S. Foreign-Country Markets for Private Line Services

| Route | Market Shares (IPLC Revenues) | | | | | HHIs/Change in HHI | | |
|---|---|---|---|---|---|---|---|---|
| | AT&T | WCom | Sprint | Merged | Big 3 | Pre-HHI | Post-HHI | Change |
| Argentina | 24.72% | 51.09% | 9.46% | 60.55% | 85.27% | 3409 | 4376 | 967 |
| Armenia | 0% | 68.03% | 31.97% | 100.00% | 100.00% | 5650 | 10000 | 4350 |
| Australia | 49.30% | 40.86% | 8.29% | 49.14% | 98.45% | 4170 | 4847 | 677 |
| Austria | 1.35% | 91.17% | 5.94% | 97.11% | 98.46% | 8352 | 9434 | 1082 |
| Bahamas, The | 40.96% | 55.07% | 2.70% | 57.76% | 98.72% | 4719 | 5015 | 296 |
| Bahrain | 46.19% | 29.32% | 24.49% | 53.81% | 100.00% | 3593 | 5029 | 1436 |
| Belarus | 0% | 78.81% | 21.19% | 100.00% | 100.00% | 6660 | 10000 | 3340 |
| Belgium | 15.00% | 62.43% | 10.84% | 73.27% | 88.27% | 4274 | 5627 | 1353 |
| Brazil | 24.29% | 58.99% | 14.08% | 73.07% | 97.36% | 4274 | 5936 | 1662 |
| Canada | 36.09% | 30.97% | 25.83% | 56.80% | 92.89% | 2949 | 4549 | 1600 |
| Cayman Islands | 22.31% | 74.96% | 2.72% | 77.69% | 100.00% | 6125 | 6533 | 408 |
| Chile | 18.52% | 46.43% | 16.75% | 63.17% | 81.69% | 2899 | 4454 | 1555 |
| China | 52.60% | 26.39% | 20.39% | 46.78% | 99.39% | 3880 | 4956 | 1076 |
| Cyprus | 4.85% | 13.46% | 81.69% | 95.15% | 100.00% | 6878 | 9076 | 2198 |
| Czech Republic | 36.48% | 21.71% | 41.81% | 63.52% | 100.00% | 3550 | 5366 | 1816 |
| Egypt | 1.26% | 61.90% | 33.71% | 95.61% | 96.87% | 4979 | 9153 | 4174 |
| El Salvador | 19.56% | 25.64% | 29.71% | 55.36% | 74.92% | 2552 | 4076 | 1524 |
| Ethiopia | 0% | 37.60% | 62.40% | 100.00% | 100.00% | 5308 | 10000 | 4692 |
| France | 14.51% | 55.29% | 27.51% | 82.80% | 97.32% | 4031 | 7074 | 3043 |
| Georgia | 0% | 19.99% | 80.01% | 100.00% | 100.00% | 6802 | 10000 | 3198 |
| Germany | 24.23% | 54.73% | 19.43% | 74.16% | 98.40% | 3961 | 6088 | 2127 |
| Guatemala | 38.91% | 47.32% | 10.78% | 58.10% | 97.01% | 3879 | 4899 | 1020 |
| Haiti | 4.87% | 84.01% | 11.13% | 95.13% | 100.00% | 7204 | 9074 | 1870 |
| Hong Kong | 31.99% | 53.76% | 9.41% | 63.17% | 95.16% | 4014 | 5025 | 1011 |
| Hungary | 0% | 52.98% | 43.04% | 96.01% | 96.01% | 4675 | 9234 | 4559 |
| India | 18.59% | 68.95% | 12.46% | 81.41% | 100.00% | 5255 | 6974 | 1719 |
| Indonesia | 22.30% | 58.92% | 18.78% | 77.70% | 100.00% | 4322 | 6534 | 2212 |
| Ireland | 24.18% | 65.09% | 10.74% | 75.82% | 100.00% | 4936 | 6334 | 1398 |
| Israel | 11.61% | 68.79% | 19.60% | 88.39% | 100.00% | 5251 | 7948 | 2697 |
| Italy | 40.77% | 36.23% | 23.00% | 59.23% | 100.00% | 3504 | 5170 | 1666 |
| Jamaica | 41.10% | 34.83% | 24.08% | 58.90% | 100.00% | 3482 | 5159 | 1677 |
| Japan | 43.16% | 38.79% | 9.40% | 48.19% | 91.35% | 3474 | 4203 | 729 |
| Jordan | 0% | 86.29% | 13.71% | 100.00% | 100.00% | 7634 | 10000 | 2366 |
