**Attachment 6**

**AT&T *Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services***

**FCC RM Docket No. 10593**
**October 15, 2002**



DOCKET FILE COPY ORIGINAL

RECEIVED

OCT 15 2002

FEDERAL COMMUNICATIONS COMMISSION
OFFICE OF THE SECRETARY

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| AT&T Corp. | ) |
| | ) |
| Petition for Rulemaking To Reform | ) WC Docket No. 02-____ |
| Regulation Of Incumbent Local Exchange | ) |
| Carrier Rates For Interstate Special | ) |
| Access Services | ) |

## <u>PETITION FOR RULEMAKING</u>

David W. Carpenter
SIDLEY AUSTIN BROWN & WOOD
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

David L. Lawson
James P. Young
C. Frederick Beckner III
Christopher T. Shenk
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Mark C. Rosenblum
Lawrence J. Lafaro
Judy Sello
AT&T CORP.
Room 3A229
900 Route 202/206 North
Bedminster, New Jersey 07921
(908) 532-1846

*Attorneys for AT&T Corp.*

No. of Copies rec'd _O + 8_
List ABCDE _02-250_
_WcB_

October 15, 2002

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ............................................................................2

I.     THE BELLS' SPECIAL ACCESS RATES ARE GROSSLY EXCESSIVE AND
       UNLAWFUL AND ARE BECOMING MORE SO ..................................................7

II.    THE BELLS' UNLAWFUL SPECIAL ACCESS RATES ARE HAVING
       SEVERE AND GROWING ANTICOMPETITIVE EFFECTS ..............................16

       A.     The Bells' Excessive Special Access Rates Impede The Ability Of CLECs
              To Self-Deploy Alternative Transmission Facilities. ..........................................16

       B.     Existing Regulation Permits The Bells To Target Their Market Power...............18

       C.     The Bells' Excessive Special Access Rates Are Having An Increasingly
              Anticompetitive Impact On The Long Distance Market. ...................................23

III.   NEITHER MARKET FORCES NOR THE COMMISSION'S EXISTING
       SPECIAL ACCESS RATE REGULATION CAN CONCEIVABLY ADDRESS
       THESE MARKET POWER ABUSES. .....................................................................25

       A.     Market Forces Cannot Constrain Bell Prices, Because IXCs and CLECs
              Generally Have No Choice But To Purchase Special Access From The
              Bells. ....................................................................................................................25

              1.     Competitive Carriers Can Self-Supply Or Use Third Party
                     Facilities-Based Special Access Only In Very Unusual
                     Circumstances. ...........................................................................................25

              2.     Self-Deployment Of Alternative Facilities To Provide Special
                     Access Is Infeasible In Most Cases. ...........................................................28

       B.     The Existing Regime of Special Access Rate Regulation Is Exacerbating
              the Problem.............................................................................................................32

IV.    THE COMMISSION CANNOT LAWFULLY STAND ON THE SIDELINES
       WHILE THE BELLS CONTINUE TO EXPLOIT THEIR MARKET POWER
       OVER SPECIAL ACCESS. .....................................................................................33

CONCLUSION ....................................................................................................................41

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington D.C.  20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| AT&T Corp. | ) |
| | ) |
| Petition for Rulemaking To Reform | )    WC Docket No. 02-____ |
| Regulation Of Incumbent Local Exchange | ) |
| Carrier Rates For Interstate Special | ) |
| Access Services | ) |
| | ) |

## PETITION FOR RULEMAKING

Pursuant to Section 1.401 of the Commission's Rules, 47 C.F.R. § 1.401, AT&T Corp. ("AT&T") hereby requests that the Commission promptly initiate a rulemaking to reform regulation of price cap incumbent local exchange carrier ("ILEC") rates for interstate special access services.  As detailed below, there is now indisputable proof that:  (i) large ILECs, and particularly the Bell Operating Companies ("Bells"), retain pervasive market power in the provision of these services, (ii) the large ILECs are abusing that market power with patently unjust and unreasonable rates that impose a multi-billion dollar annual overcharge or tax on American businesses and consumers and also severely harm both local and long distance competition, (iii) the Commission's existing rules are incapable of addressing this worsening crisis, and, indeed, only exacerbate the problem, and (iv) the Commission therefore has a clear legal obligation promptly to reform its regulation to protect the public interest and to put an end to these monopoly abuses.

## INTRODUCTION AND SUMMARY

The Commission has been duped. For several years now, the Bells have been peddling the story that they face substantial competition in the provision of high capacity loops and transport and that the only appropriate Commission response is reduced regulation and greater reliance upon market forces. In order to "meet competition" from many alternative suppliers of loops and transport, the Bells have argued, they have an urgent need to escape rate regulation of their own special access services.

The Bells' approach to selling their special access tale has been quite clever. Early on, they recognized the futility of attempting to supply evidence of actual competition that creates market forces adequate to constrain their power over price. The marketplace reality is that, despite limited, targeted entry, price-constraining levels of competition in the provision of special access services simply did not (and do not) exist in any local market, as even regulators in the local markets with the *most* competitive activity have recently held. Thus, although the Bells knew full well that they were (and are) the *only* suppliers of high capacity local links to the vast majority of buildings, they proffered the novel, and, at the time, largely unverifiable, theory that the existence of some collocation in some of a Bell's central offices in an area signals sufficient competition to justify rate flexibility and, ultimately, rate deregulation. Without access to the contrary facts in the Bells' sole possession, the Commission made a predictive judgment that the Bells' theory was sound, and, noting the great deference owed to such predictive judgments, the court of appeals affirmed.

The Bells responded with a torrent of "pricing flexibility" requests, and, to no one's great surprise, they had little trouble meeting the "competitive triggers" that had been adopted. Today, more than half of the Bells' special access revenues come from areas in which they are no longer

2

subject to price cap regulation. On current trends, special access rate deregulation will be all but complete by the end of next year.

That would have the makings of a great regulatory success story, but for the unfortunate fact that the Bells' own subsequent actions and submissions to the Commission have exposed their story – and the entire foundation of reduced regulation of their special access rates – as a fraud. The Bells' claims that their rates are constrained by market forces were false when made, are false today, and will remain false for the foreseeable future. The Bells have not used rate deregulation to meet competition, but to gouge both their captive special access customers and the general public. The Bells' already exorbitant special access rates and revenues have soared, and the ever-increasing annual returns that the Bells enjoy on those services are now as much as *50 percent* or more. The Bells' special access windfalls already represent at least a *$5 billion* annual direct tax on American businesses and consumers, and the problem is only worsening. The Bells' unjust – and, as compared to the Bells' own costs of accessing the underlying facilities, patently discriminatory – special access rates are also among the greatest threats to both local and long distance competition. In short, special access rates that have long been a problem have now become an industry crisis that portends irreversible harm to competition and consumers. Immediate Commission action is imperative.

The relevant facts are straightforward and indisputable. As the Bells' own ARMIS reports confirm, their special access returns – and hence the special access rates that have produced those returns – are, without exception, both grossly excessive and rapidly rising. Indeed, the colossal returns reflected in the Bells' *embedded cost* ARMIS data greatly understate the Bells' windfalls. Comparing the Bells' special access revenues to their true economic costs of providing those dominant carrier services reveals that their annual returns are simply obscene

3

– rates are more than *double* costs. In *every* area in which they have received pricing flexibility, the Bells have avoided the substantial "X-Factor" productivity reductions that would otherwise have been required in the absence of pricing flexibility, and either maintained rates at previous levels or raised rates still further. And, as further confirmation of their enduring market power, the Bells have managed to *increase* their special access sales even as they continue to inflate the rates for those services and to provide their unaffiliated special access customers with remarkably poor (and often deteriorating) performance in delivering those services. Indeed, the Bells' special access revenues have more than tripled since 1996. By any standard, these facts alone establish that the Bells retain considerable power over price, that neither market forces nor the existing regulatory scheme constrains that power, and that existing special access rates are unjust and unreasonable.

The resulting harm to consumers and competition is immense. The dwindling ranks of competing local carriers must, of course, pass on to consumers the Bells' special access rate increases. By charging other carriers these inflated rates, the Bells also avoid retail price competition. This is not lost on business and consumer groups, which are increasingly voicing their opposition to the Bells' special access abuses, most recently in Commission proceedings directed at the other primary outlet of the Bells' special access market power, discriminatory provisioning and poor performance. The Bells' special access rates are, if anything, an even bigger problem. In generating billions of dollars of windfalls each year, the Bells' special access "tax" places a substantial drag on the nation's economy.

But the harm from failing to curb the Bells' special access market power runs much deeper. The Bells' high capacity loops and transport, which are characterized by enormous economies of scale (and sunk costs), remain essential inputs for competitive local exchange

4

carriers ("CLECs"). Although Congress addressed that reality by requiring the Bells to lease those facilities at forward-looking economic costs, the Bells evade that obligation through the "use" and "commingling" restrictions that the Commission has allowed them to impose on competitors, and thus CLECs have no choice but to pay the Bells' exorbitant special access rates. That gives the Bells, which access those same facilities at their much lower economic costs, an enormous cost advantage in competing to serve both business and residential customers. Worse yet, pricing flexibility (both "Phase I" contract tariffs and "Phase II" rate deregulation) allows the Bells to use anticompetitive price discrimination and profitably to target with predatory rates the small minority of buildings where CLECs might otherwise have a fighting chance. Real customer choice cannot be sustained under these circumstances.

