**Attachment 12**

***Competition in Access Markets: Reality or Illusion.  A
Proposal for Regulating Uncertain Markets***

**paper prepared by Economics and Technology, Inc. for the
Ad Hoc Telecommunications Users Committee, August 2004**



# COMPETITION IN ACCESS MARKETS: REALITY OR ILLUSION

# A Proposal for Regulating Uncertain Markets

August 2004

**ETI** ECONOMICS AND TECHNOLOGY, INC.

TWO CENTER PLAZA, SUITE 400 • BOSTON, MASSACHUSETTS 02108

**Preface** | **COMPETITION IN ACCESS MARKETS: REALITY OR ILLUSION A Proposal for Regulating Uncertain Markets**

The Ad Hoc Telecommunications Users Committee is a group of large corporate telecommunications customers whose members collectively purchase more than $2-billion worth of local and long distance, voice and data, conventional and advanced telecommunications services annually. Committee members include some of the nation's largest and most sophisticated corporate buyers of telecommunications services, thirteen of which are in the Fortune 500 and nine of which are in the Fortune 100. The members of Ad Hoc represent a broad range of industry sectors (including manufacturing, financial services, insurance, retail, and information technology).

As an active participant on behalf of large user concerns in FCC rate and policymaking proceedings for nearly three decades, the Ad Hoc Committee has consistently advocated policies aimed at facilitating the development of competition in all telecom sectors, and has supported a variety of deregulatory initiatives wherever competition has obviated the continuing need for regulation as a means for assuring competitive market outcomes. Indeed, no customers would likely benefit more from the development of robust competition and the reliance upon markets rather than regulation than Ad Hoc's members. However, where effective and sustainable competition is not present or not feasible, the Committee believes that ongoing *and effective* regulation is essential, both to afford entrants a fair opportunity to compete and to assure customers fair, just and reasonable prices where competition is not capable of assuring that result.

To be sure, competition has arisen in a number of telecom industry sectors, but one key area that remains monopolized by incumbent local exchange carriers is the market for *access services* – switched and dedicated "last mile" connections between interexchange carrier networks and local end users. In the Committee members' experience, deregulatory initiatives with respect to access services – in the form of ILEC pricing and earnings flexibility – have been premature, and have often resulted in persistently excessive prices, operating to frustrate, rather than to facilitate, competition in this sector.

i



ECONOMICS AND
TECHNOLOGY, INC.

*Competition in Access Markets:  Reality or Illusion*

In that context, the Ad Hoc Committee has asked Economics and Technology Inc., as its economic and policy advisors, to examine the current state of the access services market and to formulate a plan for a regulatory paradigm capable of affording incumbent local carriers the flexibility they require to meet actual competitive challenges where these exist, while at the same time protecting customers against excessive monopoly prices and practices where the ILEC access services monopoly remains intact.  This paper sets forth the results of that effort.

This paper was prepared by Lee L. Selwyn, Susan M. Gately and Helen E. Golding.  The authors gratefully acknowledge the contributions and assistance provided by the Committee's legal counsel, James S. Blaszak and Colleen L. Boothby of Levine, Blaszak, Block and Boothby, LLP, as well as the invaluable assistance of numerous Committee members.

Boston, Massachusetts
August 2004



# Executive Summary | COMPETITION IN ACCESS MARKETS: REALITY OR ILLUSION A Proposal for Regulating Uncertain Markets

## The illusion of a competitive access services market

The incumbent local telephone companies (ILECs) – the very entities that have the most to gain by mischaracterizing the current state of the market – contend that competition is rampant across the country and in all sectors of the US telecom industry, and that competition is growing day by day. Their rhetoric, however, clearly does not square with marketplace reality. Unlike competing *providers* of access services, as *users* of these services, members of the Ad Hoc Telecommunications Users Committee (*Ad Hoc*) – some of the largest consumers of telecommunications services in the country – have no commercial self-interest in maintaining unnecessary regulation on any class of service providers. Indeed, as high-volume purchasers of telecommunications services, Ad Hoc members have been among the first to benefit from efforts at telecom deregulation and, as a consequence, Ad Hoc has consistently advocated deregulation wherever actual and effective competition in specific service markets has emerged.

However, the level and extent of actual competition in the telecommunications market being experienced by Ad Hoc Committee members regrettably falls far short of the hyper-competitive market that incumbent local exchange carriers seek to portray. No customers would benefit more from robust competition and the elimination of needless regulation than members of the Ad Hoc Committee. However, because effective competition has not materialized, the diluted regulatory framework adopted *in anticipation of* competition has actually resulted in higher prices, grossly excessive profits for the incumbents and, ironically, less competition overall. Every day that the FCC allows to pass before correcting this regulatory deficiency costs business and government users more than $15-million in excessive special access prices – and maintains in place an unjustified windfall for the ILECs, which in 2003 resulted in RBOC profits (realized rates of return) on special access services averaging a jaw-

iii


ECONOMICS AND TECHNOLOGY, INC.

dropping 43.7%. The marketplace conduct of the dominant ILECs – raising prices in precisely those geographic areas in which "competition" is presumed to have materialized – would not be possible if actual competition was in fact present, and thus demonstrates and confirms the "on the ground" experience of Ad Hoc members as to the utter lack of such competition. If users confronted actual competitive choices for ILEC switched and special access services, the ILECs would be forced by competitors to lower their prices rather than increasing them, and ILEC earnings would be moving down toward competitive levels, not rising to astronomical heights.

## The lack of alternatives to ILEC switched and special access services

One area where the assumptions about the presence of competition have been furthest from reality is *access services*, the means by which long distance carriers are afforded use of local telco facilities to connect their networks to end user customer locations. There are two principal types of access services – *switched access* and *special access*. Switched access is provided in connection with most types of long distance calls, establishing temporary connections (between the long distance network and the local customer at each end of a call) that are disconnected when the parties hang up. For customer locations with relatively high volume (outbound or inbound) calling requirements, a dedicated (special access) connection is typically more efficient because, among other things, its use eliminates the need for repetitive switching operations involving the same customer locations.

Intuitively, one might assume that large users' needs are confined primarily to large buildings and commercial centers at which competing services will be readily available. However, corporate networks frequently involve thousands or even tens of thousands of individual sites – the vast majority of which have relatively low-volume – yet still mission-critical – telecom needs and are located in places where the ILEC is the *only* source of access connectivity. In order to effectively manage their overall telecommunications costs, corporate customers cannot ignore systematic overpricing to these myriad small-to-medium sized locations.

Although there is intense competition for interexchange switched voice and dedicated voice and data services – where interexchange carriers (IXCs) have competed robustly for over two decades – the ILEC monopoly over switched and dedicated access connections (the link between those interexchange carrier networks and individual end-user sites) persists largely unchallenged. As demonstrated in Chapter 2 of this paper and as confirmed by the repeated experience of Ad Hoc Committee members regularly doing business in the telecom marketplace, competition for switched access services is all but nonexistent, and while limited alternatives exist for special access, the incumbent local exchange carriers remain the sole source of connectivity at roughly 98% of all business premises nationwide, even for the largest corporate users. The lack of competitive alternatives for access services – including high capacity access services – is attributable to the numerous and well-recognized barriers to competitive entry, especially the enormously high fixed-cost investments required to enter this market coupled with the increasingly uncertain future return on those investments. These conditions, which are not likely to change any time soon, mean that, for large as well as small users, prices for telecommunications


ECONOMICS AND
TECHNOLOGY, INC.

services are not being effectively constrained by competition, *and are likely to rise as what little competition that now exists continues to falter*.

## ILEC profits on access services exceed anything that would be expected to arise under competitive market conditions

The rates for access services – "access charges" – were introduced in 1984 in the aftermath of the break-up of the former Bell System. Special access rates – charges for dedicated connections between end users and their long distance carrier – are nominally subject to annual price cap rate adjustments which, due to low current economywide inflation rates, would typically require annual rate *decreases*. However, in those geographic markets in which the FCC deems certain "competitive triggers" to have been met, ILECs are exempt from making these required downward adjustments in their special access rates. These "exempt" markets now account for the vast majority of all special access services. In these areas, ILECs are afforded "pricing flexibility" and are allowed to increase or decrease rates as they see fit. Significantly, evidence that we present in Chapter 3 illustrates that in these "pricing flexibility" markets, special access rates have either increased or have not been decreased, as would have been required under the price cap rules. Ironically and counter-intuitively, special access rates in the putatively "competitive" geographic markets are now actually *higher* than those in effect in areas where the ILECs' monopoly is officially deemed still to be in full force.

Switched access rates – for the ILEC-owned segment of dial-up long distance calls – also remain well above cost and well above the rates for comparable use of the switched network for other types of calls (e.g., local and wireless). In addition to covering the cost of access to the ILEC's network, switched access charges also include a portion of the subsidy to basic local service that has been incorporated into long distance rates since long before the Bell System break-up. Although this subsidy component has been decreasing through a series of transition mechanisms, switched access rates are still set well above cost at "target" levels adopted in the so-called *CALLS* settlement in 2000. However, contrary to the FCC's expectations at the time it approved the *CALLS* settlement, "competition" has not continued to push switched access prices down towards costs following the elimination of X-factor reductions; in fact, precisely the opposite appears to have occurred.

Access service prices remain at large multiples of cost, and have actually been increasing such that their profitability far exceeds "competitive" levels. The FCC last established an "authorized rate of return" for the RBOCs at 11.25% in 1990 – at a time when market interest rates were considerably higher than those in effect today. However, with respect to special access services in particular and as a direct consequence of their FCC-sanctioned pricing flexibility, the RBOCs are now earning from two to four times that 11.25% rate of return level. As we discuss in detail in Chapter 3, and as is illustrated in the figure on the following page, the average return on special access services has been climbing steadily since 1996. The reported average special access return across the RBOCs for 2003 was 43.7%. Verizon's return on special access for 2003 was 23.5%, and BellSouth's and Qwest's were at the rarified level of 56.6% and 57%, respectively. Total interstate earnings for the RBOCs – switched and special


ECONOMICS AND TECHNOLOGY, INC.

access, and common line combined – averaged in excess of 17.1%. Earnings levels of these extreme magnitudes could not be maintained if the competition that the RBOCs claim to confront were actually present.



Average RBOC Special Access realized rates of return. 1996-2003.

## The Ad Hoc Committee's Solution: A regulatory model that would give ILECs the freedom to cut prices in response to competition while protecting consumers from price increases resulting from inadequate competition

Continuing to regulate a market that is effectively competitive – or failing to adequately regulate a market still dominated by an incumbent monopolist – would in each case be highly inefficient and certainly counterproductive. What is needed is a regulatory plan that will be both sufficiently robust to accommodate a wide spectrum of competitive conditions and sufficiently flexible so as to respond rapidly to changing competitive conditions with minimal disruption or delay. This paper presents the Ad Hoc Committee's solution – a plan that would



ECONOMICS AND
TECHNOLOGY, INC.

*Competition in Access Markets: Reality or Illusion*

- curb the pricing excesses that have arisen in the absence of effective competition by re-targeting access prices back to competitive levels, and that, going forward,

- would establish a *self-executing regulatory paradigm* that will allow the ILECs the flexibility they demand while at the same time relying upon regulation to continue to protect customers against excessive prices if, in the end, actual competition fails to materialize.

The Ad Hoc plan is self-executing in that it would automatically cease imposing operative pricing constraints as soon as marketplace forces take over that function.

Initially, the Ad Hoc plan would re-target special access rates at the 11.25% authorized rate of return so as to eliminate the monopoly prices that presently exist. Thereafter, it would allow ILECs *downward* pricing flexibility, enabling them to respond to competition while assuring that prices remain at competitive levels where actual entry does not occur. And, in order to ensure that prices remain at competitive levels where actual entry does not occur, the ILECs' access rates would once again be adjusted annually by a price cap rate adjustment mechanism that includes a productivity adjustment ("X-factor") and an earnings sharing component.

US telecommunications policy continues to be driven in large part by the fundamentally *factual* questions as to precisely how much competition is present and how much competition is sufficient to replace regulation in assuring a competitive outcome. These questions remain highly controversial and even after the Commission makes findings regarding competitive conditions, persistent challenges mean that they must be revisited again and again. Ad Hoc's *self-executing* plan gets past this contentious debate because it will operate correctly under either monopoly or competitive conditions. If, as Ad Hoc and many other stakeholders believe, competition is not yet sufficient to constrain ILEC pricing, then re-targeting and applying price cap adjustments to ILEC rates with respect to their upper pricing limits will assure that end users will not be subject to excessive monopoly prices. On the other hand, if the market is – or becomes – effectively competitive, the ILECs will have the full and unconstrained ability to respond to such competition by lowering prices. Ad Hoc's plan will assure a win-win-win result by affording consumers competitive-level pricing whether or not actual competition is present, by affording interexchange carriers fair, reasonable and nondiscriminatory access to ILEC networks, and by affording the incumbent telcos the ability to rapidly respond to *legitimate* competitive challenges.



<table>
<tr><td>

**Table of Contents**

</td><td>

**COMPETITION IN ACCESS MARKETS: REALITY OR ILLUSION**
**A Proposal for Regulating Uncertain Markets**

</td></tr>
</table>

PREFACE ............................................................................................. i

EXECUTIVE SUMMARY ..................................................................... iii

1    A TWO-PRONGED APPROACH TO ACCESS REFORM ........ 1

     Rumors of the demise of the ILEC access services monopoly are highly exaggerated    1

     The need exists for a self-executing regulatory mechanism that gives ILECs the freedom to cut prices in response to competition while protecting consumers from price increases resulting from inadequate competition    3

     Ad Hoc's self-executing plan for pricing flexibility    3

     Re-targeting Switched and Special Access Prices and re-instituting annual price-cap X-Factor rate adjustments    5

     Competition is not regulating access service prices    7

     The Commission should implement a Self-Executing form of Pricing Flexibility for Special Access that does not require a competitive showing and that allows downward pricing flexibility where and when the RBOCs deem it necessary    9

2    NO WAY OUT: THE LACK OF ALTERNATIVES TO SPECIAL ACCESS    11

     Despite CLEC gains in other market segments, the competitive availability of "last mile" connections for large business users remains very limited    11



ECONOMICS AND TECHNOLOGY, INC.

