**Attachment 13**

**Declaration of Susan M. Gately on behalf of the
Ad Hoc Telecommunications Users Committee
filed June 20, 2006 in FCC WC Docket No. 06-74
(*AT&T/BellSouth Merger Application*)
updating *Competition in Access Markets***



In the Matter of

AT&T Inc. and BellSouth Corporation
Applications for Approval of
Transfer Of Control.

**WC Docket No. 06-74**

Reply Declaration

of

**SUSAN M. GATELY**

on behalf of

Ad Hoc Telecommunications Users Committee

June 20, 2006

# REPLY DECLARATION OF SUSAN M. GATELY

# EXECUTIVE SUMMARY

In August, 2004 the Ad Hoc Telecommunications Users Committee ("Ad Hoc") released *Competition in Access Markets: Reality or Illusion - A Proposal for Regulating Uncertain Markets* (herein after "*Reality or Illusion*"). The paper was prepared under my direction. *Reality or Illusion* debunked the popular illusion of readily available competitive alternatives for local access facilities, particularly the kinds of dedicated access facilities (*aka* special access) that large enterprise customers utilize. In conjunction with its review of the issues raised by the proposed merger of AT&T Inc. and BellSouth, the Ad Hoc Committee asked that I review and update the material in that paper with any new data that have become available since that time. This declaration contains the results of that effort. Refreshing the data with year-end 2005 results, and including RBOC data submissions that were made after the original work was complete only reinforced the conclusions drawn in the initial analysis. The new data shows that RBOC rates of return on special access services are higher than ever (67.7% average across the four RBOCs), that intermodal competitive offerings still do not address the needs of enterprise customers, and that at the vast majority of commercial locations nationwide, enterprise customers have no where to turn but their local RBOC for special access connections.

i



ECONOMICS AND
TECHNOLOGY, INC.

TABLE OF CONTENTS

EXECUTIVE SUMMARY                                                                    i

INTRODUCTION                                                                         1

UPDATED AND SUPPLEMENTED DATA                                                        3

    RBOC earnings on special access services have continued to climb.            6

    RBOC special access prices in areas that have been granted pricing flexibility continue to be
    higher than in areas regulated under price caps                               14

    Competitive metrics continue to demonstrate that competitive alternatives for local access
    connections are not available to enterprise customers.                        15


VERIFICATION                                                                         22

LIST OF UPDATED TABLES AND FIGURES

*Updated* Table 1.1 "2005 Total RBOC Overcharges"                                    4

*Updated* Figure 3.1  "Analysis of individual RBOC Special Access
    Rates of Return: 2005"                                                         6

*Updated* Figure 3.2  "Average RBOC Special Access realized
    rates of return. 1996 - 2005"                                                  7

*Updated* Table 3.1 "RBOC Interstate Rates of Return"                                10

*Updated*  Figure 3.3 "Comparison of Special Access line shares
    vs. Special Access net investment shares"                                      11

*Updated*  Table 3.2 "Analysis of Special Access Net Investments in Relation
    to Net Investment Levels for All Interstate Access Services – 2005"            12

*Updated* Figure 2.4 "Mass market cable telephony lines account for
    most of the growth in CLEC-owned lines"                                        21



*Reply Declaration of Susan M. Gately – Table of Contents*

LIST OF SUPPLEMENTAL TABLES AND FIGURES

*New* Table 3.4:  Historic AT&T and BellSouth Special Access Rates of Return          10

*New* Figure 3.4 As costs trend downward faster than prices, a widening gap
    can be seen between the average revenue per special access VGE
    and the average operating expense per VGE.  - AT&T Inc.          13

*New* Figure 3.5 As costs trend downward faster than prices, a widening gap
    can be seen between the average revenue per special access VGE
    and the average operating expense per VGE.  -  Bell South          14

*New* Figure 3.6 "The Price for a 10-mile DS1 Special Access Service Channel
    is Higher in Areas Where SBC Has Been Granted Pricing Flexibility
    Than in Areas in Which SBC Pricing Is Still Subject to Price Caps.          15

*New* Figure 2.5 "Locations of SBC Special Access services being used by
    CLECs to provide local service to enterprise customers in the
    San Francisco Metropolitan Area *map supplied by SBC*"          18

*New* Figure 2.6 Locations of SBC Special Access services being used by
    CLECs to provide local service to enterprise customers in the
    Dallas  Metropolitan Area *map supplied by SBC*"          19

*New* Figure 2.7 Locations of SBC Special Access services being used by
    CLECs to provide local service to enterprise customers in the
    Oakland Metropolitan Area *map supplied by SBC*"          20

**Attachments**

1    Statement of Qualifications



**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of<br><br>AT&T Inc. and BellSouth Corporation<br>Applications for Approval of<br>Transfer Of Control. | **WC Docket No. 06-74** |

