**Attachment 14**

***Confronting Telecom Industry Consolidation: A Regulatory
Agenda for Dealing with the Implosion of Competition***

**prepared by Economics and Technology, Inc.
for the
National Association of State Utility Consumer Advocates
April 2005**



ECONOMICS AND
TECHNOLOGY, INC.

# CONFRONTING TELECOM INDUSTRY CONSOLIDATION

## A Regulatory Agenda for Dealing with the Implosion of Competition



**NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES** **NASUCA**

prepared for NASUCA by

Lee L. Selwyn
Helen E. Golding
Hillary A. Thompson

April 2005

**ETI ECONOMICS AND TECHNOLOGY, INC.**

TWO CENTER PLAZA, SUITE 400 • BOSTON, MASSACHUSETTS 02108

## Preface | CONFRONTING TELECOM INDUSTRY CONSOLIDATION

NASUCA is an association of 44 consumer advocates in 42 states and the District of Columbia. NASUCA's members are designated by the laws of their respective jurisdictions to represent the interests of utility consumers before state and federal regulators and in the courts.

It is by now widely recognized that the competitive telecommunications landscape that was expected to emerge as a result of the various market-opening provisions of the federal Telecommunications Act of 1996 (1996 Act) has not materialized. However, US telecommunications policy and regulation has gotten in front of this marketplace reality, adopting a variety of deregulatory measures predicated upon the existence of competition while at the same time reversing many of the pro-competitive provisions and safeguards of the 1996 legislation. The announcements earlier this year of merger agreements between SBC Communications, Inc. and AT&T Corp., and between Verizon Communications, Inc. and MCI, have been seen by many as an indication that the nation's experiment with a competitive telecommunications marketplace has now come to an end. The future of telecommunications competition depends critically upon what regulators and policymakers do *now* to protect it, but if competition is no longer to be relied upon, then the various deregulatory initiatives that had been premised upon its existence must now be revisited and reversed.

NASUCA and its members have asked Economics and Technology, Inc. (ETI) to prepare this report in order to provide a realistic assessment of the actual extent of competition in local and long distance telecommunications and the potential impact of the two mergers thereon, and to review the various regulatory events that have brought us to the present situation. NASUCA also asked ETI to develop and propose a specific policy agenda for reinvigorating the nation's regulatory machinery to reflect the growing reconcentration and potential for remonopolization of the US telecom industry that the two proposed mergers portend.

This paper was prepared by Lee L. Selwyn, Helen E. Golding and Hillary A. Thompson. The authors gratefully acknowledge the contributions and valuable assistance provided by the NASUCA Telecommunications Committee and its members in the preparation of this report. The views expressed herein are, however, those of the authors.

Boston, Massachusetts
April 2005

i


ECONOMICS AND
TECHNOLOGY, INC.

**Executive Summary** | **CONFRONTING TELECOM INDUSTRY CONSOLIDATION**

## I. Overview:  The end of the experiment

The announcements earlier this year of the SBC takeover of AT&T and the Verizon acquisition of MCI may well bring the nation's 35-year experiment with telecommunications competition to a sad end.  The Telecommunications Act of 1996 was intended as a means to curb incumbent local exchange carrier (ILEC) dominance of local phone service, permitting the robust competition that existed at that time for long distance service to extend throughout the telecommunications industry, while at the same time relying upon competitive marketplace forces to replace the structural separation of local and long distance services that had been imposed by the Modification of Final Judgment (MFJ), the 1982 consent decree  that concluded the Justice Department's epic antitrust action and broke up the Bell System.

Instead, what has resulted nine years later is the enfeeblement of even the largest long distance providers and the refortification of the local bottleneck.  What started out as seven Regional Bell Operating Companies (RBOCs) following the MFJ has today become four massive, vertically-integrated mega-companies each controlling vast amounts of the nation's wireline, wireless, and broadband infrastructure.   With the proposed mergers, the two largest RBOCs seek to integrate even more of the nation's communications assets, and in so doing acquire their own global long distance networks and significant market power in one of the few remaining competitive sectors – enterprise services.  These mergers are the last step in the consolidation of the nation's telecommunications system into four autonomous, unregulated, regional, vertically-integrated monopoly powerhouses.

Not only is the old Bell System being put back together, but the very same anticompetitive conditions that the MFJ had sought to foreclose are already reemerging.  RBOC "bundling" of local and long distance, wireline and wireless, telephone and Internet services is eroding consumers' ability to choose separate providers for each of these services.  At the same time, the continued regulatory and judicial rulings that limit the ability of Competitive Local Exchange Carriers (CLECs) to compete in the local market are rapidly making such "bundles" the sole purview of the RBOCs.  Post-merger local in-region RBOC retail market shares will *start out* at close to 90%, and in-region long distance market shares will be more than 70% in some areas.


ECONOMICS AND
TECHNOLOGY, INC.

*Executive Summary: Confronting Telecom Industry Consolidation*

These figures translate into extremely high market concentrations that are even greater than those that have previously caused the Department of Justice (DOJ) to reject proposed mergers in other industries.

These market shares and the resulting market concentration will only grow as competitive providers, unable to gain or maintain a foothold against the RBOCs' overwhelming dominance, are forced out of business. The prospect of this massive industry consolidation and the near-eradication of any meaningful competition presents grave risks for consumers while imposing critically important burdens on regulators and other policymakers.

As state consumer advocates, NASUCA's members have worked vigorously to advance competition for the benefit of consumers. However, NASUCA's member have the responsibility to see that consumers pay just and reasonable rates – even if competition fails to develop in the manner or at the speed promised by the dominant players. This looming reconcentration creates an immediate need to reinvigorate the regulatory machinery that has been largely dismantled as a result of overly optimistic expectations as to the emergence and sustainability of an effectively competitive telecom market.

At the same time, it would be extremely unfortunate for consumers and the national economy if the telecommunications industry were left to veer permanently off the path to competition that Congress established in the 1996 Act. Such abandonment of competition is a real possibility if the Federal Communications Commission (FCC) continues to take regulatory actions that undercut the opportunities for competition to develop. The pro-competitive provisions in the 1996 Act, intended to encourage entry and protect new entrants from RBOC anticompetitive conduct, are still the law and can still be enforced. In evaluating the proposed takeovers of AT&T by SBC and of MCI by Verizon, the FCC has the opportunity to take a long, hard look at the effects of its policies and make changes that, going forward, will help to establish the conditions for the revitalization of competition. But if competition is not to be a factor in telecom's future – whether the result of regulatory policies that continue to frustrate its development or, alternatively, because at bottom the telecommunications industry turns out to be a "natural monopoly" after all – then consumers and the public interest generally demand that the regulatory infrastructure that has been dismantled based upon the *assumption*, *expectation* or *hope* of an effectively competitive marketplace now be reinstated and reinvigorated, and that this process take place *before* the currently-pending industry reconcentration is permitted to go forward.

## II. The genesis of the current industry condition

What happened to cause this debacle? The FCC, after at first establishing a regulatory framework that appeared to fairly implement the 1996 Act and setting attainable standards for local entry, changed course and began (with support from the D.C. Circuit Court of Appeals) to withdraw regulatory protections that had been put in place to preserve the intended pro-



*Executive Summary: Confronting Telecom Industry Consolidation*

competitive opportunities created by the 1996 legislation.  The FCC expressed its belief that it could force CLECs into building their own facilities if it eliminated their ability (as provided in the 1996 Act) to obtain "unbundled network elements" (UNEs) at cost-based prices from the incumbent carriers.  The FCC's strategy could not – and did not – work.  Facilities deployment required massive capital investments that in most cases could not support an economically feasible business model.  Congress had understood this, and had provided for two *non-facilities-based* modes of entry – UNEs leased from ILECs and resale of ILEC services.  Rather than stimulate facilities-based entry, the withdrawal of the UNE-based entry model forced competitors out of the market altogether.  Additionally, rather than stimulate additional facilities investment in those few cases where it might have been feasible, the negative regulatory climate for CLECs that the FCC had created sent potential investors scurrying to find other places to land.  In addition, because the FCC had interpreted the 1996 Act as permitting the RBOCs to enter long distance long before actual competition had taken hold for local exchange and access services, the RBOCs were able to rapidly capture long distance market share, eroding the previously well-established competitive status of that segment as well.  Not surprisingly, financing dried up, further regulatory setbacks occurred, and by the end of 2004 the two largest CLECs had become takeover targets.

### III.  The fading prospects for competition in local and long distance markets

Today, the vast majority of wireline telephone service offered by competitors consists of service provided out of a combination of local loops and switching leased from the ILECs (the so-called UNE-Platform (UNE-P)).  The source of the ILECs' continuing market power is twofold:

- First, the RBOCs and other ILECs continue to control the "local loop" – the wireline bottleneck facilities linking the public telecommunications network with virtually every home and business premises nationwide.  With few exceptions, these facilities are necessary to provide local telephone service to an end user.  Although CLECs serve some 18% of residential customers at retail nationwide, the vast majority of all local lines are still being provided over ILEC-owned facilities.

- Second, the RBOCs' legacy monopoly subscriber base allows them to enjoy substantial economies of scale not available to competitors (which is precisely why Congress had adopted non-facilities-based entry as a means for enabling competitive entry, at least at the retail level).  By virtue of their overwhelming dominance in retail lines, the RBOCs have an insurmountable cost advantage over facilities-based CLECs.

By early 2006 – at about the same time that the proposed mergers would be completed – the RBOCs' obligation to offer cost-based UNE-P will end, and the RBOCs are highly unlikely to offer these unbundled elements to CLECs at rates that will support a UNE-based business model


ECONOMICS AND
TECHNOLOGY, INC.

*Executive Summary: Confronting Telecom Industry Consolidation*

– leaving aside the fact that by that time the two largest CLEC competitors will have been swallowed up by the two largest RBOCs.

As was the case prior to the break-up of the former Bell System in 1984, most consumers once again take their long distance service from whomever provides their local phone service. Thus, as a practical matter, the maximum long distance market share that an RBOC can attain is limited only by its share of the local phone market. But as CLECs disappear and the RBOCs "win back" the former CLEC customers, those customers' long distance business comes along for the ride. If, in the end-game, SBC and Verizon ultimately recapture upwards of 90% or more of the retail local service subscribers within their  respective serving areas – as they almost certainly will within a very short time – their in-region long distance shares will escalate to similar heights.

## IV.  The myth of "intermodal" competition

In the absence of sustainable competition for traditional wireline services, the RBOCs have begun looking to so-called "intermodal" competition from cable TV and wireless providers, along with the emergence of Voice over Internet Protocol service (VoIP), as purportedly challenging the RBOC wireline monopoly. However, the RBOCs' portrayal of the potential competitive impact of these alternatives upon RBOC market power for local exchange and exchange access services is overstated and inaccurate. Although cable telephony is available to many residential and small business users, in the absence of other CLECs, it creates at best a duopoly (consisting of the monopoly cable operator and the monopoly ILEC), nothing even remotely close to effective competition.

There are also serious flaws in the theory that the RBOCs face competition because customers can substitute wireless service or VoIP for their wireline service. The cost of VoIP (once the additional cost of the required digital subscriber line (DSL) or cable modem service is factored in) and issues with its quality limit its competitive influence at the present time. Moreover, there is little understanding at this time as to the actual *scalability* of VoIP were its use to graduate from the early adopters to widespread demand on a mass scale. At the very least, the capacity of the public Internet – and/or of dedicated IP networks constructed by VoIP service providers – would need to be substantially increased, and it is at best unclear that the cost involved would be consequentially different from the costs of providing conventional circuit-switched services.

While there has been a limited amount of "wireless substitution" at the margin, the fact remains that the vast majority of mass market customers are still much more likely to use wireless service as a complement to their wireline phone than as a true substitute. Several studies exist estimating the number of customers who have "cut the cord," each with wildly different results. Other studies prove that where wireless substitution has occurred, it is generally restricted to certain demographics and geographic areas. Far more compelling is the



*Executive Summary: Confronting Telecom Industry Consolidation*

fact that at least 94% of wireless users *also maintain their traditional wireline telephone service*. Whatever nominal amount of "substitution" may be taking place, it is clearly not sufficient to constrain ILEC market power and ILEC prices.

## V.  Reinstatement of regulation in the wake of massive industry consolidation

Whether successful implementation of the *Telecommunications Act of 1996* could have set the stage for further telecommunications industry deregulation is no longer an issue worth debating, because the anticipated competition has simply not materialized.  Regulators must now take a long, hard look at the structure of the existing telecommunications industry and come up with a regulatory framework that can accommodate today's reality.

Regulators need to consider the consequences of the proposed SBC/AT&T and Verizon/MCI mergers for the future of competition, particularly in light of the various deregulatory measures that have been put in place on the *supposition* that competition in all sectors of the US telecommunications industry had arrived, was economically sustainable, and indeed was *irreversible*.  Consideration of the two merger applications must not be divorced from this deregulatory reality.  Today virtually all states and the FCC have abandoned cost-based rate of return regulation in favor of various forms of "incentive" or "market-based" systems, and have over the past decade eliminated most safeguards and backstops that had been hard-wired into the early incentive regulation plans – things like inflation-related annual price cap adjustments, productivity offsets to those annual price cap changes, sharing and capping of excess earnings, and periodic reviews intended to achieve a balance between providing the Bells with incentives for efficiency while maintaining protections against monopoly abuses.  Yet in many important respects, there is an even greater need for regulation of the Bell monopolies today than there was when the Bell System was whole.  Today, the Bell companies are allowed to, and do, operate in both monopoly and competitive markets *using the same network assets and pool of human and other resources*.  Cost allocation requirements, where they even exist, are at best subject to lengthy after-the-fact reviews and virtually no effective enforcement.  The Bell monopolies have enormous incentives and opportunities to shift costs to their monopoly operations while shifting revenues to other  "below-the-line" business units and affiliates.  And their chances of being caught are less than an ordinary taxpayer's chances of an IRS audit – and in proportion the penalties for such cost shifting – if actually detected – are almost always far less severe.

Reconcentration requires reregulation.  At a minimum:

•  Price cap and other alternative regulation regimes must be revised to conform to competitive realities, so as to ensure just and reasonable rates for all consumers.

•  Consumers – and surviving competitors – deserve the protections  intended under Sections 271 and 272 of the 1996 Act, and these should be reinstated and vigorously enforced.


ECONOMICS AND TECHNOLOGY, INC.

*Executive Summary: Confronting Telecom Industry Consolidation*

• With AT&T and MCI "impaired" out of existence, the weakening of interconnection, unbundling, and cost-based pricing mandates in Section 251 and 252 must be reversed. Competition is failing at an accelerating rate, and regulatory and judicial "findings" that CLECs are not impaired without access to UNEs cannot be squared with this reality.

Getting telecommunications competition back on track requires the commitment of all federal and state policymakers. Whether in the long run reasonable rates will be achieved through the imposition of stricter regulatory controls or through the achievement of effective competition remains to be seen. However, at the moment, consumers are protected neither by effective competition nor by effective regulation. The *fact* of industry reconcentration demands that regulators and legislators resist facile appeals to deregulate (further) for deregulation's sake, and instead reassess the status of the nation's telecommunications markets so as to determine whether the present combination of emerging (yet seriously impaired) competition and less-than-effective regulation is in the public interest. Whether or not the two mergers are ultimately allowed, reinstatement of effective regulatory oversight of the incumbent LECs is essential to protect consumers and to restore the industry on the path to competition.



# Table of Contents

# CONFRONTING TELECOM INDUSTRY CONSOLIDATION

PREFACE                                                                        i

EXECUTIVE SUMMARY                                                              ii

1    INTRODUCTION                                                              1

2    THE GENESIS OF THE CURRENT INDUSTRY CONDITION                            5

    The triumph of incumbency over competition on the regulatory front        5

    Capital for new investments evaporates, while regulatory pressure to deploy
    CLEC-owned facilities ramps up                                           6

    Succumbing to intense RBOC pressure, the FCC simply disregarded the
    persistence of the local bottleneck in permitting RBOC long distance entry   13

3    THE FADING PROSPECTS FOR COMPETITION IN LOCAL AND LONG
    DISTANCE MARKETS                                                         16

    Sources of ILEC market power                                             16

    The Local Wireline Market: Enduring ILEC Bottleneck Control              17

    The effects of the enduring bottleneck on the long distance market       21

    The pending mergers will harm the current not-very-competitive environment   23



ECONOMICS AND
TECHNOLOGY, INC.

*Executive Summary: Confronting Telecom Industry Consolidation*

4    THE MYTH OF INTERMODAL COMPETITION                                    24

      "Intermodal Competition" – is it a reality or merely a rationalization for
      deregulation?                                                         24

      Cable providers: Bottleneck bypass results in duopoly                 25

      The myth of widespread access line substitution                      28

            The decline of the second line market                          28

            Primary line substitution:  ways to "cut the cord"             30

            Wireless substitution                                          30

            Use of wireless phones for long distance calling is not "intermodal
            competition"                                                   33

            Wireless/Wireline as complements                               36

            VoIP services do not bypass the enduring local bottleneck      37

            WiMax, WISPs, and other fixed wireless "solutions" are not the
            answer.                                                        38

      The future is not today                                              39

5    RE-THINKING DEREGULATION IN THE WAKE OF MASSIVE INDUSTRY
      RECONCENTRATION                                                      40

      Conditions protecting consumers and the development of competition need to
      accompany any decisions approving the SBC/AT&T and Verizon/MCI mega-
      mergers                                                              42

      Regulatory prerequisites for merger approval                        45

            Price cap and other alternative regulation regimes must be revised to
            conform to competitive realities, so as to ensure just and reasonable
            rates for all consumers                                       45

            Consumers – and surviving competitors – deserve the protections
            intended under Sections 271 and 272 of the 1996 Act           49

ix

ECONOMICS AND
TECHNOLOGY, INC.

