Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 37 of 94

1    48.  RBOC contentions that CLECs can easily utilize fiber that is already in place to serve

2    additional customers is belied by the RBOCs' own submissions.  Referring back to the SBC map

3    of the San Francisco financial district (Figure3), it is worth noting that (according to SBC) *all of*

4    *the customer locations identified on that map are being served by CLECs either through the use*

5    *of CLEC-owned facilities (the purple squares) or via SBC special access (the yellow triangles).*

6    Taking SBC's information at its face value, a physical count of the squares and triangles reveals

7    that there are approximately 436 instances in the small area included on this map where,

8    according to SBC, the CLEC is using SBC special access *even though there is CLEC-owned*

9    *fiber passing the customer's building on the very same street.*  However, given the rather

10   questionable nature of the data sources that were used by SBC in preparing these maps, it is also

11   possible that for at least some of these locations the purported CLEC fiber does not actually

12   exist, it may exist but not be "lit," it may belong to a different CLEC than the one serving the

13   specific customer, or it may have been placed and engineered for some use other than for "last

14   mile" local service, such as for interoffice transport or as an interexchange carrier access facility.

15

16   49.  Clearly, the proximity of a customer to CLEC-owned fiber is not the controlling factor

17   in the CLEC's economic choice as between using its own already-in-place fiber facilities or

18   purchasing special access *at above-cost prices* from SBC.  As AT&T Declarants Fea and

19   Giovannucci explain, there are a number of reasons why a CLEC may be forced to use RBOC

20   facilities even if there is CLEC-owned fiber nearby.  Among the key issues are these:

21



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 38 of 94

1    (1)  Connections to the fiber facility can only be made at a limited number of "Network

2         Access Points" that have been established for this purpose, places where terminating

3         equipment and cross-connection facilities are in place.  There is a direct analogy to a

4         superhighway or mass transit system – even if you live right next to the highway or the

5         transit line, you can only access it at interchanges (in the case of the highway) or

6         stations (in the case of the transit line).

7

8    (2)  The costs of effecting such a connection are often substantial, and can only be justified

9         where revenues at the particular customer location will be sufficient.

10

11   (3)  Building owners are not obligated, as a legal matter, to allow CLECs to bring facilities

12        into their buildings, and where they do permit such entry may impose construction,

13        rental or other fees that will serve only to increase the entry barrier overall.

14

15   (4)  Depending upon where the demarcation has been established, the BOC may own the

16        riser facilities within the building, whose use by a CLEC may potentially involve

17        makeready and recurring charges.

18

19  It is critical that the Commission not be misled by the kind of utterly superficial "geographic

20  proximity" arguments being advanced by the RBOCs, arguments that ignore entirely the

21  economic costs and other considerations that are actually involve in determinations as to the

22  economic feasibility of providing service using CLEC-owned facilities.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 39 of 94

1                                    TRANSPORT

2

3     **The RBOC "spider-web" maps of "possible" CLEC self-provisioned transport routes are**
4     **entirely hypothetical and fictitious, identify no *actual* self-provisioned interoffice routes,**
5     **and make no distinction as between routes with traffic requirements above or below the**
6     **twelve DS-3 self-provisioning threshold adopted in the *TRO*.**
7

8          50.  The RBOCs argue that CLECs always have alternatives to unbundled transport.  Accor-

9     ding to Verizon, "when competitive fiber is present in a given wire center, it almost always

10    connects to the CLEC's own fiber network, or the fiber network of another competing provider,

11    and can therefore be used to reach any other wire center that also is reached by those competitive

12    networks."  In support of this contention, Verizon has created stylized maps portraying entirely

13    fictitious spider-webs of point-to-point interoffice connections between every possible pair of

14    wire centers containing CLEC collocations throughout each of its top-20 MSAs.  Verizon's maps

15    identify no *actual* CLEC-provisioned interoffice routes, nor do they differentiate such routes as a

16    CLEC may require on the basis of channel capacity.

17

18         51.  AT&T declarants Fea and Giovannucci explain that CLEC fiber backbone networks

19    have no requirement for such "anywhere-to-anywhere" pairwise connectivity among all of the

20    CLEC's collocations, that to engineer such connectivity into CLEC networks would be

21    enormously costly and inefficient, and that as such CLEC networks simply do not possess the

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 40 of 94

1    "spider-web" structure that Verizon has fantasized.[49]  Beyond its fictitious maps and

2    characterizations, Verizon offers no *actual* evidence that *any* CLEC networks actually possess

3    the connectivity attributes that it portrays.

