Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 49 of 94

1    validity of these two critically important suppositions, *nor could they, since both suppositions*

2    *are demonstrably false*.  This limitation on the connectivity of CLEC networks is discussed in

3    more detail in the declaration of AT&T experts Anthony Fea and Anthony Giovannucci clearly

4    document, it is extremely unusual for CLEC fiber to be deployed to interconnect multiple ILEC

5    wire centers.  Such connections can rarely be justified on economic grounds.

6

7    ***The existence of fiber-enabled equipment in an ILEC end office is not evidence that there***
8    ***is dedicated transport available from that end-office over a route that a particular CLEC***
9    ***may require.***
10

11       58.  As AT&T declarants Fea and Giovannucci explain, CLEC fiber rings are designed and

12   configured to provide "entrance facilities"  to a CLEC switch or point of presence, and not to

13   provide dedicated transport between ILEC offices.  Transport facilities that are configured and

14   used to serve only as entrance facilities to a CLEC switch or point of presence cannot and do not

15   provide dedicated transport between ILEC offices.  While it is theoretically possible for such

16   networks to be configured to provide dedicated transport between ILEC offices, this would

17   involve considerable cost and decrease the overall capacity of the fiber network, all to provide a

18   capability that CLECs ordinarily do not themselves require.  The fact that a CLEC has two

19   collocations – even two collocations connected to the CLEC's switch or point of presence by its

20   own fiber facilities – falls several steps short of demonstrating that the CLEC *actually* is

21   *providing* dedicated transport between the two collocations, or even that the CLEC *could* provide

22   dedicated transport without the expenditure of substantial time and money.

23

 ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 50 of 94

1    59.  The fiber facilities that CLECs have deployed into ILEC central offices primarily serve

2    to connect an individual CLEC's network to the ILEC network at a point on the ILEC network

3    where the CLEC has aggregated traffic.  In short, CLEC fiber facilities that are connected to

4    ILEC central offices have been deployed and provisioned as "entrance facilities"  that connect

5    CLEC collocation arrangements at SBC end offices to CLEC switches or points of presence.

6    With very limited exception, the fiber that CLECs have deployed to ILEC central offices has not

7    been provisioned – and is not being used – to carry traffic *between* two ILEC central offices

8    because it is highly unusual that any one CLEC end user customer would itself have a

9    requirement for a specific dedicated point-to-point circuit where both endpoints happen to be on

10   the CLEC's fiber ring.

11

12   ***The GeoTel data upon which the RBOCs' claims as to CLEC deployment are based is***
13   ***unsubstantiated and wrong.***
14

15   60.  For purposes of discussion, I have up to now been treating as accurate the CLEC

16   networks being depicted in the various maps that Verizon and the other RBOCs have introduced

17   in their effort to portray CLEC network deployment as extensive.  Upon closer examination,

18   however, it is clear that the RBOCs' depiction is anything but accurate.  Verizon, SBC and

19   Qwest all rely upon the same underlying data source for their maps – GeoTel's Metro Fiber

20   database.[52]  The maps purport to show many different things:  CLEC "lit" buildings, CLEC fiber

---

52.  *Verizon July 2, 2004 ex parte*, at 10.  *SBC August 18, 2004 ex parte*, at 3.  *Qwest August 19, 2004 ex parte*, at 2.



1    routes, ILEC wire centers in which CLECs have collocated fiber-enabled equipment, and CLEC

2    customer locations served using special access.  Relative to the issue of dedicated transport, the

3    RBOCs' maps purport to show CLEC fiber running down city streets and around metropolitan

4    areas, and connected to RBOC wire centers at which CLECs are "known" to have collocated

5    fiber-enabled equipment.  As I will discuss below, since the GeoTel database is a proprietary

6    product with no detailed source references, the matter of whether or not the RBOC maps

7    accurately portray the CLEC fiber routes cannot be readily confirmed.[53]  Moreover, as I noted

8    earlier (at para. 37), at least one of the key sources in input to the GeoResults data – Telcordia's

9    CLONES database – contains numerous out-of-date and obsolete records, and cannot be relied

10   upon as evidence of *current* CLEC facilities deployment.  Similar conclusions were reached by

11   QSI Consulting, Inc. and by the New York State Department of Public Service Staff.  In any

12   event, even taking them at face value, the RBOC maps offer no useful  information relative to the

13   ability of CLECs to self-provision dedicated transport *below the OC-12 level* – and more

14   importantly, *provide no evidence whatsoever that any CLECs are currently doing so.*

15

---

53.  According to GeoTel's website, its MetroFiber dataset contains metro fiber routes for "[o]ver 200 carriers in more than 130 MSAs," but fails to identify any of the specific CLECs that have contributed their data, nor does it provide specific citations to any other data sources.  There is thus no means by which the Commission can verify that the fiber routes and other data being portrayed by SBC and Verizon are current or accurate, or that the specific routes and buildings identified as being "lit" are in fact "lit" and are not themselves carrier, rather than end user, locations, including in particular RBOC building locations to which CLEC fiber is connected. *See* http://www.geo-tel.com/products.cfm (accessed September 30, 2004).



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 52 of 94

1      61.  QSI undertook to develop an independent estimate of CLEC transport based upon data

2   developed from state impairment proceedings.  QSI found that alternative loop and transport

3   facilities at the trigger levels were scarce in the states it evaluated. Typical of the QSI findings is

4   the following example. QSI found only 40 dedicated transport routes with two or more providers

5   offering wholesale DS3 transport across all twelve of the states that it had evaluated, compared to

6   5,985 such routes that had been claimed by the RBOCs in those same proceedings.

7   Significantly, 37 out of those 40 routes were in New York,[54] such that *only three routes with two*

8   *or more providers offering wholesale DS3 transport could be found across the remaining eleven*

9   *states*.  Put differently, the RBOCs' figure for the number of such routes in the twelve state

10  proceedings as having met the dedicated transport trigger for wholesale DS3 service was

11  overstated by roughly 15,000 percent!

12

13     62.  Notably, a Staff Report prepared by the State of New York Department of Public

14  Service summarizing its Staff's analysis of switching and transport triggers found similar

15  exaggerations.[55]  In that report, released March 31, 2004, the NY DPS Staff found a total of only

16  100 dedicated transport routes that met all of the transport triggers combined (72 in Verizon

17  territory, 28 in Frontier territory), as compared with the roughly 4,000 such routes that, according

---

54.  *QSI Report*, Table 7.

55.  NY DPS Staff's Analysis of Switching and Transport Triggers, released March 31, 2004, in conjunction with the NYPSCs Case 03-C-0821 implementing the *TRO*.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 53 of 94

1   to the QSI analysis, Verizon and Frontier had claimed to exist in New York State.[56]  Specifically,

2   the NY DPS found the following routes met the FCC's triggers:

3

4         36 wholesale DS-1 routes

5         48 self-provisioned DS-3 routes

6         37 wholesale DS-3 routes

7         46 self-provisioned dark fiber routes, and

8         0 competitive dark fiber routs

9

10    ***Evidence of CLEC fiber-enabled equipment in an ILEC central office is not evidence that***

11    ***there is dedicated transport between that office and any other ILEC central office.***

12

13     63.  Verizon supplies what it characterizes as market-by-market analyses of what it believes

14   to be CLEC dedicated transport routes compiled from what it describes as "two highly reliable

15   sources of data," one of which is a series of "inspections" of individual CLEC collocations in

16   Verizon wire centers, conducted by Verizon itself.[57]  The stated purpose of Verizon's surveys

17   was "to identify those [wire centers] in which competing providers have obtained fiber-based

18   collocation."[58]  Importantly, however, that is the most that such inspections could have revealed.

19   More specifically, Verizon could not have determined, from those inspections, the routing or

20   connectivity associated with the fiber at the collocation, *yet it is the assumption of universal*

21   *connectivity that lies at the heart of Verizon's non-impairment contention*.  Indeed,

---

56.  *QSI Report*, at Table 7.

57.  *Verizon July 2, 2004 ex parte*, at 9.

58.  *Id.*, at 10.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 54 of 94

1    conspicuously absent from all of the RBOCs' submissions are maps or data showing ILEC wire

2    centers with CLEC collocated fiber-enabled equipment *connected via operational CLEC fiber* to

3    any other ILEC wire centers with CLEC collocated fiber-enabled equipment.  Even if such maps

4    were to have been prepared, they would have shown no such facilities, because CLECs do not

5    have such dedicated transport connections.

6

7        64.  More importantly, however, both the Verizon inspection data and the "reliable" third-

8    party data obtained from GeoTel[59] suffer from a flaw of interpretation by Verizon.  Specifically,

9    Verizon took reports of central offices that contain fiber-fed collocation equipment, and from that

10   *inferred* that every such office had a dedicated transport connection to every other such office.

11   There is no means by which Verizon could have made such a determination from the kind of

12   inspections that it has described and, as I have previously explained, CLECs *do not need and do*

13   *not have point-to-point connectivity between individual ILEC central offices*.

14

15       65.  The heart of Verizon's argument (and underpinning SBC's and Qwest's filings as well)

16   appears to be the belief that if a competing carrier has a fiber-based collocation arrangement in

17   both central office 'A' and central office 'Z', it must follow that the carrier has transport facilities

18   connecting A and Z.  Such an interpretation fails to consider how CLECs have actually deployed

19   and provisioned the fiber facilities they have extended to their collocation spaces at ILEC central

20   offices, and how CLECs are actually using those facilities.  Indeed, in its examination of CLEC

---

59. *Id.*

ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 55 of 94

1    collocation cages, Verizon gave no indication that its inspectors had examined the specific use of

2    *any* CLEC's fiber facilities or collocated equipment on any individual route – in fact their

3    examinations could not have provided any details as to *where* the fiber went after it left the wire

4    center.  In any event, since CLECs do not ordinarily interconnect their collocations, Verizon's

5    "inspections" actually prove nothing at all.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 56 of 94

1          SPECIAL ACCESS AND RESULTING PRICE SQUEEZES

2

3    **The requirement that CLECs utilize DS-1 and DS-3 loop and transport facilities priced as**
4    **"Special Access" services subject to full pricing flexibility due to the nonavailability of**
5    **these facilities as UNEs would afford the RBOCs both the incentive and the ability to**
6    **impose a price squeeze upon rival carriers and in so doing impair CLECs' ability to**
7    **profitably serve large segments of the enterprise market.**
8

9          66.  I understand that the RBOCs have argued that the Commission should "de-list" high

10    capacity loops and transport facilities as UNEs because competitors can lease those facilities

11    from the RBOCs as "special access" services.  In my expert view, competitive carriers would be

12    impaired without access to cost-based loop and transport UNEs.  Because special access services

13    are not effectively regulated – indeed, they are generally priced well-above economic cost – the

14    RBOCs can foreclose competition at any time through a classic "price squeeze."  In fact, AT&T

15    has demonstrated that there are several local business services that it has ceased to offer in light

16    of the special access prices that the RBOCs charge.[60]  Likewise, AT&T has shown that for many

17    other services such as private line service and Frame Relay, the RBOCs have set special access

18    and retail prices at levels that do not allow AT&T or any other efficient carrier to compete for

---

60.  AT&T first announced on June 23, 20004 that it was exiting the residential local and
long-distance markets in seven states across the country (see AT&T News Release "AT&T to
Stop Competing in the Residential Local and Long-Distance Market in Seven States," June 23,
2004, available at http://www.att.com/news/item/0,1847,13121,00.html).  The following month,
AT&T went on to announce that it was ceasing all investment in traditional consumer services
(see AT&T News Release, "AT&T Announces Second-Quarter 2004 Earnings, Company to Stop
Investing in Traditional Consumer Services; Concentrate Efforts on Business Markets," July 22,
2004 available at http://www.att.com/news/item/0,1847,13163,00.html).

economics and TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 57 of 94

1    many customer segments.[61]  Competition for these services can thus "flourish"[62] only if AT&T

2    and other new entrant carriers are permitted to lease cost-based loop and transport UNEs whose

3    prices accurately reflect long run incremental costs.

4

5        67.  Significantly, none of the maps or other data purporting to show competitor use of

6    RBOC special access services that have been provided by Verizon, SBC, Qwest and BellSouth

7    indicate the type of service that is actually being provided to the end user.  Special access service

8    has been used by IXCs to provide services such as AT&T's Megacom[SM], Megacom 800[SM],

9    VTNS (Tariff 12) services, Software-Defined Network[SM] (SDN), MultiQuest[SM]; MCI's VNET[SM],

10   MCI On-Net[SM], MCI Vision[SM], MCI Prism[SM], MCI WorldCom Frame Relay, MCI Dedicated 800

11   Service, MCI Dedicated Leased Line Service, and MCI Business Communications Services; and

12   Sprint Clarity[SM], Sprint Premiere[SM], Real Solutions[SM], Business Sense[SM], Frame Relay Service,

13   Sprint Business Flex[SM], Sprint Real Solutions VPN[SM], Sprint ATM Integrated Services (AIS),

14   Sprint ATM Integrated Services (AIS) Business Options A and Option B (Formerly Sprint ION),

15   and Miscellaneous Services, Sprint Voice VPN[SM] Solutions, Sprint Business AnyTime[SM], Sprint

16   Solutions for Business (Classic Solution, PRI Solution, Priority Solution, Sprint Business Basic,

17   and Sprint Custom Access Solutions[SM], Sprint Complete Sense for Business[SM] (Sprint Complete

18   Sense for Business[SM] Basic, Sprint Complete Sense for Business[SM] Premium, and Sprint

---

61.  Declaration of Alan G. Benway, Robert G. Holleron, Jeffrey King, Michael E. Lesher, Michael C. Mullan, and Maureen Swift on behalf of AT&T Corp., WC Docket 04-313, October 4, 2004 ("*Benway et al Declaration*").

62.  *USTA II*, 359 F.3d at 576.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 58 of 94

1    Complete Sense for Business Unlimited), Sprint Voice Solutions, Sprint Business Essentials[SM],

2    Sprint Business Adjustable Rates[SM] Plan, Sprint Hospitality Connection, Sprint Single Source

3    Solutions, Sprint Conferencing Services, Sprint WATS and Toll Free Services, Sprint Small

4    Business Unlimited Solutons[SM], Sprint Dedicated Leased Line Services, Sprint Frame Relay,

5    Enhanced Frame Relay Services; as well as generic interexchange services such as dedicated

6    (voice and data) private lines, Frame Relay, ATM, dedicated private line, international private

7    line, and perhaps others.  The use by an IXC of special access to provide any of these

8    interexchange (i.e., *non-local*) services *teaches nothing, one way or the other, regarding the*

9    *ability of CLECs profitably to provide enterprise local services via special access*, and any

10   inference that the RBOCs attempt to draw to that effect is without basis and without merit.

