Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

In the Matter of

Application by SBC Communications Inc.,
Pacific Bell Telephone Company, and
Southwestern Bell Communications Services,
Inc. for Provision of In-Region, InterLATA
Services in California

WC Docket No. 02-306

RECEIVED

SEP 2 0 2002

FEDERAL COMMUNICATIONS COMMISSION
OFFICE OF THE SECRETARY

To:    The Commission

**BRIEF IN SUPPORT OF APPLICATION BY SBC FOR
PROVISION OF IN-REGION, INTERLATA SERVICES IN CALIFORNIA**

JAMES D. ELLIS
PAUL K. MANCINI
MARTIN E. GRAMBOW
KELLY M. MURRAY
ROBERT J. GRYZMALA
RANDALL JOHNSON
TRAVIS M. DODD
JOHN D. MASON
    175 E. Houston
    San Antonio, Texas 78205
    (210) 351-3410

*Counsel for SBC Communications Inc.*

PATRICIA DIAZ DENNIS
JAMES B. YOUNG
ED KOLTO
L. NELSONYA CAUSBY
    140 New Montgomery Street
    San Francisco, California 94105
    (415) 545-9450

*Counsel for Pacific Bell
    Telephone Company*

September 20, 2002

MICHAEL K. KELLOGG
GEOFFREY M. KLINEBERG
COLIN S. STRETCH
KELLOGG, HUBER, HANSEN,
  TODD & EVANS, P.L.L.C.
    1615 M Street, N.W., Suite 400
    Washington, D.C. 20036
    (202) 326-7900

*Counsel for SBC Communications Inc.,
    Pacific Bell Telephone Company,
    and Southwestern Bell
    Communications Services, Inc.*

SBC Communications Inc.
California 271
September 20, 2002

## EXECUTIVE SUMMARY

This Application marks the culmination of six years of collaborative work by Pacific Bell Telephone Company ("Pacific"), the California Public Utilities Commission ("California PUC" or "CPUC"), and dozens of local carriers to establish the framework for local competition in California. The results of this work are impressive and undeniable:

- Pacific has satisfied each of the 14 statutory checklist requirements for opening the local market to competition, thereby ensuring that CLECs have access to all the facilities and services they need to compete in the provision of local telecommunications services in Pacific's region.

- Pacific has put in place state-of-the-art, independently tested operations support systems ("OSS") pursuant to which Pacific successfully processes, on a monthly basis, hundreds of thousands of CLEC orders for local services and facilities.

- Pacific routinely meets approximately 90 percent of the performance measures that track its responses to these hundreds of thousands of orders, a level of performance that is particularly outstanding since, under the rigorous standards imposed by the CPUC, Pacific can be expected to miss up to 10 percent of the measures in any given month due to random variation alone.

As a direct result of these extraordinary efforts, CLECs in California have established a market presence unparalleled in any other state at the time their section 271 applications were filed. According to the most conservative estimate, CLECs are serving at least 2.6 million access lines in Pacific's serving area, more than three-quarters of a million of which are provided to residential customers. While CLECs are serving the bulk of these lines over their own facilities – either exclusively or in combination with the close to half a million unbundled loops they have leased from Pacific – Pacific has also provided them with close to a quarter of a million UNE-platforms. CLECs have obtained approximately 1.29 million interconnection trunks, which they are using to exchange with Pacific approximately 6.0 billion minutes of traffic each month. By any measure, the level of competition in California far exceeds the levels in New York and

SBC Communications Inc.
California 271
September 20, 2002

Texas – the two largest states for which the Commission has reviewed section 271 applications previously – when applications for those states were filed.

This vibrant competition provides the lens through which the Commission should view the issues raised by this Application. CLECs can and do compete effectively in California, and they are proving it every day. As the Department of Justice ("DOJ") has stressed, "[i]f actual, broad-based entry through each of the entry paths contemplated by Congress is occurring in a state, this will provide invaluable evidence supporting a strong presumption that the BOC's markets have been opened." That "invaluable evidence" is abundant in this case, and Pacific has earned the "strong presumption" that the DOJ has properly identified.

