Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  No, and in fact there is a considerable amount of uncertainty as whether VoIP will prove to

2      be a more efficient technology than circuit-switched telephony once the numerous pecuniary

3      distortions between VoIP and circuit-switched services are eliminated.  Interest in VoIP

4      services has been escalating dramatically over the past several years as the FCC and state

5      commissions grapple with unresolved regulatory concerns arising from VoIP providers'

6      efforts to integrate their services into the public switched telephone network.  To be sure,

7      some of the claims being made about VoIP are true – VoIP services do offer some

8      functionalities that are not presently available with traditional voice services, and VoIP

9      services are *currently* less expensive to purchase than traditional voice services – *provided*

10     *that the customer already subscribes to high-speed Internet access via DSL or cable modem*

11     *services.*[124]  However, much of the apparent price advantage available to VoIP providers vis-

12     a-vis wireline carriers stems from pecuniary factors, *all of which are in the process of being*

13     *eliminated.*  Specifically:

14

15     •   VoIP providers generally do not pay either intrastate or interstate switched access

16         charges on calls terminated to or originated from wireline ILEC and CLC customers.

17

18     •   VoIP providers are not required to contribute to federal or state universal service funding

19         mechanisms (although some do make nominal voluntary contributions).

20

---

124.  At current rates, the customer typically has to expend $30-$45 to get DSL or cable
modem high-speed Internet access.

ETI ECONOMICS AND
TECHNOLOGY, INC.

REDACTED – PUBLIC VERSION

Cal. PUC A.05-04-020                LEE L.  SELWYN

1    •    VoIP providers do not currently provide access to E-911 emergency reporting services

2         that is equivalent to that being provided by ILECs and CLCs, and VoIP providers do not

3         currently contribute to the cost of maintaining Public Safety Access Points (PSAPs) or

4         other public service programs (such as dual-party relay services and CALEA), and may

5         not be collecting state sales taxes.

6

7    These costs are not insignificant.  Interexchange carriers such as MCI are required to pay as

8    much as 1.8 cents per minute at both the originating and terminating end of each intrastate

9    long distance call they carry within California, and approximately 1.1 cents per minute for

10   each interstate long distance call.  VoIP providers typically gain access to the public switched

11   network via interconnections with CLCs that exchange traffic with ILECs under local

12   reciprocal compensation arrangements, typically involving payments of less than one-tenth

13   of one cent at the terminating end of a VoIP-originated call.

14

15   Customers of California LECs are required to pay $0.47 for the Federal Universal Service

16   Fee (and 10.02% more on any additional interstate services such as long distance) and are

17   required to pay 4.29% in California Universal Service surcharges, and a 0.3% surcharge for

18   California Relay Service.  Additionally these customers may face surcharges for E-911

19   access and CALEA.  Some VoIP providers impose a "regulatory fee" of $1.50 per month,

20   which they use to make voluntary contributions to certain (but not all) of these programs.

21   There is simply no way to predict how VoIP would fare vis-a-vis wireline services once these

22   distortions are removed, and certainly there is no basis whatsoever to extrapolate the

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    *potential* growth of VoIP services from the extremely limited early-adopter demand that

2    exists at this time.

3

4  Q.  Are there other differences between VoIP and traditional circuit-switched services that make

5      it impossible to predict the extent to which VoIP will receive widespread public acceptance

6      as a close substitute for wireline services?

7

8  A.  Yes.  VoIP does not provide a quality of service that is even close to that of traditional

9      circuit-switched wireline services.  While these qualitative differences can be overcome, the

10     cost of bringing VoIP up to circuit-switched quality standards is also not fully known or

11     predictable at this time.  VoIP's ongoing service quality deficiencies were highlighted in a

12     recent column in *PC Magazine* by *PC's* longtime technology columnist John Dvorak:

13

14         [I]f you're sitting on a real T1 line rather than a DSL connection, the quality [of a
15         VoIP call] is usually identical to the switched service.  That's because the T1 line is
16         a different level of service than flaky DSL. ... But the T1 is still the premium-level
17         service, and the only line that appears to work flawlessly with VoIP systems all the
18         time. ... [W]ith the current Internet slogging along under constant denial-of-service
19         attacks and overloaded with spurious e-mail transmissions, the idea that VoIP is
20         going to push aside land lines any time soon is wishful thinking.  And now
21         phonecos such as Verizon are selling the VoIP equipment themselves, while
22         indicating that if you use a VoIP phone that hooks to the company's switched
23         network you are going to have to pay them – unless, of course, you use the
24         company's VoIP service.[125]
25

26     Most of the existing consumer VoIP traffic is being carried over the public Internet, which it

27     contends for capacity along with a myriad of other applications, some of which, like VoIP,

---

125.  Dvorak, John, "The Problem with VoIP Phones," *PC Magazine*, January 24, 2005.

129

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    require large amounts of bandwidth and experience serious service quality problems when

2    individual packets are delayed or lost.  As presently configured, the public Internet could not

3    handle the volume of VoIP traffic that would develop if VoIP were ever to become a serious

4    *mainstream* competitor of circuit-switched telephony.

5

6    While start-up VoIP providers such as Vonage, Packet8, VoIP.net and Broadvox Direct have

7    all adopted business models involving the public Internet as their principal transport medium,

8    any large-scale roll-out of VoIP in the consumer market – or any roll-out of VoIP in the

9    enterprise market – will involve the use of dedicated IP networks and *not* the public Internet.

10   Certainly this is the direction that MCI, Verizon, Comcast and others are pursuing.  Another

11   technological solution is the use of premium arrangements whereby service providers can

12   purchase priority transmission of designated packets so as to minimize latency problems

13   (which produce "clipping" and other voice quality distortions).  Also, existing consumer-

14   level high-speed Internet access services – ADSL and cable modem – are themselves subject

15   to extreme variability in effective data transmission rates based upon local traffic conditions.

16   VoIP quality can become seriously degraded if, for example, there is a lot of demand

17   contending for capacity on the same cable trunk along a given street.

18

19   Q.  But won't these problems ultimately be resolved?

20

21   A.  Yes, they probably will, but not without potentially substantial additional investment and

22       ongoing cost.  We cannot predict with any sort of certainty what these costs may be, or how

23       they would compare with the costs of traditional circuit-switched technology.  What we can

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                      LEE L.  SELWYN

1    say with considerable certainty is that the existing quantity of consumer mass market VoIP

2    demand involving the use of consumer broadband access services and the public Internet is

3    not *scalable* were the aggregate demand for VoIP to increase to 10%, 20% or more of the

4    total voice telephony market.  For now, VoIP is to traditional circuit-switched telephony as

5    the Segway scooter is to the traditional automobile.  Both may be able to get you from point

6    A to point B (if the distance involved is fairly small), but (contrary to the early predictions of

7    its inventor), nobody seriously expects the Segway to replace the automobile any time soon,

8    and no one would seriously claim that the Segway and the automobile are in the same

9    product market.

10

11   Q.   §1.521 of the *Merger Guidelines* state that "if a new technology that is important to long-

12        term competitive viability is available to other firms in the market, *but is not available to a*

13        *particular firm*, the Agency may conclude that the historical market share of that firm

14        overstates its future competitive significance."  Wouldn't this require that in order to be

15        considered in determining the post-merger Verizon market share, VoIP technology would

16        have to *not be available* to the post-merger Verizon?

17

18   A.   That is indeed correct, and this is an extremely important point.  VoIP technology clearly *is*

19        available to a post-merger Verizon, and if VoIP actually becomes a serious factor in the voice

20        telephony market, the post-merger Verizon will clearly be a major player, if not the dominant

21        mass market VoIP provider within its ILEC footprint.  Verizon already provides <<BEGIN

22        VZ/MCI PROPRIETARY          END VZ/MCI PROPRIETARY>> of high-speed Internet

131

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    access within its California operating areas,[126] and its position in the broadband access

2    market will only be strengthened through its vertical integration with the MCI Tier 1 Internet

3    backbone network.  So even if at some point VoIP and circuit-switched services are in the

4    same relevant product market,  §1.521 of the *Merger Guidelines* would then require that

5    Verizon's VoIP and circuit-switched shares be aggregated for purposes of calculating the

6    post-merger Verizon's share of that product market and its HHI.  Either way, the presence of

7    VoIP does not materially reduce the post-merger Verizon's share of the voice telephony

8    product market or the extremely high level of concentration that will result when the current

9    MCI and Verizon shares are combined.

10

11  Q.  One of the specific qualitative factors differentiating VoIP from circuit-switched services that

12    you had mentioned earlier involves access to E-911 emergency reporting services.  Does

13    VoIP currently offer the same type of E-911 access as traditional circuit-switched services?

14

15  A.  No, it does not.  At the present time, VoIP access to E-911, where it is provided, is decidedly

16    inferior to the level of access and security offered by traditional circuit-switched services.

17    Some VoIP services, such as Vonage, offer consumers the ability to dial 911 from their VoIP

18    phone and be connected to a local PSAP.  However, unlike traditional wireline service, where

19    a call placed to 911 automatically connects the caller to the *correct* PSAP serving the

20    community in which the customer resides and automatically provides the E-911 operator

21    with information as to the caller's location, a Vonage currently requires its subscribers to

---

126.  See fn. 58, *supra.*

132

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    *affirmatively* identify their physical location (which typically has no direct correspondence

2    with the telephone number assigned to them), which Vonage then uses to determine the

3    correct PSAP (for that specific customer location) and route E-911 calls to it.  That is all that

4    the FCC currently requires.[127]

5

6    Q.    How does this requirement differ from the process by which traditional circuit-switched local

7          telephone service is connected to the correct PSAP?

