Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    •    The costs of effecting such a connection are often substantial, and can only be justified

2         where revenues at the particular customer location will be sufficient.

3

4    •    Building owners are not obligated in many areas, as a legal matter, to allow CLCs to

5         bring facilities into their buildings, and where they do permit such entry may impose

6         construction, rental or other fees that will serve only to increase the entry barrier overall.

7

8    •    Depending upon where the demarcation has been established, the BOC may own the

9         riser facilities within the building, whose use by a CLC may potentially involve

10        makeready and recurring charges.

11

12   Given these complications, and given that much of the "CLEC owned" fiber cited by Verizon

13   in these maps doubtless belongs to MCI, once MCI is no longer an independent provider, the

14   capability of the remaining CLCs to build their own "facilities-based" last mile facilities will

15   sink even further.

16

17 Q.  You have just described the significant competitive hurdles faced by even a large and well-

18      established carrier (MCI in this case) in attempting to compete with the ILEC within its

19      incumbent region.  Do you expect the surviving competitors to face even greater hurdles if

20      the proposed merger is approved?

21

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1  A.  Yes, definitely.  Verizon's excessive special access prices will significantly enhance its

2      position and opportunities in the retail enterprise services market, especially if Verizon is

3      permitted to merge with MCI.

4

5  Q.  Beyond the elimination of MCI as a large competitor of Verizon for access services, what

6      additional harm will the merger do to competition for these services in California?

7

8  A.  The merger will fundamentally change the cost structure that this one very large (former)

9      competitor pays for access services.  In bringing MCI's access capabilities (and customers)

10     into Verizon's very large corporate umbrella,  Verizon's ability to set its switched and special

11     access prices at excessive, supracompetitive levels will significantly enhance its position and

12     opportunities in the retail enterprise services market if, following the merger, MCI is no

13     longer required to "pay" Verizon for access services.

14

15 **Predation and price squeezes between Verizon's retail prices and its special access charges**
16 **are currently occurring, and have the potential to become even more aggressive vis-à-vis**
17 **other CLCs once MCI has been absorbed into Verizon.**
18

19 Q.  How has Verizon used its market power with respect to special access services to put its

20     rivals as a competitive disadvantage?

21

22 A.  Through its practice of shifting virtually all of its economic profit into the monopoly special

23     access services and away from the retail services that Verizon offers to end-user enterprise

24     customers, Verizon is able to maintain essentially the same aggregate earnings level whether

183

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    or not it, or a competitor, provides the end-user service.  But by overpricing special access,

2    Verizon has been able to impose a classic price squeeze upon competitors, making their retail

3    offerings in the enterprise segment unprofitable.

4

5    Q.   What evidence of predation and price squeezes has been put forward?

6

7    A.   In various FCC proceedings, AT&T has presented detailed analyses of the RBOCs' ability to

8         engage in a price squeeze, notwithstanding the existence of price cap regulation.  For

9         example, in the TRR proceeding, AT&T declarants Benway *et al*. explained:

10

11            [T]he special access rates paid by AT&T (which are among the lowest access rates
12            available) are typically well in excess of what the RBOC charges its own retail
13            customers.  For example, as AT&T has already shown in prior filings, the access
14            component of RBOC retail offerings are substantially lower than AT&T's wholesale
15            special access rates.  Thus, even if AT&T can offer the other parts of the service at a
16            cost equal to, or less than, what the RBOC incurs, this "spread" makes it impossible
17            for AT&T to profitably offer many services.  Worse yet, Exhibits 1-5 herein show
18            that even the RBOCs' *total* retail price for these services is below what AT&T pays
19            for special access.[176]
20

21    These circumstances are substantially the same as those faced by MCI.

22

23    Q.   What, if anything, has MCI or AT&T been able to do about this problem?

24

25    A.   Up to now, the *only* practical constraint on Verizon's special access rate escalations has been

26         AT&T's persistence in challenging Verizon's practices at the Federal Communications

---

176. *Benway et al. Declaration*, at para. 45.

184

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    Commission and in the federal courts, such as through its petition to end the ineffective

2    special access flexibility rules, which the FCC delayed dealing with, forcing AT&T to seek

3    court intervention.[177]  Even then, when forced to move forward, the FCC dodged most of the

4    issues raised and simply issued a NPRM asking for current data (on issues for which

5    AT&T's data was current at the time it was filed).  With MCI and AT&T both out of the

6    picture as an advocate on special access pricing issues, the prospect of further FCC action

7    becomes even more uncertain.  There is a real concern that Verizon may have held back on

8    even more aggressive price increases in the face of the pending litigation, but that without the

9    prospect of a major competitor challenge,  Verizon move forward to impose substantially

10    higher rate levels as soon as the merger is closed.

11

12    Q.  How does the proposed merger (along with that of SBC and AT&T) exacerbate this

13        situation?

14

15    A.  MCI and AT&T are the two largest providers of enterprise services to national customers,

16        and through years of experience and extensive networks have acquired significant market

17        share in the enterprise market.  It is this enterprise market share that Verizon and SBC covet,

18        and it is this combination of enterprise market share and special access monopoly that make

19        the proposed mergers a sure-fire recipe for rapid remonopolization of this segment.  If

20        Verizon is able to obtain MCI's *retail* market share and combine that with its *wholesale*

---

177.  Recently, while dealing with its bankruptcy, MCI has been absent from these
proceedings.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                LEE L.  SELWYN

1    access monopoly, it will have the facilities, customer base, incentive *and the opportunity* to

2    discriminate against rivals and engage in predatory pricing on a massive scale.

3

4  Q.   What is likely to happen to the surviving competitors if Verizon raises rates even further?

5

6  A.   Raising special access rates to levels that make competition unprofitable will enable

7        Verizon/MCI to force smaller competitors out of the market altogether.  Moreover, the

8        demonstrated ability of Verizon to impose different prices for the same essential services to

9        different customers would enable Verizon to be selective in its competition foreclosure

10       efforts.  Where such competitors rely upon any kind of Verizon access service or facility as

11       in essential input to that carrier's end-user service offering, Verizon will be able to

12       significantly undercut that competitor's retail price – especially when it can exact a higher

13       charge from the competitor than from its own affiliate for the same service or facility.

14       Through targeted predatory pricing, Verizon/MCI will be able to make certain customers or

15       products or geographic markets unprofitable for rival firms.

16

17  **Existing rules governing the allocation of ILEC costs as between "regulated" and**
18  **"nonregulated" services are incapable of addressing the massive integration of network**
19  **facilities and organizational resources that would result from the merger of Verizon and**
20  **MCI.**
21

22  Q.   How is it that such predation and price squeezes are occurring when there are affiliate

23       transaction rules intended to address this type of problem?

24

ETi ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  Simply put, there are some serious problems with the effectiveness of the current rules and

2      with the ability of regulators to police the types of conduct they are intended to address.

3

4      A number of parties filing comments at the FCC regarding the proposed merger have raised

5      serious concerns regarding the potential for cross-subsidization of competitive services by

6      Verizon's monopoly services, and discriminatory treatment favoring Verizon's (or its

7      affiliates') competitive services vis-à-vis those furnished by nonaffiliated rivals.[178]  Such acts

8      are, of course, expressly prohibited by the Commission's rules and by statute,[179] but the

9      detection of such conduct has become increasingly difficult and the extent of after-the-fact

10     enforcement has been largely ineffective, if for no other reason than the fact that it takes so

11     long for complaints of such anticompetitive conduct to be resolved that extensive damage

12     can be done to competition and to specific competitors even if, in the end, the complaints are

13     held to be valid.  Former FCC Chairman Powell recognized these potentials for

14     discrimination where he noted, "Only through facilities-based competition can a competitor

15     lessen its dependency on an intransigent incumbent, who if committed to frustrate entry has a

16     thousand ways to do so in small, imperceptible ways."[180]

17

---

178.  Federal Communications Commission, *Verizon Communications Corp. and MCI Corp. Application for Approval of Transfer of Control*, WC Docket No. 05-75, May 9, 2005; *Comments of ACN et al.*, at 21-40; *Petition to Deny of Cbeyond et al.*, May 9, 2005, at 10-59.

179.  47 U.S.C. § 254(k).

180.  See fn. 160, supra.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1      Moreover, many of the existing regulatory mechanisms for detecting and preventing cross-

2      subsidization and discrimination were never designed to deal with a substantially deregulated

3      Verizon/MCI entity that would result from the proposed merger.  As an example, nearly

4      twenty years ago the FCC adopted 47 CFR §64.901 for the purpose of foreclosing cross-

5      subsidization of nonregulated services via cost misallocation.  However, as recognized by the

6      Commission in the *OI&M Order*, 47 CFR §64.901(c)) does *not* prevent cost misallocation

7      and cross-subsidization in the case of jointly owned facilities.[181]  Generally, 47 CFR §64.901

8      requires that the costs of jointly-used facilities be allocated between competitive and

9      monopoly services based upon *use*, and not upon cost causation.  Thus, the decision to

10     purchase a particular asset may be driven exclusively by the goal of providing a competitive

11     service, but if the asset, once having been acquired, is then used to provide both competitive

12     and monopoly services, its costs would then be allocated strictly in proportion to such use.

13     Allocation of fixed plant as between monopoly and competitive services is inherently

14     arbitrary, and can be easily manipulated, even within the context of 47 CFR §64.901(c)), to

15     shift costs from the competitive services to monopoly services.[182]

---

181.  See fn. 183, *infra.*

182.  Consider the following example.  Suppose that the existing copper loop distribution plant is not capable of providing (competitive) video services (which is in fact the case).  So the RBOC embarks upon a massive capital spending program to entirely *replace* its copper plant with fiber to the home.  Once installed, the fiber will then be used to provide *both* conventional monopoly voice telephone service *and* competitive video service.  Under the use-based allocation requirement of 47 CFR §64.901, the cost of the jointly-used plant is to be assigned based upon the highest use of the asset for each purpose over the coming three (3) year period. If, during that period, only a small fraction of customers sign up for the BOC's video service, the overwhelming majority of the costs of the fiber-to-the-home investment will be assigned to Plain Old Telephone Service ("POTS"), *even though no portion of the capital investment was required*

(continued...)

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L. SELWYN

1  Q.   What kinds of concerns does this potential for manipulation lead to in the present merger

2      review?

3

4  A.   If the *effect* of ownership of joint facilities is to shift costs to regulated services and/or to

5      permit nonregulated services to use jointly-owned facilities without properly allocating costs

6      (which the Commission noted would be extremely difficult[183]), then the result is to create a

7      cross-subsidy of Verizon's competitive operations by its regulated monopoly services.  And

8      that is expressly and unambiguously prohibited in, although not foreclosed by, 47 CFR

9      §64.901(c)):  "A telecommunications carrier may not use services that are not competitive to

---

182.  (...continued)
*for POTS*.  47 CFR §64.901(c) was adopted at a time when the extent of an ILEC's nonregulated activities was expected to be relatively small.  Indeed, even today, only a small portion of the BOC's total costs are actually being classified as *nonregulated*.  For example, according to the latest (end-of-year 2004) Verizon ARMIS reporting, only 1% of total Verizon plant in service and 12% of total Verizon operating expenses are classified as "nonregulated." 47 CFR §64.901(c) is simply not up to the task of dealing with the infusion of massive amounts of nonregulated plant and expenses, which is exactly what will occur if Verizon and MCI are permitted to merge.

183.  Federal Communications Commission, *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates*, WC Docket No. 03-228, *Petition of SBC for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions under Sections 53.203(a)(2) and 53.203(a)(3) of the Commission's Rules and Modification of Operation, Installation, and Maintenance Conditions Contained in the SBC/Ameritech Merger Order*, CC Docket Nos. 960149, 98-141, *Petition of BellSouth for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions Under Section 53.203(a)(2)-(3) of the Commission's Rules,* CC Docket No. 96-149, *Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, CC Docket No. 01-337, *Report and Order* in WC Docket No. 03-228, *Memorandum Opinion and Order* in CC Docket Nos. 96-149, 98-141, 01-337, March 17, 2004 (*OI&M Order*). Though Section 272 only applies to RBOCs, the cost allocation rules apply to former GTE operating companies.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    subsidize services subject to competition," notwithstanding the limitations of 47 CFR

2    §64.901's ability actually to detect such conduct.

3

4    Similarly, the ownership of essential local inputs like high-capacity digital access facilities

5    and collocation space by an *integrated* local/long distance enterprise provider such as the

6    combined Verizon/MCI entity would produce significant risks of discrimination.  The FCC,

7    in its *Non-Accounting Safeguards Order*, specifically cited the potential effect of joint

8    ownership on discriminatory access to facilities, saying:

9
10           Moreover, the ban on joint ownership of facilities should protect local exchange
11           competitors that request physical collocation by ensuring that a BOC's section 272
12           affiliate does not obtain preferential access to the limited available space in the
13           BOC's central office.[184]
14

15   As discussed earlier, the FCC recently found that competitors were impaired without access

16   to DS1 and DS3 facilities into customer premises at cost-based rates.[185]  Verizon's proposal

17   to own the MCI network and to provide these essential inputs *both* to itself *and* to its

18   competitors will specifically allow Verizon preferential access to these and other

19   competitively essential facilities.

20

_____

184.  Federal Communications Commission, *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended*, CC Docket No. 96-149, *First Report and Order*, 11 FCC Rcd 21905(1996), 21983 (footnotes omitted).

185.  *TRR Proceeding*, *Order On Remand*, 2005 FCC LEXIS 912 ("*TRRO*").

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   **The merger exacerbates the already tenuous competitive situation created by the sunset of**
2   **Section 272.**
3

4   Q.   Could matters get worse before they get better with respect to opportunities for Verizon (and

5        MCI) to engage in anticompetitive cost misallocation?

6

7   A.   It appears likely that they could.  Although, as a former GTE operating territory, Verizon's

8        long distance operations in California are not strictly subject to Section 272, in order to

9        operate a single long distance affiliate for all states and regions, Verizon's Section 272

10       compliant affiliate must generally operate in the same manner regardless of the legacy

11       operating company location.  That is, because Verizon is subject to Section 272 in many

12       places, efficiency keeps it from reintegrating Verizon Long Distance operations in areas

13       where it is not still, or never was, subject to Section 272.  A Verizon/MCI merger, if

14       combined with the "sunset" of Section 272 on schedule (and thus the nationwide integration

15       of Verizon local and Long Distance) would substantially heighten the merged company's

16       ability and incentives to engage in cost misallocation both in BOC and former GTE operating

17       areas, which would facilitate overpricing local services to cross-subsidize retail long-distance

18       services, to the detriment of competition and consumers.

19

20       Presently, under the terms of the FCC's *OI&M Order*, although the RBOCs are permitted to

21       contract for BOC and affiliate OI&M functions, they are still subject to the Section 272(b)(1)

22       restriction on joint ownership of facilities.  Thus, at present, the BOC and its affiliates are not

23       permitted to collaborate on the purchase of equipment used by both entities.  In retaining this

24       restriction, the FCC heeded comments from AT&T that showed the serious risks of cost

191

**REDACTED – PUBLIC VERSION**

ET ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    misallocation if the BOCs and their Section 272 affiliates were allowed to jointly own

2    network facilities.  AT&T pointed out that:

3
4        [I]f the BOCs were permitted to integrate their operations by jointly owning
5        switches, transmission and associated land and buildings, a massive and far larger
6        pool of joint and common costs would be created that would have to be allocated
7        through inherently arbitrary allocations.  As the Commission concluded in 1996,
8        "the costs of wired telephony networks and network premises are largely fixed and
9        largely shared among local, access, and other services," and thus sharing of these
10       network facilities among the BOC and its § 272 affiliates would dramatically
11       increase the magnitude of joint and common costs and thereby provide a
12       "significant opportunity for improper allocation of costs" that would impede
13       long-distance competition and harmratepayers.[186]
14

15   In the *OI&M Order*, the Commission accepted this reasoning, and maintained its policy of

16   requiring that facilities used to provide competitive and noncompetitive services be

17   separately owned, noting:

18
19       The joint facilities ownership restriction was adopted concurrently with the OI&M
20       sharing prohibition to implement the "operate independently" requirement of
21       section 272(b)(1).  The joint facilities ownership restriction, codified in section
22       53.203(a)(1) of the Commission's rules, provides that "[a] section 272 affiliate and
23       the BOC of which it is an affiliate shall not jointly own transmission and switching
24       facilities or the land and buildings where those facilities are located."  In adopting
25       this restriction, the commission believed that joint ownership of facilities could
26       facilitate cost misallocation and discrimination.  Based on the record presented in
27       this proceeding, we continue to believe that, unlike the OI&M sharing prohibition,
28       the costs of maintaining separate ownership of facilities do not outweigh the

---

186.  Federal Communications Commission, *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates*, WC Docket No. 03-228, Comments of AT&T Corp., at 17.

