## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) Civil Action No. 05CV2102 (EGS) |
| SBC Communications, Inc. and AT&T Corp., | ) ) ) ) |
| Defendants. | ) ) |

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) ) ) Civil Action No. 05CV2103 (EGS) |
| v. | ) ) |
| Verizon Communications, Inc. and MCI, Inc., | ) ) ) |
| Defendants. | ) ) ) |

## NOTICE OF FILING REDACTED VERSION OF DECLARATION OF NICHOLAS ECONOMIDES, Ph.D., IN RESPONSE TO THE AUGUST 7, 2006 SUBMISSION OF THE UNITED STATES

Eliot Spitzer, Attorney General of the State of New York, as *amicus curiae*, submits this notice that the accompanying Declaration of Nicholas S. Economides, Ph.D., dated September 5, 2006, ("Economides Declaration") is hereby filed under seal pursuant to the Protective Order in the above referenced matter, dated August 4, 2006. A redacted copy of the Economides Declaration and an unredacted, sealed copy of the Economides Declaration are filed under is filed under the provisions of the Protective Order and per LcvR 5:1(j).

Dated: New York, New York
      September 5, 2006

ELIOT SPITZER
Attorney General of the State of New York


By:   <u> / s /   Jay L. Himes         </u>

                    Jay L. Himes
                    Chief, Antitrust Bureau
Mary Ellen Burns         120 Broadway
Special Counsel           Suite 26C
Public Advocacy Division   New York, NY 10271
                    212-416-8282
Jeremy R. Kasha
Margaret A. Ross
Assistant Attorneys General, Antitrust Bureau

Keith H. Gordon
Assistant Attorney General, Consumer Frauds and Protection Bureau

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05CV2102 (EGS) |
| | ) |
| SBC COMMUNICATIONS, INC. and | ) |
| AT&T CORP., | ) **PUBLIC VERSION** |
| | ) **REDACTED PURSUANT** |
| Defendants. | ) **TO PROTECTIVE ORDER** |
| | ) **ENTERED AUGUST 4, 2006** |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05CV2103 (EGS) |
| | ) |
| VERIZON COMMUNICATIONS, INC. | ) |
| and MCI INC., | ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF NICHOLAS ECONOMIDES**

I, NICHOLAS ECONOMIDES, declare as follows:

1.      I am professor of economics at the Stern School of Business of New York

University, located at 44 West 4th Street, New York, New York 10012.  I received my

undergraduate degree in economics from the London School of Economics, and a master's

degree and doctorate in economics from the University of California at Berkeley, with an

emphasis on industrial organization.  Besides N.Y.U., I have taught economics at Columbia University and Stanford University.

2.      I have published more than one hundred research papers in the areas of industrial organization, microeconomics, antitrust, network economics, telecommunications policy, and finance, and I have given many presentations at academic and government institutions and conferences.  A copy of my *curriculum vitae* is annexed as Exhibit 1.

3.      I have also consulted for the Federal Trade Commission and been retained by others in conjunction with litigation and administrative proceedings involving the telecommunication industry.  In that capacity, I have prepared reports and affidavits, and testified as an expert witness. A list of cases in which I have been engaged as an expert witness during the last four years is annexed as Exhibit 2.

4.      I have been asked by the Attorney General of New York to evaluate and comment on the remedy in the Proposed Final Judgments ("PFJs") in these two cases, which arise out of the mergers of  Verizon and MCI and of SBC and AT&T.[1]  My opinion is set forth below.

### Summary of My Conclusions

5.      In my opinion, the two mergers here are likely to have anti-competitive consequences that will harm consumers of telecommunications services and the public interest generally.  The remedy offered by the Department of Justice ("DOJ") to redress the injury is simply insufficient.  Significantly, DOJ has provided only limited and inadequate economic

---

[1]      For ease of exposition, I use SBC's pre-merger name, disregarding the name change to AT&T that SBC assumed after closing the merger.  Also, for each transaction, I use the term "merger" in a non-technical sense to refer to the combination of the two companies, regardless of the corporate procedure used to accomplish the combination.

modeling, argument and supporting evidence for an economist to use to evaluate its chosen remedy.

6.     DOJ has identified the retail and wholesale markets for local private lines, along with the voice and data telecommunications services that rely on local private lines, as the relevant antitrust product markets.  In its complaints, DOJ expresses serious concerns about reduced competition in these markets as a consequence of the mergers.  However, the remedy that DOJ proposes has serious flaws both in corresponding appropriately to the market definition of the complaints and in addressing the anti-competitive concerns that DOJ itself identifies.

7.     *First*, in fashioning its remedy, DOJ uses a flawed geographic market definition for retail local private lines services, implicitly defining the relevant antitrust market as a single building.  DOJ's definition ignores a central feature of private lines:  the fact that they are part of a telecommunications network service, in which the customer typically needs to connect a number of buildings, themselves frequently dispersed geographically, to each other.  Thus, DOJ's single building market definition is inconsistent with the way that telecommunications carriers view their business, and is at odds with the DOJ's Horizontal Merger Guidelines.  Nothing in the August 7, 2006 declaration of W. Robert Majure, DOJ's economist, or in any other DOJ submission, supports DOJ's conclusory assumption that the relevant antitrust market for local private lines services is a single building.

8.     *Second*, having begun with a flawed market definition, DOJ compounds error by offering a tightly cabined divestiture remedy, applicable not to all the buildings identified, but only to those where the two merging companies – either Verizon and MCI, or SBC and AT&T – were the only service providers pre-merger.  These are so called "two-to-one" buildings, reflecting the fact that the number of suppliers serving such buildings will change, post-merger,

3

from the two merging companies to only one – either Verizon or SBC.  Thus, DOJ seemingly believes that, absent divestiture, there would be price increases in two-to-one buildings, but not in three-to-two or four-to-three buildings, and so on.  On this approach, there is no need for divestiture or any other remedy for all these other buildings.

9.     DOJ's view is inconsistent with practically all industry models that economists use.  Economic models that predict price increases where competitors decline from two to one also typically predict price increases where competitors decline from three to two, or from four to three, or from five to four, *etc*.  Because DOJ does not reveal the industry model that it used, if any, it is impossible to evaluate either the model's soundness or the validity of its underlying assumptions.  But the conclusion that DOJ has reached is so improbable as a matter of fundamental economics that it cries out for an elaborate and meticulous justification – totally lacking in DOJ's submission.

10.     *Third*, DOJ does not apply its remedy to all two-to-one buildings, but only to a subset of them consisting of ones where DOJ believes that new entry is unlikely post merger.  Again,  DOJ does not disclose an economic model of entry, used to identify those buildings where entry would be likely, and where it would not be.  DOJ also does not provide any algorithm or other procedure that could be applied to all two-to-one buildings to extract those in which DOJ thinks entry is likely, and which should  therefore be excluded from the remedy.  Absent such information, an independent party cannot replicate DOJ's process, nor confirm the soundness of DOJ's decision to include some buildings in the remedy, while excluding many others.

11.     As an academic economist, I believe that making a judgment on the probability of entry is generally speculative.  This is especially true after a very significant industry change

4

such as the one here, in which the dominant incumbent in each region has just bought one of its two largest competitors. Besides industry-specific factors, entry and investment in infrastructure depend on other variables that affect the whole of the economy, such as interest rates and the macroeconomic environment. These are hard to predict accurately. Moreover, the likelihood of entry will crucially depend on pricing by the dominant incumbents – *i.e.*, the merged Verizon-MCI and SBC-AT&T entities – during the period in which the DOJ consent decree allows them to be legal monopolists in the non-divested two-to-one buildings, as well as on prediction of pricing and the extent of competition after potential entry. These calculations are complex, and economists have substantial disagreements in how they play out.

12.     Accordingly, I am surprised that DOJ believes it can pinpoint, with a significant degree of confidence, the individual buildings in which entry is likely or unlikely. I doubt that a robust model can be created that would make accurate entry predictions. In all events, because DOJ has not disclosed its model, if indeed it used one, it is impossible to conclude that DOJ's entry predictions are accurate – and not just speculation.

