# EXHIBIT 4

**NY PSC Case 00-C-2051**
**Proceeding to Investigate methods to Improve and Maintain High**
**Service Quality Special Services Performance by Verizon New York, Inc.**

**WorldCom Inc.'s Comments**

**January 12, 2001**

**WORLDCOM**  )

)

**Laura Gallo**
Sr. Attorney
Public Policy
Northern Region

200 Park Avenue
New York, NY 10166
212 519 4378
Fax 212 519 4569
Laura.Gallo@wcom.com

January 12, 2001

*PUBLIC SERVICE COMMISSION*
*RECEIVED*
*JAN 1 6 2001*
*FILES*
*ALBANY, N.Y.*

ORig - Files
( 00-C-2051
Copies:
PeR 11/21/00 Dist. List
6 copies

VIA OVERNIGHT COURIER

The Honorable Janet Hand Deixler
Secretary
New York Public Service Commission
Three Empire State Plaza
Albany, New York 12223

> **Re:**   **Case 00-C-2051 - Proceeding to Investigate Methods to Improve and
> Maintain High Quality Special Services Performance by Verizon New
> York, Inc.**

Dear Secretary Deixler:

I have enclosed for filing an original and fifteen copies of WorldCom Inc.'s
Comments in the above-referenced proceeding.  Please call me if you have any questions
concerning this filing.

Respectfully submitted,
WORLDCOM, INC.

Laura Gallo

cc:   The Honorable Jaclyn A. Brilling (Via E-Mail and Overnight Carrier)
Mr. Daniel Martin (Via E-Mail and Overnight Carrier)
Mr. Craig Biegen (Via E-Mail and Overnight Carrier)
Ronald Vero, Esq. (Via E-Mail and Overnight Carrier)
All Active Parties (Via E-Mail and U.S. Mail)

**Before the**
**STATE OF NEW YORK**
**PUBLIC SERVICE COMMISSION**

| | |
|---|---|
| Proceeding to Investigate Methods to ) | |
| Improve and Maintain High Quality ) | Case 00-C-2051 |
| Special Services Performance by ) | |
| Verizon New York, Inc. ) | |

### WORLDCOM, INC.'S COMMENTS

On November 24, 2000, the Commission issued an order instituting this proceeding to examine how Verizon New York, Inc. ("Verizon" or "the company") can improve and maintain high quality performance in provisioning Special Services.[1] In furtherance of that objective, the Order required Verizon to: (1) file a service quality improvement plan; (2) substantiate nondiscriminatory treatment; and (3) comment on five issues concerning more effective means of achieving service quality improvements. On that same date, the Commission also issued a notice inviting interested parties to comment on Verizon's submission and on the issues set out by the Commission in its Order.[2] As a purchaser of Verizon's Special Services that has been, and continues to be, detrimentally affected by the company's poor provisioning performance, WorldCom appreciates this opportunity for comment and hereby submits its response to the Commission's Notice.

---

[1] Case 00-C-2051, Order Instituting Proceeding to Investigate Methods to Improve and Maintain High Quality Special Services Performance by Verizon New York, Inc., issued and effective November 24, 2000 ("Order").

[2] Case 00-C-2051, Notice Inviting Comments, issued and effective November 24, 2000 ("Notice").

## I.    INTRODUCTION

### A.    Relief Sought

As the record in this case will make clear, Verizon provides special access services -- those services required to connect New York businesses to WorldCom's network, including WorldCom's long distance network -- at substandard levels. New York businesses and competitors alike pay the price for this poor performance. The result of such poor performance is that New York businesses have been forced to wait literally months for service. In the meantime, moreover, Verizon uses its poor provisioning against competitors by providing faster service to New York businesses than Verizon provides to competitors, who serve those very same concerns. When obtaining New York businesses as long distance customers is at stake, Verizon's performance improves greatly in an outright attempt to squeeze competitors out of the market. This blatant and outrageous behavior, as explained in attached declarations, must stop immediately <u>and</u> Verizon's poor provisioning for competitors must be fixed. Furthermore, Verizon must be compelled by whatever means necessary to clear the current backlog of unfilled orders.

In these comments, WorldCom urges the Commission to:

(1)  mandate an end to the anti-competitive behavior that threatens the viability of competition in all telecommunication markets in New York;

(2)  order specific standards of performance and behavior modifying penalties, high enough to attract Verizon executive attention, for failure to meet those standards; and

(3)  order a third party audit by KPMG to identify the root cause of Verizon's provisioning problems so an appropriate remedy to those problems can be identified.

## B.    Background of Proceeding

As the Commission is aware, WorldCom and other carriers compete against Verizon to provide local and long-distance services to customers in New York and, in doing so, also compete against Verizon to provision the facilities necessary for delivering those services.  In particular, in vying for long-distance customers, WorldCom and other long-distance carriers compete against Verizon to provision "special" or "dedicated" access services in order to reach the customer's long-distance carrier.  This dedicated access allows customers with large long-distance volumes to move traffic directly from their location to the long-distance carrier's facilities, known as a "Point of Presence" or "POP."  Thus, when WorldCom wins a new business long-distance customer, it offers as part of that service access to WorldCom's POP from the customer's building.  Verizon competes with WorldCom to sell such dedicated access to end-user consumers and, most notably in New York, to provide the long distance service itself to customers.

