**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
UNITED STATES OF AMERICA,      )
                     Plaintiff,  )
                               )
          v.              )    Civil Action No. 1:05CV02102 (EGS)
                               )
SBC COMMUNICATIONS, INC. and  )
AT&T CORP.,                )    **REDACTED FOR PUBLIC**
                Defendants.  )    **INSPECTION**
_____)
                               )
UNITED STATES OF AMERICA,      )
                     Plaintiff,  )
                               )
         v.              )
                               )    Civil Action No. 1:05CV02103 (EGS)
VERIZON COMMUNICATIONS, INC.  )
and MCI, INC.,             )
                Defendants.  )
_____)

**RESPONSE OF SPRINT NEXTEL CORPORATION TO THE**
**UNITED STATES' SUBMISSION IN RESPONSE TO THE**
**COURT'S MINUTE ORDER OF JULY 25, 2006**

      Under the Tunney Act, this Court must determine whether the proposed consent decrees are in the public interest. That depends on whether they restore the competition lost on account of the mergers. The consent decrees fall far short of satisfying that standard.

      The government attempts to circumvent that fact by arguing that this Court's authority is strictly limited to comparing the antitrust harm set forth in the complaints with the remedy in the consent decrees. According to the Department of Justice ("DOJ"),

as long as the remedy offered by the government "fits" the antitrust harm in the complaints, this Court *must* find the consent decrees to be in the public interest.

DOJ's argument is both legally incorrect and logically unsound. It is incorrect because nothing in the Tunney Act's "public interest" standard suggests that this Court's role is so limited. And Congress's 2004 amendments requiring "independent" and "meaningful" review in Tunney Act cases remove any possible doubt on the matter. The government's argument is illogical because it suggests that DOJ could – by articulating an unreasonably narrow antitrust harm and a correspondingly narrow remedy – oblige this Court to hold that a consent decree is in the public interest even though it manifestly is not. In fact, however, the Tunney Act requires this Court to ensure that the consent decrees really *are* in the public interest, and *not* just that they address an improperly narrow statement of the harm resulting from the mergers.

The harm that the mergers will cause in markets for local private lines and related services is straightforward: Where SBC and pre-merger AT&T, or Verizon and MCI, each have a local private line running into a particular building, one of those lines will be effectively lost as a result of the mergers. As the Complaints themselves acknowledge, the result will be to "lessen competition substantially . . . for (a) Local Private Lines and (b) voice and data telecommunications services that rely on Local Private Lines, in violation of Section 7 of the Clayton Act." Complaints ¶ 32 (setting forth the "Violation Alleged"). Unfortunately, the proposed consent decrees address only a small portion of that lost competition. Specifically, the government unreasonably construes competition to be "lost" only when the number of vendors offering access to a building is going from two to one as a result of the mergers – and only in a minority of those cases. DOJ does

not explain why competition is not *also* lost in cases where the number of alternative

vendors decreases, for example, from three to two or from four to three.  Obviously,

competition is lost in those circumstances, and the consent decrees are therefore

inadequate.

The government appears to believe that markets for local access are *already* so

concentrated that the *additional* concentration resulting from the merger will not matter.

Not so.  Certainly it is true that markets for local private lines are highly concentrated and

are dominated by the incumbent local exchange carrier ("ILEC") – such as Verizon or the

new AT&T – that previously provided monopoly service in their respective territories.

But applying *DOJ's own measures for increases in concentration*, the mergers at issue

here will enhance the ILECs' market power not only in 2-1 situations, but in 3-2, 4-3, and

5-4 situations as well.

Both the case law and the relevant economic literature demonstrate that duopoly

and oligopoly service providers are able to increase prices when competition is lost as a

result of a merger and high barriers to additional entry into the relevant market exist.

DOJ itself recognized that fact when Qwest proposed to buy facilities owned by

Allegiance in 2004 – DOJ determined that it would be necessary to require divestiture of

*all* of Allegiance's local facilities in Qwest's region, not merely those where Allegiance

was the only alternative to Qwest.  At a minimum, such a remedy is warranted here.

In short, the mergers are making a bad situation substantially worse and the

consent decrees do not provide an appropriate antitrust remedy.  Under the Tunney Act's

public interest standard, this Court should therefore reject them.  That will not only yield

the correct result in this case, but may also spur government policymakers to revisit the

ineffective regulatory regime that has allowed the ILECs to charge unreasonable prices and realize exorbitant rates of return on their bottleneck local access facilities.

## BACKGROUND

To appreciate the antitrust harm resulting from the mergers, it is necessary to understand both the evolution of the market for local communications services and the basic components of those services.

1.    *Competitive Networks Require Local Access and Transport*:  During the decades of the pre-1984 Bell System's government-regulated monopoly over communications services in the United States, it owned essentially all telecommunications facilities (including local access and transport facilities) in most metropolitan areas.  In other words, customer premises were wired directly to the Bell System's local transport network and from there to its nationwide long distance network. With the break-up of that monopoly in the 1980s, regional ILECs like Verizon and SBC became the owners of the Bell System's local access and transport facilities.[1]  AT&T became the owner of the interexchange (long distance) lines previously owned by the Bell System.

In the 1970s the FCC, followed by the states, began introducing competition into long distance markets.  Following the 1984 break-up, that competition – including competition from Sprint and MCI – flourished.  In 1986 Sprint completed the first nationwide, 100% digital, fiber-optic long haul network.  Declaration of Keith L. Kassien (*Kassien Declaration*) (Attachment 1), ¶ 6.  Since that time, other companies have

---

[1] At that time, those local facilities were generally thought to be "natural monopolies" and therefore not susceptible to competition. *See* J. Nuechterlein & P. Weiser, *Digital Crossroads: American Telecommunications Policy in the Internet Age* (2005), at 60.

deployed an array of regional and national long-haul wireline and wireless networks, and the interexchange and wireless markets are highly competitive.

To connect customer premises to their national networks, however, companies like Sprint Nextel need both "access" to buildings and local "transport" facilities to take traffic to network points of interconnection. The same is true with respect to connecting the tens of thousands of cellular towers in Sprint Nextel's cellular network. The necessary local private lines (or circuits) -- including both local access and transport -- are often referred to in the telecommunications business as "special access" circuits. Initially, only the companies operating the former Bell System's local facilities and other ILECs were able to provide these services. But in the 1990s, competitors began constructing local facilities, particularly after the Telecommunications Act of 1996, Pub. L. No. 104-104, was enacted to promote the development of competition in local telecommunications markets.[2]

2.    *Local Access and Local Transport are Different*: At the July 12 hearing before this Court, there was a good deal of discussion of the quantity of facilities owned by vendors offering local services in competition with the ILECs. The parties were not always careful, however, to distinguish between *transport* facilities, which tend to be high capacity and relatively lengthy, and *access* facilities, which tend to be short haul, lower capacity facilities. As noted above, national communications companies like Sprint Nextel need both access (into buildings) and transport (to points of interconnection) in order to connect customer premises or cellular towers to their networks.

