UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
UNITED STATES OF AMERICA,          )
                    Plaintiff,          )
                                        )
      v.                                      )
                                        )    Civil Action No. 1:05CV02102 (EGS)
SBC COMMUNICATIONS, INC. and       )
AT&T CORP.,                        )
                    Defendants.       )
_____)
                                        )
UNITED STATES OF AMERICA,          )
                    Plaintiff,          )
                                        )
      v.                                      )
                                        )    Civil Action No. 1:05CV02103 (EGS)
VERIZON COMMUNICATIONS, INC.       )
and MCI, INC.,                     )
                    Defendants.       )
_____)

### DECLARATION OF KEITH L. KASSIEN

Pursuant to 28 U.S.C. § 1746, I, Keith L. Kassien, state:

1. I make this Declaration to support the Response of Sprint Nextel Corporation to which it is attached.

2. I have worked for Sprint Nextel Corporation and its predecessors for 20 years. My current position is Manager – Access Planning. As a result of my position, I have extensive knowledge of Sprint Nextel's needs concerning "local private lines," commonly called "special access circuits."

3. Sprint Nextel was formed by the merger of Sprint Corporation ("legacy Sprint") and Nextel Communications, Inc. ("legacy Nextel"). Both entities were large

purchasers of local private lines, and Sprint Nextel remains a large purchaser of local private lines today. In 2005, Sprint Nextel spent more than $500 million leasing circuits from Verizon Communications, Inc. and more than $600 million leasing circuits from the new AT&T Corporation.

4. Prior to Verizon's merger with MCI and SBC's merger with AT&T, MCI and the old AT&T were the primary sources of local private lines used by Sprint Nextel other than those leased from incumbent local exchange carriers ("ILECs") such as Verizon and SBC. The remedy proposed by the Department of Justice does not restore the competitive alternatives previously offered by MCI and the old AT&T.

**Sprint Nextel's Need for Local Private Lines**

5. Legacy Nextel was initially a "specialized mobile radio" ("SMR") operator, providing two-way radio services to fleet vehicles in urban areas. In September 1996, the company introduced "iDEN" technology developed with Motorola that permitted the use of SMR spectrum to provide nationwide cellular services. Legacy Nextel did not own substantial wireline facilities.

6. Legacy Sprint completed the first nationwide, 100% digital, fiber-optic network in 1986 and began to offer wireless service under the Sprint PCS brand in 1995. Legacy Sprint acquired fiber rings (called "metropolitan area networks" or "MANs") in a large number of metropolitan areas. Those fiber rings permitted legacy Sprint to provision its own local transport in most large metropolitan areas.

7. Despite the extensive wireline facilities of legacy Sprint, Sprint Nextel needs to lease a large number of local private lines, primarily for two reasons. First, even where it has fiber rings and therefore can provide its own local transport, Sprint

Nextel requires "last-mile" circuits to reach enterprise customers to whom the company offers "bundled" voice and data services, including local and long distance voice service and Internet connectivity. Second, Sprint Nextel needs local private lines to connect its cellular sites to its wireless switches and to the public switched telephone network ("PSTN").

8. On account of their prior status as franchised monopolists, Verizon and the new AT&T have local private lines deployed to virtually every building in their ILEC territories. Competitive carriers, in contrast, do not and face substantial barriers in deploying last-mile circuits. Those barriers fall primarily into three categories.

9. First, competitive carriers face large fixed costs in deploying new last-mile facilities which, once expended, become sunk costs. For example, it is expensive to dig up roads and other terrain to install new facilities, and it is time-consuming and costly to obtain necessary rights-of-way and access to buildings. Moreover, once installed, last-mile facilities cannot be re-deployed for some other use.

10. Second, local transmission facilities are characterized by large economies of scale. Most of the cost of deploying facilities lies in the supporting structures, placement, rights of way, and access to buildings, and not in the fiber strand or copper wires themselves. Because the cost of the supporting structures is relatively insensitive to the number of lines deployed, ILECs enjoy substantial economies of scale that competitive carriers cannot duplicate, rendering market entry uneconomic.

