**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil Action No.: 1:05CV02102 (EGS) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| SBC Communications, Inc. and | ) | |
| AT&T Corp., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| The Alliance for Competition in | ) | |
| Telecommunications | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COMPTEL, | ) | |
| | ) | |
| *Amicus-Curiae*. | ) | |
| | ) | |

_____ )

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil Action No.: 1:05CV02103 (EGS) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Verizon Communications Inc. and | ) | |
| MCI, Inc., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| The Alliance for Competition in | ) | |
| Telecommunications | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COMPTEL, | ) | |
| | ) | |
| *Amicus-Curiae*. | ) | |

_____ )

## ACTEL'S CORRECTED AND REDACTED RESPONSE TO THE UNITED STATES' SUBMISSION PURSUANT TO THE COURT'S MINUTE ORDER OF JULY 25, 2006

# TABLE OF CONTENTS

**Page**

I. THE GOVERNMENT'S SUBMISSION DOES NOT CONTAIN THE ELEMENTS NECESSARY FOR MERGER ANALYSIS. .................................................................. 3

    A.    No market concentration data ............................................................... 3
    B.    No pricing data or analysis .................................................................. 3
    C.    No explanation of limited harm ........................................................... 4
    D.    No documentation of each allegation ................................................... 4

II. THE MATERIALS THE GOVERNMENT RELIED ON DO NOT SUPPORT THE PROPOSED REMEDY. .................................................................................... 5

    A.    Wholesale market.................................................................................. 5
    B.    Fiber maps............................................................................................. 7
    C.    Building data......................................................................................... 7
    D.    Entry analysis........................................................................................ 8
    E.    Documentation of Each Allegation........................................................ 8

III. THE GOVERNMENT IGNORES THE "RELEVANT MARKET" ALLEGATIONS OF ITS OWN COMPLAINT............................................................................. 9

IV. THE PROPOSED REMEDY NEITHER ADDRESSES NOR CURES ALL 2-TO-1 SITUATIONS. ............................................................................................... 11

V. THE COMPLAINT AND CID MATERIALS BELIE THE GOVERNMENT'S "ENTRY" FORMULA. ................................................................................. 14

VI. THE MERGERS LESSEN COMPETITION THROUGHOUT THE "RELEVANT MARKETS."................................................................................................. 17

    A.    Pre-merger Competition of AT&T and MCI...................................... 18
    B.    Fiber maps........................................................................................... 19
    C.    CLEC Business Plans ......................................................................... 20
    D.    Wholesale Purchasing Records........................................................... 22

VII. THE MERGERS RAISE PRICE THROUGHOUT THE "RELEVANT MARKETS."................................................................................................. 23

VIII. NO FURTHER PROCEEDINGS ARE WARRANTED................................. 27

Fed up by months of stonewalling, the Court, on July 25, 2006, pointedly directed the Government to produce two categories of materials. First, the Government was to produce "materials" of "substance" – not merely declarations or statements – that support "each and every allegation the government made in its complaint that the proposed merger was anticompetitive" – "each and every allegation," not just a few of the allegations.[1] Second, the Government was to produce materials that "support the allegations in the proposed consent decree."[2] The Government stunned both the Court and the gallery by declaring its intention to comply with the Court's broad directive within ten days.

The Government responded on August 7, 2006. The paucity of materials in the Government's response explains why it could respond so quickly. In a controversial case of enormous magnitude involving one of the nation's most important industries, the Government could find to support its proposed remedy only:

(1)     Some lists of buildings lit by the merging parties and CLECs,[3] but without the key data necessary for the Court to determine whether customers in those buildings will be or even could be served by multiple carriers after the merger;

(2)     Some fiber maps that were "massaged" by the parties to show overlapping networks, but without the key data necessary for the Court to determine whether any of the fiber on the maps could be accessed economically by a CLEC whose supplier was acquired in the mergers at issue;

(3)     A handful of internal business documents that largely support key arguments made by *amici* in this case; and

(4)     Some customer testimonials, none of which come from wholesale customers of Local Private Lines and all of which were given to the

---

[1] Transcript of July 25, 2006 at p. 19.

[2] *Id.*

[3] To review the terminology, ILECs (Incumbent Local Exchange Carriers) are the former Bell Companies like SBC (and the old Verizon). CLECs (Competitive Local Exchange Carriers) are companies like the old AT&T, MCI and smaller companies like XO and Time Warner Telecom that buy Local Private Lines from ILECs and resell (lease) them to retail customers. Wholesale customers of Local Private Lines (such as the ACTel members) include both CLECs and other types of carriers (such as "IXCs"), all of which purchase (lease) Local Private Lines at wholesale.

Government by the merging parties (whose retail customers were doubtless prodded into signing by solicitors from the parties).

According to the August 7 brief, the Government decided simply by looking at the fiber maps that "a significant number of other competitors also operate in each of the metropolitan areas where the merging parties' operations overlap." Govt. Brief at 5.  And by looking at CLEC business plans, the Government concluded that "some were in the process of expanding the number of buildings connected to their networks."  *Id.*  That was the extent of the Government's analysis of anticompetitive effects in the "relevant market,"  and that analysis is the Government's justification for its settlement.  The analysis is both superficial and misleading.  It does not come close to providing an adequate basis for the settlement.  And the Government's conclusions are contradicted by far more probative information collected by the CIDs, which the Government has not shared with this Court.

The Government then assembled a list of buildings for which the merger "would reduce the number of competitors with lateral connections from two to one." *Id.* at 8.  From that list, the Government subtracted buildings at which it claimed entry by other CLECs "would be likely to prevent anticompetitive effects."  *Id.*  The Government decided which buildings to subtract by using a simple formula that ignored important obstacles to entry that were emphasized in both the Complaint[4] and the CID submissions.  After performing these steps, the Government claimed that post remedy "all customers…will have a choice of two facilities-based providers, just as they did before the merger." Majure Decl. at ¶ 16.  This assertion is demonstrably incorrect.

