## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>    Plaintiff, )<br>v. )<br><br>SBC Communications, Inc. and )<br>AT&T Corp., )<br><br>    Defendants. ) | Civil Action No.<br>1:05CV02102 (EGS) |
| UNITED STATES OF AMERICA, )<br><br>    Plaintiff, )<br>v. )<br><br>Verizon Communications Inc. and )<br>MCI, Inc., )<br><br>    Defendants. ) | Civil Action No.<br>1:05CV02103 (EGS) |

### VERIZON'S REPLY TO COMMENTS REGARDING THE
### DEPARTMENT'S SUPPLEMENTAL SUBMISSION

The Department of Justice's ("Department" or "DOJ") submission in response to the Court's July 25, 2006 minute order provides exactly the kind of supporting detail the Court said it needed to assure itself that entry of the Consent Decree is in the public interest. The Department's submission provides sworn testimony and extensive record evidence that support each of the key elements of the proposed remedy. This evidence further demonstrates that the Department's proposed remedy meaningfully addresses the competitive concerns it identified in the Complaint based on a careful and reasoned analysis.

Although the purpose of this latest round of briefing was to respond to the Department's submission, the amici instead focus on relitigating the same claims they made in the proceedings below (where they were rejected) and made again before this Court in earlier filings. For the most part, the amici's arguments seek to persuade the Court that the Department should have filed a different complaint alleging broader competitive harms. As the Court has correctly recognized, however, such arguments are irrelevant here. The Court will instead "consider those same factors that the parties have considered and then make determinations of fact and law that either the proposed final judgment addresses and resolves issues raised by the complaint in a manner that's consistent with the public's interest or not." Hearing, Tr. at 9:17-21 (July 12, 2006) ("July 12, 2006 Tr."); *see also United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995) ("Congress surely did not contemplate that the district judge would, by reformulating the issues, effectively redraft the complaint himself.").

To the limited extent the amici do address the Department's submission, their arguments are factually and legally without support. For example, the amici criticize the Department for failing to include certain market concentration and pricing data in its analysis. But the Department submitted to the Court the materials that it determined were most useful and reliable in showing the Court how the Department devised the proposed remedy. By contrast, neither the Department nor the Federal Communications Commission ("FCC") found either HHI analysis or the pricing data that the CLECs introduced either reliable or helpful. Submission and explication of such data accordingly are unnecessary for the Court to make its public interest evaluation. Moreover, even by amici's own assertion, such data is relevant *only* to whether there

were competitive problems beyond those charged in the Complaint, which is not relevant to the Court's inquiry here.

The amici also argue that the proposed remedy is narrower than the harms alleged in the Complaint. But these arguments are based on a misreading of the Complaint. The Complaint did not challenge effects in broad markets for Local Private Line services and retail voice and data services provided over those lines, but instead alleged that the merger threatened competition only in several hundred buildings where it would eliminate the sole existing competitor and where other competitive entry is relatively unlikely. The amici's argument – that the remedy does not address all 2-to-1 buildings – therefore boils down to just another challenge to the Complaint itself rather than the proposed remedy for the competitive harm alleged in the Complaint, which is not a proper inquiry for this Court. And, even on its own terms, the amici's argument fails. The Department correctly determined (as did the FCC) that at many 2-to-1 buildings there was no likelihood of competitive harm, because those buildings were likely to attract additional entry.

While the amici try to couch some of their arguments as a criticism of the Department's submission or the proposed remedy, the majority of their claims instead criticize the Department's Complaint for failing to allege additional competitive harms. These claims lack either legal or factual support. For example, the amici make several variations of the argument that MCI, because of its size, provided competition that other competing carriers will not be able to duplicate. But as the Department's submission explains, based on the evidence in the record, it could not conclude that MCI had such unique capabilities. The amici also claim that the test the Department used to identify

whether competitive entry was possible at a given location did not expressly take into account all of the factors that the Complaint says CLECs themselves use in deciding whether to enter. But this argument rests on a misunderstanding of the Department's test, which used certain verifiable criteria as an administrable proxy for all the various factors that affect competitive entry. This is the same basic approach that the FCC has adopted in analyzing the likelihood of entry in this context, and which the D.C. Circuit has approved.

The record demonstrates that customers overwhelmingly support this merger; that it will produce significant efficiencies; and that the Department's remedy fully addresses the competitive harm alleged in the Complaint. The Court should accordingly grant the Department's motion for entry of the Final Judgment.

## I.    THE DEPARTMENT'S SUBMISSION DEMONSTRATES THAT THE PROPOSED REMEDY FULLY ADDRESSES THE COMPETITIVE HARMS IDENTIFIED IN THE COMPLAINT

### A.    The Department's Submission Includes Materials That Support Every Key Element of the Proposed Remedy

The core theory of the Department's Complaint is that, while MCI broadly competed against Verizon, the merger would significantly reduce the level of competition only in the provision of particular private line facilities and only at certain buildings where (a) MCI had deployed fiber optic facilities, (b) no competitors with comparable facilities were present, and (c) no potential entrant was likely to emerge. The Department concluded that at all other locations and for all other services, existing competition or potential entry would be sufficient to restrain Verizon's prices. The Department accordingly fashioned a remedy that requires divestiture of facilities at the locations where MCI allegedly provided a unique source of competition, and designed the remedy

4

to ensure that those facilities could be used by another provider to offer the same services that MCI previously provided.

As the Court requested, the Department's supplemental submission provides sworn testimony and record evidence that support each of the key elements of the proposed remedy.  <u>First</u>, the Department explains the analytical underpinnings of the theory of harm alleged in the Complaint in testimony from the Department's expert economist, W. Robert Majure.  *See* Majure Decl. ¶¶ 6-14.  Mr. Majure explains why the Department concluded that prices were likely to rise only at those locations where there was no existing competitor and where entry was unlikely – because "[w]hen entry . . . is likely, firms often recognize that fact and avoid giving the would-be entrant cause to enter."  *Id.* ¶ 14.

<u>Second</u>, the Department provides testimony explaining how it identified the locations where competitive entry was likely to occur together with the evidence on which the Department relied to perform that analysis.  The Department first identified all the locations where MCI had deployed fiber.  *See* Submission Mem. at 7; Majure Decl. ¶ 14.  The Department's submission includes a list of these locations, based on data that MCI provided.  *See* Majure Decl., Tab 5 (MCI Buildings List).  The Department next identified locations where other competing carriers had deployed fiber, and its submission includes a list of these buildings as well, based on data that competing carriers supplied.  *See id.*, Tabs 3 (AT&T Building Lists) & 6 (CLEC Building Lists). The Department then developed a methodology to assess "the likelihood of entry" for the remaining buildings by "examin[ing] the criteria CLECs use in deciding whether to make such investments, *i.e.*, whether the potential revenue to be earned will be sufficiently

greater than the cost of building a lateral." *Id.* ¶ 14. The Department developed "screens and eliminated from the list of potentially problematic buildings those" where, based on the evidence, the revenue opportunities available to a competing carrier were likely to outweigh the costs of deploying fiber to the location. *Id.* ¶ 14 n.17. The Department based these screens, in part, on the criteria that CLECs themselves told the Department they use in such evaluations, *see id.* ¶ 14 n.15, and the Department provided those CLEC responses to the Court, *see id.*, Tab 9 (CLEC Interrogatory Responses).

