**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America,     ) | Civil Action No.: 1:05CV02102 (EGS) |

United States of America,                    )
                                )
         Plaintiff,         )         Civil Action No.: 1:05CV02102 (EGS)
                                )
      v.                  )

**FILED UNDER SEAL PURSUANT
TO PROTECTIVE ORDER
ENTERED AUGUST 4, 2006**

# REDACTED FOR PUBLIC INSPECTION

SBC Communications, Inc. and
AT&T Corp.,                                  )

         Defendants.

United States of America,                    )          Civil Action No.: 1:05CV02103 (EGS)

         Plaintiff,

      v.

Verizon Communications Inc. and
MCI, Inc.,

         Defendants.

**UNITED STATES' REPLY SUBMISSION IN RESPONSE TO THE
COURT'S MINUTE ORDER OF JULY 25, 2006**

On October 27, 2005, the United States filed complaints alleging antitrust violations

involving the provision of local private lines ("LPL") at more than 700 buildings where the

mergers will harm competition by reducing the number of facilities-based competitors from two to

one. The proposed Final Judgments filed the same day provide a straightforward and

comprehensive remedy for the violations alleged by requiring a divestiture of facilities at each of

those buildings, thereby replacing the competition lost at each of the buildings. Despite filing

more than 2,100 pages of materials, amici have not seriously challenged the sufficiency of the proposed Final Judgments to remedy the violations alleged or explained why their entry would otherwise not be in the public interest.

Instead, amici once again attempt to direct the discussion to issues not before the Court. Amici urge the Court to address whether the mergers themselves are in the public interest – a question not before this Court and a question different than the legal standard under which the United States brought these cases. Amici allege that the United States should have brought a broader case and even suggest that the United States through its merger review, or this Court pursuant to the Tunney Act, should address a litany of grievances that are not even arguably caused by the mergers. In addition, amici repeatedly argue that the proposed Final Judgments should not be entered because the United States did not "prove" various elements of the Complaints in its submission to the Court. Nothing in the Tunney Act requires the United States to prove the underlying case, as if this proceeding were a trial on the merits, before the Court can approve the settlements.

The United States acknowledges that the merging parties are large corporations that provide diverse telecommunications services. This is why the United States devoted so much time and effort to investigating these transactions. But in the end, the United States concluded there was not sufficient evidence to support broader allegations of harm, including those championed by amici. Federal and state telecommunications agencies reached consistent conclusions. Amici now ask the Court to second-guess the manner in which the United States exercised its prosecutorial discretion. The Department of Justice was under no obligation to file any complaint. It filed the Complaints because its investigation revealed that the mergers would be likely to cause real and

2

demonstrable harm to competition for LPL at the buildings identified in the proposed Final Judgments. A finding that the proposed Final Judgments are not in the public interest could leave this harm unaddressed.

In the remainder of this reply submission, the United States describes the harm alleged in the Complaints and the remedies proposed, with reference to issues and misunderstandings raised by amici. The United States then addresses the claims of the amici regarding issues beyond the scope of the violations alleged in the Complaints and rebuts the arguments of amici regarding the burden on the United States and the role of the Court under the Tunney Act.

1.   **THE COMPLAINTS ALLEGE STRAIGHTFORWARD AND UNDISPUTED COMPETITIVE HARM THAT IS REMEDIED BY THE PROPOSED FINAL JUDGMENTS**

   a.   **The United States' Product Market Analysis Is Straightforward, Reasonable, and Largely Undisputed**

In his reply declaration, Dr. Majure explains the economic theory behind market definition and describes the generally accepted methodology set forth in the *Horizontal Merger Guidelines* ("*Merger Guidelines*").[1] The *Merger Guidelines* define the relevant product market as the smallest possible group of products over which a hypothetical monopolist likely would profitably impose a small, but significant, non-transitory price increase.[2]

---

[1] Reply Declaration of W. Robert Majure ("Majure Reply Decl."), ¶¶ 3-10; *see also* U.S. Dep't of Justice & Federal Trade Comm'n, *Horizontal Merger Guidelines* (rev. ed. 1997) ("*Merger Guidelines*").

[2] *See Merger Guidelines* § 1.11. The approach set forth in the *Merger Guidelines* is consistent with legal precedent, which defines product markets by evaluating the extent of cross-elasticity of demand between a product and possible substitutes; in other words, the readiness and ability of consumers of one product to turn to the other product. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (definition of the "relevant market" rests on a determination of available substitutes).

In defining a product market here, the United States began its analysis with the LPL products of the merging parties.[3] As Dr. Majure explains, this is an appropriate place to start because LPLs are a fundamental input for any telecommunications product serving a large customer with a significant volume of traffic, and are routinely bought and sold commercially. LPL has a price and it is possible to consider what would happen if a hypothetical monopolist raised that price. The next closest substitute would be an undedicated or switched circuit. The only way to avoid directly or indirectly purchasing LPL would be to sacrifice the functionality of a dedicated connection. A customer with the volume and other requirements that justify paying for a private line would not be likely to make that sacrifice. The United States, therefore, concluded that there are no practical alternatives to LPL for most customers and that it constitutes a relevant product market.[4]

In mergers in which close substitutes exist for a particular product, market definition can be a contentious issue. In this instance, however, there are no significant close substitutes for LPL. Moreover, many of the amici have participated in regulatory proceedings related to special access, the term for LPLs provided by Regional Bell Operating Companies ("RBOCs ") pursuant to certain regulations, that consider these services as a product market for purposes of competitive analysis.[5] It is not surprising, therefore, that amici have not challenged the United States' alleged

---

[3] Local private lines are dedicated point-to-point circuits offered over copper and/or fiber-optic transmission facilities that originate and terminate within a single metropolitan area. Complaints ¶ 3.

[4] Majure Reply Decl. ¶ 6.

[5] *See, e.g.*, Order and Notice of Proposed Rulemaking, *In re: Special Access Rates for Price Cap Local Exchange Carriers; AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, 20 F.C.C.R. 1994 (Jan. 31, 2005). To avoid burdening the Court with paper, the United States has not provided copies of publicly available records, including materials available on the Federal Communications Commission website. The United States would be pleased to provide copies of these materials at the Court's request.

LPL market other than to suggest that the United States should have alleged additional product markets as well.

### b.    Geographic Markets Consisting of Individual Buildings Are Consistent with Well-Established Antitrust Principles

Several amici criticize the United States for alleging that individual building locations can constitute an appropriate relevant geographic markets for LPL.[6] This market definition, however, is consistent with well-established antitrust principles as well as the prior practice of the Department of Justice.[7] Moreover, the Federal Communications Commission ("FCC") has repeatedly stated that a building-by-building approach is the most accurate way to evaluate wholesale competition for LPL.[8]

---

[6] The NYAG even makes the unsupportable argument that a geographic market can *never* be smaller than a metropolitan area. Memorandum of Eliot Spitzer, Attorney General of the State of New York, in Response to the August 7, 2006 Submission of the United States at 3 (Sept. 5, 2006) ("NYAG Resp."). However, *Brown Shoe*, the case on which NYAG relies, merely requires that the geographic market "correspond to the commercial realities of the industry and be economically significant." 370 U.S. at 336-37 (internal quotation omitted). It places no lower limit on the size of a geographic market. As described *infra*, a single-building geographic market reasonably reflects the "commercial reality" of the LPL product market.

[7] *See, e.g.,* Complaint, *United States v. Echostar Communications Corp.*, Civ. No. 1:02CV02138 (D.D.C. filed Oct 31, 2002), ¶¶ 30-31 (alleging that each residence constitutes a separate geographic market but aggregating, for ease of analysis, residences that face the same choice of providers). In the present cases aggregation is not useful because different providers own the connections to each building. The State of New York, represented by amicus NYAG, joined the *Echostar* complaint.

[8] In reviewing these two mergers, the FCC asserted that the relevant geographic market "is a particular customer's location, since it would be prohibitively expensive for an enterprise customer to move its office location in order to avoid" a price increase. Memorandum Opinion and Order, *In re: SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control,* 20 F.C.C.R. 18,290 (rel. Nov. 17, 2005), ¶ 28 ("FCC SBC/AT&T Order"); Memorandum Opinion and Order, *In re: Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control,* 20 F.C.C.R. 18,433 (rel. Nov. 17, 2005), ¶ 28 ("FCC Verizon/MCI Order") (collectively, "FCC Merger Orders").

