## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

United States of America,

Plaintiff,

v.

SBC Communications, Inc. and
AT&T Corp.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.:  1:05CV02102 (EGS)

**FILED UNDER SEAL PURSUANT
TO PROTECTIVE ORDER
ENTERED AUGUST 4, 2006**

## REDACTED FOR
## PUBLIC INSPECTION

United States of America,

Plaintiff,

v.

Verizon Communications Inc. and
MCI, Inc.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.: 1:05CV02103 (EGS)

## REPLY DECLARATION OF W. ROBERT MAJURE

1.     I have been asked to prepare this reply declaration in order to further explain the basis for

the Complaints and relief sought by the Antitrust Division of the United States

Department of Justice (the "Department") and to address the arguments raised by the

various amici.   In this declaration, I will address issues raised by the amici that are

focused on the harm alleged by the government and the remedies contained in the

1

proposed Final Judgments.  However, many of the objections raised by the amici pertain

to issues other than whether the proposed remedies will adequately address the harm

alleged in the Complaints.  I have been asked to briefly touch upon the government's

analysis of these other issues for the benefit of the Court and the public.

2.      It is important to remember that the Department has a specific role in reviewing mergers.

It determines whether in its judgment the merger violates the antitrust laws, and because it

does not have the power to enjoin mergers, whether there is enough evidence to convince a

court that the merger is likely to substantially lessen competition in a particular market.

The Department will be unable to prevail in court if it has insufficient evidence to prove

each element of an antitrust violation.[1]

## I.      The Department Employed Standard Antitrust Analysis In Evaluating these Mergers

3.      Some amici argue that my previous declaration was deficient because it did not describe

the competitive harm using the tools of geographic market definition or market shares and

concentration figures described in the Department's *Horizontal Merger Guidelines*,[2] which

outline the analytical framework used in reviewing the competitive effects of a merger.

Others argue that the geographic markets alleged in the Complaints are too narrow, too

---

[1] Some amici fail to understand the analytical elements of an antitrust investigation or the need for evidence to support a challenge. They imply, for instance, that the Department could properly sue based solely on figures that suggest high concentration in a market, or achieve broad divestitures even though it cannot be proved that entry is unlikely to alleviate the competitive concerns.

[2] U.S. Dep't of Justice & Federal Trade Comm'n, *Horizontal Merger Guidelines* § 1.0 (rev. ed. 1997) ("*Merger Guidelines*").

broad, or ignore commercial realities of the telecommunications business. I explain below why the product and geographic markets alleged in the Complaints are appropriate based on the characteristics of local private line services, and why concentration figures are not especially helpful in analyzing these markets.

### A.    Market Definition

4.    Market definition is an analytical tool used to assist in determining the ultimate question of whether a merger will result in harm for some consumers.[3] It is useful for describing the scope of potential harm and for identifying the set of possible competitors. My initial declaration addressed directly the alleged competitive harm and number of providers that own a direct connection to the buildings at issue, but it is also possible to explain the analysis with the tool of market definition.

5.    The market definition methodology set forth in the *Merger Guidelines* starts by looking at the smallest set of goods sold by the merging parties, and then adds goods that customers consider similar (and that would serve as a substitute in the face of a price increase) until a set of goods is found where an owner of all those goods (a "hypothetical monopolist" over those goods) would find it profitable to raise price a small but significant amount. The hypothetical monopolist would not be able to raise price successfully if a number of customers would switch to other products rather than pay the higher price. Thus, the

---

[3] U.S. Dep't of Justice & Federal Trade Comm'n, *Commentary on the Horizontal Merger Guidelines* at 2 (2006) ("*Merger Guidelines Commentary*").

methodology is essentially that of identifying the smallest set of goods over which it is possible for market power to be exercised, and calling that set the market.[4]

6.    In defining a product market in these cases, the Department began its analysis with the local private line products of the merging parties.[5] This is an appropriate place to start because a local private line[6] is a fundamental product that is routinely bought and sold. It has a price and one can consider what would happen if a hypothetical monopolist raised that price. To confirm that local private lines is an appropriate product market, I also considered whether there are other options customers could use instead of purchasing local private lines. As local private lines are fundamental to any telecommunications product serving a business customer with any significant volume of traffic, the only way to avoid directly or indirectly purchasing local private lines as part of a telecommunications package is to give up the functionality of a dedicated connection. However, for the traffic volumes that lead a customer to consider local private lines in the first place, an undedicated (or switched) circuit would be insufficient to allow the company to obtain the type and quality of communication services it requires. I do not believe that undedicated

---

[4] *Merger Guidelines* §1.0.

[5] There is potentially an even smaller set of goods one could start with because the parties generally set distinct prices for local private lines with different capacities (DS1, DS3, OC3). However, because those prices appear to be more of a menu of "flavors" available from any carrier capable of providing local private line service, using the smaller market definition does not substantially alter the analysis because the same set of providers would participate in each of the smaller markets.

[6] Local private lines are dedicated point-to-point circuits offered over copper and/or fiber-optic transmission facilities that originate and terminate within a single metropolitan area. Complaints ¶ 3.

4

services are a practical constraint. As far as I can see, there simply is no other
telecommunications service or product that would be an effective alternative for the
customer.

