IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:05CV02102 (EGS) |
| v. | ) | |
| | ) | |
| SBC Communications, Inc. and | ) | **MICHAEL LOVERN, SR. ET AL's** |
| AT&T Corp., | ) | **(AMICUS CURIAE)** |
| | ) | **SUPPLEMENTAL EVIDENTIARY** |
| | ) | **BRIEF, [with Exhibits] FOR** |
| Defendants. | ) | **INTERVENTION AND** |
| | ) | **APPEARANCE PURSUANT TO** |
| | ) | **Rule 15 – F.R.Civ.P.** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:05CV02103 (EGS) |
| | ) | |
| Verizon Communications Inc. and | ) | |
| MCI, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

**SUPPLEMENTAL EVIDENTIARY BRIEF, [with Exhibits] PURSUANT TO
RULE 15, F.R.Civ.P. - BY MICHAEL LOVERN, SR., ET AL (AMICUS CURIAE)
- CASE NO. 1:05CV02102 (EGS) and, CASE NO. 1:05CV02103 (EGS) TO
AMICUS CURIAE'S INTERVENTION**

**TO: ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN:**
*Amici's Supplemental Evidentiary Brief, with Exhibits*

The undersigned Intervenors, Michael Lovern, Sr., et al (Lovern) respectfully

submit this Supplemental Evidentiary Brief, with Exhibits, pursuant to Rule 15,

F.R.Civ.P., to Intervenor's Original Petition to Intervene.

The Questions Lovern has brought before the Court are as follows:

1. **Does the control of the Intercompany Settlement System (ISS) in 2006 by AT&T create an unfair, anticompetitive environment within the telecommunication industry, in violation of antitrust laws, considering the rulings of Judge Harold Greene previously, and the evidence presented to this Court by Lovern? If Yes, should AT&T be required to divest themselves of the ISS as part of these hearings?**

2. **Did Southwestern Bell / SBC Communications, in their capacity as "Contract Administrator" of the ISS, orchestrate preferential services, i.e. billing & collection and calling card, for AT&T post divestiture, in violation of the Modified Final Judgment (MFJ)?**

3. **Did Verizon knowingly participate in any illegal services provided AT&T to the detriment of MCI Shareholders, which could have affected the shareholder vote by MCI Shareholders to merge with Verizon?**

4. **If the Court finds the answer to question No. 2 is Yes, does Lovern have a right to have his claims adjudicated in these proceedings?**

In the following brief Lovern will offer documentary evidence to support his allegations in his motion to intervene, and, as an expert help the Court answer questions 1-4.

On December 5, 1983, Southwestern Bell Telephone (SWBT) signed their InterCompany Settlements and Calling Card / Third Number System (CATS) Agreement. [See Lovern Exhibit D]. The other RBOCs signed the same agreement.

(2)

On January 1, 1984, SWBT entered into the "Contract Administrator Agreement" [Lovern Exhibit E] whereby SWBT became the Contract Administrator for the Intercompany Settlement System (ISS), and, SBC Communications, Inc. / a.k.a. AT&T Corp. is the "Contract Administrator" today, even though Judge Greene ruled in 1983 that AT&T could not control the ISS as it violated antitrust.

As way of background, having spent a great deal of time with RBOC Account Managers for AT&T who worked in the industry prior, and after the 1984 divestiture of the Bell System, Lovern can assure this Court that Bellcore spent considerable staffing time and resources in analyzing the operational and revenue impacts of Divestiture.

Bellcore's conclusion, with respect to RBOC Billing and Collection (B&C) services, which is clearly stated in a1984 Bellcore document [Exhibit F, {This exhibit only has the first nine pages, which provide the summary. This document has over 300 pages and it can be made available to the Court when needed}] is that RBOC revenues would not be adversely affected in a post-Divestiture environment due to the existing RBOC and Independent Telephone Company infrastructure and accounting systems that maintain the ability to Record, Rate, Bill and Collect on behalf of AT&T throughout the U.S., U.S. Protectorates, Caribbean Countries, and Canada. In essence from day 1 of Divestiture, AT&T enjoyed 100% On-Net Billing & Collection (B&C) for all intra- and inter-LATA long distance and third party, calling card, and collect calls, contrary to their competitors.

