MARK DAHLEN AFFIDAVIT

LOVERN EXHIBIT P

## AFFIDAVIT

**State of Washington**
**County of** _Thurston_

BEFORE ME, the undersigned Notary,
_Audrey J. Baily_ _____ [name of Notary before

whom affidavit is sworn], on this ___NINTH (9)___ [day of month] day of

_October_ _____ [month], 20_06_, personally appeared

___Mark E. Dahlen___ _____ [name of affiant], known

to me to be a credible person and of lawful age, who being by me first duly sworn, on

_his_ [his or her] oath, deposes and says:

**Professional Background**

1. I am a telecommunications professional with over twenty-nine years of varied telecommunications experience, which includes Pacific Northwest Bell Telephone, AT&T Communications, U.S. West, U.S. Intelco Networks, Inc., and a NYSE list company that provides essential database services to domestic and international carriers. Areas of expertise; among other training and experience, is Billing and Collections. Significant Bell System training includes Marketing Data Systems Training (the successor of what was then known as "Coopers Town"), 1979, and Communications Systems Engineering, 1980 – 1982, contracted through the Sloan Institute, M.I.T., by AT&T.

2. From January 1984 to December 1986, I served as the U.S. West Account Manager (F.K.A. Pacific Northwest Bell) for the national AT&T Communications account, responsible for post-divestiture AT&T Billing and Collection (B&C) services. During this time period, I interfaced directly with the AT&T Communications Open Billing National Billing team and U.S. West executive management on areas concerning Billing and Collection services, AT&T strategies, and throughout 1986, directly participated as a U.S. West Billing and Collection Subject Matter Expert during the U.S. West – AT&T Communications De-regulated Billing and Collections contract negotiations.

3. From February 1987 to October 1996, I was National Marketing and Product Development Manager; with specific responsibility for the development of the AT&T Communications Billing and Collections Revenue Administration program for U.S. Intelco Networks, Inc. (subsequently U.S. Intelco Networks,

Inc. became Illuminet, Inc., which has since been acquired by VeriSign). U.S. Intelco Networks, Inc. was a company formed by Independent Telephone Companies to provide certain administrative services and collective functionality for Independent Telephone Companies. Among services provided by U.S. Intelco Networks, Inc. was a Calling Card Data Base, hosted by South Western Bell Telephone (SWBT) Company, which contained the participating Independent Telephone Company's calling card and Special Billing Number (SBN) information. Participation in the U.S. Intelco Calling Card Data Base enabled the Bell System and Independents to validate and collect earned revenues for calls placed by the participating Independent's subscribers through the use of calling cards, third number-billed, collect, etc.

Scope and Purpose of This Affidavit

4. I have been asked to submit This Affidavit, as an industry expert, to corroborate certain claims made by Mr. Michael Lovern, Sr. This Affidavit contains my first hand experiences and observations representing first; U.S. West, as the National Account Manager for AT&T Communications, and then, secondly; as the National Market Development Manager with U.S. Intelco Networks, Inc.

> **Does the control of the Intercompany Settlement System (ISS) in 2006 by AT&T create an unfair, anticompetitive environment within the telecommunication Industry?**

U.S. West

5. Upon transferring from AT&T Communications to U.S. West in January 1984, I was immediately advised by the director of our department, that under no uncertain circumstances were we, as Account Managers, to contact our counterparts at U.S. West – Mountain (F.K.A. Mountain Bell) or U.S. West – East (F.K.A. Northwestern Bell) for any purpose or to share any market insights or account information. This edict came from the office of the U.S. West – West president, Mr. Andrew (Andy) Smith. The stated purpose that we were prohibited from contacting our counterparts was, supposedly, to create an atmosphere whereby each U.S. West entity stood on its own and to ensure that there was no obvert or inadvertent breach of the Modified Final Judgment. Further, each Account Manager was advised that we were not to share any information or inadvertently allow the Account Manager for other Inter-exchange Carriers, i.e., SBS Communications (which eventually became MCI), Sprint, etc. to acquire proprietary information of another carrier, that is, AT&T Communications. At all times myself and other Account Managers were lead to believe by Senior Management that all services being provided AT&T were in total compliance with the MFJ etc, however, today it is apparent that was not the case.

