IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br> v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>    Defendants. | Civil Action No.: 1:05CV02102 (EGS)<br><br>**FILED UNDER SEAL PURSUANT<br>TO PROTECTIVE ORDER<br>ENTERED AUGUST 4, 2006**<br><br>**REDACTED FOR PUBLIC<br>INSPECTION** |
| United States of America,<br><br>    Plaintiff,<br><br> v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>    Defendants. | Civil Action No.: 1:05CV02103 (EGS) |

**UNITED STATES' REPLY TO ALLEGATIONS MADE BY AMICI
AT NOVEMBER 30, 2006 HEARING**

Pursuant to the Court's invitation, the United States files this brief reply to certain allegations made by amici during the November 30, 2006 hearing. At the hearing, counsel for the amici alleged that the United States "made up" the legal, factual, and economic support for its analysis. These allegations fail to survive a review of the materials cited during the hearing, much less the entire record. The specific allegations made by amici are based on mischaracterizations of relevant legal standards, misstatements of the United States' positions,

and misrepresentations of the factual record.[1] The United States respectfully submits that it has provided ample, well-founded legal, factual and economic analyses for this Court to conclude that entry of the Final Judgments is in the public interest.[2]

### I. The United States Has Been Candid and Consistent in Describing the Limited Scope of the Harm Alleged in the Complaints

Despite the allegations by amici to the contrary,[3] the United States has stated clearly and consistently from the date it filed the Complaints that it found harm only in certain 2-to-1 buildings where entry was unlikely.[4] The United States explained in the Response to Public

---

[1] Charges by amici that the United States did not submit materials that the Court ordered produced are simply incorrect. During the July 25, 2006 hearing, the Court afforded the United States the opportunity to submit "materials that will enable [the Court] to discharge [its] judicial and statutory responsibilities." Hearing Transcript at 20:23-22:1 (July 25, 2006) ("July 25 Hr'g Tr."). The Court noted that it did not intend "to micromanage what the parties intend to provide the Court" but would "leave it to the parties." *Id.* at 10:22-11:2. The United States informed the Court that its submissions would include declarations and materials "illustrative" of points it raised in its pleadings. *Id.* at 10:12-21, 11:3-8. In response to the Court's Minute Order of July 25, 2006, the United States submitted business records, declarations, and other materials that provide the Court with a fair representation of the information and materials it relied upon in reaching conclusions relating to the alleged harm and the proposed remedies. *See* United States' Submission in Response to the Court's Minute Order of July 25, 2006 (Aug. 7, 2006) ("U.S. Subm."); Declaration of W. Robert Majure and Attachments (Aug. 7, 2006) ("Majure Decl." and "Majure Decl. Attachs," respectively); United States' Reply Submission in Response to the Court's Minute Order of July 25, 2006 (Sept. 19, 2006) ("U.S. Reply Subm."); Reply Declaration of W. Robert Majure (Sept. 19, 2006) ("Majure Reply Decl."). As previously stated, the United States will attempt to provide responses to additional questions that the Court may have pertaining to whether entry of the proposed judgments is in the public interest.

[2] Attached is a chart entitled "United States' Responses to Allegations Made by Amici at November 30 Hearing." The chart includes transcript citations to specific allegations and arguments made by amici and the United States' responses with citations to previous filings in which the United States has addressed the substance of amici's arguments and to relevant legal citations. The chart includes some references and responses to arguments made by amici that are not addressed in this brief.

[3] Hearing Transcript at 79:13-21 (Nov. 30, 2006) ("Nov. 30 Hr'g Tr.").

[4] Complaints ¶¶ 3, 17-18, 29; *see also* Press Release, U.S. Dep't of Justice, Justice Department Requires Divestitures in Verizon's Acquisition of MCI and SBC's Acquisition of AT&T at 2 (Oct. 27, 2005); Competitive Impact Statements at 8 (Nov. 16, 2005) ("CISs").

