**JOINT STATEMENT OF
CHAIRMAN KEVIN J. MARTIN AND
COMMISSIONER DEBORAH TAYLOR TATE**

Re:  *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, WC Docket No. 06-74

The telecommunications market continues to be a dynamic one.  New technologies and services are continuing to transform every aspect of our lives.  The merged AT&T/BellSouth (AT&T) promises to offer consumers a wider array of IP-enabled services, including voice, data, wireless, and video services.  In particular, the merger will enable the combined company to accelerate its deployment of broadband and IPTV in the BellSouth region.   The merger also will enhance national security by creating a stronger and more efficient U.S. supplier of critical communications capabilities.  Further, the merger will allow the combined entity to expand its global reach and be better positioned to provide the broad range of communications services that enterprise customers demand.  As a result, today the Commission finds that this merger will further many of its broadband, competition, and public safety priorities and finds that the merger, on balance, will serve the public interest.

In particular, this merger promises to result in greater competition in the broadband and video markets.  Broadband deployment to all Americans remains one of the highest objectives for us at the Commission.  This deployment is critical to our nation's competitiveness in the global economy and to our national security.  All consumers should expect to benefit from this technology.  The merging parties recognize this and continue to deploy high bandwidth broadband to consumers.  This merger will enable the combined entity to build upon the progress the companies have individually made in the deployment of broadband technologies in the combined territory.

The merging parties are also engaged in plans to deploy IPTV service throughout their territories to compete with other video providers, like cable and satellite.  By enhancing the ability of new entrants to provide video services, we are advancing our goal of universal affordable broadband access for Americans, as well as our goal of increased video competition.  Greater competition in the market for the delivery for multichannel video programming is a primary and long-standing goal of federal communications policy. Consumers across the country will reap the benefits of this new competition – and sooner as a result of this merger.  The addition of new entrants in the video marketplace holds prices down and improves service.  The additional competition, as well as the nature of IPTV, will also improve the availability and control of content that American consumers demand.  Moreover, the delivery of quality video services that demand a quality broadband infrastructure will only further encourage the deployment of broadband networks into yet unserved or underserved areas.

Although we believe that this transaction offers significant benefits to consumers, we have reservations about some of the voluntary commitments offered by the merger applicants. Like the review by the Department of Justice, nineteen states, and three foreign countries, the order we adopt today does not find there to be any public interest harms resulting from the merger. Unlike the Department of Justice and these other entities, however, we nevertheless impose a number of conditions on the merging parties.

Some of the conditions will certainly provide additional consumer benefits. We find the imposition of some of the conditions, however, to be unnecessary. And, some of the conditions impose burdens that have nothing to do with the transaction, are discriminatory, and run contrary to Commission policy and precedent.

To be sure, we are pleased that some of these conditions should accelerate the deployment of broadband facilities and adoption of broadband service throughout the 22-state region of the merged company. For example, the applicants have committed to offer high-speed broadband services to all consumers in the combined territory by the end of 2007. They have also committed to providing new retail broadband customers a $10 a month broadband Internet access service throughout the combined region and they have committed to provide a stand-alone broadband service – one that doesn't require the purchase of other bundled services – at $19.95 per month. While we would not impose these requirements as regulations, we are pleased that these conditions will further encourage the deployment and adoption of broadband by consumers. As such, these are certainly consumer-friendly concessions and are additional public benefits of the transaction.

Other conditions, however, are unnecessary and may actually deter broadband infrastructure investment. The conditions regarding net-neutrality have very little to do with the merger at hand and very well may cause greater problems than the speculative problems they seek to address. These conditions are simply not warranted by current market conditions and may deter facilities investment. Accordingly, it gives us pause to approve last-minute remedies to address the ill-defined problem net neutrality proponents seek to resolve.

Importantly, however, while the Democrat Commissioners may have extracted concessions from AT&T, they in no way bind future Commission action. Specifically, a minority of Commissioners cannot alter Commission precedent or bind future Commission decisions, policies, actions, or rules. Thus, to the extent that AT&T has, as a business matter, determined to take certain actions, they are allowed to do so. There are certain conditions, however, that are not self-effectuating or cannot be accomplished by AT&T alone. To the extent Commission action is required to effectuate these conditions as a policy going forward, we specifically do not support those aspects of the conditions and will oppose such policies going forward.

For example, today's order does not mean that the Commision has adopted an additional net neutrality principle. We continue to believe such a requirement is not necessary and may impede infrastructure deployment. Thus, although AT&T may make a voluntary

business decision, it cannot dictate or bind government policy. Nor does this order. Similarly, this order does not bind the Commission to reregulate prices or reestablish price controls. Specifically, with regard to special access condition #6, AT&T is required to file an amended tariff which reduces its wholesale special access prices for DS1, DS3, and Ethernet services to some but not all companies. Unlike the commitment to offer broadband services to consumers for $19.95 a month, this condition provides no consumer benefit and is aimed at large enterprise customers and some competing carriers. And, AT&T will not be giving theses discounts to all customers equally. Specifically, the merged entity will lower the prices for some carriers but not for others. Carriers such as Verizon and Qwest do not qualify for these discounted rates unless they also lower their rates in their respective regions. In effect, therefore, the Democrat Commissioners want to price regulate not only AT&T but also Verizon and Qwest. Accordingly, not only are the conditions unnecessary as there is no finding of public interest harm, but the conditions attempt to impose requirements on companies that are not even parties to the merger. As such, this condition imposes burdens on carriers that are not even parties to the transaction. This condition surely imposes burdens that have nothing to do with the transaction.

