**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-2102 (EGS) |
| v. | ) | |
| | ) | |
| SBC COMMUNICATIONS, INC. and AT&T CORP., | ) | |
| | ) | |
| Defendants. | ) | |

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-2103 (EGS) |
| v. | ) | |
| | ) | |
| VERIZON COMMUNICATIONS, INC. and MCI, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

In the span of a couple of weeks in early 2005, four of this nation's largest telecommunications companies announced that they had agreed to merge, leaving only two companies in their place. Mergers of this magnitude have, as can be expected, engendered heated opposition, which has been reflected in the filings of numerous interested parties in this case. Arguments have been put forth regarding the mergers' effects in several major

industries, including residential telephone service, cellular telephone service, and internet services.  This Court, however, is not tasked with deciding whether these mergers as a whole run afoul of the antitrust laws, nor whether they are altogether in the public interest, nor whether they should be approved by other branches of the federal government.  This Court's role is much more limited.  The only question facing this Court, under the procedures crafted by Congress, is whether the divestitures agreed upon by the merging parties and the Department of Justice are "in the public interest."

Pending before the Court is plaintiff United States' motion for entry of the proposed final judgements in each of these civil antitrust cases.  The procedure governing acceptance of these proposed judgments is specified in Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h), otherwise known as the Tunney Act.  Upon consideration of the motions and supporting memoranda, the filings of several *amici curiae* admitted for this case, the responses and replies thereto, the arguments made by all parties at multiple hearings, the applicable law, and the entire record, the Court determines that entry of the proposed final judgments is in the public interest.  Therefore, for the reasons stated herein, plaintiff's motion for entry of final judgments in both cases is **GRANTED**.

2

**BACKGROUND**

**I. Background of Proposed Final Judgments**

**A. SBC-AT&T Merger**

SBC Communications, Inc. ("SBC"), formerly Southwestern Bell, is a regional bell operating company ("RBOC"), formed as one of the seven regional holding companies to result from the breakup of AT&T's local telephone business in 1984. *United States v. SBC Comm., Inc.*, 05-2102-EGS, Compl. ¶ 7 (hereinafter "SBC Compl."). In 2005, after having acquired two other RBOCs, Pacific Telesis and Ameritech, during the 1990's, SBC served over 50 million switched access lines, both residential and business, in 13 states. *Id.* SBC has fiber optic or copper connections to virtually all of the commercial buildings in its franchised territory. *Id.*

AT&T Corp. ("AT&T") is the nation's largest interexchange carrier ("IXC"), offering traditional long distance telephone service, as well as one of the largest competitive local exchange carriers ("CLEC"), offering local network exchange and access for voice and data services. *Id.* ¶ 8. AT&T serves consumers and businesses across the United States and around the globe, and owns significant local network assets within SBC's 13-state operating territory including direct fiber optic connections to numerous commercial buildings. *Id.* Pursuant to an Agreement and

Plan of Merger dated January 30, 2005, SBC agreed to acquire AT&T for approximately $16 billion.  *Id.* ¶ 9.

## B. Verizon-MCI Merger

Verizon Communications, Inc. ("Verizon"), formerly Bell Atlantic Corporation ("Bell Atlantic"), is the nation's largest RBOC.  *United States v. Verizon Comm., Inc.*, 05-2103-EGS, Compl. ¶ 7 (hereinafter "Verizon Compl.").  Bell Atlantic was another of the seven regional holding companies to result from the AT&T breakup.  *Id.*  Since that time, Bell Atlantic acquired Nynex, another RBOC, and GTE Corporation, an ILEC that provided local exchange and other services in 28 states, and formed Verizon. *Id.*  In 2005, Verizon served over 50 million switched access lines, both residential and business, in 29 states plus the District of Columbia.  *Id.*  Verizon has fiber optic or copper connections to virtually all of the commercial buildings in its franchised territory.  *Id.*

MCI, Inc. ("MCI") is one of the nation's largest IXCs, offering traditional long distance telephone service, as well as one of the largest CLECs, offering local network exchange and access for voice and data services.  *Id.* ¶ 8.  MCI serves consumers and businesses across the United States and around the globe and owns significant local network assets within Verizon's 29-state operating territory including direct fiber optic connections to numerous commercial buildings.  *Id.*  Pursuant to

4

an Agreement and Plan of Merger dated February 14, 2005, as
amended on March 4, March 29, and May 2, 2005, Verizon agreed to
acquire MCI for approximately $8.54 billion.  *Id.* ¶ 9.

## C. Alleged Competitive Harms

Plaintiff, the United States through the Department of
Justice ("DOJ"), filed complaints in both of these cases on
October 27, 2005.  The government sought to enjoin the mergers on
the grounds that the mergers would "substantially lessen
competition for (a) Local Private Lines that connect hundreds of
commercial buildings in [SBC and Verizon]'s franchised territory
to a carrier's network or other local destination, and (b) other
telecommunications services that rely on Local Private Lines."
SBC Compl. ¶ 1; Verizon Compl. ¶ 1.  Specifically, the complaints
are concerned with hundreds of commercial buildings in
metropolitan areas where the two merging parties (either SBC and
AT&T, or Verizon and MCI) are the only two firms that own or
control a direct wireline connection to the building.  SBC Compl.
¶ 3; Verizon Compl. ¶ 3.  The government alleged that due to
these competitive harms, the mergers violated Section 7 of the
Clayton Antitrust Act, 15 U.S.C. § 18.  SBC Compl. ¶ 32; Verizon
Compl. ¶ 32.

The complaints address the same type of competitive harm for
each merger, and differ only in geographic scope due to the
territorial coverage of the RBOCs, SBC and Verizon.  The SBC

5

Complaint addresses harms in metropolitan areas in SBC's territory, specifically with regard to buildings where SBC and AT&T are the only two firms that own or control direct wireline connections.  SBC Compl. ¶ 3.  Analogously, the Verizon Complaint addresses harms in metropolitan areas in Verizon's territory, specifically with regard to buildings where Verizon and MCI are the only two firms that own or control direct wireline connections.  Verizon Compl. ¶ 3.  Apart from that difference, and the identities of the parties, the complaints are drafted virtually identically.

The government's detailed description of the alleged competitive harm is based on "local loops" and "local private lines," which are components of telecommunications networks operated by the merging parties.  Local loops, sometimes referred to as "last-mile" connections, are typically either copper or fiber-optic transmission facilities that connect commercial buildings to a carrier's network.  SBC Compl. ¶ 12.  These last-mile connections are necessary assets for providing service to business customers located in the building.  *Id.*

The government defines a Local Private Line ("LPL") as a dedicated, point-to-point circuit offered over copper and/or fiber-optic transmission facilities that originates and terminates within a single metropolitan area and typically includes at least one local loop.  *Id.* ¶ 13.  LPLs are sold in

both retail markets (to business customers) and wholesale markets (to other carriers). *Id.* LPL circuits are sometimes referred to as "special access." *Id.* Depending on how they are configured, LPLs can be used to carry voice traffic, data, or a combination of the two. *Id.* ¶ 14. LPLs may be purchased as standalone products, but are also an important input to value-added voice and data telecommunications services that are offered to business customers. *Id.*

For the vast majority of commercial buildings in its respective territory, either SBC or Verizon is the only carrier that owns a last-mile connection to the building. SBC Compl. ¶ 15; Verizon Compl. ¶ 15. Thus, in order to provide voice or data telecommunications services to customers in those RBOC-only buildings, competing carriers typically must lease the connection from SBC or Verizon as LPL service, i.e. special access. SBC Compl. ¶ 15; Verizon Compl. ¶ 15.

For a small percentage of commercial buildings (though accounting for a substantial percentage of customer demand and revenue), other competitors (CLECs) have built or acquired their own last-mile fiber-optic connections, separate from the RBOCs, to connect their networks to the buildings. SBC Compl. ¶ 16.[1]

---

[1] Competitive providers have to date deployed independent connections to approximately 30,000 individual commercial buildings, representing roughly 1% of the 3 million commercial buildings nationwide. Nat'l Ass'n of State Util. Consumer Advocates Resp., Selwyn Decl. at 6.

