IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED

MAR 1 9 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:05CV02102 (EGS) |
| | ) |
| SBC Communications, Inc. and | ) **MICHAEL LOVERN, SR.** |
| AT&T Corp., | ) **(AMICUS CURIAE),** |
| | ) **MOTION FOR LEAVE TO INTERVENE** |
| | ) **FOR PURPOSES of Rule 60(b) Motion** |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 1:05CV02103 (EGS) |
| | ) |
| Verizon Communications Inc. and | ) |
| MCI, Inc., | ) |
| | ) |
| Defendants. | ) |

## MOTION BY AMICI CURIAE MICHAEL LOVERN, SR., FOR
## LEAVE TO INTERVENE FOR PURPOSES OF Filing a Rule 60(b) MOTION

Michael Lovern, Sr. ("MLS"), pursuant to Rule 24 of the Federal Rules of Civil

Procedure, hereby respectfully moves for leave to intervene for purposes of filing the

enclosed Rule 60(b) motion. The Rule 60(b) Motion is filed timely and is accompanied

by sufficient grounds fully set forth in the accompanying Memorandum of

Points and Authorities. This court has authority to grant this request pursuant to Rule 24

and Rule 60(b) of the Federal Rules of Civil Procedure, and granting this request will be

in the "Public's Interest" and in compliance with antitrust laws, and the rules of the court.

WHEREFORE, this motion should be granted and MLS should be authorized to intervene as a party "who can aid the court in making its public interest determination." United States v. LTV Corp., 746 F.2d 51, 54 (D.C. Cir. 1984).

Final Judgment was granted in this case on May 29, 2007, therefore, this motion to intervene for purpose of filing a Rule 60(b)(2)(3)(5) & (6), F.R.Civ.P., Motion is timely and authorized pursuant to 15 U.S.C., § 16 (f)(3) & (5).

Respectfully submitted,

Michael Lovern, Sr.
163 Mitchells Chance Rd., #121,
Edgewater, MD 21037
(443)-995-0001
mlsatt@myway.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 28th day of March 14, 2008, copies of the foregoing
MOTION OF MICHAEL LOVERN, SR., AS AMICUS CURIAE, REQUESTING TO
INTERVENE FOR PURPOSES OF Filing a Rule 60(b) Motion with proposed Order,
will be served by U.S. Mail, or e-mail, on counsel of record as follows:

(2)

Lawrence M. Frankel (D.C. Bar No. 441532)
Matthew C. Hammond
Trial Attorneys
Telecom & Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States

--------------------------------------------------------------------------------

FOR DEFENDANT
SBC COMMUNICATIONS, INC.

Wm. Randolph Smith (D.C. Bar No. 356402)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2700

FOR DEFENDANT AT&T CORP.

Michael Payne
175 E. Houston
San Antonio, Texas 78205-2233
210-351-3500

Michael Lovern, Sr.
163 Mitchells Chance Rd., #121,
Edgewater, MD 21037
(443)-995-0001
mlsatt@myway.com

March 14, 2008

(3)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:05CV02102 (EGS) |
| v. ) | |
| ) | |
| SBC Communications, Inc. and ) | |
| AT&T Corp., ) | |
| ) | |
| ) | |
| ) | **MEMORANDUM** |
| Defendants. ) | |
| ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 1:05CV02103 (EGS) |
| ) | |
| Verizon Communications Inc. and ) | |
| MCI, Inc., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION BY AMICI CURIAE MICHAEL LOVERN, SR.,
FOR LEAVE TO INTERVENE FOR PURPOSES OF Filing a Rule 60(b) Motion**

Michael Lovern, Sr., (MLS), pursuant to Rule 24 and 60(b)(2)(3)(5) & (6) of the

Federal Rules of Civil Procedure, and 15 U.S.C., § 16 (f)(3) & (5), respectfully submits

this Memorandum in support of his motion for leave to intervene for purposes of aiding

the court in its determination of what is in the public's best interest in the matter of the

mergers that are part of this proceeding.

## INTRODUCTION

Movant (MLS) is a private citizen who is a subject matter expert on the substantive issues that support this motion. 15 U.S.C., § 16 (f)(3) & (5) provide that,

> (f)(3) - authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate;

> (f)(5) - take such other action in the public interest as the court may deem appropriate.

MLS files this motion using the standards of Rule 60(b)(2)(3)(5) & (6), F.R.Civ.P. As to Rule 60(b)(2), "newly discovered evidence", the new evidence that warrants the re-opening of this proceeding **did not ripen until the court's order in this case became final May 29, 2007**, because the massive Antitrust, RICO, "joint & several" liability [Trillions of Dollars] owned by the old AT&T – connected to MasterCard (MC) & Visa [the old AT&T use to own a bank that issued MC & Visa for 7 years], **unknown by the court**, did not officially transfer to SBC Communications, Inc.(hereinafter referred to as the "New AT&T") until this Court's Order became final.