| Korea, South | 35.31% | 42.48% | 21.74% | 64.23% | 99.54% | 3525 | 5372 | 1847 |
| Kuwait | 0% | 91.57% | 8.43% | 100.00% | 100.00% | 8456 | 10000 | 1544 |
| Lithuania | 0% | 45.88% | 54.12% | 100.00% | 100.00% | 5034 | 10000 | 4966 |
| Luxembourg | 20.03% | 20.91% | 59.07% | 79.97% | 100.00% | 4327 | 6797 | 2470 |
| Malaysia | 63.30% | 33.38% | 3.32% | 36.70% | 100.00% | 5132 | 5354 | 222 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mauritius | 0% | 17.51% | 82.49% | 100.00% | 100.00% | 7111 | 10000 | 2889 |
| Mexico | 45.97% | 39.13% | 11.82% | 50.94% | 96.92% | 3787 | 4712 | 925 |
| Netherlands | 33.83% | 48.03% | 17.54% | 65.57% | 99.39% | 3758 | 5443 | 1685 |
| Netherlands Antilles | 12.03% | 69.57% | 18.39% | 87.97% | 100.00% | 5324 | 7883 | 2559 |
| New Zealand | 13.30% | 10.35% | 75.40% | 85.75% | 99.05% | 5970 | 7531 | 1561 |
| Nicaragua | 3.52% | 57.55% | 38.92% | 96.48% | 100.00% | 4840 | 9320 | 4480 |
| Nigeria | 8.91% | 38.32% | 52.76% | 91.09% | 100.00% | 4332 | 8376 | 4044 |
| Norway | 19.30% | 60.62% | 20.08% | 80.70% | 100.00% | 4451 | 6885 | 2434 |
| Oman | 0% | 16.48% | 83.52% | 100.00% | 100.00% | 7247 | 10000 | 2753 |
| Pakistan | 3.75% | 74.26% | 21.98% | 96.25% | 100.00% | 6012 | 9278 | 3266 |
| Peru | 14.86% | 75.91% | 7.74% | 83.65% | 98.51% | 6044 | 7219 | 1175 |
| Philippines | 25.67% | 57.87% | 16.30% | 74.16% | 99.83% | 4273 | 6159 | 1886 |
| Poland | 6.29% | 88.18% | 5.54% | 93.71% | 100.00% | 7845 | 8822 | 977 |
| Portugal | 7.28% | 63.17% | 15.03% | 78.21% | 85.48% | 4480 | 6380 | 1900 |
| Qatar | 0% | 7.60% | 92.40% | 100.00% | 100.00% | 8596 | 10000 | 1404 |
| Saint Kitts & Nevis | 0% | 92.87% | 7.13% | 100.00% | 100.00% | 8675 | 10000 | 1325 |
| Saudi Arabia | 48.26% | 50.21% | 1.53% | 51.74% | 100.00% | 4852 | 5006 | 154 |
| Singapore | 41.25% | 42.82% | 13.71% | 56.52% | 97.77% | 3727 | 4901 | 1174 |
| South Africa | 45.91% | 26.10% | 26.93% | 53.03% | 98.95% | 3516 | 4922 | 1406 |
| Sri Lanka | 0% | 91.89% | 8.11% | 100.00% | 100.00% | 8510 | 10000 | 1490 |
| Switzerland | 32.89% | 51.71% | 12.83% | 64.54% | 97.43% | 3924 | 5250 | 1326 |
| Taiwan | 55.98% | 25.78% | 18.24% | 44.02% | 100.00% | 4131 | 5072 | 941 |
| Thailand | 51.08% | 33.89% | 15.03% | 48.92% | 100.00% | 3984 | 5002 | 1018 |
| Turkey | 23.84% | 51.49% | 24.67% | 76.16% | 100.00% | 3828 | 6369 | 2541 |
| Ukraine | 39.39% | 57.88% | 2.73% | 60.61% | 100.00% | 4909 | 5225 | 316 |
| United Arab Emirates | 30.15% | 65.40% | 4.46% | 69.85% | 100.00% | 5206 | 5788 | 582 |
| Uruguay | 17.45% | 50.25% | 32.30% | 82.55% | 100.00% | 3873 | 7120 | 3247 |
| Venezuela | 19.35% | 52.31% | 15.47% | 67.77% | 87.12% | 3444 | 5062 | 1618 |
| Vietnam | 15.78% | 39.81% | 44.41% | 84.22% | 100.00% | 3806 | 7342 | 3536 |