The Bells' unlawful special access rates are equally destructive of long distance competition. Local access is, of course, an essential input for long distance services, and, as the Commission has expressly recognized, absent regulation, the Bells have both the incentive and ability to use inflated access charges to "price squeeze" their long distance competitors. In the past, the Commission has pointed to price cap regulation and network element substitutes for access as checks on Bell price squeezes, but those are obviously no checks at all in the face of rate deregulation and use and commingling restrictions. If the Bells' long distance rivals must continue to pay more than twice the Bells' own forward-looking economic costs of local access, remonopolization is inevitable.

There is only one responsible and lawful Commission solution to this special access crisis. The Commission has ample authority to, and must, initiate a rulemaking and, on an expedited basis, reform and tighten its special access rate regulations to the full extent necessary to protect consumers and competition and to curb the Bells' existing ability to impose unjust,

unreasonable and discriminatory charges for their special access services. At a minimum, the Commission should revoke pricing flexibility and reinitialize price caps to levels designed to produce normal, rather than monopoly, returns. Moreover, existing special access rates are so far out of line with lawful, compensatory levels that the Commission should, as an interim measure, (1) reduce all special access rates subject to Phase II pricing flexibility to levels that would produce an 11.25% rate of return, and (2) impose a moratorium on consideration of further pricing flexibility applications pending completion of the rulemaking. In addition, the Commission should specify that access purchasers may take advantage of this interim relief without triggering any termination liabilities or other penalties in the Bells' optional pricing plans.

This course of action can no longer be considered discretionary. The Communications Act requires that all charges in connection with common carrier services be just and reasonable, 47 U.S.C. § 201, and it is well established that the Commission has a duty to enforce that requirement. There are no circumstances under which permitting the Bells to earn such "creamy returns" at the public's expense could be squared with these requirements.[1] But, as the courts have stressed, where, as here, the Commission has based its existing regulatory regime on a predictive judgment, it is absolutely imperative that "the Commission . . . vigilantly monitor the consequences of its rate regulation rules."[2] "If, in light of the actual market developments, the Commission determines that competition is not having the anticipated effect on access charges," it must "revisit the issue."[3] The existing relaxed (and, to a large extent, now nonexistent) rate

---

[1] *Farmers Union Cent. Exchange, Inc.* v. *FERC*, 734 F.2d 1486, 1502-03 (D.C. Cir. 1984) ("*Farmers Union II*").

[2] *American Civil Liberties Union* v. *FCC*, 823 F.2d 1554, 1565 (D.C. Cir. 1987).

[3] *Texas Office of Public Utility Counsel* v. *FCC*, 265 F.3d 313, 325 (5th Cir. 2001); *see also SWBT* v. *FCC*, 153 F.3d 523, 547 (8th Cir. 1998) (same); *see also CELLNET* v. *FCC*, 149 F.3d

regulation of interstate special access reflects predictive judgments that market forces would constrain the Bells' special access pricing. It is now clear that those predictions were wrong and that rate regulation is, and, for the foreseeable future, will remain, vitally necessary to combat the Bells' market power and to ensure that special access charges are just, reasonable and nondiscriminatory.

It is no answer to point out that the Bells' captive customers could file Section 208 complaints to address the Bells' abuses in each of the hundreds of MSAs in which they provide special access services. As the D.C. Circuit has warned, the existence of such a "safety valve" is no defense to a claim that the underlying regulatory regime is unlawful.[4] There is accordingly no scenario in which the Commission lawfully can avoid addressing the special access crisis, and AT&T strongly urges the Commission promptly to initiate the rulemaking sought by this petition.

## I.    THE BELLS' SPECIAL ACCESS RATES ARE GROSSLY EXCESSIVE AND UNLAWFUL AND ARE BECOMING MORE SO.

It can no longer be disputed that the Bells' special access rates are unjust and unreasonable and that these unlawful rates are not random or temporary occurrences. Rather, fundamental marketplace and regulatory conditions are driving a consistent, industry-wide trend resulting in higher and higher rates of return every year for each Bell holding company. It is equally clear that the Commission's existing scheme of rate regulation is not responding to this

---

429, 442 (6th Cir. 1998) ("If the FCC's predictions about the level of competition do not materialize, then it will of course need to reconsider its [regulations] in accordance with its continuing obligation to practice reasoned decisionmaking"); *Bechtel* v. *FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) (it is "settled law that an agency may be forced to reexamine its approach if a significant factual predicate of a prior decision . . . has been removed.").

[4] *See, e.g., Time Warner Entertainment Co.* v. *FCC*, 56 F.3d 151, 176 (D.C. Cir. 1995).

trend, but instead is allowing it to spiral more and more out of control every year, with increasingly negative consequences for consumers and competition.

The Bells' own ARMIS reports to the Commission establish that the Bells' rates of return on special access are triple, quadruple, *even quintuple*, the 11.25% rate of return that the Commission found just and reasonable for dominant ILEC services in 1990 (which is itself far too high given the much lower inflation and decreased borrowing rates that prevail today). For 2001, the Bells' special access rates of return were as follows:[5]

| | |
|---|---|
| BellSouth | 49.26% |
| Qwest | 46.58% |
| SBC | 54.60% |
| Verizon | 21.72% |
| Verizon (excluding NYNEX) | 37.08% |

These extraordinarily excessive returns are no aberration; the Bells are fleecing special access customers nationwide, and, by doing so, are reaping shocking windfalls. For example, SBC's special access revenues in 2001 exceeded amounts that would have produced an 11.25% rate of return by an astonishing $2.5 billion. For the same year, Verizon, BellSouth, and Qwest reaped special access windfalls of more than $1 billion, $966 million, and $710 million, respectively. Thus, for 2001 alone, the Bells' excessive special access rates were equivalent to a more than *$5 billion tax* on American businesses.

These patently excessive returns represent conclusive proof of the Bells' overwhelming market power. In fully competitive markets, market forces drive prices toward costs. Costs, of

---

[5] These rates of return were calculated from 2001 ARMIS 43-01, Table I, Cost and Revenue Table, Column S, Rows 1910 and 1915. *See* Friedlander Dec. ¶¶ 2-4 & Exhibit 1 (Tab A).

course, include the "cost of obtaining debt and equity financing."[6] But in competitive markets, debt and equity investors earn – and a company can pay – only "normal" profits that compensate investors for the riskiness of the investment.[7] That is because any attempt by a firm in a competitive market to charge prices that would allow it to earn more than a normal, risk-adjusted rate-of-return would cause the firm to lose business to other firms that charged prices that reflect the lower level of return that would still be sufficient to induce investment. It is precisely for these reasons that the very definition of monopoly profit is a return in excess of normal profits.[8] And there can be no serious claim that the Bells must earn 50 percent rates of return to attract capital.

The *trend* in the Bells' excess returns for interstate special access is even more alarming. As the following chart demonstrates, the Bells' interstate special access rates of return continue to grow every year, with no exceptions, and with year-to-year increases that are quite remarkable.[9]



---

[6] *Local Competition Order*, 11 FCC Rcd. 15499, ¶ 700 (1996).

[7] *Id.*

[8] *See* Ordover/Willig Dec. ¶ 23 (Tab B).

[9] *See* Friedlander Dec. ¶ 5 & Exhibit 1.

Moreover, returns calculated from the Bells' ARMIS reports, as high as they are, grossly *understate* the extent of the Bells' special access tax on American consumers and businesses. The costs reported on the Bells' ARMIS reports are, of course, *embedded* costs. And, as the Commission and the courts have consistently recognized, the Bells' true costs of providing services over their local networks are their much lower forward-looking economic costs.[10]  The Bells' special access rates exceed their economic costs by enormous margins.

Special access services are provided over the same facilities and are functionally equivalent to high capacity loop and transport unbundled network elements.  Yet, the Bells' month-to-month special access rates are generally double or more their comparable UNE rates. The Declaration of Joseph Stith (attached hereto as Tab C) compares the Bells' tariffed interstate special access rates, on a state-by-state basis, with the rates for the functionally equivalent unbundled network elements.  For services still subject to price cap regulation, the Bells' month-to-month DS1 and DS3 special access rates are routinely more than 100% higher than the comparable UNE rates, and sometimes they are even 200% or 400% higher.  Thus, if the Bells' annual special access returns are calculated on the basis of their *economic* costs, rather than their embedded costs, it becomes clear that their real returns on these monopoly services are astronomical.

---

[10] *See, e.g., Local Competition Order* ¶ 679 ("We believe that our adoption of a forward-looking cost-based pricing methodology . . . estabish[es] prices . . . based on costs similar to those incurred by the incumbents."); *Verizon Communications Inc.* v. *FCC*, 122 S. Ct. 1646, 1672 (2002) (costs that exceed TELRIC are inefficient costs); *Alenco Communications Co.* v. *FCC*, 201 F.3d 608, 615 (5th Cir. 2000) ("rates must be based not on *historical, booked costs,* but rather on *forward-looking, economic costs.*  After all, market prices respond to current costs; historical investments, by contrast, are sunk and thus ignored.").