*Competition in Access Markets:  Reality or Illusion*

All signs point to the continuing lack of competitive alternatives for the large user market                                                                                15

    Competitive intra-modal choices being provided by CLECs and CAPs address only a small portion of the total business market for special access services and other forms of local connectivity                                        16

    Intermodal competitive alternatives from Cable and Fixed Wireless are not realistic alternatives for most business                                       22

Slow and sporadic expansion of alternative loop facilities, including loops for the provision of special access services, is consistent with the Commission's findings that significant barriers to entry continue to exist                                  24

3    UNDISCIPLINED PRICING AND LIMITLESS EARNINGS IN THE FACE OF PUTATIVE COMPETITION                                                                      27

ILEC rates of return on special access services exceed anything that would be expected from a competitive marketplace                                           27

    Source of the huge special access profit levels                                   32

Persistent excessive RBOC pricing of Special Access Services in areas where Phase II Pricing Flexibility has been granted demonstrates that the level of competition in those areas is not sufficient to constrain RBOC monopoly pricing practices      35

Competition has not service to push switched access prices down since the adoption of the FCC's *CALLS* plan, and the average switched access price per minute is today in some cases more than 30% above the $0.0055 *CALLS* ATS Target rate            38

EPILOGUE:    A Self-Executing Win-Win-Win Solution                                 41

Taking the Commission out of the role of deciding how much competition is "enough"                                                                            41


TABLES

1.1    Total RBOC Overcharges – 2003                                              8

2.1    Optimistic Estimates of Facilities Based Special Access                    19


ECONOMICS AND TECHNOLOGY, INC.

3.1    RBOC rates of return for all interstate access services, 2004          32

3.2    Analysis of Special Access net investment levels in relation to net investment levels
       for all interstate access services – 2003                              34

3.3    Analysis of "Average Traffic Sensitive" (ATS) Prices per Minute – 2003   40


FIGURES

2.1    Locations of Verizon Special Access services being used by CLECs to provide local
       service to enterprise customers in the New York metropolitan area.       14

2.2    Locations of Verizon Special Access services being used by CLECs to provide local
       service to enterprise customers in the Washington metropolitan.          15

2.3    Most US Commercial Buildings Do Not Have CLEC-Owned Special Access
       Facilities Available                                                     20

2.4    Mass market cable telephony lines account for most of the growth in CLEC-owned
       lines                                                                    26

3.1    Analysis of individual RBOC Special Access rates of return: 2003         28

3.2    Average RBOC Special Access Realized Rates of Return – 1996-2003         30

3.3    Comparison of Special Access line shares vs. Special Access net investment shares   34



ECONOMICS AND
TECHNOLOGY, INC.

# 1 | A TWO-PRONGED APPROACH TO ACCESS REFORM

*The members of the Ad Hoc Telecommunications Users Committee, representing some of the largest corporate telecom purchasers in the US with combined annual spends in excess of $2-billion, would theoretically be the most likely of all customers to experience the benefits of competition in their everyday procurement of telecommunications services – but the reality is that they do not. This paper presents the Ad Hoc Committee's proposal for re-targeting access prices back to competitive levels and for a self-executing regulatory paradigm that will allow the ILECs the flexibility they demand while at the same time protecting customers against excessive prices if actual competition fails to materialize. Initially, the Ad Hoc plan would re-target access rates at the 11.25% authorized rate of return so as to eliminate monopoly prices. Thereafter, it would allow ILECs downward pricing flexibility enabling them to respond to competition. However, to ensure that prices remain at competitive levels where actual entry does not occur, access rates need to once again be adjusted annually by a price cap rate adjustment mechanism that includes a productivity adjustment ("X-factor") and an earnings sharing component.*

## Rumors of the demise of the ILEC access services monopoly are highly exaggerated

There is growing folklore in Washington that local telecom markets are now fully competitive, and particularly so in urban areas where business customers are located. The Ad Hoc Telecommunications Users Committee ("Ad Hoc"), whose members include some of the largest corporate telecom consumers in the nation with combined annual telecom spending in excess of $2-billion, has on numerous occasions advised the Commission that this view of the status of competition – while optimistic and appealing in theory – does not track with the reality in the local telecom marketplace, even for purchasers with greater than average buying power.

ECONOMICS AND TECHNOLOGY, INC.

*A Two-Pronged Approach to Access Reform*

ILECs portray a picture of effective competition for access services and on that basis contend that they require increased regulatory flexibility, if not outright deregulation, in order to respond to competitive challenges. Competitive local exchange carriers ("CLECs") and long distance carriers ("IXCs"), on the other hand, maintain that whatever limited competition they are able to offer is utterly dependent upon continued and uninterrupted access to the incumbent carriers' networks at economically-based prices. They point out that, without such access, the small amount of local market competition that presently exists would rapidly evaporate. Where ILECs seek to hold out what little competition that may exist as the basis for relieving them of numerous regulatory constraints and obligations, CLECs see continued ILEC regulation as critical to their survival.

As users, Ad Hoc members have no vested interest in either the ILEC or the CLEC/IXC positions. Large users are interested in obtaining the best prices – i.e., prices that reflect a robust competitive market – and they value true competition because of the cost and operational advantages that result from having alternative service providers. From where Ad Hoc sits, there is a fundamental disconnect between the ILECs' claims about competition in the special and switched access markets and what Ad Hoc members actually experience in their everyday procurement of telecom services.

The Committee's concerns differ from those of CLECs and IXCs. From the standpoint of *purchasers* of end-user services, premature deregulation of ILEC rates permits prices to increase – sometimes dramatically – where actual competition is not present. These concerns are not merely theoretical. As the ILECs have been allowed increased "pricing flexibility" for services that confront little or no actual competition, they have not decreased prices as one would expect in a competitive marketplace. Instead prices in markets granted pricing flexibility are now *higher* than prices in the more heavily regulated areas.

The purpose of this paper is to focus attention upon regulatory concerns that are specific, albeit not necessarily unique, to *end users*. The paper has two principal objectives:

- To demonstrate that competitive alternatives for the provision of local service and dedicated special access facilities to large business users are extremely limited, where they exist at all, and are certainly not sufficient to constrain the behavior of dominant carriers and to protect large business users from ILEC abuse of monopoly power. Evidence of the limited competition for access facilities – both special and switched – is presented in Chapter 2. In Chapter 3, we discuss ILEC over-earnings on special access in particular: evidence that prices – even for high capacity services required by large users – are not being constrained by competition.

- To describe a revised regulatory regime for access services that will properly regulate access services where a sufficient level of competition to constrain prices has yet to develop, while at the same time implementing a self-executing plan for reducing regulation (and allowing the ILECs the freedom to compete).



ECONOMICS AND
TECHNOLOGY, INC.

## The need exists for a self-executing regulatory mechanism that gives ILECs the freedom to cut prices in response to competition while protecting consumers from price increases resulting from inadequate competition

For several years, the FCC has been attempting to navigate the line between monopoly and competition, attempting to design and to apply a degree of regulation appropriate to each market condition. To do this successfully the Commission is required to make a detailed and, more importantly, an accurate assessment of the actual state of competition. Continuing to regulate a market that is effectively competitive, or failing to adequately regulate a market still dominated by an incumbent monopolist, would in each case be highly inefficient and certainly counterproductive. The Commission's task is made all the more difficult by the highly fluid nature of telecommunications markets and technology. Protracted rulemakings and other regulatory proceedings increase competitive risk, discourage capital investment in competitive ventures, and (wittingly or unwittingly) work to solidify, rather than to challenge, RBOC dominance.

What is needed now is a regulatory plan that will be both sufficiently robust to accommodate a wide range of fact sets, and sufficiently flexible as to respond rapidly to changing competitive conditions with minimal disruption or delay. With respect to the regulation of access services, the FCC needs to remove itself from the continuing battle over whether and where true competition exists. Instead, the FCC should implement a regulatory mechanism that would include appropriate protections for users of access services by eliminating the excessive prices currently in effect where competition is not present, while concurrently affording ILECs the flexibility and freedom from regulation that they need to compete in those situations in which rivals are active in a particular geographic market area or service segment.

## Ad Hoc's self-executing plan for pricing flexibility

Ad Hoc's proposal has the two-pronged objective of (1) eliminating excess monopoly prices for essential services that confront no effective competitive alternative; and (2) assuring ILECs the ability to adjust their prices and service offerings where a response to actual competitive entry is required.

- *Eliminate excess monopoly prices.* Access price levels are grossly excessive by any of several standards. First, they are pegged to historic embedded costs *as they existed in the late 1980s*, not to the significantly lower forward-looking economic cost that applies with respect to prices for other essential services, most particularly Unbundled Network Elements (UNEs). Second, special access service prices are currently set well in excess of those historic embedded costs, generating profit levels for the ILECs (expressed in terms of total return on investment) in the 23% to 69% range. Ultimately, the regulatory distinction between UNEs and access services needs to be eliminated, with access charges, like UNEs, being set at Total Element Long Run Incremental Cost


ECONOMICS AND TECHNOLOGY, INC.

(TELRIC) under a unified intercarrier compensation regime.[1]  For the moment, however, the excessive access prices relative to *embedded cost* must certainly be eradicated before any further pricing flexibility or regulatory relief for the ILECs is allowed.  In order to eliminate the excess earnings presently being generated by ILEC access services, all access rates should be reinitialized at their *current* embedded cost, based upon the last-authorized 11.25% rate of return.[2]  With the *CALLS* plan expiring on July 1, 2005,[3] the ILECs that had previously been subject to price cap regulation should once again revert to that regulatory device, but with reinitialized going-forward rates and a productivity offset factor ("X factor") set to accurately capture the productivity growth experience specifically applicable to interstate access services.

• *Allow downward pricing flexibility to the ILECs*.  ILECs assert a need for increased pricing flexibility – the ability to alter prices with short or no notice without first obtaining regulatory approval – in order to rapidly respond to the pressures of a competitive market.  If the gas station across the street has just dropped its price for regular by five cents a gallon, you'd certainly want the ability to respond without first having to deal with a regulatory bureaucracy to gain approval.  The problem is that, where pricing flexibility has been allowed, the ILECs have used – or more accurately, *abused* – their new freedoms to *keep prices high* and in some cases to *increase them*, not to lower them to the levels that have been required by price cap regulation in non-pricing flexibility areas.  The ability of a firm to charge higher prices without losing so much business to competitors as to make those higher prices unprofitable  – the classic evidence of market power[4] – should not be possible in a market in which actual and effective competition is present.  ILECs should not *be able* to raise prices where competition is present, and thus have no legitimate need for pricing flexibility in the upward direction.  On the other hand, ILECs should be allowed to reduce prices in response to competition.  Downward pricing flexibility is a self-executing regulatory device that will automatically provide the appropriate regulatory treatment of ILEC rates without the need to assess the extent to which actual and effective competition is present with respect to any particular ILEC service.

---

1. The FCC has indicated an interest in pursuing a unified intercarrier compensation scheme, but as of this writing no such rulemaking proceeding has been initiated.  *See*, *Intercarrier Compensation Proposal Will Be Unveiled Soon, FCC Official Says*, TR Daily, May 19, 2004.

2. *Respricing the Authorized Rate of Return for Interstate Services of Local Exchange Carriers*, CC Docket No. 89-624, *Order*, FCC No. 90-315, 5 FCC Rcd 7507 (1990).  As discussed more fully later in this paper,  the 11.25% authorized rate of return was adopted in 1990.  Interest rates are precipitously lower today, as such even a reinitialization of access rates at the 11.25% ROR level would be overly generous to the ILECs.

3. *Access Charge Reform*, CC Docket No. 96-262; *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1; *Low-Volume Long Distance Users*, CC Docket No. 99-249; *Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, *Sixth Report and Order in CC Docket Nos. 96-262 and 94-1; Report and Order in CC Docket No. 99-249; Eleventh Report and Order in CC Docket No. 96-45*, FCC No. 00-193, 15 FCC Rcd 12962 (2000) ("*CALLS Order*").

4. Karl E. Case & Ray C. Fair, *Principles of Economics: Annotated Instructor's Edition*, Prentice Hall, 1989, p. 308; William J. Baumol & Alan S. Blinder, *Economics: Principles and Policy*, Harcourt Brace Jovanovich, 1991, p. 689.


ECONOMICS AND
TECHNOLOGY, INC.

*A Two-Pronged Approach to Access Reform*

## Re-targeting Switched and Special Access Prices and re-instituting annual price-cap X-Factor rate adjustments

For more than three decades, the FCC has sought to achieve cost-based rates for all telecommunications services. To this end, it has worked to reduce and ultimately eliminate subsidies – both explicit and implicit – that have historically been used to support a low priced entry platform, the (residential) dial tone exchange access line. The Commission's approach for achieving this outcome has had two principal components. First, it has encouraged the development of competition in those industry segments in which such competition would be feasible (initially customer premises equipment and long distance services) so as to drive prices down to cost. Second, for those industry segments in which competition was not present or could not be expected to develop to a point where it would be capable of driving prices to cost, the Commission has adopted a variety of pricing and other regulatory devices aimed at achieving that same overall "competitive outcome." By virtually any measure that effort has been largely successful. However, in recent years, the gap between access charges and costs has widened in large part because the competition in the interstate access market that had been originally anticipated has failed to materialize.

The "price cap" approach to regulating ILEC interstate services was put into effect in 1991[5] and has been revised several times.[6] These changes involved (a) increasing the X-factor from 3% in the original plan, ultimately to 6.5%; (b) eliminating the original requirement that "excess earnings" be shared with the ILECs' customers; and (c) excluding certain services from the scope of price cap regulation altogether.[7] Various parties, including Ad Hoc, have argued that the 6.5% X-factor was insufficient, and without further increase, excessive prices and returns would result. However, rather than implement additional increases in the X-factor, in 2000 the FCC adopted the so-called *CALLS* settlement under which further price cap rate adjustments for switched access services were suspended and replaced by a set of specific price reductions that would continue only until predetermined "target rates" had been achieved.