REPLY DECLARATION OF SUSAN M. GATELY

## INTRODUCTION

3    Susan M. Gately, of lawful age, declares and says as follows:

5    1.  My name is Susan M. Gately; I am Senior Vice President of Economics and Technology,

6    Inc. ("ETI"), Two Center Plaza, Suite 400, Boston, Massachusetts 02108.  ETI is a research and

7    consulting firm specializing in telecommunications and public utility regulation and public

8    policy.  I have participated in numerous proceedings before the Federal Communications

9    Commission ("FCC" or "Commission") dating back to 1981 and have appeared as an expert

10   witness in state proceedings before state public utility commissions.  My Statement of

11   Qualifications is annexed hereto as Attachment 1 and is made a part hereof.



Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 2 of 22

1       2.  I have been asked by the Ad Hoc Telecommunications Users Committee ("Ad Hoc") to

2   review and update data contained in a White Paper that was originally prepared under my

3   direction for Ad Hoc in August, 2004.  That paper, *Competition in Access Markets: Reality or*

4   *Illusion - A Proposal for Regulating Uncertain Markets* (hereinafter "*Reality or Illusion*")

5   debunked the popular illusion of readily available competitive alternatives  for local access

6   facilities, particularly the kinds of dedicated access facilities (*aka* special access) that large

7   enterprise customers utilize.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 3 of 22

1                            UPDATED AND SUPPLEMENTED DATA

2

3        3.  The Ad Hoc Committee's stated goal  in having Economics and Technology, Inc.

4   undertake preparation of the *Reality or Illusion* paper was to cause an examination of the current

5   state of the access services market and the formulation of a plan for a regulatory paradigm

6   capable of affording incumbent local carriers the flexibility they require to meet actual

7   competitive challenges where they exist, while at the same time protecting customers against

8   excessive monopoly prices and practices where the ILEC access services monopoly remains

9   intact.[1]  The paper's relevance in the context of this particular proceeding relates to the

10  marketplace conditions uncovered and documented in that paper.  Since the completion of the

11  original paper new data points have become available allowing me to update many of the

12  analyses with data current through year-end 2005.  As described below, in all cases, the newest

13  data reinforces and adds to the strength of the arguments presented in the initial analysis.

14

15       4.  The August 2004 Ad Hoc paper found that premature deregulation of special access

16  services in advance of the development of a level of competition sufficient to discipline RBOC

17  pricing activities had resulted in a situation such that special access services are today priced

18  significantly in excess of cost.  In other words, the *potential* that competitors might deploy

19  services to enterprise customers was not sufficient to constrain RBOC behavior.  In fact, based

20  upon year-end 2003 data, we were able to quantify that every day that the FCC allowed to pass

-----

[1] *Competition in Access Markets:  Reality or Illusion.  A Proposal for Regulating Uncertain Markets*, Economics and Technology, Inc. August, 2004 at ii.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 4 of 22

1  before correcting the regulatory deficiency that allowed pricing flexibility for special access

2  services cost business and government users more than $15-million.[2]

3

4     5.  Table 1.1 of *Reality or Illusion* documented that based upon year-end 2003 data,

5  excessive special access charges were resulting in overcharges equal to $5.5-billion in 2003,

6  translating into the $15-million per day overcharge estimate discussed above.  Expressed in

7  terms of total interstate access revenues, the overcharges were somewhat less extreme, $3-billion

8  in 2003 translating into $8.3-million per day in overcharges.

9

10    6.  *Updated* Table 1.1,. below, documents that the overcharges during 2005 were even

11  more outrageous.  Special access rates during calendar year 2005 generated some $7.8-billion in

| | | *Updated* Table 1.1 | | | |
|---|---|---|---|---|---|
| | | **2005 Total RBOC Overcharges** | | | |
| | | Calculation | | Total Interstate | Special Access |
| 1 | Average Net Investment | | | $ 26,690,691 | $ 8,342,145 |
| 2 | Net Return | | | $ 6,238,849 | $ 5,652,961 |
| 3 | ROR | Line 2 / Line 1 | | 23.37% | 67.76% |
| 4 | Approved ROR | 11.25% | | 11.25% | 11.25% |
| 5 | Tax Rate | 39.25% | | 39.25% | 39.25% |
| 6 | Overearnings | (Line 3 - Line 4) * Line 1 | | $ 3,236,146 | $ 4,714,470 |
| 7 | Overcharging | Line 6 / (1-Line 5) | | $ 5,326,990 | $ 7,760,444 |
| 8 | Daily Overcharges | Line 7 / 365 | | $ 14,594 | $ 21,261 |

Sources:  Federal Communications Commission, ARMIS Report 43-04, Access Report: Table I
YE 2005. Available at http://www.fcc.gov/wcb/eafs/ (accessed April 25, 2006).
39.25% is the composite tax rate currently used in the FCC's HCPM/HAI Synthesis
Cost Proxy Model. http://www.fcc.gov/wcb/tapd/hcpm/welcome.html

---

[2]*Id.*, at iii and 7 - 8.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 5 of 22

1   excessive special access revenues, $21.3-million *per day!*   This means that the amount by which

2   corporate users of special access services were being *overcharged* in 2005 *increased* by

3   approximately 42% over the already excessive 2003 levels.