*Executive Summary: Confronting Telecom Industry Consolidation*

With AT&T and MCI now "impaired" out of existence, the weakening of interconnection, unbundling, and cost-based pricing mandates in Section 251 and 252 must be reversed    51

Getting telecommunications competition back on track requires the commitment of all federal and state policymakers    52

FIGURES

1    Net additional CLEC investment, 1996-2003.    7

2    ILECS own 96% of all dial access line facilities, even though they currently provide only 82% of these at retail.    10

3    CLECs have had some success in capturing *retail* local service market shares ...    18

4    But after more than nine years since the enactment of the 1996 legislation, ILEC shares of the underlying network *facilities* are still in the high 90% range and confront almost no serious competitive challenge.    18

5    The vast majority of CLEC services rely upon UNE-P, and the continued availability of these retail CLEC offerings is thus threatened by the imminent elimination of UNE-P.    19

6    RBOCs are acquiring long distance market share at an unprecedented rate following their receipt of Section 271 in-region long distance authority.    22

7    The rate at which cable systems have been adding new telephony customers has dropped to a trickle.    27

8    RBOCs and other ILECs control 69% of the major national wireless carriers.    33

TABLES

1    CLEC Market Capitalization from Peak to Crash    8

2    ILEC DSL is Rapidly Closing in on Cable-based High-Speed Internet Services    29

DATA APPENDIX    53



ECONOMICS AND
TECHNOLOGY, INC.

# 1 | INTRODUCTION

The announcements in January and February 2005 of the SBC takeover of AT&T and the Verizon acquisition of MCI may well signal that the nation's 35-year experiment with telecommunications competition is headed for a sad end.  The Telecommunications Act of 1996 (1996 Act) was conceived of as a means to curb incumbent local exchange carrier (ILEC) dominance of local telephone service, permitting the robust competition that existed at that time for long distance service to extend throughout the telecommunications industry, while at the same time relying upon competitive marketplace forces to replace the structural separation of local and long distance services that had been imposed by the Modification of Final Judgment (MFJ), the 1982 consent decree that settled the Justice Department's antitrust suit against AT&T and its Bell System affiliates.

Instead, the result has been the enfeeblement of even the largest long distance providers and the refortification of the local bottleneck back in the hands of the four remaining regional Bell operating companies (RBOCs).  What started out as seven RBOCs when the Bell System was broken up at the beginning of 1984 has been collapsed into four massive, vertically-integrated mega-companies controlling vast amounts of the nation's voice, data, and wireless infrastructure. With the proposed mergers, the two largest RBOCs seek to integrate even more of the nation's communications assets, and in so doing acquire their own global long distance networks and significant market power in one of the few remaining competitive sectors– enterprise services. These mergers would be the last step in the reconcentration of the nation's telecommunications system into four autonomous, unregulated, regional, vertically-integrated monopoly powerhouses.

While the 1996 Act did not prohibit such large-scale mergers, it did recognize that size mattered and that large incumbents LECs had greater influence over the competitive landscape than smaller ILECs.  For instance, while the 1996 Act applied structural conditions to the RBOCs (carrying forward some of the restrictions contained in the MFJ), it did not impose these same types of conditions upon GTE (which had also previously been subject to structural conditions in an antitrust consent decree) or on the smaller former-Bell System companies, Southern New England Telephone or Cincinnati Bell.



*Introduction*

Within four years following enactment of the 1996 legislation, the Federal Communications Commission (FCC) had allowed five RBOC mergers: SBC/Pacific Telesis, Bell Atlantic/ NYNEX, SBC/Southern New England Telephone, SBC/Ameritech, and Bell Atlantic/GTE. The wisdom of permitting these mergers could certainly be questioned; in fact, consumer advocates had challenged these mergers, expressing concerns that they would decrease the opportunities and motivation of the larger RBOCs to compete out-of-region – something that the RBOCs had *never* done since their creation in 1984.

Yet in each case, it was the prospect of future, "potential competition" that seemed to hold sway. Each of these mergers involved the combination of ILECs with non-overlapping territories, firms that were not at the time engaged in direct competition with each other for the provision of local service. Although the RBOCs made promises – even "commitments" – that they would compete for local service out-of-region following merger approval, these promises have never materialized to any significant extent. Nor did any of the RBOCs in these mergers compete directly with each other for the provision of long distance service or bundled local/long distance offerings.[1] Thus, although the mergers purportedly had implications for potential (future) competition (very little of which ever actually materialized), they did not involve direct competitors and, arguably, did not *diminish* the then all-but-nonexistent competition within each of the merging companies' respective footprints.

The proposed mergers between SBC and AT&T and Verizon and MCI pose a much more immediate and serious threat to competition, both present *and future*. First, the size and scope of the merged companies is larger than any previous combination. AT&T and MCI each have a nationwide presence, while SBC and Verizon (with three and two prior mergers, respectively), have expansive incumbent operating territories far larger than any other incumbent local service provider since before the break-up of the Bell System. Second, and more importantly, SBC and AT&T (and Verizon and MCI) are current, direct competitors. While AT&T claims to have ceased marketing local exchange and stand-alone long distance services to residential customers, it still has nearly four million local subscribers and twenty million long distance customers nationwide. AT&T is still actively competing for mid-size and large business customers (so-called "enterprise customers") nationwide, a sizable percentage of which are geographically concentrated within the thirteen state SBC region, and for consumer Voice over Internet Protocol (VoIP) customers with its CallVantage offering. MCI is still actively marketing local services to

_____

1. The FCC's approval of these mergers occurred between January 1997 (SBC/Pacific Telesis) and June 2000 (Bell Atlantic/GTE), well before the RBOCs involved had obtained Section 271 authority throughout their incumbent local operating territories. After gaining long distance entry, the merged RBOCs have concentrated on providing service principally or solely to their own local service customers.



ECONOMICS AND
TECHNOLOGY, INC.

residential customers, and thus competes directly with Verizon in both the consumer and enterprise segments for both local and long distance services.[2]

Not only is the old Bell System being put back together, but the very same anticompetitive conditions that the MFJ had sought to foreclose are already reemerging. RBOC sales of "bundles" of local and long distance services are eliminating consumers' ability to choose separate local and long distance providers. CLECs, which were the first to bring such bundles to the market and to offer "unlimited" nationwide long distance calling (e.g., MCI's The Neighborhood) are being frustrated in their ability to compete in the local market by a series of regulatory and judicial rulings that have operated to undermine the specific market-opening provisions of the 1996 Act.

Post-merger local in-region RBOC retail market shares will *start out* at close to 90%, and in-region long distance market shares will be more than 70% in some areas. These figures translate into extremely high market concentrations that are even greater than those that have previously caused the Department of Justice (DOJ) to reject proposed mergers in other industries. The RBOC shares will only grow as competitive providers, unable to gain or maintain a foothold against the RBOCs' overwhelming dominance, are forced out of business. The prospect of this massive industry consolidation and the near-eradication of any meaningful competition presents grave risks for consumers while imposing critically important burdens on regulators and other policymakers.

Ironically, but hardly unexpectedly, the RBOCs have not permitted their latest moves to cause them to miss a beat in their ongoing efforts for large-scale deregulation on both state and federal levels, where they continue to argue that this "increasingly competitive" industry requires the immediate and complete end to regulation of incumbents. To even begin to entertain these demands at a time when competition throughout the wireline telecommunications industry is in its most precarious state in years would be an intolerable failure of public policy.

As state consumer advocates, NASUCA's members have worked vigorously to advance competition for the benefit of consumers. However, NASUCA's members have the responsibility to see that consumers pay just and reasonable rates – even if competition fails to develop in the manner or at the speed promised by the dominant players in the telecommunications industry. There is an immediate need to reinvigorate much of the regulatory

---

2.  MCI is presently continuing to market its local/long distance bundle, The Neighborhood. As to AT&T, one could question whether the considerable fanfare surrounding its decision to withdraw from active marketing of consumer local and long distance services was intended primarily as regulatory posturing or to announce its availability as a takeover target, since the highly publicized decision to withdraw from the consumer market undoubtedly stimulated far more rapid consumer migration away from AT&T than would otherwise have taken place, and in so doing worked at cross-purposes with AT&T's "harvesting" strategy.



machinery that has been largely dismantled as a result of overly optimistic expectations as to the emergence and sustainability of an effectively competitive telecom market.

At the same time, it would be extremely unfortunate for consumers and the national economy if the telecommunications industry were left to veer permanently off the path to competition that Congress established in the 1996 Act.  Such abandonment of competition is a real possibility if the FCC continues to take regulatory actions that undercut the opportunities for competition to develop.  The pro-competitive provisions in the 1996 Act, intended to encourage entry and protect new entrants from ILEC anticompetitive conduct, are still the law and can still be enforced.  In evaluating the proposed takeovers of AT&T by SBC and of MCI by Verizon, the FCC has the opportunity to take a long, hard look at the effects of its policies and make changes that, going forward, will help to establish the conditions for the revitalization of competition.  But if competition is not to be a factor in telecom's future – whether the result of regulatory policies that continue to frustrate its development or, alternatively, because some portions of the telecommunications industry turn out to be a "natural monopoly" after all – then consumers and the public interest generally demand that the regulatory infrastructure that has been dismantled based upon the *assumption*, *expectation* or *hope* of an effectively competitive marketplace now be reinstated and reinvigorated, and that this process take place *before* the currently-pending industry reconcentration is permitted to go forward.

In the chapters that follow, we identify key *deregulatory* measures that have been adopted on the premise of competition.  We explore the fallacy of that premise, and demonstrate just how little competition has actually emerged in the nine-plus years since the enactment of the 1996 federal legislation.  Finally, we present a specific set of regulatory and policy initiatives that will work to protect consumers by fulfilling the "competitive outcome" goal of economic regulation when marketplace forces are not capable of producing this result.


ECONOMICS AND
TECHNOLOGY, INC.

# 2 | THE GENESIS OF THE CURRENT INDUSTRY CONDITION

**The triumph of incumbency over competition on the regulatory front**

When it passed the landmark Telecommunications Act of 1996, Congress established a broad and ambitious framework for promoting competition throughout all telecommunications markets.  The FCC's efforts to implement the pro-competitive 1996 Act got off to an auspicious start with the massive 754-page *Local Competition Order*, released exactly six months after the legislation's enactment.[3]  In this first major order interpreting the 1996 Act, the Commission observed that the new law valued  local exchange competition not only in its own right, but also as a means of ensuring that the "local bottleneck" ceased to be a barrier to increased competition for all other telecommunications services.  There, the Commission stated:

> [T]he relationship between fostering competition in local telecommunications markets and promoting greater competition in the long distance market is fundamental to the 1996 Act. Competition in local exchange and exchange access markets is desirable, not only because of the social and economic benefits competition will bring to consumers of local services, but also because competition eventually will eliminate the ability of an incumbent local exchange carrier to use its control of bottleneck local facilities to impede free market competition.[4]

In the *Local Competition Order*, the FCC evidenced a strong commitment to fostering competitive entry by enforcing the incumbent LECs' obligations under Section 251 to provide interconnection to competitors, to offer CLECs access to unbundled elements of the ILEC networks at TELRIC-based prices, and to offer all retail services for resale at a wholesale discount.  The Commission also committed to applying the public interest standard in its Section

---

3.  *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket No. 96-98, *First Report and Order*, 11 FCC Rcd 15499 (1996) ("*Local Competition Order*").

4.  *Id.*, at para. 4.



*The Genesis of the Current Industry Condition*

271 reviews, going beyond a mechanical inquiry into merely whether "checklist" criteria were superficially satisfied.

Unfortunately, the FCC's vision of the Act, as described in the *Local Competition Order*, was slowly – but steadily – eroded, to be replaced by an entirely new perspective, one decidedly *not* envisioned in the 1996 legislation, yet given currency as a result of intensive RBOC lobbying. The FCC was urged to adopt a cynical view of CLEC purchases of unbundled network elements. The RBOCs complained that they had no incentive to invest in their networks if they had to sell unbundled components of the network to their competitors, at TELRIC rates.[5] CLECs, under this RBOC-perpetrated view, were merely parasites. Over time, the FCC became increasingly negative in its descriptions of competition that did not entirely consist of facilities built by CLECs. This perspective underlies a series of Commission and federal court decisions that progressively limited CLECs' ability to overcome, as the 1996 Act had intended, the economic barriers to competing in the local exchange market.[6]

## Capital for new investments evaporates, while regulatory pressure to deploy CLEC-owned facilities ramps up

There can be no question that the 1996 Act catalyzed extensive interest and investment in competitive telecom ventures. Between 1996 and 2001, some $65-billion was invested in CLEC ventures alone. CLEC stock prices soared, with the sector achieving a total market capitalization of $430-billion in September of 1999. The excitement and interest were short-lived. When the bubble ultimately burst, the fall was precipitous and hard. In fact, and as Figure 1 demonstrates, capital investment in CLEC ventures plummeted after 2001.

---

5. *See, e.g., Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, WC Docket No. 04-313 and CC Docket No. 01-338, Comments of SBC Communications Inc., filed October 4, 2004; *Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, WC Docket No. 04-313 and CC Docket No. 01-338, Comments of Verizon, filed October 4, 2004.

6. The 1996 Act contemplated three forms of competitive entry – through resale of "bundled" ILEC services, through CLEC use of one or more "unbundled network elements" of the ILECs' network, or through the use of CLEC-owned facilities, or any combination thereof – and expressed no preference for or against any of these business models. In fact, Congress understood that a ubiquitous, nationwide facilities-based overbuild would be an incredibly costly undertaking, and that no such outcome could reasonably be expected any time soon, if at all. Assuring entrants' access to incumbents' networks was the means by which widespread *retail* level competition could be facilitated and encouraged even if and where facilities-based competition was not practical. Nowhere in the 1996 Act or in its legislative history can one find any suggestion that non-facilities-based competition is in any manner uneconomic or not in the public interest, or any basis upon which such competition should be discouraged or foreclosed altogether. For example, for purposes of Section 271 reviews, RBOCs consistently relied on and the FCC endorsed, competitors' purchases of UNEs as evidence of "facilities-based" competition. Ironically, once allowed back into long distance, Verizon, SBC and BellSouth all adopted *resale-only* long distance business models.


ECONOMICS AND TECHNOLOGY, INC.

*The Genesis of the Current Industry Condition*



**Figure 1.** Net additional CLEC investment, 1996-2003.

While not the only factor, certainly the change in the CLECs' regulatory fortunes contributed to their adverse treatment by the financial markets. By the end of 2002, CLEC share values had dropped by 91.1%, from their $423.9-billion peak to only $37.5-billion (see Table 1). Telecom equipment manufacturers, from the giants like Lucent and Nortel to the start-ups like Tripath Technologies and Ditech Communications, fell on hard times as the demand for their products dried up and the credit that they had extended to purchasers became uncollectible.

As capital to support CLEC investment evaporated, those companies still in business altered their business model from one involving their own facilities to one based upon use of incumbent telco distribution, switching and transport resources. An early series of FCC actions and court rulings[7] had, so it seemed, assured entrants with access to ILEC network assets at cost-based (so-called TELRIC) rates. The FCC, believing that the availability of UNEs at cost-based rates

---

7. *Local Competition Order*, aff'd in part and vacated in part sub nom. *Comp. Tel. Assoc. v. FCC*, 117 F.3d 1068 (8th Cir. 1997) and *Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997), *aff'd in part and remanded, AT&T v. Iowa Utils. Bd.*, 525 U.S. 366 (1999); *on remand Iowa Utils. Bd. v. FCC*, 219 F.3d 744 (8th Cir. 2000) ("*Iowa Utilities II*"), *reversed in part sub nom. Verizon Communications, Inc. v. FCC*, 535 U.S. 467 (2002) ("*Verizon v. FCC*").

ECONOMICS AND
TECHNOLOGY, INC.