4

5    **The RBOCs have completely ignored the purposes for which CLECs have deployed fiber**
6    **and the inability to obtain seamless transport over fiber deployed by different CLECs, and**
7    **so their contrived evidence does not establish that competitors are not impaired without**
8    **access to unbundled dedicated transport facilities.**
9

10       52.  Even the largest CLECs serve only a small fraction of the number of customers that are

11   served by a typical RBOC.  As such, CLECs do not maintain switching and other network

12   facilities at each RBOC wire center.  CLEC interoffice networks are designed primarily, if not

13   exclusively, for the limited purpose of *extending individual subscriber loops from the ILEC wire*

14   *center at which they terminate to the CLEC's switch and network hub.*  In the *TRO*, the

15   Commission had determined that self-provisioning of such interoffice transport links could not

16   be economically justified unless the CLEC's capacity requirement was greater than twelve DS-3s

17   over each specific point-to-point route, and found that CLECs would be impaired without access

18   to unbundled interoffice transport with respect to traffic requirements of twelve DS-3s or less, or

19   where there was less than two other CLECs offering wholesale interoffice transport over the

20   specific point-to-point route.

21

---

49.  Declaration of Anthony Fea and Anthony Giovannucci on behalf of AT&T Corp.
("Fea/Giovannucci Declaration"), at para. 15.


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 41 of 94

1    53.  In the traditional architecture of *ILEC* networks, *loops* provide connectivity between

2    individual customer premises and the serving wire center where a central office switch is located,

3    and *interoffice transport* facilities provide connectivity between and among those wire centers

4    and switches.  However, when viewed in the context of *CLEC* network architecture, this "bright

5    line" distinction between "loops" and "transport" is more difficult to draw.  While I have no

6    doubt whatsoever that this key difference between the design of ILEC and CLEC networks is

7    well understood by all of the RBOCs, it is equally apparent, from the manner in which the

8    RBOCs have framed this issue both before the Court and now before the Commission, that the

9    RBOCs are misportraying the CLECs' need for and use of interoffice transport in a manner that

10   seems intended to make the evaluation of the impairment question far more difficult than it needs

11   to be.

12

13   54.  RBOC subscriber loops terminate at RBOC wire centers, which also house RBOC

14   switches.  Thus, no interoffice transport facilities are typically required to effect connectivity

15   between an RBOC subscriber and an RBOC switch.  In contrast, when a CLEC uses a UNE loop

16   leased from an RBOC to provide service to the CLEC's customer, that loop will terminate at the

17   CLEC's collocation space *in the RBOC's wire center*.  However, unlike the RBOC, the CLEC

18   *does not have any switching facilities in the RBOC's building*, and so it must *extend* the loop

19   from the RBOC wire center to the CLEC's switch or network hub, which may itself be located at

20   some distance from the RBOC's wire center where the subscriber loop terminates.  This

21   extension of the individual subscriber loop *beyond the collocation in the RBOC wire center*

22   involves *interoffice transport*.  There are several different means by which this can be



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 42 of 94

1   accomplished, with the efficient choice among them being driven by the total volume of CLEC

2   traffic (e.g., number of CLEC subscriber loops) terminating at the RBOC wire center and the

3   proximity of that wire center to the CLEC's network hub or fiber ring:

4

5   (1)  The CLEC can bring its own fiber into its collocation – i.e., put that wire center on its

6        fiber ring.

7

8   (2)  If another carrier has fiber terminating in that same wire center capable of providing

9        connectivity to the CLEC's network or hub, the CLEC may be able to lease transport

10       capacity from that other carrier.

11

12  (3)  The CLEC may lease unbundled interoffice transport from the RBOC from the wire

13       center to the CLEC's network or hub (so-called "extended enhanced loops," or

14       "EELs").

15

16  There is no direct analogy between a CLEC's use of interoffice transport to extend individual

17  subscriber loops to its switch or hub and an ILEC's use of interoffice transport to provide

18  temporary switched interoffice connections among end users served by different wire centers or

19  to provide leased (private line) dedicated interoffice channels interconnecting end user premises.