11   Indeed, evidence of the historic and current use of special access by IXCs could not support even

12   impairment inferences with regard to long distance services, given the fundamental market

13   structure changes that are not reflected in those data.

14

15       68.  Even where an *existing* special access service is being furnished to a CLEC for purposes

16   of providing local service to an enterprise customer, there is still no basis for the inference that

17   the RBOCs ask the Commission to make regarding the ability to CLECs profitably to serve *new*

18   customers using special access or to retain existing customers once current contracts expire.

19   CLECs incur substantial start-up costs to initially furnish new service to a customer – costs that

20   are further increased where a special access connection is required.  In addition to the costs

21   associated with customer acquisition (marketing, advertising, sales), the CLEC will need to incur

22   one-time costs to establish the customer's account, design and engineer the service being



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 59 of 94

1    ordered, install the service and test the connection and, where the use of ILEC special access is

2    required, pay an often substantial nonrecurring service connection charge to the ILEC.  All else

3    equal, the *ongoing* profitability of *maintaining service in place to an existing customer* (after all

4    up-front costs have been incurred and sunk) will necessarily be greater than the profitability of

5    initially providing service to a new customer, where all such up-front costs have yet to be

6    expended.  Thus, even if one were to assume (for sake of discussion) that *all* of the *existing*

7    CLEC service locations identified by Verizon, SBC and Qwest as being served via special access

8    are being served profitably going forward, that fact would provide no basis for an inference that

9    even similarly situated customer locations where the CLEC is not at present furnishing service

10   could be served profitably going forward.

11

12       69.  Many existing CLEC enterprise customers take service subject to a term agreement.

13   Many of these agreements were negotiated at a date *before* the RBOC had obtained Section 271

14   in-region interLATA authority, in which case the RBOC would not have been in contention for

15   the customer's business.  That is certainly no longer the case, and there is no assurance that all

16   existing CLEC customers will remain with the CLEC (or a different CLEC) once they are "up for

17   grabs."  Moreover, not only do CLECs now face RBOC competition when the CLECs'

18   customers' contracts are up for renegotiation, CLECs also likely confront significantly higher

19   special access prices than had existed when the current customer's service was initially quoted.

20   If, as is likely, the CLEC will be forced, due to the increased special access prices it must pay to

21   the RBOC, to correspondingly increase its own retail prices, its likelihood of being able to retain

22   the customer is further diminished.  Additionally, the increased special access prices may force



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 60 of 94

1    CLECs to withdraw altogether from the less profitable segments of the enterprise market.  Thus,

2    even if the RBOCs' data as to the *present* existence of CLEC customers being served via special

3    access were 100% accurate – which of course it is not – there would be no basis for any inference

4    that all – or even most – of those customers would or could be retained by the CLEC if forced to

5    continue to use special access going forward.

6

7    ***Most special access rates are not currently regulated by the Commission, and may be –***
8    ***and are being – significantly increased by the RBOCs as it serves their own strategic ends.***
9

10    70.  The Commission's has previously observed that "forcing requesting carriers to rely on

11    tariffed offerings would place too much control in the hands of the incumbent LECs, which could

12    subsequently alter their tariffs and thereby engage in a vertical price squeeze," is clearly a valid

13    concern.  In fact, and as demonstrated in the Declaration of Benway *et al* on behalf of AT&T,

14    such price squeezes are precisely what is taking place in the market.  Forcing CLECs to pay

15    above-TELRIC prices for essential network elements impairs their ability profitably to serve

16    customers that could be profitably served if the "last mile" facilities were available as UNEs at

17    TELRIC rates.  The direct effect of the non-availability of UNEs is that such potential CLEC

18    customers are no longer available to the CLEC.  However, there are indirect effects that operate

19    to further limit the portion of the total product and geographic market that would be available to

20    CLECs.  For example, where a CLEC is able to serve only a portion of a particular product and

21    geographic market, customers whose requirements include locations that cannot profitably be

22    served by the CLEC may be unwilling to purchase services from the CLEC even at those



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 61 of 94

1    locations where the CLEC is able to operate profitably (using its own facilities or special access),

2    thereby removing even potentially profitable service opportunities from the addressable market.

3    Additionally, as successive segments of the total product and geographic market are rendered

4    unprofitable to serve as a result of the succession of RBOC special access rate increases, the

5    overall scale of the CLEC's operations are diminished, forcing it to spread its fixed costs across a

6    smaller customer base, further impairing its overall profitability and ability to successfully

7    compete with the RBOC.

8

9        71.  Importantly, in *USTA II* the Court has acknowledged "the ILECs' incentive to set the

10   tariff price as high as possible."[63]  Special access pricing flexibility gives the RBOCs the means

11   to pursue this incentive, and the evidence that they have done just that is undeniable.  The

12   Commission's assessment at para. 102 of the *TRO* that "forcing requesting carriers to rely on

13   tariffed offerings would place too much control in the hands of the incumbent LECs, which could

14   subsequently alter their tariffs and thereby engage in a vertical price squeeze" is demonstrably

15   correct, and the Commission should now make the specific findings that the Court has required

16   to support the fundamental accuracy of its conclusion.

17

---

63.  *USTA II*, 359 F.3d at 576.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 62 of 94

1    ***Because both RBOC retail enterprise service rates and special access rates are essentially***
2    ***unregulated, the RBOCs have both the incentive and the ability to impose a price squeeze***
3    ***on rival CLECs.***
4

5    72.  But impairment still exists even for services for which AT&T and other carriers are

6    providing today using special access.  The reason is that an RBOC can change its wholesale and

7    retail rates at any time, or simply alter the "rate design" for how it prices its special access

8    services.  In light of the RBOCs' ability to continually change its prices,, there is simply no way

9    for the Commission to continuously adjust its impairment inquiry to determine on an ongoing

10   basis whether such tactics result in a price squeeze.   The Commission would have to be

11   constantly monitoring RBOC special access and retail prices – most of which are no longer

12   regulated and may be modified at the option of the RBOC – to determine whether they were

13   sufficient to allow competitors to profitably offer competing services.  In contrast, cost-based

14   UNEs create a level playing field and avoid these administrative burdens.

15

16   73.  The reason why the RBOCs have the ability to price squeeze rivals that use special

17   access to provide retail telecommunications services is because their special access rates are well

18   above the economic cost of providing this service *and* because those rates, in most cases, are

19   subject to "pricing flexibility" and may be increased by the RBOCs at will.  The RBOCs

20   themselves have openly acknowledged this fact.  Verizon, for example, stated that its DS-1

21   prices are at least 35% above TELRIC levels.[64]  BellSouth and Qwest likewise acknowledged

---

64.  *See Ex Parte* Letter from Dee May, Verizon, to Marlene Dortch, FCC, at 16 (filed in CC
(continued...)

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 63 of 94

1   earlier in this proceeding that their special access rates can be *double* the forward-looking

2   economic cost levels.[65]  These concessions are well taken.  In his accompanying declaration, Mr.

3   Stith quantifies the extent to which the RBOCs' special access rates are above economic cost by

4   comparing those rates with the TELRIC-based UNE rates set by state commissions for

5   corresponding facilities.  Mr. Stith's testimony demonstrates that RBOC special access rates are

6   almost uniformly higher than TELRIC levels and in some instances are more than 150% higher

7   that the RBOCs' UNE rate, which can be taken as a surrogate for the RBOCs' true economic

8   costs.[66]  Other carriers have likewise filed evidence that the special access rates they would pay

9   are well in excess of prevailing UNE rates.[67]

10

11      74.  The RBOCs' ability to price squeeze competitors can also be seen from the difference in

12   how they price services that they sell at retail to end users that incorporate functionalities that are

13   provided to competitors through special access or UNEs, versus how they price those wholesale

14   access services to competitors.  As documented in the *Benway et al Declaration*, the RBOCs

---

64.  (...continued)
Docket No. 01-338, Aug. 13, 2004).

65.  *See* Comments of BellSouth, at 3 (filed in CC Docket No. 96-98, Apr. 5, 2001);
Comments of Qwest, at 7 (filed in CC Docket No. 96-98, Apr. 5, 2001).

66.  *Stith Declaration*, at para. 17.

67.  *See  Ex Parte* Letter from Michael Pryor, NuVox, to Marlene Dortch, August 19, 2004
("*NuVox August 19, 2004 ex parte*") Jennings Dec., Tables 2-4 (showing that DS1 EEL rate
NuVox currently purchasing is approximately 50% the price of comparable special access rates
offered by BellSouth).



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 64 of 94

1   typically offer access to retail customers at a price that is far below what the RBOCs charge

2   wholesale competitors for the same access.

3

4        75. An RBOC can use the cost differential between what its rivals pay it for high-capacity

5   loop and transport facilities and the lower economic cost that it incurs as a vertically integrated

6   company to foreclose competition.[68]  As the Commission has recognized, an

7

8        incumbent LEC could ... set its in-region, interexchange prices at or below its access

9        prices.  Its competitors would then be faced with the choice of lowering their retail

10       rates for interexchange services, thereby reducing their profit margins, or maintaining

11       their retail rates at the higher price and risk losing market share."[69]

12

13  This strategy may be profitable for the RBOCs, but it will certainly weaken the ability of rivals

14  to compete for local exchange business while enhancing the RBOCs' ability to maintain their

15  monopoly hold over all local services.  Similarly, because long distance services provided to

16  enterprise customers rely upon high-capacity facilities that are typically provided only by the

17  RBOCs, the RBOCs foreclose competition for these customers as well.

18

19       76. Ultimately, the Commission need not guess about the RBOCs' ability to engage in price

20  discrimination to foreclose competition because there is powerful evidence showing that the

---

68. To be sure, the RBOCs have an obligation under 47 U.S.C. § 272(e)(3) to "impute" access prices into the services offered by long distance affiliates.  However, the Commission has effectively gutted this requirement by allowing the separate affiliate obligation under section 272 to sunset.

69. *Access Reform Order,* at para. 277.

ET ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 65 of 94

1    RBOCs have been doing just that.  In accompanying declarations, AT&T's experts testify that,

2    despite having the incentive to offer the full range of local and long distance services that

3    customers seek to buy, there are several local services that AT&T no longer provides because it

4    is simply not profitable to do so in light of the RBOCs' existing special access and competing

5    retail services pricing.  In particular, AT&T has effectively abandoned offering certain classes of

6    local private line service, Ethernet service, and "transparent" LAN service.

7

8        77.  As AT&T shows, competition is simply not possible for many services because RBOC

9    special access services are so high that even an efficient competitor cannot match the RBOC's

10   retail price.  Indeed, in many instances the RBOCs' special access rates alone are *higher* than

11   their retail rates for many data services that they offer using the same access facilities  making

12   competition mathematically impossible.

13

14       78. Another carrier, NuVox, has recently offered complementary evidence showing the

15   potential impact of having to pay above-cost special access services on its finances.  According

16   to NuVox, it currently uses DS1-level EELs to provide voice and data services to small and

17   medium sized businesses.  Although NuVox purchases some special access, the vast majority of

18   its services are provided using UNEs.[70]  According to NuVox's calculations, using special access

---

70.  *See NuVox August 19, 2004 ex parte*, Jennings Dec., at para. 9.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 66 of 94

1    instead of cost-based UNEs would "increase network costs by 53 percent on average and would

2    result in earnings ("EBIDTA") per customer going from positive to negative."[71]

3

4        79.  To be sure, there are services that AT&T and other carriers offer today using special

5    access, but this certainly does not provide a valid basis for eliminating access to cost-based

6    UNEs going forward.  Prior to the RBOCs' long distance entry, above-cost special access rates

7    did not disable competition because all competitors were paying those rates.[72]  As existing

8    contract periods expire, these customers will be up for grabs.  And to the extent that competitive

9    carriers are relegated to above-cost special access services, the RBOCs will have the incentive

10   *and the ability* to adjust their retail prices to foreclose competition for these customers.  In that

11   regard, I would observe that the various RBOC maps purporting to identify CLEC customer

12   locations being served via special access do not identify the type of service being provided nor

13   the date at which the existing customer contract will terminate.  As such, no inference can

14   reasonably be made from the present existence of such customers to the CLECs' ability to retain

15   them in the future in the face of the RBOCs' ability to use their above-cost and flexible pricing of

16   special access to impose a price squeeze upon competing providers.

17

---

71.  *Id.,* at para. 12.

72.  In addition, I understand that the Commission's "use restrictions" effectively prevented CLECs from gaining access to loop-transport combinations as UNEs, even to serve local customers in many situations.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 67 of 94

1   ***It is not administratively feasible for the Commission to adjust its impairment inquiry "on***
2   ***the fly" to account for whether the RBOCs are engaging in competition foreclosure.***
3

4       80.  The *USTA II* court expressly recognized that relegating competitive carriers to special

5   access would potentially subject those carriers to debilitating price squeezes and the burdens that

6   this possibility imposed on the Commission could be sufficiently high that the administrative

7   costs of accounting for special access in the impairment inquiry outweighed any benefit.[73]  This

8   is clearly the case here.  It is simply not administratively feasible for the Commission to adjust its

9   impairment inquiry "on the fly" to account for whether the RBOCs are engaging in competition

10  foreclosure.  There are simply too many ways in which the RBOCs can price squeeze rivals.

11  Indeed, the very possibility of such conduct on the part of the RBOCs will itself operate to

12  impair competitors' ability to attract capital where the risk of anticompetitive responses by the

13  RBOCs could be seen as foreclosing investors' ability to recover their investments in CLEC

14  ventures.

15

16      81.  As explained above, the RBOCs can foreclose rivals by setting special access prices

17  above economic cost and then setting retail rates that reflect their own lower economic cost.

18  Under the Commission's *Pricing Flexibility Order*, the RBOCs have the ability to raise special

19  access prices whenever they want in most geographic areas.  They also have flexibility to lower

20  retail prices at any time.  Any increase in the wholesale rate charged competitors or lowering of

---

73.  *USTA II*, 359 F.3d at 575-77 (recognizing categorical rule against considering special
access services in impairment inquiry could be justified "based on factors such as
administrability, risk of ILEC abuses, and the like").