Indeed, the CLECs themselves have trumpeted the openness of the local market in California. More than a year ago, AT&T had already, by its own admission, achieved 19 percent telephony penetration in California's Bay Area, "with many communities in the high 20s," and it was boasting that it was "happy with the progress [it had] made so far." A few months later, AT&T publicly identified certain California markets as among the "most profitable locations" in the country for a UNE-based entry strategy. For its part, WorldCom earlier this year rolled out "The Neighborhood" program in California – an action that, again by its own admission, it takes only where the incumbent LEC has "opened [the] market[] to competition."

Each of these admissions came, moreover, *before* the California PUC's recent interim UNE rate decision that, according to AT&T, "set the stage for real competition." The California PUC set rates for interconnection and unbundled network elements in a comprehensive proceeding that lasted several years, involved thousands of pages of comments and other pleadings as well as live hearings with witnesses subject to cross-examination, and gave rise to

ii

SBC Communications Inc.
California 271
September 20, 2002

contemplated by the Act.  CLECs serve between approximately 2.2 and 3.5 million access lines

over their own facilities, either exclusively or in combination with the hundreds of thousands of

UNEs they have leased from Pacific.  See id. Table 1 & Attach. A.  They serve an additional

222,000 or so access lines using UNE-P, and another approximately 151,000 using resale.

Plainly, consumers in California are witnessing "actual, broad-based entry through each of the

entry paths contemplated by Congress."[13]

        While all measures of competition show rapidly increasing CLEC penetration of the local

market in California, competition in the residential market is particularly robust.  CLECs already

serve more than three-quarters of a million residential access lines, the vast bulk of which are

provided over CLECs' own facilities.  See id. ¶¶ 10-12 & Table 2.  Measured in percentage

terms, this extensive facilities-based penetration in the residential market dwarfs the levels in, for

example, Texas and New York when the FCC reviewed section 271 applications for those states.

See id. ¶ 12; see also id. Attach. D (comparing various indicators of local competition in

California with those in other states with section 271 relief).

        To hear AT&T and WorldCom tell it, moreover, these impressive levels of competition

can only be expected to increase.  A little over a year ago, AT&T described its cable telephony

operation in California as not only "'racking up customers and providing hefty local competition

for Pac Bell,'" but also "'positioned to realize significant financial returns.'"  Id. ¶ 15 (quoting

AT&T Broadband's Vice President of Communications and its Broadband Investor

Presentation).  A few months later, in January of this year, AT&T expressed an equally bullish

---

[13] DOJ Oklahoma I Eval. at 43.

SBC Communications Inc.
California 271
September 20, 2002

view on the prospects for UNE-based competition, describing San Diego and Los Angeles as among the nation's "'most profitable locations'" for a UNE-based local entry strategy. Id. ¶ 16 (quoting AT&T Consumer's President and CEO). And in May of this year, AT&T described the the California PUC's decision reducing Pacific's UNE rates on an interim basis as "'set[ting] the stage for real competition'" and "'ensur[ing] more jobs and investment in the state as companies compete for local phone customers.'" Id. ¶ 18 & Attach. L (quoting AT&T press release). Indeed, according to an independent analysis released just this week, AT&T's own data "shows that the company achieved its highest first month [UNE-P] penetration in California and New Jersey, its two most recent states."[14]

WorldCom has told a similar tale. It has rolled out "The Neighborhood" in California – an action that, by its own admission, it takes only where the local phone company has "opened [the] market[] to competition"[15] – and it has publicly proclaimed that the UNE rates now in effect in California will permit it to expand the availability of that offering. See id. ¶ 18. Indeed, WorldCom has stated that, if Pacific "'commits to these approved rates and other market-opening requirements, [WorldCom] will have no reason to oppose'" Pacific's bid for long-distance relief. Id. & Attach. M (quoting WorldCom press release).