8

9    A.    When a customer subscribes to local phone service from an ILEC, a CLC or a cable

10         company, the *provider* is responsible for identifying the correct PSAP for that customer and

11         entering this information into its E-911 routing tables.  It is also responsible for populating

12         the customer location information with the PSAP's E-911 database.  These activities are

13         entirely *passive* to the customer.  Stand-alone VoIP providers like Vonage and Packet8,

14         which do not provide the *physical broadband connectivity* to the customer, have no

15         automatic means of identifying the actual physical location at which the VoIP service is

16         being provided, and thus must rely upon the *customer* to provide this information to them.

17         Moreover, to the extent that customers avail themselves of the "portability" feature of these

18         services, which allows them to use their VoIP Telephone Adapter from anywhere in the

19         world that a broadband Internet connection is available, a customer's failure to affirmatively

---

127.  Even that appears to face delays.  According to Senator Sununu, "I believe the public understands the limitations of VoIP... Everybody competing in this industry understands that there is going to have to be some kind of waivers [ from the FCC's 120-day E911 compliance mandate]" As quoted in "Sununu Says VoIP 911 Waivers Likely, Questions Mandates," *Telecommunications Reports*, August 1, 2005.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    advise the VoIP provider each time the customer's physical location changes will produce

2    two outcomes both of which are entirely unacceptable from a public safety standpoint: First,

3    if the customer dials 911, the call will be routed to the PSAP associated with the last location

4    for which the customer had provided location information.  That PSAP will get the call and

5    will dispatch emergency assistance to the specified address – which will not be the correct

6    address because the customer is not calling from that location – and the customer will not

7    receive the needed emergency assistance.  Second, whatever emergency services are

8    dispatched will be sent on a wild goose chase, since no emergency will have occurred at that

9    location.

10

11   Suppose that a Vonage customer living in Oakland – and who has registered his Oakland

12   address with Vonage – takes his Vonage Telephone Adapter with him on a trip to Seattle, but

13   neglects to advise Vonage as to the change in location.  While in Seattle, he experiences

14   chest pains, dials 911 on his Vonage phone, and asks for an ambulance.  The call will be

15   routed to the Oakland PSAP, which will dispatch an ambulance to the caller's Oakland

16   address.  A wasted ambulance trip (since there's no emergency at that address) which could

17   result in a delay in responding to another – and real – emergency in Oakland, and no

18   ambulance for the stricken man in Seattle.

19

20   Q.  What is the reason for this limitation on VoIP E-911 access?

21

22   A.  The problem stems from the basic architecture of the Internet and the lack of any specific

23   relationship between a given IP address (which is assigned by the ISP to the Internet service

134

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                       LEE L.  SELWYN

1    subscriber) and the VoIP telephone number, which is assigned by the VoIP service provider.

2    While in theory an ISP may (in many cases) be able to identify the physical location at which

3    a given IP address has been assigned, PSAPs use standard 10-digit North American

4    Numbering Plan (NANP) telephone numbers as the search key for their customer/location

5    databases, and there is no direct means (at least for the present) of associating a VoIP phone

6    number with a specific IP address or customer location.

7

8    Additionally, one of the unique features being offered by many VoIP providers is the ability

9    to have the service travel with the user from place to place (referred to as "nomadic" service).

10   This is accomplished by taking the VoIP Telephone Adapter or VoIP-equipped handset and

11   simply plugging it in to any high-speed Internet access line, such as that which is provided at

12   many hotels.  Vonage offers a "virtual" VoIP phone service using the customer's laptop

13   computer, which may even access the Internet wirelessly where a Wi-Fi "hot spot" is

14   available.  In addition, many VoIP providers allow the customer to select a phone number in

15   an area code or location distant from where the service would ordinarily be used, further

16   complicating the ability of a PSAP to precisely locate the caller placing a 911 call.

17

18   Q.   How is the association between a VoIP phone number and the appropriate PSAP established?

19

20   A.   Under the existing serving arrangement, the VoIP *customer* is responsible for informing the

21   VoIP service provider as to the customer's physical location.  Using that information, the

22   VoIP service provider determines the appropriate PSAP and enters the appropriate routing

23   data into its service platform such that a 911 call dialed by that customer will be delivered to

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

1    the appropriate PSAP.  This process of activating 911 service typically does not take place

2    immediately upon the receipt of the physical location information from the customer, and can

3    take as long as 48 hours to complete.  For this reason, up to now it is now been practical for

4    VoIP to offer 911 access to customers who move their VoIP service from place to place.

5

6    Just recently, the FCC issued an order requiring VoIP providers, within 120 days, to offer E-

7    911 service as a standard feature of interconnected VoIP service.  However, rather than

8    eliminate the difference between wireline and VoIP E-911, the FCC's action actually serves

9    to reinforce the substantial inferiority of VoIP E-911 access.  As a threshold matter, the very

10   fact that the FCC has seen fit to step in and regulate this issue is a clear indication that, at the

11   present time, VoIP E-911 service is not functionally equivalent to what customers have come

12   to expect from their wireline service.  Moreover, while on its face the FCC's order might

13   appear to address some of the safety concerns surrounding VoIP E-911 service, it remains to

14   be seen whether VoIP providers can or will be able to implement the requirements of the

15   order.  And even if they comply in all respects with the new requirements, VoIP and wireline

16   E-911 will be far from equivalent.  Specifically, under the new regulations, VoIP *customers*

17   still have the responsibility to identify their physical location to the VoIP provider and to

18   notify the VoIP provider when that physical location changes.  If the customer does not

19   provide accurate information, or fails to provide a new location when the service is

20   physically relocated, or fails to provide any location information at all, access to the correct

21   PSAP will not be provided.

22

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    Even assuming that customers take their responsibility seriously and are religious in

2    reporting locations and changes of locations to their VoIP provider, VoIP providers may still

3    not be able to create a workable solution that effectively duplicates the E-911 capabilities of

4    traditional wireline service, especially within the short time frame set forth by the FCC.  Two

5    recent articles in the *Wall Street Journal* highlight the costs and difficulties associated with

6    implementing functional E-911 service for non-wireline phones in a timely manner. [128]  Given

7    the hodge-podge of state and federal regulations, a serious lack of funding, and technological

8    challenges, it hardly seems surprising that of the nation's 6,000 E-911 call centers, "only

9    41% of them can locate cell phones"[129] let alone Internet-based phones.  The *Journal*

10   continues, suggesting that "it would take $8-billion and at least four more years to modernize

11   the nation's 911 system for wireless calls.  And that doesn't include the costs of updating the

12   system to handle Internet phone services."  The fact that wireless E-911 is still far from

13   reliable is yet another reason why wireless – as well as VoIP – cannot be considered a

14   sufficiently close substitute for traditional wireline services to bring them into the same

15   product market.

16

17  Q.  Is there a solution that would make VoIP E911 equivalent to circuit-switched E911?

18

---

128.  "No Signal, Cellphone Hangup: When You Dial 911, Can Help Find You?," *The Wall Street Journal*, May 12, 2005, at page A1 ("*No Signal*"); "Tests Show Many Cellphone Calls to 911 Go Unlocated," *The Wall Street Journal*, May 19, 2005, at page B1.

129.  *Id.*

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   A.   Perhaps, but it would probably work only where the VoIP provider is also the customer's

2        broadband service provider – i.e., where VoIP service is provided either by the ILEC that

3        provides the customer's DSL service or the cable company that provides the customer's

4        cable modem service.  Other providers of VoIP services, such as Vonage, Packet8, and even

5        AT&T's CallVantage VoIP service, would not be able to passively identify the customer's

6        location at the time that a call to 911 is dialed.

7

8        The DSL or cable modem service provider can identify the specific service location from the

9        IP address assigned to the customer.  So if Verizon or Comcast is both the broadband service

10       and VoIP provider, it can (in theory) determine the customer's location (when the call to 911

11       is placed) from the IP address it had assigned to the customer.  Independent VoIP providers

12       can similarly determine the caller's IP address, but do not have the ability to translate that IP

13       address into a street address.  In fact, the independent VoIP provider does not even know the

14       identify of its customer's broadband service provider.  So for it to translate the IP address

15       into a street address, it would first have to identify (from the IP address) the broadband

16       service provider, then transmit a message to that provider containing the caller's IP address,

17       wait for a response with the street address, then determine from that street address the

18       appropriate PSAP, and then format and deliver a message to that PSAP containing all of this

19       information.  PSAPs are not even set up to receive this type of information.  Currently a

20       PSAP maintains a fixed database keyed to phone numbers.  When a 911 call comes in, the

21       calling number is used to retrieve the customer location information.  However, because most

22       consumer broadband services utilize so-called "dynamic IP addresses" that may change from

23       session to session, the transmittal of location information from the VoIP provider to the

138

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  PSAP would necessary have to occur in real time.  None of this will happen any time soon, if

2  it ever happens at all.

3

4  Q.  What are the potential consequences of this limitation on the ability of some VoIP providers

5      to offer reliable E-911 access on the development of VoIP as a true competitive alternative to

6      circuit-switched telephony?

7

8  A.  If independent VoIP providers are not able to achieve full E-911 parity and are ultimately

9      forced to exit the market, then the VoIP "alternative" will be available only from the ILEC

10     and from the local cable operator.  ILEC VoIP services are not – and cannot be considered as

11     – "intermodal alternatives" to ILEC circuit-switched services, thus leaving cable as the only

12     competing provider.

13

14 Q.  Prof. Rubinfeld cites certain third-party forecasts that suggest strong growth in the use of

15     VoIP services in the consumer market.  What weight, if any, should be afforded these third-

16     party studies?

17

18 A.  Like most market forecasts, these studies are highly speculative and also highly optimistic.

19     But even then, it would appear that Prof. Rubinfeld has misinterpreted the results that such

20     studies purport to present.