192

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L. SELWYN

1    benefits the rule provides against cost misallocation and discrimination.  For
2    example, based on the record, we are persuaded that shared facilities would likely
3    create significant joint and common costs that would be inherently difficult to
4    allocate properly.[187]

5

6  Q.   How do these concerns play out in the context of the proposed Verizon/MCI merger

7       inasmuch as Verizon is not even subject to Section 272 in California?

8

9  A.   The formidable competitive advantages that Verizon/MCI will gain from integrated facilities

10      cannot be overstated.  As I mentioned above, the integration of facilities, throughout Verizon

11      territory– including in California, are dependent on region-wide Sunset of the Section 272

12      safeguards.  Verizon's control of vast local facilities crucial to the provision of many

13      enterprise services will afford Verizon substantial opportunities to discriminate against

14      competitors and engage in anticompetitive conduct if it is able to own and operate the

15      facilities on MCI's network on an integrated basis.  Section 272 of the *1996 Act* requires the

16      RBOCs initially to operate their long distance services out of a separate affiliate that

17      transacts business with the BOC ILECs on an "arm's length" basis.  The initial idea of the

--------

187.  Federal Communications Commission, *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates; Petition of Verizon for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions under Sections 53.203(a)(2) and 53.203(a)(3) of the Commission's Rules and Modification of Operating, Installation, and Maintenance Conditions Contained in the Verizon/Ameritech Merger Order; Petition of BellSouth Corporation for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions Under Section 53.203(a)(2)-(3) of the Commission's Rules; Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, WC Docket No. 03-228; CC Docket Nos. 96-149, 98-141; CC Docket No. 96-149; CC Docket No. 01-337, *Report and Order in WC Docket No. 03-228 Memorandum Opinion and Order in CC Docket Nos. 96-149, 98-141, 01-337,* 19 FCC Rcd. 5102 (2004) at para 32.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    OI&M restriction, the joint ownership restriction, and the other safeguards of Section 272

2    was to mitigate the RBOCs' bottleneck advantages, in hopes of allowing CLCs to acquire a

3    base of customers and resources sufficient to allow them to neutralize the RBOCs' bottleneck

4    control of essential facilities.

5

6  Q.  What is the basis for your concern that the affiliate protections in Section 272 will be going

7     away?

8

9  A.  Sec. 272(f)(1) provides that the separate affiliate requirement is to sunset three years

10    following the RBOC's receipt of Section 271 in-region long distance entry in a given state,

11    but may be extended by the Commission by rule or order.  Thus far, however, the

12    Commission has declined to order any such extension, and has allowed the safeguards of

13    Section 272 to sunset on schedule in all instances in which the three-year period has elapsed.

14    Despite the objections of state commissions and others, who contend that it is premature to

15    lift the separate affiliate safeguards provided by Section 272,[188] the FCC has not provided any

16    explanation or justification for its determination not to extend the separate affiliate

17    requirement beyond the sunset date.  Once the sunset date passes in all Section 271 Verizon

18    states, it is likely that significant changes will occur both in these states and other Verizon

19    states where Verizon Long Distance operates.

20

---

188.   Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliated and Related Requirements*, WC Docket 02-112, *Memorandum Opinion and Order*, Concurring Statement of Commissioner Kevin J. Martin, December 23, 2002.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  Since Verizon already has signicant incentives to favor its affiliates, what would the

2       proposed merger do to make matters worse?

3

4  A.  The mergers, when combined with the sunset of Section 272, will have a serious adverse

5       impact upon the *sustainability* of competition.  The timing of the sunsets with the dates at

6       which the approval process for the Verizon/MCI and SBC/AT&T mergers may be completed

7       may mean that at virtually the *exact same time* that Verizon and SBC acquire control of their

8       largest local and long distance competitors, they will no longer be subject to any competitive

9       safeguards with respect to the joint operation of their local and long distance businesses. [189]

10      As AT&T has long argued, and as the Commission agreed in the *OI&M Order*,[190] the use of

---

189.  Absent a change in Commission policy with respect to the sunset, the separate affiliate requirement will no longer exist in any Verizon state by March 2006, just months after the merger, if approved, would likely be consummated, Verizon received Section 271 Authority in the last of its states (DC, Maryland, and West Virginia) in March 2003.  Assuming the Commission continues to allow Section 272 to sunset after three years, Section 272 restrictions will sunset in these states in March of 2006.  Although Verizon is already permitted to integrate its long distance operations into its BOC operations in New York and several other eastern states, its continues to operate them separately, pending resolution of whether and how a non-separated RBOC long distance operation will be regulated once the long distance and local operations were fully integrated (i.e., following the Sec. 272(f)(1)sunset).

190.  Federal Communications Commission, *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates; Petition of Verizon for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions under Sections 53.203(a)(2) and 53.203(a)(3) of the Commission's Rules and Modification of Operating, Installation, and Maintenance Conditions Contained in the Verizon/Ameritech Merger Order; Petition of BellSouth Corporation for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions Under Section 53.203(a)(2)-(3) of the Commission's Rules; Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, WC Docket No. 03-228; CC Docket Nos. 96-149, 98-141; CC Docket No. 96-149; CC Docket No. 01-337, *Report and Order in WC Docket No. 03-228 Memorandum Opinion and Order in CC*

(continued...)

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1  integrated facilities for regulated local and competitive long distance services raise

2  significant competitive concerns.

3

4  The proposed mergers create a fundamental change in the conduct of the RBOCs' long

5  distance operations, and raise specific concerns with respect to §854(c)(7), which requires the

6  Commission to consider whether the proposed merger will "[p]reserve the jurisdiction of the

7  commission and the capacity of the commission to effectively regulate and audit public

8  utility operations in the state."  Whereas today both Verizon and SBC provide retail long

9  distance service in large part by purchasing capacity from long distance wholesalers and

10  reselling it to their local service customers, the post-merger Verizon will presumably seek to

11  operate its own (the former MCI) long-haul facilities on an integrated basis with the BOCs'

12  operations, and to self-provide long distance service over the MCI network.  This self-

13  provisioning would necessitate a heretofore unseen level of service and facility integration.

14  As a purchaser of wholesale service, Verizon has paid wholesale IXCs for capacity on their

15  network, for which those IXCs assume responsibility for the OI&M functions associated with

16  its network.  This wholesale arrangement effectively limited the opportunities for Verizon to

17  engage in anticompetitive conduct and cost shifting by significantly limiting the number of

18  services and facilities provided by the Verizon BOC and needed by Verizon Long Distance

19  to provide service.

20

---

190.  (...continued)
*Docket Nos. 96-149, 98-141, 01-337,* 19 FCC Rcd 5102 (2004), at para. 32.

REDACTED – PUBLIC VERSION

ET  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    These practical limitations of the RBOCs' provisioning of long distance service through

2    wholesale facilities have existed for each RBOC providing long distance service during all

3    periods covered under currently available Section 272 Biennial Audits.  However, none of

4    the biennial audits completed thus far have included auditing of any significant amount of

5    facilities-based long distance services provided by an RBOC affiliate,[191] primarily because

6    none of the RBOCs that have completed biennial audits provide facilities-based long distance

7    services in-region.  (Verizon, SBC and BellSouth provide in-region long distance entirely via

8    resale of wholesale services purchased from other carriers.)

9  Q.  What will be the combined effect of removing the Section 272 requirements from Verizon at

10    the same time it acquires significant long distance facilities?

11

12  A.  The effect will be to make cost misallocation, cross-subsidization, and discrimination

13    virtually undetectable.  Integrated operations such as those available to the post-merger, post-

14    sunset Verizon will make it extremely difficult for state commissions and other regulatory

15    bodies to set rates and allocate costs.  Even with the structural separation requirement in

16    place, Verizon is able to engage in cost shifting via joint marketing of local and long distance

17    services using BOC employees and other resources, and by furnishing various services to

---

191.  Verizon, SBC and BellSouth all provide long distance service through resale.  Qwest, as a result of accounting irregularities, provided long distance service through a resale Section 272 affiliate until November 3, 2003, and did not, at that time, merge its resale affiliate into its facilities-based affiliate.  The most recently filed Qwest Section 272 biennial audits cover the period from January 2, 2003 through January 1, 2004.  As a result, there is less than 2 months worth of audited data regarding a start-up facilities based Qwest Section 272 affiliate. See, Federal Communications Commission, *Qwest Communications International, Inc. Section 272 Biennial Audit*, EB Docket No. 03-198, Ernst & Young, Report of Independent Accountants on Applying Agreed-Upon Procedures, filed June 10, 2004, at 8.

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1     both its BOC and long distance entities out of a separate "service company" that is able to

2     engage in *de facto* resource sharing for the benefit of both the BOC and long distance

3     entities.  As noted by the Pennsylvania Public Utility Commission during the New York

4     Sunset proceeding:

5

6          The separate accounting requirement of section 272 is consistent with the PA PUC's
7          interest in preserving their right to do an audit.  Audits can produce useful
8          information for policymakers such as the PUC.  With recent changes and reduction
9          in FCC accounting and reporting, the collapse of the affiliate into the incumbent
10         local exchange carrier perpetuates what appears to be a continual reduction in
11         available information, and, therefore, is not a preferred change.  The PA PUC
12         currently proscribes separate accounting for operations related to ILEC, CLC, IXC,
13         and CAP.  Maintaining this separation will be difficult if the FCC allows the section
14         272 safeguards to collapse.  This separate accounting method assists the PA PUC in
15         its ability to design rates for the local exchange carrier segment, including the
16         unbundled network elements. The ability to readily identify costs and revenues from
17         the business segment is critical to ongoing rate review.[192]

18

19  Q.  What, if anything, has Verizon and MCI done to allay this type of concern?

20

21  A.  To date, Verizon and MCI have not divulged any details as to their plans regarding their

22      specific intended organization of MCI assets within the combined post-merger entity.

23      However, the merged entity would emerge with *no regulatory oversight whatsoever* on its

24      ownership of vast MCI and Verizon facilities and its use of these facilities to provide

25      combined local and long distance services, making it almost impossible to detect and prevent

---

192.  Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC Docket No. 02-122, Comments of the Pennsylvania Public Utility Commission, July 22, 2002, at 4-5.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

1    cost misallocation, cross-subsidization and discrimination favoring the merged entity's

2    competitive services at the expense of customers of monopoly local and access services.

3

4    **The Verizon/MCI and SBC/AT&T mergers will result in *de facto* geographic market**
5    **allocation as between the two mega-carriers, leaving each to largely remonopolize the**
6    **enterprise market within its BOC operating footprint.**
7

8   Q.  If Verizon is not significantly more likely to compete out of region after acquiring MCI than

9      before, what does that suggest as to the potential for continued competition between MCI (as

10     part of Verizon) and AT&T (as part of SBC)?

11

12  A.  SBC's Mr. Kahan has *conceded* that SBC has been unable to profitably serve enterprise

13     customers whose principal service requirements fall outside of the SBC BOC footprint.[193]

14     Verizon declarant Mr. McCallion states that "Using Verizon's strong local network and

15     MCI's global fiber-optic and broadband networks, the combined company will be able to []

16     provide end-to-end connectivity to the customer."[194] Neither Verizon nor MCI offer any

17     explanation or suggestion as to how their merger will alter this condition *except where the*

18     *service is being furnished within the Verizon footprint and MCI is, as a practical matter,*

19     *relieved of the requirement to "pay" Verizon for special access at Verizon's*

20     *supracompetitive prices.*  Put differently, but accepting Mr. Kahan's "sweet spot"

21     explanation for SBC's focus on in-region enterprise customers, or Verizon's claim that it

22     would take too much time to invest in its own facilities to enter out of region markets, the

---

193.  *Kahan Declaration*, SBC/AT&T proceeding, at paras. 23-28.

194.  *McCallion Declaration*, at para. 21.

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    merger will afford Verizon/MCI a formidable – perhaps *insurmountable* – competitive

2    advantage in serving both Verizon and MCI enterprise customers within the Verizon region,

3    but will do little or nothing to improve the *out-of-region* situation for Verizon or MCI.

4

5    Presumably, Verizon has encountered similar conditions in attempting to expand beyond its

6    legacy Bell Atlantic/NYNEX and GTE ILEC serving areas.  As I have previously noted,

7    Verizon's Mr. McCallion has specifically identified the importance to the post-merger

8    Verizon of "Verizon's local and regional presence," and MCI's Ms. Hallbach has recognized

9    that Verizon does not presently compete out-of-region.[195]  After its merger with MCI,

10   Verizon/MCI would enjoy precisely the same type of special access competitive advantage

11   within the Verizon "sweet spot" that SBC/AT&T will achieve within the SBC "sweet spot."

12   Verizon/MCI will have the same type of economic incentive to concentrate its efforts in the

13   Verizon region as SBC/AT&T will have for concentrating its efforts in the SBC region.  In

14   fact, MCI has already expressed publicly its recognition of this considerable access charge

15   advantage.  In a March 29, 2005 press release explaining its rejection of Qwest's revised $26

16   per share offer for the acquisition of MCI, MCI gave as one of its considerations for

17   accepting the lower-valued Verizon offer the superior "access economics" that would be

18   available to MCI by joining with Verizon.[196]  Verizon serves some 53.0-million switched

19   access lines, 21.6-million of which are in the Northeast, whereas Qwest serves only 13.4-

---

195. *Hallbach Declaration,* at para. 55.

196. MCI Press Release, *MCI Accepts Revised Proposal From Verizon*, March 29, 2005.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

1   million switched access lines spread across fourteen western states.[197]  In its September, 2004

2   analysis of the proposed MCI/Verizon Merger, Verizon noted that <<BEGIN VZ/MCI

3   PROPRIETARY

4                                                             END VZ/MCI PROPRIETARY>>

5

6   Thus, when considered together with the pending SBC/AT&T merger, the result of both

7   mergers will almost certainly be a *de facto* geographic market allocation of enterprise

8   customers as between post-merger Verizon and post-merger SBC.   At the same time, the

9   persistence of supracompetitive special access prices will operate to keep other competitors –

10  including CLCs and the other two RBOCs (i.e., BellSouth and Qwest) – out of both the

11  Verizon and the SBC states.

12

13  Q.  Have others expressed similar concerns?

14

15  A   Yes.  In comments to the FCC in the SBC/AT&T merger proceeding, Cbeyond *et al.* and its

16  declarant Dr. Wilke suggest that the RBOCs have up to now operated under at least a tacit

17  agreement not to compete with one another, and that such an outcome is even more likely in

---

197.  ARMIS Report 43-08, Switched Access Lines in Service, 2004, accessed May 6, 2005. "Northeast" is considered Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont.