13.     *Fourth*, given the prevailing network effects in the private lines market, the extremely limited extent of asset divestiture, the nature of the divested assets and other factors discussed below, it is unlikely that any lessee of divested assets could replace the competition lost by eliminating MCI and AT&T.

14.     *Fifth*, DOJ does not apply *any* remedy to the *wholesale* private lines services market, which is severely affected by eliminating AT&T and MCI, the second and third largest wholesale market participants in the Verizon and SBC regions. Verizon and SBC have access to virtually all the business buildings in their respective regions. Competing carriers combine their own facilities with facilities that they lease in the wholesale market, either directly from Verizon

5

and SBC, indirectly through a sublease offered by a competing local exchange carrier ("CLEC"), or, in limited instances, from other CLECs offering to lease their own facilities. In this way, competitors can offer service to customers having multiple building locations.

15.    As discussed below, the Verizon-MCI and SBC-AT&T mergers make the wholesale market significantly more concentrated. The proposed divestiture of a few buildings would not have a significant effect on the increased concentration. The FCC itself recognized the likely increases in prices in the wholesale local private lines market, and imposed a 30-month moratorium on price increases.[2] Remarkably, DOJ does not consider the two mergers' significant anti-competitive effects in this market, does not propose a remedy, and does not discuss whether the FCC remedy is adequate.

16.    *Sixth*, DOJ's complaints express concern about the anti-competitive effect of these mergers on the markets for voice and data telecommunications services that rely on local private lines. DOJ provides no analysis and no evidence to demonstrate that its proposed remedy addresses these concerns. Pre-merger, AT&T and MCI competed directly with Verizon and SBC. Increased concentration and dominance by Verizon and SBC, each in its respective region, in both the retail and wholesale markets for local private lines directly results in increasing concentration and dominance by Verizon and SBC in the business voice and data telecommunications markets. Because DOJ itself has identified these anti-competitive effects, I cannot comprehend why it does not remedy them.

---

2    *See* WC Docket No. 05-75 - In the Matter of Verizon Communications Inc. and MCI Inc. Applications for Approval of Transfer of Control, FCC 05-184 - *Memorandum Opinion and Order*, ("FCC Verizon-MCI Merger Order") Appendix G, pp. 128-131, adopted Oct. 31, 2005, rel. Nov. 17, 2005. *See also* WC Docket No. 05-65 - In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control, FCC 05-184 - *Memorandum Opinion and Order*, ("FCC SBC-AT&T Merger Order") Appendix G, pp. 122-125, adopted Oct. 31, 2005, rel. Nov. 17, 2005.

17.    *Seventh*, I believe that DOJ did not identify all relevant antitrust markets where the two mergers can result in price increases and hurt the public interest.  DOJ did not examine the consequences of coordinated actions that the post merger duopolists can take with much more detrimental effects to consumers than in the pre-merger world.  The merging parties participate in dozens of markets.  Their increased market power in wholesale private lines will harm competition in other markets, including wireless, cable packet voice, and long distance services.

18.    I elaborate on my conclusions below.  I first discuss the basic facts typifying the retail and wholesale local private lines markets, including  how competition has developed and how competitors combine their own and wholesale offerings to meet the private lines network demands of business customers. After that, I identify the mergers' effects on wholesale and retail competitors in the local private lines markets.  I conclude that the mergers will increase Verizon and SBC's market power, enabling them to further increase local private lines prices.  Finally, I identify a number of inadequacies in the DOJ's proposed remedy.  My conclusion is that the proposed remedy would not produce replacements for MCI or AT&T, the two largest competitors, within the foreseeable future, and also that the FCC's merger conditions do not cure the shortcomings in DOJ's remedy.

## I.  The Retail and Wholesale Private Lines Markets

19.    DOJ alleges that these mergers will substantially lessen competition:  (a) for "Local Private Lines," and (b) for voice and data telecommunications services that rely on Local Private Lines.[3]  DOJ defines a local private line as "a dedicated, point-to-point circuit offered

---

[3]        DOJ Verizon-MCI Complaint, ¶¶ 1, 19; DOJ SBC-AT&T Complaint, ¶¶ 1, 19.

over copper and/or fiber-optic transmission facilities that originates and terminates within a single metropolitan area and typically includes at least one local loop."[4]   As the DOJ acknowledges, local private lines are sometimes referred to in the industry as "special access" facilities.   DOJ SBC-AT&T Complaint, ¶ 13; DOJ Verizon-McI Complaint, ¶ 13. In the interest of simplicity, I will generally refer to "local private lines," a term that I use interchangeably with the shorter expression "private lines."

20.     Businesses typically use these large capacity, dedicated telecommunications circuits to connect their offices in multiple buildings.  As such, local private lines involve a *network* service.  This service requires physical connections to buildings and the ability to transport signals among buildings.  This service also exhibits *network effects*:  a customer is willing to pay significantly more to a single carrier if the carrier can provide local private lines services to all of the customer's buildings or locations.[5]  These network effects imply that firms with a larger network, and hence larger market share, can charge higher prices.[6]

21.     In the retail local private lines services market, telecommunications companies offer to business customers their network services, including the high capacity, dedicated and

---

4       DOJ Verizon-MCI Complaint, ¶ 13; DOJ SBC-AT&T Complaint, ¶ 13. A "loop"is  the copper or optical fiber connection between a customer building and the telecommunications company's central office or other network location.  Loops are also commonly referred to as "lateral" connections.  Loops are one of several service components used to carry a customer's data and voice from one building to another in a private lines network, or from individual buildings to the public switched network.

5       In a market with network effects, customers are willing to pay more if the provider's network is larger.  For example, I would prefer a library of books or DVDs with more titles, rather than fewer.  Similarly, I would be willing to pay more to use a telecommunications network of more, rather than fewer, subscribers.  *See* Nicholas Economides, *The Economics of Networks*, 14 Int'l Journal Indus. Org. 675 (1996).

6       *See Reply Of The United States To Actel's Opposition To The United States' Motion For Entry Of The Final Judgments in US v. SBC,* n. 51 ("Indeed, the RBOCs which have by far the largest networks typically offer the highest prices").

exclusive circuits connecting offices typically located in multiple buildings. The companies

offering these services include Verizon and SBC, two of the so-called regional Bell operating

companies ("RBOCs") that resulted from the 1984 breakup of AT&T, as well as independent

companies called Competitive Local Exchange Carriers ("CLECs"). The largest and most

prominent CLECs are AT&T and MCI.

22.    In the wholesale private lines market, telecommunications companies that have

local private lines lease their facilities to other suppliers, which in turn use them to provide

networked service to their business customers. Thus, the wholesale private lines market allows a

telecommunications provider that owns limited facilities to serve customers in multiple locations

using another facilities-based carrier's loops to supplement its own.

23.    The third product market in the DOJ complaints is voice and data

telecommunications services that rely on the local wholesale and retail private lines service.

Some customers use private lines networks to carry both data and voice communications on the

same circuits.

**A.    Features of the Retail Local Private Lines Market**

24.    DOJ alleges that "[t]he relevant geographic markets for both Local Private Lines,

as well as voice and data telecommunications services that rely on Local Private Lines, are no

broader than each metropolitan area and no more narrow than each individual building."[7]

However, DOJ's market analysis fails to consider the way in which most local private lines

customers in fact buy services.

25.    A typical local private lines customer is a business with offices in a number of

locations which buys the service to connect permanently all of its offices. The customer thus

---

[7]    DOJ SBC-AT&T Complaint, ¶ 24.

buys a *network service,* connecting multiple buildings to form a dedicated private lines network. This network service typically requires that facilities be provided in multiple locations. So, when a business customer with offices in buildings A, B, and C, buys retail local private lines services, it requires permanent dedicated connections between its three locations – buildings A, B, and C. Components of the network services that the customer buys include physical lateral connections to each of the buildings A, B, and C, also called loops, as well as use of a transport facility to connect to the rest of the provider's network. Like many network and telecommunications services, retail local private lines services require a number of components, and loops (lateral connections) are only one of them. It is a fallacy to confuse a service that requires several components with any of the components. If DOJ explicitly applies its Horizontal Merger Guidelines to the market for private lines services, it can not reasonably conclude that the market is a single building because private lines services typically require as its component parts access to a number of buildings (as demanded by the customer) as well as transport among them.