Critically, Verizon is not only WorldCom's retail competitor, it is also WorldCom's wholesale supplier.  If WorldCom provides the access service to the customer, it must first obtain the facilities necessary to provide such service.  Typically, and notwithstanding Verizon's assertion to the contrary in its comments,[3] Verizon is the primary carrier capable of providing such facilities. Although some competitive access providers ("CAPs") compete with Verizon to provide, on a wholesale basis, the physical facilities needed for dedicated access, the number of customers they reach is de minimis.  In Verizon's territory, for example, only a very small percentage of WorldCom's total purchase of access facilities goes to CAPs.  This is not because WorldCom is satisfied with Verizon's service and prefers to utilize Verizon instead of a CAP.  In fact, the opposite

---

[3] Verizon's Comments at p.2.

3

is true. When provisioning an order from a customer, WorldCom chooses a CAP over Verizon where a choice exists. Thus, when WorldCom searches for facilities over which to provide access services to a customer, it first determines whether WorldCom itself can provide such services over its own network. If this can be done, WorldCom uses such "on-net" facilities. If no such facilities are available, WorldCom searches for facilities owned by competitive access providers. Only if access cannot be provided through the use of WorldCom or CAP facilities does WorldCom utilize Verizon facilities.

Despite WorldCom's systematic attempt to utilize alternative facilities, however, it is virtually certain to have to rely on Verizon to provision any given access order. In New York, for example, WorldCom uses its own facilities and purchases dedicated access from CAPs, generally those with the largest number of on-net buildings, next to Verizon. Bearing this in mind, the CAPs with which WorldCom has agreements to purchase dedicated access have the potential to offer WorldCom competitive access to only 1,483 lit buildings. Although WorldCom does not know the exact number of commercial buildings in Verizon's New York territory, 1,483 is a tiny fraction of the total. It is plain to see that even those CAPs that have the greatest access to lit buildings do not reach the vast majority of business customers. In essence, Verizon has and will continue to retain an effective monopoly over these essential facilities, and WorldCom and other carriers will remain their captive customers.

## II.    DISCUSSION

Verizon's position as the dominant provider of Special Services in New York carries with it disturbing implications for New York business because the company's provisioning of these services has been, and continues to be, incredibly poor. In fact, the Commission initiated this

4

proceeding, "[b]ased on the importance of Special Services to competition and the economy, Verizon's position as a dominant carrier for Special Services, and Verizon's inability over the last several years to meet Commission prescribed targets for timely installation of these services."[4] In doing so, the Commission acknowledged the failure of previous efforts by Staff, as well as a Commission directive, to bring Verizon's Special Services performance to acceptable service quality levels, and expressed the consequent need to establish more effective ways of encouraging sustained improvements in Verizon's provisioning performance.[5] For the reasons discussed below, and because business-to-business discussions by WorldCom with Verizon have failed to result in improved Verizon service in the past, WorldCom agrees that strong medicine is required to cure Verizon's provisioning problems and to produce the kind of sustained improvements in Verizon's performance that are essential to the existence and viability of a competitive market.

A.    **Verizon's Unreasonable and Discriminatory Provisioning Performance**

WorldCom has been suffering from systematic, unreasonable and discriminatory actions taken by Verizon in connection with the provisioning of DS1 and DS3 Special Services[6] beginning long before Verizon's strike in August 2000.

1.    **Verizon's Unreasonable and Inadequate Performance**

Principally, Verizon's performance in filling orders for Special Services has been unreasonably slow, and the information Verizon provides to its wholesale customers, such as WorldCom, is unreasonably late and unreliable. More specifically, the performance problems

---

[4] Order at 1.

[5] Id. at 2.

[8] A DS1 contains 24 individual (DS0) circuits. A DS3 contains 28 DS1s, or 672 individual circuits.

)                                                    )

experienced by WorldCom include Verizon's:

- **failure to deliver a Firm Order Commitment or FOC** (sometimes called a Firm Order Confirmation). The FOC tells WorldCom, for the first time, the date that Verizon will install the requested facilities. Thus, it is not until the FOC is received that WorldCom can notify its own customers of the installation due date. Verizon's failure to deliver FOCs is not a rare occurrence. To the contrary, in WorldCom's experience, Verizon fails to deliver FOCs whenever it determines that an order involves a facilities issue, <u>e.g.</u>, lack of facilities. This problem is made more profound by the fact that Verizon does not even inform WorldCom that it is not providing a FOC because of an alleged Verizon facilities issue. As a consequence, WorldCom is left in the dark indefinitely about the status of its order.

- **late delivery of Firm Order Commitments**. Verizon has informed WorldCom that it targets 5 business days to return a FOC for DS1s, and 7 business days for DS3s. In WorldCom's experience, however, Verizon consistently fails to meet its own target intervals for returning FOCs for DS1s and DS3s. For example, Verizon has failed to meet its own FOC delivery dates for approximately 20% of the WorldCom orders in New York that are currently pending, and WorldCom is still awaiting Verizon's delivery of them. It remains to be seen whether WorldCom will receive those FOCs from Verizon at all.