---

[2] In particular, Section 253(a) of that Act removed State and local legal barriers to entry that had long inhibited local telecommunications competition.

Most of the local facilities owned by non-ILEC vendors offering local services are transport facilities employing high capacity fiber optic cables. These fibers are typically configured as rings because traffic direction can be instantaneously reversed and service maintained even if the fiber ring is cut. The record in this case is replete with "fiber maps" showing where competitors have successfully installed these high capacity transport facilities. Again, such local transport facilities typically take telecommunications traffic aggregated from multiple end users and transmit it to points of interconnection with national networks or to other local destinations. A single transport facility, in other words, serves numerous end users, and the substantial costs of constructing the facility may be spread out over those customers. Competitive local service providers have therefore been quite successful at building transport facilities.

Sprint Nextel itself has constructed or purchased local transport fiber facilities in a large number of metropolitan areas. *Kassien Declaration*, ¶ 6. Moreover, in urban areas where Sprint Nextel does not own fiber rings, it is often possible to obtain local transport from competitive carriers that have fiber in the region rather than purchasing transport from the ILECs. In short, as DOJ has pointed out in this proceeding, there is a substantial amount of competitive local fiber – both used ("lit") and unused ("dark") – in existence.

But transport within a local area is only part of what carriers need to connect customers to their networks. As noted above, carriers also need lower capacity short haul access lines, or laterals, running into specific customer premises. These laterals are also commonly used to link cellular radio towers. Unfortunately, the economics of constructing access facilities are much different from those of constructing fiber rings. Because a lateral serves a particular building or site, it serves only a very limited number

of customers – often one – and the costs of providing the facility are therefore much more difficult to recoup.  To this day, the ILEC is the *only* provider of laterals to the vast majority of buildings and cell sites.  Notably, however, until the mergers AT&T and MCI were the largest competitive providers of access – and, indeed, the *only* national competitive access providers.

       3.     *Building Competitive Local **Access** Facilities is Rarely Economically Feasible*:  As explained in the attached *Kassien Declaration*, ¶¶ 9-11, there are several reasons why competitive local access vendors have not successfully constructed extensive "last-mile" facilities.  First, would-be access providers face large fixed costs in deploying new laterals that, once expended, become sunk costs.[3]  It is expensive to dig up roads and sidewalks to install new facilities, and it is time-consuming and costly to obtain necessary rights-of-way and access to buildings.[4]  Moreover, once installed, access facilities cannot be re-deployed or employed for other purposes – again, wires running into specific buildings offer access only to those buildings.

       Second, local loops are characterized by large economies of scale.  Most of the cost of deploying access facilities lies in the supporting structures, placement, rights of way, and access to buildings, and not in the fiber strand or copper wires themselves.  Because the cost of the supporting structures is relatively insensitive to the number of

---

[3] In other word, the installation of loops or laterals involves expenses for which the recoverable value is low.  *See* Gabel, *Why is There So Little Competition in the Provision of Local Telecommunications Services?: An Examination of Alternative Approaches to End-User Access*, 2002 L. Rev. M.S.U.-D.C.L. 651, 655 n.10.

[4] *See, e.g., id.* at 654-55.

lines deployed, ILECs serving most of the market enjoy substantial economies of scale that competitive carriers cannot duplicate, rendering market entry uneconomic.[5]

Third, competitive access vendors face operational hurdles – such as the difficulty of obtaining access to buildings and rights of way noted above – that often render the deployment of lateral facilities a practical impossibility. New network construction typically requires cooperation from local authorities, other carriers, and building owners. In the best of circumstances, the process of deploying access facilities requires many months of pre-construction while the competitive carrier secures (if possible) the necessary rights of way from the municipality and negotiates terms of building access from the landlord.[6] ILECs – by virtue of the fact that they already have legacy loops deployed to essentially all customer premises within their footprint – do not have to bear these costs.

Finally, competitors face hurdles constructed by the ILECs. Perhaps most significantly, the ILECs employ pricing strategies made possible by their historical monopoly position to prevent carriers from using alternative vendors' local access services even where they are available. For example, the ILECs often require local private line customers to maintain high special access "buy" rates through "take or pay" contracts – if purchasers attempt to buy access from competitors on routes where the ILECs face competition and they fail to reach their volume commitment, they must make up the shortfall. *Kassien Declaration*, ¶ 17. As a result, companies frequently do not

---

[5] *See, e.g.,* Beard, Ford, and Spiwak, *Why AdCo? Why Now?: An Economic Exploration into the Future of Industry Structure for the "Last Mile" in Local Telecommunications Markets*, 54 Fed. Comm. L.J. 421, 431-32 (2002); and Ford and Spiwak, *Set It and Forget It: Market Power and the Consequences of Premature Deregulation in Telecommunications Markets,* Phoenix Center Policy Paper 18 (July 2003), *available at* http:/www.phoenix-center.org/ppapers.html (visited August 31, 2006).

[6] *See, e.g., id.* at 432 (industry experts estimated that approximately 10% of entry costs are related to necessary government approvals alone.)

purchase local private lines from competitors *even when it would, for that particular circuit, be dramatically cheaper to do so*. *Id*.[7]

[REDACTED]

In short, as pre-merger AT&T explained to the Federal Communications Commission ("FCC"), *"building alternative loop" facilities to connect customer premises to competitors' networks is, "in most instances, fundamentally uneconomic."*[8] Accordingly, while competitive local communications carriers have built a significant amount of local transport facilities, those carriers have been able to build alternative access facilities only to reach customer premises where unusually high traffic volumes justify the significant investment in facilities. In Sprint Nextel's experience, it is

---

[7] Even if the ILECs were not to engage in such pricing, it is difficult to persuade the typical large user of local private lines to switch to a competitive vendor for the small portion of the user's service for which competitive alternatives are available. For the reasons set forth above, no ILEC competitor is likely to be able to fulfill all, or even a substantial portion, of the user's needs for local private lines. Users are often reluctant to sign on to the headaches associated with trouble isolation and service repair when multiple vendors are involved in providing what is often a large, complex service or bundle of services.

[8] AT&T Petition for Rulemaking, FCC WCB Docket No. 02-250 (filed Oct. 15, 2002), at 25 (emphasis added). Nor does the FCC's flawed regulation serve as an effective substitute for competition in the local private line market. In Ford and Spiwak, *supra* note 5, the authors conducted a careful empirical analysis of the FCC's misguided 1999 deregulation of ILEC local private lines (and its associated grant of substantial pricing flexibility for these services) and concluded (emphasis in original):

> [T]he Commission's deregulatory scheme for Special Access has produced *substantial* and *sustained* price increases for Special Access services where pricing flexibility is granted. Based on the results of an econometric model, these price increases are found to be the consequence of ILEC market power rather than price adjustments reflecting costs. The empirical model suggests that Special Access service is priced at about three times incremental cost, and this result is in line with other recent studies of market power in Special Access markets (*e.g.,* Rappoport, Taylor *et al.*, 2003), which find that the Bells receive a 40 percent return on Special Access revenues of $13.3 billion.