11. Third, competitive carriers face operational hurdles – such as limited access to buildings and rights of way – that render the deployment of last-mile facilities a practical impossibility in many circumstances. New network construction typically

requires cooperation from localities, other carriers, and building owners. In the best of circumstances, the process of deploying transmission facilities takes months of pre-construction while the competitive carrier secures (if possible) the necessary rights of way from the municipality and negotiates terms of building access from the landlord. ILECs – by virtue of the fact that they already have legacy loops deployed to essentially all customer premises within their footprint – do not have to bear these costs

12. The Department of Justice correctly recognized that self-provisioning last-mile connections is difficult, time-consuming, and expensive. It is possible to justify that time and expense only in limited circumstances. In my experience, it is rarely economically efficient to self-deploy last-mile circuits at the DS1 and DS3 levels, which have bandwidth equivalent to 24 and 672 voice-grade channels. Therefore, it is not generally economically efficient to deploy a last-mile circuit to connect to a cell site or a small or medium size business office, which require bandwidth at that level. It may be economically sensible to deploy circuits at the OCn level, which have bandwidth equivalent to more than 2,016 voice-grade channels, if an existing customer needs such bandwidth because of the large revenue typically generated by such high-capacity circuits.

13. Sprint Nextel usually has no choice but to purchase local private lines from the ILEC, which owns the only local private line reaching most customer locations and cell sites. Wherever available, however, Sprint Nextel prefers to purchase local private lines from alternative access vendors ("AAVs") because they generally lease local private lines at prices considerably lower than those offered by the ILECs.

    Sprint Nextel selects AAVs to participate in its "preferred vendor" program based on a combination of pricing and performance considerations. Prior to the mergers at issue, MCI and the old AT&T were Sprint Nextel's primary alternative sources of local private lines.

14. Sprint Nextel maintains a database that shows whether a particular building is "on-net" for one or more AAVs. Sprint Nextel's enterprise services sales force accesses that database to determine available options (if any) for obtaining non-ILEC special access circuits to customer premises. Although there are dozens of AAVs in Sprint Nextel's database, most offer local private lines to only a relatively small number of buildings in urban locations within a specific geographic area. Among AAVs, only old AT&T and MCI ever approached a national footprint.

15. Although legacy Sprint used AAVs to reach enterprise customers in a substantial number of cases, it used AAVs to reach cell sites in very few cases. Legacy Nextel used AAVs to reach cell sites in a limited number of cases, but typically purchased more than 90% of its local private lines from ILECs because they were the only available source.

16. In 2005 – before the mergers at issue here – approximately three-quarters of Sprint Nextel's "spend" on local private lines went to the ILECs. More of the remainder went to the old AT&T and MCI than to all other AAVs combined. [REDACTED]. Again, while these quantities of circuits purchased from old AT&T and MCI are relatively small in comparison to the number of circuits Sprint Nextel is obliged to obtain from the ILECs, they are much greater than the quantities Sprint Nextel can obtain from any other AAV.

17. SBC responded to the limited competition from the old AT&T and MCI by offering price reductions to companies that committed to buying large quantities of local private lines over extended periods. Those plans had the effect of requiring purchasers, including Sprint Nextel, to lease from SBC even in some cases where less costly alternatives were available in order to meet the volume commitments required by SBC. But the competition from AAVs, and principally old AT&T and MCI, did have the positive effect of leading SBC to offer price reductions.

18. In short, while there is no question that local private line markets were highly concentrated prior to the mergers, old AT&T and MCI were the chief sources of alternative local private line facilities used by Sprint Nextel. The mergers will therefore cause the already highly concentrated market to become substantially more concentrated.

**The Effects of the Mergers**

19. Sprint Nextel expects significant negative effects from the mergers of SBC and old AT&T and of Verizon and MCI, especially after the limited price freeze conditions imposed by the Federal Communications Commission expire. The mergers have removed the two largest (and the only national) AAVs from the marketplace. This reduction in the supply of alternative access circuits will, of course, cause prices to rise.