---

[4] As in prior filings, to make the argument easier to read, we use the singular to identify both complaints at issue in this case.

**I.**

**THE GOVERNMENT'S SUBMISSION DOES NOT CONTAIN
THE ELEMENTS NECESSARY FOR MERGER ANALYSIS.**

The Government's analysis was purposely superficial and was intended merely to justify the remedy to which the merging parties had already agreed. The Government's August 7 response to this Court does not even include the standard elements necessary for a merger review.

**A.    No market concentration data**

Wholly absent from the Government's response was any data for (or calculation of) market concentration, such as an HHI, the key first step in merger analysis according to both the case law and the Government's own Merger Guidelines. The Complaint in this case charges that the mergers will lessen competition for Local Private Lines in numerous geographic markets. The DoJ gathered ample data through its CIDs to provide such concentration calculations. But the Government neither provided the Court with concentration calculations nor even forwarded to the Court concentration analyses provided by CID respondents, notwithstanding the Complaint's allegations.

**B.    No pricing data or analysis**

Also missing from the Government's response is any data or analysis with regard to price. The Government has conceded in earlier briefs that post merger price increases are a key indicia of anticompetitive injury that must be remedied. The Complaint alleges that prices for Local Private Lines will increase to anticompetitive levels as a result of the mergers, and the Government gathered through its CIDs detailed pricing information for which projections of post merger pricing behavior could have been made. But the Government did not provide the Court with any data or analysis predicting post merger pricing activity. The Government has not

3

explained why prices throughout the relevant market have reversed a downward trajectory and have consistently increased since the  mergers.  Nor does the Government claim that its remedy will prevent post-merger price increases, even in 2-to-1 buildings.  The Government response does not even forward to the Court pricing analyses gathered by the CIDs, so that the Court itself may evaluate them.

### C.     No explanation of limited harm

Nor does the Government's response include any description, analysis or materials documenting its theory of harm, and explaining why that harm would be restricted to only a small portion of the "relevant market" pled in the Complaint.  The Government's economist merely states (Majure Decl. at ¶ 13) that the Complaint "predicts" harm in certain 2-to-1 situations.  He does not explain how any credible analysis could predict harm in 2-to-1 but not 3-to-2 situations.

### D.     No documentation of each allegation

Beyond these deficiencies, the Government simply ignored the Court's directive to document "each and every allegation" of anticompetitive effect.  Plainly, the procedure ordered by the Court is a good initial screen by which to assess the validity of the Government's position – a step fully in accord with the most conservative reading of both the statute and the legislative history.  By comparing the substantive materials supporting "each and every allegation" of anticompetitive effect in the Complaint with the materials supporting the efficacy of the proposed remedy, the Court can make an independent and objective determination of whether the remedy even addresses, much less cures, the anticompetitive effects pled in "each and every allegation" of the Complaint.

Because neither the Court nor these *amici* have access to the full submission of CID responses, the Court's procedure might be vulnerable to manipulation in that the Government

could "cherry pick" the CID materials and simply withhold key documents that support the allegations to the Complaint but reveal the deficiencies of the proposed remedy. But that issue is of limited concern here because the materials submitted on August 7 reveal just how deficient and misleading the Government's analysis is.[5]

## II.

### THE MATERIALS THE GOVERNMENT RELIED ON DO NOT SUPPORT THE PROPOSED REMEDY.

The Government's analysis is not deficient merely because it lacks the standard components necessary for merger review. The materials supplied to the Court with the Government's response do not even support the Government's assertion that the remedy is effective in the limited number of office buildings identified by the Government. Indeed, the materials contradict this assertion.

### A.     Wholesale market

At the outset, it is important to recall that these *amici* are concerned primarily with wholesale prices for Local Private Lines. Both the old AT&T and MCI offered Local Private Lines for lease at wholesale, and the wholesale market is specifically covered in the Complaint. For example, Paragraph 2 of the Complaint alleges competition between the merging parties for "wholesale customers" and Paragraph 26 of the Complaint gives an example of how wholesale CLEC customers will be harmed by the merger.

---

[5] We leave aside, at this stage, issues regarding the anticompetitive effects in markets beyond those pled in the "relevant market" section of the Complaint. We believe, given the rather unusual and questionable circumstances in which these mergers were cleared by the Department of Justice, that it is incumbent upon the Court to seek some showing that materials of substance also support DoJ's determination that there was no harm to the markets for Internet backbone and consumer long distance, among other markets affected by the mergers. Of course, if the Government cannot even satisfy the public interest test for the remedy in the market pled in its Complaint, the Government's failure to attempt to remedy other harms becomes moot.

By leasing circuits from the old AT&T and MCI, these *amici* (and others) were able to connect their own smaller networks to the larger AT&T and MCI networks.  The AT&T and MCI networks included far more deployed fiber and provided wholesale service to a far greater number of buildings than any of the other smaller CLEC networks.

These mergers eliminate the old AT&T and MCI as providers of wholesale fiber and wholesale building access ("transport" and "loop").  The Government contends that there are, among the remaining CLECs, adequate substitutes for the vast networks being eliminated, so that the Government can limit its remedy to a few hundred buildings.[6]  But in order to be a valid replacement for *wholesale* services, a provider's network must be configured to permit economical access by CLECs formerly connected to AT&T and MCI, and the substitute network must itself provide service to buildings formerly serviced by AT&T and MCI.