Third, the Department provided additional evidence demonstrating that its determination that other competing carriers would be able to replace the competition allegedly lost by MCI was not based merely on theory, but confirmed by real-world experience. The Department's submission accordingly provided (a) declarations from customers of Local Private Lines indicating that they have many competitive alternatives available to them, *see id.*, Tab 1[1]; (b) copies of CLEC business plans indicating that these carriers plan to compete against MCI and expand their reach, Majure Decl. ¶ 10 & Tab 8; (c) data and statements from CLECs in response to interrogatory requests confirming that they are serving many locations with fiber today and have been adding new locations over time, *id.* ¶ 10 & Tabs 6 & 10; and (d) documents from the defendants indicating that they perceive carriers other than MCI as a serious competitive threat, *id.* ¶¶ 11, 17 & n.20 & Tabs 10-12. The Department further explained that it "investigated but did not find

---

[1] Although the Department's submission included customer declarations regarding the SBC/AT&T transaction, it correctly noted that "additional declarations from retail customers" were part of the record but not submitted to the Court "due to confidentially requests" and that it "has requested that the parties take any steps necessary to facilitate its filing of these statements under seal." Submission Mem. at 3 n.4. At the Department's request, Verizon has contacted its customers to obtain permission to provide their declarations in this proceeding. Attachment A contains copies of these declarations, some of which are being filed under seal to preserve customer sensitivity, and one of which has been further redacted to protect the customer's identity at its request.

evidence suggesting a unique competitive role for either of the acquired firms in selling local private lines," and that the evidence instead demonstrated that "any supplier that can provide a technically reliable point-to-point connection is a competitive option." Submission Mem. at 9; Majure Decl. ¶ 17 & n.22.  The Department supplied documents in support of this finding as well.  *See* Submission Mem. at 9 (citing examples included in Majure Decl, Tab 10).

 <u>Finally</u>, the Department's submission described how the proposed remedy was designed to ensure that the divested assets could be used by another provider to offer the same level of competition that MCI provided.  The Department explained that divestiture of lateral connections would "replace the competition lost due to the merger" because "all customers will have a choice of two facilities-based providers at these locations – just as they did before the mergers."  *Id.* at 9.  The Department further explained why requiring divestiture of at least 8 strands of fiber as a long-term indefeasible right of use ("IRU") would provide "sufficient assets to restore competition."  *Id.* at 10.  The Department provided sworn testimony and other supporting evidence demonstrating that, based on real-world experience, eight strands "was sufficient capacity to be a viable competitor," *id.*; Majure Decl. ¶ 20 & Tab 14; Carnes Decl. ¶ 6; Todd Decl. ¶ 6; that "the use of IRUs is appropriate" because they convey "essentially all ownership rights to the current IRU holder," Majure Decl. ¶ 22; Todd Decl. ¶5; and that "[t]he 10-year terms for IRUs are appropriate" in light of the fact that "[c]ustomer contracts are typically one to three years, so the IRUs allow the buyer to compete through multiple contracting cycles," Majure Decl. ¶ 23.

**B.      There Is No Merit to the Amici's Claims That the Department's Submission Omits Critical Data**

For the most part, the amici treat their briefs as yet another opportunity to argue that the Department should have brought a different case, based on a different theory of harm than the one the Department actually alleged.  The amici devote little attention to what was supposed to be the focus of their filings – whether the Department's submission supports *its* proposed remedy in light of the claim it filed.  To the limited extent the amici do address the Department's submission, their main criticism is that the Department failed to include certain information in their filing – in particular, market concentration data such as an HHI analysis,[2] and data or analysis with regard to price.[3]  These claims are misplaced.

The Department submitted to the Court the materials that it determined were most useful and reliable in showing the Court how the Department devised the proposed remedy.  As explained above, the Department's submission contains extensive evidence that is more than sufficient to support each key element of the proposed remedy.  By contrast, the Department did not find either HHI analysis or the pricing data that the CLECs introduced either relevant, reliable, or helpful.  And the FCC reached the same determination.  Submission and explication of such data are not required to allow the Court to make its public interest evaluation.  Moreover, even by amici's own assertion,

---

[2] *See* ACTel's Corrected and Redacted Response to the United States' Submission Pursuant to the Court's Minute Order of July 25, 2006, at 3 (filed Sept. 11, 2006) ("ACTel"); Comptel's Response to the Department of Justice's Supplemental Submission at 9, 26 (filed Sept. 5, 2006) ("Comptel"); Memorandum of Eliot Spitzer, Attorney General of the State of New York, in Response to the August 7, 2006 Submission of the United States, at 4, 11 (filed Sept. 5, 2006) ("NYAG").  The HHI – or Herfindahl-Hirschman Index – is simply an arithmetic calculation, summing the squares of the market shares of the various firms in the market.

[3] *See* ACTel at 4, 28.

such data is relevant *only* to whether there were competitive problems beyond those charged in the Complaint, which is not relevant to the Court's inquiry here.

HHI Analysis. The Department's analysis of competitive harm made any HHI analysis essentially irrelevant. The first step in an HHI analysis is to define the relevant product and geographic markets. In telecommunications, that process is extremely complex, because there are no neat dividing lines either between products or between geographic markets. The Complaint does not identify a unique geographic market: with respect to the alleged Local Private Line market, the Department determined that the relevant geographic market was "no broader than each metropolitan area and no more narrow than each individual building." Complaint ¶ 24. Based on its investigation, the Department concluded that it was unnecessary to define more precise geographic markets, because when it looked across the metropolitan areas where MCI had deployed facilities, it found large numbers of other competitors, and determined that the only consumers that conceivably could be harmed by the merger were those located in the limited set of 2-to-1 buildings that were not certain to attract additional competitive entry.[4] In light of this determination, it was unnecessary for the Department to conduct the type of market definition that would be necessary to perform an HHI analysis, and such an analysis would be irrelevant to whether the remedy addresses the harm alleged in the Complaint. The FCC, in its review of the merger, also reached a similar determination in its analysis of the Local Private Line market, and also cited "weaknesses with this analysis and data" regarding the HHI analysis the amici submitted.

---

[4] *See* DOJ Response to Public Comments at 31 (filed Mar. 21, 2006) ("Regardless, however, of whether the appropriate geographic market here is as narrow as the individual building or as broad as the metropolitan area, the competitive harm likely to result from the proposed merger is limited to a set of 2-to-1 buildings, and that is what the Complaints allege.").

Memorandun Opinion and Order, *Verizon Communications Inc. and MCI Inc.,*

*Applications for Approval of Transfer of Control*, 20 FCC Rcd 18433, ¶ 49 (2005)

("*Verizon/MCI Order*").[5]

Although the amici argue that HHI analysis is a "key first step" in merger analysis

under the Department's own Merger Guidelines,[6] that is misleading.  As the

Department's Claude Scott explained at the July 12 hearing, while HHI can in some cases

be a useful tool, it is just one of many tools, and "you have to go behind that and look at

what's there and determine whether it, in fact, supports a case in the context of how the

competition actually works."  July 12, 2006 Tr. at 212:7-10.  When the Department did

so, it "found serious flaws" with the HHI analysis that the amici submitted; "it did not

support the conclusions that it was being asserted for and, therefore, we could give it very

little weight in the context of deciding what to do with this deal."  *Id.* at 212:11-17.

Both the Department (and the Federal Trade Commission ("FTC")) also have

recognized in other contexts, and leading antitrust scholars have likewise concluded, that

the HHI calculation was never intended to be the sole criterion in merger analysis, and in

fact is often little (if any) use in a rapidly changing market.  As the leading antitrust

treatise, by Professor Areeda et al., explains, "the HHI should always be used very

tentatively," because "although the HHI appears to give very definitive answers to how

---

[5] Although the FCC did conduct an HHI analysis with respect to certain retail services provided over Local Private Lines to enterprise customers, and found that this analysis often indicated high levels of concentration pre- and post-merger for certain services, *see Verizon/MCI Order* ¶¶ 70-72, the FCC concluded that this was not sufficient evidence of a competitive problem given other factors that were not captured in an HHI analysis.  In particular, the FCC found that, regardless of current market share, there are "myriad providers . . . prepared to make competitive offers," that "available market share data does not reflect the rise in data services, cable, and VoIP competition, and the dramatic increase in wireless usage," and that "market shares may misstate the competitive significance of existing firms and new entrants" given the "large number of carriers compet[ing] in this market."  *Id.* ¶ 74.  There is no basis for the Court to reach a different result here.