Similarly, in its 2003 Triennial Review Order, the Commission directed the states to evaluate the extent of competition separately for each "particular customer location," to assist in determining impairment pursuant to under Section 251 of the Telecommunications Act of 1996. Report and Order, *In re: Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18

As with product markets, the *Merger Guidelines* define geographic markets by evaluating demand substitution responses, i.e., how purchasers would respond to a price increase. A relevant geographic market is the smallest geographic region in which a hypothetical monopolist could profitably impose a price increase.[9] Stated differently, it includes the set of sellers to which a buyer could practicably turn for the product at existing or slightly higher prices.[10] In making this evaluation, it is important to consider the "commercial realities" faced by consumers.[11]

From the perspective of a buyer of LPL, competitive options are limited to suppliers able to provide LPL service to a given building. Theoretically, a buyer might obtain LPL service from a competitor with facilities at a nearby location by moving its business to that building and thereby escape the hypothetical monopolist's price increase. The cost and disruption of relocating, however, will almost always outweigh the benefits of avoiding a slightly higher price.[12] A hypothetical monopolist owning all of the LPLs to a building would, therefore, be able to raise prices profitably.

---

F.C.C.R. 16,978 (Aug. 21, 2003), ¶ 328, *vacated and remanded in part, aff'd in part, United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004), *cert denied*, 543 U.S. 925 (2004). In its 2005 Triennial Review Remand Order, subsequent to litigation, the FCC recognized that "a properly designed building-specific test could assess variations in impairment far more subtly than could a wire center or MSA-based approach . . . ." Order on Remand, *In re: Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 20 F.C.C.R. 2533 (Feb. 4, 2005) ("FCC TRRO"),¶¶ 155, 157-61, *petition for review denied by Covad Communications Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006).

[9] *Merger Guidelines* § 1.21.

[10] *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004) (holding that the "relevant geographic market in which to examine the effects of a merger is 'the region in which the seller operates, and to which the purchaser can practicably turn for supplies'" (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961))).

[11] *Brown Shoe*, 370 U.S. at 336.

[12] Majure Reply Decl. ¶ 7.

NASUCA's consultant, Dr. Selwyn,[13] applied similar reasoning to reach the same geographic market definition in a recent FCC proceeding. In a declaration submitted on behalf of AT&T, Dr. Selwyn argued that competition for local telecommunications services, including special access facilities, should be evaluated on a building-by-building, rather than metro-wide, basis.[14] Dr. Selwyn recognized that a "physical facilities-based presence at a particular customer premises affords the CLEC access *only to that specific premises* and to no others."[15] He further argued that the "commercial reality" is that customers will not relocate to obtain a competing telephone service.[16] Citing to both the *Merger Guidelines* and *Brown Shoe*, Dr. Selwyn concluded that an appropriate demand-based definition would "necessarily define the 'relevant geographic market' as consisting, in each case, of one individual customer premises."[17]

COMPTEL argues that a building-specific market definition is not reasonable because the evidence does not support the "notion that customers, either retail or wholesale, or competitors, view a building as a market."[18] Yet COMPTEL, which purports to represent both customers and competitors in the market for LPL, argued that the FCC should use a building-by-building

---

[13] Declaration of Lee L. Selwyn (Sept. 5, 2006) ("Selwyn NASUCA Decl."), attached to Reply of Amicus the National Association of State Utility Consumer Advocates Regarding the Public Interest (Sept. 5, 2006) ("NASUCA Reply").

[14] Declaration of Lee L. Selwyn on Behalf of AT&T Corp., *In re: Petition of Qwest Corp. for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metropolitan Statistical Area*, WC Docket No. 04-223 (Aug. 24, 2004), ¶ 32.

[15] *Id.* ¶ 23 (emphasis in original).

[16] *Id.* ¶ 32.

[17] *Id.*

[18] COMPTEL's Response to the Department of Justice's Supplemental Submission at 19-21 (Sept. 5, 2006) ("COMPTEL Resp.").

approach to evaluate competitive conditions for LPL.[19]  Various CLECs touted the same building-

specific approach in other FCC proceedings addressing LPL.[20]  Even the submission by amicus

Sprint Nextel ("Sprint") in this proceeding illustrates that customers evaluate purchasing options

for LPL on a building-by-building basis:

> Sprint Nextel maintains a database that shows whether a particular building is 'on-
> net' for one or more AAVs [alternative access vendors].  Sprint Nextel's enterprise
> services sales force accesses that database to determine available options (if any)
> for obtaining non-ILEC special access circuits to customer premises.[21]

Consistent with this commercial reality, the United States found that each commercial building

could constitute a separate geographic market.

Although many amici have advocated this very approach in the past, they are now united in

opposition to the use of individual buildings as an appropriate market.  However, they cannot

agree whether this is too broad or too narrow.  The market definitions proposed by amici range

---

[19] *See Covad*, 450 F.3d at 544 ("[T]he CLECs argue that impairment should be assessed on a
building-by-building (as opposed to a wire center-by-wire center) basis.").  Petitioners in *Covad* included
COMPTEL, XO Communications, Xspedius Communications, LLC, Covad Communications Co., Time
Warner Telecom Inc., Alpheus Communications, LP, ATX Communications, Inc., CTC Communications
Corp., McLeodUSA Telecommunications Services, Inc., Mpower Communications Corp., Pac-West
Telecomm, Inc., RCN Telecom Services, Inc., TDS Metrocom, LLC, Eschelon Telecom, Inc., NuVox,
Inc., and US LEC Corp.  *See* Opening Brief of CLEC Petitioners and Intervenor in Support, *Covad v.
FCC*, No. 05-1095 (D.C. Cir. filed July 26, 2005).

[20] *See, e.g.*, Comments of Time Warner Telecom, *In re: Special Access Rates for Price Cap
Local Exchange Carriers*, WC Docket No. 05-25 (June 13, 2005), at 1, 7, 25 ("[A]ny regulatory
framework for special access channel terminations must reflect the fact that carriers decide to construct
loop facilities to commercial customers based on the characteristics of particular buildings.");  Letter
from Broadview, Covad, CBeyond, Eschelon, KMC, NuVox, XO, and Xspedius, to Marlene H. Dortch,
FCC, *Re: WC Docket No. 04-313, CC Docket No. 01-338* (Dec. 8, 2004), at 1-5 (supporting building-
specific analysis);  Letter from Thomas Jones, Counsel for Time Warner Telecom, to Marlene H. Dortch,
FCC, *Re: CC Docket No. 01-338, WC Docket No. 04-313* (Dec. 1, 2004), at 3-6 (advocating building-by-
building assessments for both actual deployment and potential entry).

[21] Declaration of Keith L. Kassien (Sept. 1, 2006) ("Kassien Sprint Decl."), ¶¶ 13-14, attached to
Response of Sprint Nextel Corporation to the United States' Submission in Response to the Court's
Minute Order of July 25, 2006 (Sept. 5, 2006) ("Sprint Resp.").

from the very narrow (individual floors of each building)[22] to the very broad (the entire United

States).[23]

As discussed below, the United States concluded, and therefore alleged, that the

anticompetitive effects of the transactions will be limited to buildings where (a) the mergers will

reduce the number of competitors from two to one and (b) where entry is not likely.[24]  Treating

individual buildings as separate geographic markets follows well-established antitrust principles

and accurately captures the harm to competition the United States alleged in these cases.

Because there are also some facts that suggest broader markets, the United States' Complaints

acknowledge that the geographic market may be as broad as the metropolitan area.  Nevertheless,

if the market is as broad as the metropolitan area, then the market is highly differentiated, with

different carriers able to reach very different sets of locations and buildings within the area.

Regardless of whether the appropriate geographic market here is as narrow as the individual

building or as broad as the metropolitan area,  the competitive harm likely to result from the

---

[22]ACTel suggests that the appropriate geographic market may consist of each individual floor in each building.  ACTel's Response to the United States' Submission Pursuant to the Court's Minute Order of July 25, 2006, at 7-8, 11-14 (Sept. 5 , 2006) ("ACTel Resp.").

[23] Several amici have suggested that a broader geographic market is dictated by the way that retail enterprise customers purchase the services that are provided over LPL.  COMPTEL argues that the customer statements show that retail customers look for suppliers of these services that can serve multiple locations, and based on past practices of the Department, the market could be the entire United States.  COMPTEL Resp. at 28-30.  The NYAG's economist notes that retail customers purchase network services that use LPL to connect multiple locations.  Declaration of Nicholas Economides (Sept. 5, 2006) ("Economides NYAG Decl."), ¶¶ 25-27, attached to NYAG Resp.  Both conclude that a geographic market for retail services, therefore, cannot be a single building and Dr. Economides suggests that it must be at least as large as a metropolitan area.  As discussed in Dr. Majure's Reply Declaration, the way end-user customers purchase services provided over LPL does not preclude a finding that each individual building is a separate market for LPL.  Majure Reply Decl. ¶¶ 8-9 & n.7.