7.     Probably the closest alternative for a buyer is the same local private line service provided
to a different location. If that other location is not also monopolized, the customer could
get service there from another carrier and escape the hypothetical monopolist's price
increase. But unless the customer is willing to relocate in order to lower its telephone bill,
this is an impractical alternative. The cost and disruption of relocating will certainly
outweigh the benefits of avoiding a small price increase.

8.     The *Merger Guidelines* methodology therefore supports the conclusion that local private
lines is a relevant product market and that a relevant geographic market would be the
individual buildings (a definition that fits well with the harm identified in the
Complaints).[7]

9.     Amici NYAG and COMPTEL argue that a single building cannot be a market because

---

[7] The delineation of geographic markets limited to individual buildings is also consistent with
how the Department has defined markets in other telecommunications merger matters. *See, e.g.,*
Complaint, *United States v. Echostar Communications Corp.*, Civ. No. 1:02CV02138 (D.D.C. filed Oct
31, 2002), ¶¶ 30-31 (alleging that each residence constitutes a separate geographic market but
aggregating, for ease of analysis, residences that face the same choice of providers). Such aggregating
would not be useful here given the differences in CLEC networks.

retail customers buy networks, i.e., the ability to connect to multiple locations.[8]  It is true

that many of the customers for local private lines are actually wholesalers – carriers who

combine local private lines with other facilities and services, to sell end-user customers

services that create a local, regional or national network.  This fact, however, does not

prevent a connection to a single building from being deemed a relevant market.  Local

private lines are priced and sold separately, and purchasers buy them because they allow

dedicated connections to particular locations.  The fact that they are inputs into other

services that are sold in different markets with different characteristics does not alter the

analysis.[9]

10.     Local private line services to individual buildings is an acceptable market definition given

---

[8] Memorandum of Eliot Spitzer, Attorney General of the State of New York, in Response to the August 7, 2006 Submission of the United States at 8 (Sept. 5, 2006) ("NYAG Resp."); Declaration of Nicholas Economides (Sept. 5, 2006) ("Economides NYAG Decl."), ¶¶ 21, 25, attached to NYAG Resp.; COMPTEL's Response to the Department of Justice's Supplemental Submission at 20 (Sept. 5, 2006) ("COMPTEL Resp."); Declaration of Joseph Gillan (Sept. 1, 2006) ("Gillan COMPTEL Decl."), ¶¶ 10-11, attached to COMPTEL Resp.

[9] For example, consider cars and their windshields.  When consumers walk into an automobile showroom they expect to buy an entire car; however, that car is composed of other products, including windshields.  The fact that an end-user typically buys an entire car would not preclude the definition of a product market of automotive windshields, nor would it suggest that car manufacturers could not suffer harm due to a merger of windshield producers.

Amicus COMPTEL implies that the proper geographic market should be the entire United States. COMPTEL Resp. at 29-30.  COMPTEL's confusion appears to be linked to its misreading of the Complaints.  It interprets the language "and telecommunications services that rely on local private lines," Complaints ¶ 19, to mean that the Department filed a case alleging harm for all telecommunications services provided to business customers.  That is not correct.  The Department's case is limited to local private lines but the language "telecommunications services that rely on local private lines" refers to the indirect effect of the merger on customers that purchase services that use local private lines to the affected buildings as an input.  In terms of the example provided above, this means that if a merger were to cause the price of windshields to increase, the price of cars might increase.

6

the nature of the competition between the merging parties. But, as amici point out, there
are some factors that suggest one could do the analysis by looking at a broader market,
such as a metropolitan area.[10] As I discuss above, market definition is a tool for assisting
with the analysis of the likely competitive effect. A somewhat different market definition
may serve as an equally useful tool in this regard. To perform the analysis using the
broader geographic market definition one would need to take into account that different
carriers serve different buildings. Indeed, AT&T's competitive significance in a particular
building depends on whether AT&T is capable of providing a local private line to that
building. It would be inappropriate to let the choice of market definition cloud the fact
that in this case, ultimately, the predicted harm stems from a loss of competition to serve
the buildings identified in the Appendices to the proposed Final Judgments.

### B.    Market Shares and Concentration Statistics

11.    Although concentration measures (e.g., market shares or more complicated statistics such
as HHIs) are often useful tools in antitrust analysis,[11] sometimes they do not add anything
useful to the evaluation of competitive effects. For example, calculating market shares
based on sales can be misleading in analyzing a local private line market. To illustrate
this, assume that a building has only one tenant who solicited bids for all of its
telecommunications business last year. Assume also that the tenant obtained competitive
bids from five carriers, and that all of the carriers have lateral connections into the

---

[10] *See* COMPTEL Resp. at 18-19, 28; Economides NYAG Decl. ¶¶ 25-27.

[11] *Merger Guidelines* § 1.5.

building. If market shares were calculated based on sales, and if the entire contract were awarded to one carrier, the market share of the winning bidder would be 100% and each of the other four firms would have a zero share. This would incorrectly suggest that one firm has a monopoly when in fact there was substantial competition for the tenant's business.