(3)

Bellcore takes the position that for the foreseeable future, no other Inter-exchange Carriers would want to enter into Billing and Collection (B&C) agreements with the RBOCs due to costs and marketing interests.

This changed dramatically with the introduction of Feature Group D, or what is known as "Equal Access." With the introduction of Equal Access, MCI, Sprint, et al, were now faced with the enormity of having to bring into their billing systems large numbers of new customers in many diverse markets served by RBOCs and Independent Telephone Companies in very short time frames, thus tremendously straining their existing billing infrastructure and staffs.

The newly filed, post divestiture, B&C tariffs filed by the RBOCs caused AT&T anguish and they began filing emergency petitions with the FCC. AT&T said they would lose roughly 60% of there interstate revenue based on the costs and tariffs filed by the newly formed RBOCs and ECA.

To calm AT&T the RBOCs secretly settled with AT&T outside the FCC, with the help of Bert Halprin – FCC Common Carrier Bureau Chief, and the RBOCs gave AT&T a present to sooth the wound. That present was called *"Operation Stargate."* Cincinnati Bell Telephone [CBT] was AT&T's sponsoring LEC into the Bell System proprietary Centralized Message Distribution System (CMDS) and CATS billing system [this is how CBT became a BCC {Bellcore Client Company}]. This included access to the ISS system and the CMDS / CATS $.05 price.

(4)

On August 29, 1985, AT&T sent out their "Request for CMDS I Proposal" [Lovern Exhibit G]. Keep in mind CMDS already existed pre-divestiture [See Lovern Exhibit D], but the RBOCs created CMDS I exclusively for AT&T, all in violation of the MFJ as no other long distance carrier (IXC) was offered this service. Notice that Cincinnati Bell Telephone [CBT], is not on the list on Exhibit G. That is because CBT had not been made a Bellcore Client Company [BCC] at this time. CBT subsequently became a BCC [ISS Direct Participant, so as to give AT&T back door access to the ISS]. This was the beginning of "*Operation Stargate.*"

By 1986, MCI, Sprint, and other competitive entities, such as the emerging Operator Service Providers (OSPs) and new Long Distance Providers, began the arduous task of having to seek and negotiate individual B&C agreements with the RBOCs as well as with over an estimated 1200 Independent Telephone Companies in order to recover the millions of dollars that were unbillable, due to the fact that these companies did not have existing B&C agreements in place to bill those end-users that had received long distance or operator services from these carriers.

Competition in the markets was working, but billing and collection of these competitive services was not.

While AT&T enjoyed 100% On-Net B&C through the CMDS / CMDS I and CAT[S] systems [CATS & BEARCATS, etc...], the other competitive carriers did not.

(5)

The associate Account Managers for MCI, Sprint, etc. had no knowledge of how AT&T achieved 100% On-Net B&C through the CMDS / CMDS I and CAT[S] systems. This was by corporate design and decree. RBOC Account Managers were not allowed to share **ANY** competitive information with their co-workers, and most important, RBOC - AT&T Account Managers were lead to believe by RBOC Senior Management that the systems being used by AT&T were all in compliance with Judge Greene's Modified Final Judgment. In other words, the B&C / RBOC Worker Bees [Account Managers like Mark Dahlen] were simply deceived and used by senior management inside the RBOCs, in relation to AT&T, the ISS, and B&C in general. B&C was the new cash cow as it was being applied to AT&T's Competitors, the circle outside the circle. Why wasn't MCI, SPRINT, etc. advised of the ISS? Simple, the RBOCs could make more money with less work under separate B&C Agreements. This inferior, high price B&C System being offered the competition provided much less rigorous reporting detail and substantiation of collection efforts than that provided AT&T.

The Exchange Carrier organizations within each RBOC played a critical and key role in maintaining the AT&T competitive advantage by processing the AT&T intra- and inter-LATA EMR messages through CMDS / CMDS I and CATS – BEAR/CATS.