6. Having account responsibility for U.S. West – West billing services on behalf of AT&T Communications, during January and February timeframe in 1984, I

worked closely with the Regulatory Department, which had responsibility for Billing and Collection (B&C) tariffs in the post divestiture environment. The B&C tariffs covered both intra-state and inter-state B&C services. During my review of the B&C tariff structure, one poignant staffer's comment that stands out is the one made during one of my early February meetings with the Regulatory staff. I raised the question came as to why the tariffed rates for certain functions seemed so out of proportion to normal market rates, in this instance the per hour rates for software development programming. The response from the Regulatory staff was that the U.S. West – West B&C tariffs, and I gathered that the other U.S. West B&C tariffs were structured the same way, were to re-coup a like amount of corporate revenues under the post-divestiture tariff structure, as U.S. West received prior to divestiture under the AT&T revenue sharing program. This comment made by the Regulatory staffers comment seem double edged, since not only were the tariffs designed to recover a fully allocated cost structure for an open tariff service, but the Regulatory staff was also responsible for revenue projections.

7. It should be noted at this time, that there was no change in the quantity or quality of billing services provided to AT&T Communications on December 31, 1983 pre-divestiture as those same billing services provided AT&T Communications going forward on January 1, 1984 post-divestiture. To Mr. Lovern's point regarding an "...unfair, anticompetitive environment within the telecommunication Industry," AT&T Communications entered the post-divestiture competitive long distance market with Billing & Collection arrangements with every Bell Operating Company, Independent Telephone Company, Canada, U.S. Protectorates, and the Caribbean countries. It became very apparent that AT&T Communications maintained a disproportionate market advantage by; 1) emerging in a post-divestiture environment with 100% billing and collections' agreements with all local exchange carriers, demographics noted above, for all inter- and intraLATA long distance and ancillary services (calling card, third number billed, collect, etc.) traffic, 2) that these billing services encompassed the following functions on behalf of AT&T Communications; Recording, Rating, Assembling and Editing, Message Distribution when applicable, Bill Rendering, Collections, and Reporting, 3) ability to have their toll message receivables purchased and remitted, based upon their normal billing cycle, by the LEC, which included placing the AT&T toll message on the LEC portion of the local telephone bill instead of being placed on a separate AT&T Page in the back of the LEC bill - [it should be noted that the purchasing LEC had the ability to disconnect the consumer's phone for non-payment of any charges on the LEC portion of the bill including AT&T long distance calls. No other IXC received the extent of billing and collection services as AT&T Communications received, nor the added enforcement of having the LEC disconnect the end-user for non-payment]; 4) Message distribution from the Recording telephone company to the Billing telephone company through the use of the Southwester Bell Telephone's Centralized Message Distribution System (CMDS), 5) comprehensive billing detail and reports through the Southwestern Bell

Telephone's Intercompany Settlement software processes which [1] "...which is utilized to allocate revenues and billing cost (which will reimburse a BOC for handling other BOC messages)."

8.  As previously noted in paragraph 5, although we were instructed that under no uncertain circumstances were we to contact our counterparts at U.S. West – Mountain or U.S. West – East for any purpose, I, along with my U.S. West counterparts, received an informal invitation to meet with other Bell Operating company Account Managers assigned to the AT&T Communications account. This invitation was received in the March 1984 timeframe. Place of the meeting was St. Louis, Missouri. Purpose of the meeting was to discuss AT&T Communications Open Billing issues in a **confidential and restricted** meeting atmosphere. It was strongly requested that no lawyers were to be in attendance at this meeting.

9.  This meeting of BOC Account Managers for AT&T Communications revealed that most of the BOC Account Managers had extremely limited insight into the highly complex and inter-twined operations that existed post-divestiture for AT&T Communications. Further, the ensuing discussions highlighted the enormous revenue responsibilities associated with AT&T Communications B&C, yet there were no apparent account strategies that were forthcoming from the BOC executive management, other than to maintain the B&C revenues, at all costs.

10. At the conclusion of the meeting, it was mutually agreed that each Account Manager would continue to maintain informal contacts with the other Account Managers relative to any specific AT&T Communication's service requests that may be broached during our regularly scheduled meetings with the AT&T Communications Open Billing group. This in fact did occur.

11. At about the same time as the informal St. Louis meeting, in early 1984, AT&T Communications Open Billing requested that each BOC develop and present to AT&T Communications an overview and justification of their respective B&C tariffed rates. This presentation was made to Mr. A. Marvin Roscoe, Jr., Division Manager of AT&T Communications Open Billing. As noted in paragraph 6, the B&C tariffs were structured to re-coup a like amount of corporate revenues under the post-divestiture tariff structure, as U.S. West received prior to divestiture under the AT&T revenue sharing program. This was not lost on Mr. Roscoe, who excoriated the tariff pricing structure as blatant price gouging, demanding that we go back to our executive management team and adjust the tariffed B&C rate structure downward. This message was conveyed to U.S. West executive management and during the next few months the tariffs were re-structured downward.