2

Comments that it "identified one limited competitive problem: for hundreds of buildings, the transactions would combine the only two firms that owned or controlled a direct fiber-optic connection to the building, and *for a subset of these buildings*, entry . . . was not sufficiently likely to offset the potential anticompetitive effect."[5]

## II. The United States' Analysis Is Consistent with Both the *Merger Guidelines* and Existing Law

Allegations by counsel that the United States did not follow the *Horizontal Merger Guidelines*[6] ("*Merger Guidelines*") and "made up" the law[7] ignore the extensive submissions by the United States which explain in detail how it applied the *Merger Guidelines*.[8] The United States will address here specific challenges by amici to its analysis of entry, and why the government's analysis of 3-to-2 and 4-to-3 buildings is consistent with the *Merger Guidelines*

---

[5] Plaintiff United States' Response to Public Comments at 5 (Mar. 21, 2006) (emphasis added) ("Resp. to Public Comments"). Counsel for amici wrongly suggested that the United States filed under seal materials relating to the scope of the case brought in order to hide them from the public. Nov. 30 Hr'g Tr. at 79:13-21. While the United States has filed materials under seal pursuant to the protective order entered by this Court, the decision whether to afford confidential status was not left to the discretion of the United States. Order, 1:05CV02102, 1:05CV02103 (EGS) (D.D.C. Aug. 4, 2006). The materials that the United States submitted under seal were subject to statutory confidentiality protection when obtained by the United States during its investigations of the mergers. 15 U.S.C. § 18a(h); 15 U.S.C. § 1313. That confidential protection was extended to this proceeding through the entry of the above-referenced protective order. The materials that the United States is required to treat as confidential under the protective order include materials produced by members of ACTel and COMPTEL.

[6] U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (rev. ed. Apr. 8, 1997) ("*Merger Guidelines*"), *available at* <http://www.usdoj.gov/atr/public/guidelines/hmg.htm>.

[7] *See, e.g.*, Nov. 30 Hr'g Tr. at 73:13-14, 90:5-10, 96:12-17.

[8] *See, e.g.*, U.S. Reply Subm. at 3-21; Majure Reply Decl. ¶¶ 3-21; *see also* U.S. Subm. at 11 n.38; Majure Decl. ¶ 15 & n.18; Reply of the United States to ACTel's Opposition to the United States' Motion for Entry of the Final Judgments at 16 n.48, 21 & n.62 (June 1, 2006) ("U.S. Reply to ACTel's Opposition").

3

and applicable law.[9]

### A. The United States Applied a *Merger Guidelines* Entry Analysis Based on a Careful Analysis of the Facts

The United States' entry analysis followed the *Merger Guidelines* and is supported by factual evidence.[10] Amici misstated the *Merger Guidelines*'s requirements. Counsel for amici asserted that the Court would have to assume that entry *would* occur during the next two years "in every single" 2-to-1 building excluded from the remedy in order to approve the Final Judgments.[11] This is certainly not a part of the Tunney Act, nor required under established antitrust principles. The *Merger Guidelines* do not provide that entry be shown with certainty, only that sufficient entry be "likely" to occur in a timely manner.[12] The Court of Appeals, moreover, has recognized that where entry is found to be likely, the threat of entry can deter anticompetitive behavior, regardless of whether entry ever occurs.[13] Therefore, either actual entry (if the CLEC wins the customer) or the threat or probability of entry (even if the incumbent

---

[9] *See* United States' Opposition to ACTel's Motion for Leave to File Surreply at 3-5 (Sept. 28, 2006) (explaining that the United States followed well-established antitrust law and principles).