Moreover, unlike other voluntary business commitments, this condition requires future Commission approval. Such approval would contravene established Commission policy and precedent and we would object. In short, we object to effectuating a change in Commission policy by a voluntary commitment by one company.

First, the reimposition of rate regulation in the special access market is inconsistent with the Commission's general policies of deregulating prices in competitive markets. Second, such a condition is explicitly inconsistent with Section 202(a) of the Communications Act of 1934, as amended, that prevents discrimination in, among other things, charges, practices, or services and finds it unlawful to give any undue or unreasonable preferences or advantages. *See* 47 U.S.C. § 202(a) (prohibiting unreasonable discrimination in charges or services for like communication services directly or indirectly); *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 130-31 (1990) (invalidating order allowing a carrier to charge a tariffed, regulated rate to certain customers and not others); *MCI v. CompTel*, 842 F. 2d. 1296, 1304 (1988) (stating that the Commission is required by statute to ensure that special access tariffs "conform to the dictates of section 202(a). If certain prices are discriminatory, it is not enough to point to the fact that they were computed in accordance with dissimilar methodologies. The FCC has no choice but to see that the terms of section 202(a) are observed, even if that entails some modification of the methodologies used to derive the proposed charges."). Carriers that are denied the discounts would be subject to a competitive disadvantage in the marketplace.

As such, even when AT&T attempts to fulfill its merger commitment by filing its tariffs, the Commission is not bound to approve these tariffs. Indeed, consistent with the Commission's prior policies and precedent, we would oppose such discriminatory practices and would encourage such tariffs to be rejected.

Finally, in addition to the fact that this condition appears aimed to give certain competing carriers an advantage over others, we note that there is no requirement that the benefits of the discounted special access rates are passed through to customers.

AT&T's proposed commitments turn the clock backward to rate regulations of a decade past. While the company has voluntarily agreed to these conditions, the Commission is required by law to recognize competition and will continue to use other tools and legal avenues to continue down the deregulatory path envisioned by Congress and adopted by the Commission.

# STATEMENT OF
# COMMISSIONER MICHAEL J. COPPS, CONCURRING

Re:   *In the Matter of AT&T and BellSouth Corporation Application for Transfer of Control (WC Docket No. 06-74)*

We celebrate today not a triumph for huge corporate mergers but a modest victory for American consumers. The AT&T-BellSouth transaction is the largest telecommunications merger ever, the latest in a litany of former Bell Company mergers that has gone on for nearly a decade. When it comes to consolidation among communications giants, we operate in a world that is certainly not of my choosing. Nor do I think it is what Congress had in mind when it passed the Telecommunications Act of 1996. That particular Congress intended to create a "pro-competitive, deregulatory" communications environment. In the past several years, the FCC has been disastrously selective in its reading of this two-fold charge. We couldn't act quickly enough to approve every call to deregulate, but we studiously avoided our obligation to encourage the kind of fair competition necessary to protect consumers in a deregulated world. I have made my disaffection with this course of Commission decision-making clear ever since I came here more than five years ago. But as I have said before, in the end we are charged with considering these mergers in the context of the world that is, not the one that might have been. With that as prologue, I began my consideration of this transaction wondering if there was some equation by which I could support the combination before us today—some way to ensure that consumers actually derive tangible value instead of being left once again holding the bag of higher prices and less competition.

We embarked upon a strange and tortured odyssey in October when the U.S. Department of Justice incomprehensibly concluded that it had no concerns about the AT&T/BellSouth merger. Instead of providing a reasoned analysis of the effects this unprecedented merger might have on the highly-complicated and increasingly concentrated telecommunications market, all DOJ could produce was a "hear no evil, see no evil, speak no evil" press release. Surreal as that was, we Commissioners were initially asked to approve the merger the very next day ***without a single condition*** to safeguard consumers, businesses, or the freedom of the Internet. This is all the more astonishing when you consider that this $80-some odd billion dollar acquisition would result in a new company with an estimated $100 billion dollars in annual revenue, employing over 300,000 people, owning 100% of Cingular (the nation's largest wireless carrier), covering 22 states, providing service to over 11 million DSL customers, controlling the only choice most companies have for business access services, serving over 67 million access lines, and controlling nearly 23% of this country's broadband facilities.

It became clear to Commissioner Adelstein and me that if there were going to be any consumer-friendly results from the transaction, it would be up to us to represent and deliver upon the many concerns that consumers had expressed to the Commission. To make matters still worse—in a farce transcending the comedic, we were expected to negotiate for safeguards without knowing who of the Commissioners were actually

participating in the proceeding—an ambiguity that could have been resolved months earlier but for the alleged strategic benefits of creating uncertainty in the process and the outcome.  Fortunately, just two weeks ago, this progress-inhibiting underbrush was finally cleared away and we were able to accelerate the job of reaching an outcome.

From the start I made plain to all parties and stakeholders that it would be a very steep hill for me to climb to support a merger of this magnitude and consequence. Meeting with the parties, I raised many concerns that questioned whether the merger would be consistent with the public interest and represent an improvement over the status quo.

Before creating the largest Internet access provider in history, there was the glaring need to ensure this merger would not usher in an age of discrimination on the Internet—that wonder of technology whose freedom and openness is so dramatically refashioning all of our lives.  It was time to add a fifth principle of neutrality to protect the huge network the merged entity would control.  How could we be party to a transaction that would enhance both the capacity and the commercial incentive of the new company to discriminate on the Net?  History, it seems to me, documents that when a firm has both the technological ability and the business incentive to control a network to its own advantage, it will at some point attempt to do just that.