Once a CLEC has incurred the high fixed cost to construct a last-mile connection to a building, the CLEC can usually provide service to business customers in the building at a lower cost than it would otherwise be able to do if it had to lease the connection from the RBOC.  *Id.*  It can also provide alternative access to other CLECs seeking to serve business customers in the building, i.e., LPL service can be resold on the wholesale market.  *Id.*

AT&T is among the leading CLECs in SBC's territory in the number of buildings it has connected with its own last-mile fiber facilities, as is MCI in Verizon's territory.  SBC Compl. ¶ 17; Verizon Compl. ¶ 17.  For hundreds of buildings in SBC's and Verizon's territory, AT&T and MCI respectively are the only CLECs with a last-mile connection into the building.  SBC Compl. ¶ 17; Verizon Compl. ¶ 17.  In these buildings, the instant mergers would thus reduce the number of carriers with last-mile connections from two to one.  SBC Compl. ¶ 18; Verizon Compl. ¶ 18.  The parties accordingly refer to these buildings as "2-to-1" buildings.

The government states that the relevant product markets affected by the mergers are the markets for LPLs, and voice and data telecommunications services that rely on LPLs.  SBC Compl. ¶

19.[2]  LPLs themselves are a recognized service category among telecommunications carriers and end-user business customers, as customers typically purchase LPLs in standard bandwidth increments.  *Id.* ¶ 21.  LPLs are distinct from switched local exchange telephone services.  *Id.* ¶ 22.  Switched local exchange lines route calls through a central office, do not necessarily use a dedicated circuit, and thus do not offer the guaranteed bandwidth, high service levels, and security that LPLs provide. *Id.*  Carriers often rely on LPL circuits to connect a business customer's location to their networks, enabling the carrier to supply value-added data networking, Internet access, local voice, and long distance services to the business customer.  *Id.* ¶ 23. AT&T and MCI were among the largest competitors to SBC and Verizon respectively in the market for LPLs.  SBC Compl. ¶ 20; Verizon Compl. ¶ 20.

Based on this background, the government claims that the mergers would eliminate competition for LPL service to 2-to-1 buildings, resulting in higher prices for both retail and wholesale customers.  SBC Compl. ¶ 25; Verizon Compl. ¶ 25.  The government also claims that the mergers would tend to lessen the competition for retail voice and data telecommunications services

---

[2]  The government is vague about the relevant geographical areas for these product markets, alleging that they are no broader than each metropolitan area and no more narrow than each individual building.  SBC Compl. ¶ 24.

provided over LPL access to 2-to-1 buildings.  SBC Compl. ¶ 26;
Verizon Compl. ¶ 26.

    The government acknowledges that other competitors (CLECs)
could build new last-mile connections to buildings in response to
the mergers, but that such entry is difficult, time-consuming,
and expensive.  SBC Compl. ¶ 27.  The government identified five
factors that affect whether a CLEC would build a new last-mile
connection to a particular building: (1) the proximity of the
building to the CLEC's existing network interconnection points;
(2) the capacity required at the customer's location (and thus
the revenue opportunity); (3) the availability of capital; (4)
the existence of physical barriers, such as rivers and railbeds,
between the CLEC's network and the customer's location; and (5)
the ease or difficulty of securing the necessary consent from
building owners and municipal officials.  *Id.*  Because their
costs are so substantial, firms typically only build a connection
after they have secured a customer contract of sufficient size to
justify the anticipated construction costs.  *Id.* ¶ 28.

    Therefore, the government states that although entry may
occur in some 2-to-1 buildings, conditions for entry are unlikely
to be met in hundreds of those buildings, and thus entry is
unlikely to eliminate the competitive harms that would result
from the mergers.  SBC Compl. ¶ 29; Verizon Compl. ¶ 29.
Accordingly, the government alleged that the mergers would

violate Section 7 of the Clayton Act because they eliminate or substantially lessen competition in the markets for LPLs and voice and data telecommunications services that rely on LPLs, and would correspondingly raise prices for those products.  SBC Compl. ¶ 32; Verizon Compl. ¶ 32.

### D. Proposed Remedy

The government's proposed remedies for the alleged antitrust harms of the mergers are specified in the proposed final judgments.  *See* Pl.'s Mot. for Entry of Final J. at 2-3.  Apart from the difference in geographic scope due to the identities of the parties, the proposed final judgments are practically identical and require the same type of divestitures.  *See id.,* Proposed SBC-AT&T Final J. at 1-17 & Proposed Verizon-MCI Final J. at 1-16.

The proposed final judgments require defendants, within 120 days after the closing of the mergers, or five days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest the "Divestiture Assets."  Proposed SBC-AT&T Final J. at 5.[3]  The Divestiture Assets are defined in terms of an indefeasible right of use ("IRU"), a long-term leasehold interest that gives the holder the right to use specified strands

---

[3]  If defendants do not accomplish the divestiture within the periods prescribed, the proposed final judgments provide that the Court will appoint a trustee selected by the United States to effect the divestitures.  *Id.* at 8-11.

of fiber in a telecommunications facility. *Id.* at 4.  All of the
IRUs must be for a minimum of 10 years, may not include any
recurring fee, and cannot limit the right of the acquirer to use
the asset as it wishes. *Id.*

The Divestiture Assets consist of IRUs for lateral (or
last-mile) connections to hundreds of buildings in the identified
metropolitan areas along with transport facilities sufficient to
enable the IRUs to be used by the purchaser to provide
telecommunications services. *Id.* at 3.  The divestitures must be
accomplished in such a way as to satisfy the United States that
the Divestiture Assets can and will be used by the acquirer as
part of a viable, ongoing telecommunications business. *Id.* at 7.
All Divestiture Assets in a given metropolitan area must be
divested to a single acquirer unless otherwise approved by the
United States. *Id.* at 7-8.

To ensure that the acquirer has adequate capacity to serve
customers in a given location, the lateral connection to be
divested will consist of an IRU for the greater of (1) eight
fiber strands or (2) one-half of the currently unused fiber
strands in AT&T's or MCI's facilities serving the building. *Id.*
at 4.  The strands shall connect the point of entry of the
building to the splice point with fiber used to serve different
buildings. *Id.*  The fiber strands may be provided from those
controlled by either of the merging parties. *Id.*  To ensure that

12

the acquirer can connect the last-mile connections to its network facilities, the divestiture includes IRUs for transport facilities sufficient to connect the divested last-mile connections to locations mutually agreed upon by defendants and the acquirer.  *Id.* at 3.

Each proposed final judgment includes a list of specific buildings for which lateral connections must be divested.  *Id.* at 18-27.  Using information provided by the parties and other CLECs, the government compiled a list of 2-to-1 buildings as described in the complaints.  Pl.'s Resp. to Ct.'s Order of July 25, 2006, at 8.  The government then applied an algorithm to determine if entry by another competitor was likely for each 2-to-1 building, based on the criteria identified in the complaints.  *Id.*  The proposed final judgments encompass all 2-to-1 buildings where it was determined that entry by another competitor was unlikely.  *Id.*[4]

The proposed final judgments also include additional terms regarding notice of the proposed divestitures, financing, preservation of assets, compliance inspections, and a ban on reacquisitions.  Proposed SBC-AT&T Final J. at 11-15.  The proposed final judgments are set to expire ten years from the date of their entry.  *Id.* at 16.  They also specify that this

---

[4]  In the final tally, the proposed final judgments cover 383 buildings for the SBC-AT&T merger and 365 buildings for the Verizon-MCI merger.

Court retains jurisdiction to enable any party to apply at any time for further orders and directions as may be necessary to carry out or construe the judgments.  *Id.* at 15.

## II. Procedural History

### A. Tunney Act Procedures

The government filed the complaints in both of these cases on October 27, 2005.  At the same time, the government filed stipulations and proposed final judgments designed to remedy the alleged anti-competitive harms.  Pl.'s Mot. for Entry of Final J. at 2-3.  Amended proposed final judgments for both cases were filed on November 28, 2005.  *Id.* at 3.  In December, the Court consolidated the two cases.  Order, Dec. 21, 2005.