After this court entered its final order, DOJ's Antitrust Department told MLS that they did not know about the infamous liability that can easily bankrupt the New AT&T, hence, it was impossible for the court to consider the situation and how it plays into the best interest standard for the public at large. In addition, the undisclosed liability is directly connected to antitrust violations, and, Verizon and Bellsouth are also co-

(2)

defendants in three upcoming class actions being prepared under Antitrust, RICO, Conspiracy, etc. MLS knows about this because he is directly involved and working with the legal team preparing the class actions, which have collective joint & several liability in excess of **Seventy Five Trillion Dollars ($75,000,000,000.00)**.

The combined companies of SBC, Pac Bell, Ameritech, SNET, Bellsouth, and the old AT&T, now control over 25% of all consumer dollars spent on telecom services, and about 40% of all consumer dollars spent on land line service. [TNS Telecom Report]. If AT&T were to go bankrupt due to the undisclosed liability it would <u>NOT</u> be in the public's best interest for the Old AT&T to merge with SBC, becoming the New AT&T, especially considering SBC has now merged with Bellsouth.

As to Rule 60(b)(3), there clearly was misrepresentation and misconduct by both the old AT&T and SBC regarding the infamous liability (hereinafter refereed to as "MC / Visa Liability") as both companies had been put on written notice by MLS in his capacity as named plaintiff in all three upcoming class action cases, and MLS was in charge of the nine year global investigation and is a subject matter expert. It is impossible for either party, nor Verizon, to claim they had <u>no</u> knowledge as MLS put all three on written notice during the MC / Visa antitrust, conspiracy, racketeering investigation, which said notice was long before these proceedings. The disingenuous omission by the old AT&T, SBC and Verizon, warrant the use of Rule 60(b)(3) in this motion.

As to Rule 60(b)(5), it simply speaks for itself.

As to Rule 60(b)(6), this court has enormous flexibility to determine if this new evidence requires a review of the approved merger, which at the time had a whole

different meaning than now. If AT&T was still a stand alone company, and if it was to go out of business in the future, the rest of the industry could easily pick up AT&T's customers and continue to provide uninterrupted service[s], however, if the NEW AT&T goes out of business, that will <u>not</u> be possible and it will certainly <u>not</u> be in the public's best interest, based on the New AT&T's market share.

## FACTUAL NEW EVIDENCE

Beginning in 1971, Bank of America (BOA), in conjunction with its decision to nationalize Bankamericard, created various legal entities and fees that today can be proven to be illegal, in violation of, but not limited to, Antitrust, Racketeering, Conspiracy, Truth-in-Lending, FTC Act, Common Law Fraud, and Regulation Z. Bankamericard / Association are known today as Visa.

The same illegal schemes were implemented into Mastercharge, known today as MasterCard (MC), by a portion of the co-conspirators in BOA and Bankamericard.

The statute of limitations has not even begun to run associated with the continuous [1971 to present day] MC / Visa Conspiracy, which pertains to every party who joined the alleged conspiracy – acted in concert, and, because there is no evidence of the affirmative action on the part of the old AT&T, SBC, or Verizon, which is necessary to establish their withdrawal from it, *Pinkerton v. U.S.*, 328 U.S. 640 (1946), (quoting) *Hyde v. United States*, 225 U.S. 347, 369, 32 S. Ct. 793, 803, Ann.Cas.1914A, 614, hence, their joint & several liability is in tact, which is a problem considering that all three can be put out of business due to the massive MC / Visa Liability facing them.

(4)

All the Bankamericard, Mastercharge, MasterCard & Visa (hereinefater referred to as "MC / Visa") issuers, since 1971, have collectively and in concert, maintained the position that a non disclosed [completely hidden from the consumer] fee known as the Interchange Fee (IF), which is undeniably / admittedly built into every MC / Visa transaction, has <u>never been charged</u> to the MC / Visa Cardholder's Account, therefore, Truth-in-Lending (TILA) nor Regulation Z (Reg. Z), applies to the IF. MLS has now proven with a mountain of physical evidence, and <u>written admissions</u> from the Federal Reserve [the only entity authorized by Congress to interpret TILA], GAO, and the FDIC, that the IF is definitely charged to the MC / Visa Cardholder's Account, hence, the IF is a *"cost of credit."* Because the IF is actually charged to the MC / Visa Cardholder's Account on every MC / Visa transaction, it is a *cost of credit*, therefore, TILA / Reg. Z disclosure policies do apply.

The claims associated with the three upcoming class actions that I have legal standing in have never been litigated in any form, nor prosecuted under 15 U.S.C., Sec. 1611, etc.

Title 12: Banks and Banking (current)
PART 226—TRUTH IN LENDING (REGULATION Z)
Subpart B—Open-End Credit

§ 226.7 Periodic statement.