In the past, the Bells have attempted to justify the disparity between their special access rates and forward-looking costs by attacking the Commission's "TELRIC" rules, claiming that since special access rates are "competitively disciplined," TELRIC must be considered the problem. In fact, it is the Bells' argument that is flawed. At the outset, it is difficult to conceive how attacking TELRIC could aid the Bells in this context, given that the Bells' special access rates are so plainly excessive even as compared to their preferred embedded cost standard. In any event, the Supreme Court has flatly rejected the Bells' criticisms of TELRIC and has upheld that established forward-looking cost estimation methodology as a fully valid and compensatory method of calculating the Bells' true costs.[11] Indeed, TELRIC is, if anything, *overly* compensatory, given that costs must be calculated on the basis of existing wire center locations and given the inevitable regulatory lag in TELRIC price adjustments.[12] The Bells thus have it precisely backwards: their ability to charge special access rates that are multiples of their forward-looking costs demonstrates that their special access services are *not* subject to any meaningful competitive discipline.

Any possible doubt about the Bells' pervasive market power should be put to rest by the overwhelming evidence that the Bells have, without exception, maintained or even *raised* their special access prices when given flexibility to do so and have had no trouble retaining customers – and, indeed, greatly *increasing* sales – in the wake of those price increases. Beginning in the fall of 2000, the Bells have sought and won pricing flexibility in numerous MSAs. As of the 2002 tariff filings, approximately 59 percent of the Bells' special access revenues (excluding GTE) are no longer subject to price cap regulation. In *every* MSA in which the Bells have

---

[11] *See Verizon*, 122 S. Ct. at 1672.

[12] *Id.* at 1670.

obtained this "Phase II" pricing flexibility, they have maintained or even *raised* their rates, which are now consistently above where they would otherwise be under price caps. In particular, if these services had remained subject to price cap regulation, the Bells would have been required to apply substantial X-Factor reductions to these rates in both 2001 and 2002.[13] The elimination of price cap regulation for these services has allowed the Bells to avoid those X-Factor reductions (and to keep rates at pre-pricing flexibility levels), which has deprived access purchasers of over $390 million dollars in rate reductions that they would otherwise have received since the inception of pricing flexibility.[14]

Even more egregiously, both BellSouth and Verizon have increased special access rates in every MSA in which they have been awarded Phase II pricing flexibility. For example, Verizon increased its month-to-month DS1 rates as much as 15% (and its month-to-month DS3 rates by 6%) in *every* MSA in which it won Phase II pricing flexibility, even in large cities such as New York and Boston where the presence of competitors is greatest.[15] Similarly, BellSouth raised its month-to-month DS3 rates by almost 9%, and its DS1 rates by approximately 8%, in each of the MSAs in which it received Phase II pricing flexibility, including such large cities as Atlanta and Miami.[16]

The Commission required price cap LECs to continue to file their rates in tariffs even after receiving Phase II pricing flexibility (*i.e.*, removal from price caps), and therefore it is

---

[13] 47 C.F.R. § 61.45(b)(1)(iv).

[14] *See* Stith Dec. ¶ 11. For example, for DS1 term rates – which represent the largest volumes and the largest expense – SBC-Southwestern Bell's pricing flexibility rates are 35% higher than the price cap rates, SBC-Pacific Bell's are 24% higher, Verizon-Bell Atlantic-South's are 16% higher, and Verizon-Bell Atlantic-North's are 7% to 14% higher (depending on the state).

[15] Verizon Transmittal No. 134 (December 21, 2001).

[16] BellSouth filed Transmittal No. 608, effective November 1, 2001, increasing Special Access rates for DS3 and DS1 services in MSAs with Phase II pricing flexibility.

possible to compare the Bells' tariffed Phase II rates with their price capped rates in each state. The tariffed rate in Phase II MSAs no longer subject to price cap regulation is equal to or higher than the rate for the same service in areas that remain subject to price cap regulation for virtually *every* special access service in *every* state for *every* Bell.[17]

The Bells' only defense of this naked exercise of monopoly power has been to seize on the Commission's speculation in the *Pricing Flexibility Order* (¶ 155) that "some access rate increases may be warranted, because our rules may have required incumbent LECs to price access services below cost in certain areas." But such a claim is obviously unsustainable in light of the Bells' grossly excessive rates of return. In light of the facts, the notion that price caps were holding the Bells' rates below costs is preposterous. Indeed, even though the Bells' rates of return were *already* excessive when they were awarded pricing flexibility, it is striking that after most special access has now been removed from price caps, the Bells have not seen fit to respond to competition by lowering their rates in *any* of those MSAs.[18]

These rate increases are particularly anticompetitive, because the areas in which the Bells have obtained Phase II deregulation tend to be the more densely populated areas and thus would typically be characterized by costs that are *lower* than those in the areas in which the Bells have not received pricing flexibility. The fact that the Bells' rates are consistently higher in the lower cost areas is vivid proof that the Bells retain overwhelming market power in every local market, including those with the most competitive activity.

---

[17] The only exception is Ameritech's rates for OC-3; the pricing flexibility rate is one percent lower than the price cap rate. The chart attached to the Stith Declaration is based on each Bell's rates as of August 1, 2002, and each price is calculated as a ten mile stand-alone circuit in order to facilitate apples-to-apples comparisons. If the distance were changed from ten miles to five miles, the pricing flexibility rate would be higher even for Ameritech's OC-3 service.

[18] *See* Ordover/Willig Dec. ¶ 30.

At the same time that the Bells have been increasing already above-cost access charges, IXCs and other competitive local carriers have been increasingly forced to rely on the Bells' access services, even to provide competitive local services. This can be seen most directly in the dramatic increase in the Bells' special access revenues. Specifically, special access revenues of the Bells have more than tripled since 1996, from $3.4 billion to $12.0 billion. Once again, this trend holds true for all of the Bells and has been very consistent from year to year; indeed, if anything the trend has become more pronounced in recent years.[19]



Of course, if last mile alternatives to the Bells' facilities truly existed, the Bells would not be able to impose staggering rate increases and simultaneously increase overall usage of their networks. Nor have carriers been able to use UNEs to bypass the Bells, as Congress intended. As AT&T has explained in detail in the Triennial UNE Review Proceeding, because of the Commission's use and commingling restrictions on enhanced extended links ("EELs"), IXCs and competitive carriers must rely on Bell special access in order to provide both exchange access

---

[19] *See* Friedlander Dec. ¶ 7 & Exhibit 2.

14

*and* local service.[20]  Thus, competitive entry into the local market has had the perverse effect of swelling the Bells' special access revenues (and thus their excessive earnings).

The Bells' abysmal performance in provisioning their special access services even as they continue to raise their special access rates further confirms the Bells' continuing market power and the need for immediate reform of rate regulation.[21]  The Joint Competitive Industry Group, which represents the entire spectrum of purchasers of special access (including non-carrier end-user customers), has documented the Bells' patently unacceptable performance and proposed specific performance metrics and other remedies.  The fact that customers, including end-user customers, stay with the Bells in the face of both widespread service problems and excessive rates, is conclusive proof that customers rarely have alternative suppliers.[22]

In sum, in enacting the pricing flexibility regime, the Commission recognized that pricing flexibility could be lawful only to the extent that "price cap LECs do not increase rates to unreasonable levels for customers that lack competitive alternatives."[23]  But the indisputable evidence now shows that price cap LECs *are* increasing rates to unreasonable levels for customers that lack competitive alternatives.  The Commission cannot allow this situation to continue.  The Commission's prime directive is to protect the public interest by ensuring that telecommunications services are provided "at reasonable charges."[24]  By any measure, the Bells'

---

[20] *See* Comments of AT&T Corp., CC Docket No. 01-338 *et al.*, at 136-40 (filed April 5, 2002) ("AT&T Triennial Review Comments"); Reply Comments of AT&T Corp., CC Docket No. 01-338, at 283-300 (filed July 17, 2002) ("AT&T Triennial Review Reply Comments").

[21] *See Performance Measures and Standards for Interstate Special Access Services*, CC Docket No. 01-321, Notice of Proposed Rulemaking (rel. Nov. 19, 2001); *id.*, Comments of AT&T, filed January 22, 2002.

[22] *See* Ordover/Willig Dec. ¶ 31.

[23] *Pricing Flexibility Order*, 14 FCC Rcd. 14221, ¶ 3 (1999).

[24] 47 U.S.C. § 151.

special access charges exceed lawful levels by billions of dollars. Although this special access tax undoubtedly benefits the Bells, it inflicts great harm on the public and is an enormous drag on the U.S. economy.

## II.    THE BELLS' UNLAWFUL SPECIAL ACCESS RATES ARE HAVING SEVERE AND GROWING ANTICOMPETITIVE EFFECTS.

The Bells' "creamy returns" alone require the Commission to reform its regulation of the Bells' special access rates.[25] But regulatory reform is also necessary to prevent the Bells from using their control of bottleneck network facilities to raise rivals' costs, to foreclose the development of local competition, and to impede long distance competition. Given the fragility of emerging local competition and the recent entry of the Bells into the long distance market, there is an urgent need to foreclose this anticompetitive conduct.

### A.    The Bells' Excessive Special Access Rates Impede The Ability Of CLECs To Self-Deploy Alternative Transmission Facilities.