A central element of the Commission's rationale for eliminating the sharing requirement and for limiting the level of the X-factor was the expectation that competition for access service would develop and would act as a back-stop, constraining ILEC prices even if the specific price adjustments called for by the X-factor and by the *CALLS* settlement were by themselves insufficient to maintain the proper

---

5. *Policy and Rules Concerning Rates for Dominant Carriers*, CC Docket No. 87-313, *Second Report and Order*, FCC No. 90-314, 5 FCC Rcd 6786 (1990) *("LEC Price Cap Order")*.

6. *See, e.g., Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1, *First Report and Order*, FCC No. 95-132, 10 FCC Rcd 8961 (1995); *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1; Access Charge Reform, CC Docket No. 96-262, *Fourth Report and Order in CC Docket No. 94-1 and Second Report and Order in CC Docket No. 96-262*, FCC No. 97-159, 12 FCC Rcd 16642 (1997) ("*1997 Price Cap Review Order*").

7. *1997 Price Cap Review Order,* 12 FCC Rcd 16645, para. 1.

ECONOMICS AND TECHNOLOGY, INC.

alignment between prices and costs.[8]  Indeed, the Commission expressed the specific expectation that by the termination date for the *CALLS* plan in 2004, such competition would have developed to the point where even continuing the *CALLS* plan would no longer be necessary, let alone reverting to price caps or to some other regulatory paradigm.  Almost four years have now elapsed since *CALLS* was adopted, but the development of effective competition in the access market remains as elusive as ever.

The evidence presented in this paper (Chapter 3) clearly demonstrates that switched access prices are still recovering revenues substantially in excess of the embedded cost of providing those services.  It also demonstrates that special access services – *that were themselves never specifically targeted to generate subsidies to any ILEC local services* – are being overpriced to an even greater degree.  The idea of using interstate access as a source of subsidization for local service arose out of the break-up of the former Bell System *and at a time when Bell companies were expressly excluded from the interLATA long distance market*, and when most other ILECs did not themselves offer long distance services.  Now that the BOCs and most other ILECs have entered the interLATA market,  perpetuation of this access charge policy creates formidable market distortions and inappropriately benefits BOCs and other LECs – which do not pay the excessive access charges to themselves – while competitively disadvantaging interexchange carriers that remain subject to such excessive local access fees.  Indeed, the use of access charges as a source of implicit subsidy to local service  *is not allowable by law*.[9]  More to the point, there is no indication that any of the excess profits *currently being generated by the overpriced access services* are actually even being used to support or subsidize basic local phone service.

The institution of subscriber line charges (SLCs) as a recovery mechanism for non-traffic-sensitive (NTS) RBOC costs, together with the FCC's substantial Universal Service Fund, have transformed the revenue recovery mechanism and in so doing obviated the need for any other subsidies to basic local service.  Today, in 29 of the 50 states in which RBOCs  provide service, the residential SLCs are *below* the FCC's SLC cap of $6.50 per month, and in 45 states the RBOC business multiline SLC is below the $9.20 business cap, confirming that the interstate portion of subscriber line costs is being fully recovered through those rate elements. The Primary Interexchange Carrier Charge (PICC), an additional per-line assessment collected from IXCs on business exchange access lines to make up the shortfall in those few states in which the SLC revenues do not satisfy the entire NTS revenue requirement, has been all but eliminated in RBOC regions.[10]  As of May 2004, Qwest was the only RBOC still collecting PICCs, and its current PICC charge is $0.04 per business multiline per month.  Clearly, there no longer remains any requirement for excessively priced switched and special access prices to subsidize the interstate portion

---

8.  *Id.*. at 12 FCC Rcd 16700-16701, paras. 148-153.

9.  The Telecommunications Act of 1996 specifically required the FCC to make all subsidies explicit.  Ad Hoc submits that The Act's language applies to "*cross-subsidies*" going to the RBOCs competitive operations as well.

10.  While Ad Hoc would certainly welcome a move to TELRIC-based pricing for switched and special access services that would lower the overall NTS revenue requirements, this  is not the specific proposal at this time, therefore we are not taking issue with the level of that NTS requirement.  Ad Hoc's proposal contemplates the use of  cost-based rates,  based upon the traditional access tariff basis of Part 32 regulated costs, including a reasonable level of return.



of local service. Table 3.1 in Chapter 3 summarizes the overall interstate earnings of each of the RBOCs for 2003, the last full reporting period, and reveals those earnings to range from a low of 12% to a high of 24%.

## Competition is not regulating access service prices

The evidence in Chapters 2 and 3 demonstrates that the FCC cannot rely upon competition in the access service markets to push access services prices down to just and reasonable levels. As we discuss in Chapter 3, earlier expectations that competition would discipline the market have proven false. Almost four years after the implementation of the *CALLS* plan, competition in local service markets has not driven the average switched access charge down below the $0.0055 per minute target rate and closer to cost -- in fact without the application of annual price reductions driven by the "X factor," the "Average Traffic Sensitive" (ATS) charge per minute has actually moved in precisely the opposite direction.[11] The existence of "competitors" in some highly limited areas of the special access market has done nothing to force special access prices closer to costs. Monopoly-level profits continue to be generated on these services, and these are eventually extracted from end-user business customers that rely upon special access facilities, who are being forced to pay prices that grossly exceed anything that would be found in a competitive market.

To eliminate the excess revenues being generated by interstate access services, the prices for these services (including those special access services that have been removed from price caps under the Pricing Flexibility rules) need to be re-targeted to a level not to exceed the FCC's most recently authorized rate of return for the RBOCs, i.e., 11.25%. Considering that the most recently authorized rate of return was adopted in 1990 at a time when the prime rate was 10% and the 10-year US Treasury Bond rate was 8.89% (September 1990), allowing earnings of this level would be extremely generous. Today, those rates are 4.25% and 4.73% (July 2004) respectively[12] – such that if the Commission were to actually reset an authorized return level, it would most likely be in the 8% to 9% range – considerably less than that now-ancient 11.25%.

Nevertheless, the Ad Hoc plan contemplates continued use of the 11.25% authorized return level and prices based upon embedded rather than forward-looking costs. However, these concessions are offered only for purposes of expediency. In order to simulate a competitive market outcome, access prices should be set based upon forward-looking costs, and absent that, a new, lower authorized return level should be used for re-targeting. As demonstrated on Table 1.1 below, reduction of existing special access prices to a level that would generate even the 11.25% rate of return would result in elimination of more than *$5-billion* in excessive special access charges per year, or put differently, $15-million

---

11. See discussion at p. 39, *infra*.

12. Federal Reserve Board, *Statistics: Releases and Historical Data,* available at http://www.federalreserve.gov/releases/h15/data.htm#fn3, (accessed July 28, 2004).

ECONOMICS AND
TECHNOLOGY, INC.

*A Two-Pronged Approach to Access Reform*

dollars per day.  Reduction of the earnings in the interstate access category in total (as opposed to special access services in isolation)  to the 11.25% level would require a reduction of $3-billion in annual billing ($8-million per day).  Customer that are presently being overcharged in excess of $3-billion per year  should not be held hostage to protracted proceedings addressing the costing standard itself (embedded vs. TELRIC) or the authorized rate of return.  If forward-looking cost studies were to take two years to be developed, litigated, and approved, another $10-billion in excess special access payments would have been imposed on corporate, government and institutional telecommunications users.  Every day that the Commission does not act to correct the current situation costs large business and government users some $15-million – and confers an unjustified windfall to the ILECs.

The extreme disparity between switched and special access with respect to earnings requires that separate, service-specific X-factors be established for each.  Special access demand has experienced unprecedented growth, and as the volume of units in service increases, the effects of economies of scale and scope work in concert to enhance productivity overall.  The X-factor can best be determined through a detailed analysis of productivity growth experience coupled with an examination of input price changes.  Alternatively, the Commission can apply the implicit X-factor methodology proposed by then-Common Carrier Bureau staff members Chris Frentrup and Mark Uretsky,[13] under which the X-factor is determined by calculating the value of the offset factor that would have been required to maintain RBOC earnings at their authorized level, i.e., 11.25%.  In principle, both approaches should produce roughly equivalent results, but the implicit X-factor method can be implemented far more directly and more simply than the data- and analysis-intensive Total Factor Productivity (TFP) approach.

| **Table 1.1** | | | | |
|---|---|---|---|---|
| **2003 Total RBOC Overcharges** | | | | |
| | | Calculation | Total Interstate | Special Access |
| 1 | Average Net Investment | | $31,983,983 | $10,208,233 |
| 2 | Net Return | | $5,438,687 | $4,486,021 |
| 3 | ROR | Line 2 / Line 1 | 17.00% | 43.95% |
| 4 | Approved ROR | 11.25% | 11.25% | 11.25% |
| 5 | Tax Rate | 39.25% | 39.25% | 39.25% |
| 6 | Overearnings | (Line 3 - Line 4) * Line 1 | $1,840,488.91 | $3,337,594.79 |
| 7 | Overcharging | Line 6 / (1-Line 5) | $3,029,611.38 | $5,493,983.19 |
| 8 | Daily Overcharges | Line 7 / 365 | $8,300.31 | $15,052.01 |
| Sources: | Federal Communications Commission, ARMIS Report 43-04, Access Report: Table I YE 2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed April 7, 2003). 39.25% is the composite tax rate currently used in the FCC's HCPM/HAI Synthesis Cost Proxy Model. http://www.fcc.gov/wcb/tapd/hcpm/welcome.html | | | |

---

13. *Price Cap Performance Review for Local Exchange Carriers,* CC Docket No. 94-1, *Fourth Further Notice of Proposed Rulemaking*, FCC No. 95-406, 10 FCC Rcd 13659 (1995), 13672, at para. 85.


ECONOMICS AND
TECHNOLOGY, INC.

*A Two-Pronged Approach to Access Reform*

Finally, in view of the persistent excessive earnings that the RBOCs have enjoyed under price caps, it has become abundantly clear that the sharing requirement must be reinstated. The RBOCs had claimed that imposing a requirement that they share "excess earnings" with ratepayers would erode their incentives to operate efficiently and to invest in the network.[14] But in its original ILEC price cap decision, the Commission had expressly relied upon sharing as a back-stop to protect consumers from excessive ILEC earnings in the event that the X-factor had been mis-specified. 20/20 hindsight and more than a decade of actual experience under price caps confirms that the X-factor had been mis-specified. In fact, on multiple occasions the Commission had determined that the X-factor needed to be increased. Even with those increases, RBOC earnings have continued to escalate to dizzying heights. Whatever efficiency gains the RBOCs may have achieved were not passed on to consumers in the form of lower prices. A sharing requirement still affords the RBOCs sufficient incentive to invest and to improve their efficiency, while at the same time assuring that consumers of monopoly RBOC services obtain some benefit from those improvements.

## The Commission should implement a Self-Executing form of Pricing Flexibility for Special Access that does not require a competitive showing and that allows downward pricing flexibility where and when the RBOCs deem it necessary

ILECs argue that when competition is present for a particular service, consumers no longer require regulatory protection with respect to that service's price, and that ILECs can no longer afford the often protracted regulatory delays involved in modifying their prices in response to competitive initiatives. While that may be true, ILECs also have a strong incentive to seek pricing flexibility whether or not actual competition is present. Where competition exists, pricing flexibility enables ILECs to rapidly respond to the pressures of a competitive market. However, if competition is only present at an extremely incidental level but the ILEC nevertheless succeeds in convincing the regulator that effective competition exists, the ILEC achieves an even better outcome: It gains the ability to increase its prices without fear of any consequential competitive retaliation.

In the past, the FCC and various state commissions have granted ILEC petitions for increased pricing flexibility after a detailed review of evidence of the actual extent of competition present in the market for the service(s) in question. Since the actual extent of competition can vary from a nominal presence of one small provider with extremely limited capacity to widescale entry by large, well-capitalized firms, a good deal of regulatory effort in such pricing flexibility proceedings is consumed in gathering data on the actual presence of competition, and on arguing as to whether that presence is sufficient to obviate the need for continued price regulation. All of this takes time, and leads to outcomes that are less than satisfactory to all concerned.

---

14. *See, e.g.*, *Price Cap Performance Review for Local Exchange Carriers,* CC Docket No. 94-1, *Reply Comments of Bell Atlantic*, filed March 1, 1996.

ECONOMICS AND
TECHNOLOGY, INC.

Whatever justification any type of pricing flexibility might have with respect to the need to rapidly respond to competitive market conditions, no valid basis for *upward pricing flexibility* has ever been satisfactorily demonstrated.  Indeed, if actual and effective competition is present, the ILECs' ability to raise prices would be largely foreclosed by competitive marketplace forces.  *The very fact that ILECs seek authority to increase prices without regulatory justification and review cannot be squared with their claimed need to be able to "rapidly respond" to competitive pressure.*  If competition is present, then what the ILECs need is *downward pricing flexibility*.  And if all that needs to be granted is downward pricing flexibility, there is no longer a need for the Commission to affirmatively find that competition is actually present.

Downward pricing flexibility provides a *self-executing regulatory device* that will automatically assure the appropriate regulatory treatment of ILEC rates without the need to assess the extent to which actual and effective competition is present with respect to any particular ILEC service.  Indeed, given the extraordinarily high profit levels that the RBOCs currently realize from their special access services, the suggestion that any sort of upward price movement should be permitted seems absurd on its face. When costs are declining, as in telecommunications, it should not be possible, as an economic matter, for an ILEC to increase its prices in a market in which actual and effective competition is present – in other words, if actual and effective competition really exists, ILECs would have no economic ability to increase prices even if, as a legal matter, they are permitted to do so.  *Since ILECs should not be able to raise prices where competition is present, they have no legitimate need for pricing flexibility in the upward direction.  On the other hand, ILECs should be allowed to reduce prices in response to competition.*

Allowing pricing flexibility in the downward direction only eliminates the need to evaluate the presence of competition or to utilize arbitrary "triggers" as a short-cut in lieu of more detailed examinations.  Downward pricing flexibility is, in essence, a self-executing regulatory device that can operate effectively whether or not actual competition exists.  Ad Hoc's plan is self-executing in that, if competition is present and  works to force prices lower, downward pricing flexibility will assure the ILEC the ability and opportunity to respond to those competitive pressures.  On the other hand, if there is no actual and effective competition, the regulatory protection of a price cap mechanism should operate to limit excessive prices.