4

5       7.  Over the combined three year period of 2003, 2004 and 2005 the RBOCs overcharged

6   purchasers of special access service almost $20-billion.   As detailed here and in an earlier

7   update to the whitepaper that was filed in last years AT&T / SBC merger – the magnitude of the

8   overcharge has increased each year – $5.5-billion in 2003, $6.4-billion in 2004,[3] and $7.7-billion

9   in 2005 ($19.6-billion total).  Unless the Commission takes action to correct the problem soon,

10  there is every reason to expect the 2006 overcharges to exceed the 2005 level – perhaps reaching

11  $8.5-billion to $9-billion for this year.

12

13      8.  In a nutshell, using evidence provided by both *RBOC*s and the largest CLEC and CAP

14  *competitors* that do exist, ETI's original research revealed that competitive alternatives simply

15  do not exist at most commercial locations in the United States.   Secondarily, RBOC pricing

16  behavior in the special access market corroborates that finding.  The RBOCs have been earning

17  excessive, and continually growing, rates of return on special access services, and *prices* for

18  special access services in those areas where they have been granted the pricing flexibility to

19  respond to competition have been *increasing*, not decreasing.

20

---

[3]See page 4 of my Declaration filed in support of Ad Hoc Reply Comments in CC Docket
05-65 on May 10, 2005.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 6 of 22

1    **RBOC earnings on special access services have continued to climb**.

2

3        9.  Chapter 3 of the white paper, entitled *Undisciplined Pricing and Limitless Earnings in*

4    *the Face of Only Putative Competition,* documented that as of the end of 2003 the average rate of

5    return for RBOC special access services averaged a jaw-dropping 43.7%.[4]   The results

6    demonstrated that the individual RBOCs were earning multiples of the last FCC authorized rate

7    of return 11.25%, with rates ranging from two times (Verizon at 23.2%) to approximately six

8    times (SBC, Qwest and BellSouth at 63.2%, 68.1% and 69.1% respectively) that 11.25% rate.[5]

9

10       10.  The most recently released ARMIS data for year end 2005 shows that the earnings

11   levels on special access service for the most recently ended year are even greater than the jaw-

12   dropping 2003 levels.  As of year end 2005, the rates of return on the special access category for

13   the RBOCs was as follows: Verizon - 41.6%, AT&T - 91.7%, Qwest - 109.4% and BellSouth -

14   98.3%. The average across all four RBOCs was an awe-inspiring 67.8%.

15

16       11.  Figure 3.1 of *Reality or Illusion* contained a graphic representation of RBOC special

17   access rates of return for 2003.[6]  *Updated* Figure 3.1 on the previous page contains that same

18   representation using 2005 data, demonstrating that the passage of two years has only exacerbated

19   the problem.

_____

[4]*Id.,* at iv - vi, 28 and 33.

[5]*Id.,* at v -vi, 3 and 28.

[6]*Id.*, at 28.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 7 of 22



***Updated* Figure 3.1:  Analysis of individual RBOC special access rates for return: 2005**

1      12.  Figure 3.2 of *Reality or Illusion* contained a graphic representation of the steady

2   increase in  RBOC special access rates of return from the time of the passage of the Telecom Act

3   in 1996 to the end of  2003 -- illustrating in particular the excess special access profits generated

4   during that time frame.[7]  *Updated* Figure 3.2 below adds 2004 and 2005 data to that analysis,

5   revealing that the average return level across the RBOCs has continued to climb.

6

---

[7]*Id.*, at 30.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 8 of 22



***Updated*** Figure 3.2:  Average RBOC Special Access realized rates of return.  1996 - 2005.

1    13.  Specifically relevant to the AT&T / Bellsouth merger are these companies' historical

2    special access earnings levels. *New* Table 3.4, below, illustrates the steady climb in AT&T and

3    BellSouth's special access earnings levels, from 12% and 16% in 1996 the year the Telecom Act

4    was passed, to the 91% and 98% in 2005 -- a level more than 6 times the 1996 level.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 9 of 22

|  | AT&T Inc. | BellSouth |
|---|---|---|
| 1996 | 12.6% | 16.2% |
| 1997 | 16.0% | 17.4% |
| 1998 | 24.5% | 31.3% |
| 1999 | 39.6% | 32.4% |
| 2000 | 41.4% | 36.8% |
| 2001 | 61.3% | 49.3% |
| 2002 | 51.3% | 56.6% |
| 2003 | 63.2% | 69.1% |
| 2004 | 73.2% | 81.9% |
| 2005 | 91.7% | 98.4% |