*The Genesis of the Current Industry Condition*

| Table 1. CLEC Market Capitalization from Peak to Crash | | | | | | | |
|---|---|---|---|---|---|---|---|
| | September 30, 1999 | | | September 18, 2002 | | | |
| | | In Millions | | | | In Millions | |
| Company | Stock Price | Shares out-standing | Market Cap | Stock Price | Shares out-standing | Market Cap | % chg 9/99 to 9//02 |
| Adelphia | $ 28.00 | 51.42 | $  1,440 | -- | -- | -- | -100% |
| Allegiance | $ 63.00 | 64.86 | $  4,086 | $  0.09 | 124.74 | $  11 | -100% |
| AT&T Corp | $ 47.44 | 3195.63 | $151,601 | $ 22.32 | 788.06 | $17,589 | -88% |
| Commonwealth | $ 44.00 | 22.11 | $  973 | $ 41.47 | 23.93 | $  992 | 2% |
| Connectiv | $ 19.63 | 87.27 | $  1,713 | -- | -- | -- | -100% |
| CoreCom | $ 37.19 | 72.05 | $  2,680 | -- | -- | -- | -100% |
| CTC Comm. | $ 16.44 | 14.55 | $  239 | -- | -- | -- | -100% |
| CTCI | $ 47.00 | 19.93 | $  937 | $ 14.29 | 18.76 | $  268 | -71% |
| Intermedia | $ 25.00 | 50.99 | $  1,275 | -- | -- | -- | -100% |
| Focal | $ 23.94 | 60.65 | $  1,452 | -- | -- | -- | -100% |
| Global Crossing | $ 26.50 | 794.77 | $ 21,061 | -- | -- | -- | -100% |
| GST Telecomm | $  7.03 | 37.71 | $  265 | -- | -- | -- | -100% |
| Northpoint | $ 24.31 | 125.24 | $  3,045 | -- | -- | -- | -100% |
| ICG Communications | $ 15.56 | 47.34 | $  737 | -- | -- | -- | -100% |
| Level 3 | $ 52.22 | 341.08 | $ 17,811 | $  4.96 | 655 | $ 3,249 | -82% |
| Worldcom | $ 76.88 | 1880.22 | $144,551 | -- | -- | -- | -100% |
| RCN | $ 49.69 | 76.18 | $  3,785 | $  2.57 | 111.17 | $  286 | -92% |
| Sprint | $ 54.25 | 785.21 | $ 42,598 | $ 15.58 | 903.17 | $14,071 | -67% |
| Time Warner | $ 20.88 | 104.54 | $  2,183 | $  9.05 | 114.93 | $ 1,040 | -52% |
| Winstar | $ 39.06 | 54.93 | $  2,146 | -- | -- | -- | -100% |
| XO Comm | $ 61.38 | 315.45 | $ 19,362 | -- | -- | -- | -100% |
| Total CLEC | | | $423,939 | | | $37,507 | |
| Source: Company 10Q reports, www.thedigest.com/stocks | | | | | | | |
| Note: -- Indicates that the company has filed for bankruptcy or has been delisted from the NASDAQ. | | | | | | | |

8


ECONOMICS AND
TECHNOLOGY, INC.

would make the local service market "irreversibly open to competition"[8] had, by the end of 2003, allowed Bell companies in every state to reenter the long distance market. By then, CLECs had captured approximately 15-million residential and small business ("mass market"[9]) retail customers using the Unbundled Network Element Platform (UNE-P) service arrangement obtained from the incumbents[10] and, while the Bells had been incredibly successful in rapidly capturing long distance market share, the growing CLEC activity in the local market provided at least some level of constraint on RBOC market power.

As of the end of 2003 (some eight years after passage of the 1996 Act) only about 7-million customers – representing less than 5.1% of all residential and small business access lines nationwide – were being served exclusively via CLEC-owned facilities.[11]  The remaining CLEC retail customers received service via UNEs, made available as a result of Section 251(d)(2) of the 1996 Act[12] or through CLEC resale of ILEC services, as provided for at Sections 251(c)(4) and 252(d)(3) of the Act.  Put differently, even though CLECs had captured some 16.3% of *retail* customers, ILECs were the underlying service provider for some 96% of all US exchange access lines (see Figure 2).

---

8.  See  *Application by Bell Atlantic New York for Authorization Under Section 271 of the Communications Act To Provide In-Region, InterLATA Service in the State of New York*, CC Docket No. 99-295, *Memorandum Opinion and Order,* 15 FCC Rcd 3953 (1999) ("*New York 271 Order*"); *Application by SBC Communications Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services in Texas,* CC Docket No. 00-65, *Memorandum Opinion and Order,* 15 FCC Rcd 18354 (2000) ("*Texas 271 Order*"); see also http://www.fcc.gov/Bureaus/Common Carrier/in-region_applications/ (accessed April 11, 2005).

9.  *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-989; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, 18 FCC Rcd 16978 ("*Triennial Review Order*" or "*TRO*").  There (at para. 50), the FCC combined residential and small business customers into a single "mass market" for purposes of the impairment analysis.  The reality is that residential customers and small business customers are separate, distinct markets, no less distinguishable from each other than are small business customers and large (so-called enterprise) business customers.

10.  FCC Wireline Competition Bureau, Industry Analysis and Technology Division, *Local Telephone Competition: Status as of June 30, 2004*, December 2004 ("*FCC Local Comp Report*").

11.  *Id.*

12.  Section 251(d)(2) provides:  "In determining what network elements should be made available [as UNEs], the Commission shall consider, at a minimum, whether ... the failure [of the incumbent LEC] to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer."



*The Genesis of the Current Industry Condition*



Source: FCC Local Competition Report, December 2004.

**Figure 2.** ILECs own 96% of all dial access line facilities, even though they currently provide only 82% of these at retail.

The fact that the vast majority of CLEC lines were provided over a combination of UNE facilities that included the local loop and local switching was clear evidence that the economic barriers to CLEC ownership of bottleneck access facilities were not being overcome.[13] Nonetheless, the incumbents persisted in asserting that the mere existence of virtually *any* CLEC

---

13.  The RBOCs' "spin" on this point was that the lack of CLEC investment in facilities was due to the requirement that UNEs be priced at TELRIC, which the Bells portrayed as representing a "subsidized" price. *Unbundled Access to Network Elements, Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* WC Docket No. 04-313, CC Docket No. 01-338, Comments of SBC Communications Inc., filed October 4, 2004, at 8.  Of course, if there were any truth to that contention, one would have expected a massive infusion of capital once UNE prices were increased or once UNEs became unavailable, following the *USTA II* ruling and the FCC's *Triennial Review Remand Order*.  *Order On Remand*, 2005 FCC LEXIS 912 ("*Triennial Review Remand Order*" or "*TRRO*").  Instead, what we saw were CLECs running for the exits.


ECONOMICS AND TECHNOLOGY, INC.

facilities was in and of itself fully sufficient to confirm the *feasibility* of full facilities ownership and, by extension, that all other CLECs were not "impaired" without access to unbundled elements of the incumbents' networks. This theoretical view of "impairment" – which ignores the economic realities reflected in the extremely limited *actual* CLEC deployment of facilities – was embraced by the United States Court of Appeals for the D. C. Circuit and, ultimately, by the FCC.[14] The nearly complete disintegration of CLEC competitors in recent months proves that this entirely theoretical and mechanical framework for determining CLEC "impairment" was disastrously wrong.

Despite some regulatory setbacks, AT&T continued to invest heavily in acquiring local service customers and, by the summer of 2004, had been providing local service to some four million of them.[15] MCI in 2002 became the first to introduce a bundled flat-rated local and toll service pricing plan known as *The Neighborhood* and by the end of 2003 was already serving 3-million *Neighborhood* subscribers.[16] However, the announcement in June 2004 by the Solicitor General that he would not appeal the D.C. Circuit's *USTA II* ruling – which continued *USTA I*'s process of limiting access to UNEs – to the United States Supreme Court was the final blow to the CLECs' eight-year crusade to secure their competitive position in the local exchange market.

Without access to essential network elements at cost-based prices, CLEC after CLEC has exited the market for these services, and many have gone out of business altogether. The FCC's and court's rulings, which have precluded the CLECs' use of UNE-P to gain entry to local markets, has made it impossible for CLECs to attract the capital that they would have needed to expand their ownership of facilities. Facilities-based competition requires capital, but investors demand regulatory consistency and stability as a condition of making capital available. Capital that had invested in UNE-based CLEC business models was decimated, not because the business model itself was unsound, but rather because, after the funds had been committed, the FCC and courts interpreted the statutes and regulations setting up the system in a manner that made it impossible to carry out those business plans. Having been burned by earlier initiatives, investors have withheld the capital necessary for future CLEC deployment of their own facilities.

---

14. In its *TRO*, the FCC initially rejected the kind of broad application of this claim that the incumbents were seeking, but nevertheless determined that "non-impairment" could be made by state utility commissions subject to specific guidelines set forth by the FCC. In March 2004, the D.C. Circuit Court of Appeals struck down that particular aspect of the FCC's order, and substituted its own determination of non-impairment (in line with the ILEC contentions) with respect to UNE-P and UNE-switching for mass market (residential and small business) services. *United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ("*USTA II*") cert. denied, 125 S.Ct. 313, 316, 345 (2004).

15. *Description of the Transaction, Public Interest Showing, and Related Demonstrations,* SBC Communications and AT&T Corporation, filed with the FCC on February 21, 2005, at 54.

16. *Phone Service Bundles Could Backfire as Customers Switch*, The Wall Street Journal, November 7, 2003.



ECONOMICS AND TECHNOLOGY, INC.

Thus, the strategy of attempting to force CLECs into "true" (i.e., CLEC-owned facilities-based) competitive entry by pulling out the rug with respect to what former Chairman Powell referred to as "artificial" (i.e., UNE-P) competition[17] has essentially backfired.  What the FCC has done is to shut down all forms of wireline competition through policies that both foreclose use of UNEs and that discourage facilities-based investment.

It was in this regulatory and marketplace context that AT&T concluded that it could no longer profitably serve residential customers and, in August 2004, announced that it was withdrawing from this market.[18]  Similarly, at about that same time, MCI scaled back active marketing of its *Neighborhood* service to new customers.[19]  By early February 2005, the withdrawal of AT&T and MCI as *competitive* local exchange carriers appeared complete, with announcement on January 31 that AT&T had agreed to be acquired by SBC, followed shortly by the news that Verizon planned to acquire MCI.[20]  Also in 2004, a number of smaller entrants announced plans to scale back their operations or to withdraw altogether, and several others filed for bankruptcy protection.[21]  It is difficult, to say the least, to square the FCC's and the D.C. Circuit's determinations that CLECs are "not impaired" without access to UNEs with these real-life marketplace failures.

In sum, the FCC's conclusion that competition is flourishing[22] when the United States' two largest CLEC/IXCs have just agreed to sell themselves to the two largest ILECs can only be attributed to the final triumph of optimism over realism.  In discussing FCC Chairman Michael Powell's tenure prior to his departure, *Business Week* commented that:

---

17.  *TRO*, Separate Statement of Chairman Michael Powell, 18 FCC Rcd 16978 at 17517.

18.  AT&T Corp. News Release, "AT&T Announces Second-Quarter 2004 Earnings, Company to Stop Investing in Traditional Consumer Services; Concentrate Efforts on Business Markets," July 22, 2004, Available at http://www.att.com/news/ (Accessed April 11, 2005.)

19.  MCI, Inc., 10K Annual Report, filed March 16, 2005.

20.  Verizon News Release, "Verizon to Acquire MCI for $5.3 Billion in Equity and Cash," February 14, 2005. Available at http://newscenter.verizon.com (Accessed April 11, 2005).

21.  E.g. ATX/Corecomm filed for Chapter 11 protection on January 15, 2004, RCN filed for protection on May 27, 2004, and Elantic Telecom filed July 20, 2004.

22.  *FCC Local Comp Report.*



ECONOMICS AND
TECHNOLOGY, INC.

*The Genesis of the Current Industry Condition*

Deregulation is good, and so is technology. But running U. S. telecom policy requires appreciating when a bit of regulation can be a positive thing. That's something Powell never seemed to understand.[23]

When one looks beyond the hype and the rhetoric, it is painfully clear – now nine years since the 1996 legislation – that the "enduring local bottleneck" is as entrenched as ever, and that the nation's all-too-short experiment with telecommunications competition is rapidly coming to an end.[24]

### Succumbing to intense RBOC pressure, the FCC simply disregarded the persistence of the local bottleneck in permitting RBOC long distance entry

At the same time that the largest ILECs – the RBOCs – were working to weaken the regulatory framework for local competition, they also worked systematically to wear down the FCC with respect to RBOC long distance entry under Section 271. To achieve their goal on an expedited schedule, the RBOCs needed to disabuse the FCC of the notion that effective (that is, actual) competition in local exchange and exchange access services was a necessary precondition for RBOC long distance entry to be in the public interest.[25] The FCC's acquiescence in permitting the RBOCs to reenter the long distance market without evidence of actual local competition, as discussed in the next chapter, set the stage for the ultimate collapse of the nation's largest IXCs.

Beginning in 1997, when the RBOCs launched their initial bids to be permitted to reenter the long distance market, they hammered the theme that without their entry the long distance market was a "tight oligopoly" and that consumer welfare was being hurt by a lack of competitive options – options that the RBOCs themselves were eager to provide.[26] This theme appeared repeatedly in the RBOCs' Section 271 filings. Ironically, even though this "tight

---

23. "How to Rewire the FCC," *Business Week*, February 7, 2005, at 96.

24. In February 1994, Economics and Technology, Inc. together with Hatfield Associates, Inc. released *The Enduring Local Bottleneck: Monopoly Power and the Local Exchange Carriers*, a study funded by AT&T, MCI and the Competitive Telecommunications Association (CompTel). Given the state of local competition today, some eleven years later, our choice of the adjective "enduring" has clearly stood the test of time.

25. Compare New York Section 271 Order, 15 FCC Rcd 3953 (1999) at paras. 422-445, with analysis in California Section 271 Order, 17 FCC Rcd 25650 (2002) at para. 147.

26. *Application by SBC Communications Inc., Michigan Bell Telephone Company, and Southwestern Bell Communications Services, Inc. for Authorization To Provide In-Region, InterLATA Services in Michigan*, WC Docket No. 03-138, Affidavit of Paul W. MacAvoy on behalf of SBC Communications, March 1997.



ECONOMICS AND
TECHNOLOGY, INC.

oligopoly" existed at the time the 1996 Act was passed and prior to the RBOCs' own entry, the long distance market was actually far more competitive than it is today.

Between 1984 and 1997, AT&T's market share (based upon operating revenues) dropped from 90.1% to 44.5%. In 1997, when AT&T's market share was at 44.5%, MCI had a 19.7% market share, with Sprint at 9.7%, Worldcom at 6.7% and all other carriers combined accounting for 19.8% of the market.[27]  Contrast with the fact that, in the relatively short time that the RBOCs have been providing long distance service,[28] *RBOC long distance shares* at the *retail* level have soared to more than 60% of residential lines within their respective BOC footprints.

Although the FCC was decisive in rejecting the earliest Section 271 applications that had relied upon flimsy evidence of competition,[29] it bowed to steady pressure from the RBOCs and gradually gave less and less weight to the "public interest" language in Section 271.[30]  Once the receipt of Section 271 authority was made dependent almost exclusively upon a showing that "checklist" elements were being provided to competitors (regardless of whether CLECs were successfully using the various elements to compete throughout a state) and a nominal "Track A" showing that one or more competitor provided some kind of residential and business service in the state, RBOC long distance reentry quickly occurred nationwide.[31]

Under the 1996 Act, however, Section 271 did not stand alone as the only protection consumers and competitors were supposed to have against the RBOCs' regaining the ability to use their market power in local exchange services to gain undue competitive advantage in the

---

27. FCC, Common Carrier Bureau, Long Distance Market Shares, March 31, 1999, Table 3.2.

28. Verizon in New York was granted the first such authority in December 1999, while the final RBOC 271 grant of authority went to Qwest for Arizona in December 2003. The FCC lists the dates for all of its Section 271 approvals at www.fcc.gov/Bureaus/Common_Carrier/in-region_applications.

29. For example, in SBC's initial Section 271 application for Oklahoma, it claimed to have met the conditions for providing competitors with essential interconnection capabilities when there was a single CLEC, providing 4 residential connections as a trial to its employees.

30. Compare the FCC's analysis in the New York Section 271 Order, 15 FCC Rcd 3953 (1999) at paras. 422-445, with its analysis in the California Section 271 Order, 17 FCC Rcd 25650 (2002) at para. 147 ("Accordingly, although the Commission must make a separate determination that approval of a section 271 application is 'consistent with the public interest, convenience, and necessity,' it may neither limit nor extend the terms of the competitive checklist of section 271(c)(2)(B). Thus, the Commission views the public interest requirement as an opportunity to review the circumstances presented by the application to ensure that no other relevant factors exist that would frustrate the congressional intent that markets be open, as required by the competitive checklist, and that entry will serve the public interest as Congress expected.")

31. The first RBOC 271 application was filed on January 2, 1997 (and withdrawn the next month). The last 26 of the 49 Section 271 authorizations occurred within the 12 months between December 15, 2002 and December 15, 2003. *See*, http://www.fcc.gov/Bureaus/Common_Carrier/in_region_applications/ (accessed April 11, 2005).

14


ECONOMICS AND TECHNOLOGY, INC.

long distance market.  Under Section 272, Congress established the requirement for structural separation of the RBOC ILEC and long distance entities, along with the associated transactional and nondiscrimination requirements precisely because the mere satisfaction of the Section 271 "competitive checklist" was not by itself sufficient to constrain or otherwise diminish a BOC's market power with respect to local and access services.

Unfortunately, the RBOCs were unwilling to forgo the many opportunities to take advantage of assets (including human capital) from their ILEC business to get a "leg up"in their new ventures.   The RBOCs began pushing for the FCC to agree to allow Section 272 to "sunset,"[32] even though Congress had allowed the FCC to extend Section 272 safeguards as long as competitively necessary. Given the still underdeveloped state of CLEC competition, there were many compelling reasons to adopt such a course, but the FCC decided, once again, to listen to assertions from the RBOCs that they had neither the intent nor ability to act anticompetitively in the absence of the affiliate transaction safeguards in Section 272.[33]

Shortly after deciding to allow Section 272 to sunset three years following the grant of Section 271 authority in a state, the FCC was again persuaded by the RBOCs, over strong objections from competitors and consumer advocates, to eliminate a critical rule (and one of the key affiliate transaction safeguards adopted by the Commission in 1996 consistent with its interpretation of the 1996 Act's requirements)  that disallowed the sharing of operating, installation, and maintenance (OI&M) functions between the RBOC and its long distance affiliate.[34]  By removing this safeguard, the FCC made it easier for the RBOCs to give its own long distance affiliate preferential treatment over that afforded to unaffiliated providers, and made any such discriminatory treatment (which remains illegal under Section 272(e)) much harder to detect.