20

21      55.  In the *TRO*, the Commission determined that the deployment of CLEC transport

22  facilities was only feasible where the aggregate capacity demand *on a specific point-to-point*



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 43 of 94

1    *route* was greater than 12 DS-3s (equivalent to one OC-12 facility), and that CLECs are impaired

2    without access to unbundled interoffice transport where their requirements are twelve DS-3s or

3    less, or where fewer than two CLECs are offering wholesale interoffice transport over the

4    specific route required by the CLEC.[50]  The RBOCs' "evidence" of transport facilities

5    deployment, as was the case with RBOC loop "evidence," fails to identify these different

6    capacity fiber routes, and therefore ignores the Commission's previous findings of feasible self-

7    deployment.

8

9    ***RBOC "spider-web" maps and data portray entirely fictitious interoffice connectivity and***
10   ***clearly overstate the actual existence of CLEC fiber, even at undifferentiated capacity***
11   ***levels.***
12

13   56.   Nowhere is this misportrayal more evident than in Verizon's *ex parte* filing:

14

15       Maps C show, for each of the 20 MSAs, the transport routes between wire center
16       service areas where known competitive fiber is present. This does not mean to suggest
17       there is fiber directly between each of these wire centers, but it does show where, in
18       the Court's word, it is "possible" to establish connections between wire centers. This
19       is so because when competitive fiber is present in a given wire center, it almost always
20       connects to the CLEC's own fiber network, or the fiber network of another competing

---

50.   In fact, as AT&T experts Fea and Giovannucci clearly document, it is extremely unusual for CLEC fiber to be deployed to interconnect multiple ILEC wire centers.  Such connections can rarely be justified on economic grounds.  There may be other impediments to a CLEC's ability to deploy its own fiber transport facilities, such as right-of-way and other construction-related issues.


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 44 of 94

1        provider, and can therefore be used to reach any other wire center that also is reached

2        by those competitive networks.[51]

3

4   A copy of Verizon's "Map C" for the New York-Northern New Jersey MSA is provided here as

5   Figure 4.

6

7       57.  Verizon would have the Commission believe that *all* of the interoffice facilities owned

8   by *all* of the CLECs serving a given MSA have been merged into a single, integrated network

9   "cloud" such that connectivity to any one point within the "cloud" provides connectivity to every

10   point within the "cloud."  That vision is entirely inaccurate and inapposite with respect to the

11   specific design *and use* of interoffice transport networks by CLECs – which is primarily, if not

12   exclusively, for the purpose of *extending individual subscriber loops from the ILEC wire center*

13   *at which they terminate to the CLEC's switch and network hub.*  The anywhere-to-anywhere

14   functionality being portrayed by Verizon on its "Map C" precisely describes the PSTN, *but has*

15   *nothing whatsoever to do with the CLEC fiber rings that Verizon purports to be portraying*.

16   Functionally, CLEC networks are of the "hub and spoke" or "star" design, providing redundant

17   point-to-point connectivity from each of the individual network nodes to the network hub (see

18   Figure 5).  There is no requirement for interconnection *among* the individual network nodes, and

19   there is certainly no requirement for connectivity *between* different CLECs' respective networks.

20   Verizon's suggestion that "it is 'possible' to establish connections between wire centers" has

21   validity only as a theoretical abstraction: "Anything's *possible*," of course, but in this specific

---

51. *Verizon July 2, 2004 ex parte*, "White Paper," at 11.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 45 of 94



**Figure 4.** Verizon's "Map C" for the New York MSA showing what Verizon claims to be the hypothetical existence of CLEC interoffice transport facilities.

ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 46 of 94



**Figure 5.**  Illustrative diagram of CLEC interoffice transport network functionality.  No
connectivity between or among ILEC wire centers (B, C, D, E, F) is provided or required.

1    case such connectivity is neither *practical* as an economic matter nor *necessary* as a business or

2    technical matter.  Because these networks are designed specifically to carry traffic between a

3    node and the network hub, without major reengineering the only practical means by which one

4    CLEC network could be used for node-to-hub EEL-type transport by a different CLEC is where

5    both maintain network hubs in essentially the same place.  Figure 6 illustrates this problem.

6    Suppose that CLEC #1 has its hub at location "A" and has constructed a fiber ring designed to

7    provide connectivity between "A" and its collocations at each of five ILEC wire centers, B, C, D,

8    E and F.  Suppose that CLEC #2 maintains its hub at a site near (but not *at*) ILEC wire center

9    "C" and would like to use CLEC #1's fiber ring to provide connectivity between its hub near "C"

10   to B, D, E and F.  The problem is that CLEC #1's network only provides connectivity over the

ECONOMICS AND
TECHNOLOGY, INC.