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 68 of 94

1   the retail rates is directly relevant to whether the RBOCs have effected a price squeeze. The

2   Commission would thus be faced with having to conduct an impairment review every time the

3   RBOC raised its wholesale rates or lowered it retail rates.[74]  Among the administrative

4   complexities that this would create is the fact that in some cases the RBOC's retail service may

5   be tariffed at the state level, making it almost impossible for the Commission to "connect the

6   dots" running between the increased *interstate* special access rate and the *intrastate* retail price

7   that may be less than the special access rate that a competing CLEC would be forced to

8   confront.[75]

---

74.  Indeed, the RBOC can effect a price squeeze without even "raising" rates. It can also do it through rate design. For example, the RBOCs generally have three or more density zones for their special access rates, but have the authority under 47 CFR §69.123(b)(1) to create as many as seven density zones. Such additional deaveraging could potentially increase rates in some areas to levels that made it effectively impossible for some existing services to be provided profitably. Or the RBOCs could change how mileage-sensitive access charges are assessed, which would have the effect of raising the rates for low mileage services versus high mileage services or *vice versa*. Again, even such subtle shifts could potentially raise a rivals' costs in debilitating fashion.

75.  Keeping tabs on an RBOC's state tariffs is not a simple task. They vary significantly by carrier within a state and, indeed, even the same carrier does not necessarily file similar rates and tariffs across states. For example, in Massachusetts, Verizon sells digital PBX trunks under the name *Flexpath*. The *Flexpath* service requires a digital port for $357 per month (with term discounts for three and five year contracts – $321 and $285 per month respectively), a digital transport facility for $105.40 per month (with term discounts for three and five year contracts – $94.85 and $84.30 per month respectively), and digital transport for $30 per half-mile (again with term discounts for three and five year contracts – $27 and $24 respectively). Alternatively, *Flexpath* can be replaced with any other Verizon Massachusetts intrastate high capacity service. Verizon specifically identifies the *Integrated Access Service* (IAS) local loop transport service as a viable alternative to the *Flexpath* digital transport facility. IAS is a DS3, OC3 or above SONET-based retail access service that may be used for the provision of multiple different

(continued...)



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 69 of 94

1    82.  In this regard, I recognize that the *USTA II* court stated that the justifications offered by

2    the Commission in defense of its prior rule – *i.e.*, that consideration of special access tariffs could

3    potentially allow the RBOCs to evade the Act's cost-based pricing obligations – was not

4    sufficient where there is already fierce competition from carriers purchasing services out of

5    special access tariffs and where "there is no claim that ILECs would be able to drastically hike

6    those rates."[76]  I assume here that the Court was not holding that the ILECs have no ability to

7    "hike" rates, but only that the Commission had failed to explore the RBOCs' potential ability to

8    do so.

9

10    83.  Indeed, there is abundant evidence demonstrating that the RBOCs have power to

11    increase their special access rates in the wake of the *Pricing Flexibility Order*.  For example,

12    Verizon has been granted Phase II pricing flexibility in all but one (Trenton, NJ) of the "20

---

75.  (...continued)
services.  The month-to-month retail rate for one DS3 is $1,970 (with term discounts for three,
five, seven, and ten year contracts – $1,477.50, $1,379, $1,280.50 and $1,182.50 per month
respectively).  So *Flexpath* could be priced at as much as $762 for a DS1 under month-to-month
pricing and assuming five miles of transport) and as little as $610 for a DS1 under a five-year
plan also with five miles of transport).  Clearly, prices can vary significantly depending upon
how the service is ordered even within the same state.  (See, New England Telephone and
Telegraph, DTE MA No. 10, Part C Section 5, 2nd Revised Sheet 1, Effective 4/11/04.  New
England Telephone and Telegraph, DTE MA No. 10, Part C Section 6, Original Sheet 1, 2, and
3, Effective 12/20/02.  New England Telephone and Telegraph, DTE MA No. 10, Part M Section
3, Original Sheet No. 15, Effective 7/14/99.  New England Telephone and Telegraph, DTE MA
No. 10, Part M Section 3, 1st Revised Sheet No. 16, Effective 1/20/02.)

76.  *USTA II*, 359 F.3d at 576.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 70 of 94

1   MSAs in Verizon's serving area with the largest amount of high-capacity demand."[77]  Similarly,

2   of the 20 MSAs included in SBC's August 18, 2004 *ex parte*, all but Orange County, California

3   have achieved Phase II pricing flexibility.[78]  On August 16, 2004, Qwest filed rate increases of

4   between 9% and 94% with an average rate increase of 27%, applicable to special access services

5   subject to pricing flexibility.[79]  This represents the third major rate hike in less than two years,

6   and the second in the last six months.[80]

7

8       84.  Further, the RBOCs can also affect a price squeeze by lowering retail rates.  Where the

9   RBOCs have priced special access above economic cost, they have the ability to either set retail

10  rates at a "high" level that permits rivals to win customers but earns the RBOCs' high margins on

---

77.  The Verizon Telephone Companies, FCC Tariff No. 1, Access Service, Section 14.7, Original Page 14-49 through Original Page 14-63; The Verizon Telephone Companies, FCC Tariff No. 11, Access Service, Section 15.3, Original Page 15-19 through Original Page 15-35; *Verizon Petitions for Pricing Flexibility for Special Access and Dedicated Transport Services,* CCB/CPD Nos. 00-24, 00-28, *Memorandum Opinion and Order*, DA 01-663, 16 FCC Rcd 5876 (2001) 5880 at fn 30; *Petition of Verizon for Pricing Flexibility for Special Access and Dedicated Transport Services,* CCB/CPD File No. 00-27, *Memorandum Opinion and Order*, DA 02-706, 17 FCC Rcd 5359 (2002) 5362 at fn 28.

78.  Pacific Bell Telephone Company, FCC Tariff No. 1, Access Service, 6th Revised Page 31-3, Effective August 4, 2004; Southern New England Telephone Company, FCC Tariff No. 39, Access Service, 1st Revised Page 24-2, Effective August 4, 2004; Ameritech Operating Companies, FCC Tariff No. 2, Access Service, 3rd Revised Page 689, Original Page 689.1, Effective August 4, 2004; Southwestern Bell Telephone Company, FCC Tariff No. 73, Access Service, 3rd Revised Page 39-3, Effective August 4, 2004.

79.  *Qwest Corporation Transmittal No. 206*, Petition of AT&T Corp., August 28, 2004 ("*AT&T Petition to Investigate Transmittal No. 206*"), at 2.

80.  *AT&T Petition to Investigate Transmittal No. 206*, at 1.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 71 of 94

1   both sales of special access and retail services, or set retail rates at "low" levels that prevent

2   competition in light of prevailing special access prices.  Thus, even to the extent that the RBOCs

3   special access prices were fixed, it does not follow that a price squeeze is not possible because

4   the RBOCs also have unfettered control to change their retail rates.

5

6        85.  Here, history provides a powerful example of the RBOCs' ability to change overnight

7   its rate structure from one that allows competition to flourish to one that forecloses competition

8   altogether.  After SBC was granted authority to provide long distance telephone service in the

9   SBC territories, SBC entered the mass market long distance customers and charged rates that

10  were generally competitive with prevailing long distance carriers' prices.  As discussed in an

11  accompanying declaration, SBC, not content with the share it gained from this pricing, in March

12  of 2003, began offering pricing plans in which long distance service was provided at rates that

13  were, in some cases, less than half the lowest prevailing long distance rates.

14

15       86.  SBC was able to offer these low rates because of its access charge advantage – or, more

16  specifically, because as a practical matter it does not pay access charges for any call originations

17  or terminations within the full thirteen state SBC footprint.  Specifically, because SBC has a

18  monopoly share of local service customers throughout each state in which it offers long distance

19  service, the SBC enterprise as a whole does not incur the "switched access," "special access,"

20  and other charges that SBC imposes on its long distance competitors when they originate or

21  terminate calls to these customers because, while SBC's long distance entity nominally "pays"

22  access charges, for the most part these "payments" are made from one SBC "pocket" to another



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 72 of 94

1    SBC "pocket."  At the same time, the costs of switched and special access services constitute a

2    substantial percentage of the overall cost of long distance services.  For example, AT&T reported

3    that for 2003 it had spent some $10.7-billion on services – primarily switched and special access

4    – purchased from other carriers, representing some 42% of total cash operating expenses.[81]

5

6        87.  Critically, even to the extent that competitive carriers were able to obtain "UNE-P" at

7    truly economic costs and obtain originating access at economic cost, SBC still enjoys an artificial

8    cost advantage with regard to offering long distance services.  Competitive carriers ordinarily

9    have to pay terminating access for their customer's calls because it is very infrequent that one of

10   their local customers makes a long distance call to another local customer of that carrier.  On the

11   other hand, it is quite often the case that for SBC – with its monopoly customer base across 13

12   states, representing approximately 40% of the total U.S. population – to have one of its customer

13   call another one of its customers.  In such circumstances, SBC effectively avoids above-cost

14   terminating access charges, instead incurring only the lower economic cost.

15

---

81.  *See,* UBS, *How Access Charges Determine Winners and Losers in Telecom Services*, at 22 (April 2, 2004) ("In many instances, the special access circuits required to connect the end user to the IXC network represent the majority of the total cost of the circuit.  That is more than 50% of the total cost of a frame relay drop or private line circuit is represented by the cost of the last mile that the IXCs must pay to the ILECs."); *see also* AT&T Corp. Consolidated Statement of Income (Unaudited), 7/22/04, http://www.att.com/ir/xls/2q04_financials_.xls ("IS Quarterly" Tab), accessed 9/29/04.  Total cash operating expenses are total operating expenses minus depreciation.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 73 of 94

1    88.  The Commission now knows full well the results of the efforts of SBC and similar

2    conduct by the other RBOCs.  SBC and Verizon have in a few short years gone from zero market

3    share to being the dominant mass market long distance providers in their territories.  For

4    example, as of the end of 2003, Verizon had amassed a 61% market share in New York and a

5    52% share in Massachusetts.  Similarly, SBC had achieved a nearly 60% market share in Texas.[82]

6    At the same time, AT&T – the company with the largest share in these states prior to the

7    RBOCs' entry – has announced that it will cease marketing residential long distance services

8    throughout the nation.  This is the most powerful evidence that the RBOCs can *at any time*

9    undertake a campaign to eliminate competition by lowering retail rates to levels that rivals cannot

10   match due to the RBOCs' above-cost access rates.  The RBOCs are no more efficient in the

11   production of long distance services than the preexisting interexchange carriers since, for the

12   most part, the RBOCs are *reselling* long distance services purchased from interexchange carriers.

13   Hence, whatever "efficiencies" they bring to the retail market are solely the result of their legacy

14   incumbency advantages – their access services monopoly and their unique ability to engage in

15   joint marketing of retail local services, which the RBOCs overwhelmingly dominate, and the

16   (formerly) competitive retail long distance market, which the RBOCs are rapidly coming to

17   dominate.[83]

---

82. Verizon January 29, 2004 Securities Analysts Briefing; SBC Analyst Conference 2003,
at slide 10, available at: http://www.shareholder.com/sbc/downloads/AnalystPres_nov03.pdf.

83.  Several RBOCs executives have recently advised investors that they expected to get
back most of the residential customers lost to CLECs since 1996.  "Baby Bells see rivals taking
fewer phones," Reuters, Sept. 9, 2004.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 74 of 94

1      89.  It is also the case that evaluating whether the RBOC has engaged in competition

2   foreclosure is a substantial undertaking requiring significant resources and time.  In this regard,

3   and as explained in greater detail below, it must be emphasized that RBOC special access and

4   end user prices are often customer-specific, service-specific, and location-specific.  Thus, in the

5   event that the Commission would account for access services in its impairment analysis, it would

6   potentially have to evaluate whether the RBOC is undertaking a price squeeze not only for

7   classes of service and customers, but for discrete customer segments including individual

8   customer locations.

9

10     90.  Specifically, in order for the Commission to determine whether competitors can

11  "flourish" despite having to pay above-cost access charges, the Commission would need to

12  evaluate whether an efficient competitor could profitably match an RBOC's retail rates for local

13  and/or long distance services.  At a minimum, such an analysis requires the Commission to (1)

14  determine the special access prices that each ILEC charges competitors and (2) compare that to

15  the ILECs' retail prices which may be tariffed at either the state or federal level, or in some cases

16  not tariffed at all.  While undertaking this direct comparison is certainly feasible on a case-by-

17  case basis, it is simply not feasible to undertake this comparison for the entire array of services

18  offered by the RBOC using special access facilities in sufficient time that the Commission could

19  adjust its impairment rules quickly enough that competitive carriers would have a meaningful

20  opportunity to win customers.

21

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 75 of 94

1    91.  In order to determine the price of special access services used in the retail service at

2    issue it is first necessary to identify the relevant special access tariffs.  The RBOCs provide

3    interstate special access and intrastate special access and private line services.  In the case of the

4    intrastate special access tariffs, each RBOC files a different tariff in each state in which it offers

5    that service.  Thus, in evaluating price squeeze claims, the Commission will not only need to

6    examine and analyze federal special access tariffs, but multiple state tariffs as well.

7

8    92.  Simply locating and understanding the relevant special access tariffs, of course, is only

9    the start of the exercise.  It is then necessary to determine the special access rates that apply to

10   the service at issue.  Such calculations cannot be made generically, for the RBOCs provide

11   numerous retail services using special access as an input.  As explained in the accompanying

12   Benway *et al* declaration, special access is used as an input to provide, *inter alia*, private line

13   service, local voice, long distance voice, ATM, Frame Relay, Virtual Private Network service.

14   The cost of special access relative to the total cost of the retail service varies for each of these

15   services.  And even with respect to a particular service, the price of special access utilized  to

16   provide that service will vary dramatically depending on a host of factors.

17

18   93.  In fact, there are literally thousands of unique price points in RBOC special access

19   tariffs (which themselves run thousands of pages).[84]  For example:

---

84.  *See*, e.g., BellSouth FCC Tariff No. 1, § 7; Pacific Bell FCC Tariff No. 1, § 7;
Southwestern Bell Tel. Co. FCC Tariff No. 73, § 7; Verizon Tel. Cos. FCC Tariff No. 1, § 7;

(continued...)