---

[14] UBS Warburg: Global Equity Research, AT&T Says UNE-P Is Here to Stay, at 2 (Sept. 18, 2002).

[15] See MCI, The Neighborhood, Help – Questions About Service, at www. theneighborhood.com/res_local_service/jsps/help.jsp?subpartner=FREEMONTH#q12.

Before the

FEDERAL COMMUNICATIONS COMMISSION

Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Unbundled Access to Network Elements | ) | WC Docket No. 04-313 |
| | ) | |
| Review of the Section 251 Unbundling | ) | CC Docket No. 01-338 |
| Obligations of Incumbent Local Exchange | ) | |
| Carriers | ) | |

DECLARATION OF PARLEY C. CASTO

ON BEHALF OF SBC COMMUNICATIONS INC.

The undersigned, being of lawful age and duly sworn, does herby state as follows:

Qualifications

1.  My name is Parley C. Casto.  I am the Executive Director - Industry Markets Special Access Product Management for SBC Communications Inc.  I am responsible for product management, product development, rate development, policy development, and tariff management for the wholesale special access business of SBC on an enterprise-wide basis.

2.  I previously served as Director of various other product management organizations within SBC.  In those positions, I supervised product management teams responsible for switched access, advanced data services, and certain transport (special access and unbundled network element) product management teams.  I also was responsible for SBC enterprise-wide product development, rate development, and company policy for these products.

3.  I began working for Illinois Bell Telephone Company in 1992 in the network services organization in Chicago, Illinois.  Since then I have held a variety of positions in network construction, fiber optic engineering, sales engineering, and product management positions.

4.  I received my BA from DePaul University in Chicago, Illinois in 1999 and my MBA from DePaul University in 2002.  I also earned a Telecommunications Certificate on telecommunications traffic management and engineering from DePaul University's School of Computer Science, Telecommunications and Information Systems.

Purpose of Declaration

5.  The purpose of this declaration is to respond to allegations by AT&T and other competitive local exchange carriers ("CLECs") that they cannot compete effectively in the market for high capacity services using special access services because, they claim, incumbent LECs ("ILECs") retain market power in the special access market, which the ILECs purportedly have used to increase special access prices to supracompetitive levels. These CLECs also claim that ILECs have imposed restrictive terms and conditions that deny CLECs access to the lowest available rates for special access services unless they agree to draconian volume and term commitments that limit their ability to self-deploy their own transmission facilities or to use other competing high capacity services.

6.  These allegations are wrong. As discussed below, SBC faces stiff competition in the special access market from a variety of facilities-based competitors who rely on self-deployed and third party facilities, as well as competitors who rely exclusively on SBC's special access services or a combination of those services and competitive facilities. These competitors have been building their networks and competing to sell transport services for years. Indeed, competitors have deployed alternative high capacity facilities so widely in SBC's region that, since 2001, SBC has obtained pricing flexibility in 81 MSAs. Moreover, the vast majority of SBC's special access revenues (*i.e.*, 90% of its DS-1 and 93% of its DS-3 revenues) are derived from wholesale customers, which use SBC's special access services as an input to provide high capacity services to retail customers in competition with SBC.

7.  As a result of this competition, SBC's competitors have won a substantial share of the market for high capacity services. In particular, competitors now account for over 40% of the total wholesale market for high capacity services in the thirteen states served by SBC, and well over 70% of the wholesale market for the highest capacity services (*i.e.*, OC-n).

8.  Far from increasing, the rates SBC's customers pay for special access services have declined over the past several years due to growing special access competition. As discussed below, SBC's average rates for DS-1s purchased as special access dropped a total of 11% between 2001 and August 2004. In addition, SBC has developed a variety of volume and term plans, which offer customers significant discounts for special access services. For example, SBC's Managed Value Plan (MVP), which was developed over 5 years ago in collaboration with many of SBC's largest wholesale customers, offers additional discounts of 9%-14% off of SBC's standard tariff special access rates over a five-year term. This plan has proven very attractive to SBC's wholesale customers, and now accounts for roughly 65% of SBC's special access revenue. These wholesale customers have recognized the value of SBC's competitive special access pricing and chosen to use SBC as their supplier.