21

22 Q.  How so?

23

139

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

1  A.  Consider the Jupiter Research study that Prof. Rubinfeld cites:  "Jupiter Research predicts

2       that 10 percent of all U.S. households will be using VoIP telephony by 2009."[130]  In fact,

3       Jupiter Research says a good deal more than that:

4
5           JupiterResearch ... partitioned the target market into single line and multiple line
6           households, based on the belief that secondary lines are more like [sic] to be
7           converted to VoIP service.
8

9       In fact, of the 12.1-million households that Jupiter predicts will be "using" VoIP in 2009,

10      only 6.7-million – i.e., slightly more than half – are expected to be using VoIP as their

11      *primary* telephone service.[131]

12

13      Additionally, Prof. Rubinfeld appears to have overlooked several of Jupiter's specific

14      observations regarding the development of VoIP in the mass market:

15
16          JupiterResearch believes that although they jump-started the market, firms like
17          Vonage, VoiceGlo, and Packet8 will be highly challenged to stay competitive. They
18          face competitors with far better brands and marketing clout, which actually own the
19          last-mile connection. At present, all the ILECs except Qwest require DSL customers
20          to purchase a voice line as a perquisite to getting DSL. Barring radical change at the
21          FCC, regulators are unlikely to force them to offer "naked DSL," and
22          JupiterResearch does not expect other ILECs voluntarily to follow Qwest's lead.
23
24          As the cable operators roll out their own voice services, they too have every
25          incentive to create bundles that disadvantage "bring your own access" broadband
26          telephony competitors. Last mile owners could go so far as to delay, impede, or
27          prevent connections to independent telephony providers; however, JupiterResearch

---

130. *Rubinfeld Declaration*, at para. 86.

131. Jupiter Research, *Broadband Telephony*, Volume 2, 2004, at 18, and accompanying
Jupiter Research Voice over IP Model.

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED – PUBLIC VERSION

1  believes this is both unwise (in that it will spark consumer, and perhaps regulatory,
2  backlash) and unnecessary. Strategic pricing of bundled services will create ample
3  incentives to steer consumers toward last mile providers.[132]
4

5  And Jupiter offers some fairly pointed advice to ILECs seeking to respond to competition

6  from VoIP:

7
8      Emphasize Traditional Telephony Strengths to Deter Service Defections
9
10     The rise of broadband telephony leads to a mixed mandate for ILECs.  On the one
11     hand, they should stoke quality and reliability concerns about VoIP, but on the other
12     they should start to embrace and offer VoIP services of their own.
13
14     Create fears to deter primary line replacement. ILECs should stress their reliability
15     and service quality to counter the broadband telephony value proposition.  Asked to
16     prioritize the most important benefits of landline telephony, more broadband
17     consumers chose reliability and service quality than chose value for money or
18     included features.  Emphasizing blackouts and 911 calls will focus consumers on the
19     strengths of the traditional telephone network.[133]
20

21  Predictions of VoIP development and growth are just that – predictions, not facts.  According

22  to the Jupiter study, outright replacement of traditional ILEC circuit-switched *primary* local

23  telephone services with VoIP will occur in only about 6.3% of all US households with

24  telephone service by 2009, and a sizable portion of that will still be provided by the ILEC or

25  by a local cable operator.  At best, and after four more years, Jupiter's forecast of VoIP-for-

26  wireline substitution would put us roughly where wireless substitution is today – at an

27  entirely marginal and incidental level, and certainly not at a level sufficient to constrain

28  Verizon pricing of traditional telephone services.

---

132.  *Id*., at 8.

133.  *Id.*, at 13.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1  **Wi-Fi, Wi-Max, and other fixed wireless services do not serve as legitimate competitors to**
2  **DSL or cable modem services, especially at the residential and small business level.**
3

4  Q.  In a discussion of Wi-Fi and Wi-Max technology, Prof. Rubinfeld suggests that these service

5       can substitute for a DSL or cable modem connection, or in the case of Wi-Max, a T-1 line.

6       Do you agree that these and other fixed wireless alternatives are sufficiently close substitutes

7       for DSL and cable modem service to satisfy the *Merger Guidelines*' requirements for

8       inclusion in the same product market?

9

10 A.  No.  Today few residential (or business, for that matter) customers are served by wireless

11      Internet service providers, which face severe speed, range and reliability issues, among

12      others.[134]  Recently, the industry has made significant statements about the coming of

13      "WiMax," the next-generation of wireless data services that is supposed to bring increased

14      security, range, and reliability to fixed wireless services.  The development, however, is

15      being driven by large carriers for business customers, a very different focus than that of

16      Wireless Internet Service Providers (WISPs) that serve residential and small business users.

17      Issues for residential consumers, such as price, interoperability, and vendor availability are

18      unlikely to be addressed by this technology for several years.  As one analyst recently noted,

19      "In short, WiMAX will not likely be anything like a panacea for WISPs, especially in the

---

134.  For example, Verizon Wireless' "broadband" service operates at 500kbps, compared
to the 1-3 mbps speed of most cable modems and DSL.

142

**REDACTED – PUBLIC VERSION**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    short term, and it could easily be as late as mid-2006 before WiMAX systems truly suitable

2    for WISPs become available."[135]

3

4  Q.  What about initiatives by cities or towns – such as San Francisco – that have considered

5    installing municipal wireless broadband services that would be available to residents and

6    business at low or no cost?

7

8  A.  While its true that such plans have been floated, the RBOCs – *including Verizon in particular*

9    – have moved to prevent this competition.  According to the *New York Times*:

10
11       Pushed by industry lobbyists, lawmakers in Kansas, Ohio, Texas, Indiana, Iowa,
12       Oregon, and other states have proposed legislation to restrict or prohibit local
13       governments from offering telecommunications services.  Nearly a dozen states
14       already enacted some restrictions.[136]
15

16    Assuming that Verizon and other ILECs have similar political power in other states, it

17    appears that low-cost or free wireless data services may be indefinitely postponed. Such

18    activities are, of course, entirely consistent with other situations (e.g., with respect to UNE-P)

19    where the ILECs have worked to undermine competition at the same time that they rely upon

20    competitors' existence as support for their claim of eroding ILEC market power.

21

---

135.  Steve Stroh, "WISP Heresies," *ISP Plant*, December 24, 2004, available at
http://www.isp-planet.com/fixed_wireless/business/2004/stroh_heresies.html, (accessed May 26,
2005).

136.  James Dao, "Philadelphia Hopes to Lead the Charge to Wireless Future," *The New York Times*, February 17, 2005.

143

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1   **The identifiable adverse impact upon competition from the merger must not be**
2   **subordinated to speculative claims as to future changes in market structure due to the**
3   **growth of putative intermodal alternatives**.
4
5   Q.   Is this the first time that claims of "intermodal" competition have been advanced by Verizon?
6
7   A.   No.  In fact, Verizon and the other RBOCs have certainly raised the "red flag" of intermodal
8        competition before.  In 2002 during the FCC's *Triennial Review* proceeding, the four RBOCs
9        filed the "UNE Fact Report" which details a panoply of purported intermodal competition
10       from cable and wireless providers.  The "Fact Report" presents many of the same claims as
11       Prof. Rubinfeld makes in his testimony here, including RBOC access line loss, and the large
12       jump in wireless subscribership levels.
13
14  Q.   After three years, what has come of those claims of widespread intermodal competition?
15
16  A.   Despite these claims of widespread technological substitution originally made three years
17       ago and repeated on numerous occasions since then, RBOC wireline services remain quite
18       robust and face very little competition at all.  As I noted above, net additions of cable
19       telephony customers have slowed dramatically over the past several years, and although
20       wireless subscribership continues to grow, there is no corresponding decrease in *primary*
21       wireline service access lines.  The claims of intermodal competition, both then and now,
22       wear thin with the evidence that clearly shows that, except for a few "early adopters,"
23       consumers in general are not substituting new technologies for basic wireline telephone
24       service.

144

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1  Q.  How will the landscape of intermodal competition change after the proposed merger of

2      Verizon and MCI?

3

4  A.  Regardless of the development of intermodal alternatives in the future, the post-merger

5      Verizon will maintain a major presence as a retail provider of "intermodal" services such as

6      wireless and VoIP and as a wholesale provider of essential inputs to other providers of

7      intermodal services or to customers desiring to utilize intermodal services.  Verizon's

8      disingenuous claims of facing intermodal competition will remain just as baseless – or

9      become even more ludicrous to the extent that the post-merger Verizon is itself a major

10     provider of these "alternative" services.  For all of these reasons, the so-called intermodal

11     competition identified by the Joint Applicants is not properly included within the relevant

12     product market and, as such, must not be considered as diminishing the overwhelming

13     market concentration that will surely result if the Verizon/MCI merger is permitted to go

14     forward.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1        VERTICAL INTEGRATION ISSUES ARISING FROM THE PROPOSED MERGER

2

3    **Both Verizon and MCI currently purchase massive quantities of services in markets**
4    **currently served by the other as inputs to support their own activities in downstream**
5    **markets.**
6

7    Q.   Dr. Selwyn, you have discussed how the proposed Verizon/MCI merger differs from

8         previous RBOC mergers in its horizontal impacts.  Are there also vertical impacts of this

9         merger that were not seen in the earlier RBOC mergers?

10

11   A.   Yes.   In those previous mergers, the firms did not for the most part either compete with each

12        other or engage in upstream or downstream transactions with each other.  Their respective

13        service areas were entirely non-overlapping and, most importantly, they did not compete with

14        each other to any measurable degree outside of their own operating areas.  The proposed

15        merger involves, for the first time, extensive *vertical* integration of what are currently

16        supplier-purchaser relationships.