198.  *Verizon, Project Eli, Finance,* September 23, 2004, at 13, VZCA 00000825, 00000861.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

1    an industry dominated by two giant, yet roughly equal sized firms. [199]  While I certainly do

2    not disagree with Dr. Wilkie's analysis – one that is amply supported by observed RBOC

3    conduct over the past twenty-one years – I would note that for the reasons that I have

4    previously discussed, geographic market allocation is the most likely outcome of the

5    combined Verizon/MCI and SBC/AT&T mergers even in the absence of a deliberate policy

6    on the part of each firm to stay out of the other's territory.

7

8  Q.  Are there other ways in which the post-merger Verizon and post-merger SBC will reap

9      competitive benefits from concentrating on activities within their own (albeit expansive)

10     geographic areas?

11

12  A.  Yes.  Various types of reciprocal accommodations as between post-merger Verizon and post-

13      merger SBC are also a likely outcome, whose effect would be to exclude all smaller rivals –

14      including BellSouth and Qwest – from competing within the greater Verizon/SBC footprint.

15      Qwest likely appreciates this, which may well explain its frenzied – and ultimately

16      unsuccessful – pursuit of MCI.  Such reciprocal arrangements can be easily accomplished

17      through the use of volume-based discounts for essential facilities.  With Verizon and SBC

18      together controlling the only two national interexchange carriers with significant presence in

19      the national enterprise customer market, tacit conduct that works to preserve and to allocate

---

199.  Federal Communications Commission, *SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, WC Docket No. 05-65, *Petition to Deny of Cbeyond Communications, Conversent Communications, Eschelon Telecom, Nuvox Communications, Tds Metrocom, XO Communications and Xspedius Communications*, filed April 25, 2005, at 41-54.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    the enterprise market between the two of them and to exclude all others is certainly an

2    entirely plausible outcome.

3

4    As long as special access charges remain at their present heights and create the kind of

5    economic barrier that has supposedly made SBC's and Verizon's attempts to compete out-of-

6    region unsuccessful, the net result of the two mega-mergers will be to make Verizon/MCI the

7    *de facto* monopoly provider of enterprise services in the Verizon states and to make

8    SBC/AT&T the *de facto* monopoly provider of enterprise services in the SBC footprint.

9    Competitors – including the other two RBOCs – will certainly confront even greater barriers

10   to entry within these fortress monopoly areas than those that Verizon has confronted when

11   attempting to compete out of region.

203

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1                              CONDITIONS FOR APPROVAL

2

3    **If the Commission determines that the merger should be allowed to go forward, it should**
4    **consider and adopt specific measures to mitigate the substantial economic and competitive**
5    **harms that would otherwise result from the transaction.**
6

7    Q.   Dr. Selwyn, does the proposed merger of Verizon and MCI as presently structured satisfy the

8         specific requirements set out at §854(b) and (c) of the California Public Utilities Code?

9

10   A.   No, it does not.  The Joint Applicants have not shown that the merger will actually result in

11        any positive short-term and long-term economic benefits for ratepayers, certainly none that

12        would overcome the substantial risks and adverse effects upon competition in the California

13        telecommunications market that will surely arise if the transaction goes forward.  Indeed, the

14        specific quantification of the "total short-term and long-term forecasted economic benefits to

15        ratepayers" where the Commission has ratemaking authority that have been presented by the

16        Joint Applicants are so insignificant as to compel the conclusion that no net positive benefits

17        *to ratepayers* arising from the merger can be identified.  By joining Verizon with its second

18        largest competitor in the California telecommunications market, the merger will increase

19        market concentration overall, and pave the way for the post-merger Verizon to raise prices in

20        both the consumer and enterprise services markets.  The merger will result in a loss of at least

21        <<BEGIN VZ/MCI PROPRIETARY        END VZ/MCI PROPRIETARY>> jobs in

22        California, producing a total $807-million net present value negative impact on the California

23        economy overall.  The facts of this case do not permit the Commission to make the required

24        §854 findings, and as such the proposed merger should not be allowed to go forward.

204

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  §854(d) provides that "when reviewing a merger, acquisition or control proposal, the

2       commission shall consider reasonable options to the proposal recommended by other parties,

3       including no new merger, acquisition or control, to determine whether comparable short-term

4       and long-term economic savings can be achieved through other means while avoiding the

5       possible adverse consequences of the proposal."  In that regard, are there any measures that,

6       if accepted by the Joint Applicants as conditions for approval, could eliminate at least some

7       of the harms to ratepayers, to competition, and to the California economy that you have

8       identified as arising from the proposed merger?

9

10 A.  While I do not believe that the merger satisfies the statutory requirements for approval by the

11      Commission, in the event that the Commission determines otherwise there certainly are

12      measures that can be initiated that would offset at least some of the potential harms

13      associated with the transaction.  In the final analysis, however, I do not believe that it will be

14      possible to devise a set of conditions that would overcome all of these negative impacts.

15

16 Q.  What types of conditions or mitigation measures could the Commission consider to address

17      the specific harms and concerns that you have been discussing?

18

19 A.  For convenience, I have prepared a summary of the various merger conditions that I discuss

20      below, which is provided as Attachment 6 hereto.  Probably the best way to consider

21      potential mitigation measures is in the context of the specific requirements of §854.

22

205

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1   •  *Benefits to ratepayers*.  §854(b)(1) requires that the Commission find that the merger

2       will provide short-term and long-term economic benefits to ratepayers.  As I have

3       explained, the Joint Applicants have not satisfied that burden because all of the

4       purported "benefits" are highly general and unspecific, and in any event have not been

5       shown to flow specifically to *ratepayers*, as required by the statute.  The §854(b)(1)

6       deficiency could, however, be overcome if the short-term and long-term forecasted

7       economic benefits to be allocated to *California* ratepayers where the Commission has

8       ratemaking authority are specific and are sufficient to overcome the risks to competition

9       and to the California economy.

10

11   •  *Harms to competition*.  §854(b)(3) requires the Commission to find that the merger will

12       "not adversely affect competition," but in fact the merger will significantly increase

13       Verizon's market power and market concentration overall, and will result in decidedly

14       less competition in the California telecommunications market.  The various competitive

15       harms that will result when Verizon's second largest competitor is taken out of the

16       market can be offset by the adoption of various regulatory measures that would assure

17       competitor access to Verizon's network at cost-based rates *notwithstanding the putative*

18       *"non-impairment" findings with respect to certain unbundled network elements by the*

19       *D.C. Circuit Court of Appeals and the FCC*.

20

21   •  *Harm to California ratepayers*.  While the continued availability to the remaining

22       competitive carriers of all UNEs will perhaps help to make at least *some* level of

23       competition feasible, the departure of the two largest local service competitors from the

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                 LEE L.  SELWYN

1       California market – MCI and AT&T – will surely result in less competition overall,

2       certainly in the immediate future.  Regulation will need to be adapted to recognize and

3       specifically address the return of the California telecommunications market to a near-

4       monopoly condition – these measures would also need to be coordinated and largely

5       replicated in the pending SBC/AT&T merger application as well.

6

7    •   *Harms to employment and to the California economy*.  The various adverse impacts upon

8       existing Verizon and MCI employees and the California economy overall resulting from

9       the loss of jobs and the shifting of Verizon and/or MCI activities that now take place in

10      California to other parts of the country can be addressed and minimized through specific

11      job- and employee benefits-retention commitments that would need to be accepted by

12      the Joint Applicants as conditions for approval.

13

14   **Assuring that the merger will produce benefits to ratepayers**

15

16   Q.  If as you have determined the merger will not satisfy the §854(b)(1) requirement that it

17      provide short-term and long-term economic benefits to ratepayers, what conditions would

18      need to be adopted so as to overcome this specific defect?

19

20   A.  The Joint Applicants have advised their directors and shareholders that the "national synergy

21      benefits" arising from the merger, when expressed in terms of their net present value (NPV),

22      are forecast to be in the range of $7-billion.  Accepting for purposes of discussion the

23      accuracy of this forecast, virtually all of that $7-billion will flow to the combined company's

207

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    shareholders.  However, §854(b)(1) requires that merger benefits inure specifically to

2    *ratepayers*, and it is that specific showing that the Joint Applicants have failed to make.  In

3    fact, more than half of the "synergy gains" identified by Verizon and MCI in their disclosures

4    to shareholders and directors actually operate at cross-purposes with specific requirements of

5    §854.  For example, §854(c)(4) requires that the merger "be fair and reasonable to affected

6    public utility employees," and §854(c)(6) requires that the merger "be beneficial on an

7    overall basis to state and local economies, and to the communities in the area served by the

8    resulting public utility."  Yet clearly, by targeting a reduction of 7,000 employees, a large

9    portion of the $7-billion in national synergy benefits is expected to arise through work force

10   reductions in both MCI and in Verizon.  Although we do not have a specific figure for the job

11   loss *in California*, a straight extrapolation based upon proprietary estimates in each category

12   (see Attachment 5), would indicate potential job losses in this state of <<BEGIN VZ/MCI

13   PROPRIETARY        END VZ/MCI PROPRIETARY>> jobs, representing $269-million in

14   payroll reductions when expressed on the same net present value basis as was used to

15   develop the total $7-billion estimate of synergy gains.  As I have previously noted, a direct

16   Verizon payroll reduction of $269-million has a multiplicative impact upon the California

17   economy overall, which I estimate (again in NPV terms) at roughly $807-million.  Clearly,

18   one of the major challenges facing the Commission in this proceeding is the need to balance

19   the putative "economic benefit" of the headcount and other synergies allocated to California

20   by Verizon of $6.6-million against the total $807-million harm to the California economy

21   that those same job cuts will produce.

22

23   Q.  How might these and any other seemingly conflicting objectives be reconciled?

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    A.   According to the Joint Applicants, the net present value of the full extent of the "economic

2         savings"inuring to California is all of $6.6-million, or less than one-tenth of one percent of

3         the more than $7-billion in "national" economic savings that the two companies forecast to

4         result from their proposed transaction.  Indeed, if Verizon and MCI persist in this patently

5         absurd claim while at the same time confronting the California economy with $807-million

6         in negative impacts arising from their expected "head count" reductions, the Commission

7         will have no choice but to summarily reject the proposed transaction out-of-hand.  As a

8         threshold matter, therefore, it is critical for the Commission to demand that the Joint

9         Applicants provide a *legitimate* "allocation" of their aggregate national synergy benefits to

10        California.

11

12        As explained above, I have estimated the total short-term and long-term economic benefits

13        properly allocable to California to be *at least* $206-million, and probably more.[200]  This

14        should be the baseline value against which all other "benefits" and "harms" arising from the

15        merger are evaluated, and against which proposed mitigation measures advanced by other

16        parties are considered, as the Commission is required by §854(d) to do.

17

18   Q.   Does §854(b)(2) require that California ratepayers receive this share of benefits in the form

19        of cash refunds or Commission-mandated rate reductions?

---

200.  As a result of the extremely short proceeding time, as well as the delay in Verizon's
production of a working synergy model, I have not adjusted the Verizon synergy model, but
have produced an alternate estimate based upon the $7.3-billion publicly released synergy
information.  As explained by the testimony of Karen Watts-Zagha on behalf of ORA, the cost of
capital and revenue synergies used by Verizon are incorrect.  With these adjustments, the
California synergy calculation would be higher.

209

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1  A.  No, not necessarily.  It does require, however, that the aggregate short-term and long-term

2       *economic value* of all identified benefits provided to California ratepayers be not less than 50

3       percent of the total $206-million California share, i.e., not less than $103-million.

4

5  Q.  How can ratepayers receive "not less than 50 percent of the total short-term and long-term

6       forecasted economic benefits" other than as cash payments or mandatory rate reductions?

7

8  A.  In principle, where positive synergy gains are to arise from the merger, ratepayers might

9       expect to receive the required share of such benefits ratably through the operation of

10      competitive marketplace forces, provided of course that the level of competition in the

11      market for those specific Verizon/MCI services where the Commission has ratemaking

12      authority is sufficient to force rates down to forward-looking long run economic cost – i.e., to

13      assure that the efficiency gains arising from the merger are flowed through in the form of

14      lower prices for the (by then presumably competitive) services furnished by the post-merger

15      Verizon.  In previous RBOC merger cases (SBC/Pacific Telesis and Bell Atlantic/GTE), the

16      Commission limited the *explicit* mandatory ratepayer share to identified synergies arising in

17      the early years of each merger, adopting the merging parties' position that by the end of that

18      initial period competitive marketplace forces would be sufficient to assure flow-through to

19      ratepayers.[201]

20

21  Q.  In hindsight, were those expectations realized?

_____

201.  *Verizon/Pacific Telesis Merger Order*; *NYNEX/Bell Atlantic Merger Order*.

210

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  No, and in fact the level of competition – particularly for mass market consumer services – is

2       on the decline, and will erode even more rapidly if Verizon is allowed to take MCI out as its

3       second largest competitor and if SBCn is concurrently allowed to take out AT&T as its

4       largest competitor.

5

6  Q.  But aren't Verizon and SBC – post-merger – going to be competing with each other?

7

8  A.  While both Verizon and SBC are claiming that this will occur, more than twenty years of

9       history and any number of unfulfilled "commitments" can only lead to the conclusion that

10      such claims are offered solely for purposes of securing merger approval, after which they

11      will turn out to be as vacant as in all prior merger proceedings.  Post-merger competition

12      between the two mega-RBOCs would require that post-merger Verizon and post-merger SBC

13      actually compete aggressively with each other in the other's incumbent territory – *something*

14      *that has never happened in the more than twenty years since the RBOCs were carved out of*

15      *the predivestiture AT&T despite repeated promises and "commitments" by both companies*

16      *that they would compete out-of-region*.  Indeed, SBC's Mr. Kahan in his testimony in A.05-

17      02-027 now concedes the extreme difficulty of out-of-region competition – particularly in the

18      consumer services market:  *These difficulties are in no way reduced or eliminated by*

19      *Verizon's proposed acquisition of MCI or SBC proposed acquisition of AT&T*.  MCI has

20      *demonstrated* its own inability to compete for consumer service business using the "last

21      mile" facilities of other RBOCs and other ILECs – *and now concedes that those difficulties,*

22      *coupled with a series of adverse regulatory and judicial rulings, have forced it to scale back*

23      *its active marketing of consumer services*.  Given this history and the present regulatory

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    climate with respect to competitive mass market services, there is no reasonable basis for the

2    Commission to expect or to count on any consequential competition between post-merger

3    Verizon and post-merger SBC, and must dismiss any claims by either company to the

4    contrary as simply not credible and not borne out by identifiable facts or other evidence.

5

6  Q.  What about competition from other sources – won't that be sufficient to assure flow-through

7      of merger synergies by Verizon?

8

9  A.  No.  If the two largest CLCs (MCI and AT&T) and the two largest *facilities-based*

10     interexchange carriers (also MCI and AT&T) have concluded that they cannot compete with

11     the RBOCs, it would be nothing short of irrational for anyone to expect that smaller carriers

12     owning neither "last mile" nor interexchange facilities and having no consequential

13     embedded customer base would be successful in challenging an even stronger Verizon than

14     MCI and AT&T ever had to confront.  And as I have discussed in considerable detail above,

15     none of the putative "intermodal" alternatives to basic wireline local exchange service fall

16     within the same "relevant product market" because none of these are sufficiently close

17     substitutes as to constrain wireline ILEC market power with respect to basic local wireline

18     service.

19

20  Q.  What is the alternative to outright refunds and/or rate decreases to assure that California

21      ratepayers receive the minimum $103-million ratepayer share of the California economic

22      benefits of the merger?