 26. For this reason, the retail market for local private lines has to be at least as large as the number of buildings that customers demand be connected to form private lines networks. This is supported by the FCC's evaluation of these mergers:

> We find that these customers typically seek service from a provider that can serve all of their locations, and generally only a few carriers serving a particular location have such capabilities. In light of the fact that there are relatively few providers that can offer a high level of ubiquitous service, we conclude that this geographic market should encompass all the geographic locations where these multi-location business customers may have a presence.[8]

---

[8] FCC  SBC-AT&T Merger Order, *supra* n. 2, at ¶ 63.

27.    There is evidence that the competing companies, including the merging parties, considered the relevant market to be at least as large as the metropolitan area in making their business decisions. Only a few years ago, SBC's main argument in acquiring Ameritech – thus expanding its service area and private lines customer base from eight states to thirteen – was that it needed an expanded geographic footprint because of the demand by businesses of local private lines and other telecommunications services in the combined territory of SBC and Ameritech.[9] Similarly, in the customers' declarations in this Tunney Act proceeding, over half expressed a preference for a carrier that meets all its needs.[10]  **REDACTED.**[11]

### B.    Features of the Wholesale Market

28.    The wholesale local private lines services market is one in which telecommunications carriers are both buyers and sellers. Verizon and SBC have access to virtually all the business buildings in their respective regions. Therefore, to offer services to companies with many building locations, CLECs – such as MCI or AT&T – must combine the facilities that they themselves own or control with facilities leased in the wholesale market. CLECs typically lease facilities from an Incumbent Local Exchange Carrier ("ILEC"), such as Verizon or SBC, or from another competitor who either owns such facilities or resells facilities leased from an ILEC.

---

[9]    Reply Affidavit of James Kahan, Senior Vice President for Corporate Development, SBC Corporation, FCC CC Docket 98-141, November 13, 1998, at 16.

[10]    DOJ Submission to the Court, Tab. 1.

[11]    RHK Advisory Services, Special Access Pricing Diagnostic - *Top 5 Metros*, Sept. 9, 2003, at 71, VZ 074-0117349 (DOJ Tunney Act production).

11

29.     Pre-merger, AT&T and MCI were the second and third largest wholesale market participants, after Verizon and SBC in their respective regions.[12]  These companies played dual roles in wholesale private lines services market:

> AT&T and MCI provide not only alternate facilities, but they also provide discounted pricing arrangements for those facilities which are competitive with or significantly better than the terms or pricing arrangements that Verizon offers to many smaller carriers.[13]

30.     Both AT&T and MCI resold to other smaller CLECs private lines leased under special discounts from Verizon, SBC, and other ILECs.  AT&T and MCI priced these resold ILEC facilities very competitively to the prices that ILECs offered the smaller CLECs.[14]  Most other CLECs cannot negotiate such discounts from ILECs directly because their usage levels do not approach those of AT&T and MCI.

31.     In consequence, it makes little sense to define a wholesale market for each individual building.  A more appropriate geographic definition of this market is at the metropolitan statistical area ("MSA") level, or even larger where customers demand private networks linking buildings in multiple MSAs.  Carriers' pricing and FCC evidence support a geographic definition at the MSA level.  The FCC acknowledged pricing by SBC at the MSA geographic level and examined MSA-level pricing in the mergers:

---

12      *See, e.g.*, NY PSC Case 05-C-0237 - Joint Petition of Verizon New York, Inc. and MCI, Inc. for a Declaratory Ruling Disclaiming Jurisdiction over or in the Alternative for Approval of Agreement and Plan of Merger and ~Case 05-C-0242 - Joint Petition of SBC Communications, Inc., AT&T Corporation, together with its Certificated New York Subsidiaries, for Approval of Merger, *Department of Public Service Staff White Paper,* July 6, 2005, at 41 ("NY PSC Staff Merger White Paper"), available at http://www3.dps.state.ny.us/pscweb/webfileroom.nsf/Web/086FC6C29DB258D2852570360078F0B1/$File/05-c-0237.pdf?OpenElement.

13      *Id.*, at 41.

14      Id.

In addition, however, we [the FCC] will consider the potential effect of the merger on SBC's special access prices, which are generally set on a wider geographic basis.  Because SBC has gained Phase II pricing flexibility for its special access services in some metropolitan statistical areas (MSAs), but not others, SBC's rates for special access may vary from MSA to MSA.[15]

## C.     Verizon and SBC Dominance in Local Private Line Markets

32.     Within their respective regional service areas, Verizon and SBC,  successors to the pre-1984 AT&T national monopoly, are the only providers that possess local private lines connections to virtually every building.  Even though, pre-merger, AT&T and MCI had the second and third-largest private lines facilities in many metropolitan regions, their own "last mile" building connections were minuscule, compared to Verizon's or SBC's loops serving commercial buildings.  As a result,  to serve retail customers AT&T and MCI had to lease circuits in the wholesale market from the Verizon, SBC and other ILECs for most of their private lines requirements.[16]

33.     The history of competitive entry into private lines markets is itself instructive in evaluating the PFJs.  After the 1984 AT&T breakup, competitors such as Teleport Communications Group ("TCG") and other competitive access providers ("CAPs") entered the business customer local private lines services markets, beginning first in New York City, and then expanding into other major business centers.  New York City has the nation's highest concentration of large national and global financial corporations and other telecommunications-intensive companies.  As such, this market has always been the most attractive for

---

15      FCC SBC-ATT Merger Order, *supra* n. 2, at ¶ 29.

16      FCC RM No. 10593 - In the Matter of AT&T Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services, *Petition for Rulemaking* (filed Oct. 15, 2002), at 25 ("FCC RM No. 10593"), available at http://gullfoss2.fcc.gov/prod/ecfs/retrie ve.cgi?native_or_pdf= pdf&id_document=6513297623.

telecommunications providers, incumbents and competitors alike.  CLEC entry into other metropolitan areas across the country has generally come later.

34.    The CAPS gradually built loops connecting their own networks to buildings housing their most profitable customers.  After 10 years of build-out to individual commercial buildings, one customer at a time, the CAPs had a beachhead in the still ILEC-dominated markets for private lines networks.  By 1994, CAPS like TCG, Metro Fiber Systems ("MFS") and Brooks Fiber collectively captured only "five percent of that market, or about $250 million."[17]  The ILECs, each one dominant within its separate service area, retained the other 95%.

35.    Congress' passage of the Telecommunications Act of 1996 spurred the next transformation of telecommunications competition.  For the first time since the 1984 AT&T breakup, RBOCs became eligible to compete in long distance markets against such carriers as AT&T, MCI and Sprint.  But to do so, they had to open their local networks to competition by others.  AT&T and MCI, the leading long distance companies, had a choice in terms of entering the local business markets, including private lines services.  Either they could build fiber rings and loops to thousands of commercial buildings nationwide, or they could buy the CAPS who already owned loop networks in multiple business centers.

36.    In 1998, AT&T purchased TCG, then the largest CAP, with facilities in 57 U.S. markets.[18]  AT&T Chairman Michael Armstrong explained the acquisition:

---

[17]    Annunziata, Bob, President of TCG, *Whither the CAPS*, Sixth Annual Telecommunications Reports Conference: *Redefining Local Exchange Competition,* April 8, 1994, at 4, available at *http://www.citi.columbia.edu/tcgpapers.htm*.

[18]    Rohde, David, *Network World: ATT jumps back into local loop,* Jan. 12, 1998.