- **failure to provide any notice when an order is held for facilities issues**, <u>i.e.</u>, lack of facilities in Verizon's network.

- **unreasonably long offered and completed installation intervals.** The offered

6

installation interval is measured from the date the order is sent until the date on the FOC; it represents the length of time within which Verizon promises to provide service. The completed installation interval is measured from the date the order is sent until the date service is actually provided. Verizon has indicated to WorldCom that, if facilities exist, it targets 9 days to install a DS1 and 20 days to install a DS3. These intervals are consistent with what Verizon is required to provide pursuant to New York's Special Service Guidelines (requiring installation of DS1s within 9 days, and installation of DS3s within 20 days). In WorldCom's experience, the installation dates Verizon offers are significantly above Verizon's target intervals. The reality of Verizon's performance is far worse, however, as Verizon frequently misses the intervals it offers, making the actual installation intervals even longer and well over the company's target intervals.

- **extremely poor percent on-time performance**. In WorldCom's experience, Verizon frequently misses the target date for installation that it specifies in the FOC.

Although WorldCom has met repeatedly with Verizon in an attempt to rectify these problems, Verizon's provisioning performance has continued to deteriorate. Today, because of Verizon's provisioning problems, there are literally thousands of WorldCom orders waiting to be installed throughout the Verizon footprint. In New York alone, of WorldCom's pending DS1 orders, approximately 35%, have been pending between 10 and 30 business days, and nearly 40% have been pending more than 31 business days. Further, of the DS1 orders pending for 31 days or more, at least 14% have been pending more than 61 business. The picture for WorldCom's pending DS3 orders is even bleaker. Of those orders, approximately 8% have been pending between 21 and 30 business

7

)                                    )

days, whereas nearly 60% have been pending more than 31 business days.[7]  Of the DS3 orders

pending for 31 days or more, at least 20% have been pending more than 61 business days.  At the

current rate of Verizon installation and provisioning, WorldCom's pending orders will continue to

age and remain pending for the foreseeable future.

The impact of Verizon's provisioning problems on WorldCom and its customers is obvious.

Verizon's consistent failure to meet its own target intervals and those under the Special Service

Guidelines leaves WorldCom's customers waiting months for service.  This impedes the ability of

WorldCom's customers to do business, leading to potential and real losses in their revenues, and

substantially harms WorldCom's own revenue recognition.  To add insult to injury, the lengthy

provisioning delays created by Verizon cause WorldCom's customers to become frustrated and

dissatisfied with the quality of WorldCom's service.  Customers, understandably, want to know

when they can expect installation of the facilities needed to turn up their long-distance service.

When they choose WorldCom to provide those long-distance services, they look to WorldCom to

provide them the installation dates and to meet those dates.  If WorldCom cannot do so for weeks,

customers blame WorldCom, not Verizon.  This harms WorldCom's reputation in the marketplace,

adversely affecting WorldCom's ability to acquire and maintain long distance accounts.  Customers

may also feel that they cannot trust WorldCom to provide access for local services.  Clearly,

WorldCom cannot provide acceptable service to its customers under these constraining

circumstances, which threaten the viability, let alone the development, of a competitive market in

New York.

---

[7] These WorldCom orders have been pending an average of 35 business days for DS1 orders and an average of

)                                                          )

### 2.    Verizon's Discriminatory Behavior

To exacerbate matters, Verizon is using its own poor performance as a monopoly wholesaler to leverage its position in the retail market. WorldCom – which is almost totally dependent on Verizon for access facilities – has recently learned that Verizon has brazenly used its poor performance to try to get customers to switch from WorldCom to Verizon for access services. In some cases, WorldCom has evidence that Verizon representatives have actually told customers that they will receive quicker provisioning if they switch from WorldCom to Verizon. In others, Verizon has provided quicker service to customers who place duplicate orders with WorldCom and Verizon, ensuring that Verizon rather than WorldCom becomes the customer's primary access provider.

For example, one of WorldCom's clients is Bloomberg Financial Services ("Bloomberg"), a financial information provider. In mid-February 2000, Bloomberg placed an order for a DS1 to connect one of its facilities in New York City with one of its customers, Viking Global ("Viking"). On February 23, 2000, Verizon returned a FOC to WorldCom, specifying an installation date of April 14, 2000, two months later (40 business days), for the requested DS1.

Verizon failed to meet even its given installation date. When WorldCom called Verizon on April 12, 2000, to confirm the installation date, Verizon stated that it would not be able to deliver the DS1 until May 5, 2000, because it had to install a multiplexer at the Viking location before it could install the DS1. As the attached declaration details (Tab 1), thus began a pattern of Verizon promising installation dates and missing those installation dates. This pattern continued until mid to late July 2000, five months after the customer's order, when Verizon finally installed the DS1 at the Viking location and informed WorldCom that the DS1 was connected to WorldCom's system.

---

approximately 57 days for DS3 orders. See Attachment at Tab C.