> This evidence suggests that while admittedly imperfect prognostications about competition and market power may be acceptable *ex ante*, continued agency review of incumbent market power is not only warranted, but virtually mandatory. Further, when abstract measures of competition are found, *ex post*, to be inadequate checks on market power such as in the case of Special Access services, the continued use of such abstractions by regulatory agencies should be immediately reviewed and potentially eliminated, particularly where such failure has a significant adverse impact on consumer welfare and a deleterious effect on U.S. telecoms competition and, by extension, the economy overall.

generally not economically efficient to build competitive access facilities to buildings for customers needing bandwidth at the level provided by DS1s or DS3s (equivalent to 24 and 672 voice-grade lines, respectively). *Kassien Declaration*, ¶ 12. In a few cases, lateral facilities can be efficiently constructed for customers requiring services at the OC3 level (equivalent to 2,016 voice-grade lines) or higher, but only customers with a large number of employees in a specific location or unusual communications needs (such as wholesale internet access) require such bandwidth. *Id.*[9] In other words, it is usually prohibitively expensive to construct alternative access facilities to a building to serve small, medium-sized, or even many large businesses.

    4. *Before the Mergers, AT&T and MCI Were Uniquely Positioned to Provide Competitive Access Facilities*: Notwithstanding the difficulties of providing competitive local access facilities, some competitors – most notably pre-merger AT&T and MCI – succeeded in bringing a significant number of buildings (albeit a small minority of *all* enterprise buildings) "on-net."

    AT&T and MCI obtained many of those access facilities as the result of unique historical circumstances. As recently as the late 1990s, it was widely expected that competitive access companies would successfully construct ubiquitous local networks, including alternative access facilities. That belief was, however, founded on "several fundamental misconceptions about the underlying economics of the telecommunications business by all of the major stakeholders, including Wall Street, policymakers, and would-be entrepreneurs." Beard et al., *supra* note 5, 54 Fed. Comm. L.J. at 423. More specifically, investors mistakenly believed that "(a) entry into the local market would be

---

[9] Even a company as large as Sprint (a Fortune 50 company) rarely finds it economic to build competitive access facilities even at the OC-3 level.

relatively inexpensive; [and] (b) the market immediately would be capable of sustaining multiple local access networks." *Id*.

On the basis of these misconceptions, would-be local service providers raised billions of dollars on Wall Street to build local networks, including access facilities. And much of that money was, indeed, spent beginning to construct such facilities. But then it became clear that competitors generally "cannot achieve sufficient economies of scale, scope, or density to warrant the capital required to build various components . . . of the local exchange network" – and particularly access facilities – from the ground up. *Id.* at 425. Moreover, policymakers and Wall Street learned to their chagrin that the cost of entry into the local market is not limited to the massive costs of network construction and architecture. Rather, "entry into the telecommunications business requires the additional commitment of tremendous fixed and sunk costs to cover the costs of billing systems, regulatory efforts and responses, pre-positive cash flow, general administrative costs, and, perhaps most significant of all, customer acquisition and retention costs." *Id.* at 431.

Finally, the ILECs proved adept at using pricing strategies and internal administrative roadblocks to prevent carriers from using competitors' local private line access services even where they were available. *Kassien Declaration*, ¶ 17. In short, it became clear that "in the real world it is impossible for a new entrant" to gain the level of market share necessary to survive as a facilities-based entry into the local market. *See* Gabel, *supra* note 3, 2002 L. Rev. M.S.U.-D.C.L. at 656.

That fact combined with the bursting of the "bubble" in technology equities at the beginning of this decade put an abrupt stop to the ability of would-be local access providers to raise further capital. From 2000-2002, more than 50 competitive local

exchange carriers ("CLECs") filed for bankruptcy, as the market capitalization of publicly traded CLECs dropped about 95%, from $86 billion to $4 billion. Dibadj, *Competitive Debacle in Local Telephony: Is the 1996 Telecommunications Act to Blame?*, 81 Wash U.L.Q. 1, 3-4 (2003).

Significantly, however, the substantial quantity of local access facilities constructed during the 1990s did not simply disappear. *The companies that had been most successful at constructing local facilities were purchased near the height of the boom by MCI (then WorldCom) and AT&T.* Before acquiring MCI, WorldCom paid approximately $14 billion to acquire MFS Communications, Inc. ("MFS") in 1996. It stated that the combination of MFS's local facilities and WorldCom's interexchange facilities made it "the first company since the breakup of AT&T to bundle together local and long distance services carried over an international end-to-end fiber network owned or controlled by a single company."[10] The next year, WorldCom paid approximately $2.4 billion to acquire Brooks Fiber Properties, Inc. ("Brooks Fiber"), "a leading facilities-based provider of competitive local telecommunications services."[11] AT&T purchased Teleport Communications Group ("TCG") in 1998 for approximately $11 billion. AT&T described TCG as "the nation's premier provider of competitive communications services" because "TCG has more fiber route miles and serves more businesses in more cities than any other competitive local services company."[12]

---

[10] WorldCom News Release, *WorldCom, Inc. and MFS Announce Merger To Form Premier Business Communications Company* (Aug. 26, 1996) (Attachment 2).

[11] WorldCom News Release, *WorldCom and Brooks Fiber Announce Merger* (Oct. 1, 1997) (Attachment 3).

[12] AT&T News Release, *AT&T completes TCG merger; TCG now core of AT&T local services network unit* (July 23, 1998) (Attachment 4).

Before the mergers AT&T and MCI were uniquely positioned in the local access market in substantial part as a result of these purchases. TCG owned approximately 5,300 laterals before it was acquired by the pre-merger AT&T and Brooks Fiber owned approximately 2,000 before it was acquired by MCI's predecessor.[13] These laterals (together with the laterals MCI acquired through MFS) constituted a significant portion of the laterals owned by AT&T and MCI before SBC and Verizon acquired them.[14] As a result of the current mergers, most of those unique local facilities will disappear (or, more accurately, have already disappeared) from the competitive marketplace.