20. Sprint Nextel leased a substantial number of local private lines from old AT&T and MCI. Sprint Nextel did not lease those lines from those companies only in situations where there were only two alternatives, one of which was the incumbent local exchange carrier. Sprint Nextel's database shows that the divestitures proposed

in the consent decree reaches only a small portion of the buildings in SBC's territory (now new AT&T's territory) where the old AT&T was one of five or fewer companies providing access to a building. The database shows the same result for MCI in Verizon territory. The competition from old AT&T and MCI had significant competitive effects in those other cases. For example, if SBC, old AT&T, and MCI provided the only lines reaching a customer, and old AT&T offered the lowest price, then after the merger MCI's price will be the best available.

21.     Moreover, knowing that it no longer faces competition from old AT&T and that the incumbents generally charge very high prices, MCI will have no incentive to keep its price low after the FCC conditions expire. The remedy in the consent decrees proposed by the Department of Justice simply does nothing to remedy the competition lost by the mergers in that situation. Nor does it provide any relief from the competitive alternatives lost on account of the mergers in many other cases where competitive alternatives have been reduced, though not eliminated, on account of the mergers. Rather, the proposed remedy provides relief only in those limited cases where competitive alternatives are eliminated altogether.

22.     Moreover, the number of alternatives effectively will further decrease if the new AT&T and Verizon fail to compete vigorously with one another. In the past, the ILECs have frequently maintained that mergers – for example, the SBC-Ameritech and Bell Atlantic-GTE mergers – would serve as catalysts for out-of-region competition. More than five years after those mergers, however, significant out-of-ILEC-region competition between the ILECs has not materialized. Consistent with this past behavior, there is a strong likelihood that the newly merged entities will

tacitly agree *not* to pursue aggressively the provision of special access facilities to third parties in each others' territories.

23. The newly merged entities also have considerable incentive and ability to engineer a "price squeeze." As noted above, local private lines are a key input into both the bundled enterprise services and the wireless services that Sprint Nextel provides. The ILECs are Sprint Nextel's primary competitors in both of those markets. The acquisition of old AT&T and MCI thus provides the ILECs with increased opportunity to weaken the competitive position of Sprint Nextel and other companies competing in those markets by overcharging for local private lines. An increase in price for local private lines will provide the ILECs a strategic cost advantage that is not related to efficiency, but rather to their ability to provide preferential treatment for their enterprise customers and wireless subsidiaries and affiliates. Through this discriminatory behavior, the ILECs will be able to make the services of non-affiliated carriers such Sprint Nextel relatively more costly than would be justified by the economic cost of providing local private lines.

24. Moreover, *performance* (as well as price) for non-affiliated companies is also likely to worsen in the long term. Just as the ILECs have an incentive to raise their rivals' costs by increasing their rates for local private lines, they also have an incentive to degrade their rivals' performance by provisioning and repairing circuits leased to other companies slowly. Indeed, audits performed by the FCC pursuant to Section 272 of the Communications Act indicate that the ILECs already provide their long distance affiliates with special access performance superior to that offered to competitors. The mergers will encourage the ILECs to engage in more of this

behavior and thus pose a considerable threat to Sprint Nextel on the level of performance as well as price.

**Conclusion**

25.     Contrary to the representations of the merging companies, local private line markets are highly concentrated and likely to stay that way. The ILECs have long held the lion's share of that market due to their historical monopoly over local services, and Sprint Nextel must lease local private lines from them in most cases. The mergers have made a highly concentrated market even more concentrated and eliminated Sprint Nextel's top two alternative providers of local private lines. The result inevitably will be higher prices and poorer performance for companies that lease local private lines from Verizon and the new AT&T. There is no reason to think that harm will be limited to the situations addressed by the proposed consent decrees. To the contrary, the loss of competition from MCI and the old AT&T will broadly diminish the competitive alternatives for obtaining local private lines.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on _____, 2006          _____
                                         Keith L. Kassien