The owner of the substitute network must also be willing to offer its facilities at wholesale to other CLECs; the mere fact that a CLEC's network connects to retail customers in a building does not mean that those circuits are available for lease by other CLECs.  As the old AT&T repeatedly pointed out,[7] CLECs that connect retail customers face "substantial economic barriers" in extending their businesses to wholesale customers.[8]  The provision of wholesale services is a very different business from retail.  Some CLEC networks are simply not

---

[6] Of course, the Government nowhere asserts that these substitutes would provide service at the same low price formerly provided, nor does the Government assert that these substitutes would prevent Local Private Line prices from rising post merger.

[7] On November 30, 2004, the old AT&T submitted a White Paper to the FCC entitled "Record Evidence That Satisfies USTA II on Contested Points."  This document was submitted in the FCC proceeding identified as "CC Docket Nos. 04-313 and 01-338."

The document explains many of the issues currently before this Court and the statements it makes are admissions against interest by the merging companies.  We refer to this AT&T White Paper frequently in this brief.  Because it is a short document, we attach it as Exhibit 1 to the memorandum so that the Court may read it in full.

[8] *Id.* at pp. 2-3.

technically equipped for wholesale services.[9]  And, even if a CLEC with retail customers has an existing network technically capable of providing wholesale services, the CLEC would be required to "incur additional fixed investments in multiplexing equipment and OSS systems, and invest in marketing, customer support and product development" in order to provide wholesale services.[10]  The Government's response addresses none of these considerations.  Indeed, the Government's analysis incorrectly assumes that any CLEC retail connection is equally available at wholesale.

### B.    Fiber maps

The Government used fiber maps to justify its conclusion that "a significant number of other competitors also operate in each of the metropolitan areas where the merging parties' operations overlap."  Government Brief at 5.  But the Government knows full well that such maps are useless for antitrust analysis of the *wholesale* market without information about where customer buildings and CLEC "Points of Presence" can be connected to the fiber depicted on the maps.  Indeed, the fiber depicted on the maps may not even be available for wholesale at all. The Government collected the necessary information through its CIDs, but did not disclose the information to the Court.  Nor, if it is to be believed, did the Government use this key information in its analysis.

### C.    Building data

The Government claimed that it reviewed data submitted by CLECs "to identify *buildings* where the merger would reduce the number of competitors with lateral connections from 2-to-1."  Government Brief at 8, emphasis supplied.  But the Government knows full well

---

[9] The AT&T White Paper gives good examples of this in the footnotes on page 3 of Exhibit 1.

[10] The AT&T White Paper provides good examples of this on page 3 and the related footnotes of Exhibit 1.

that CLECs most frequently provide (and only have rights to provide) wholesale service only for

specific floors of buildings to which they are connected.  The Government CIDs specifically

gathered information about floor connections.  The CID responses indicate that in most cases

CLECs are connected to only isolated floors of buildings where their current customers reside,

and they have no rights whatsoever to provide services to other floors of those buildings.  The

Government, nevertheless, represented to this Court that after the merger "all customers … will

have a choice of two facilities-based providers, just as they did before the merger."  Majure Decl.

at ¶ 16.  This is not true and not borne out by the Government's analysis; it is, in fact,

contradicted by the documents the Government produced on August 7.

### D.    Entry analysis

The Government claimed that in determining whether a CLEC would build a lateral to a

specific building, the Government "developed a screen" that used criteria "fully consistent with

the [entry] factors identified in the Complaint."  Government Brief  at 8.  In fact, as explained

below, the Government used only a couple of the criteria identified in the Complaint, and

ignored both the other more important criteria set out in the Complaint, as well as CID

information that totally undermines the Government's "screen."

### E.    Documentation of Each Allegation

In the remainder of this memorandum, we provide the materials necessary to comply with

the Court's directive.  We set out the materials that support the five key allegations of

anticompetitive effect in the Complaint, allegation by allegation, so that those allegations and

their supporting materials can be compared to the consent decree.  There is only one reason that

the Government's submission ignores the Court's directive and makes no attempt to document

the Complaint's allegations:  a comparison of the materials supporting the Complaint's

allegations of anticompetitive effects on competition and pricing in the relevant markets with the

8

materials that support the consent decree demonstrates conclusively that the proposed remedy does not even address most of the anticompetitive effects pled in the relevant market, and fails to cure even the specific situations covered by the proposed remedy.

We do not have access to all the materials gathered by the Government, but we have access to many.  In addition, we can identify and describe materials in the Government's possession that we do not have in our own possession because we have access to the Civil Investigative Demands served on many of the companies in the industry.  A true and correct copy of the actual CIDs served by the Government, virtually identical to the CIDs served on all respondents, is attached to this memorandum as Exhibit 2.  We refer to the specific information demands of the CID from time to time in this memorandum.

The materials provided to the Court with this memorandum include highly confidential information submitted to the Government by companies pursuant to compulsory process and provided here with their permission, together with facts and materials from reliable public sources, such as the securities filings of public companies.  From all of these materials, broken out allegation by allegation as the Court requested, one can see just how deficient the Government's remedy is.

**III.**

**THE GOVERNMENT IGNORES THE "RELEVANT MARKET" ALLEGATIONS OF ITS OWN COMPLAINT.**

The Complaint defines the relevant product market as "Local Private Lines," and the relevant geographic market as including every possibility from individual buildings to whole metropolitan areas. Complaint at ¶¶ 19, 24.  Ordinarily, in an antitrust case, the proper identification of the relevant product and geographic market is an important and elaborate procedure involving evaluation of evidence of buyer attitudes, product substitutes, timing and

costs of switching suppliers, and the like. These and many other important factors for market definition are explained in Section 1 of the DoJ Merger Guidelines.

The Government's response to this Court provides no materials to explain or defend its market definition. The Government simply ignores what its own Complaint says about "relevant market" and instead urges the Court to look only at the few violations that the proposed decree allegedly terminates. Government Brief. at 4. Indeed, the Government urges the Court to not only ignore the "relevant market" section of the Complaint, but also the "violation alleged" section and even the "prayer for relief" (all of which address the entire market for local private lines), and to focus only on paragraphs 25 and 26, the "anticompetitive effects" section of the Complaint. These two paragraphs are all the Government even purports to remedy, and they are the only allegations in the Complaint for which the Government purports to provide documentation. The legal authority the Government cites for this approach is the *Microsoft* decision overruled by the 2004 amendments to the Tunney Act. *See* Government Brief at 4.