[6] *See* ACTel at 3-5; *see* Comptel at 9, 26; NYAG at 4, 11.

markets respond to increasing variations in the number and size disparities among firms, such responses are in fact far more complex and depend on" a variety of other factors.[7] Not surprisingly, and contrary to the amici's claims, the DOJ/FTC Merger Guidelines suggest only a limited role for HHI calculations, as merely "an aid to the interpretation of market data."[8]  More importantly, since the Merger Guidelines were issued, HHIs "have, if anything, become *progressively less significant*," as FTC Commissioner Thomas Leary explained in 2002.[9]  The deemphasizing of simple arithmetic calculations in merger analysis is reflected in the enforcement decisions of the federal antitrust agencies, in both Democratic and Republican administrations.[10]

      Pricing Data.  Both the Department and the FCC also rejected the use of the pricing data that ACTel criticizes the Department for failing to include with its

---

[7] IV Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 930b, at 151-52 (2d ed. 2006).

[8] Dep't of Justice & F.T.C., *Horizontal Merger Guidelines* § 1.5 (rev. Apr. 8, 1997).

[9] Thomas B. Leary, Commissioner, F.T.C., Remarks at the University of California at Berkeley School of Law, *The Essential Stability of Merger Policy in the United States* (Jan. 17, 2002), *available at* http://www.ftc.gov/speeches/leary/learyuseu.htm (emphasis added).  In a similar vein, Lawrence Fullerton, then-Deputy Assistant Attorney General for Antitrust at DOJ, said in 1996 that DOJ does "not approach merger analysis mechanistically" and that, after defining markets and assessing market concentration, DOJ then determines "whether anticompetitive effects are likely, given the[] concentration levels and other characteristics of the market."  Lawrence R. Fullerton, Remarks before The Conference Board Council of Chief Legal Officers, *Recent Developments in Merger Enforcement* (Mar. 13, 1996), *available at* http://www.usdoj.gov/atr/public/speeches/0619.htm.

[10] A study of DOJ and FTC merger challenges from 1999 to 2003 confirms that "a gap exists between the Merger Guidelines as written and actual enforcement practice."  John Kwoka, Economics Professor, Northeastern University, Presentation at FTC/DOJ Workshop on Merger Enforcement, *Some Thoughts on Concentration Market Shares, and Merger Enforcement Policy* at 7 (Feb. 17, 2004), *available at* http://www.ftc.gov/bc/mergerenforce/presentations/040217kwoka.pdf#search=%22Kwoka%20Some%20T houghts%20on%20Concentration%20Market%20Shares%20and%20Merger%20Enforcement%20Policy% 22. In fact, of the 1,263 individual markets in 173 mergers where DOJ or the FTC interposed a challenge related to its HHI calculations, approximately 65 percent of the markets had *both* a post-merger HHI of 3,000 or more *and* a change in the HHI of 500 or more.  *See* Dep't of Justice & F.T.C., *Merger Challenges Data, Fiscal Years 1999–2003*, 1-2, Table 1 (Dec. 18, 2003), *available at* http://www.ftc.gov/os/2003/12/mdp.pdf.  Similarly, in the telecommunications industry mergers that DOJ or the FTC challenged during this time period, 57 percent of individual markets had *both* a post-merger HHI of 3,000 or more *and* a change in the HHI of 500 or more.  *See id.*, Table 6.

submission.[11]  At the outset, ACTel concedes (at 23, 25) that the Department did in fact

gather extensive pricing information from the parties, including ACTel's members.  As

the Department has previously explained, however, when it analyzed the data that it

collected (particularly those supplied by ACTel) it found that such pricing data "could

not be given great weight for several reasons."  Reply of the United States to ACTel's

Opposition to the United States' Motion for Entry of the Final Judgment at 15 (filed June

1, 2006) ("United States June 1, 2006 Reply").  The Department concluded that such data

were too "limited in scope" to "extrapolate market-wide effects," and that when "simple

and routine tests of the robustness" of the data were performed, they "often produced

dramatically different results."  *Id.* at 16.  And while ACTel contends (at 29) that no

pricing analysis "could possibly predict price increases in 2-to-1 situations but not in 3-

to-2 situations," the Department explained that it "did not find significant reliable

corroborating evidence to support the claimed competitive problem in 4-to-3 or 3-to-2

situations" based on the "large evidentiary record" it reviewed.  United States June 1,

2006 Reply at 16.  Moreover, the FCC also was "not persuaded" by ACTel's pricing data,

finding that it was subject to several flaws.  *See Verizon/MCI Order* ¶ 46.  Here, too,

there is no basis for the Court to second-guess the Department's and the FCC's

considered judgments.

## II.     THERE IS NO MERIT TO CLAIMS THAT THE PROPOSED REMEDY IS NARROWER THAN THE HARMS ALLEGED IN THE COMPLAINT

The Complaint defines two relevant product markets – "(a) Local Private Lines,

and (b) voice and data telecommunications services that rely on Local Private Lines" –

and states that the relevant geographic markets for both "are no broader than each

---

[11] *See* ACTel at 4, 22, 28.

metropolitan area and no more narrow than each individual building." Complaint ¶¶ 19, 24. The Complaint does not allege that the merger will impact competition throughout the relevant markets, but instead alleges that the merger will affect competition only in "hundreds of commercial buildings" in eight metropolitan areas where "Verizon and MCI are the only two firms that own or control a direct wireline connection to the building," *id.* ¶ 3; *see id.* ¶¶ 18, 25, and where "the conditions for entry" by other competitors "are unlikely to be met," *id.* ¶ 29. Thus, the Complaint makes clear that it is alleging an antitrust offense only in certain buildings that the Complaint specifically identified and that are listed in the proposed final judgment.

Several amici claim that there is a disconnect between the supposedly broad product markets defined in the Complaint and the scope of the remedy.[12] But these arguments misread the Complaint as identifying a competitive problem throughout the relevant markets, rather than in just a subset of buildings, as the plain language of the Complaint indicates.[13] Moreover, even if the Court thought that the Complaint was somehow ambiguous as to its scope, which it is not, surely the Department's view must be controlling when it says that it interprets its Complaint – which, after all, embodies the Department's claims (and no one else's) – *not* to allege a particular competitive problem. The Department has unreviewable prosecutorial discretion as to whether to bring a complaint in the first place,[14] and it follows that the Department's statements regarding the limitations of the Complaint's allegations reflect its own prosecutorial judgments.

---

[12] *See* ACTel at 9-14; Comptel at 15; Sprint/Nextel at 19-22; NYAG at 9-10.

[13] *See* DOJ Response to Public Comments at 16-17 ("ACTel construes the Complaint far too broadly. For instance, ACTel misreads the Complaints as identifying a competitive problem in *all* 2-to-1 buildings. The allegations in the Complaints do not reach all such buildings, and therefore, whether the remedy addresses them is not a proper subject for Tunney Act review.").

[14] *See, e.g., Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1236-37 (D.C. Cir. 2004).

And, as Comptel concedes (at 16), if the Court accepts the Department's view of the scope of its Complaint, that "would allow the Court to find that entry of the . . . PAFJs is in the public interest."

At bottom, the amici's arguments regarding the "fit" between the Complaint and the remedy simply repackage their challenge to the Complaint itself rather than the proposed remedy, which is not a proper inquiry for this Court. Even if one were to accept the amici's reading of the Complaint, however, their arguments would still fail.