[24] Declaration of W. Robert Majure (Aug. 7, 2006) ("Majure Decl."), ¶ 14, attached to United States' Submission in Response to the Court's Minute Order of July 25, 2006 (Aug. 7, 2006) ("United States' Submission").

proposed merger is limited to a set of 2-to-1 buildings, as alleged in the Complaints. Because the

Department had entered into settlements that remedied all the harm it had identified from the

mergers, it was not necessary to determine whether a market definition that was broader than

individual buildings was more appropriate.[25]

### c.    The Competitive Harm Alleged in the Complaints Is Consistent with the Record and Well-Established Antitrust Principles

The United States alleges a straightforward theory of competitive effects. After the merger,

SBC[26] or Verizon would be the only remaining supplier of LPL to certain buildings where they

previously competed. The mergers therefore are likely to result in higher prices or lower quality

(e.g., less responsiveness to service outages or requests to provide new circuits) for LPL and

services sold across LPL to customers in these buildings.[27]

### i.    HHI Calculations Would Add Little to the Competitive Analysis of the Harm Alleged by the United States

Several amici fault the United States' competitive effects analysis for not calculating HHIs

or market concentration measures.[28] Theoretically, it would be possible to calculate building-

specific market shares for LPL using either revenues or capacity. In the markets where harm is

alleged in the Complaints, however, the first approach is inherently unreliable, while the second

adds little to a competitive effects analysis. Dr. Majure's reply declaration explains why using

---

[25] Majure Reply Decl. ¶ 10.

[26] Although the merged firm has changed its name to AT&T, Inc., the United States refers to it herein as "SBC" to avoid confusion.

[27] Majure Decl. ¶ 13.

[28] *See, e.g.,* NYAG Resp. at 11-13; Reply of the New Jersey Rate Counsel to the United States' Submission in Response to the Court's Minute Order of July 25, 2006 at 5-11 (Sept. 5, 2006) ("NJRC Reply").

revenues may lead one to draw incorrect conclusions in these markets.[29] Moreover, using HHIs

and market concentration based on capacity would add little to competitive effects analysis here.

In each of the buildings where the United States has alleged competitive harm, the number of

competitors would go from two to one. To say that HHI figures would increase from 5,000 to

10,000 would add nothing useful to the United States' explanation of harm. The Complaints make

it clear that customers in these buildings would be harmed by losing the benefits of the

competition provided by either AT&T or MCI.[30]

In their responses, amici also have overstated the role of HHIs and concentration figures in

the United States' enforcement decisions. Several amici have implied that HHI figures compel a

finding of broader competitive harm from these mergers.[31] To the contrary, as a recent joint

agency commentary on the *Merger Guidelines* stated clearly, though low market shares and

concentration are a sufficient basis for *not* challenging a merger, large market shares and high

concentration by themselves are an insufficient basis for challenging a merger.[32] It is not

---

[29] Majure Reply Decl. ¶ 11.

[30] Several amici offer HHI calculations for product markets that are clearly not alleged in the United States Complaints. Much of the NJRC's response, for example, offers an HHI analysis for five mass-market and retail products. NJRC does not even attempt to argue that these markets are within the scope of the United States' Complaints. NJRC Reply at 5-11. NYAG's economist likewise reported that the New York Public Service Commission staff calculated HHIs for telecommunications services to various retail market segments. Economides NYAG Decl. ¶ 55. Sprint and COMPTEL offer HHIs that attempt to reflect concentration levels for LPL markets, but as explained in Dr. Majure's reply declaration, these numbers are unreliable. Majure Reply Decl. ¶ 13 & n.15.

[31] *See* COMPTEL Resp. at 30-31; Sprint Resp. at 25-26; NJRC Reply at 7-11.

[32] U.S. Dep't of Justice & Federal Trade Comm'n, *Commentary on the Horizontal Merger Guidelines* at 15-16 (2006) ("*Merger Guidelines Commentary*"); *see also United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (stating that evidence of market concentration simply provides a convenient starting point for a broader inquiry into future competitiveness); *Arch Coal*, 329 F. Supp. 2d at 130 (recognizing that "this circuit has cautioned against relying too heavily on a statistical case of market concentration alone").

11

surprising, therefore, that data on recent merger challenges shows that the United States often does not challenge mergers involving market shares and concentration above the thresholds described in the Guidelines.[33]

> ii.    **The United States Reasonably Concluded that Entry Was Not Likely to Prevent Harm in Certain Buildings**

The *Merger Guidelines* explains that mergers that would otherwise appear problematic may not harm consumers if new firms likely would enter in response to a price increase by the hypothetical monopolist. The Guidelines explain that in order to counter the impacts of the merger, such entry must be timely, likely, and sufficient.[34] Moreover, the U.S. Court of Appeals for the D.C. Circuit has appropriately recognized that where barriers to entry are sufficiently low, even the threat of outside entry can deter anticompetitive behavior.[35]

Therefore, the United States investigated whether entry would be likely to deter competitive effects in any of the buildings where it otherwise anticipated harm to competition. It found that entry does occur – CLECs have indisputably constructed laterals to thousands of buildings in order to compete for LPL sales. On the other hand, the investigation revealed that there are thousands of buildings where competitive entry has not occurred. To determine why entry happens at some buildings but not others, the United States investigated the criteria CLECs consider in deciding whether to enter a building.[36] Though there is some variation among CLECs, the United States

---

[33] *Merger Guidelines Commentary* at 15.

[34] *Merger Guidelines* § 3.0; *see also* Majure Decl. ¶ 15.

[35] *Baker Hughes*, 908 F.2d at 988.

[36] This investigative effort included information requests contained in CIDs issued to CLECs. Some of the responses have previously been provided to the Court. Majure Decl., Attachs. Tab 9, CLEC Interrogatory Responses.

12

found that the most significant – the most often determinative – factors governing whether a CLEC

will build into a particular building are the revenue opportunity in the building (as reflected by the

capacity demand) and the cost of building a lateral to the building (which typically depends heavily

on the distance of the building from the carrier's network). The United States also found that in

limited cases, building-specific barriers may also impact the decision. Based on its analysis of all

these factors, the United States concluded that entry would be likely in many buildings but that the

conditions for entry would be unlikely to be met in hundreds of other buildings where competition

would be harmed by the mergers.

   The United States crafted entry screens that it could apply to the buildings where, absent

entry, the merger would likely harm competition. These entry screens take into account the factors

that the United States found to be the most important – the demand for LPL services at the building

and the distance of the building from competitive fiber.[37] Notably, no amici challenge the specific

distance/demand elements of the United States' entry screens.[38] Indeed, some amici materials –

such as those submitted by Sprint – tend to support it.[39]

---

[37] Majure Decl. ¶ 14. ACTel complains that the fiber maps that the Department used do not tell whether the fiber is "available for wholesale at all." ACTel Resp. at 7, 20. But all of the carriers whose fiber maps the United States used offer LPL on a wholesale basis. *See* Majure Decl., Attachs. Tab 7, Note on Overlapping Fiber Maps. The FCC Order approving the Verizon/MCI merger identifies more than 25 CLECs that sell LPL at wholesale. FCC Verizon/MCI Order ¶ 30.

[38] One amicus declarant, however, complains that the United States did not state what its entry criteria were. *See* Selwyn NASUCA Decl. ¶ 50. This is incorrect. *See* Majure Decl. ¶ 14 n.7 (stating the distance and demand thresholds the United States utilized in determining the likelihood of entry).

[39] Sprint Resp. at 10 (stating that Sprint rarely enters for DS-1 or DS-3, but will occasionally for OC-3). Consistent with this, the United States' entry criteria never predicted a likelihood of entry for buildings with a single DS-3 or less of demand for dedicated services, but did predict entry for instances where demand exceeded an OC-3 and competitive fiber was sufficiently close. (For the intermediate case, 2 DS-3s, which is between a single DS-3 and an OC-3 (roughly equivalent to 3 DS-3s), the United States' screen predicts a likelihood of entry only where competitive fiber is extremely close – within one-tenth of a mile.)

Some amici, however, contend that the United States' entry screens are faulty because they do not explicitly evaluate all potential barriers to entry mentioned in the United States' Complaints.[40] But the barriers identified by amici either are already implicitly incorporated in the demand-distance criteria used by the United States or are relatively minor ones that would have an impact only in atypical cases.[41] Recognizing that it would be impracticable to separately analyze any building-specific access costs or potential physical barriers for each of the more than one thousand two-to-one buildings, that the plaintiff ultimately has the burden of proving competitive harm in every market it alleges, and that the United States' entry methodology is based on the most important factors governing CLEC entry decisions, the entry screens devised by the United States constitute a reasonable and practical approach that predicts entry as closely as feasible.[42]

Several amici claim that the United States' methodology is flawed because CLECs would not enter a building in the absence of "committed revenue" in the form of customer contracts.[43] The United States, however, has not suggested that CLECs randomly undertake the construction of

---

[40] ACTel Resp. at 14-16 (stating that "the Government's formula simply ignored all the other factors in Paragraph 27 - specifically, (3) the availability of capital, (4) physical barriers such as railbeds, and, most importantly, (5) the difficulty in securing consents from building owners and municipalities"); Selwyn NASUCA Decl. ¶ 46 (same); Sprint Resp. at 7-8 (stating that competitive access vendors face large capital expenditures, often do not have the economies of scale to justify construction, and have difficulty obtaining access to buildings and rights of way); Economides NYAG Decl. ¶¶ 68-70 (stating that DOJ only considered two of the five factors stated in the Complaints).