12.     Amicus ACTel suggests that it is appropriate to calculate market shares and HHIs by giving each carrier with a lateral connection an equal market share,[12] but that is effectively the same as just reporting the number of carriers that have facilities capable of providing local private line service in a building. For example, in the merger cases at issue here, the Department has alleged that harm would occur in buildings with two carriers but only one post-merger. It would not have added anything useful to the Department's explanation of the harm here to say that HHI figures would increase from 5,000 to 10,000 in those situations. The Complaints make clear that customers in those buildings would no longer have a choice.[13]

_____

[12] ACTel's Reply Memorandum in Opposition to the United States' Motion for Entry of Final Judgments at 9 (June 7, 2006).

[13] Amici NYAG and COMPTEL have suggested that HHI figures alone can be used to determine whether competitive harm is likely from a merger. *See* NYAG Resp. at 12; Economides NYAG Decl. ¶ 55; COMPTEL Resp. at 25-26. Although the *Merger Guidelines* do establish presumptions for markets being more or less likely to support a prediction of harm, they go on to describe the other factors that need to be taken into account before such a conclusion can be reached (i.e., theory of competitive harm, entry, and efficiencies). Thus, calculating HHIs is not meaningful unless other information related to the industry is evaluated. *Merger Guidelines Commentary* at 15-16. These other factors are discussed in my initial declaration as well as below. Declaration of W. Robert Majure (Aug. 7, 2006) ("Majure Decl."), ¶¶ 12-14, attached to United States' Submission in Response to the Court's Minute Order of July 25, 2006 (Aug. 7, 2006) ("United States' Submission"). *See also infra* ¶¶ 16-18, 24-32.

13.     As discussed above,[14] there are essentially only two ways to generate a building-specific

market share for local private lines (either by using the revenues on sales of local private

lines involving the building or to count capacity to serve the building). Amicus

COMPTEL has cited statistics calculated by FCC staff for "local voice services" for each

state in SBC's territory based on data from a survey conducted by SBC of medium and

large enterprise retail customers.[15] These figures are for many reasons inappropriate for

evaluating competition in local private lines. First, there is no way to assess the validity of

SBC's survey results. Second, the data refer to retail sales and may include purchases of

switched as well as dedicated services. Finally, because the choice of local private line

provider is limited to those firms capable of providing that service at a particular building,

any measure that aggregates buildings where a carrier has facilities with ones where it does

not, would not account for the fact that a carrier may be competitively significant in the

former and not in the latter. For example, AT&T may be relatively successful in selling

service in buildings where it has facilities, but if one merely averages its sales across the

entire state AT&T appears to be more important than it really is in some places and less

important in the places where it really is a significant competitor.[16]

---

[14] *See supra* ¶¶ 11-12.

[15] COMPTEL Resp. at 30-31. The FCC notes that SBC did not provide a definition for "local voice services." Memorandum Opinion and Order, *In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, 20 F.C.C.R. 18,290 (Nov. 17, 2005), ¶ 70 n.201. In addition, the data is reported on a statewide basis. *Id.* ¶ 70 & n.200. COMPTEL fails to note that the FCC did not find a competitive problem in any retail enterprise business market despite the figures cited.

[16] Three other amici submitted HHIs. New Jersey Rate Counsel submitted HHIs for retail residential and small and medium businesses, customers unlikely to be purchasing local private lines. Reply of the New Jersey Rate Counsel to the United States' Submission in Response to the Court's

14.    Thus, although it is possible to cite measures reporting significant concentration in local

telecommunications services, it is not clear that any of these are relevant to the analysis of

the markets at issue. Indeed, all of the ways in which one might calculate such a measure

seem more prone to distortion and misinterpretation than is a simple description of the

facts such as that presented in my initial declaration.[17]  Precisely because mechanical

application of concentration measures can produce flawed conclusions, the *Merger*

*Guidelines* use such statistics only to establish initial presumptions, and make clear that

further refinement of the analysis is necessary. In practice, the Department and the FTC

have often found that specific transactions are likely to have consequences different than

these initial presumptions would indicate.[18]

---

Minute Order of July 25, 2006 at 9-10 (Sept. 5, 2006) ("NJRC Reply").  NYAG quotes HHI figures from
the report of the NY Public Service Commission ("NYPSC") staff which were included in the section
that analyzed retail enterprise competition. NYAG Resp. at 12. The NYPSC staff does not use these
figures to evaluate competition for local private lines. Sprint refers to concentration numbers provided to
the FCC by Dr. Wilkie on behalf of ACTel members XO Communications and Savvis Communications
that were calculated for six metropolitan areas based on capacity being used to serve customers.
Response of Sprint Nextel Corporation to the United States' Submission in Response to the Court's
Minute Order of July 25, 2006, at 26 (Sept. 5, 2006) ("Sprint Resp."). Dr. Wilkie's source for the data
seems to be building lists from the parties and less reliable data on other CLECs from a third-party
report. The report appears to include only capacity figures pertaining to business that was actually won,
and therefore may be prone to the same misinterpretation problems as using revenue figures, as described
here. *See supra* ¶ 13.

[17] Majure Decl. ¶¶ 6-14.

[18] *Merger Guidelines Commentary* at 15-16.