Now the conspiracy is in full swing, but DOJ throws AT&T a curve ball. When DOJ ordered the RBOCs / Bell Operations Companies (BOCs) to cancel AT&T's roughly 12 million line based BOC issued calling cards because they violated the MFJ. AT&T

(6)

had no way to replace the 12 million cards because they had no RAO Numbers, so they purchased the right to use Caribbean LEC RAO numbers [four] owned by Cable & Wireless, plus, Cincinnati Bell (CBT) received two Carrier Issue Identifiers (CIID) numbers from Bellcore. Each RAO / CIID number was good for about 2 million calling card combinations; hence, the 12 million cancelled cards were replaced, except with one very serious difference. Because AT&T was forced to issue their own calling cards, OSPs and IXCs thought that the AT&T 809 [RAO] credit card was billable, that it was a Special Billing Number (SBN) assigned to AT&T, part and parcel to DOJ's order and the FCC mandate. The industry outrage about what actually happened led to the CIID card.

The new AT&T proprietary calling cards had scrambled numbers on them, which made it impossible for AT&T's competitors to format a billable call record after having transported a call for an AT&T customer, which resulted in 100% of these message being sent back to AT&T's competitors marked unbillable. Bottom line, when someone other than AT&T transported a call charged to one of the AT&T scrambled calling cards the IXC who transported the call never got paid. The industry thought the AT&T customer was getting free long distance. WRONG! Through a sophisticated illegal scheme now known as "Reverse Translation" stolen messages were collected by the BCCs in their capacity as "ISS Hosts," then sent to CBT [domestic calls - Bellsouth for International Calls] who sold the receivables to AT&T via Purchase of Account Receivables Information System (PARIS) [accounting system designed specifically for AT&T], part and parcel to the secret billing system] on paper, who then in turn sold them back to CBT

(7)

[decoding the messages in the process], which said messages were then submitted by CBT [domestic] Bellsouth {International] into the secret billing system [ISS] coded 000 [means transported by the BCC LEC] in the carrier identification code in the EMR format instead of 288 [AT&T's carrier identification code]. By being coded 000 it appeared that the messages had been transported by the BCC LEC, therefore the revenue belonged to the BCC, not AT&T. Between 1985 and 1992 the vast majority of the messages were laundered through CBT including interstate interLata messages. The big problem was CBT did not transport interstate messages outside OHIO. Millions of interstate message revenue[s] were credited to CBT's BCC CATS account. CBT was being credited Millions of Dollars by Bellcore for interstate messages, via their CATS account / reports. CBT, and the other BCCs [BCCs were the seven RBOCs, CBT and Southern New England Telephone (SNET), the infamous nine are also known as the exclusive ISS "Direct Participants"] to this day [privately – <u>not in this court proceeding</u>] deny ever billing AT&T interstate messages, even though the physical evidence is undeniable, and the BEARS / BEAR-CATS operating system was designed to account for interstate as well as intrastate messages, in conjunction with CMDS and CMDS I, whereas CATS only accounted for intrastate intra-LATA messages.

To the question regarding anyone's surprise that the Exchange Carrier group did not see other carriers participating in the CIID cards, they couldn't. By this time, many carriers, including MCI and Sprint, as well as the new Billing and Collection Clearinghouses had applied for CIID numbers and received them from Bellcore, but

(8)

without 100% On-Net B&C, issuance of the CIID Calling Card was pointless because these same carriers would have lost millions and millions of dollars due to the lack of B&C agreements throughout the industry. AT&T and the RBOCs knew this.

With respect to the "scrambled" calling card[s] which is the Special Billing Number (SBN) RAO based calling card, MCI, Sprint, et al did accept calls made on the SBN calling cards as well as line-based calling cards, but again were losing millions and millions of dollars because in many cases there were no established LEC - B&C agreements to recover the money from the customer. Small Carriers, like American TeleDial Corp. (ATC), did accept those cards and transport the calls, only to never get paid as all records were edited out by the BCCs in their capacity as ISS Host, and sent back marked "uncollectible, Caribbean Calling Card, no B&C." At this time in history payphones were known as "dumb phones" [no smart technology] so all the IXC carrier could obtain was that it was an AT&T calling card being offered for payment, so most small carriers [IXCs] accepted the AT&T calling card and transported the call, only to never get paid, and never knowing the BCCs and AT&T stole their revenue.

This controversy is well documented in FCC records, industry meetings, their SEC filings, and in the print media, plus the Ohio PUC via Integretel [a Billing & Collection Service Bureau] complaints / hearings. The lack of B&C agreements severely impacted the bottom lines of these same carriers, and MCI & Sprint et al, quarter after quarter, year after year, being reflected in "Unbillable Call Revenues" in their public financial disclosures.