---

[1] Reference March 23, 1984 letter and attachments from Frank J. Adair, Division Manager, Billing Services, Bell Communications Research, Inc. to The Members of the Billing Services Panel, Section C – Customized Billing – Message Distribution.

12. It should also be noted, that during our ongoing discussions with AT&T Communications Open Billing group, the suggestion was made that instead of meeting with each BOC and GTE Account teams separately, that it might make more sense time-wise and financially, if the Account Managers would consider hosting a quarterly meeting whereby the AT&T Communications Open Billing group could present common national issues and concerns in an open forum. From an Account Team perspective, we agreed, and I hosted the very first AT&T Communications Open Billing forum in Seattle.

13. The Open Billing forum seemed to take on a life of its own, becoming more extravagant with each quarterly meeting. As noted in paragraph 9, our shared corporate directive, was to maintain the lucrative B&C revenue stream at all cost. As for the U.S. West Account Team, there seemed to be unlimited budget for meetings and dinners with the AT&T Communications Open Billing group. Budgetary oversight was never an issue when it came to the Billing Services program for AT&T Communications.

14. It became apparent during 1985 that AT&T Communications corporate directive was to extricate itself from BOC and GTE billing services. Late in 1985, during a Quarterly Meetings, Mr. David Thurston, Director, AT&T Communications Open Billing Group presented a succinct overview on AT&T Communications strategic goal to self provision its own billing services. At the conclusion of Mr. Thurston's presentation, Mr. Roscoe, Division Manager, AT&T Communications Open Billing Group, acknowledged that much effort and expense had been expended on customer surveys by certain RBOCs to justify the continuation of a "single bill" format by AT&T Communications. However, Mr. Roscoe re-iterated, that AT&T Communications goals were clear and that he invited each of the BOC and GTE Account Management teams to submit a "Long Term Billing" proposal that would set forth the company's "best effort and price" for consideration by AT&T Communications. It was evident from Mr. Roscoe's remarks that AT&T Communications had every intention of moving its large corporate customers under its direct control and leaving certain small business and residential customers for BOC and GTE billing, for a period of time. This was to become known as the "Light User" Billing Proposal.

15. On behalf of US West (Pacific Northwest Bell), I prepared our "Light User" proposal. Our presentation was made before Mr. Roscoe and his management team late in 1985. Contained within our "Light User" proposal was our analysis of Message Telephone Service (MTS), the core measure of billing services which represents the individual billing telephone call placed by an AT&T customer. Based on our analysis, we stated in the "Light User" proposal that [2] "…through the continuous examination of our rates, the average charge per MTS message has been reduced over 60%. Individual rates such as programming charges have been

---

[2] Long Term Billing Proposal to AT&T Communications, presented by Pacific Northwest Bell Telephone Co.

reduced from $268 per hour to an average of $52.31 per hour, which represents an 80% rate reduction." The billing services we proposed included intraLATA and interLATA billing and collection services. We were notified by AT&T Communications, that our proposal had been accepted and that AT&T Communications wished to proceed with further negotiations.

16. Before further negotiations could be scheduled, it should be noted that on January 29, 1986, CC Docket No. 85-88 Report and Order. Rel. ("Billing and Collection Service Order") was issued, which made our "Long Term Billing Proposal" moot in the eyes of AT&T Communications, however this did not change the MFJ.

17. In the spring of 1986, I received the initial draft of the AT&T Communications Deregulated Billing and Collections Agreement. As noted in paragraph 2, throughout the remainder of 1986, I directly participated as a U.S. West Billing and Collection Subject Matter Expert during the U.S. West – AT&T Communications De-regulated Billing and Collections contract negotiations. Final agreement was reached on December 22, 1986 which codified the Billing and Collection Services Requirements between AT&T Communications and US West. It is know as the "AGREEMENT FOR THE PROVISION OF BILLING AND COLLECTION SERVICES BETWEEN U S WEST AND AND (sic) AMERICAN TELEPHONE AND TELEGRAPH COMPANY – INTERSTATE DIVISION". Inclusive in this agreement were provisions that covered intraLATA as well as interLATA billing and collections, CMDS 1 message transport, "Statement of Amount Due AT&T (Purchase of Accounts Receivable Statement), which is the statement sent to AT&T by the Local Exchange Carrier (LEC) detailing the purchase of accounts receivable, and AT& Card, which are [3] "Those cards distributed to an AT&T Customer by or on behalf of AT&T, which contain the customer's name, telephone or billing number and Personal Identification Number (PIN) and allow a customer to place calls on the facilities of AT&T or the LEC and have the charges for such calls billed to the customer." US West received and transmitted billable messages attributable to the AT&T Card through the intercompany settlements system.