[10] *See* Majure Decl. ¶ 14 & n.17. As Dr. Majure explained, the United States applied a series of entry screens that compare the revenue potential at the building (based on then-current traffic) with the cost of entry (based on the distance to the closest CLEC fiber). *Id.* The United States' rationale for using a demand/distance screen is further described in Dr. Majure's Reply Declaration, as well as in many other filings in this proceeding. Majure Reply Decl. ¶ 16 & nn.23-24; U.S. Reply Subm. at 12-15; *see also* Complaints ¶¶ 27-28; CISs at 8; Resp. to Public Comments at 23; U.S. Reply to ACTel's Opposition at 22; U.S. Subm. at 6.

[11] Nov. 30 Hr'g Tr. at 85:24-86:1.

[12] *Merger Guidelines* § 3.0.

[13] *United States v. Baker-Hughes*, 908 F.2d 981, 988 (D.C. Cir. 1990) ("If barriers to entry are insignificant, the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs. If a firm that *never* enters a market can keep that market competitive, a defendant seeking to rebut a prima facie case certainly need not show that any firm *will* enter the relevant market." (citations omitted) (emphases in original)).

4

wins the customer) is likely to prevent anticompetitive harm from the mergers in those buildings that meet the United States' entry screens.[14]

Amici disregarded, moreover, the extensive factual basis that underlies the United States' entry analysis.[15] These materials include CLECs' Civil Investigative Demand ("CID") interrogatory responses relating to the criteria they used to determine whether to enter and offer service in a building and the numbers of buildings they had recently entered. These responses, along with interviews of industry participants, were the basis for the metric used by the United States in determining whether entry was likely.[16]

### B. The United States Followed the *Merger Guidelines* in Declining to Bring a Broader Case

The United States did not find sufficient evidence to support charging an antitrust violation relating to 3-to-2 or 4-to-3 buildings and therefore it reasonably exercised its discretion not to charge such a violation.[17] Its action rested on sound *Merger Guidelines* analysis.

---

[14] U.S. Reply Subm. at 14-15; Majure Reply Decl. ¶¶ 16-18. Moreover, because the United States bears the ultimate burden of persuading a court of harm to competition in a litigated merger case, it generally will exercise its prosecutorial discretion not to allege harm unless the possibility of entry can be ruled out with some confidence. U.S. Reply Subm. at 15-16; Majure Reply Decl. ¶ 17.

[15] The United States attached the following to its August 7, 2006 submission: lists of on-net buildings served by AT&T and MCI in the cities referenced in the Complaints; examples of network maps supplied by AT&T and MCI; maps from numerous CLECs; lists of the locations reached by 29 CLECs (including end-user buildings, carrier hotels, points of presence, and ILEC central offices); and exemplars of electronic fiber maps produced by MCI, AT&T, and several other CLECs. Majure Decl. Attachs., Tabs 2-7.

[16] U.S. Subm. at 6-7; *see also* Majure Decl. Attachs., Tab 8, CLEC Business Plans (showing that CLECs plan to expand networks); Tab 9, CLEC Interrogatory Responses (noting the number of buildings recently added to CLEC networks).

[17] In arguing that the United States should have included 3-to-2 and 4-to-3 buildings in its Complaints, amici misconstrued the state of the law. Amici essentially argued that logic would suggest a lessening of competition in 3-to-2 buildings, compelling the United States to bring a case unless it can affirmatively demonstrate a lack of harm. Congress and the courts have determined that the United

Amici inaccurately alleged that the United States has invented legal requirements that the mergers would only violate the law if "AT&T and MCI were unique in some respect" or that AT&T and MCI offer the lowest prices.[18] As previously explained, the United States considered theories of harm in the local private line ("LPL") markets based on the potential for either unilateral effects or coordinated effects. Uniqueness is a factor in a standard unilateral effects analysis. If AT&T's or MCI's products were somehow "unique" or otherwise differentiated, or if the parties were able to price their products below their competitors, then the mergers might have anticompetitive effects because of the merged entities' ability to unilaterally raise prices.[19] However, as previously explained, the United States concluded that LPL markets are essentially commodity markets, and that neither AT&T nor MCI was the lowest priced supplier at the time of the mergers.[20] The United States further considered and rejected coordinated effects theories of harm that might arise even if the products were not unique.[21] The United States diligently

---

States bears the ultimate burden of persuasion in Section 7 cases and therefore the United States does not bring merger cases if the evidence is insufficient to prove harm to competition. Allegations that a 3-to-2 reduction in the number of competitors is unlawfully anticompetitive must be proven and can be rejected by the courts. The actions brought by the United States in *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004), and *United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001), are examples of challenges where the government alleged the mergers were 3-to-2 in markets with high entry barriers which were rejected by the courts for failures of proof.