We also heard the pleas of consumers, small businesses and others that this transaction should bring tangible gains in terms of services and prices to them and bring them now, not at some promised future date.  A company this deeply involved in controlling telecommunications networks should also be expected to do its part to ensure that broadband is deployed more quickly throughout the nation, including to rural America and other under-served parts of the country.  Finally, before accumulating enormous additional market power in the special access market, the company should address the well documented concern that businesses are being charged inflated prices for high-volume voice and data services—behavior that retards small business growth, inhibits America's international competitive posture, and eventually trickles down to consumers in higher costs.

Over the course of the intensely-busy weeks and months since we were asked to approve a condition-less merger proceeding, I have had wide-ranging discussions with many, many stakeholders that have been useful, substantive and productive.  Mergers of this magnitude cannot and should not be considered without ongoing consultation with as many stakeholders as possible.  This is what Commissioner Adelstein and I fought for and we were pleased when the Chairman provided, at our request, an additional period of public comment during the course of our deliberations.  Indeed, I believe that this proceeding has allowed for more comment and sharing of knowledge by interested parties than any merger consideration that I have participated in during the five years I have served on the Commission.  It's still short of a perfect process, but like the merger result itself, it ended better than it began.

After much hard work and countless hours of deliberation on all sides, the

applicants have now offered unprecedented and substantial commitments that I believe will safeguard and serve the public interest to a degree few envisioned at the time the merger item was presented to the Commission. Would I have preferred to do even more? Of course. Am I entirely satisfied? No. Do I agree with much of the analysis contained in the Order? Decidedly not. The analysis falls far short of the mark in many important respects. This is a major reason for my concurrence—which is predicated on voting for the overall results of the Order, including the commitments the applicants have made, without endorsing all of the reasoning set forth in the Order. But I do believe the overall outcome is a genuine step forward on the fronts I enumerate below. I believe that the commitments concerning the future of the Internet; consumer access to broadband, video, and advanced wireless services; business prices for high-volume voice and data services; competitor access to UNEs and interconnection; public safety and disaster relief; and the repatriation of jobs to the United States comprise a package that will benefit the American public for years to come, and I am pleased to have worked toward this end. And the conditions are expressly enforceable by the Commission. The results we approve today allow me to concur in this Order.

I should make clear that this is a package of commitments composed of many individual elements. Not every Commissioner has equal enthusiasm for each element of the final item, so I am grateful for my colleagues' willingness to look at the package as a whole in order to produce a majority to approve or concur in the result we reach today. I think it is a real credit to the strength of the institution and the working relationships we have forged that we have been able to reach this result.

*<u>Network Neutrality.</u>* Perhaps most important, we have taken steps that will preserve and encourage the truly transformative openness and power of the Internet. The Internet is surely this generation's most transformative technology—perhaps as transformative as any technology in history. It was conceived and nurtured in freedom and it empowered not those who controlled the pipes but those at the edges—consumers, you and me. I know there are some who still believe that the government has no business overseeing any aspect of the Internet (ignoring, of course, government's formative role in creating the Internet in the first place). Their theory is that technology mandates from on high will inevitably stifle innovation and are antithetical to the de-centralized, non-hierarchical genius of the Internet. My response is that in an age when the Internet is increasingly controlled by a handful of massive private network operators, the source of centralized authority that threatens the Internet has dramatically shifted. The tiny group of corporations that control access to the Internet is the greatest threat to Internet freedom in our country today. If left unchecked, the merged entity resulting from today's decision would have gained the ability to fundamentally reshape the Internet as we know it—in whatever way best serves its own profit motives, rather than preserving the integrity and the effectiveness of the Internet.

The condition builds upon the four principles of net neutrality unanimously adopted by this Commission and made enforceable in the context of the Bell mergers completed last year. In addition to the company's compliance with these four principles, the condition agreed to by the merged entity includes a fifth principle that requires the

company to maintain a "neutral network and neutral routing" of internet traffic between the customer's home or office and the Internet peering point where traffic hits the Internet backbone.  The company is prohibited from privileging, degrading, or prioritizing any packets along this route regardless of their source, ownership, or destination.  This obligation is enforceable at the FCC and is effective for two years.  It ensures that all Internet users have the ability to reach the merged entities' millions of Internet users—without seeking the company's permission or paying it a toll.  The next Drudge Report, Wikipedia, Craigslist, Instapundit, or Daily Kos should not have to seek a massive corporation's blessing before it can begin reaching out to the American public, and we can take considerable comfort from the fact that today's condition prohibits such behavior.  While I might have preferred a longer duration, prior mergers resulted in similar time periods for the net neutrality conditions and it is in my view sufficient to allow Congress to take longer-term network neutrality action if it chooses to do so.

Relatedly and importantly, the merged entity is required to continue to maintain the present number of Internet backbone peering relationships for the next three years.  Thus the status quo in the Internet backbone market is preserved by preventing the merged entity from using its larger size and immense last-mile customer base to terminate the settlement-free peering relationships that are fundamental to the Internet as we know it.  Read in conjunction with the network neutrality obligation, this peering provision will help to protect the Internet experience and the powerful opportunities it promises for the future.

***Consumer Benefits.***  This Order clearly prevents the merging parties from tying their Internet access service to the purchase of traditional telephone service.  Additionally the merged entity commits to offer stand-alone DSL service at a more consumer-friendly price of $19.95/month.  This should prove an enormous boon to customers who are happy with their wireless service and seek to "cut the cord" on wireline telephone service, or who want to take advantage of competing VoIP services that have the potential to lower consumer phone bills.