In compliance with the procedures mandated by the Tunney Act, the government filed Competitive Impact Statements ("CIS") for both mergers with the Court on November 16, 2005.  The government also published the proposed final judgments and CISs in the *Federal Register* on December 15, 2005.  *See* SBC-AT&T CIS, Proposed Final Judgment, Complaint, Amended Stipulation, 70 Fed. Reg. 74,344 (Dec. 15, 2005); Verizon-MCI CIS, Proposed Final Judgment, Complaint, Stipulation, 70 Fed. Reg. 74,350 (Dec. 15, 2005) (Verizon-MCI Merger).  Finally, the government published separate summaries of the terms of the proposed final judgments in the *Washington Post* for seven days beginning on December 8, 2005 and ending on December 14, 2005.  Pl.'s Mot. for Entry of

14

Final J. at 3.  Within the 60-day period for public comments,
which ended on February 13, 2006, three comments were received.
*Id.*  These comments were filed by the Alliance for Competition in
Telecommunications ("ACTel"), COMPTEL, and the New York Attorney
General.

The government filed the pubic comments and its response to
the comments with the Court on March 21, 2006.  The comments and
response were also published in the *Federal Register* on April 5,
2006.  *See* Response to Public Comments on the Proposed Final
Judgments, 71 Fed. Reg. 17,164 (Apr. 5, 2006).  On that same day,
the government filed with the Court its Certificate of Compliance
with the Tunney Act procedures, and its motion for entry of the
proposed final judgments.

The SBC-AT&T merger closed on December 18, 2005, and the
Verizon-MCI merger closed on January 6, 2006.  Pl.'s Resp. to
Public Comments at 7 n.10.  The government states that this is in
keeping with its standard practice that neither the stipulations
nor pending proposed final judgments prohibit the closing of the
mergers.  *Id.* (citing ABA Section of Antitrust Law, *Antitrust Law
Developments* 387 (5th ed. 2002)).

## B. Amici Curiae

Over the course of the proceedings, several parties have
been granted leave to participate as amici curiae.  *See* 15 U.S.C.
§ 16(f)(3).  "COMPTEL is an association of competitive local

communications providers that are both wholesale customers of and competitors to the merging parties in the Local Private Line service markets that are the subject of the Complaints." COMPTEL's Mot. to Intervene at 5.  COMPTEL members include Sprint Nextel, XO Communications, RCN Corporation, Covad Communications, and over 300 other members.  *Id.*  Defendants AT&T and MCI were members of COMPTEL prior to the mergers.  *Id.*  The Court permitted COMPTEL to participate as an amicus on May 10, 2006.

ACTel is a group of firms whose "members includes both [CLECs] and [IXCs] that buy Local Private Lines from the merging companies."  ACTel's Mot. to Intervene, Ex. 1 at 3 (comments to Proposed Final Judgments).  ACTel members combine these purchased LPLs with additional facilities, technology, and services to sell their own value-added telecommunications services, sometimes in competition with the merging parties, to business customers.  *Id.* The Court permitted ACTel to participate as an amicus on May 10, 2006.

The New York Attorney General is charged with enforcing federal and state antitrust and consumer protection laws.  N.Y. Att'y Gen. Mot. to Intervene at 2.  The New York Attorney General "advocates in federal and state administrative and judicial proceedings on behalf of New York State consumers and small businesses, and the public interest generally."  *Id.*  The Court

permitted the New York Attorney General to participate as an
amicus on July 25, 2006.

The National Association of State Utility Consumer Advocates
("NASUCA") is a voluntary, national association of 44 consumer
advocates in 41 states and the District of Columbia.  NASUCA Mot.
to Intervene at 3.  "NASUCA's members are designated by the laws
of their respective states to represent the interests of utility
consumers before state and federal regulators and in the courts."
*Id.*  Members operate independently from state utility commissions
as advocates primarily for residential ratepayers.  *Id.*  The
Court permitted NASUCA to participate as an amicus on July 25,
2006.

Sprint Nextel Corporation ("Sprint") is corporation that was
a significant purchaser of LPL services from the merging parties.
Sprint Mot. to Intervene at 3.  Sprint relies on those services
to provide connectivity to its cellular telephone sites.  *See id.*
The Court permitted Sprint to participate as an amicus on July
25, 2006.

The New Jersey Division of Rate Counsel ("Rate Counsel"),
formerly known as the New Jersey Ratepayer Advocate, "is a
division within the Department of the Public Advocate, that
represents and protects the interests of all utility consumers,
including residential, business, commercial, and industrial
entities."  N.J. Rate Counsel Mot. to Intervene at 2.  The New

Jersey Rate Counsel participates actively in relevant federal and state administrative and judicial proceedings. *Id.* The Court permitted the New Jersey Rate Counsel to participate as an amicus on August 8, 2006.

### C. Compilation of the Court's Record

In response to the initial materials and motion filed by the government, ACTel and COMPTEL filed oppositions to the motion for entry of the proposed final judgments, and replies were filed thereto. On July 12, 2006, the Court held a hearing involving the government, the merging parties, ACTel, and COMPTEL. *See* Order, July 7, 2006 (setting out instructions to counsel for the hearing). At the hearing, the Court noted that there was no party specifically representing the public in the matter. *See* Hr'g Tr., July 12, 2006, at 5. At the conclusion of the hearing, the Court took the matters under advisement. *Id.* at 223. Following the hearing, the Court also requested the Federal Communication Commission's ("FCC") Memorandum Opinion and Order regarding the mergers. *See* Order, July 14, 2006.

The Court held another hearing on July 25, 2006, to discuss further proceedings for the case. Based on that hearing, the Court permitted three new parties to participate as amici as described above. In addition, the Court found there to be insufficient material in the record, which consisted largely or exclusively of unverified legal pleadings, to allow the Court to

18

adequately discharge its duties under the Tunney Act.  Hr'g Tr.,
July 25, 2006, at 7.  Rather than hold an evidentiary hearing,
the Court ordered the government to provide further materials
that would allow the Court to make the public interest
determination required by the Tunney Act.  *Id.* at 8, 22.  The
Court allowed the government to decide exactly what types of
materials were appropriate to submit.  *Id.* at 10-11, 22.  The
Court also provided the other parties and amici the opportunity
to respond to this supplemental filing.  Appropriate protective
measures were put in place to allow for the submission of
confidential material.  *See* Order, July 25, 2006; Order, August
15, 2006.

    The government's supplemental submission consisted of a
memorandum explaining its submission, the declaration of W.
Robert Majure, an economist in the Antitrust Division of the
Department of Justice, and various technical materials provided
by the merging parties and other telecommunications firms.  Pl.'s
Submission in Resp. to Order of July 25, 2006 (hereinafter "Gov.
Supp.").  These technical materials consisted of retail customer
statements, network maps and buildings lists of the merging
parties and other firms, business plans of other firms,
interrogatory responses by other firms, internal business records
of the merging parties, and the divestiture assets purchase
agreements for three firms that have agreed to purchase

19

Divestiture Assets from AT&T under the proposed final judgments. *Id.*, Decl. of Jared A. Hughes (describing technical materials submitted).

Responses to the government's supplemental submission were filed by all of the admitted amici, as well as Verizon and AT&T. The responses of several amici included declarations by economists or other experts. *See* COMPTEL Resp. (including declaration of economist Joseph Gilliam); N.Y. Att'y Gen. Resp. (including declaration of Nicholas Economides, Ph.D., Economics); NASUCA Resp. (including declaration of Lee L. Selwyn, Ph.D.); Sprint Resp. (including declaration of Keith L. Kassien).  The government also submitted a reply to these responses, including a reply declaration of Robert Majure.  Pl.'s Reply Submission in Resp. to Order of July 25, 2006 (hereinafter "Gov. Reply").

The Court held a hearing on November 30, 2006, to discuss the supplemental filings.  At the hearing, the government represented that six purchasing agreements had been reached for the Divestiture Assets, pending only approval of the proposed final judgments.  Hr'g Tr., Nov. 30, 2006, at 24.  After hearing from the government, merging parties, and all amici, the Court took the matter under advisement.  In addition, the government and amici were permitted to file, and did file, supplemental responses to the specific arguments raised at the hearing.

**ANALYSIS**

## I. Scope of Review Under the Tunney Act

The Antitrust Procedures and Penalties Act of 1974, also known as the Tunney Act, requires the Court to determine whether the proposed final judgments are "in the public interest."  15 U.S.C. § 16(e)(1).  The statute does not further define the meaning of "in the public interest," but specifies that in making the public interest determination, the Court *shall* consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of public benefit, if any, to be derived from the determination of the issues at trial.