The creditor shall furnish the consumer with a periodic statement that discloses the following items, to the extent applicable:

(a) Previous balance. The account balance outstanding at the beginning of the billing cycle.

(5)

(b) Identification of transactions. An identification of each credit transaction in accordance with §226.8.

(c) Credits. Any credit to the account during the billing cycle, including the amount and the date of crediting. The date need not be provided if a delay in crediting does not result in any finance or other charge.

(d) Periodic rates. Each periodic rate that may be used to compute the finance charge, the range of balances to which it is applicable,14 and the corresponding annual percentage rate.15 If different periodic rates apply to different types of transactions, the types of transactions to which the periodic rates apply shall also be disclosed.
14 See footnotes 11 and 13. 15 If a variable rate plan is involved, the creditor shall disclose the fact that the periodic rate(s) may vary.

(e) Balance on which finance charge computed. The amount of the balance to which a periodic rate was applied and an explanation of how that balance was determined. When a balance is determined without first deducting all credits and payments made during the billing cycle, that fact and the amount of the credits and payments shall be disclosed.

(f) Amount of finance charge. The amount of any finance charge debited or added to the account during the billing cycle, using the term finance charge. The components of the finance charge shall be individually itemized and identified to show the amount(s) due to the application of any periodic rates and the amount(s) of any other type of finance charge. If there is more than one periodic rate, the amount of the finance charge attributable to each rate need not be separately itemized and identified.

(g) Annual percentage rate. When a finance charge is imposed during the billing cycle, the annual percentage rate(s) determined under §226.14, using the term annual percentage rate.

**(h) Other charges. The amounts, itemized and identified by type, of any charges other than finance charges debited to the account during the billing cycle.**

(i) Closing date of billing cycle; new balance. The closing date of the billing cycle and the account balance outstanding on that date.

(j) Free-ride period. The date by which or the time period within which the new balance or any portion of the new balance must be paid to avoid additional finance charges. If such a time period is provided, a creditor may, at its option and without disclosure, impose no finance charge when payment is received after the time period's expiration.

(k) Address for notice of billing errors. The address to be used for notice of billing errors. Alternatively, the address may be provided on the billing rights statement permitted by §226.9(a)(2).

(6)

As you can see, 226.7 (h) has not changed, and cannot change because if the Federal Reserve Board attempted to support the banks non-disclosure of the Interchange Fee (IF) on monthly billing statements that would violate TILA & Regulation Z [a regulation cannot change the legislative intent of Congress], and, the Fair Debt Collection Practices Act, resulting in a violation of 18 U.S.C, § 241 [felony]. Now, here is what slams the back door closed, locked, and impossible for the defendants to open and get out, and, keep in mind the Federal Reserve cannot change a federal statute; and, Congress cannot pass legislation to nullify the liability without amending the U.S. Constitution:

**Truth-in-Lending (TILA) – Title 15, U.S.C., Sec. 1637 (c)(4)(A)(ii) states,**

"(4) Charge card applications and solicitations
(A) In general
Any application or solicitation to open a charge card account
shall disclose clearly and conspicuously the following
information in the form required by section 1632(c) of this
title, subject to subsection (e) of this section:

  (i) Any annual fee, other periodic fee, or membership fee
      imposed for the issuance or availability of the charge card,
      including any account maintenance fee or other charge imposed
      based on activity or inactivity for the account during the
      billing cycle.

  **(ii) Any transaction charge imposed in connection with use of the card to
      purchase goods or services."**

Once again the Interchange Fee [IF] is in fact built into every transaction and the physical evidence proves it is debited from the Cardholder's Account. The *Federal Reserve, FDIC* and GAO have now <u>admitted</u> this <u>in writing</u> [See quotes below on pgs. 8 & 9] hence, there is a <u>cost of credit</u> and TILA / Reg. Z are in play.

(7)

From Visa's Website November 22, 2007:

> "Visa uses interchange reimbursement fees as transfer fees between
> financial institutions to balance and grow the payment system for the
> benefit of all participants. <u>Merchants do not pay interchange</u>
> <u>reimbursement fees; merchants pay "merchant discount" to their</u>
> <u>financial institution."</u> [underline added for emphasis]

Interchange Fees are paid by the Consumer, charged to the Consumer's MC / Visa

Account, having been passed on to the Consumer by the Merchant. This is critical as the

entire basis for the claims against any MC / Visa Conspiracy defendant comes down to

whether or not the Cardholder is paying the IF, and if the Cardholder does pay it, the IF

becomes a *cost of credit* and subject to TILA / Reg. Z.