The Bells' bloated access charges create an enormous local entry barrier. As described in greater detail in Part III below, there are generally no alternatives to the Bells' last mile transmission facilities, even high-capacity loops and transport facilities. Thus, competitive carriers that seek to self-deploy switches are critically dependent upon incumbent transmission facilities to connect customer locations to their switches.

Competitive carriers also need access to Bell transmission facilities as a "bridge" mechanism to self-deploying their own transmission facilities in the few instances where it is theoretically economic to do so. The reasons for this are quite simple. Given the sunk cost nature of transmission facilities, competitive carriers simply cannot build transmission facilities

---

[25] *Farmers Union II,* 734 F.2d at 1502-03; *Illinois Bell Tel. Co.* v. *FCC,* 988 F.2d 1254, 1260 (D.C. Cir. 1993). *See also Potomac Elec. Power Co.* v. *Public Utils. Comm'n of the District of Columbia,* 158 F.2d 521, 527 (D.C. Cir. 1947) (*quoting Dayton-Goose Creek R. Co.* v. *United States,* 263 U.S. 456, 483 (1924)).

"on spec" and hope that customers will show up. Rather, they need some reasonable assurance that there is sufficient demand to support a deployment of transmission facilities. *USTA* v. *FCC*, 290 F.3d 415, 424 (D.C. Cir. 2002) ("access to UNEs may enable a CLEC to enter the market gradually, building a customer base up to the level where its own investment would be profitable."). Customers, on the other hand, are understandably not willing to commit to service and then wait the many months (and in some cases, years) that it takes to secure the necessary rights-of-way and build transmission facilities.[26]

The availability of UNEs could mitigate these entry barriers by allowing a CLEC to win customers immediately by purchasing access to incumbent network facilities and then to construct the transmission facilities to serve its growing customer base. In its *Supplemental Order* and *Supplemental Order Clarification*, however, the Commission permitted incumbents to impose "use" and "commingling" restrictions on combinations of unbundled loops and transport facilities that have prevented CLECs from converting special access services into unbundled network elements in all but the most unusual circumstances.[27] Thus, the only alternatives available to CLECs are the Bells' special access services. As a result, over 98% of AT&T's facilities-based *local* service for business customers using incumbent facilities of DS-1 level or higher is provided over incumbent special access services, not UNEs.[28]

Meaningful facilities-based competition is simply not possible under these conditions. As explained above, special access rates are typically twice (and sometimes three or four times) the TELRIC rates for the comparable UNEs. Because TELRIC measures the incumbent's true

---

[26] *See infra* Part III.A.

[27] Comments of AT&T Corp., CC Docket No. 96-98, at 18-23 (filed April 5, 2001) ("AT&T Use Restriction Comments"); AT&T Triennial Review Reply Comments at 283-300.

[28] *See* AT&T Triennial Review Reply Comments at 283 & Pfau Reply Dec. ¶ 26 n.10.

economic costs,[29] the fact that access rates are twice TELRIC means that the CLEC's cost of accessing the underlying facilities is usually twice (or more) that of the incumbent. And a competitive carrier generally cannot justify constructing its own transport facilities unless it can aggregate traffic from numerous LSOs to a hub, and then place the aggregated traffic onto its own transport facilities at the hub.[30] CLECs are thus forced into a Hobson's Choice: they can either pay excessive special access rates to reach those additional LSOs and thereby internalize a cost structure that will not allow them to compete effectively with the Bells, or they can attempt to build fiber facilities with enormous excess capacity and substantial up front costs that would dwarf the reasonably anticipated revenue stream. In either case, these costs – which the Bells do not face – are true barriers to entry that simply foreclose broader facilities-based competition.

**B.      Existing Regulation Permits The Bells To Target Their Market Power.**

The competitive damage permitted under the existing rules goes well beyond allowing the Bells to charge excessive prices for critical inputs that serve as a necessary bridge or complement to facilities deployment. The Bells' ability to engage in discriminatory contract tariffs is equally pernicious, because it allows the Bells surgically to foreclose competition. In particular, the existing pricing flexibility rules permit the Bells to price discriminate in order to prevent entry or drive competitors out of the market and to use long term contracts to deny competitors access to the traffic necessary to justify facilities deployment.

*The Existing Regulations Permit The Bells To Engage In Exclusionary Pricing Behavior.* It has been noted that the Bells' grossly excessive special access rates create a "price umbrella"

---

[29] *Local Competition Order* ¶ 679.

[30] *See* AT&T Triennial Review Reply Comments at 251-52.

for CLECs that deploy alternative facilities. However, as Professor Willig has explained, the sunk cost nature of investment in transmission facilities means that

> reliance on the existence of this pricing umbrella . . . is very risky. To the extent that an ILEC can price discriminate, it will be able to lower prices selectively, only to those customers that could potentially be served by the new entrant and keep prices high for all other customers. For example, if a competitive carrier were to deploy transport facilities between two points, an ILEC could respond by lowering prices on that route but not any others. Also, the price umbrella could be collapsed by the possible future entry of *other* CLECs. Thus, even if a CLEC can be reasonably sure that prices will remain stable in the near term after entry, to be successful over the long term, it must enter at costs comparable to the ILEC's because there remains a significant risk that the ILEC will ultimately choose to lower its prices down towards its costs.[31]

The Commission in its *Pricing Flexibility Order* (¶ 79) was "concerned" about this precise point. The Commission observed that "Phase I relief, which enables [the Bells] to offer contract tariffs to individual customers, [could permit the Bells] to engage in exclusionary pricing behavior." *Id.* In particular, the Commission observed that, absent regulation, the Bells had the ability to "reduce prices in the short run and forgo current profits in order to prevent the entry of rivals or to drive them from the market." *Id.* Indeed, because the Bell almost always enjoys substantial advantages over the CLEC in terms of per-unit costs, the Bell can reduce its rates to a point between its own unit cost and that of the CLEC at any time. As a result, the Bell can drive any CLEC from the market to the extent the CLEC's business plan is based on being able to charge prevailing supracompetitive access prices.[32]

The Commission found that these concerns would be addressed by its decision to grant downward pricing flexibility only where CLECs had made "substantial sunk investment." *Id.* ¶ 80. The Commission reasoned that where investment in alternative facilities had been sunk, the

---

[31] AT&T Triennial Review Reply Comments, Willig Reply Dec. ¶ 25.

[32] *See* AT&T Triennial Review Reply Comments, Lesher Reply Dec. ¶ 28.

Bells would have no incentive to engage in exclusionary behavior because there would be little prospect of driving the CLECs out of the market. "If a competitive LEC has made a substantial sunk investment in equipment, that equipment remains available and capable of providing service in competition with the incumbent, even if the incumbent succeeds in driving that competitor from the market." *Id.*

Experience now shows that the Commission's belief that its pricing flexibility triggers "measure the extent to which competitors have made sunk investment in facilities used to compete with the incumbent LEC" was erroneous. For example, the trigger for deregulation of dedicated transport is inherently flawed, because it focuses only on whether there is *some* fiber deployed in a collocation, and not whether the CLEC's transport facilities fully bypass the Bell's transport facilities. Indeed, as the Commission itself noted in the *Pricing Flexibility Order* (¶ 81), most transmission facilities in a collocation are trunk-side "facilities leading from the collocated equipment to the IXC POP." As a result, the Commission's dedicated transport trigger deregulates the Bell's transport rates, even though the CLEC has bypassed only one of the transport links included in that service – the Bell's entrance facilities. The triggers for channel terminations are even less representative of the existence of relevant sunk investment, because they rely exclusively on a showing of *transport* deployment as evidence of loop deployment.[33] Under this test, a Bell can receive deregulation of its channel termination rates without showing that CLECs have deployed a single loop anywhere in the MSA. In other words, the collocation trigger identifies only the possibility of competitive facilities between the collocation cage and

---

[33] This is rather like deregulating the rates for first class mail because there is competition for overnight deliveries under the "trigger" that post offices are used in the delivery of both overnight mail packages and first class mail. In effect, the existing special access pricing flexibility triggers allow deregulation of "first class mail" (here, transport and customer channel terminations) because there is competition for "overnight packages" (entrance facilities) through

the competitor; it says nothing about the potential for competition between the collocation cage and the customer – *i.e.*, interoffice transport and loop equivalent facilities.[34]

The Commission's "percentage of revenues" trigger is especially pernicious. The Commission offered the Bells two alternative triggers: they could demonstrate "fiber-based collocations" in a certain percentage of the wire centers in an MSA, *or* they could show fiber-based collocations in wire centers representing a certain percentage of the Bell's revenues from the relevant services in that MSA. The "percentage of revenues" test usually means that the Bell need only demonstrate facilities-based collocations in an even smaller percentage of wire centers (*i.e.*, those in the most urban area of the MSA), and – not surprisingly – the Bells have relied almost exclusively on that alternative trigger in winning pricing flexibility all over the country.

*The Existing Rules Permit The Bells To Engage In Customer Foreclosure.* As the Commission recognized in its *Pricing Flexibility Order*, the Bells can prevent facilities competition by engaging in customer foreclosure. In particular,

> [a]n incumbent can forestall the entry of potential competitors by "locking up" large customers . . . . Specifically, large customers may create the inducement for potential competitors to invest in sunk facilities . . . . To the extent the incumbent can lock in the larger . . . customers whose traffic would economically justify the construction of new facilities, the incumbents can foreclose competition for the smaller customer as well.[35]

It is now clear that the existing rules do not prevent this type of exclusionary conduct. The Bells are using their market power to force carriers to enter into anticompetitive optional pricing plans ("OPPs") that remove even the possibility that market forces could constrain the

---

the use of the collocation cages (post offices).