Once existing rate levels have been reinitialized to eliminate the excessive prices that presently apply to access services, the Commission can then grant downward pricing flexibility, including contract tariffing authority, across all access markets.  There would be no reason for the Commission to require an affirmative showing as to the presence of competition, or to evaluate the extent to which specific "triggers" have been satisfied in any particular market.  This "self-executing" form of deregulation takes the Commission out of the debate over the actual level of competition, and offers all stakeholders – ILECs, CLECs, IXCs *and customers* – a level of regulatory certainty that exceeds anything that presently exists.  Price cap regulation would continue in effect, but only for purposes of establishing ceiling price levels.


ECONOMICS AND
TECHNOLOGY, INC.

# 2 | NO WAY OUT: THE LACK OF ALTERNATIVES TO SPECIAL ACCESS

*Although there is intense competition for interexchange switched voice and dedicated voice and data services, the ILEC monopoly persists largely unchallenged in the case of switched and dedicated access connections between those interexchange carrier networks and individual end-user sites. Some might think that large users' needs are confined primarily to large buildings and commercial centers at which competing services will be readily available. However, many corporate networks involve tens of thousands of small sites – the vast majority of which are in places where the ILEC is the only source of connectivity. Competitive service is available on a very limited basis, and the incumbent local exchange carriers remain the sole source of dedicated ("special") access connectivity at roughly 98% of all business premises nationwide, even for the largest corporate users. The lack of competitive alternatives for high capacity access services is attributable to many well-recognized barriers to competitive entry, especially the very high fixed-costs and risk associated with such investments. These conditions are not likely to change any time soon.*

## Despite CLEC gains in other market segments, the competitive availability of "last mile" connections for large business users remains very limited

Since the first competitive alternatives in telecommunications appeared nearly half a century ago,[15] large business users have frequently been among the earliest to adopt them and were among the first to

---

15. In its *Above 890* ruling, 27 FCC 359, 396 (1959), in which the FCC authorized the award of private microwave licenses directly to end users, the Commission declined to require common carriers to interconnect with these private systems. That policy remained in effect until the *Specialized Common Carrier* ruling, when such interconnection between private and carrier networks was required. *Specialized Common Carrier Services, First Report and Order*, 29 FCC 2nd 870, 940 (1971). *Recon. denied*, 31 FCC 2nd 1106 (1971). *Aff'd sub nom. Washington Utilities & Transportation Commission v. FCC*, 513 F. 2d 1142 (9th Cir. 1975).

11



realize the economic and technological benefits that these new choices had created.  Many of these customers regularly make sizable telecommunications purchases and are willing to make volume commitments and enter into long-term contracts, factors that tend to make them particularly attractive to potential suppliers.  Nonetheless, while large corporate users have been actively pursuing a broad range of competitive telecommunications choices for several decades, they remain even today *overwhelmingly dependent upon the traditional incumbent local telephone monopolies for the vast majority of locations and service requirements*.

To be sure, there is intense competition in the market for *interexchange* switched voice and dedicated voice and data services, competition that has resulted in extensive capacity expansion and significant reductions in the prices of these services.  That is not the case, however, with respect to the switched and dedicated access connections between those interexchange carrier networks and individual end-user sites.  There is at best only limited competition for "last mile" connections – so-called "local loops" – between individual customer premises and common carrier networks, whether for conventional "dial-tone" access to the local public switched network, for dedicated access for voice or data private lines, or for Internet access.  Even though it has been nearly two decades since competitive access providers made the first, targeted inroads into the access markets, the current availability of special access services from competing providers remains confined to a small number of buildings in an even smaller number of concentrated business districts.  While some of large users' requirements fall within those highly concentrated urban areas, many major companies have networks that connect, in some cases, tens of thousands of individual sites – the vast majority of which are areas where the ILEC is the only source of connectivity.[16]  It is critically important that policymakers understand that incumbent local exchange carriers remain the sole source of special access connectivity at roughly 98% of all business premises nationwide and that this condition affects even the largest corporate users.  In its 2003 *Triennial Review Order*, the FCC found that while competing facilities are available to *some* business customers at *some* of their locations, competitive alternatives are far from universally available:

> ... When competitive LECs self-deploy fiber they predominantly do so at the OCn-level. ...  In contrast, the record contains little evidence of self-deployment, or availability from alternative providers, for DS1 loops.  As for DS3 loops, evidence of self-deployment and wholesale availability is somewhat greater than for DS1s and is directly related to location-specific criteria.  Indeed, competitive LECs agree that at a three DS3 loop capacity level of demand, it is economically feasible to self-deploy ...[17]

---

16. For example, a bank network would typically serve hundreds or thousands of branches and thousands or tens of thousands of ATMs.  An airline network would have connections to tens of thousands of travel agents.  An automobile manufacturer's network would provide service to thousands of auto dealerships.  The overwhelming majority of such locations are nowhere near any central business district or concentration of CLEC facilities.

17. *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carrier*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking*, FCC No. 03-36, 18 FCC Rcd 16978 (2003) ("*Triennial Review Order*") at para. 298.  *See also* paras. 299-307.



ECONOMICS AND TECHNOLOGY, INC.

*No Way Out: The Lack of Alternatives to Special Access*

CLECs have deployed limited amounts of fiber optic cable along major streets in downtown business districts, but those facilities are physically connected to only a small fraction of the buildings that they pass. This is because the cost to establish each such connection is substantial and is typically incurred by a CLEC only in those limited cases with the actual or potential demand *in a given building* is sufficiently large that these fixed costs can realistically be recovered.[18]

Evidence recently submitted to the FCC by Verizon confirms the extent of enterprise customers' extreme and utter dependence upon BOC-provided special access services, even in what many consider to be the most competitive local service markets in the country (see Figures 2.1 and 2.2). Verizon's maps conclusively demonstrate that throughout both the New York and Washington metropolitan areas, CLECs are required to rely upon overpriced Verizon special access loops to reach enterprise customers.[19] The picture being painted by these two graphics is even more compelling when one considers that the customer locations shown represent only special access facilities provided to CLECs for local service use – they do not include special access services furnished for more traditional uses, such as for access to long distance carrier voice networks, connections to dedicated private lines, connections to frame relay or ATM ports, or facilities used to provide Internet access.

---

18. Consider an analogy to mass transit or highway construction. The costliest parts of such projects are stations (in the case of transit systems) or interchanges (in the case of highways). Yet access to such facilities can only be accomplished at these points, so living next to a railroad but miles from the nearest station is no better, in terms of convenient access, than not living near the railroad to begin with.

19. July 19, 2004 *ex parte* filing by Verizon Communications, Inc. in CC Docket No. 01-338, *Section 251 Unbundling Obligations for Incumbent Local Exchange Carriers*. In its filing, Verizon also included maps purporting to display locations of enterprise customers being served by CLEC-owned facilities. However, these "CLEC facility" maps do not offer any information as to the nature of such facilities, nor do they indicate whether these CLEC installations consist primarily (as is likely) of multiple DS-3s or OCn channels. The fact that *some* locations are being served by CLEC-owned facilities in no way diminishes Verizon's absolute monopoly at all locations where no alternative facilities are in place or at locations at which customer demand is insufficient to make CLEC entry economically feasible.

ETI ECONOMICS AND TECHNOLOGY, INC.

*No Way Out: The Lack of Alternatives to Special Access*



**Figure 2.1.  Locations of Verizon Special Access services being used by CLECs to provide local service to enterprise customers in the New York Metropolitan area.**

ECONOMICS AND
TECHNOLOGY, INC.



**Figure 2.2.  Locations of Verizon Special Access services being used by CLECs to provide local service to enterprise customers in the Washington Metropolitan area.**

## All signs point to the continuing lack of competitive alternatives for the large user market

The limited competition for the provision of access services that exists today is not all new. Competitive Access Providers ("CAPs") have been around since the early 1980s.  The earliest public utilities commission decisions authorizing local competition pre-date the 1996 Telecommunications Act by more than a decade.  Yet, even today, the non-ILEC local service providers – whether they employ

ECONOMICS AND TECHNOLOGY, INC.

traditional wireline facilities or some inter-modal alternative such as cable or wireless, are still at best marginal players in the local service market.[20]

### *Competitive intra-modal choices being provided by CLECs and CAPs address only a small portion of the total business market for special access services and other forms of local connectivity.*

After reviewing the voluminous record submitted by ILECs, CLECs and IXCs in the FCC's *Triennial Review Order* (TRO) Proceeding, the Commission reported that "between 3% and 5% of the nation's commercial office buildings are served by competitor-owned fiber loops."[21] Even by the most generous of the ILECs' own counts, all CLECs *combined* serve only about 30,000 of the roughly 3-million commercial buildings nationwide.[22] Verizon reported this estimate in response to AT&T's 2002 *Special Access Petition*,[23] and as such, had every incentive to identify and report the largest base of special access competition possible.[24] Table 2.1 below presents the optimistic estimates of "connected" buildings put forth by Verizon, the FCC and CLECs. The Table also includes estimates of commercial building connections via cable and fixed wireless. In not one of the depicted cases in Table 2.1 is the number of "connected buildings" greater than 1% of a conservatively estimated 3-million commercial buildings. Combining the most expansive (Verizon) estimate of "connected" buildings from traditional ILEC special access facilities with the purportedly intermodal competitive alternatives offered by cable and fixed wireless providers, and assuming *no overlap* in the buildings "connected" by these different technologies – all extremely conservative assumptions – provides a *lower bound* estimate of the commercial buildings that have no alternative to ILEC special access at 98%, with the actual figure

---

20. The March 2, 2004 ruling by the US Circuit Court of Appeals for the District of Columbia Circuit, if not reversed, portends to eliminate the sole telecommunications market segment in which at least *some* non-trivial level of competition has developed – *retail* mass market services. While pejoratively portraying such activity as "synthetic competition," the DC Court has ignored the important service and pricing innovations that are attributable specifically to competing retail service providers, and has also failed to recognize that virtually every other major US industry is structured with a retail segment that does not itself "produce" the underlying product or service. With UNE-P gone, the prospects for any consequential competition for mass market services has all but vanished. *See, United States Telecom Association, Petitioner v. Federal Communications Commission and United States of America, Respondents, Bell Atlantic Telephone Companies, et al., Intervenors*, 359 F.3d 554 (D.C. Cir., 2004).

21. *Triennial Review Order*, at fn. 856.

22. *AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services,* RM Docket No. 10593, *Opposition of Verizon*, filed December 2, 2002 ("*RM 10593 Opposition of Verizon*") at p. 13.

23. *AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services*, RM Docket No. 10593, *AT&T Corp. Petition for Rulemaking*, filed October 15, 2002 ("*AT&T Special Access Petition*").

24. It should be noted that even using this most optimistic of estimates, in many instances even when a CLEC is able to establish its own facility-based "connection" to a multi-tenant commercial building, it is not given access to all tenants within the building.



ECONOMICS AND
TECHNOLOGY, INC.

likely higher than that.  Although the reported data is in some cases up to two years old,  there is no reasons to believe that the number of "connected" buildings has increased substantially since 2002.  In point of fact, the availability of competitive special access connections may actually be decreasing.  As service providers exit the business altogether or scale down operations as part of Chapter 11 proceedings, they frequently scale back their actual connections and/or are forced to admit that their "on net" building connectivity and network deployment claims had been exaggerated.

If competitively supplied loops were widely available, one would expect that the large IXCs would be using them to the maximum extent possible for their special access needs,[25] because special access charges comprise a significant portion of their costs of doing business.  However, in a  declaration accompanying its 2002 *Petition* AT&T reported that it has been unable to obtain non-ILEC special access services for all but a small fraction of its special access requirements.  Specifically, AT&T stated that it serves some 186,000 buildings using special access, yet except in 5% of those cases (9,700 buildings), it must still rely upon the ILECs' special access services.[26]  Of the 5% of buildings for which AT&T has been able to obtain an alternative, the majority are self-provided circuits, and only about 3,700 buildings – or 2% of the total – are served using other CLECs' facilities.[27]  As a CLEC, AT&T has facilities to only 6,000 of the roughly 3-million commercial buildings in the U.S.  – a mere *one-fifth of one percent*!

AT&T's experience is corroborated by statements that Sprint Corporation has made in several FCC proceedings.  Back in 1998, Sprint reported that "in 1996, only nine cents of every special access dollar spent by Sprint went to non-ILEC vendors.  By January 1998, this figure had increased only slightly, with alternative vendors accounting for only 9.6% of Sprint's total access facility outlays.[28]   In comments filed in 2002, Sprint reported that the passage of four years had not improved its ability to obtain special access facilities from ILEC competitors.  Filing in the Commission's *Special Access Performance Measurement* proceeding, Sprint states that "Sprint Long Distance ...  continues to rely upon the ILECs for approximately 93% of its total special access needs despite aggressive attempt to

---

25. We recognize that the FCC's "commingling" rules bar the use of unbundled loops solely to provide special access service, but do allow certain combinations of special access and local exchange service on the same loop facility.  See 47 C.F.R. 51.318.

26. *AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services*, RM Docket No. 10593, *Declaration of Kenneth Thomas on behalf of AT&T,* filed October 15, 2002 as part of the A*T&T Special Access Petition*, (*"RM 10593 Declaration of Kenneth Thomas on behalf of AT&T"*) at p. 1.

27. *Id.*, at p. 1.