*New* **Table 3.4:  Historic AT&T and BellSouth Special Access
Rates of Return**

1

2      14. Chapter 3 of *Reality or Illusion* also documented that total interstate access return levels

3   were generally substantially above the FCC's last authorized rate.  Table 3.1 documented

4   interstate access rates of return for the total interstate category that were, on average, more the

5   50% above the last authorized return level[8].  Inclusion of 2005 return levels on *Updated* Table

6   3.1 below demonstrates that, like special access, the overall earnings of the RBOCs have

7   continued to climb, with the *average* interstate rate of return for the RBOCs increasing by almost

8   37%,  from 17.1% to 23.4%. (The new range is between 18.9% earned by Verizon, and 32.7%

9   earned by Qwest.)

10

---

[8]Id., at 32.  These same return levels were also discussed in the initial report at vi and 7.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 10 of 22

| | | | | |
|---|---|---|---|---|
| **_Updated_ Table 3.1** | | | | |
| **RBOC Interstate Rates of Return** | | | | |

| | BellSouth | Qwest | SBC | Verizon | ALL RBOCs |
|---|---|---|---|---|---|
| Interstate ROR:2003 | 19.3% | 23.6% | 19.8% | 12.4% | 17.1% |
| Interstate ROR:2004 | 20.3% | 28.7% | 22.2% | 15.9% | 19.9% |
| Interstate ROR:2005 | 22.5% | 32.7% | 27.3% | 18.9% | 23.4% |

Source: Federal Communications Commission, ARMIS Report 43-04, Access Report: Table I, YE 2005
Accessed April 25, 2006.  Available at http://www.fcc.gov/wcb/eafs/

15.  Foreshadowing arguments that the costs of special access services have been mis-allocated to other interstate categories, Figure 3.3 of _Reality or Illusion_ documented that as of year-end 2003, almost one-third of total interstate investment is found in the special access category even though special access lines accounted for only 2.5% of total RBOC access lines.[9]

16.  Analysis of the most recently available ARMIS data reveals those relationship to be much the same as of the end of 2005.  _Updated_ Figure 3.3, below, documents the results of the same analysis using year-end 2005 data.

---

[9]_Id._, at 33-34

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 11 of 22



***Updated*** **Figure 3.3: Comparison of Special Access lines shares vs. Special Access net investment shares.**

1    17.   Following in the same vein, Table 3.2 demonstrated that as of the end of 2003  the net

2    investment allocated to the special access category for the four RBOCs was roughly one third of

3    their total interstate net investment and approximately 40% of their combined Common Line and

4    Special Access investment categories.  With only about 4-million special access loops and

5    associated interoffice transport facilities, compared to more than 158-million Common Line

ETi ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 12 of 22

1    local service loops in the RBOCs' operating territories[10] it appears more likely that the costs of

2    *other* services have been allocated to the special access category than vice-versa.[11]  *Updated*

3    Table 3.2, below, reveals that conducting the analysis on year-end 2005 data does not change the

4    overall picture revealed by the data..

|  | ***Updated* Table 3.2** | | | | |
|---|---|---|---|---|---|
|  | **Analysis of Special Access Net Investments** | | | | |
|  | **in Relation to Net Investments Levels** | | | | |
|  | **for All Interstate Access Services -- 2005** | | | | |
|  | **BellSouth** | **Qwest** | **SBC** | **Verizon** | **ALL RBOCs** |
| SPAC Net Investment | $   1,159,716 | $   737,102 | $   2,039,681 | $   4,405,646 | $   8,342,145 |
| Common Line Net Investment | $   3,052,710 | $   1,688,361 | $   3,619,423 | $   5,504,931 | $   13,865,425 |
| Total Interstate Net Investment | $   4,834,559 | $   2,957,170 | $   7,360,619 | $   11,538,343 | $   26,690,691 |
| SPAC as % of Total Interstate Investment | 24.0% | 24.9% | 27.7% | 38.2% | 31.3% |
| SPAC as % of SPAC+Common Line Investment | 27.5% | 30.4% | 36.0% | 44.5% | 37.6% |
| Source: Federal Communications Commission, ARMIS Report 43-04, Access Report: Table I, YE 2004. Available at http://www.fcc.gov/wcb/eafs/ (accessed April 25, 2005). | | | | | |

---

[10] While there is no definitive count of Special Access lines, various sources put the count at between 3.2 and 4.5 million lines.  A Bellsouth and SBC joint proposal for Assessment and Collection procedures suggests 3.2 million Special Access lines, while data from the FCC's Statistics of Communications Common Carriers puts the value at about 4.5 million.  Comments of SBC and Bellsouth, CC Docket Nos. 96-45, 98-171, 90-571, 92-237, 99-200, 96-116, 98-170, 02-33, 95-20, 98-10 and NSD File No. L-00-72, October 10, 2002; Industry Analysis and Technology Division, Federal Communications Commission, *Statistics of Communications Common Carriers 2002/2003*, March 2, 2004 ("*SOCC*") at Table 2.6.