---

32.  Section 272(f)(1) provides that most portions of section 272 (other than subsection (e) [non-discrim-ination]) expire three years after the BOC receives Section 271 authority "unless the Commission extends such 3-year period by rule or order."

33.  *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC Docket No. 02-112, *Memorandum Opinion and Order*, 17 FCC Rcd 26869 (2002) ("*Section 272 Sunset Order*").

34.  *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates*, WC Docket No. 03-228, *Report and Order*, 19 FCC Rcd 5102 (2004) ("*OI&M Order*").



# 3 | THE FADING PROSPECTS FOR COMPETITION IN LOCAL AND LONG DISTANCE MARKETS

**Sources of ILEC market power**

Economists and antitrust courts have long understood that market power in one industry segment can reduce competition in adjacent, otherwise competitive, markets.[35]  Addressing this concern was the goal of the MFJ – the 1982 consent decree that separated the former Bell System's monopoly local exchange carrier operating companies from, and prohibited them from re-entering, the long distance, manufacturing and enhanced services lines of business.  That divestiture was specifically aimed at preventing the Bell monopolies from leveraging their local exchange market power into these adjacent – and potentially competitive – markets.[36]  The 1996 Act replaced the outright structural separation of monopoly local and competitive long distance services with a set of conditions that, when satisfied, was expected to ensure that the local market would be opened to competition to the point where the incumbent BOCs would no longer have a local monopoly from which to dominate adjacent long distance and wireless services. However, this central premise of the 1996 legislation could work only if competition for local services actually developed, and of course that has not happened.

Unfortunately, the conditions under which the RBOCs were permitted to enter long distance – set out at section 271 of the 1996 Act – were interpreted to require only that they eliminate certain specific barriers to local entry, and *not* that competition actually emerge.  The RBOCs

---

35.  See, *e.g.*, *United States of America v. Microsoft Corporation*, Civil Action No. 98-1232 in US District Court for the District of Columbia, Direct Testimony of Franklin M. Fisher, January 5, 1999, at para. 55, noting, "[a monopoly firm] may choose to exercise its power to gain an advantage or even a monopoly in a second market."

36.  *U.S. v. Western Electric Co. et al.*, 552 F. Supp. 131 (D. D.C. 1982), Section VII, *aff'd sub nom. Maryland vs. U.S.*, 460 U.S. 1001 (1983).  The Consent Decree noted that, "These [line of business] restrictions are justified, according to the Department, because the Operating Companies will have 'both the ability and the incentive' to thwart competition in these market by leveraging their monopoly power in the intraexchange telecommunications market.  In the absence of the restrictions, it is reasoned, the Operating Companies will be able (1) to subsidize their prices in competitive markets with supracompetitive profits earned in the monopoly market, and (2) to hinder competitors by restriction their access to the intraexchange network."



ECONOMICS AND
TECHNOLOGY, INC.

were able to gain authorization to begin providing long distance service long before even the most well-financed CLECs were able to make significant inroads into local service. As a result, the RBOCs had little trouble extending their market power to the adjacent long distance, wireless, Internet, and other growing competitive markets.

Today, the Bell companies continue to overwhelmingly dominate the local phone market, and they now acknowledge that their shares are likely to increase.[37] Even as the Bells and the FCC continue to promote claims that local service has become competitive, the strongest of the Bells' would-be competitors have been weakened to the point where they perceive no choice but to be acquired by the largest RBOCs. The nine years of a regime intended to promote competition have done little to diminish the RBOCs' legacy incumbent status, geographic ubiquity and pervasive economies of scale, and now these incumbent companies are poised to eliminate their what should have been their strongest rivals.

## The Local Wireline Market:  Enduring ILEC Bottleneck Control

Notwithstanding the clear objectives of Congress in 1996, the series of regulatory and court decisions described in the previous chapter have allowed ILECs – and particularly the RBOCs – to maintain their market power in local exchange service and in the adjacent markets. The source of the ILECs' continuing market power is twofold:

- First, the ILECs continue to control the "local loop" – the wireline bottleneck facilities linking the public telecommunications network with virtually every home and business premises nationwide. With few exceptions (discussed below), these facilities are necessary to provide local telephone service to an end user. Today, although CLECs now serve some 18% of residential customers nationwide, the vast majority of all local lines are still being provided over ILEC-owned facilities (see Figures 3 and 4).

- Second, the ILECs' legacy monopoly subscriber base allows them to enjoy substantial economies of scale not available to competitors. For example, switching equipment (required to complete calls) is collocated at a wire center and connected to a local loop serving an end user customer. The cost of this switch is spread over all end-user customers served by the switch owner at that wire center. By virtue of their overwhelming dominance in retail lines, the ILECs have a significant cost advantage over CLECs in terms of switching equipment.

---

37.  BellSouth 4th Quarter 2004 Investor Guidance Conference Call, January 25, 2005, available at http://www.bellsouth.com/investor/?src=abtus_dd  (Accessed April 12, 2005) ("*BellSouth Investor Call*").



*The Fading Prospects for Competition*



**Figure 3.** CLECs have had some success in capturing *retail* local service market shares.



**Figure 4.** But after more than nine years since enactment of the 1996 legislation, ILEC shares of the underlying local network *facilities* are still in the high 90% range and confront almost no serious competitive challenge.


ECONOMICS AND
TECHNOLOGY, INC.

*The Fading Prospects for Competition*

In part to overcome this advantage, the FCC had required the RBOCs to provide, again at cost-based rates, unbundled local switching combined with local loop facilities. These so-called UNE-Platform (UNE-P) arrangements allowed the CLECs to provide customized services without requiring them to install switches in every wire center or, alternatively, to provide interoffice facilities to connect the unbundled ILEC loops to the CLEC's switch. Except for the very largest of ILEC wire centers, the deployment of CLEC switch or interoffice facilities could rarely be economically justified. As illustrated by Figure 5 below, UNE-P proved a successful means of retail entry for many CLECs.



Source: FCC Local Competition Report, December 2004.

**Figure 5.** The vast majority of CLEC services rely upon UNE-P, and the continued availability of these retail CLEC offerings is thus threatened by the imminent elimination of UNE-P.

The vast majority of the current 17- million UNE-P lines will likely disappear within the next year or so, regardless of whether the mergers are approved. As a result of the FCC's *TRRO*,



*The Fading Prospects for Competition*

ILECs are no longer required to provide cost-based UNE-P arrangements.[38]  The *TRRO* allows the CLECs to retain, for the period of one year, in-place UNE-P serving arrangements, but at higher rates.  After that, CLECs without the critical mass of customers to make the use of their own switches economically feasible will be left with few, if any, options other than to exit the market.[39]  It is almost certain that the ILECs will win back the lion's share of these customers.[40]

Two of the few CLECs that might have had a critical mass of customers to justify switch investment are AT&T and MCI.  Although it is unclear what SBC and Verizon intend to do with these customers post-merger, it is likely that the companies will fold in-region AT&T and MCI CLEC lines back into the RBOCs' own customer base.  We don't know what will happen to the AT&T and MCI out-of-region lines, since up to now neither SBC nor Verizon have competed out-of-region, even after having agreed to do so as conditions for approval of their last round of mergers.[41]

This trend of vanishing UNE-P-based CLEC lines had begun even before the official release of the *TRRO*.  For the fourth quarter of 2004, the total number of Verizon-provided UNE-P lines actually fell.[42]  SBC has reported negative UNE-P growth for two consecutive quarters, with more than half-a-million UNE-P lines being disconnected.[43]  While it is possible that some of these UNE-P lines were converted to UNE-Loop arrangements using CLEC-owned switching, the fact that both BOCs have touted the success of "win-back" suggests that the customers frequently return to *retail* BOC services.

---

38.  *Triennial Review Remand Order*, at para 5.

39.  A few small CLECs have announced that they have negotiated "commercial agreements" for serving arrangements roughly comparable to UNE-P with SBC and Qwest.  *See, e.g.*, Sage Telecom News Release, "*Sage Telecom and SBC Reach Wholesale Telecom Services Agreement*" April 5, 2004.  However, there is no marketplace evidence that such arrangements are economically viable, and the fact that the largest CLECs – AT&T and MCI in particular – both of which had *millions* of in-place UNE-P customers chose to exit the market rather than enter into such "commercial agreements" certainly casts serious doubt as to the market viability of these pseudo-UNE-P offerings as serious mass market CLEC entry vehicles.

40.  BellSouth recently advised securities analysts that it is recapturing "more than our fair share" of former CLEC customers. *Bellsouth Investor Call*, January 25, 2005.

41.  *Applications of Ameritech Corp., Transferor, and SBC Communications Inc., Transferee, For Consent to Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 5, 22, 24, 25, 63, 90, 95 and 101 of the Commission's Rules,* CC Docket No. 98-141, 14 FCC Rcd 14712 (1999) at Appendix C ("Conditions"), Fostering Out-of-Region Competition, XXI. Out-of-Territory Competitive Entry (National-Local Strategy).

42.  Verizon 4th Quarter Investor Briefing Slide Show, January 27, 2004, at slide 23.

43.  SBC 4th Quarter Investor Briefing Slide Show, January 26, 2004, at slide 13.


ECONOMICS AND TECHNOLOGY, INC.

*The Fading Prospects for Competition*

### The effects of the enduring bottleneck on the long distance market

The power of the RBOCs to pick up long distance market share became quickly apparent following their gaining Section 271 authority to enter the long distance market.  After approximately twelve months following its receipt of such authority in New York, Verizon Long Distance reported a New York long distance residential market share of 20%.[44]  Nine months after receiving Section 271 authority in Massachusetts, Verizon reported a long distance share of more than 20%, and indicated that sales results for Pennsylvania, where Verizon had begun marketing long distance services in late October 2001, were in line with early success rates in other Verizon states.[45]  In Texas, where SBC received interLATA authority in June of 2000, SBC reported that after less than nine months its long distance affiliate had acquired 2.1-million of SWBT's 10-million local customers, representing a 21% share in the state.[46]  Most recently, Verizon announced that "[a]pproximately 56 percent of Verizon residential customers have purchased local services in combination with either Verizon long-distance or Verizon DSL, or both."[47]

Long distance revenues for Verizon grew at a 10.4% year-over-year rate.  SBC showed similar successes, reporting a 49% share of SBC retail consumer and business lines across its 13-state footprint as of the end of 2004[48]  The chart below (Figure 6) reproduces the slide presented by Verizon at its fourth quarter 2003 investor briefing, and confirms the consistent success that Verizon has enjoyed in rapidly acquiring long distance customers following its long distance entry in each state.

---

44.  See Verizon Press Release, "Verizon Communications Post Strong Results for Fourth Quarter and 2000," February 1, 2001.

45.  See Verizon Press Release, "Verizon Communications Post Strong Results for Fourth Quarter, Provides Outlook for 2002," January 31, 2002.

46.  *SBC Investor Briefing*, April 23, 2001, at 7.

47.  Verizon 4th Quarter Investor Quarterly, January 27, 2005, at 4.

48.  SBC Investor Briefing Slide Show, January 26, 2005, at slide 10.  This is a combined figure for all SBC states, with early Section 271 states likely to be significantly higher.



*The Fading Prospects for Competition*



**Figure 6.** RBOCs are acquiring market share at an unprecedented rate following their receipt of Section 271 in-region long distance authority.
(Source: Verizon 4th Quarter 2003 Investor Briefing, January 29, 2004)

22



*The Fading Prospects for Competition*

**The pending mergers will harm the current not-very-competitive environment**

The  SBC and Verizon long distance market shares will escalate to market dominant elevations if the SBC/AT&T and Verizon/MCI mergers are permitted.  SBC did not receive Sec. 271 authority in some of its states until as recently as 2003, so its end-of-year 2004 share understates the ultimate "end state" SBC in-region long distance share.  In those SBC states in which the company has been providing long distance service for five or more years (Connecticut and Texas), its shares have climbed to the 60% to 70% range.  The last data released by the FCC reports a 2002 year-end AT&T household market share in the Southwest and West Coast of 27.3% and 39.2% respectively.[49]  While these percentages have likely decreased over the last two years (due mainly to out-migration of AT&T  customers to SBC), the likely result of the SBC/AT&T merger would be a combined long distance market share in SBC BOC operating territory of 80% or more.  The numbers are likely to be similar for Verizon and for the Verizon/MCI merger.  It is in the context of this concentration in the long distance market that the mergers must be evaluated.  Already, there is scarce and struggling local competition, and the situation will only get worse if the proposed mergers are approved.

Prior to the RBOCs' reentry into long distance, *all* RBOC subscribers were required to purchase their long distance service from somebody *other than the RBOC*.  RBOC entry, however, brought with it a sea change in the market.  Not only are so many consumers taking long distance service from the BOC, they are doing so under bundled local/long distance or even more expansive service packages (e.g., local/long distance/Internet/wireless, or some combination).  This dramatic shift has fueled speculation that the market for "stand-alone" long distance services will all but disappear in the near future.

As was the case prior to the break-up of the former Bell System in 1984, most consumers once again take their long distance service from whomever provides their local phone service.  Thus, as a practical matter, the maximum long distance market share that an ILEC can attain is limited by its share of the *local* phone market.  But as CLECs disappear and the BOCs "win back" the former CLEC customers, those customers' long distance business comes along for the ride.  If, in the end-game, SBC and Verizon ultimately recapture upwards of 90% or more of the long-distance business of the retail local service subscribers within their  respective serving areas – as they will almost certainly do within a very short time – their in-region long distance shares will reach similar heights.  And that is hardly good news for consumers.

---

49.  FCC Wireline Competition Bureau, Industry Analysis and Technology Division, *Statistics of the Long Distance Telecommunications Industry*, May 2003, at Table 15.



# 4 | THE MYTH OF INTERMODAL COMPETITION

**"Intermodal Competition" – is it a reality or merely a rationalization for deregulation?**

The number of competitive local service entrants is dropping precipitously while the RBOCs rapidly increase their long distance customers and market shares. The "competition" that was supposed to have been fostered by the 1996 federal legislation has not arrived and is not likely to emerge any time soon. Undeterred by these *facts*, the RBOCs now posit "intermodal competition"as the new competitive force that, they assert, will constrain their ability to increase wireline rates.

"Intermodal competition" consists of services – principally wireless and cable telephony – provided over alternative media (i.e., not incumbent telco "loop" plant) that allegedly represent *substitutes* for basic local exchange telephone service. More recently, Voice over Internet Protocol (VoIP) has been added to the short list of intermodal alternatives although, as we discuss below, access to VoIP services often involves the very same incumbent telco "last mile" facilities as traditional phone service.

The inclusion of intermodal competition in the analysis is critical to the RBOCs' argument, because it provides a rationale for expanding the definition of the "relevant product market" beyond traditional wireline telephony. As noted, SBC's and Verizon's market share is huge, when limited to wireline. However, by claiming that the relevant market includes intermodal forms of communication, the RBOCs seek to dilute their market shares[50] so that the pending mergers will appear to have a less detrimental impact upon competition.

As explained below, the inclusion of wireless service and VoIP in the same product market as wireline telephony often rests upon a seriously flawed and largely subjective or anecdotal analysis. The RBOCs' theory is that they face competition from wireless and VoIP because,

---

50. A firm's market share is calculated by dividing its sales by total sales in the relevant market. One way to reduce a firm's (apparent) market share is to enlarge the denominator by adopting an overly inclusive "relevant market" definition.


ECONOMICS AND TECHNOLOGY, INC.

they contend, their customers will substitute wireless service or VoIP for their wireline telephone service.  In economics, "substitution" is not an absolute concept:  Products or services may be substitutes under certain circumstances but not in others, based on customer perceptions, price points, and technical considerations.  In addition, there are service quality and safety issues – in particular the lack of reliable E911 service from many VoIP providers – that raise questions about VoIP's substitutability for traditional wireline service.

Viewed solely through anecdotal evidence, these "intermodal" services may appear to be sufficient substitutes for some uses of traditional wireline telephone services.  However, when the effect of these intermodal alternatives in constraining the continued market power of the incumbent telcos is examined in a comprehensive and analytical manner, it becomes evident that their relative importance is minimal at best.  Moreover, to the extent that the very same incumbent telcos or their corporate affiliates are themselves the *source* of the putative "intermodal" alternative, characterizing these services as "competitive" with traditional wireline telephony is disingenuous.  The fallacy of the "intermodal competition" theory is further compounded when corporate affiliates of the RBOCs themselves are included within the list of the purported "competitors" for basic wireline telephone services.

## Cable providers:  Bottleneck bypass results in duopoly

Competition by CLECs has failed to develop to any significant degree.  However, one of the catalysts for the 1996 Act was the promise, or at least the potential, that monopoly cable operators and monopoly ILECs would enter each other's business.  Cable providers had been flirting with telephony for a number of years and, indeed, it was the prospect of cable serving as the second wire into the home that prompted AT&T's disastrous foray into cable TV in 2000.  Cable TV operators like Comcast, Time Warner and RCN offer retail local telephone service to their (primarily residential) cable subscribers, but do not and are not required to make components of their networks available to CLECs on an unbundled or even on a bundled resale basis.  Thus, while cable TV companies compete with the incumbent LECs on a retail basis, they are not a source of wholesale competition for access to facilities into the home.