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 76 of 94

1    (1)  RBOC special access prices vary depending upon the capacity level of the circuit
2         involved (e.g., DS-1, DS-3, OC-12).

3

4    (2)  RBOC special access prices vary depending upon whether the circuit is a channel
5         termination or a transport circuit.

6

7    (3)  RBOC special access prices vary depending upon whether the circuit is located in a
8         pricing flexibility MSA or in a non-pricing flexibility area.

9

10   (4)  RBOC special access prices vary depending upon the density zone of the wire center in
11        which the circuit is located.

12

13   (5)  RBOC special access prices vary depending upon whether the carrier has agreed to a
14        volume and term commitment.

15

16   (6)  RBOC special access prices vary depending upon whether a carrier has agreed to "lock-
17        up" a certain level of traffic with the RBOC (something that, for example, an RBOC
18        affiliate could easily agree to, since any "penalty" for noncompliance with the
19        committed level of demand would be yet another one-pocket-to-another-pocket
20        transaction).

────────────────────

84.  (...continued)
Qwest Corp. FCC Tariff No. 1, § 7.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 77 of 94

1    (7)  In the case of the transport element, RBOC special access prices vary depending upon

2          the length of the circuit.

3

4    (8)  RBOC special access prices vary depending upon whether the circuit will be used for

5          purely in-state, local service or will be used to carry some interstate service.

6

7    (9)  Different non-recurring charges and/or termination liabilities will apply to different

8          special access services (which must be amortized over the expected life of the

9          customer).

10

11   Each of these factors must be analyzed in order to determine what the special access rate is for a

12   particular circuit.  And in the case of calculating the special access costs that a carrier incurs in

13   serving multi-location customers, such determinations may need to be made for special access

14   services provided by several RBOCs.

15

16      94.  Efforts to determine the retail price of the RBOC service are likely to be even more

17   complex.  Not only do the RBOCs' retail rates vary according to factors similar to those just

18   discussed,[85] retail services include rate elements and features beyond the basic channel

---

85. *See, e.g.*, SBC Long Distance Voice Product Reference and Pricing Guidebook for Interexchange, Interstate and International Voice Services (available at http://www.sbc.com/gen/public-affairs?pid=320); SBC Long Distance Data Product Reference and Pricing Guidebook for Interstate Data Services and International Data Services (available at

(continued...)



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 78 of 94

1    terminations and transport ordinarily purchased in special access tariffs. For example, data

2    services like ATM and Frame Relay include port charges. RBOC retail prices will also often

3    vary based upon the extent to which a customer has locations in the RBOC's territory – a fact

4    that powerfully reflects the influence of above-cost special access pricing. Because the

5    Commission has detariffed long distance services, the RBOCs can offer customized deals. Thus,

6    in many cases, the precise terms of the RBOCs' retail offers are not publicly available. RBOC

7    local retail offerings are contained in state tariffs or are themselves detariffed, conditions that

8    would also need to be separately analyzed.

9

10    95. This comparison of the RBOCs' special access rates and retail rates, however, is only

11    the first step in the price squeeze analysis that the Commission must undertake if it were to deny

12    competitive carriers access to cost-based loop and transport UNEs. Although RBOC special

13    access rates in excess of retail prices conclusively establishes a price squeeze, a price squeeze is

14    still possible even where retail rates are above special access rates. That is because for most

15    retail services, special access is only one of several inputs necessary to provide the service.

16    Thus, the RBOC can still foreclose competition where it sets a retail price above special access,

---

85. (...continued)
http://www.sbc.com/gen/public-affairs?pid=319); BellSouth Long Distance Inc. Business
Services Pricing and Service Guide (available at
http://www.tariffs.net/tariffs/481/Bus_Pricing_Guide.pdf); Complex Business Services Interstate
Pricing Guide (available at
http://www.tariffs.net/tariffs/481/Complex_Services_Guide_071504.pdf).



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 79 of 94

1   but still not sufficiently high so as to provide competitors with the opportunity to recover their

2   other efficient costs of providing the retail service.

3

4      96.  Most obviously, providing finished retail local and long distance services requires that

5   the CLEC acquire network facilities of its own, beyond the loop and transport facilities it will

6   need to obtain from RBOCs.  For example, long distance services require a long haul network.

7   Likewise, ATM services require investment in a packet switching network.  Of course, a carrier

8   must also incur costs in connection with planning, operating, and maintaining those facilities.  In

9   order to provide retail services, a carrier must also market to customers, provide customer care,

10  and billing.  All of these "back office" costs are actual costs incurred by efficient carriers and

11  must be reflected in any price squeeze analysis.  Thus, the Commission will necessarily be

12  required to examine *all* of the costs that a carrier incurs beyond special access to provide local

13  and long distance service.

14

15     97.  In short, even if it could be assumed that the RBOCs currently were not price-cost

16  squeezing competitors today – and, as explained above, the evidence is clearly to the contrary –

17  reflecting the availability of special access services in its impairment inquiry would put the

18  Commission in the position of having to continuously evaluate whether the RBOCs have set

19  special access and retail rates at levels that forecloses competition, and permit access to UNEs

20  wherever the RBOCs have done so.  While such inquiries can be made in specific cases, it is

21  simply not feasible to do so perpetually for the entire industry given the range of services and

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 80 of 94

1  carriers involved, the myriad ways in which the RBOCs can alter their rates, and the significant

2  informational demands attendant to any price squeeze calculation.

3

4    98.  For these same reasons, it is no answer to say that the Commission could address this

5  issue in after-the-fact complaint proceedings.  As discussed, the informational demands attendant

6  to price squeeze determinations would place a substantial burden on CLECs.  Many CLECs

7  simply lack the resources to pursue such claims.  Indeed, because RBOC retail rates are often not

8  publicly available, CLECs will often lack the ability to determine whether the price the RBOC

9  charged was one that it could have profitably matched given the access charges it was paying.

10  Finally, and most importantly, the point of the 1996 Act is to create a regulatory structure that

11  enables competition, not merely to create an after-the-fact cause of action for price squeezes that

12  were already illegal under pre-existing antitrust laws.

13

14  ***The apparently successful use of high capacity special access facilities by wireless carriers***
15  ***provides no basis for the inference that CLECs can similarly "flourish" if forced to pay***
16  ***special access prices if their access to UNEs is foreclosed.***
17

18    99.  In its *ex parte* filing, Verizon cited the DC Circuit Court's March 2, 2004 ruling as

19  observing that "[w]here competitors have access to necessary inputs at rates that allow

20  competition not only to survive but to flourish, it is hard to see any need for the Commission to

21  impose the cost of mandatory unbundling."[86]  Verizon fails to mention, however, that the cited

---

86.  *Verizon July 2, 2004 ex parte*, at 5, citing *USTA II*, 359 F.3d at 576.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 81 of 94

1    observation was made by the Court in the context of its discussion of "Wireless providers' access

2    to unbundled dedicated transport" where, among other things, the Court had noted that:

3
4        ... the data above [referring solely to wireless carriers] clearly show that wireless
5        carriers' reliance on special access has not posed a barrier that makes entry
6        uneconomic.  Indeed, the multi-million dollar sums that the Commission regularly
7        collects in its auctions of such spectrum, and that firms pay to buy already-issued
8        licenses, seem to indicate that wireless firms currently expect that net revenues will, by
9        a large margin, more than recover all their non-spectrum costs (including return on
10       capital).[87]
11

12   Significantly, and also left unmentioned by Verizon, the Court made no comparable observations

13   or performed any comparable analyses as to the current state of *wireline* competition or of the

14   CLECs that are attempting to compete in the enterprise market.  The Court made no findings that

15   wireline CLECs are "flourishing," that any had paid multi-million dollar sums for a franchise to

16   operate, or that multi-million dollar premiums had been paid by wireline CLECs to acquire other

17   wireline CLECs then already engaged in business.  Indeed, there is no factual basis upon which

18   the conclusion that wireless carriers are "flourishing" could be extrapolated as also applying to

19   *wireline* CLECs.

20

21       100.   In view of Verizon's attempt to finesse the Court's conclusions as to the state of

22   competition in the *wireless* market over to the wireline market where the current state of

23   competition is anything but "flourishing," it may be useful to highlight the stark differences

---

87.  *USTA II*, 359 F.3d at 575-576, citations omitted.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 82 of 94

1    between these two segments and, in particular, the nature of their respective use of high capacity

2    facilities.

3

4        101.  To begin, with the exception of the *lilliputian* out-of-region RBOC CLEC token

5    ventures,[88] CLECs are not owned by the RBOCs from whom they purchase essential services

6    either as UNEs or as special access – such purchases in all cases involve the payment of *cash* by

7    the CLEC to the RBOC.  The two largest wireless carriers – Verizon Wireless and Cingular – by

8    contrast, are *owned or controlled by RBOCs.*  As such, their "purchases" of special access or

9    other services either involve intracorporate transfers between the wireline and wireless affiliates,

10   or are cross-transactions involving the same pair of companies (i.e., Verizon Wireless purchases

11   special access services from SBC or BellSouth, while at the same time the SBC/BellSouth

12   wireless entity – Cingular – purchases special access services from Verizon).  Rather than

13   disadvantage the RBOC-owned wireless carriers, the requirement that they pay special access

14   rates rather than the lower UNE rates simply raises costs for their non-RBOC rivals (Sprint,

15   Nextel and T-Mobile).  It is hardly surprising that the RBOC-owned wireless carriers were

16   entirely silent as to the issue of wireless carrier access to UNEs rather than being required to pay

---

88.  Verizon, for example, concedes that it is currently serving only 500 enterprise customers outside of its ILEC footprint.  *Verizon July 2, 2004 ex parte*, Attachment 2, Declaration of Claudia P. Cuddy, at para. 13.  Verizon makes no other disclosures regarding such customers as to, for example, the quantity of the service being provided, or whether such customers are themselves Verizon affiliates.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 83 of 94

1    special access rates for the dedicated facilities they use to connect transceiver sites to their

2    mobile telephone switching offices ("MTSO") and to interconnect those MTSOs.[89]

3

4    102.  Wireless carriers need to utilize high-capacity facilities to connect their switching

5    offices ("MTSOs") with their individual "cell sites" at which transmitters, receivers and antennas

6    are located, and to interconnect their MTSOs with each other.  While undeniably essential to the

7    wireless carriers' operations, these facilities form part of the common wireless network and are

8    not provided for or dedicated to any individual customer or specific group of customers.

9    Importantly, while the total expenditure on special access facilities may be large in absolute

10   terms, it is a tiny fraction of the wireless carrier's total operating costs.  For example, according

11   to AT&T Wireless' Annual Report to Shareholders, in 2001 the carrier spent a total of $300

---

89.  Both AT&T Wireless and Nextel filed comments in CC Docket No. 01-338 arguing that "The Commission should clarify that CMRS providers are entitled to purchase UNEs and convert existing special access facilities to UNEs without termination liability."  (See *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange* Carriers, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of The Telecommunications Act of 1996*, CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capacity*, CC Docket No. 98-147, The Comments of AT&T Wireless, filed 04/05/02, at 23.  Also see (in the same proceeding), Comments of Nextel Communications, Inc., filed 04/04/02, at 2.)  Interestingly, both SBC and BellSouth filed comments stating that wireless carriers should not have access to UNEs.  According to SBC, "[e]xactly the same analysis should govern the potential use of UNEs by providers of wireless service. Wireless carrier competition has clearly not been impaired by the unavailability of UNEs to carriers in that market."  (See *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange* Carriers, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of The Telecommunications Act of 1996*, CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capacity*, CC Docket No. 98-147, Comments of SBC Communications Inc., filed April 5, 2004, at 24.  Also see (in the same proceeding), Comments of BellSouth Corporation, filed April 8, 2002, at 46-53.)



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 84 of 94

1    million on special access services, representing approximately 2.31% of its $13.0 billion in total

2    operating costs.[90]  Indeed, in 2003 its special access costs ($198 million) represented

3    approximately 1.28% of its $15.5-billion in total operating costs.[91]  To put this in context, AT&T

4    Wireless reported SG&A expenses for 2003 at $5.4-billion, i.e., roughly 27 times its special

5    access outlays.

6

7        103.   Contrast this to the situation confronting a CLEC.  Segments of a high-capacity UNE-

8    loop or its special access counterpart – a Channel Termination – are dedicated to one specific

9    customer or to a specific group of customers sharing the same route or route segment.  The same

10   is also true of the dedicated interoffice transport connections that are used to link the wire center

11   serving the customer's premises with the CLEC's fiber ring or other facility.  Depending upon

12   the service involved and the basis under which it is obtained (i.e., UNE or special access), the

13   out-of-pocket cash payment to the ILEC for the loop and transport facilities may represent the

14   majority of the total revenue from that customer, which revenue must also cover the CLEC's

15   own network costs, customer acquisition and customer service costs, and various other expenses.

---

90.  AT&T Wireless, 2001 Annual Report to Shareholders, released 3/28/02, at 24 and 46.

91.  In 2001 AT&T Wireless spent approximately $300-million on special access services, representing approximately 2.31% of its $13-billion in total operating costs.  AT&T Wireless did not present Dedicated Transport Lease Obligations for the year ending 2002.  As noted, AT&T Wireless identified its 2003 Dedicated Transport Lease Obligations as $198-million. In 2004 AT&T Wireless puts its lease obligation at $222-million, representing approximately 1.39% of its annualized $15.9-billion in total operating costs.  AT&T Wireless, 2001 10K Report, March 28, 2002;  AT&T Wireless, 2001 Annual Report;  AT&T Wireless, 2003 10K Report, March 5, 2004;  AT&T Wireless, 2002 Annual Report;  AT&T Wireless, Second Quarter 2004 10Q Report, August 6, 2004;  AT&T Wireless, 2003 Annual Report.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 85 of 94

1   If by virtue of having to pay special access rates rather than the considerably lower TELRIC-

2   based UNE rates for the same underlying facility, the CLEC may find it unprofitable to serve

3   many otherwise potential customers, its ability to address such customers and to compete for

4   their business would be impaired by the nonavailability of UNEs.