2

across SBC's 13-state region.[1]  Graph A sets forth the results of that survey, broken down by product, and shows that competitors have won over 40% of the total wholesale market for special access services in SBC's territory, and currently supply over a third of the wholesale market for DS-1 and DS-3 services.

Graph A:  SBC Regional Market Share By Product*



*Reference:  December, 2003 Yankee Group Study          **Products and Total**          ☐ SBC Market Share ■ All Others' Market Share

12. As noted above, the vast majority of SBC's special access revenues (*e.g.*, 90% of its DS-1 and 93% of its DS-3 revenues) come from wholesale customers, which use SBC's special access services as an input for the competitive high capacity services that they offer to retail customers.  As a consequence, SBC continues to be a bit player in the retail special access marketplace, which continues to be dominated by AT&T, MCI and Sprint – carriers which, even as they rely in part on special access purchased from SBC, have managed to win the vast majority of enterprise retail business while also being significant providers of wholesale special access services.

13. Based on a study by an outside consulting firm, SBC estimates that the total nationwide enterprise business market was approximately $99 billion in 2003, of which SBC's share was approximately five percent (or $5 billion).  Since SBC received 271 approval in all of its in-region states, it has only won approximately $200M of incremental business in the nationwide enterprise business.

---

[1] In preparing this study, the Yankee Group interviewed buyers from IXCs, CLECs, ILECs, ISPs and wireless service providers, as well as competitive special access providers to determine purchasing behavior in SBC's markets.  The Yankee Group also surveyed 142 service providers that purchase wholesale services from SBC and other ILECs.

REDACTED – FOR PUBLIC INSPECTION

Before the

**FEDERAL COMMUNICATIONS COMMISSION**

Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Unbundled Access to Network Elements | ) | WC Docket No. 04-313 |
| | ) | |
| Review of the Section 251 Unbundling | ) | CC Docket No. 01-338 |
| Obligations of Incumbent Local Exchange | ) | |
| Carriers | ) | |

**REPLY DECLARATION OF PARLEY C. CASTO**
**ON BEHALF OF SBC COMMUNICATIONS INC.**

The undersigned, being of lawful age and duly sworn, does hereby state as follows:

**<u>Qualifications</u>**

1.    My name is Parley C. Casto.  I am the Executive Director - Industry Markets Special

Access Product Management for SBC Communications Inc.  I previously provided a

declaration in this proceeding, dated October 4, 2004.

**<u>Purpose of Declaration</u>**

2.    The purpose of this reply declaration is to respond to the arguments of AT&T and other

competitive local exchange carriers ("CLECs") that they cannot compete effectively in the

market for high capacity services by relying, in whole or in part, on special access services

provided by ILECs.

3.    As I explained in my previous declaration, and as I will explain further below, the CLECs'

allegations are wrong.  In fact, competition in the special access market is strong, and it

REDACTED – FOR PUBLIC INSPECTION

to ***[BEGIN REDACTED]***                ***[END REDACTED]*** from which to

provide the remaining inputs and make a profit.

43.     Moreover, more than 90 percent of SBC's DS1 revenues, and 93 percent of its DS3

revenues, come from wholesale customers.  These services are merely inputs into the types

of enterprise services that AT&T (and others provide), and SBC has only a tiny share of the

enterprise services market.  To suggest that SBC could drive its rivals from the enterprise

services market by raising special access prices is a stretch, to say the very least.

**Attachment 4**

**Imputation Rule Proposed by AT&T
in WC Docket No. 02-112
June 2004**



Ex Parte Declaration of Lee L. Selwyn
FCC WC Docket No. 02-112, CC Docket No. 00-175
June 8, 2004
Page 32 of 35

APPENDIX

DRAFT IMPUTATION RULE

**1.   Applicability of Section 32.27 to integrated local/long distance operations**

(a)  Whenever a dominant provider of local exchange service that also provides long distance services has elected to offer long distance services through a separate affiliate, those transactions shall be subject to Section  32.27 of the Commission's rules.