17

18        The result of such integration will be to diminish competition in wholesale network services

19        and other supplier markets.  In addition to the extensive horizontal competition that presently

20        exists between Verizon and MCI, the two companies also engage in an extensive range of

21        *vertical* transactions both with each other and with other carriers involving both upstream

22        and downstream activities.  In order to provide both local and interexchange services to

23        customers located within the Verizon local service footprint, MCI must purchase switched

24        and special access services and unbundled network elements ("UNEs") from Verizon; in fact,

146

ECONOMICS AND
TECHNOLOGY, INC.

1    MCI is probably Verizon's *second largest customer* for these services.  Access charge

2    payments to incumbent LECs may represent as much as 80% of the total network costs of

3    producing switched long distance service, and in the range of 50% of the price of long

4    distance services paid by enterprise customers (which primarily utilize special access

5    service).

6

7    Once joined with Verizon, MCI would no longer have to "pay" for switched and special

8    access services within the Verizon operating areas, a benefit that no other carrier could

9    possibly match, given Verizon's unassailable dominance over local exchange and access

10   services within its region, affording the merged entity a formidable competitive advantage

11   vis-à-vis rival carriers.  And following the merger, Verizon's cash purchases of

12   interexchange network services from nonaffiliated wholesale IXCs for downstream resale to

13   its end-user long distance customers would be replaced by non-cash transfers of similar

14   services provided over the MCI network; again, a benefit no other carrier could match, given

15   Verizon's near-monopoly in its local ILEC serving areas.  The very reasons why Verizon

16   sees advantage in acquiring MCI impose formidable competitive disadvantages and barriers

17   to rival carriers – including other RBOCs – virtually assuring that the "all distance" US

18   telecom industry will devolve into geographically-based regional monopolies.

19

147

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1  **The vertical integration of the Verizon local access and MCI interexchange network**
2  **infrastructures will diminish competition in wholesale markets and provide Verizon with**
3  **the means to further extend its local service market power into adjacent and currently**
4  **competitive markets**.

5

6  Q.   What impact will the vertical integration of Verizon and MCI have on competition in the

7       affected upstream and downstream markets?

8

9  A.   The proposed Verizon/MCI merger raises serious concerns regarding both horizontal and

10      vertical concentration and anticompetitive effects, since the Verizon ILECs possess dominant

11      market power over important upstream inputs that the merged Verizon/MCI and other

12      competitors will continue to need to produce downstream retail services.

13

14      With regard to horizontal analysis, Verizon and MCI compete directly with one another in a

15      number of important markets, including all three of the local market segments recently

16      identified by the FCC in its *Triennial Review Order*[137] and *Triennial Review Remand*

17      *Order*[138]: (1) mass market, consisting of residential services and very small business services;

---

137.  Federal Communications Commission, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338; Federal Communications Commission, *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-989; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147 (*TRR Proceeding*), *Report and Order on Remand*, 18 FCC Rcd 16978 ("*TRO*").

138.  Federal Communications Commission, *TRR Proceeding*, *Order On Remand*, 2005 FCC LEXIS 912 ("*TRRO*").

**REDACTED – PUBLIC VERSION**



Cal. PUC A.05-04-020                    LEE L. SELWYN

1    (2) small enterprise market; and (3) large enterprise market.[139]  Competitive conditions must

2    be analyzed in each of these three segments separately, and separately by geographic area.[140]

3

4    The vertical market problems raised by this proposed merger, however, are potentially even

5    more serious.  Many competitive and putatively competitive telecommunications service

6    markets including those in which MCI is a powerful competitor today are utterly dependent

7    upon obtaining access to or use of local distribution and interoffice transport facilities that in

8    the vast majority of cases within the Verizon local region are owned and controlled on a

9    monopoly or near-monopoly basis by the Verizon ILEC operating companies.[141]  When

10   Verizon or, if the merger is allowed to proceed, MCI provides a competitive service such as

11   long distance or Internet access to an Verizon ILEC local service customer either out of a

12   separate corporate affiliate or out of a separate business unit within the ILEC entity itself,

13   such access is obtained as an internal corporate transaction, in which no cash changes hands

14   and which has no effect upon the parent company's "bottom line."  However, when

---

139. *TRO*, at para. 124.

140. *See*, e.g., *TRO*, at para. 130; Federal Communications Commission, *Comsat Corporation Petition Pursuant to Section 10(c) of the Communications Act of 1934, as amended, for Forbearance from Dominant Carrier Regulation and for Reclassification as a Non-Dominant Carrier*, CC Docket No. 80-634, *Order and Notice of Proposed Rulemaking*, FCC No. 98-78, 13 FCC Rcd 14083 (1998).  The Courts have recognized geographic markets in *United States Telecom Association v. FCC*, 290 F.3d at 422.

141. In fact, and as the Commission has expressly recognized, even where the access is provided by a CLC, the CLC has the ability to exercise monopoly power with respect to "its own local service customers."  Federal Communications Commission, *MCI Corp., Complainant, v. Business Telecom, Inc., Defendant*, EB-01-MD-001, *Sprint Communications Company, L.P., Complainant, v. Business Telecom, Inc., Defendant*, EB-01-MD-002, *Memorandum Opinion and Order*, 16 FCC Rcd 12312 (2001).

149

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1      unaffiliated rivals provide the same type of competitive service, they are required to expend

2      actual cash money to obtain the required access services from Verizon (just as Verizon would

3      have to pay the ILEC or CLC that provides the customer's local service if it sought to

4      provide such competitive services to a customer of another LEC either within its own thirteen

5      state region or outside of it).

6

7      **The *horizontal* concentration of retail long distance and enterprise services within the**
8      **Verizon footprint, coupled with the *vertical* integration of Verizon's local and MCI's long**
9      **distance networks, when viewed together with the concurrent vertical merger of SBC and**
10     **AT&T, will eviscerate the demand for *wholesale* interexchange services.**
11

12     Q.   How do the Joint Applicants respond to concerns as to the consequences of vertical

13          integration?

14

15     A.   In contending that they do not compete with one another, the Joint Applicants describe their

16          respective firms as being "complementary," with each providing capabilities, resources and

17          market presence that the other does not presently possess.[142]  "Complementary" is, in the

18          context of the proposed merger, a euphemism for *vertical integration* on a massive scale.

19          The one key aspect of the Verizon/MCI merger that has no direct parallel in any of the

20          previous RBOC marriages is the *vertical integration* that will result when the two companies

21          combine, precisely because of these extensive complementarities.  MCI is probably

22          Verizon's second-largest purchaser of services that MCI requires to serve downstream mass

23          market and enterprise, local and long distance markets, and Verizon purchases massive

142.  *See, generally*, *Application*.

150

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    quantities of interexchange services from IXCs to support Verizon's downstream retail long

2    distance business, *most or all of which can and likely will be provided by MCI following the*

3    *merger.*  The consequences for competition *at both the retail and the wholesale levels* is all

4    too clear:

5

6    • MCI will no longer need to "purchase" access services and UNEs for its downstream

7       services within the Verizon footprint.  While some of these downstream services

8       compete directly with Verizon's existing retail offerings and are thus likely to be

9       discontinued, to the extent that MCI (or what is left of MCI) continues to provide

10      services within the Verizon region, it will have gained a formidable – perhaps

11      insurmountable – advantage over any non-Verizon-affiliated rivals, which will have to

12      keep paying "tribute" to Verizon for the privilege of doing business within Verizon's

13      turf.

14

15    • At the same time, Verizon will be eliminating external demand for access that could

16      have supported facilities-based entry by competitive access providers.  MCI and AT&T

17      have explained previously how the Bells were able to use vertical contracts to foreclose

18      business from facilities-based rivals and thereby exclude or limit entry.  Now they will

19      achieve permanent foreclosure through acquisition rather than through contracts.

20

21    • Verizon currently purchases interexchange network services for resale in its downstream

22      retail long distance business in a highly competitive wholesale market – indeed, Verizon

23      would not have been able to pursue a *resale* long distance business model if the

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1       interexchange market were as concentrated as the local market.  However, after the

2       merger, Verizon will (presumably) cease making such third-party purchases, and instead

3       utilize the MCI interexchange network to supply retail long distance services.

4

5   Q.  How will the increase in overall market concentration arising from the *horizontal*

6       combination of Verizon and MCI affect competition in the *vertical* wholesale services

7       markets?

8

9   A.  The *horizontal* concentration of retail long distance and enterprise services within the

10      Verizon footprint, coupled with the *vertical* integration of Verizon's local and MCI's long

11      distance networks, when viewed together with the concurrent vertical merger of Verizon and

12      MCI, will eviscerate the demand for *wholesale* interexchange services.

13

14  Q.  Please explain.

15

16  A.  If both mergers are allowed, Verizon and SBC will each have achieved a retail market share

17      in the range of 80% or more in mass market in-region long distance services.  The two

18      RBOCs will collectively dominate the enterprise market and will likely carve up the

19      enterprise market along RBOC lines.  Verizon and SBC each have controlling interests in the

20      two largest wireless carriers, with combined national market shares of 63% and in-region

21      shares that are likely much greater.  Both will have achieved vertical integration with

22      national interexchange networks, and will have little or no need for any other carriers'

23      wholesale interexchange services either in-region or out-of-region.  As a result of this

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1    diversion of wholesale demand away from independent wholesale carriers and over to the

2    then-integrated Verizon/MCI and SBC/AT&T networks, the remaining non-RBOC wholesale

3    demand will have been sufficiently diminished as to threaten the continued survival of

4    wholesale carriers.

5

6    As independent wholesale carriers exit the market, Verizon and SBC will then be the primary

7    sources for wholesale interexchange services.  However, having achieved a close-to-80%

8    share of retail long distance, Verizon and SBC will then be in a position to eradicate the

9    remaining retail service competition simply by refusing to make wholesale services available

10   to long distance resellers – a tactic that Verizon has already employed with great success in

11   dismantling competition for *local* services.