23

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    A.    One approach is for the Commission to consider the $103-million ratepayer share as a sort of

2          "currency" to be "spent" on an array of mitigation measures based upon each's value to

3          California ratepayers and to the California economy generally.  Requiring that such alternate

4          forms of "provid[ing] short-term and long-term forecasted economic benefits to ratepayers"

5          satisfy the requirement of §854(b)(2) be subject to specific quantification will help to assure

6          that the statutory goal is achieved.  A repetition of the "on faith" presumptions about the

7          putative growth of "competition" as the means for conferring such economic benefits upon

8          ratepayers – the approach used by the Commission in the SBC/Telesis and Bell Atlantic/GTE

9          mergers – are no longer valid in the face of dwindling competition and escalating market

10         concentration.  As the Commission there noted, "There may be a merger that at some point

11         crosses the line and produces a giant that is 'too big,' with too much 'reach,' and with a

12         resulting market that is too concentrated, wherein the adverse consequences cannot be

13         mitigated."[202]  The instant mergers are precisely the 'too big' with a 'too concentrated' result

14         that the Commission contemplated at that time.

15

16         **Measures to offset the merger's adverse impact on competition**

17

18   Q.    Inasmuch as the Verizon/MCI and the concurrent SBC/AT&T mergers will remove the two

19         largest competitive carriers from both the California local and long distance markets, are

20         there measures that the Commission could adopt that would eliminate the loss of competition

21         that would result from the two mergers?

22

---

202.  *GTE/Bell Atlantic Merger Order, Slip op.*, at 144.

213

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.   There is no practical means for replacing MCI as a formidable competitive presence in the

2       California local and long distance markets, and the very same regulatory conditions that led

3       MCI to withdraw from active marketing of consumer services would surely work to

4       discourage others from attempting to fill the void left by MCI's (and AT&T's) departure.

5       Indeed, if the Commission has any hope of encouraging other competitive carriers to enter

6       and/or to expand their activities in the California consumer market, it will be necessary that

7       the specific regulatory conditions that led MCI to exit the consumer market, as discussed by

8       MCI witness Ms. Hallbach, be reversed.

9

10      The FCC had relied upon the unbundling mandates in the 1996 Act, along with nominal

11      evidence of actual entry, when it let the RBOCs begin offering interLATA service in every

12      state – only to see the primary competitors falter as soon as the RBOCs were able to leverage

13      their market power and market dominance in local exchange services to quickly overwhelm

14      the largest CLC-IXCs – MCI and AT&T – forcing both to "throw in the towel" and join up

15      with the very RBOCs that had been successful in shutting them out of the market.

16      Subsequently, over the objections of state commissions,[203] the FCC began to summarily

17      permit the "separate affiliate" protections set out at Section 272 of the Act to lapse, by

18      operation of law[204] rather than following an affirmative examination of the need for

19      continuing these competitive safeguards as  necessary to meet their core objectives.  Almost

---

203.  Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC 02-112, *Memorandum Opinion and Order*, 17 FCC Rcd 26869 (2002), at Copps/Adelstein dissent.

204.  *Id.* at paras. 14-15.

214

ETI ECONOMICS AND TECHNOLOGY, INC.

1    immediately thereafter, the FCC launched a rulemaking proceeding to consider whether the

2    time had come to end dominant carrier regulation of RBOC in-region, interstate and/or

3    international services because of "changes to the competitive landscape within the

4    interexchange market."[205]

5

6    The types of protections that were encompassed within Sections 271 and 272 of the Act were

7    not novel or untested approaches.  They evolved from decades of experience with specific

8    and well-documented opportunities for the abuse of market power by the incumbent LECs

9    and their long distance affiliates, and captured elements of the remedies that had previously

10   been implemented as a result of two major antitrust actions that the Justice Department

11   pursued against MCI and the Bell System (which ended in 1956 and 1982, respectively), as

12   well as time-tested regulatory mechanisms used by the FCC and state PUCs for preventing

13   anticompetitive practices.  Yet these protections were cavalierly abandoned by the FCC

14   before there was time to ensure that a competitive industry had developed and that such

15   competition was sustainable and irreversible.

16

17   Now, in connection with their review of the mergers and industry conditions as they will

18   exist after these mergers, the Commission has the opportunity *and the responsibility* to

19   reinstate these critical pro-competitive safeguards – and to apply them to Verizon California

20   as well, despite the fact that Verizon California, as a former GTE operating company, was

---

205.  Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC 02-112, *Further Notice of Proposed Rulemaking,* 18 FCC Rcd 10914 (2003).

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

1    not subject to Sections 271 and 272.  Where permitted, the protections afforded by Section

2    271 and 272 of the Act – and those set out at PU Code §709.2 – should be revived.

3    Specifically:

4

5    •    The 47 U.S.C. §272(a) and Cal.  PU Code §709.2(c)(3) separate affiliate requirement

6         should be made applicable to all Verizon long distance and other competitive services.

7

8    •    The conduct requirements applicable to the separate affiliate and its relationship to

9         Verizon's ILEC operations at 47 U.S.C. 272(b)(1) through (b)(5) and at Cal.  PU Code

10        §709.2(c)(1) and (c)(2) should be strictly enforced.

11

12   •    An imputation rule applicable to all use of ILEC services by any Verizon affiliate or

13        incorporated into any competitive services provided by Verizon California should be

14        adopted and strictly enforced.

15

16   •    Measures necessary to assure, going forward following the merger, "that there is no

17        anticompetitive behavior by the local exchange telephone corporation, including unfair

18        use of subscriber information or unfair use of customer contacts generated by the local

19        exchange telephone corporation's provision of local exchange telephone service" per

20        Cal.  PU Code §709.2(c)(2), and "that there is no substantial possibility of harm to the

21        competitive intrastate interexchange telecommunications markets" per Cal.  PU Code

22        §709.2(c)(4), should be adopted and strictly enforced.

23

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1   Q.   Suppose that MCI was willing to divest its consumer local and long distance business as a

2        condition for approval of the merger.  Would that help to assure the survival of competition?

3

4   A.   Not by itself, but perhaps if divestiture is accompanied by all of the competitive conditions

5        and safeguards that I have outlined above *and* if a qualified purchaser of the to-be-divested

6        consumer operations can actually be found.  MCI has stated that under existing regulatory

7        conditions it cannot successfully compete in the consumer market.  Verizon's overwhelming

8        dominance of the local exchange market when coupled with its ability to jointly market and

9        to bundle local and long distance services has enabled it to capture the long distance market

10       shares shown in Figure 1 in such a brief period.  Any potential purchaser of the MCI

11       consumer business in California would necessarily have to confront this reality going

12       forward, and recognize that it could not expect to retain the remaining MCI stand-alone long

13       distance customers for very long.

14

15       With respect to *local* service, any purchaser of the MCI customer base would confront

16       precisely the same problems with respect to the non-availability of UNE-P that led MCI to

17       withdraw from this segment.  Indeed, one would have to assume that, acting prudently and in

18       its shareholders' best interests, MCI had itself explored the possibility of selling its consumer

19       business rather than simply abandoning it.  The fact that MCI had chosen to scale back,

20       rather than sell-off, its consumer segment certainly suggests a lack of interest on the part of

21       potential buyers, which is hardly surprising given that any buyer would obviously confront

22       the same regulatory conditions that drove MCI from the consumer market.  Significantly, the

23       going business market value of MCI's consumer business was almost certainly higher a year

217

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    ago than at any time since, and is almost certainly depressed in the wake of the announced

2    mergers between Verizon and MCI and between SBC and AT&T.  Even if the Commission

3    were to require divestiture as a condition for approval, there is no assurance of a viable

4    purchaser, nor is there any assurance that, even if one were found, the business could be

5    operated successfully going forward.

6

7    Q.   Have divestiture proposals – where the merger partners both compete in the same market –

8         been rejected in the past as failing to provide a sufficient basis for allowing such a merger to

9         go forward?

10

11   A.   Yes, in fact, in a strikingly similar case, the Department of Justice concluded that where the

12        business segment that was being proposed for divestiture did not have a realistic chance of

13        competing successfully with the merged entity following such divestiture, such a solution

14        was not sufficient to allow the merger to go forward.

15

16   Q.   To which case are you referring?

17

18   A.   In 1995, Microsoft had agreed to acquire the software firm Intuit, the publisher of a line of

19        personal finance ("PF")/Checkbook software (Quicken), TurboTax, and various other

20        financial software products.  In its filing in opposition to the proposed merger with the U.S.

21        District Court for the Northern District of California, the DoJ explained its position as

22        follows:

23

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L. SELWYN

1          2.  The PF/Checkbook Software Market is highly concentrated, with Intuit's
2    "Quicken" product commanding a 1994 unit sales share of 69% and a total installed
3    base of more than seven million customers. Microsoft's PF/Checkbook product,
4    "Microsoft Money," was introduced in 1991, and the resulting competition led to
5    lower prices and increased innovation.  Microsoft is now the number two competitor
6    in the PF/Checkbook Software Market, with a 1994 unit sales market share of about
7    22%, and an installed user base of about one million customers.  Absent the
8    acquisition, Microsoft Money would likely continue to compete successfully
9    because (a) Microsoft already has devoted substantial resources to the Money
10   product, which it would increase even more substantially in the future, and (b) the
11   PF/Checkbook Software Market, for the reasons explained below, is strategically
12   important to Microsoft.
13
14         3.  The effects of this proposed acquisition could reach well beyond today's
15   PF/Checkbook Software Market. The acquisition threatens harm to consumers in
16   other important areas of commerce, especially the area of personal computer based
17   ("PC-based") home banking, which is a relatively tiny part of the PF/Checkbook
18   Software Market today.  Before the acquisition, Microsoft and Intuit had
19   independent plans to compete in the field of electronic commerce, starting with
20   enhancement of their PF/Checkbook software products to enter the emerging home
21   banking marketplace.  Established PF/Checkbook software products provide an
22   important asset to develop home banking, in part because existing customers are
23   likely candidates for PC-based home banking. ...
24
25         5.  ... In an attempt to avoid an obvious antitrust challenge, Microsoft devised a
26   planned "fix," whereby it has agreed simultaneously to transfer part (but not all) of
27   Microsoft's Money business unit to a third party, Novell, Inc.  *The purported fix*
28   *would fail to remedy the anticompetitive effects of the proposed Intuit transaction.*
29   *Novell, with the assets it is supposed to receive from Microsoft, cannot be nearly as*
30   *effective a competitor with Money as Microsoft is and would be absent the*
31   *transaction.*[206]
32

---

    206.  *U. S.  v.  Microsoft Corporation and Intuit, Inc.*, Complaint for Injunctive Relief
Against Combination in Violation of Section 7 of the Clayton Act, filed April 27, 1995 with the
United States District Court for the Northern District of California , emphasis supplied.
Subsequent to the filing of this Complaint, Microsoft and Intuit called off their proposed
transaction.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    In other words, the Department concluded that while *Microsoft* would be an effective

2    competitor with its *Money* product to Quicken in the PF/Checkbook software market, the

3    proposed divestee, Novell, would not be capable of competing with Microsoft/Intuit.  As the

4    Department explained in its competitive analysis:

5

6        32.  Actual and potential competition between Microsoft and Intuit, the two
7        strongest and most significant competitors in the PF/Checkbook Software Market,
8        will be eliminated.  Competition from Novell against Quicken will be at best a weak
9        replacement for the lost competition from Microsoft.  Microsoft, the strongest
10       competitor in the software industry, has the resources, ability and resolve to
11       challenge Intuit's leading market position (in both the OEM and retail channels),
12       while Novell does not.  Absent the acquisition, competition between Quicken and
13       Microsoft Money would increase.  Microsoft's reason for proposing the acquisition
14       of Intuit was its identification of the PF/Checkbook Software Market as strategically
15       important to Microsoft as a leading home PC application today, as a front end for
16       home banking tomorrow, and as a front end more generally for on-line financial
17       transactions in the more distant future.  ...
18
19       35.  Potential new competitors, if any, would find it even more daunting to
20       compete against Quicken, the number one product in the market, if it were in
21       Microsoft's hands.  Microsoft would retain many of the advantages that made
22       Microsoft Money a powerful number two competitor against Quicken.  Instead of
23       using those advantages to compete against Quicken, Microsoft would be able to use
24       the combined advantages of both to dominate potential customers and strategic
25       partners more thoroughly than Intuit could do with Quicken or Microsoft could do
26       with Microsoft Money – especially if the two had to compete with each other.[207]

27

28   MCI has been one of Verizon's strongest competitors, and any potential purchaser/acquirer

29   of MCI's consumer business would not be capable of replacing MCI as an effective

30   competitive force in constraining Verizon's market power.  The divestee would not have

31   access to the MCI brand, to the MCI network, to MCI Labs, or to most other MCI assets and

---

207. *Id.*

220

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                      LEE L.  SELWYN

1    resources.  In the Microsoft/Intuit transaction, Microsoft controlled Windows, the dominant

2    PC operating system, and even though it was in the number two position relative to Intuit in

3    the PF/Checkbook software market, its dominance in the OS market made it a serious

4    competitor.  The proposed divestee, Novell, had no leverage at all in mass market software,

5    and had by 1995 been singularly unsuccessful in competing with Microsoft with word

6    processing, spreadsheet and graphics software it had acquired from other companies.  If

7    divestiture is to make a difference, the divestee must be a serious and capable player.  Given

8    MCI's difficulties, it is highly unlikely that a qualified purchaser of the MCI consumer

9    business could be found.

10

11   Q.  Assuming that a qualified purchaser/divestee of the MCI consumer business was identified,

12       would divestiture standing alone be sufficient to overcome the potential competitive harms

13       that you have identified?

14

15   A.  No.  Divestiture would be a valid merger condition only if the purchaser/divestee had a

16       reasonable chance of competing successfully with Verizon.  And to do that, *all* of the specific

17       regulatory impediments that operated to drive MCI out of the consumer market would need

18       to be rescinded.  The purchaser/divestee would need to be able to obtain UNE-Ps at TELRIC-

19       based rates from Verizon.  Verizon would need to be precluded from pursuing the (now

20       former) MCI stand-alone long distance customers that would be included in the divestiture.

21       And the post-merger Verizon would have to be expressly precluded and enjoined from

22       seeking to reimpose those regulatory changes subsequent to the closing of the merger or the

221

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    divestiture.  Finally, so as not to discourage entry and expansion by other competitors, these

2    same conditions would have to apply to all competing carriers, not just to the divestee.

3

4   Q.   Should these requirements remain in place indefinitely, or might there be a time when some

5        or all of them could be relaxed or rescinded?

6

7   A.   Never is a long time, and I am not suggesting that policies adopted here could not be

8        revisited if conditions change.  However, in order to be effective and to avoid confronting

9        would-be entrants and investors in competitive services with undue regulatory uncertainty, it

10       is critical that the competitive safeguards and unbundling requirements remain in place until

11       such time as *sufficient* competition becomes firmly established.  Many of the current policies

12       with respect to tests for sufficient competition apply highly theoretical standards rather than

13       empirical real-world analysis, and in nearly a decade following enactment of the 1996 federal

14       legislation, these theoretical standards have been proven, time and again, to be incapable of

15       assuring competitive viability.  For example, Sec.  271(c)(1)(a) can be satisfied by the

16       existence of as few as *one* facilities-based carrier providing residence and business

17       services;[208] the FCC subsequently ruled that a competitive carrier providing services via

18       UNEs obtained from the Bell operating company and owning no facilities of its own would

19       also satisfy this requirement.[209]  The *USTA II* Court's finding of "non-impairment" with

---

208.  47 U.S.C. §271(c)(1)(A).

209.  *See,* Federal Communications Commission, *Application of Ameritech Michigan Pursuant to Section 271 of the Communications Act of 1934, as amended, To Provide In-Region, InterLATA Services in Michigan*, CC Docket 97-137, *Memorandum Opinion and Order*, rel.

(continued...)

222

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   respect to UNE-P and UNE-switching was also based upon similar *existential* evidence,

2   rather than upon evidence that competition had developed to the point where the incumbent's

3   market power was actually being constrained.