Completion of this merger accelerates our entry into the $21 billion business local service market because we're reducing our dependence on the Bell companies for direct connections to businesses.[19]  TCG has more fiber route miles and serves more businesses in more cities than any other competitive local services company. . . . [TCG's] fiber optic network encompasses more than 250 communities from coast to coast, including 66 of the nation's major markets.[20]

37.    MCI similarly acquired MFS, the second largest CAP.  Brooks Fiber, another major CAP, was acquired by WorldCom at about the same time that WorldCom merged with MCI.[21]

38.    By acquiring established CAP businesses that owned loops serving many buildings in many metropolitan areas, MCI and AT&T rapidly achieved sufficient scale to compete with the ILECs, and converted MCI and AT&T into the two largest CLECs, both in New York and nationally.  Because MCI and AT&T now owned loops serving a critical mass of buildings where many business customers were located, and because their typical rates were substantially lower than those of Verizon, SBC and other ILECs, AT&T and MCI successfully challenged the ILECs' dominance in the private lines markets and partially constrained the ILECs' ability to exercise market power.[22]

39.    AT&T and MCI's success as competitors in private line markets would not have been possible without their access to the established CAP networks, located in thousands of buildings across hundreds of metropolitan areas.  In addition, as noted earlier, AT&T and MCI further facilitated private lines competition by smaller CLECs

---

19    AT&T news release, July 23, 1998.

20    *Discount Long Distance News:  AT&T Merges with Teleport*, Jan. 19, 1998.

21    *Business Week*, *WorldCom and MCI, Together*, Oct. 13, 1997.

22    *See* initial Tunney Act Comments of Comptel, p. 17.  *See also* FCC WC Docket No. 05-75, *supra* n. 2, *Opposition of Broadwing Comm. LLC, and SAVVIS Corp. To the Merger Application filed by Verizon Communications, Inc. and MCI, Inc.,* at 22-25.

through reselling ILEC private lines at prices below those charged by ILECs selling

directly to the smaller CLECs.

40.     But however significant AT&T and MCI were, each paled by comparison

to the ILECs.  As the NY PSC, examining Verizon's dominance of private lines markets

in the State in 2001, found:

> Local exchange carriers reported the number of special service circuits
> each has in service as of August of 2001. This data corroborates our
> earlier finding of dominance, and shows that Verizon serves over 79.5%
> of the statewide market with the next largest carriers, a competitor serving
> 6.6%, and an incumbent serving less than 5.9% of the statewide market.[23]

41.     Subsequent MCI and AT&T filings in the FCC Special Access Proceeding

demonstrate no significant change.[24]  In a 2003 filing, MCI told the FCC that ILEC

dominance of private lines markets resulted in "harm to competition and deadweight loss

to the national economy [that] are monumental."[25]  MCI also rejected, as "nonsense on

steroids," the ILECs' argument that private lines competition was widespread, robust,

and thriving.[26]  For its part, AT&T documented that "[e]ven in the most competitive area

in the United States, New York, no AT&T or other CLEC facilities are available at

85.9% of those locations.  A similar pattern is evident in each of the other three large

---

[23]     AT&T was the unnamed competitor with 6.6 %.  Frontier of Rochester had 5.9% in a service area
that does not overlap Verizon's.  The NY PSC did not disclose the market share of MCI, the next largest
CLEC after AT&T.  Cases 00-C-2015 and 92-C-0665, *Order Denying Petitions for Rehearing and
Clarifying Applicability of Special Services Guidelines*, at 9 (issued and effective December 20, 2001).

[24]     *See* FCC RM No. 10593 - *supra* n. 16; *see also* FCC 05-18 - *Order and Notice of Proposed
Rulemaking*, rel. Jan. 31, 2005 (Special Access NPRM), available at http://hraunfoss.fcc.gov/edocs_
public/ attachmatch/FCC-05-18A1.doc.

[25]     FCC RM No. 10593, *supra* n. 16, *WorldCom Reply Comments* (Jan. 23, 2003), pp. 2-3, available
at http://gullfoss2.fcc.gov/ prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6513404338.

[26]     *Id.*, p. 2.

markets [Boston, Chicago, and Los Angeles]."[27]  MCI likewise estimated the ILECs' market share of private lines services at approximately 90%,[28] with competitive private lines transport available in less than 10 percent of the wire centers to which it required transport.[29]

42.    In its 2003 Triennial Review Order on the state of competition, the FCC found that only "between 3% and 5% of the nation's commercial office buildings are served by competitor-owned loops."[30]  Verizon itself estimated in 2002 that all CLECs *combined* served only about 30,000 of the roughly 3 million commercial buildings nationwide – a mere 1%.[31]  AT&T's 2002 petition to the FCC declared that of 186,000 buildings it serves using local private lines, 95% rely on ILECs' special access, with 3% using AT&T's facilities, and 2% facilities of other CLECs.[32]

43.    Indeed, the proof of ILEC dominance of private lines markets at the time of the current mergers is telling.  Despite more than two decades of facilities-based competition, and despite overall *downward* cost trends in the industry, private lines rates in New York and nationally *increased* during the five years that the FCC has allowed

---

27    *Id.*, *Selwyn Declaration* in support of AT&T's January 23, 2003 *Comments*, p. 18, ¶ 20.

28    *Id.*, *WorldCom Reply Comments, supra* , p. 5, fn. 15.

29    *Id.,* p. 5, fn. 16.

30    CC Docket No. 01-338; CC Docket No. 96-98; CC Docket No. 98-147 - In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability, *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking*, *18 FCC Rcd 16978,* at fn. 856.; 2003 FCC LEXIS 4697, Adopted Feb. 20, 2003, rel. Aug. 21, 2003.

31    FCC RM Docket No. 10593, *supra* n. 16, *Opposition of Verizon*, Dec. 2, 2002, at 13.

32    *Id.*, *Declaration of Kenneth Thomas on behalf of AT&T,* Oct. 15, 2002, at 1.

Verizon and SBC pricing flexibility.[33]

### D.    How CLECs Compete

44.    When seeking to serve a business customer needing local private line services, a CLEC will first identify the building locations that the customer wishes to connect with a private network.  The CLEC will use its own facilities if it owns or controls loops to one or more of the customer's buildings.  The CLEC will next evaluate whether additional customer buildings are located near enough to the CLEC's facilities, such that constructing new local loops to one or more buildings would be cost-justified. Frequently, it is more economical to lease local loops from another provider.  The CLEC then computes a packaged offering to the prospective customer, which combines the costs of using its own facilities and those of leasing other CLECs' and ILECs' facilities. A CLEC that is able to serve more customer buildings using its own facilities is more likely to be able to bid successfully against the ILECs and other CLECs.

45.    Scale matters a great deal in the private lines business.  A CLEC with local loops serving many buildings in a given metropolitan area generally will outperform another CLEC with local loops serving fewer buildings.[34]  This is a key reason that AT&T and MCI were the most successful CLECs challenging the ILECs for

---

33    FCC WC Docket No. 05-65 - *In the Matter of SBC Communications, Inc. and AT&T Corp. Applications for Approval of Transfer of Control, Reply Comments of Ad Hoc Telecom. Users Committee*, May 10, 2005, p.8; *see also* FCC WC Docket No. 05-75 - In the Matter of Verizon Communications, Inc. and MCI, Inc. Applications for Approval of Transfer of Control, *Reply Declaration of Susan Gately, Economics & Technology, Inc. on behalf of Ad Hoc Telecom. Users Committee*, May 24, 2005, pp. 5-10. Ad Hoc advocates for large business customers.

34    Capacity tends not to be a significant private lines factor, as the incremental cost of installing extra capacity is minor, compared to the other costs of constructing last mile connections.  Therefore, CLECs having a sound business basis to construct an additional building loop to serve one customer routinely provide ample excess capacity in the hope that the current customer's demand will grow, or that other tenants in the same building can be won over at a later time.

private lines customers.[35]  In short, because of the network effects of the private lines

market, survival depends on having a substantial numbers of local loops to meet

customers' needs.

### E.    Local Private Lines Pricing

46.    As discussed earlier, a customer will pay significantly more to a single

carrier if the carrier can provide local private lines services to all the customer's

buildings or locations.  Because customers are willing to pay more for access to larger

networks, private lines services exhibits network effects.  This implies, in turn, that large

carriers charge more than smaller ones.  The largest pre-merger carriers – Verizon and

SBC, with ubiquitous coverage in their regions – charged the highest prices.

47.    Verizon and SBC augment their ability to charge supra-competitive prices

through volume and time commitments in their wholesale offerings.  For example, if a

customer commits to buy more than $10 million per year in private lines services for five

years, it receives a progressively increasing discount, starting with 9% in the first year

and ending with 14% in the fifth year.[36]  Similarly, to get private line discounts from

Verizon, the customer has to maintain 90% of its baseline year's spending over a five-

year term.[37]  Reinforced by significant penalties for termination, this type of commitment

---

[35]    "Although special access facilities owned by MCI and AT&T reach only a fraction of the buildings served by the BOCs, they reach many more buildings than any other [competitor] company and normally reach the larger buildings in an area." FCC WC Docket No. 05-75, *Opposition of Broadwing , and Savvis supra* n.22, at 22-23.