)                                              )

However, on July 26, 2000, when WorldCom checked the cross signal, it was unable to get a signal from the DS1. WorldCom called Verizon to report the problem and was initially assured that the DS1 was connected. Later, on August 9, 2000, WorldCom learned that Verizon had not yet tested the connection through its system up to the point it connects with WorldCom's system, and that Verizon would not perform this test until after the strike, which was already underway. WorldCom escalated this order with Verizon as soon as the strike ended and, on September 18, 2000, Verizon finally completed its service and WorldCom was able to hook-up the final circuit to provide connection to Bloomberg.

By way of contrast, Bloomberg informed WorldCom that, in accordance with its now standard practice, it had placed a direct order with Verizon for a back-up DS1 to be installed at the same Viking location <u>after</u> having ordered the primary DS1 from WorldCom. Bloomberg placed its order for the back-up circuit on March 31, 2000, and Verizon returned an installation date of three weeks later, April 19, 2000. The Bloomberg order was completed on May 24, 2000, less than two months after having been placed and four months before WorldCom's order was completed.[8]

As this and other incidents described in the attached declarations demonstrate, Verizon uses its poor provisioning as an anticompetitive weapon in the marketplace. This kind of blatant anticompetitive behavior is most problematic in a state like New York, where Verizon has been granted authority to compete in the long distance market and has every incentive to do all within its power to obtain market share from other long distance companies, including poor provisioning of

---

[8] The details of the Bloomberg incident and other, similar incidents are contained in declarations attached at Tabs 1 and 2. It should be noted, however, that these declarations do not represent the universe of discriminatory incidents WorldCom has suffered. Instead, they are merely representative of Verizon's discriminatory and flatly unlawful behavior.

10

monopoly wholesale services to dependent competitors.[9]

**B.    WorldCom's Remedy Proposal**

To ensure the continued existence and growth of competitive long distance and local markets, Verizon must dramatically improve its Special Services performance and immediately cease all anticompetitive activity. It is apparent, however, that Verizon must be given a powerful incentive to do so. Currently, no such incentive exists. Most notably, there are no financial penalties tied to Verizon's failure to meet performance target levels under New York's Special Service Guidelines. Without such financial consequences, Verizon has shown that it has no incentive to improve its Special Services provisioning performance, as previous attempts by the Commission and Staff to improve Verizon's service quality have come to no avail, and WorldCom's own ongoing, exhaustive efforts to help resolve Verizon's provisioning problems have been futile in the past. In fact, absent

---

[9] Because Verizon's performance in provisioning access services in New York markedly deteriorated after the FCC granted its section 271 application to provide interLATA services in New York last year, this Commission may deem it appropriate to request that the FCC take action under its section 271 authority to appropriately sanction Verizon. As the FCC has repeatedly recognized, when an incumbent carrier is a retail competitor as well as a wholesale supplier of the inputs other carriers need to provide their own retail service, the incumbent has both the "incentive and the potential ability to unfairly act to the detriment of their . . . competitors and to act in other anti-competitive ways." In the Matter of Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Report and Order, 11 F.C.C. Rcd. 20,541, ¶ 14; see also In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, 11 F.C.C.R. 15499, ¶ 307 (1996). That Verizon's performance has deteriorated in the wake of the grant of authority to compete with WorldCom and other interexchange carriers is not coincidental. Indeed, Verizon's ability to favor its own long-distance affiliate through deficient provisioning of its bottleneck local facilities is the central focus of the section 271 application process. And because the FCC was well aware that Verizon retained the ability to engage in such discriminatory practices, in granting its section 271 application it took the precaution of reiterating its authority to address the kind of backsliding in which Verizon is engaging. Specifically, the FCC made clear that it would "not hesitate" to use its power to suspend approval to provide interLATA service in appropriate circumstances. Bell Atlantic NY Section 271 Order ¶ 448 (quoting section 271(d)(6)(A)). Nor does the fact that access provisioning is not itself a part of the competitive checklist, id. ¶ 340, change this analysis. The FCC has long made clear that it will consider as part of the public interest test discriminatory or anticompetitive conduct by a BOC, as well as a BOC's failure to comply with state and federal regulations. Ameritech Michigan 271 Order ¶ 397. Failure to provide competitors nondiscriminatory access to access services in violation of sections 201 or 202 of the federal law, or in violation of state or federal tariff provisions, obviously is relevant to section 271 compliance, and therefore should be addressed by the FCC as part of its section 271 authority to address backsliding from arrangements and practices necessary to promote competition in all telecommunications markets.

11

strict regulatory intervention, Verizon has every incentive to let its poor provisioning performance go unchecked and uncorrected and to use that poor performance as a weapon against other long distance companies. Accordingly, in this proceeding, meaningful standards of performance must be established with associated penalties so severe that they compel Verizon executive action and cause Verizon to dedicate substantial resources to improve its service quality.

### 1.    Metrics and Standards

At present, the Special Service Guidelines only contain five measures of Verizon's provisioning performance, two associated with maintenance service (the Customer Trouble Report Rate and Average Trouble Duration Time) and three associated with provisioning service (% of On-Time Installations, Average Delay Days and Quality of Installation). However, nothing in the Special Service Guidelines speaks, for example, to Verizon's performance in providing FOCs or reasonable offered installation intervals, both of which are critically important to the ability of WorldCom and other carriers to manage their customers' expectations. So that all key aspects of Verizon's provisioning performance are addressed, the Special Service Guidelines should be expanded to incorporate additional metrics, including, but not limited to, those which measure the following items:

- **Timeliness of Firm Order Confirmation (FOC).** Customers need to know when service delivery can be expected and, as mentioned above, FOCs enable competitors to provide this information to their customers. Timely receipt of FOCs enables competitors to manage their customers' expectations and, equally important, to begin their own planning process in order to coordinate the installation of the ordered facilities.