In addition, before the mergers AT&T and MCI were in a better position than other competitors to connect to additional buildings. As discussed above, it does not usually make sense for a competitor to connect to a building unless a customer in that building has extremely high bandwidth needs, typically at least OC3 level (equivalent to 2,016 voice-grade lines) and often higher. The pre-merger AT&T and MCI were the companies most likely to obtain customers needing such very high-capacity lines because they served most large businesses. Indeed, SBC and Verizon stated that they wanted to acquire AT&T and MCI principally because they were the premier providers of communications service to customers with high-bandwidth needs.[15] Simply stated, a

---

[13] Teleport Communications Group Form 8-K (Aug. 10, 1998) (Attachment 5). Brooks Fiber Form 10-K (Mar. 31, 1998) (Attachment 6).

[14] Professor Selwyn estimated that AT&T had a total of about 6,400 buildings on-net before the mergers and MCI had about 6,000. Lee L. Selwyn, *Lessons from the United States' Brief Experiment in Telecommunications Competition* (Oct. 25, 2005), at 8 (Attachment 7).

[15] *See* SBC and AT&T Joint Press Release, *SBC To Acquire AT&T* (Jan. 31, 2005) ("AT&T brings to the combined company the world's most advanced communications network to meet the sophisticated data communication needs of large businesses. AT&T serves virtually every member of the Fortune 1000.") (Attachment 8); Press Release, *Verizon-MCI Transaction Creates New Competitor in Large-Business, Government Markets, Seidenberg Says* (Mar. 15, 2005) ("with Verizon as a partner, MCI can continue to be a strong competitor to AT&T, which today is the largest provider of services to the largest business and government customers") (Attachment 9).

company with a need for [REDACTED] was more likely to contract with the pre-merger

AT&T or MCI than with a smaller carrier, even one as large as Sprint.  Indeed, SBC and

Verizon argued that they needed to acquire AT&T and MCI to serve those customers.  In

situations where AT&T or MCI was able to self-provision such a high-capacity line, it

would often have excess capacity in that line to lease to other companies serving smaller

customers in the same building.

In sum, ten years after the enactment of the Telecommunications Act of 1996, the

ILECs are still monopoly providers of local access to the vast majority of buildings

across the country.  Competitors provide a substantial amount of local transport and are

able to provide access to buildings where they have customers with extremely high-

bandwidth needs.  But the substantial legacy local access networks of companies such as

MFS, TCG, and Brooks Fiber have largely been removed from the competitive market as

a result of the mergers at issue.  So have their owners, the pre-merger AT&T and MCI,

which threatened the ILECs' dominance because their enterprise business groups served

the largest corporate customers whose demand for bandwidth might justify the

deployment of additional laterals.

## ARGUMENT

Under the Tunney Act, this Court must determine whether the proposed consent

decrees are "in the public interest."  15 U.S.C. § 16(e).  A consent decree is in the public

interest only if it will restore the competition lost as a result of a merger.  *See Ford Motor*

*Co. v. United States*, 405 U.S. 562, 573 (1972).  The decrees at issue here fail that test.

The Complaints correctly note that the mergers will "lessen competition

substantially . . . for (a) Local Private Lines and (b) voice and data telecommunications

14

services that rely on Local Private Lines, in violation of Section 7 of the Clayton Act."
Complaints ¶ 32 (specifically setting forth the "Violation Alleged").  But the proposed
consent decrees address only a small portion of that lost competition.  More specifically,
the decrees seek to remedy only certain situations where the number of access vendors in
a particular building falls from two to one as a result of the mergers.  It does not address
competition lost when providers go, for example, from three to two, or four to three or
even most of the competition lost where providers go from two to one.

DOJ thus apparently believes that most of the competition lost as a result of the
mergers does not matter for some reason, perhaps because the competitive landscape for
special access services is so bad that further deterioration is immaterial.  But the
government does not clearly say so, and surely does not attempt to justify its position.
Indeed, the only document in which the government deigns to address the question at all
is its Response to Public Comments of March 21, 2006.  The government's explanation,
however, serves primarily to underscore its view that it may write complaints limiting the
Court's inquiry to only a small slice of lost competition resulting from the mergers.

That is not a plausible reading of the Tunney Act.  If in the face of the same
merger-related loss of competition at issue here, the government were to draft complaints
limiting its concern to a single building and to address that concern in a consent decree,
this Court plainly could not find the decree to satisfy the public interest standard.  DOJ's
focus on a mere 739 buildings across the country is little different.  At a minimum, the
government must *reasonably articulate the antitrust harm resulting from the mergers*,
and must show that its proposed decrees address that harm.

Once DOJ's position that it is entitled to artificially circumscribe the antitrust

15

harm from the mergers is rejected, the proposed remedy plainly falls far short of restoring

the true extent of lost competition.  The government does not seriously maintain

otherwise, but falls back on its claim that the Court cannot consider the real scope of

harm to the private line market from the mergers.  DOJ is wrong, and under these

circumstances this Court cannot properly find the consent decrees to be in the public

interest.

## I.    THIS COURT HAS AUTHORITY TO ADDRESS – AND, INDEED, MUST ADDRESS – WHETHER THE CONSENT DECREES RESTORE LOST COMPETITION RESULTING FROM THE MERGERS.

### A.    The Government's Claim that this Court's Review is "Limited" is Legally Incorrect.

The threshold issue here is whether the Tunney Act limits[16] this Court's review to

examining *only* the "fit" between the antitrust harm identified by the complaints (as the

government interprets them) and the remedy in the proposed consent decrees, or whether

the Act requires the Court to consider the *real* loss of competition from the mergers and

whether the decrees remedy that harm.  The Tunney Act itself provides the answer.  It

states that the Court "shall" consider "the impact of  entry of such [proposed] judgment

*upon competition in the relevant market or markets*."  15 U.S.C. § 16(e)(1)(B) (emphasis

added).  It also indicates that the Court "shall" consider *any* "competitive considerations

bearing upon the adequacy of such [proposed] judgment that the court deems necessary

to a determination of whether the consent judgment is in the public interest."  *Id.* §

---

[16] The government uses some form of the word "limited" to describe this Court's role in Tunney Act proceedings no fewer than three times in the first four pages of its Submission, *see, e.g.*, *DOJ Submission* at 2 (twice), 4 n.7; *see also id.* at 13, 14, 18, 20, with a "does not authorize [the Court]," *id.* at 4 n.7, and an "only authorizes [the Court]," *id.*, thrown in for good measure.  At the same time, the DOJ Submission contains repeated references to DOJ's "discretion," *see, e.g., id.* at 2, 4 n.7, 11, and "prosecutorial judgment," *id.* at 5.

16(e)(1)(A). There is thus nothing "limited" about the Court's authority under the Act – it is broadly authorized (and, indeed, required) to consider the adequacy of the proposed consent decrees in restoring competition *actually lost* as a result of the mergers.