The Government's approach to "relevant market" is familiar ground that has been plowed and replowed in prior briefing. We pause only to note that the Court has now moved well past this argument. At the July 25 hearing, the Court made it clear it was ordering the production of materials for a very specific reason – "to consider the statutory factors that Congress mandated federal judges consider" in Tunney Act public interest determinations.[11] The key statutory factor – the factor added by Congress to 15 U. S. C. § 16(e) in 2004 – is the requirement that the Court must consider "the impact of the entry of the proposed judgment upon competition in the *relevant market*" (emphasis supplied). Despite the plain language of both the statute and the Court's directive to document "each and every allegation" of anticompetitive effect in the

---

[11] Transcript of July 25, 2006 at p. 7.

Complaint, the Government simply ignores the "relevant market" allegation in the Complaint (and all allegations other than those of paragraphs 25 and 26) and, by this approach alone, fails to satisfy the public interest standard of 15 U. S. C. § 16(e).

Beyond that, as we explain below, the Government's response of August 7 demonstrates that its proposed remedy does not even cure the harm set forth in paragraphs 25 and 26 of the Complaint.

## IV.

### THE PROPOSED REMEDY NEITHER ADDRESSES NOR CURES ALL 2-TO-1 SITUATIONS.

Paragraphs 25 and 26 of the Complaint allege that the Government has identified buildings for which the old AT&T and SBC (or MCI and Verizon) were the only suppliers and further alleges that customers in these buildings will be harmed as a result of the mergers.[12]

The Government claims that its proposed remedy cures the merger-related harm in the buildings it has identified.  Specifically, in its response of August 7, the Government represents that as a result of the remedy, after the merger "all customers … will have a choice of two facilities-based providers, just as they did before the merger."  Majure Decl. at ¶ 16.  But the documents submitted by the Government, on which it claims to have relied, prove just the opposite.  The Government's methodology does not even count all 2-to-1 buildings.  Moreover, the mergers reduce the number of suppliers for many *customers* from two to one.  The documents produced by the Government show that the proposed remedy does not change that result at all, particularly for customers that buy Local Private Lines at wholesale.

---

[12] The Complaint does not say that the injury alleged in these paragraphs is the "only" harm in the relevant market produced by these mergers, but provides this particular example of merger-related harm to customers.

The Government claims it selected the buildings to which its remedy applies by reviewing "data from competing CLECs to identify buildings where they have lateral connections." Government Brief at 8. The Government has submitted that data to the Court. *See* Tab 6 to Hughes Decl. But the data shows that CLEC connections are most often limited to specific floors in buildings, and connected CLECs do not have rights with respect to other floors. In addition, connected CLECs may not have sufficient capacity to take on additional customers and may not be in the wholesale business at all.

The Government was fully aware that it needed to factor the CLECs' floor restrictions, capacity constraints and limited wholesale services into its analysis. Even AT&T has repeatedly made these points. In 2004, for example, AT&T publicly identified all of these constraints and pointed out that

> CLECs can only provide wholesale service comparable to the ILEC where they have rights to access an entire building, and…CLECs' rights are typically limited to particular floors in a building.[13]

Because of the importance of these constraints, the Government's CID required each responding CLEC to **[REDACTED]**.

But the Government did not even discuss any of these factors in its response to the Court. Rather, the Government assumes that if a CLEC connects to any floor of a building, it provides a choice for all customers in that building. The CLEC documents produced by the Government show otherwise. **[REDACTED]**[14] **[REDACTED]**[15]

---

[13] This is a quote from the AT&T White Paper, attached as Exhibit 1, at p. 2.

[14] **[REDACTED]** attached as Exhibit 3.

[15] **[REDACTED]**attached as Exhibit 4.

These CLEC constraints undermine the justification for the proposed remedy in two ways.  First, the Government's methodology dramatically understates the number of 2-to-1 buildings.  The Government counts a CLEC as a supplier to a building even if the CLEC cannot service the whole building, or even a significant portion of it.  The Government's approach would therefore count a building as having three suppliers, when the reality is that most of the building really only has two suppliers.  So, the Government does not include all 2-to-1 buildings in its list.

Second, the Government's remedy fails to leave all customers with two facilities-based choices.  If, before the merger, a customer on Floor 7 of a ten story building had a choice between AT&T and SBC, the merger eliminated that choice.  But the remedy proposed by the Government would not apply if another CLEC was connected to a different floor of the same building, despite the fact that that CLEC had no rights whatsoever to service Floor 7 nor any interest in providing wholesale services to other CLECs that might do so.  Instead, under the Government's procedure, the building would be listed as a 3-to-2 building, even though the customer on Floor 7 had only two choices before the merger, going to one afterward.  In short, the proposed remedy does not "effectively redress the violation," nor does it provide "all customers" with a choice of "two facilities-based providers,"  as the Government's expert claimed.[16]

---

[16] The difficulties a CLEC encounters in trying to extend its coverage from one floor of a building to other floors are virtually identical to a number of the CLEC constraints described in the next section of this memorandum.

## V.

## THE COMPLAINT AND CID MATERIALS BELIE
## THE GOVERNMENT'S "ENTRY" FORMULA.

Paragraphs 27-29 of the Complaint explain how difficult and unlikely it is for a CLEC other than AT&T or MCI to build its own loop and transport connection from a network to an additional building it wishes to service. The Government refers to the construction of such a connection as "entry" to the building. Paragraph 27 lists a number of obstacles to such construction and Paragraph 29 concludes that "entry is unlikely to eliminate the competitive harm that would likely result from the proposed merger."