First, ACTel claims (at 13) that the Department's remedy fails to address buildings where CLECs may have facilities, but face various obstacles connecting those facilities to the customer (for example, where the CLEC cannot gain access to the customer's floor). But this is simply another argument about the scope of the Complaint – that is, an argument that the Government should have alleged a competitive problem at a greater number of buildings – rather than about the scope of the remedy. In any event, in the real world, the types of obstacles that ACTel describes – such as gaining the building owner's permission to enter the building or access a particular floor – can be and routinely are overcome. For example, with respect to the large enterprises that formed the core of MCI's customer base, the FCC held that issues of building access were not serious because such customers "may have the ability to exert greater influence over building access because: (1) their operations are so substantial that they own the premises outright; (2) they control the access to the premise; or (3) they have sufficient influence over the landlord/building owner to overcome building access impairments the

competitive provider may encounter due to the amount of leased occupancy space for which this enterprise customer has committed."[15]

Second, some of the amici claim that the proposed remedy addresses the alleged harms only with respect to *retail* services, but not *wholesale* services.[16] But the remedy contains no such limitations – the fiber at the divested locations can be used for either retail or wholesale services. While the amici allege that many CLECs choose not to make their services available at wholesale, they fail to substantiate that claim with any evidence. In reality, CLECs do routinely buy and sell from each other, as both the Department's and the amici's submissions confirm,[17] and as the FCC has found.[18] For example, ACTel's own largest member – XO – states on its company website that it provides Local Private Line services on its fiber networks on a wholesale basis.[19]

## III.   THE AMICI'S CRITICISMS OF THE DEPARTMENT'S COMPLAINT FAIL AS A MATTER OF LAW AND FACT

While the amici try to couch some of their arguments as a criticism of the Department's submission or the proposed remedy, the majority of their claims instead criticize the Department's Complaint directly.[20] As explained above and at length in

---

[15] Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCC Rcd 16978, ¶ 317 (2003) ("*Triennial Review Order*") (subsequent history omitted).

[16] *See* ACTel at 5-8; NYAG at 9.

[17] *See* Majure Decl., Tab 9; ACTel Exh. 5.

[18] *See Triennial Review Order* ¶ 95 (rejecting the claim that "evidence of alternative deployment is irrelevant unless access to those facilities is available to requesting carriers on a wholesale basis").

[19] *See* XO, *XO Carrier Private Line*, available at http://www.xo.com/products/carrier/transport/privateline/ ("XO Carrier Private Line services provide high-speed, dedicated point-to-point connectivity for voice, data and video applications. Typically consisting of non-switched communications circuits and the required equipment to connect two or more locations, Carrier Private Line has long-haul and local circuits available in a variety of configurations.").

[20] The amici submit lengthy new economic testimony specifically for this purpose. Even apart from its substantive failings, this testimony is of questionable reliability – one of the amici's economists (Joseph. Gillan) does not even have a Ph.D. (only an M.A. from the University of Wyoming), and another

15

previous filings, these claims must be rejected as a matter of law.[21]  It is not this Court's

role to redraft the Department's complaint to add allegations of competitive problems that

the Department did not find and allege.  In addition, these claims are without merit as a

factual matter.  Indeed, most of the claims that the amici raise here have previously been

rejected by the FCC and the courts.

First, the amici rehash multiple variations of the claim that MCI, because of its

size, provided competition that other competing carriers will not be able to duplicate.[22]

The Department's submission provides a complete answer to these claims.  The

Department's submission first explains that there was significant evidence to indicate that

multiple other CLECs were in the same position to compete as MCI in all areas where

MCI was competing.  The Department states that "CLECs other than AT&T and MCI

have also built local area networks in the same cities where either AT&T or MCI owned

local facilities," and these "CLECs' networks tend to cover the same high-density areas

covered by AT&T and MCI."  Majure Decl. ¶ 10.  The Department provided detailed

maps and building lists to corroborate these assertions.  *See id.*, Tabs 2-7.  It also

provided customer declarations, and documents from the CLECs and the defendants,

indicating that customers and suppliers alike viewed other competing carriers as viable

alternatives to AT&T and MCI.  *See id.*, Tabs 1 & 10.  The Department also explained

that some CLECs were "adding new buildings at a faster rate than either MCI or AT&T,"

---

(Professor Nicholas Economides) has had previous testimony criticized as "so incomplete as to be inadmissible as irrelevant." Opinion and Order, *Freeland v. AT&T Corp.*, No. 04 Civ. 8653, __ Supp. 2d. __, 2006 WL2380410, at *14 (S.D.N.Y. Aug. 17, 2006).

[21] *See* Verizon's Reply in Support of the United States' Motion for Entry of Final Judgment and in Opposition to ACTel's Memorandum of Points and Authorities in Support of ACTel's Motion for Amicus Curiae and Intervenor Status at 7-9 (filed May 31, 2006) ("Verizon's May 31, 2006 Brief").

[22] ACTel at 17-18; Sprint/Nextel at 13-15, 26-28; Gillan Decl. ¶¶ 18-23 (filed Sept. 5, 2006); Selwyn Decl. ¶¶ 24-30 (filed Sept. 5, 2006).

and provided statements from CLECs themselves to prove this was the case. *Id.* ¶ 10 &
Tab 9.

The Department's submission next explained that, in contrast to the significant
evidence that other CLECs would be able to compete against MCI, the Department
"found no evidence suggesting a unique competitive role for [MCI] in selling local
private lines. In fact, any supplier that can provide a technically reliable point-to-point
connection is a competitive option for purchasers interested in accessing those two
locations." *Id.* ¶ 17. The Department supported these statements with documents and
other evidence demonstrating that "AT&T and MCI purchased local private lines from a
laundry list of carriers, and other CLECs routinely purchase local private lines from each
other." *Id.* ¶ 17 n.20 (citing Tabs 10 & 11).

The amici quibble with certain aspects of the Department's showing, but their
claims do not withstand scrutiny. ACTel argues (at 18-19) that, nationwide, AT&T and
MCI served more lines and buildings than any other individual CLEC. But those
carriers' nationwide presence is irrelevant under the terms of the Department's
Complaints. The only relevant issue is the effect on competition in the relevant
geographic markets at issue, markets that are no bigger than individual Metropolitan
Statistical Areas ("MSAs"). Moreover, ACTel assumes that AT&T and MCI will not
compete against each other, despite the fact that the companies are in fact each other's
largest competitors – and with more complementary local assets even stronger, vis-à-vis
each other, than they were pre-merger. ACTel also improperly compares MCI to other
individual CLECs, rather than to CLECs as a whole. But given that other CLECs can and
do provide access to each other's networks, the only relevant comparison is to the

networks that other carriers collectively operate, not the network of any one carrier. For precisely this reason, the FCC rejected claims that MCI had "unique advantages" by virtue of it size, explaining that "other competing carriers *collectively*" had more extensive facilities than did MCI in the areas where MCI was competing. *Verizon/MCI Order* ¶¶ 42, 44 (emphasis added); *see also id.* ¶ 47.

Several amici next argue that, even to the extent other CLECs have built networks that rival those of MCI, those networks were largely constructed during the "investment bubble" of the dot-com era, and CLECs have been building less in recent years.[23] It is true that many CLECs deployed networks far more aggressively during the dot-com era than in the time since, but this was also true of MCI. In any event, the point is irrelevant. The only relevant question is whether competing carriers are continuing to build where revenue opportunities exist. The Department's submission demonstrates that this is the case,[24] and none of the amici provides any evidence to the contrary.

ACTel next contends that MCI was the "low price leader[]" in the local wholesale market prior to the merger.[25] But ACTel's principal support for this claim consists of the statements of a small number of carriers that ACTel handpicked.[26] When the Department looked at evidence for *all* carriers, however, it found no evidence to support ACTel's claims. ACTel also claims (at 30-31) that one of MCI's internal documents produced by the Department shows that MCI was a price leader during the 2002-2004 period, while MCI was in bankruptcy. As the Department explained in its submission, however,

---

[23] ACTel at 21; Sprint/Nextel at 11-13.

[24] *See* Majure Decl., Tab 9.

[25] ACTel at 26; *see also* Sprint/Nextel at 27-28.

[26] *See* ACTel at 23.

"[a]lthough MCI adopted an aggressive pricing policy during its bankruptcy in order to protect its customer base, MCI had abandoned this approach by the time of the merger." Majure Decl. ¶ 17 n.20; *see also* Verizon's May 31, 2006 Brief at 13.[27]

NASUCA also attempts to resurrect the claim that MCI, because of its size, was able to get uniquely large discounts on Local Private Line services purchased from Verizon, and was therefore capable of reselling such services to other carriers at lower rates than they could obtain on their own.[28] But both the Department and the FCC found that resold special access is in a separate relevant product market from the Local Private Line market at issue here. *See* Competitive Impact Statement at 7 ("Although other competitors might resell Local Private Lines from Verizon [that is, provide Type II service], those competitors would not be as effective a competitive constraint because Verizon would control the price of the resold circuits"); *Verizon/MCI Order* ¶ 46. The FCC further held, in the face of the same arguments and evidence presented here, that elimination of MCI as provider of resold special access "should not have an appreciable effect on price or availability" of these services, because MCI had no true unique advantages in supplying these services. *Verizon/MCI Order* ¶ 47; *see id.* ¶¶ 42-45.