[41] Building-specific barriers such as building access costs or physical barriers (such as rivers) may, in rare instances, make a difference in the likelihood of entry, but those instances are by far the exception rather than the rule. Building access costs, i.e., the costs of "securing the necessary consent from building owners," Complaints ¶ 27(e), typically constitute only a small fraction of the costs of constructing fiber laterals to a building. The fact that AT&T or MCI has already built into all the 2-to-1 buildings subject to the United States' entry analysis tends to suggest that these buildings are not subject to some unusually troublesome entry obstacle such as a river or particularly obstructionist landlord.

[42] Majure Reply Decl. ¶¶ 16, 18; Majure Decl. ¶ 14.

[43] *See, e.g.,* COMPTEL Resp. at 22-24; ACTel Resp. at 16-17; Sprint Resp. at 32.

laterals regardless of the potential to win business from customers in the building.  Rather, the screens utilized by the United States evaluate the entry response of CLECs when harm would otherwise be likely – i.e. when customer contracts are up for bid and only one carrier owns all the lateral connections to a building. The question is whether one or more CLECs would be likely to bid for that business, even if winning would require the CLEC to build fiber into the building in question.  If the demand and distance criteria set forth in the United States screens are satisfied, the answer is likely to be yes.  Entry (where the CLEC wins the bid), or the threat of entry (where the incumbent wins the bid), is likely to prevent any anticompetitive effects from the mergers in those buildings.[44]

Several other amici have argued, in essence, that entry is too difficult to predict with confidence and therefore should be ignored or discounted.  NYAG's consultant, for example, suggests that judgments regarding the likelihood of entry are largely speculative and therefore should not be the basis for analysis or predictions.[45]  NASUCA's consultant takes a similar approach, suggesting that because of the uncertainties involved in predicting entry, "the Department could have erred on the side of overinclusiveness in the selection of divestiture assets."[46]  The fact that entry analysis is difficult or forward-looking does not relieve the United States of its obligation to undertake it.  Merger analysis is predictive in nature.  If the United States is not sufficiently

---

[44] *See, e.g., Baker Hughes*, 908 F.2d at 988 ("If barriers to entry are insignificant, the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs." (emphasis in original)).

[45] Economides NYAG Decl. ¶¶ 11-12.

[46] Selwyn NASUCA Decl. ¶ 51.

confident that a harm can be predicted and proven, it does not allege one.[47]  Remedies obtained in a

consent decree are the product of adversarial negotiations, in which the United States must often

convince the merging parties that it could successfully sue to obtain the same relief.  The fact that it

would be difficult to prove that entry is unlikely (particularly given the large amount of deployed

fiber) is one of the factors that was considered in deciding whether to enter into these settlements.

### d.    The Proposed Final Judgments Offer a Straightforward and Comprehensive Remedy for the Harm Alleged in the Complaints

As reflected in the *Antitrust Division Policy Guide to Merger Remedies*, any settlement must

"fit[] the violation and flow[] from the theory of competitive harm."[48]  Given the theory of

competitive harm the United States alleged, the proposed Final Judgments provide a comprehensive

remedy.  Each requires the divestiture of lateral connections into the buildings where the merger

will reduce the number of competitors from two to one and where entry is not likely to prevent harm

to competition.  The buyer of the divested assets would provide customers for LPL in those

buildings with an alternative to SBC or Verizon.  All customers – the tenants in the building as well

as the carriers that need to buy a connection in order to sell their services to tenants – will have a

choice of two facilities-based providers, just as they did before the mergers.[49]  The divestitures will

thereby remedy the harm in each of these markets for LPL and protect the enterprise customers in

those buildings that purchase telecommunications services sold over those lines as well.[50]

---

[47] Majure Reply Decl. ¶ 17; U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* at 3 (2004) ("*Merger Remedies Guide*").

[48] *Merger Remedies Guide* at 4.

[49] Majure Decl. ¶ 16.

[50] COMPTEL has directed the Court's attention to the settlement recently announced by the Department relating to the acquisition of Midwest Wireless Holdings LLC by ALLTEL Corporation as an example of "the Guidelines 'Done Right.'"  Motion to Supplement COMPTEL's Response to the

> **i.    The United States Will Ensure that the Divested Assets Are Sold Only to Effective Competitors**

ACTel suggests that the buyer of the divestiture assets may be unable or unwilling to serve wholesale customers for LPL.[51]   Under the proposed Final Judgments, however, the United States has approval rights over each buyer,[52] and is obligated to review, among other factors, each potential purchaser's "ability to be a viable competitor" for wholesale LPL.[53]   To date, all of the buyers that the United States has conditionally approved for the divestiture assets are active wholesale providers of LPL.[54]   Thus, there is no reasonable basis to object to the decrees on the grounds that the buyers will not provide service to wholesale customers.

ACTel also argues that at least one of the proposed divestiture buyers –  **[REDACTED]**

– is small compared to AT&T and is "losing money."[55]   Financial stability is one factor that the United States always considers when evaluating the fitness of a proposed

---

DOJ's Supplemental Submission (Sept. 14, 2006), at 2.  Based on the outcome in that case, COMPTEL argues that the settlements here should require broader divestitures.   However, the "one size fits all" approach for crafting remedies suggested by COMPTEL is inappropriate.  The Department determines what remedies are appropriate on a case-by-case basis, taking into account the facts of the particular merger, the nature of competition in the market, and the specific harm identified.  The Department has obtained a wide range of remedies including, where appropriate, divestitures that include on-going businesses and customers when necessary to address the harm identified.  In these cases, for the reasons discussed in Dr. Majure's declaration, divestitures of customers were not warranted or necessary. Majure Decl. ¶ 18.

[51] ACTel Resp. at 6.

[52] Proposed Final Judgments § IV(H).

[53] Competitive Impact Statements at 9 (emphasis added) ("CISes").

[54] *See* FCC Verizon/MCI Order ¶ 30 (listing wholesale providers, including     **[REDACTED]**
).

[55]
    **[REDACTED]**

17

purchaser of divestiture assets.[56] But there is little or no reason to doubt [REDACTED] financial

viability or its ability to adequately – indeed, aggressively – provide LPL to the buildings in

question.[57] In its most recent earnings announcement,       **[REDACTED]**


[58] Thus, amici cannot persuasively argue that [REDACTED] – or any other buyer the

United States would approve – would be able to adequately replace the competition in the buildings

addressed by the decrees.

NYAG's consultant, Dr. Economides, also complains that the divestiture of lines to several

hundred buildings would not allow a competitor to "replace AT&T or MCI."[59] However, the

purpose of the remedy is not to "replace" AT&T or MCI in its entirety, but rather to replace

competition for LPL services to those specific buildings where the merger is likely to lead to

---

[56] *Merger Remedies Guide* at 32 ("[T]he Division will perform a 'fitness' test to ensure that the purchaser has sufficient acumen, experience, and financial capability to compete effectively in the market over the long term.").

[57] Although a firm's long-term financial viability is relevant to whether it is an acceptable divestiture buyer, the fact that a firm is "losing money" does not necessarily suggest that it is not financially viable nor that it could not be an effective competitor. Indeed, AT&T – [REDACTED] – lost money in its final fiscal year as an independent firm, far more than [REDACTED]  . *See* AT&T Corp. SEC Form 10-K Filing at 25 (Mar. 10, 2005) (reporting an operating loss of approximately $10 billion in 2004).

[58]

**[REDACTED]**


[59] Economides NYAG Decl. at 33 (sub-head E); *see also* Selwyn NASUCA Decl. ¶ 37 (divestiture buyer will be "no match for the two mega-RBOCs").

18

consumer harm.[60]  The proposed remedy accomplishes that by allowing another CLEC to use the divested assets to provide the competition that AT&T or MCI would have provided in each of these buildings.

> ii.    **The Divested Assets Will Replace the Competition Lost from the Merger**

Several amici argue that the divested assets are insufficient to remedy the harm to competition alleged in the Complaints.  NYAG's consultant, Dr. Economides, complains that the fiber being divested is unused or "dark" fiber and, therefore, it "could be useful only if existing customers in a particular building needed additional bandwidth that Verizon or SBC could not supply . . . or if the customers chose to switch providers."[61]  But this does not undermine the effectiveness of the remedy.  The whole point of the remedy is to ensure that when customers *do* consider switching providers or buying additional capacity, a competitive alternative to the merged firm is available; a divestiture of dark fiber accomplishes that.[62]

Dr. Economides also complains that, because the divestiture is in the form of an IRU rather than full ownership, the divestiture buyer will have to rely on the merged firm to maintain the fiber, and the merged firm may not do an adequate job of maintenance.[63]  If the terms in the IRU agreements were not sufficient to ensure that the divested fiber would be adequately maintained it could, theoretically, impair the effectiveness of the remedy.  However, the United States has

---

[60] Majure Reply Decl. ¶ 19.