C.    **Entry**

15.    The *Merger Guidelines* recognize that concentration measures may fail to account for new firms that are either about to enter or would likely enter. The *Merger Guidelines* indicate that if such entry will be timely, likely and sufficient, it should be included in the analysis.[19]

16.    In evaluating whether to challenge these mergers in certain buildings where the parties have the only facilities capable of providing local private line service, the Department considered the potential for other CLECs to construct new laterals into these buildings. Amicus COMPTEL has misconstrued this analysis as a prediction of speculative entry by these CLECs (i.e., building connections in the hope of using them at some later date to serve customers).[20] Although purely speculative entry may be unlikely, there are clearly instances where a CLEC with fiber close to a building has bid on business in that building with the intention to build a connection to serve the customer.[21] Therefore, the possibility of entrants bidding for new opportunities as they arise needs to be addressed to correctly depict the likely set of competitors.[22] The Department attempted to do that consistently

---

[19]    *Merger Guidelines* §§ 1.32, 3.0.

[20]    COMPTEL Resp. at 22-24.

[21]    *Id.* at 22-23; Sprint Resp. at 24; *see also* Majure Decl., Attachs. Tab 9, CLEC Interrogatory Responses.

[22]    These competitors can drive prices down as the carrier who already has facilities into the building is forced to offer prices that are low enough to keep the customer from accepting the bid from the entrant. This would be significant competition even if, in the end, the customer decided to use the provider with existing facilities.

across a wide array of buildings[23] by using the information provided by CLECs to construct entry screens that took into account the cost of constructing facilities from each CLEC's network to the building and the potential revenue opportunities that might be involved in future competitions.[24]

17.    As Professor Economides notes in his declaration, it is difficult to predict precisely where and when entry is likely, and economists may disagree on the likelihood that a firm will be willing to undertake the necessary investment.[25] I agree. But one cannot say that the merger is likely to harm customers in a building if the possibility of entry cannot be ruled out with some confidence. If the Department is not sufficiently confident that a harm can be predicted (and, presumably, proven), it cannot allege one.

18.    Amici have argued that the Department's entry analysis is incomplete because it ignores various factors listed in paragraph 27 of the Complaints.[26] The entry screens did take into

---

[23] The criteria that any particular CLEC uses in deciding whether to construct a lateral into a building are not necessarily or absolutely consistent with those used by other CLECs. The Department estimated possible entry using information gathered from multiple sources to evaluate whether the potential benefits to a firm could be sufficient to induce it to build a lateral. The Department found no internal business documents that analyze the costs and benefits of entering each individual building in an area.

[24] This is, of necessity, an approximation. However, because the approximation is based on the decisions made under current conditions, it will tend to understate entry to the extent that there would be additional incentives to enter following any significant exercise of market power (e.g., raising prices in the building) by the merged firm.

[25] Economides NYAG Decl. ¶ 11.

[26] ACTel's Response to the United States' Submission Pursuant to the Court's Minute Order of July 25, 2006, at 14-16 (Sept. 5 , 2006) ("ACTel Resp."); Economides NYAG Decl. ¶¶ 68-76;

account the most important factors, which were the potential revenue stream likely to be obtained at some point in the future and the biggest component of the cost of entering.[27] But they did not take into account unusual features or circumstances regarding buildings or customers that could raise costs (e.g., the existence of railbeds), nor did they consider the possibility of increased revenues (e.g., if sales could be predicted to increase). Given the Department's obligation to be able to defend in court its allegations of where harm is likely to occur, however, I believe that the analysis used predicts likely entry as closely as is practical.

## II.    The Remedies Are Appropriate to Restore Competition in the Relevant Buildings.

19.    My initial declaration explained in detail how the divestitures required by the proposed Final Judgments will remedy the harm alleged in the Complaints.[28] I will not repeat that discussion here. The amici have raised two arguments about the proposed remedies. First, they allege that the divestitures are not extensive enough to create another company of the

---

Declaration of Lee L. Selwyn (Sept. 5, 2006) ("Selwyn NASUCA Decl."), ¶ 46, attached to Reply of Amicus the National Association of State Utility Consumer Advocates Regarding the Public Interest (Sept. 5, 2006) ("NASUCA Reply").

[27] ACTel points out that the Department's screen did not account for the fact that an acceptable connection point or node may not be located at the network's closest point to the building. *See* ACTel Resp. at 20-21. The Department only accounted for the cost to construct a connection to the network at its closest point. It seems likely that the cost of pulling fiber from this point to the nearest node through an existing conduit is far less than that of actually constructing new conduit, and so the additional distance to reach a network node is unlikely to generate costs significant to the entry decision.

[28] Majure Decl. ¶¶ 15-25.

13

same size and scope as AT&T and MCI.[29]  The purpose of the remedy is not to recreate the acquired company but to remedy the alleged competitive harm.  AT&T and MCI compete in numerous markets.  For many telecommunications services, such as providing sophisticated data networks to multinational companies, they faced little or no competition from their respective merger partners.  There is no significant harm stemming from the lost competition in these markets, so no divestitures are required.  The predicted harm from these mergers stems only from the lost competition to provide a basic service, local private lines, to more than 700 buildings where entry appears to be unlikely, and the remedies result in another CLEC stepping into AT&T's or MCI's shoes in each of these buildings.