(9)

AT&T enjoyed an insurmountable competitive advantage over every other carrier through its RBOC sponsored 100% On-Net B&C from day one of Divestiture. This was an enormous competitive advantage to AT&T in terms of revenue recovery and market presence by being on the LEC billing statement, not just in the back of the bill on a separate AT&T bill page [that was Article 31 and simply window dressing to make it look like the RBOCs were offering AT&T's Competitors the same billing services as AT&T. Article 31 contracts were actually an effort to "sell" the LECs the AT&T CIID traffic, which was then to be placed on the LEC portion of the bill. Only a small portion of AT&T's long distance traffic went on the AT&T separate page in back of the LEC Bill. The bulk of their traffic went on the LEC portion of the bill coded 000, making it look like the revenue belonged to the BCC / Direct Participant. This optional service was never offered to AT&T's Competitors, and, it violated the MFJ].

Through discovery in federal court, Lovern obtained Exhibit H, which is a Proprietary Bellcore Document where Bellcore [owned by the RBOCs] explains how they are implementing "Reverse Translation," which allowed them to launder the stolen money / revenue associated with AT&T's scrambled calling cards. AT&T had three options for billing & collecting their long distance revenue. 1) They could direct bill their customer; 2) they could have the message placed on the AT&T separate page in the back of the LEC Bill; or, 3) they also had the option of having their long distance message placed on the LEC portion of the bill, which was a huge advantage because the LEC could <u>disconnect</u> the consumer's phone for non-payment of the LEC portion of the bill.

(10)

NO OTHER IXC had option No. 3, as it was exclusive to AT&T, thus violating the MFJ. [See pg. 6 of 9 "Billing of Messages" – Lovern Exhibit H].

On pages 8-9 of 9 – [Lovern Exhibit H], "Host Responsibilities" it explains in detail "Reverse Translation," which is how AT&T and the BCCs stole AT&T Competitor's revenue from long distance calls transported by an IXC other than AT&T, charged to an AT&T Scrambled Calling Card. This is how Lovern lost approximately $154,000 of revenue entered into the ISS under the protection of a **Court Order**. [See Lovern's original amicus brief pages 12-13].

Lovern Exhibit I [6 pages], dated just a few days after Lovern Exhibit H, explains how the BCCs and AT&T were laundering the stolen revenue from AT&T scrambled calling cards transported by an AT&T Competitor. It refers to the $.05 charge per message, and it refers to reverse translation. Exhibits H & I are clearly **"smoking guns."**

Lovern Exhibit J [1 page], another Bellcore Proprietary Document, shows how to format "Reverse Translation." Remember only AT&T enjoyed this option.

After the FCC ruled CBT's conduct in relation to the scrambled AT&T calling cards [also known as "Special Billing Number" calling cards] was in violation of Title II of the Communications Act [FCC Docket No. 89-323], CBT and Bellsouth told the FCC they had gotten out of the calling card business. NOT SO! Bellsouth continued to operate AT&T's covert Caribbean Calling Card operation out of the Bellsouth Human Resources Department, disguised inside Bellsouth International.

When AT&T was confronted with all this in 1993 by Lovern they completely reassigned all AT&T personnel in that department and brought in Jack McMaster from England to take over. This brings us to Lovern Exhibit K, which is proof of how Bellcore just happened to assign CIID numbers to AT&T that EXACTLY matched AT&T's already issued RAO based "Scrambled," or, "Special Billing Number" joint use calling cards that violated not only the MFJ, but DOJ's order regarding AT&T's line based calling cards. All of this was part and parcel to the RBOCs preferential treatment to AT&T regarding calling cards, all in violation of the MFJ. This was over and above the illegal preferential billing & collection services.

This enabled AT&T to continue to bill through the CMDS / CMDS I and various CATS system[s] all of their inter- and intra-LATA messages, receiving comprehensive reports on all billing and collection activity. This is well documented in the AT&T Exchange Message Interface Exchange Standards Reference Document or "ESRD".

The RBOC and Independent Telephone Companies Exchange Carrier groups continued to process untold millions of AT&T inter- and intra-LATA messages through CMDS / CMDS I and the CAT[S] systems. These messages were received by every RBOC, GTE, and Independent Telephone Company, and the Exchange Carrier group managed this process.