18. Services inclusive to this AT&T Billing and Collection Agreement included, Long Distance Services (LDS), Wide Area Telecommunication Services (WATS), as well as Private Line Functional Services. It should be noted that Private Line billing was not universal throughout the Bell System and that [4] "Private Line Billing which some BOCs offer only to AT&T/C, is customized to a specific carrier under the present tariff."

---

[3] AGREEMENT FOR THE PROVISION OF BILLING AND COLLECTION SERVICES BETWEEN US WEST AND AND (sic) AMERICAN TELEPHONE AND TELEGRAPH COMPANY – INTERSTATE DIVISION
[4] Reference March 23, 1984 letter and attachments from Frank J. Adair, Division Manager, Billing Services, Bell Communications Research, Inc. to The Members of the Billing Services Panel, Customized Billing Service, General.

19. Also contained in this AT&T Billing and Collection Agreement were provisions for "LIVE TREATMENT AND COLLECTIONS", which includes [5] "FULL SERVICE DENIAL (also referred to as Local Service Denial." Exhibit D, <u>US WEST IDC'S COLLECTION POLICY</u> states that "Full service denial is the restriction of access to telephone network services when using a telephone number associated with an account which is not paid. End users whose service is denied for non-payment lose not only the ability to place toll calls, but they also lose the ability to place local calls because they no longer have dial tone." Exhibit D goes on to state that "In conformity with the above statements, the IDC's will utilize full service denial on behalf of AT&T unless there are Equal Access Restriction or selective denial capabilities in a given central office OR until a state public utility commission directs that local service denial be discontinued on behalf of interexchange carriers.

20. It goes with saying, based on my personal observations and experience that the AT&T Billing and Collections Agreement that I helped negotiate, was a codification of the pre-divestiture practices in a deregulated post-divestiture environment. **To Mr. Lovern's allegations, the highly sophisticated and comprehensive billing services provided to AT&T Communications prior to divestiture continued to be in use post divestiture and included the use of the SWBT CMDS message distribution system, intercompany settlements system, and comprehensive billing and collection practices and in depth reporting structures which were not made available, to my knowledge, to the other competitive long distance providers that contracted separate B&C Agreements with US West.**

21. At the end of December 1986 I left US West, accepting the "Employee Package", having already accepted a position with U.S. Intelco Networks, Inc. as the National Marketing and Product Development Manager, with specific responsibility for the AT&T Communications Billing and Collections Revenue Administration program.

**U.S. Intelco Networks, Inc.**

22. As noted in paragraph 3, from February 1987 to October 1996, I was National Marketing and Product Development Manager, initially responsible for the development of the AT&T Communications de-regulated Billing and Collections Revenue Administration program for U.S. Intelco Networks, Inc. The U.S. Intelco Networks Revenue Administration program offered as the main feature the Revenue Administration program. The Revenue Administration part of the program was a multi-year long-term B&C compensation arrangement with AT&T Communications. U.S. Intelco would send a single consolidated billing statement of all participating Independent Telephone Companies billing and collection

---

[5] AGREEMENT FOR THE PROVISION OF BILLING AND COLLECTION SERVICES BETWEEN US WEST AND AND (sic) AMERICAN TELEPHONE AND TELEGRAPH COMPANY – INTERSTATE DIVISION, US WEST EXHIBIT D, <u>US WEST IDC'S COLLECTION POLICY.</u>

activity for a given billing period to AT&T Communications. In return, AT&T Communications would send one check to U.S. Intelco, which would then distribute individual checks to each of the participating Independent Telephone companies for the B&C compensation. The U.S. Intelco Networks AT&T Revenue Administration program was referred to as the U.S. Intelco Networks or USIN 8-1 AT&T Communications Billing and Collection (B&C) program.