[18] Nov. 30 Hr'g Tr. at 91:23-25 (uniqueness), 92:14-16 (lowest prices).

[19] *See generally Merger Guidelines* § 2.21 (discussing unilateral effects analysis for differentiated products). These factors may also be relevant to a *Merger Guidelines* analysis of coordinated effects. *See generally id.* § 2.1.

[20] *See* Majure Reply Decl. ¶¶ 24-30; U.S. Reply Subm. at 26-34. *See also infra* pp. 10-11 as to why documents cited by counsel for amici on these points do not undercut the government's conclusions.

[21] U.S. Reply Subm. at 32-34 & n.113; Majure Reply Decl. ¶¶ 24-26 & n.38, ¶ 32; *see also* Resp. to Public Comments at 24-25, 41-42 & n.71.

applied existing law and well-established antitrust principles in reaching the conclusion that harm in 4-to-3 or 3-to-2 buildings could not be established.[22]

Despite the sound foundation for the government's action, amici pointed to the proposed Qwest/Allegiance transaction as evidence that the United States did not follow its normal approach here, and alleged that the United States has "not said one word about why they took such a radically different approach here."[23] This allegation is incorrect. The United States *did* explain months ago why its approach to Qwest/Allegiance was atypical and has no bearing here.[24] As previously noted, the United States "did not conduct a full investigation, did not conclude that competitive harm was likely in any relevant market, did not file a complaint, and did not seek to impose a remedy."[25] Indeed, the United States did not reach a conclusion on the antitrust merits at all. Rather, Qwest agreed to divest all overlapping assets so that it could represent to a bankruptcy

---

[22] The attack by counsel for amici on the government's "use" of the Bertrand model has no merit. Nov. 30 Hr'g Tr. 93:8-24. Dr. Majure referred to the Bertrand model only because well-accepted principles underlying the model are applicable to the competitive framework of LPL markets. *See* Majure Reply Decl. ¶ 25 n.36. The joint *Commentary on the Horizontal Merger Guidelines* explains that the Department's analysis of unilateral effects draws on many models developed by economists, including the Bertrand model. U.S. Dep't of Justice & Fed. Trade Comm'n, *Commentary on the Horizontal Merger Guidelines* at 25 (Mar. 2006). ACTel cannot contend that the Bertrand model is unrealistic and counterintuitive for all purposes. Dr. Wilkie, ACTel's economist, cites the model and its principles in support of his analysis contesting these mergers in an affidavit filed with the FCC. Declaration of Simon Wilkie ¶ 46 (Apr. 25, 2005), attached to Petition to Deny of Cbeyond Communications, Conversent Communications, Eschelon Telecom, Nuvox Communications, TDS Metrocom, XO Communications, and Xspedius Communications, *In re SBC Communications Inc. and AT&T Corp. Applications for Transfer of Control*, FCC WC Docket No. 05-65 (Apr. 25, 2005), *available at* <http://svartifoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6517585085>.

[23] Nov. 30 Hr'g Tr. at 96:18-97:11.

[24] Reply of the United States to COMPTEL's Opposition the United States' Motion for Entry of the Final Judgments at 11-12 (Apr. 17, 2006) ("U.S. Reply to COMPTEL's Opposition").