At a more macro level, I have long maintained that consumers have been sorely burdened by our nation's lack of a national broadband strategy.  Today, large swaths of rural America, low-income areas, and other underserved populations lack access to affordable broadband services, and our nation ranks 16th in the world in broadband penetration according to the International Telecommunications Union (ITU).  In a more recent and nuanced ITU Digital Opportunity Index, the United States ranks 21st!  These are not rankings to be proud of.  There will be no end to this downward spiral absent a comprehensive national strategy to reverse it—just as every other industrialized country on the planet has developed its own national broadband strategy.  But, again, the focus of today's merger proceeding cannot be on what might have been, but rather on making sure that our Commission action doesn't make an already bad situation even worse.  So, even though we cannot promulgate such a broad strategy, we do secure in this merger real, tangible, and important  broadband commitments that will ensure that this mega-merger does not send us even further in the wrong direction and, yes, even tips the balance a bit in the right direction.

4

First, the merged entity has committed to offer broadband to **100%** of the customers in its 22-state region by the end of 2007.  There are no exceptions for sparsely populated areas; in fact, the company has committed that at least 30% of its new deployment will be in rural and low income areas.  Would I have liked this commitment to apply to the faster speeds of fiber rather than to copper wire?  Absolutely—but this is at least a credible commitment and a tangible beginning.  And the company has agreed to at least accelerate its fiber build-out for the AT&T region by acknowledging its intention to pass at least one and a half million homes in the BellSouth region with fiber facilities by the end of 2007.  The new company will need to come back to the FCC at the end of next year to tell us whether it has met its responsibility.  I, for one, will be watching closely to ensure that it does.

Second, in terms of affordable broadband, the company has agreed in its 22 states to offer new retail consumers its basic broadband service for $10 per month as well as a free modem to current dial-up customers in order to make broadband affordable and available to many more people than have it today.  Put this commitment together with its broadband deployment obligation, its $19.95 Stand Alone DSL commitment, and its commitment to preserve network neutrality, and I believe we have a framework that will help provide affordable, user-friendly broadband for consumers around the country.

Third, the more this agency can do to spur "third pipe" options for competitive broadband services, the better.  Without conditions the merged entity would have held onto spectrum that it has not substantially developed but that is uniquely suited to wireless broadband applications.  We know the merged entity will have little business incentive to invest in building out this spectrum, because doing so would just cannibalize its wireline broadband offerings as well as the broadband wireless services it offers through Cingular.  I am therefore pleased that the company has agreed to divest its 2.5 GHz spectrum licenses within 12 months and to use its 2.3 GHz spectrum licenses in a timely manner or forfeit this spectrum as well.  In doing this, we have taken substantial steps to enable entrepreneurs to use their talents to develop new, exciting wireless broadband applications and we have ensured that the new company has the right incentives to innovate with the spectrum it retains.

In crafting a set of measures to avoid the new company's abuse of its Internet market power, we have also taken pains to preserve competition in the very important market for plain old voice service—which is still one of the more daunting bills that American households must pay each month.  One bright spot on the FCC's radar screen is the progress that cable and other competitive providers are making through offerings of facilities-based telephone service to residential customers.  This merger initially raised the specter of a consolidated entity—one owning nearly all of the telephone network in roughly half the country—using its market power to reverse the inroads that new entrants have made and, in fact, to squeeze them out of the market altogether.  To mitigate this concern, the merged entity has agreed to allow the portability of interconnection agreements and to ensure that the process of reaching such agreements is streamlined.  These are important steps for fostering residential telephone competition and ensuring

that this merger does not in any way retard such competition.

*__Benefits for Enterprise Services__*:  Today's Order makes substantial strides in limiting the merged entity's ability to use its stranglehold over business access services in 22 states to raise prices for special access to even more unreasonable heights.  Nowhere is the FCC's folly in de-regulating without ensuring competition more apparent than in the special access market.  As the Government Accountability Office (GAO) recently pointed out, only 6% of buildings with demand for special access services have any competitive alternative besides the incumbent LEC.  Indeed, the GAO report concludes that the FCC's de-regulatory "price flex" regime has actually led to higher prices in the very areas where one would ordinarily expect to find lower prices.  Today's Order helps restore balance by reinstituting price caps throughout the 22 state footprint of the merging parties—a measure that should result in approximately $500 million in savings to competitors.  The Order also prohibits reliance on certain anti-competitive contract conditions.  Importantly, these protections are in effect for a period of four years.  While this is real progress, we still have far to go.  It is time for the FCC to finish its long-dormant special access proceeding that has been languishing for years.

*__Additional Benefits__*:  A detailed reading of the merged entity's commitments will show other important benefits in addition to the ones I have already described.  Let me briefly highlight just a few of these.  Because the loss of jobs is so often the first cost-cutting move of any merger, I am pleased at the company's willingness to repatriate approximately 3,000 jobs from overseas back to the United States, with at least 200 jobs being created in the hurricane-ravaged area of New Orleans.  I believe this commitment is the first such job repatriation ever to accompany a telecom merger.  While I fear other jobs will be lost, this provides at least some job comfort for the company's employees.  The revolution in communications that we are witnessing must not come at the expense of America's hard-working communications workers.  Indeed, these high-quality, dedicated, and organized workers are key to bringing us the next generation of communications services.