15 U.S.C. § 16(e)(1).  The Court is not required to conduct an evidentiary hearing nor is it required to permit anyone to intervene.  15 U.S.C. § 16(e)(2).  Instead, the procedure for making the public interest determination is generally left to the discretion of the Court.  *See* 15 U.S.C. § 16(f).  The Court is permitted to take testimony of government officials or expert witnesses, appoint a special master or expert consultant,

authorize participation by other parties as amici or interveners, or "take such other action in the public interest as the court may deem appropriate." *Id.*

The Tunney Act as it stands is the product of amendments recently enacted in the Antitrust Criminal Penalty Enhancement and Reform Act of 2004. A body of law interpreting the Tunney Act's vague language has developed since its inception, but no court has yet examined the impact of the 2004 amendments. While amici argue that the 2004 amendments expanded the Court's scope of review under the Tunney Act, a close reading of the law demonstrates that the 2004 amendments effected minimal changes, and that this Court's scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings.

### A. 2004 Amendments and Legislative History

The 2004 amendments to the Tunney Act made two relevant changes to the text of the statute: (1) the Court "shall" instead of "may" consider the enumerated factors in making its public interest determination; and (2) there are additional and amended factors to consider in making the determination. *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 221(b)(2) (codified at 15 U.S.C. § 16). The additional factors are "whether [the proposed final judgment's] terms are ambiguous," and "the impact of entry of such judgment upon competition in the relevant market or markets." *Id.* The

22

catch-all factor was amended from "any other consideration bearing upon the adequacy of such judgment" to "any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest." *Id.*

The amendments also included a set of Congressional findings.  Congress stated that the purpose of the Tunney Act "was to ensure that the entry of antitrust consent judgments is in the public interest." *Id.* § 221(a)(1).  Congress further states that "it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function'." *Id.*  Finally, Congress stated that the purpose of the amendment was to "effectuate the original Congressional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest." *Id.*

The legislative history provides further explanation for the amendments.[5]  Several legislators spoke of the need to prevent judicial "rubber-stamping" of proposed consent decrees.  *See* 150

---

[5] "The court applies the traditional tools of statutory interpretation in determining congressional intent, looking to the text, structure, purpose, and legislative history of a statute." *Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 282 (D.C. Cir. 2006).

Cong. Rec. S3613-14, S3619 (Apr. 2, 2004) (Statements of Senators Hatch and Dewine);[6] 150 Cong. Rec. H3659-60 (June 2, 2004) (Statements of Representatives Scott and Conyers).  Senator Leahy stated that there was concern that judicial discretion in making the public interest determination resulted in an overly deferential review of prosecutors' judgments.  150 Cong. Rec. at S3615.  In his view, the amendments mandate instead that "the court make an independent judgment based on a series of enumerated factors."  *Id.*

Senator Kohl, however, was the lone legislator to articulate in depth the rationale for the Tunney Act amendments.  *See id.* at S3615-18.  Generally, he stated that the purpose of the amendments was to renew the district court's responsibility to independently examine proposed antitrust settlements.  *Id.* Senator Kohl traced the history of the Tunney Act, describing Senator Tunney's concerns with the political influence of large companies in these matters, which had been triggered by the ITT antitrust settlement in 1971.  *Id.* at S3616.  He spoke of the text, legislative history, and early interpretation of the original Tunney Act to demonstrate Congress's intent to prevent

---

[6]  Some senators refer to the amendments as Title II of the Standards Development Organization Advancement Act.  When passed in its final form, however, Title II of the Act was renamed the Antitrust Criminal Penalty Enhancement and Reform Act.

judicial "rubber-stamping" of antitrust settlements, and require judicial scrutiny instead. *Id.*[7]

Senator Kohl stated that the D.C. Circuit Court of Appeals had subsequently interpreted the Tunney Act in a manner that made meaningful review of the consent decrees almost impossible. *Id.* at S3617. He specifically pointed to decisions that held that final judgments should only be rejected by courts if they make "a mockery of judicial power." *Id.* (citing and quoting *United States v. Microsoft*, 56 F.3d 1448 (D.C. Cir. 1995), and *Mass. School of Law at Andover, Inc. v. United States*, 118 F.3d 776 (D.C. Cir. 1997)). He stated that to the extent these decisions are contrary to the Congressional findings in the amendments, they are overruled. *Id.* at S3618. In his view, the amendments intend "to assure that courts undertake meaningful review of antitrust consent decrees to assure that they are in the public interest and analytically sound." *Id.* This is in part accomplished by requiring examination of the enumerated factors, which is "intended to preclude a court from engaging in 'rubber stamping' of antitrust consent decrees, but instead to seriously and deliberately consider these factors in the course of determining whether the proposed decree is in the public interest." *Id.*

---

[7] Senator Kohl also noted that the text of the pre-amended Tunney Act contained "no standards governing how a court is to conduct this review." *Id.* at S3616.

In order to understand the findings in the 2004 amendments, the Court must therefore closely examine D.C. Circuit precedent regarding Tunney Act review.  Moreover, to the extent that this precedent has not been overruled by the 2004 amendments, it is still binding on this Court.  As the concept of "mockery of judicial power" is specifically highlighted by both the Congressional findings and legislative history, the Court's inquiry begins there.

### B. "Mockery of Judicial Power"

In *United States v. Microsoft*, 56 F.3d 1448 (D.C. Cir. 1995), the Circuit court reviewed the district court's rejection of a consent decree under the pre-amended Tunney Act.  In analyzing the proper scope of review in a "public interest" inquiry, the Circuit court considered whether district courts should evaluate proposed settlements by examining issues outside the underlying complaint.  *See id.* at 1458-60.  The Circuit court concluded that in evaluating a proposed settlement, the Tunney Act does not permit the district court to "reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made."  *Id.* at 1459.

It is with regard to this conclusion that the Circuit court invoked the concept of "mockery of judicial power."  *Id.* at 1462. The court stated:

26

> But, when the government is challenged for not bringing
> as extensive an action as it might, a district judge
> must be careful not to exceed his or her constitutional
> role.  A decree, even entered as a pretrial settlement,
> is a judicial act, and therefore the district judge is
> not obliged to accept one that, on its face and even
> after government explanation, appears to make a mockery
> of judicial power.  Short of that eventuality, the
> Tunney Act cannot be interpreted as an authorization
> for a district judge to assume the role of Attorney
> General.

*Id.*  In other words, the court held that district courts cannot

reach beyond the complaint unless the limited nature of the

complaint makes a mockery of judicial power.  For example, if an

antitrust complaint and proposed settlement in this case only

addressed the telephone connections for a single household

residence, but none other in the entire country, such an absurd

complaint would seem to violate the "mockery" standard.

This particular understanding of the "mockery" standard,

however, may have been altered (or misconstrued) by a subsequent

decision.  In *Massachusetts School of Law at Andover, Inc. v.*

*United States*, 118 F.3d 776 (D.C. Cir. 1997), the court held that

in a Tunney Act proceeding, the "district court must examine the

decree in light of the violations charged in the complaint and

should withhold approval only if any of the terms appear

ambiguous, if the enforcement mechanism is inadequate, if third

parties will be positively injured, or if the decree otherwise

makes 'a mockery of judicial power.'"  *Id.* at 783 (quoting

*Microsoft*, 56 F.3d at 1462).  This formulation of the "mockery"

concept apparently casts it as a standard of review, to be used unless there are other specific problems with the consent decree.

The 2004 amendments to the Tunney Act clearly overruled the Circuit court's holding in *Massachusetts School of Law*. First, a court must now consider all of the enumerated factors, as opposed to just ambiguity of terms, enforcement mechanisms, and third-party harms. *See* 15 U.S.C. § 16(e)(1) (as amended). Second, the Congressional findings in the text of the amendments state that Tunney Act review is not limited "solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function'." Pub. L. No. 108-237, § 221(a)(1)(B). This statutory language appears to overrule *Massachusetts School of Law*'s use of the "mockery" standard of review.