> "Credit card interchange fees are a hidden tax on all Americans - Because
> the cost of the hidden credit card interchange fee has to be built into the price
> of everything a merchant sells, the average American household pays hundreds
> of dollars in interchange fees each year. Unlike other costs, the credit card
> interchange fee is not negotiable. Because merchants have no real option but to
> accept credit and debit cards, they have no choice but to include the cost of
> hidden credit card interchange fees in the prices they charge to all their
> customers." **MERCHANTS PAYMENTS COALITION - December 2007**

> "Consumers Pay for Interchange - All consumers shoulder the burden of
> interchange fees as the costs are passed along in the form of higher prices for
> goods and services. In fact, the average household paid more than $300 in
> hidden interchange fees in 2006." **The Merchants Payments Coalition,**
> **September 14, 2007 - Prepared for the House Judiciary Committee**
> **Antitrust Task Force In Response to Questions Raised by Congressman Ric**
> **Keller at the July 19, 2007 hearing of the Antitrust Task Force, entitled,**
> **"Credit Card Interchange Fees."**

From GAO's report to Congress in 2006:

> "After the transaction is approved, the issuing bank will send the purchase
> amount, <u>less an interchange fee</u>, to the merchant's bank. The interchange fee
> is established by the card association." [underline added for emphasis] **United**
> **States Government Accountability Office Report to the Ranking Minority**
> **Member, Permanent Subcommittee on Investigations, Committee on**

(8)

**Homeland Security and Governmental Affairs, U.S. Senate, September 2006
- CREDIT CARDS Increased Complexity in Rates and Fees Heightens Need
for More Effective Disclosures to Consumers.**

The Federal Reserve and FDIC also have admitted in writing that the IF is

charged to the Cardholder's Account, which again is critical to the issue of "cost of

credit" as there is only one creditor, that being the MC / Visa Issuing Bank, and if the

cardholder does not agree to pay the IF to the Issuing bank there is NO extension of

credit, hence, the IF is in fact a *cost of credit*, and, TILA / Reg. Z apply.

From the Federal Reserve:

"The network routes information first to authorize then to settle the payment.
To settle, the card issuing bank obtains funds from the cardholder - $100 in
this example – with which it can pay the merchant bank.

However, the card-issuing bank retains a portion of the funds as an interchange
fee. In this example, the fee is $1.50 and the card-issuing bank sends $98.50 to
the merchant bank." [underline added for emphasis] **Interchange Fees in Credit
and Debit Card Markets: What Role For Public Authorities? A summary of
a Federal Reserve Bank of Kansas City Conference. By Barbara Pacheco
and Richard Sullivan – 2005.**

From the FDIC:

"Finally, figure 3 provides a basic illustration of the most complex model,
the model with one card association, many cardholders, many merchants,
and multiple banks. In this model, the card association (or network) plays
an important role by imposing rules for issuing cards, clearing and settling
transactions, advertising and promoting the brand, authorizing transactions,
assessing fees, and allocating revenues among transaction participants. Further,
each participant in the credit card transaction has an incentive for participating
in the network. Figure 3 shows the typical flow of information and funds for a
sample $100 credit card purchase. The process begins when the cardholder
presents the credit card to the merchant to purchase a good or service. The
merchant transmits to the acquiring bank the cardholder's account number and
the amount of the transaction.  The acquiring bank forwards this information to
the card association network requesting authorization for the transaction. The
card association forwards the authorization request to the issuing bank. The

(9)

issuing bank responds with its authorization or denial through the network to the acquiring bank and then to the merchant. <u>If approved, the issuing bank also sends to the acquiring bank, via the network, the transaction amount less an interchange fee.</u> The interchange fee is established by the card association. The example illustrated in figure 3 shows $98.00 ($100.00 purchase price minus 200 basis point interchange fee) flowing from the issuing bank, though the network, to the acquiring bank. The acquiring bank, after subtracting its own service fee, passes the payment on to the merchant. In figure 3, the merchant receives $97.50 ($98.00 minus a 50 basis point fee)." [underline added for emphasis] **FDIC Banking Review -** ***Overview of Recent Developments in the Credit Card Industry*** **by Douglas Akers, Jay Golter, Brian Lamm, and Martha Solt – 2005.**

There are three sets of fees, all separate and distinct, all paid to three different parties. 1) Processing Fees - paid by the Merchant to the Acquiring Bank. 2) Network Fees – paid by the Merchant to MC / Visa for use of their Networks [transmission costs] paid through the Acquiring Bank. 3) Interchange Fee – passed on to the Merchant by the Acquiring Bank, whereby the Merchant then passes it on to the consumer - built into the cost of goods and services, [cost of IF illegally bundled in on monthly billing statement – Reg. Z prohibits the bundling of fees] and said IF debited from the Cardholder's Account [credit line], via the total transaction cost charged to the MC / Visa Credit Card.

12 CFR 226.7 (h) doesn't address who actually pays the IF, only whether it is debited from the Cardholder's Account. Once again the physical evidence proves this, part and parcel to the Four Party System.