[34] This is especially problematic because entrance facilities represent a relatively small percentage of the overall cost of special access (typically around 15 percent).

[35] *Pricing Flexibility Order* ¶ 79.

Bells' market power. The Bells have threatened IXCs with even higher rates unless they sign long-term contracts with huge penalties for early termination. Carriers have agreed to these OPP deals, because of the urgent need to cut access expense (or, at least, to keep it from rising even further).

These OPPs are severely anticompetitive. For example, virtually all of these plans require AT&T to commit to certain levels of annual purchases to obtain the discounts. As a result, if AT&T were to migrate even a relatively small portion of its traffic to its own or Bell competitors' facilities, it would lose the OPP discounts (typically on a *regionwide* basis), which in most cases would dwarf whatever savings AT&T could achieve by using competitive alternatives. Indeed, some Bells have insisted on specific penalties for migrating traffic to competitors.[36] And even if more broadly available alternatives were to become available – *e.g.*, if the Commission were to eliminate use restrictions on EELs or if broad-based facilities-based alternatives were somehow to emerge – AT&T could not take advantage of them in many cases, because virtually all of these OPP plans impose substantial penalties for early withdrawal, which would negate any savings.[37] Moreover, as the Commission recognized in the *Pricing Flexibility Order*, long term contracts can also prevent entry because the Bells have locked up the largest

---

[36] For example, SBC's Managed Value Plans require that, to the extent AT&T meets its special access needs over SBC facilities (as it overwhelmingly must), it must use UNEs to provision no more than 5% of those needs, and it must meet 95% or more of those needs using SBC special access. Similarly, Qwest's plans require AT&T to pay 125% of the remaining value of the OPP for circuits that are converted to UNEs. And Verizon's plans condition discounts for DS1 services on expanded commitments to purchase DS3 services.

[37] For example, SBC's Managed Value Plans require forfeiture of the previous six months' credits plus anywhere from 20% to 40% of the monthly revenue commitment for the remainder of the term of the agreement. Qwest imposes termination penalties of 100% of the recurring expense for the first remaining year plus 50% of the recurring expense for all other remaining years.

special access customers, thereby depriving competitive carriers of the traffic and revenues necessary to fund construction of bypass facilities.[38]

**C.    The Bells' Excessive Special Access Rates Are Having An Increasingly Anticompetitive Impact On The Long Distance Market.**

The Bells' excessive special access rates also are having an increasingly anticompetitive effect in the long distance market, as the Bells win interLATA authority. Access is a "necessary input for long-distance service" and access charges constitute a sizeable percentage of the overall cost of long distance services.[39] This gives the Bells the opportunity to undertake a classic strategy of raising rivals' costs.[40]

> Absent appropriate regulation, an incumbent LEC and its interexchange affiliate could potentially implement a price squeeze once the incumbent LEC began offering in-region, interexchange toll services. . . . The incumbent LEC could do this by raising the price of interstate access services to all interexchange carriers, which would cause competing in-region carriers to either raise their retail rates to maintain their profit margins or to attempt to maintain their market share by not raising their prices to reflect the increase in access charges, thereby reducing their profit margins. If the competing in-region, interexchange providers raised their prices to recover the increased access charges, the incumbent LEC's interexchange affiliate could seek to expand its market share by not matching the price increase. The incumbent LEC affiliate could also set its in-region, interexchange prices at or below its access prices. Its competitors would then be faced with the choice of lowering their retail rates for interexchange services, thereby reducing their profit margins, or maintaining their retail rates at the higher price and risk losing market share.[41]

---

[38] The Commission has previously ordered the Bells not to apply termination penalties in similar circumstances. *See Local Exchange Carriers' Individual Case Basis DS3 Service Offerings*, CC Docket No. 88-136, 4 FCC Rcd. 8634, ¶ 79 (1989) (in ordering LECs to convert all individual case basis pricing for DS3 services to generally available rates, the Commission found that "we will not permit LECs to assess converted ICB customers termination liability charges or non-recurring charges").

[39] *Access Reform Order*, 12 FCC Rcd. 15982, ¶ 275 (1997).

[40] *See generally Premier Elec. Constr. Co. v. National Elec. Contractors Ass'n*, 814 F.2d 358, 368 (7th Cir. 1987) (citing T. Krattenmaker & S. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209 (1986)).

[41] *Access Reform Order* ¶ 277.

The Commission's *Access Reform Order* made the predictive judgment that "appropriate regulation" was in place to prevent such anticompetitive price squeezes. But in so holding, the Commission relied on both the existence of price cap regulation to "limit[] the ability of LECs to raise the prices of the input services,"[42] and the availability of UNEs that would allow "rival long-distance providers" to "purchase unbundled network elements" as substitutes for Bell-provided access.[43] The *Pricing Flexibility Order* gutted the "limit" imposed by the price cap regime, and the *Supplemental Order* and *Supplemental Order Clarification* foreclosed IXCs from using UNEs for access.

The evidence confirms that the Bells not only can but have undertaken such price squeezes. For example, BellSouth offers an intrastate service in its region called "Fast Packet Option." Under this offer, end users can obtain special access at rates that are lower than those in BellSouth's federal tariffs, but only if the end user agrees to purchase BellSouth's frame relay services as well.[44] As a result, AT&T cannot obtain special access at the "Fast Packet Option" rates and pair that service with its own frame relay services. The Bells' grossly excessive special access rates easily facilitate such blatant price squeezes, and the dangers of such price squeezes will only increase as the Bells' continue to win interLATA authority under Section 271.[45]

---

[42] *Id.* ¶ 276.

[43] *Id.* ¶ 280; *see also Bell Atlantic NYNEX Merger Order*, 12 FCC Rcd. 19985, ¶ 117 (1997).

[44] *Compare* BellSouth Telecommunications Inc., Georgia, General Subscriber Service Tariff, Twelfth Revised Page 1, A.40 (Frame Relay Service), *with* BellSouth Telecommunications, Inc., Tariff FCC No. 1, 6th Revised page 21-1 (Fast Packet Access Services). BellSouth has similar tariffs in each of the states in its region.

[45] *See* Ordover/Willig Dec. ¶¶ 62-67.

III.   **NEITHER MARKET FORCES NOR THE COMMISSION'S EXISTING SPECIAL ACCESS RATE REGULATION CAN CONCEIVABLY ADDRESS THESE MARKET POWER ABUSES.**

The only way to combat the Bells' excessive special access rates is to reform rate regulations. The problem will not solve itself, because there are not (and will not be for the foreseeable future) sufficient competitive alternatives to constrain the Bells' special access pricing. And it is equally clear that the Commission's existing regulatory regime does not provide such constraints; indeed, the current regime is exacerbating the problem by facilitating the removal of even the inadequate constraints provided by price caps.

A.   **Market Forces Cannot Constrain Bell Prices, Because IXCs and CLECs Generally Have No Choice But To Purchase Special Access From The Bells.**

As explained above, the Bells have been able both to grow the special access traffic that they carry on their networks and to maintain poor provisioning and performance even as they increase their special access service rates. This is because, in the vast majority of cases, there are no alternatives to the Bells' special access services. That is unlikely to change soon, because building alternative loop and transport facilities is, in most instances, fundamentally uneconomic. And even if that were not the case, the Bells have locked carriers into long term special access contracts, thereby ensuring that IXCs and CLECs will remain captives of the Bells for at least the next several years.

1.   **Competitive Carriers Can Self-Supply Or Use Third Party Facilities-Based Special Access Only In Very Unusual Circumstances.**

Despite billions of dollars in investments, AT&T has been able to replicate only a small fraction of the Bells' high-capacity networks. Even in those limited instances where AT&T has deployed a fiber ring, it still relies on the Bell to provide both "tails" from customers' premises to AT&T's fiber ring and "backbone" transport used to carry traffic to hubs where it can be aggregated and then carried on AT&T's fiber ring. For the "backbone" portion of AT&T's own

local network, AT&T almost never self-provides DS-1 transport and self-provides DS-3 transport only a small proportion of the time.[46]  Likewise, for the "tail" portion of the network, AT&T provides a very small fraction of its own DS-1 facilities.[47]  The remaining service is provided almost entirely by utilizing the facilities of the Bells.[48]  And even in instances in which AT&T has established connectivity to a building, landlords frequently limit AT&T to a "fiber to the floor" arrangement – *i.e.*, AT&T can serve only a particular customer with its own facilities, and not other customers in the same building.[49]

    AT&T also has severely limited opportunities to expand its use of facilities-based alternatives.  As explained in the attached declaration of Ken Thomas (Tab D), AT&T's long distance unit has a team charged with finding and negotiating alternative access arrangements. This team's data demonstrate, however, that CLECs have established alternative facilities to only a tiny fraction of buildings.  AT&T has contractual arrangements with virtually all of the major CLECs that offer facilities-based access services, such as MFS/WorldCom, Adelphia, and Time Warner.  These CLECs, however, can provide access to only a small minority of additional buildings nationwide.[50]

    Moreover, even where AT&T has a contractual arrangement with a CLEC, AT&T often cannot use that CLEC to provide access, for at least three important reasons.  First, many CLECs have overstated the extent to which they have buildings "on-net."  AT&T has contractual arrangements with all of the major CLECs for the right to purchase special access services to any

---

[46] AT&T Triennial Review Reply Comments, Fea-Giovannucci Dec. ¶ 58.