28. *Access Charge Reform*, CC Docket No. 96-262; *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1; *Petition for Rulemaking of Consumer Federal of America, International Communications Association and National Retail Federation Relating to Access Charge Reform*, RM No. 9210, *Comments of Sprint Corporation*, filed on October 26, 1998, at p. 4.

ECONOMICS AND
TECHNOLOGY, INC.

self- supply and to switch to CLEC-provided facilities wherever feasible."[29]  Sprint's estimate of total alternative access provider connections into commercial buildings is larger than AT&T's (Sprint estimates that there are approximately 30,000 connected buildings, and estimates the total number of US commercial buildings at just under 750,000),[30] buts still represents connectivity at less than 5% of commercial buildings in the US.  Moreover, Sprint goes on to report that in 12,000 of the buildings (e.g., 40% of the time), the connection is limited to a single customer, and the CLEC is unable to provide access to other customers located in the same building.[31]

CLECs typically seek out opportunities to purchase service from other CLECs (rather than from ILECs) so as to expand the number of buildings where they can "bypass" ILEC facilities.  However, the availability of such alternatives continues to be quite limited.  AT&T, for example, indicated that looking to the other major CLECs gives it potential access to only an additional 14,000 buildings nationwide (which includes the 3,700 buildings where AT&T actually purchases some CLEC access).[32] Figure 2.3 provides a graphic illustration of the availability of CLEC loops to large business users.  The difficulties being experienced by even the largest IXCs in attempting to find alternatives to ILEC special access services underscore the ILECs' continuing dominance of the special access market.  Of course, the dearth of competitive alternatives applies just as much to large businesses seeking to obtain those services directly as it does to IXCs that might use special access to provide an integrated package of telecommunications services to large users.

---

29.  *See, Performance Measurements and Standards for Interstate Special Access,* CC Docket No. 01-321, *Comments of Sprint Corporation,* filed January 22, 2002, at pp. 4-5;  *See also, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carrier*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capability,* CC Docket No. 98-147, *Comments of Sprint Corporation,* April 5, 2002, at pp. 23-24.

30.  *AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services*, RM Docket No. 10593, *Comments of Sprint Corporation,* filed December  2, 2002 ("*RM 10593 Sprint Comments*"), at p. 4.

31.  *Id.,* at p. 4.

32.  As indicated, AT&T uses CLEC facilities at approximately 3,700 of the approximately 14,000 locations where such facilities are available.  See, *RM 10593 Declaration of Kenneth Thomas on behalf of AT&T*, at p. 3.  According to AT&T, and certainly confirmed by first-hand experience of Ad Hoc members,  there are several critical factors that account for AT&T's reluctance to purchase CLEC access facilities, even when they exist.  First, major IXCs typically require underlying suppliers to meet criteria for service quality, performance measures and cost effectiveness.  *Id.* at p. 2.  Some CLECs do not meet these criteria and thus do not provide viable options.  Similarly, IXCs that depend upon CLECs for special access often confront a level of uncertainty that threatens to impair their continuing use of such competitive alternatives.  According to AT&T, more than half of the buildings for which CLEC special access was available are served by CLECs that have declared bankruptcy.  *Id.* at p. 4.  Not surprisingly, large users, who cannot afford service disruptions, often direct their principal IXCs to avoid obtaining access links from potentially unstable, bankrupt CLECs.  Moreover, CLECs are not always able to secure the building owners' permission to locate equipment in the building's common space, so that in many cases access is limited to a "fiber to the floor" arrangement in which only particular floors in the building can be served *Id.* at p. 2.  Thus, even where there is competitive special access in a building, there is not always competitive special access available to serve all customers in that building.



ECONOMICS AND
TECHNOLOGY, INC.

*No Way Out:  The Lack of Alternatives to Special Access*

| Table 2.1 Most Optimistic Estimate of Facilities Based Special Access Competition From All Sources | | | | | |
|---|---|---|---|---|---|
| | Traditional Wireline | | | CATV | Fixed Wireless |
| | AT&T | CLECs | Verizon | FCC | FCC |
| Number of Buildings | 6,000 | 14,000 | 30,000 | 30,000 | 25,000 |
| Total % of Commercial Buildings | 0.20% | 0.47% | 1.00% | 1.00% | 0.83% |

Notes: Total number of commercial buildings is estimated to be 3-million; each CATV and fixed wireless line is treated as a separate building/address.

Sources: AT&T estimate reported in RM 10593 Declaration of Kenneth Thomas on behalf of AT&T at p. 1; Verizon estimate reported in RM 10593 Opposition of Verizon at p. 13; CLEC estimate reported in RM 10593 Declaration of Kenneth Thomas on behalf of AT&T, at p. 3; FCC CATV and Fixed Wireless estimates reported in High Speed Services for Internet Access: December 31, 2003, Tables 3 and 5, and Tables 1 and 3, respectively.

The experience of Ad Hoc's own members corroborate this evidence.  Despite being among the largest and most technologically sophisticated users of telecommunications services in the country, the members of the Ad Hoc Committee report that they face no competitive alternatives to ILEC services to meet their broadband business services requirements in the overwhelming majority of their service locations.  Even where competitive alternatives are nominally "available," members are able to make little use of those competitor services for a variety of reasons.

In 2002, members of the Ad Hoc Committee  aggregated their company-specific information regarding the number of customer locations with broadband service needs falling into each of the four following categories:

- Category A:    Capacity of 12 DS-0 channels or less (i.e., ½ T-1, 760 kHz, xDSL, etc.).
- Category B:    Capacity of at least one but not more than four DS-1 circuits.
- Category C:    Capacity greater than four DS-1 circuits, or at a level sufficient to justify the provision of at least one DS-3 facility, other than SONET or Optical Carrier ("OC") service.
- Category D:    SONET or OC service.


ECONOMICS AND TECHNOLOGY, INC.



**Figure 2.3:  Most US Commerical Buildings Do Not Have CLEC-Owned Special Access Facilities Available**

Committee members were then asked to provide estimates of the percentage of locations by category for which they were aware of the presence of viable competitive alternatives to ILEC services. Finally, members were asked to estimate the percentage of locations by Category at which they currently used a competitive carrier to satisfy their service requirements.  The total number of locations surveyed was about 30,000.[33]

The results of the survey demonstrate that viable competitive alternatives are not frequently available, particularly with respect to smaller business service locations.[34]   For the overwhelming majority of Category A and B business service locations, viable competitive alternatives to the incumbent LEC's data service were available at less than 10%.  The vast majority of the Category C business service locations also appear to have very few viable competitive alternatives.  Although some members indicate the presence of some competitive alternatives for seldom-purchased Category D

---

33.  This data was first reported in Ad Hoc comments filed in CC Docket No. 01-337.  *See, Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, CC Docket No. 01-337, *Comments of Ad Hoc Telecommunications Users Committee*, filed March 1, 2002  *("CC 01-337 Ad Hoc Comments")*.

34.  The survey asked respondents to indicate whether there were viable competitive alternatives for each category of service at (a) fewer than 10% of the service locations; (b) between 10% and 25% of the service locations; (c) between 25% and 50% of the service locations; and (d) more than 50% of the service locations.


ECONOMICS AND
TECHNOLOGY, INC.

*No Way Out: The Lack of Alternatives to Special Access*

services, others indicate that viable competitive offerings are no more prevalent for the highest capacity services than for the lowest.

As would be expected, the existence of few viable competitive alternatives has resulted in few actual purchases of competitive data services by Ad Hoc's members.[35]   Members indicate that in all Category A locations and nearly all Category B locations, fewer than 10% are served by competitors. The majority of Category C and D locations also are served by competitors less than 10% of the time.

Committee members have raised several issues that determine whether or not they can use a competitive carrier in those few locations where one is available. Service quality, reliability, and security are all critical issues that business end users must consider when evaluating competitive alternatives to the ILEC's broadband service offerings.  CLEC network ubiquity and price are two other interrelated issues.  Because CLEC networks are not as ubiquitous as those of the incumbents, many business service locations seeking broadband services from a CLEC either require (1) additional build-out by the competitor, or (2) "backhauling" of access to the CLEC POP (at the customer's expense).  Either outcome increases the cost of service as compared to the ILEC, creating additional barriers for CLEC efforts to penetrate the business end user market.  Statistics that focus solely upon the nominal "presence" of competitors, in particular the criteria adopted by the Commission as the threshold standard for Phase II pricing flexibility, fail utterly to account for the practical realities of acquiring and utilizing services from non-ILEC providers.

Indeed, issues of total cost, network integration, reliability, and responsiveness ultimately determine whether a competitor's service is considered by an end user to be a viable alternative in the first place. It is not enough simply to have competitors "operating" in the market – rather, the services provided by carriers other than the incumbent LEC must also satisfy the customer's standards for purchase and use. The survey responses provided by Ad Hoc's members substantiate the fact that even where "available," CLEC services rarely met members' needs in 2002; a recent polling of those same members in the first quarter of 2004 indicated no material change in circumstances since the time of the original survey.  As such, it is clear that the business data service market is far from being effectively competitive, and thus continues to require more robust price regulation than the FCC now applies to this sector.

Similarly. current data filed with the FCC also suggests that CLECs have never attained a significant market share using their own loops for *switched* access.  CLECs serve about 7-million (approximately 23.5%) of their switched access lines using their own facilities,[36] but roughly just under half of those – 3.22-million – are mass market (mostly residential) services being furnished by cable

---

35.  The survey asked respondents to indicate whether they purchased data services from competitive carriers for each category of service at (a) fewer than 10% of the service locations; (b) between 10% and 25% of the service locations; (c) between 25% and 50% of the service locations; and (d) more than 50% of the service locations.

36.  Industry Analysis and Technology Division, Federal Communications Commission, *Local Telephone Competition: Status as of December 31, 2003,* June 2004 ("*Local Competition Report*"), at Table 3.

21

ECONOMICS AND
TECHNOLOGY, INC.

television operators to their cable subscribers.[37]  Even if we assume that *all* of the *non-cable* facilities-based CLEC lines are being used to serve medium and large business customers (and not mass market subscribers), then *at the very most*, CLEC-owned facilities account for only about 8% of the total reported end user switched business access lines[38] and, because medium and large businesses have multiple lines – some in the tens of thousands – the number of *customers* obtaining service from carriers other than ILECs is a far smaller figure.

### Intermodal competitive alternatives from Cable and Fixed Wireless are not realistic alternatives for most business applications

As the Commission has often posited, non-wireline ("intermodal") alternatives to traditional ILEC services have the potential to offer viable competitive choices.  Regardless of their merits or prospective potential as full-fledged substitutes for plain old telephone service (POTS), the substitutability of these alternatives for most *business* uses is close to nonexistent.  As the Commission has recognized, intermodal alternatives are not always reasonable substitutes for ILEC wireline services due to the lack of comparability in availability, quality, price, or the maturity of the alternative provider.[39]  Moreover, specific customers (or customer classes) may have specialized requirements (e.g., data security or full-time reliability) that effectively preclude the use of non-wireline substitutes.  As detailed below, at least for the present, it is clear that intermodal providers are not capable of supplying a sufficient quantity or quality of service to represent a serious competitive choice for the extensive special access needs of large business customers.

**Cable:**   Cable television companies ("cable") have been portrayed by the ILECs to be a formidable source of competition, and arguably they have been the most significant facilities-based alternative to the ILECs *with respect to mass market (principally residential and "home business") services*. However, cable is not well positioned to meet the connectivity needs of large business users, for several reasons.[40]  First, the networks constructed by cable companies are largely designed to reach residential dwellings, not business locations.  With the possible exception of local retail shopping areas interspersed within or adjacent to residential neighborhoods, cable infrastructures generally do not "pass" business

---

37.  *Local Competition Report,* at Table 5.

38.  *Local Competition Report,* at Tables 2, 3 and 5:  CLEC-owned switched access lines [6,935,000] minus cable telephony lines [3,220,000] divided by the sum of ILEC "other" switched access lines [33,086,052] and CLEC "other" switched access lines [10,841,075].

39.  *Triennial Review Order,* at 18 FCC Rcd 17044, at para. 97.

40.  The Ad Hoc Committee has discussed these issues in greater detail in its comments in the FCC's broadband services proceeding, CC Docket No. 01-337.  See, *01-227 Ad Hoc Comments,* at 17-19; and *Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, CC Docket No. 01-337, *Reply Comments of Ad Hoc Telecommunications Users Committee*, filed April 22, 2002, at 4-6.



ECONOMICS AND
TECHNOLOGY, INC.

locations and thus cannot readily serve the vast majority of office buildings and other business sites. In the context of its monitoring of advanced services deployment, the FCC found that:

> Residential and small business subscribers, not surprisingly, account for over 96 percent of the reported high-speed lines delivered over cable systems.  This is consistent with our understanding that most cable systems are currently deployed in primarily residential areas.[41]

In addition, because cable companies are primarily oriented towards a mass-market customer base, their telephony and data (*i.e.*, cable modem) offerings generally fall short of ILEC offerings in the areas of service reliability and security.  Cable networks do not have the same degree of back-up electrical power as do the ILEC networks, and the "shared platform" nature of cable modem service raises data security and transmission performance issues that are particularly important to business customers, who routinely transmit highly sensitive or mission-critical financial and commercial data.

Given the shortcomings of CATV-provided business services, it is not surprising that cable providers reported supplying fewer than 16,000 coaxial cable connections to medium and large businesses *nationwide* at the time the FCC reached its conclusions in the *Triennial Review* proceeding, and report less than 30,000 such connections today.[42]  Considered in relation to the roughly three million commercial buildings, these connections represent less than one percent of potentially addressable business locations.  Clearly, cable has thus far had minimal impact upon the ILECs' virtual monopoly on connectivity supplied to large businesses, and this situation appears unlikely to change any time soon.[43]

**Fixed Wireless:**  Fixed wireless service is more easily deployed than cable, but like cable is a wholly inadequate substitute for high capacity wireline access for business customers.  Fixed wireless began as yet another highly touted technology of the late 1990s, and like many of the others, it has not lived up to its expectations.  Since its inception, the technology has been bogged down with operational

---

41. *Inquiry Concerning the Deployment of Advanced Telecommunications Capability*, CC Docket 98-146, *Third Report*, FCC No. 02-33, 17 FCC Rcd 2844 (2002) at 2864,  para. 45 (footnotes omitted, emphasis supplied).