[11]*Reality or Illusion,*  at 33-34

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 13 of 22



***New*** **Figure 3.4: As costs trend downward faster than prices, a widening gap can be seen between the average revenue per special access VGE and the average operating expense per VGE.**

18.  Supplementing the evidence found in *Reality or Illusion* are *New* Figures 3.4 and 3.5,

1  documenting a widening gap between the operating expenses associated with provisioning a

2  voice-grade equivalent (VGE) of special access services and the average revenue generated by

3  that same VGE, with costs trending down much more quickly than rates over the period 1997 7o

4  present.[12]

---

[12]Federal Communications Commission, ARMIS Report 43-01, Annual Summary Report: Table I, YE 1996-2005, Available at http://www.fcc.gov/wcb/eafs (accessed June 1, 2006).

ETI ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 14 of 22



*New* **Figure 3.5: As costs trend downward faster than prices, a widening gap can be seen between the average revenue per special access VGE and the average operating expense per VGE.**

1  **RBOC special access prices in areas that have been granted pricing flexibility continue to**
2  **be higher than in areas regulated under price caps**
3

4      19.  Review of current price levels reveals that the excessive price levels documented in the

5  *Reality or Illusion* continue today.  *New* Figure 3.6, below, compares the prices in effect for a

6  sample AT&T 10-mile DS1 special access circuit.[13]  As the table clearly reveals AT&T has

_____

[13]Pacific Bell Telephone Company, Tariff FCC No. 1, Access Service, Sections 7 and 31.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 15 of 22



*New* Figure 3.6. The Price for a 10-mile DS1 Special Access Service Channel is Higher in Areas Where AT&T Has Been Granted Pricing Flexibility Than in Areas in Which AT&T Pricing is Still Subject to Price Caps.

1   sustained increased pricing level in those areas where competition was expected to discipline its

2   pricing.  As the chart also demonstrates, the prices being charged to customers located in areas in

3   which pricing flexibility has been granted remain higher, by more than 25%, than the prices in

4   effect for areas still subject to price caps regulation.

5

6   **Competitive metrics continue to demonstrate that competitive alternatives for local access**
7   **connections are not available to enterprise customers**
8

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 16 of 22

1    20.  Chapter 2 of *Reality or Illusion*, entitled *No Way Out: The Lack of Alternatives to*

2    *Special Access*, documents that competitive alternatives are available to connect enterprise

3    customer locations on only a very limited basis, and that RBOCs remain the sole source of

4    dedicated access connectivity at roughly 98% of all business premises nationwide, even for the

5    largest corporate users.[14]  The metrics analyzed at that time came from CLECs, the RBOCs,

6    users, and the FCC.  The paragraphs below discuss updated data that has become available in

7    several instances since the release of the report.  As with the evidence of market behavior

8    discussed above, the new data serves to corroborate the picture painted in the August, 2004

9    report.

10

11    21.  Figures 2.1 and 2.2 of *Reality or Illusion*, contained reproductions of two maps

12    prepared and submitted by Verizon documenting that even in what many consider to be the most

13    competitive local service markets in the country - the New York and Washington metropolitan

14    areas, CLECs must rely upon RBOC special access loops to reach enterprise customers.[15]  This

15    evidence was submitted in the context of the FCC's Triennial Review Remand Investigation.

16    Shortly after the completion of *Reality or Illusion*, AT&T, BellSouth and Qwest also made

17    filings with the Commission that revealed the same to be true: in the vast majority of cases,  even

18    CLECs are required to utilize RBOC special access services to reach their (the CLECs)

19    customers.

20

---

[14]*Reality or Illusion*, at 11-26.

[15]*Reality or Illusion*, at 13-15.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 17 of 22

1    22.  BellSouth, estimated that across its 9 state region only 2,220 buildings can be access via

2    non-ILEC fiber.  Compare that to BellSouth's estimate that in just one of those states, Florida, it

3    provides approximately 40,000 DS1 special access circuits to CLECs desiring to reach

4    customers in buildings which CLEC-owned fiber is not available.[16] Qwest, providing

5    information to the Commission on the Denver metro area as a surrogate for the rest of its

6    territory reported that CLECs have 979 "lit" buildings in the Denver metro, and that CLECs

7    purchase 18,563 special access facilities to reach their customers in 6,350 other commercial

8    buildings in the Denver metro.[17]

9

10   23.  SBC, in a 94 page *ex parte* filing in that same docket made on August 18, 2004