Cable telephony has been touted as having great competitive promise, but that potential has been slow to develop.  Upgrading cable systems from their traditional one-way analog video distribution capability to a network architecture capable of supporting digital video and two-way services such as high-speed Internet access and circuit switched telephony is a costly under-taking.  Nationally, cable passes some 107.1-million homes, but not all are telephony-capable (making it less ubiquitously available than wireline telephone service).  Of that number, 61% (i.e., 66.1-million) currently subscribe to cable TV service.  By mid-2004, cable systems were



*The Myth of Intermodal Competition*

providing basic local phone service to about 3.34-million customers nationwide.[51]  Thus, the 3.34-million cable telephony customers represent only 3.1% of all homes passed by cable, 5% of all cable TV subscribers, and only about 1.85% of all local telephone access lines.

Moreover, the rate at which the cable systems have been adding new telephony customers has clearly been slowing (see Figure 7 below).  Up to now, at least, the bulk of the required investment has been directed at upgrades to support digital cable services (on-demand, pay-per-view, etc.) and Internet access, and it is not at all clear that substantial additional investment in *circuit-switched* telephony will occur.  Comcast, for example, has recently announced plans to pursue a VoIP strategy[52] (we discuss VoIP in more detail below), apparently in place of any further circuit-switched telephony roll-out.  For residential and small business customers, cable telephony is the only remaining vestige of facilities-based local competition to the ILECs.  Yet there is no indication that cable telephony is in any material sense operating to constrain ILEC prices and market power.

Even the FCC has been skeptical of claims about cable alternatives to traditional ILEC services for enterprise customers.  In the recent *Triennial Review Remand Order*, the FCC noted the following fallacies in the ILEC's assertions regarding intermodal competition from cable providers and other intermodal sources with respect to high-capacity loop facilities used by enterprise customers:

- "First, the record before us contains little evidence that cable companies are providing service at DS1 or higher capacities. ... [M]ost of the businesses served by cable companies are not large enterprise customers, but mass market small businesses that would never generate enough traffic to require a high-capacity loop."[53]

- "In addition, the record suggests that where cable companies do provide service to business customers, they provide cable modem service, rather than service that is comparable to service provided over high-capacity loops.  Competitive LEC commenters explain that bandwidth, security, and other technical limitations on cable modem service render it an imperfect substitute for service provided over DS1 loops.  Commenters also note that businesses that do require DS1 loops are willing to pay

51. *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* MB Docket No. 04-227, *Eleventh Annual Report*, rel. February 4, 2005.

52. "Comcast Plans Major Rollout of Phone Service Over Cable," *The Wall Street Journal*, January 10, 2005, at B1.

53. *TRRO*, at para. 193, footnotes omitted.


ECONOMICS AND TECHNOLOGY, INC.

*The Myth of Intermodal Competition*



**Figure 7.** The rate at which cable systems have been adding new telephony customers has slowed to a trickle.

significantly more for them than the cost of a cable modem connection, which also indicates that the two are not interchangeable."[54]

• Finally, at least two competitors maintain that, based on their internal data, they rarely lose enterprise customers to cable providers.[55]

With other CLECs disabled from serving customers over ILEC loops unless they incur significant *uneconomic* switching investment and with no obligation on cable to provide CLECs access to their loops or switching capabilities, what remains at best is a cable/ILEC duopoly in

---

54. *Id.*

55. *Id.*

ECONOMICS AND
TECHNOLOGY, INC.

the retail market. Duopoly markets, where two large firms carve up all of the demand, tend to behave like monopolies, not like competitive markets.[56] Put differently, if cable is the only actual competitor to the ILECs for basic local telephone service, its presence is not likely to have any effect in constraining ILEC prices and market power over "last mile" facilities to the home. Thus, despite Congress' best intentions in 1996 and with or without a cable telephony presence, the local exchange market ultimately ends up at exactly the same place where it began.

### The myth of widespread access line substitution

*The decline of the second line market*

ILECs have sought to ascribe their recent decline in access lines to the growth of competition generally and, more recently, to intermodal competition from wireless and other services. However, they have never produced any substantive evidence that such competition is the only or even the primary source of the decline in demand for ILEC access lines. There have been other economic and market forces that have contributed more significantly to access line erosion. One source may have been the economic downturn that began in 2001. The largest influence, however, is undoubtedly the substantial *growth* in the demand for high-speed Internet access via DSL and cable modem services. Beginning in the mid-1990s, the growing interest in dial-up Internet access stimulated the demand for additional residential access lines; by 2000, some 26% of all US households had at least one additional phone line.[57] DSL and cable modems *replace* those additional dial-up access lines that had been installed principally for the purpose of accessing the Internet. And, of course, the ILECs themselves provide a substantial share of these alternative (high-speed) Internet access arrangements.

---

56. Viscusi, W. Kip, *et al*, *Economics of Regulation and Antitrust Second Edition*, MIT Press, 1998, ("*Economics of Regulation and Antitrust*") at 81.

57. The SEC 10K Annual Reports of all of the RBOCs note significant growth in "additional residential lines" during this period. SBC Communications, filed March 10, 2000; Bellsouth Corp., filed March 2, 2000; Qwest Corporation, filed March 3, 2000; Bell Atlantic Corp., filed March 30, 1999.



ECONOMICS AND
TECHNOLOGY, INC.

*The Myth of Intermodal Competition*

| Table 2<br>ILEC DSL is Rapidly Closing in on Cable-based High-Speed Internet Services | | | | |
|---|---|---|---|---|
| | **Number of High Speed Lines** | | **% of All High Speed Lines** | |
| **Date** | **ADSL** | **Coaxial Cable** | **ADSL** | **Coaxial Cable** |
| 2000 | 952 | 2,284 | 22% | 52% |
| 2001 | 2,694 | 5,184 | 28% | 54% |
| 2002 | 5,101 | 9,173 | 31% | 57% |
| 2003 | 7,675 | 13,684 | 33% | 58% |
| 2004 | 11,398 | 18,593 | 35% | 57% |

As Table 2 demonstrates, ILEC-provided DSL services now represent some 35% of all high-speed Internet lines, with 57% being provided by the incumbent cable operator.[58]

Once the transition from dial-up to high-speed Internet access has been completed, the outlook for the ILECs with respect to their basic core residential local telephone services is not one of continually declining demand. In fact, in some key competitive areas, the BOC share of the local wireline primary access line market is increasing. For example, in New York (the oft-cited area exhibiting the largest amount of CLEC activity, and the largest wireless market in the nation), the number of Verizon primary residential lines actually remains relatively unchanged during the period 2002-2004.[59]

---

58. Cable overbuilds have occurred in a limited number of locations, but only a single cable system is available at 96.3% of all US households. A recent *Wall Street Journal* graphic entitled "Many Places to Surf" noted that "[c]onsolidation in the cable and telecommunications industries has not significantly narrowed consumer choices for high-speed Internet access" and showed a pie chart of high-speed Internet market share. The chart includes the market shares of SBC, Verizon, BellSouth, "Other" telecom companies, Comcast, Time Warner, Cox, Charter, and "Other" cable companies, seeming to imply customer choice among any of these companies. In fact, the vast majority of households have only *one* cable company and *one* phone company offering high speed service to their location. From the standpoint of an individual consumer, the *total* number of players in the high speed market nationally is entirely irrelevant; what is relevant is the *specific* choice available to that particular consumer in the consumer's own *specific* geographic market. In Table 2, high-speed line market share percentages do not include the share of "other wireline," "fiber," and "satellite or wireless" facilities, which account for the net difference between ADSL plus cable and 100%.

59. From 2002-2003, primary access lines in New York actually *increased* by 4.6%, while the most recent ARMIS data shows that lines decreased 5.6% during 2004. FCC, ARMIS Report 43-08, Operating Data Report: Table III, YE 2002-2004. Available at http://www.fcc.gov/wcb/eafs/ (accessed April 11, 2005).



ECONOMICS AND
TECHNOLOGY, INC.

*The Myth of Intermodal Competition*

*Primary line substitution: ways to "cut the cord"*

The most oft-cited "intermodal" competitors to wireline services are wireless and VoIP.  In order for these services to be "competitors," however, they must fall within the same relevant product market, which means that they must be perceived by consumers as substitutes for local wireline telephone service.  Substitutability among products or services (which can be expressed quantitatively in terms of cross-elasticities) is at best a *relative* concept.  Two products or services may be substitutable under certain conditions and for certain purposes, and yet be entirely non-substitutable for other purposes.

For example, automobiles and airplanes both provide transportation between two points, and may be substitutes for one another in certain cases.  A trip from Washington to Philadelphia takes about three hours door-to-door either by car or by plane, and, cost differences aside, people making such a trip might well see cars and planes as close substitutes for this purpose.  On the other hand, airplanes are not particularly practical for very short distances, such as 10 or 20 mile commutes, and cars may not be practical for short business trips exceeding 300 or 400 miles.  The fact that consumers view these two alternative modes of travel as close substitutes for trips of 150 to 300 miles provides no basis whatsoever for an inference that as a general matter cars and planes are close substitutes.  Those who advance the claim that wireless and VoIP are substitutes for wireline telephone service identify limited, anecdotal instances of CLEC or intermodal competition, and, from that, assert that if direct competition occurs *somewhere*, then it must be possible *everywhere*.

*Wireless substitution*

The vast expansion of wireless phone subscribership in recent years has occurred with little corresponding drop in wireline service demand, which would *not be the case* if consumers *in general* viewed wireless as a substitute for their wireline phone.  Whatever intermodal substitution may be taking place is extremely limited, both with respect to residential, small business, and enterprise services.  By subscribing to *both* services, consumers are confirming that they see the products as complements, not substitutes.  Indeed, it is the utter *lack* of substitution of wireless for wireline by the vast majority (indeed, very close to all) of households that provide compelling, essentially *irrefutable* evidence that wireless and wireline are *not in the same relevant product market* and that *wireless is not an "intermodal competitor" for traditional wireline telephone service*.

A recent paper presented at the American Association of Public Opinion Research by Julian V. Luke, Stephen J. Blumberg, and Marcie L. Cynamon of the Centers for Disease Control and Prevention, National Center for Health Statistics presents an independent, unbiased view of the



extent of wireless substitution, and its demographics.[60]  Using data from the National Health Interview Survey, January-December 2003, the authors determined that 3.1% of civilian, non-institutionalized adults have only a wireless phone, and 3.7% of all households are wireless-only.

Moreover, the small number of customers willing to substitute wireless for wireline service is by no means evenly distributed.  7.1% of adults between the ages of 18 and 24 years are "wireless-only" (and indeed, many may not have "cut the cord" so much as never had a wireline phone at all).  Substitution rates are 4.3% for those 25 through 44 years, 1.6% for those 45 through 65 and 0.5% for those over 65 years old.  Thus, even if 7.1% of young adults consider wireless a true substitute for wireline, 92.9% of that same demographic *do not*.  Even larger percentages of older adults and senior citizens don't buy the "wireless substitution" story, and all but 2.6% of households with children were unwilling to substitute wireless for wireline services, with the highest percentage of substitution among rental households (7.5%) and adults living with roommates (8.7%) or alone (6.2%).  Household size appears to play a large role in household substitution, with 6% of one person households identified as "wireless-only" but only 2.0-2.2% of households with three or more people identifying as such.

To be sure, some RBOCs have cited studies (conducted by or for them) that purport to show somewhat higher, but typically still single-digit, substitution rates.[61]  However, even these likely exaggerated statistics still confirm that well in excess of 90% of all households do not consider wireline and wireless to be substitutes, and hence not in the same relevant product market.[62]

---

60.  Currently, health surveys done by these, and other, organizations use random digit dialing frames consisting of wireline-only telephone numbers.  To ensure the accuracy of health surveys, researchers must control for "unreachable" customers who have substituted wireless for wireline services, including the specific demographics (and health characteristics) of the substituting populations.  The authors of this paper utilized a series of questions added by the National Center for Health Statistics (NCHS) of the Centers for Disease Control and Prevention to the National Health Interview Survey (NHIS) to ascertain the prevalence and demographics of households that have substituted wireless telephone service for their residential landline telephones.  Luke, Julian V., Blumberg, Steven J., and Cynamon, Marcie L., "The Prevalence of Wireless Substitution," presented at 59th Annual Conference of the American Association for Public Opinion Research, May 15, 2004; and updates from slide presentation.

61.  *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements; 2000 Biennial Regulatory Review of the Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, WC Docket No. 02-112 and CC Docket No. 00-175, Ex Parte Submission of Qwest Communications, filed October 28, 2003; *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements; 2000 Biennial Regulatory Review of the Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, WC Docket No. 02-112 and CC Docket No. 00-175, Ex Parte Submission of Verizon Inc., filed October 15, 2003.

62.     Former FCC Chairman Michael Powell, along with numerous ILECs, have cited to the substitution of wireless for wireline services as proof that the ILECs' bottleneck market power is eroding.  This perception of substitution has been reinforced by the popular media, which have carried any number of stories about individuals who have "cut the cord" and now use only their wireless phone, both at home and away.  Various studies have

(continued...)


ECONOMICS AND TECHNOLOGY, INC.

Indeed, conservative estimates indicate that 94% of all wireless households also have a wireline phone.[63]

To the extent that consumers seem willing to shift their calling entirely or primarily to a wireless phone, but nevertheless retain their wireline service, there is cause for continued skepticism about whether such consumers truly perceive the two services as "substitutes."  In any event, and whichever one of the various studies of wireless substitution are to be believed, the low single-digit substitution rates and skewed demographics indicated most consistently by the research on this subject cannot possibly impose any consequential constraints on the incumbent LECs' market power or prices, and there is no evidence that further growth in wireless/wireline substitution will come quickly enough, be widespread enough, or even ultimately be sufficient to discipline RBOC activities.  This is especially true given E911 service location problems, and so-called "dead zones" with unreliable or no wireless coverage.

Even if the claimed wireless substitutes are validly included within the same product market as basic wireline telephone service – which they are not – describing these services as "competitors" to ILECs – and to RBOCs in particular – strains credulity to its limits.  As shown in Figure 8, RBOCs – SBC, BellSouth and Verizon – together control some 63% of the major national wireless service providers,[64] and likely enjoy even larger shares within their home ILEC region due to the historical grants to the RBOCs in the mid-1980s of the so-called "B-block" wireline set-aside cellular licenses and more recently to aggressive joint marketing efforts by the

---

62.  (...continued)
attempted to quantify this phenomenon, yet have presented widely varying results, with estimates of substitution varying from 2.5% to as much as 20% (the high end of the range is found in surveys of very limited geographic scope).  Much of the variation is due to the study methodology and, where that involved customer surveys and interviews, the manner in which the specific questions were framed.  For example, a study performed by RoperASW asked about households using cell phones only to make and receive calls.  Other studies asked about the customer's "primary" phone, or where they make "most" of their calls.  These surveys typically result in a higher rate of substitution – it is also likely that they pick up many respondents who maintain their wireline connections for incoming calls, emergencies, and occasional use.

63.  TNS data indicates that 70% of US households have wireless phones, and 96% of US households have wireline phones.  *See,* http://www.tnstelecoms.com/press-10-20-04.html.  Based upon US Census data, there are 108-million households in the country, from which we can estimate 76-million wireless households and 4-million households without wireline service.  Even if we assume that 100% of all households without wireless service have wireless service, this still results in more than 94% of wireless households retaining wireline service.

64.  Wireless Competition Bureau, Federal Communications Commission, *Ninth Annual CMRS Report*, September 2004, at Appendix A, Table 4.  The subscribers of all national carriers from the table are summed, and divided into the combined subscribers of Verizon Wireless and Cingular Wireless (Combined Cingular Wireless and AT&T Wireless).



ECONOMICS AND
TECHNOLOGY, INC.

*The Myth of Intermodal Competition*



**Figure 8.** RBOCs and other ILECs control 69% of the major national wireless carriers.

BOCs and their wireline affiliates.[65] Other ILECs own an additional 6% of the national wireless carrier segment, bringing total ILEC ownership of national wireless carriers to 69%. Thus, a "loss" of a wireline phone to wireless – even in the extremely limited number of cases where that actually occurs – in most instances is *not a loss* of the customer to the RBOC.

*Use of wireless phones for long distance calling is not "intermodal competition"*

The most common application in which customers may use their wireless phone from home is to originate long distance calls. Most wireless rate plans include long distance calling at no additional charge (as long as total usage stays within the block of time selected by the customer)

---

65. For example, Verizon offers its Massachusetts customers a $5 discount if they combine their wireline and wireless billing into a single account. Verizon New England Inc., DTE MA No. 10, Part M, Section 1, 12th Revised Page 64, Effective January 15, 2005.

ETI ECONOMICS AND TECHNOLOGY, INC.

and, where the rate plan provides "free" night and weekend calling or "free" on-net or "family" calling, or provides a block of time that significantly exceeds the customer's needs, customers would perceive wireless-originated long distance as "free." Not surprisingly, consumers have shifted substantial portions of their long distance calling to their wireless phones.[66] Despite that *usage substitution*, as noted, *very few consumers have actually disconnected their wireline service altogether*, and many still choose long distance wireline calling plans. In its investor briefing, SBC cited the "high percentage of [its] long distance customers on plans with recurring charges," (and there is little reason to suspect that this condition does not hold for Verizon as well).[67] With "nearly 80% of consumers" on recurring charge plans (many on pricey unlimited plans), SBC appears to be continuing to extract revenue from its long distance customers, including those with wireless phones which, according to believers in intermodal competition theory, constitute an easily accessible, cost-effective long distance substitute.