5

6      104.   Quite obviously, the RBOCs' ability to price squeeze competitors using special access

7   diminishes to the extent that special access represents only a small fraction of the cost of the

8   service.  As AT&T shows, special access is a significant portion of the cost of the retail services

9   it offers to business customers.  Indeed, in the specific price squeeze examples identified by

10   AT&T, special access accounts for the majority of the overall costs of the service.

11

12      105.  In contrast, wireless services use special access in a far more limited way – as links

13   between the carrier's cell sites and its PSTN switching facilities.  Thus, wireless carriers do not

14   need to lease "loops" from the RBOCs to provide service to individual customers, and need only

15   a relatively short transport piece that is shared by multiple users.  Moreover, because wireless

16   carriers utilize these services to interconnect their own fixed-location cell sites with their own

17   fixed-location central offices and not to provide permanent connections to individual customer

18   locations, they are able more easily to utilize long-term special access contract rates involving

19   volume and term commitments that may not be practical for many wireline carriers that provide

20   service to specific retail end-user locations.

21

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 86 of 94

1    106.  This different use of special access has competitive significance for a second reason.

2    In order to serve a new customer using special access, a competitive carrier typically purchases a

3    special access channel termination specifically to serve that customer (and often purchases

4    special access transport specifically for the customer).  In other words, special access is

5    incremental to the customer.  In contrast, special access is effectively a fixed, common network

6    cost for wireless carriers.  The addition or subtraction of any particular customer does not

7    ordinarily cause the wireless carrier to change its special access purchases.  Indeed, even for cell

8    sites that have little usage, it must have some minimum capacity available.  This difference

9    means that a special access price squeeze has a more immediate impact in the case of wireline

10   carriers.  To the extent that special access costs are fixed, a price squeeze will not affect a

11   wireless carrier's near-term pricing decisions.  On the other hand, where special access costs are

12   incremental to providing service to a specific customer, the impact of those pricing has

13   immediate effect on the purchaser's pricing decisions.

14

15   107.  Finally, although the Court has found that wireless carriers in general are successfully

16   competing with one another using special access instead of UNEs, it cannot be established that

17   this is the case for all wireless carriers – specifically those *not* owned or controlled by RBOCs

18   themselves.  RBOC-affiliated CMRS carriers' shares of the overall wireless market have, in fact,

19   been increasing, while those of their non-affiliated rivals have been on the decline.

20

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 87 of 94

1   **Cable and fixed wireless do not present a serious competitive challenge to the RBOC**
2   **special access monopoly as a means for serving enterprise customers.**
3

4      108.  In addition to incorrectly counting "route miles of fiber" and lit buildings, Verizon

5   appears to have incorrectly relied upon the NPRG metric for "route miles" by assuming that

6   "route miles" means "route miles of fiber."  They do not.  Specifically, NPRG defines route

7   miles as the "number of geographic miles covered by a communications network as it would

8   appear on a network map,"[92] and appears to apply this term to whatever transmission technology

9   the carrier may be using (i.e., fiber, coax, fixed wireless, etc.).  As a result, the NPRG figures

10   make no distinction between a fiber network or any other type of telecommunications network.

11   Such a distinction is crucial to assessing competitive facilities capable of serving enterprise

12   customers, since both coaxial and fixed wireless are not acceptable substitutes for enterprise

13   customers seeking service over fiber routes.

14

15      109.  Fixed wireless began in the late 1990s as a highly touted technology, and like many of

16   the other "technologies *du jour*" it has not lived up to its expectations.[93]  It was believed that the

17   technology could drastically alter how telecommunication networks are set up – fixed wireless

18   completes loops by providing the last mile of connectivity to buildings over a wireless network.

---

92.  New Paradigm Research Group, CLEC Report 2004, Chapter 9 at 19.

93.  In the late 1990s and early 2000, overzealous analysts and technology research firms predicted enormous growth potential for fixed wireless.  According to one article from Wireless Week (September 2000), "The Strategis Group forecasts fixed-wireless sales growing at a compounded annual rate of 77 percent, moving from $231 million in 2000 to $2.3 billion by 2004. And Ovum suggests the equipment market could reach $7 billion by 2005."

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 88 of 94

1   However, in practice, the technology has been bogged down with operational troubles including

2   both security and transmission problems since its inception.  According to Network World

3   Fusion, an on-line network research firm, "[T]here are important issues that network executives

4   will need to resolve before signing up for fixed wireless, including security and possible

5   performance degradation from interference with other service providers."[94]  Both of these issues,

6   but especially security, are imperatives for large business users.   As a result of these concerns,

7   the technology is not yet (and may never be) a reasonable replacement for business applications.

8

9       110.  Fixed wireless has not become an entry strategy for CLECs or ISPs entering the

10   enterprise market because it creates a network which is less reliable and difficult to secure.[95]

11   According to Air2Web, a wireless solutions provider, "security in the wireless world is more

12   complex and different than tethered network security models.  Wireless security measures hinge

13   on the types of data and applications being mobilized.  The more sensitive the data, the more

14   elaborate security measures must be."[96]  And still, regardless of the type of network (whether is

15   an older technology like LMDS or MMDS, or a newer technology like Wi-Fi), it is relatively

16   easy for people to tap into these networks.  "Researchers at the University of California at

---

94.  http://www.nwfusion.com/techinsider/1022broadband/feat.html, accessed 9/28/04.

95.  Some ISPs provide fixed wireless Internet in urban areas to the mass market.  However, fixed wireless mostly began to find inroads in rural areas (even remote islands) where DSL hasn't been deployed to yet.  In these remote areas, most of the marketing is to the mass market but also to a small degree to small businesses.  See Network World Fusions, "Fixed Wireless Fills a Niche," which discusses fixed wireless's success on the British Virgin Island of Anguilla.

96.  http://www.air2web.com/security_whitepaper.jsp, accessed 9/27/04.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 89 of 94

1   Berkeley have found flaws in the 802.11 WEB [Wi-Fi] algorithm and claim it is not capable of

2   providing adequate security"[97]  In addition, Broadband Wireless Business Magazine reports,

3   "Wireless security is a mounting problem…'In security, there is no magic pill.  Every wireless

4   transmission is a virtual postcard, potentially viewable by anyone.'"[98]  The bottom line is that

5   wireless networks will never be as secure as a wireline network.  Efforts to secure a wireline

6   network, such as using complex encryption algorithms, authentication software, media access

7   control (restricting access to specific computers), and virtual private network (VPN) technology

8   can be layered on top of fixed wireless technologies to create a relatively secure connection.

9   However, each solution increases the complexity of setting up and maintaining the connection,

10  adding to costs and overhead for any business that adopts it.

11

12      111.  In addition to security issues, fixed wireless also struggles with connection problems

13  because the technology requires unobstructed line-of-sight transmission.  This means that all of

14  the microwave dishes tend to be set up in the same places, namely on top of towers or hillsides.

15  The conglomeration of dishes in one location creates interference problems.  According to

16  Network World Fusion, "radio frequency interference from competing systems causes problems

17  for service providers and end users.  An interfering signal of one wireless system will corrupt and

18  sometimes block transmission of another wireless system, causing significant performance

---

97.  http://www.nwfusion.com/techinsider/1022broadband/feat.html, accessed 9/28/04.

98.  http://www.shorecliffcommunications.com/magazine/volume.asp?vol=29&story=291, accessed 9/27/04.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 90 of 94

1   degradation."[99]  Line-of-sight fixed wireless connectivity is also susceptible to atmospheric or

2   other electromagnetic interference, such as fog, rain, and sunspots.[100]  When real-time

3   communication is essential, this technology is a liability.

4

5       112.  Competition dictates the use of the most efficient technology.  If corporations don't

6   compete, they won't survive.  As such, large corporations need to protect their important

7   proprietary information such as financials , patents, new products, new technologies, and

8   marketing ideas.  They also need to be able to communicate and transmit information in real-time

9   without interference.  Fixed wireless currently does not allow for this to happen.  Due to the

10  problems described above, fixed wireless remains an insignificant technology in the enterprise

11  market.  In fact. the most recent statistics regarding the deployment of fixed wireless lines

12  support this belief.  Current deployment in the enterprise market is minimal – 25,254 lines across

13  the country.[101]  To understand the magnitude of this figure, assume that all of those fixed wireless

---

99.  http://www.nwfusion.com/techinsider/1022broadband/feat.html, accessed 9/28/04.

100.  Fixed wireless technology is subject to interference from a number of sources.
Attenuation due to rain and fog is a concern, particularly  in frequencies above 11 Ghz.  Fog, in
combination with other atmospheric conditions can more adversely affect signals.  Wind or
building sway can also negatively affect signal strength.  See, Cisco Systems, *Cisco Broadband
Fixed Wireless Site Planning Guide*.  Available at
http://www.cisco.com/univercd/cc/td/doc/product/wireless/bbfw/ptop/p2pspg02/spg02prf.htm
(accessed September 29, 2004); Winstar, Government Solutions Wireless Fiber Presentation,
http://www.inetdaemon.com/tutorials/theory/concepts/media.html (accessed September 29,
2004)

101.  Industry Analysis and Technology Division, Wireline Competition Bureau, High

(continued...)



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 91 of 94

1    lines were used as special access lines.  The resulting total number of special access lines

2    (measured in voice grade equivalents) reported as of the end-of-year 2003 was 118,629,181

3    lines.[102]  So fixed wireless would then account for 0.02% of the total market for special access,

4    and that 0.02% share has remained virtually unchanged over the past three years.[103]  Clearly,

5    these data confirm that the enterprise market is not using this technology.

6

7    113.  Cable television companies ("cable") have been portrayed by the RBOCs to be a

8    formidable source of competition, and arguably they have been the most significant

9    facilities-based alternative to the RBOCs with respect to mass market (principally residential and

10   "home business") services.[104]  However, cable is not well positioned to meet the connectivity

---

101.  (...continued)
Speed Services for Internet Access: Status as of December 31, 2003 (June 2004 Report).

102.  ARMIS Report 43-08, Operating Data Report, Table 3, YE 2003.

103.  Share was calculated using: Industry Analysis and Technology Division, Wireline
Competition Bureau, High Speed Services for Internet Access: Status as of December 31, 2003
(June 2004 Report); and Federal Communications Commission, ARMIS Report 43-08,
Operating Data Report, Table 3, YE 1999-2003.

104.  The Ad Hoc Telecommunications Users Committee discussed these issues in greater
detail in comments filed in the FCC's broadband services proceeding.  See, for example,
*Competition in Access Markets: Reality or Illusion*, *Ex Parte* Submission of the Ad Hoc
Telecommunications Users Committee in CC Docket Nos. 03-173, 01-338, 04-242, RM-10329,
00-229, 96-149, 98-141, 96-98, 98-147, 00-51, 98-10, 01-321, 95-20, 02-33, 04-36, 01-337, 00-
175, 02-112, RM-10593, filed August 26, 2004, at 17-19; and Review of Regulatory
Requirements for Incumbent LEC Broadband Telecommunications Services, CC Docket No.
01-337, Reply Comments of Ad Hoc Telecommunications Users Committee, filed April 22,
2002, at 4-6.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 92 of 94

1   needs of large business users, for several reasons. First, the networks constructed by cable

2   companies are largely designed to reach residential dwellings, not business locations. With the

3   possible exception of local retail shopping areas interspersed within or adjacent to residential

4   neighborhoods, cable infrastructures generally do not "pass" business locations and thus cannot

5   readily serve the vast majority of office buildings and other business sites. In the context of its

6   monitoring of advanced services deployment, the FCC found that:

7

8         Residential and small business subscribers, not surprisingly, account for over 96
9         percent of the reported high-speed lines delivered over cable systems. This is
10        consistent with our understanding that most cable systems are currently deployed
11        in primarily residential areas.[105]

12

13      114. In addition, because cable companies are primarily oriented towards a mass-market

14   customer base, their telephony and data (i.e., cable modem) offerings generally fall short of

15   RBOC offerings with respect to service reliability and security. Cable networks do not have the

16   same degree of back-up electrical power as do typical ILEC networks, and the "shared platform"

17   nature of cable modem service raises data security and transmission performance issues that are

18   particularly important to business customers, who routinely transmit highly sensitive or

19   mission-critical financial and commercial data.

20

---

    105. Inquiry Concerning the Deployment of Advanced Telecommunications Capability, CC
Docket 98-146, Third Report, FCC No. 02-33, 17 FCC Rcd 2844 (2002) at 2864, para. 45
(footnotes omitted).



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 93 of 94

1    115.  Given the shortcomings of CATV-provided business services, it is not surprising that

2    cable providers reported supplying fewer than 16,000 coaxial cable connections to medium and

3    large businesses nationwide at the time the FCC reached its conclusions in the *Triennial Review*

4    proceeding, and report less than 30,000 such connections today.[106]  Considered in relation to the

5    roughly three million commercial buildings, these connections represent less than one percent of

6    potentially addressable business locations.  Clearly, cable has thus far had minimal impact upon

7    the RBOCs' virtual monopoly on connectivity supplied to large businesses, and this situation

8    appears unlikely to change any time soon.[107]

---

106.  *Triennial Review Order* at 18 FCC Rcd 17010,  para. 41.  Citing Industry Analysis and
Technology Division, Wireline Competition Bureau, High Speed Services for Internet Access:
Status as of June 30, 2002, rel. December 2002.  Analysis of the most recent IATD report reveals
that for the period ended December 31, 2003, 5-million  high speed coaxial cable connections
serving new residence and small business cable high speed connections were added, and that
only approximately 3,400 new coaxial cable connections were added that served large business
subscribers, with the total number of connections to high speed cable connections to large
business users still less than 30,000 in total.  See, Industry Analysis and Technology Division,
Wireline Competition Bureau, High Speed Services for Internet Access: Status as of December
31, 2003, rel. June 2004 ("High Speed Services for Internet Access: December 31, 2003"); and
Industry Analysis and Technology Division, Wireline Competition Bureau, High Speed Services
for Internet Access: Status as of December 31, 2002,  June 2003.

107.  A report issued by Cahners In-Stat Group claims that businesses account for only 5%
of cable modem subscribers, and penetration is only expected to increase to 10% by 2005. See,
Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications
Services, CC Docket No. 01-337,  AT&T Comments, filed April 22, 2002, at p. 41 (citing
Cahners In-Stat Group, Despite Service Provider Pratfalls, Cable Modem Subscriber Growth
Remains Robust, December 1, 2001,  at p. 1).