(b)  Whenever a dominant provider of local exchange service that also provides long distance services has elected to operate on an integrated basis, rather than providing its long distance services through a separate affiliate, then, for purposes of imputing costs to that provider's long distance services, the requirements of section 32.27 of the Commission's rules shall apply as though the long distance services were being provided through an affiliate.

(c) In no event shall the retail price of any long distance service being furnished by a dominant provider of local exchange service that also provides long distance services be set less than the sum of items 2(b)(1) through 2(b)(5) and 2(c) below, plus any incremental network or other costs required for the provision of long distance service.

**2.   Imputation cost standard applicable to each category of cost**

(a)  For purposes of imputation, a distinction is made among three types of costs – "direct costs," "joint costs," and "common overhead costs."

   (1)  "Direct costs" are incurred for the production of a specific product or service and are avoided in their entirety if such service is not provided.  "Direct costs" may include both fixed components as well as variable components that increase (although not necessarily in direct proportion to) the quantity of the product or service that is being produced.

   (2)  "Joint costs" are incurred for the production of two or more products or services and not avoided as long as at least one such product or service continues to be produced.

   (3)  "Common overhead costs" relate to functions of a general business nature not specifically associated with any product or group of products.  "Common overhead costs"



Ex Parte Declaration of Lee L. Selwyn
FCC WC Docket No. 02-112, CC Docket No. 00-175
June 8, 2004
Page 33 of 35

may include both fixed components as well as variable components that increase (although not necessarily in direct proportion to) the overall scale of the enterprise.

Direct costs and Joint costs shall be imputed into the price of long distance services furnished by a dominant provider of local exchange service in accordance with 2(b) following; Common Overhead costs shall be imputed into the price of long distance services furnished by a dominant provider of local exchange service in accordance with 2(c) following.

(b) For purposes of imputation for any long distance service furnished by a dominant provider of local exchange service that also provides long distance services, the following shall apply:

(1) *Access services*. For purposes of imputation, the tariff prices of all switched and special access services that would ordinarily be utilized by a section 272(a) affiliate or by a non-affiliated provider of interexchange services shall be utilized, whether or not such services are actually being utilized by the integrated provider in the specific network architecture applicable to an integrated dominant provider of local exchange service that also provides long distance services.

(2) *Non-access tariff services*. For purposes of imputation, the tariff prices applicable to all non-access local exchange services that would ordinarily be utilized by a section 272(a) affiliate or by a nonaffiliated provider of interexchange services shall be utilized, whether or not such services are actually being utilized by the integrated provider in the specific net-work architecture applicable to an integrated dominant provider of local exchange service that also provides long distance services.

(3) *Non-tariff services or functionality satisfying the Prevailing Company Pricing threshold set out at 47 CFR 32.27(d)*. For purposes of imputation, the prevailing company prices applicable to all non-tariff services of a type or providing a functionality that would be offered to and, in some cases, utilized by a section 272(a) affiliate or by a nonaffiliated provider of interexchange services, where the level of utilization by nonaffiliated entities is sufficient to satisfy the Prevailing Company Pricing threshold set out at 47 CFR 32.27(d), the Prevailing Company Price as it would be set in accordance with 47 CFR 32.27(d) shall be utilized, whether or not the precise manner in which the integrated provider furnishes such functionality to itself is the same as that which is being offered to nonaffiliated entities.

(4) *Non-tariff services, functionality, information or the beneficial transfer of assets not satisfying the Prevailing Company Pricing threshold set out at 47 CFR 32.27(d)*. Where non-tariff services, information or the beneficial transfer of assets of a type or providing a functionality that would be provided to a section 272(a) affiliate but whose usage by one or


ECONOMICS AND TECHNOLOGY, INC.