12

13   **The vertical integration of MCI and Verizon will dramatically increase Verizon's**
14   ***monopsony* power over its suppliers.**
15

16   Q.   Are there other consequences of the vertical integration that would result from the merger?

17

18   A.   Yes.  As with the previous RBOC mergers, Verizon and MCI also tout, as an additional

19        merger "benefit," the merged entity's ability to obtain better prices from its suppliers, such as

20        equipment manufacturers and wholesale network services carriers, in effect, to gain increased

21        *monopsony power* with respect to such purchase transactions.  This result was not only

22        addressed in each of the previous RBOC merger situations, but was actually presented by the

23        applicants in each instance with a positive *spin*, i.e., as providing a positive benefit to

24        consumers and to the public interest.  Specifically, in each of the previous RBOC mergers,

153

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L. SELWYN

1    the applicants identified as a "merger benefit" the increased purchasing power that the larger

2    firm would enjoy with respect to its purchases of plant and equipment.[143]  Significantly,

3    Verizon advances similar expectations of "economies of scale in procurement and

4    deployment" in this case as well.[144]

5

6  Q.  But isn't this a valid benefit?

7

8  A.  To be sure, there are economies of scale in procurement of most any type of product or

9    service, but these do not typically increase indefinitely.  Ultimately, however, the ability of

10    successively larger firms to achieve lower prices from suppliers is more the result of the large

11    purchasers' *monopsony power* than of any scale economies.  Economics texts define

12    monopsony power as follows:

13

14        *Monopsony* refers to a market in which there is only one buyer.  An *oligopsony* is a
15        market with only a few buyers.  With one or only a few buyers, some buyers may
16        have *monopsony power*:  a buyer's ability to affect the price of a good.  Monopsony
17        power enables the buyer to purchase the good for less than the price that would
18        prevail in a competitive market.[145]

19

---

143.  *See, e.g.* Federal Communications Commission, *Application of Ameritech Corporation and SBC Communications, Inc. for authority, pursuant to Part 24 of the Commission Rules, to Transfer Control of a License Controlled by Ameritech,* CC Docket No. 98-141, Exhibit 2 to Application, Affidavit of Martin A. Kaplan, filed on July 24, 1998, at para. 20; Exhibit 2 to Application, Affidavit of Richard J. Gilbert and Robert G. Harris, filed on July 24, 1998 at para. 45.

144.  *Smith Declaration*, at para. 15.

145.  Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics 5th Edition*, Prentice Hall, 2001, at 352.

154

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    If both the Verizon/MCI and SBC/AT&T mergers are allowed to go forward, the two largest

2    telecommunications firms will control some 58% of total US wireline revenues and 60% of

3    total US wireless revenues,[146] and will have the ability to dictate prices and equipment design

4    specifications to suppliers of equipment and network services.[147]  Additionally, to the extent

5    that these mergers have vertical as well as horizontal components, some existing third-party

6    suppliers may be forced out of the market altogether.

7

8    Consider, in particular, the wholesale network services that are purchased by Verizon for

9    downstream resale to its retail mass market and enterprise customers.  Mr. Smith states that,

10       Verizon will realize savings by moving a large share of its long-distance traffic onto
11       under-utilized [sic] portions of MCI's existing long-haul transport facilities. As a
12       result, Verizon will avoid payments to third parties for such transport services.
13       Verizon will also realize related savings in avoiding capital costs to build out its
14       own long-haul network. Second, Verizon will be able to use MCI's metropolitan
15       area network facilities in areas outside of Verizon's current franchise territories and

---

146.  This figure is likely extremely conservative because it includes intra-industry purchases of access services, UNEs and services for resale.  FCC Form 499-Q Filings, Detailed Revenues by Type of Carrier, 1st Quarter 2004–4th Quarter 2004 (all filers minus wireless service providers); Carrier revenue figures are from *UBS Investment Research, Wireline Telecom Play Book,* January 14, 2005, VZCA 00002444.

147.  The consequences of this aspect of monopsony power is illustrated in a June 2, 2005 *Wall Street Journal* article, "Wireless Carriers' Veto Over How Phones Work Hampers Innovation" by Walter S. Mossberg:  "In the U.S., the wireless phone carriers have used their ownership of networks to sharply restrict what technologies can actually reach users. ... the U.S. carriers are exercising far too much control over the flow of new technologies into users' hands. In an ideal world, any tech company with a new cellphone, or with software to run on cellphones, should be able to sell it directly to users.  These customers would then separately buy plans from the cellphone companies allowing those devices to work on the networks. ... But that isn't how it works.  In most cases, manufacturers must get the network operators' approval to sell hardware that runs on their networks, and carriers don't allow downloading of software onto phones unless they supply it themselves."  June 2, 2005, at p. B1.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    thus avoid incurring capital costs to construct or lease such networks. Third, the
2    greater volume of interexchange traffic carried by the new firm will enable more
3    efficient arrangements for the origination and termination of long-distance traffic,
4    reducing access costs...  Fifth the acquisition will enable MCI to benefit fro
5    Verizon's economies of scale associated with network equipment purchases. [148]

6

7    What Mr. Smith fails to mention is that Verizon <<BEGIN VZ/MCI PROPRIETARY

8

9

11

12    END VZ/MCI PROPRIETARY>>

13

14    Mr. Smith and Verizon's other witnesses readily concede that Verizon's acquisition of MCI

15    will virtually obviate its need to rely upon third-party providers long-distance providers, and

16    that Verizon will gain significant competitive advantage in serving large enterprise customers

17    because, "Ownership of the various pieces of the network enhances a carrier's ability to

18    standardize service quality and other requirements across the entire network." [150]

19

20    In so doing, however, Verizon will cut off wholesale carriers from the indirect access to

21    Verizon's retail customers that such carriers currently obtain via their wholesale services

22    relationship with Verizon.  Additionally, if Mr. McCallion and Prof. Rubinfeld's claims as to

---

148. *Smith Declaration*, at para 15.

149. *ESG CLC Update, Ed McGuinness,* September 23, 2004, at 6, VZCA 00000438.

150. *McCallion Declaration*, at para. 21.

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    Verizon's alleged difficulties in competing out-of-region are to be afforded any credence,

2    then any wholesale-only carriers would have absolutely no ability to compete in the *retail*

3    mass or enterprise markets with Verizon or Verizon because the non-RBOC IXCs have no

4    local service "footprint" at all.  Indeed, and as I discuss at greater length below, *it will be*

5    *impossible for competition to survive in a post-Verizon/MCI merger industry because*

6    *Verizon has no obligation to assure that non-affiliated competitors are afforded precisely the*

7    *same level of access to the core Verizon monopoly "last mile" local network infrastructure –*

8    *including local switching and interoffice transport – that MCI will come to acquire through*

9    *the vertical integration of its and Verizon's network.*

10

11   Q.   But don't the Joint Applicants contend that the merger will result in real efficiency gains

12        arising from the exploitation of synergies between the two firms?

13

14   A.   Verizon claims that the merger will generate some $7-billion in synergy gains when

15        expressed in net present value (NPV) terms, a portion of which are attributed to efficiency

16        and productivity gains through elimination of duplicative functions between the two firms.

17        Of course, some portion of these "cost savings" may well result from the elimination of

18        competition between Verizon and MCI.  But even if there are some actual *incremental*

19        efficiency gains arising from the merger, there is no assurance that any of these would be

20        flowed through to consumers – especially if the merger results in less competition overall.

21        From the standpoint of the overall California and US economies, the *dynamic losses* arising

22        from a decrease in competition at both the retail and wholesale levels would more than offset

23        any *static gains* inuring specifically and parochially to Verizon.  Indeed, exerting monopsony

157

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    power to force down a supplier's price is *not* an efficiency gain for the economy overall

2    unless the supplier's *costs* are also reduced, nor are these welfare appropriations merger-

3    specific.  If these arrangements are so pro-competitive and efficiency-enhancing, then the

4    Bells could form buyers' coops, since none competes out-of-region anyway.  Moreover, to

5    the extent that the attempt to dictate such price reductions to suppliers forces them to curtail

6    new investment, expenditures on assuring service quality, or ultimately to cease providing

7    the wholesale service altogether, economic efficiency and the California and US economies

8    overall are decidedly *disserved*.

9

10   **Excessive special and switched access charges raise competitive problems even in the**
11   **absence of a merger, but an Verizon/MCI merger would make the problem far worse.**
12

13   Q.   How would the persistence of above-cost access charges affect the ability of rivals to

14        compete with Verizon post-merger?

15

16   A.   Verizon's prices for both special and switched access services are far in excess of forward-

17        looking economic cost.  When access charges were first introduced in 1984, they were based

18        upon *embedded fully distributed cost*, but today even that standard has been abandoned, and

19        access charges now include substantial economic rents.  For example, according to Verizon's

20        most recent ARMIS reporting for the year ended December 31, 2004, its realized rate of

21        return on its *embedded* investment in the interstate special access services category was

22        31.64% overall, but 64.21% for the former GTE operating companies; these figures would be

23        even higher if based upon forward-looking economic cost.  Switched access charges are also

24        set well in excess of economic cost.  Interstate switched access rates are around $0.0055 per

158

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1    minute, and intrastate switched access rates in Verizon territory may be as high as $0.02 to

2    $0.03 per minute or higher.  Yet the *cost* to provide a switched access connection, based upon

3    cost studies conducted for purposes of setting local intercarrier call termination rates, are in

4    the range of $0.001 or less.

5

6    The ability of Verizon to force its rivals to pay a "tribute" to Verizon for the privilege of

7    competing in Verizon territory is exacerbated by its absorption of MCI which, after the

8    merger, will in effect no longer be required to pay these excessive charges to Verizon (since

9    the nominal payments would be, in effect, a pocket-to-pocket transaction among corporate

10    affiliates with no effect on the overall bottom line).