4

5   Going forward, the Commission should require that all competitive safeguards remain in full

6   force and effect until sufficient *facilities-based* competition has actually developed to the

7   point where Verizon's market power as the incumbent LEC is diminished to the point where

8   it can no longer dictate prices or control essential facilities.  For example, the Commission

9   could require that prior to revisiting these competitive safeguards a minimum of 30% of the

10   primary line consumer market is being served by *facilities-based* competitors (and not via

11   UNEs), and that such facilities-based services are available to at least 90% of Verizon

12   California subscribers.  These parameters are suggestions, of course, but even with a

13   facilities-based share of 70%, Verizon California's consumer segment HHI would still

14   exceed 5000, well above the 1800 level that the Department of Justice identifies as evidence

15   of a "highly concentrated" market.

16

17  Q.  Have the Joint Applicants addressed the possibility of divestiture of the MCI consumer

18      business?

19

20  A.  <<BEGIN VZ/MCI PROPRIETARY

21

---

209.  (...continued)
August 19, 1997, at paras. 92-101.

223

REDACTED – PUBLIC VERSION



Cal. PUC A.05-04-020                    LEE L.  SELWYN



END VZ/MCI PROPRIETARY>>

Q.   Are there other specific competitive safeguards and conditions that should be adopted if the

merger is to be allowed to go forward?


A.   Yes.  As I have discussed (at pages 148-156 above), the merger will create vertical

integration in both the Internet and enterprise business segments.  Integration of MCI's Tier 1

Internet backbone with Verizon's consumer DSL customer base will serve to increase

barriers to competitive entry in the high-speed Internet access market relative to the already

significant barriers that presently exist.  Verizon has exploited its exchange service market

dominance by capturing virtually all of the consumer DSL market within its operating areas,

and has also been successful in capturing the majority of the overall high-speed Internet

access market within its California footprint.  Once vertically integrated with MCI's Tier 1

backbone, Verizon will acquire charge-free access to other Tier 1 carriers, and will be in an

even stronger competitive position.  If the merger is allowed to go forward, the combined

---

210.  *Project Eli SME Feedback on Business Model,* September 29, 2004, VZCA00025413.

211.  *E-mail from Paul Shizume to Steve W. Micciche,* September 30, 2004, VZCA00025397.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    company should be subject to specific competitive safeguards to limit its potential market

2    dominance in the California Internet access market.  Specifically:

3

4    •    Verizon should be required as a merger approval condition to offer DSL line sharing at

5         TELRIC-based UNE rates to competing providers of DSL services; and

6

7    •    Verizon should as a merger approval condition be required to discontinue its practice of

8         requiring consumers to buy ILEC-provided local service as a condition of purchasing

9         ILEC DSL services ("naked DSL").

10

11   •    Notwithstanding the August 5,2005 FCC action eliminating the mandatory sharing

12        requirement on ILEC broadband (DSL) Internet access, Verizon should, as a merger

13        approval condition, be required to continue affording competing providers access to the

14        DSL channel at cost-based rates to be approved by the Commission, so as to maintain

15        competition in the provision of this service within Verizon's California operating areas..

16

17   In the enterprise business market, Verizon presently provides the vast majority of "last mile"

18   high-capacity (i.e., DS-1 and above) digital special access connections to business customers

19   located within its California service areas.  MCI offers limited competition in a small

20   percentage of commercial buildings, but even that will largely evaporate following the

21   merger.

225

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1  Q.  Is divestiture of MCI's competing digital "last mile" facilities a possible solution?

2

3  A.  It's a possible solution, but like the idea of divesting the MCI consumer business segment, it

4       is highly unlikely that a qualified buyer capable of providing the same level of competitive

5       strength as MCI in the enterprise business market could be found.  Moreover, the potential

6       demand for CLC digital loop facilities will be substantially reduced following the two

7       mergers.  Up to now, MCI and AT&T have both had a practice of using CLC loop facilities

8       where available.  However, there would be no reason for Verizon to maintain this same

9       policy after the merger, since it will have its own facilities in the same locations (within its

10      ILEC footprint).  So following the merger, not only will MCI be eliminated as a *seller* of

11      last-mile facilities to enterprise customers, it will also be eliminated as a major *purchaser* of

12      such facilities from other CLCs.  That loss of business could well force other rival carriers to

13      exit the market, creating an even greater market share for Verizon.

14

15  **Measures to limit potential ratepayer harms.**
16

17  Q.  Would it ever be possible for ratepayers to receive the required share of economic benefits in

18      the absence of both competition and specific, mandatory price reductions or refunds?

19

20  A.  In theory, if economic regulation were working as intended as a *replacement* for the

21      (nonexistent) competitive marketplace forces, the efficiency gains and cost savings arising

22      from the merger would be flowed through to ratepayers in the form of lower rates.  For

23      example, under the pre-NRF "rate of return regulation" ("RORR") regime, the reduced costs

**REDACTED – PUBLIC VERSION**

**ETI** ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    would result in a lower overall revenue requirement, which would be captured and reflected

2    in lower rates in the next general rate case proceeding.  Under the NRF as it existed

3    beginning in 1990, these same types of efficiency gains would have been captured and

4    flowed through to ratepayers in the short-term through the "sharing" of excess earnings

5    requirement, and in the longer-term through an increase in the productivity offset or "X-

6    factor" that would have been determined in the next triennial review of the NRF.  However,

7    the X-factor was eliminated in 1995 and the sharing requirement was suspended in 1999, so

8    the NRF as it presently exists would not assure flow-through of merger savings, and thus

9    could not assure compliance with §854(b)(2).

10

11  Q.  You are not suggesting, are you, that the Commission revert to RORR or to the use of a

12       productivity factor as it had in the original NRF?

13

14  A.  I'm certainly not suggesting a reversion to rate of return regulation, but it may well be

15       necessary at this time for some of the *evolutionary* changes to the NRF that have occurred

16       over the past eight to ten years to be revisited in light of the failure of effective competition

17       to develop and the looming reconcentration of the California telecommunications market.

18

19       As originally envisioned, the adoption of an "alternative regulatory framework" that had

20       commenced in I.87-11-033 was not specifically premised upon the development of

21       competition.  In fact, it was not until 1995 that competitive intraLATA long distance carriers

227

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                 LEE L.  SELWYN

1    were even certificated in California,[212] and the Commission began certificating CLCs shortly

2    thereafter.  Subsequent changes in the NRF – like the elimination of the X-factor and the

3    suspension of sharing, as well as the reclassification of most services from Category 1 to

4    Category 2 – were, however, premised upon the development of competition as a

5    *replacement* for economic regulation.

6

7    Q.  I assume that you are aware that the Commission is currently considering *further*

8        deregulatory measures in the current Unified Regulatory Framework ("URF") rulemaking,

9        R.05-04-005.[213]  Are you suggesting here that the Commission move in the opposite direction

10       in this proceeding?

11

12   A.  While I do not agree with many of the premises that have been advanced in the OIR initiating

13       the URF proceeding,[214] the two mega-mergers involving the two largest RBOCs and the two

---

212.  *Alternative Regulatory Frameworks for Local Exchange Carriers and Related Matters*, Decision No. 94-09-065, *Interim Opinion*, September 15, 1994, 1994 Cal. PUC LEXIS 681 at 4.

213.  *Order Instituting Rulemaking on the Commission's Own Motion to Assess and Revise the Regulation of Telecommunications Utilities,* OIR 05-04-005, issued April 7, 2005.

214.  The OIR appears to be premised upon the notion that all telecommunications providers possess equal market power and accordingly should be subject to equal, or "unified," regulatory treatment.  The OIR appears to accept on faith the notion that services such as wireless, cable telephony, text messaging and VoIP are perfect substitutes for traditional wireline telephone service.  OIR at 2.  Since providers of such services are not subject to any form of price regulation or are not regulated at all, the OIR proposes that incumbent LECs be subject to equivalent deregulatory treatment.  OIR, at A-2.  In so doing, the OIR fails to recognize the longstanding distinction between "dominant" and "non-dominant" carriers, a distinction that is made even more important if both of the currently pending mergers are approved.  The OIR

(continued...)

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    largest IXCs have the potential to effect a profound change in the competitive landscape.

2    Obviously the Joint Applicants' perspective is quite opposite to that being advanced here by

3    myself as well as by most every other intervening party in the case.

4

5    One thing I would hope that most everyone would agree with is that there is considerable

6    uncertainty as to the ultimate structure of the post-merger telecom landscape, and it is *critical*

7    that the post-merger regulatory structure recognize and be capable of adapting to this

8    uncertainty.  If the form of regulation is premised upon the development of effective

9    competition but effective competition fails to develop – or worse, the small amount of

10    competition that still exists diminishes further – consumers face the risk of having to

11    confront an *unregulated monopoly* as the sole source of essential telecommunications

12    services.  On the other hand, if the current system of economic regulation is revised *on the*

13    *expectation that competition will not survive* and it actually grows and flourishes, then the

14    incumbents Verizon and SBC could be competitively harmed if they are subject to tight

15    regulation while their rivals are free to operate without any significant regulation at all.

16

17  Q.  Is there a unified regulatory solution that could operate to protect consumers, the incumbents

18    and competitors no matter what the ultimate market outcome?

19

---

214.  (...continued)
proposes to confer what would amount to *non-dominant* status upon post-merger Verizon and
post-merger SBC notwithstanding their 95%+ shares of the local service market, 80%+ shares of
the long distance market, cross-ownership controlling interests in the two largest wireless
carriers, and status as Tier 1 Internet backbone carriers.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                        LEE L.  SELWYN

1  A.  Yes, I believe that there is.  What is needed is some type of "self-executing" regulatory

2      scheme under which price – and perhaps even limited earnings – constraints would become

3      operative in the absence of effective competition while essentially "dropping out" if true

4      price-constraining competition actually materializes.  Under such an arrangement, the

5      Commission would be able to extricate itself from the seemingly endless debates as to how

6      much competition is actually present, which "intermodal" services constitute actual

7      competition for basic wireline services, and even from having to decide how much compe-

8      tition constitutes effective competition.  At the same time, however, it is essential that the

9      continuing dominant position of the post-merger Verizon and SBC be recognized.  Verizon

10     and SBC are the *only* service providers with ubiquitous facilities-based network infra-

11     structure throughout their respective operating areas.  There is no present realistic

12     expectation that any competing facilities-based carrier could expect to replicate the ILECs'

13     ubiquity anytime soon.  MCI and AT&T have each abandoned their efforts to compete with

14     Verizon and SBC for mass market services primarily if not solely due to the elimination of

15     their access to UNE-P and UNE switching.  Competition at the *retail* level is possible but

16     only if access to ILEC network resources *at the wholesale level* is assured.  That said, a

17     regulatory system capable of responding flexibly to the presence or absence of effective

18     competition at the retail level can be designed and implemented.

19

20  Q.  How would such a "self-executing" form of regulation work?

21

22  A.  Actually, many aspects of the original NRF, as configured in D.89-10-031, have the potential

23      to provide these "self-executing" features.  Consider, for example, the requirement that

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

1    ILECs subject to the NRF "share" excess earnings with ratepayers.  By de-linking rates and

2    costs, the NRF provided ILECs with the opportunity to increase their earnings above the

3    "authorized" level.  However, it is also possible that under such "incentive regulation"

4    systems excessive earnings could be accumulated not so much due to innovation and

5    efficiency on the part of the utility, but rather due to the failure of competition to develop, or

6    to the misspecification of the regulatory system itself.  For example, if the productivity offset

7    or X-factor was set too low – i.e., below the level of realistic productivity gains achievable

8    by incumbent LECs or by competing providers to the extent they are present – the result

9    would be excessive earnings simply because actual productivity gains (including reductions

10   in input prices) exceeded the level implied by the X-factor.  Similarly, to the extent that the

11   market was expected to become competitive, prices and earnings would also be constrained

12   to "competitive" levels by marketplace forces.  If competition failed to develop as expected,

13   no such market constraints would be present.

14

15   The "sharing" requirement under the NRF was essentially a back-stop protection against

16   misspecification of the X-factor and the failure of competition to constrain the incumbents'

17   prices.  Sharing became operative only where earnings had increased to in excess of 150

18   basis points above the "authorized" level, and were to be subject to 50/50 sharing with

19   ratepayers up to 500 basis points above the authorized level, at which point earnings would

20   be capped.

21

231

ECONOMICS AND
TECHNOLOGY, INC.

1  Q.  But isn't one of the consequences of a sharing requirement the elimination of incentives for

2      efficiency?

3

4  A.  That argument has been advanced – and is one of the reasons why the Commission in 1999

5      determined to temporarily suspend the sharing requirement – but in reality a sharing

6      requirement would have a similar effect upon innovation as a corporate income tax.  In

7      California, the marginal state and federal corporate tax rate is 43.84%, which means that *all*

8      *companies* are being required to "share" *43.84% of their earnings* with the state and federal

9      governments.  When NRF sharing was in effect, California ILECs were still financially far

10     better off having achieved "shareable" earnings than they would have been if earnings were

11     limited to the authorized rate of return.

12

13 Q.  How is sharing a self-executing regulatory mechanism going forward?

14

15 A.  The Joint Applicants have devoted a considerable portion of their evidence to claims as to the

16     high level of competitiveness of the California local and long distance markets.  If the level

17     of competition is as they have sought to portray it, there is no realistic possibility that the

18     combined company could expect to impose monopoly prices or to achieve excessive

19     monopoly earnings or economic rents.  A requirement to share excess earnings would

20     become operative only if excess, monopoly earnings materialize, and that would occur only

21     if effective competition fails to materialize.  If earnings are truly constrained by the intense

22     competition that the Joint Applicants describe, then a sharing requirement would not become

23     operative at all.  It is thus "self-executing" in that it only takes effect if the market fails to

232

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1    achieve a level of effective competition sufficient to constrain Verizon's prices to

2    competitive levels.

3

4  Q.  Are there other features of the original NRF that exhibit similar "self-executing" effects?

5

6  A.  Yes.  The NRF specified three "categories" of ILEC services – monopoly (category 1),

7    subject to emerging competition (category 2), and fully competitive (category 3).  Services in

8    Category 1 were subject to the annual price cap rate adjustment and could be modified only

9    through an advice letter tariff filing subject to CPUC approval.  Category 2 services were

10   also subject to the price cap, but could be "flexibly priced" in the downward direction only.

11   Fully competitive category 3 services were not subject to any pricing constraints.  Today,

12   most ILEC retail services are classified as Category 2.  However, because the X-factor was

13   eliminated in 1995, Verizon California has not been required to reflect any productivity gains

14   it had achieved with respect to such services for roughly ten years.  Thus, although nominally

15   "frozen," prices for most Category 2 services have actually remained unchanged.

16   Conceptually, downward pricing flexibility is also a self-executing regulatory device, in that

17   it enforces a price ceiling where competition is not sufficient to impose one.  However,

18   without the requirement to flow-through productivity/efficiency gains in what are *de facto*

19   monopoly services, Verizon California has actually been enabled to increase rates above the

20   "competitive level" – i.e., above where prices would be if forced to long-run economic cost

21   by the operation of competitive marketplace forces.  Reinstatement of an actual productivity

22   factor together with downward pricing flexibility will create a self-executing outcome:  If

23   effective competition develops, prices will be forced down; if competition fails to develop,

233

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    the regulatory constraints will become operative.  Also, reinstatement of a productivity offset

2    factor will help to ensure that the substantial synergy gains in the form of increased

3    efficiency that are being claimed by the Joint Applicants will actually flow through to

4    California ratepayers.  Simply maintaining the nearly decade-long rate freeze will *guarantee*

5    that the combined company will retain virtually all of the economic benefits of the merger –

6    which is expressly prohibited by §854(b)(2).

7

8    Q.   What about essential services that are purchased by competing carriers as inputs to their own

9         retail offerings – what regulatory treatment is appropriate for these services?