[36]    *See* Southwestern Bell Tel. Co. FCC Tariff No. 73, pp. 1426-1450, available at http://svartifoss2. fcc.gov/cgi-bin/ws.exe/prod/ccb/etfs/bin/binary_out.pl?8979

[37]    *See* Verizon South FCC Tariff No. 1, §§ 6.8.26, 7.2.13, 25.1; and Verizon North FCC Tariff No. 11, §§ 6.2.12, 7.2.16, 25.

contract enhances an ILEC's ability to increase its market share to the detriment of competitors and consequently to keep prices high.

48.     In 2004, an in-depth analysis of the ILECs' private lines rates by Economics and Technology, Inc. ("ETI"), on behalf of a consortium of large business telecommunications customers, documented that Verizon's rate of return was 23.2%, while SBC's 2003 return exceeded 65%.[38]  ILEC rates of return far exceeded profitability levels found in markets with effective competition.[39]  In 2004, SBC's private lines rate of return grew to 73.2%, and in 2005 was a whopping 91.7%, while Verizon's 2005 rate of return was 41.6%.[40]  These profit levels reflect the limited competitive inroads achieved by CLECs supplying their own loops to commercial buildings:

> There is at best only limited competition for "last mile" connections – so-called "local loops" – between individual customer premises and common carrier networks . . ..  Even though it has been nearly two decades since competitive access providers made the first, targeted inroads into the access markets,  the current availability of special access services from competing providers remains confined to a small number of buildings in an even smaller number of concentrated business districts. . . . [L]ocal exchange carriers remain the sole source of special access connectivity at roughly 98% of all business premises nationwide.[41]

---

[38]     *See*  Economics and Technology, Inc., *Competition in Access Markets: Reality of Illusion, A Proposal for Regulating Uncertain Markets*, August 2004, at 28 (Exhibit 3).

[39]     By comparison, ILECs' profits were multiples of the most recent FCC-established 11.5% authorized rate of return applicable before many of these markets were deregulated.

[40]     Source: FCC ARMIS Report 43-04, *Separations and Access Data Report: Table 1*, as reported in Jun. 20, 2006 Susan M. Gately Decl. on behalf of Ad Hoc Telecom. Users Comm., FCC WC Docket No. 06-74 (AT&T-Bell South Merger Application), at 6 (updating *Competition in Access Markets)*.

[41]     Reality/Illusion, *supra* n. 38, at 12.

49.     The ETI study demonstrated that CLEC competition did not effectively constrain the ILECs' private lines pricing even before the mergers under review.  The little constraint that did exist dissolves post-merger, as MCI and AT&T exit the market.

50.     Pre-merger, AT&T and MCI also played an important role as wholesale resellers of ILEC facilities that other CLECs needed to provide private lines services to business customers.  Because AT&T and MCI themselves needed huge amounts of private lines to serve their long distance customers, they could take advantage of substantial discounts offered by ILEC private lines tariffs.[42]  However, these large discounts are only available to providers with the ability to guarantee to the ILECs high private lines usage levels over sustained time periods.  Most CLECs lacked the scale necessary to take advantage of such discounted private lines terms from the ILECs directly.  Enter AT&T and MCI as wholesale suppliers: they resold surplus ILEC private lines at prices well below those that smaller CLECs could obtain from the ILECs directly.

51.     Hence, an estimated "75% of the special access circuits that AT&T and MCI sell to [CLEC] third parties" are resold ILEC special access.[43]  Smaller CLECs, including British Telecom, XO Communications, Level3 and others, depended on MCI's and AT&T's offerings of private lines to make competitive offerings to many of their own customers.  No non-ILEC private lines provider can supply CLECs at levels

---

[42]     FCC WC Docket No. 05-75, *Opposition of Broadwing-SAVVIS, supra* n. 22, at 22-25.

[43]     *Id.*

comparable to that available from AT&T or MCI.[44]  The probable effect of eliminating the two leading CLECs is increased prices in the wholesale market.

52.    In sum, the likely consequences of each merger are plain enough.  By expanding, through merger, their respective networks, market shares, and market dominance, Verizon and SBC can each increase significantly its price for local private lines services.

## II.  THE MERGERS' EFFECTS ON PRIVATE LINES MARKETS

### A.    Competition by CLEC's Challenging Verizon and SBC Will Be Significantly Reduced.  While Verizon and SBC's Market Power Will Increase.

53.    The loss of either MCI or AT&T would eliminate the largest or second largest CLEC competitor as an option for customers in both Verizon and SBC's service areas.  Because the remaining CLECs are currently far smaller in size and market share than either AT&T or MCI, these mergers may be expected to reduce competition significantly.   Moreover, if Verizon chooses not to continue MCI's aggressive competition in SBC's service area, or SBC similarly does not continue AT&T's forays in Verizon's region, customers would lose both of the major competitors and be largely at the mercy of an even more dominant service area provider, either Verizon or SBC.

54.    The DOJ Horizontal Merger Guidelines use the Herfindahl-Hirschman Index ("HHI") of concentration as an important tool to gauge the effects of a horizontal

---

44    A Broadwing request for such circuits produced useful bids only from AT&T and MCI, with MCI able to serve less than 20% of the routes needed.  AT&T's building loops were more substantial, "although its list was far shorter than the total number of buildings served by Verizon.  No other carrier could serve more than a tiny percentage (usually one or two percent) of Broadwing's special access needs."  *Id.*, at 25.

merger.[45]  According to the Guidelines, "[w]here the post-merger HHI exceeds 1800, it

will be presumed that mergers producing an increase in the HHI of more than 100 points

are likely to create or enhance market power or facilitate its exercise."[46]

55.    Although the DOJ has omitted any HHI analysis from its court filings, the

Staff of the New York Public Service Commission ("NY PSC") performed an HHI

analysis of the Verizon-MCI merger as it affects the State of New York.[47]  For the

"wireline voice" market for "large business, institutional and government market," which

roughly corresponds to the voice component of the local private lines services, the NY

PSC staff found both pre-merger and post-merger HHIs in excess of 4,000, with an HHI

increase from the merger of 398.[48]  For the "data services" component of the same access

lines, the results were even more concentrated – a pre-merger HHI of 4664 and a post-

merger HHI of 6,353, an increase of 1,689.  These figures far exceed the presumptive

threshold of rejection under the DOJ Guidelines.

56.    Furthermore, it is likely that AT&T and MCI's resale to other CLECs of

spare private lines, purchased  from the ILECs, will either cease entirely or drop sharply.

As NYS PSC Staff concluded:

> [A]cquisition of the second (MCI is roughly tied for second place with AT&T)
> largest wholesale provider by the largest provider of high capacity loop access
> services (Verizon) will significantly increase market concentration in the

---

[45]    "The HHI is calculated by summing the squares of the individual market shares of all the
participants." *1992 Horizontal Merger Guidelines*, § 1.5, available at www.ftc.gov/bc/docs/horizmer.htm.

[46]    *Id.,* ¶ 1.51.

[47]    NY PSC Case 05-C-0237 - NY PSC Staff, *Merger White Paper,* supra n. 12, at 26-33.

[48]    NY PSC Staff computed the HHI before the Verizon-MCI merger at 4,401, and 4,799 post-
merger.  *Id.* at 28.

transport and special access markets.  This may result in an unequal bargaining position for small carriers, which, at some point, could result in the elimination of the favorable rates, terms and conditions currently offered by MCI to smaller carriers.

The merger may also eliminate or greatly reduce Verizon's incentive to enter into commercial agreements or contracts with small carriers for the provision of these services, or to make the terms of these agreements favorable in the future. Further, Staff tentatively concludes that the merger could affect business customers by potentially increasing T1 prices, and/or cause deterioration of retail service quality. . . . [49]

57.    Remaining smaller CLECs therefore will lose access, post-merger, to the favorable wholesale prices for local private lines from the ILECs that MCI and AT&T offered. Instead, CLECs would have to lease such service directly from the more expensive ILEC tariffs for any building loops not available from competitors or uneconomical to construct themselves. The high profit margins built into these ILEC local private lines wholesale tariffs will seriously undercut the remaining smaller CLECs' ability to compete in Verizon and SBC's service areas.