12

- **% On-Time Design Layout Record (DLR)**. A DLR is a technical document provided by Verizon, which shows how a circuit is designed in Verizon's network and where that circuit meets a competitor's network. Timely receipt of DLRs is crucial for the competitor to confirm the accuracy of the circuit's design, so that installation of the circuit may be properly coordinated, and for trouble-shooting during turn-up.

- **Timeliness of Held Facilities Notice**. Again, it is critical to the customer-provider relationship that competitors have the ability to inform their customers of when service delivery can be expected. Therefore, it is imperative that competitors receive timely notice that their customer orders are being held by Verizon for facilities issues, so that competitors can, in turn, notify their customers. This metric is particularly relevant in light of the fact that, as discussed more fully below, Verizon points to its inability to meet the increase in demand for high capacity services as a basis for its poor provisioning performance. Verizon's current practice of not sending WorldCom a FOC or any other notice or information when orders are held for facilities issues is unacceptable.

- **Timeliness of Order Queries/Rejects**. If information in a WorldCom order is coded incorrectly or is missing, Verizon's system will not accept that order. Today, Verizon provides no electronic notification of an order query or rejection, and WorldCom must rely on being contacted by Verizon and informed of the problem with its order. This is particularly problematic since, at present, Verizon has no standardized query process in place. Timely receipt of order queries/rejects is extremely important because delays in Verizon's notification of order queries or rejects delay service to the competitor's customer. Competitors need to find out quickly if Verizon has a query about an order,

13

)                                                    )

or if an order has not been accepted, so that they can answer the query, resubmit the corrected version or question rejections believed invalid.

- **% Held Orders in Open Status.** This metric measures the number of open orders that at the close of the reporting period have been in a hold status for an extended period of time (e.g., more than 30 or 90 calendar days), as a percentage of orders completed in the reporting period. Open orders include orders that have passed the originally committed installation due date, and those that have not been assigned an installation due date for Verizon reasons. This measure enables competitors to determine the aging of their pending orders so that appropriate measures can be taken to get those orders provisioned, including escalating orders with Verizon.

- **Average Offered Installation Interval.** If customers are less likely to get their service installed in the same amount of time from a competitor as from Verizon, they will become dissatisfied with the competitor's service from the very beginning of the customer-provider relationship. Competitors must have the same ability to offer the same provisioning intervals as Verizon.

- **Average Actual Installation Interval.** The need for this measure is apparent. If Verizon provisions its non-carrier, private line customer orders in a shorter time period than for its competitors' customer orders, competitors will be at an extreme competitive disadvantage.

- **Jeopardy Intervals and % Jeopardies on Missed Appointments.** Customers need to know when their service will be delayed. Jeopardy intervals measure how much advance notice a competing carrier receives from Verizon that its order may not be completed on

14

)                                                )

time, so that it can then provide notice to its customer. Competitors require sufficient advance notice that the customer's due date may be missed, so that they can give their customers the opportunity to reschedule and make appropriate arrangements. The percentage jeopardies measurement focuses on whether or not the competitor received any advance notice at all that a due date may be missed, without excusing Verizon's failure to meet that due date.

In this way, the areas of Verizon's performance that have the most profound affect on the ability of carriers, like WorldCom, to provide timely, quality service to their customers will be measured, monitored through reporting and, as discussed below, subject to penalties should Verizon fail to meet the performance standards for those areas.

Obviously, performance standards need to be determined for these, and any other, Special Services metrics which may be established in this proceeding. Traditionally, in the New York Carrier-to-Carrier proceeding,[10] the Commission adopts parity standards for functions that have retail analogs and absolute standards, or benchmarks, for functions that do not. In order to determine whether an appropriate retail analog exists for the functions listed above as they relate to Special Services or whether absolute standards should be used, Verizon should be required to clarify how it currently reports its performance results for Special Services under the Special Service Guidelines. Simply, it is unclear what services Verizon presently includes in the retail analog it uses to report its performance results and, therefore, whether that retail analog affords an apples-to-apples comparison of the performance Verizon provides its retail, end-user customers and the performance it provides

---

[10] Case 97-C-0139, <u>Proceeding on Motion of the Commission to Review Service Quality Standards for Telephone Companies</u>.

15

to its wholesale customers.[11] For these open questions to be answered, WorldCom submits that the Commission should require Verizon to file and serve on all parties: (1) its business rules for reporting under the Special Service Guidelines; (2) a list itemizing what it includes in each of the two broad categories of Special Services, Exchange Access and IntraLATA, on which it reports its performance results; and (3) a report of its performance results for its top ten largest non-carrier, private line customers. Furthermore, Verizon should be required to make this submission before the technical conferences in this proceeding commence on February 6, 2001.[12] Upon careful examination of that information, even if an appropriate retail analog is found for certain metrics so that a parity standard of performance may be used, WorldCom submits that an objective performance standard should also be established for those metrics. The objective standards would work in tandem with the parity standards to ensure that Verizon's provisioning performance is reasonable by acting as a "floor," below which Verizon's performance cannot fall under any circumstances.