The legislative history of the 2004 amendments to the Act repeatedly underscores this point. One of the bill's Senate sponsors, Senator Leahy, explained that it was intended to mandate that the "courts make an independent judgment" regarding the adequacy of proposed consent decrees, rather than being "overly deferential to prosecutors' judgments." 150 Cong. Rec. S3610, S3615 (Apr. 2, 2004). Senator Kohl emphasized that courts must consider "both the narrow and broad impacts of the decree," including its effect "upon the enforcement of antitrust laws generally." *Id*. at S3616. He also indicated that "meaningful review" of consent decrees by district courts must include ensuring that they are "analytically sound." *Id*. at 3618. Like the text of the Act itself, then, the legislative history of the 2004 amendments is inconsistent with the government's efforts to curtail this Court's review of the proposed consent decrees.[17]

### B. The Government's Claim that this Court's Review is "Limited" is Logically Flawed.

As a logical matter, DOJ's position that the Court may look only at whether the consent decrees "fit" the problem identified by the complaints makes no sense. This Court's inquiry cannot reasonably be limited to testing the artfulness of the government's drafting. DOJ plainly *could* have written complaints focusing on a competitive problem in 100 buildings rather than 739, or in 10, or even in only one. If DOJ *had* done so (and if it had limited its remedy to the problem thus alleged), then under the government's

---

[17] Tellingly, the government largely ignores the 2004 amendments. Indeed, *all* of the cases cited by the government pre-date those amendments.

view the Court would have no choice but to agree that the decree fully terminated the

violation *alleged.*

It is highly doubtful whether that understanding of the Tunney Act was ever

correct.  Were there ever any question, however, the 2004 amendments should put it to

rest.  The "independent" analysis of whether consent decrees are "analytically sound"

mandated by Congress at least requires the Court to assess whether the government has

reasonably articulated an antitrust problem that it proposes to remedy.  For example, if

DOJ alleges that the antitrust problem will occur only for two weeks and then disappear

(and thus advances a consent decree limited to two weeks), the government must have the

obligation to explain why the antitrust problem will exist for only two weeks.  Equally

plainly, if the government's explanation is that Martians will arrive on Earth in two

weeks with the ability to enter the relevant market on a significant scale, then the Court

could not approve the decree as being in the public interest.  In this example, the

articulation of the antitrust problem as being limited to two weeks makes no sense, so the

fact that the consent decree would adequately address the artificially narrow problem is

not sufficient under the Tunney Act.

In short, a consent decree "adequately addressing" an unreasonably limited

articulation of antitrust harm stemming from a merger cannot be approved as being in the

"public interest."  This is not, of course, to suggest that this Court may "re-write" the

Complaint.  The government can draft its own Complaint and it need not explain why it

did or did not pursue every potential theory of antitrust harm resulting from a merger.

But the government must identify the contours of the antitrust problem it seeks to

address, and its articulation of the problem must make sense.  If it does not – as here – the Court should reject the proffered consent decree.

### C.    As Construed by the Government, the Proposed Complaints Do Not Reasonably Articulate a Competitive Problem.

The complaints in this case *could* be understood to articulate a reasonable antitrust harm.  As noted above, they indicate that "the proposed merger[s are] likely to substantially reduce competition for Local Private Lines and telecommunications services that rely on Local Private lines."  Complaints ¶ 3.  On its face, however, that "reduce[d] competition" obviously affects many more buildings than the 739 targeted by the government's decrees.  *See infra* at 28-31.  Accordingly, the "fit" between the complaints as they are most naturally read and the proposed remedy is inadequate.  *See* Part II, *infra*.

The government therefore construes the complaints much more narrowly.  It points to language in them focusing on situations in which the merging parties are "the only two firms that own or control a direct wireline connection to the building."  Complaints ¶ 3.  By narrowing the complaints in that manner, the government is able to make a better argument as to "fit."  But, as discussed above, the government's articulation of the antitrust problem is incomplete.  The *fact* that the mergers will result in a loss of competition in situations beyond those addressed by the remedy is simply that – a *fact*, and one of which this Court could certainly take judicial notice if necessary.  *See, e.g.,* Fed. R. Evid. 201(b)(2) (judicial notice may be taken of a fact that is "not subject to reasonable dispute").  Emphasizing the competition lost in a subset of cases where two providers are reduced to one, as the government does, does not make the competition lost in other situations magically reappear.

Indeed, DOJ acknowledges generally that reducing the number of competitors

19

from three to two or four to three is a competitive problem. *DOJ Response* at 24. And DOJ cannot deny that the mergers will eliminate a competitor in situations far beyond those addressed by its remedy. Rather – although the government does come out and say so in its Submission – DOJ appears to believe that this loss of competition really should not be seen as a problem.

The government's position may be teased out of its Response to the Public Comments in this case. That position, however, does not withstand even a cursory glance, and certainly cannot meet the government's obligation under the Tunney Act to reasonably articulate the antitrust harm caused by the mergers. First, DOJ stated in its response that "given the particular structure of the marketplace, in looking at buildings where the number of competitors went from three to two or four to three, the United States was unable to conclude that the mergers would significantly increase the risks of coordinated interaction." *Id*. at 24-25. This statement is in considerable tension with DOJ's general view, described above, that such a reduction *does* pose a competitive problem. *See id.* at 24. Moreover, it is widely recognized that oligopolistic markets characterized by few producers tend to result in "interdependent pricing," where sellers set prices at a profit-maximizing, supracompetitive level. *See, e.g.,* Richard A. Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 Stan. L. Rev. 1562, 1582 (1969); Donald Arthur Washburn, *Price Leadership*, 64 Va. L. Rev. 691, 693-697 (1978). If DOJ believes the market for private lines is somehow immune to these tendencies, it should explain why. A single, wholly conclusory sentence is surely inadequate.

Next, the government suggests that "because the merging firms were not especially close substitutes, the evidence did not support a finding of likely unilateral

anticompetitive effects in these buildings." *DOJ Response* at 25. This is a puzzling point to make regarding the situations that DOJ does *not* address because it is equally applicable in the context of the two-to-one buildings that it *does* address. If the merging companies were not actually "close substitutes,"[18] then there was no loss of competition at all, and there is no reason for an antitrust remedy even in two-to-one situations. In any event, DOJ's claim that there was actually *no* competition lost because of the mergers is hardly a reasoned explanation for defining the *scope* of the problem as the consent decrees do.[19]

DOJ finally offers that "the fact that at least two CLECs had added the buildings in question to their networks suggested that the characteristics of the buildings … made them susceptible to entry – significantly more so than the 2-to-1 buildings." DOJ Response at 25. But as discussed above, much of the competitive entry at issue here occurred in the 1990s. The fact that competitive entry was – incorrectly – thought to be viable back in the go-go years of the mid-1990s provides no reason to believe that the same is true today. And the pre-merger AT&T and MCI were more likely to have a customer needing a high-capacity line into a building than smaller competitive access providers. At a minimum, further analysis of the issue is necessary.