The Government's response does not attempt to support these allegations from the Complaint. Rather, the Government's response does the contrary and attempts to explain why entry is likely in many cases. The Government now claims at page 8 of its brief that, contrary to Paragraphs 27-29, there is no need to apply the remedy even to all 2-to-1 buildings.

The Government used a formula to determine when, in its judgment, it is likely that a CLEC will construct its own building connections. The Government claims that this formula "is fully consistent with the factors identified in the Complaint" – that is, consistent with the obstacles to construction enumerated in Paragraph 27 of the Complaint. In point of fact, the Government's formula is not at all consistent with the Complaint. Paragraph 27 lists five important factors that govern a CLEC's decision to build a connection. Paragraph 28 adds an even more important sixth factor. But the Government's formula includes only two of these factors and ignores all the others.

The first two factors listed in Paragraph 27 are (1) the distance from the building to the CLEC's existing facilities, and (2) the revenue opportunity for the building under consideration. The Government's formula incorporated these two factors. *See* Majure Decl. at n. 17. But the

14

Government's formula simply ignored all the other factors in Paragraph 27 – specifically, (3) the availability of capital, (4) physical barriers such as railbeds, and, most importantly, (5) the difficulty in securing consents from building owners and municipalities.

The Government cannot simply ignore these factors – they are specifically charged in the Complaint, and with good reason.  Even the old AT&T repudiated the simple approach the Government now attempts to pass off on this Court:

> [T]he mere fact that a customer may be only a certain number of feet from a competitive carrier's nearest network access point does not permit a simple cost per foot assumption about what the cost of deploying a transmission facility would be.[17]

The AT&T filing then went on to explain that the other factors of Paragraph 27, rights of way, physical obstacles and particularly issues of municipal permits and landlord building access are frequently dispositive in the CLEC's decision-making process.  *Id.* The FCC, after considering these issues, reached precisely the same conclusion:

> In addition to delays associated with gaining access to rights-of-way and permits from local or municipal authorities, competitive LECs face additional barriers with regard to serving multiunit premises due to difficulties sometimes outright prohibitions in gaining building access. … [I]f the entity or individual controlling access to the premises does not allow a competitor to reach its customer residing therein (or places unreasonable burdens on the competitive LEC as a condition of entry) the competitive LEC may be unable to serve its customers via its own facilities … .

FCC Triennial Review Order ¶ 305.

Even the documents submitted by the Government belie the simple formula it used to evaluate the likelihood of entry.  In their CID responses, CLECs warned the Government that all

---

[17] Declaration of Anthony Fea and Anthony Giovannucci on behalf of AT&T Corp, In The Matter of Unbundled Access to Network Elements, WC Docket No. 04-313 at ¶ 41.

the factors of Paragraph 27 are important.  **[REDACTED]**[18]  **[REDACTED]**[19] **[REDACTED]**[20]

**[REDACTED]**[21]

But the Government ignored all of this and simply asserted that its formula (which incorporates only two of the five factors) "is fully consistent with the factors identified in the Complaint."  This assertion deserves little more than to be rejected out of hand.  The Government's formula by which it identified buildings to eliminate from the proposed remedy is inconsistent with the allegations of the Complaint, the prior findings of the FCC, and even the CID documents provided to the Court.

Even more telling is the Government's failure to address the allegation of Paragraph 28 of the Complaint.  That Paragraph states that the factors enumerated in Paragraph 27 are so limiting that CLECs "will typically only build in to a particular building *after* they have secured a customer" (emphasis supplied).[22]  This statement explains a great deal of what is at issue in this case.

The old AT&T and MCI were originally long distance companies. *See* Majure Decl. at ¶ 6.  When they entered the local exchange markets in competition with SBC and Verizon, therefore, they already had customers to which they could build connecting circuits from their long distance fiber networks.  **[REDACTED]**[23]  Other CLECs have no such legacy customers. The old AT&T and MCI were therefore far better positioned to satisfy the entry criteria of the

---

[18] **[REDACTED]**, at Tab 9 of the August 7 response.

[19] **[REDACTED]**, at Tab 9 of the August 7 response.

[20] **[REDACTED]**; **[REDACTED]** at Tab 9 of the August 7 response.

[21] **[REDACTED]**, at Tab 9 of the August 7 Response.

[22] This is well-documented in the CID material submitted by the Government.  **[REDACTED]**.

[23] **[REDACTED]** at Tab 11 of the August 7 response.

Complaint than are any of the remaining smaller CLECs.  This explains why the AT&T and MCI local networks were so much larger than those of other CLECs, and why no other CLEC could reasonably be expected to construct a network that will replace either AT&T or MCI, nor even to connect its existing network to all the buildings AT&T and MCI used to service.

## VI.

### THE MERGERS LESSEN COMPETITION THROUGHOUT THE "RELEVANT MARKETS."

Paragraph 20 of the Complaint identifies AT&T as one of "SBC's largest competitors" for Local Private Lines.  Paragraph 32 of the Complaint alleges that the acquisition of AT&T by SBC will "lessen competition substantially in interstate trade and commerce in numerous geographic markets for Local Private Lines."  The Verizon Complaint makes identical allegations with respect to MCI.

The Government's August 7 response attempts to impeach these allegations of the Complaint, rather than to support them.  For example, the Government's expert claims, without citation to any supporting materials, that he "found no evidence suggesting a unique competitive role for either [AT&T or MCI] in selling local private lines."[24]  Pressing the point even further, the Government's brief argues that fiber maps show a number of CLECs operating in areas where the merging parties' operations overlap, and business plans show "some" CLECs adding buildings to their networks.  Government Brief at 5.  Apparently, the Government would like the Court to believe that the mergers do not lessen competition all that much, after all.  But both the responses to the Government's CIDs and the public record amply support the Complaint's

---

[24] Majure Decl. at ¶ 17.  We have no idea why the Government's economist is even looking for a "unique competitive role."  The issue is merely whether AT&T and MCI were key suppliers in the wholesale market prior to the mergers.

allegations about the importance of AT&T and MCI and the effect on competition of these mergers.