---

[27] There also is no merit to ACTel's insinuation (at 31) that Verizon acquired MCI to reduce price competition. ACTel claims that a Verizon document shows that Verizon "endorse[d] a strategy 'to maintain current price' – which according to the Verizon documents, could only be achieved by a 'change the game' strategy like the mergers." The document on which ACTel relies, however, was produced by an outside consultant (RHK Advisory Services or "RHK"), not Verizon itself. The document says nothing of acquiring MCI or any other entity, and nothing in the context of the document suggests that RHK intended "change the game" to be code for "acquire MCI." To the contrary, what RHK was recommending was that Verizon adopt a new pricing strategy of *lowering* prices in areas where it faces the most competition. *See* Majure Decl. Tab 10, at VZ-074-0117296-97 (stating that, because of Verizon's "zone-based pricing" as opposed to granular "customer-level deal-by-deal" pricing, Verizon "cannot 'zone' price low enough to compete" against facilities based alternatives, and that Verizon should therefore engage in more granular "customer-level deal-by-deal negotiations" in which it would offer lower prices where competitive alternatives exist).

[28] Selwyn Decl. ¶¶ 15-16.

Second, several amici claim that the Department's "proposed geographic market is too narrow."[29] These parties claim that the Department's focus on single-buildings is inconsistent with real-world experience regarding how customers purchase Local Private Line services, and "underestimate[s] the competitive value of AT&T and MCI in the local market."[30] They argue that the relevant geographic market should be defined as at least as large as an MSA.[31] This argument is flawed in several respects.

As an initial matter, it is incorrect that the Department defined the relevant market as an individual building. As explained above, the Complaint determined that the relevant geographic market was "no broader than each metropolitan area and no more narrow than each individual building." Complaint ¶ 24. Based on its investigation, the Department concluded that it was unnecessary to define more precise geographic markets, because when it looked across the metropolitan areas where MCI had deployed facilities, it found large numbers of other competitors, and determined that the only consumers that conceivably could be harmed by the merger were those located in the limited set of 2-to-1 buildings that were unlikely to attract additional competitive entry. See DOJ Response to Public Comments at 29-32. That determination was made based on the assumption that geographic market could be as broad as an MSA (the same market definition that CLECs concede would be proper). As the Department has previously explained, to the extent that the amici disagree with this analysis, not only is the disagreement over market definition fundamentally beside the point, but also "[t]his

---

[29] NYAG at 8; see Economides Decl. ¶ 31 (filed Sept. 6, 2006); Comptel at 18-19; Gillan Decl. ¶ 13.

[30] Gillan Decl. ¶ 21.

[31] See Gillan Decl. ¶ 13; Economides Decl. ¶ 31.

concern is, primarily, a challenge to the United States' Complaints rather than the proposed remedy" and is therefore improper.  *Id.* at 30.

Furthermore, the underlying assumption of the amici's argument for a broader market definition – that AT&T and MCI are uniquely capable of serving customers across broad geographic areas – is flawed as a factual matter.  As demonstrated above, the Department's submission explained that, based on the evidence in the record, it could not conclude that AT&T and MCI had such unique capabilities.  The competitive data included in the Department's submission show that, even if the Department defined the relevant market as an MSA as the amici urge, there are multiple competitors in each of the MSAs where MCI had deployed facilities, and in no case would the merger reduce the number of competitors other than Verizon and MCI to only one, two, or even three.[32] Ironically, precisely because the number of active competitors in each MSA is so large, the amici have, in other regulatory contexts, argued for a building-specific market definition in evaluating competition for Local Private Lines.[33]  Their attempt to do an about-face here calls into question the credibility of their filings.

In fact, if a broader product market definition were accepted here, there would be no antitrust offense at all.  The buildings at which DOJ identified a concern would represent no more than a small fraction of the Local Private Line market in any broader

---

[32] *See* Majure Decl., Tab 7.  Significantly, the Department's overlapping network maps and data do not purport to and do not include all competitors in the relevant MSAs.

[33] For example, during the *Triennial Review Order* proceedings Comptel argued that the FCC should analyze competition for Local Private Lines "route-by-route" (and, hence, building-by-building, as the connection to each building is an individual route), because "it most closely mirrors CLECs' own decision-making process about facility deployment."  Comments of CompTel/ASCENT Alliance, *Access to Unbundled Network Elements*, WC Docket Nos. 04-313 & 01-338 at 14 (FCC filed Oct. 4, 2004). Comptel's justification for this approach is substantively identical to the one the Department has used here – that "CLECs consider the customers that will or may be served along various transmission paths (*i.e.*, the addressable demand) and compare the potential resulting revenues to the costs of deployment."  *Id.*; *see* Submission Mem. at 6-7; Majure Decl. ¶ 14.

geographic market, and any attempt to raise prices in those buildings would not have a material effect in such a broader market. For this reason, common carrier mergers that involve insubstantial overlaps between the carriers do not raise valid antitrust claims under the applicable standard – Paragraph 4 of § 7 Clayton Act, 15 U.S.C. § 18. *See Navajo Terminals, Inc. v. United States*, 620 F.2d 594, 600 (7th Cir. 1980) (upholding a finding of substantial lessening of competition in four city-pair geographic markets but reversing because "it is equally clear that each [carrier] serves a large territory not served by the other"); *South Austin Coal. Cmty. Council v. SBC Communications Inc.*, 274 F.3d 1168, 1172 (7th Cir. 2001) (applying Paragraph 4 of § 7 Clayton Act to telecom mergers).

 Third, Comptel criticizes the Department for not re-adopting one of the product market definitions that the Department had used more than five years ago, in the WorldCom/Sprint merger.[34] Comptel argues (at 29-30) that the Department should have identified a market for "Custom Network Services," which it defines as consisting of "very large business customers (those who purchase more than $5 million/year in voice and data telecommunications and services)." But it is not the Court's role to redraw the relevant markets in the Department's Complaint. Moreover, there has been an enormous amount of change in the telecommunications industry over the past five-plus years, and Comptel fails to provide any evidence that the Department's previous market definition is still applicable.

 Finally, several amici criticize the test that the Department used to identify the competitive harms alleged in the Complaint, claiming that those tests do not account for

---

[34] *See* Comptel at 28-31.

each of the factors that the Department specifically identified in the Complaint as relevant to a CLEC's decision to build its own fiber connection.[35]  In particular, the amici claim that the Department's test does not address the ease or difficulty of securing the necessary consent from building owners and officials, and does not consider whether a CLEC has committed revenue at a particular location.  These claims are misplaced.

The Department's test for determining the likelihood of competitive entry has two dimensions – demand and distance – that provide a reasonable and administrable proxy for all the various factors that affect competitive entry.  In fact, this is the same basic approach that the FCC has adopted in analyzing the likelihood of entry in this context, and which the D.C. Circuit has approved.[36]  The FCC recognized that, although there are many factors that go into a CLEC's decision to build fiber, analyzing just the demand in a particular geographic market, and the distance of existing fiber from that demand, provided a reasonable "proxy" for determining whether entry was likely to occur.[37]  By contrast, the contrary approach suggested by the amici would be entirely unworkable. There are no readily administrable benchmarks that could be used to gauge how likely it will be for a CLEC to secure building or municipal access at a given location, or to win a customer at that location.  To the extent that the amici argue that the Department did not set its screens at high enough thresholds to account for certain entry factors, this is a

---

[35] *See* ACTel at 14-16; Comptel at 22; Gillan Decl. ¶ 22.