[61] Economides NYAG Decl. ¶ 66.

[62] A divestiture of "lit" fiber – fiber currently in use by a customer – could potentially raise unnecessary complications, including the possibility of outages or other harm to the end-users in question. *See, e.g.,* Majure Decl. ¶¶ 18, 21.

[63] Economides NYAG Decl. ¶ 67.

approval authority over the terms of the IRU agreements,[64] and will exercise that authority to ensure that they are adequate.[65]  For instance, the divestiture agreements with all three buyers that have been conditionally approved by the United States          **[REDACTED]**


[66]          **[REDACTED]**

[67]  Accordingly, the IRU form of the divestiture will not impair the effectiveness of the proposed remedy.

Finally, NASUCA's declarant, Dr. Selwyn, argues that the price paid by the purchasers of the divested assets indicates that they cannot be used effectively to provide competition.[68]  Contrary to Dr. Selwyn's suggestion, there is no reason to expect that these assets would fetch prices

---

[64] *See* Proposed Final Judgments §§ IV(A), (H)(2).

[65] Of course, the divestiture buyer also has to agree to the IRU terms, including those involving maintenance, and it is unlikely that the sophisticated carriers buying these assets would agree to terms that did not provide adequate guarantees of maintenance.  Indeed, as previously noted, carriers in the industry routinely use IRUs to add fiber to their networks and negotiate terms that, in their business judgment, adequately protect them.  Majure Decl. ¶ 22.

[66]*See, e.g.,* Majure Decl., Attachs. Tab 16, Divestiture Purchase Agreements


**[REDACTED]**


The SBC agreements have been submitted to the Court because the terms have been conditionally approved by the United States.  The Verizon agreements have not been because they were more recently submitted to the United States and the terms have not yet been approved.

[67] *See, e.g., id.*          **[REDACTED]**


[68] Selwyn NASUCA Decl. ¶¶ 53-54.

equivalent to the prices paid when one firm acquires another firm outside of a divestiture context.[69]
Prices here *should* be lower because the buyers of the divested assets are not acquiring a current
revenue stream. Instead they are acquiring assets that provide the ability to compete for future
business opportunities as they arise.[70]   Moreover, it is not uncommon for acquirers to pay lower
prices for assets divested under consent decrees. Buyers recognize that the merged entity has an
obligation to sell the assets under the timetable set forth in a publicly available consent decree.
Under those circumstances, economists generally expect the buyer to get the better end of the
negotiations. For all of these reasons, the prices paid for the divested assets do not support the
inference made by amici.[71]  While the price would undoubtedly be higher if customers were also
being divested, that does not mean that the purchasers of the divested assets will be weakened and
thus unable to remedy the harm alleged in the Complaints.   As soon as the acquirer has the ability
to serve these buildings without having to make an extensive investment in infrastructure, it will be
able to compete aggressively for each new business opportunity.

## 2.    THE COURT SHOULD REJECT AMICI'S THEORIES ABOUT HARMS THAT ARE BEYOND THE SCOPE OF THE UNITED STATES' COMPLAINTS

### a.    Arguments Made by Amici About Harms Beyond the Scope of the Complaints Are Irrelevant to the Court's Public Interest Determination

Several amici harbor fundamental misconceptions about the authority of the Department of
Justice and the task before this Court in a Tunney Act proceeding. The Department of Justice is
not a regulatory agency -- it is a law enforcement agency empowered to bring suit in federal court

---

[69] Majure Reply Decl. ¶ 21.

[70] *Id.* ¶ 20.

[71] *See id.* ¶¶ 20-21.

to challenge specific violations of the antitrust statutes.[72] Unlike regulatory agencies such as the

FCC and state utility commissions, the Department of Justice is not authorized to challenge or

block a merger on "public interest" grounds that are not antitrust violations, nor can it seize upon a

merger as an opportunity to improve the state of competition in an industry or a market beyond

remedying the effects of an unlawful merger. Congress delegated regulatory responsibility for

telecommunications mergers to the FCC, which weighs whether merger applicants have shown

that, on balance, a transaction will serve the "public interest, convenience, and necessity."[73] Many

states authorize state regulators, such as the New York Public Service Commission, to conduct

similar "public interest" reviews.[74] Unsatisfied with the outcome of those proceedings,[75] as well as

the manner in which the Department of Justice exercised its prosecutorial discretion, various amici

have seized upon these Tunney Act proceedings as a forum to revisit the merits of the underlying

---

[72] Clayton Act § 15, 15 U.S.C. §§ 4, 25.

[73] 47 U.S.C. § 310(d); *see also* 47 U.S.C. § 214(a).

[74] For example, under New York law, the New York Public Service Commission must determine whether a merger between telephone companies "is in the public interest." N.Y. Pub. Serv. Law § 100 (Consol. 2006). In fact, NYAG participated in the New York Public Service Commission proceedings unsuccessfully raising many of the arguments that it brings here in objecting to the Verizon/MCI merger.

[75] These agencies reached conclusions about the mergers that are consistent with those reached by the United States. FCC Merger Orders ¶ 2; Order Approving Merger, In re: Joint Petition of SBC Communications Inc., AT&T Corp., N.Y. Public Service Commission CASE 05-C-0242, at 11 (Sept. 21, 2005) ("NYPSC SBC/AT&T Order"); Order Asserting Jurisdiction and Approving Merger Subject to Conditions, *In re: Joint Petition of Verizon Communications Inc. and MCI, Inc. for a Declaratory Ruling Disclaiming Jurisdiction Over or in the Alternative for Approval of Agreement and Plan of Merger*, N.Y. Public Service Commission CASE 05-C-0237, at 60-64 (Nov. 22, 2005) ("NYPSC Verizon/MCI Order"); Order of Approval, *In re: Joint Petition of Verizon Communications Inc. and MCI, Inc. for Approval of Merger*, N.J. Board of Public Utilities Docket No. TMO5030189, at 49-50 (Apr.12, 2006) ("NJBPU Verizon/MCI Order"); Order, *In re: Joint Petition of SBC Communications Inc. and AT&T Corp., Together with its Certificated Subsidiaries for Approval of Merger*, N.J. Board of Public Utilities Docket No. TMO5030168, at 23 (Oct. 4, 2005) ("NJBPU SBC/AT&T Order").

transactions and to achieve goals they failed to achieve before the FCC and other regulatory agencies.[76]

This expansive view of the scope of the current proceedings is patently inconsistent with the plain language of the Tunney Act, which directs the Court to evaluate the impact of the proposed consent decree, rather than of the underlying transaction, on the public interest. Specifically, the statute directs the Court to consider whether "*entry of such judgment* is in the public interest."[77] The Court's role under the Tunney Act is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaints.[78] It should not base its public interest determination regarding the proposed Final Judgments on antitrust concerns that would not have been part of the government's case had these cases gone to trial on the existing Complaints.

Amici also misconstrue the burden on the United States in a Tunney Act proceeding. Amici, principally ACTel and COMPTEL, attack the "evidentiary" weight of the materials[79] that

---

[76] Some amici go so far as to ask the Court to use its authority to deal with issues not before it and that are inappropriate for a merger remedy. *See, e.g.,* NJRC Reply at 22-23 (asking Court to "direct the parties to consider . . . having Verizon and SBC compete out of region" for mass market customers); Sprint Resp. at 33 (suggesting that "[a] holding by this Court that the proposed consent decrees are inadequate may cause the federal government to take the steps necessary to lower the merging parties['][special access] prices to just and reasonable levels").

[77] 15 U.S.C. § 16(e) (emphasis added).

[78] *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995) (statute does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case"); *United States v. BNS*, 858 F.2d 456, 462-63 (9th Cir. 1998) (holding that a district court may not base its public interest determination on antitrust concerns in markets other than those alleged in the government's complaint); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that a court is not to "review allegations and issues that were not contained in the government's complaint").

[79] On August 7, 2006 the United States provided the Court with materials relating to the harm identified and the remedy crafted to address this harm. *See* United States' Submission Attachs. The materials include data and documents produced by the merging parties, competing telecommunications

the United States provided to the Court and argue that the United States failed to "prove" various elements of the allegations in the Complaints. As movant, the United States has the burden of persuading the Court that the entry of the consent decrees is in the "public interest." Nothing in the Tunney Act or in Tunney Act jurisprudence, however, suggests that the United States is required to prove by a preponderance of the evidence (or any other standard) each of the elements of cases that it has settled. Such a requirement would substantially undercut the reasons for entering settlements – saving time and expense and avoiding the risk of losing at trial.

Amici continue to raise a host of issues that go beyond the scope of the United States' Complaints despite this Court's statement "for the record" that it would not consider such issues.[80] These issues include alleged harms in broader LPL markets as well as product markets (e.g., mass-market telephony) that are separate and distinct from LPL. The United States explained below why it did not allege a broader harm than described in its Complaints, and it would be impracticable and improper to require the United States to disprove the cases that it did not bring.