20.  The other argument made by the amici is that based on the small dollar amount potential buyers are willing to pay for the SBC divestiture assets, the Court should conclude that the assets will not allow the purchaser to be competitively significant in the marketplace.[30]  I am not concerned by the actual prices obtained by SBC for these assets.  First of all, the buyer is not acquiring a current revenue stream, but only the ability to compete for future business opportunities as they arise.  They of course would have been willing to pay more if customers had been included with the divestiture assets.  Amici equate no customers, and consequently no market share, with no ability to influence prices bid to customers

---

[29]  Gillan COMPTEL Decl. ¶¶ 21, 23; Selwyn NASUCA Decl. ¶¶ 35-37; Economides NYAG Decl. ¶¶ 67, 88.

[30]  Gillan COMPTEL Decl. ¶¶ 23-27; Selwyn NASUCA Decl. ¶¶ 48-49, 52-54.

seeking to buy new services or change providers. This is incorrect. As soon as an acquirer has the ability to serve these buildings without having to build extensive new infrastructure, it will be able to compete aggressively for each new business opportunity.

21.    Second, it is not uncommon for those acquiring assets to be divested pursuant to Department consent decrees to pay prices that seem much lower than what those assets would cost in other contexts. Buyers know that the merged entity must sell the assets and is anxious to do so under the deadlines imposed by a final judgment. Economists generally expect that the party negotiating with more urgency and fewer options will get the worst of an agreement, but how that plays out in any given sale depends on many other conditions. Thus, specific inferences of the true value of an asset package cannot be based on the price paid.

## III.    Other Arguments Advanced by Amici Have No Merit

22.    The amici also contend that the Department should have brought broader cases than the ones alleged in the Complaints to address: (1) the effect on local private line services provided to buildings other than those identified in the proposed Final Judgments (the "3-to-2" or "4-to-3" situations),[31] (2) AT&T's and MCI's positions as resellers of local private lines,[32] (3) potential for collusive behavior between SBC and Verizon post-

---

[31] Economides NYAG Decl. ¶ 61.

[32] *Id.* ¶¶ 50-51; Selwyn NASUCA Decl. ¶¶ 12-16.

merger,[33] (4) loss of competition in consumer telephony,[34] and (5) retail

telecommunications services.[35]  Although I have been told that these topics are outside the

scope of these proceedings, I offer a brief explanation of the Department's reasons for not

seeking relief in these areas.


### A.    No Harm in "3-to-2" and "4-to-3" Buildings

23.    Although many mergers will result in the elimination of a competitor in a market, not all

such mergers will result in a substantial lessening of competition.  Whether the elimination

of a particular competitor is significant will depend on the structure of the industry, the

nature of competition, the goods or services involved, and the competitive characteristics

of the merging parties.  For those buildings where AT&T or MCI is not the only CLEC

with the facilities capable of providing local private line services, I believe the evidence

did not suggest a significant loss of competition as a result of the mergers.


### 1.    Local Private Lines Are Essentially a Commodity

24.    The Department's investigation produced evidence suggesting that local private lines are

close to a pure commodity.  That is, customers perceive no substantial difference between

the various local private line options that might be available for connecting two points in a

city.  These are generally sophisticated buyers who understand the technical nature of the

---

[33] Sprint Resp. at 29-30; Economides NYAG Decl. ¶ 53.

[34] NJRC Reply at 2-3; Selwyn NASUCA Decl. ¶¶ 58-61.

[35] COMPTEL Resp. at 27-31.

local private line connection they are buying. They know that the capacity of the connection they are buying is standardized, and that, for example, the OC-3 grade connection from one carrier, is interchangeable with the OC-3 grade connection of another carrier. The competition for these customers generally comes down to price.

25.    For commodity products, intense competition can occur in a market with only two firms, absent some type of collusive agreement between the firms.[36] In addition to describing how to delineate markets and calculate measures of concentration, the *Merger Guidelines* discuss the need to evaluate whether competitive harm is likely given the specific characteristics of the market. In these cases, this evaluation is to determine whether there is an economic story that would explain why the loss of AT&T or MCI would result in higher prices or other anticompetitive effects. The *Merger Guidelines* describe two ways in which a merger may harm competition.[37] The first is that the merger would make collusion among the remaining firms more likely. The second is that the merged firm may be able

---

[36] Economic theory has long recognized two models of how industries can be perfectly competitive. The first is where there is such a large number of suppliers that no one of them can exercise any influence over the price or total quantity sold. The other is where there are at least two firms whose products are so nearly identical that any difference in price drives all of the customers immediately to the lower-priced firm. These models of competition can be found in any textbook of industrial organization economics. *See, e.g.*, Jean Tirole, *The Theory of Industrial Organization* 209-11 (1988). This latter model, known as Bertrand competition, has been studied extensively by economists. *Id.* at 211-18. For either merger to have significant competitive effects, we would have had to establish that the concept embodied in the Bertrand model did not apply – i.e., establish that there are significant differences between the services offered by AT&T or MCI and another CLEC in the same building. This is not to imply that local private lines markets are an ideal fit to the Bertrand model. That model does not incorporate important characteristics of the industry such as regulation and the economics of networks. Nevertheless, the basic concept in the Bertrand model would apply and limit the degree to which the presence of additional CLECs in a building results in significantly more competition.