No other IXC or other competitive service provider was ever informed or allowed to use the CAT[S] reporting systems, although in the 1990's the RBOCs and GTE

(12)

allowed CMDS I to be used as EMI record transport service, because it became operationally expedient for them.

The CAT[S] reporting systems were NEVER opened up to other IXC's or competitive interLATA Service Providers, even though the competitive carriers brought up the need for this type of service year after year in the ATIS Order and Billing Forum (OBF), at the FCC, and at other industry forums.

As stated in Lovern's original Amicus Petition, AT&T never divested themselves of their original <u>pre-divestiture</u> Revenue Sharing Billing System as ordered by Judge Greene. Post Divestiture, a replicated version was created and installed at SWBT's Data Center in Kansas City. Additional evidence of this is Lovern Exhibit L, which is a Bellcore memo from Ron Seigle, who still works for Bellcore / Telcordia Technologies, that demonstrates AT&T's ability in 1993 [10 years after divestiture] to interface with the Bell Operating Companies via ITTS [ITTS was AT&T's name for their original CATS billing system]. AT&T, by virtue of never giving up their original pre-divestiture billing system, could continue to interface directly with the Bell Operating Companies for any service or information that AT&T provided. Unitel was to be handled the same as the Caribbean LEC – AT&T joint use [scrambled] "Special Billing Number" calling cards. Once again, preferential treatment for AT&T, not available to their competitors, all in violation of the MFJ. [**Note: Unitel, a Canadian telecommunications firm became a B&C clearinghouse for AT&T. Unitel also got caught re-routing access traffic back to the U.S. for reduced Access fees**].

(13)

Regarding how Lovern's companies, ATC & NTI, were able to successfully utilize the CMDS and CAT[S] systems, that is a very straight forward discussion.

Independent Telephone Companies were never part of the Divestiture mandates, with the exception of GTE, which requested that the Divestiture mandates apply to them. This request was granted.

The 1,200 plus Independent Telephone Companies scattered throughout the nation had always enjoyed 100% On-Net billing and collections for any ancillary chargeable calls, i.e. calling card, operator assisted, third party, ship to shore, etc., placed in their service area, but required B&C from another telephone company anywhere in the U.S., U.S. Protectorates, the Caribbean Countries, or in Canada.

The Independent Telephone Companies were and are served by the RBOC and GTE Exchange Carrier departments and have full privileges in the use of CMDS and the CAT[S] systems.

It should be noted that Independent Telephone Companies were able to and do issue line based and SBN calling cards.

It should also be noted that Independent Telephone Companies are not restricted to providing long distance services.  Independent Telephone Companies can and do provide intra- and inter-LATA long distance services, not just "corridor" inter-LATA traffic.

(14)

The RBOC and GTE Exchange Carrier departments facilitated the exchange of these Independent Telephone Companies billable records, unfettered and unrestricted.

Lovern's use of the CMDS and CATS system[s] for 100% On-Net B&C did not breach any written or unwritten rules as Lovern had entered into a contractual arrangement with Fidelity Telephone Company, an Independent Telephone Company with a state of Missouri franchise to provide telecommunication services.

Further, the June 28, 1995, [Lovern Exhibit M] Memorandum from Pete Nowak, Bellcore Manager, Exchange Carrier Relations, which he received a copy from Ron Seigle, clearly reflects that the "New CATS/BEARS Reports Proposed by Tim Yelton" [Tim Yelton still works for Bellsouth] expands only the CATS reporting functionality of the Intercompany Settlements System, but does not require any modifications to CMDS or the CATS system. "No modification required" shows it was operational already.

The 29 page attachment [Lovern Exhibit N – fax cover page plus 28 page document] codifies the existing B&C functions, which clearly reflects the ability for RBOCs and Independents to bill and collect for all inter-and intra-LATA calls, and not just inter-LATA "corridor" traffic. This couples back precisely to the AT&T - ESRD message processing document that was used by every RBOC, GTE, and Independent Telephone Company or their Service Bureau.

What Lovern Exhibit N [the 29 page Billing Exchange Accounting Report System (BEARS) Project Charter document, prepared by Brian Irvin on February 6, 1995] clearly

(15)

reflects is that for inter-LATA calls, the value in Indicator 19 should be changed to 000 reflecting LEC billing. [page 13 of 29]. Once again, evidence of "Reverse Translation," AT&T's secret, illegal billing option never offered to AT&T's Competitors.