23. Once launched, the U.S. Intelco Networks, Inc. national AT&T Communications Revenue Administration program became AT&T's largest contract entity for Independent Telephone Companies (over 600 Independents, excluding GTE and Alltel), enabling Independent Telephone Companies to continue, in a post-divestiture environment, to Record, Rate, Bill and Collect AT&T inter- and intra-LATA messages and receive Billing and Collection fees through the U.S. Intelco Networks program. There were no changes to the existing CMDS message distribution system or intercompany settlements systems that remained in place and fully functional. Only minimal industry competition existed, represented by Independent NECA Services (INS) AT&T Communications Revenue Administration program.

**Did Southwestern Bell / SBC Communications, in their capacity as "Contract Administrator" of the ISS orchestrate preferential services, i.e. billing & collection and calling card, for AT&T post divestiture, in violation of the Modified Final Judgment (MFJ)?**

24. As noted in paragraph 3, a key service provided by U.S. Intelco Networks, on behalf of Independent Telephone Companies. was the Calling Card Data Base or DBAS, which was hosted by South Western Bell Telephone (SWBT) Company. In retrospect, it is without a doubt that through the CMDS message distribution system and the 100% on-net billing capability afforded through the ISS, which is administered by SWBT, AT&T Communications enjoyed a dominant competitive advantage that no other market competitor could ever realize or overcome. In 1986 there were over 300 Independent Telephone Companies residing in 43 states participating in the DBAS service, which contained the participating Independent Telephone Company's calling card and Special Billing Number (SBN) information. Participation in the U.S. Intelco Calling Card Data Base enabled the Bell System and Independents to validate and collect earned revenues for calls placed by the participating Independent's subscribers through the use of calling cards, third number billed, collect, etc.

25. Market dynamics took a sudden shift under Civil Action No. 82-0192 United States of America, Plaintiff, v. Western Electric Company, Inc., et al., Defendants, when United States District Judge Harold Greene, on October 14, 1988 signed the order mandating that AT&T divest itself from the shared Local Exchange Carrier (LEC) calling card and Special Billing Number calling cards. The infant Alternative Operator Services (AOS) industry suddenly took on a life

of its own, and found its voice through its trade association known as Operator Service Providers of America ("OSPA").

26. With the proliferation of "private" payphones throughout airports, hotels, and many public places throughout 1998 - 1999, I was contacted by several of the larger AOS providers seeking Billing and Collection agreements with our representative Independent Telephone Companies. The reason that these AOS providers required help in acquiring billing and collection agreements is that for the AOS to have a marketable service to their clients, they made the conscious decision to accept all calling card (0+ calls) and operator assisted (0- calls), regardless of which local telephone served the calling customer. Initially the 0+ and 0- calls from Independent Telephone customers were monetarily small and were written off as "unbillables". Gradually over time, the "unbillables" amounts represented by the Independent Telephone Companies subscribers became significant, especially when taken into consideration that this was the period of 900 calls. The "unbillables" calls now ranged in the 10's of millions of dollars annually and growing at an astounding monthly rate. In other words, a competitive telecommunications industry was coming of age, but without the ability to bill and collect for every chargeable call unlike their competitor – AT&T.

27. In late summer of 1989, US Intelco was approached by AT&T Communications regarding Article 31 negotiations. Article 31 is an AT&T agreement that includes terms and conditions for the mutual honoring of calling cards between AT&T and the local telephone company (LEC). Article 31 represented a significant departure from the existing industry card honoring traditions in that it moves mutual acceptance of each company's respective calling cards from a "handshake" agreement to a codified "credit card-like" contractual agreement between the card issuing parties.

28. Article 31 contained another drastic departure from the industry norm, which was, for AT&T Communications to "honor" the LEC's calling card, which the LEC was required to purchase, at a discount those calls that had been placed on AT&T Communications networks using the LEC calling card. Further, the LEC would now be responsible for uncollectibles, and fraud. In addition, the LEC, under Article 31, would now be required to place those AT&T recorded and rated calls on the LEC portion of the end-user billing statement.