[25] *Id.*

7

court that its bid for Allegiance's assets would not face an antitrust challenge, but that agreement was conditional. It was understood that the resulting "pocket decree" (i.e., an agreed-upon decree not yet filed in court) was merely a backstop. Had Qwest prevailed in that auction the United States would have then proceeded to conduct a thorough investigation to determine whether, or to what extent, the merging parties might have been required to divest any overlapping assets.[26]

### III. The Factual Record Supports the United States

Counsel for amici accused the United States of "mak[ing] up facts" and advocating positions that are contradicted by the documentary record it submitted to the Court.[27] To support this allegation, counsel had to misrepresent the nature and content of the materials submitted by the United States. More specifically, counsel cited portions of documents out of context and disregarded other information in the record supporting the United States' conclusions.

#### A. The Factual Record Supports the United States' Conclusion about the Competitive Significance of Access to Buildings Rather Than Individual Floors

Counsel charged that the United States "assumed away their own record" as to whether CLECs could serve entire buildings or only individual floors, pointing to the CID responses from two CLECs that list individual floors that the CLECs were capable of serving.[28] Amici apparently contend that LPL markets should be defined by individual floors and not by individual buildings,

---

[26] U.S. Reply to COMPTEL's Opposition at 12 n.27. Amici's suggestion at the hearing that the United States arrived at this agreement after calculating pre-merger and post-merger HHIs is false. Nov. 30 Hr'g Tr. at 97:1-4. The United States had not developed the necessary information for an HHI calculation.

[27] Nov. 30 Hr'g Tr. at 73:22-25.

[28] *Id.* at 78:12-21.

and that the United States' remedy will not replace the lost competitors as it provides access to the building rather than to individual floors.[29]

Amici ignored the detailed explanations the United States proffered (and the divestiture buyers implicitly adopted) that obtaining access to a building provided customers in that building with competitive alternatives.[30] Amici also ignored their own submissions that confirm that access to the building rather than to individual floors is the critical issue in a competitor's ability to supply service. As noted by the economist for the New York Attorney General, "CLECs having a sound business basis to construct an additional building loop to serve one customer *routinely* provide ample excess capacity in the hope that the current customer's demand will grow, or that *other tenants in the same building* can be won over at a later time."[31]

---

[29] Although ACTel now contends that the failure to take into account that CLECs are connected in many cases only to single floors is a major deficiency in the proposed remedy, this appears to be a recent revelation for ACTel as it failed to raise this as a potential problem with the remedy in its comments filed with the United States last February or in its white paper commenting on the proposed settlement in October 2005. *See* Comments Regarding the Proposed Consent Decrees in United States v. SBC Communications, Inc. and AT&T Corp. (Civil Case No. 05-2102) and United States v. Verizon Communications, Inc. and MCI, Inc. (Civil Case No. 05-2103), Submitted on Behalf of the Alliance for Competition in Telecommunications (ACTel) (Feb. 9, 2006); ACTel, A Bit of Irony (Oct. 3, 2005), *attached to* ACTel's Reply Memorandum in Opposition to the United States' Motion for Entry of Final Judgments (June 7, 2006). ACTel is the only amicus that contends that the appropriate geographic market should be each floor of each building. ACTel's Response to the United States' Submission Pursuant to the Court's Minute Order of July 25, 2006 at 11-14 (Sept. 5, 2006) ("ACTel's Resp. to U.S. Subm.").

[30] Majure Decl. ¶ 14 & nn.14-15, ¶ 21 & n.25; Majure Decl. Attachs., Tab 9, CLEC Interrogatory Responses; U.S. Reply Subm. at 12-13 & n.39; 33 & n.111; Majure Reply Decl. ¶ 18 & n.27; *see also* CISs at 11-12; Resp. to Public Comments at 39.

[31] Declaration of Nicholas Economides (Sept. 5, 2006) ¶ 45 n.34 (emphasis added), *attached to* Memorandum of Eliot Spitzer, Attorney General of the State of New York, in Response to the August 7, 2006 Submission of the United States (Sept. 5, 2006). *See* Majure Decl. Attachs., Tab 9, CLEC Interrogatory Responses.