I am also pleased that the merged company has made public safety commitments that will help protect our nation's communications networks in the event of a natural or man-made disaster.  As I have often stated, providing for the safety of the people is the most important role that a government can fulfill.  So I am pleased that the merged company will ensure that legacy AT&T's first-rate disaster recovery resources will now be made available in the former BellSouth states.  The company should be commended for developing these advanced capabilities beyond any government mandate to do so, and I believe that expansion of this capability to an additional broad swath of the nation is an important step forward in readying ourself for the next disaster.  I have also stated that the FCC should lead the charge in securing the security, reliability, and robustness of our networks, including through public-private partnerships.  Towards that end, the merged company will donate $1 million to non-profit or public entities for the purpose of promoting public safety.

6

Our disabilities communities get easily left behind in such huge transactions. So I am pleased that the merged entity has agreed to produce an important report on its service to consumers with disabilities—a report that can help the Commission in its mission, mandated by statute, to ensure the availability of effective and comparable communications tools to *all* our people. I should note that Cingular Wireless—which will now be owned wholly by the merged entity—has distinguished itself in its willingness to work with us on disabilities and public safety issues. I look forward to continuing that relationship in the years ahead, as well as to learning what new initiatives and policies the merged entity will pursue to make sure that every American has access to the wonders of the communications revolution.

Further, in what many might see as a very technical agreement, but an important one nonetheless, the company has agreed not to use our forbearance procedures to evade or frustrate any of the commitments it has made here. We have also been quite cognizant in recent months of the Tunney Act proceeding concerning the prior merger between SBC and AT&T that is currently pending in district court. While the resolution of this issue will ultimately be between the federal courts and the Justice Department, I do believe the FCC's public interest review of this merger must take into account a concern about whether the ultimate decision in the prior mergers will be reflected in this current, related merger. To alleviate this concern, the company has agreed to come back to the FCC after the courts and the Justice Department have resolved the pending proceeding to work with us in good faith to ensure that any remedies ultimately imposed in the prior merger are adequately addressed here.

In sum, I believe that we have made this transaction at least minimally acceptable to American consumers. It brings price reductions rather than price increases, more broadband rather than less, a free and open Internet rather than one rife with opportunities to degrade and limit, and numerous other safeguards and protections.

I would be remiss in not expressing gratitude to all parties who participated in these discussions. So I thank them one and all. I wish to thank the Chairman and Commissioner Tate who have spent so much time and energy on this transaction for so many weeks and months. It detracts from no one's effort to pay special thanks to my friend and colleague Commissioner Adelstein for vision and perseverance that were so important in getting us where we are today. My colleagues' personal staffs worked long and hard to get this done and we appreciate particularly the long hours and excellent contribution made by Scott Bergmann of the Adelstein Office. I am grateful to the Bureau for all the work it has done during the course of this proceeding. Most of all, I thank my dedicated, hard-working and downright brilliant staff for their tireless exertions during the pendancy of this proceeding. Scott Deutchman, joined by Bruce Gottlieb, worked literally around the clock on many occasions. They gave up family vacations, sacrificed holidays, and pushed themselves far beyond what anyone should rightly expect. Their good judgment, always-incisive analysis and remarkable outreach skills are a huge reason why this agreement was reached.

STATEMENT OF
COMMISSIONER JONATHAN S. ADELSTEIN,
CONCURRING

Re:   *AT&T Inc. and BellSouth Corporation Application for Transfer of Control, WC Docket No. 06-74, Memorandum Opinion and Order, FCC (Dec. 29, 2006)*

As a Commissioner, I am required to review the transactions that come before me – not necessarily the ones that I would have preferred.  This transaction has given me serious pause, but through hard work and genuine compromise, we were able to achieve a result that delivers major, tangible benefits to consumers.  A historic merger warrants historic conditions.  I don't pretend that we addressed every possible issue presented here or that it is possible, or even appropriate in this context, to try to rectify years of decisions that have undercut competition.  Yet, drawing on the full record, I have tried to counter-balance the effects of this transaction by asking for meaningful conditions that protect the open and neutral character of the Internet, benefit consumers by promoting affordable broadband services, and preserve competitive choices for residential and business consumers.

These are rapidly changing times in the telecommunications industry and the broader communications marketplace in general.  Mergers that were unthinkable only a few years ago now seem like a regular occurrence.  But for a few brave voices in the competitive community, a handful of tireless consumer rights advocates, and a few concerned leaders on Capitol Hill, most observers, both inside and outside Washington, DC, don't focus on this trend of consolidation.  It seems as if the widespread view, from our supposed antitrust watchdogs at the Department of Justice to many inside this building, is to simply accept this process as inevitable.

It is against this backdrop the Commission today conditionally approves the formation of the country's largest wireline, wireless, and broadband company.  This combination will directly touch residential consumers, wireless customers, small and large businesses, local governments and institutions across the United States.  A merger of this breadth and scope raises serious questions for policymakers and consumers because communications services – voice, data, and video – are so integral to our daily lives and to the economic success of our communities and national economy.  I share many of the concerns raised about this combination and have tried to put in place a meaningful set of conditions to address them.

The result we reach today is not perfect.  Rather, it reflects true compromise.  Yet, on balance, it will benefit the public interest in several significant ways.  In the item, we take important steps to address concentration in the broadband market by accepting as a condition AT&T's commitment to maintain a neutral network and neutral routing in its provision of wireline broadband Internet access service.  This commitment will help preserve the open nature of the Internet from the consumer to the Internet cloud.  As a result of our conditions, consumers also will have access to more affordable broadband services, whether purchased as a bundled package or as a stand-alone offering that can be paired with wireless or Internet phone service.  In addition, we take significant steps to promote and preserve competition by requiring that the applicants divest wireless broadband spectrum that will be critical to the development of an independent broadband option; by ensuring that competitive carriers will continue to have access

1

to critical wholesale inputs that they need; and by providing that these conditions last for a meaningful period of time.