It is somewhat awkward and unusual for Congress to overrule judicial precedent through a "finding" as opposed to through the operative language of a statute. Nonetheless, this finding was approved by the whole of Congress and the President in the final version of the Act. Therefore, the Court must accept it as a definitive statement of Congressional intent. *See Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006) (holding that courts, like agencies, "must give effect to the unambiguously expressed intent of Congress" (quoting *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842 (1984)); *see also Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-81 (1969) ("Subsequent

28

legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."). Accordingly, the Court cannot use the "mockery of justice" standard as the general standard of review under the Tunney Act.

That being settled, the Court now turns to the two most significant legal questions concerning the public interest determination under the amended Tunney Act: (1) whether this Court has any authority to inquire into matters outside the scope of the complaint as drafted; and (2) how much deference, if any, is accorded to the government's evaluation of the adequacy of the proposed settlements.

**C. Review Beyond the Complaints**

Some of the amici have argued that, in making its public interest determination, the Court can and should consider matters other than those specifically addressed by the government's complaints.  The text of the amended Tunney Act is silent as to whether the Court can probe beyond the scope of the government's complaint in making a public interest determination.  The legislative history similarly provides no direct guidance on the question.  Therefore, the D.C. Circuit's previous holding remains binding on this Court.

As described above, the D.C. Circuit held in *Microsoft* that a district court should not inquire beyond the complaint unless the complaint makes a mockery of judicial power.  56 F.3d at

1462.  Apart from that rare case, a district court is not
permitted to "reach beyond the complaint to evaluate claims that
the government did *not* make and to inquire as to why they were
not made."  *Id.* at 1459.  The Circuit court derived this
limitation from the language of the Tunney Act factors,
specifically the factors focusing on the "alleged violations" and
"violations set forth in the complaint."  *Id.* (citing 15 U.S.C. §
16(e)).  In addition, the Circuit court based its decision on
constitutional concerns that overriding prosecutorial discretion
to initiate antitrust suits infringes on the proper separation of
powers.  *Id.* at 1458-60.  Finally, the Circuit court took note of
the argument that the government could constrain Tunney Act
review by drafting a narrow complaint, but explained that this
argument has little force because the "court's authority to
review the decree depends entirely on the government's exercising
its prosecutorial discretion by bringing a case in the first
place."  *Id.* at 1459-60.

Nothing in the text or legislative history of the 2004
amendments undermines this reasoning.  While the drafters of the
2004 amendments stated that "mockery of judicial power" should
not be the general standard of review under the Tunney Act, the
*Microsoft* decision did not make it so.  Rather, it is only if the
complaint underlying the consent decree is drafted so narrowly as
to make a mockery of judicial power can the district court reject

30

a consent decree due to matters outside the scope of the underlying complaint. *Id.* at 1462. In all other cases, a court cannot do so. *Id.* at 1459.

Some amici, however, maintain that the 2004 amendments do allow the Court to examine matters beyond the scope of the complaint. The textual basis for this assertion is the added factor that the Court must consider, "the impact of entry of such judgment upon competition in the relevant market or markets." 15 U.S.C. § 16(e)(1); *see, e.g.*, Sprint Resp. at 17. The plain language, however, does not compel the result amici seek. Rather, the text is ambiguous because "relevant markets" could refer to the markets implicated by the merger as a whole, or only those markets implicated by the government's complaint.

The legislative history favors the latter interpretation. It states that the purpose of that specific added language is to "ensure that the Tunney Act review is properly focused on the likely competitive impact of the judgment, rather than extraneous factors irrelevant to the purposes of antitrust enforcement." 150 Cong. Rec. S3618 (Statement of Senator Kohl). As review is focused on the "judgment," it again appears that the Court cannot go beyond the scope of the complaint. *See Microsoft*, 56 F.3d at 1459 ("We therefore dismiss the claim that the last line in section 16(e)(1), the catchall clause allowing the district court to entertain 'any other considerations bearing upon the adequacy

of such judgment,' authorizes the wide-ranging inquiry the district court wished to conduct in this case."). Therefore, the 2004 amendments have left in place the Circuit's holding that this Court cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power.

**D. Standard of Review for Proposed Remedies**

The remaining core question concerning Tunney Act review is how much deference, if any, is accorded to the government's evaluation of the adequacy of the proposed settlements. The overall standard for the Court is deciding whether entry of the proposed settlements is "in the public interest." 15 U.S.C. § 16(e)(1). No explanation of this standard is provided, apart from the aforementioned Congressional finding that it is more stringent than a "mockery of judicial power" standard. The text of the amended Tunney Act specifies factors the Court must consider in making its determination, but is silent as to whether the Court should defer to the government's conclusions regarding those factors. While the legislative history of the original Tunney Act and 2004 amendments make clear that the Court is not to "rubber-stamp" proposed settlements, Congress has not instructed how much scrutiny the Court should apply instead.

In this respect, the 2004 amendments have not altered the conundrum courts face under the Tunney Act. The D.C. Circuit

confronted this puzzle in some depth in the *Microsoft* case.  The
*Microsoft* court was aware that Congress sought to foreclose
"judicial rubber-stamping," and require an "independent"
determination of whether a proposed settlement is in the public
interest.  56 F.3d at 1458.  The great difficulty with the
"public interest" standard was that there was "virtually no
useful precedent."  *Id.*  At the very least, no appellate court
had ever approved a district court's rejection of a settlement as
outside the public interest.  *Id.*  This assessment appears just
as true today as it did in 1995.

The Circuit court nonetheless addressed the question of how
to evaluate whether a proposed remedy is adequate to address an
alleged antitrust violation.  It held that a district court is
not permitted to reject proposed remedies merely because the
court believes other remedies are preferable.  *Id.* at 1460.
Instead, the question is not whether a proposed remedy is the
best one, but only whether it is "within the reaches of the
public interest."  *Id.* (internal quotation marks and citations
omitted).  Such a rule is justified because "[r]emedies which
appear less than vigorous may well reflect an underlying weakness
in the government's case, and for the district judge to assume
that the allegations in the complaint have been formally made out
is quite unwarranted."  *Id.* at 1461.  Even though the government
has alleged antitrust harms, a court considering a proposed

settlement does not have actual findings that defendants engaged in illegal practices, as would exist after a trial. *Id.* Moreover, room must be made for the government to grant concessions in the negotiation process for settlements. *See id.* ("it could also be that this was a concession the government made in bargaining").

For these reasons, the Circuit court also held that district courts should be deferential to the government's predictions as to the effects of the proposed remedies. *Id.* Accordingly, the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable. *See id.* (stating that Professor Arrow's opinion that the remedies in question were appropriate provided a sufficient basis for finding the government's remedies reasonable).

The textual changes in the 2004 amendments do not address these holdings and in no way undermine them. The amendments' legislative history also provides little reason to question the Circuit's holdings or reasoning. The legislative record for the most part only contains several general statements that district courts should "carefully review," "undertake meaningful and measured scrutiny of," and "independently review" proposed consent decrees. 150 Cong. Rec. S3616-17. The Circuit, however,

already considered the same Congressional sentiments in analyzing the pre-2004 Act.  *See Microsoft*, 56 F.3d at 1458.

A couple of the statements of Senator Kohl though warrant closer inspection.  First, he specifically cited the "reaches of the public interest" language and stated that this holding along with others make it "difficult if not impossible for courts to exercise meaningful scrutiny" of proposed decrees.  150 Cong. Rec. S3617.  There is no indication, however, that Congress intended to overrule the holding.  Instead, it appears that Congress chose to strengthen review by expanding the list of factors a court must consider.  *See id.* at 3618.

Second, Senator Kohl stated that courts should assure that consent decrees are "in the public interest and analytically sound."  *Id.*  This formulation perhaps indicates that the Court should examine whether the proposed settlement remedies the harms identified in the complaint in an analytically sound manner. This echoes several arguments made by amici that the Court should guarantee that the government has followed sound, established antitrust principles in reaching a settlement.  This argument, however, is ultimately without force because the "analytically sound" language was not actually added to the text of the statute.  The statement of a lone legislator, unaccompanied by a corresponding change in the statutory language, is insufficient to override a well-established judicial construction of the

35

statute.  *See Ruhe v. Bergland*, 683 F.2d 102, 104 (4th Cir. 1982)
(holding that legislative history unaccompanied by a legislative
act is insufficient to overrule prior statutory interpretation).[8]
Moreover, the Circuit's reasoning in *Microsoft* is still
persuasive, as it is improper for a court to require a proposed
settlement to perfectly remedy antitrust violations when those
violations have not yet been proven at trial, and when the
government needs room to negotiate a settlement.