Visa and MasterCard set [and periodically adjust] Interchange Rates. These Fees represent the "price" that an "Acquiring Bank" must collect [on paper] from the merchant, via data, to transmit cardholder transaction <u>data</u> to the "Issuing Bank." In most cases, the Acquiring Bank is not the same institution as the Issuing Bank that issued the

(10)

card[s] used at the merchant. **IMPORTANT:** There is no financial transaction at the point of sale, only a collection of data. The merchant collects the cardholder's personal data by swiping the card, then the cardholder signs a receipt, which simply promises the merchant the cardholder's bank will pay for the transaction [the merchant has already received approval through the Visa or MasterCard Network for the transaction]. The merchant then transmits the transaction data to the Acquiring Bank, who transmits the data to the respective Network, who transmits the data to the Issuing Bank, who debits the Cardholder's Account [credit line], and then the Issuing Bank immediately A) deducts the IF right off the top and keeps it. The balance is remitted to the Network who B) deducts their "network fee;" they remit the remaining balance to the Acquiring Bank who then C) deducts the processing fees. Merchant gets the remaining balance. Collectively A,B, & C are known as the "Discount Fees." A & B together are known as "Interchange Rate." The same result occurs even when there is a purchase of account receivable due to a third party processor working on behalf of the issuing bank.

Think about where the money comes from to pay for the transaction. It's the Issuing Bank who supplies the actual money that pays for the transaction, not MC / Visa. The physical evidence proves this beyond a reasonable doubt. Even BOA's own Website states this under Merchant Processing where it states under **Clearing and Settlement**:

> "The acquirer [Acquiring Bank] sends the transactions in a batch
> through the card association, which debits the issuers for payment
> and credits the acquirers. In effect, the issuers pay the acquirer for
> the transaction." *Bank of America Website November 22, 2007*
> [underline added for emphasis].

(11)

The fact that the IF is built into the cost of every MC / Visa transaction in connection with the use of the card to purchase goods and services, that brings into play TILA's statute 15 U.S.C. - 1637 (c)(4)(A)(ii), as no MC / Visa Solicitation or Application has ever disclosed the IF for 20 years. This illegal conduct also makes the card agreements during this time frame null & void. Couple this with the illegal monthly statements since day one and now you can understand why the **Nine Hundred Fifty Billion Dollars ($950,000,000,000.00)** in credit card asset backed securities currently on the street are fraudulent. This makes the sub-prime mortgage lending scandal look tame, and, it is clear to any reasonable person that the public stock Issuing Banks have all been committing securities fraud [this liability is over and above the $75 Trillion] for not disclosing the liability under 17 CFR 229.303, [there is a difference between 303 and 103 disclosure] as defined by the U.S. Supreme Court, and foreign issuing banks have not disclosed their liability in this conspiracy since 2003 either. Foreign defendants can easily be named in all three class actions in the U.S. under the Foreign Trade Antitrust Improvement Act 1982 (FTAIA), 15 U.S § 6a (1994).

Just look at the last 20 years, no MasterCard or Visa Solicitation or Application has ever complied with TILA, as it relates to the Interchange Fee. No monthly billing statement has ever complied with TILA / Regulation Z, hence, the entire product is fraudulent. The FRB cannot bail the banks out because of TILA and the Fair Debt Collection Practices Act, and, if they try they face 18 U.S.C., Sec. 241 [felony]. The FRB cannot promulgate a regulation that contradicts an existing federal statute. No Judge

(12)

anywhere is going to rule that you can hide the IF on monthly billing statements when you can't legally hide it on Applications and Solicitations.

The substantial effort on my part to mitigate the damages in this Antitrust / RICO, etc case is now over. "An antitrust plaintiff has a duty to mitigate damages." *Litton Sys., Inc. v. AT&T, 700 F. 2nd 785, 820 n. 47 (2nd Cir. 1980).* My attempt to mitigate is well documented and starts in 2003. All the Defendants have intentionally failed to stop the fraud, hence, I will stop the fraud via a TRO / Permanent Injunction, followed by three class actions that have collective "joint & several liability in excess of **SEVENTY FIVE TRILLION DOLLARS ($75,000,000,000,000.00).**

The U.S. Supreme Court has repeatedly ruled that antitrust cases are "rarely susceptible of the kind of concrete, detailed proof of injury, which is available in other types of contexts." *Zenith radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123 (1969); also see *J. Pruett Payne Co., Inc. v. Chrysler Motor Corp.,* 451 U.S. 557, 561-568 (1981) ("in order to recover damages [plaintiffs] must establish... some approximation of damages," the 'traditional rule excuses antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury").

In the three class actions, Plaintiffs can establish with relative accuracy in Class 1) the amount of Interchange Fees that need to be refunded since 1971, with interest, times treble damages; Class 3) the amount of other charges illegally collected due to all the card agreements since the very first one being null and void since 1971; plus, all solicitations and applications for the last 20 years must be refunded with interest, times

(13)

treble damages; but, Class 2) will be impossible to be completely accurate as there is no

way to determine how much cash customers have paid in excess of the actual cost of

goods and services, with interests, times treble damages. Antitrust law does not require an

exact damage figure. The claims in Class Actions 1, 2, & 3 have never been litigated

anywhere.