[47] *Id.* ¶ 68.

[48] *Id.* ¶¶ 58, 68.

[49] AT&T Triennial Review Reply Comments, Fea-Giovannucci Dec. ¶¶ 59-68.

[50] *See* Thomas Dec. ¶¶ 6-7.

buildings in which they have facilities.  Although many of these CLECs initially represented that they had a certain number of buildings "on-net," it became clear later that, in many cases, the CLECs actually relied on the *Bell's* special access services to reach the building.[51]

Second, most of the major CLECs that provide alternative access are bankrupt, which has greatly diminished the ability of AT&T to use their services.  Indeed, most of the buildings available to AT&T that are served by CLECs are served by Adelphia, WorldCom, and other companies in bankruptcy.[52]  A carrier cannot assume that a bankrupt supplier will remain in business and continue to provide uninterrupted service.  AT&T has faced numerous situations in recent months in which the continued availability of supply from one of AT&T's third party suppliers has been thrown in doubt, and AT&T has had to expend considerable resources to ensure that a backup source of supply would be available.[53]  And even if AT&T had confidence in these carriers, AT&T's customers do not.  As Mr. Thomas explains, potential customers are increasingly insisting that AT&T not rely on bankrupt (or potentially bankrupt) CLECs for any part of its service.[54]

Third, capacity on CLECs' networks is also often expensive, because CLECs typically provide only a modest discount off of the price umbrella of the Bells' special access services.[55] Moreover, use of a wholesaler's network often requires inefficient routing, and physically interconnecting with wholesalers' facilities often poses costly logistical and other practical problems that the ILECs typically do not face because of their large and integrated networks.

---

[51] *See id.* ¶ 8.

[52] *See id.* ¶ 9; *see also* AT&T Triennial Review Reply Comments, Fea-Giovannucci Reply Dec. ¶ 55.

[53] *See* AT&T Triennial Review Reply Comments, Fea-Giovannucci Reply Dec. ¶¶ 55-56.

[54] *See* Thomas Dec. ¶ 10.

[55] *See id.* ¶ 11.

In short, AT&T must rely on the incumbent in the vast majority of cases. As Mr. Thomas shows, AT&T has a theoretically available, facilities-based alternative in only about five percent of the buildings in which AT&T purchases special access. And even that figure overstates the availability of alternatives, because CLEC bankruptcies, "fiber to the floor" arrangements, and similar restrictions render many of even these buildings (or portions of these buildings) unavilable to AT&T.

AT&T's experience is confirmed by the findings of the state commissions that have undertaken investigations of special access services. As the New York PSC has found, Verizon's network serves 7354 buildings in LATA 132 (Manhattan) over fiber while CLECs serve fewer than 1000 buildings.[56] Indeed, the New York PSC recently reaffirmed that "Verizon continues to be the dominant provider of high-capacity loops used to provide service to large volume customers," and that "[e]ven in lower/midtown Manhattan, Verizon facilities (retail and wholesale) still serve over half of all special service circuits."[57] Similarly, the Massachusetts DTE recently held that strict rate regulation of Verizon's intra-LATA special access service was necessary to protect competition.[58]

### 2. Self-Deployment Of Alternative Facilities To Provide Special Access Is Infeasible In Most Cases.

This clear lack of facilities-based alternatives to Bell special access will not change in the foreseeable future. The record from the Triennial UNE Review Proceeding demonstrates that, because of basic economic and network engineering considerations, competitors will be able to

---

[56] *Opinion and Order Modifying Special Services Guidelines for Verizon New York Inc., Conforming Tariff, and Requiring Additional Performance Reporting*, Case Nos. 00-C-2051, at 7 (NYPSC June 15, 2001).

[57] Comments of New York Department of Public Service, CC Docket 01-338 *et al.*, at 5 (filed April 5, 2002).

[58] Order, DTE 01-31-Phase I (Mass. DTE May 8, 2002).

28

deploy alternative facilities in only limited circumstances. Loop and transport facilities are characterized by enormous economies of scale and sunk costs. Thus, in most instances, replicating incumbent transmission facilities would be economically wasteful. And even in those few instances where self-deployment can be economically justified, barriers to entry such as the inability to obtain necessary rights-of-way in a timely fashion often prevent competitive deployment of facilities.

*Transmission Facilities Are Characterized By Enormous Economies Of Scale.* Most of the cost of deploying loops, including "high capacity" loops, is in the supporting structures, placement, rights of way, and access to buildings, and not in the conductors (fiber strand or copper wires) themselves. Because the costs of supporting structures are relatively insensitive to the number of wires of fiber deployed, the Bells enjoy substantial economies of scale.[59]

Dedicated transport is also characterized by enormous economies of scale and scope.[60] Not only do the Bells have fiber interconnecting virtually all of their LSOs (either directly or indirectly), they also generally deployed dark fiber capacity at the time of the initial facility construction, so they can dramatically increase capacity on most routes simply by adding terminating electronics at relatively minimal incremental costs (and certainly at a trivial cost compared to new construction). Thus, even on specific, high-demand point-to-point routes, a CLEC cannot hope to achieve the per-unit cost of the Bells' transport.[61]

*Transmission Facilities Are Characterized By Substantial Sunk Costs.* The difficulties in self-deploying transmission facilities in competition with incumbents are exacerbated by the fact that costs to construct loop and transport facilities are sunk. An investment is sunk if, once

---

[59] AT&T Triennial Review Reply Comments, Fea-Giovannucci Dec. ¶¶ 6-8.
[60] *Id.* ¶ 8.
[61] *See* Ordover/Willig Dec. ¶ 40-41.

made, it cannot be re-deployed for some other use.[62]  Investments spent on trenching, structure, and rights of way for a loop clearly fall into this category.  It is basic economics that the need to incur significant sunk costs to deploy facilities that have substantial scale economies establishes a significant entry barrier.

When investments must be sunk, an entrant will be hesitant to undertake an investment if there is a substantial risk that it will not be able to recover the costs of the investment.  As Professor Willig has explained:

> The reasoning for this is straightforward.  If costs are sunk, the potential entrant knows that it will not be able to recover its costs if it is unable to attract sufficient revenues to recover the sunk costs.  At the same time, because of economies of scale, the new entrant will incur higher per-unit costs, making it difficult for it to win sufficient customers away from the incumbent.  Further, because the incumbent has already sunk its costs and has very low marginal costs, there is a significant threat that the incumbent could drop its prices in response to competitive inroads at any time down to its short run costs.[63]

There is broad agreement in the economics community that industries characterized *both* by declining average costs *and* sunk costs are generally natural monopolies.[64]  Thus, even if an entrant could reasonably approximate the scale economies of the incumbent, the existence of sunk costs and the threat that the incumbent would respond with rock-bottom prices may deter all but targeted, limited entry – a point that the Commission has repeatedly recognized.[65]

---

[62] See Third Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 15 FCC Rcd. 3696, ¶ 75 (1999) ("*UNE Remand Order*").

[63] AT&T Triennial Review Comments, Willig Reply Dec. ¶ 21.

[64] William J. Baumol, John C. Panzar, and Robert D. Willig, CONTESTABLE MARKETS AND INDUSTRY STRUCTURE (Harcourt Brace Jovanovich, Inc., 1982); Dennis W. Carlton and Jeffrey M. Perloff, MODERN INDUSTRIAL ORGANIZATION (3rd ed. Addison Wesley, 2000).

[65] *See Section 257 Report*, 12 FCC Rcd. 16802, ¶ 18 n.48 (1997) ("If entry into an industry requires large sunk costs, the firm that incurs these sunk costs first (the incumbent) can have a tremendous advantage.  Potential new entrants may realize that any large scale facilities-based entry into the market will probably force prices to decrease and those prices may be in fact below the point necessary to recover the sunk cost investment.  As a result, facilities-based entry will be

*CLECs Face Enormous Real-World Entry Barriers.*  Finally, the Bells enjoy a first mover advantage over any CLEC that is often dispositive.  This creates a substantial entry barrier in the classic sense, for CLECs must bear costs that the Bells did not.  George J. Stigler, THE ORGANIZATION OF INDUSTRY 67 (1968) (an entry barrier is "a cost of producing (at some or every rate of output) which must be borne by a firm which seeks to enter an industry but is not borne by firms already in the industry"); *see also Bell Atlantic-NYNEX Merger Order*, 12 FCC Rcd. 19985, ¶ 129 n.247 (1997) (same).

As first movers, the Bells received rights-of-way from local governments for underground cables and telephone poles and wires with only minimal transaction costs, because persons in the neighborhood or municipality otherwise would not receive *any* telecommunications services.  Similarly, building owners and landlords welcomed Bells that promised to bring, for the first time, telecommunications facilities to their properties.  As subsequent entrants, CLECs, on the other hand, generally cannot rely on existing facilities, rights of way, or conduit.[66]  Rather, CLECs must construct the loops and transport from scratch, which inevitably takes many months of pre-construction while the CLEC negotiates and secures (if possible) the necessary rights of way and construction permits from the municipality and negotiates terms of building access from the landlord.[67]  Rather than welcoming additional competition, these entities often view CLEC requests for rights-of-way as a nuisance.  Customers understandably do not wish to wait the many months necessary for the competitive carrier to negotiate this thicket, and they usually choose the Bell instead.  For all of these reasons, there is

---

deterred."); *see also MCI-BT Merger Order*, 12 FCC Rcd. 15351, ¶ 162 (1997) (same).