42. *Triennial Review Order* at 18 FCC Rcd 17010,  para. 41.  Citing,  Industry Analysis and Technology Division, Wireline Competition Bureau, *High Speed Services for Internet Access: Status as of June 30, 2002*, rel. December 2002.  Analysis of the most recent IATD report reveals that for the period ended December 31, 2003, 5-million  high speed coaxial cable connections serving new residence and small business cable high speed connections were added, and that only approximately 3,400 new coaxial cable connections were added that served large business subscribers, with the total number of connections to high speed cable connections to large business users still less than 30,000 in total.  See, Industry Analysis and Technology Division, Wireline Competition Bureau, *High Speed Services for Internet Access: Status as of December 31, 2003*, rel. June 2004 ("*High Speed Services for Internet Access: December 31, 2003*"); and Industry Analysis and Technology Division, Wireline Competition Bureau, *High Speed Services for Internet Access: Status as of December 31, 2002*,  June 2003.

43.  A report issued by Cahners In-Stat Group claims that businesses account for only 5% of cable modem subscribers, and penetration is only expected to increase to 10% by 2005. *See, Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, CC Docket No. 01-337,  *AT&T Comments,* filed April 22, 2002, at p. 41 (citing Cahners In-Stat Group, *Despite Service Provider Pratfalls, Cable Modem Subscriber Growth Remains Robust,* December 1, 2001,  at p. 1).

ECONOMICS AND
TECHNOLOGY, INC.

troubles, including both security and transmission problems.  According to Network World Fusion, an on-line network research firm, "[t]here are important issues that network executives will need to resolve before signing up for fixed wireless, including security and possible performance degradation from interference with other service providers."[44]  When real-time communication is essential, this technology is a liability.  In addition to security and service quality issues, fixed wireless also struggles with connection problems.  The technology requires line-of-sight transmission.  This means that all of the microwave dishes tend to be set up in the same places, namely on top of towers or hillsides – and the concentration of this equipment with these sites exacerbates the interference problems.   In analyzing competitive alternatives available to enterprise customers in the context of its market review for the *TRO*, the FCC all but dismissed fixed wireless as an alternative for enterprise customers, finding that "while there was some fixed wireless entry in the enterprise market, it has been limited."[45]

Due to these problems, fixed wireless has remained a marginal technology for serving the needs of enterprise customers (and the fixed per-customer cost makes it prohibitive for mass market adoption).  Current deployment in the enterprise market is minimal – a little over 25,000 lines across the country.[46]  Indeed, even if one were (unrealistically) to assume that all of those fixed wireless lines were being used as substitutes for ILEC special access, they would account for *two one-hundredths of one percent* of the 103.8-million special access lines (measured in voice grade equivalents).[47]

## Slow and sporadic expansion of alternative loop facilities, including loops for the provision of special access services, is consistent with the Commission's findings that significant barriers to entry continue to exist

The lack of competitive alternatives for high capacity services should come as no surprise given the numerous and well-recognized barriers to entry being confronted by competitors.  Chief among these barriers are the enormously high fixed-cost investment required to enter this market and the uncertain return on that investment.  The Commission has recognized that CLECs have faced and continue to confront significant economic and operational barriers to the self-deployment of loops.  In the *Triennial Review Order*, the FCC concludes, "[b]ased on the record as a whole, for DS1 and some DS3 loops, overbuilding to enterprise customers that require services over these facilities generally does not present

---

44.  Jim Geier, *Fixed Wireless Fills a Niche,* Network World Fusion, October 22, 2001. Available at http://www.nwfusion.com/techinsider/1022broadband/feat.html (accessed June 4, 2004).

45.  *Triennial Review Order* at 18 FCC Rcd 17012, fn. 144.

46.  *High Speed Services for Internet Access: December 31, 2003*, Table 1 and 3.

47.  Industry Analysis and Technology Division, Wireline Competition Bureau, *Statistics of Communication Common Carriers 2002/2003*, March 2, 2004.



ECONOMICS AND
TECHNOLOGY, INC.

*No Way Out: The Lack of Alternatives to Special Access*

sufficient opportunity for competitors to recover their costs and, therefore, may not be economically feasible."[48] In the same vein, the Commission observes:

> Because the cost to self-deploy local loops *at any capacity* is great and the cost to deploy fiber does not vary based on capacity, a competitive LEC that plans to self-deploy its own facilities must target customer locations where there is sufficient demand from a potential customer base, usually a multi-unit premises location, to generate a revenue stream that could recover the sunk construction costs of the underlying loop transmission facility, including laying the fiber and attaching the requisite optronics to light the fiber.[49]

The Commission acknowledges that the decision to deploy loop facilities involves assessment of the economics at "*a particular customer location.*"[50]  It also notes that

> [e]ven when the customer demand at a certain location may support self-deployment from a pure cost recovery perspective, however, there are other obstacles that must be overcome before such self-deployment can effectively occur.  These other barriers include the inability to obtain reasonable and timely access to the customer's premises both in laying the fiber to the location and getting it into the building thereafter, as well as convincing customers to accept the delays and uncertainty associated with deployment of alternative loop facilities.[51]

CLEC deployment of subscriber loop facilities has indeed slowed.  Figure 2.4 illustrates the total quantity of CLEC-owned subscriber lines (including those provided over coaxial cable) from December 2000 to June 2003.  As the data demonstrates, the total quantity of CLEC-owned loops has remained relative constant at just over 6-million since June 2003, and in point of fact, the total quantity of non-cable CLEC subscriber lines has declined somewhat during the period June 2002 to June 2003 (most likely as a result of CLEC bankruptcies during that time frame), with growth in lines provisioned over coaxial cable (to mass market customers) accounting for the minimal growth that has occurred.

---

48.  *Triennial Review Order* at 18 FCC Rcd 17157, fn. 859.

49.  *Triennial Review Order* at 18 FCC Rcd 17160, para. 303.

50.  *Id.*

51.  *Id.*  "The record [in the *TRO* proceeding further] reflects that constructing local loops generally takes between 6-9 months without unforeseen delay. ...  These delays can be attributable to securing rights-of-way from local authorities which is necessary before competitive LECs can dig up streets to lay fiber. Often, carriers must engage in lengthy negotiations with local authorities over the ability to use the public rights-of-way.  Similarly, obtaining building and zoning permits adds further delay as local authorities often conduct extensive inquiries into the planned construction activity of the competitive carrier. Moreover, commenters note that many local jurisdictions impose construction moratoriums which prevent the grant of a franchise agreement to construct new fiber facilities in the public rights-of way."  *Triennial Review Order* at 18 FCC Rcd 17161, para. 304., footnotes omitted.

ECONOMICS AND
TECHNOLOGY, INC.

*No Way Out:  The Lack of Alternatives to Special Access*



**Figure 2.4.  Mass market cable telephony lines account for most of the growth in CLEC-owned lines**



# 3 | UNDISCIPLINED PRICING AND LIMITLESS EARNINGS IN THE FACE OF ONLY PUTATIVE COMPETITION

*Marketplace conduct of the dominant ILECs – extracting higher prices in precisely those geographic areas in which competition is presumed to have materialized – confirms the absence of actual competition.  If users confronted actual competitive choices for ILEC switched and special access services, the ILECs would be lowering their prices rather than charging more in purportedly competitive markets, and ILEC earnings would be moving down toward competitive levels, not rising to astronomical heights.  But in the markets in which the FCC's pricing flexibility "triggers" have been satisfied, ILEC prices are higher than those in regulated "monopoly" areas, and ILEC profits (as reflected in realized rates of return) for both switched and special access services have risen to high double-digit levels.  Contrary to the FCC's expectations at the time it approved the CALLS settlement, competition has not continued to push switched access prices downward toward costs following elimination of X-factor reductions.  Thus, affirmative measures are required to get switched access rate reductions back on course, and to bring special access prices back down to reasonable levels.*

## ILEC rates of return on special access services exceed anything that would be expected from a competitive marketplace

When the FCC adopted its pricing flexibility rules, it expressed the expectation that where actual competition had not yet developed for special access service, potential competition would nonetheless constrain the ILECs' exercise of market power.[52]  Experience has shown otherwise.  Neither the existing

---

52. *Access Charge Reform*, CC Docket No. 96-262; *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1; *Interexchange Carrier Purchases of Switched Access Services Offered by Competitive Local Exchange Carriers*, CCB/CPD File No. 98-63; *Petition of U S West Communications, Inc. for Forbearance from Regulation as a Dominant Carrier in the Phoenix, Arizona MSA*, CC Docket No. 98-157, *Fifth Report and Order and Further Notice of Proposed Rulemaking*, FCC No. 99-206, 14 FCC Rcd 14221 (1999) ("Pricing Flexibility Order") at 14264, para. 80.

ECONOMICS AND TECHNOLOGY, INC.



**Figure 3.1:  Analysis of individual RBOC Special Access rates of return: 2003**

level of competition for special access services nor the threat of potential entry has constrained the ILECs' exercise of market power in their local exchange and exchange access markets.   Figure 3.1 provides the results of an earnings analysis for each of the RBOCs' special access services category for the year ended 2003, comparing those levels to the FCC's most recently authorized return level for interstate service of 11.25%.   The results demonstrate that the RBOCs are earning from two times (Verizon at 23.2%) to six times (Qwest and BellSouth at 68.1% and 69.1% respectively) the last-authorized return level.[53] These earnings averaged a jaw-dropping 43.7% for special access services across all of the RBOCs (i.e., close to four times the most recently authorized return level) and, as the data presented in Chapter 1 showed, those returns have been increasing since pricing flexibility was allowed.   While the FCC no longer employs an upper earnings bound as part of its regulatory mechanism, earnings in the 30% to 60% range are clearly excessive by any standard.

Moreover, evidence demonstrates that these earnings levels are not a short-term phenomenon resulting from a one-time change in circumstance.  Rather, they are the culmination of a long term trend of  increasing profit-taking  that has not been limited by competition as it would have been in a well-functioning market. Using the passage of the *Telecommunications Act of 1996* as a starting point (a time widely heralded as flinging open the monopoly gates to competitors) Figure 3.2 below illustrates the steadily increasing average earnings level in the special access category from that date to the present.

---

53.  Rates of Return calculated with data from:  FCC ARMIS Report 43-01, Annual Summary Report: Table I YE 1996-2003; FCC ARMIS Report 43-04, Access Report: Table I YE 1996-2003. ("*ARMIS ROR Data*") Available at http://www.fcc.gov/wcb/eafs/ (accessed April 6, 2004).



*Undisciplined Pricing and Limitless Earnings*

The average special access category earnings increased from 8.25% in 1996 to the whopping 43.7% at the end of 2003. The significance of this trend in the "average" earnings level is amplified by the fact that it is an "average" and is not simply reflective of a single company's superior performance.[54] Returns of this level simply could not be sustained over a multi-year period in a mature market (such as the market for local telecommunications service) if even a modest amount of *bona fide* competition were present.

The ILECs' primary response to evidence of the extraordinarily high level of profit on special access services has been to claim that the regulatory accounting data found in the Commission's ARMIS reports could not be credibly used for ratemaking purposes.[55] The ILEC criticism of earnings results based on ARMIS data must be dismissed in this instance for a number of reasons.

- *First*, the ARMIS financial results simply document the costing and accounting rules that have been implemented by the Commission over several decades. The ILECs themselves have had as large or larger a role in the development of these rules as any other party. If the rules and reporting requirements do not reflect reality, now is hardly the time to complain.

- *Second*, whether or not ARMIS data includes minor cost mis-allocations at the margins does not affect the overall integrity of *trends* in the data, *since those (arguable) mis-allocations do not change from period to period*. In other words, even if the absolute rate of return developed for the special access category using ARMIS data is off by some percentage, the trend in the data (in this case steadily *up*) should nevertheless be a reliable indicator of the BOCs' ability to increase prices to supracompetitive levels without fear of attracting competitive entry.

---

54. The earnings histories of the individual RBOCs, while tracking above and below the "average" are reflective of the same trend. In 1996, the individual RBOC special access earnings ranged between 4% (Verizon) and 16% (BellSouth), as noted above, by 2003 the individual RBOC earnings ranged between 23% (Verizon) and 69% (BellSouth). *See, ARMIS ROR Data.*

55. The ILECs' claims in this area can be found throughout the comment cycles in response to *AT&T's Special Access Petition* to re-regulate special access services (RM 10593) and in response to AT&T's Petition for Writ of Mandamus relative to that proceeding. *See, AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services,* RM Docket No. 10593, *Opposition of Qwest Communications,* filed December 2, 2002 at pp. 8-13; *Opposition of SBC Communications,* filed December 2, 2002 at pp. 19-22; *Comments of BellSouth,* filed December 2, 2002 at pp. 4-6; *Opposition of Verizon,* at pp. 21-23. In addition BellSouth and Qwest also suggested that the inclusion of DSL revenues in the Special Access Revenue category skewed results. Dr. Lee Selwyn, in his reply comments on behalf of AT&T calculated that adjusting for DSL revenues would only reduce overall return rates by a couple of percentage points. *See, AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services,* RM Docket No. 10593*, Reply Declaration of Lee L. Selwyn on behalf of AT&T Corp, filed with AT&T's Reply Comments, January 23, 2003,* at pp. 46-58.

ECONOMICS AND
TECHNOLOGY, INC.