11   submitted maps for 22 metro areas.[18]  *New* Figures 2.5, 2.6 and 2.7, contain reproductions of one

---

[16]August 18, 2004 *ex parte* filing by Bell South in CC Docket 01-338, *Section 251 Unbundling Obligations for Incumbent Local Exchange Carriers.*

[17]August 20, 2004 *ex parte* filing by Qwest  in CC Docket 01-338, *Section 251 Unbundling Obligations for Incumbent Local Exchange Carriers.*

[18]August 18, 2004 *ex parte* filing by SBC Telecommunications, Inc. in CC Docket 01-338, *Section 251 Unbundling Obligations for Incumbent Local Exchange Carriers.*



Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 18 of 22



*New* **Figure 2.5: Locations of SBC Special Access Services being used by CLECs to provide local service to enterprise customers in the San Francisco metro area** *maps supplied by SBC*

1   of the maps for just three of those areas: San Francisco, Dallas and Oakland.  Although a variety

2   of maps were included for each metro area, the maps chosen for inclusion here identify CLEC

3   fiber routes running through the metro areas, CLEC "lit" buildings, and "unlit" buildings where

4   CLECs have customers but need to use SBC special access  to reach those customers.  The maps

5   clearly document that CLEC "lit" buildings represent only a small portion of the totality of

6   commercial buildings in these metro areas, and that the quantity of buildings where CLECs find

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 19 of 22



*New* **Figure 2.6:  Locations of SBC Special Access services being used by CLECs to provide local service to enterprise customers in the Dallas metro areas** *map supplied by SBC*.

1  it necessary to utilize RBOC special access dwarf the number of buildings the CLECs have

2  actually "lit."  Most striking, however, is the fact that in many  instances, buildings where the

3  CLECs find it necessary to purchase RBOC special access lie right along CLEC fiber routes!

4       24.  Chapter 2 of *Reality of Illusion* also provided evidence that *intermodal*  competitive

5  alternatives (cable, fixed wireless) are not competitive alternatives to high speed special access

6  services.  The FCC has since released new data pertinent to portions of those analyses -- the new

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 20 of 22



*New* **Figure 2.7:  Locations of SBC Special Access services being used by CLECs to provide local service to enterprise customers in the Oakland metro areas** *map supplied by SBC*.

1    data does nothing to change the competitive landscape detailed by Ad Hoc.

2

3          25. Page 23 of *Reality or Illusion* cites an FCC source suggesting that 96% of high-speed

4    cable lines are provided to residential and small business subscribers.  The FCC's most recent

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 21 of 22

1    High Speed Services for Internet Access report shows that cable companies provide 23.9-million

2    high speed lines, and that 23.5-million of those lines are provided to residential and small

3    business users, suggesting that in fact, more than 98.3% of all cable high speed lines continue to

4    be provided to residential and small business subscribers.

5

6        26.  Page 24 of *Reality or Illusion* reported that there are only a little more than 25,000 fixed

7    wireless high speed connections serving enterprise customers, representing two one hundredths



8    *Updated* **Figure 2.4. Mass market cable telephony lines account for most of the growth in CLEC-owned lines.**

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Susan M. Gately
FCC WC Docket No. 06-74
June 20, 2006
Page 22 of 22

1   of a percent of the 103.8-million ILEC voice-grade equivalent special access lines.  Data from

2   the FCC's most recent High Speed Services for Internet Access report, released April, 2006,

3   increases that number to 48,000.

4

5       27.  Figure 2.4 contained an analysis revealing that mass market cable telephony lines had

6   driven most of the growth in CLEC-owned lines between December 2000 and June 2003.

7   *Updated* Figure 2.4, above, carries that analysis out to June 2005 and shows no change in the

8   data trends.

9                               VERIFICATION

10

11      The foregoing statements are true and correct to the best of my knowledge, information, and

12  belief.

13

14                                      _____

15                                          SUSAN M. GATELY

16

17

ECONOMICS AND
TECHNOLOGY, INC.

## Statement of Qualifications

## SUSAN M. GATELY

Susan M. Gately is Senior Vice President of Economics and Technology, Inc., and has been employed at ETI since 1981. Her experience and expertise encompass a wide range of telecommunications policy issues. Ms. Gately has concentrated particularly in the area of rate structures and operating characteristics of telephone companies and the mechanisms used in their regulation. Ms. Gately has been extensively involved in the analysis and design of pricing plans for large user custom telecommunications pricing plans. Ms. Gately has twenty years of experience analyzing incumbent LEC intrastate and interstate access tariffs, participating in virtually every FCC proceeding on access charges and price caps, and is among the nation's leading experts on access charge rate structure, methodology, and policy. Ms. Gately has designed and presented training sessions for corporate users and public service commission staffs in subject areas ranging from tariff structures, contract negotiation strategies and regulatory practices, to in-depth exploration of public policy issues.