Completely ignored by popular accounts – and even in the "evidence" of usage substitution produced by the RBOCs and cited by the FCC as examples of "intermodal competition" – is the *fact* that wireless carriers' ability to offer putatively "free" long distance calling results from certain pecuniary distortions created by FCC regulations, certainly *not* from any production efficiency or technological advantage. Wireline long distance carriers are required, pursuant to Part 69 of the FCC's Rules,[68] to pay access charges to local exchange carriers for the origination and termination of interexchange calls carried by the IXC.[69] Wireline ILECs, such as SBC and Verizon, are required by Sec. 272(e)(3) of the 1996 Act to "impute" access charges into their retail long distance rates. "Interexchange" calls are defined for this purpose as calls between

---

66. Because of the difficulty in pinning down the number of customers actually "cutting the cord," the issue of intermodal substitution for wireline local service is often cited in terms of declining wireline *minutes of use*. In fact, such statistics are extremely misleading as a means for measuring the effect of competition on local wireline incumbents. Statistics as to declining minutes of use do not provide any information as to *line* substitution of wireless (or other intermodal alternatives) for wireline services. Since most local wireline services provide flat rate outgoing local calling and unlimited inbound usage, ILEC revenues are impacted only to the extent that originating long distance calls are shifted to wireless, which is able to offer lower-priced (or "free") long distance calling precisely because wireless carriers *do not pay any originating access charges at all* and pay terminating access charges on only about half of the long distance calls that they carry. Moreover, the source of these wireless exemptions from access charges is FCC policy and not any inherent cost advantage unique to wireless carriers. It is, to say the least, disingenuous for the FCC to, on the one hand, confer an enormous competitive advantage upon the wireless industry with respect to access charge obligations and then, on the other hand, use the resulting usage substitution as a basis for portraying wireless as "competing" with wireline.

67. SBC Communications, 4th Quarter 2004 Investor Briefing Slide Presentation, available at http://www.sbc.com/gen/investor-relations?pid=262 (accessed April 13, 2005).

68. 47 CFR §69.105

69. To be more precise, IXCs are required to pay access charges on *all* calls handed off to them, even if the two endpoints of the call are physically located within the same ILEC local calling area.


ECONOMICS AND
TECHNOLOGY, INC.

exchanges not within the same local calling area.  Local calling areas are ordinarily established in ILEC (or CLEC) tariffs and are subject to approval by the state commission.  However, in the case of *wireless* carriers, the FCC has *preempted* the state commissions with respect to the definition and scope of *wireless* local calling areas:

> [I]n light of this Commission's exclusive authority to define the authorized license areas of wireless carriers, we will define the local service area for calls to or from a CMRS network for the purposes of applying reciprocal compensation obligations under section 251(b)(5).  Different types of wireless carriers have different FCC-authorized licensed territories, the largest of which is the "Major Trading Area" (MTA).  *Because wireless licensed territories are federally authorized, and vary in size, we conclude that the largest FCC-authorized wireless license territory (i.e., MTA) serves as the most appropriate definition for local service area for CMRS traffic for purposes of reciprocal compensation under section 251(b)(5) as it avoids creating artificial distinctions between CMRS providers.*  Accordingly, traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges.[70]

Unlike wireline local calling areas that typically involve distances of between 10 and 30 miles from the calling party's location, MTAs are large expanses of geography; nationwide, there are only fifty-one MTAs, many of which encompass entire states or even several states.  Wireless calls are considered to be "local calls" when placed to points anywhere within the same MTA from where the call had originated.  Such "local calls" are considered by the FCC to be §251(b)(5) local traffic, which is not subject to access charges, irrespective of distance (which could be up to several hundred miles) or jurisdiction (intrastate or interstate).

This federal preemption operates to expressly *exempt* wireless carriers from paying access charges on any intra-MTA wireless-originated call even where the very same call would be subject to access charges if placed from a wireline phone.  Those access charges – that wireless carriers avoid – fall between about 1.1 cents per minute for interstate calls to as much as 6 or 7 cents a minute (sometimes even higher) for some intrastate calls.  It is difficult to square the existence of this substantial FCC-imposed *intermodal* disparity with the notion that consumer migration to "free" wireless long distance calling represents a *bona fide* economically-based intermodal alternative.[71]

---

70.  *Local Competition Order*, at para. 1036, footnotes omitted, emphasis supplied.

71.  The FCC is currently addressing the existence of this wireline/wireless access charge disparity, in its recently-initiated intercarrier compensation rulemaking proceeding.  *Developing a Unified Intercarrier Compensation Regime*, Further Notice of Proposed Rulemaking, WC Docket No. 01-92, Adopted February 10,

(continued...)



ECONOMICS AND
TECHNOLOGY, INC.

*The Myth of Intermodal Competition*

*Wireless/Wireline as complements*

Even among those consumers who do rely on wireless for most of their calling, the continued demand for wireline phones for emergency and for incoming calls is demonstrated by a recent offering by Cingular and its RBOC owners, SBC and BellSouth.  With this "FastForward" service, Cingular customers whose local wireline provider is either SBC or BellSouth can place their wireless phone in a special cradle, which then signals Cingular to automatically forward all incoming cell phone calls to the customer's wireline home phone.  Under this arrangement, which SBC and Cingular describe as an "integration" of wireless and wireline service, the customer does not incur a charge for air time usage on the forwarded call.  BellSouth and SBC permit their bundled wireline and wireless customers to share one bucket of long distance minutes between their wireless and wireline phone.

Another example of wireless/wireline integration, and their status as complements rather than as substitutes, is shown by the recent introduction of a single voice mail account for both wireless and wireline phones.[72]  SBC and BellSouth are also not treating Cingular as a "competitor" of their local exchange services.  They report that Cingular sales through SBC or BellSouth sales channels represented 15% of gross Cingular adds in the second quarter of 2003.[73]

Thus, far from positioning themselves as a substitute, it appears that such joint marketing programs are more likely to stimulate additional demand for both wireline and wireless RBOC services.  The fact that the RBOCs perceive a demand for these integrated service arrangements and benefits of joint wireline/wireless marketing programs cannot be squared with their *unsupported* contentions that wireline and wireless are substitutes.

---

71.  (...continued)
2005, Released March 3, 2005, at paras. 134-138.

72.  See, e.g., Sprint News Release, *Sprint Introduces New Integrated Office Solution that Combines the Mobility of Wireless Phones with Features and Functionality of a Wireline Desk Phones*, available at http://www2.sprint.com/mr/news_dtl.do?id=1115 (accessed April 13, 2005); and Verizon Industry Letter, *Unified Communication Service*, available at http://www22.verizon.com/wholesale/library/local/industryletters/1,,east-wholesale-resources-clec_01-10_29,00.html (accessed April 13, 2005).

73.  Cingular Wireless, SBC and BellSouth Joint Announcement, *Cingular Wireless, SBC Communications and BellSouth to Launch FastForward℠ – Latest in a New Category of Services That Integrate Wireless and Wireline Communications*, September 9, 2003, available at http://www.sbc.com/Common/files/pdf/IB_fastforward.pdf (accessed April 19, 2005).


ECONOMICS AND
TECHNOLOGY, INC.

*The Myth of Intermodal Competition*

*VoIP services do not bypass the enduring local bottleneck*

The hype over VoIP services has been escalating dramatically over the past several years, as the FCC and state commissions grapple with unresolved regulatory concerns arising from VoIP providers' efforts to integrate their services into the public switched telephone network. To be sure, some of the claims being made for VoIP are true – VoIP services do offer some functionalities that are not available with traditional voice services, and VoIP services are generally less expensive to purchase than traditional voice services – *if a customer already subscribes to high-speed Internet access via DSL or cable modem services*. At current rates, the customer has to expend $30-$40 for DSL or cable modem Internet access, *plus* $10 to $30 for VoIP service, for a total of $40 to $70. However, VoIP has a long way to go before it becomes a serious competitive threat to incumbent local service providers.

First, as noted above, the ILECs and cable companies maintain an effective duopoly with respect to the "last mile" high-speed Internet access services that are essential for VoIP use. This suggests that over time the prices of DSL and cable modem service are likely to drift upward. Second, as illustrated by a recent column in *PC Magazine*, VoIP lacks the quality and consistency necessary to permit widespread residential and small business adoption. As *PC*'s longtime technology columnist John Dvorak points out,

> [I]f you're sitting on a real T1 line rather than a DSL connection, the quality [of a VoIP call] is usually identical to the switched service. That's because the T1 line is a different level of service than flaky DSL. ... But the T1 is still the premium-level service, and the only line that appears to work flawlessly with VoIP systems all the time. ... [W]ith the current Internet slogging along under constant denial-of-service attacks and overloaded with spurious e-mail transmissions, the idea that VoIP is going to push aside land lines any time soon is wishful thinking. And now phonecos such as SBC are selling the VoIP equipment themselves, while indicating that if you use a VoIP phone that hooks to the company's switched network you are going to have to pay them – unless, of course, you use the company's VoIP service.[74]

Importantly, much of VoIP's current price advantage vis-a-vis wireline telephony is certainly not economically based. VoIP providers are not currently subject to access charges on long-distance calls, subscriber line charges, federal or state universal service, high-cost, or E-fund programs, payments for E-911 services or other public service programs (such as dual-party relay services and CALEA), and may not be collecting state sales taxes.

To date, VoIP appears to have been adopted by somewhere around a million subscribers; however, there is no data as to the number of households that have *only* VoIP-based services –

---

74. Dvorak, John, "The Problem with VoIP Phones," *PC Magazine*, January 24, 2005.

ETI ECONOMICS AND
TECHNOLOGY, INC.

*The Myth of Intermodal Competition*

i.e., that have discontinued their primary wireline phone.   One key reason, of course, is that most ILECs refuse to sell wholesale DSL service, through line sharing, to competitors and have simultaneously refused to provide retail customers with stand-alone ("naked") DSL.  Thus, as a practical matter, the customer has no choice but to retain their wireline local phone service even when they have VoIP service.  Additionally, some VoIP providers continue to recommend that customers retain wireline service in order to have reliable E-911 service to their residences.

Thus, it becomes clear on closer examination that the purchase of VoIP is primarily limited to a small number of computer-savvy early adopters who likely see it as a low-cost way of obtaining a second phone line.  VoIP is not serving as an outright alternative to traditional phone service, and there is no justification for the claim that VoIP is a sufficiently close substitute for basic wireline telephone service to constrain RBOC prices and market power.

Indeed, the RBOCs have all announced their own foray into VoIP services, as have cable companies such as Comcast.  If, as and when VoIP ever becomes a serious point-to-point voice telecommunications medium, it is the entities that control those critical last-mile broadband links – the RBOCs and the cable operators – that will ultimately control this segment as well.

*WiMax, WISPs, and other fixed wireless "solutions" are not the answer.*

Currently, few residential (or business, for that matter) customers are served by wireless Internet service providers, which face severe speed, range and reliability issues, among others.[75] Recently, the industry has made significant statements about the coming of "WiMax," the next-generation of wireless data services that is supposed to bring increased security, range and reliability to fixed wireless services.  This development, however, is being driven by large carriers for business customers, a very different focus than that of Wireless Internet Service Providers (WISPs) that serve residential and small business users.  Issues for residential consumers, such as price, interoperability, and vendor availability are unlikely to be addressed by this technology for several years.  As one analyst recently noted, "In short, WiMAX will not likely be anything like a panacea for WISPs, especially in the short term, and it could easily be as late as mid-2006 before WiMAX systems truly suitable for WISPs become available."[76]

Where wireless broadband networks do pose a possible threat to major ILECs, the ILECs have been successful in shutting them down.  Several cities and towns have recently considered or implemented municipal broadband services, available to residents and businesses at low costs

---

75.  For example, Verizon Wireless' "broadband" service operates at 500 kbps, compared to the 1-3 mbps speed of most cable modems and DSL.

76.  Stroh, Steve, "WISP Heresies," *ISP Planet*, December 24, 2004, available at: http://www.isp-planet.com/fixed_wireless/business/2004/stroh_heresies.html.


ECONOMICS AND TECHNOLOGY, INC.

*The Myth of Intermodal Competition*

(or, in some cases, free).  However, in many cases, the RBOCs have moved to prevent this competition.  According to the New York Times:

> Pushed by industry lobbyists, lawmakers in Kansas, Ohio, Texas, Indiana, Iowa, Oregon and other states have proposed legislation to restrict or prohibit local governments from offering telecommunications services. Nearly a dozen states have already enacted some restrictions." Assuming that Verizon and other ILECs have similar political power in other states, it appears that low-cost or free wireless data services may be indefinitely postponed.[77]

This ploy is consistent with other situations (e.g., respect to UNE-P) where the ILECs have worked to undermine competition at the same time as they rely on competitors' (incomplete) efforts as proof that competition exists.

**The future is not today**

One day, technology may truly permit consumers to "cut the wire" and yet receive a full range of reliable, high-quality, and innovative telecommunications services at prices set by robust competitive market forces.  This would be a highly desirable situation, but it is not today's situation.  As we have demonstrated, wireless services are not true substitutes for wireline basic local exchange services and are not perceived that way by consumers because of a host of differences in their quality, reliability, and price.  The extent to which wireless develops as a competitive force will also depend on whether mega-ILEC conglomerates are permitted to continue expanding their already considerable ownership of the country's limited number of wireless providers.  As to VoIP, which has also yet to overcome various quality and security concerns, consumers still must rely on the wireline "last-mile" facilities provided by their local telephone company (or alternatively on their cable provider).  Thus, for the present and for some time to come, wireless, VoIP may have some overlap with wireline local and long distance services, but they cannot fairly be included within the same relevant market for purposes of assessing competition.

---

77.  Dao, James, "Philadelphia Hopes to Lead the Charge to Wireless Future," *The New York Times*, February 17, 2005.



# 5 | RE-THINKING DEREGULATION IN THE WAKE OF MASSIVE INDUSTRY RECONCENTRATION

Whether successful implementation of the 1996 Act could have brought the industry to a place – in 2005 – where further telecommunications industry deregulation was warranted is no longer an issue worth debating.  Congress' vision – that the removal of barriers necessary to ensure effective local competition would be achieved *before* the RBOCs were permitted into the long distance market – was never afforded a fair trial.  Consequently, the anticipated industry-wide, local and long distance competition has simply not materialized.

Further deregulation at this point will exacerbate the harm to consumers that has already occurred and accelerate the rate of failure for the remaining CLECs and IXCs.  State and federal regulators, and legislators as well, must now take a long, hard look at the structure of the existing telecommunications industry and design a regulatory framework that can accommodate today's reality.  At the same time, they must re-engage the pro-competitive mechanisms that exist within the 1996 Act to make future competition a reality.

More immediately, regulators must consider the consequences of the proposed SBC/AT&T and Verizon/MCI mergers for the future of competition, particularly in light of the various deregulatory measures that have been put into place on the *supposition* that competition in all sectors of the US telecommunications industry had arrived, was economically sustainable, and indeed was *irreversible*.  In that context, evidence as to how little actual competition exists today, and that even less competition can be expected going forward given the prevailing market and regulatory climate, should be used to *inform* regulators and other policymakers as to how much competition is likely to remain if the two largest RBOC rivals are swallowed up by the two largest RBOCs.  And the answer to that question will be critically dependent upon the extent to which the various competitive safeguards that were envisioned by the 1996 Act are reinstated and maintained in place, as specific merger-related conditions.

Consideration of the two merger applications must not be divorced from this deregulatory reality.  Prior to 1984 (when AT&T was divested of the seven regional Bell holding companies, pursuant to the MFJ), more than 80% of the nation's telephone lines, and nearly 100% of its long


ECONOMICS AND TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

distance network infrastructure, was owned and controlled by a single corporation.  Regulation at that time was pervasive at both the state and federal levels.  All services were tariffed.  All rates were subject to regulatory approval, intended to ensure that earnings were constrained to "authorized" rate of return levels and that the rates for specific services were "just and reasonable."  The Bell companies were prohibited from engaging in any nonregulated activities, so cost allocation and concerns about cross-subsidization were seldom an issue.

In the decade leading up to the 1984 divestiture, AT&T and its Bell System companies had worked tirelessly to block, delay, or otherwise frustrate competitive inroads into what had been their exclusive monopoly domain.  When the FCC authorized customers to own their own telephone sets and other terminal equipment and to connect these to the public network, the Bell System responded with an entirely spurious "protective connecting arrangement" (PCA) requirement that carried a monthly rent several times greater than the monthly rent on the telco-provided handsets that the customer might want to replace.  When MCI, Sprint and other start-up long distance carriers sought to compete with AT&T, the Bell companies responded with high "access charges" that, like the PCA, would impose an entry fee upon competing long distance providers[78] for the privilege of interconnecting with Bell local customers.  By the time that the MFJ consent decree was entered into by AT&T and the Department of Justice, it had become clear that as pervasive as state and federal regulation was at that time, it was still not capable of preventing the kind of anticompetitive conduct that had emerged, and that full structural separation was the only real solution.