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 94 of 94

1                                    CONCLUSION

2

3       116.  In the *TRO*, the Commission recognized the substantial variation confronting CLECs

4   in the economics of serving enterprise customers at different capacity levels, and addressed those

5   concerns by making national findings that CLECs are impaired without access to UNEs when

6   providing service to customers at capacity levels below three DS-3s and for interoffice transport

7   facilities at capacity levels at or below twelve DS-3s.  The RBOCs' "evidence" fails to

8   differentiate among the various capacity-based segments of the enterprise market, and thus fails

9   to address – let alone challenge – these critically important *TRO* conclusions.  Virtually all

10  instances of CLEC fiber connections to customer premises is at the OCn level; even where

11  CLEC fiber passes near or even directly in front of a building where the customer demand falls

12  below that threshold, the costs of bringing the fiber into the building cannot be justified.  The

13  RBOCs' claims as to non-impairment with respect to interoffice transport relies entirely on an

14  utterly fanciful portrayal of ubiquitously interconnected but utterly nonexistent CLEC fiber

15  backbone networks.  Finally, the RBOCs' claims as to the suitability of special access as a

16  substitute for UNE loop and transport facilities ignores the fact that special access services are,

17  for the most part, not subject to any rate regulation, are priced well in excess of forward-looking

18  economic cost, may be and are being increased at the whim of the RBOCs, and have created

19  persistent price squeeze conditions that have forced CLECs to abandon large segments of the

20  enterprise market.  None of the "evidence" proffered by the RBOCs undermines the

21  Commission's original *TRO* determinations, and those impairment findings should be maintained

22  in the permanent rules that the Commission adopts.



VERIFICATION

I declare under the pains and penalties of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

_____
LEE L. SELWYN

ETI ECONOMICS AND
TECHNOLOGY, INC.

**Attachment 1**

**Statement of Qualifications**

**Dr. Lee L. Selwyn**



# DR. LEE L. SELWYN

Dr. Lee L. Selwyn has been actively involved in the telecommunications field for more than twenty-five years, and is an internationally recognized authority on telecommunications regulation, economics and public policy. Dr. Selwyn founded the firm of Economics and Technology, Inc. in 1972, and has served as its President since that date. He received his Ph.D. degree from the Alfred P. Sloan School of Management at the Massachusetts Institute of Technology. He also holds a Master of Science degree in Industrial Management from MIT and a Bachelor of Arts degree with honors in Economics from Queens College of the City University of New York.

Dr. Selwyn has testified as an expert on rate design, service cost analysis, form of regulation, and other telecommunications policy issues in telecommunications regulatory proceedings before some forty state commissions, the Federal Communications Commission and the Canadian Radio-television and Telecommunications Commission, among others. He has appeared as a witness on behalf of commercial organizations, non-profit institutions, as well as local, state and federal government authorities responsible for telecommunications regulation and consumer advocacy.

He has served or is now serving as a consultant to numerous state utilities commissions including those in Arizona, Minnesota, Kansas, Kentucky, the District of Columbia, Connecticut, California, Delaware, Maine, Massachusetts, New Hampshire, Vermont, New Mexico, Wisconsin and Washington State, the Office of Telecommunications Policy (Executive Office of the President), the National Telecommunications and Information Administration, the Federal Communications Commission, the Canadian Radio-television and Telecommunications Commission, the United Kingdom Office of Telecommunications, and the Secretaria de Comunicaciones y Transportes of the Republic of Mexico. He has also served as an advisor on telecommunications regulatory matters to the International Communications Association and the Ad Hoc Telecommunications Users Committee, as well as to a number of major corporate telecommunications users, information services providers, paging and cellular carriers, and specialized access services carriers.

Dr. Selwyn has presented testimony as an invited witness before the U.S. House of Representatives Subcommittee on Telecommunications, Consumer Protection and Finance and before the U.S. Senate Judiciary Committee, on subjects dealing with restructuring and deregulation of portions of the telecommunications industry.

In 1970, he was awarded a Post-Doctoral Research Grant in Public Utility Economics under a program sponsored by the American Telephone and Telegraph Company, to conduct research on the economic effects of telephone rate structures upon the computer time sharing industry. This work was conducted at Harvard University's Program on Technology and Society,


ECONOMICS AND TECHNOLOGY, INC.

where he was appointed as a Research Associate.  Dr. Selwyn was also a member of the faculty at the College of Business Administration at Boston University from 1968 until 1973, where he taught courses in economics, finance and management information systems.

Dr. Selwyn has published numerous papers and articles in professional and trade journals on the subject of telecommunications service regulation, cost methodology, rate design and pricing policy.  These have included:

> "Taxes, Corporate Financial Policy and Return to Investors"
> *National Tax Journal*, Vol. XX, No.4, December 1967.

> "Pricing Telephone Terminal Equipment Under Competition"
> *Public Utilities Fortnightly*, December 8, 1977.

> "Deregulation, Competition, and Regulatory Responsibility in the Telecommunications Industry"
> *Presented at the 1979 Rate Symposium on Problems of Regulated Industries - Sponsored by: The American University, Foster Associates, Inc., Missouri Public Service Commission, University of Missouri-Columbia*, Kansas City, MO, February 11 - 14, 1979.

> "Sifting Out the Economic Costs of Terminal Equipment Services"
> *Telephone Engineer and Management*, October 15, 1979.

> "Usage-Sensitive Pricing" (with G. F. Borton)
> (a three part series)
> *Telephony*, January 7, 28, February 11, 1980.

> "Perspectives on Usage-Sensitive Pricing"
> *Public Utilities Fortnightly*, May 7, 1981.

> "Diversification, Deregulation, and Increased Uncertainty in the Public Utility Industries"
> *Comments Presented at the Thirteenth Annual Conference of the Institute of Public Utilities*, Williamsburg, VA - December 14 - 16, 1981.

> "Local Telephone Pricing: Is There a Better Way?; The Costs of LMS Exceed its Benefits: a Report on Recent U.S. Experience."
> *Proceedings of a conference held at Montreal, Quebec - Sponsored by Canadian Radio-Television and Telecommunications Commission and The Centre for the Study of Regulated Industries, McGill University*, May 2 - 4, 1984.



ECONOMICS AND
TECHNOLOGY, INC.

Dr. Lee L. Selwyn (continued)

"Long-Run Regulation of AT&T:  A Key Element of A Competitive
Telecommunications Policy"
*Telematics*, August 1984.

"Is Equal Access an Adequate Justification for Removing Restrictions on BOC
Diversification?"
*Presented at the Institute of Public Utilities Eighteenth Annual Conference*,
Williamsburg, VA - December 8 - 10, 1986.

"Market Power and Competition Under an Equal Access Environment"
*Presented at the Sixteenth Annual Conference, "Impact of Deregulation and
Market Forces on Public Utilities:  The Future Role of Regulation"
Institute of Public Utilities, Michigan State University*, Williamsburg, VA -
December 3 - 5, 1987.

"Contestable Markets: Theory vs. Fact"
*Presented at the Conference on Current Issues in Telephone Regulations:
Dominance and Cost Allocation in Interexchange Markets - Center for Legal
and Regulatory Studies Department of Management Science and Information
Systems - Graduate School of Business, University of Texas at Austin*, October
5, 1987.

"The Sources and Exercise of Market Power in the Market for Interexchange
Telecommunications Services"
*Presented at the Nineteenth Annual Conference - "Alternatives to Traditional
Regulation:  Options for Reform" - Institute of Public Utilities, Michigan State
University*, Williamsburg, VA, December, 1987.

"Assessing Market Power and Competition in The Telecommunications
Industry:  Toward an Empirical Foundation for Regulatory Reform"
*Federal Communications Law Journal*, Vol. 40 Num. 2, April 1988.

"A Perspective on Price Caps as a Substitute for Traditional Revenue
Requirements Regulation"
*Presented at the Twentieth Annual Conference - "New Regulatory Concepts,
Issues and Controversies" - Institute of Public Utilities, Michigan State
University*, Williamsburg, VA, December, 1988.

"The Sustainability of Competition in Light of New Technologies" (with D. N.
Townsend and P. D. Kravtin)
*Presented at the Twentieth Annual Conference - Institute of Public Utilities
Michigan State University*, Williamsburg, VA, December, 1988.


ECONOMICS AND
TECHNOLOGY, INC.

Dr. Lee L. Selwyn (continued)

"Adapting Telecom Regulation to Industry Change: Promoting Development Without Compromising Ratepayer Protection" (with S. C. Lundquist)
*IEEE Communications Magazine*, January, 1989.

"The Role of Cost Based Pricing of Telecommunications Services in the Age of Technology and Competition"
*Presented at National Regulatory Research Institute Conference*, Seattle, July 20, 1990.

"A Public Good/Private Good Framework for Identifying POTS Objectives for the Public Switched Network" (with Patricia D. Kravtin and Paul S. Keller) Columbus, Ohio: *National Regulatory Research Institute*, September 1991.

"Telecommunications Regulation and Infrastructure Development: Alternative Models for the Public/Private Partnership"
*Prepared for the Economic Symposium of the International Telecommunications Union Europe Telecom '92 Conference, Budapest, Hungary,* October 15, 1992.

"Efficient Infrastructure Development and the Local Telephone Company's Role in Competitive Industry Environment" *Presented at the Twenty-Fourth Annual Conference, Institute of Public Utilities, Graduate School of Business, Michigan State University, "Shifting Boundaries between Regulation and Competition in Telecommunications and Energy"*, Williamsburg, VA, December 1992.

"Measurement of Telecommunications Productivity: Methods, Applications and Limitations" (with Françoise M. Clottes)
*Presented at Organisation for Economic Cooperation and Development, Working Party on Telecommunication and Information Services Policies, '93 Conference "Defining Performance Indicators for Competitive Telecommunications Markets", Paris, France,* February 8-9, 1993.

"Telecommunications Investment and Economic Development: Achieving efficiency and balance among competing public policy and stakeholder interests"
*Presented at the 105th Annual Convention and Regulatory Symposium, National Association of Regulatory Utility Commissioners, New York,* November 18, 1993.

"The Potential for Competition in the Market for Local Telephone Services" (with David N. Townsend and Paul S. Keller)
*Presented at the Organization for Economic Cooperation and Development Workshop on Telecommunication Infrastructure Competition*, December 6-7, 1993.


ECONOMICS AND TECHNOLOGY, INC.

Dr. Lee L. Selwyn (continued)

"Market Failure in Open Telecommunications Networks: Defining the new natural monopoly," *Utilities Policy*, Vol. 4, No. 1, January 1994.

*The Enduring Local Bottleneck:  Monopoly Power and the Local Exchange Carriers,* (with Susan M. Gately, et al) a report prepared by ETI and Hatfield Associates, Inc. for AT&T, MCI and CompTel, February 1994.

*Commercially Feasible Resale of Local Telecommunications Services: An Essential Step in the Transition to Effective Local Competition,* (Susan M. Gately, et al) a report prepared by ETI for AT&T, July 1995.

"Efficient Public Investment in Telecommunications Infrastructure" *Land Economics*, Vol 71, No.3, August 1995.

*Funding Universal Service:  Maximizing Penetration and Efficiency in a Competitive Local Service Environment,* Lee L. Selwyn with Susan M. Baldwin, under the direction of Donald Shepheard, A Time Warner Communications Policy White Paper, September 1995.

*Stranded Investment and the New Regulatory Bargain*, Lee L. Selwyn with Susan M. Baldwin, under the direction of Donald Shepheard, A Time Warner Communications Policy White Paper, September 1995

"Market Failure in Open Telecommunications Networks: Defining the new natural monopoly," in *Networks, Infrastructure, and the New Task for Regulation*, by Werner Sichel and Donal L. Alexander, eds., University of Michigan Press, 1996.

*Establishing Effective Local Exchange Competition:  A Recommended Approach Based Upon an Analysis of the United States Experience,* Lee L. Selwyn, paper prepared for the Canadian Cable Television Association and filed as evidence in Telecom Public Notice CRTC 95-96, Local Interconnection and Network Component, January 26, 1996.

*The Cost of Universal Service, A Critical Assessment of the Benchmark Cost Model,* Susan M. Baldwin with Lee L. Selwyn, a report prepared by Economics and Technology, Inc. on behalf of the National Cable Television Association and submitted with Comments in FCC Docket No. CC-96-45, April 1996.

*Economic Considerations in the Evaluation of Alternative Digital Television Proposals*, Lee L. Selwyn (as Economic Consultant), paper prepared for the Computer Industry Coalition on Advanced Television Service, filed with comments in FCC MM Docket No. 87-268, In the Matter of Advanced


ECONOMICS AND TECHNOLOGY, INC.

Dr. Lee L. Selwyn (continued)

Television Systems and Their Impact Upon the Existing Television Broadcast Service, July 11, 1996.

*Assessing Incumbent LEC Claims to Special Revenue Recovery Mechanisms: Revenue opportunities, market assessments, and further empirical analysis of the "Gap" between embedded and forward-looking costs*, Patricia D. Kravtin and Lee L. Selwyn, In the Matter of Access Charge Reform, in CC Docket No. 96-262, January 29, 1997.

*The Use of Forward-Looking Economic Cost Proxy Models*, Susan M. Baldwin and Lee L. Selwyn, Economics and Technology, Inc., February 1997.

*The Effect of Internet Use On The Nation's Telephone Network*, Lee L. Selwyn and Joseph W. Laszlo, a report prepared for the Internet Access Coalition, July 22, 1997.

*Regulatory Treatment of ILEC Operations Support Systems Costs*, Lee L. Selwyn, Economics and Technology, Inc., September 1997.

*The "Connecticut Experience" with Telecommunications Competition: A Case in Getting it Wrong*, Lee L. Selwyn, Helen E. Golding and Susan M. Gately, Economics and Technology, Inc., February 1998.

*Where Have All The Numbers Gone?: Long-term Area Code Relief Policies and the Need for Short-term Reform,* prepared by Economics and Technology, Inc. for the Ad Hoc Telecommunications Users Committee, International Communications Association, March 1998.

*Broken Promises: A Review of Bell Atlantic-Pennsylvania's Performance Under Chapter 30*, Lee L. Selwyn, Sonia N. Jorge and Patricia D. Kravtin, Economics and Technology, Inc., June 1998.

*Building A Broadband America: The Competitive Keys to the Future of the Internet*, Lee L. Selwyn, Patricia D. Kravtin and Scott A. Coleman, a report prepared for the Competitive Broadband Coalition, May 1999.