Ex Parte Declaration of Lee L. Selwyn
FCC WC Docket No. 02-112, CC Docket No. 00-175
June 8, 2004
Page 34 of 35

more nonaffiliated providers of interexchange services is not sufficient to satisfy the
Prevailing Company Pricing threshold set out at 47 CFR 32.27(d), for purposes of imputa-
tion the fair market value or the fully-distributed cost, whichever is greater, shall be used.
The fair market value of such services shall be determined by a survey of prices of com-
parable services being offered on a stand-alone basis by firms ordinarily in the business of
providing such services,

(5) *Non-tariff functionality or the beneficial transfer of information or assets not offered or
available to nonaffiliated entities*. Where the production of long distance services on an
integrated basis by a dominant local exchange service provider involves the use of non-tariff
services, functionality, information, or the beneficial transfer of assets of a type or providing
a functionality that would be provided to a section 272(a) affiliate but which is not required
to be offered to nonaffiliated providers of interexchange services, imputation shall be based
upon the fair market value or the fully-distributed cost, whichever is greater, of such service,
functionality, information, or the beneficial transfer of assets, including in particular the fair
market value of any customer proprietary network information that is used or referenced
during the course of marketing, selling, or furnishing the long distance service. The fair
market value of such services or functionality, including any customer proprietary network
information, shall be based upon the cost that a provider of interexchange services that is not
affiliated with a dominant incumbent local exchange carrier would reasonably incur in order
to obtain or to self-provide such services, functionality and/or information.

(c) Common Overhead costs shall be imputed to long distance services furnished by a dominant
provider of local exchange service on the basis of fully distributed cost.

## 3. Service-specific imputation required

(a) A dominant provider of local exchange services that is required to impute costs to its long
distance services pursuant to these rules must satisfy such imputation requirements separately
with respect to each of its retail long distance services.

(b) Where such long distance service is included within any bundled offering that also includes
any dominant local exchange services or service elements, the price of such long distance service
to which the imputation requirement is to apply shall be determined by subtracting the retail
price(s) of all component(s) of the bundle other than long distance from the total retail price of
the bundle.



ECONOMICS AND
TECHNOLOGY, INC.

Ex Parte Declaration of Lee L. Selwyn
FCC WC Docket No. 02-112, CC Docket No. 00-175
June 8, 2004
Page 35 of 35

(c) Any bundle consisting of basic local exchange (dial tone) service, local calling, vertical features, intraLATA and interLATA toll, and any other components or features must be priced, in the aggregate, at a level sufficient to recover the aggregate of all tariff prices of all tariff services (or their functional equivalents) included within the bundle together with all other imputed and directly-assigned costs applicable to the bundled offering.

**4.    Allocation of costs for upgrades or replacements**

(a)  All investments in plant, facilities or equipment  that will be jointly used by regulated and nonregulated services within five years of the date of acquisition and installation of that plant shall be presumed to be acquired primarily for the benefit of the nonregulated services, absent a showing to the contrary.

(b)  At a minimum, any increase in net investment for the replacement assets over the remaining net book cost of the plant being replaced shall be allocated to and imputed into the price floor applicable to the nonregulated service.

**5.    Cross-subsidization prohibited**

(a)  In no event shall a dominant provider of local exchange service that also provides long distance services and that has elected to operate on an integrated basis rather than providing its competitive long distance services through a separate affiliate engage in actions that constitute a cross-subsidization of its competitive long distance services from its regulated services.

(b)  For purposes of this rule, "cross-subsidization" shall be deemed to occur when in-region long distance services or nonregulated services, or telecommunications services that are treated as nonregulated services under these rules, are priced below cost by use of subsidization from customers of regulated services; or when a provider's in-region long distance services or non-regulated services derive benefits from the regulated operations without the regulated operations receiving just and reasonable compensation from in-region long distance services or nonregulated operations for the benefits derived by such in-region long distance services or nonregulated operations.