11

12    Verizon thus enjoys a significant competitive advantage vis-à-vis any rival (including SBC or

13    other RBOCs) within its ILEC operating territories in that Verizon does not pay for access to

14    its own facilities, whereas any rival would have to pay cash *to Verizon* in order to provide

15    service to an Verizon local service subscriber.  Today, this problem is ameliorated, if at all,

16    only by the fact that Verizon's long distance offerings (including all-distance services sold to

17    enterprise customers) are a "start-up" operation that for the most part had commenced only

18    within the last few years following Verizon's receipt of Section 271 long distance authority;

19    but Verizon's unfair competitive advantage would be substantially compounded were it

20    allowed to acquire MCI, amont the oldest and largest long distance carriers in the country.

21

159

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                        LEE L.  SELWYN

1   **The vertical integration of MCI's Tier 1 Internet backbone and Verizon's "last mile" DSL**
2   **facilities will reduce competition for wholesale Internet services and erect additional entry**
3   **barriers for non-integrated Internet service providers.**
4

5   Q.   Does the vertical merger raise any competitive concerns for the market for Internet services?

6

7   A.   Indeed it does.  The Verizon/MCI merger also involves vertical integration relative to

8        Internet services at a level that no existing Internet service provider can achieve.  MCI is a

9        Tier 1 Internet backbone network service provider, which means that it is able to exchange

10       traffic with the other Tier 1 providers on a "peer-to-peer" basis without any cash payments.

11       Such peering is available only to Tier 1 providers, of which Verizon is currently not one.

12       Verizon, on the other hand, currently provides the plurality of high-speed Internet services to

13       California customers via its DSL offerings; MCI is not even involved in the downstream

14       retail broadband services market.  Retail ISPs – such as pre-merger Verizon – must purchase

15       Internet backbone capacity from Tier 1 providers for cash.  After the merger, Verizon will

16       acquire the ability to access the Internet backbone on a peer-to-peer basis, and will avoid a

17       significant cost that *every other retail ISP is forced to incur*.

18

19   Q.   How might this affect competition for downstream retail Internet services?

20

21   A.   In the short run, consumers may save some money via Verizon promotional DSL pricing.[151]

22       But such a rate decrease would constitute little more than a price war that would be initiated

---

151.  Verizon Website *Verizon Online DSL,*
http://www22.verizon.com/ForHomeDSL/Channels/DSL/ForHomeDSL.asp?LOBCode=C&PromoTCode=KFTAd&PromoSrcCode=B&POEId=BN1HP, (accessed August 3, 2005).

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L. SELWYN

1    by Verizon and fueled by Verizon's unique and considerable cost advantages relative to its

2    broadband rivals – principally cable companies.  Since in California all of the subscriber loop

3    costs are allocated to basic service (and not to DSL), and since Verizon won't have to pay for

4    access to the Internet backbone, it can engage in such aggressive retail pricing without

5    necessarily losing money.  If rival providers' – principally cable companies' – forward-

6    looking incremental costs – which include the costs of upgrading cable for two-way high-

7    speed Internet service and for access to the Internet backbone (including all marketing and

8    retailing costs) – are greater than Verizon's DSL rate, Verizon's tactic will have created a

9    price squeeze that could potentially force competitors out of the market altogether.  Were that

10   to occur, allowing Verizon to monopolize the high-speed Internet service market, prices

11   would inevitably rise, and consumers would be decidedly worse off in the long run.  When

12   SBC recently announced its $14.95 monthly DSL pricing, its CFO, Richard Linder, stated

13   that the objective of the $14.95 DSL rate is to "pillage and plunder the industry." [152]  Mr.

14   Linder states that with this offer, SBC is "trading [] some revenues during that first year's life

15   of the customer ...  and the opportunity going forward is having that customer in the base,

16   lower churn, ability to sell other services into that customer over time." [153]  Mr. Linder

17   admitted that the $14.95 price is only profitable for SBC if SBC assumes it will be able to

18   raise the price – after it has taken market share.  "We generate positive cash flow over the life

19   of those [DSL promotional] customers at that price point. ...  So over the life of the customer

20   with a discounted rate for a promotional period then moving to a standard rate we will make

---

152.  SBC Communications at Lehman Brothers Worldwide Wireless and Wireline
Conference, June 1, 2005, at 7-8.

153.  *Id.*

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    money on those customers."[154]  It is likely that Verizon's DSL offer, on the heals of SBC's

2    offer, is similarly motivated.

_____

154.  *Id.*

162

**REDACTED – PUBLIC VERSION**

ET ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1          IMPACTS ON COMPETITION FOR ENTERPRISE BUSINESS SERVICES

2

3    **Without a solid foothold in the enterprise market, carriers attempting to compete with the**
4    **giant Verizon/MCI have little chance of surviving as competitors for residential and small**
5    **business services.**
6

7    Q.    There is discussion in several of the Joint Applicants' declarations and in their Application

8          about the importance of the merger to Verizon's ability to compete for the business of large

9          national enterprise customers.[155]  Should the implications of the merger for competition in the

10         large enterprise business segment be of concern to ORA and to the Commission?

11

12   A.    Yes, it should.  First, it is a relevant consideration under §854(c)(6).  Second, even though

13         the residential consumer market obviously does not purchase the high-capacity and high-

14         volume services that are demanded by large business users, consumers nevertheless have a

15         major stake in assuring the continuation of a strong competitive market in the large business

16         segment, for several reasons.

17

18   •     Many of the so-called "enterprise" services are used to support a broad range of

19         *consumer* applications, such as Automated Teller Machines (ATMs), Internet access,

20         and a myriad of Internet applications ranging from banking to travel and online retail

21         purchases.  For example, the ability of a consumer to take an ATM card issued by a

22         California bank and get cash out of an ATM in Chicago or Cleveland, or in Copenhagen

23         or Cairo – and in local currency, no less – is fueled by high-bandwidth and high-security

---

155.  *See, e.g. Rubinfeld Declaration*, at para. 23.

163

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

1    access and transport facilities that fall within the scope of the enterprise business service

2    market.  Competition in this segment has brought about dramatic reductions in the prices

3    of these services and has expanded their capacities and capabilities.

4

5    •   Consumer and enterprise services are furnished via an integrated network infrastructure,

6    often sharing the same physical cables, switches and other network components.

7    Competing non-RBOC carriers may not be capable of sustaining a business model that is

8    limited to less than all three segments (consumer, small business, and enterprise).  If the

9    post-merger Verizon/MCI is effective in blocking competition in the enterprise market,

10    rivals may be unable to achieve sufficient mass to compete in the consumer and small

11    business segments.

12

13    •   Enterprise services are often purchased as wholesale inputs for resale to consumers in

14    competitive retail markets.  If the market for enterprise services becomes so highly

15    concentrated following the merger that existing non-RBOC carriers are forced to exit the

16    market (or be absorbed into an RBOC), the availability of such wholesale services at

17    competitive prices could suffer, which would result in less competition at the retail end

18    of the consumer market as well.

19

20  Q.  Verizon contends that it currently has only "a small existing presence" in the enterprise

21    business segment, and that while it "has been working to increase its enterprise business for

22    several years, it still has relatively few customers and does not serve a number of regions of

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   the country at all."[156]  Is that an accurate characterization of the scope of Verizon's current

2   activities in the enterprise business segment?

3

4   A.  That's certainly not the story that Verizon is presenting to Wall Street.  As I have previously

5   noted, according to Verizon's *Fourth Quarter 2004 Investor Quarterly*, "Enterprise revenues

6   totaled approximately *$6 billion in 2004, increasing 4.9 percent in the fourth quarter 2004*

7   *and 1.9 percent in the full year, compared with the same period in 2003*.[157]  Verizon's

8   statement that it "does not serve a number of regions of the country at all" is probably

9   accurate[158] – notwithstanding its specific commitment, made to secure approval of its

10  acquisition of GTE, to serve some 21 out-of-region markets – because for the most part

11  Verizon does not generally compete out-of-region.

12

13  Q.  Verizon also suggests that "the transaction will create a new competitor that is capable of

14  providing enterprise customers across the nation with a wider array of services, including

15  wireless services, than MCI is currently providing."[159]  Will the transaction "create a new

16  competitor" as Verizon contends?

17

---

156. *Application*, at 18.

157. Verizon Communications, *Fourth Quarter 2004 Investor Quarterly*, at 4, emphasis
supplied.

158. *Hallbach Declaration,* at para. 55.

159. *Application*, at 18.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  Of course not.  In fact, the transaction will *eliminate an existing competitor* by combining

2      Verizon with MCI.  We have been hearing from policymakers and industry pundits for

3      several years that the only "real" competition is "facilities-based" competition. [160]  Verizon

4      and the other RBOCs had argued, in support of their Section 271 applications, that their

5      presence in the long distance market would create additional competition for AT&T, MCI

6      and the other IXCs.  Verizon states that "Without this transaction, Verizon would require

7      years to develop the capabilities to compete effectively for such customers." [161]  Perhaps, but

8      by so doing Verizon would then be "compet[ing] effectively [with MCI and others] for such

9      customers."  But by absorbing MCI's network assets and customer base into its own asset

10     base, Verizon *avoids having to compete with MCI* at the same time that SBC, by absorbing

11     AT&T's network assets and customer base into SBC, similarly avoids the need to compete

12     with AT&T.  So if, in the end, if Verizon and SBC do end up competing against one another

13     (an outcome that is certainly far from assured), then *at the very best* we would be left with

14     just what we have today as to MCI and AT&T as competitors, but *without Verizon and SBC*

15     *as separate players, and investors, in the enterprise business segment*.  And if Verizon and

16     SBC elect not to compete with one another post-mergers, then we clearly have decidedly *less*

17     competition than at the present time.