10

11   A.   Strict regulation of essential services is critical if competition at the retail level is to survive

12        in California.  Switched access charges need to be reduced to cost-based levels and integrated

13        into a unified intercarrier compensation regime with call termination charges set at TELRIC-

14        based rates.  Special access rates must also be reduced to forward-looking economic cost, and

15        where applicable integrated with TELRIC-based UNE rates.

16

17        It is particularly important that measures be adopted, implemented and enforced to prevent

18        the post-merger Verizon/MCI from deriving competitive benefit from vertical integration

19        where little or no competition is present in the upstream market.  Specifically, wherever a

20        monopoly service is incorporated into a putatively competitive retail offering, the full price

21        of the monopoly component(s) *that would be imposed upon a nonaffiliated competitor* must

22        be imputed into the retail price of the Verizon/MCI service.  That imputed price, together

23        with all costs of the value-added functions and services that comprise the retail offering, must

234

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    establish a cost floor for the retail service.  Moreover, this imputation requirement must be

2    applied individually with respect to each retail service offering, and not across an aggregation

3    of all retail services.

4

5    Q.    Do you have any suggestions for a specific imputation requirement?

6

7    A.    Yes.  In June 2004, AT&T proposed a specific and detailed imputation rule to address

8          precisely this concern in an *ex parte* filing in the FCC's proceeding considering applying

9          non-dominant status to ILEC long distance services, WC Docket No.  02-112.  A copy of

10         AT&T's proposed imputation rule is provided herewith as Attachment 7 to this testimony.

11         These requirements were advanced and affirmatively supported by AT&T when it was

12         confronting ILEC and RBOC competition, and is even more applicable with MCI and AT&T

13         no longer in contention as competitors in the long distance and local service markets.

14

15   Q.    Does the proposed merger raise any other regulatory concerns that the Commission should

16         address as part of its consideration of this Application?

17

18   A.    Yes.  In many important respects, there is an even greater need for regulation of Verizon

19         today than there was when local and long distance competition were nonexistent.  Today,

20         Verizon is allowed to, and does, operate in both monopoly and competitive markets *using the*

21         *same network assets and pool of human and other resources*.  Cost allocation requirements,

22         where they even exist, are at best subject to lengthy after-the-fact reviews and virtually no

23         effective enforcement.  Verizon has enormous incentives to shift costs to its monopoly

**REDACTED – PUBLIC VERSION**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                            LEE L.  SELWYN

1    operations while shifting revenues to other  "below-the-line" business units and affiliates.

2    And the chances of being caught are less than an ordinary taxpayer's chances of an IRS audit,

3    and in proportion the penalties for such cost shifting – if actually detected – are almost

4    always far less severe.

5

6    Much of Verizon's and the other RBOCs' conduct over the years was directed at

7    disadvantaging MCI and AT&T, and their existence as independent entities offered at least

8    some assurance that perhaps the most egregious RBOC conduct and deregulatory initiatives

9    would be brought to FCC and state PUC attention.  With MCI and AT&T merged into

10    RBOCs, the surviving group of much smaller competitive local and long distance carriers

11    cannot hope to match the economic, legal, and political resources of the RBOCs' and their

12    "bottomless pockets."[215]  Even before their mergers are approved and with less than 100%

13    assurance that they will ultimately be approved, both MCI and AT&T have scaled back their

14    regulatory involvement in matters adverse to Bell company interests.

15

16    A case in point can be found with respect to the ongoing FCC proceedings dealing with

17    interstate special access rates.  In October 2002, AT&T filed a Petition with the FCC seeking

18    substantial reductions in RBOC special access prices and asking that special access pricing

---

215.  Describing the RBOCs' ability to cross-subsidize their entry into  competitive businesses with profits extracted from captive monopoly services, Judge Harold Greene observed, "this is not so much because the Regional Companies have deep pockets, which they do, but because their pockets are bottomless."  *United States v. Western Electric*,  Civil Action No. 82-0192, 1989 U.S. Dist. LEXIS 18852, at *27

REDACTED – PUBLIC VERSION

ETI  ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   flexibility, adopted by the FCC in 1999,[216] be rescinded.  AT&T pursued its Petition

2   aggressively, making repeated evidentiary filings with the FCC and ultimately seeking a *Writ*

3   *of Mandamus* from the D.C. Circuit Court compelling the FCC to act on its Petition.[217]

4   Worldcom made several filings in support of the AT&T Petition.[218]  Finally, on January 19,

5   2005, 12 days before the announcement of the Verizon/MCI merger plan, the FCC issued a

6   Notice of Proposed Rulemaking (NPRM) addressing most of the specific issues raised in the

7   MCI Petition.  Initial Comments on the NPRM were filed on June 13, 2005.  Significantly,

8   *neither MCI nor AT&T filed substantive comments on the special access rulemaking.*  But for

9   the two mergers, both MCI and AT&T would surely have been active and aggressive in

10  opposing the *de facto* non-dominant status that the URF OIR proposes to apply to Verizon

11  and SBC.  With the shoe now on the other foot, AT&T's and MCI's utter silence is

12  deafening.

13

14  Q.  Please summarize your recommendations for conditions intended to minimize or prevent

15      harms to ratepayers arising from the merger.

16

---

216.  Federal Communications Commission, *Special Access Rates for Price Cap Local Exchange Carriers; AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, WC Docket No. 05-25 and WC RM-10593, *Order and Notice of Proposed Rulemaking*, Rel. January 31, 2005 at para. 21.

217.  *AT&T Corp. et al.,* No. 03-1397 (D.C. Cir.), Petition for Writ of Mandamus, November 6, 2003.

218.  Federal Communication Commission, *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, WC RM-10593, *Comments of Worldcom, Inc*. filed December 2, 2002; and *Reply Comments of Worldcom Inc*., filed January 23, 2003.

237

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L. SELWYN

1    A.    While the development of an effectively competitive market for consumer telecommuni-

2        cations services remains a key regulatory and public policy goal, the elimination of the two

3        largest competitors of Verizon and SBC in California cannot be lightly dismissed. Unless the

4        retail-level competition for local and long distance services previously offered by MCI and

5        AT&T is replaced, the potential for significant price increases by the two principal California

6        RBOCs will be limited only by regulatory constraint. Self-executing regulatory measures

7        that impose price and earnings ceilings while affording flexibility in the downward direction

8        will protect ratepayers while affording Verizon and SBC the flexibility that they *legitimately*

9        need to respond to such actual competition as may develop. Continued regulation of

10       essential wholesale inputs to retail-level competitive services, including a strictly enforced

11       imputation regime, is critical to the development of competition, and must be retained until

12       such time as sufficient *and ubiquitously deployed* alternative *facilities-based* competition

13       capable of supporting services *in the same product market* as wireline telephone service

14       comes into existence.

15

16       **Elimination of harms to the California Economy**

17

18    Q.    You have identified potential harms to the California economy arising from the Verizon/MCI

19        merger in the range of $807-million on a net present value basis. What measures could be

20        imposed upon the combined company to minimize such negative impacts?

21

22    A.    The principal sources of harm to the California economy arising from the merger come in the

23        form of (a) the loss of <<BEGIN VZ/MCI PROPRIETARY      END VZ/MCI

238

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    PROPRIETARY>> Verizon and MCI California jobs, and (b) the potential increase in price

2    for telecommunications services used by large telecom- and information-intensive California

3    firms.

4

5    In the Bell Atlantic/GTE merger, Bell Atlantic had offered specific commitments to mitigate

6    impacts on employees and the California economy.  First, as represented to the Commission,

7    GTE/Bell Atlantic did not expect job cuts in California.[219]  However, despite this fact, GTE

8    made commitments to its employees to maintain the level of pension benefits for at least five

9    years, and maintain the 401(k) and [then] current severance plans for at least one year.[220]

10

11  Q.  Have Verizon or MCI offered any comparable commitments in connection with the present

12     application?

13

14  A.  No.  In fact, as I have discussed at pages 58-60 above, a key element of the "synergy

15     benefits" identified by the two companies to their respective Boards of Directors and

16     shareholders stems from massive job cuts.  No California-specific job loss figures are

17     provided, but if we assume that employment reductions are spread uniformly across the

18     entire Verizon and MCI regions, there will be numerous job cuts in California.  Despite this

---

219.  As the Commission noted, "The merger does not involve an operational consolidation. Thus, no material impact on California staffing levels or hourly labor is expected." *GTE/Bell Atlantic Merger*, *Slip Op.,* at 130.

220.  *Id.*

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                        LEE L.  SELWYN

1  significant difference, however, Applicants provide no pension, severance or other benefit

2  commitment at all.

3

4  Q.  Can the Commission address this potential adverse impact upon the California economy

5      through the imposition of merger commitments?

6

7  A.  Perhaps, but enforcement may be difficult or impossible.  Perhaps the best approach would

8      be to require that the merged company limit California job cuts to a specified maximum

9      percentage of all job cuts.  For example, the Joint Applicants' National Synergy Model is

10     premised upon a total headcount reduction of 7,000 jobs.  If California job losses in most

11     categories are in proportion to California's share of total post-merger Verizon operations,

12     that would imply a cut of more than <<BEGIN VZ/MCI PROPRIETARY      END VZ/MCI

13     PROPRIETARY>> jobs with a potential economic impact, expressed in net present value

14     terms and including multiplier effects, of approximately $807-million.  Limiting California

15     job cuts to, for example, 5% of total MCI headcount reductions for all job categories (instead

16     of the 6% that would be proportional to MCI's California employment), would save

17     <<BEGIN VZ/MCI PROPRIETARY      END VZ/MCI PROPRIETARY>> California jobs

18     and bring the negative impact upon the California economy down to $686-million.  Of

19     course, even that substantially smaller impact is still many multiples of the specific "short-

20     term and long-term economic benefit to [California] ratepayers" of only $6-million that the

21     Joint Applicants have thus far been willing to concede.

240

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    Q.   How could any such employment-related merger condition be enforced?

2

3    A.   Enforcement would be difficult, in part because so much of Verizon's aggregate employment

4         – even employment within California – still falls well outside of the Commission's

5         jurisdiction.  In order to enforce any such commitment or condition, the Commission would

6         need to create new reporting requirements and a monitoring mechanism, and would need

7         some means of imposing penalties in the event that Verizon fails to comply.  If the

8         Commission lacks the legal authority to impose such penalties, Verizon would need to enter

9         into an enforceable voluntary commitment, and agree to be bound by it and to pay specified

10        penalties if its commitment is not fulfilled.

11

12   Q.   Could the Commission make the required §854(c)(4) and (c)(6) findings without some means

13        of enforcing specific employment commitments?

14

15   A.   No, I do not see how it could.  And it probably could not make the required §854(b)(2)

16        finding either based upon the Joint Applicants' forecast of only $6-million in California

17        synergies.  Assuming an average salary of approximately $75,000, the NPV associated with

18        each California job I've estimated, including multiplier effects, is approximately $2-million.

19        A loss of only *two jobs* would eradicate the $3-million in "short-term and long-term

20        economic benefits" that the Joint Applicants propose to allocate to California ratepayers

21        resulting from the merger.  The Joint Applicants could be eliminating <<BEGIN VZ/MCI

22        PROPRIETARY ▮ END VZ/MCI PROPRIETARY>> of times that number of jobs.

23

241

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1    Although the various conditions and mitigations outlined here will reduce the overall harm to

2    ratepayers, to competition, to employees and to the California economy if the merger is

3    allowed to go forward, on balance the merger is not in the public interest and does not satisfy

4    the statutory thresholds for approval.  For all of these reasons, the Commission should not

5    approve the Verizon/MCI Application, and should reject the proposed merger.

6

7  Q.  Does this conclude your reply testimony at this time?

8

9  A.  Yes.  However, if additional information responsive to ORA or other party discovery is

10    forthcoming from Verizon, I would ask for the opportunity to supplement this testimony to

11    reflect the effects, if any, of such additional data.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN


DECLARATION


I declare under the pains and penalties of perjury that the statements contained in my Reply

Testimony filed this date in A. 05-04-020 on behalf of the Office of Ratepayer Advocates are true

and correct to the best of my knowledge, information and belief, and if called to testify under oath

thereon I am prepared to do so.


August 15, 2005

LEE L. SELWYN


243



**Attachment 1**

**Statement of Qualifications**

**LEE L. SELWYN**



## Statement of Qualifications

## LEE L. SELWYN

Dr. Lee L. Selwyn has been actively involved in the telecommunications field for more than thirty-five years, and is an internationally recognized authority on telecommunications regulation, economics and public policy.  Dr. Selwyn founded the firm of Economics and Technology, Inc. in 1972, and has served as its President since that date.  He received his Ph.D. degree from the Alfred P. Sloan School of Management at the Massachusetts Institute of Technology.  He also holds a Master of Science degree in Industrial Management from MIT and a Bachelor of Arts degree with honors in Economics from Queens College of the City University of New York.

Dr. Selwyn has testified as an expert on rate design, service cost analysis, form of regulation, and other telecommunications policy issues in telecommunications regulatory proceedings before some forty state commissions, the Federal Communications Commission and the Canadian Radio-television and Telecommunications Commission, among others.  He has appeared as a witness on behalf of commercial organizations, non-profit institutions, as well as local, state and federal government authorities responsible for telecommunications regulation and consumer advocacy.

He has served or is now serving as a consultant to numerous state utilities commissions including those in Arizona, Minnesota, Kansas, Kentucky, the District of Columbia, Connecticut, California, Delaware, Maine, Massachusetts, New Hampshire, Vermont, New Mexico, Wisconsin and Washington State, the Office of Telecommunications Policy (Executive Office of the President), the National Telecommunications and Information Administration, the Federal Communications Commission, the Canadian Radio-television and Telecommunications Commission, the United Kingdom Office of Telecommunications, and the Secretaria de Comunicaciones y Transportes of the Republic of Mexico.  He has also served as an advisor on telecommunications regulatory matters to the International Communications Association and the Ad Hoc Telecommunications Users Committee, as well as to a number of major corporate telecommunications users, information services providers, paging and cellular carriers, and specialized access services carriers.

Dr. Selwyn has presented testimony as an invited witness before the U.S. House of Representatives Subcommittee on Telecommunications, Consumer Protection and Finance and before the U.S. Senate Judiciary Committee, on subjects dealing with restructuring and deregulation of portions of the telecommunications industry.

In 1970, he was awarded a Post-Doctoral Research Grant in Public Utility Economics under a program sponsored by the American Telephone and Telegraph Company, to conduct research on the economic effects of telephone rate structures upon the computer time sharing industry.  This work was conducted at Harvard University's Program on Technology and Society, where he was appointed as a Research Associate.  Dr. Selwyn was also a member of the faculty at the College of Business Administration at Boston University from 1968 until 1973, where he taught courses in economics, finance and management information systems.

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Lee L. Selwyn*

Dr. Selwyn has been an invited speaker at numerous seminars and conferences on telecommunications regulation and policy, including meetings and workshops sponsored by the National Telecommunications and Information Administration, the National Association of Regulatory Utility Commissioners, the U.S. General Services Administration, the Institute of Public Utilities at Michigan State University, the National Regulatory Research Institute at Ohio State University, the Harvard University Program on Information Resources Policy, the Columbia University Institute for Tele-Information, the International Communications Association, the Tele-Communications Association, the Western Conference of Public Service Commissioners, at the New England, Mid-America, Southern and Western regional PUC/PSC conferences, as well as at numerous conferences and workshops sponsored by individual regulatory agencies.