**B.    Because Private Lines Services Are An Essential Input For other Retail Services, Further Wholesale Concentration Will Affect Adversely Multiple Retail Markets.**

58.    Private lines services are significant not only because they are the means by which business customers create private telecommunications networks, but also because private lines services are needed in other markets.  The enhanced market power in private lines services that Verizon and SBC will have post-merger, therefore, is likely to adversely affect other markets. For example, wireless providers use private lines to connect cell towers to the public switched network, and to connect customers to E911 emergency services.[50]  Due to the geographic dispersion of wireless cell towers, most such sites are not within reach of CLEC facilities.  Nor

---

[49]    *Id*. at 44-45.

[50]    *Id*. at 41.

would it be economical for CLECs to build new loops to serve wireless carriers' private lines needs.

59.    The two largest wireless carriers, Verizon Wireless and Cingular, are Verizon and SBC affiliates.[51]   The two remaining national wireless competitors not affiliates of ILECs, T-Mobile and Sprint-Nextel, could look to AT&T and MCI, pre-merger, as alternative suppliers of the ILECs' private lines services.  However, post-merger, T-Mobile and Sprint-Nextel would have to depend on their competitors' affiliated private lines services.[52]  This dependency threatens to impair these wireless carriers' ability to compete effectively as intermodal competitors of the Verizon and SBC's retail local and long distance voice offerings.[53]  Similar adverse impacts upon retail local and long distance competition by CLEC wireline and cable packet competitors result because these companies also depend on ILEC private lines.[54]

---

[51]    Verizon Wireless is owned by Verizon and Vodaphone.  Cingular is a joint venture of SBC and Bell South, SBC's latest merger target.

[52]    "T-Mobile depends on the merging parties' special access offerings as input for its competitive wireless services."  Over 96% of T-Mobile's base station-to-central office links and over 94% of its interoffice links are supplied by the local ILEC.  "In virtually all instances, there does not exist a suitable alternative to ILEC special access facilities."  T-Mobile Comments to FCC in WT Dockets 05-65 & 05-75, *An Independent Wireless Carrier's Perspective on Pending Wireline Mergers,* Sept. 26, 2005, at 7, available at http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_ document=65181629 22

[53]    *See* FCC WC Docket No. 05-75, *supra* n. 2, *Response of T-Mobile USA, Inc.*, May 24, 2005, at 9-18 (The mergers will further limit competitive provision of special access services that T-Mobile purchases to compete against ILEC-affiliated wireless providers), available at http://gullfoss2.fcc.gov/prod/ecfs retrieve.cgi?na tive_or_pdf=pdf&id_document=6517615733

[54]    NY PSC Staff, *Merger White Paper, supra* n. 12, at 41.

### III.  THE PROPOSED REMEDY IS INADEQUATE TO OVERCOME THE COMPETITIVE HARM OF THESE MERGERS

60.     The PFJs require divestiture in the form of a 10-year Indefeasible Right to Use ("IRU") of a small amount of excess capacity fiber in lateral connections to individual buildings: (a) where the mergers reduce the number of providers owning or controlling facilities from two to one, and (b) where DOJ deemed that post-merger entry was unlikely.[55]  This divestiture is inadequate to avert the anti-competitive consequences of the mergers, including price increases in both wholesale and retail local private lines markets and reductions in variety and service quality, all to the detriment of business customers.

### A.     The Remedy is Inadequate for the Retail Market

61.     First, even if one were to accept DOJ's incorrect geographic market analysis of a single building, the two-to-one remedy is seriously flawed.  It fails to recognize the market realities for local private lines network services customers with multiple building locations linked to form a dedicated network.  It is likely that many such private lines networks include a mix of two-to-one and three-to-two and four-to-three buildings in a single private lines network.  Economic models strongly predict that a decrease in the number of competitors results in retail price increases – not only in two-to-one buildings, but also in buildings where the number of facilities-based competitors is reduced from three to two, or from four to three.  Indeed, prices will likely increase under any scenario in which the number of providers is reduced.  Thus, the mergers will harm customers in buildings beyond those covered by the PFJs' remedy.  Nonetheless, the proposed remedy will directly address only a select number of two-to-one buildings, while ignoring the majority of two-to-one buildings and all other commercial

---

[55]     *See* Verizon-MCI PFJ, p. 3, ¶ E.

buildings.  Therefore, the PFJs would not prevent increased prices for typical private lines customers whose networks connect multiple buildings.

62.    Second, DOJ does not apply its remedy to all two-to-one-buildings where, according to its market definition, the merger produces monopoly in the market for local private lines.  Much the contrary, DOJ excludes **REDACTED** % of the two-to-one buildings in SBC's region, and **REDACTED** % in Verizon's region, based on DOJ's assumption that CLECs will enter these buildings post-merger.[56]  (My percentages are derived by comparing two-to-one buildings in the FCC examination of the mergers with the list provided by DOJ.)  No verifiable means of measuring the likelihood of entry is offered.  I am unaware of any economic model, algorithm or other objective procedure that DOJ could have used to predict accurately those buildings that competitors would enter, and those that they would not enter.  In other words, DOJ's exclusion of most two-to-one buildings is speculative, unsupported by historical facts, or economic analysis.

**B.    The Remedy is Equally Inadequate for the Wholesale Market**

63.    DOJ's complaints also allege that the mergers will have anti-competitive effects in the wholesale market for local private lines.  This conclusion seems unavoidable.   In the wholesale market, concentration increases very significantly as a result of the mergers as the dominant firm, either Verizon or SBC, absorbs its second or third largest competitor.  The vast majority of economic models predict price increases in such circumstances.  Therefore, the proposed mergers should be cause for great concern.  Despite this, no remedy at all is offered.

64.    In the wholesale market, eliminating AT&T and MCI has even deeper and more detrimental effects on competition.  As discussed earlier, AT&T and MCI were able to buy

---

[56]    *See* Majure Decl. at ¶14; FCC Verizon-MCI Order, *supra* n. 2, at ¶38*;* FCC SBC-AT&T Order, *supra* n. 2, at ¶38.

private lines in the wholesale market from Verizon and SBC at discounted prices prior to the mergers.  MCI and AT&T then resold some of these private lines to other CLECs at prices lower than the ILECs offered the smaller CLECs.  Once MCI and AT&T are eliminated, no other CLEC is large enough to play these pre-merger roles of MCI and AT&T in the wholesale private lines market.  Instead, Verizon and SBC will dominate the wholesale market in their individual regions and prices are expected to rise significantly.

65.    Post-merger, in its region, Verizon has connections to practically all the business buildings and an overwhelming market share both in the wholesale market and the retail market for local private lines.  It has little incentive to provide wholesale local private lines to any CLEC that could threaten its retail market dominance.  The lack of meaningful divestiture conditions in the PFJs will allow Verizon to use its increased dominance in the wholesale market to enhance its dominant retail market position.  The same situation prevails for SBC in its region.

### C.    DOJ's Remedy Would Divest Assets Having Limited Utility to Competitors.

66.    The PFJs require Verizon and SBC to divest only a trivial amount of MCI's or AT&T's fiber per building, and this divested fiber is itself unused, or "dark" fiber.  The availability of such unused capacity would be of speculative value to the remaining CLECs because the fiber could be useful only if existing customers in a particular building needed additional bandwidth that Verizon or SBC could not supply – highly unlikely in most instances – or if the customers chose to switch providers.  The latter scenario itself is further limited by AT&T and MCI's existing multi-year contracts, which bind building customers to the merged providers for many months or years.  CLECs normally build new facilities to serve a building *only* when they have landed a contract with a customer in the building, assuming that such construction is economically feasible.  Even if CLECs choose to purchase the assets to be

auctioned under the PFJs, acquisition of this unused capacity would have no appreciable short term impact on the competitiveness of the private lines markets because of the lock-in effect from MCI and AT&T existing customer contracts, acquired by Verizon and SBC.