WorldCom notes here, moreover, that it likewise supports the expansion of Verizon's Performance Assurance Plan ("PAP") to include metrics that cover all critical aspects of Verizon's performance in provisioning UNE Specials to the extent that those performance areas are not already covered in the PAP. In contrast to Staff's suggestion, however, WorldCom believes that penalties under the PAP ought to come from the allocation of additional funds to that plan, rather than the reallocation of existing funds. Otherwise, if the total amount at risk under the PAP remains constant, increasing the amount at risk for UNE Specials performance would necessarily decrease the amount

---

[11] It is unclear what Verizon includes in its retail analog for UNE Specials metrics with parity standards in the Carrier-to-Carrier Guidelines. Therefore, the Commission should similarly seek clarification on the services and the customers for those services which Verizon includes in its retail analog.

[12] WorldCom submits that the existing metrics and standards in the Special Service Guidelines ought to be

at risk for other services. This would severely diminish Verizon's incentive to provide other services at appropriate performance levels. In fact, the result of reallocating dollars at risk instead of adding new dollars for the additional UNE Specials metrics could easily be that in both instances – for UNE Specials and those services for which at-risk funds were decreased - the amount of bill credits at risk will be too low to motivate Verizon to provide service in accordance with prescribed performance standards.

### 2.    Reporting

Of course, the value of expanding the Special Service Guidelines and the PAP to include additional metrics would be sorely limited if Verizon is not required to report on them. Therefore, WorldCom requests that the Commission require Verizon to include in its performance reports all additional metrics established in this proceeding. In addition, Verizon should be required to disaggregate its performance results for all of the metrics by circuit (i.e., DS0, DS1 and DS3), geography and the tariff through which the circuit was ordered. This will enable carriers, like WorldCom, to detect discrimination by making appropriate comparisons between Verizon's performance for its non-carrier, private line retail customers and its performance for its wholesale customers. WorldCom proposes, moreover, that these reports be prepared and provided to the Commission and carriers alike on a carrier-aggregate and carrier-specific basis, as Verizon does with its reporting under the Carrier-to-Carrier Guidelines.[13]

---

reexamined based on this enhanced reporting by Verizon.

[13] At this time, WorldCom has no specific comments on the issue raised by the Commission concerning whether or not the number of bureaus through which Verizon monitors and reports its performance under the Special Service Guidelines should be reduced. As a general matter, however, WorldCom strongly believes that, whatever the number of bureaus, Verizon's good performance at one bureau should not offset Verizon's poor performance at another bureau, and that penalties for poor performance should be applied at the individual bureau level.

### 3.    Penalties

Along with the expansion of the Special Service Guidelines to include additional metrics and standards, self-executing, behavior modifying penalties should be imposed for Verizon's failure to meet the prescribed standard for any of the metrics under those Guidelines.  In this regard, WorldCom appreciates the Staff's diligent efforts in developing proposed performance targets and penalties for Verizon's failure to meet those targets.  That being said, however, WorldCom believes that the penalties proposed by Staff, which start at $5 million in the first year of the Staff's plan and potentially increase over three years to a maximum of $15 million per year, do not go far enough to provide Verizon with an adequate incentive to improve its provisioning performance.  Even at the $15 million per year maximum, these proposed penalties would merely be a cost of doing business for Verizon and do not come close to the annual losses in delayed and lost revenues which competitors, like WorldCom, suffer because of Verizon's poor performance.  To be behavior modifying, the penalties established in this proceeding must be severe enough to attract the attention of Wall Street, and thus Verizon executives, to compel Verizon to act and dedicate all resources necessary to rectify Verizon's provisioning problems and produce sustained improvements in the company's provisioning performance.[14]

### C.    Verizon's "Special Services Performance Improvement Plan"

Verizon does not dispute that its performance in provisioning Special Services has been extremely poor and is in dire need of improvement.  In fact, in its comments, Verizon concedes that it has "provisioning difficulties," though it offers little to explain those "difficulties" and even less

---

[14] The Commission has ample authority to impose penalties including, but not limited to, that provided pursuant to Section 25 of the New York Public Service Law.

in the way of solutions to resolve them. Rather, Verizon attributes its provisioning problems to a "host of variables, many of which are beyond Verizon's ability to control,"[15] but only goes on to describe the growth in demand for Special Services. Similarly, Verizon's "Special Services Performance Improvement Plan" ("Plan") focuses on facilities issues, namely, how Verizon intends to meet the demand for Special Services, but largely fails to address Verizon's provisioning problems that are not related to a lack of facilities.

### 1.    Verizon Fails to Provide a Root Cause Analysis of its Provisioning Problems

As a threshold matter, in light of the gravity of its poor performance problems and the detrimental impact to other carriers, consumers and competition, Verizon should provide a more detailed analysis of its provisioning problems. The root causes of its provisioning problems must be unearthed in order for Verizon to take appropriate, effective corrective actions to improve its performance. However, in addition to its failure to disclose an enumeration of the "host of variables" it blames for its provisioning problems, Verizon provides no indication that it has performed a root cause analysis of its poor performance which it has filed with the Commission and can share with the other parties to this proceeding.