In sum, the mergers remove one competitor – they "reduce competition" – and not just when providers go from two to one. DOJ's view of the complaints simply does not reasonably articulate a competitive problem, but rather elides a substantial part of the

---

[18] In fact, however, it is hard to imagine how firms providing access lines into buildings could fail to be "close substitutes" for one another. Carriers either have a choice in access or they do not.

[19] DOJ notes that the merging parties do not believe *any* remedy to be warranted. *DOJ Submission* at 14 n.55. That does not show that the limited remedy proposed by DOJ is adequate. To the contrary, it shows that the merging parties cannot explain why the limited remedy proposed by DOJ is adequate to resolve the problems identified by the government.

problem.  This Court is authorized (and, indeed, required) by the Tunney Act to say so,

and to reject the proposed consent decrees.

## II.    THE PROPOSED CONSENT DECREES DO NOT RESTORE THE COMPETITION LOST AS A RESULT OF THE MERGERS.

Once DOJ's effort to unreasonably narrow the scope of this Court's review is

rejected, there is no serious question that the proposed consent decrees are insufficient to

rectify the loss of competition in local private line services resulting from the merger.

### A.    The Market for Local Private Line Services Is Highly Concentrated.

The market for local private line services remains dominated by the ILEC that

previously provided monopoly local service in a particular geographic area.  Comments

filed before the FCC in these merger proceedings indicated that ILECs "remain the sole

source of [local private line] connectivity at roughly 98% of business premises

nationwide, even for the largest corporate users."[20]  The ILECs' dominance results in

substantial part from economic barriers to entry into the local access market.  Those

barriers, again, include (1) large fixed costs in deploying laterals that, once expended,

become sunk costs; (2) the ILECs' enormous competitive advantage as the result of large

economies of scale in the provisioning of local private lines; and (3) operational hurdles –

such as the difficulty of obtaining access to buildings and rights of way noted above –

that render it impossible for competitive carriers to deploy loop facilities in many

circumstances.

These nearly immutable economic barriers are not, however, the whole story of

the ILECs' dominant market position.  To the contrary, the ILECs reinforce their

---

[20] Reply Comments of Ad Hoc Telecommunications Users Committee, Attachment B, Reply Declaration of Susan M. Gately (May 10, 2005), FCC WC Docket No. 05-65, at 14.

hegemony by using pricing strategies and internal administrative roadblocks to prevent carriers from using competitors' local private line access services even where they are available. Again, the ILECs often require local private line customers to maintain high special access "buy" rates through "take or pay" contracts – if purchasers attempt to buy access from competitors on routes where the ILECs face competition and they fail to reach their volume commitment, they must make up the shortfall. *Kassien Declaration*, ¶ 17. As a result, companies frequently do not purchase local private lines from competitors *even when it would, for that particular circuit, be dramatically cheaper to do so*. *Id*. The ILECs also impose largely arbitrary limitations on the number of circuits that can be migrated to competitors over a specific period, and impose excessive non-recurring charges on such moves. *See* Comments of Sprint Corporation, FCC WC Docket No. 05-25 (June 13, 2005), at 6-7.

As an economic matter, companies can build alternative access facilities only where unusually high traffic volumes justify the significant investment in facilities. Sprint Nextel's own operations illustrate this point. Sprint Nextel is a major communications carrier that owns fiber rings in many metropolitan areas, and therefore is better positioned than most carriers to build laterals into the buildings in which it serves enterprise customers. [REDACTED]

[REDACTED] Extremely high traffic allows a carrier to recoup the costs of building access facilities, while it remains prohibitively expensive to self-provision a local private line to a building to serve most small or medium sized businesses or small offices of large businesses.

DOJ recognizes that it makes sense for competitive carriers to deploy laterals only in limited circumstances. DOJ states that deployment of laterals "is a difficult, time-consuming, and expensive process" that makes economic sense only after the carrier has "secured a customer contract of sufficient size to justify the anticipated construction costs for that building." Complaints, ¶¶ 27, 28. Although DOJ did not apply these factors sensibly, the basic underpinning of its analysis is correct: a competitive carrier will deploy a lateral into a building only where it has a customer with substantial bandwidth needs. And deploying a lateral – as opposed to simply owning nearby fiber – is a necessary component of competitive access. Although owning a fiber ring is helpful in reaching customer premises, it is not sufficient.

### B. The Mergers Will Make Local Private Line Markets Still More Concentrated.

The mergers at issue here will substantially *increase* the concentration of the already highly concentrated market for local private lines. DOJ measures concentration in the market by using the Herfindahl-Hirschman Index (HHI), a standard tool in antitrust analysis. U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines § 1.5.[21] DOJ considers a market with an HHI above 1800 to be "highly concentrated." *Id.* If, after a merger, the market will be highly concentrated, and if the merger causes the HHI to increase by more than 100, DOJ presumes the mergers are "likely to create or enhance market power or facilitate its exercise." *Id.* § 1.5.1.[22]

---

[21] The HHI of a market is calculated by summing the squares of the market shares of all market participants.

[22] The D.C. Circuit has concluded that those HHI standards – a pre-merger HHI above 1800 and an increase of 100 resulting from the merger – establish a "prima facie case that a merger is anti-competitive." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 & n.9 (D.C. Cir. 2001).

If a market is defined as a building, then a market that goes from two providers with equal market shares to one provider would have an HHI of 5000 going to 10000. A market with *five* providers with equal market shares going to *four* providers would have an HHI of 2000 going to 2480 – still well above DOJ's own standard for measuring increased concentration. If initial market shares are unequal, then the resulting HHIs would be *higher*. Of course, markets where four providers are reduced to three or three providers are reduced to two would have HHIs exceeding DOJ's guidelines by even wider margins.

Simon Wilkie, formerly Chief Economist at the FCC, presented calculations of HHIs for six metropolitan service areas to the FCC. Looking only to those buildings with a very high demand for bandwidth (OC3 level or above) – buildings where competitive entry is *most* economically feasible – the market with the lowest post-merger HHI was Chicago, at 4837. Chicago's pre-merger HHI was 3240. See Ex Parte, "Further Analysis of the Competitive Effects of the Proposed Mergers of SBC/AT&T and VZ/MCI" at 10, FCC WC Docket Nos. 05-65 & 05-75 (July 29, 2005). When buildings needing lower bandwidth (DS1 and DS3 levels) were analyzed, the HHIs were even higher. *Id*. Using DOJ's guidelines, then, *all* of the markets relevant here would be "highly concentrated," and *all* of the markets would see an HHI increase of much more than 100. In *all* markets, therefore, DOJ's own guidelines suggest that the merger is likely to enhance market power or facilitate its exercise.[23]

---

[23] The merging parties questioned Professor Wilkie's analysis but never attempted to present any analysis showing that the relevant markets were not highly concentrated and becoming significantly more concentrated on account of the mergers. The FCC addressed Professor Wilkie's analysis principally by stating, in conclusory fashion, that the consent decrees at issue should remedy the competitive harms resulting from the mergers. *See In re SBC Communications Inc. and AT&T Corp.*, WC Docket No. 05-65 (rel. Nov. 17, 2005), at ¶ 49. Unfortunately, they will not.