### A.     Pre-merger Competition of AT&T and MCI

While the Government's response denigrates the key competitive roles of AT&T and MCI, the truth is otherwise.  Prior to the acquisitions, AT&T and MCI provided far greater market coverage than any other CLEC.  Of all CLEC-provided voice grade equivalent lines, for example, the old AT&T and MCI together provided or serviced over two-thirds (68% to be exact).[25]  AT&T provided service at about 186,000 commercial buildings.[26]  **[REDACTED]**[27] In two of the largest metropolitan markets in old SBC territory, Chicago and Los Angeles, AT&T's market share was more than three times the shares of all other CLECs combined.[28]

**[REDACTED]**[29] **[REDACTED]**[30]

Notwithstanding this data, the Government's response to this Court suggests that the loss of AT&T and MCI will not "lessen competition" because fiber maps show other CLECs "operating in the areas where the merging companies operations overlap," and business plans show "some" CLECs adding buildings to their networks.  From these two pieces of evidence, the Government reaches a sweeping conclusion – the mergers produce no harm in the relevant markets sufficient to warrant a remedy beyond a few hundred buildings.

---

[25] *See* BellSouth, Qwest, SBC and Verizon *UNE Fact Report 2004*, attached to *ex par*te Letter from Evan Leo, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., to Marlene Dortch, Secretary, FCC filed in CC Docket No. 01-338 and WC Docket No. 04-313, (dated October 4, 2004) at pp. I8 through 1-10.

[26] Declaration of Lee L. Selwyn on behalf of AT&T Corp., In The Matter of AT&T Corp., Petition for Rulemaking, RM 10593 (January 23, 2003) at ¶ 18.

[27] *See* **[REDACTED]** (delivered to the Department of Justice on **[REDACTED]**, 2005) at p. 1.  This Confidential Response is attached to this memorandum as Exhibit 5..

[28] Selwyn Declaration on behalf of ATT *supra* n. 26 at ¶ 20.

[29] **[REDACTED]** in Tab 10 of the August 7 response.

[30] **[REDACTED]** in Tab 11 of the August 7 response.

### B.    Fiber maps

The Government's approach is so superficial that it does not produce reliable results. First, the fiber maps submitted by the Government merely show where fiber is deployed underneath streets.  The maps do not show whether the fiber is used for transport or last-mile access, the capacity of the deployed fiber, whether any of the capacity is available for additional customers, or whether the fiber is available to wholesale customers at all.[31]  Nor do the maps show whether the fiber could be used to form a connection from CLECs that buy at wholesale to potential retail customers in commercial office buildings.

Apparently, the Government's analysis assumes that the fiber is or will be connected to commercial buildings so that it can be used in the wholesale market.  But Paragraphs 26-28 of the Complaint explain in great detail the obstacles a CLEC faces in connecting its network to a building.  As explained in the previous section, a CLEC faces so many obstacles that it will not undertake such construction unless it already has a customer in the building.  So, there is no reason to assume that the fiber shown on the maps will be connected to buildings that AT&T and MCI formerly serviced.

Of course, even if the remaining CLECs have connected some of the fiber under the streets to particular office buildings, that does not mean the fiber can be used in the wholesale market.  The fiber under the streets must also be technically and economically accessible to other CLECs.  A competitive carrier, as the Government has explained, must be able to have connections "that it can effectively use to provide Local Private Line and related services."[32]  But

---

[31] AT&T has explained that fiber maps "offer no insight at all" for these reasons.  *See* Comments of AT&T Corp., In The Matter of Unbundled Access to network Elements, WC Docket No. 04-313, October 4, 2004 at p. 69.

[32] Reply of the United States, filed May 31, 2006 at p. 25.

fiber beneath a street, particularly "transport" fiber,  is like a freeway – it has limited access ramps – only a few points at which a CLEC can connect to another CLEC's network.

The Government CIDs specifically demanded a listing of **[REDACTED]**[33] **[REDACTED]**.[34]  But the Government made no effort to analyze this data in order to determine whether the fiber shown on the maps had sufficient "interconnection points" so as to permit other CLECs to actually use that fiber to service their customers.  There is, therefore, simply nothing in the Government's response to suggest that the fiber deployed underneath the streets will prevent anticompetitive injury in the relevant markets.

### C.    CLEC Business Plans

Second, the Government's response suggests that the mergers will not really lessen competition because "some" CLECs are adding buildings to their networks.  **[REDACTED]**[35] **[REDACTED]**

**[REDACTED]**[36]  **[REDACTED]**[37]

**[REDACTED]**

---

[33] *See* **[REDACTED]**, attached as Exhibit 2.

[34] *See, e.g.,* **[REDACTED]** DOJ-**[REDACTED]**-000006.

[35] This is equally true of **[REDACTED]**. *See, e.g.,* [REDACTED], *et. seq.*

[36] *See* **[REDACTED]**.