[36] *See* Order on Remand, *Unbundled Access to Network Elements*, 20 FCC Rcd 2533, ¶¶ 155-161, 167-173 (2005) ("*Triennial Review Remand Order*") (subsequent history omitted) (adopting tests based on proxies for demand within a given wire center, based on the assumption that, because the geographic boundaries of wire center are fairly narrow, CLEC entry is likely to occur within that wire center where certain demand thresholds are met); *Covad Communications Co. v. FCC*, 450 F.3d 528, 544 (D.C. Cir. 2006) (upholding FCC's determination as reasonable).

[37] *Triennial Review Remand Order* ¶¶ 174, 178.

matter of line-drawing, where deference to the Department's remedial judgment is at its most pronounced.

## IV.    THE AMICI'S CLAIMS REGARDING THE EFFICACY OF THE PROPOSED REMEDY ARE MISPLACED

As explained above, the Department's submission provides extensive evidence demonstrating that the remedy was designed to ensure that competing carriers can provide the same services as AT&T and MCI, and therefore restore any competition lost as a result of the mergers. *See* pp. 4-7, *supra*; Submission Mem. at 9-11. The amici's filings raise virtually no issues with respect to the Department's submission on these points. The amici instead claim that the relatively low price that has been negotiated for the divestiture assets indicates that those assets are of limited competitive value.[38] This is nonsense. If competitors did not think they could profitably use the assets, they would not have bid on them at all. Furthermore, the final negotiated prices for the assets were far below marketplace value because Verizon was under an obligation to sell the assets (rather than retain them if a reasonable price was not offered) and to complete that sale in a short period of time.[39]

---

[38] *See* Gillan Decl. ¶¶ 25-27; Reply of Amicus The National Association of State Utility Consumer Advocates Regarding the Public Interest at 7 (filed Sept. 15, 2006); Selwyn Decl. ¶ 48.

[39] Comptel claims that the value of the divestiture assets is diminished by the fact that customers at those locations already are committed to multi-year contracts. But as the Department has explained, such contracts typically have a two-to-three year duration, whereas the term of the IRUs is a minimum of 10 years. *See* Majure Decl. ¶ 23.

# CONCLUSION

The Department's motion for entry of the Final Judgment should be granted.

Respectfully submitted,

/s/ Mark C. Hansen

John Thorne
David E. Wheeler
Verizon Communications Inc.
1515 N. Courthouse Road
Arlington, Virginia 22201
Telephone: (703) 351-3000
Facsimile: (703) 351-3670


September 19, 2006

Mark C. Hansen
Mark L. Evans
Aaron M. Panner
Evan T. Leo
Kellogg, Huber, Hansen, Todd,
   Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
Telephone (202) 326-7900
Facsimile (202) 326-7999

**ATTACHMENT A**

**Declaration of Andrew Albert**

**Proposed Acquisition of MCI by Verizon Communications Inc.**

I, Andrew Albert, declare as follows:

1.  I am the Executive Director of the West Side Chamber of Commerce (the "Chamber of Commerce"), a not-for-profit organization serving residents and businesses located on the West Side of Manhattan. The Chamber of Commerce promotes the professional, financial, and general business interests of its members and the West Side community.

2.  I currently purchase local and long distance voice service from Verizon. This includes incoming and outbound phone lines and DSL access for Internet connectivity. I chose Verizon for these services because it offered the lowest price and is able to provide me with a reliable high speed internet connection. I have the flexibility to terminate my contract with Verizon if I believe the quality of the service decreases or if I am no longer satisfied with Verizon's prices.

3.  I am approached on a daily basis by telecommunications providers seeking my voice and Internet business. I have used MCI and Broadview in the past, and have been contacted by many local providers including AboveNet, Global Crossing, Level 3, and XO Communications.

4.  Cable companies can provide the Chamber of Commerce with high speed internet access. In fact, when I was researching providers for internet services, I contacted Time Warner Cable to obtain availability and pricing of its internet offering. I chose to purchase internet access from Verizon because it provided me with a quick installation timeframe and competitive pricing. I would not hesitate to turn to other

telecommunications providers, including cable companies, in the future if Verizon's pricing increases or its level of service deteriorates.

5.     I purchase wireless cellular service through T-Mobile. T-Mobile provides the Chamber of Commerce a discount plan for its members which includes reduced pricing on wireless equipment purchased at T-Mobile stores. T-Mobile also offers GSM coverage enabling me to use my phone and PDA overseas. I previously purchased wireless cellular service from Sprint. I believe the cellular service market is very competitive.

6.     I support the proposed acquisition of MCI by Verizon because I believe Verizon is a strong company that provides high quality telecommunications products and services. I have many choices of providers to meet my telecommunications needs, including other local exchange carriers and cable companies, and these choices will remain after the merger. Verizon is an innovative company that can use its strong financial resources to enhance the products and services offered by the combined company.

7.     For the reasons outlined in this declaration, I support the proposed merger.

I declare that the foregoing is true and correct, and is executed on this 19 day of July, 2005.

_____
Andrew Albert

**Declaration of David Cordeau and Nasir Ali**
**Proposed Acquisition of MCI by Verizon Communications Inc.**

We, David Cordeau and Nasir Ali, declare as follows:

**Background Information**

1.   The Greater Syracuse Chamber of Commerce (the "Chamber") is one of the largest

business organizations in Central New York.  The Chamber began in 1889 as a way to

offer assistance and development programs to local businesses.  Today, the Chamber

participates in activities such as government relations and lobbying, outreach and

education, technology assistance, and regional economic development.  It is a broad-

based organization serving over 750,000 people and representing more than 2,500

businesses of all sizes and from virtually every industry and profession in the area.

2.   David Cordeau has been the President of the Chamber for the past twelve years.  Nasir

Ali recently joined the Chamber as Vice President for New Venture Development.  In our

positions, we procure voice and data telecommunications for the Chamber's three

locations: its main office, the Syracuse Technology Garden ("Technology Garden"), and

the Sam Williams Business Center.  The Chamber's annual voice and data

telecommunications spending is approximately $60,000 per year.  We spend an

additional $30,000 per year on voice and data telecommunications for the Technology

Garden.

3.   The Technology Garden is a Chamber of Commerce initiative housed in a 33,000 square

foot facility in downtown Syracuse.  It offers state-of-the art internet and

telecommunications infrastructure, an auditorium for board meetings and multimedia

events, mobile videoconferencing equipment, and a resource center offering online and

printed reference materials. The Sam Williams Business Center serves as a general purpose business incubator for new companies in Syracuse. Through these facilities and other related programs, the Chamber recruits new companies to the area and encourages businesses to relocate to Syracuse.

4.    As its President, David Cordeau is responsible for overseeing the day-to-day operations of the Chamber and its staff of 54 people. Nasir Ali focuses primarily on new business growth in Syracuse and Central New York.

5.    We support the proposed acquisition of MCI by Verizon Communications Inc. ("Verizon") because we believe we have many choices for the Chamber's telecommunications needs in the Syracuse area, including traditional telecommunications providers, competitive local exchange carriers, and cable companies. Verizon is an innovative company, and we expect Verizon to take advantage of MCI's network technology to provide even broader solutions and additional competitive choices to the Chamber.

**Procurement of Voice and Data Network Services**

6.    When new telecommunications needs arise for the Chamber, we solicit bids from providers based on our existing relationships with them. Our preference is to work with Chamber members whenever possible. Most telecommunications providers in the Syracuse area are members.

7.    We negotiate open-ended contracts with the Chamber's telecommunications providers. We are constantly reviewing our existing contracts since rates are continually dropping in the market. We incorporate price protection clauses into the contracts to allow the

Chamber to periodically renegotiate pricing consistent with declining market rates. The Chamber also uses termination-for-cause clauses to enable it to opt out of contracts when the service level and reliability of the provider becomes an issue.

8. We purchase telecommunications products and services and negotiate contracts with providers separately for the Chamber's three locations. Each site has very different telecommunications needs.

**Current Telecommunications Products and Services**

9. Verizon provides incoming and outbound local and long distance voice service to the Chamber's three locations. The Chamber has a long-standing relationship with Verizon, and we have been very satisfied with the competitive pricing and reliable service that Verizon has provided to the Chamber.