---

carriers (including members of ACTel and COMPTEL), and other third parties. These materials demonstrate the reasoning behind the claims brought and the remedy and clearly support a finding that the entry of the proposed decrees is in the public interest.

[80] *See* Motion Hr'g Tr. at 14:5-14:13 (July 12, 2006):

MR. SCOTT: The case law, which we believe is still good, indicates that going beyond the complaint itself is not appropriate for the context of these proceedings as it will impinge upon our role as the prosecutors and it will result in the Court looking at issues that we have not brought before you.

COURT: I agree with you. Let me make clear for the record. It's clearly my job to scrutinize the only complaint that's pending before the Court.

24

Our system of separation of powers leaves the balancing of competing interests affecting the scope

of the United States' case "in the first instance, to the discretion of the Attorney General."[81]

### b.    The Mergers Are Not Likely to Harm Competition for LPL Beyond the Two-to-One Buildings Alleged in the Complaints

All of the amici have suggested that if the mergers cause harm to competition in two-to-

one buildings, it necessarily follows that competition will also be harmed in buildings where the

number of competitors is reduced from four to three or three to two.[82]  Sprint goes so far as to

---

[81] *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981) ("The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.  The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.  The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is 'within the reaches of the public interest.'" (citations omitted)); *cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.  This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement." (citations omitted)); *Wayte v. United States*, 470 U.S. 598, 607 (1983) (stating that prosecutor's discretion about what charges to file reflects recognition that decision to prosecute is ill-suited to judicial review); *United States v. Nixon*, 418 U.S. 683, 693 (1974) (stating that the executive branch "has exclusive authority and absolute discretion to decide whether to prosecute a case").

[82] To justify arguments related to harm not alleged in the Complaints, amici are reduced to arguing that they know the scope of the United States' Complaints better than the United States does.  The arguments made by amici, however, rely on snippets of the Complaints taken out of context.  Read in their entirety, the Complaints allege harm only in the buildings identified in the proposed Final Judgments.  *See, e.g.,* Complaints ¶¶ 3, 25.  Any suggestion that this is a *post hoc* argument developed to narrow the scope of these proceedings is demonstrably false; a contemporaneous press release issued by the United States describes the Complaints as follows:

> According to the complaint[s] against Verizon [and SBC], [the merging firms] are the only two firms that own or control a direct wireline connection to hundreds of buildings in the metropolitan areas of Washington–Baltimore; Boston; New York; Philadelphia; Tampa; Richmond, Virginia; Providence, Rhode Island; and Portland, Maine [and Chicago; Dallas–Fort Worth; Detroit; Hartford–New Haven, Connecticut; Indianapolis; Kansas City; Los Angeles; Milwaukee; San Diego; San Francisco–San Jose; and St. Louis].  Therefore, in the absence of new entry, the merger would eliminate competition for facilities-based local private line service to those buildings.

Press Release, October 27, 2005, *available at* http://www.usdoj.gov/atr/ public/ press_ releases/2005/212407.htm.

assert that such harm is a "fact," of which the Court should take judicial notice.[83]  ACTel likewise

contends that "[t]he very same analysis [that] 'predicts' harm in 2-to-1 buildings also predicts

harm in 4-to-3 and 3-to-2 buildings."[84]  The loss of a competitor, however, does not always

translate into a loss of competition.  After careful investigation, the United States did not find

sufficient evidence to support allegations by amici that AT&T and MCI are uniquely capable

competitors for LPL.  Moreover, the application of well-settled antitrust principles to LPL markets

does not suggest that the mergers are likely to significantly harm competition beyond the two-to-

one buildings where harm is alleged in the Complaints.

### i.    Amici Have Distorted the Competitive Significance of AT&T and MCI

Several amici have alleged that the elimination of the acquired firm (AT&T in SBC's

territory or MCI in Verizon's territory) will lessen competition because this company has unique

characteristics that allow it to compete more aggressively against the RBOC than other CLECs.

Amici point primarily to the size and extent of AT&T's or MCI's network, particularly the number

of buildings on-net, as advantages that distinguish the acquired firm from other CLECs, and they

rely also on the existence of network effects[85] in telecommunications networks.[86]  The amici's

arguments are misplaced because the acquired firms' networks are not the most extensive in most

geographic areas of concerns or in any event significantly larger than the networks of other

---

[83] Sprint Resp. at 20.

[84] ACTel Resp. at 29.

[85] Network effects refers to the idea that the more locations or points a supplier has on a network, the more valuable that network is to customers.  *See, e.g.*, Selwyn NASUCA Decl. ¶ 18.

[86] *Id.* ¶¶ 18-19, 28, 36; Economides NYAG Decl. ¶¶ 45-46, 52-53, 78, 80, 86.

CLECs. In addition, whatever network effects exist, AT&T and MCI do not benefit from such effects substantially more than other CLECs.

The evidence provided by the United States with its Submission of August 7, 2006, demonstrates that amici have vastly overstated AT&T's and MCI's networks and competitive significance as providers of LPL. Indeed, AT&T and MCI had only about [REDACTED] total on-net buildings in SBC's and Verizon's territories respectively,[87] and their sales of LPL were relatively small, particularly in relation to the RBOCs. A report prepared by NASUCA's consultant, which was submitted in this proceeding by amicus Sprint, indicates that on a national basis, AT&T and MCI each had approximately the same number of on-net buildings as TWT does today.[88] Moreover, in most of the metropolitan areas identified in the United States' Complaints, the acquired CLEC is not the largest CLEC in terms of number of buildings on-net.[89] In [REDACTED] of the nineteen divestiture cities, a carrier other than the acquired firm had the most on-net buildings

---

[87] Majure Decl., Attachs. Tab 3, AT&T Building List; Tab 5, MCI Building List.

[88] *Compare* Sprint Resp. at 13 n.14 (citing estimate by Dr. Selwyn that pre-merger AT&T and MCI had approximately 6,400 and 6,000 on-net buildings respectively) *with* Time Warner Telecom, Inc. SEC Form 10-Q Filing at 26 (Aug. 9, 2006) (reporting that as of June 30, 2006 TWT had 6,433 on-net buildings).

[89] AT&T was the largest CLEC in only [REDACTED] of the eleven SBC divestiture cities. MCI was the largest CLEC in only [REDACTED] Verizon divestiture cities. *See* Majure Decl., Attachs. Tab 3, AT&T Buildings List; Tab 5, MCI Building List; Tab 6, CLEC Network Maps and Building Lists. Dr. Selwyn even seems to acknowledge this when he notes that "pre-merger AT&T and MCI each possessed what were *among* the largest CLEC facilities-based fiber optic networks in terms of the quantity of nodes (buildings) being served." Selwyn NASUCA Decl. ¶ 19 (emphasis added).

of any CLEC.[90]  Even in cities where the merging party was the largest CLEC, one or more other

CLECs is typically not far behind.[91]

The arguments made by amici as to network effects also have no merit.  Although

enterprise customers want to buy a telecommunications service that allows them to reach particular

locations, no carrier, not even the RBOCs, has facilities that connect to every building nationwide

or worldwide.  Providers, therefore, rely on their ability to interconnect their networks with other

carriers' networks in order to be able to meet the particular needs of their customers.  For example,

a carrier that bids to serve a sophisticated enterprise customer by constructing an advanced data

network connecting all of the customer's offices usually has to obtain some building connections

from other carriers.[92]  The carrier would purchase LPLs to connect those buildings to its network

so that the customer gets what appears to be one network that reaches all its offices.  The fact that

the seller of the LPL has connections to many other buildings is irrelevant to the carrier purchasing

it.  The only way a seller might have a unique benefit to the buyer is if it has many of the

customer's buildings on its network.  The benefit to the buyer is that it avoids the need to have to

negotiate with more sellers, but this benefit may be quite small.  All CLECs, including AT&T and

---

[90] Majure Decl., Attachs. Tab 3, AT&T Buildings List; Tab 5, MCI Buildings List; Tab 6, CLEC Network Maps and Buildings Lists.

[91] Notwithstanding Sprint's argument that AT&T and MCI are "uniquely positioned," by its own admission there are dozens of other competitors for LPL. Kassien Sprint Decl. ¶ 14. In Verizon's region, for example, nearly **[REDACTED]** of the LPL that Sprint purchased from CLECs were from a competitor other than MCI. *Id.* ¶ 16. In SBC's region, almost **[REDACTED]** of the LPL that Sprint acquired from CLECs were purchased from someone other than AT&T. *Id.*

[92] Enterprise customers sometimes buy telecommunications services from companies that own no telecommunications facilities. These companies, known as aggregators, purchase facilities from carriers and combine them with other services to provide and manage for example a data network. A number of the customer statements identify aggregators as competitors. *See* Majure Decl., Attachs. Tab 1, Retail Customer Statements.