[37] *Merger Guidelines* § 2.0.

unilaterally to raise prices because it has eliminated a competitor who otherwise would have acted to constrain such behavior. Given the facts of this case, unilateral effects would only be significant where there were no other competitors positioned to offer the same commodity service.

26.    Collusive agreements also are not likely in these markets for several reasons, including the facts that purchases often involve long-term contracts, the prices negotiated with customers are not readily observable, the competitors that each market participant faces vary from building to building, and each market participant has a strong incentive to win every customer in order to recover the large fixed costs associated with building facilities. All of these factors make it difficult for firms to reach and police collusive agreements.[38] Consequently, I did not predict such harm in buildings where other CLECs were present.

### 2.    No Evidence that AT&T or MCI Is a Uniquely Important Competitor

27.    As I explained in my initial declaration, an additional competitor might still matter if that competitor brings some unique advantage to the competition.[39] If, for example, AT&T or

---

[38] *Merger Guidelines* § 2.1.

[39] Amicus Sprint alleges that AT&T and MCI are unique because it has used competitive offers from these companies to negotiate lower rates from the RBOCs. Declaration of Keith L. Kassien (Sept. 1, 2006) ("Kassien Sprint Decl."), ¶ 17, attached to Sprint Resp. As the fiber maps and lists of on-net buildings attached to my initial declaration illustrate, there is a significant amount of fiber available from other CLECs and a great deal of overlap in the facilities of other CLECs and AT&T and MCI. *See* Majure Decl., Attachs. Tab 6, CLEC Network Maps and Building Lists; Tab 7, Overlapping CLEC Fiber Maps. Sprint has not explained why it will not be able to obtain equally competitive bids from CLECs to use in negotiations with the RBOCs after the merger.

MCI was able to provide local private lines at a particularly low cost, then their presence

(even with other competitors) might push SBC or Verizon to an even lower level of pricing.

I did not find evidence to support a conclusion that AT&T or MCI had unique advantages

in selling local private line services.[40]

28.

                       [REDACTED]

[41]

---

[40] Amici devote substantial space in their filings to attempting to establish that AT&T and MCI are unique. However, it is not enough to point to some characteristic of AT&T and MCI that is different than other CLECs. The difference must be one that would support an economic explanation of how the loss of AT&T or MCI would affect competition for local private lines. Most of the arguments made by amici focus on the fact that AT&T and MCI are significant competitors for retail sales to large enterprise customers. Selwyn NASUCA Decl. ¶¶ 28-32; Sprint Resp. at 14; Economides NYAG Decl. ¶¶ 20-22, 77-80. They fail, however, to draw a connection between success at the retail level and the ability to be a significant provider of an input, such as local private lines. Other amici argue that the scope of the networks operated by AT&T and MCI make them unique. Selwyn NASUCA Decl. ¶¶ 35-37; Economides NYAG Decl. ¶¶ 20-21, 44-45, 74, 77-78. Network economies might make the size of the AT&T and MCI networks relevant if these networks were anywhere near large enough that a significant portion of possible interconnections a customer might want to make might have both endpoints on the AT&T or MCI network. Such an advantage may be available to the RBOC given its ubiquitous coverage in region, but not to a CLEC. As Dr. Selwyn notes, the vast majority of the buildings served by AT&T are not on-net, but are served by AT&T primarily through facilities it leases from the RBOCs. Selwyn NASUCA Decl. ¶ 13. All carriers rely on interconnecting with other providers in order to offer their customers the benefits of a larger network than the one they own. Any carrier who can offer a local private line between a given building and a common interconnection point offers just as much functionality as AT&T can offer in that building, except in some very rare cases where the customer wants to interconnect to another building to which AT&T has a connection.

[41] *See* Majure Decl., Attachs. Tab 11, AT&T Documents.

29.                [REDACTED]



[42]          [REDACTED]



[43]                    [REDACTED]

[44]

---

[42] *See* Majure Decl., Attachs. Tab 12, MCI Documents.

[43]          [REDACTED]                    MCI-DOJ-QQ0001024, at -1024 (2005).

[44] Amicus ACTel finds fault with my previous declaration because it fails to explain "why prices throughout the relevant market have reversed a downward trajectory and have consistently increased since the mergers." ACTel Resp. at 3-4. ACTel's evidence of consistently increasing prices in the market post-merger consists of selected tariffs filed in a few states in SBC's territory for one type of local private line. There are numerous reasons why some prices may increase even without a merger of firms in a market. ACTel's selection of tariff adjustments which happen to have involved price increases is far from the kind of systematic evidence I would want to rely on in predicting the consequences of a merger. In particular, ACTel does not suggest any way to determine that other market changes, such as regulatory changes, are not the more obvious explanations for these particular increases. The fact

30.    Both during the investigation and in its recent filing, ACTel has argued that the presence of

AT&T and MCI in the wholesale market resulted in lower prices.[45]    To support this

argument, ACTel provided the Department with                **[REDACTED]**

.[46]

**[REDACTED]**

Attached to this declaration is a

summary of the principal shortcomings identified in    **[REDACTED]**    Professor

Wilkie's analysis, which was prepared by Department economic staff working under my

direction.[47]    To summarize, ACTel's submissions did not provide credible support for the

conclusion that the elimination of AT&T and MCI as competitors for local private lines

---

that other amici have disputed ACTel's characterization of the pre-merger market as experiencing
decreasing prices, *see, e.g.*, Selwyn NASUCA Decl. ¶¶ 29-32, is yet further reason not to rely on
ACTel's interpretation of these tariff filings.