What Lovern Exhibit N does not reflect, but the AT&T - ESRD message processing document does state [Lovern Exhibit O], is that for inter-LATA messages processed through the CMDS and CATS system, the value of 288 (AT&Ts Carrier Identification Code, or CIC) is to be changed to, in Indicator 19, to 000 – which is LEC billed on the LEC portion of the bill. This is AT&T's *enhanced definition*, see Lovern Exhibit O, page 9 of 9.

This brings us to the $64,000 question. How can AT&T control the Intercompany Settlement System today when Judge Greene ruled they they were suppose to divest themselves of the system over 20 years ago because it violated antitrust laws. As evidenced today, still no other IXC today enjoys 100% ON NET B&C capability as does AT&T, which AT&T has this ability simply because they control the ISS, [See Lovern Exhibit E], via their merger with SBC Communications, Inc.

Look at Lovern Exhibit N, pg. 6 of 29, last paragraph, quote:

> "The benefits of adding BEARS to the CMDS family of applications include the following. It would make the use of CMDS more attractive because it would provide a centralized reporting function which could reduce the local reporting requirements and potential discrepancies. In addition, while the CATS reporting is limited to intraLATA LEC transported regulated messages, BEARS could be used for reporting messages and revenues for interexchange carriers messages (interLATA or intraLATA), wireless messages, interactive video transactions, etc., as well as intraLATA messages."

(16)

This shows unbelievable advantages all the way back in 1995, however, Lovern knows BEARS [Basic Enhanced Account Reporting System / CATS [Calling Card and Third Party Billing System] was operational long before 1995 because he used these same systems.

To put this in perspective, as a result of the merger with SBC, AT&T has a 100% ON NET System [100% ON NET means AT&T can bill & collect from every telephone number in North America without a single contract with a single local telephone company, and the respective telephone companies are required to not only provide this service to AT&T, they must purchase the receivable upon receipt. Couple this with the fact that in conjunction with this 100% ON NET System, AT&T can bill & collect, and account for **"...interexchange carriers messages (interLATA or intraLATA), wireless messages, interactive video transactions, etc., as well as intraLATA messages."** In simple language, AT&T can bill & collect any service they have with any telephone number / company in North America without having to negotiate a single contract, and NO OTHER IXC has this capability, not Sprint, Excel, or any IXC. How can this not be anti-competitive? What is different today than when Judge Greene ruled in 1983?

January 24, 2006, marked the 50th Anniversary of the Final Judgment in *U.S. v. Western Electric Company, Inc. and American Telephone and Telegraph Company Inc.* Approximately two weeks later came the 10th Anniversary of the Telecommunications

(17)

Act of 1996. Those two landmark events in the history of the Telecommunication Industry are linked together by the 1982 Modification of Final Judgment (MFJ) in the AT&T Case. The 1996 Act adopted the essence of the MFJ and preserved the involvement of the <u>Department of Justice</u> in oversight of the key competitive aspects of the law.

Title I of the MFJ broke AT&T up into local and long distance companies, a seemingly adequate antitrust remedy. Title II forbade the newly divested Bell Operating Companies (BOCs) [known as RBOCs] to "provide interexchange telecommunications service or information services," thereby fencing off the potentially competitive interexchange and information service sectors from the market power in the local exchange market.

Title II of the MFJ imposed obligations of nondiscriminatory interconnection and access on the BOCs:

Subject to Appendix B, each BOC shall provide to all interexchange carriers and information service providers exchange access, information access, and exchange services for such access on an unbundled, tariff basis, that is equal in type, quality, and price to that provided to AT&T and its affiliates. **No BOC shall discriminate between AT&T and its affiliates and their products and services or other persons and their products and services in the:**

**1. Procurement of products and services**

**2. Establishment and dissemination of technical information and procurement and interconnection standards;**

**3. Interconnection and use of the BOC's telecommunications services and facilities or in the charges for each element of service; and**

**4. Provision of new services and the planning for and implementation of the construction or modification of facilities, used to provide exchange access and information access.**

The federal courts must apply antitrust law and review antitrust consent decree[s] imposed for continued antitrust structural separations and communications-like regulation, as part of its remedy as in any Tunney Act Review. The local exchange network and the central offices controlled by SBC / a.k.a. AT&T, and Verizon are the essential bottleneck facility at the heart of this dispute.