29. As a result of Article 31, AT&T Communications took the initiative, and Bellcore joined right in, to develop a modified intercompany settlements system to accommodate the new purchase of account receivables and billing requirements, which was known as PARIS, or Purchase of Account Receivables Information System. This was a blatant example of AT&T Communications, with 100% on-net billing and collection agreements, taking advantage of its <u>exclusive</u> intercompany settlements system membership. **No other inter-exchange carrier, MCI, Sprint, or any of the multitudes of private operator service**

**providers could ever hope to participate in the intercompany settlements system, let alone propose significant business rule changes as did AT&T Communications.**

30. Market competition was fierce during the 1988 – 1990 time period resulting in one significant action by the FCC. On January 25, 1990, the FCC released an Order finding that Cincinnati Bell Telephone Company's ("CBT's") calling card practices were unreasonably discriminatory. Through an agreement with CBT, AT&T issued calling cards bearing the AT&T logo to CBT local exchange customers using telephone line numbers or RAO numbers and PINs generated by CBT. CBT treated the AT&T calling cards issued from its territory as proprietary and refused to provide validation information on the cards to other inter-exchange carriers ("IXCs") or private operator service providers ("OSP"). The FCC ordered CBT to cease and desist from this practice.

31. Undeterred, AT&T Communications entered into the same arrangements with Cable and Wireless and issued a Caribbean based "809" calling card. The AT&T "809" calling card caused untold millions of dollars of uncollectible and fraudulent calls for IXC's like MCI, Sprint as well as for the OSP's. In Mr. Lovern's case, it resulted in AT&T Communications receiving millions of dollars in revenues that rightfully belonged to Mr. Lovern's clients, through calls placed on their networks using by customers using the "809" Special Billing Number ("SBN") Calling Cards. When the billing LECs "Reverse Translated" the "809" SBN calling card messages, these same LECs then booked and remitted this money through ISS back to AT& Communications. Mr. Lovern's clients were disadvantaged first, by not knowing that the "809" SBN calling cards were billing restricted as a result of a contractual agreement through Cable and Wireless, and secondly, Mr. Lovern's clients could in no way recover the LEC billed revenues as they had no recourse through the ISS.

32. Recognizing that the competitive telecommunications industry was desperately searching for a common ground calling card product, the Consultative Committee for International Telephone and Telegraph (CCITT) developed an RAO-like calling card that was termed [6] "an automated international telephone credit card standard." This was "Recommendation E.118 (Automated International Telephone Credit Card System)", and was approved by that body in the fall of 1988.

33. The standard for the automated international telephone credit card defined the credit card as beginning with the digits "89" identifying the card as a "telecommunications-issued credit card". AT&T immediately applied for and received an "891" which was registered with Bellcore with a Card Issuer Identifier, or CIID assignment.

---

[6] May 21, 1990 Bellcore Special Report SR-BDS-001511, Administration Guidelines for Card Issuer Identifier.

34. AT&T Communications was not alone in applying for a CIID assignment. Virtually every major and many minor IXC's, OSP's, and even some service bureaus applied for a CIID assignment, assured in their business plans that there was finally a solution to issuing a universally accepted calling card.

35. Of all the IXC's, OSP's, and service bureaus who applied and received CIID assignments, only one CIID card was ever successful. That was the AT&T "891" CIID card, which can attribute its success to only one factor:      the 100% ON-NET B&C capabilities afforded AT&T through the CMDS message distribution system and the ISS. No other IXC or OSP had this indisputable competitive edge. What was also interesting is that their Validation Data Base Operator and Billing Agent/Host was Cincinnati Bell Telephone.

36. All other CIID cards languished, never to be issued. The Achilles' heel of the CIID card was lack of 100% on-net billing and collections agreements. Only AT&T Communications could be assured that issuance of the CIID "891" calling cards could result in the calls placed over this card would be billed and collected.

37. In mid-1990, AT&T sent out letters to all Independent Telephone Company's advising them of the new AT&T "891" and inviting them to become involved with the selling, provisioning, and billing of the "891" calling card messages. All the Independent Telephone Company needed to do was sign an AT&T Article 33 in order to participate. AT&T offered to pay $3 for each new card issued and $1 for each existing AT&T calling card holder's information (name, address, phone number).

38. As can be imagined, with the increasing stress on the IXC's and OSP's financial bottom-lines, Independent Telephone Companies were under constant pressure from IXC's and OSP's to offer them billing and collection agreements. This unrelenting industry pressure for billing services finally resulted in U.S. Intelco decision to offer a billing program for "casual" message types. "Casual" refers to calls placed on calling cards (0+), operator assisted, third number billed, collect and 800-collect, prison pay phones, 900, 10XXX and other miscellaneous call types. Characteristics of this billing service were; high B&C rates due to the types of messages being billed. Experience showed that "casual" messages translated into high uncollectibles and post-billing adjustments, in fact, it was not uncommon for uncollectibles and post-billing adjustments (customer's deny all knowledge of ever making the call, or dispute high call rates) to run anywhere from 35% to 50% of the IXC's and/or OSP's total billable message revenues. This billing program was referred to as the "Toll Clearinghouse ("TCH") service".