**B.    The Factual Record Supports the Conclusion that AT&T and MCI Were Not the Lowest Price Providers**

Relying on two pages excerpted from one ▮ document, amici claimed that the record the United States submitted establishes that MCI and AT&T "themselves say that they were the lowest priced suppliers."[32] In fact, an                    [REDACTED]

[33]


[REDACTED]


[35]

**C.    The Factual Record Supports the Conclusion that Price Is the Driving Factor in Purchases of LPL**

In contesting the United States' characterization of LPL as a commodity, amici selected a single page of a [REDACTED] document and suggested that it shows that carriers "don't look for price first. Totally contrary to what the government says."[36] But an ▮ document cited by counsel at

---

[32] Nov. 30 Hr'g Tr. at 92:23-24.

[33] Majure Decl. Attachs., Tab       [REDACTED]

[34] Majure Reply Decl. ¶ 29       [REDACTED]
    [REDACTED]    ; United States' Reply Subm. at 31-32 & n.105 (same); Majure Decl. ¶ 17 n.20.

[35] *See* Majure Decl. Attachs., Tab       [REDACTED]

[36] Nov. 30 Hr'g Tr. at 90:24-91:1.

10

the November 30 hearing for another purpose contradicts amici and supports the government's conclusion:    [REDACTED]

.[37] Further, the document cited by amici, rather than proving their point, is entirely consistent with the United States' position. Even the page counsel showed the Court states that    [REDACTED]    .[38] The suggestion that    [REDACTED]    is inconsistent with another page of the very same document, which notes that

[REDACTED]

.[39]

### D. The Document Cited by Counsel for Amici Does Not Support Its Contention Regarding the Intent of the Merging Parties

Finally, amici represented that documents submitted by the government "said that the intent of the merger was to retard price competition."[40] Counsel's support for this statement was a single page from an ▮▮▮ document.[41]    [REDACTED]

---

[37] Majure Decl. Attachs., Tab 10, Documents Pertaining to CLECs as Providers of Access, [REDACTED]

[38] Majure Decl. Attachs. Tab 10, Documents Pertaining to CLECs as Providers of Access, [REDACTED]

[39] *Id.* at    [REDACTED]

[40] Nov. 30 Hr'g Tr. at 94:8-15.

[41] Majure Decl. Attachs., Tab 10, Documents Pertaining to CLECs as Providers of Access, [REDACTED]

11

[REDACTED]

[REDACTED][42] Amici cannot reasonably suggest that this strained interpretation of the document could be relied upon to overcome testimony and evidence that the merging parties would likely offer at trial to support their publicly stated reasons for these mergers, which include the acquisition of AT&T's and MCI's global network assets, their lucrative enterprise businesses, the achievement of substantial efficiencies, and other competitively benign benefits.

### Conclusion

The Antitrust Division of the U.S. Department of Justice is responsible for protecting the public interest in competition by enforcing the antitrust laws. The Division takes this obligation seriously, and its public servants conduct their work pursuant to the highest professional and ethical standards. As discussed above, the evidence cited and arguments advanced by amici at the hearing do not undermine the conclusions of the United States. The ability of counsel for interested parties to argue that scattered references in an extensive record tend to support their desired conclusion does not alter the reasonableness of the thorough factual and economic analysis of the evidence as a whole conducted by the United States.

---

[42] *Id.* at [REDACTED]

The proposed consent decrees are in the public interest and, we respectfully submit, should be approved by this Court.

Respectfully submitted,

_____
Laury E. Bobbish
Assistant Chief

_____
Claude F. Scott, Jr. (D.C. Bar No. 414906)
John M. Snyder (D.C. Bar No. 456921)
Jared A. Hughes

Trial Attorneys

Telecommunications and Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States

Dated: December 13, 2006