At the same time, the applicants will be able to move forward with their plans to accelerate their broadband and video deployment across their entire footprint. To that end, I would have preferred a clearer and more enforceable set of commitments on the applicants' plans to bring true high-bandwidth broadband services to all consumers, including low income consumers and those in rural areas. But I am pleased that the combined company has agreed to reach 100% of their customers with at least basic broadband service by the end of 2007 and to file a report on their progress in deploying advanced video services.

This proceeding has been challenging. I would like to thank the parties and my colleagues for their willingness to consider and adopt critical consumer protections to mitigate some of the potential harms of this transaction. Without these conditions, I could not support this combination, so our ability to find common ground was critical to this decision. I would have preferred more rigorous safeguards in some areas and longer durations for certain conditions that we adopt. At the same time, I know and respect that some of my colleagues come at this proceeding from a very different starting position.

That fact was keenly driven home two months ago when the Department of Justice waived this merger through without the imposition of even a single condition to protect competition or consumers. I disagreed with that approach and continue to believe that a merger of this magnitude warrants a careful review of the public interest, something I have pressed hard for in this case. We are obligated to analyze carefully the record evidence and determine whether the public will be served better by the transaction being approved or being denied, and whether conditions may be necessary to mitigate harms to consumers. The manner in which the Commission reaches its decisions is also important, so I appreciated the willingness of my colleagues to provide additional opportunity for public input on the impact of this deal and on the need for adequate conditions.

We won far more concessions to benefit the public than anyone predicted when this deal was announced. People expected us to deliver a few kilobits, and we came through with several megabits. What follows is my analysis of many of the critical elements that made this agreement possible.

**Ensuring a Neutral and Open Internet**

One hallmark of this Order is that it applies explicit, enforceable provisions to preserve and protect the open and interconnected nature of the Internet, including not only a commitment to abide by the four principles of the FCC Internet Policy Statement but also an historic agreement to ensure that the combined company will maintain a neutral network and neutral routing in its wireline broadband Internet access service. Together, these provisions are critical to preserving the value of the Internet as a tool for economic opportunity, innovation, and so many forms of civic, democratic, and social participation.

The Internet has been a source of remarkable innovation and has opened a new world of social and economic opportunities, precisely because of its openness and diversity. To help preserve this character, the FCC last fall adopted an Internet Policy Statement that sets out a basic set of consumer expectations for broadband providers and the Internet. With these four principles, the Commission sought to ensure that consumers are entitled to access the lawful Internet content of their choice, to run applications and use services of their choice, subject to the needs of law enforcement, and to connect their choice of legal devices that do not harm the network. This Order rightly requires the applicants to meet these basic provisions adopted unanimously by the Commission and applied as enforceable conditions to the BOC-IXC mergers, last year.

Most significantly, the Commission takes a long-awaited and momentous step in this Order by requiring the applicants to maintain neutral network and neutral routing in the provision of their wireline broadband Internet access service. This provision was critical for my support of this merger and will serve as a "5th principle," ensuring that the combined company does not privilege, degrade, or prioritize the traffic of Internet content, applications or service providers, including their own affiliates. Given the increase in concentration presented by this transaction – particularly set against the backdrop of a market in which telephone and cable operators control nearly 98 percent of the market, with many consumers lacking any meaningful choice of providers – it was critical that the Commission add a principle to address incentives for anti-competitive discrimination. Defining the exact parameters of any neutrality provision is, almost by definition, complex and difficult. The precise contours, scope, and exclusions in this provision reflect compromise and a predictive judgment about how, in the words of Prof. Tim Wu, "to preserve the most attractive features of the Internet as it now exists." The work is not done, however. It is critical that we remain vigilant and continue to explore comprehensive approaches to this issue; but I expect this significant step will inform the debate in the coming months and years. I appreciate the efforts of the many diverse groups and individuals who have contributed to this effort and, in particular, I want to thank Commissioner Copps for his leadership on this issue and for his commitment to the effort to devise a carefully-crafted condition.

**Encouraging Consumer Access to Broadband**

*Affordable Broadband.* We made substantial progress during our review in increasing consumer access to broadband services. These services are increasingly recognized as critical for the growth of small businesses, for persons with disabilities, and as a driver of opportunity in so many aspects our lives, including distance learning and telemedicine. So, the commitment to offer basic broadband service for $10 per month should help lower the cost for many consumers who are just starting to take advantage of the broadband experience. I've said often that we need more bandwidth value in this country, so I am pleased to see this commitment from the applicants. We have heard from many Members of Congress, state and local officials, and community organizations who believe that the ability of the combined company to deliver low priced broadband services was particularly appealing to them.

*Broadband Build-Out.* I also note that, in response to our call for conditions, AT&T has committed to provide broadband services to 100% of their territory by the end of 2007. A

ubiquitous broadband commitment is key because people all over this country want access to the opportunities that flow from this technology, no matter where they live. While I support adopting this commitment as a condition of the merger, it alone will not be a panacea. It would have been substantially improved by the inclusion of more specific, quantifiable, and enforceable commitments for rural and low income consumers, who deserve to enjoy the benefits of this transaction, too.

This commitment also relies on a definition of broadband that does not nearly put our country on par with our global competitors and is not at a sufficient level of bandwidth to support the provision of video services. I would have supported adoption of a condition requiring the applicants to meet agreed-upon levels of fiber deployment, which is critical for the deployment of competitive video services, one of the chief benefits touted for this combination. I do appreciate the applicants' willingness to respond to my concerns by outlining some of their fiber and video deployment plans and agreeing to provide a report one year from now on their progress, but I wish that we could have done more to ensure that consumers truly reap the purported benefits of providing real video competition in the BellSouth region. I am hopeful this will occur even in the absence of enforceable conditions.