  Some amici nevertheless contend that this Court should apply
the standard of review for remedies utilized after antitrust
violations have been proven at trial.  *See, e.g.*, COMPTEL Resp.
at 10; ACTel Resp. to Nov. Hr'g at 2-3.  In their view, antitrust
remedies "must be effective to redress the violations and to
restore competition."  *See Ford Motor Co. v. United States*, 405
U.S. 562, 573 (1972) (internal quotation marks omitted).  These
arguments, however, fail to account for the binding precedent in
this Circuit, the lack of change effected by the 2004 amendments,
and the nature of Tunney Act proceedings that call for limited
review.  This Court instead will approve the proposed settlements

_____

  [8] In fact, an earlier version of the amendments would have
required a "reasonable belief, based on substantial evidence and
reasoned analysis, to support the United States' conclusion that
the consent judgment is in the public interest."  H.R. 1086, §
221 (as reported in Senate out of committee).  That this language
was removed in the final bill indicates that no change to the
standard of review was intended by Congress.  This history thus
indicates that Senator Kohl's statements better reflect statutory
language that was omitted, rather than the Act that was passed.

if they are "within the reaches of the public interest."  *See*
*Microsoft*, 56 F.3d at 1460.  The government need not prove that
the settlements will perfectly remedy the alleged antitrust
harms; it need only provide a factual basis for concluding that
the settlements are reasonably adequate remedies for the alleged
harms.  *See id.* at 1460-61.

### E. Additional Considerations

Finally, the Circuit court in *Microsoft* mentioned several
other factors that courts should consider, though it did not
indicate that its analysis was exhaustive.  A district court
should pay attention to a proposed judgment's clarity in order to
make implementation of the judgment manageable.  *Microsoft*, 56
F.3d at 1461-62.  In addition, the court should closely examine
compliance mechanisms in a proposed settlement.  *Id.* at 1462.
Finally, the court should be concerned with any allegations that
the proposed settlement will injure a third party.  *Id.*  The
*Massachusetts School of Law* decision held that these were the
only specific factors to consider, 118 F.3d at 783, but the 2004
amendments have clearly overruled that holding.  After the 2004
amendments, these factors along with others are explicitly
enumerated in the Tunney Act's text, and must all be considered
by the Court.  15 U.S.C. § 16(e)(1).

**F. Summary of Tunney Act Review**

In conclusion, under the amended Tunney Act, the Court
cannot reject the proposed settlements merely because the
government failed to address antitrust issues not raised in its
complaints.  Further, the Court must accord deference to the
government's predictions about the efficacy of its remedies, and
may not require that the remedies perfectly match the alleged
violations because this may only reflect underlying weakness in
the government's case or concessions made during negotiation.
The Tunney Act only requires that the Court consider specific
enumerated factors in making its public interested determination.

These factors can be loosely separated into two groups.  The
first group of factors address the competitive impact of the
proposed remedies, i.e., how well the settlement remedies the
harms alleged in the complaints.  *See* 15 U.S.C. § 16(e)(1)
(requiring consideration of: "the competitive impact of such
judgment, including termination of alleged violations," "duration
of relief sought," "the impact of entry of such judgment upon
competition in the relevant market or markets, upon the public
generally and individuals alleging specific injury from the
violations set forth in the complaint," and "any other
competitive considerations bearing upon the adequacy of such
judgment").  The second group of factors address issues unrelated
to the competitive impact of the settlement.  *See id.* (requiring

38

consideration of: "provisions for enforcement and modification,"
"anticipated effects of alternative remedies actually
considered," "consideration of the public benefit, if any, to be
derived from a determination of the issues at trial," and
"whether its terms are ambiguous").

The Court will first consider the competitive impact
factors, examining to what degree the proposed settlements remedy
the alleged harms.  This requires analyzing the government's view
of the settlements, as well as amici's arguments regarding the
settlements' inadequacies.  Finally, the Court will consider the
non-competitive factors as they relate to the proposed
settlements.

## II. Overall Approach of Proposed Settlements

### A. Rationale of Proposed Settlements

In the government's view, the proposed settlements perfectly
remedy the alleged antitrust violations because the proposed
final judgments require asset divestitures at all buildings where
harm is alleged – the 2-to-1 buildings where entry is unlikely.
Gov. Supp., Mem. at 7.  The buyer of the divested lateral (or
last-mile) connection for each building is expected to replace
the competition lost due to the mergers.  *Id.* at 9  As new sales
opportunities arise in those buildings, the asset-buyers will be
positioned to compete, just as AT&T or MCI would have been.  *Id.*
Customers seeking access or connectivity to a particular building

39

will thus have the option of two facilities-based provides, just as they did before the mergers.  *Id.*

The opinion of economist Robert Majure provides a basis for the government's building-based approach.  Majure has analyzed numerous mergers in the telecommunications industry and supervised the economists tasked with analyzing the instant mergers.  Gov. Supp., Majure Decl. ¶¶ 1-2.  In his view, the proposed remedies are straightforward because the asset-buyers "step into the shoes of AT&T or MCI."  *Id.* ¶ 16.  These asset-buyers can then offer a competitive alternative to customers – either tenants of the buildings or other carriers seeking a building connection in order to provide services to the tenants. *Id.*  In other words, the divestitures provide a remedy for both the retail and wholesale markets.

The proposed settlements require that at least eight strands of fiber be divested for each lateral connection.  In Majure's view, this amount of fiber is sufficient to serve the likely customer demand in any particular building.  *Id.* ¶ 20.  He further opines that the settlement's use of IRUs (indefeasible rights of use) instead of divestitures of full ownership of the strands is adequate because IRUs are industry-standard arrangements that carriers routinely employ.  *Id.* ¶ 22.  The ten-year terms of the IRUs are appropriate in his view because of the dynamic nature of the industry, the fact that customer contracts

are typically one to three years, and that DOJ's general policy is to limit settlements to ten years.  *Id.* ¶ 23.  The divested assets are also effective because they include additional assets necessary to connect the lateral connection with the buyer's transport network.  *Id.* ¶ 24.

Finally, one of the keys to this building-based approach is Majure's conclusion that AT&T and MCI did not have any unique qualifications as a competitor in the LPL market.  *See id.* ¶ 17.  Majure states that he "found no evidence suggesting a unique competitive role for either" AT&T or MCI.  *Id.*  For this reason, any supplier who buys the divested assets can provide an adequate competitive option for customers.  *Id.*

## B. Potential Inadequacies of the Government's Approach

The amici have presented several related arguments that question the government's building-based approach, and thus the adequacy of the proposed settlements.  First, they argue that the government's view of the relevant market is simplistic and unrealistic, and that actual customers instead employ a multi-building perspective.  Second, they argue that the government's view addresses in part the retail LPL market, but not the wholesale market.  Third, they argue that for these two reasons and others, the government has overlooked the uniquely powerful competitive positions of AT&T and MCI before the mergers, and thus has proposed an inadequate remedy.  Finally, they argue that

the government's position is inconsistent with well-established
antitrust analysis, and that the government has not provided
sufficient proof of the efficacy of the proposed remedy.  The
Court will consider each of these arguments in turn, as well as
the government's response.

First, amici contend that actual business customers do not
purchase LPL services on a single-building basis, but rather seek
to purchase from a single provider integrated telecommunications
services to connect multiple buildings.  *See, e.g.*, COMPTEL
Resp., Gilliam Decl. at 5-13; N.Y. Att'y Gen. Resp., Economides
Decl. at 8-11.  Therefore, the competitive position of LPL
providers depends not on access to a single building, but access
to a network of buildings.  Thus, customer pricing data is not
available on a single-building basis, but rather consists of
contracts for multi-building services.  For these reasons, amici
argue that the proposed remedies are structurally inadequate
because they do not replace the competitive strength of AT&T's
and MCI's large networks.  *See, e.g.*, COMPTEL Resp., Gilliam
Decl. at 10-13.