Now for the big question, is there really a Conspiracy? Yes! If you don't believe

me, simply read Judge Gleason's 2003 decision in the Visa / MasterCard antitrust case

initiated by merchants where he says;

> "In addition to their claims of substantive tying violations of § 1, the
> merchants claim that Visa and MasterCard acted in concert to impose
> those illegal tying arrangements on them. The defendants contend that
> the merchants have failed to present any "direct or circumstantial evidence
> that reasonably tends to prove that [they] had a conscious commitment to a
> common scheme designed to achieve an unlawful objective." <u>Monsanto Co.
> v. Spray-Rite Serv. Corp.,</u> 465 U.S. 752, 764 (1984) (quotations and citations
> omitted). **I disagree. There is evidence, direct and circumstantial, from
> which a jury could find a conspiracy."** [bold print added for emphasis]

How about that? Conspiracies really do exist. Now you can understand how one

can get to the **$75+ Trillion** in joint & several liability. MC / Visa, their Issuing

[member] Banks, Regulators, Foreign MC & Visa Entities, Federal Reserve Banks [they

have been laundering the illegally collected money], Foreign Central Banks [money

laundering], Lawyers, Affinity Partners [co-branded MC / Visa Cards] have been

participating in the conspiracy to violate Antitrust, RICO, etc…, actionable now as the

statute of limitations has not begun to run.

(14)

If the Issuing Bank paid the Acquiring Bank for collecting the data and sending it to the Issuing Bank, it would allow the Acquiring Bank more latitude in competitively seeking merchant deposits [eliminating anti-competitive restraints]; and, it would result in passing the cost of bankcard processing to the Issuing Bank, where it should be.

Considering the cardholder is paying the IF anyway, this would place the charge out in the open where it should be, with no incentive to not properly disclosed it on solicitations, applications, and the monthly billing statement, "identified and itemized," in compliance with TILA and Regulation Z. The merchant is required to participate in a scheme that hides the IF from the cardholder as he is responsible for collecting the data at the point of sale. Because the Acquiring Bank has to collect [on paper] the IF to pass on to the Issuing Bank so the Issuing Bank can deduct it from the amount of money debited from the cardholder's account, the Acquiring Bank passes the IF cost on to the Merchant, who in turn passes it on to the Cardholder, who builds it into the cost of goods and services. It all washes out in the paper work and the Cardholder pays the Issuing Bank the IF, except this results in fraud, antitrust violations, racketeering, etc, and massive liability attached to many different matters.

In a recent developments the EU has announced that MasterCard Interchange Fees are illegal. MLS has been providing the EU evidence regarding the MC / Visa Conspiracy and how foreign Governments, Issuing Banks, Central Banks, Regulators, and Third Parties can be named in the MC / Visa Conspiracy antitrust, etc. litigation here in the U.S. under the Foreign Trade Antitrust Improvement Act 1982 (FTAIA), 15 U.S § 6a (1994).

(15)

## ARGUMENT

Modification of a decree or judicial order is an "extraordinary" remedy, *Cook v. Billington*, 2003 WL 24868169, at *3 (D.D.C. Sept. 8, 2003), that is appropriate only in "very specific circumstances," *Stewart v. O'Neill*, 225 F. Supp. 2d 6, 9 (D.D.C. 2002). *See also NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000) ("modification [of a judgment] is an extraordinary remedy . . .") (quoting *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988) (alterations in original). What we have here are extraordinary circumstances, relevant because three of the parties in this case intentionally misrepresented their companies to the court.

The relevant standard for modifying decrees was articulated by the United States Supreme Court in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383 (1992), and subsequently applied by the D.C. Circuit in *Pigford v. Veneman*, 292 F.3d 918, 925 (D.C. Cir. 2002). This Court described the relevant multi-factor standard during the Tunney Act proceeding as follows:

> [A] district court may modify a decree pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure. . . . As the D.C. Circuit recounted the present state of the law, "a significant change in circumstances [may] warrant[] revision of [a] decree," . . . though any such revision must be "suitably tailored to the changed circumstance[s]" . . . .

*New York v. Microsoft Corp.*, 231 F. Supp. 2d 203, 257-58 (D.D.C. 2002) (citing *Rufo* and *Pigford*) (citations omitted; alterations in original). The same *Rufo* standard applies whether the modification is of a consent decree or a litigated judgment. *See Agostini v. Felton*, 521 U.S. 203, 215 (1997) (stating that *Rufo* is the correct standard for a "party

(16)

seeking relief from an injunction or consent decree"); *Rufo*, 502 U.S. at 378; *Pigford*, 292 F.3d at 923.