[66] AT&T Triennial Review Reply Comments, Fea-Giovannucci Dec. ¶¶ 11, 31.

[67] *Id.* ¶¶ 32-42.

31

no sustainable basis to conclude that the special access crisis will solve itself or that new entry can be relied upon to constrain the Bells' special access rates.[68]

**B.    The Existing Regime of Special Access Rate Regulation Is Exacerbating the Problem.**

Nor can existing rate regulation solve these fundamental problems. To the contrary, the Bells have been able to charge supracompetitive special access rates not because of lack of enforcement of the Commission's pricing regulatory regime, but because that regime is patently inadequate to prevent the exercise of the Bells' market power.

Prior to the 1990s, the Commission regulated special access rates using traditional rate-of-return regulation. In 1991, the Commission adopted a "price cap" regime, which imposed a "cap" on the aggregate prices charged by Bells for certain services, including special access services. The price cap regime originally contained numerous protections for consumers, such as the "sharing" mechanism (which required price cap reductions if the Bells' rates of return exceeded a certain threshold) and the X-Factor (which required annual reductions for anticipated gains in productivity). Indeed, it is worth noting that the threshold for 100% sharing under the Commission's previous rules was never higher than 17.25%. Over the years, however, the Commission gradually relaxed and then eliminated the sharing mechanism.

In 1999, the Commission adopted the *Pricing Flexibility Order*, which established a procedure to permit price cap LECs to remove special access services from price cap regulation altogether. Under the *Pricing Flexibility Order*, a Bell need not demonstrate that competitive conditions would warrant such radical deregulation; instead, the Bell need only satisfy certain bright-line "triggers." For special access services, a Bell can obtain complete elimination of price cap regulation in a given MSA – which is known as "Phase II" pricing flexibility – if it can

---

[68] *See* Ordover/Willig Dec. ¶¶ 43-45.

show that a certain percentage of the wire centers in that MSA have at least one collocator that is using non-ILEC transport facilities.[69]

When it adopted the *Pricing Flexibility Order,* the Commission freely acknowledged that the price cap LECs would remain dominant carriers with market power even after receiving Phase II relief.[70] The Commission nonetheless predicted that market forces would prevent the Bells from abusing that market power.[71] That prediction has now been proven wrong. The Bells have used pricing flexibility to do precisely what the Communications Act is designed to prevent – they have strategically raised rates to reap monopoly profits and to impede competition.

## IV.    THE COMMISSION CANNOT LAWFULLY STAND ON THE SIDELINES WHILE THE BELLS CONTINUE TO EXPLOIT THEIR MARKET POWER OVER SPECIAL ACCESS.

It is well settled that Sections 201 and 202 of the Communications Act provide the Commission with ample authority to address the Bells' monopoly abuses[72] and responsibility to choose the appropriate method of doing so – ranging from strict cost-based rate of return regulation to an overhaul of the current price cap regime.[73] To the extent that such measures

---

[69] *See Pricing Flexibility Order* ¶¶ 141-57.

[70] *See Pricing Flexibility Order* ¶¶ 90, 151.

[71] Indeed, the Commission predicted that the Bells would lower their rates. *See* News Release, Report No. 99-33 (August 5, 1999) ("These reforms will enable [the Bells] to compete more efficiently, and customers of interstate access services should benefit from increased choices among carriers and lower overall rates"; the order ensures against "unreasonable rate increases for customers without competitive alternatives").

[72] *See, e.g., Promotion of Competitive Networks in Local Telecommunications Markets, et al.,* First Report And Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 22983, ¶ 134 (2000) ("It is well established that the Commission has broad authority to regulate the practices of LECs in connection with their provision of interstate communications services. In addition to the general authority specified in Title I of the Communications Act, Title II [and in particular §§ 201 and 202] provides a specific, substantive framework for the Commission's regulation of such practices.").

[73] *See, e.g., Permian Basin Area Rate Cases,* 390 U.S. 747, 790 (1968); *FERC v. Pennzoil Producing Co.,* 439 U.S. 508, 517 (1979).

arguably entail a "change of mind" by the Commission, such a change does not remotely "render the agency's action arbitrary."[74]

In fact, the Communications Act *compels* prompt elimination of these ongoing Bell market power abuses. The Act requires that "*[a]ll* charges . . . and regulations for and in connection with . . . communications service . . . shall be just and reasonable."[75] Any charge or regulation that is "unjust or unreasonable is . . . unlawful."[76] And because the Commission has a "duty to execute and enforce the provisions of the Communications Act," the Commission must ensure that Bell rates for access services are "just, fair, reasonable and nondiscriminatory."[77]

As demonstrated above, the Bells' special access rates are patently unjust and unreasonable. The Bells' rates of return have been consistently rising for the last several years to increasingly unlawful levels, and since being granted pricing flexibility, the Bells have exacerbated the problem by imposing further rate increases. Where a carrier's

> returns have greatly exceeded a fair percentage of return upon a fair base, it follows as a matter of law that the rates charged . . ., instead of being "just and reasonable" as the law requires them to be, have been excessive. There is nothing new about this principle. Speaking for a unanimous Supreme Court, Chief Justice Taft said in 1924: "If the profit is fair, the sum of the rates is so. If the profit is excessive, the sum of the rates is so."[78]

And that is why the courts have made clear that permitting regulated entities to earn such excessive returns is the paradigm of arbitrary agency action and flatly violates an agency's

---

[74] *Bell Atl. Tel. Cos.* v. *FCC,* 79 F.3d 1195, 1202 (D.C. Cir. 1996).

[75] 47 U.S.C. § 201(b) (emphasis added).

[76] *Id.*

[77] *See, e.g., American Tel. & Tel. Co.* v. *FCC.,* 572 F.2d 17 (2nd Cir. 1978).

[78] *Potomac Elec. Power Co.* v. *Public Utils. Comm'n of the District of Columbia,* 158 F.2d 521, 523 (D.C. Cir. 1947) (quoting *Dayton-Goose Creek R. Co.* v. *United States,* 263 U.S. 456, 483 (1924)).

statutory obligation to establish just and reasonable rates.[79]  Thus, where, as here, regulated carriers have been able to exercise market power and earn supracompetitive profits in increasing amounts year over year, the Commission must aggressively use its broad regulatory powers to ensure that such carriers charge just and reasonable rates.[80]  Indeed, the D.C. Circuit has previously held that it could not "countenance" excessive rates which "ensure 'creamy returns' to the carriers and are 'far more generous than those [rates] that the Commission and other regulators give elsewhere.'" *Farmers Union II*, 734 F.2d at 1503 (citations omitted).

That is especially true here, because the Commission's deregulation of special access rates was based on a predictive judgment that market forces would effectively constrain the Bells' prices.[81]  That predictive judgment has not panned out – the Bells' own reported data show that competition has *not* protected special access customers from abuses of market power. It is therefore incumbent on the Commission to reassess its deficient special access regulations to account for these facts.[82]

The courts have made clear that where the Commission regulates rates on the basis of predictive judgments, it is imperative that "the Commission . . . vigilantly monitor the

---

[79] *Illinois Bell Tel. Co.* v. *FCC*, 988 F.2d 1254, 1260 (D.C. Cir. 1993); *Farmers Union II*, 734 F.2d at 1497, 1502-03.

[80] *See Farmers Union II*, 734 F.2d at 1497, 1502-03; *see also FPC* v. *Texaco Inc.*, 417 U.S. 380, 399 (1974) ("[i]n subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could not have assumed that 'just and reasonable' rates could conclusively be determined by reference to market price").

[81] *See WorldCom* v. *FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001) ("The FCC readily admits that its decision to adopt the thresholds contained in the *Pricing Flexibility Order* was dependent, at least in part, on the agency's predictive forecasts"); *see also id.* at 462 ("The FCC made a predictive judgment that the amount of collocation required for each trigger will be sufficient to constrain anticompetitive practices by incumbent LECs").

[82] Notably, the Commission itself recognized in the *Pricing Flexibility Order* that the Bells might abuse their flexibility to charge rates that were not just and reasonable, and that the Commission might have to take remedial action. *See, e.g., Pricing Flexibility Order* ¶ 83.

consequences of its rate regulation rules."[83] And "[i]f, in light of actual market developments, the Commission determines that competition is not having the anticipated effect on access charges," the agency must "revisit the issue." *Texas Office of Public Utility Counsel* v. *FCC*, 265 F.3d 313, 325 (5th Cir. 2001); *see also SWBT* v. *FCC*, 153 F.3d 523, 547 (8th Cir. 1998) (same); *see also CELLNET* v. *FCC*, 149 F.3d 429, 442 (6th Cir. 1998) ("If the FCC's predictions about the level of competition do not materialize, then it will of course need to reconsider its [regulations] . . . in accordance with its continuing obligation to practice reasoned decisionmaking"); *Bechtel* v. *FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) (it is now "settled law that an agency may be forced to reexamine its approach if a significant factual predicate of a prior decision . . . has been removed."); *AFL-CIO* v. *Brock*, 835 F.2d 912, 916-17 (D.C. Cir. 1987) ("courts recognize that agencies must respond to changed circumstances to carry out Congress' purposes"). Put simply, because the Commission's predictive judgments concerning the ability of market forces to reign in the Bells' market power over access services have not materialized, it would be unlawful for the Commission to decline to modify its regulatory scheme in order to check the Bells' market power abuses.