*Undisciplined Pricing and Limitless Earnings*



**Figure 3.2.**  Average RBOC Special Access realized rates of return. 1996-2003.

- *Third*, the ILECs themselves rely on ARMIS and laud its value in other contexts.  While the ILECs reject the use of ARMIS results when these indicate *excessive* earnings, they raise the ARMIS flag to the rooftops when ARMIS results suggest an earnings deficiency or "below cost" pricing.[56]  The

---

56.  For example, in May 2003 in Federal District Court in Chicago, Illinois, just five months after having challenged the use of ARMIS data for evaluating the reasonableness of special access prices in FCC RM 10593, SBC relied specifically upon ARMIS results to support its contention that UNE rates were not covering their costs.  According to SBC's expert witness:

SBC Illinois' average revenue per loop (for UNE-L) and revenue per line (for UNE-P) per month is substantially below the costs that SBC Illinois recognizes on its books to provide those UNEs.  I used the FCC's financial accounting information as reported in its Automated Reporting Management Information System ("ARMIS") files to obtain the historical cost data specifically for SBC Illinois.  These data are reported to the FCC for purposes of tracking the interstate rate of return and are subject to a highly detailed set of reporting guidelines.

*See,* Affidavit of Debra J. Aron on behalf of SBC in United States District Court for the Northern District of Illinois, Eastern Division, Case No. 03-C3290, filed May 27, 2003.

Several months later, in December 2003  SBC was joined by USTA and other BOCs  in lauding ARMIS as the source for the "actual" costs of UNEs in the response to the FCC's *TELRIC NPRM.  See, e.g.*, *Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*,  WC Docket No.



*Undisciplined Pricing and Limitless Earnings*

ILECs' claims that ARMIS-based rates of return for special access are inflated by the misallocation of costs to other services (i.e., the Common Line category)[57] are belied by their defense of the accuracy of ARMIS cost allocations to the Common Line category (thus admitting that special access costs are not being misallocated to that category) in other proceedings and venues.[58] In other words, to explain away excessive profit levels for special access, the ILECs assert that in ARMIS, costs associated with special access are being mis-allocated to the Common Line category, but when the shoe is on the other foot, they staunchly defend the use of ARMIS Common Line data as the basis for UNE-Loop prices and claim that prices developed on this basis would include only costs actually attributable to switched access loops (and no others – not even from interstate special access). At least one of these two patently conflicting claims must be false. The Commission cannot ignore ARMIS earnings data on the basis of irreconcilable and patently self-serving claims that ARMIS is (1) reliable for determining the cost of a single disaggregated service element but (2) unreliable for calculating the aggregate (and excessive) rate of return for the entire special

---

03-173, *Comments of United States Telecom Association*, December 16, 2003, at p. 10; *Comments of the Verizon Telephone Companies*, at pp. 40, 46, 58, 94; *Opening Comments of SBC Communications, Exhibit A, "The Economics of UNE Pricing," prepared by Debra J. Aron, PhD and William Rogerson, PhD*, December 16, 2003, pp. 28-32.

Then, one month later, in January 2004, SBC and its sister RBOCs argued to the US Court of Appeals for the District of Columbia Circuit (in opposing AT&T's Petition for Writ of Mandamus) that "ARMIS data 'contain arbitrary allocations that are 'economically irrational.'" See, *In re AT&T Corp. et al.*, No. 03-1397 (D.C. Cir.), *Response of Intervenors in Opposition to AT&T's Petition for a Writ of Mandamus*, filed January 9, 2004, ("*03-1397 BOC Opposition*") at 13.

However, flip-flopping yet again, in testimony filed with the Illinois Commerce Commission as recently as March 5, 2004, SBC again defended the validity of ARMIS as the correct basis for benchmarking UNE costs. Its witness, Dr. Aron, stated,

> In the final analysis, ARMIS is no better or worse than any cost accounting system for a large, multiproduct firm. It is subject to strict reporting requirements and a consistent set of rules across carriers. Virtually all cost accounting systems will be subject to the criticism that they make allocations, and to the criticism that any full cost estimate (which, as I noted, includes TELRIC-based UNE prices as well) will reflect such allocations. However, the fact nevertheless remains that accounting systems are the basis for decision making in our economy, and that it is reasonable to look at accounting estimates of costs for benchmarking purposes such as this one.

*See,* Illinois Commerce Commission, Docket No. 02-0864 SBC Illinois Ex. 2.2 (Surrebuttal Testimony of Dr. Debra J. Aron) ("*Illinois - Aron Surrebuttal Testimony*") filed March 5, 2004, at p. 9.

57. In its Response to AT&T's Petition for Writ of Mandamus, ILECs (including SBC) claimed that the apparently high rates of return on special access arises because ARMIS rules require that certain special access-related costs be assigned elsewhere. See, *03-1397 BOC Opposition* at 14. In fact, in the interstate jurisdiction, the only other place where these costs *could be* allocated is to the Common Line category.

58. For example, in a recent UNE proceeding, SBC submitted testimony that claimed that ARMIS costs for the switched access loop are "fairly straightforward" and reliable indicators of the investment and associated expenses specifically associated with that category (and element)." In this context, SBC's witness stated, "... the costs that ARMIS associates with the loop are fairly straightforward and, except for the shared and common costs of the sort that affect TELRIC costs as well, these costs are reliable indicators of the investment and associated expenses specifically associated with that category (and element). The shared and common costs represent a portion of the costs associated with support assets (and expenses) such as land, buildings, trucks, tools, and personnel, a share of which are appropriately assigned to elements in ARMIS. These costs are also allocated to elements in a TELRIC analysis." *See, Illinois - Aron Surrebuttal Testimony*, at p. 9.

ECONOMICS AND
TECHNOLOGY, INC.

*Undisciplined Pricing and Limitless Earnings*

access category.  Moreover, as illustrated in Figure 3.2 above, average earnings for the totality of FCC regulated interstate access services are more than 50% above the last authorized rate of return. Table 3.1 illustrates total interstate earnings for each RBOC, ranging from a low of 12.4% (for Verizon) to a high of 23.6% (for Qwest).

| **Table 3.1** | | | | |
|---|---|---|---|---|
| **RBOC Interstate Rates of Return** | | | | |
| | **BellSouth** | **Qwest** | **SBC** | **Verizon** | **ALL RBOCs** |
| Interstate ROR | 19.3% | 23.6% | 19.8% | 12.4% | 17.1% |
| Source:  Federal Communications Commission, ARMIS Report 43-04, Access Report: Table I, YE 2003.  Available at http://www.fcc.gov/wcb/eafs/ (accessed April 7, 2004). | | | | | |

### *Source of the huge special access profit levels*

Returning to the issue at hand, there are several possible ways in which earnings for a specific service category, such as special access, could have grown to such dizzying heights under the price cap regime that prevails in the federal jurisdiction.  Three possible explanations are explored below.

•  *Explanation #1:  Prices for special access services could have been held constant or increased while the underlying costs of providing these services have decreased.*  This is by far the most likely explanation for the ILECs' overearning on special access.  As a result of special access "pricing flexibility" adopted by the Commission in 1999,[59]  many special access services are no longer subject to any form of price cap or to the so-called "*CALLS*" settlement.  As was  initially documented by Ad Hoc in comments filed more than two years ago, and is discussed more fully below, in many instances the prices in the non-price caps areas (where Phase II non-price flexibility has been granted) are higher than the prices regulated under price caps.[60]  Such pricing behavior has been almost uniformly adopted by price-cap ILECs across the US. In almost every situation in which pricing flexibility has been allowed, the ILECs have either raised their interstate special access rates or, alternatively, have maintained them at the same level while prices for those other services still subject to price caps *have gone down.*

•  *Explanation #2:  Special access services could be exhibiting rates of productivity growth far in excess of that characteristic of all interstate services as a group.*  This explanation, while not

---

59.  *Pricing Flexibility Order*, 14 FCC Rcd 14221 (1999).

60.  *Performance Measurements and Standards for Interstate Special Access,* CC Docket No. 01-321, *Comments of the Ad Hoc Telecommunications Users Committee,* filed January 22, 2002 ("*CC 01-321 Ad Hoc Comments*").



ECONOMICS AND
TECHNOLOGY, INC.

*Undisciplined Pricing and Limitless Earnings*

impossible, is improbable, as there is no *a priori* basis to believe or to expect that productivity growth rates for interstate special access have exceeded the average for all interstate services.[61] However, even if exceptional productivity were initially the basis for such high returns, the fact that prices did not later fall would clearly indicate a lack of competitive pressure. Moreover, if one assumes that the production function for special access services has undergone a radical change and has begun exhibiting extreme productivity growth, that result by itself argues for reviewing the existing price cap system and updating the productivity factor adjustments included in the FCC's price cap plan.

• *Explanation #3: The costs of special access services could have been misallocated to other BOC services.* As discussed above, the ILECs' (inconsistently) adopt this explanation. We find this justification uncompelling. In fact, it appears that if any misallocation is occurring, costs from other ILEC services are being improperly assigned *to* special access. Table 3.2 below shows that, for 2003, the net investment allocated to the special access category for the four RBOCs was roughly one third of their total interstate net investment and approximately 40% of their combined Common Line and Special Access investment categories. But there are fewer than 4-million special access loops and associated interoffice transport facilities, compared to more than 158-million Common Line local service loops in the RBOCs' operating territories.[62] Thus, the allocated investment is completely disproportionate to the number of special access loops, as a percentage of total loops in service.[63] The wide discrepancy between the number of loops used for special access and the amount of interstate investment assigned to those loops certainly raises suspicions that costs are being *overallocated* to the special access category. This suggests that the average 43.7% rate of return shown by ARMIS for the combined RBOC interstate special access services would represent the *lower bound* of the actual returns being reaped from these services. [64]

---

61. In many cases, special access services are still being provisioned on a case-by-case basis, with each circuit requiring circuit-specific engineering and manual cross-connections.

62. While there is no definitive count of Special Access lines, various sources put the count at between 3.2 and 4.5 million lines. A Bellsouth and SBC joint proposal for Assessment and Collection procedures suggests 3.2 million Special Access lines, while data from the FCC's Statistics of Communications Common Carriers puts the value at about 4.5 million. Comments of SBC and Bellsouth, CC Docket Nos. 96-45, 98-171, 90-571, 92-237, 99-200, 96-116, 98-170, 02-33, 95-20, 98-10 and NSD File No. L-00-72, October 10, 2002; Industry Analysis and Technology Division, Federal Communications Commission, *Statistics of Communications Common Carriers 2002/2003*, March 2, 2004 ("*SOCC*") at Table 2.6.

63. This is true even after accounting for the fact that only 25% of Common Line loop investment is allocated to the interstate jurisdiction.

64. However, even if the rate of return for special access were merely equal to the 17% level earned by the RBOCs on their total interstate services, it would be too high.



*Undisciplined Pricing and Limitless Earnings*



**Figure 3.3. Comparison of Special Access lines shares vs. Special Access net investment shares**

| Table 3.2 | | | | | |
|---|---|---|---|---|---|
| **Analysis of Special Access Net Investments in Relation to Net Investment Levels for All Interstate Access Services -- 2003** | | | | | |
| | **BellSouth** | **Qwest** | **SBC** | **Verizon** | **ALL RBOCs** |
| SPAC Net Investment | $ 1,317,121 | $ 1,036,069 | $ 2,580,419 | $ 5,265,290 | $ 10,198,899 |
| Common Line Net Investment | $ 3,366,747 | $ 2,174,913 | $ 4,094,600 | $ 6,113,136 | $ 15,749,396 |
| Total Interstate Net Investment | $ 5,435,064 | $ 3,911,137 | $ 8,960,543 | $ 13,454,462 | $ 31,761,206 |
| | | | | | |
| SPAC as % of Total Interstate Investment | 24.2% | 26.5% | 28.8% | 39.1% | 32.1% |
| | | | | | |
| SPAC as % of SPAC+Common Line Investment | 28.1% | 32.3% | 38.7% | 46.3% | 39.3% |
| Source: Federal Communications Commission, ARMIS Report 43-04, Access Report: Table I, YE 2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed April 7, 2004). | | | | | |



*Undisciplined Pricing and Limitless Earnings*

While ARMIS may not be a perfect tool for evaluating the level of special access prices at any individual point in time, it is, in fact, the only tool available. Ideally, access charges (switched and special) – like UNE rates[65] – should be based upon forward-looking economic cost – i.e., TELRIC. This would make embedded ARMIS costs entirely irrelevant. Recommendations to that effect have been made by Ad Hoc[66] and others, and the Commission has indicated its intention to address this matter as part of its forthcoming comprehensive review of all intercarrier compensation issues.[67]

For the present, however, access services are *not* required to be, and are not being, set on the basis of TELRIC or any other forward-looking economic cost standard. Interstate access charges are subject to a price cap form of regulation as modified by the *CALLS* settlement[68] and (in the case of special access services) by the *Special Access Pricing Flexibility Order*.[69] Rates for these services are rooted in *embedded costs* as they existed at the time that the current ILEC price cap regime was put into operation (i.e., 1991).[70] Subsequent modifications to the annual price adjustment mechanism (the so-called "X" factor) were based, in part, upon realized productivity experience as measured *with respect to embedded costs,* as was the timing of revenue changes arising from the CALLS settlement. Whatever its infirmities may be, the reasonableness (or lack thereof) of special access charges needs to be evaluated *with respect to the embedded costs assigned to the special access category*.

## Persistent excessive RBOC pricing of Special Access Services in areas where Phase II Pricing Flexibility has been granted demonstrates that the level of competition in those areas is not sufficient to constrain RBOC monopoly pricing practices

Special access services supposedly represent the most competitive segment of last mile connections that have historically been provided on a monopoly basis by the ILECs. Put succinctly, the theory behind the FCC's pricing flexibility rules for special access adopted in mid-1999 was that competition, be it actual or potential, would be sufficient to constrain ILEC pricing behavior once specific

---

65. The historic distinction between "access services" and "UNEs" is an anachronism that is no longer valid as a policy matter, now that the RBOCs may themselves enter into and compete in the interLATA switched and private line services markets.

66. *See, for example,* the Ad Hoc Committee's recent reply comments in WC Docket No. 03-173. *Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*, WC Docket No. 03-173, *Reply Comments of Ad Hoc Telecommunications Users Committee*, filed January 30, 2004.

67. *Intercarrier Compensation Proposal Will Be Unveiled Soon, FCC Official Says*, TR Daily, May 19, 2004.