Ms. Gately has also been extensively involved in the analysis of cost and operational data submitted by telephone companies in the context of regulatory proceedings and audits, including the submission of expert testimony in state public utility proceedings. Her responsibilities have involved the analysis of telephone company cost data and cost study methodologies. Ms. Gately's work has included the development of alternative cost figures for the purpose of presenting alternative rate proposals. She has participated in the preparation of expert testimony on local calling area expansion, affiliate transactions, survey and statistical methodologies, cost study methodologies, revenue requirement, infrastructure and modernization, new service pricing, access pricing, unbundled network element pricing, avoided retail costs for use in setting wholesale prices and other issues related to the opening and operation of markets.

Ms. Gately has devoted a large amount of time to the analysis of the Interstate Access Tariffs (to non-price issues as well as the more traditional cost and rate questions) since the filing of the initial access tariffs in 1983. Ms. Gately has participated in the preparation of hundreds of submissions to the FCC on issues including access service pricing and rate structures, price caps implementation, access service costs (including cost allocation of regulated and non-regulated services), and alternative forms of regulation. Among those issues recently addressed at the FCC has been the appropriate rate structure for the collection of universal service costs from end users, and rules related to the level of universal service funding that should be available to rural telecommunications service providers. Ms. Gately was also actively involved in the investigation of the level of cost to be recovered from the implementation of local number portability (LNP) and the appropriate method of recovering those costs. Ms. Gately was also been involved in modeling and analysis related to the most recent step in the FCC's reformation of iTS access charge and price caps plan — the so called "CALLS" plan.

Throughout 1994, acting as a staff expert for the Delaware PSC Staff, Ms. Gately participated actively in the litigation of rules implementing an alternative regulatory plan put in place by the



ECONOMICS AND
TECHNOLOGY, INC.

Delaware state legislature. Ms. Gately was one of the designated staff negotiators during an attempted negotiated settlement of the rules using Alternate Dispute Resolution (ADD) techniques. Subjects addressed by the PSC's Rulemaking included, among other things, the development of both incremental and fully distributed costing methodologies to be used by Bell Atlantic for use as incremental cost floors, and to ensure against cross-subsidization. She co-authored comments on behalf of staff regarding cost methodology, rate imputation, and unbundling requirements.

Ms. Gately was particularly active in the examination of ILEC cost data and deployment plans for basic rate interface (BRI) ISDN service. Ms. Gately was involved in all facets of a New England Telephone BRI ISDN investigation that culminated in an affordable, widely deployed ISDN offering in Massachusetts. She has also prepared and/or sponsored testimony and comments relative to the deployment and pricing of ISDN services in Colorado, Tennessee, Texas, Ohio, and Connecticut. Ms. Gately also co-authored two separate ISDN position papers in conjunction with Dr. Lee L. Selwyn; *A Migration Plan for Residential ISDN* for the Electronic Frontier Foundation and *The Prodigy ISDN White Paper: ISDN Has Come of Age* for Prodigy Services Company.

Ms. Gately was also heavily involved in the development of avoided cost estimates for use in setting wholesale prices in a resale environment. Ms. Gately co-authored (with Dr. Lee L. Selwyn) *Commercially Feasible Resale of Local Telecommunications Services: An Essential Step in the Transition to Effective Local Competition*. She has participated in resale proceedings and or inter-connection arbitrations (relative to wholesale pricing) in California, Hawaii, Illinois, Ohio, Nevada, and Louisiana. Ms. Gately was also involved in the analysis of issues related to the application of several of the Bell Companies for Section 271 authority to enter the interLATA long distance market. Ms. Gately has also undertaken a detailed analysis of the Continuing Property Record (CPR) audits conducted by the Accounting and Audits Division of the FCC.

More recently Ms. Gately has been involved in the analysis of issues related to the application of several of the Bell Companies for Section 271 authority to enter the interLATA long distance market. Ms. Gately has also undertaken a detailed analysis of the Continuing Property Record (CPR) audits conducted by the Accounting and Audits Division of the FCC. That analysis culminated in the preparation of a paper (written in conjunction with Dr. Lee L. Selwyn) *Inflated BOC Prices: An Agenda for State PUC Actions Arising from the FCC CPR Audits.*

Ms. Gately has assisted numerous Fortune 100 companies in the evaluation of pricing, terms and conditions as part of the long distance and local procurement process.

In addition to her regulatory work, Ms. Gately has been a frequent speaker at various industry gatherings including large conventions and more specialized seminars and conferences. The subject matters have included the following wide range of issues:

- Negotiation of custom network contracts;
- ILEC central office collocation;
- The FCC's price cap plan for ILECs;
- Principles for pricing ISDN basic rate service.