Compare those pre-divestiture conditions to where we are today.  Virtually all states, and the FCC, have long since abandoned cost-based rate of return regulation in favor of various forms of "incentive" or "market-based" regulation.  What's more, every year the various safeguards and backstops that had been hard-wired into the early incentive regulation plans are whittled away.  These included inflation-related annual price cap adjustments, productivity offsets to the annual price cap changes, sharing and capping of excess earnings (to protect against mis-specification of the productivity offset), and periodic reviews intended to achieve a balance between providing the Bells with incentives for efficiency while maintaining protections against monopoly abuses.  Today, in most states and at the federal level, these safeguards and protections no longer exist.

In many important respects, there is an even greater need for regulation of the Bell mono-polies today than there was prior to 1984.  Today, the Bell companies are allowed to, and do, operate in both monopoly and competitive markets *using the same network assets and pool of human and other resources*.  Cost allocation requirements, where they even exist, are at best

---

78.  After the Bell System break-up in 1984, "access charges" were formalized in FCC regulations and were applied on an equal basis to all long distance carriers, including the now-divested AT&T.  But once the Bells were allowed to enter the long distance market beginning in 2000, the persistence of above-cost access charges has operated to confer a significant competitive advantage for ILECs and a significant burden for IXCs, conditions that have undoubtedly contributed to the decisions by AT&T and MCI to "throw in the towel."

ETI® ECONOMICS AND TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

subject to lengthy after-the-fact reviews and virtually no effective enforcement. The Bell monopolies have enormous incentives to shift costs to their monopoly operations while shifting revenues to other "below-the-line" business units and affiliates. And their chances of being caught are less than an ordinary taxpayer's chances of an IRS audit, and in proportion the penalties for such cost shifting – if actually detected – are almost always far less severe.

Much of the RBOCs' conduct over the years was directed at disadvantaging AT&T and MCI, and their existence as independent entities offered at least some assurance that perhaps the most egregious RBOC conduct and deregulatory initiatives would be brought to FCC and state PUC attention. With AT&T and MCI merged into RBOCs, the surviving group of much smaller competitive local and long distance carriers cannot hope to match the economic, legal, and political resources of the RBOCs' and their "bottomless pockets."[79]

**Conditions protecting consumers and the development of competition need to accompany any decisions approving the SBC/AT&T and Verizon/MCI mega-mergers**

There are compelling public interest and antitrust grounds for rejecting both the SBC/AT&T and Verizon (Qwest)/MCI acquisitions. The vertical and horizontal integration and market concentration that will result from these two combinations will afford the two post-merger RBOCs near-monopoly control of the local market within each RBOC's core local service footprint. In the less-than-certain event that the two companies (along with the other two RBOCs) were actually to "compete" out of region, the result would be a "tight oligopoly" at best. Yet even this marginally more competitive outcome is unlikely. Notably, despite explicit promises to regulators that they would vigorously pursue out-of-region entry (e.g., as a condition of prior merger approvals), both SBC's and Verizon's effort at competing outside their home regions have been extremely feeble.[80]

---

79. Describing the RBOCs' ability to cross-subsidize their entry into competitive businesses with profits extracted from captive monopoly services, Judge Harold Greene observed, "this is not so much because the Regional Companies have deep pockets, which they do, but because their pockets are bottomless." *United States v. Western Electric*, Civil Action No. 82-0192, 1989 U.S. Dist. LEXIS 18852, at *27.

80. In support of SBC's contention that it does not compete with AT&T for enterprise customers outside the SBC incumbent territory, SBC's declarant James S. Kahan discusses the minimal competitive inroads arising out of SBC's "National-Local Strategy." SBC/AT&T Application for Consent to Transfer of Control, WC Docket No. 05-65, February 22, 2005, Declaration of James S. Kahan, at para. 27. Moreover, the efforts that SBC has taken to gain a competitive foothold out of region hardly suggest a major marketing push. Mr. Kahan refers to a $1-billion investment made over five years covering all 30 of the major out-of-region markets targeted by SBC. *Id.* at para. 24. This works out to an average of only $6.7-million a year in each market – hardly a particularly aggressive investment for a company of SBC's size or when compared with the massive multibillion dollar investments than had been made by AT&T, MCI and numerous other CLECs and cable television companies in pursuit of a local telecom entry.



ECONOMICS AND
TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

Through successive RBOC mergers, SBC and Verizon have each expanded their respective areas of local exchange service incumbency to cover more territory, population, and urban areas. With Section 271 authority, they have leveraged their market power within those footprints to rapidly capture a dominant share of the consumer/small business long distance market. The size and scope of the proposed mergers, however, is even greater, and would yield telecommunications giants larger than any combination that has existed since the 1984 Bell System break-up.

Size, however, is not the primary issue; competition is. The RBOC mergers of 1997 through 2000 yielded larger incumbents and reduced the potential that these companies would eventually compete out-of-region as providers of local and/or long distance service. However, AT&T and MCI not only compete with their respective proposed RBOC merger partners, AT&T and MCI are *the largest competitors* that the two RBOCs currently face in the local, long distance, and bundled services sectors.

Contrary to their representations, SBC and AT&T – and Verizon and MCI – are current, direct competitors. It is undeniable that AT&T serves enterprise customers nationwide, including ones geographically concentrated within SBC's incumbent territory, and the same holds true for MCI with respect to Verizon. MCI has not discontinued marketing its "Neighborhood" combined local and long distance service to mass market customers.[81] As to AT&T, one could question whether the considerable publicity surrounding its decision to withdraw from active marketing of consumer services was intended primarily as a regulatory gesture or to announce its availability as a takeover target, since the discontinuation of marketing could otherwise have been undertaken in a much more low-key manner.[82]

It is well established that, in addition to the authority to reject the mergers outright, the FCC also has the authority to impose specific regulatory conditions on the merging parties.[83] Numer

---

81. For example, as recently as April 2005, MCI sent out a mailing to members of the Northwest Airlines frequent flyer program offering 10,000 bonus miles as an inducement to sign up for MCI's The Neighborhood local and long distance bundle, if ordered by May 15, 2005. The Neighborhood is still an active consumer offering on MCI's website.

82. Indeed, if the merger is allowed, we will never know whether AT&T's decision to exit the consumer market was "irreversible" as SBC has claimed.

83. Many state PUCs also have authority to review the effects of telecommunications company mergers on consumers and to set conditions consistent with the public interest. Among the states that have exercised authority to review and approve prior RBOC mergers are Ohio (see, e.g., *Joint Application of SBC Communications Inc., SBC Delaware Inc., Ameritech Corporation, and Ameritech Ohio for Consent and Approval of a Change of Control*, Case No. 98-1082-TP-AMT [pursuant to Sections 4905.402, 4905.49, or 4905.491, Ohio Revised Code]; California (see, e.g., A.98-12-005, *Joint Application of GTE Corporation (GTE) and Bell Atlantic Corporation (Bell Atlantic) to Transfer Control of GTE's California Utility Subsidiaries to Bell Atlantic, Which Will Occur Indirectly as a Result of GTE's Merger with Bell Atlantic* [pursuant to California Public Utilities Code Section 854]); and Connecticut (see,

(continued...)


ECONOMICS AND
TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

ous conditions were specified in prior merger approvals, including SBC/Ameritech and Bell Atlantic/GTE.[84] Should the FCC and DoJ permit these mergers to go forward, that approval must be accompanied by *concurrent* changes to existing regulations and regulatory mechanisms.

In its FCC application, SBC offers limited recognition of the interaction of its merger plans and potential adjustments to the existing regulatory regime, but suggests, in essence, that the FCC should first allow the merger, and then deal with its regulatory ramifications, if any.[85] (SBC, of course, denies that its merger with AT&T would require any regulatory changes.) SBC's position may have certain appeal to the FCC, which is likely to feel pressured to act on the merger applications in a much shorter time frame than it customarily requires to complete a rulemaking or other complex regulatory proceeding.

This is not an acceptable approach. If these mergers go forward before new rules are put in place or conditions are met, the SBC/AT&T and Verizon(Qwest)/MCI entities will have the luxury of operating for some time under patently insufficient regulatory constraints, while at the same time will have the opportunity, once the merger has been approved and implemented, of actively and aggressively *opposing* any FCC or Congressional efforts to reregulate them or any aspect of their business. Even if the needed regulatory measures are ultimately adopted, by the time that could happen it is almost certain that only a few competitors will still be standing. Therefore, to the greatest extent possible, the FCC should enforce a requirement that conditions be met and rules be established *before* the mergers may be consummated.

---

83. (...continued)
DPUC 98-02-20, *Joint Application of SBC Communications, Inc. and Southern New England Telephone Corporation for Approval of a Change of Control* [pursuant to Section 16-47 of the Connecticut General Statutes]).

84. *Application of GTE Corporation, Transferor, and Bell Atlantic Corporation, Transferee; For Consent to Transfer Control of Domestic and International Sections 214 and 310 Authorizations and Application to Transfer Control of a Submarine Cable Landing License,* CC Docket No. 98-184, *Memorandum Opinion and Order*, 15 FCC Rcd 14032 (2000); *Applications of Ameritech Corp., Transferor, and SBC Communications Inc., Transferee, For Consent to Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 5, 22, 24, 25, 63, 90, 95 and 101 of the Commission's Rules,* CC Docket No. 98-141, 14 FCC Rcd 14712 (1999).

85. See, SBC/AT&T *Application for Consent to Transfer of Control*, WC Docket No. 05-65, February 22, 2005, *Description of Transaction, Public Interest Showing, and Related Demonstrations ("Public Interest Statement")* at 102-105 (arguing that concerns about special access pricing should not be addressed within the context of the merger review).



ECONOMICS AND
TECHNOLOGY, INC.

**Regulatory prerequisites for merger approval**

The conditions that the FCC and state PUCs should consider imposing as preconditions for merger approval fall into three general categories:

(1) Conditions aimed at realigning the regulatory regime applicable for the RBOCs with the new market conditions arising from the merger-driven industry reconcentration;

(2) Structural conditions aimed at limiting the potential harm to consumers and competition from the new, consolidated mega-carriers; and

(3) Conditions aimed at assuring that any efficiency gains arising from the mergers will flow to consumers, especially where, as here, competition would be insufficient to bring about this outcome.[86]

We focus here primarily on the first two categories. As discussed below, these conditions need to be coupled with the comprehensive reevaluation and restoration of effective regulation at the state and federal levels.

*Price cap and other alternative regulation regimes must be revised to conform to competitive realities, so as to ensure just and reasonable rates for all consumers*

The FCC adopted its first price cap plans for large incumbent ILECs in 1991. Over the next several years, price caps replaced traditional rate-of-return regulation in many states as well. Although the existence of competition is not a prerequisite for using price regulation rather than cost-based regulation as a means of ensuring that the ILECs charge "just and reasonable" rates, the extent of competition is a consideration that may influence particular elements of a price cap plan. In support of their price cap plan proposals, the RBOCs consistently made claims of confronting robust competition.[87]

Much of the competition that the RBOCs relied on never actually existed. Often what they relied on was "potential" competition, based on the possibility of market entry by competing

---

86. For example, California Public Utilities Code Section 854 explicitly provides for ratepayers to share in merger-related benefits.

87. For example, in 2002, in arguing that Massachusetts should abandon its price cap plan entirely, Verizon claimed that "[n]o economic, regulatory or legal barriers to competitive entry and expansion exist in any segment of the market in which local exchange carriers choose to compete .... Massachusetts is at the point where competitive forces, rather than government regulation, are sufficient to discipline Verizon MA." Initial Brief of Verizon Massachusetts, D.T.E. 01-31 (Phase I), filed February 12, 2002.



*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

suppliers – which often did not materialize.[88]  When there were actual competitors, they rarely competed throughout the relevant geographic or product market.

Moreover, the competition that the RBOCs pointed to frequently depended upon the availability of UNEs purchased by the competitor at wholesale from the very same RBOC.  For example, in 2002, the Massachusetts Department of Telecommunications and Energy agreed to permit Verizon complete "market-based pricing" (i.e., deregulation) of substantially all retail business services because the underlying components were available on a wholesale basis as unbundled network elements, pursuant to Section 251 of the Act.[89]  At the very time that the Massachusetts regulators were acceding to Verizon's demands for broad deregulation of business services, Verizon was actively involved in the FCC's *Triennial Review* proceeding, advocating that it be relieved of any obligation under Section 251 to provide many of the UNEs whose availability to CLECs was specifically relied upon by the Massachusetts DTE as the rationale for its deregulatory measures.  Significantly, even though Verizon is now no longer required to provide UNE-P and UNE-switching to CLECs, the deregulation ordered by the Massachusetts DTE remains in full force and effect, *even though the factual predicate for that order is no longer applicable*.[90]

Price cap LECs were also able to convince regulators that their ability to respond to competition – through deregulation of services (or, at a minimum, broad pricing flexibility) – should shape other key price cap plan provisions.  Over time, they attacked all links between prices and rate levels that existed under earnings-based regulation.  As justification for its 1997 decision to eliminate earnings sharing for price cap LECs, the FCC stated, "A price cap plan without sharing should greatly facilitate our overarching goal of deregulating services that face sufficient competition by making it easier to remove from regulation those services subject to

---

88.  The RBOCs often rely upon the concept of "contestability," which relates to supply elasticity.  (See *Economics of Regulation and Antitrust*, at 162-163.)  The theory is that if the prices of the market's dominant supplier rise above a competitive level, other suppliers will be drawn into the market. (See *id.*, at 155).  This, of course, assumes that there are not substantial barriers to entry, which is clearly not the case with respect to mass market local exchange services – as the experience of AT&T and MCI plainly demonstrates.

89.  *Appropriate Regulatory Plan to succeed Price Cap Regulation for Verizon Massachusetts' intrastate retail telecommunications services in the Commonwealth of Massachusetts*, DTE 01-31, Phase 1 (2002), pp. v, 89.

90.  Such *whipsawing* tactics by the RBOCs are more the norm than the exception.  The FCC and state PUCs had insisted upon the availability to CLECs of UNEs at cost-based rates and through efficient and seamless provisioning and "hot cut" arrangements as a precondition for approval of RBOC Section 271 in-region long distance entry.  Yet just as the approvals were forthcoming in the last few remaining states, the RBOCs immediately embarked upon an ultimately successful litigation and lobbying campaign to extricate themselves from the requirement to provide the most important UNE of them all – the UNE Platform (UNE-P).


ECONOMICS AND TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

competition."[91]  Today, some eight years later, the FCC is in the process of reevaluating whether the area of greatest deregulation of interstate access services – high-capacity special access – was not well-justified and permitted the RBOCs to charge their customers excessive rates.[92]

Recently, several state commissions have dropped the productivity offset in their price cap plans altogether, after their RBOCs had claimed, among other things, that the offset dulled efficiency incentives and interfered with competitive pricing of services.[93]  In effect, many states have watered down their regulation, based upon phantom competition, so that RBOC prices are no longer being constrained either by traditional cost-based regulation, by any effective alternative form of regulation (such as price caps), *or by competition that does not exist*.

Because the 1996 Act and the various state and federal proceedings that had been set in motion to implement its provisions *presupposed* that local competition would develop, regulators were often predisposed to accept ILEC claims that their services faced ever-increasing levels of competition.  Such "on faith" acceptance of the *fact* of competition was often done without any evidence that this was actually taking place – and sometimes even in the face of evidence to the contrary.  In some states, alternative regulation plans have been boiled down to simple rate caps on basic service for residential and small business customers, with most or all other ILEC services afforded upward pricing flexibility or outright deregulation, even for explicitly noncompetitive services.[94]  Still others impose rigid caps (rate freezes), but contain no provision for requiring rates to fall based upon reasonably predictable cost decreases arising from industry-wide productivity gains.[95]

It has been a long time since many regulators have asked the fundamental question:  Does the existing plan of regulation result in just and reasonable rates?  The ILECs claim that any attempt to look at their earnings levels is anachronistic and deprives them of incentives to innovate and be more productive.  Yet the truth is that ILECs have seldom innovated without pressure from competition – competition that is increasingly endangered.  As to ILEC claims that their supranormal profits reflect productivity that, they say, must flow only to shareholders and not consumers, there is much basis for skepticism.

---

91.  *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1, *Fourth Report and Order*, 12 FCC Rcd 16642 (1997) at 16650, para. 14.

92.  *Special Access Rates for Price Cap Local Exchange Carriers*, WC Docket No. 05-25; RM-10593; FCC 05-18, released January 31, 2005 (Federal Register, v. 70, no. 7 at pp. 19381-19396, April 13, 2005).

93.  *See, e.g.,,* Massachusetts DTE 01-31Phase I, at 100-102.

94.  *See*, *e.g.*, Ohio Admin. Code Chapter 4901:1-4; Illinois Compiled Statutes § 220 ILCS 5/13-502.5.

95.  *E.g.,* Nevada and Oklahoma.  *See* Nevada Administrative Code NAC 704.68482; Oklahoma Code 55.5.65.