*Bringing Broadband to Rural America: Investment and Innovation In the Wake of the Telecom Act*, Lee L. Selwyn, Scott C. Lundquist and Scott A. Coleman, a report prepared for the Competitive Broadband Coalition, September 1999.

Dr. Selwyn has been an invited speaker at numerous seminars and conferences on telecommunications regulation and policy, including meetings and workshops sponsored by the National Telecommunications and Information Administration, the National Association of


ECONOMICS AND
TECHNOLOGY, INC.

Dr. Lee L. Selwyn (continued)

Regulatory Utility Commissioners, the U.S. General Services Administration, the Institute of Public Utilities at Michigan State University, the National Regulatory Research Institute at Ohio State University, the Harvard University Program on Information Resources Policy, the Columbia University Institute for Tele-Information, the International Communications Association, the Tele-Communications Association, the Western Conference of Public Service Commissioners, at the New England, Mid-America, Southern and Western regional PUC/PSC conferences, as well as at numerous conferences and workshops sponsored by individual regulatory agencies.



**Attachment 2**

***Ex Parte* Submission of
Pac-West Telecomm, Inc.
in CC Docket No. 01-338
filed September 7, 2004**



# SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

THE WASHINGTON HARBOUR
3000 K STREET, NW, SUITE 300
WASHINGTON, DC 20007-5116
TELEPHONE (202) 424-7500
FACSIMILE (202) 424-7645
WWW.SWIDLAW.COM

RICHARD M. RINDLER

DIRECT DIAL (202) 424-7771
RMRindler@SWIDLAW.COM

NEW YORK OFFICE
THE CHRYSLER BUILDING
405 LEXINGTON AVENUE
NEW YORK, NY 10174
(212) 973-0111 FAX (212) 891-9598

September 7, 2004

**VIA ELECTRONIC FILING**

Marlene R. Dortch, Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington, DC 20554

> Re:  ***Ex Parte,*** CC Docket Nos. 01-338, 96-98, 98-147
> *In the Matters of Review of Section 251 Unbundling Obligations for Incumbent Local Exchange Carriers; Implementation of Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability*

Dear Ms. Dortch:

In an ex parte letter dated July 2, 2004, filed in CC Docket No. 01-338 et al, Verizon made certain representations regarding Pac-West Telecomm's deployment of fiber optic local distribution networks that it purports to have obtained from the "CLEC Report 2004" published by the "New Paradigm Resources Group." According to Verizon, Pac-West has "On-net" or "Operational" fiber optic networks owned by Pac-West currently in place in the following MSAs:

> Los Angeles-Long Beach-Santa Ana, California
> San Francisco-Oakland-Fremont, California
> Riverside-San Bernadino-Ontario, California
> Phoenix-Mesa-Scottsdale, Arizona
> Seattle-Tacoma-Bellevue, Washington
> San Diego-Carlsbad-San Marcos, California
> Denver-Aurora, Colorado
> Sacramento-Arden-Arcade-Roseville, California
> San Jose-Sunnyvale-Santa Clara, California
> Las Vegas-Paradise, Nevada
> Fresno, California
> Bakersfield, California
> Stockton, California
> Salinas, California

*See* Verizon July 2 ex parte letter, Attachment 8.

Marlene R. Dortch
September 7, 2004
Page 2

The information being proffered by Verizon as it pertains to Pac-West Telecomm is wrong. In fact, Pac-West owns no fiber. Pac-West serves all customers via facilities obtained from other carriers, with much of that being obtained from the ILECs.

From time to time, Pac-West does communicate with the New Paradigm Resources Group, but is not aware of the source of the data cited by Verizon.

In view of the clearly erroneous information submitted by Verizon with respect to Pac-West Telecomm, the information being submitted by Verizon with respect to other CLECs' deployment of fiber networks must be independently verified before it may be accepted as fact and relied upon by the Commission.

Sincerely,

Richard M. Rindler

cc:    John Sumpter

**Attachment 3**

**CLEC Industry and Financial Data**



*Attachment 3 – CLEC Industry and Financial Data*

| Table A3-1<br>Total CLEC Capital Expenditures 1996-2003<br>As Reported by the New Paradigm Research Group<br>($Millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **1996** | **1997** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** |
| Annual Capital Expenditure | $1,580 | $3,368 | $6,723 | $14,492 | $21,166 | $17,017 | $4,150 | $3,895 |
| Cumulative Capital Expenditure | $1,580 | $4,948 | $11,671 | $26,163 | $47,329 | $64,346 | $68,496 | $72,391 |
| Source:      New Paradigm Research Group, "2004 CLEC Report," Chapter 2, at 6. | | | | | | | | |



ECONOMICS AND TECHNOLOGY, INC.

*Attachment 3 – CLEC Industry and Financial Data*

| Table A3-2 CLEC Capital Expenditures ($000) as reported by New Paradigm Research Group 2001 - 2003 | | | | |
|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **CAGR** |
| AT&T | $3,000,000 | $950,000 | $650,000 | -53.45% |
| Buckeye | $1,500 | $1,500 | $1,300 | -6.91% |
| Cablevision Lightpath | $126,200 | $30,000 | $70,000 | -25.52% |
| Cavalier | $15,000 | $10,000 | $10,000 | -18.35% |
| ChoiceOne | $85,051 | $28,500 | $20,000 | -51.51% |
| Cinergy | $1,000 | $1,000 | $1,000 | 0.00% |
| Comcast Business | $150,000 | $40,000 | $38,000 | -49.67% |
| Cox Communications | $335,000 | $1,932,416 | $1,700,000 | 125.27% |
| Grande Communications | $60,000 | $15,000 | $19,000 | -43.73% |
| ICG Communications | $41,463 | $51,162 | $49,000 | 8.71% |
| IDT Solutions | $90,000 | $6,000 | $6,500 | -73.13% |
| Integra Telecom | $50,000 | $35,000 | $40,000 | -10.56% |
| ITC^DeltaCom | $161,965 | $33,800 | $35,000 | -53.51% |
| KMC Telecom | $109,076 | $40,000 | $32,000 | -45.84% |
| MCI | $1,600,000 | $600,000 | $400,000 | -50.00% |
| McLeodUSA | n/a | $125,200 | $58,800 | n/a |
| NewSouth | $24,000 | $21,000 | $24,000 | 0.00% |
| NTS Communications | $20,000 | $10,000 | $15,000 | -13.40% |
| Qwest | $1,600,000 | $300,000 | $250,000 | -60.47% |
| SIGECOM | $2,500 | $2,000 | $3,900 | 24.90% |
| TelCove | $467,000 | $30,000 | $25,000 | -76.86% |
| Time Warner Telecom | $425,452 | $104,800 | $100,000 | -51.52% |
| XO | $1,433,745 | $250,900 | $38,994 | -83.51% |
| Xpedious | $30,000 | $10,000 | $8,000 | -48.36% |
| **All CLECs** | **$9,828,952** | **$4,628,278** | **$3,595,494** | **-39.52%** |

Note:     CAGR is the compound annual growth rate, the average annual growth rate based solely upon the beginning and ending balance.

Sources:     New Paradigm Research Group, "CLEC Report 2004," Chapter 6.
New Paradigm Research Group, "CLEC Report 2003," Chapter 6.


ECONOMICS AND TECHNOLOGY, INC.

*Attachment 3 – CLEC Industry and Financial Data*

| | | | | |
|---|---|---|---|---|
| **Table A3-3**<br>**CLEC "On-Net" Buildings**<br>**As Reported by the New Paradigm Research Group**<br>**2001 - 2003** | | | | |
| | **2001** | **2002** | **2003** | **CAGR** |
| AT&T | 6,300 | 6,300 | 6,500 | 1.57% |
| Buckeye TeleSystem | 447 | n/a | n/a | n/a |
| Cablevision Lightpath | 1,100 | 1,505 | 1,650 | 22.47% |
| Comcast Business | 250 | 265 | n/a | n/a |
| Cox Communications | 6,500 | 6,600 | 6,600 | 0.77% |
| ICG Communications | 912 | n/a | 904 | -0.44% |
| IDT Communications | 3,400 | 3,000 | 3,000 | -6.07% |
| McLeodUSA | n/a | 1,489 | 1,500 | 0.74% |
| NTS Communications | 50 | 50 | 50 | 0.00% |
| Qwest | 250 | n/a | n/a | n/a |
| RIO | 200 | 200 | 200 | 0.00% |
| TelCove | 3,369 | n/a | n/a | n/a |
| Time Warner Telecom | 3,146 | 3,541 | 4,429 | 18.65% |
| Verizon Avenue | 1,893 | 2,050 | 2,050 | 4.06% |
| XO | 2,379 | 2,405 | 2,355 | -0.51% |
| **Total CLECs** | **24,968** | **25,651** | **26,834** | **3.67%** |

Note:    CAGR is the compound annual growth rate, the average annual growth rate based solely upon the beginning and ending balance.

Sources:    New Paradigm Research Group, "CLEC Report 2004," Chapter 6.
New Paradigm Research Group, "CLEC Report 2003," Chapter 6.

ECONOMICS AND
TECHNOLOGY, INC.

*Attachment 3 – CLEC Industry and Financial Data*

| Table A3-4 CLEC Route Miles of Fiber As Reported by the New Paradigm Research Group 2001 - 2003 | | | | |
|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **CAGR** |
| AT&T | 17,000 | 17,000 | 17,000 | 0.00% |
| Buckeye | 1,813 | 1,813 | 1,813 | 0.00% |
| Cablevision Lightpath | 10,000 | 2,200 | 2,300 | -52.04% |
| Cavalier | 2,000 | 2,000 | 2,000 | 0.00% |
| ChoiceOne | 613 | 1,343 | 1,571 | 60.09% |
| Cinergy | 1,000 | 1,000 | 1,000 | 0.00% |
| Comcast Business | 1,500 | 1,600 | 1,600 | 3.28% |
| Cox Communications | 9,000 | 9,500 | 9,500 | 2.74% |
| Grande Communications | 800 | 800 | 5,000 | 150.00% |
| ICG Communications | 5,542 | 5,542 | 5,542 | 0.00% |
| IDT Solutions | 10,000 | 5,000 | n/a | -100.00% |
| Integra Telecom | 85 | 85 | 85 | 0.00% |
| ITC^DeltaCom | 9,980 | 9,980 | 14,500 | 20.54% |
| KMC Telecom | 2,336 | 2,336 | 2,400 | 1.36% |
| MCI | 10,937 | 10,937 | 11,500 | 2.54% |
| McLeodUSA | n/a | 28,500 | 31,000 | n/a |
| NewSouth | n/a | n/a | n/a | n/a |
| NTS Communications | 7,000 | 7,000 | 7,000 | 0.00% |
| Qwest | 1,800 | 1,800 | 1,800 | 0.00% |
| SIGECOM | 860 | 860 | 860 | 0.00% |
| TelCove | 19,186 | 19,186 | 19,186 | 0.00% |
| Time Warner Telecom | 16,806 | 17,384 | 18,039 | 3.60% |
| XO | 22,398 | 23,700 | 23,800 | 3.08% |
| Xpedious | n/a | 3,500 | 3,500 | n/a |
| **All CLECs** | **140,656** | **136,066** | **146,496** | **2.05%** |

Note:     CAGR is the compound annual growth rate, the average annual growth rate based solely
upon the beginning and ending balance.

Sources:     New Paradigm Research Group, "CLEC Report 2004," Chapter 4, Table 16, at 3-4.
New Paradigm Research Group, "CLEC Report 2003," Chapter 4, Table 14, at 4-5.



*Attachment 3 – CLEC Industry and Financial Data*

| Table A3-5 Bankruptcies of Publicly Traded CLECs Since January 2001 Identified by the New Paradigm Research Group | | | |
|---|---|---|---|
| **Company** | **Bankruptcy Filing Date** | **Total CLEC Assets at the Time of Filing** | **Current Status of Company** |
| Northpoint Communications | Jan 16, 2001 | $738,211,000 | Assets acq. by AT&T |
| Pathnet Telecom | Apr 2, 2001 | $304,413,838 | Liquidated |
| Winstar Communications | Apr 18, 2001 | $4,469,245,000 | Assets acq. by IDT |
| Covergent Communications | Apr 19, 2001 | $297,357,000 | Liquidated |
| Advanced Radio Telecom | Apr 20, 2001 | $539,434,000 | Reorganization Complete - Known as 1st Ave. Ntwks |
| Telscape International, Inc. | Apr 27, 2001 | $343,019,841 | Reorganization Complete |
| Teligent | May 21, 2001 | $1,178,014,000 | Reorganization Complete |
| Novo Networks | Jul 1, 2001 | $60,927,908 | Operating Under Ch. 11 |
| Rhythms | Aug 1, 2001 | $973,927,000 | Operating Under Ch. 11 |
| Covad | Aug 7, 2001 | $1,255,932,000 | Reorganization Complete |
| Ardent Communications | Oct 11, 2001 | $101,621,000 | Liquidated |
| Net2000 Communications | Nov 16, 2001 | $257,730,000 | Assets acq. by Cavalier |
| Global Crossing, Ltd. | Jan 28, 2002 | $25,511,000,000 | Reorganization Complete |
| McLeodUSA | Jan 31, 2002 | $4,792,600,000 | Reorganization Complete |
| Network Plus Corp. | Feb 4, 2002 | $433,239,000 | Assets acq. by Broadview Ntwks |
| Logix Communications | Feb 28, 2002 | $234,210,000 | Assets acq. by Western Com. |
| Adelphia Business Solutions | Mar 27, 2002 | $2,126,334,000 | Reorganization Complete - Known as TelCove |
| Mpower Communications | Apr 8, 2002 | $691,646,000 | Reorganization Complete |
| XO Communications | Jun 16, 2002 | $5,704,479,000 | Reorganization Complete |
| ITC^DeltaCom | Jun 25, 2002 | $841,482,000 | Reorganization Complete |
| WorldCom (MFS Subsidiary) | Jul 21, 2002 | $12,500,000,000 | Reorganization Complete - Known as MCI |
| Birch Telecom | Jul 30, 2002 | $238,176,000 | Reorganization Complete |
| Knology Broadband | Sep 18, 2002 | $369,398,000 | Reorganization Complete – Subsidiary of Knology Inc |
| CTC Communications | Oct 3, 2002 | $329,328,338 | Reorganization Complete |
| Allegiance Telecom | May 14, 2003 | $1,441,218,000 | Assets acq. by XO |
| ATX/CoreComm | Jan 15, 2004 | $158,723,000 | Operating Under Ch. 11 |
| **Total CLECs** | | **$65,891,665,925** | |
| Note: Total CLEC assets at the time of bankruptcy filing and the current status of the CLEC do not represent information in the New Paradigm Research Group. Sources: New Paradigm Research Group, "CLEC Report 2004," Chapter 2, at 2-4. 10-Qs, 10-Ks, and other company press releases identified in Table A3-7. | | | |