**Attachment 5**

**SBC Response to FCC Staff April 18, 2005
Initial Information and Document Request
Item 4**

**PROPRIETARY**

**Attachment 6**

**Summary of Proposed Conditions
for Approval**



Attachment 6

SUMMARY OF PROPOSED CONDITIONS FOR APPROVAL

***Conditions necessary to flow through required benefits to ratepayers***.  The §854(b)(1) deficiency could be overcome if the short-term and long-term forecasted economic benefits to be allocated to *California* ratepayers are specific and are sufficient to overcome the risks to competition and to the California economy.

- In order to satisfy the requirement that "ratepayers receive not less than 50 percent" of such benefits, at least $\*\*-million in short-term and long-term economic benefits must be provided to California ratepayers.

    - Direct, cash payment to ratepayers would most directly and efficiently satisfy this requirement.

    - An alternative approach is for the Commission to consider the $\*\*-million ratepayer share as a sort of "currency" to be "spent" on an array of mitigation measures based upon each's value to California ratepayers and to the California economy generally. Requiring that such alternate forms of "provid[ing] short-term and long-term forecasted economic benefits to ratepayers" satisfy the requirement of §854(b)(2) be subject to specific quantification will help to assure that the statutory goal is achieved.

    - Alternatively, in theory, the efficiency gains and cost savings arising from the merger could be flowed through to California ratepayers pursuant to a regulatory regime acted as a surrogate for the competitive marketplace forces (which presently do not exist). The original NRF (set forth in D.89-10-031) – *before the elimination of the sharing requirement and productivity factor, and the reclassification of many services from monopoly/non-competitive (Category 1) to emerging competitive (Category 2)* – went a long way toward achieving this result.

      The testimony (pp. \*\*-\*\*) outlines a self-executing form of regulation that, if adopted in full, would achieve this result.  This regulatory regime would need to include (at a minimum):

      - Sharing mechanism
      - Productivity factor
      - Classification and pricing flexibility rules
      - Imputation requirement
      - Cost allocation safeguards



*Proposed Conditions for Approval*

***Conditions necessary to mitigate harms to competition and to California ratepayers***.  The various competitive harms that will result when SBC's single largest competitor is taken out of the market can be offset by the adoption of various regulatory measures that would assure competitor access to SBC's network at cost-based rates.   For the protection of ratepayers, regulation will need to be adapted to recognize and specifically address the return of the California telecommunications market to a near-monopoly condition – these measures would also need to be coordinated and largely replicated in the pending Verizon-MCI merger application as well.

- Where permitted, the protections afforded by Section 271 and 272 of the Act – and those set out at PU Code §709.2 – should be revived.  Specifically:

    - The 47 U.S.C. §272(a) and Cal.  PU Code §709.2(c)(3) separate affiliate requirement should be reinstated, and made applicable to all SBC long distance and other competitive services.

    - The conduct requirements applicable to the separate affiliate and its relationship to SBC's ILEC operations at 47 U.S.C. 272(b)(1) through (b)(5) and at Cal. Public Utilities Code §709.2(c)(1) and (c)(2) should be reinstated and strictly enforced.

    - An imputation rule applicable to all use of ILEC services by any SBC affiliate or incorporated into any competitive services provided by SBC California should be adopted and strictly enforced.

    - Measures necessary to assure, going forward following the merger, "that there is no anticompetitive behavior by the local exchange telephone corporation, including unfair use of subscriber information or unfair use of customer contacts generated by the local exchange telephone corporation's provision of local exchange telephone service" per Cal.  PU Code §709.2(c)(2), and "that there is no substantial possibility of harm to the competitive intrastate interexchange telecommunications markets" per Cal.  PU Code §709.2(c)(4), should be adopted and strictly enforced.

- Divestiture of AT&T's consumer local and long distance business, if subject to additional conditions that ensured that the purchaser/divestee had a reasonable chance of competing successfully with SBC.  To do that, *all* of the specific regulatory impediments that operated to drive AT&T out of the consumer market would need to be rescinded, including:

    - The purchaser/divestee would need to be able to obtain UNE-Ps at TELRIC-based rates from SBC.