18

---

160.  Speech of Chairman Powell, Communicopia Conference, October 2, 2002, at 6, available at http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-226929A1.pdf, (accessed July 4, 2005).

161.  *Application*, 19.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    **By eliminating MCI as a competitor, Verizon would be able to solidify its monopoly control**
2    **of the wholesale (upstream) special access market, while simultaneously fortifying its ability**
3    **and incentives to discriminate against downstream retail competitors.**
4

5    Q.    What types of advantages does Verizon obtain by expanding its already substantial special

6          access market share?

7

8    A.    Let's begin by looking at conditions as they exist today.  Verizon is the *only* source of special

9          access services to every customer location throughout the Verizon footprint.  As such,

10         Verizon has unique opportunities not available to other competitors.  A particularly relevant

11         example is provided by Dr. Joseph Farrell, former chief economist at the FCC, in a recent

12         statement attached to comments on the proposed SBC/AT&T merger filed at the FCC by

13         Global Crossing, and applied to the Verizon situation by the Global Crossing federal filing in

14         the Verizon/MCI proceeding.[162]  There, Global Crossing describes the anticompetitive effects

15         of a Verizon practices that employ a volume-based pricing scheme, in which discounts are

16         applied based upon all of a wholesale customer's purchases of Verizon special access

17         services.  In order to benefit from Verizon's pricing arrangement for special access, the

18         wholesale customer is required to commit 90% of its total special access demand to Verizon,

19         or to purchase 90% of its base period demand *from* Verizon.  As such, in order to meet the

---

162.  Federal Communications Commission, *Applications SBC Communications, Inc. and AT&T Corporation for Consent to Transfer of Control of Section 214 and 308 Licenses and Authorizations and Cable Landing License*, WC Docket No. 05-65, *Comments of Global Crossing North America, Attachment A, Statement of Joseph Farrell*, April 25, 2005 ("*Farrell Statement*"); Federal Communications Commission, *Verizon Communications, Inc. And MCI, Inc. Applications for Approval of Transfer of Control*, WC Docket No. 05-75, *Comments of Global Crossing North America,* May 9, 2005.

167

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1      minimum volume threshold, special access customers may be compelled to forgo purchasing

2      special access services from a CLC or CAP competitor – or perhaps even forgo self supply –

3      even if its price or cost is below that of Verizon, if by making such a purchase the customer

4      would then fall below the 90% Verizon contract demand threshold.  Thus, as long as Verizon

5      is able to maintain an absolute monopoly over *some* (in fact, over *most*) of the special access

6      market within its footprint, Verizon can – and does – leverage that monopoly to foreclose

7      competition elsewhere even where it may otherwise be economically viable.

8

9   Q.   Is MCI a major competitor of Verizon for the provision of enterprise services, including

10       special access?

11

12  A.   Absolutely.  Through its 1997 acquisition of Metropolitan Fiber Systems ("MFS"), MCI is

13       now one of the largest competitive providers of high-capacity last mile digital subscriber

14       facilities at the DS-1 level and above connecting to the premises of enterprise customers

15       within the Verizon region.  As Dr. Simon Wilkie, testifying in the FCC merger review for

16       Cbeyond and several other CLCs has noted, the elimination of MCI as a competing provider

17       of special access services will significantly reduce the extent of CLC presence in many

18       Verizon enterprise markets.[163]  For example, absorption of MCI into Verizon and AT&T into

19       SBC would reduce the number of CLC-served (enterprise customer) buildings in the

---

163.  Federal Communications Commission, *Verizon Communications, Inc. And MCI, Inc. Applications for Approval of Transfer of Control*, WC Docket No. 05-75, *Declaration of Simon Wilkie on behalf of Cbeyond et al.*, May 9, 2005, at paras. 18-21, Tables 1 and 2.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

1  Pittsburgh MSA by 80.6%, from 3,988 to 772.[164]   In the New York, New York MSA, the

2  number of CLC-served buildings would drop by 79.6%, from 16,869 to 3,440, with MCI and

3  AT&T out of the picture.[165]

4

5  In a June 15, 2005 *ex parte* submission to the FCC, Prof. Wilkie provided pre- and post-

6  merger market share and HHI statistics for the Verizon portion of the Los Angeles MSA.

7  There, Verizon's capacity-based share of the enterprise loop market (T-1 or greater) is

8  96.6%, yielding a pre-merger HHI of 9,340.  Adding MCI's capacity-based 2.1% share to

9  Verizon's increases post-merger the HHI to 9,751, i.e., a jump of 411.  MCI is the *only*

10  competitor to Verizon at locations requiring at least an OC-3 level of service, where it enjoys

11  a 16.2% share as against Verizon's share at 83.8%.  Ironically, while Verizon's *current* share

12  in this segment is lower than in any other category, its absorption of MCI would give

13  Verizon a 100% share – because there is no other provider serving this end of the market

14  within Verizon's Los Angeles area territory.  The effect of the merger here would be to

15  increase the HHI for this segment from a pre-merger level of 7,290 to a post-merger 10,000 –

16  i.e., a jump of 2,710.[166]

17

---

164.  *Id.*, at Table 1.

165.  *Id.*

166.  Federal Communications Commission, *Applications of SBC Communications, Inc. and AT&T Corporation for Consent to Transfer of Control of Section 214 and 308 Licenses and Authorizations and Cable Landing License*, WC Docket No. 05-65, *Simon J. Wilkie, "Proposed Mergers of SBC/AT&T and VZ/MCI: Preliminary Analysis of Competitive Effects," ex parte submission by Cbeyond et al.*, June 15, 2005, at 14.

**REDACTED – PUBLIC VERSION**



Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  Hasn't MCI previously claimed that it was "impaired" without access to Verizon's DS-3

2       facilities?

3

4  A.  Only at lower levels of demand.  Although MCI stated in its comments in the *TRR*

5       proceeding that it was not generally economical for MCI to provide end user facilities-based

6       connections to its fiber optic networks where the end user's demand was at or below a

7       threshold capacity, MCI was and continues to be a provider of facilities-based connectivity to

8       larger end users and to other carriers whose demand is above the capacity threshold. [167]

9       Elimination of MCI as a competitor to Verizon creates even greater concentration in special

10      access than exists at the present time and will enable Verizon to apply an even larger price

11      penalty where the (wholesale) special access customer fails to meet Verizon's volume

12      discount requirements than it faces today, with MCI in the market. [168]

13

14 Q.  How does this *horizontal* leveraging then provide Verizon the opportunity to engage in

15      vertical discrimination favoring its own retail long distance affiliate over competitive

16      providers?

17

18 A.  A recent BellSouth tariff – rejected after AT&T had lodged a complaint with the FCC – went

19      one step further than the volume-based pricing arrangement just described.  This targeted

---

167. See, e.g. *TRR Proceeding*, Comments of MCI, October 4, 2004.

168. *Farrell Statement*, at para. 15, *Global Crossing Verizon Comments*.

170

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    special access tariff (dubbed the "Transport Savings Plan" ("TSP"))[169] was similar to the

2    Verizon plan discussed by Global Crossing in that the customer had to commit a high

3    percentage of its total purchases to the ILEC in order to qualify for substantial discounts, but

4    the plan differed by virtue of also offering price breaks based on growth.  In this way,

5    BellSouth was able to offer higher discounts to its own affiliate (a provider that had started

6    with virtually zero base demand) than to well-established carriers (such as MCI) that – while

7    much larger – were no longer growing.  In rejecting the BellSouth tariff, the FCC found that

8    BellSouth had designed the service to "favor BellSouth Long Distance and substantially

9    disfavor BellSouth Long Distance's larger competitors in a manner that appears to lack any

10   cost basis.  Section 272 'flatly' forbids such discrimination."[170]

11

12   Q.  How does this bear upon Verizon's opportunities and incentives for discrimination against

13       downstream suppliers?

14

15   A.  It illustrates that whenever an opportunity exists, Verizon has strong incentives to tailor

16       volume discounts and specialized pricing plans for critical wholesale inputs to favor its own

17       affiliates over unaffiliated entities who offer competing retail services.   As I mentioned

18       earlier, in addition to being one of Verizon's largest competitors for special access services,

19       MCI is also a large Verizon customer in California for special and switched access services.

---

169.  Federal Communications Commission, *MCI Corp., Complainant, v. BellSouth Telecommunications, Inc., Defendant*, File No. EB-04MD-010, FCC 04-278*, Memorandum Opinion and Order*, December 9, 2004.

170.  *Id.*, at para. 29.

171

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    Thus, rather than being diminished by its acquisition of MCI, Verizon's opportunities and

2    incentives will increase in scale and scope by being combined with its second largest

3    customer and second largest competitor.

4

5    **The merger of Verizon and MCI will produce an extensive array of competitive advantages**
6    **for the combined entity that will operate to create potentially insurmountable barriers to**
7    **entry and competition for rivals seeing to serve enterprise customers within the Verizon**
8    **ILEC footprint.**
9

10   Q.   How do the Joint Applicants describe the effect of the proposed merger upon their ability to

11        compete for the business of large enterprise customers?

12

13   A.   Verizon's Mr. McCallion explains that

14
15        A principal benefit of this transaction is that it will enable Verizon to compete
16        effectively in the provision of services to enterprise customers, including large
17        federal and state government agencies.  Since these customers demand a
18        comprehensive suite of communications services (including, increasingly, wireless
19        services that MCI does not provide), this transaction will position the combined
20        company to compete more effectively for that business.  Neither MCI nor Verizon,
21        standing alone, can be as effective at meeting the needs of these customers as they
22        will be together after the deal is closed.[171]

23

24   Q.   Do you agree that the merger will "enable Verizon to compete effectively in the provision of

25        services to enterprise customers, including large federal and state government agencies"?

26

---

171.  *McCallion Declaration*, at para. 6.