**Previous appearances before the California Public Utilities Commission**

Dr. Selwyn has participated in numerous California PUC proceedings dating back to the mid-I 970s. These have included Pacific Telephone general rate case Applications *55492,* 58223, 59849, 83-01-022 and 85-01-034; the Commission*s generic Centrex rate and cost inquiry, Case 10191; the Commission*s Service Cost investigation, 1.83-02-01, regarding policy development for intrastate exchange access charges and competition; at the Commission *s *en banc* hearings on intra- and interLATA telecommunications policy in November, 1984; in the revenue requirements, rate design, and modernization and utilization phases of A.85-O1-034; in the GTE Mobilnet proceeding, A.83-07-04; in 1.87-11-031 dealing with the TRS surcharge; in the Los Angeles area ZUM Expansion proceeding (A.87-0I-002/I.87-02-025); and in A.90-l 1-011 involving so-called CLASS and Caller ID services.

Dr. Selwyn participated in all phases of the Commission*s *New Regulatory Frameworks* (NRF) investigation, 1.87-I-033, beginning with written comments submitted in response to the Commission*s August 11, 1987 Notice of *En Banc* Hearing on Competition and Regulatory Reform. He participated in the settlement workshops in Phase I, and submitted testimony in Phase II, Phase III, the "Touch Tone/ELCA" phase, and in the Implementation and Rate Design (IRD) phase. He also submitted testimony in the first and second triennial reviews of the New Regulatory Framework, A.92-05-002/004 and 1.95-05-047, respectively.

Dr. Selwyn has testified in several CPUC proceedings addressing efforts by Pacific Bell to enter or otherwise pursue strategic initiatives in new telecommunications markets. In 1993, he appeared as a witness for the Commission*s Division of Ratepayer Advocates (DRA) in the PacTel cellular/wireless "spin-off* investigation, 1.93-02-028. He was an invited speaker at the Commission*s en *banc* hearings on infrastructure issues in July, 1993. He also participated in several proceedings involving the Pacific Bell Information Services Group and Pacific Bell Information Services issues, A.88-08-031, Pacific*s proposal to offer an enhanced (information) services "gateway," in A.92-12-052, in which Pacific sought separate subsidiary status for its


ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Lee L. Selwyn*

voice mail business under the name "Pacific Bell Information Services," and A.93- 11-031, which was to authorize PBIS to enter the so-called "electronic publishing" business on a "below the line basis." In September, 1996, Dr. Selwyn submitted testimony on behalf of the Commission⋆s Office of Ratepayer Advocates (ORA) in A.96-04-038, the Joint Application of Pacific Telesis Group and SBC Communications Inc. for approval of the takeover by SBC of Pacific Telesis. He also submitted testimony on behalf of ORA in A.98-12-005, GTE/Bell Atlantic merger proceeding. Also on behalf of ORA, Dr. Selwyn presented testimony in A.97- 12-020, the 1997 PG&E general rate case, regarding alternative forms of regulation for PG&E.

Dr. Selwyn has offered testimony in three phases of R.93-04-003/I.93-04-002, the Commission⋆s Investigation and Rulemaking on Open Access and Network Architecture Development (OANAD). His most recent involvement in that proceeding was the filing of direct and rebuttal testimony, on April 8 and 27, 1998, on behalf of AT&T and MCI concerning the pricing of incumbent Local Exchange Carrier unbundled network elements. On April 30, he submitted an affidavit on behalf of AT&T in the Commission⋆s proceeding to consider Pacific Bell⋆s Notice of Intent to seek authority to offer long distance services pursuant to Section 271 of the *Telecommunications Act of 1996.* In previous phases of R.93-04-003/I.93-04-002, Dr. Selwyn testified on behalf of AT&T and MCI on the pricing of wholesale basic telephone services. On December 20, 1995, he submitted testimony on behalf of the California Telecommunications Coalition addressing the financial impacts of local competition upon Pacific Bell and other incumbent LECs in the Franchise Impacts phase of in R.95-04-043/I.95-04-044, the Commission⋆s local competition investigation and rulemaking. On October 3, 1997, Dr. Selwyn prefiled direct testimony presenting the results of an Avoided Retailing Cost analysis giving effect to Section *252(d)(3)* of the *Telecommunications Act of 1996* as it relates to resale of incumbent local exchange calTier services, and offering recommendations concerning the level of wholesale/retail differential or "discount" that should be applied in setting prices for wholesale basic services furnished to resellers.

In April of 1996, Dr. Selwyn submitted opening and rebuttal testimony on behalf of AT&T and MCI in the Commission⋆s Universal Service Funding (USF) proceeding, R.95-01-020/I.95-01-021, and in June, 1996, he submitted testimony in the Open Access and Network Architecture Development (OANAD) proceeding, R.93-04-033/I.93-04-022, also on behalf of AT&T and MCI. In August of 1996, he submitted testimony on behalf of AT&T Communications of California, Inc. in two arbitration proceedings, A.96-08-040 (Pacific Bell) and A.96-08-04l (GTE-California). Dr. Selwyn⋆s most recent appearance before the Commission was in the 2001 Pacific Bell Section 271/Section 709.2 proceeding.

ETI ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Lee L. Selwyn*

## Papers and Publications

"Taxes, Corporate Financial Policy and Return to Investors," *National Tax Journal*, Vol. XX, No.4, December 1967.

"Considerations for Computer Utility Pricing Policies" (with Daniel S. Diamond), presented at the 23rd Association for Computing Machinery National Conference, 1968.

"Real Time Computer Communications and the Public Interest " (with Michael M. Gold), presented at the 1968 American Federation of Information Processing Societies,  Fall Joint Computer Conference, San Francisco, CA, December 9-11, 1968.

"Computer Resource Accounting in a Time Sharing Environment," presented at the 1970 American Federation of Information Processing Societies, Spring Joint Computer Conference, Atlantic City, NJ, May 5-7, 1970.

*Planning Community Information Utilities*, H. Sackman and B. W. Boehm, Eds., Chapter 6, "Industrial and Vocational Services," Montvale, NJ, AFIPS Press, 1972, at 137-172.

"Competition and Structure in the Computer Services Industry," *Proceedings, Second Annual Symposium on Economic Considerations in Managing the Computer Installation*, New York: Association for Computing Machinery, 1972.

"Computer Resource Accounting and Pricing," *Proceedings, Second Annual Symposium on Economic Considerations in Managing the Computer Installation*, New York: Association for Computing Machinery, 1972.

"Pricing Telecommunications  Services: Policy Goals and Rate Design Principles," *Presented at the 1977 Symposium on Problems of Regulated Industries -  Sponsored by Foster Associates, Inc., Missouri Public Service Commission, University of Missouri-Columbia*, Kansas City, MO, February 13-16, 1977.

"Pricing Telephone Terminal Equipment Under Competition," *Public Utilities Fortnightly*, December 8, 1977.

"Deregulation, Competition, and Regulatory Responsibility in the Telecommunications Industry," *Presented at the 1979 Rate Symposium on Problems of Regulated Industries - Sponsored by: The American University, Foster Associates, Inc., Missouri Public Service Commission, University of Missouri-Columbia*, Kansas City, MO, February 11 - 14, 1979.

"Sifting Out the Economic Costs of Terminal Equipment Services," *Telephone Engineer and Management*, October 15, 1979.

"Usage-Sensitive Pricing" (with G. F. Borton), (a three part series), *Telephony*, January 7, 28, February 11, 1980.

4



*Statement of Qualifications – Lee L. Selwyn*

"Perspectives on Usage-Sensitive Pricing," *Public Utilities Fortnightly*, May 7, 1981.

"Diversification, Deregulation, and Increased Uncertainty in the Public Utility Industries" *Comments Presented at the Thirteenth Annual Conference of the Institute of Public Utilities*, Williamsburg, VA - December 14-16, 1981.

"Local Telephone Pricing: Is There a Better Way?; The Costs of LMS Exceed its Benefits: a Report on Recent U.S. Experience," *Proceedings of a conference held at Montreal, Quebec - Sponsored by Canadian Radio-Television and Telecommunications Commission and The Centre for the Study of Regulated Industries, McGill University*, May 2-4, 1984.

"Long-Run Regulation of AT&T:  A Key Element of A Competitive Telecommunications Policy," *Telematics*, August 1984.

"Is Equal Access an Adequate Justification for Removing Restrictions on BOC Diversification?" *Presented at the Institute of Public Utilities Eighteenth Annual Conference*, Williamsburg, VA - December 8-10, 1986.

"Market Power and Competition Under an Equal Access Environment," *Presented at the Sixteenth Annual Conference, "Impact of Deregulation and Market Forces on Public Utilities: The Future Role of Regulation," Institute of Public Utilities, Michigan State University*, Williamsburg, VA - December 3-5, 1987.

"Contestable Markets: Theory vs. Fact," *Presented at the Conference on Current Issues in Telephone Regulations: Dominance and Cost Allocation in Interexchange Markets - Center for Legal and Regulatory Studies Department of Management Science and Information Systems - Graduate School of Business, University of Texas at Austin*, October 5, 1987.

"The Sources and Exercise of Market Power in the Market for Interexchange Telecommunications Services," *Presented at the Nineteenth Annual Conference, "Alternatives to Traditional Regulation:  Options for Reform," Institute of Public Utilities, Michigan State University*, Williamsburg, VA, December, 1987.

"Assessing Market Power and Competition in The Telecommunications Industry:  Toward an Empirical Foundation for Regulatory Reform," *Federal Communications Law Journal*, Vol. 40 Num. 2, April 1988.

"A Perspective on Price Caps as a Substitute for Traditional Revenue Requirements Regulation," *Presented at the Twentieth Annual Conference, "New Regulatory Concepts, Issues and Controversies," Institute of Public Utilities, Michigan State University*, Williamsburg, VA, December, 1988.



*Statement of Qualifications – Lee L. Selwyn*

"The Sustainability of Competition in Light of New Technologies" (with D. N. Townsend and P. D. Kravtin), *Presented at the Twentieth Annual Conference, Institute of Public Utilities, Michigan State University*, Williamsburg, VA, December, 1988.

"Adapting Telecom Regulation to Industry Change: Promoting Development Without Compromising Ratepayer Protection" (with S. C. Lundquist), *IEEE Communications Magazine*, January, 1989.

"The Role of Cost Based Pricing of Telecommunications Services in the Age of Technology and Competition," *Presented at National Regulatory Research Institute Conference*, Seattle, July 20, 1990.

"A Public Good/Private Good Framework for Identifying POTS Objectives for the Public Switched Network" (with Patricia D. Kravtin and Paul S. Keller), Columbus, Ohio: *National Regulatory Research Institute*, September 1991.

"Telecommunications Regulation and Infrastructure Development: Alternative Models for the Public/Private Partnership," *Prepared for the Economic Symposium of the International Telecommunications Union Europe Telecom '92 Conference, Budapest, Hungary,* October 15, 1992.

"Efficient Infrastructure Development and the Local Telephone Company's Role in Competitive Industry Environment" Presented at the *Twenty-Fourth Annual Conference, Institute of Public Utilities, Graduate School of Business, Michigan State University, "Shifting Boundaries between Regulation and Competition in Telecommunications and Energy,"* Williamsburg, VA, December 1992.

"Measurement of Telecommunications Productivity: Methods, Applications and Limitations" (with Françoise M. Clottes), *Presented at Organisation for Economic Cooperation and Development, Working Party on Telecommunication and Information Services Policies, `93 Conference "Defining Performance Indicators for Competitive Telecommunications Markets," Paris, France,* February 8-9, 1993.

"Telecommunications Investment and Economic Development: Achieving efficiency and balance among competing public policy and stakeholder interests," *Presented at the 105th Annual Convention and Regulatory Symposium, National Association of Regulatory Utility Commissioners, New York,* November 18, 1993.

"The Potential for Competition in the Market for Local Telephone Services" (with David N. Townsend and Paul S. Keller), *Presented at the Organization for Economic Cooperation and Development Workshop on Telecommunication Infrastructure Competition*, December 6-7, 1993.

"Market Failure in Open Telecommunications Networks: Defining the new natural monopoly," *Utilities Policy*, Vol. 4, No. 1, January 1994.


ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Lee L. Selwyn*

*The Enduring Local Bottleneck:  Monopoly Power and the Local Exchange Carriers,* (with Susan M. Gately, et al) a report prepared by Economics and Technology, Inc. and Hatfield Associates, Inc. for AT&T, MCI and CompTel, February 1994.

*Commercially Feasible Resale of Local Telecommunications Services: An Essential Step in the Transition to Effective Local Competition,* (Susan M. Gately, et al) a report prepared by Economics and Technology, Inc. for AT&T, July 1995.

"Efficient Public Investment in Telecommunications Infrastructure," *Land Economics*, Vol 71, No.3, August 1995.

*Funding Universal Service:  Maximizing Penetration and Efficiency in a Competitive Local Service Environment* (with Susan M. Baldwin, under the direction of Donald Shepheard), A Time Warner Communications Policy White Paper, September 1995.

*Stranded Investment and the New Regulatory Bargain* (with Susan M. Baldwin, under the direction of Donald Shepheard), A Time Warner Communications Policy White Paper, September 1995

"Market Failure in Open Telecommunications Networks: Defining the new natural monopoly," in *Networks, Infrastructure, and the New Task for Regulation*, by Werner Sichel and Donal L. Alexander, eds., University of Michigan Press, 1996.

*Establishing Effective Local Exchange Competition:  A Recommended Approach Based Upon an Analysis of the United States Experience,* paper prepared for the Canadian Cable Television Association and filed as evidence in Telecom Public Notice CRTC 95-96, Local Interconnection and Network Component, January 26, 1996.

*Adapting Taxation Policies to a Changing Telecommunications Industry*, presented at the Public Utilities Seminar, International Association of Assessing Officers, Louisville, KY, March 22, 1996.

*The Cost of Universal Service, A Critical Assessment of the Benchmark Cost Model,* (with Susan M. Baldwin), a report prepared by Economics and Technology, Inc. on behalf of the National Cable Television Association and submitted with Comments in FCC Docket No. CC-96-45, April 1996.

*Economic Considerations in the Evaluation of Alternative Digital Television Proposals*, paper prepared for the Computer Industry Coalition on Advanced Television Service, filed with comments in FCC MM Docket No. 87-268, In the Matter of Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service, July 11, 1996.

*Assessing Incumbent LEC Claims to Special Revenue Recovery Mechanisms:  Revenue opportunities, market assessments, and further empirical analysis of the "Gap" between embedded and forward-looking costs*, (with Patricia D. Kravtin), filed in *Access Charge Reform*,



*Statement of Qualifications – Lee L. Selwyn*

CC Docket No. 96-262, January 29, 1997.

*The Use of Forward-Looking Economic Cost Proxy Models* (with Susan M. Baldwin), Economics and Technology, Inc., February 1997.

*The Effect of Internet Use On The Nation's Telephone Network* (with Joseph W. Laszlo), report prepared for the Internet Access Coalition, July 22, 1997.

*Regulatory Treatment of ILEC Operations Support Systems Costs*, Economics and Technology, Inc., September 1997.

*The "Connecticut Experience" with Telecommunications Competition: A Case Study in Getting it Wrong* (with Helen E. Golding and Susan M. Gately), Economics and Technology, Inc., February 1998.

*Where Have All The Numbers Gone? Long-term Area Code Relief Policies and the Need for Short-term Reform,* prepared by Economics and Technology, Inc. for the Ad Hoc Telecommunications Users Committee, International Communications Association, March 1998, second edition, June 2000.

*Broken Promises: A Review of Bell Atlantic-Pennsylvania's Performance Under Chapter 30* (with Sonia N. Jorge and Patricia D. Kravtin), Economics and Technology, Inc., June 1998.

*Building A Broadband America: The Competitive Keys to the Future of the Internet* (with Patricia D. Kravtin and Scott A. Coleman), report prepared for the Competitive Broadband Coalition, May 1999.

*Bringing Broadband to Rural America: Investment and Innovation In the Wake of the Telecom Act* (with Scott C. Lundquist and Scott A. Coleman), report prepared for the Competitive Broadband Coalition, September 1999.