67.     Furthermore, the PFJs do not purport to sell full title to the handful of building loops that DOJ selected for divestiture.  Bidders in the PFJ auctions would receive only ten-year leases, dubbed "IRUs."  By denying CLECs the opportunity to own these building loops, the PFJs further diminish the divested assets' value to competitors.  CLECs who partake in these PFJ auctions would still have to depend on Verizon or AT&T maintenance services for these facilities, a circumstance that most CLECs try to avoid.[57]  Indeed, the experience of most CLECs is that ILEC service performance on loops leased to competitors is not on a par with the service that ILECs deliver to their own retail customers.  This is why the NY PSC, for example, required Verizon to monitor and report special services performance standards and imposed monetary penalties for failure to meet such standards.[58]  The PFJs' failure to transfer ownership and control of any of MCI and AT&T's building loops is another shortcoming in the proposed remedy – one

---

[57]     "Critically, Verizon is not only WorldCom's retail competitor, it is also WorldCom's wholesale supplier. . . .  In Verizon's territory, for example, only a very small percentage of WorldCom's total purchase of access facilities goes to CAPs.  This is not because WorldCom is satisfied with Verizon's service and prefers to utilize Verizon instead of a CAP.  In fact, the opposite is true.  When provisioning an order from a customer, WorldCom chooses a CAP over Verizon where a choice exists. . . . Only if access cannot be provided through the use of WorldCom or CAP facilities does WorldCom utilize Verizon facilities."  NY PSC Cases 00-C-2015 and 92-C-0665, *supra* n. 23, *WorldCom, Inc's Comments*, January 12, 2001 at 3-4 (*see* Exhibit 4).

[58]     "Verizon treats other carriers less favorably than its retail customers.  On average, it meets only 74% of its appointments on carrier service requests, but meets 94% of its retail customer appointments."  NY PSC Cases 00-C-2015 - Proceeding on Motion of the Commission to Investigate Methods to Improve and Maintain High Quality Special Services Performance by Verizon, New York, Inc. and 92-C-0665 - Proceeding on Motion of the Commission to Investigate Performance-Based Incentive Regulatory Plans for New York Telephone Company, *Opinion and Order Modifying Special Services Guidelines for Verizon, New York Inc., Conforming Tariff, and Requiring Additional Performance Reporting*, *Opinion 01-1*, at 5, 13.

that will make it even less likely that any competitors will be able to replace AT&T's or MCI's

competitive roles in the foreseeable future.

### D. DOJ's Remedy Does Not Address the Barriers to Entry Identified in the Complaints.

68.    In its complaints, DOJ identifies factors that carriers consider in entering a market.

The complaints state that whether a CLEC builds a last mile connection to a given building

depends on such factors as:

a.    the proximity of the building to the CLEC's existing network interconnection points;

b.    the capacity required at the customer's location (and thus the revenue opportunity);

c.    the availability of capital;

d.    the existence of physical barriers, such as rivers and railbeds, between the CLEC's network and the customer's location; and

e.    the ease or difficulty of securing the necessary consent from building owners and municipal officials.[59]

69.    Even when all these are satisfied, DOJ recognizes that successful entry is

problematic:

> Even if all the above criteria favor the construction of a last-mile connection in a particular case, a single such connection typically costs tens, sometimes hundreds, of thousands of dollars to build and activate. Thus, CLECs will typically only build in to a particular building after they have secured a customer contract of sufficient size to justify the anticipated construction costs for that building.[60]

DOJ further states that:

> Although entry may occur in response to a post-merger price increase in some of the buildings where MCI is the only connected CLEC, the conditions for entry are

---

[59]    DOJ Verizon-MCI Complaint, at ¶ 27; DOJ SBC-AT&T Complaint, at ¶ 27.

[60]    DOJ Verizon-MCI Complaint, at ¶¶ 28-29; DOJ SBC-AT&T Complaint, at ¶¶ 28-29.

unlikely to be met in hundreds of those buildings. Thus, entry is unlikely to eliminate the competitive harm that would likely result from the proposed merger.[61]

70.    Having correctly identified a significant competitive concern, DOJ then proceeds largely to ignore it. DOJ's expert points to only two factors in concluding that entry would occur in the majority of two-to-one buildings: (a) the capacity used in a customer's location, which DOJ equates with revenue opportunity; and (b) the proximity of the building to CLEC interconnection points.[62] Thus, DOJ's expert takes into account only two out of the five factors stated in the complaints. This discussion disregards, for example, difficulties associated with getting permits from the municipality and the building owners, and the availability of capital, as well as physical barriers.

71.    In my opinion, the DOJ's entry model has an error in logic. Clearly, low demand and lack of proximity to CLEC facilities will discourage CLEC entry. But high demand and proximity to CLEC facilities alone are insufficient to ensure timely entry due to the other factors identified in DOJ's complaints. DOJ did not evaluate these additional factors in determining to exclude most two-to-one buildings from divestiture.

72.    To elaborate, existing high capacity usage at a location does not necessarily translate to a revenue opportunity for a CLEC, as DOJ incorrectly assumes. Absent AT&T and MCI's presence in the wholesale market, CLECs will have to rely mostly on resold Verizon or SBC lines in other buildings to be able to serve all of a potential customer's buildings. But Verizon and SBC have every reason to quote high prices for resale of any of their local private

---

61    *Id.*

62    Majure Decl. at ¶ 14.

lines to the potential entrant CLEC, thereby deterring the CLEC from entering, while maintaining Verizon and SBC market dominance.

74.     Similarly, general proximity to some CLEC's interconnection point is not sufficient for entry.  The CLEC involved must satisfy the customer's needs in terms of the collection of buildings at which the customer requires service, the quality of service involved, the reliability of its service, and any of a number of other idiosyncratic factors.  Thus, the DOJ's predictions on entry are likely to be inaccurate and speculative.

75.     Further, DOJ's entry model, never explicitly presented in its filings and thus inscrutable, does not seem to take into account either:  (a) the market power that Verizon and SBC had in their respective regions before the mergers; or (b) the enhanced dominance after the merger or the resulting ability of Verizon and SBC, post-merger, to control prices in the wholesale market.  Instead, DOJ has put forward the remedy as though entrants could buy all the inputs they require from perfectly competitive markets.  But, Verizon and SBC control a key input required by the CLEC entrant – resold local private lines in other buildings – and these two dominant carriers have every reason to charge very high prices for that input.[63]  This is a very serious flaw of the DOJ entry model, one that makes its predictions worthless.

76.     Another entry barrier consists of MCI and AT&T's existing multi-year contracts, referred to above.  The contracts make it unlikely that these customers will seek service from CLECs for a number of years.  Therefore, according to DOJ's own allegations in the complaints, little or no entry will occur for a prolonged period despite the proposed divestiture remedy.

---

[63]     This is documented by the fact that during the five years prior to these mergers, ILEC wholesale private lines prices have increased well above levels that would exist in a more competitive market. Economics and Technology, Inc., *Reality or Illusion, supra* n. 38, Chapter 3:  Undisciplined Pricing and Limitless Earnings in the Face of Putative Competition, pp. 27-32 (Exhibit 3).

Meanwhile, Verizon and SBC will have an excellent opportunity to consolidate their enhanced dominance in the market, and to increase prices accordingly.

**E.    The PFJs' Trivial Asset Divestitures Would Not Enable Any Competitor To Replace AT&T or MCI Within A Foreseeable Time Period**.

77.    To reiterate, the network nature of private lines markets dictates that, to compete effectively with Verizon and SBC, a CLEC must have loops connecting to a substantial number of commercial buildings in each metropolitan area.  Numerous customers seek a private lines network linking multiple building locations within or between metropolitan areas.  Given the high profit margins built into Verizon and SBC wholesale private lines rates, CLECs cannot compete successfully if their bid must include mostly loops leased from Verizon and SBC.

78.    Prior to the mergers, AT&T and MCI were the most successful CLECs challenging the ILECs' dominance of private lines markets, chiefly because these entrants acquired  TCG, MFS and Brooks Fiber, thereby availing themselves of the advantage of substantial scale.  Still, it took over two decades for AT&T, MCI and their predecessor CAPs to construct the facilities needed to satisfy private lines network customers' needs.