To the extent that Verizon attempts to address the one variable it has identified – increased demand for high capacity facilities – Verizon has offered no information to enable the Commission to assess, in particular, the adequacy of its plan to: (1) increase spending on additional interoffice facilities from $750 million in 2000, to $801 million in 2001; (2) increase deployment of SONET rings in New York and initiate deployment of Dense Wave Division Multiplexing; (3) lower SONET system utilization points to trigger deployment relief efforts earlier than had occurred in the past; and

---

[15] Verizon's Comments at 3.

19

)                                              )

(4) increase employee headcount in specific organizations responsible for operations and network engineering. Significantly, Verizon provides no supporting data or analysis of the reasons behind its inability to meet the demand for high capacity facilities, such as a detailed description of where the frailties in its network lie. Without this information, it is impossible for the Commission to determine and parties to comment on whether Verizon's planned actions actually target the shortcomings in the company's ability to meet the demand for facilities and, if so, whether the level of Verizon's expenditures and implementation of specific technology are enough to fix them.

Certainly, too many open questions concerning the underlying reasons for Verizon's provisioning problems remain unanswered for Verizon's plan to be ratified in any respect. Therefore, so that parties can meaningfully comment on and the Commission can evaluate the substance of Verizon's Plan, either before or at the technical conferences scheduled in this proceeding, Verizon should be prepared: (1) to answer the questions raised here, including (a) what constitutes the host of variables on which Verizon blames its poor performance, and (b) which of those variables are within Verizon's control; and (2) to provide a root cause analysis of its poor performance to the Commission and parties.[16]

Moreover, to ensure that a root cause of the problem and effective remedies are established, WorldCom requests that the Commission appoint a third party network auditor, funded by Verizon: (1) to perform a root cause analysis of Verizon's provisioning problems; (2) to recommend how Verizon can improve provisioning performance; (3) to monitor Verizon's network planning in

---

[16] Verizon likewise fails in providing support for its response to the Commission's concern regarding discriminatory treatment. Having providing no underlying support for its showing, including what services Verizon includes in its retail analogue for the purposes of demonstrating parity of performance between it retail and wholesale services, Verizon can hardly be said to have substantiated nondiscriminatory treatment, as the Commission's order required.

20

accordance with the level of facilities deployment deemed appropriate by the Commission in this proceeding; and (4) to report to the Commission on Verizon's progress in meeting its deployment commitments and the demand for special access services, so that the Commission can take appropriate remedial actions, if necessary. Indeed, in discussing Verizon's poor provisioning performance, Staff itself has acknowledged that, "[i]t is important to be sure of the root cause(s) of this performance, and that Verizon takes whatever corrective measures may be necessary to ensure improved performance."[17] Logically, it makes sense first to identify the root causes of Verizon's provisioning problems, and then to determine the appropriate means of fixing those problems. The most equitable and expeditious way of accomplishing this would be to have a neutral third party, like KPMG, to perform an analysis of Verizon's poor provisioning and dig out the root causes of Verizon's provisioning problems.[18]

### 2.    Verizon's Plan is Not Comprehensive

Compounding Verizon's failure to fully explain the reasons for its poor performance is the fact that, on its face, Verizon's Plan to improve its performance is inadequate. Principally, Verizon's Plan is not comprehensive, as it largely neglects to address Verizon's poor performance when lack of facilities is not an issue. Nor is any portion of the Plan responsive to the Commission's concerns regarding discrimination and Verizon's misuse of its market position. Surely, these performance and discrimination matters should be addressed in Verizon's Plan.

---

[17]  Department of Public Service Staff Memorandum to the Commission, dated October 27, 2000, Attachment A to the Order, at 13.

[18] WorldCom notes that KPMG was the third party auditor that tested Verizon's operations support systems (OSS), in preparation for the company's application for section 271 authority in New York and, therefore, is familiar with Verizon' systems.

In addition, the Plan incorporates no consequences for Verizon's failure to build-out its network or to meet its other commitments under the Plan, as promised. Standing alone, for example, Verizon's assurances of increased capital expenditures and building out its network are worthless. WorldCom's concerns in this regard are not unfounded, but are based on WorldCom's own experiences and dealings with Verizon. Over the course of more than a year, Verizon has made numerous commitments to WorldCom, including the dedication of additional resources, to clear the backlog of pending WorldCom orders and to rectify its provisioning problems. Nevertheless, the enormous backlog of pending WorldCom orders remains, and Verizon's provisioning problems persist.

### 3.    Verizon's Forecasting Proposal

#### a.  DS3 Demand Forecasts for Points Between Verizon's Central Offices and POPs

As part of its "Special Services Performance Improvement Plan," Verizon proposes that carriers requesting high capacity interoffice facilities (DS3 and above) provide Verizon with route specific (A to Z) demand forecasts for each quarter, where "As" and "Zs" are points between Verizon central offices and/or between a Verizon central office and a POP (e.g., entrance facilities).