It should not be surprising that the elimination of AT&T and MCI would make local private line markets significantly less competitive. As discussed above, the pre-merger AT&T and MCI were different from all other competitors because they purchased the leading competitive access providers in the 1990s and therefore had the largest competitive access networks. In addition, as the leading providers of business communication services, they were most likely to be able to provide new connections to enterprise buildings.

The distance between the pre-merger AT&T and MCI and the next largest providers of private line services is striking. Sprint Nextel maintains a database that shows whether a particular building is "on-net" for one or more competitors. Although there are dozens of competitors in Sprint Nextel's database, most offer special access circuits to only a relatively small number of buildings in urban locations within a specific geographic area. Among non-ILEC competitors, only the pre-merger AT&T and MCI ever approached a national footprint in the access market. That is part of the reason why those two companies were more likely to obtain customers with high-bandwidth needs, since such customers often seek a single service provider for their many offices around the country.[24]

As set forth in paragraph 16 of the attached Declaration of Sprint Nextel's Manager – Access Planning, in 2005 – before the mergers at issue here – more of Sprint Nextel's special access "spend" went to AT&T and MCI than to all other competitors combined. [REDACTED] Again, while these quantities of circuits purchased from the

---

[24] DOJ notes that one CLEC appeared to be adding buildings to its network at a faster rate than the pre-merger AT&T and MCI during parts of 2004 and 2005. *DOJ Submission*, at 7 & n. 18. If that is correct, Sprint Nextel does not believe that such an operation could be profitable or sustainable in the long run. And an unsustainable burst of spending does not suffice to show that, in the long run, new local access vendors will be able to occupy the void left by the mergers.

pre-merger AT&T and MCI are relatively small in comparison to the number of circuits Sprint Nextel is obliged to obtain from the ILECs, they are much greater than the quantities Sprint Nextel obtained from any other competitive provider.

In addition, Sprint Nextel's database shows that the effect of the mergers will be felt far beyond the limited number of buildings affected by DOJ's proposed divestitures. In the territory where the new AT&T is the ILEC, that database indicates that the divestitures proposed in the consent decree reach only a small portion of the buildings in SBC's territory (now new AT&T's territory) where the pre-merger AT&T was one of five or fewer companies providing access to a building. The database shows the same result for MCI in Verizon's territory.

In short, while there is no question that the special access market was highly concentrated prior to the mergers – the ILECs accounted for approximately three-quarters of Sprint Nextel's special access spend – AT&T and MCI were the chief sources of alternative special access facilities used by Sprint Nextel. The mergers will therefore cause the already highly concentrated special access market to become substantially more concentrated.

## C.     The Loss of Competition Resulting from the Mergers Will Cause Prices to Rise.

The government acknowledges the obvious point that the mergers will cause prices to rise – that the "merged firm[s will] . . . have the ability to raise price to retail and wholesale customers of Local Private Lines" – in situations where only two carriers offer access to a particular building. *See, e.g.*, Complaints ¶ 25. But the same is also true in other situations.

Indeed, as an economic matter, there is little difference between a durable duopoly and a monopoly. *See, e.g.*, Edward Hastings Chamberlin, *The Theory of Monopolistic Competition: A Re-orientation of the Theory of Value* 46-55 (8th ed. 1962) (arguing that in a market with only two competitors, supracompetitive pricing at monopolistic levels is a danger). And, as mentioned above, oligopolistic markets tend to result in supracompetitive prices through "interdependent pricing." *See* Richard A. Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 Stan. L. Rev. 1562, 1582 (1969); Donald Arthur Washburn, *Price Leadership*, 64 Va. L. Rev. 691, 693-97 (1978).

The D.C. Circuit has explained that the "combination of a concentrated market and barriers to entry is a recipe for price coordination." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 724 (D.C. Cir. 2001). As set forth above, the market for private line services is characterized by unusually high barriers to entry and extraordinary levels of market concentration. These features will make it easy for firms in the post-merger environment to "force price[s] above or farther above the competitive level." *FTC v. University Health*, 938 F.2d 1206, 1218 n.24 (11th Cir. 1991).

Consider, for example, a situation where, before the mergers, three companies – SBC, AT&T, and MCI – had lines reaching a building and the AT&T offered the lowest price. The Federal Communications Commission required the new AT&T not to increase rates on DS1s and DS3s to existing customers for 30 months.[25] But after the conditions have expired, the new AT&T will no longer have to provide local private lines at the price offered by AT&T before the merger. In fact, it is very unlikely to continue to offer

---

[25] The conditions are set forth in Appendix F of the FCC's merger orders, which the FCC has submitted to the Court.

service at that price – after all, SBC could have offered lines at that price but declined to do so.  Thus, Verizon (the new MCI) will likely offer the lowest price at that building.  But it will know that it no longer faces competition from legacy AT&T and therefore will not need to attempt to beat its price.  As a result, prices will rise.

Moreover, Verizon will know that aggressively competing with the new AT&T will likely lead the new AT&T to retaliate in Verizon's region.[26]  Both are likely to be better off by offering local private lines at approximately the same price in their regions and outside their regions.  Indeed, both are likely to determine that the approach that best leverages their increased dominance in local private line markets is to emphasize the use of plans that require competitors to buy large quantities of lines from them in order to obtain any discount at all from their excessive rates – thus further discouraging competitors from leasing lines from competitive carriers even where they are available at lower prices.  *Kassien Declaration*, ¶ 17.  The mergers make it easier for Verizon and the new AT&T to exploit their dominance in this manner.

The pernicious effects of uncompetitive local private line pricing extend to "downstream" markets as well.  Local private lines are essential inputs to large business networks and cellular telephone networks.  For Verizon Wireless, the cost of local private lines in the Verizon ILEC territories is essentially a left pocket/right pocket transfer.  For Sprint Nextel and other independent providers, local private lines are a real cost.[27]

---

[26] *See* Letter from Conversent Communications et al., FCC WC Docket Nos. 05-65 & 05-75 (Aug. 31, 2005), at 7-8.  The ILECs have repeatedly claimed that mergers were necessary to facilitate competition, but rather than competing with each other the ILECs have chosen to strengthen their dominance in their regions rather than compete.  *See, e.g.*, Petition to Deny of Cbeyond et al., FCC WC Docket No. 05-65 (Apr. 25, 2005), at 48-51.