[37] **[REDACTED]**.

| Company Comparison[38] | | | |
|---|---|---|---|
| | [REDACTED] | [REDACTED] | [REDACTED] |
| Rev. | | | |
| 05 | [REDACTED] | | |
| 04 | [REDACTED] | [REDACTED] | [REDACTED] |
| 03 | [REDACTED] | [REDACTED] | [REDACTED] |
| | | | |
| Capex | | | |
| 05 | [REDACTED] | | |
| 04 | | [REDACTED] | [REDACTED] |
| 03 | | [REDACTED] | [REDACTED] |
| | | | |
| Employees | [REDACTED] | [REDACTED] | [REDACTED] |

**[REDACTED]**[39]

**[REDACTED]**[40]

**[REDACTED]**[41]  **[REDACTED]**[42]

**[REDACTED]**

The Government offers absolutely nothing credible to suggest that the remaining CLECs will add buildings to their networks in sufficient numbers and in the appropriate locations to replace those lost by the acquisitions of AT&T and MCI.  The business plans provided by the Government show that many CLECs are not expanding at all; others expanded only during the investment bubble but have added few new buildings in recent years.  **[REDACTED]**

---

[38] *See* **[REDACTED].**

[39] *See* **[REDACTED]**

[40] This is a portion of the **[REDACTED]** (delivered to the Department of Justice on **[REDACTED]**, 2005), *supra*, **[REDACTED].**

[41] **[REDACTED]**.

[42] *See, e.g.,* **[REDACTED]**

### D.     Wholesale Purchasing Records

The Government's whole approach of relying on fiber maps and building lists obfuscates rather than clarifies the issues in this case.  There is simply no reason for the Government to evaluate competition in the wholesale market by drawing unwarranted inferences from fiber maps and building lists when more reliable and more relevant evidence can easily be obtained.

If the Government really wanted to know how important AT&T and MCI were as wholesale suppliers prior to the mergers, and whether the elimination of those companies as wholesale suppliers will lessen competition, the Government could merely have asked wholesale purchasers of Local Private Lines to provide records that identify the suppliers that offered to sell Local Private Lines at wholesale prior to the mergers and the prices at which those suppliers offered their circuits.  This straightforward approach avoids all the problems of determining which fiber and which floor connections are actually economically available to wholesale purchasers.  The business records of purchasers would definitively show whether AT&T and MCI were significant wholesale suppliers of Local Private Lines, whether they offered their circuits at low prices, and whether other CLECs offered as many circuits at similar prices.

In fact, the Government did demand the production of these business records, but it did not provide them to the Court.  **[REDACTED]**[43]  **[REDACTED]**[44]

Wholesale purchasers of Local Private Lines submitted vast volumes of information in response to these CIDs, but the Government's submission to the Court does not contain any of this information.  The Government has not provided this information because the information conclusively shows that the proposed remedy is a fraud.  The information submitted by

---

[43] Exhibit 2 attached to this memorandum.

[44] **[REDACTED]**, is attached as Exhibit 6.

purchasers shows that AT&T and MCI were important suppliers to the local wholesale market; that they were, in many cases, low price leaders; and that their elimination will significantly lessen competition and raise prices throughout the relevant markets, not just in a few hundred buildings.

**[REDACTED]**

**[REDACTED]**[45]  **[REDACTED]**

**[REDACTED]**[46]  **[REDACTED]**

In sum, the Government gathered ample evidence to support its allegations that the acquisitions of AT&T and MCI will lessen competition in the relevant market.  The fiber maps, business plans and building lists submitted by the Government on August 7 do not support the efficacy of the proposed remedy in the wholesale markets.  And the CID responses of numerous wholesale purchasers confirm the pre-merger importance of AT&T and MCI and the lack of credible substitutes among the remaining CLECs.

## VII.

### THE MERGERS RAISE PRICE THROUGHOUT THE "RELEVANT MARKETS."

The most important allegation of the Complaint is found in Paragraph 33.  In that paragraph, the Government contends that, as a result of the mergers, prices for Local Private Lines "would likely increase to levels above those that would prevail absent the merger(s)."  The Government's response of August 7 repeatedly recognized the importance of pricing for antitrust analysis of the merger,[47] but the response lacks any substantive discussion of the pricing effect of

---

[45] Attached as Exhibit 7.

[46] Attached as Exhibit 8.

[47] *See* Majure Decl. at ¶¶ 4, 12.

the proposed remedy.  The Government's brief argues (at p. 9) that wholesale purchasers are extremely price-conscious, but neither the Government's brief writers, nor the Government's expert economist, denies that the mergers have produced dramatic price increases.  Nor do they claim that the proposed remedy will roll back those price increases – even with respect to the few buildings on the Government's list, and notwithstanding the proposed remedy.[48]

The Government's proposed remedy is directed to some buildings that were serviced by two suppliers prior to the mergers, but only one afterward.  The Government's economist offers no justification in either common sense or economics for limiting the divestiture remedy to these few buildings.  He does not claim that the mergers result in higher prices only in 2-to-1 buildings, and not in 3-to-2 buildings.  He reports only that he has read the Complaint and that it "predicts" harm in certain 2-to-1 situations.  According to the economist, the harm "predicted" in the Complaint is the merged company's ability to raise prices.  Majure Decl. at ¶ 13.  But the economist does not explain what kind of analysis could possibly predict price increases in 2-to-1 situations but not in 3-to-2 situations.

The Government's economist provides no explanation because there is none.  The very same analysis "predicts" harm in 2-to-1 buildings also predicts harm in 4-to-3 and 3-to-2 buildings.  We have demonstrated in earlier briefing, for example, that "5-to-4", "4-to-3" and "3-to-2" buildings produce increases in concentration (HHIs) far greater than Merger Guidelines thresholds – concentrations the Guidelines say are "likely to create or enhance market power or facilitate its exercise."[49]

---

[48] The Government's economist claims that "any supplier that can provide a technically reliable point-to point connection is a competitive option for purchasers." Majure Decl. at 17, but he does not claim that the new supplier can offer the same low price that MCI and AT&T did.

[49] *See* ACTel's Reply Memorandum at pp. 8-10.