10. The Syracuse Technology Garden is connected to the Syracuse MetroNet, a high-speed network linking a consortium of 200 regional education, government, and not-for-profit sites in Central New York,. MetroNet is a gigabyte speed fiber network built by Verizon. At the time it was built, it was a closed loop VLAN among participating locations to communicate with each other via audio, video, data exchange.

11. About one year ago, the Syracuse MetroNet selected and negotiated a contract with Time Warner Telecom to open up the closed Verizon loop and provide bulk Internet service to MetroNet member institutions. The Syracuse Technology Garden still has access to the other MetroNet sites, but now also has external internet access through Time Warner Teclom's connection with the loop. While the Syracuse Technology Garden can procure internet access outside of MetroNet, it has chosen to use the Time Warner access because

of its very favorable pricing. In addition, Time Warner Cable provides Internet connectivity for the main Chamber building as well as the Sam Williams Business Center. Favorable pricing was the key selection driver in each case.

12.     We procure cellular service for the Chamber staff through Verizon Wireless. In our opinion, the cellular wireless market is very competitive, but Verizon Wireless offers the best combination of coverage, quality, and price.

13.     AT&T provides the Technology Garden with 3 ISDN lines for videoconferencing.

**Competition and Trends in the Telecommunications Industry**

14.     In our opinion, the Syracuse telecommunications market is very competitive. Each of the Chamber's locations uses as many as six carriers. In addition to Verizon, we have the choice to purchase local and long distance voice services from CLECs such as Northland Communications and Choice One, and cable companies, such as Time Warner Cable. As mentioned previously, we also obtain services from Time Warner Telecom, Time Warner Cable, and AT&T. We are approached on a daily basis by telecommunications providers seeking the Chamber's business.

**Proposed Merger Between Verizon and MCI**

15.     We do not currently purchase any products or services from MCI for the Chamber. MCI has not been a significant competitive choice for us in the Syracuse market, mainly because we have not been approached by MCI for any of the Chamber's business.

16.     We believe Verizon is an innovative company and is leading Syracuse as a community towards new technology solutions. For example, Verizon was a large supporter of the

Syracuse Technology Garden and helped to create the state-of-the art Technology

Theater for hosting high-tech training, videoconferences, board meetings, and other

seminars, guest speakers, etc.. Verizon also selected Syracuse as one of the first cities for

the roll-out of its Fiber-To-The-Premises initiative. We expect Verizon to bring this

innovative spirit to the merger and use it to expand MCI's R&D resources to strengthen

MCI's network product offerings.

17.    The strength and profitability of Verizon is very important to Upstate New York. We

believe that the combined company will continue to invest in the community and keep it

on the forefront of technology.

18.    For the reasons outlined in this declaration, we support the proposed merger.

We declare that the foregoing is true and correct, and is executed on this ___ day of July, 2005.


David Cordeau


Nasir Ali

**Declaration of Brian Griffin**

**Proposed Acquisition of MCI by Verizon Communications Inc.**

I, Brian Griffin, declare as follows:

**Background**

1.  I am the Director of Strategic Sourcing for M&T Bank, a regional bank headquartered in Buffalo, New York. M&T Bank has branch office locations in New York, Maryland, Pennsylvania, Washington, D.C., Virginia, West Virginia, and Delaware. M&T Bank also maintains an ATM network of more than 1,500 locations and offers customers access to state-of-the-art telephone and Web Banking. M&T Bank employs 14,000 people.

2.  I work within M&T Bank's Purchasing Department. As the Director of Strategic Sourcing, I am responsible for setting up relationships with all of the bank's suppliers at all of M&T Bank's locations. I have worked for M&T Bank for one year. Prior to joining the bank, I was the executive director of a technology council in Western New York.

**Telecommunications Purchasing**

3.  M&T Bank spends over $10 million per year on telecommunications products and services. I work closely with M&T Bank's Information Technology Department to identify the bank's needs for telecommunications products and services and select the vendors that can fill those needs.

4.  M&T Bank has recently initiated an RFP process for all contracts with providers. The bank divides its purchasing into categories. For telecommunications products and

services, for example, the categories include Long Distance Voice Services, Local Voice Services, and Computer Communications.

5.    The terms of the bank's telecommunications contracts vary depending on the type of technology, the length of the project, and the timeframe in which the products or services will be implemented. Our goal is to negotiate contracts spanning three to five years.

6.    Because of the nature of our business, the redundancy and reliability of our telecommunications products and services are very important to us. M&T Bank cannot afford to have any business-critical service go down for more than four hours. While we seek out providers who can offer quality service at competitive prices, the reliability of the service is also very important.

**Current Telecommunications Providers**

7.    M&T Bank currently purchases voice and data telecommunications products and services from multiple providers. The bank purchases local and long distance voice, data, Internet, and wireless services from Verizon and Sprint. M&T Bank purchases communications lines (point-to-point circuits) and conference calling services from MCI and Global Crossing. The bank also purchases some point-to-point circuits from AT&T.

8.    At some branch office locations, we purchase high speed Internet access through cable companies, such as Adelphia.

9.    M&T Bank is currently working with Verizon Wireless to test and implement a wireless network for a portion of the bank's automated teller machines located throughout the East Coast.

2

10.     M&T Bank is also beginning to implement a VoIP solution at some of our branch office locations. This project involves replacing our Cisco CPE, which we purchase through Verizon.

**I Support the Proposed Merger**

11.     As we continue to use an RFP process to negotiate contracts, I would like to begin to consolidate the vendors that provide M&T Bank with telecommunications products and services. Going forward, I will look for providers who can offer us end-to-end solutions while balancing the bank's need for reliable service and redundant systems. I support the proposed acquisition of MCI by Verizon because I believe that the combined company can offer M&T Bank these end-to-end solutions. We are satisfied with the service Verizon provides to us today and look forward to the expanded range of products and services the company can offer the bank after its acquisition of MCI.

12.     While there are numerous choices in the marketplace and while our bank is certainly taking advantage of many of those choices right now, I believe that the industry in general is moving toward the combination of companies that can provide a broad range of options for customers. The merger of Verizon and MCI is perfectly in line with this industry trend. It is also in line with our desire to streamline our telecommunications purchasing and vendor relationships.

13.     I do not believe that the merger will alter the telecommunications landscape. There will still be sufficient choice for us in selecting redundant carriers.

14.    For the reasons outlined in this declaration, I support the proposed merger.

I declare that the foregoing is true and correct, and is executed on this _13_ day of July, 2005.

                                                          Brian Griffin

# DECLARATION OF HENRY KACZMARCZYK

I, Henry Kaczmarczyk, declare as follows:

## Background Information

1.      My name is Henry Kaczmarczyk, and I am the Special Products Coordinator for Baker

Victory Services ("BVS").  BVS is the human services division of  Our Lady of Victory

Institutions ("OLV").  Located in Lakawanna, NY, Our Lady of Victory Institutions is comprised

of the OLV Homes of Charity, Hospital, School, Parish, National Shrine and BVS.  BVS is a

non-profit charitable organization that provides a wide range of services to more than 3,500

children and families in need each year.  BVS is comprised of 800 full- and part-time staff

members in a number of fields including educational, residential, outpatient, adoption (both

international and domestic), foster care, and general dental services.

2.      I have served as the Special Products Coordinator for three years.  I supervise major

technology procurement and coordinate vendors, project spending and workload through project

completion.

3.      BVS has over 700 voice and data lines coming into our 31 facilities, and an annual

telecommunications expenditure of approximately $260,000.  About $192,000 of this goes to

local voice and data service, $8,500 to long distance, and $60,000 to wireless.

## Procurement

4.      Sometimes individual departments have purchasing discretion, but we are now trying to

centralize our purchasing.  I feel that we benefit from standardization and are able to leverage

our buying power to secure volume discounts when we can consolidate our purchasing for the

entire organization.

5.    As part of this centralization, Baker Victory Services is trying to migrate more of our voice and data communications to Verizon. We are generally satisfied with Verizon because it has quality connectivity and good service. I can usually elevate problems quickly through the corporate hierarchy in order to get them resolved.