28

MCI, own facilities that connect to only a small percentage of the buildings in an area, and therefore, it would be very unlikely for an enterprise customer to be interested in multiple buildings on the same CLEC's network. Thus, AT&T and MCI generally are unlikely to have an advantage over other CLECs in selling LPLs due to such network effects .

Perhaps in recognition of the fact that the acquired firm typically does not have a uniquely large facilities-based network in the metropolitan areas in question, several amici have argued that the impact of the mergers extends to buildings where neither AT&T nor MCI owns a connection. They contend that the loss of AT&T and MCI in SBC's and Verizon's regions, respectively, will have anticompetitive consequences due to the loss of those firms as *re*-sellers of LPL to other carriers.[93] According to these amici, AT&T and/or MCI were particularly important sellers of "Type II" circuits – circuits that include at least a portion that is purchased wholesale from the RBOC.[94] The United States considered this issue but did not find evidence to support such allegations.[95] To the contrary, AT&T's and MCI's sales of "Type II" LPL pre-merger were

---

[93] *See, e.g.*, Economides NYAG Decl. ¶¶ 50-51 (claiming that AT&T and MCI "resold surplus ILEC private lines at prices well below those that smaller CLECs could obtain from the ILECs directly"); Selwyn NASUCA Decl. ¶¶ 12-16 (suggesting that DOJ suffers from serious misconception, i.e., that the only source of competition for LPL comes from competing facilities-based providers). Dr. Selwyn concedes that this concern is beyond the scope of the Complaints. Selwyn NASUCA Decl. ¶ 16 (stating that "the Department's *Complaints* ignore this important source of Local Private Line competition in its entirety").

[94] "Type II circuits" typically refer to circuits of which a part is resold from the RBOCs. Often, it refers to a circuit where the competitive carrier (like AT&T or MCI) provides the transport portion, and the RBOC provides the "access" portion – the portion between the customer and the nearest RBOC central office. These are distinguished from "Type I circuits," which are circuits provided entirely over the seller's own facilities.

[95] United States' Response to Public Comments at 45-46; Majure Reply Decl. ¶ 31; *see also* FCC Merger Orders ¶¶ 41-47.

relatively small.[96]  Indeed, as a document attached to NASUCA's reply shows, AT&T had decided

before the merger that it could not profitably offer Type II LPL except where it is able to provision

the service using primarily its own network facilities.[97]  Neither AT&T nor MCI have uniquely

extensive transport networks that they could combine with RBOC access circuits to become

especially effective sellers of Type II circuits.[98]  Nor is there any evidence to suggest that AT&T or

MCI obtained discount terms from the RBOCs for LPL that were significantly, materially better

than those available to other CLECs.[99]  For the reasons above, the United States did not conclude

---

[96] AT&T's and MCI's "Type II" sales amounted to a small minority of their overall LPL sales, which in turn were relatively small to begin with.  Declaration of Anthony Fea, Anthony Giovannucci, Bob Handal, Michael Lesher and C. Michael Pfau (May 9, 2005), ¶ 43 (attached to Joint Opposition of SBC Communications Inc. and AT&T Corp. to Petitions to Deny and Reply to Comments, *In re: SBC Communications Inc. and AT&T Corp. Applications for Transfer of Control*, WC Docket No. 05-65 (May 10, 2005) ("AT&T currently provides less than [REDACTED]    a year in wholesale local private line services in SBC's territory.  Of that amount, only    [REDACTED]    is associated with Type II services for which AT&T leases a portion of the circuit from SBC.")), United States' Reply Submission Attach.1; Declaration of Jonathan P. Powell, Peter H. Reynolds, and Edwin A. Fleming (May 20, 2005), ¶ 11 (attached to Joint Opposition of Verizon Communications Inc. and MCI, Inc. to Petitions to Deny and Reply to Comments, *In re: Verizon Communications Inc. and MCI, Inc. Applications for Transfer of Control*, WC Docket No. 05-75 (May 24, 2005) ("Notably, more than [REDACTED]    percent of MCI's wholesale Metro Private Line revenue is derived from circuits that are entirely on-net and do not use incumbent LEC special access at all, i.e., Type I circuits.")), United States' Reply Submission Attach. 2.

### [REDACTED]

[97] Selwyn NASUCA Decl., Attach. 2., Declaration of Alan G. Benway, Robert G. Holleron, Jeffrey King, Michael C. Lesher, Michael C. Mullan and Maureen Swift on Behalf of AT&T Corp., *In re: Unbundled Access to Network Elements*, WC Docket No. 04-313, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338 (Oct. 1, 2004), ¶ 101.

[98] Majure Decl. ¶ 10.

[99] Majure Reply Decl. ¶ 31.

that the elimination of AT&T or MCI as a reseller of LPL was likely to have a significant

anticompetitive effect on LPL.[100]

Finally, contrary to ACTel's suggestions, the evidence does not show that the loss of

AT&T and MCI would have a disproportionate effect because of their purported roles as "low

price leaders."[101]   ACTel's primary evidence in support of this allegation consists of

[REDACTED]          [102]


[REDACTED]


[103]  As Dr.

Majure notes, other evidence the United States analyzed suggests that,          [REDACTED]

---

[100] A number of amici point to the fact that AT&T purchases large quantities of special access
from the RBOCs and serves the vast majority of its customer locations via such special access as
evidence that the loss of AT&T as a reseller will adversely impact competition. *See, e.g.,* Selwyn
NASUCA Decl. ¶ 13 (claiming that of 186,000 buildings where AT&T was providing retail DS-1 or
higher services, only 5.7% was provided over its own, or CLEC, LPL); *see also* Economides NYAG
Decl. ¶ 51. But this misses the point. These sales are not sales of "Type II" LPL to other carriers. These
sales are principally sales of inputs to telecommunications services ultimately sold to enterprise
customers. The United States did not find evidence of an anticompetitive problem related to the sale of
"Type II" LPL, nor did it find evidence sufficient to suggest that either merger would significantly reduce
competition to large enterprise customers that rely on LPL as an input – except in the rare situation where
a substantial portion of the customer's needs was in an AT&T (or MCI) on-net building and there was no
other CLEC with a connection to that building or likely to build in.

[101] *See* ACTel Resp. at 26 (AT&T and MCI were in many cases low price leaders);   [REDACTED]

[102]          [REDACTED]

[103] *See* Reply of the United States to ACTel's Opposition to the United States' Motion for Entry
of Final Judgments at 15-18 (June 1, 2006). The significant problems with those materials are discussed
in more detail in Dr. Majure's Reply Declaration and accompanying attachment. *See* Majure Reply Decl.
¶ 30.

31

[REDACTED]                    104


[REDACTED]


105


### ii.   Application of Well-Established Antitrust Theories Does Not Suggest that the Mergers will Cause Broader Harm in LPL Markets

As Dr. Majure explains, the two basic theories of competitive harm discussed in the

Merger Guidelines are coordinated effects and unilateral effects.[106] Whether a merger is likely to

cause either unilateral or coordinated effects depends on the nature of competition in a particular

market.  Notwithstanding conclusory statements by amici to the contrary, neither theory provides

a sound basis for alleging harm beyond the two-to-one buildings identified in the proposed Final

Judgments.[107]

---

[104] Majure Reply Decl. ¶ 28.

[105] In an SEC filing, MCI reported that its 2004 wholesale revenue fell by $0.9 billion, in part due to the "elimination of certain incentive discounts" that it had offered in 2003.  MCI, Inc., SEC Form 10-K Filing at 52 (Aug. 30, 2005).  Similarly, before the merger, MCI predicted the continued decline in its wholesale revenues as it continued to "strive to achieve higher margins in this business."  MCI, Inc., SEC Form 10-Q Filing at 29 (May 9, 2005).

[106] *Merger Guidelines* § 2.0; *see also* Majure Reply Decl. ¶ 25.

[107] ACTel has attempted to imply that prices have increased since the mergers, but the evidence it conjures up is all smoke and mirrors. The pricing tariffs it previously submitted show a price increase for no more than a handful of services in a handful of states in SBC's territory.  There is no indication that the increases were merger-related or that they are symptomatic of "dramatic" across-the-board price increases as ACTel claims.  *See* Majure Reply Decl. ¶ 29 n.44; *see also* AT&T, Inc.'s Memorandum in Response to ACTel's Reply Memorandum in Opposition to the Department of Justice's Motion for Entry of Final Judgments at 1-4 (June 27, 2006) (pointing to similar pricing tariff increases for the period before the consummation of the merger and thereby suggesting that these sorts of increases are not at all atypical, and have nothing to do with the mergers).  ACTel's citations to documents and press statements are equally misleading and taken out of context. ACTel Resp. at   [REDACTED]   , 31-32.