[45]  ACTel Resp. at 25-27.

[46]
            **[REDACTED]**                ACTel had previously provided a
declaration from Dr. Wilkie describing the same empirical work. Declaration of Dr. Simon J. Wilkie
Submitted on Behalf of the Alliance for Competition in Communications (May 4, 2006), attached to
ACTel's Motion for *Amicus Curiae* and Intervenor Status Pursuant to the Tunney Act (May 5, 2006).

[47]  Critique of Dr. Wilkie's Analysis, Majure Reply Decl. Attach.

would result in any significant loss of competition where other CLECs remain to offer the service.

**B.    AT&T and MCI Were Not Significant Resellers of Local Private Lines**

31.    Amici raise concerns about the Department's failure to remedy the loss of competition due to the elimination of AT&T and MCI as resellers of local private lines leased from SBC or AT&T.[48] The amici argue that MCI and AT&T were able to buy local private lines from the RBOCs at lower rates[49] than other CLECs and then often resell this access bundled with their own facilities to other CLECs. Amici allege that whereas this allowed the CLECs to avoid paying the higher prices charged by the RBOCs for equivalent circuits, after the merger, CLECs will have to buy access at higher prices.[50] These arguments fail because they are factually untrue.                   **[REDACTED]**

AT&T received the same discount from SBC that was available to any carrier that committed to spending a minimum of $10 million annually.[51] The $10

---

[48] Economides NYAG Decl. ¶¶ 50-51, 57, 64; Selwyn NASUCA Decl. ¶¶ 12-16.

[49] Dr. Selwyn discusses the ability of a carrier to purchase a high-capacity circuit and resell it as a collection of lower capacity circuits (assuming there is enough demand for the lower capacity circuits between the circuits's end points). Selwyn NASUCA Decl. ¶ 15. But any carrier can engage in this type of resale, so AT&T and MCI only have an advantage in dividing and reselling lines to other CLECs if they received discounts above and beyond those available to other competitors. As discussed here, they do not.

[50] *Id.* ¶¶ 13-17; Economides NYAG Decl. ¶¶ 28-30, 39, 50-51.

[51] Declaration of Parley C. Casto (May 6, 2005), ¶ 6, attached to Joint Opposition of SBC Communications Inc. and AT&T Corp. to Petitions to Deny and Reply to Comments, *In re: SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control,* FCC WC Docket No. 05-65 (May 10, 2005).

million threshold did not preclude other CLECs from qualifying for discounts under these plans.[52] Verizon also offered several plans under which discounts were available to all CLECs including MCI. Not surprisingly, MCI and AT&T did not resell large dollar volumes of local private lines to other carriers.[53]

## C. Department Concluded that Collusion Between RBOCs Was Unlikely

32.    Several amici repeat arguments previously espoused by COMPTEL criticizing the Department for failing to consider that after the mergers, Verizon and SBC might collude by tacitly agreeing not to sell local private lines to other CLECs in each other's territories.[54] Specifically, they contend that it is intuitive that Verizon will not use the MCI facilities in SBC's region to sell services to SBC's competitors if SBC similarly refrains in Verizon's territory.[55] As even Sprint and the NYAG recognize, such an agreement would somehow

---

[52] *Id.*

[53] AT&T reported that [REDACTED]   of its local private line sales were resales of an SBC facility ( [REDACTED]      ). Declaration of Anthony Fea, Anthony Giovannucci, Bob Handal, Michael Lesher and C. Michael Pfau (May 9, 2005), ¶ 43 (attached to Joint Opposition of SBC Communications Inc. and AT&T Corp. to Petitions to Deny and Reply to Comments, *In re: SBC Communications Inc. and AT&T Corp. Applications for Transfer of Control*, WC Docket No. 05-65 (filed May 10, 2005)), United States' Reply Submission Attach. 3. Similarly, MCI stated that [REDACTED] of its wholesale local private lines sales in Verizon East territory were in part resales ( [REDACTED]       ).

[REDACTED]

[54] *See, e.g.,* Sprint Resp. at 30; Economides NYAG Decl. ¶ 53; *cf.* COMPTEL's Opposition to the Department of Justice's Motion for Entry of Final Judgments at 19-20 (Apr. 6, 2006); Motion and Memorandum in Support of COMPTEL's Motion for Leave to Intervene, or in the Alternative to Participate as Amicus Curiae at 18-19 (Feb. 8, 2006).