Over the years of its jurisdiction, the federal court overseeing the original AT&T divestiture antitrust case lifted the prohibition on provision of information services and issued a number of other waivers to the bar on provision of service. But it never lifted the obligation of nondiscrimination in interconnection and exchange access that is equal in **"type, quality, and price."**

For over ten years post divestiture AT&T enjoyed <u>preferential treatment</u> associated with billing & collection and calling cards, until Lovern uncovered the racketeering enterprise, then the RBOCs kicked AT&T out of the Country Club as a matter of liability survival, and they sold Bellcore to SAIC in an attempt to cover their tracks. SAIC covered up the conspiracy after Lovern gave SAIC all the evidence, yet they ignored Bellcore's involvement, and Bellcore's liability. Today, SAIC is on the verge of

(19)

a $1.7 Billion IPO, yet the Public has no idea about SAIC's liability associated with Bellcore, as reflected in this case, which could bankrupt SAIC.

To this day SBC / a.k.a. AT&T Corp., Verizon, Qwest, Cincinnati Bell, Bellsouth, NECA and DOJ continue to deny the allegations in Lovern's Motion to Intervene, yet the evidence is overwhelming, and if that's not enough, Lovern presents to this Court yet another "*SMOKING GUN*" in the form of an Affidavit prepared and signed by Mr. Mark Dahlen [Lovern Exhibit P], an industry billing & collection expert who was present during the years of 1983-1996, to include a secret meeting in St. Louis attended by all the RBOCs where they discussed how they were going to bill & collect AT&T's messages, post divestiture. You can find Mr. Dahlen's name on the header of Lovern Exhibit F.

Mr. Dahlen's Affidavit corroborates Lovern's allegations that AT&T received preferential services under billing & collection and calling cards, unavailable to AT&T's Competitors, including Lovern. This Court cannot ignore Mr. Dahlen's Affidavit [Lovern Exhibit P] as Mr. Dahlen was present during these years, and worked on AT&T billing & collection for both U.S. West and U.S. Intelco (SKA Illuminet, now a VeriSign owned company).. He is one of the Industry's best and formidable experts on the ISS.

We find ourselves in this uncomfortable situation today because of preferential treatment, inclusive of political favors. The improper politics started back in 1990 when Ed Whitacre became CEO of SWBT. He immediately demanded a meeting with then

Missouri Governor John Ashcroft, and got one the next day. From Business Week

Online, April 12th, 1999, pg. 6 of 9: [Lovern Exhibit Q].

> **"Almost before the governor could finish congratulating Whitacre, the newly minted CEO said SBC couldn't keep returning a portion of its profits to customers if the company had to compete with new, unregulated phone companies. 'He sure didn't pull any punches,' Barron remembers Ashcroft saying. The Governor talked to his Missouri regulators, who eased off SBC in Missouri."** [Randall D. Barron was Whitacre's Chief in Missouri].

This is why the Missouri Regulators refused to help Lovern when his money was stolen in Missouri while using the ISS.

It should be noted that prior to becoming SWBT / SBC's CEO, Ed Whitacre was

in control of all the company's external operations, to include Bellcore. By controlling

Bellcore, Whitacre orchestrated huge profits from B&C into the company, which helped

him rise to CEO. He was considered somewhat of a Maverick.


## CONCLUSION

Did AT&T receive preferential services associated with billing & collection and

calling cards post divestiture? YES, it is undeniable, yet the guilty Parties continue to

deny this and the regulators cover-up for them. WHY? Lovern has explained in his

various court filings to include the conflict of interest DOJ – Antitrust Lawyers have.

Does the evidence support Lovern's allegations? Yes, as does Mr. Dahlen's

Affidavit.

The answer to Question No. 1 is:  YES! AT&T's control of the ISS is anticompetitive and this Court must order them to divest themselves of the ISS.

The answer to Question No. 2 is:  YES! SWBT / SBC, in their position as "Contract Administrator" for the ISS did in fact orchestrate illegal services for AT&T and helped cover up this illegal activity since 1984. This goes toward Lovern's personal claims.