39. The Toll Clearinghouse service was designed to enable U.S. Intelco to offer a contractual billing services arrangement between participating Independent Telephone Companies and participating IXC's and OSP's. On the front end, the Toll Clearinghouse managed the receipt and distribution of the IXC's and OSP's

physical EMI billable records to the participating Independent Telephone Company's. On the back end, the Independent Telephone Company's remitted the adjusted account receivables and detail reports along with the collected money's, net their B&C charges. U.S. Intelco, in turn, consolidate these Independent Telephone Company invoices, and remit the money and reports, net our fees, to the IXC's and OSP's, net U.S. Intelco's fees for handling the transactions.

40. Toll Clearinghouse became the nations largest Independent Telephone billing program, third largest profit center for U.S. Intelco, and claimed over 600+ participating Independent Telephone Companies, processing over 1.0 million messages a month, representing on an annual basis, over $50.0 million dollars of billable revenue for IXC's and OSP's, however, the Toll Clearinghouse program palled in comparison to the millions of dollars billed and collected by the participating Independent Telephone Company's through the U. S. Intelco AT&T Billing and Collection program (8-1).

41. Early in the 1990's MCI and Sprint both joined the Toll Clearinghouse program, thus expanding the program to include 1+ (direct dialed long distance) messages on behalf of the respective company's. However, neither the MCI nor the Sprint 1+ B&C program was very popular with the participating Independent Telephone Companies due to the extensive reporting requirements mandated by the MCI and Sprint B&C agreements. Many Independent Telephone Company's refused to participate in the MCI and Sprint B&C programs; however, U.S. Intelco never had an Independent Telephone Company opt out of the AT&T Communications Revenue Administration (USIN 8-1) due to onerous reporting requirements.

## Hindsight

42. In reflecting upon the inter-workings of CMDS and its associated intercompany settlements system, it becomes apparent, once I stepped back and critically observed the full impact of this network, that this was, and is, a huge, unchecked, unregulated, un-audited financial labyrinth of astonishing proportions that stretches not only from every local telephone company in America, but beyond its borders into Canada, U.S. Protectorates, Caribbean countries and even internationally.

43. This uncharted financial highway, virtually unfettered by any type of fiduciary oversight, courses with billions of dollars annually through any number of murky paths, utilizing one common currency, which the Industry refers to as the Exchange Message Interface (EMI) record. The Alliance for Telecommunications Industry Solutions ("ATIS") subcommittee known as the Order and Billing Forum ("OBF") maintains the EMI guidelines which support IXC, LEC, and Competitive Local Exchange Carriers (CLECs) billing and customer transactions using EMI billing records.

44. As noted above, the EMI record is a "guideline" and not a "standard" by any means as noted in [7] Decision 02-070-34 July 17, 2002 BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA that Accutel Communications, Inc. (Accutel) in violation of billing "at least 43,992 California customers for products or services which were either not ordered or not authorized by those customers." This is a practice referred to as "cramming".

45. Accutel describes its business functions as being a nonfacilities based reseller of long distance services, providing both retail and wholesale products. Accutel said that in order to bill its customers, Accutel contracted with OAN, a California based Billing and Collection clearinghouse that had contracts with the Bell Operating Companies, GTE, and U.S. Intelco, among other billing entities.

46. What is interesting is that Accutel did not dispute that unauthorized charges which appeared on the consumers' phone bills. Instead, [8] Accutel states that it adopted a "no questions asked" policy, and that it authorized credits to those consumers who complained." This leads to the only conclusion that one can come to, which is, that the "unauthorized' charges were received by Accutel via an EMI record from its wholesale customer; Accutel, in turn, submitted that wholesale customer's EMI record to OAN for LEC billing purposes. OAN, then in turn, submitted Accutel's EMI records to the billing LEC. The billing LEC, then created a billing statement which was sent to the unwitting consumer. What we see here is a continuous "no questions asked" along each step of the process. Well this example is from that messy competitive free-market where we know there were shady characters providing dubious services. This couldn't happen in the world of traditional telephone companies, Theodore Vail's Bell's System of virtue, or could it.