I am particularly pleased that AT&T also has committed to increase its build-out of wireless broadband services. As a condition of this merger, AT&T will jumpstart service in the under-used 2.3 GHz band by agreeing to a specific construction commitment over the next three and a half years. AT&T already has conducted a number of successful trials on the spectrum and is running a commercial WiMAX network in Pahrump, Nevada. I want to see more deployment in the 2.3 GHz band. In addition to divesting its 2.5 GHz wireless broadband holdings, AT&T has met my challenge by committing today to a specific level of buildout by July 2010. Much like the Sprint-Nextel merger, I am hopeful that this build-out commitment will prove a catalyst to the entire Wireless Communications Service. Like a rising tide that lifts all boats, AT&T's work in this band will be a boon for other wireless broadband providers looking to provide service in the 2.3 GHz band.

*Stand-Alone DSL.* Another major victory for consumers is the ability to purchase broadband services without having to buy a whole bundle of traditional telephone service. So, I fully support the applicants' commitment to provide a meaningful stand-alone DSL option for consumers who want access to broadband services but who want to "cut the cord." Consumer advocates have strongly supported this condition, which should expand the options available for residential and small business consumers who are interested in relying on wireless or Internet phone service for their voice connections.

We have shown greater attention in this Order to the stand-alone DSL condition because it must be implemented fairly in order to be a meaningful option for consumers. In the previous merger of then SBC with AT&T, we conditioned our support on the offer of a similar naked DSL service. I was disappointed when that offer was made to consumers at a price point that seemed designed to make it unattractive for consumers, virtually at the same level as the entire bundled offering. In California, for example, consumers who were actually able to learn of the availability of stand-alone DSL, which had not been advertised, were quoted a rate of $44.99 per month, a mere one dollar less than the least expensive regular bundle of DSL and phone service.

So, it is especially meaningful here that we were able to reach agreement for AT&T to offer the service at $19.95.  Particularly in combination with the Internet neutrality conditions adopted today, this stand-alone DSL offering should create an opportunity for the development of competitive Voice over Internet Protocol (VoIP) services.  This condition has the potential both to give consumers more options and flexibility in their broadband and voice services, and to spur the development of competition and choice.

**Promoting Competitive Alternatives**

Some have argued that this combination is a mere afterthought in the world of converged communications.  But this analysis falls short.  Even the Order as drafted recognizes that the markets for business and residential services are highly concentrated in the applicants' in-region territories.  Moreover, AT&T is already a substantial competitive force and has the potential to be a greater competitive force in the BellSouth region.  In fact, just last year AT&T justified the SBC-AT&T merger on grounds that it would compete nationwide, not merge nationwide.  So, in the absence of meaningful conditions from the Department of Justice, it is critical that we adopt the safeguards we do today to protect against the loss of competition.

*UNEs.*  To address concerns about the loss of competitive alternatives, the applicants have agreed to freeze the wholesale rates for critical unbundled network elements and to recalculate the impairment triggers for determining the availability of the elements.  As a result, competitors will have access to critical elements in some additional markets where AT&T is lost as a competitor, and they will not be faced with draconian price increases.  The applicants have also offered an important new commitment – a commitment not to seek forbearance from section 251 unbundled network elements – that should provide competitors another critical measure of stability.

*Reducing Costs of Interconnection Agreements.*  I was also pleased that we require the applicants to take a number of steps – including providing interconnection agreement portability and allowing parties to extend their existing agreements – to reduce the costs of negotiating interconnection agreements.  This condition also responds to concerns about incentives for discrimination – whether through the terms of access offered to competitors or through raising competitors' costs – long-recognized by Commission precedent.  This condition also addresses the purported purpose of this merger, which is to respond to intermodal competition.

*Special Access Services.*  It is clear that many business customers and wholesale carriers rely heavily on the applicants' special access services for their voice and high-speed connections.  Independent wireless companies, satellite providers, and long distance providers also depend on access to the applicants' nearly ubiquitous network and services to connect their networks to other carriers.  In addition, many small rural providers depend on these services to connect to the Internet backbone.  So, if the applicants were to raise prices as a result of diminished competition, such action would directly impact the cost and availability of services for large and small businesses, schools, hospitals, government offices, and independent wireless providers.  Particularly in light of DOJ's inaction, I believe it is imperative to adopt measures to protect against the loss of competition.  The Order includes modest provisions to reduce the applicants' prices for special access services in areas where the Government Accountability Office (GAO),

in its recent report on special access services, raised the most significant concern, and the Order includes a price freeze for the remainder of the applicant's special access services across the entire 22 state territory of the new company.

The Order also addresses some of the terms and conditions that have been called into question by GAO. For example, it eliminates on a going forward basis at least one condition that restricts the ability of wholesale providers to buy from other channels. While I would have supported, and many commenters have strongly urged the Commission to adopt, more stringent safeguards in this area, we have attempted to provide a modest level of stability for 48 months for these many consumers of special access services. I do note that the Commission has a long-pending proceeding on special access services and, with fresh motivation from GAO's report, it will be even more critical that the Commission tackle these issues as comprehensively and expeditiously as possible. I will continue to push for action on this long-overdue proceeding.

*Wireless Broadband.* I am particularly pleased with the conditions related to wireless broadband because these services offer one of the most significant opportunities for much-needed broadband competition. And while many simply talk about broadband deployment, I have been passionate about taking specific steps to drive actual wireless broadband build-out. I want to promote flexibility and innovation in this wireless space, but since the spectrum is a finite public resource, I want to see results as well – particularly in the area of wireless broadband.