The government responds that while carriers may seek to
combine LPLs for multiple locations into a network for customers,
LPLs are distinct inputs that are priced and sold separately.
Gov. Reply, Majure Decl. ¶ 9.  In effect, the government's
rationale is that restoring competition for single-building LPLs

will restore competition for multi-building networks.  The
government acknowledges that a firm's network size can be a
competitive advantage if it can cover all of a customer's
locations, but argues that AT&T's and MCI's networks were not
sufficiently large.  *Id.* ¶ 27 n.40 (pointing out that AT&T owned
lateral connections for only 4% of the commercial buildings where
it provided service and leased LPL access for the other buildings
(citing NASUCA Resp., Selwyn Decl. ¶ 13)).

Second, amici contend that the proposed settlements do not
remedy harms in the wholesale market for LPL services.  The
wholesale market involves selling LPL access to buildings to
other telecommunication carriers, who in turn sell services to
the building tenants.  The amici argue that AT&T and MCI acted as
major resellers in the wholesale market, in competition with SBC
and Verizon, and were able to resell access at especially low
rates because they could acquire LPL access at very favorable
rates.  *See, e.g.*, ACTel Resp. at 25-28; N.Y. Att'y Gen. Resp.,
Economides Decl. at 21-22.  The proposed settlements would thus
be inadequate because the buyers of the divested assets could not
replace AT&T and MCI's presence in the wholesale market.

The government responds that business records demonstrate
that AT&T and MCI did not benefit from favorable rates
unavailable to other LPL resellers.  Gov. Reply, Majure Decl. ¶
31.  Rather, those rates were available to any carrier spending a

minimum of $10 million annually.  *Id.*  Moreover, evidence shows that neither AT&T nor MCI generated a large amount of revenue from its LPL reselling.  *Id.* ¶ 31 & n.53.  Further, under the proposed final judgments, the government is obligated to ensure that buyers of the Divestiture Assets have the ability to be a viable competitor for wholesale LPL service.  *See* Gov. Reply at 17; Proposed SBC-AT&T Final J. at 7-8.

Third, amici argue that AT&T and MCI were especially strong competitors in the relevant markets not only because of their large networks and strength in the wholesale market, but also because of their high name recognition, extensive customer service operations, significant customer base, and dominance in the long-distance telephone service market.  *See, e.g.*, COMPTEL Resp. at 30-33, N.Y. Att'y Gen. Resp., Economides Decl. at 13-16, 33; NASUCA Resp., Selwyn Decl. at 18-23.  The proposed settlements would thus be inadequate to replace the lost competition because only a fraction of AT&T's and MCI's assets are being divested among multiple, smaller firms.

The government responds that the only relevant attributes of AT&T and MCI are those that directly affect the market for LPLs. Gov. Reply, Majure Decl. ¶ 19.  Majure states that the evidence shows that AT&T's LPL services were often priced significantly higher than other carriers.  *Id.* ¶ 28.  Majure notes that MCI set low prices for LPLs, but only during the period it was in

bankruptcy, and raised prices after emerging from bankruptcy. *Id.* ¶ 29.

Finally, amici contend that the government's inadequate view of the market is the result of the failure to follow established antitrust principles, specifically those in DOJ's own Merger Guidelines. *See* DOJ & FTC, *Horizontal Merger Guidelines* (rev. ed. 1997) ("Merger Guidelines"). Specifically, the amici point to the government's failure to properly determine the relevant geographic markets and conduct market concentration analyses using the Hirschman-Herfindahl Index ("HHI"), a commonly used antitrust analysis tool. *See, e.g.*, COMPTEL Resp. at 8-9, 24-28; N.Y. Att'y Gen. Resp. at 6-13; Sprint Resp. at 25-26. In addition, they claim that the government has failed to provide sufficient evidence to support the complaint's allegations as well as the proposed remedy. *See, e.g.*, ACTel Resp. at 28; COMPTEL Resp. at 15.

The government responds that individual buildings are relevant geographical markets under the Merger Guidelines, and that HHI analysis, though useful in other situations, would add little in understanding the situation with 2-to-1 buildings. Gov. Reply, Majure Decl. ¶¶ 3-14. The government also notes that the Tunney Act does not require it to prove its underlying case as if this proceeding were a trial on the merits.

## C. Sufficiency of Proposed Remedies

As an initial matter, amici's arguments regarding DOJ's
method of analyzing the mergers are not substantial.  The
government has proffered a reasonable explanation of how its
analysis conforms to the established policies in the Merger
Guidelines.  Moreover, the Tunney Act does not require the
government to employ any specific type of analysis in evaluating
and settling cases.  *See* Section I.D, *supra*.  Finally, the
government is correct that it need not prove its underlying
allegations in a Tunney Act proceeding.  *See id.*  To require the
government to do so would fatally undermine the practice of
settling cases and would violate the intent of the Tunney Act.
*See* 15 U.S.C. § 16(e)(2) (specifying that the Act does not
require a court to hold an evidentiary hearing).

Notwithstanding the government's counter-arguments, the
amici have presented two significant shortcomings of the proposed
settlements.  First, the government acknowledged that network
size matters because carriers are in a better competitive
position when they own lateral connections to more locations
customers seek to interconnect.  *See* Gov. Reply, Majure Decl. ¶
27 n.40.  Therefore, buyers of the Divestiture Assets may not be
able to fully replace AT&T or MCI in the competitive landscape
because their networks may not be as extensive.  In fact, the

divestiture agreements already reached encompass multiple buyers, indicating that AT&T and MCI's networks will be split up.

Second, the amici have presented convincing reasons why AT&T and MCI were especially competitive firms in the LPL market, specifically their extensive customer bases, customer support services, and complimentary offerings of other services.  Even if AT&T and MCI did not offer LPL services at the lowest price, they may have offered the best options for customers due to other qualities such as superior customer service or existing business relationships.  It is quite possible that the buyers of the Divestiture Assets may not be able to offer overall services of the same quality to customers, and thus the proposed settlements would not replace the competition lost to the mergers.

While these shortcomings could reduce the effectiveness of the proposed settlements, they do not completely undermine the settlements.  Even accounting for these issues, the government has presented a reasonable basis for concluding that the proposed settlements will replace much of the competition lost to the mergers, if perhaps not all of it.  Therefore, the Court finds that the proposed settlements are reasonably adequate, and thus within the reaches of the public interest.  *See Microsoft*, 56 F.3d at 1460.

**III. Accounting for the Likelihood of Entry**

The amici argue that the proposed settlements are inadequate because the government overestimated the likelihood of competitor entry, and thus failed to require divestitures in enough buildings.  The government contends, however, that it made predictions for entry in a reasonable manner that is as accurate as practically possible.

In both of the complaints, the government recognized that competitors could build new last-mile connections to buildings in response to the mergers.  The government identified five factors that affect whether a firm would build a new last-mile connection to a particular building: (1) the proximity of the building to the firm's existing network of interconnection points; (2) the capacity required at the customer's location (and thus the revenue opportunity); (3) the availability of capital; (4) the existence of physical barriers, such as rivers and railbeds, between the firm's network and the customer's location; and (5) the ease or difficulty of securing the necessary consent from building owners and municipal officials.  The government also noted that because their costs are so substantial, firms typically only build a connection after they have secured a customer contract of sufficient size to justify the anticipated construction costs.

48

As is typical in established antitrust analysis, the
government had to account for the possibility that the entry of
new firms may replace competition lost to the merger.  *See* Gov.
Reply, Majure Decl. ¶ 15; Merger Guidelines §§ 1.32, 3.0.  In
order to account for entry, the government created an algorithm
to identify 2-to-1 buildings where the competitive harm was not
likely to be offset by entry.  Gov. Supp., Majure Decl. ¶ 14.
The government specifically focused on two of the five identified
factors — proximity to another carrier's network and likely
customer demand at the particular building.  *Id.*  If a building
had customer demand over a certain threshold, and a competing
carrier had facilities within a certain distance, the government
considered entry likely in that building and did not require
divestiture.  *Id.* ¶ 14 n.17 (describing algorithm in detail).

The amici contend that the government's entry algorithm was
unreasonable because the government accounted for only two of the
five identified factors that determine whether entry is likely.
*See, e.g.*, ACTel Resp. at 14-17; N.Y. Att'y Gen., Economides
Decl. at 30-33; Sprint Resp. at 7-8.  The amici also argue that
the government's algorithm overlooks that fact that firms will
not build new connections until they have a committed revenue
opportunity.  *See, e.g.*, COMPTEL Resp. at 22.  The amici further
contend that the distance factor in the entry algorithm does not
properly take into account the fact new connections with existing

networks can only be made at certain points.  NASUCA Resp.,
Selwyn Decl. at 30.  Finally, they argue that the entry algorithm
should have been under-inclusive rather than over-inclusive.  *Id.*
at 51.