At the request of the party seeking equitable relief, a court may tighten the decree in order to accomplish its intended result. *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 252 (1968). At the request of the enjoined party, the court may relieve the party of the decree's constraints. Modifications of the latter sort now come within Rule 60(b)(5), F.R.Civ.P., which has been described as "little more than a codification of the universally recognized principle that a court has continuing power to modify or vacate a final decree," CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2961 (1994). Rule 60(b)(5) provides:

> Rule 60(b)(5) of the Federal Rules of Civil Procedure states the general common law principle for judgment modification: "On motion and upon terms as are just, a court may relieve a party . . . from a final judgment . . . [if] it is no longer equitable that the judgment should have prospective application . . . ." This principle gives rise to different standards in different circumstances. In the context of consent decrees in government antitrust cases, two distinct standards have been applied.

When the government and an antitrust defendant agree to modify or remove a decree restriction, the courts consistently apply the common law "public interest" standard, which also governs review of proposed consent decrees. See <u>Bechtel</u>, 648 F.2d at 665-66. This standard accords broad discretion to the Department of Justice to prosecute antitrust litigation and to settle it on terms that the Department determines will best serve the public interest in antitrust enforcement. See, e.g., <u>Western Elec.</u>, 900 F.2d at 305-09; <u>Bechtel</u>, 648 F.2d at 665-66; <u>Gillette</u>, 406 F. Supp. at 715-17. See also <u>United States v. American Cyanamid Co.</u>, 719 F.2d 558, 565 (2d Cir. 1983), <u>cert. denied</u>, 465

U.S. 1101 (1984); <u>United States v. National Fin. Adjusters</u>, 1985-2 Trade Cas. (CCH)

¶66,856, at 64,248 (E.D. Mich. 1985). Under the public interest standard, the court has

the important role of "insuring that the government has not breached its duty to the public

in consenting to the decree." <u>Bechtel</u>, 648 F.2d at 666.

When the government and an antitrust defendant do not agree to modify or

remove a decree restriction, courts generally apply a more strict standard. Such

circumstances usually arise when a defendant wants to be relieved from a decree

restriction, but the Department believes that the restriction should continue in effect. The

proper standard in such circumstances requires the court to consider whether there has

been a "significant change in factual conditions or law" and whether the proposed

modification is suitably tailored to the changed circumstances. <u>Rufo</u>, 502 U.S. at 384-91

(quoted in <u>Western Elec.</u>, 46 F. 3d at 1203-04).

This Court has explained that as a prerequisite to intervention in a Tunney Act

case, the movant "must first establish that participation by the intervenor would <u>aid the</u>

<u>court</u> in making its public interest determination." United States v. LTV Corp., 746 F.2d

51, 54 (D.C. Cir. 1984).

Rule 24(b)(2) provides that a movant may be granted permissive intervention if its

claim or defense and the main action have a question of law or fact in common. In this

proceeding, the main issue before the district court is whether the proposed Final

Judgment is in the public interest. This Court has made clear that this inquiry is a narrow

one. When reviewing a proposed consent decree -- which represents a settlement between

the parties – the court must give great deference to the government's predictions as to the

(18)

effect of the proposed remedies, however in this case the government has admitted that it didn't know about the MC / Visa Liability, nor that the liability had attached to SBC as it could not transfer until this court's order was final. This was stated to MLS by Matthew Hammond, DOJ Antitrust Lawyer, who worked on these cases.

This court needs to take into consideration that the alleged MC / Visa Conspiracy is centered around antitrust violations. By allowing the SBC / AT&T merger to continue the court is only enlarging the criminal enterprise and helping facilitate the alleged antitrust conduct / criminal enterprise. Granted the court should not reject a proposed remedy "unless 'it has exceptional confidence that adverse antitrust consequences will result -- perhaps akin to the confidence that would justify a court in overturning the predictive judgments of an administrative agency.'" 56 F.3d at 1460 (citations omitted). This is exactly what we have here, and it warrants this court taking a further review.

The MC / Visa Liability is <u>not</u> routine litigation. Whether or not it will materialize is not an issue, it's guaranteed because MLS is in charge of it and has already obtained plaintiff law firms to represent the classes, and the TRO Permanent Injunction Request will be filed in this court. Couple this with the potential liability associated with securities fraud, etc, it is in no way in the **Public's Best Interest** to recreate the Old AT&T by allowing SBC to merge with the Old AT&T, purchasing AT&T's liability in the process [this is also not fair to SBC Shareholders as they have no knowledge of this – no disclosure by SBC or AT&T in their SEC filings as required by 17 CFR 229.303, as defined by the U.S. Supreme Court], nor is it in the best interest to allow SBC to purchase Bellsouth's liability connected to the MC / Visa Conspiracy.