The Commission has previously found it necessary to modify price cap regulation to ensure that access rates remained at "just and reasonable" levels. In 1995, the Commission found that "the price cap LECs had experienced higher earnings on average under price caps than in earlier periods" and found that these consistently high returns confirmed that the Commission's price cap system was not adequately keeping up with the LECs' cost improvements and adequately constraining the Bells' prices.[84] And again, in the *CALLS Order*,

---

[83] *American Civil Liberties Union* v. *FCC*, 823 F.2d 1554, 1565 (D.C. Cir. 1987) (emphasis added).

[84] *See Price Cap Performance Review for Local Exchange Carriers*, 10 FCC Rcd 8961, ¶ 100

recognizing that the then-current "traffic-sensitive rate structure provide[d] price cap LECs with more revenue when demand increases, regardless of whether costs have increased, resulting in higher earnings," the Commission "target[ed] reductions to [those] traffic-sensitive services."[85] Consistent with these prior actions, and with its affirmative duty to address unjust and unreasonable rates and failed predictive judgments, the Commission can and must take immediate action to address the Bells' current exercise of market power over special access services.[86]

The Commission cannot reasonably rely on the Section 208 complaint process to address the Bells' unlawful special access rates.[87] Neither the injured carriers nor the Commission has the resources to resolve such a nationwide problem in the context of hundreds of individual rate

---

(1995), *aff'd, Bell Atlantic Tel. Cos.* v. *FCC*, 79 F.3d 1195, 1202 (D.C. Cir. 1996) (upholding the order based in part on the fact that "[t]he Commission originally predicted that sharing would be rare, . . . [but i]n practice, sharing had become routine. By 1993, all seven of the Bell Operating Companies were in the sharing zone, leading the Commission to believe that the original X-Factor had been too low").

[85] *See CALLS Order* ¶ 171 & n.376.

[86] The *CALLS Order* is no bar to re-establishing effective regulation of the Bells' interstate special access services. Indeed, the Commission expressly stated in the *CALLS Order* that "the Commission has authority to modify the rules we adopt today before the end of the five-year term of the CALLS Proposal," and that the "Order addresses a marketplace that is dynamic and evolving, and the Commission may exercise its authority should the need arise." *CALLS Order* ¶ 36 n.45.

Similarly, the CALLS Agreement does not bar the requested relief. Section 4.2 of that Agreement states simply that the mechanisms laid out in paragraphs 2 and 3 of the CALLS Agreement constitute a fair and reasonable means of moving "usage sensitive rates" to the point achieved by those mechanisms. That section applies only to usage sensitive *switched* access rates. *See* Memorandum of CALLS in Support of Plan, p. 37 (August 20, 1999) (mechanisms in CALLS effect a freeze in the caps for the "services comprising switched access services"). In other words, Section 4.2 says simply that the means set forth in the Agreement for achieving the agreed-upon rates for switched access services (*i.e.*, what the *CALLS Order* terms the "average traffic-sensitive rate," or "ATS" rate) are a fair and reasonable means for achieving those rate levels. Section 4.2 does not apply to special access rates, which are not included in the ATS rates.

[87] *See* 47 U.S.C. § 208.

cases. Indeed, taken to its illogical extreme, this argument would permit the Commission to abandon the field altogether so long as it held open the prospect of allowing individual complaint cases. It is precisely for these reasons that the courts of appeals have held that the existence of a "safety valve" that permits a variance from a generally applicable regulatory scheme does not excuse an agency from failing to address a systemic problem inherent in the underlying regulatory scheme. For example, in *Time Warner Entertainment Co., L.P.* v. *FCC*, 56 F.3d 151 (D.C. Cir. 1995), the court of appeals considered a challenge to a provision of the Commission's rate-cap regime for cable television. The Commission failed to permit recovery of cost increases incurred in the period between the date on which the baseline rates were set and the effective date of the regulations.[88] The Court rejected the Commission's attempt to justify its decision on the grounds that disadvantaged cable companies could always seek the imposition of cost-of-service ratemaking. Because that option "is costly . . . and is intended to be a limited 'safety-valve' exception," the court held that it cannot be a widely-used mechanism for correcting an imprudent rate scheme.[89] Accordingly, the Commission cannot rely on the complaint process to remedy the endemic and unlawfully excessive special access rates spawned by the Bells' anticompetitive behavior and the Commission's overly-permissive regulatory scheme.

The bottom line is this: The Commission adopted its aggressive deregulation of the Bells' special access services based on a predictive judgment that competition would provide sufficient safeguards to protect against the Bells' exercise of monopoly power over special access customers. Years of data now confirm that the Commission's predictive judgment was wrong. Competition has not developed for special access services, and the Bells have

---

[88] *See Time Warner*, 56 F.3d at 173.

[89] *Id.; see also Ass'n of Oil Pipelines* v. *FERC*, 281 F.3d 239, 244 (D.C. Cir. 2002); *American Gas Ass'n* v. *FERC*, 912 F.2d 1496, 1517-18 (D.C. Cir. 1990); *ALLTEL Corp.* v. *FCC*, 838 F.2d

consistently exercised market power to extract massive windfalls from IXCs, CLECs and end-user customers. This evidence conclusively establishes that current Bell special access rates are not just and reasonable and, therefore, are unlawful.

Because the Commission has an affirmative duty to enforce the act by ensuring that special access rates are just and reasonable, the Commission can and must take immediate action to establish meaningful regulatory constraints on the Bells' rates for all of their special access services. At a minimum, the Commission should revoke pricing flexibility and reinitialize price caps to levels designed to produce normal, rather than monopoly, returns. Moreover, given that existing special access rates are so far out of line with lawful, compensatory levels, the Commission should also adopt immediate, interim relief while the rulemaking is pending. In particular, the Commission should: (1) immediately reduce all special access charges for services subject to Phase II pricing flexibility to the rates that would produce an 11.25% rate of return,[90] and (2) impose a moratorium on consideration of further pricing flexibility applications pending completion of the rulemaking.[91] Retargeting special access rates to an 11.25% return on an interim basis is necessary to align prices more closely with what would be expected in a competitive market (and, indeed, with what was expected when the Commission granted pricing flexibility). Moreover, an 11.25% rate of return is the last authorized rate of return for the Bells

---

551, 561 (D.C. Cir. 1988).

[90] The Commission could accomplish this easily by calculating the percentage reductions necessary to reduce each Bell's overall special access returns to 11.25%, and then applying that percentage reduction only to the rates that have been removed from price caps.

[91] The Commission has ample authority to institute interim rate relief pending the completion of a rulemaking, *see, e.g., Lincoln Tel. & Tel. Co.* v. *FCC*, 659 F.2d 1092, 1107-08 (D.C. Cir. 1981), and also to impose a moratorium on any further pricing flexibility petitions while a rulemaking is pending, *see Neighborhood TV Co., Inc.* v. *FCC*, 742 F.2d 629, 634-40 (D.C. Cir. 1984); *Kessler* v. *FCC*, 326 F.2d 673, 679-85 (D.C. Cir. 1963); *Western Coal Traffic League* v. *Surface Transportation Board*, 216 F.3d 1168, 1177 (D.C. Cir. 2000).

and is thus appropriate for retargeting rates on an interim basis (even though an 11.25% rate of return is quite generous given conditions in today's capital markets). In conjunction with this interim relief, the Commission should make clear that (3) this rate relief shall not trigger any termination liabilities or other penalty provisions of the Bells' OPP plans.[92]

---

[92] *See Local Exchange Carriers' Individual Case Basis DS3 Service Offerings*, CC Docket No. 88-136, 4 FCC Rcd. 8634, ¶ 79 (1989) (in ordering LECs to convert all individual case basis pricing for DS3 services to generally available rates, the Commission found that "we will not permit LECs to assess converted ICB customers termination liability charges or non-recurring charges").

## CONCLUSION

For the foregoing reasons, the Commission (1) must reform and tighten rate regulation of the price cap ILECs' special access services, and (2) on an interim basis, should immediately reduce all special access charges for services subject to Phase II pricing flexibility to the rates that would produce an 11.25% rate of return and impose a moratorium on consideration of further pricing flexibility applications pending completion of the rulemaking.

Respectfully submitted,

*Mark C. Rosenblum/jny*

David W. Carpenter                    Mark C. Rosenblum
SIDLEY AUSTIN BROWN & WOOD            Lawrence J. Lafaro
Bank One Plaza                        Judy Sello
10 South Dearborn Street              AT&T CORP.
Chicago, Illinois 60603              Room 3A229
(312) 853-7000                        900 Route 202/206 North
                                      Bedminster, New Jersey 07921
David L. Lawson                       (908) 532-1846
James P. Young
C. Frederick Beckner III
Christopher T. Shenk
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

*Attorneys for AT&T Corp.*

October 15, 2002

41