68. *CALLS Order* 15 FCC Rcd 12962.

69. *Pricing Flexibility Order* 14 FCC Rcd 14221 .

70. *LEC Price Cap Order*, 5 FCC Rcd 6786 (1990).



ECONOMICS AND
TECHNOLOGY, INC.

competitive metrics had been met.[71]  Actual experience demonstrates that this is not the case.  As has been documented by Ad Hoc in several different ongoing proceedings,[72] a review of ILEC tariffs indicates that the ILECs have increased, not decreased their prices for high capacity services in those areas where they have been granted Phase II pricing flexibility.  In many cases, almost unbelievably, those prices are now higher than the prices for areas still regulated under price caps.

In the *Fifth Report and Order and FNPRM* in its *Access Reform* proceeding, the FCC granted pricing flexibility to the ILECs for special access services in Metropolitan Statistical Areas (MSAs) in which the ILEC could demonstrate the existence of certain competitive conditions.[73]  In those MSAs in which Phase II pricing flexibility is granted (the category for those MSAs meeting the highest of the two competitive showings), the ILEC is allowed to offer contract- based pricing for special access services in addition to maintaining generally available pricing for those special access customers located in the MSA that have not negotiated special contract agreements.  In Phase II MSAs, the generally available pricing is not regulated under the Commission's Price Cap rules, nor are the prices constrained by the Part 69 access pricing structures or levels.[74]

When it removed the generally available pricing for special access from under Price Caps and Part 69 rules, the Commission expressed its expectation that market forces would "govern" the rates for these access services.[75]  However, comparing the prices for the generally available special access services in MSAs where Phase II Pricing Flexibility has been granted with the prices still set in accordance with the Commission's price cap and Part 69 rules – for the same services, from the same companies, and in the same states and density zones – reveals a pattern of *higher* prices being charged in the Phase II MSAs (presumably the very MSAs that have demonstrated the greatest levels of competitive activity).  Notably, *our review did not reveal any instances of lower prices being charged for generally available services in Phase II MSAs.*

Analysis of ILEC pricing conduct in markets where Phase II Pricing Flexibility has been granted demonstrates that the level of competition, even in the most competitive of those markets, has not constrained ILEC pricing in a way that emulates what would be expected in a truly competitive market.

---

71.  *Pricing Flexibility Order* at 14 FCC Rcd 14264, para. 80.

72.  *See, CC 01-321 Ad Hoc Comments*; *See also, AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services,* RM Docket No. 10593, *WorldCom Comments*, filed December 2, 2002 p. 1 - citing Qwest Corporation Transmittal 145 (filed October 31, .2002), increasing DS1 rates virtually across the board in pricing flexibility MSA, Density Zone 1;  and *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338, *Reply Comments of Sprint*,  filed July 17, 2002 ("*01-338 Reply Comments of Sprint*") at pp. 24-25 (discussed in more detail below).

73.  *Pricing Flexibility Order* 14 FCC Rcd 14221.

74.  *Id.*, at 14 FCC Rcd 14301, para. 153-154.

75.  *Id.,* at 14 FCC Rcd 14301, para. 155.



ECONOMICS AND
TECHNOLOGY, INC.

*Undisciplined Pricing and Limitless Earnings*

In fully competitive markets, competition can be relied upon to produce reasonable and efficient pricing and service provisioning.  In fully competitive markets, firms could not sustain profit levels (rates of return) in the 24% to 69% range.  In the absence of competition, regulation must be relied upon to set *and to enforce* pricing standards that can protect customers that do not have competitive options for purchasing services.

Unfortunately, the net effect of the FCC's *Pricing Flexibility Order* has been an *increase in prices and an increase in ILEC earnings*.  Clearly, additional entry has not continued to occur at a level sufficient to constrain pricing, and the ILECs have been able to exercise their ability to raise prices to monopoly levels.  For example, in Manhattan (the largest and arguably the most competitive telephone market in the country), Verizon's prices for DS1 special access have increased by almost ten percent since Phase II pricing flexibility was granted.[76]  And this situation is not unique to New York City: price increases in the range of ten percent have occurred in other areas subject to Phase II pricing flexibility such as Baltimore, Philadelphia, Springfield (MA), and Washington D.C.[77]  In other words, the current regulatory scheme has permitted carriers to charge higher prices to customers in ostensibly "competitive" markets and lower prices to customers in markets without evidence of competition.  This is precisely opposite to the outcome that had been predicted by the FCC, and the opposite of what one would anticipate if price-constraining competition actually existed.

AT&T submitted similar evidence in its petition for the re-regulation of special access services, and not one of the ILECs disputed that evidence.  The only ILEC to respond at all (Verizon) offered an "explanation" that was comprised entirely of vague and unsubstantiated justifications for why it had increased  rates in "competitive areas" and that did not even attempt to address many of the types of price changes that have been observed.[78]

Sprint submitted similar evidence in its filings in the FCC's *Triennial Review* proceeding and in the RM 10593.

> Sprint's own experience in price flex markets suggests that RBOCs have, and exploit, market power. In those MSAs where RBOCs received pricing flexibility relief, RBOCs have restructured their rates and fees. Rather than lower rates, the effect has been to increase fees that collocating competitors must pay.  Sprint's MAN network is being built in several markets in order to minimize Sprint's transport expense paid to the RBOCs.  It includes collocating at key central offices and the self-provisioning of transport between those end offices and Sprint's POP. Sprint then purchases connections from these central offices to the customer premises.  Soon after learning of Sprint's competitive strategy for its MAN network, Verizon doubled its administrative fee per DS0 equivalent in specific locations where it expected to lose transport revenue to its competitor. ... If the market were truly competitive, Verizon would not have had the ability to unilaterally increase prices for fear of losing out to the competition.

---

76.  *CC 01-321 Ad Hoc Comments*, at p. 6.

77.  *Id.*

78.  *Opposition of Verizon*, at fn. 58.

ECONOMICS AND
TECHNOLOGY, INC.

Additionally, Sprint compared the RBOC special access rates before and after price flexibility was granted and determined that DS1 special access rates increased an average of 9.8% and DS3 rates increased an average of 5.6%.[79]

But firms in truly competitive markets would not be able to raise prices and collect supra-competitive profits as the ILECs have done for special access prices without attracting competitors who would be able to take away customers by charging far lower (but nonetheless compensatory) prices. Those ILECs that increased their special access prices above the fully compensatory prices set under the FCC's price caps regime clearly were not constrained by the threat of existing or future competitors eroding their market share.

### Competition has not served to push switched access prices down since adoption of the FCC's *CALLS* plan, and the average switched access price per minute is today in some cases more than 30% above the $0.0055 *CALLS* ATS Target rate

In its efforts to reduce switched access charges to the economic levels that would be expected from a competitive market, the Commission has repeatedly chosen to rely upon the *market* to achieve those ends rather than upon any rate prescription. Review of RBOC average switched access rate levels in effect today reveals that *market conditions* have not driven switched access charges down. Instead, the average revenue per minute received by those carriers that have been liberated from the application of X-factor-driven annual reductions to their switched access charges per the terms of the *CALLS* agreement have *increased* – not decreased. Table 3 details the date when the ATS "target rate" of $0.0055 per minute was reached for each of the RBOCs, and also identifies the RBOCs' most recent forecast of the average traffic sensitive charge per minute based upon their 2004 annual access tariff filings.

In its *CALLS* order, the Commission expressed its conviction that switched access charges would continue downward below the nominal target prices as a result of competitive pressures. Addressing the concerns raised by *CALLS* opponents that the access rates that would be in effect in the latter years of the *CALLS* plan would result in access charges approximately $1-billion higher than they would be absent *CALLS*, the Commission responded as follows:

> [W]e believe that increased competition will serve to constrain access rates in the later years of the CALLS Proposal as X-factor reductions are phased out. We believe that market forces, instead of regulatory prescription, should be used to constrain prices whenever possible. As competitors utilizing a range of technologies, including cable, cellular, MMDS and LMDS, continue to enter the local exchange market, we expect that rates will continue to decrease. We also believe that adoption of the

---

79. *01-338 Reply Comments of Sprint,* at pp. 24-25.



ECONOMICS AND
TECHNOLOGY, INC.

> CALLS Proposal will encourage competition by removing implicit subsidies in access charges and recovering costs from those services that cause them. Therefore, the significant up-front reductions coupled with increased competition ultimately should result in access charges that are comparable to those that would be achieved under our current price cap system over the five-year term of the CALLS Proposal. Furthermore, after the five-year term, we can re-examine the issue to determine whether competition has emerged to constrain rates effectively.[footnotes omitted][80]

The desire to rely upon competition to discipline switched access rates did not originate with *CALLS*. Some four years earlier, in its 1996 *Access Reform Order*, the FCC contemplated setting access prices at forward looking costs but declined do so, choosing instead to rely upon the market:

> Regulation cannot replicate the complex and dynamic ways in which competition will affect the prices, service offerings, and investment decisions of both incumbent LECs and their competitors. A market-based approach to rate regulation should produce, for consumers of telecommunications services, a better combination of prices, choices, and innovations than can be achieved through rate prescription.[81]

Without a doubt, pricing based upon competitive market conditions is preferable to pricing produced through rate regulation. Just as surely, however, pricing produced through rate regulation is preferable to unregulated pricing under monopoly market conditions. Review of the prices shown in Table 3.3 reveals that, contrary to the FCC's expectations, switched access charges have not trended downward following achievement of the ATS targets from the *CALLS* plan. Rather, contrary to the Commission's expectations, the average price for a minute of interstate switched access has actually increased. Thus, for the first time since the FCC began its major switched access charge reduction plan in 1984, switched access charges are on the rise.

The pricing conduct being exhibited by the RBOCs demonstrates that there is no effective competition – actual or potential – for switched access services. Accordingly, it is *essential* that the FCC retarget rates and apply X-factor reductions until such time as prices are equal to the forward looking cost levels that would result from competitive market conditions.

---

80. *CALLS Order* at 15 FCC Rcd 13031, para. 166.

81. *Access Charge Reform,* CC Docket No. 96-262; *Price Cap Performance Review for Local Exchange Carriers,* CC Docket No. 94-1; *Transport Rate Structure,* CC Docket No. 91-213; *Pricing End User Common Line Charges*, CC Docket No. 95-72, *First Report and Order*, FCC No. 97-158, 12 FCC Rcd 15982, at 16107, para. 289.

ECONOMICS AND
TECHNOLOGY, INC.

*Undisciplined Pricing and Limitless Earnings*

| **Table 3.3**<br><br>**Following Elimination of X-Factor Driven Reductions, the "Average Traffic Sensitive" Price per Access Minute has Increased for Most CALLS Participants** | | | | |
|---|---|---|---|---|
| | | *Date when average ATS Target of $0.0055 met* | *Proposed ATS Rates as of July, 2003* | *Change from $0.0055 Target* |
| BellSouth | All | 8/1/00 | $0.006403 | 16% |
| Qwest | All | 7/27/01 | $0.005269 | -4% |
| SBC | Ameritech | 6/18/01 | $0.007042 | 28% |
| SBC | Pacific Bell | 5/7/01 | $0.006781 | 23% |
| SBC | SWBT | 6/17/02 | $0.006328 | 15% |
| Verizon | BATL | 7/1/00 | $0.007254 | 32% |
| Verizon | NYNEX | 7/1/02 | $0.006762 | 23% |
| Source:  Most recent RBOC TRP Filings accompanying FCC-required annual access tariff filings. | | | | |


ECONOMICS AND
TECHNOLOGY, INC.

# Epilogue | A SELF-EXECUTING WIN-WIN-WIN SOLUTION

## Taking the Commission out of the role of deciding how much competition is "enough"

Throughout this paper we have presented what we believe is compelling evidence of the lack of competitive alternatives available to US enterprise customers for the "last-mile" telecommunications services they require in order to conduct business. To many this reality may come as something of a surprise: The largest corporations that annually spend tens and even hundreds of millions of dollars on local and long distance, voice and data telecom services have long been *assumed* to be the primary beneficiaries of competition in all telecom sectors. Surprising as it may be, this paper documents that in most locations enterprise customers have no options except to use services and facilities that are available exclusively from the incumbent local exchange carriers. Given this condition, the ILECs' persistently impose higher prices for last mile services in precisely those geographic and product markets that have been declared prematurely (by regulators) to be "competitive." As we have shown, ILECs confront so little competition in the special access market that they are able in some cases to earn annual returns in excess of 50% on each dollar of special access investment! However, despite this overwhelming evidence, the ILECs will undoubtedly dispute these findings.

Importantly, however, the self-executing regulatory mechanism being proposed here by the Ad Hoc Committee does not require that the market reality that we have described in this paper be exhaustively validated, because the proposed regulatory paradigm is designed to operate successfully *and automatically* whether or not competition is present in any particular product or geographic market. ILECs would be afforded full and immediate *downward* pricing flexibility, enabling them rapidly to respond to whatever actual competitive challenges they may confront, but would no longer be able to overprice services that remain noncompetitive or to generate excessive or supranormal profits in markets where the ILECs' monopoly persists.

The Commission needs to extricate itself from the ongoing role of being asked to make bureaucratic and often arbitrary determinations as to when competition is present and when it is not. Indeed, industry

41



*A Self-Executing Win-Win-Win Solution*

dynamics cannot withstand the protracted regulatory processes that such factual determinations ultimately require.  Most importantly, there is no valid basis for the ILECs to object to Ad Hoc's self-executing proposal; indeed, any such objection – which would operate to preserve the ILECs' ability to maintain the existing excessive prices and supranormal profits from services for which no actual competitive alternatives are present – would serve only to corroborate the realities that the Ad Hoc Committee members have experienced.   The self-executing plan takes the Commission out of an ongoing fact-finding role, and assures a regulatory and market outcome  sufficiently robust to accommodate whatever level of competition may ultimately arise.  Its adoption will also assure that the US economy will no longer be forced to carry the unfair and uneconomic burden of grossly excessive rates for special access services, services that are essential for the efficient conduct of modern American enterprises.

42