Statement of Qualifications – Susan M. Gately

Ms. Gately has co-authored a number of papers of note not mentioned above. Specifically, Ms. Gately was co-author (and project manager) of a report authored jointly by ETI and Hatfield Associates, Inc. entitled: *The Enduring Local Bottleneck: Monopoly Power and the Local Exchange Carriers*. She also managed and co-authored (with Dr. Lee. L. Selwyn) *Access and Competition: The Vital Link* (submitted to the FCC in support of a petition by the Ad Hoc Telecommunications Users Committee requesting initiation of combined access charge and separation reform proceeding) as well as a paper entitled *LEC Price Cap Regulation: Fixing the Problems, Fulfilling the Promise* (co-authored with Dr. Lee L. Selwyn, Dr. David J. Roddy, Scott C. Lundquist and Sonia N. Jorge) filed in support of the Ad Hoc Telecommunications Users Committee's comments in the FCC's Docket 94-1 review of the LEC Price Caps Plan. Ms. Gately also co-authored *The "Connecticut Experience" with Telecommunications Competition: A Case in Getting it Wrong*, with Lee L. Selwyn and Helen E. Golding. Ms. Gately's most recent work, *Lost in Translation: How Rate of Return Regulation Transformed the Universal Service Fund for Consumers into Corporate Welfare for the RLECs,* co-authored with Scott C. Lundquist was completed and filed earlier this year in support of Western Wireless Corporation's Petition to the FCC to calculate USF funding requirements on a forward look cost basis.

Prior to joining ETI, Ms. Gately was employed as an Economic Analyst at Systems Architects, Inc. Her work there primarily involved the analysis of economic data and survey results for the Health Care Finance Administration, the Social Security Administration, and the Department of Defense. Ms. Gately graduated from Smith College with a B.A. in Economics.

## Appearances in Regulatory Proceedings

**United States District Court, District of New Jersey,** in *Re: AT&T Corp. v. JM Telecom, LLC*, Civil Action No. 99-2578, on behalf of AT&T Corp., Expert Report filed December 5, 2003.

**California Public Utilities Commission**, in *Re: Order Instituting Rulemaking to Review Policies Concerning Intrastate Carrier Access Charges*, Docket No. R.03-08-018, on behalf of AT&T Communications of California, Inc. , Declaration filed November 12, 2003.

**Colorado Public Utilities Commission**, in *Re: Application of US West Communications, Inc. for Investigation into Switched Access Rates,* Docket No. 00A-201T, on behalf of AT&T Communications of the Mountain States, Inc., Testimony of Lee L. Selwyn, filed July 18, 2000, adopted by Susan M. Gately, cross-examined on October 17, 18, 2000.

**Arizona Corporation Commission**, in *Re: In the Matter of the Application of US West Communications, Inc., a Colorado Corporation, for a Hearing to Determine the Earnings of the Company, the Fair Value of the Company for Ratemeking Purposes, to Fix a Just and Reasonable Rate of Return Thereon and to Approve Rate Schedules Designed to Develop Such Return*, Docket No. T-1051B-99-105, on behalf of AT&T Communications of the Mountain States, Direct Testimony filed August 9, 2000, Supplemental Direct Testimony filed November 13, 2000.



*Statement of Qualifications – Susan M. Gately*

**United States District Court, District of Massachusetts**, in *Re:  Telephone Management Corporation, Plaintiff, v. State Street Bank and Trust Company, Defendant*, Civil Action No. 97-10993 PBS, on behalf of State Street Bank and Trust Company, Expert Report filed July 17, 1998.

**Delaware Public Service Commission**, in *Re: In the Matter of Development of Regulations for the Implementation of Telecommunications Technology Investment Act*, Docket No. PSC Reg. 41, on behalf of Delaware Public Service Commission Staff, cross-examination March 2, 1995.

**New York Public Service Commission**, in *Re: Proceeding on Motion of the Commission to Investigate Performance-Based Incentive Regulatory Plans for New York Telephone Company*, Docket No. 92-C-0665, on behalf of Cable Television Association of New York, Supplemental Testimony filed September 8, 1994.

**California State Legislature**, in *Re:  California Long Distance Telecommunications Consumer Choice Act*, Assembly Bill 3720, on behalf of AT&T, Statement before the California State Legislature, April 11, 1994.

**Tennessee Public Service Commission**, in *Re: In the Matter of the Commission's Investigation of Integrated Services Digital Network (ISDN)*, on behalf of Prodigy Services Company, oral testimony, November 11, 1992.

**Arizona Corporation Commission**, in *Re: In the Matter of the Commission's Examination of the Rates and Charges of the Mountain States Telephone and Telegraph Company*, Docket No. E-1051-88-306, on behalf of Residential Utility Consumer Office, Direct Testimony filed July 13, 1990, Rebuttal Testimony August 7, 1990.