*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

In evaluating whether rates subject to various forms of incentive regulation have remained just and reasonable, it is not inappropriate (contrary to ILEC arguments) to consider whether ILEC net revenues for the sale of noncompetitive services are yielding them a "normal" (not supranormal) return on their investment. The initial rates indexed under federal and state price cap plans were based upon rates of return from the 1980s and early 1990s, when interest rates were much higher than they are today. For example, the rate of return authorized by the FCC for interstate services at the time the Commission adopted its first price cap plan for large ILECs was 11.25%.[96] By contrast, in a recent case to determine prices for unbundled network elements, the Washington Utilities and Transportation Commission (WUTC) concluded that Verizon's weighted average cost of capital was 9.98%.[97]

In reality, based upon their current prices, the RBOCs are earning far more than 11.25% on their interstate services. Reinitialization of the RBOCs' interstate rates to the last authorized rate of return of 11.25% would reduce their net interstate rates by some $4.1-billion. If these rates were reinitialized to the rate of return recently approved by the WUTC, the RBOCs' interstate rates would drop by an additional $600-million, for a total reduction of about $4.7-billion.

Broad pricing flexibility – including pricing flexibility for many services that do not face effective competition – makes it far easier for the RBOCs to engage in predatory pricing and other anticompetitive practices. Consumers are harmed both directly and indirectly by excess pricing flexibility in the absence of competition for the services involved. Without competitive pressure, the RBOCs' quickly revert to profit-maximizing pricing behavior in which costs are disproportionately recovered from services with least demand elasticity (basic services). At the same time, the RBOCs retain the ability to cut their prices strategically in market niches where competition emerges. Consumers pay more for services and emerging competition is eradicated, so that consumers never experience its benefits.

Under the present circumstances, state regulators and the FCC must immediately review price cap and other alternative regulation plans and restore their ability to achieve their fundamental objectives. Where plans have been watered down in anticipation of competition or had been based upon competitive claims that cannot conceivably be believed in light of the surrender of AT&T and MCI to RBOC takeovers, prompt action must be taken prior to the approval of the mergers to:

---

96.  *Policy and Rules Concerning Rates for Dominant Carriers*, CC Docket No. 87-313, 5 FCC Rcd 6786, 6788 (1990) ("*LEC Price Cap Order*").

97.  *Review of Unbundled Loop and Switching Rates; the Deaveraged Zone Rate Structure; and Unbundled Network Elements, Transport and Termination (Recurring Costs)*, Wash. Util. and Transp. Comm'n, Docket No. UT-023003, 24th Supplemental Order, February 9, 2005, at para. 78.



ECONOMICS AND
TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

- Reinitialize price levels to produce rates of return that reflect current financial market and industry conditions;

- Reevaluate prior reclassifications of services as "competitive," in light of reliance upon unsubstantiated future projections and the major industry consolidation represented by the proposed mergers;

- Reinstate earnings sharing as a means to reduce supracompetitive profits;

- Tighten up price cap rules that permit cross-subsidization of competitive services by noncompetitive services and unregulated activities by regulated ones;

- Impute earnings from lines of business that benefit from joint BOC/affiliate activities, such as joint marketing of local, long distance and Internet services;

- Reinstate reporting requirements, including financial data and written records of affiliate transactions.

*Consumers – and surviving competitors – deserve the protections intended under Sections 271 and 272 of the 1996 Act*

Despite the all-too-apparent failure of the pro-competitive goals of the 1996 Act, it would nevertheless be a serious mistake to assume that all of the harm that can be done to consumers and competition has already occurred. There are many CLECs and IXCs that, while smaller than AT&T and MCI, are still trying to survive and provide consumers with serious and innovative competitive alternatives to the RBOCs' services. Consumers have been promised competition and are still ready to accept it – when it develops. One key prerequisite to future competition is to ensure that the RBOCs are not permitted to use their local exchange/access bottleneck to advantage their own long distance and broadband operations or to disadvantage their rivals.

As discussed in Chapter 2, the FCC relied upon the unbundling mandates in the 1996 Act, along with nominal evidence of actual entry, when it let the RBOCs begin offering interLATA service in every state – only to see the primary competitors falter as soon as the RBOCs were able to leverage their market power in exchange services to quickly overwhelm the largest CLEC-IXCs. Subsequently, over the objections of state commissions,[98] the FCC began to summarily permit the protections in Section 272 of the Act to lapse, by operation of law[99] rather

---

98. *Section 272 Sunset Order* at Copps/Adelstein dissent.

99. *Id.* at paras. 14-15.



ECONOMICS AND
TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

than following an affirmative examination of the need for continuing these competitive safe-guards as necessary to meet their core objectives. Almost immediately thereafter, the FCC launched a rulemaking proceeding to consider whether the time had come to end dominant carrier regulation of RBOC in-region, interstate and/or international services because of "changes to the competitive landscape within the interexchange market."[100]

The types of protections that were encompassed within Sections 271 and 272 of the Act were not novel or untested approaches. They evolved from decades of experience with specific and well-documented opportunities for the abuse of market power by the incumbent LECs and their long distance affiliates, and captured elements of the remedies that had previously been implemented as a result of two major antitrust actions that the Justice Department pursued against AT&T and the Bell System (which ended in 1956 and 1982, respectively), as well as time-tested regulatory mechanisms used by the FCC and state PUCs for preventing anticompetitive practices. Yet these protections were cavalierly abandoned by the FCC before there was time to ensure that a competitive industry had developed and that such competition was sustainable and irreversible.

Now, in connection with their review of the mergers and industry conditions as they will exist after these mergers, the FCC and state PUCs have the opportunity *and the responsibility* to reinstate these critical pro-competitive safeguards. Where permitted, the protections afforded by Section 271 and 272 of the Act should be revived. Whether reinstated pursuant to statute, rulemaking, or voluntarily by the RBOCs as conditions for approval of their respective mergers, the various safeguards that had existed over the years under the FCC's rules and in state regulation should be applied going forward. Specifically, the following structural conditions should be imposed and remain in place at least until after the conclusion of the Commission's review of the third biennial audit following merger approval:

- SBC and Verizon should be required to operate in accordance with all provisions of Section 272 of the Act (including those previously "sunset");

- SBC/AT&T and Verizon/MCI should be required to reinstate all accounting and non-accounting safeguard requirements adopted by the FCC in 1996 for the purpose of implementing the 1996 Act;[101]

---

100. *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC 02-112, *Further Notice of Proposed Rulemaking,* 18 FCC Rcd 10914 (2003).

101. *Implementation of the Telecommunications Act of 1996: Accounting Safeguards Under the Telecommunications Act of 1996,* CC Docket 96-150, *Report and Order,* 11 FCC Rcd 17539 (1996); and *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934,* CC Docket No. 96-149, *First Report and Order and Further Notice of Proposed Rulemaking,* 11 FCC Rcd 21905 (1996).


ECONOMICS AND TECHNOLOGY, INC.

*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

- For purposes of the biennial audit pursuant to Section 272, SBC and Verizon should be required to retain and pay for the services of a qualified *independent* auditing firm that has no business relationship (currently or within the prior two years) with the respective companies;

- The biennial audit must encompass Verizon and SBC's Section 272 affiliates and any Verizon or SBC entity that performs joint services for any of their ILECs and one or more of their Section 272 affiliates; and

- All results of biennial audits must be made publicly available.

*With AT&T and MCI now "impaired" out of existence, the weakening of interconnection, unbundling, and cost-based pricing mandates in Section 251 and 252 must be reversed*

In Chapters 2 and 3, we discussed the harm that has been done to local competition by a series of decisions by the FCC and the courts, under unrelenting pressure from the RBOCs. Whether one was persuaded by the analysis and findings contained in these decisions at the time they were originally issued, the changes in the industry that have occurred since these decisions were made – and the further anticompetitive changes that will result from the mergers of the industry's largest companies – warrant a wholesale reexamination of the factual basis for each of the major decisions related to the requirements of Section 251 and 252 of the 1996 Act.

Given the scope of this undertaking and the importance of these policies to consumers and competitors alike, to the extent that the FCC does not have the resources to complete its reconsideration of these policies prior to taking action on the proposed mergers, temporary measures that operate to reinstate all of the unbundling and interconnection requirements set forth at Sections 251 and 252, as originally recognized by and implemented in the FCC's *Local Competition Order*, should be adopted as mandatory merger conditions.

Specifically, as conditions for approval of their respective mergers, SBC and Verizon should be required to accept each and all of the following conditions, which should remain in effect until such time as objective, quantifiable levels of competitive penetration are shown both to have developed and to have been sustained for a minimum of 6 years:

- SBC and Verizon should be required as merger approval conditions to offer UNE mass-market switching and UNE-P, and to price these elements at TELRIC-based rates;

- SBC and Verizon should be required as merger approval conditions to offer DSL line sharing to competing providers of DSL services; and



*Rethinking Deregulation in the Wake of Massive Industry Reconcentration*

- SBC and Verizon should as merger approval conditions be made to discontinue their practice of requiring consumers to buy ILEC-provided local service as a condition of purchasing ILEC DSL services ("naked DSL").

**Getting telecommunications competition back on track requires the commitment of all federal and state policymakers.**

Whether in the long run reasonable rates will be achieved through the imposition of stricter regulatory controls or through the achievement of effective competition remains to be seen. However, at the moment, consumers are protected neither by effective competition nor by effective regulation. Over the next year, critical decisions will be made that will determine whether consumers can obtain high-quality telecommunications services at just and reasonable prices, or instead be confronted with "take-it-or-leave-it" services from one (or at best two) dominant national providers. During this critical period, regulators and legislators must resist facile appeals to deregulate (further) for deregulation's sake. Policymakers must also take into account that two of the most experienced, vocal, and well-funded advocates for competition are being taken out of action by their former arch-rivals.

The proposed mergers – by their very scale and scope – require that the FCC and state PUCs reassess the status of the nation's telecommunications markets so as to determine whether the present combination of emerging (yet seriously impaired) competition and less-than-effective regulation is in the interest of consumers. If this reassessment is taken seriously and undertaken in good faith, the answer must be that consumers' interests are not being served. In this paper, we have outlined a series of steps that will help remedy this situation. Maximizing consumer benefits and minimizing harm from the proposed mega-mergers between SBC and AT&T and Verizon and MCI is a priority because of their enormous potential impact upon industry structure and, because, once in place, they cannot be readily undone. Even assuming that appropriate pre- and post-merger conditions are imposed (or the mergers denied), there are other key changes in regulatory oversight of the incumbent LECs that must be undertaken to reverse ill-advised regulatory concessions obtained based upon unfulfilled promises and expectations of competition that have not materialized, and to restore the industry on the path to competition.

 ECONOMICS AND TECHNOLOGY, INC.

**Data Appendix** | **CONFRONTING TELECOM INDUSTRY CONSOLIDATION**



Data Underlying Figure 1.
          Net Additional CLEC Investment (in billions)

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|------|------|------|------|------|------|------|------|
| $2 | $3 | $7 | $14 | $21 | $17 | $4 | $4 |

Source: NPRG *CLEC Report* 2004

Data Supporting Figures 2,3,4
End-User Switched Access Lines (In thousands)

| | CLEC Facilities | Resale | UNEs | ILECs (total) | ILECs (to end users) |
|---|---|---|---|---|---|
| Dec-99 | 2723 | 3513 | 1959 | 187294 | |
| Jun-00 | 4042 | 4315 | 3201 | 188171 | |
| Dec-00 | 5217 | 4114 | 5540 | 188304 | |
| Jun-01 | 5776 | 3919 | 7580 | 187201 | |
| Dec-01 | 6072 | 4250 | 9332 | 185517 | |
| Jun-02 | 6236 | 4478 | 10930 | 182487 | |
| Dec-02 | 6479 | 4677 | 13709 | 181756 | |
| Jun-03 | 6370 | 4887 | 15728 | 177860 | |
| Dec-03 | 7045 | 4842 | 17888 | 174536 | |
| Jun-04 | 7487 | 5140 | 19356 | 171129 | 148103 |

Source: Industry Analysis and Technology Division, Federal Communications Comission
Local Telephone Competition, Status as of June 30, 2004.

Data Supporting Figure 5
End User Switched Access lines (in thousands)
CLECs

| Period | Coaxial Cable | Non-Coax Facilities | Resale | UNEs | Total | Total Facilities |
|---|---|---|---|---|---|---|
| Dec-00 | 1125 | 4092 | 4114 | 5540 | 14871 | 5217 |
| Jun-01 | 1876 | 3900 | 3919 | 7580 | 17275 | 5776 |
| Dec-01 | 2246 | 3826 | 4250 | 9332 | 19654 | 6072 |
| Jun-02 | 2597 | 3639 | 4478 | 10930 | 21644 | 6236 |
| Dec-02 | 3071 | 3408 | 4677 | 13709 | 24865 | 6479 |
| Jun-03 | 3123 | 3247 | 4887 | 15728 | 26985 | 6370 |
| Dec-03 | 3301 | 3744 | 4842 | 17888 | 29775 | 7045 |
| Jun-04 | 3338 | 4149 | 5140 | 19356 | 31983 | 7487 |

Data Supporting Figure 7

| Period | Net Coaxial Cable Additions |
|---|---|
| Jun-01 | 751 |
| Dec-01 | 370 |
| Jun-02 | 351 |
| Dec-02 | 474 |
| Jun-03 | 52 |
| Dec-03 | 178 |
| Jun-04 | 37 |

Source: Industry Analysis and Technology Division, Federal Communications Comission
Local Telephone Competition, Status as of June 30, 2004.


ECONOMICS AND
TECHNOLOGY, INC.

Data Supporting Figure 8
Wireless Market Shares

| Company | Subscribers (in thousands) |
|---|---|
| Verizon Wireless | 37522 |
| Cingular | 46007 (includes AT&T Wireless) |
| Qwest | 871 |
| RBOC total | 84400 |
| Alltel | 8023 |
| ILEC total | 41910 |
| Sprint PCS | 15900 |
| T-Mobile | 13128 |
| Nextel | 12882 |
| National Total | 134333 |
| | 63% |

Source: Wireless Telecommunications Bureau, Federal Communications Commission
9th Annual CMRS Report, Rel. September 28, 2004, at Appendix A, Table 4.

Data Supporting Table 2

| Date | Number of High Speed Lines | | | % of High Speed | |
|---|---|---|---|---|---|
| | ADSL | Coax Cable | Total | ADSL | Coax Cable |
| Dec-99 | 369,792 | 1,411,977 | 2,754,286 | 13% | 51% |
| Jun-00 | 951,583 | 2,284,491 | 4,367,434 | 22% | 52% |
| Dec-00 | 1,977,101 | 3,582,874 | 7,069,874 | 28% | 51% |
| Jun-01 | 2,693,834 | 5,184,141 | 9,616,341 | 28% | 54% |
| Dec-01 | 3,947,808 | 7,059,598 | 12,792,812 | 31% | 55% |
| Jun-02 | 5,101,493 | 9,172,895 | 16,202,540 | 31% | 57% |
| Dec-02 | 6,471,716 | 11,369,087 | 19,881,549 | 33% | 57% |
| Jun-03 | 7,675,114 | 13,684,225 | 23,459,671 | 33% | 58% |
| Dec-03 | 9,509,442 | 16,446,322 | 28,230,149 | 34% | 58% |
| Jun-04 | 11,398,199 | 18,592,636 | 32,458,458 | 35% | 57% |

Source: Industry Analysis and Technology Division, Federal Communications Comission
High Speed Services for Internet Access, Status as of June 30, 2004.


ECONOMICS AND
TECHNOLOGY, INC.

### About the Authors

**Lee L. Selwyn** is President and founder of Economics and Technology, Inc.  He is an internationally recognized authority on telecommunications economics, regulation, and public policy. Since founding ETI in 1972, Dr. Selwyn has advised a broad range of telecom industry stakeholders – regulatory agencies, consumer advocates, large corporate telecom users, and a number of competitive local and interexchange carriers – on a variety of telecom policy issues, including technology, rate design, service cost analysis, market structure, form of regulation, affiliate transactions, universal service, access charges and intercarrier compensation, and taxation of telecommunications services.  He has appeared as an expert before more than forty state commissions, the FCC, the United States Congress and several foreign regulatory bodies.  [Ph.D. in Management, Alfred P. Sloan School of Management, Massachusetts Institute of Technology; Master of Science in Industrial Management, MIT; B.A. with Honors in Economics, Queens College, City University of New York.]

**Helen E. Golding**, Vice President of ETI, has over twenty years experience in the utilities field, including experience in the public sector at the FCC and as Assistant General Counsel and Acting General Counsel at the Massachusetts Department of Public Utilities and in the private sector in telecommunications and energy law and strategic planning.  At ETI, Ms. Golding has managed and participated in a broad range of projects involving the transition from regulation to competition, including incentive regulation, inter-connection, universal service and access charge reform, and the public interest review of mergers and BOC long distance entry requirements.  [J.D., Boston University School of Law; A.B. *cum laude*, Bryn Mawr College.]

**Hillary A. Thompson**, Consultant at ETI, has developed extensive expertise in the areas of competitive entry in the local and long distance telephone markets, affiliate transactions, predation, and valuation of intangible assets.  Ms. Thompson has participated in numerous state and federal level proceedings dealing with Section 271 RBOC long distance entry and Section 272 structural separation and affiliate transaction issues.  [B.A. in Political Science and Philosophy, Swarthmore College, Coursework at St. Catherine's College of Oxford University.]

**Economics and Technology, Inc.** has been primarily and continuously engaged in the telecommuni-cations policy field for more than thirty years.  ETI has participated in more than 500 regulatory and policymaking proceedings in more than forty states, at the FCC, and in a number of foreign countries.  The firm has served as consultants on a broad range of policy and ratesetting issues to more than fifteen state commissions and more than a dozen consumer advocacy agencies across the country, as well as to numerous corporate consumer and competitive carrier clients.


ECONOMICS AND
TECHNOLOGY, INC.