*Attachment 3 – CLEC Industry and Financial Data*

| **Table A3-6**<br>**Net Economic Loss of Previously Bankrupt Publicly Traded CLECs**<br>**Identified by the New Paradigm Research Group** | | | | |
| --- | --- | --- | --- | --- |
| **Company[1]** | **Bankruptcy Filing Date** | **Total CLEC Assets at the Time of Filing** | **Acq. Price/ Current Value of Assets** | **Net Economic Loss** |
| Northpoint Communications | Jan 16, 2001 | $738,211,000 | $135,000,000 | $603,211,000 |
| Winstar Communications | Apr 18, 2001 | $4,469,245,000 | $55,800,000 | $4,413,445,000 |
| Advanced Radio Telecom | Apr 20, 2001 | $539,434,000 | $29,257,000 | $510,177,000 |
| Novo Networks | Jul 1, 2001 | $60,927,908 | $4,363,800 | $56,564,108 |
| Rhythms[2] | Aug 1, 2001 | $973,927,000 | $32,997,000 | $940,930,000 |
| Covad | Aug 7, 2001 | $1,255,932,000 | $425,451,000 | $830,481,000 |
| Global Crossing, Ltd. | Jan 28, 2002 | $25,511,000,000 | $2,171,000,000 | $23,340,000,000 |
| McLeodUSA | Jan 31, 2002 | $4,792,600,000 | $1,461,300,000 | $3,331,300,000 |
| Network Plus Corp. | Feb 4, 2002 | $433,239,000 | $15,750,000 | $417,489,000 |
| Logix Communications | Feb 28, 2002 | $234,210,000 | $24,300,000 | $209,910,000 |
| Mpower Communications | Apr 8, 2002 | $691,646,000 | $99,874,000 | $591,772,000 |
| XO Communications | Jun 16, 2002 | $5,704,479,000 | $1,507,939,000 | $4,196,540,000 |
| ITC^DeltaCom | Jun 25, 2002 | $841,482,000 | $699,391,000 | $142,091,000 |
| WorldCom (MFS Subsidiary)[3] | Jul 21, 2002 | $12,500,000,000 | $3,028,800,000 | $9,471,200,000 |
| Allegiance Telecom | May 14, 2003 | $1,441,218,000 | $635,000,000 | $806,218,000 |
| **Total CLECs** | | **$60,187,550,908** | **$10,326,222,800** | **$49,861,328,108** |

Notes: (1)  This table does not include some previously bankrupt CLECs (e.g. Adelphia Business Solutions and Teligent) because there is no publicly available information about the current value of their assets.  In many instances, including these two examples, the previously bankrupt public CLEC has gone private and thus no longer provides asset information to the public.

   (2)  Rhythms Net Connections sold some of its assets to WorldCom in December 2001 for $31,000,000.  The remaining $1.99 million in assets are still owned by Rhythms.

   (3)  WorldCom's MFS subsidiary assets have been estimated to be 12% of MCI's total assets because when MFS was originally purchased by WorldCom, it represented 12% of WorldCom's total assets.

Sources:  New Paradigm Research Group, "CLEC Report 2004," Chapter 2, at 2-4.
   10-Qs, 10-Ks, and other company press releases identified in Table A3-7.



*Attachment 3 – CLEC Industry and Financial Data*

| Table | Input | Source |
|---|---|---|
| **Table A3-7**<br>**Source Materials**<br>**Identified in Table 1, Table A3-5, and Table A3-6** | | |
| Table 1 | Cablevision Lightpath: Route Miles of Fiber | *Lightpath's Network Advantage*, Cablevision Lightpath, available at http://www.lightpath.net/Interior188.html, accessed 8/26/04; or *Getting Down to Business*, CED Magazine, http://www.cedmagazine.com/ced/2003/1103/11a.htm, accessed 8/27/04. |
| | IDT Solutions: Route Miles of Fiber | *IDT Corporation Announces Reorganization of Winstar/IDT Solutions*, IDT Press Release, available at http://www.idtsolutions.net/about/press/releases/1023.asp, accessed 9/8/04. |
| | IDT Solutions: On-Net Buildings | *Business Continuity Solutions*, IDT Solutions, available at http://www.idtsolutions.net/products/buscont/solutions.asp, accessed 8/26/04. |
| | KMC Telecom: On-Net Buildings | *Wholesale Services*, KMC Telecom, http://www.kmctelecom.com/Wholesale/, accessed 8/27/04 |
| | McLeodUSA: On-Net Buildings | McLeodUSA Release, "McLeodUSA Reports Second Quarter 2004 Results," July 28, 2004, at 2. |
| | TelCove: On-Net Buildings | TelCove Company Brochure, *Telcove: Advanced Secure Communications*, available on TelCove's website at http://www.telcove.com/prroom/media.htm, accessed 8/27/04. |
| Table A3-5 and Table A3-6 | Northpoint: Total CLEC Assets at the time of Filing | Northpoint Communications, Third Quarter 2000 10Q filed with the Securities & Exchange Commission, 11/20/00. |
| | Northpoint: Current Status and Current Value of assets | AT&T Press Release, "AT&T Acquires Assets of Northpoint Communications," *see* http://www.att.com/news/item/0,1847,3726,00.html, accessed 9/14/04. |
| | Pathnet: Total CLEC Assets at the time of Filing | Pathnet Telecommunications, First Quarter 2001 10Q filed with the Securities & Exchange Commission, 5/15/01. |
| | Pathnet: Current Status | Telecom Asset Management, Recent Transactions, *see* http://www.telecomassets.com, accessed 9/14/04. |
| | Winstar: Total CLEC Assets at the time of Filing | Winstar Communications, Third Quarter 2000 10Q filed with the Securities & Exchange Commission, 11/14/00. |
| | Winstar: Current Status and Current Value of assets | IDT Corp., 2003 10K filed with the Securities & Exchange Commission, 10/29/04. |
| | Convergent: Total CLEC Assets at the time of Filing | Convergent Communications, Third Quarter 2000 10Q filed with the Securities & Exchange Commission, 11/13/00. |
| | Convergent: Current Status | http://www.nsn-wireless.net/Bankrupt_telcoms.htm, accessed 9/14/04 |
| | Advanced Radio: Total CLEC Assets at the time of Filing | Advanced Radio Communications, Third Quarter 2000 10Q filed with the Securities & Exchange Commission, 11/14/00. |



ECONOMICS AND TECHNOLOGY, INC.

*Attachment 3 – CLEC Industry and Financial Data*

| | | |
|---|---|---|
| Table A3-5 and Table A3-6 | Advanced Radio: Current Status and Value of assets | Advanced Radio Communications, Second Quarter 2004 10Q filed with the Securities & Exchange Commission, 7/29/04. |
| | Telscape: Total CLEC Assets at the time of Filing | Telscapes International, Third Quarter 2000 10Q filed with the Securities & Exchange Commission, 11/20/00. |
| | Telscape: Current Status | *Telscape Fact Sheet*, available at http://www.telscape.com/about_corp.html#, accessed 9/14/04. |
| | Teligent: Total CLEC Assets at the time of Filing | Teligent, Third Quarter 2000 10Q filed with the Securities & Exchange Commission, 11/14/00. |
| | Teligent: Current Status | *Teligent: A Fixed Wireless Company*, available at http://www.teligent.com/aboutustg.html, accessed 9/14/04. |
| | Novo: Total CLEC Assets at the time of Filing | Novo Networks, First Quarter 2001 10Q filed with the Securities & Exchange Commission, 5/15/01. |
| | Novo: Current Status and Current Value of assets | Novo Networks, Second Quarter 2004 10Q filed with the Securities & Exchange Commission, 5/17/04. |
| | Rhythms: Total CLEC Assets at the time of Filing | Rhythms's First Quarter 2001 10Q filed with the Securities & Exchange Commission, 5/09/01. |
| | Rhythms: Current Status and Current Value of assets | Rhythms' 8K filed with the Securities & Exchange Commission, 4/28/04.  Info concerning Rhythms' sale of assets to WorldCom see *Failed Start-up Landed Among Scandals' Debris*, USA Today, available at http://www.usatoday.com/money/industries/technology/2002-12-18-rhythm_x.htm, accessed 9/20/04. |
| | Covad: Total CLEC Assets at the time of Filing | Covad Communications, First Quarter 2001 10Q filed with the Securities & Exchange Commission, 6/20/01. |
| | Covad: Current Status and Current Value of assets | Covad Communications, Second Quarter 2004 10Q filed with the Securities & Exchange Commission, 7/30/04. |
| | Ardent: Total CLEC Assets at the time of Filing | Ardent Communications, Second Quarter 2001 10Q filed with the Securities & Exchange Commission, 8/20/01. |
| | Ardent: Current Status | *Ardent Communications Pieces Sold*, Washington Business Journal, available at http://washington.bizjournals.com/washington/stories/2002/05/20/daily7.html, accessed 9/14/04 |
| | Net2000: Total CLEC Assets at the time of Filing | Net2000's Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/19/01. |
| | Net2000: Current Status | *Cavalier Making Telecom Deal*, Philadelphia Business Journal, available at http://www.bizjournals.com/philadelphia/stories/2001/11/12/daily52.html, accessed 9/14/04. |
| | Global Crossing: Total CLEC Assets at the time of Filing | Global Crossing, Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/14/01. |
| | Global Crossing: Current Status and Current Value of assets | Global Crossing, 2003 10K filed with the Securities & Exchange Commission, 3/26/04. |



*Attachment 3 – CLEC Industry and Financial Data*

| | | |
|---|---|---|
| | McLeodUSA: Total CLEC Assets at the time of Filing | McLeod's Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/14/01. |
| | McLeodUSA: Current Status and Current Value of assets | McLeod's Second Quarter 2004 10K filed with the Securities & Exchange Commission, 8/9/04. |
| | Network Plus: Total CLEC Assets at the time of Filing | Network Plus's Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/13/01. |
| | Network Plus: Current Status and Current Value of assets | *Broadview Networks Acquires NetworkPlus from Bankruptcy for $15.75 million*, Converge Network Digest, available at http://www.convergedigest.com/ Bandwidth/newnetworksarticle.asp?ID=2945, accessed 9/14/04. |
| | Logix: Total CLEC Assets at the time of Filing | Logix's Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/14/01. |
| | Logix: Current Status and Current Value of assets | *Houston Company Buys Logix*, Austin Business Journal, available at http://www.bizjournals.com/austin/stories/2002/10/14/daily11.html, accessed 9/14/04. |
| Table A3-5 and Table A3-6 | Adelphia: Total CLEC Assets at the time of Filing | Adelphia Business Solutions, Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/13/01. |
| | Adelphia: Current Status | *Adelphia Business Solutions and its Creditors Reach Agreement*, TelCove Press Release, available at http://www.telcove.com/prroom/pr032603.htm, accessed 9/14/04. |
| | Mpower: Total CLEC Assets at the time of Filing | Mpower Communications, Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/13/01. |
| | Mpower: Current Status and Current Value of assets | Mpower Communications, Second Quarter 2004 10K filed with the Securities & Exchange Commission, 8/6/04. |
| | XO: Total CLEC Assets at the time of Filing | XO Communications, First Quarter 2002 10Q filed with the Securities & Exchange Commission, 5/14/02. |
| | XO: Current Status and Current Value of assets | XO Communications, Second quarter 2004 10K filed with the Securities & Exchange Commission, 8/9/04. |
| | ITC: Total CLEC Assets at the time of Filing | ITC^DeltaCom, First Quarter 2002 10Q filed with the Securities & Exchange Commission, 5/15/02. |
| | ITC: Current Status and Current Value of assets | ITC^DeltaCom, Second Quarter 2004 10K filed with the Securities & Exchange Commission, 8/9/04. |
| | WorldCom (MFS Subsidiary): Total CLEC Assets at the time of Filing | WorldCom, First Quarter 2002 10Q filed with the Securities & Exchange Commission, 5/15/02. |
| | WorldCom (MFS Subsidiary): Current Status and Current Value of assets | MCI, Second Quarter 2004 10K filed with the Securities & Exchange Commission, 8/9/04. |
| | Birch: Total CLEC Assets at the time of Filing | Birch Telecom, Third Quarter 2001 10Q filed with the Securities & Exchange Commission, 11/14/01. |



*Attachment 3 – CLEC Industry and Financial Data*

| | | |
|---|---|---|
| Table A3-5 and Table A3-6 | Birch: Current Status | Birch Telecom website available at www.birch.com, accessed 9/14/04. |
| | Knology: Total CLEC Assets at the time of Filing | Knology Broadband, Second Quarter 2002 10Q filed with the Securities & Exchange Commission, 8/13/02. |
| | Knology: Current Status | Knology Inc., Second Quarter 2004 10K filed with the Securities & Exchange Commission, 8/13/04 |
| | CTC: Total CLEC Assets at the time of Filing | CTC's Second Quarter 2002 10Q filed with the Securities & Exchange Commission, 8/14/02. |
| | CTC: Current Status | *CTC Bought out of Bankruptcy by Columbia Ventures*, Boston Business Journal, available at http://www.bizjournals.com/boston/stories/2003/12/15/daily32.html, accessed 9/14/04. |
| | Allegiance: Total CLEC Assets at the time of Filing | Allegiance Telecom, 2002 10K filed with the Securities & Exchange Commission, 3/31/03. |
| | Allegiance: Current Status and Current Value of assets | XO Communications, Second Quarter 2004 10K filed with the Securities & Exchange Commission, 8/9/04. |
| | ATX/CoreComm: Total CLEC Assets at the time of Filing | ATX/CoreComm, Third Quarter 2003 10Q filed with the Securities & Exchange Commission, 11/19/03. |
| | ATX/CoreComm: Current Status | ATX/CoreComm, 8K filed with the Securities & Exchange Commission, 6/2/04. |