*Proposed Conditions for Approval*

- SBC would need to be precluded from pursuing the (now former) AT&T stand-alone long distance customers that would be included in the divestiture.

- The post-merger SBC would have to be expressly precluded and enjoined from seeking to reimpose those regulatory changes subsequent to the closing of the merger or the divestiture.

- So as not to discourage entry and expansion by other competitors, these same conditions would have to apply to all competing carriers, not just to the divestee.

• Competitive safeguards must remain in full force and effect until sufficient *facilities-based* competition has actually developed to the point where SBC's market power as the incumbent LEC is diminished to the point where it can no longer dictate prices or control essential facilities. The Commission should identify specific metrics that would indicate that this condition has been acheived.

• The combined company should be subject to specific competitive safeguards to limit its potential market dominance in the California Internet access market. Specifically:

- SBC should be required as a merger approval condition to offer DSL line sharing at TELRIC-based UNE rates to competing providers of DSL services; and

- SBC should as a merger approval condition be made to discontinue their practice of requiring consumers to buy ILEC-provided local service as a condition of purchasing ILEC DSL services ("naked DSL").

***Conditions to mitigate harms to employment and to the California economy***. The various adverse impacts upon existing SBC and AT&T employees and the California economy overall resulting from the loss of jobs and the shifting of SBC and/or AT&T activities that now take place in California to other parts of the country can be addressed and minimized through specific job- and employee benefits-retention commitments that would need to be accepted by the Joint Applicants as conditions for approval.

• An example of one such commitment would be to require the merged company to limit California job cuts to a specified maximum percentage of total job cuts. Limiting California job cuts to, for example, 5% of total SBC headcount reductions would save some ** California jobs and bring the negative impact upon the California economy down to only $**-billion.

A6-3



**Attachment 7**


**A. 05-02-027**
**Discovery Responses**
**Referenced in Reply Testimony**
**of Lee L. Selwyn**


**PROPRIETARY**

# INDEX TO ATTACHMENT 7

AT&T Amended and Supplemental Response to TURN 1-1

SBC Response to TURN 1-4, "000329-000401 CONFIDENTIAL Consumer Market Share - Feb 2005.xls," Consumer Analytics & Research Customer and Product Share Report - Consumer (February 2005), sheets "Local-DA," "LD," and "Internet."

AT&T Response to TURN 1-8, Bates ATCA000144, ATCA4000179

SBC Response to TURN 1-8, SBC/AT&T - EYES ONLY 0220, 0231-0232, 0280, 0334

AT&T Response to TURN 1-20

SBC Response to TURN 1-20

SBC Response to TURN 7-23, Bates 014033, 014047

SBC Supplemental Response to ORA 6-13

SBC Supplemental Response to ORA 6-14

SBC Supplemental Response to ORA 6-15

SBC Supplemental Response to ORA 6-16

SBC Response to ORA 11-1

SBC Supplemental Response to ORA 12-13, SBC/AT&T - EYES ONLY 01208, 01212

SBC Supplemental Response to ORA 13-9



ECONOMICS AND TECHNOLOGY, INC.

**Attachment 8**

**WC Docket No. 05-25**
**FCC Staff Discovery Responses**
**Referenced in Reply Testimony**
**of Lee L. Selwyn**

**PROPRIETARY**

# INDEX TO ATTACHMENT 8

SBC Supplemental Response to ORA 6-8, Bates SBCFCC000419716 , SBCFCC000419720

SBC Supplemental Response to ORA 6-8, Bates SBCFCC000232103, SBCFCC000232184, SBCFCC000232757

SBC Supplemental Response to ORA 6-8, Bates SBCFCC000419716, SBCFCC000419720

SBC Supplemental Response to ORA 6-8, Bates SBCFCC000451949, SBCFCC000451986 - SBCFCC000451987

SBC Supplemental Response to ORA 6-8, Bates SBCFCC000450477