172

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  Yes, but that is not necessarily a good thing if the effect is to create a set of competitive

2      advantages for the combined company that are not available to any rivals, at least not within

3      the Verizon ILEC operating areas, and that would operate to bar entry or effective

4      competition with Verizon within the Verizon footprint.

5

6  Q.  Will the merger have this effect?

7

8  A.  Yes.  Indeed, while the Joint Applicants insist that the merger will not result in harm to

9      competition, their recitations as to the "benefits" (to them) arising from the merger do not

10     square with that position.  As Mr. McCallion explains:

11
12         Although Verizon has been working to increase its enterprise business for several
13         years, it still has a relatively small share of this business in its operating territories
14         and even less presence outside its operating territories.  By joining Verizon's and
15         MCI's complementary assets and experienced sales forces, the transaction will make
16         the post-transaction company more competitive across the enterprise segment than
17         either company would be alone. *Verizon's local and regional presence and its*
18         *substantial wireless investment*, coupled with MCI's innovative enterprise sales
19         expertise and product offerings, will allow the new firm to provide enterprise
20         customers with a suite of products and services capable of addressing the full range
21         of these customers' needs.[172]
22

23     Mr. McCallion's statement that "the transaction will make the post-transaction company

24     more competitive across the enterprise segment than either company would be alone"

25     deserves particular attention.  After the merger, Verizon/MCI will be the *only* provider of

26     services to enterprise customers that also has a ubiquitous *local* presence within the Verizon

---

172.  *McCallion Declaration,* at para. 16, emphasis supplied.

173

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    ILEC operating areas.  The very reason why "the transaction will make the post-transaction

2    company more competitive" will make *all other rivals less competitive* within the Verizon

3    ILEC footprint.  The post-merger Verizon/MCI entity will then be the *only* carrier with a full

4    "local and regional presence" within the Verizon ILEC operating areas, which means that *no*

5    *other competitor* would be in this position.  As such, carriers other than Verizon seeking to

6    serve enterprise customers in Verizon territory would be forced to purchase essential services

7    (access services and UNEs, to the extent still available) from Verizon in order to compete

8    with Verizon, subjecting them to the very same disadvantages that MCI currently faces and

9    that, according to Mr. McCallion, the merger of Verizon and MCI would overcome.

10

11  Q.   What types of disadvantages would such competitors confront?

12

13  A.   The most substantial competitive/operational disadvantage consists of the need to purchase

14    special access services, a necessary input for serving enterprise customers, from Verizon, at

15    considerably above-cost rates.

16

17  Q.   Exactly how excessive are Verizon's and other RBOCs' prices for special access service?

18

19  A.   Verizon has been able to set its DS-1/DS-3 special access prices at supracompetitive levels as

20    a result of the near-total dependence of virtually all IXCs and CLCs on these facilities in

21    order to serve enterprise customers.  These supracompetitive prices are much higher than the

22    corresponding UNE prices for the same elements, which are based upon forward looking per-

23    unit average costs and many multiples above the competitors' prices for the same services

174

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1      where available, because competitors' prices are based upon economic cost.  As a result of

2      FCC restrictions on the use of UNEs for so-called "mixed" (i.e., local and long distance

3      traffic), and "available facilities" limitations on UNE-provisioning requirements, IXCs and

4      others are unable to purchase these facilities at competitive rates.[173]  In its most recent (end of

5      year 2004) ARMIS 43-04 Report, Verizon data indicate that for the former GTE ILECs the

6      company generated a 64.21% rate of return on its interstate special access services, up from

7      54.72% for the previous year.  For Verizon California, the corresponding figures are 67.66%

8      for 2004 and 48.82% for 2003.  In fact, the Verizon-GTE and Verizon California rates of

9      return on special access have each been growing steadily, *as has their respective special*

10     *access revenue*.

11

12  Q.  Haven't the RBOCs attacked the validity of rate of returns reported in ARMIS?

13

14  A.  Yes, but their arguments[174] are without merit.  The ARMIS financial results for Verizon are

15     derived from accounting data compiled by Verizon itself, presumably in accordance with the

16     Commission's rules, which Verizon and the other RBOCs themselves had a major role in

17     developing

18

---

173.  *See, e.g. TRRO*, at paras. 34-40, and 64.

174.  *See, e.g.,* Federal Communications Commission, *AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services,* RM Docket No. 10593, *Opposition of Verizon Communications,* December  2, 2002, at pp. 19-22; *Opposition of Verizon*, December 2, 2002, at pp. 21-23.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    In any event, whether or not ARMIS data includes minor cost misallocations at the margins

2    does not affect the overall integrity of *trends* in the data, *since those claimed misallocations*

3    *do not change from period to period*.  As Table 5 demonstrates, Verizon California's former

4    GTE rate of return on interstate special access has escalated from 30.69% in 1999 to an

5    astounding 67.66% for 2004, while its interstate special access *revenues* also grew at double-

6    digit year-over-year rates, from $138.8-million in 1999 to $385.3-million in 2004.  Also

7    shown in Table 5, Verizon-GTE's rate of return on interstate special access has escalated

8    from 33.29% in 1999 to an astounding 64.21% for 2004, while its interstate special access

9    *revenues* also grew at double-digit year-over-year rates, from $761-million in 1999 to

10   $1.419-billion in 2004.  Thus, even if the absolute rate of return developed for the special

11   access category using ARMIS data is off by some (at most a very small) percentage, the

12   trend in the data (escalating returns coupled with escalating revenues) provides compelling

13   evidence that Verizon has the ability to increase prices to supracompetitive levels without

14   fear of attracting competitive entry or of losing so much demand as to make the price

15   increase unprofitable.

16

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

| Table 5 | | | | |
|---|---|---|---|---|
| Verizon Interstate Special Access Revenues and Rates of Return | | | | |
| | Verizon California | | Verizon - former GTE companies | |
| Year | Special Access Revenues ($millions) | Special Access ROR | Special Access Revenues ($millions) | Special Access ROR |
| 1999 | 139 | 30.69% | 761 | 33.29% |
| 2000 | 203 | 47.50% | 969 | 47.39% |
| 2001 | 228 | 46.73% | 1,156 | 58.67% |
| 2002 | 231 | 44.89% | 1,111 | 51.05% |
| 2003 | 284 | 48.82% | 1,222 | 54.72% |
| 2004 | 385 | 67.66% | 1,419 | 64.21% |

Source: Federal Communications Commission, ARMIS Report 43-04, Access Report, YE 1999-2004.  Available at http://www.fcc.gov/wcb/eafs (accessed April 25, 2005).  Column O (Special Access) Row 8041 (Net Return) divided by Row 8040 (Average Net Investment).

Q.  But didn't MCI acquire its own facilities to serve these customers so that it could avoid

having to pay Verizon and other RBOCs for special access at these exorbitant rates?

A.  For the most part, no.  As I discussed earlier, it is prohibitively expensive to build out

facilities at low capacities, a fact known and exploited by Verizon in its special access

pricing.

Q.  Is there other evidence that demonstrates the extent of competitors' dependence upon

Verizon's special access facilities, even where competitive fiber exists in the same area or

even on the same streets?

177

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  Yes.  In a June 2004 *Ex Parte* submission in CC Docket Nos. 01-138, 96-98, and 98-147,

2      Verizon produced a set of extremely detailed maps of approximately twenty MSAs and

3      central business districts thereof within its operating territory for the specific purpose of

4      demonstrating widespread use of Verizon special access services by CLCs *even on streets*

5      *where competing fiber optic facilities are portrayed as being in place*.  Figures 2-3 below

6      reproduce Verizon's maps of its Los Angeles MSA and Riverside MSA operating areas.  The

7      maps do indeed demonstrate extensive use of Verizon (and SBC) special access – and also

8      show *very few CLC-lit buildings* within the Verizon California operating areas Although

9      Verizon's maps do not depict fiber routes, they do show CLC use of Verizon special access

10     service at locations in close physical proximity to buildings identified as "lit" by CLC fiber –

11     i.e., CLC "on-net" locations.[175]

---

175.  Federal Communications Commission, *Petition for Forbearance of the Verizon Telephone Companies Pursuant to 47 U.S.C. §160(c)*, WC Docket No. 01-338, Verizon June 2004 *ex parte* letter.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN



**Figure 2.**  CLEC "lit" buildings and CLEC use of Verizon special access services to serve enterprise customers – Los Angeles area.

Cal. PUC A.05-04-020                    LEE L.  SELWYN



**Figure 3.**  CLEC "lit" buildings and CLEC use of Verizon special access to serve enterprise customers – Riverside area

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    The Verizon map of its Los Angeles operating area (Figure 2) includes *only* customer

2    locations that, according to Verizon, *are being served by CLCs either through the use of*

3    *CLC-owned facilities (the purple squares) or via Verizon special access*; the map does not

4    identify *any* enterprise customers that are being served on a retail basis directly by Verizon

5    itself.

6

7    Q.   What does this analysis demonstrate?

8

9    A.   Since it appears that CLCs are using special access even where they have fiber, the proximity

10         of a customer to CLC-owned fiber is not the controlling factor in the CLC's economic choice

11         as between using its own already-in-place fiber facilities or purchasing special access *at*

12         *above-cost prices* from Verizon.  Aside from the exclusionary effects of special access

13         contracts discussed above, there are a number of reasons why a CLC may be forced to use

14         RBOC facilities even if there is CLC-owned fiber nearby, including:

15

16         •    Connections to the fiber facility can only be made at a limited number of  "Network

17              Access Points" that have been established for this purpose, places where terminating

18              equipment and cross-connection facilities are in place.  Consider, by analogy, a

19              superhighway or mass transit system – even if you live right next to the highway or the

20              transit line, you can only access it at interchanges (in the case of the highway) or stations

21              (in the case of the transit line).

22

181

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.