*Bringing Local Telephone Competition to Massachusetts* (with Helen E. Golding), prepared for The Massachusetts Coalition for Competitive Phone Service, January 2000.

*Subsidizing the Bell Monopolies: How Government Welfare Programs are Undermining Telecommunications Competition*, Economics and Technology, Inc., April 2002.

*Competition in Access Markets: Reality or Illusion, A Proposal for Regulating Uncertain Markets* (with Susan M. Gately and Helen E. Golding), Economics and Technology, Inc., prepared for the Ad Hoc Telecommunications Users Committee, August 2004.



**Attachment 2**

**A. 05-04-020
Discovery Responses
Referenced in Reply Testimony
of Lee L. Selwyn**

**PROPRIETARY**

TURN 1-19: Please provide the best available count of employees in each Applicant-affiliated organization that was located in California at the start of 2005. Do Applicants anticipate that these employee counts will change as a result of the merger?  If Applicants' response is anything other than an unqualified "no," please provide the most detailed description of the anticipated changes that is available.


Response:  Subject to the foregoing objections, and without waiving them, Applicants will respond.

Verizon Response:  18,215 as of 12/31/04

MCI Response:  The total employees for all MCI operating subsidiaries in California is 2,467 as of January 1, 2005.  A further response will be provided to the remainder of this request.

California Docket A.05-04.020
Party TURN 1-
Request No.1
Date of Request May 2, 2005

TURN 1-19: Please provide the best available count of employees in each Applicant-affiliated organization that was located in California at the start of 2005. Do Applicants anticipate that these employee counts will change as a result of the merger?  If Applicants' response is anything other than an unqualified "no," please provide the most detailed description of the anticipated changes that is available.


Response:  Subject to the foregoing objections, and without waiving them, Applicants will respond.

<u>Verizon Response:</u>  18,215 as of 12/31/04

<u>MCI Response</u>:  The total employees for all MCI operating subsidiaries in California is 2,467 as of January 1, 2005.  A further response will be provided to the remainder of this request.

**Attachment 3**


**WC Docket No. 05-75
FCC Staff Discovery Responses
Referenced in Reply Testimony
of Lee L. Selwyn**


**PROPRIETARY**

**Attachment 4**

**Analysis of the
Intrastate Portions of
Verizon/MCI Net Present Value Calculations**

**PROPRIETARY**

**Attachment 5**

**Analysis of the
Economic Impact of
Verizon/MCI California Headcount Reductions**

**PROPRIETARY**

**Attachment 6**

**Summary of Proposed Conditions
for Approval**



Attachment 6

SUMMARY OF PROPOSED CONDITIONS FOR APPROVAL

***Conditions necessary to flow through required benefits to ratepayers***.  The §854(b)(1) deficiency could be overcome if the short-term and long-term forecasted economic benefits to be allocated to *California* ratepayers are specific and are sufficient to overcome the risks to competition and to the California economy.

- In order to satisfy the requirement that "ratepayers receive not less than 50 percent" of such benefits, at least $206-million in short-term and long-term economic benefits must be provided to California ratepayers.

  - Direct, cash payment to ratepayers would most directly and efficiently satisfy this requirement.

  - An alternative approach is for the Commission to consider the $103-million ratepayer share as a sort of "currency" to be "spent" on an array of mitigation measures based upon each's value to California ratepayers and to the California economy generally. Requiring that such alternate forms of "provid[ing] short-term and long-term forecasted economic benefits to ratepayers" satisfy the requirement of §854(b)(2) be subject to specific quantification will help to assure that the statutory goal is achieved.

  - Alternatively, in theory, the efficiency gains and cost savings arising from the merger could be flowed through to California ratepayers pursuant to a regulatory regime acted as a surrogate for the competitive marketplace forces (which presently do not exist). The original NRF (set forth in D.89-10-031) – *before the elimination of the sharing requirement and productivity factor, and the reclassification of many services from monopoly/non-competitive (Category 1) to emerging competitive (Category 2)* – went a long way toward achieving this result.

    The testimony (pp. 229-234) outlines a self-executing form of regulation that, if adopted in full, would achieve this result.  This regulatory regime would need to include (at a minimum):

    - Sharing mechanism
    - Productivity factor
    - Classification and pricing flexibility rules
    - Imputation requirement
    - Cost allocation safeguards



*Proposed Conditions for Approval*

***Conditions necessary to mitigate harms to competition and to California ratepayers***.  The various competitive harms that will result when SBC's single largest competitor is taken out of the market can be offset by the adoption of various regulatory measures that would assure competitor access to SBC's network at cost-based rates.   For the protection of ratepayers, regulation will need to be adapted to recognize and specifically address the return of the California telecommunications market to a near-monopoly condition – these measures would also need to be coordinated and largely replicated in the pending Verizon-MCI merger application as well.

- Where permitted, the protections afforded by Section 271 and 272 of the Act – and those set out at PU Code §709.2 – should be revived.  Specifically:

  - The 47 U.S.C. §272(a) and Cal.  PU Code §709.2(c)(3) separate affiliate requirement should be reinstated, and made applicable to all SBC long distance and other competitive services.

  - The conduct requirements applicable to the separate affiliate and its relationship to SBC's ILEC operations at 47 U.S.C. 272(b)(1) through (b)(5) and at Cal. Public Utilities Code §709.2(c)(1) and (c)(2) should be reinstated and strictly enforced.

  - An imputation rule applicable to all use of ILEC services by any SBC affiliate or incorporated into any competitive services provided by SBC California should be adopted and strictly enforced.

  - Measures necessary to assure, going forward following the merger, "that there is no anticompetitive behavior by the local exchange telephone corporation, including unfair use of subscriber information or unfair use of customer contacts generated by the local exchange telephone corporation's provision of local exchange telephone service" per Cal.  PU Code §709.2(c)(2), and "that there is no substantial possibility of harm to the competitive intrastate interexchange telecommunications markets" per Cal.  PU Code §709.2(c)(4), should be adopted and strictly enforced.

- Divestiture of AT&T's consumer local and long distance business, if subject to additional conditions that ensured that the purchaser/divestee had a reasonable chance of competing successfully with SBC.  To do that, *all* of the specific regulatory impediments that operated to drive AT&T out of the consumer market would need to be rescinded, including:

  - The purchaser/divestee would need to be able to obtain UNE-Ps at TELRIC-based rates from SBC.

  - SBC would need to be precluded from pursuing the (now former) AT&T stand-alone long distance customers that would be included in the divestiture.



*Proposed Conditions for Approval*

- The post-merger SBC would have to be expressly precluded and enjoined from seeking to reimpose those regulatory changes subsequent to the closing of the merger or the divestiture.

- So as not to discourage entry and expansion by other competitors, these same conditions would have to apply to all competing carriers, not just to the divestee.

- Competitive safeguards must remain in full force and effect until sufficient *facilities-based* competition has actually developed to the point where SBC's market power as the incumbent LEC is diminished to the point where it can no longer dictate prices or control essential facilities. The Commission should identify specific metrics that would indicate that this condition has been acheived.

- The combined company should be subject to specific competitive safeguards to limit its potential market dominance in the California Internet access market. Specifically:

  - SBC should be required as a merger approval condition to offer DSL line sharing at TELRIC-based UNE rates to competing providers of DSL services; and

  - SBC should as a merger approval condition be required to discontinue their practice of requiring consumers to buy ILEC-provided local service as a condition of purchasing ILEC DSL services ("naked DSL").

  - Notwithstanding the August 5,2005 FCC action eliminating the mandatory sharing requirement on ILEC broadband (DSL) Internet access, Verizon should, as a merger approval condition, be required to continue affording competing providers access to the DSL channel at cost-based rates to be approved by the Commission, so as to maintain competition in the provision of this service within Verizon's California operating areas..

***Conditions to mitigate harms to employment and to the California economy***. The various adverse impacts upon existing SBC and AT&T employees and the California economy overall resulting from the loss of jobs and the shifting of SBC and/or AT&T activities that now take place in California to other parts of the country can be addressed and minimized through specific job- and employee benefits-retention commitments that would need to be accepted by the Joint Applicants as conditions for approval.

- An example of one such commitment would be to require the merged company to limit California job cuts to a specified maximum percentage of total job cuts. Limiting California job cuts to, for example, 5% of total MCI headcount reductions would save California jobs and bring the negative impact upon the California economy down to only $686-million.



**Attachment 7**

**Imputation Rule Proposed by AT&T
in WC Docket No. 02-112
June 2004**



Ex Parte Declaration of Lee L. Selwyn
FCC WC Docket No. 02-112, CC Docket No. 00-175
June 8, 2004
Page 32 of 35

APPENDIX

DRAFT IMPUTATION RULE

**1.    Applicability of Section 32.27 to integrated local/long distance operations**

(a)  Whenever a dominant provider of local exchange service that also provides long distance services has elected to offer long distance services through a separate affiliate, those transactions shall be subject to Section  32.27 of the Commission's rules.

(b)  Whenever a dominant provider of local exchange service that also provides long distance services has elected to operate on an integrated basis, rather than providing its long distance services through a separate affiliate, then, for purposes of imputing costs to that provider's long distance services, the requirements of section 32.27 of the Commission's rules shall apply as though the long distance services were being provided through an affiliate.

(c) In no event shall the retail price of any long distance service being furnished by a dominant provider of local exchange service that also provides long distance services be set less than the sum of items 2(b)(1) through 2(b)(5) and 2(c) below, plus any incremental network or other costs required for the provision of long distance service.

**2.    Imputation cost standard applicable to each category of cost**

(a)  For purposes of imputation, a distinction is made among three types of costs – "direct costs," "joint costs," and "common overhead costs."

(1)  "Direct costs" are incurred for the production of a specific product or service and are avoided in their entirety if such service is not provided.  "Direct costs" may include both fixed components as well as variable components that increase (although not necessarily in direct proportion to) the quantity of the product or service that is being produced.

(2)  "Joint costs" are incurred for the production of two or more products or services and not avoided as long as at least one such product or service continues to be produced.

(3)  "Common overhead costs" relate to functions of a general business nature not specifically associated with any product or group of products.  "Common overhead costs"



may include both fixed components as well as variable components that increase (although not necessarily in direct proportion to) the overall scale of the enterprise.

Direct costs and Joint costs shall be imputed into the price of long distance services furnished by a dominant provider of local exchange service in accordance with 2(b) following; Common Overhead costs shall be imputed into the price of long distance services furnished by a dominant provider of local exchange service in accordance with 2(c) following.

(b) For purposes of imputation for any long distance service furnished by a dominant provider of local exchange service that also provides long distance services, the following shall apply:

(1) *Access services*. For purposes of imputation, the tariff prices of all switched and special access services that would ordinarily be utilized by a section 272(a) affiliate or by a non-affiliated provider of interexchange services shall be utilized, whether or not such services are actually being utilized by the integrated provider in the specific network architecture applicable to an integrated dominant provider of local exchange service that also provides long distance services.

(2) *Non-access tariff services*. For purposes of imputation, the tariff prices applicable to all non-access local exchange services that would ordinarily be utilized by a section 272(a) affiliate or by a nonaffiliated provider of interexchange services shall be utilized, whether or not such services are actually being utilized by the integrated provider in the specific network architecture applicable to an integrated dominant provider of local exchange service that also provides long distance services.

(3) *Non-tariff services or functionality satisfying the Prevailing Company Pricing threshold set out at 47 CFR 32.27(d)*. For purposes of imputation, the prevailing company prices applicable to all non-tariff services of a type or providing a functionality that would be offered to and, in some cases, utilized by a section 272(a) affiliate or by a nonaffiliated provider of interexchange services, where the level of utilization by nonaffiliated entities is sufficient to satisfy the Prevailing Company Pricing threshold set out at 47 CFR 32.27(d), the Prevailing Company Price as it would be set in accordance with 47 CFR 32.27(d) shall be utilized, whether or not the precise manner in which the integrated provider furnishes such functionality to itself is the same as that which is being offered to nonaffiliated entities.

(4) *Non-tariff services, functionality, information or the beneficial transfer of assets not satisfying the Prevailing Company Pricing threshold set out at 47 CFR 32.27(d)*. Where non-tariff services, information or the beneficial transfer of assets of a type or providing a functionality that would be provided to a section 272(a) affiliate but whose usage by one or



more nonaffiliated providers of interexchange services is not sufficient to satisfy the Prevailing Company Pricing threshold set out at 47 CFR 32.27(d), for purposes of imputa-tion the fair market value or the fully-distributed cost, whichever is greater, shall be used. The fair market value of such services shall be determined by a survey of prices of com-parable services being offered on a stand-alone basis by firms ordinarily in the business of providing such services,

(5)  *Non-tariff functionality or the beneficial transfer of information or assets not offered or available to nonaffiliated entities*.  Where the production of long distance services on an integrated basis by a dominant local exchange service provider involves the use of non-tariff services, functionality, information, or the beneficial transfer of assets of a type or providing a functionality that would be provided to a section 272(a) affiliate but which is not required to be offered to nonaffiliated providers of interexchange services, imputation shall be based upon the fair market value or the fully-distributed cost, whichever is greater, of such service, functionality, information, or the beneficial transfer of assets, including in particular the fair market value of any customer proprietary network information that is used or referenced during the course of marketing, selling, or furnishing the long distance service.  The fair market value of such services or functionality, including any customer proprietary network information, shall be based upon the cost that a provider of interexchange services that is not affiliated with a dominant incumbent local exchange carrier would reasonably incur in order to obtain or to self-provide such services, functionality and/or information.

(c)  Common Overhead costs shall be imputed to long distance services furnished by a dominant provider of local exchange service on the basis of fully distributed cost.

## 3.   Service-specific imputation required

(a)  A dominant provider of local exchange services that is required to impute costs to its long distance services pursuant to these rules must satisfy such imputation requirements separately with respect to each of its retail long distance services.

(b)  Where such long distance service is included within any bundled offering that also includes any dominant local exchange services or service elements, the price of such long distance service to which the imputation requirement is to apply shall be determined by subtracting the retail price(s) of all component(s) of the bundle other than long distance from the total retail price of the bundle.


ECONOMICS AND
TECHNOLOGY, INC.

Ex Parte Declaration of Lee L. Selwyn
FCC WC Docket No. 02-112, CC Docket No. 00-175
June 8, 2004
Page 35 of 35

(c) Any bundle consisting of basic local exchange (dial tone) service, local calling, vertical features, intraLATA and interLATA toll, and any other components or features must be priced, in the aggregate, at a level sufficient to recover the aggregate of all tariff prices of all tariff services (or their functional equivalents) included within the bundle together with all other imputed and directly-assigned costs applicable to the bundled offering.

**4.    Allocation of costs for upgrades or replacements**

(a)  All investments in plant, facilities or equipment  that will be jointly used by regulated and nonregulated services within five years of the date of acquisition and installation of that plant shall be presumed to be acquired primarily for the benefit of the nonregulated services, absent a showing to the contrary.

(b)  At a minimum, any increase in net investment for the replacement assets over the remaining net book cost of the plant being replaced shall be allocated to and imputed into the price floor applicable to the nonregulated service.

**5.    Cross-subsidization prohibited**

(a)  In no event shall a dominant provider of local exchange service that also provides long distance services and that has elected to operate on an integrated basis rather than providing its competitive long distance services through a separate affiliate engage in actions that constitute a cross-subsidization of its competitive long distance services from its regulated services.

(b)  For purposes of this rule, "cross-subsidization" shall be deemed to occur when in-region long distance services or nonregulated services, or telecommunications services that are treated as nonregulated services under these rules, are priced below cost by use of subsidization from customers of regulated services; or when a provider's in-region long distance services or non-regulated services derive benefits from the regulated operations without the regulated operations receiving just and reasonable compensation from in-region long distance services or nonregulated operations for the benefits derived by such in-region long distance services or nonregulated operations.