79.    The PFJs' divestiture remedy would require Verizon and SBC to make available to CLECs only a few hundred building loops spread across the entire country – a tiny fraction of the network facilities possessed by AT&T and MCI pre-merger.  Considering that none of the remaining CLECs comes anywhere close to AT&T or MCI's private lines capacity before the mergers, the offering of a few hundred loops spread across the country will have a *de minimis* impact on market competition.

80.    As AT&T and MCI demonstrated in 1998, when they purchased the three largest CAPs, in order to enter private lines markets in a commercially effective manner, many thousands

of building loop connections in hundreds of metropolitan areas are essential to compete effectively with the dominant ILECs. Even if a single CLEC purchased all of the MCI and AT&T facilities to be divested under the two PFJs, this competitor would not come close to replacing either AT&T or MCI as a private lines market competitor.

81.     Verizon and SBC's demonstrated ability to raise the prices of private lines services to business customers – despite *pre-merger* competition from MCI and AT&T[64] – will only increase after the mergers eliminate one or both of their fiercest competitors. Verizon and SBC increased market power means higher rates for private lines customers who will have fewer competitive alternatives to the ILECs.

82.     Indeed, the marketplace reality here bears emphasis. As incumbents, Verizon and SBC had connections to virtually every commercial building within their service areas *before* acquiring MCI and AT&T. Thus, the facilities that MCI used to serve private lines customers in Verizon's service area overlap Verizon's own pre-merger facilities.[65] Likewise, AT&T's loops serving private lines customers located in SBC's service area overlap SBC's existing loops to the same buildings.

83.     This overlap condition means that Verizon and SBC have no business necessity to retain any of the in-region access facilities acquired by merging with MCI and AT&T. Nevertheless, the PFJs will allow them to retain all but a handful of these redundant building loops. In so limiting the divestitures, the PFJs deny the remaining CLECs access to the vast majority of AT&T and MCI in-region access facilities, even though they duplicate the Verizon and SBC loops to the same commercial buildings. As I have shown, these two mergers are likely

---

[64]     *Id.*

[65]     "[T]here are large overlaps between Verizon and MCI local loop facilities, especially in New York City." NY PSC Staff, *Merger White Paper, supra* n. 12, at 42.

to have significant anti-competitive effects.  Recognizing this, it is difficult to grasp how permitting Verizon to retain MCI's in-region facilities – and SBC to retain AT&T's in-region facilities – despite their redundancy, can accomplish anything other than to cement the mergers' anti-competitive consequences.  This hands off approach denies remaining CLECs the very facilities that were the engines driving the pre-merger competition that MCI and AT&T offered to Verizon and SBC in the private lines markets.

84.     On the other hand, a remedy that calls for Verizon and SBC to divest these in-region assets would have a competitively salutary effect.  This would give remaining CLECs the opportunity to approach the scale of operations that MCI had pre-merger in Verizon's metropolitan areas, and also the scale of AT&T's pre-merger private lines operations in SBC's region.

85.     Such an approach is, moreover, entirely feasible.  Both MCI and AT&T maintained their earlier CAP acquisitions as separate subsidiaries not integrated into other company departments.[66]  Thus, at the time of the Verizon and SBC mergers, both AT&T and MCI operated the facilities, staffs, and customer accounts relating to their private lines activities as discrete entities, notwithstanding their ability to market other services to these same business customers.  All in-region CAP networks that AT&T and MCI acquired with their purchases of TCG, MFSand Brooks Fiber, together with any additions built on by AT&T and MCI pre-merger,

---

[66]     *E.g.*, in the companies' merger application to the New York State Public Service Commission, "AT&T ha[d] five subsidiaries (AT&T Communications of New York, Teleport Communications Group, TC Systems, Teleport Communications of New York and ACC Corporation) that provide services in New York."  NYSPSC Case 05-C-0242, *Joint Petition of SBC Communications, Inc., AT&T Corp., together with its Certificated New York Subsidiaries for Approval of Merger, Order Approving Merger*,  issued Sept. 21, 2005, at 3.  Similarly, MCI's MCI Metro subsidiary was the renamed CAP MFS.

could be divested by Verizon and SBC without disrupting the their local private network customer services.[67]

86.    Because of the network nature of the private lines markets and the high profit margins included in Verizon and SBC's wholesale private lines rates to competitors, the smaller the share of competitor-owned loops, the greater Verizon and SBC's market power will be.  The potential economic harm to customers seeking private lines networks is irrefutable.  By acquiring MCI, Verizon can increase the price to remaining CLECs seeking to lease any of MCI's building loops, with the minor exception of the handful of loops the PFJ would divest.  Likewise, for SBC's acquisition of AT&T.  This, in turn, would prevent CLEC competitors from constraining Verizon's ability to raise wholesale private lines rates even higher, thereby increasing costs to private line network customers.  Absent divestiture of all in-region access facilities, the prospect of competitive alternatives to Verizon and SBC for private lines customers is bleak.

F.    **The FCC's Merger Approval Conditions Do Not Repair The Defects In The PFJs' Divestiture Remedy**

87.    In approving both merger applications, the FCC adopted as conditions several of the applicants' "voluntary commitments."[68]  Each Order adopted five identical conditions relating to private lines markets:  (a) Verizon and SBC must report their private lines service quality performance quarterly; (b) rates for existing customers of the acquired customers may not be increased; (c) special access offerings to affiliates must be available to unaffiliated parties on like terms; (d) no new tariffed service may be offered to affiliates without certification that it is also

---

[67]    To be sure, Verizon and SBC would need a reasonable time period to migrate acquired private lines customers from MCI and AT&T's loops to their own pre-merger facilities.

[68]    *See* FCC SBC-AT&T Merger Order, *supra* n. 2, Appendix G, pp. 128-131.  *See also* FCC SBC-AT&T Merger Order, *supra* n. 2, Appendix G, pp. 122-125.

provided to unaffiliated parties; and (e) no increases in rates for interstate special access to in-region customers.[69]  Other than the quality performance reporting, the conditions end after 30 months.

88.    The 30-month rate period in these FCC Orders will not enable the remaining CLECs to replace AT&T and MCI's private lines market competition, even with the divestitures proposed by the DOJ consent judgments.  It is impossible for these far smaller CLECs to build, in a mere two and a half years, what it took the CAPS, AT&T and MCI 22 years to construct. Moreover, because the vast bulk of the pre-merger in-region facilities of AT&T and MCI would *not* be divested under the PFJs, the few hundred loops that the PFJs would make available will not meaningfully close the gap in facilities-based private lines competition resulting from Verizon and SBC removing the two largest CLECs from these markets.

89.    Furthermore, the FCC's provision protecting existing MCI and AT&T retail private lines customers from rate hikes for 30 months may make competition during that period especially difficult.  CLECs courting these customers may find the customers uninterested in alternative providers while their legacy AT&T or MCI rates remain frozen.  Thus, the FCC's conditions could dampen short-term network expansion opportunities for the remaining CLECs. This would further delay the possibility of any competitor growing enough to fill the competitive roles vacated by AT&T and MCI.

## Conclusion

90.    The PFJs do not remedy the significant, foreseeable reduction in competition – as identified by the DOJ itself in its complaints – that these mergers will bring about.  Accordingly, I respectfully urge the Court to find that the proposed consent decrees are not in the public interest.

---

[69]    FCC Verizon-MCI Merger Order, *supra* n. 2, at ¶¶ 129-30 ; FCC SBC-AT&T Merger Order, *supra* n. 2, at ¶¶ 123-124.

I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed on September 5, 2006 at San Francisco, California.

_____
Nicholas Economides

## INDEX OF EXHIBITS

1       *Curriculum vitae* of Nicholas Economides

2       List of recent cases in which Nicholas Economides has testified

3       Economics and Technology, Inc., *Competition in Access Markets: Reality of Illusion, A Proposal for Regulating Uncertain Markets*, August 2004.

4       NY PSC Case 00-C-2051 - Proceeding to Investigate methods to Improve and Maintain High Service Quality Special Services Performance by Verizon New York, Inc., *WorldCom Inc.'s Comments*, January 12, 2001.