However, WorldCom already provides its annual forecasted demand for DS3 rates and above by type (e.g., DS3, OC3, OC12) for the dedicated entrance facilities between WorldCom's POPs and Verizon's serving wire centers. Additionally, WorldCom meets with Verizon several times during any given year to conduct a mutual review of WorldCom's forecasts and fine-tune the requirements as needed. In spite of providing these forecasts and engaging in forecast review meetings with Verizon, WorldCom still faces considerable, serious problems with Verizon's provisioning

performance due to facilities shortages. Verizon's inability to meet WorldCom's forecasted demand is puzzling given that WorldCom, as one of the largest carriers in New York and one of the largest telecommunications companies in the world, in all likelihood submits a very large percentage of the total number of orders Verizon receives for Special Services. For these reasons, WorldCom is not convinced that forecasting will remedy the problem because it is not evident that Verizon even considers them in its plans for capital expenditures and facilities deployment. WorldCom is convinced, though, that these compelling circumstances raise an important question as to how much capacity Verizon reserves for itself, which the Commission should require Verizon to answer in this proceeding.

Notwithstanding its reservations, in the spirit of cooperation, WorldCom is amenable to continue furnishing Verizon with annual demand forecasts and attending forecast review meetings. WorldCom emphasizes, however, that it should not be held under any obligation, Commission mandated or otherwise, to do so. Furthermore, so long as it provides Verizon with these forecasts, WorldCom believes it should be given greater assurances that once capacity becomes available, it will get its share of its forecasted requirements. To this end, WorldCom submits that Verizon should commit to reserve capacity for WorldCom based on its forecasted demand. WorldCom requests, moreover, that the Commission require Verizon to provide competing carriers with full information on the extent of its current deployment of facilities and location of SONET rings so that they have the same ability as Verizon to manage their ordering and provisioning processes, as well as their customers' expectations.

### b. End-User Location to Serving Wire Center Forecasts

Also with respect to forecasting, Verizon suggests that carriers provide forecasts of all DS1

23

and above services from end-user locations to Verizon's serving wire centers. WorldCom objects

to this suggestion. As an initial matter, WorldCom is neither in the position to, nor business of,

helping Verizon plan its network to the granular levels implicated by these forecasts and believes

that Verizon should produce them based on its analysis of market trends and utilization, as

WorldCom does for its long distance backbone. More fundamentally, WorldCom is incapable of

providing such forecasts.

First, after purchasing DS0 and DS1 circuits from Verizon, WorldCom uses the Facilities

Management Service ("FMS") tariff to connect to Verizon's network. Pursuant to the FMS tariff,

WorldCom brings its circuits to Verizon-designated and owned serving wire centers, at which point

Verizon decides how to route the traffic from those circuits over its network to end-users.[19]

Accordingly, because Verizon manages the traffic traveling over its facilities to end-users,

WorldCom has no visibility to the circuits Verizon uses to reach end-users, let alone where those

circuits are located.

Second, WorldCom has no reasonable, reliable way of predicting the addresses of end-users

to whom it will service over the course of a year, whether via DSOs, DS1s or DS3s. Therefore, even

if WorldCom could produce the suggested forecasts, which it cannot, the accuracy of those forecasts

would be questionable, at best.

Finally, Verizon is the largest local service provider in New York with the most ubiquitous

local network, on which WorldCom and other carriers depend for access to the last mile to end-users.

---

[19] This tariffed arrangement is mutually beneficial to Verizon and the carriers who use it. On the one hand, it enables Verizon to optimize its network by allowing it to manage the traffic of other carriers over its facilities, rather than compelling Verizon to build to the specifications of those carriers. On the other hand, carriers using the FMS tariff receive an improved pricing scenario for the significant fee paid to Verizon for managing the traffic over its facilities and are relieved from specifying a Verizon end office through which to route traffic for each circuit ordered, and thus

Hence, Verizon is aware of its own requirements for access to the last mile to end-users, as well as the requirements of individual carriers who go to, and rely on, Verizon for that access. Given this unique position, only Verizon is privy to the aggregate demand for access to the last mile to end-users and is, therefore, best able to determine the largest/fastest growth areas and develop more accurate demand forecasts for planning its deployment of additional facilities.

## III.    CONCLUSION

For all of these reasons, WorldCom respectfully requests that the Commission adopt WorldCom's proposed measures to resolve Verizon's provisioning problems and encourage sustained improvements in its provisioning performance, including the establishment of additional metrics and standards to measures all critical aspects of Verizon's provisioning performance, the institution of self-executing, behavior modifying penalties for Verizon's failure to meet prescribed performance standards and the appointment of a third party auditor to perform a root cause analysis of Verizon's provisioning problems. WorldCom submits that anything short of these and the other measures proposed here will fail to inspire Verizon to improve its performance in a way that will enable carriers reliant on Verizon to expeditiously provide their customers with telecommunications

the burden of planning Verizon's network.

25

services and help further this Commission's goal of fostering a robust competitive market in New York.

Respectfully submitted,

WORLDCOM, INC.

By: _Laura Gallo_
Laura Gallo
200 Park Avenue
New York, New York  10166
(212) 519-4378

Its Attorney

Dated:  January 12, 2001

26