[27] Sprint Nextel is well aware of the advantages of owning an ILEC that earns a very high rate of return on its private line offerings.  Sprint Nextel's predecessor, Sprint Corporation, owned a large and highly profitable ILEC division that was spun off to shareholders in May 2006 and is now an independent company called Embarq.  In pricing service offerings to large businesses customers in its Sprint ILEC

In the past, DOJ has recognized that lost competition from a decline in competitive access providers is significant regardless of whether the number of vendors goes to one or to more than one. When Qwest Communications, an ILEC, proposed to buy the assets of Allegiance Telecom, a competitive carrier, in 2004, DOJ determined that it would be necessary to require divestiture of *all* of Allegiance's local facilities in Qwest's region, and *not* merely those where Allegiance was the only alternative to Qwest.[28] Notably, however, while appropriate in the case of Allegiance, not even such an extensive divestiture would replace the competition lost by the removal of the pre-merger AT&T and MCI from the market because of their ability to deploy lines to additional buildings. That is, a Fortune 1000 company was much more likely to use the pre-merger AT&T or MCI than Allegiance. Nonetheless, contrasting the proposed remedy in the Qwest-Allegiance proceeding highlights the inadequacy of the consent decrees at issue here.

### D.    The Government Has Not Explained How the Proposed Divestitures Adequately Address the Loss of Competition Resulting from the Mergers.

DOJ has utterly failed to supply a reasonable explanation for the extremely limited divestitures required by the proposed consent decrees. As we have explained, there is every reason to think that the mergers will reduce competition beyond two to one situations. Yet DOJ has simply refused to explain why it limited the scope of relief to two to one situations when its merger guidelines and its prior practice call for broader relief.

---

territories, Sprint was well aware that it had a significant cost advantage, not related to the efficiency of its operations, compared to competitors that had to purchase last-mile access from the Sprint ILEC.

[28] See DOJ-Qwest Agreement (Attachment 10).

Moreover, DOJ has not adequately explained why it did not require divestitures in many buildings even in two to one situations. In its complaints, DOJ recognized that CLECs will deploy a line to a building only after securing a customer contract of sufficient size to justify the investment. Complaints, ¶ 28. But the screen that DOJ used to remove buildings depends on a CLEC having facilities near the building, together with the demand for capacity in the building – and does not depend at all on whether a CLEC has a customer contract of sufficient size to justify the investment. *DOJ Submission*, Declaration of W. Robert Majure, at 11 n. 17. SBC and Verizon certainly appeared to recognize the significance of that factor, however – the primary reason they gave for acquiring AT&T and MCI was those competitors' base of Fortune 1000 customers.[29]

It is not clear that a broader divestiture of the sort contemplated when Qwest sought to acquire Allegiance would restore the competition lost on account of the mergers, given the facilities and client bases of MCI and pre-merger AT&T. But there is no question that such a divestiture would come closer than the extremely limited divestitures proposed by the consent decrees. DOJ's failure to explain why it is not taking the same approach it contemplated two years ago – even though it is an obvious issue that has been called to DOJ's attention in submissions by CompTel and ACTel – suggests that there simply is no good answer. We cannot think of one.

In the pending AT&T/BellSouth merger proceeding at the FCC, Sprint Nextel has advocated rate regulation rather than divestitures to address the problems resulting from

---

[29] The fact that the old AT&T and MCI deployed a line to a building with such a customer – or perhaps acquired a line to that building as part of their acquisitions of TCG, MFS, and Brooks Fiber in the late 1990s – hardly shows that any other competitor is likely to deploy a line to that building in the future. If, for example, a large national bank in New York previously used MCI for its communications needs, it is simply unlikely to switch from MCI to a small regional competitor, even if that competitor has fiber near the particular building. And as noted earlier, customers are often reluctant to "piece out" their network requirements because it often makes their networks harder to manage.

the merger.[30]  Specifically, Sprint Nextel believes the merging companies should be

required to reduce their charges for local private lines at the DS1 and DS3 capacity levels

– the levels where DOJ acknowledges that competitive deployment is unlikely – by

applying revised price cap and pricing flexibility rules that will allow the companies to

obtain a reasonable rate of return rather than the dramatically high rates of return that the

ILECs have been earning.[31]

Rate regulation would provide an appropriate remedy for the mergers at issue in

this proceeding.  Indeed, given the harms likely to result from these mergers, which

further concentrate ownership of bottleneck local private line facilities that are needed to

provide competition in a host of communications markets, rate regulation is plainly

desirable.  A holding by this Court that the proposed consent decrees are inadequate may

cause the federal government to take the steps necessary to lower the merging parties

prices to just and reasonable levels.

---

[30]  The FCC's somnolence in addressing the obvious problems posed by unreasonable special access
pricing led pre-merger AT&T and others to take the extraordinary step of filing a petition for writ of
mandamus in the United States Court of Appeals for the District of Columbia Circuit on November 6,
2003.  There, AT&T asked the court to oblige the FCC to grant the AT&T's petition for rulemaking and
request for interim relief on special access.  The court held oral argument and required the FCC to report on
the status of old AT&T's petition.  Less than seven weeks after filing its first report with the court, the FCC
adopted a Notice of Proposed Rulemaking on special access services.  After receiving comments and reply
comments in the Summer of 2005, the FCC has taken no further action in that docket.

[31]  *See* Comments of Sprint Nextel Corporation on Application for Transfer of Control, FCC WC Docket
No. 06-74 (June 5, 2006), at 14-15.  That filing specifies the steps necessary to ensure that the merged
company cannot charge unreasonable rates for its bottleneck facilities.  In addition to reducing rates overall,
it would be necessary for the government to ensure that an ILEC may not effectively force customers to
buy its local private lines rather than a competitor's lines where competition exists in order to obtain lines
at reasonable rates where there is no competitive alternative.  *Id*.  In a related proceeding at the FCC, Sprint
Nextel recently showed that in 2005 Verizon and the new AT&T had excessive rates of return for local
private lines: Verizon had a 41.97% rate of return and the new AT&T had a 91.73% rate of return.  Sprint
Nextel's Opposition to Petitions for Forbearance, FCC WC Docket No. 06-125 (Aug. 17, 2006), at 9.
BellSouth, which AT&T is seeking to acquire, had a 98.37% rate of return in 2005.  The FCC considers
11.25% to be a reasonable rate of return.

## <u>CONCLUSION</u>

This Court should conclude that the proposed consent decrees are not in the

public interest because they do not restore the competition lost on account of the mergers.


Respectfully submitted,


_____

Sprint Nextel Corporation                Christopher J. Wright
2001 Edmund Halley Drive                   D.C. Bar No. 367384
Reston, VA  20191                         Timothy J. Simeone
                                            D.C. Bar No. 453700
                                          HARRIS, WILTSHIRE & GRANNIS LLP
                                          1200 Eighteenth Street, N.W., 12th Floor
                                          Washington, D.C.  20036
                                          (202) 730-1300

                                          *Counsel for Sprint Nextel Corporation.*


September 5, 2006