This conclusion is confirmed by the CID responses to the Government's interrogatory about wholesale pricing.  The responses attached to this memorandum  demonstrate empirically that four competitors usually produce lower prices than three competitors, and three competitors usually produce lower prices than two competitors.  **[REDACTED]**  This conclusion could hardly have come as a surprise to the Government.  Even AT&T has unequivocally stated that "robust competition is unlikely to occur in the absence of at least four competitors to an incumbent."[50]

The Government chose in these cases to address only situations in which "each merger would effectively create a monopoly for facilities-based Local Private Lines service."  Government Brief at 7.  Such monopolies are bad, according to the Government's economist, because "the fact that the merged firms would no longer face competition…is likely to result in higher prices" for Local Private Lines.[51]

But the reduction of suppliers from 3-to-2 (a market with only two suppliers is known as a "duopoly") is also likely to result in higher prices.  The CID responses of wholesale purchasers provide empirical documentation of this fact.  AT&T has made the point most clearly:

> Both the Commission and the courts have repeatedly held that duopoly is not a sufficient basis to ensure effective competition, and that a larger number of competitors is necessary to demonstrate that a market is even minimally "competitive."

AT&T White Paper, Exhibit 1, at p. 3.  The AT&T analysis, attached to this brief, goes on to cite case law and FCC decisions for the proposition that "the Supreme Court's and Commission precedents establish that duopolies presumptively violate antitrust standards."

---

[50] AT&T White Paper, Exhibit 1, at p. 4.

[51] Majure Decl. at ¶ 13

The Government cannot and does not deny that the mergers will produce price increases throughout the markets for Local Private Lines.  The CID documents submitted by the Government provide ample support for the prediction of post-merger price increases. **[REDACTED]**[52]

In fact, the documents demonstrate that the merging parties looked to the acquisitions as the vehicle by which price competition could be curtailed.  **[REDACTED] [REDACTED]**[53]

These acquisitions have enabled the merging companies to achieve their goal of raising prices.  There have already been numerous price increase announcements by the merged companies for Local Private Lines, some of which we have placed into the record.  And executives of the merged companies have bragged on the public record about the fact that prices have "stabilized" since the acquisitions, thereby increasing the merging companies' profits.  Since our last briefing of this issue, the merged companies have closed another quarter, and both continue to report higher pricing and increased profits.[54]

What, one might wonder, do the merged companies intend do with their increased profits?  Both companies have provided the same answer – both intend to repurchase substantial amounts of their company stock in order to drive up their share prices.[55]  So, while these mergers will harm consumers, they will provide AT&T CEO Ed Whitacre, a major AT&T shareholder, with a nice nest egg for his retirement.

---

[52].**[REDACTED]**

[53] **[REDACTED]**.

[54] *See*, n. 41 *supra*.

[55] *See, e.g.,* "AT&T Delivers Strong Second Quarter Earnings," http://broadband.wordpress.com/2006/07/25/att-delivers-strong-second-quarter-earnings/ ( "'[W]e plan to ramp up the share repurchase program we outlined in March,' Whitacre said."); "Verizon Reports Continued Strong Quarterly Results," http://www.prnewswire.com/cgi-bin/stories.pl?ACCT=104&story.

# VIII.

## NO FURTHER PROCEEDINGS ARE WARRANTED.

The Supreme Court has repeatedly stated that claims in an antitrust case must make "economic sense."[56]  But the rationale of the Government's proposed remedy in this case makes no sense, economic or otherwise.  The same theory of economic injury that predicts price increases for customers in the buildings on the Government's remedy list – higher prices because of fewer suppliers – also predicts price increases elsewhere in the relevant market.

On July 25, this Court gave the Government one final opportunity to present materials to justify the claim that the proposed remedy is in the public interest.  The Government could not do so – the materials provided to the Government by CID respondents undermine rather than support the efficacy of the proposed remedy.  The CID responses demonstrate that the proposed remedy will not prevent the merged companies from raising prices to customers on the Government's list or elsewhere in the relevant market.

The Supreme Court has held that "[t]the relief in an antitrust case must be effective to redress the violations" and "to restore competition."[57]  Using this standard to evaluate "competition in the relevant market" as the Tunney Act requires, the proposed remedy is inadequate and ineffective.  Entry of the proposed judgment is not in the public interest.  We have previously urged this Court to hold an evidentiary hearing in this case.  We withdraw that request.  The procedure accepted by the Court on July 25 has been far more efficient than an evidentiary hearing would have been.  The Government has provided its most favorable

---

[56] *See, e.g.,* Matsushita Electric Industrial Corp. *v.* Zenith Radio Corp., 475 U. S. 574 (1986); Brooke Group *v.* Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993).

[57] Ford Motor Co., *v.* United States, 405 U. S. 562, 573 (1972) (citing United States *v.* DuPont & Co., 366 U. S. 316, 326 (1961) (internal citations omitted).

evidence, and the Government cannot justify its proposed remedy.  No further proceedings are warranted.  It is time for the Court to rule.[58]

Dated: September 11, 2006

Respectfully submitted,

_____/s_____

Gary Reback (Bar No. 218594)
Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA  94303
650-812-3489 (phone)
650-812-3444 (facsimile)
greback@carrferrell.com

Thomas Cohen (Bar No. 269332)
Kelley Drye & Warren, LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20005
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
tcohen@kelleydrye.com

*Attorneys for the Alliance for
Competition in Telecommunications*

---

[58] In earlier briefing, we argued that the divestiture of all overlapping facilities, along with "take or pay" guarantees, would improve the level of competition post merger, but would not restore the level of competition in the wholesale market lost by the mergers.  The Government spends a great deal of its August 7 response arguing that the divestiture of customers might inconvenience third-parties.  But ACTel has never asked for the divestiture of customers.  Along with the divestiture of all overlapping facilities, the merged companies should simply guarantee and pay for a specified amount of traffic on the strands they divest, thereby permitting the winning bidders for the divested assets to actually acquire revenue-generating facilities that could be used to compete more meaningfully.  No customers would have to be inconvenienced.