6.    We currently spend over $200,000 per year with Verizon. Our current Verizon contract covers local voice, long distance voice, Internet, DS3 (data) and T1 service (data and Internet). Going forward, we intend to negotiate short-term contracts because the telecommunications industry is changing rapidly. I think a contract of a maximum of three to five years will allow BVS to take full advantage of declining prices and new technologies as they become available.

7.    The rest of our telecommunications spending is spread amongst AT&T, MCI, AOL, Buffnet, and various wireless providers including Arch Wireless, Cingular, Nextel, T-Mobile and Verizon Wireless.

8.    I believe we have numerous large and small telecommunications providers from whom to choose for our voice and data needs. When selecting providers, we look for companies that can offer good performance, competitive pricing, and comprehensive support. Because we have been satisfied with Verizon, we are shifting more of our business to them when the pricing and service offerings meet our needs.

9.    The bidding process for services is initiated by issuing RFPs or RFIs. In analyzing the bids, we weigh factors such as performance, pricing and support. We also take a good look at our situation and try to determine if a particular provider will be most compatible with our needs. Recommendations are then made which are reviewed by our CEO and CFO. Our CEO engages in the actual contract negotiations.

**Current Telecommunications Products and Services**

10.    BVS currently uses several providers for our telecommunications needs.  Verizon provides local voice and data services, including ISDN, DS3 and T1 data circuits.  These circuits are the last mile components for many of our services, including Internet.

11.    We currently have a fiber and T1 data network.

12.    AT&T and MCI also provide BVS with long distance.  Our long distance usage is primarily in Western New York.  We are trying to migrate this service away from AT&T and MCI and over to Verizon because Verizon currently offers us the best price.

13.    AOL, Buffnet and Verizon provide us with our Internet connectivity.  Buffnet is a local company that provides full service ISP and marketing support to thousands of businesses and consumers in Western New York, and has been in operation since 1994.

14.    BVS maintains wireless contracts with Arch Wireless, Cingular, Nextel, T-Mobile and Verizon Wireless.  We need to consider standardizing our wireless purchasing.  We currently use multiple wireless providers and this does not necessarily work well for us, but it gives our wireless users, by department a number of providers to choose from.

15.    Verizon provides last mile fiber into our facilities.  There is local competition for last mile fiber from several companies, including Fibertech.  Fibertech is a broadband provider that builds and operates fiber optic networks in mid-size cities in the Eastern and Central United States.  Fibertech has laid some internal private fiber for BVS.  Given that much of the infrastructure in Lakawanna is old, the competition offered by companies like Fibertech is a good impetus for convincing traditional telecommunications providers to upgrade.

16.    We are also looking into new products such as a wireless campus environment and a PBX system for all of BVS.  Because we are in a low-income district, we qualify for funding

through the federal government's e-rate program. This funding may enable us to implement wireless network solutions. I believe that this type of technology will allow us to eliminate the recurring fees we currently pay for leased lines and provide added flexibility for our mobile users.

**Competition and Trends in the Industry**

17.    I believe there is ample competition in the industry. In addition to the providers currently used by BVS, we have been approached by cable companies, such as Adelphia, that are offering to run broadband over cable. Power companies, like Buffalo Niagara, are also offering pilot telecommunications programs in our area.

18.    Although we currently use a range of providers, I would like to simplify our telecommunications purchasing by migrating BVS' services to Verizon, both for standardization and cost reduction purposes. I believe that our telecommunications service and repair will be easier to manage if we have a single point of accountability.

**Verizon/MCI Merger:**

19.    I support the acquisition of MCI by Verizon. I believe the merger will increase the services available to BVS while decreasing our costs. We are in a competitive market now and I expect that competitive atmosphere to continue after the merger.

20.    I also hope that the merger will streamline billing. We now receive a 700 or 800 page bill every month for our 700 lines. We have one employee strictly dedicated to billing and we would like the process to become more efficient. The merger should help to boost efficiency in this area by allowing us to combine services such as local and long distance voice, that we currently purchase from multiple vendors and thereby pay only one bill.

4

21.    Verizon is more of a local or regional player while MCI has a broader reach. I believe both companies will be able to combine their infrastructure in their respective regional and national markets, which will result in great performance, pricing and support benefits to customers.

22.    I believe customers will also benefit from the combination of the best practices of each company which will create a "best of both worlds" scenario. The sales teams of each company will combine to reach out to customers and provide them with the best services and products Verizon and MCI have to offer.


I hereby declare that the foregoing is true and correct. Executed on this _29th_ day of August, 2005.

Henry Kaczmarczyk

50 E. North Street
Buffalo, NY 14203
P 716.885.8318 (V/TTY)
F 716.885.4229

420 Evans Street
Williamsville, NY 14221
P 716.505.2000 (V/TTY)
F 716.505.2002

1026 Union Road
West Seneca, NY 14224
P 716.558.1105 (V/TTY)
F 716.558.1108

Silver Creek Montessori School
87 Main Street
Silver Creek, NY 14136
P 716.934.4274 (V/TTY)
F 716.934.9129

www.askbhsc.org



Buffalo Hearing & Speech Center **BHSC** Sound Answers

### Declaration of Joseph P. Sonnenberg
### Proposed Acquisition of MCI by Verizon Communications Inc.

I, Joseph P. Sonnenberg, declare as follows:

1.  I am the Vice President of Research and Development for the Buffalo Hearing & Speech Center ("BHSC"). Founded in 1953, BHSC provides comprehensive treatment for adults and children with speech-language and hearing impairments. I have worked at BHSC for over 31 years. As Vice President, I am responsible for overseeing the development of new research and program initiatives and managing BHSC's facilities.

2.  BHSC is a not-for-profit organization with four locations throughout Western New York. It employs the services of 300 full and part time staff including over 125 licensed audiologists and speech-language pathologists.

3.  BHSC initiates a competitive bid process to procure telecommunications products and services for all of its locations. We use numerous providers to meet our voice and data telecommunications needs. As a not-for-profit organization, price is the most important factor in our decision to select a provider. I am approached regularly by telecommunications companies seeking BHSC's business. I would not hesitate to switch providers for a particular service if I could obtain competitive service at a lower price.

4.  I seek to negotiate contracts that span approximately two to three years, depending on our past experience with the vendor. I believe the telecommunications market is very competitive, as reflected in the continually declining prices in the industry. I want the flexibility in my contracts to be able to switch providers to take advantage of these lower

5.  prices. In addition, I believe that technology in the telecommunications industry is constantly evolving. I do not want to be locked into long-term contracts that would prevent BHSC from taking advantage of emerging technology.

6.  We use several providers for our inbound and outbound local and long distance voice telecommunications needs. Verizon, Adelphia, Choice One, and DFT Communications provide BHSC with voice services. We purchase cellular wireless service from Verizon Wireless. Adelphia connects our four locations across a data network and provides us with high-speed access to the Internet.

7.  I support the proposed acquisition of MCI by Verizon. As mentioned above, BHSC has many choices for telecommunications products and services, and I expect my ability to select from among a variety of providers to continue after the merger. In my opinion, Verizon is a first-class company that provides BHSC with very good service. MCI will improve on the breadth of products Verizon currently offers by bringing a long distance and Internet infrastructure to the combined company.

I declare that the foregoing is true and correct, and is executed on this 17th day of August, 2005.

Joseph P. Sonnenberg
Vice President, Research and Development

## CERTIFICATE OF SERVICE

    I hereby certify that on the 19th day of September 2006, I caused a copy of the foregoing Verizon's Reply to Comments Regarding The Department's Supplemental Submission to be served by overnight mail on the parties below:

| | |
|---|---|
| FOR THE UNITED STATES<br><br>Lawrence M. Frankel<br>U.S. Department of Justice<br>City Center Building<br>1401 H Street, N.W.<br>Washington, D.C.  20530<br><br>Matthew C. Hammond<br>U.S. Department of Justice<br>1401 H Street, N.W.<br>Suite 8000<br>Washington, D.C. 20530 | |

LaTanya T. Parker