The United States investigated whether the mergers were likely to cause broader harm under a unilateral effects theory. As discussed above, the United States did not find that AT&T or MCI is uniquely situated to compete for LPL.[108] The evidence shows that LPL is close to a pure commodity product in which buyers perceive no substantial difference between the various LPL options and make purchasing decisions based primarily on price.[109] In commodity markets, antitrust theory does not suggest unilateral effects unless the remaining competitor or competitors in the market are capacity constrained such that they would be unable to supply customers seeking to escape a price increase by the merged firm.[110] That is not a concern here because the incremental cost of expanding capacity is relative minor once a carrier has established a connection into a building.[111] As long as at least one other CLEC has a connection to a building there is no reason to believe that that CLEC can not adequately replace AT&T or MCI.

The United States also investigated the potential for the merger to have coordinated effects in broader LPL markets. Successful collusion depends on the ability of the parties to reach and police an agreement regarding pricing or output.[112] Dr. Majure's reply declaration explains that

---

[108] *See supra* Part 2.b.i.

[109] Majure Reply Decl. ¶ 24.

[110] *Merger Guidelines* § 2.22 (stating that unilateral effects would be unlikely in commodity market unless competitors "of the merged firm likely would not respond to the price increase and output reduction by the merged firm with increases in their own outputs sufficient in the aggregate to make the unilateral action of the merged firm unprofitable").

[111] Sprint Resp. at 7 ("Most of the cost of deploying access facilities lies in the supporting structures, placement, rights of way, and access to buildings, and not in the fibert strand or copper wires themselves."); *see also* Economides NYAG Decl. ¶ 45 n.34 (noting that because the incremental cost of installing additional capacity is small CLECs typically install ample capacity to supply customers that might be won over later ).

[112] *Merger Guidelines* § 2.11.

33

LPL markets are not conducive to collusion for several reasons, including the fact that carriers that invested to bring a building "on-net" have the strong incentive to compete aggressively for every customer in the building in order to recover the large fixed costs associated with building facilities.[113] A reasoned application of antitrust principles, therefore, suggests that neither unilateral effects nor coordinated effects are likely where the merged firm faces competition from another CLEC after the mergers.

> **c.    The Mergers Are Not Likely to Harm Retail Competition for Telecommunications Services Provided over LPL Beyond the Two-to-One Buildings Alleged in the Complaints**

A number of amici suggest that the mergers are likely to cause competitive harm to retail enterprise customers beyond the harm in the 2-to-1 buildings that was alleged in the Complaints. The United States carefully investigated whether the mergers in question would cause competitive harm to retail enterprise customers for a broad array of telecommunications services and concluded that it would not. Based on its review of the documents and data submitted by the parties as well as approximately 200 customer interviews,[114] the United States concluded that there are numerous other firms competing to provide telecommunications services to large businesses.

---

[113] Speculation by amici that the two merged firms will not compete in each other's region in the future is similarly unreasonable. After acquiring AT&T or MCI, each merged firm will own substantial facilities in the other's region. Amici have not suggested why the merged firms would not have every incentive to utilize those facilities to compete aggressively, particularly for enterprise customers whose office locations may extend beyond a single RBOC's region. *See* Majure Reply Decl. ¶ 32.

[114] *Id.* ¶ 34. COMPTEL criticizes the United States' purported reliance on the customer statements submitted to the Court earlier in this proceeding. COMPTEL Resp. at 27. As Dr. Majure has explained, although these statements by themselves may be of limited evidentiary value they are consistent with the interviews that the United States conducted, and relied on in part, in making its decision not to pursue allegations of competitive harm to large enterprise customers. Majure Reply Decl. ¶ 34.

In fact, the United States' investigation revealed that the retail business offerings of the

merging firms are largely complementary rather than overlapping.[115]   Whereas AT&T and MCI

tend to be strong competitors for long distance voice service and advanced data services sold to

customers with nationwide or international reach, SBC and Verizon are focused on providing

business services to retail customers with primarily "in-region" needs.   Both SBC and Verizon

have explained that it was partly their inability to win large enterprise customers that provided the

impetus for these mergers.[116]   The United States did not find harm in retail enterprise markets

except for services provided over LPL to customers in certain two-to-one buildings.[117]

### d.       The Mergers are Not Likely to Harm Retail Mass-Market Competition

Some amici reprise their demands that the Court base its public interest determination on

unsubstantiated claims of harm in consumer markets that are not even arguably within the scope of

the Complaints.   NASUCA, NJRC, and NYAG argue that the Court should refuse to enter the

proposed Final Judgments because they fail to remedy purported harm to mass-market customers

---

[115] The statements previously submitted by the United States are consistent on this point.  Of the 129 retail customer statements previously submitted by the United States, at least 33 specifically characterize the merging parties as primarily offering complementary, rather than competitive retail products.  These customers included all sizes of customer, from the largest Fortune 50 customers ( **[REDACTED]** ) to small customers such as [REDACTED] , which spends less than [REDACTED] on telecommunications services annually.  *See* Majure Decl., Attachs. Tab 1, Retail Customer Statements.

[116] SBC Communications, Inc., Description of the Transaction, Public Interest Showing, and Related Demonstrations at 67, 96-101, *In re SBC Communications Inc. and AT&T Corp. Applications for Transfer of Control*, WC Docket No. 05-65 (Feb. 22, 2005); Verizon Communications, Inc., Public Interest Statement at 25-26, *In re Verizon Communications Inc. And MCI, Inc. Applications for Transfer of Control*, WC Docket No. 05-75 (Mar. 11, 2005).

[117] NYAG points to a customer survey to suggest that customers are concerned about the merger. However, the survey, which was prepared at the request of opponents to the transaction, is unpersuasive for reasons explained by Dr. Majure.  *See* Majure Reply Decl. ¶ 34 & n.57.

who purchase products like "plain old telephone" or residential "long distance" services.[118]  Their

concerns, however, have little to do with the mergers, much less with the harm alleged in the

Complaints.  Mass-market products utilize a different technology (switched  access) and are sold

to a different set of customers (residential and small business).  The primary grievance stated by

amici appears to be with the FCC, and its recent decisions to relieve RBOCs of regulatory

obligations to make switched-access facilities available to competitive CLECs under a cost-based

tariff.[119]  In fact, at least one amicus specifically asks the Court to overturn the FCC's Order with

respect to the merging parties.[120]

The United States fully investigated the mergers' potential to harm competition for mass-

market services and found insufficient evidence to allege a violation of Section 7 of the Clayton

Act.  The United States' decision was based on a number of factors discussed in Dr. Majure's

declaration, including regulatory changes that diminished the ability of AT&T and MCI to

compete with the RBOCs to serve mass-market customers.[121]  Several regulatory agencies that

reviewed the mergers found that AT&T and MCI had already begun to exit mass markets before

---

[118] *See* NJRC Reply at 2 (remedies fail to protect mass-market customers who want plain old telephone service); NASUCA Reply at 7 (asserting that the Complaints take an unreasonably narrow view of the merger's impact, which will have broad impacts on residential and other customers); *see also* Economides NYAG Decl. ¶ 17 (claiming that DOJ has not identified all relevant antitrust markets, including wireless, cable packet voice and long distance).

[119] *See* NJRC Reply at 3-5 (discussing impact of FCC TRRO on local switched service).

[120] *See, e.g.,* Motion of the New Jersey Division of the Ratepayer Advocate to Intervene and Memorandum of Points at 7 (July 18, 2006) (asking the Court to force Verizon and AT&T to sell switched residential access facilities to competitors at "TELRIC" rates).

[121] Majure Reply Decl. ¶ 33.

the mergers.[122]  Under those circumstances, the United States' conclusion that the mergers were

unlikely to harm competition in mass markets was clearly reasonable.   In any event, the law is

well settled that such claims, which are far beyond any conceivable interpretation of the

Complaints, cannot serve as the basis for the Court to find that the proposed Final Judgments are

not in the public interest.[123]

---

[122] *See, e.g.*, NJBPU SBC/AT&T Order at 9 (finding no harm to competition from the AT&T/SBC merger based on the "inescapable [and] firmly established" fact that "AT&T has ceased attempting to compete with other CLEGs in New Jersey for mass market customers"); NJBPU Verizon/MCI Order at 36 (finding "MCI has essentially ceased to compete vigorously [in mass markets]"); NYPSC Verizon/MCI Order at 29 ("We find that MCI, already deemphasizing its presence in the mass market, would no longer be in a position to exert significant influence over this market in the absence of this merger.").

[123] *See United States v. Pearson plc*, 55 F. Supp. 2d 43, 45 (D.D.C. 1999) (citing *BNS*, 858 F.2d at 462-63).

## 3.    CONCLUSION

Accordingly, the United States respectfully requests that the Court grant the United States'

motion for entry of the proposed Final Judgments.

Respectfully submitted,

_____

Laury E. Bobbish
Assistant Chief

_____

Claude F. Scott, Jr. (D.C. Bar No. 414906)
John M. Snyder (D.C. Bar No. 456921)
Jared A. Hughes

Trial Attorneys

Telecommunications and Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States

Dated:  September 19, 2006

38