[55] I concentrate here on the likelihood of a tacit agreement as an explicit agreement would be illegal and possibly criminal.

have to be limited to the sales of these facilities to other CLECs. Verizon and SBC will want to continue to use these facilities to compete against each other to serve large enterprise customers. But such a limited tacit agreement is unlikely to be effective. The facilities are already deployed, they will presumably be maintained to support retail sales, which would make cheating on the agreement attractive. In addition, the agreement may be unsustainable because a wholesale sale can easily be recharacterized as retail to circumvent the agreement. Therefore this tacit agreement, that seems intuitive to amici, is rather unlikely. Indeed, while amici contend that SBC and Verizon naturally avoid invading each other's territories, in wireless telephony they have made extensive investments to compete nationwide.

### D.    Consumer Telephony

33.    Several amici have raised concerns about traditional switched local and long distance telephony services marketed to consumers.[56] The Department's decision to not seek relief for these products was based in large part on the significant changes that had occurred, and continue to occur, in the markets for these services. First, there were significant regulatory changes. For example, an FCC order, later affirmed by the D. C. Circuit, changed existing regulation to alter the ability of CLECs, including AT&T and MCI, to buy from the RBOCs low-priced wholesale access services that had allowed them to serve mass-market customers. AT&T and MCI were relying on these access services to reach customer locations, and thus, this ruling diminished AT&T's and MCI's ability to compete. Second,

---

[56] NJRC Reply at 2-3; Selwyn NASUCA Decl. ¶¶ 58-61.

the increased use of wireless telephones for long distance calling also diminished AT&T's

and MCI's appeal as providers of bundled local and long distance services. Many customers

that had been drawn to AT&T and MCI because of their reputations and expertise as

providers of long distance services no longer place as high a value on purchasing from these

providers, as most, if not all, of these customers' long distance calls are now placed on cell

phones. Finally, the traditional cable companies have entered and made significant inroads

in offering both local and long distance telephony. As a result of these continuing changes,

the Department concluded that it would not be able to prove that the mergers would have a

sustained effect on the consumer markets.


### E.    Retail Sales to Enterprise Customers

34.    The Department concluded that as to retail sales to large enterprise customers, with the

exception of customers in the 2-to-1 buildings, harm from the mergers was unlikely. This

conclusion was based in large part on the limited competition that exists between the

merging parties, with Verizon and SBC providing primarily local services, and AT&T and

MCI selling primarily long distance and advanced network services. The lack of extensive

direct competition was confirmed by the parties' documents as well as through extensive

interviews of retail customers. In conducting its interviews, the Department sought to

canvass a wide range of retail customers, and to focus on retail customers that would be

more likely to have concerns about the mergers – such as customers in buildings likely to be

affected by the transaction. In total, 211 customer interviews were conducted. These

interviews failed to identify customer concerns supportive of an antitrust theory of harm,

but, more important, many customers told us that in purchasing telecommunications services they did not consider the merging firms to be competitors. The Division also looked at data produced by the parties to identify price differences for retail customers based on the number of competitors with competing facilities servicing the customers' buildings. No such relationship was found. In order to make available to the Court some of the information the Department obtained in customer interviews, I attached to my initial declaration a large number of customer statements. The amici attack my use of the 129 customer statements, alleging that they are not a representative sample of customers' views[57] and are suspect because they were provided by defendants.[58] The Department agrees that these statements (submitted by one of the merging parties) standing alone would be given limited weight. However, as noted in my initial declaration, these statements are consistent with the interviews of customers conducted by the Department and the other information that it reviewed.[59]

---

[57] Amicus NYAG questions the value of these statements based on the results of what it refers to as a "scientific" survey of 100 "randomly" selected Fortune 1000 companies. NYAG Resp. at 11 & n.4 (citing Center for Survey Research & Analysis, *Views of the Proposed AT&T/SBC and MCI/Verizon Mergers: From the Perspective of Fortune 1000 AT&T and MCI Customers* (Sept. 2005) (commissioned by ACTel) ("CSRA Survey")). The survey cited was not scientific and the sample was not random. The companies were specifically selected because they had purchased telecommunications services from AT&T or MCI. The survey respondents were asked 10 questions, only one of which related to concerns about the merger. In addition, the construction of the survey tended to bias the respondents' response as to this question. The survey did not request information about the extent to which the merging parties competed for the company's business or about the nature of the concern that the company had about the merger. Although NYAG reported that two-thirds of the respondents expressed concerns, it did not reveal that only 11% were very concerned, and that more than 50% expressed no or little concern. CSRA Survey at 15.

[58] COMPTEL Resp. at 27.

[59] Majure Decl. ¶ 4 & n.1.

**IV.    Conclusion**

35.    The issues and evidence presented by the amici are not new.  These issues were considered

extensively in the course of the Department's investigation and as part of the decision to

seek the proposed remedies.  For the most part, the factual information that is attached to or

cited in their filings was available to the Department.  Notwithstanding the volume and

length of these filings, there is nothing that leads me to question the Department's

conclusions that these mergers pose an identifiable threat to competition for local private

line service provided to more than 700 buildings in Verizon's and SBC's territories, and that

the proposed remedies can reasonably be expected to mitigate this threat with minimal

collateral harm to customers.

**I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.**

**Executed on September __, 2006**

_____

**W. Robert Majure, Ph.D.**