The answer to Question No. 3 is:  YES! Verizon, in their capacity as a BCC and 1/7 owner of Bellcore, did in fact participate and conspire with the SWBT / SBC and the other BCCs to provide AT&T illegal, preferential services, to the detriment of MCI and its Shareholders. Before the Verizon / MCI Merger is approved there should be another shareholder vote due to the Billions of Dollars of liability owed MCI, Verizon being one of the liable Parties.

The answer to Question No. 4 is: YES! Lovern has a right to Intervene. **Jones v. Princes George's County, Maryland, C.A.D.C. 2003,** 348 F. 3d 1014, 358 U.S. App. D.C. 276. There is an obvious adverse position in these cases between Lovern, the Public, AT&T's Competitors, and the Government / Taxpayers' lawyers. DOJ's narrow view of anti-competitive issues allows for Lovern to intervene on it's own. **See Forest Conservation Council v. U.S. Forest Service,** 66 F. 3d 1489. **Civil Procedure "Key" 338.** DOJ has made it perfectly clear they will not represent Lovern's interest in these cases. This Court's role in protecting the public's interest, as required by the Tunney Act

when approving antitrust consent decree, is one of ensuring that the government has not breached its duty to the public in consenting to a consent decree. **Clayton Act, § 5(e), 15 U.S.C.A. § 16(e). U.S. v. Microsoft,** 231 F. Supp. 2d 144, affirmed *Massachusetts v. Microsoft Corp.*, 373 F. 3d 1199, 362 U.S. App. D.C. 152.

In addition, Lovern, in his capacity as an ISS Expert, goes far beyond the capabilities of the Government's lawyers, therefore, Lovern has a guaranteed right to intervene in his capacity as an Expert. **Sagebrush Rebellion, Inc. v. Watt**, 713 F.2d 525. [Also see *Prete v. Bradbury*, 438 F.3d 949 (2006).

For all the reasons stated above and in Lovern's previous Motions and Briefs, Lovern respectfully asks the Court to address his personal claims to protect them from further decay that will certainly occur if the mergers are approved by the Court, therefore, in the interest of fairness and judicial economy, in an attempt to avoid years of appeals and future litigation, Lovern asks the Court to address his claims before ruling on the proposed mergers. Lovern has clearly met his burden regarding his allegations before this Court.

Respectfully submitted,

Michael Lovern, Sr.
3713 Parke Drive
Edgewater, MD 21037
(206)-202-9074
pratgen@myway.com

(23)

American TeleDial Corp. &
National Teleprocessing, Inc.

By: Michael Lovern, Sr.
3713 Parke Drive
Edgewater, MD 21037
(206)-202-9074
pratgen@myway.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of October, 2006, copies of the foregoing Motion For Leave to Supplement the Petition OF MICHAEL LOVERN, SR., ET AL, (INTERVENORS) AS AMICUS CURIAE, with supporting brief and exhibits, was served by U.S. Mail, or e-mail, on counsel of record as follows:

Lawrence M. Frankel (D.C. Bar No. 441532)
Matthew C. Hammond
Trial Attorneys
Telecom & Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States


FOR DEFENDANT
SBC COMMUNICATIONS, INC.
Wm. Randolph Smith (D.C. Bar No. 356402)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2700

(24)

FOR DEFENDANT AT&T CORP.

David L. Lawson (D.C. Bar No. 434741)
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-808

FOR DEFENDANT VERIZON COMMUNICATIONS, INC. / MCI

John Thorne
Verizon Communications Inc.
1515 North Courthouse Road
Arlington, Virginia 22201

ATTORNEYS FOR ACTel

Gary Reback, Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA 94303

ATTORNEYS FOR NEW JERSEY DIV.
OF THE RATEPAYER ADVOCATE

Christopher J. White
Dep. Ratepayer Advocate
31 Clinton Street, 11th Floor
P.O. Box 46005
Newark, NJ 07101

ATTORNEY FOR AMERICAN ANTITRUST INSTITUTE

Jonathan L. Rubin, Esq.
1717 K Street, N.W., Ste 600
Washington, D.C. 20036

ATTORNEY FOR COMPTEL

Kevin R. Sullivan
King & Spalding
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

ATTORNEYS FOR NASUCA

John R. Perkins
Iowa Consumer Advocate
Office of Consumer Advocate
310 Maple Street
Des Moines, IA 50319

Michael Lovern, Sr., et al
3713 Parke Drive
Edgewater, Maryland 21037
(206)-202-9074
pratgen@myway.com

October 11, 2006