**Did Verizon knowingly participate in any illegal services provided AT&T to the detriment of MCI Shareholders, which could have affected the shareholder vote by MCI Shareholders to merge with Verizon?**

47. To Mr. Lovern's question regarding "Did Verizon knowingly participate in any illegal service provided AT&T to the detriment of MCI shareholders..." I can't answer specifically since I was never employed by Verizon or MCI, nor associated with either company in any way. However, I can say without hesitation, that had MCI, as well as other competitive carriers, been afforded the same billing and collections ubiquity available to AT&T Communications through the ISS, then the competitive landscape would be much different today, and that untold millions of dollars in B&C fees, uncollectibles, and unbillables would have been avoided. This same competitive disadvantage still exists today,

---

[7] Decision 02-07-034 July 17, 2002 Investigation into Accutel Communications, Inc., D.b.a. Florida Accutel Communications, Inc. (U-5865).
[8] Decision 02-07-034 July 17, 2002 Investigation into Accutel Communications, Inc., D.b.a. Florida Accutel Communications, Inc. (U-5865), reference page 5.

and without corrective action will continue to hamstring true unfettered
competition in the telecommunications industry.

## Summary

48. Numerous claims have been made over the years that the Bell Company's have
engaged in anti-competitive activities, or that competitive carriers have engaged
in fraudulent or less than truthful advertising, promotions or service offerings.
From the consumer's perspective, these charges, on both sides have been, for the
most part, to have been proven true. We have witnessed the Worldcom and
Adelphia scandals. The Bell Companies have not been without their share of
corporate missteps, and accusations of heavy handed market tactics, but my
affidavit has tried to go beyond what the public normally sees in a post-divestiture
business environment and to explore the least understood world of how an
unregulated money flow transits in the regulated world of the Bell System. Not
just a trickle of dollars that flow between one telephone company or another, but
billions of dollars annually, that course through the intercompany settlements
system, without any checks or balances, based solely on an electronic currency
called the "EMI Record".

49. An EMI record is not "write protected" when it is sent from one Telephone
Company to another. There are no "in house" or "system wide" audit systems
that monitor each EMI record once it is received by the billing entity. The entire
intercompany settlements system is based on "no questions asked". And the
intercompany settlements system is closed to all but the chosen few. The ISS is to
Local Telephone Companies what the Federal Reserve Banks are to the Banking
Industry.

50. One may argue that with the increasing popularity of cell phones and Voice over
Internet Providers (VoIP), the long distance markets are in a state of demise,
however, Verizon Wireless and Cingular Wireless are both "A" side cellular
operators owned by the largest wireline carriers. And while long distance charges
may become a thing of the past, billing services are still needed for the rich
content promised by both wireless and wireline carriers for today's consumer
markets, along with interactive Video, etc. True open market competition can
never be realized as long as there remains the hidden banking system known as
the Intercompany Settlement System waiting to steal away the competitor's
market edge with discriminatory billing and settlements agreements. In my
opinion as an expert, the new "AT&T" has no more right to enjoy unfettered
access through the ISS or the right to control the ISS anymore today than 20 years
ago when Judge Greene ordered AT&T to divest itself of the ISS. If any changes
should be made, then the CMDS message distribution system along with the ISS
should be remanded over to a neutral third party to administer these critical
industry services in a neutral and evenhanded manner.

51. After many years of experience and through my dialogues with Mr. Lovern, I have no reservations in stating that, in my opinion, the ISS is truly run as a monopolistic enterprise through the Bell System. Having never really had the opportunity to view the massive scale upon which the ISS operates, until Mr. Lovern contacted me, I am utterly amazed that there has been no regulatory investigation into this huge unregulated financial empire. On the advent of the AT&T – BellSouth merger, I find that it is incredulous that AT&T could once again become a walled city that regains all of its anti-competitive, monopolistic advantages without truly inspecting their ISS financial networking system

[signature of affiant]

_____Mark E. Dahlen_____
[typed name of affiant]

_____2226 Vista S.E. Olympia, WA_____
[address of affiant, line 1]

_____
[address of affiant, line 2]

Subscribed and sworn to before me, this _NINTH (9)_ [day of month] day of
_October_ [month], 20_06_.

[Notary Seal:]

_Audrey J. Baily_
[signature of Notary]

_____Audrey J. Baily_____
[typed name of Notary]

NOTARY PUBLIC

My commission expires: _November 1_ , 20_08_ .