Consistent with my efforts to promote wireless broadband deployment in other mergers and proceedings, I worked closely with the applicants to come up with conditions for the merged company's holdings that will serve the public interest. Most significantly, AT&T will divest the licenses and leases it acquires in the 2.5 GHz band from BellSouth within one year of the merger's closing date. This significant commitment will ensure that independent broadband access providers interested in developing services in the 2.5 GHz band will now have access to spectrum in an important part of the country that may otherwise have been unavailable to them. Increased 2.5 GHz availability in the southeast will lead to the deployment of wireless broadband services in this market in direct competition to the new AT&T – a real boon for consumers. And consumers in other markets will benefit as increased deployment in the southeast will continue to improve efficiencies for the entire 2.5 GHz industry as broadband services are rolled out in the band across the country over the next several years.

Taken together, the two spectrum conditions – a build-out condition for the 2.3 GHz band and divestiture of the 2.5 GHz band – will significantly advance the deployment of wireless broadband services in the southeast and throughout the rest of the country. With the belief that actions speak louder than words, I truly am pleased to have been an advocate for that outcome.

*Tunney Act Review.* It is worth noting that, even as we move forward with this proposed merger, a federal court is still reviewing the historic Bell-IXC mergers approved by DOJ and the Commission last year, and the adequacy of the conditions imposed on those mergers. With that review pending, leading members of Congress on a bi-partisan basis have raised questions about whether it is appropriate to move forward with review of this transaction. Both this Order and the Commission's orders in last year's mergers take note of DOJ's review and conclusions, so I

am pleased that the applicants have committed to apply the result of any changes in the consent decree regarding the divested buildings in the SBC-AT&T merger in the BellSouth territory, as well. I have serious reservations about whether the divestiture analysis applied by DOJ adequately reflects the competitive harms, so I was also pleased that AT&T has agreed to consult with the FCC on the need for further conditions, should the Tunney Act review process lead to the imposition of greater conditions for last year's mergers.

**Ensuring Access for All Americans**

*Persons with Disabilities.* It is significant that we have heard in this proceeding from many groups representing persons with disabilities. Many of these commenters have noted that the applicants have a good history of working with consumers with disabilities and have encouraged the Commission to look carefully at the how the merged company will provide accessible services in the future. To that end, I want to commend the applicants for agreeing to provide a report describing the efforts of the combined company to provide high quality service to consumers with disabilities on a going-forward basis.

*Rural Carrier Concerns.* I also note that a number of commenters have raised concern about the impact of this transaction on small, rural carriers and their ability to deliver high quality, advanced services to customers in Rural America. This Order does adopt a number of measures – including the freeze on special access rates, a freeze on certain transiting rates, and a condition to address Internet backbone peering issues – that should help ameliorate these concerns. Still, it will require an on-going effort to ensure that Rural Americans benefit from the evolution of technology and this changing marketplace.

*     *     *     *     *

I support the conditions that we adopt in this Order and find that they strike a reasonable balance. Particularly given where we started, and the paltry baseline afforded by DOJ's review, I believe that we have advanced the public interest significantly. Were the pen solely in my hand, I likely would have crafted different conditions, but each of my colleagues would likely say the same thing.

I rely specifically on the companies' assurances that they will faithfully and fairly implement the commitments they have made both in their applications and in their more recent filings. I fully expect they will live up to the letter and spirit of this agreement. It will also be important that this Commission commit to monitor and vigorously enforce the terms of this Order.

While I support this transaction as conditioned, it is important to note that there is much analysis in this Order that I find lacking or downright troubling. It is important to consider this combination in light of larger industry trends and developing intermodal competition, but I still find that the Order's sweeping conclusions about the lack of impact requires us to take too much on faith. It also rejects long-standing Commission precedent on the harms of horizontal consolidation in the industry, in what some might describe as an effort to walk away from "phone-to-phone" competition solely in favor of intermodal competition. While I can agree to

support the package of conditions agreed to by the applicants and my colleagues, I choose to concur to the Order given my concern with the overall analysis.

I would also like to thank the many Members of Congress, outside parties, and consumers for their comments, and AT&T and BellSouth for their efforts to address concerns that have been raised in this proceeding. I'd especially like to thank my colleague and friend Commissioner Copps for his tenacity and dedication to the public interest. He and his staff have worked tireless to make this agreement possible. It has taken effort on all sides, but we have worked quickly to achieve a result that strikes a balance. At times, this has been a difficult and unnecessarily protracted process but I am pleased that we moved quickly to conclude this proceeding once the Commission moved past its own internal drama. It turns out there wasn't an impasse, after all.

Finally, the fact that I was able to reach a successful conclusion in the waning days of the year is a tribute to the monumental efforts of my staff, especially Scott Bergmann and Barry Ohlson. They sacrificed their holidays, holding marathon sessions and working countless long hours. My heartfelt thanks are due to their families, as well, for the considerable sacrifices they made in allowing them to carry on. These are two of the finest public servants I have known, and two of the finest telecom lawyers in this city. They rose to this occasion as they have so often in the past. Appreciation is due not only from me, but from so many Americans who will benefit from their work, even if they never know any of our names.

As I have oft stated, the opportunities arising from today's technologies are greater than ever, but so is the penalty for those left without options. With that in mind, I have made every effort to ensure that consumers reap the benefits of this rapidly changing marketplace and this transaction.

For all these reasons, I concur in this Order.