While the government's entry algorithm does not account for
all relevant factors, it is a reasonable, practical prediction of
likely entry.  Quite reasonably, the algorithm is based on the
two most important and easily measured factors — customer demand,
a proxy for potential revenue, and distance, a proxy for overall
cost.  The other factors, such as physical barriers and licensing
hurdles, are far more difficult to measure on a building-by-
building basis.  *See* Gov. Reply, Majure Decl. ¶ 18.  Because the
proposed final judgments need not be perfect remedies, the entry
algorithm can be a reasonable instead of perfect prediction of
entry.  Moreover, there is no requirement that the government
account for entry in an under-inclusive as opposed to over-
inclusive manner.  Finally, the algorithm accounts for the need
for committed revenue to begin construction because interested
firms can bid on customer contracts before constructing a new
connection.  The competitive bidding by an outside firm can
create competition even if the firm has not yet constructed a
connection.  *See id.* ¶ 16.  Because the entry formula is a
reasonable, if not perfect, prediction of likely entry, the

proposed settlements are within the reaches of the public
interest.

## IV. Remedies for Additional Buildings or Markets

The amici argue that the proposed settlements are inadequate
because they do not require divestitures for other buildings or
other markets affected by the mergers.  Primarily, the amici
argue that if the mergers create competitive harms for 2-to-1
buildings, they must similarly create competitive harms in "3-to-
2" or "4-to-3" buildings, i.e., buildings where the mergers
reduce the number of carriers with connections to two or three.
*See, e.g.*, ACTel Resp. at 29-30; Sprint Resp. at 19-22, 29.  In
addition, some amici argue that the settlements are inadequate
because they fail to remedy competitive harms in markets for
other products that indirectly rely on LPL services.

Amici argue that based on standard economic models, a
decrease in competitors will result in higher prices for
buildings where connected carriers decrease from four to three,
or from three to two.  *See, e.g.*, N.Y. Att'y Gen., Economides
Decl. ¶ 61.  The government correctly responds, however, that the
underlying complaints in these cases only address 2-to-1
buildings.  *See* Gov. Reply at 25 n.82.  The complaints are
clearly and explicitly limited to 2-to-1 buildings.  SBC Compl.
¶¶ 3, 18, 25, 29; Verizon Compl. ¶¶ 3, 18, 25, 29.  Therefore,
amici seek to challenge the proposed settlements on grounds

51

beyond the scope of the complaints.  That the government chose to address only 2-to-1 buildings does not render the complaints so narrow as to make a mockery of judicial power.  *See Microsoft*, 56 F.3d at 1462.  Accordingly, the Court cannot find the proposed settlements inadequate for failing to address matters outside the scope of the complaints.  *See id.* at 1459.

Some amici also argue that the proposed settlements are inadequate because they fail to remedy competitive harms in the general LPL market that are not the specific anti-competitive harms identified in the complaints.  *See, e.g.*, ACTel Resp. at 9-11; NASUCA Resp., Selwyn Decl. at 11-12.  They also argue that the settlements should have addressed the market for LPL-based telecommunications services besides services for the building's tenants.  *See* NASUCA Resp., Selwyn Decl. at 38-40 (focusing on markets for residential customers, wireless carriers, and internet service providers); N.J. Rate Counsel Resp. at 3-11, 21-22 (focusing on mass market consumers).  Again, however, these areas of concern are outside the scope of the complaints.  Therefore, they cannot be grounds for rejecting the proposed settlements.  *See Microsoft*, 56 F.3d at 1459.

## V. Consideration of Remaining Factors

The first additional factor to consider is "anticipated effects of alternative remedies actually considered."  The government states that the only other remedy "actually

considered" was seeking to enjoin the entire transactions and proceeding to trial.  Gov. Supp., Mem. at 14.  Success at trial was surely not assured, so pursuit of that alternative may have resulted in no remedy at all.  While a trial may have created an even greater evidentiary record, that benefit may not outweigh the possible loss of the settlement remedies.  *See* 15 U.S.C. § 16(e)(2) (requiring "consideration of the public benefit, if any, to be derived from a determination of the issues at trial").

The government also indicates, however, that it considered certain detailed alternatives in crafting the particular terms of the Divestiture Assets.  Gov. Supp., Mem. at 15.  First, as some of the amici had proposed, the government considered whether to divest customer contracts along with "live" circuits that serve those customers, instead of currently unused, "dark" fiber.  *See* Gov. Supp., Majure Decl. ¶ 18.  Some amici contend that this would have been a more effective remedy than the divestiture of dark fiber, which they claim is of little value.  *See, e.g.*, COMPTEL Resp., Gilliam Decl. ¶ 24; NASUCA Resp., Selwyn Decl. at 54-60.  The government's rationale though was that divesting live circuits would have been disruptive and costly for customers, and that the dark fibers are still of value because the customer contracts are relatively short in duration (typically one to three years) and thus will soon be up for competitive bidding.  Gov. Supp., Majure Decl. ¶ 18.  The government notes that the

selling price of the Divestiture Assets may be low, but explains that buyers often pay lower prices for assets divested under consent decrees.  Gov. Reply at 20-21.

The government also considered whether to include wiring or electronics inside the building as part of the Divestiture Assets.  *See* Gov. Supp., Majure Decl. ¶ 21.  Some amici consider this to be a significant flaw in the proposed settlements because although a carrier may have a connection to a particular building, the connection may not extend to all the floors in the building.  *See* ACTel Resp. at 7-8, 12-14.  The government's justification, however, is that the additional costs of internal wiring and electronics is too small to prevent connected firms from competing, and divesting those materials would be disruptive to existing customers.  Finding these explanations rational, the Court concludes that the government's choices amongst these alternatives were reasonable, and thus that the proposed settlements are within the reaches of the public interest.

The next factor to consider is the proposed settlements' "provisions for enforcement and modification."  The proposed final judgments contain standard provisions that maintain the Court's jurisdiction and enure compliance with the decrees as entered.  *See* Proposed SBC-AT&T Final J. at 8-16.  The Court retains jurisdiction over the action for further orders necessary to carry out, construe, modify, enforce, or punish violations of

the proposed final judgments.  To preserve the Divestiture Assets until divested, the proposed final judgments require the preservation of the Divestiture Assets and bar any actions that would interfere with the divestitures.  To ensure all necessary actions are being taken to comply with the judgments, the proposed final judgments require the defendants or trustees, if appointed, to make regular submissions of affidavits describing efforts to comply with the judgments.  Finally, the government may investigate any potential violations of the judgments, by, among other things, gathering documents, interviewing employees on the record, and requesting written submissions.  These are adequate provisions for the enforcement and modification of the final judgments.

The final factor to consider is "whether [the proposed final judgments'] terms are ambiguous."  As the government states, the proposed final judgments contain no significant ambiguities — they are clear and specific regarding the assets to be divested, how the divestitures will occur, to whom the assets may be divested, the circumstances in which modifications may be made, and how the judgments can be enforced.  *See* Gov. Supp. at 15-16; Proposed SBC-AT&T Final J. at 3-16.  While some terms of the purchase agreements are left to negotiation by the acquirers and defendants in commercial arms-length transactions, this is appropriate for these types of divestitures.  Therefore, the

Court finds that the terms of the proposed final judgments are not ambiguous.

## CONCLUSION

The Court has complied with the procedures mandated by the Tunney Act and conducted a review of the proposed final judgments in accordance with the Act as amended in 2004 and the precedent of this Circuit.  By requiring the government to submit supplemental material and admitting several interested parties to act as amici curiae, the Court has availed itself of a record sufficient for the review mandated by the Act.  Upon review of the material submitted and arguments raised by all parties, the applicable law, and the entire record, the Court determines that entry of the proposed final judgments is in the public interest. Therefore, plaintiff's motion for entry of final judgments in both cases is **GRANTED**.  An appropriate Order accompanies this Opinion.


**Signed by:**      **Emmet G. Sullivan**
                **United States District Judge**
                **March 29, 2007**