(19)

What we have now is a <u>mess</u>, one that is certainly going to get worse as MLS has put DOJ, all federal banking regulators, Senate Judiciary Committee, and the House / Senate Banking Committee[s] on notice of his intention to file the three class action cases described in the Motion, along with is "private attorney general" authority under Title 31 U.S.C., False Claims Act. No was has officially denied the allegations.

Not one potential defendant, state or federal banking regulator, has answered a single demand letter or provided one single written denial of the alleged legal claims, nor has any federal banking regulator been able to produce any legal authority for the banks intentional non disclosure of the IF for 37 years. This includes FOIA requests. Reg. Z has an <u>exemption provision</u> but the IF has never been exempted, nor has the Federal Reserve ever established written policy that exempts the IF from disclosure under TILA / Reg. Z. The alleged claims are real and cannot be ignored. The problems the MC / Visa Liability creates with the merger of SBC and the Old AT&T are worthy of a review of this court's approval of the merger.

The New AT&T continues to commit overt acts in furtherance of the MC / Visa Conspiracy by virtue of its daily activities associated with their co-branded credit cards, which they promote, entice, and help solicit the consumer into obtaining and using the AT&T Universal MCs, all in return for a percentage of the illegal IF collected by their banking partner, who in turn gives AT&T a percentage. "Fruit from the Poison Tree," proceeds from the racketeering enterprise.

This is how SBC and Bellsouth got involved, yet after being put on written notice by MLS prior to these hearings they did nothing to stop the fraud, just like the Old AT&T

did nothing, hence, all three went from vicarious liability, to direct liability as co-conspirators. This is how we got to this position today and **Trillions of Dollars in joint & several liability** directly connected to all three defendants.

Just before Christmas, The EU Commission declared MasterCard's Interchange Fee to be illegal. I have been informed they will deal with Visa's Interchange Fee in early 2008 as Visa's antitrust exemption expires at the end of 2007.  [News Story]

### EU declares MasterCard's fees system illegal, threatens fines
### Posted on : 2007-12-19 | Author : DPA - News Category : Finance

Brussels - The European Union Commission on Wednesday accused MasterCard of violating the bloc's competition rules by applying unnecessary fees on cross-border payment card transactions. In a statement, the EU executive said such charges, levied on each payment at a retail outlet when the payment is processed, "inflated the cost of card acceptance by retailers without leading to proven efficiencies."

MasterCard was told it had six months to withdraw the fees - which range from 0.4 per cent to 1.20 per cent of the value of the transaction - or face daily fines worth 3.5 per cent of the company's daily global turnover on the preceding business year.

"Multilateral interchange fee agreements such as MasterCard's inflate the cost of card acceptance by retailers," Competition Commissioner Neelie Kroes said.

"The Commission will accept these fees only where they are clearly fostering innovation to the benefit of all users," Kroes added.

MasterCard uses a complex mechanism to determine a minimum price merchants must pay for accepting the organisation's payment cards.

Such fees are applied on virtually all cross-border transactions as well as on domestic card payments in Belgium, Ireland, Italy, the Czech Republic, Latvia, Luxembourg, Malta and Greece.

In its investigations, the Commission concluded that such fees were not justified.

Over 23 billion payments, exceeding a value of 1,350 billion euros (1,946 billion dollars), are made every year with payment cards in the EU."

(21)

## CONCLUSION

For all these reasons, the Court should grant this motion and permit Michael Lovern, Sr. to intervene in this case for purposes of aiding the court in reviewing new evidence and how it will impact the public at large if the SBC merger with the Old AT&T is allowed to continue.

Respectfully submitted,

Michael Lovern, Sr.
163 Mitchells Chance Rd., #121,
Edgewater, MD 21037
(443)-995-0001
mlsatt@myway.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of March, 2008, copies of the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THIS MOTION BY AMICI CURIAE MICHAEL LOVERN, SR., <u>FOR LEAVE TO INTERVENE FOR PURPOSES OF Filing the Rule 60(b) Motion</u>** with supporting brief and proposed order, were sent by U.S. Mail, or e-mail, to counsel of record as follows:

Lawrence M. Frankel (D.C. Bar No. 441532)
Matthew C. Hammond
Trial Attorneys
Telecom & Media Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530 - (202) 514-5621

Attorneys for the United States

(22)

FOR DEFENDANT
SBC COMMUNICATIONS, INC.

Wm. Randolph Smith (D.C. Bar No. 356402)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2700

FOR DEFENDANT AT&T CORP.

Michael Payne
175 E. Houston
San Antonio, Texas 78205-2233
210-351-3500

FOR DEFENDANT VERIZON COMMUNICATIONS, INC. / MCI

John Thorne
Verizon Communications Inc.
1515 North Courthouse Road
Arlington, Virginia 22201

Michael Lovern, Sr.
163 Mitchells Chance Rd., #121,
Edgewater, MD 21037
(443)-995-0001
mlsatt@myway.com

March 14, 2008

(23)